UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
DR. SARI EDELMAN,

                                                                    **Case No.:** 1:21-cv-502 (LGS) (GWG)

                                    Plaintiff,

                    -against-

NYU LANGONE HEALTH SYSTEM, NYU
LANGONE HOSPITALS, NYU LANGONE
MEDICAL CENTER, NYU LANGONE NASSAU
RHEUMATOLOGY,     NYU     SCHOOL     OF
MEDICINE, NYU GROSSMAN SCHOOL OF
MEDICINE,  NYU  HOSPITALS  CENTER,
ANDREW T. RUBIN, DAVID KAPLAN, JOSEPH
ANTONIK, and JOSHUA SWIRNOW,

                                    Defendants.

---------------------------------------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**



**MILMAN LABUDA LAW GROUP PLLC**

Joseph M. Labuda, Esq.
Emanuel Kataev, Esq.
3000 Marcus Ave., Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
joe@mllaborlaw.com
emanuel@mllaborlaw.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS .............................................................................................2

ARGUMENT ...............................................................................................................2

   I.   LEGAL STANDARD ........................................................................... 2

   II.  DR. EDELMAN WAS PAID LESS THAN HER MALE COUNTERPARTS IN VIOLATION OF THE EPA ..................................................................... 4

   III. DEFENDANTS DISCRIMINATED AGAINST PLAINTIFF BASED ON SEX IN A MULTITUDE OF WAYS ........................................................ 8

      A. Dr. Edelman Easily Establishes a *Prima Facie* Discrimination Case Under Title VII, the NYSHRL, and the NYCHRL, and Defendants' Proffered Reasons for Termination Are Clearly Pretextual ............................................ 8

      B. Dr. Edelman's Establishes That She Was Treated Less Well Based on Her Gender and Therefore Her Claim of Gender Discrimination Under the NYCHRL Must Survive Summary Judgment ............................................................ 18

   IV. DR. EDELMAN'S TERMINATION WAS RETALIATORY .................................. 19

      A. Dr. Edelman Clearly Establishes a Prima Facie Retaliation Case Under Title VII and the NYSHRL, and Shows that Defendants' Proffered Reasons for Termination Are Pretextual ............................................................ 19

      B. Dr. Edelman's NYCHRL Claim Must Survive Summary Judgment Pursuant to the Less Demanding Requirements of that Statute ...................................... 22

CONCLUSION............................................................................................................23

## TABLE OF AUTHORITIES

**Cases**

*Aiken v. Mta N.Y. City Transit*,
    2021 U.S. Dist. LEXIS 188629, 2021 WL 4481094 (S.D.N.Y. 2021) ............................. 8

*Aldrich v. Randolph Cent. Sch. Dist.*,
    963 F.2d 520 (2d Cir. 1992) ............................................................................................ 4

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .................................................................................................... 2, 3

*Belfi v. Prendergast*,
    191 F.3d 129 (2d Cir. 1999) ........................................................................................ 3, 4

*Bennett v. Health Mgt. Sys., Inc.*,
    92 A.D.3d 29, 936 N.Y.S.2d 112 (1st Dep't 2011) ....................................................... 22

*Blanco v. Brogan*,
    620 F. Supp. 2d 546 (S.D.N.Y. 2009) ........................................................................... 20

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .................................................................................................. 2, 15

*Chertkova v. Connecticut Gen. Life Ins. Co.*,
    92 F.3d 81 (2d Cir. 1996) ............................................................................................... 3

*Donlon v. Group Health Inc.*,
    2001 U.S. Dist. LEXIS 1001, 85 Fair Empl. Prac. Cas. (BNA) 705 (S.D.N.Y. 2001) ..... 19

*EEOC v. Ethan Allen, Inc.*,
    44 F.3d 116, 120, 1994 U.S. App. LEXIS 37173, 66 Fair Empl. Prac. Cas. (BNA) 1102
    (2d Cir. 1994) ................................................................................................................. 3

*EEOC v. J.C. Penney Co., Inc.*,
    843 F.2d 249 (6th Cir. 1988) .......................................................................................... 4

*Espinoza v. New York City Dep't of Transportation*,
    304 F. Supp. 3d 374 (S.D.N.Y. 2018) ............................................................................ 8

*Ford v. Reynolds*,
    316 F.3d 351 (2d Cir. 2003) ........................................................................................... 3

*Fuller v. Interview, Inc.*,
    2014 U.S. Dist. LEXIS 79615, 2014 WL 260137 ........................................................... 8

*Gallo v. Prudential Residential Servs., Ltd. Partnership,*
    22 F.3d 1219 (2d Cir. 1994)................................................................................. 3

*Grant v. Bethlehem Steel,*
    622 F.2d 43 (2d Cir. 1980).................................................................................. 20

*Hartley v. Rubio,*
    785 F. Supp.2d 165 (S.D.N.Y. 2011)................................................................ 13

*Holcomb v. Iona Coll.,*
    521 F.3d 130 (2d Cir. 2008)................................................................................ 17

*Kessler v. Westchester County Dept. of Social Services,*
    461 F.3d 199 (2d Cir. 2006)................................................................................. 3

*Kronish v. United States,*
    150 F.3d 112 (2d Cir. 1998)................................................................................. 3

*Mandell v. County of Suffolk & John Gallagher,*
    316 F.3d 368 (2d Cr. 2003)............................................................................. 9, 11

*Massaro v. Bd. of Educ.,*
    No. 18-2980-cv, — F. App'x —, 2019 U.S. App. LEXIS 15325, 2019 WL 2183483 (2d
    Cir. May 21, 2019)............................................................................................... 20

*Matima v. Celli,*
    228 F.3d 68 (2d Cir. 2000)................................................................................. 14

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973)............................................................................................. 8

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,*
    715 F.3d 102, 112-113, 2013 U.S. App. LEXIS 8494 (2d Cir. 2013)............. 18

*Risco v. McHugh,*
    868 F. Supp. 2d 75 (S.D.N.Y. 2012).................................................................. 14

*Santos v. Costco Wholesale, Inc.,*
    271 F. Supp. 2d 565 (S.D.N.Y. 2003).............................................................. 17

*Thompson v. Corizon Health,*
    2021 U.S. Dist. LEXIS 6107, 2021 WL 105767 ........................................... 22

*Tufariello v. Long Island R.R. Co.,*
    454 F.3d 80 (2d Cir. 2006)................................................................................... 3

*Verint Sys. Inc. v. Red Box Recorders Ltd.*,
 2016 WL 7177844 (S.D.N.Y. 2016)...................................................................... 3

*Vogel v. CA, Inc.*,
 662 Fed. Appx 72 (2d Cir. 2016) ......................................................................... 3

*Warmin v. New York City Dep't of Educ.*,
 2019 U.S. Dist. LEXIS 125774, 2019 WL 3409900 (S.D.N.Y. 2019)............................. 20

*Williams v. KFC Nat'l Mgmt. Co.*,
 391 F.3d 411 (2d Cir. 2004)............................................................................... 3

*Wu v. Metro. Transp. Auth,*,
 2020 U.S. Dist. LEXIS 22641 (S.D.N.Y. 2020) ........................................................ 19

*Zann Kwan v. Adales Grp.*,
 737 F.3d 834 (2d Cir. 2013)............................................................................... 17

## Statutes

26 U.S.C. § 206................................................................................................. 4

New York Executive Law § 296....................................................................... 8 n. 7

New York Labor Law § 194-A............................................................................. 7

## Rules

Fed. R. Civ. P. 56............................................................................................. 2

Fed. R. Evid. 802 ............................................................................................. 7

## Other Sources

Inc., A New Study Reveals That Telling Women They Need to Smile Is Bad for Business. Here's
 Why, available at **https://www.inc.com/marcel-schwantes/a-new-study-reveals-that-telling-women-they-need-to-smile-more-is-bad-for-business-heres-why.html** ...................... 10 n. 8

The Washington Post, Masks are off – which means men will start telling women to 'Smile!'
 again, available at **https://www.washingtonpost.com/lifestyle/2021/05/22/men-telling-women-smile/** ............................................................................................ 10 n. 8

United States Department of Labor Blog, 5 Facts About the Gender Pay Gap, available at
 **https://blog.dol.gov/2021/03/19/5-facts-about-the-state-of-the-gender-pay-gap** ............. 6 n. 4

USA Today, *Why you shouldn't tell a woman to smile*, available at
    **https://www.usatoday.com/story/news/nation-now/2017/03/08/dont-tell-women-to-
    smile/98906528/** ........................................................................................................... 10 n. 8

## PRELIMINARY STATEMENT

At the 2022 Oscars last Sunday, Amy Schumer joked: "This year, the Academy hired three (3) women to host, because it's cheaper than hiring one (1) man." They say that there's a grain of truth in every joke; but in this case, that grain is merely the tip of the iceberg when it comes to Defendants' pay inequality due to gender. Their discrimination in pay due to sex is no joke.

Plaintiff Dr. Sari Edelman ("Dr. Edelman") was an exemplary rheumatologist. She built a successful practice and chose employment with Defendants because insurance carriers became increasingly difficult to deal with in relation to her smaller practice compared to Defendants' status as a conglomerate in the healthcare industry. She always met and often exceeded her productivity targets. She was never written up and had no indication that her job was in jeopardy for more than five (5) years. Like many women, she faced male chauvinism and gender discrimination in her terms and conditions of employment, including in her pay

In September 2019, the most invidious type of male chauvinism and gender discrimination took form when Defendant Joseph Antonik ("Antonik") declared that Dr. Edelman was to share her office going forward, despite the fact that male physicians had individual office space. Antonik raised his voice, threatened to contact the "powers that be," and called her a bitch. Naturally, Dr. Edelman immediately made a complaint with Human Resources ("HR"). HR did nothing with the complaint despite repeated follow up by Dr. Edelman.

In November 2019, unbeknownst to her, the office manager where Dr. Edelman works was directed to log every single issue with Dr. Edelman. A plan was quickly hatched by Antonik to terminate Dr. Edelman in retaliation for making her complaint. Antonik bided his time until Dr. Edelman's contract was about to expire, and he then struck. Commandeering the list that he, in all likelihood, asked the office manager to create, Antonik prepared an email for Dr. Andrew Porges ("Dr. Porges") to submit to Defendant David Kaplan ("Kaplan") complaining about Dr. Edelman.

He told Dr. Porges and other support staff that the email he is drafting with a list of issues against Dr. Edelman needed to be "clear, convincing summary with examples," including "recent examples of innapropriate [*sic*] behavior and communicates [*sic*] between Edelman, staff and patients." Knowing that he could not immediately act against her in September 2019, Antonik was all but ecstatic to terminate her in December 2020. Revenge is, in fact, best served cold.

To buttress their illegal termination of Dr. Edelman, Defendants submit that she had personality conflicts with staff and was a danger to patients, despite the fact she remained employed for six (6) months following her notice of non-renewal. Defendants' after-the-fact justifications for Dr. Edelman's termination are not only disputed by her, they are also contradicted by Defendants varying explanations to terminate her. Summary judgment must be denied.

## STATEMENT OF FACTS

We respectfully refer the Court to Dr. Edelman's Counterstatements of Material Facts, set forth in Dr. Edelman's Response to Defendants' Confidential Rule 56.1 Statement of Material Facts, submitted herewith (hereinafter "CSF").

## ARGUMENT

### I.    Legal Standard

A court may grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Fed. R. Civ. P. 56(c).

The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In deciding a motion for summary judgment, the court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Importantly, the Court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences and resolving any ambiguities in the non-moving party's favor. *See Tufariello v. Long Island R.R. Co.*, 454 F.3d 80, 85 (2d Cir. 2006); *Vogel v. CA, Inc.*, 662 Fed. Appx 72, 75 (2d Cir. 2016); *Kessler v. Westchester County Dept. of Social Services*, 461 F.3d 199, 206 (2d Cir. 2006). To avoid summary judgment, all that is required of the nonmoving party is a showing of sufficient evidence supporting the claimed factual dispute as to require a judge or jury's resolution of the parties' differing versions of the truth. *See Kessler* at 206 (*citing Anderson*, 477 U.S. at 248-49). Indeed, "[s]ummary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003).

The Second Circuit has repeatedly "emphasized that the trial court must be especially cautious in deciding whether to grant this drastic provisional remedy [i.e., summary judgment] in a discrimination case, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination." *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999), *citing Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir. 1996) and *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994). Indeed, "[c]ases are often proved by way of circumstantial evidence – and there is no reason why such evidence cannot raise a triable issue of fact for trial." *See Verint Sys. Inc. v. Red Box Recorders Ltd.*, 2016 WL 7177844, at *1 (S.D.N.Y. 2016) (in declining a summary judgment motion) (*citing, e.g., Williams v. KFC Nat'l Mgmt. Co.*, 391 F.3d 411, 422 (2d Cir. 2004) (concluding that plaintiff presented "sufficient circumstantial evidence" to survive summary judgment); *Kronish v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) (holding that plaintiff's circumstantial evidence was sufficient to "entitle him to proceed to trial").

Defendants have failed to demonstrate entitlement to summary judgment in this case.

## II.      Dr. Edelman Was Paid Less Than Her Male Counterparts in Violation of the EPA

To prove a violation of the Equal Pay Act ("EPA"), a plaintiff must first establish a *prima facie* case of discrimination by showing: "i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions." *Belfi v. Prendergast*, 191 F.3d 129, 135-136 (2d Cir. 1999).  Proof of discriminatory intent is not necessary for a plaintiff to prevail on an EPA claim.  *See id.*  Rather, "a *prima facie* showing gives rise to a presumption of discrimination." *See id.*  Once the plaintiff establishes a *prima facie* case:

> [T]he burden of persuasion shifts to the defendant to show that the wage disparity is justified by one of the affirmative defenses provided under the Act: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). Further, to successfully establish the "factor other than sex" defense, an employer must also demonstrate that it had a legitimate business reason for implementing the gender-neutral factor that brought about the wage differential. *See Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 526-27 & n.1 (2d Cir. 1992); *EEOC v. J.C. Penney Co., Inc.*, 843 F.2d 249, 253 (6th Cir. 1988) ("The 'factor other than sex' defense does not include literally *any* other factor, but a factor that, at a minimum, was adopted for a legitimate business reason.").

*See id.* at 135-36.  As to the first prong of the *prima facie* standard, it cannot be disputed that NYU paid Dr. Edelman lower wages than doctors of the opposite sex. Because Dr. Edelman had no administrative duties, her pay was entirely for her clinical work. Thus, for purposes of comparison, **the Court must look only to the pay her comparators received for their clinical work** – *not* for administrative duties, which pay was allocated to male physicians separately per their contracts.[1]

---

[1] Dr. Edelman was not offered any such roles during her employment with Defendants; administrative duties and titles, with their commensurate additional compensation, were offered only to male physicians.)

4

Because compensation for administrative duties is separately allocated to the male physicians who were given administrative titles, that compensation is entirely irrelevant to this analysis. The chart below details how Dr. Edelman was paid less for her clinical work than her male comparators for their clinical work.

| Doctor | Initial Pay for Clinical Duties | Initial wRVU Target | Initial Clinical Pay Per wRVU | Renewal Pay for Clinical Duties | Renewal wRVU Target | Renewal Clinical Pay Per wRVU | 2d Renewal Pay for Clinical Duties (If prior to 12/20) | 2d Renewal wRVU Target | 2d Renewal Clinical Pay Per wRVU |
|---|---|---|---|---|---|---|---|---|---|
| Dr. Goldberg | ▉ (11/22/13) | ▉ | **$83.31** | ▉ (1/13/17) | ▉ | **$85.47** | ▉ (1/16/19) | ▉ | **$87.17** |
| Dr. Porges | ▉ (8/11/14) | ▉ | $52.12 | ▉[2] (4/3/17) | ▉ | $49.50 | N/A | N/A | N/A |
| Dr. Modi | ▉ (2/10/17) | ▉ | $58.94 | ▉ (7/24/20) | N/A | N/A (after 12/20) | N/A | N/A | N/A |
| Dr. Edelman | ▉ (9/5/14) | ▉ | <span style="color:red">$41.68</span> | ▉ | 5,200 | <span style="color:red">$53.46</span> | N/A | N/A | N/A |

As shown above, with the exception of Dr. Porges' clinical pay upon his 2017 contract renewal,[3] male employees consistently received greater compensation for their clinical work than Dr. Edelman received for hers. In fact, Dr. Goldberg was paid approximately *twice* what Dr. Edelman was earned in terms of pay per wRVUs. Dr. Edelman would have had to increase her wRVUs by 100% to match Goldberg's compensation. As for Dr. Modi, his pay was approximately 30% higher than Dr. Edelman's. Dr. Porges' pay, pursuant to his initial contract, was approximately 20% higher.

---

[2] Dr. Porges' compensation of $▉ remained intact; the remaining $▉ was allocated and paid to him for his subsequent "administration/leadership" role. (See Kataev Decl., Ex. M (D000871)).

[3] Even in that instance, the $▉ reduction in Porges' clinical compensation was restored for his purported leadership role. Notably, many witnesses who testified were surprised to hear that Dr. Porges had such a role. This demonstrates that the role was truly a "title only" position, with no substance. Such titles were given to men in an attempt to justify paying them more than women.

Indeed, Dr. Edelman would have had to earn 3,477 more wRVUs to be paid as much as Goldberg, 3,191 more wRVUs to be paid as much as Dr. Porges, and 3,671 more wRVUs to be paid as much as Dr. Modi.  Paying a woman 80%, 70%, or 50% on the dollar compared to male peers is unacceptable and inexcusable discrimination. While it is very common,[4] it is still discriminatory despite its unfortunate ubiquity, as highlighted at the Oscars.

As to the second and third prongs of the *prima facie* standard, the clinical work performed by rheumatologists in NYU's FGP was effectively identical and thus constituted "equal work on jobs requiring equal skill, effort, and responsibility." [5]As their jobs were all performed within the same practice group with the same staff, same management, same equipment, etc., they were clearly performed under similar working conditions.

Dr. Edelman, thus having established a *prima facie* case and created a presumption of discrimination, shifts the burden to Defendants to prove one of the aforementioned affirmative defenses. In their Memorandum of Law in Support of the Motion for Summary Judgment ("Def. Mem."), Defendants argue that Dr. Edelman's compensation was set pursuant to "reasonable and legitimate business practices, creating a 'factor other than sex'[6] affirmative defense." (*See id.* at 18).

Specifically, Defendants argue that Dr. Edelman's initial salary was set based on the revenue she generated in private practice. This makes absolutely no sense and is discriminatory in any event.  Defendants' argument does not explain why, for example, Dr. Goldberg's initial contract provided for him to be paid $83.31 per wRVU, while Dr. Edelman's initial contract

---

[4] See, e.g., https://blog.dol.gov/2021/03/19/5-facts-about-the-state-of-the-gender-pay-gap.

[5] Again, because we are comparing Dr. Edelman's compensation only with the pay male physicians received for their clinical work, any administrative tasks male physicians performed are entirely irrelevant to this analysis.

[6] Notably, Defendants rely on the "catch-all" defense as none of the other three (3) apply.

provided her to receive $41.68 per wRVU, meaning her work was valued at approximately half of the rate at which Dr. Goldberg's work was valued. In other words, if private practice productivity was truly relevant to the setting of the wRVU target – to which compensation was explicitly tied under the physicians' contracts –  it was nevertheless *not* relevant to the amount to be paid per wRVU. That amount was determined solely at the discretion of NYU, and, as the chart above illustrates, was significantly higher for men then for Dr. Edelman – to the tune of 20%, 30%, and 100% higher.

Moreover, because Defendant has not included, as exhibits to its motion, K-1s or W-2s for the male physicians it hired out of private practice, its representations as to compensation those physicians earned in private practice is nothing more than hearsay, and would be inadmissible at trial and clearly may not be considered on this motion. *See* Fed. R. Evid. 802.

Furthermore, employers are prohibited from soliciting information from job applicants about their past or current salaries under New York law because it is discriminatory. *See* New York Labor Law § 194-A. This law was enacted to avoid discrimination in the form of perpetuating lower pay received at a prior position based on membership in a protected class. Therefore, New York has recognized what has always been true – that basing pay on lower pay received in a prior job based on, *e.g.*, sex, is a form of discrimination. Accordingly, even if, hypothetically, Dr. Edelman's compensation in private practice was lower than her male peers', her compensation from prior practice should not have been considered, as such consideration is discriminatory. It is telling that Defendants base their explanation for Dr. Edelman's pay disparity on an illegal practice that is not allowed by New York State.  Based on the foregoing, it is clear that Dr. Edelman's pay for clinical work was unlawfully lower than her male peers.' Accordingly, Defendants' motion for summary judgment on Dr. Edelman's EPA claim must be denied.

### III.    Defendants Discriminated Against Plaintiff Based On Sex in a Multitude of Ways

A. Dr. Edelman Easily Establishes a *Prima Facie* Discrimination Case Under Title VII, the NYSHRL, and the NYCHRL, and Defendants' Proffered Reasons for Termination Are Clearly Pretextual

In discrimination cases under Title VII and the NYSHRL, the familiar three-part burden shifting analysis applies, with the plaintiff bearing the initial burden of establishing a *prima facie* case of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Fuller v. Interview, Inc*., 2014 U.S. Dist. LEXIS 79615, *12, 2014 WL 260137 (applying *McDonnell Douglas* to NYSHRL discrimination claim).

Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the adverse employment action. If the defendant satisfies this burden, the burden shifts back to the plaintiff to show that the proffered reason is merely a pretext for unlawful discrimination.  Id.

Dr. Edelman makes out a *prima facie* case of discrimination under Title VII by showing that: (1) she belongs to a protected class; (2) she was qualified for the position at issue; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination."[7] *Aiken v. Mta N.Y. City Transit*, 2021 U.S. Dist. LEXIS 188629, *7, 2021 WL 4481094 (S.D.N.Y. 2021), *citing Espinoza v. New York City Dep't of Transportation*, 304 F. Supp. 3d 374, 387 (S.D.N.Y. 2018).

Here, as to the first prong, Dr. Edelman indisputably belongs to a protected class by virtue of being female.

---

[7] Under the more relaxed standard of the NYSHRL, N.Y. Exec. Law § 296(1)(h), the plaintiff need only prove she was subjected to "inferior terms, conditions or privileges of employment because of [her sex]." Here, Dr. Edelman was subjected to lower compensation than her male peers, different treatment than men (e.g., not having her administrative tasks completed in a timely manner while males' were, not having her suggestions implemented while males' were, not being permitted to bring her own furniture and equipment while males were, etc.) and ultimately termination, supposedly for performance and behavioral issues raised in a performance review email, while her male peers' performance and behavior was not evaluated in kind.

As to the second prong, Defendants do not meaningfully dispute that Dr. Edelman is qualified for her position, having included in their Memorandum of Law only the conclusory statement, "Dr. Edelman cannot demonstrate that she is qualified for her position" with absolutely no supporting evidence (Def. Mem., p. 20). Dr. Edelman can, in fact, easily and decisively demonstrate that she was qualified for her position.  Dr. Edelman is a board-certified, licensed physician. See CSF ¶¶ 1-6. Prior to joining NYU, Dr. Edelman has approximately nineteen years' experience in private practice. See CSF ¶ 2; see also Kataev Decl. Ex. A at 51: 15-17. Thus, she is qualified to practice as a physician.

As to the third prong, Defendants cannot dispute that Dr. Edelman suffered an adverse employment action when she was terminated, paid less, and subjected to inferior terms, conditions, and privileges of employment.

Accordingly, to establish a *prima facie* case of discrimination, Dr. Edelman need only demonstrate that the termination occurred under circumstances giving rise to an inference of discrimination.

> A showing of disparate treatment -- that is, a showing that the employer treated Dr. Edelman less favorably than a similarly situated employee outside his protected group -- is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case. …Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury.

*See Mandell v. County of Suffolk & John Gallagher*, 316 F.3d 368, 379 (2d Cr. 2003) (internal quotations and citations omitted).  Here, Dr. Edelman was treated less favorably than similarly situated male employees –*i.e.*, the male physicians in the FGP rheumatology group – throughout her employment. As discussed at length in Section II in this Argument, she was paid less per wRVU than her male comparators for clinical work, based on an analysis that takes into account only compensation her comparators received for clinical work – not for any administrative duties.

She was also called a "bitch" as discussed further below.  Dr. Edelman's first experience with male chauvinism at NYU was actually pre-employment, at her initial meeting with upper-level executives, who, at the meeting, expressed surprise that she was female.  See CSF ¶ 9. As Dr. Edelman testified, their surprise "[spoke] volumes as to how [they] view females in the workplace, that two females couldn't possibly have had a start-up practice and be productive. And being brought in, there was an automatic assumption that we were males…." See Id. Further, when she first joined the practice, she and her female partner from private practice were told they could not bring their own office furniture, equipment, or personal items, see CSF ¶ 11, yet male physicians were permitted to bring their own things. Id..

In addition, male physicians' procedures and protocols from their private practices were adopted, while Dr. Edelman's were not. See CSF ¶ 12. Administrative assistance Dr. Edelman required was delayed, while administrative tasks needed by male physicians were executed promptly. See CSF ¶ 13. When Dr. Edelman made a suggestion for improved office procedures, it was denied, but when a male doctor made the same suggestion, it was implemented. Id. ¶ 14

In or about 2017, NYU management called Dr. Edelman to a meeting at its New York City location and told her she should smile more at work. See CSF ¶ 25. Telling a woman to smile more is a very common form of discrimination against women; indeed, men are rarely told to smile at work.[8]

In or about September 2019, Dr. Edelman was informed she must share her Marcus Avenue office two days a week with an incoming male physician, Dr. Given.

---

[8]    See, e.g., https://www.inc.com/marcel-schwantes/a-new-study-reveals-that-telling-women-they-need-to-smile-more-is-bad-for-business-heres-why html;    see    also    https://www.usatoday.com/story/news/nation-now/2017/03/08/dont-tell-women-to-smile/98906528/. "Requests for smiles may seem harmless to some, but they're often considered to be in line with catcalling, unwelcome gestures and other kinds of harassment, says Kimberly Fairchild,    an    associate    professor    of    psychology    at    Manhattan    College…." https://www.washingtonpost.com/lifestyle/2021/05/22/men-telling-women-smile/.

When she first received this directive from Antonik and objected to it, Antonik called her a "bitch" and yelled at her, waving his arms around frantically, making her feel physically threatened. See CSF ¶¶ 28-29; see also Kataev Decl. Ex. A at 126:21-25; 122: 1-25; 123: 1-6. The directive to share her office space to accommodate a male physician was repeated by Mr. Kaplan several days later.  See CSF ¶ 30. During that conversation, Mr. Kaplan spoke to Dr. Edelman in a demeaning, mocking tone, belittling her as a woman. Id.

Dr. Edelman complained to HR about the encounters with Antonik and Kaplan, clearly explaining that her complaint was not about the office space issue itself but about discrimination. She explicitly complained to HR, in writing on September 25, 2019, that she was subjected to "male chauvinism" at NYU, and "discrimination" in favor of a "male physician." See CSF ¶ 32. Neither HR nor management did anything to rectify Dr. Edelman's Complaint.  Crucially, Messrs. Antonik and Kaplan deny these events, creating an issue of fact.  Because Dr. Edelman, as set forth above, was subject to discriminatory treatment based on her gender throughout her employment with NYU, Dr. Edelman can demonstrate that her termination and conditions of employment of consistently being treated less well than her male counterparts occurred under circumstances giving rise to an inference of discrimination. *See Mandell v. County of Suffolk & John Gallagher*, 316 F.3d 368, 379 (2d Cr. 2003). Dr. Edelman can therefore make out a *prima facie* case of discrimination.

The burden thus shifts to Defendants to proffer a legitimate, non-discriminatory reason for the adverse employment action. Where the defendant satisfies this burden, the burden shifts back to the plaintiff to show that the proffered reason is merely a pretext for unlawful discrimination.

As an initial matter, there was no reason to terminate Plaintiff's employment.

The evidence adduced in discovery shows that she was qualified, met all of her performance metrics, was not written up or disciplined in any way, and had a large following of loyal patients.  It is therefore obvious that her termination had nothing to do with her performance.  Notwithstanding, Defendants claim they terminated Dr. Edelman due to "poor performance and inappropriate behavior." (Def. Mem., p. 22).  But these reasons do not make any sense.

With respect to Defendants' argument that she engaged in inappropriate behavior, they point to only two isolated instances in November 2019 and March 2020 with support staff.  Unlike Dr. Edelman's September 2019 complaint, none of these incidents gave rise to a complaint with human resources by either employee.  Crucially, each of these documented instances arose *after* Dr. Edelman made a complaint, with the first coming from the same individual who was tasked with creating a special spreadsheet[9] called "Issues with Dr. Edelman!"

With respect to Defendants' argument that she had poor performance, Defendants attempt to support this justification by claiming that Drs. Porges and Goldberg suddenly determined that Dr. Edelman presented a danger to patients.  However, had Defendants really believed that, they would have immediately terminated Dr. Edelman to avoid any risk to patients whatsoever.  In fact, they were required to do so pursuant to their own policies and under the law!

None of the foregoing reasons support or justify Defendants' decision to terminate Plaintiff.  The reasons offered are thus pretextual.  A review of the timeline of events in this case supports this argument:

(i) Plaintiff begins working in November 2014 and has no issues with her employment;

(ii) despite once being counseled to "smile more" in 2017, Defendants shortly thereafter renew her contract for another three (3) years;

---

[9] Plaintiff sought the production of similar lists for other doctors in discovery; Defendants produced nothing.

(iii) Plaintiff files a complaint against Antonik for discrimination and harassment in September 2019 because he bullied her and called her a bitch;

(iv) a support staff employee is then directed to keep a log of all "issues" with Dr. Edelman, and the first entry is dated November 2019;

(v) Antonik drafts an email on November 6, 2020 *using the aforementioned log* for Dr. Porges to submit to Kaplan, which has to be "clear" and "convincing" to support the decision to terminate Dr. Edelman and disguise the fact that Antonik wishes for her to be terminated;

(vi) Dr. Porges, who admits he has a lot to lose if his employment relationship with NYU is terminated, submits the email Antonik drafted to Kaplan a mere few hours later on the same date;

(vii) Dr. Edelman is terminated on December 1, 2020 and told by Defendant Rubin that Defendants are merely going in a different direction; and

(viii) Plaintiff files a lawsuit and Defendants now claim that there were "performance issues."

Viewing the facts in this light, it is evident that Defendants are merely engaged in after-the-fact justifications for their decision to terminate Dr. Edelman, which was obviously based on her decision to pursue a complaint against Antonik. Their decision was a *fait accompli*. Defendants do not even argue that Dr. Edelman violated their policies or their code of conduct.

In support of Defendants' unavailing position, they cite several cases, all of which are distinguishable from the case at bar. In *Hartley v. Rubio*, 785 F. Supp.2d 165, 178-79 (S.D.N.Y. 2011), cited by Defendants, the misconduct of the plaintiff consisted of severe, shocking insubordination, threats, and even a physical altercation between the plaintiff and management, instigated by the plaintiff. *See id.* at 171-72.

For example, the plaintiff, a teacher, said to the principal, "[T]his is my classroom. Leave me alone or I will have you arrested." He also shouted, "PUNK, you know what, I am going to make sure you and [the superintendent] get it…Watch…."

The next case cited by Defendant, *Matima v. Celli*, 228 F.3d 68 (2d Cir. 2000), also involved extreme misconduct by the plaintiff, as shown in the following excerpt:

> [The] decision to terminate Matima was based on Matima's "gross insubordination, failure to follow instructions, being insubordinate to his immediate supervisor, and to Dr. Leonard. It was getting to a point where his behavior was so uncontrollable that we weren't getting any work out of Mr. Matima, he was disrupting the labs and we weren't getting any work out of the people. . . ." … … [T]he company was being frozen, in terms of trying to get the work that we had to do done. When it takes three or four people, several hours, to simply discuss with someone why they have to meet company policy, there is no work getting done . . . ." [The plaintiff] was fired for insubordination and basically creating such havoc and discontent in the lab that it was not a suitable work environment for the remaining people on the staff."

*See id.* at 76, (2d Cir. 2000). Further, in another case cited by Defendant, *Risco v. McHugh*, 868 F. Supp. 2d 75 (S.D.N.Y. 2012), the plaintiff was terminated because:

> She "regularly exhibits inappropriate behavior and comments," "seems unable to demonstrate empathy, remain non-judgmental, and remain objective in a diverse range of circumstances," and is hindered in her ability to be a counselor by her "preconceptions [and] stereotypes." [The plaintiff] was unable to get along with her co-workers, and…her confrontational and disruptive conduct "has had a definite negative impact on [the] workforce and environment."

*See id.* at 94.

In contrast to the cases cited by Defendants, Dr. Edelman did not disrupt the workplace, nor was she insubordinate. Indeed, Defendants make no such allegations, nor could they.

Instead, Defendants rely on supposed concerns about Dr. Edelman's practice – all of which are refuted by Dr. Edelman in sworn testimony (cited below) – and a few isolated instances of common conflict among work colleagues.

14

As noted above, the moving party carries the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). NYU has not met that burden. With regard to performance, Dr. Edelman was and remains an excellent physician; she has produced evidence of this fact. <u>See</u> Responses to Defendants' Statement of Facts ¶ 98. Defendants claim that Dr. Edelman's performance issues included the following:

- Defendants allege that Dr. Edelman did not read her Outlook emails in a timely manner.
  - Outlook was not the primary means of daily patient care communication; patient care information was sent via the "EPIC" system. (*See* Dr. Edelman's Decl., ¶45) To the extent she received numerous Outlook emails regarding business-related issues, rarely related to daily FGP information, managers were aware that, due to the abundance of Outlook emails received by Dr. Edelman, more critical emails were to be printed for her review. (<u>*Id.*</u>)
- Defendants allege that patients complained about Dr. Edelman not returning calls and messages.
  - Dr. Edelman made every effort to return calls and messages left for her in the patient portal. (*See id.*, ¶ 45). She addressed EPIC emails either once or twice daily, even though patients were informed through the portal that return messages may take two to three days. (*See id.*) She generally answered all EPIC messages within 24 hours. (*See id.*)
- Defendants, citing a written message, state that one patient asked to speak to Dr. Edelman urgently, "begging" for her help, and was not responded to promptly.
  - The message in question is inadmissible hearsay and cannot be relied upon by Defendants. Further, it was sent via EPIC on a Friday and the medical team did not send it to Dr. Edelman until the following Monday. (See Dr. Edelman's Decl., ¶ 45). Dr. Edelman notes that the medical team members who failed to send the message in a timely manner were not disciplined. (*See id.*) Dr. Edelman further notes that she spent hours every day responding to patients' emails and calls. and generally replied to all messages within 24 hours. (*See id.*)
- Defendants allege that Dr. Edelman included inappropriate material in a patient's chart and did not memorialize verbal orders in a patient's chart.
  - Anything involving a patient should be included on the patient's chart, per proper practicing standards. (Dr. Edelman's Decl., ¶ 45). Further, Dr. Edelman disputes the allegation that she gave orders that were not memorialized in a patient's chart (Dr. Edelman's Decl., 45). Verbal orders were rare but were always memorialized in the chart. (*See id.*)
- Defendants allege that Dr. Edelman's patients sometimes had long wait times to see her.
  - To the extent that there were sometimes wait times to see Dr. Edelman, this was because she gave each patient the time he or she deserved, sometimes putting her behind schedule. (Kataev Decl., Ex. A at 124: 6-18). On some occasions, patient visits were prolonged due to incomplete medical records, missing radiology and labs, and other mistakes by staff. (Dr. Edelman's Decl., ¶ 45).

15

- Defendants allege that Dr. Edelman ordered more tests and X-rays than standard.
  - Any alleged remarks by X-ray technicians or lab technicians regarding the number of tests Dr. Edelman ordered are inadmissible hearsay. Further, Dr. Edelman ordered the appropriate amount of diagnostic tests for patients (Kataev Decl., Ex. A at 120: 15-18). Dr. Edelman is known in her field as an expert diagnostician. While her colleagues'' practices may differ, she practiced at a higher level within the scope of her specialty. (Dr. Edelman's Decl., ¶ 45).

None of the above "concerns" were *ever* raised to Dr. Edelman by management, at any time, including at the time of her termination. (Dr. Edelman Decl., ¶ 46). Clearly, these concerns were trumped up to find a basis to terminate Dr. Edelman upon the expiration of her contract.

Regarding the supposed "inappropriate behavior," Defendants state in their Memorandum of Law that "Dr. Edelman was counseled for behavioral issues, but her conduct did not improve." Yet the only "behavioral issues" Defendant cites as having occurred subsequent to the supposed counseling (in which no specific behavioral issues were identified but Dr. Edelman was admonished to "smile") are two isolated incidents.

The first such incident involved a discussion that Dr. Edelman had with Ms. Ruiz regarding scheduling patients. Far from having been "unprofessional, inappropriate and demeaning" toward Ms. Ruiz, Dr. Edelman testified, "I did not lash out, but I was pretty firm that I'm asking [Ruiz] to do something pretty basic, and I'd like to understand why it's not being done." (See Kataev Decl., Ex. B at 122: 2-4).

The second such incident was an alleged complaint by Dr. Edelman's Medical Assistant that she was offended by the way Dr. Edelman spoke to her. Defense counsel failed to question Dr. Edelman about this alleged incident at her deposition, despite extending the deposition for two full days. In her sworn Declaration submitted in opposition to the summary judgment motion, however, Dr. Edelman emphatically denies ever speaking to the Medical Assistant inappropriately (Dr. Edelman's Decl., ¶ 47).

16

Further, Defendants' current claims that Dr. Edelman was terminated for performance and behavioral issues are undercut by Defendants' actual words to Dr. Edelman at the time she was informed her contract was not being renewed. Specifically, Mr. Rubin told her: "the organization was going in a different direction, that it had nothing to do with my care as a physician, that I was much loved and I was a great doctor and he wished me the best. And he offered to take my resume to submit it through the organization for a position somewhere else within NYU." See CSF ¶ 44. Thus, Defendants' proffered reasons for termination are obviously pretextual. Where a central dispute of material fact has to do with the employer's motive for terminating an employee, summary judgment is strongly disfavored. *See Zann Kwan v. Adales Grp*., 737 F.3d 834, 843 (2d Cir. 2013) (noting the "need for caution about granting summary judgment to an employer in a discrimination case where…the merits turn on a dispute as to the employer's intent" (*quoting Holcomb v. Iona Coll*., 521 F.3d 130, 137 (2d Cir. 2008); *see also Santos v. Costco Wholesale, Inc*., 271 F. Supp. 2d 565, 571 (S.D.N.Y. 2003) ("Summary judgment is 'ordinarily inappropriate' in the context of a workplace discrimination case because the allegations … require an exploration into an employer's true motivation and intent for making a particular … decision…" and "Employers are rarely so cooperative as to include a notation in the personnel file that the [adverse employment action] is for a reason expressly forbidden by law." (citations omitted).

Here, as noted above, Dr. Edelman was told she was being fired because NYU was "going in a different direction" and that it had nothing to do with her performance. On this motion, however, Defendants offer entirely different reasons for Dr. Edelman's termination: supposed performance and behavioral issues. Where an employer offers different reasons for termination, pretext is inferred. *See EEOC v. Ethan Allen, Inc*., 44 F.3d 116, 120, 1994 U.S. App. LEXIS 37173, *11, 66 Fair Empl. Prac. Cas. (BNA) 1102 (2d Cir. 1994).

Dr. Edelman can thus establish that Defendants' proffered reasons for her termination are a pretext for discrimination.  As such, Dr. Edelman's discrimination claim under Title VII must survive the summary judgment motion.

### B.  Dr. Edelman Establishes That She Was Treated Less Well Based on Her Gender and Therefore Her Claim of Gender Discrimination Under the NYCHRL Must Survive Summary Judgment_____

The Second Circuit set forth the standard for evaluating summary judgment claims on a NYCHRL claim in *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112-113, 2013 U.S. App. LEXIS 8494, *24-25 (2d Cir. 2013), explaining as follows:

Federal courts reviewing NYCHRL claims are to be guided by the following …:

(1) NYCHRL claims must be analyzed separately and independently from federal and state discrimination claims;

(2) the totality of the circumstances must be considered because the overall context in which the challenged conduct occurs cannot be ignored;

(3) the federal severe or pervasive standard of liability no longer applies to NYCHRL claims, and the severity or pervasiveness of conduct is relevant only to the scope of damages;

(4) the NYCHRL is not a general civility code, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives, or if the defendant proves the conduct was nothing more than petty slights or trivial inconveniences;

(5) while courts may still dismiss truly insubstantial cases, *even a single comment may be actionable in the proper context;*

(6) summary judgment is still appropriate in NYCHRL cases, but only if the record establishes as a matter of law that a reasonable jury could not find the employer liable under any theory.

*See id.* (internal citations and quotations omitted) (emphasis added).

Here, Dr. Edelman has offered evidence, in the form of her sworn testimony, that she was treated less well due to her gender. Obviously, as established above in Section II of this Argument, she was paid less per wRVU than male physicians, an irrefutable fact that cannot be denied by Defendants, as it is based on simple math.

In addition, and perhaps most disturbingly, a member of Defendants' management called Dr. Edelman a bitch to her face. Mr. Antonik, the Site Director for Defendant's Marcus Avenue locations, "muttered under his breath that [Dr. Edelman] was a bitch" during the meeting in which Mr. Antonik informed her she must share her office. See CSF ¶ 29.

As stated above, a single comment may be actionable under the NYCHRL. Dr. Edelman's discrimination claim under the NYCHRL must therefore survive the motion for summary judgment.

### IV.    Dr. Edelman's Termination was Retaliatory

A. Dr. Edelman Clearly Establishes a *Prima Facie* Retaliation Case Under Title VII and the NYSHRL, and Shows that Defendants' Proffered Reasons for Termination Are Pretextual_____

The standard for surviving summary judgment on a retaliation claim under Title VII and the NYSHRL is well-settled: "Retaliation claims under Title VII are examined under a three-step burden shifting analysis. First, the plaintiff must make a prima facie case of retaliation. If the plaintiff does so, the defendant then has the burden of articulating a legitimate, non-retaliatory reason for the challenged action…." *Donlon v. Group Health Inc.*, 2001 U.S. Dist. LEXIS 1001, *4-5, 85 Fair Empl. Prac. Cas. (BNA) 705 (S.D.N.Y. 2001) (internal citations omitted); *see also Wu v. Metro. Transp. Auth.*, 2020 U.S. Dist. LEXIS 22641 (S.D.N.Y. 2020). The plaintiff must then show that the defendant's proffered reason for the challenged action is pretextual. *See Wu* at *42.

A *prima facie* case of retaliation under Title VII and the NYSHRL is made by showing (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *See, e.g., Wu* at *41.

19

In their Memorandum of Law, NYU does not dispute that Dr. Edelman can show (1) participation in a protected activity (this cannot be denied since Dr. Edelman made a written complaint reporting sex "discrimination" and "male chauvinism"); (2) that the defendant knew of the protected activity (this cannot be denied since the above-referenced email was sent to HR); and (3) there was an adverse employment action (it obviously cannot be denied that Dr. Edelman's employment was terminated). With regard to Dr. Edelman's *prima facie* case, NYU argues only that there was no causal connection between the protected activity and the adverse employment action. Specifically, NYU argues that there is a lack of temporal proximity between Dr. Edelman's Complaint to HR in September 2019 and the termination in December 2020.

In making this argument, NYU ignores the facts that (a) Defendants had no opportunity to terminate Dr. Edelman sooner than at the time her contract was up for renewal; and (b) NYU began laying the groundwork for Dr. Edelman's termination in November 2019 or earlier.  As set forth in the Amended Complaint in this action, Defendants bided their time until they could take action against Dr. Edelman and then promptly did so.  It is well-settled in the Second Circuit that causal connection can be established based on temporal proximity when the employer commits the adverse action at the first opportunity it has, even if far removed from the date of the protected activity. In *Warmin v. New York City Dep't of Educ.*, 2019 U.S. Dist. LEXIS 125774, *23-24, 2019 WL 3409900 (S.D.N.Y. 2019), the court held, and cited cases in support of the holding, that:

> [C]ausal connection may still be inferred where longer periods of time separate a protected activity and adverse action, if it is plausible that there was no earlier opportunity to retaliate in the manner alleged. See Grant v. Bethlehem Steel, 622 F.2d 43, 45-46 (2d Cir. 1980) (holding that Dr. Edelman established causal connection despite an eight-month lapse in time when the defendant was unable to retaliate in the manner alleged any sooner); see also Massaro v. Bd. of Educ., No. 18-2980-cv, — F. App'x —, 2019 U.S. App. LEXIS 15325, 2019 WL 2183483, at *4 (2d Cir. May 21, 2019) (summary order) (finding causal connection where a school retaliated against an employee at its earliest opportunity, after summer break had concluded); Blanco v. Brogan, 620 F. Supp. 2d 546, 557 (S.D.N.Y. 2009)

20

> (collecting cases for proposition that "[t]he Second Circuit and the Courts of this District have found a causal connection" where a defendant retaliated at its first opportunity, even where action was up to 13 months removed from the protected activity). In this case, Warmin has alleged that the DOE acted to block his employment at its first opportunity, when he was nominated for a job in 2016. These facts support a reasonable inference of causal connection under the law of the Second Circuit.

*See id.* at *23-24. NYU terminated Dr. Edelman at the earliest opportunity it could, when Dr. Edelman's employment agreement was up for renewal. NYU could not terminate Dr. Edelman any sooner than this under her Employment Agreement. Pursuant to her contract, Dr. Edelman could be terminated during the three-year term of her contract only if there were "Cause." (See Kataev Decl., Ex. M (D000051, D000057)). Despite their supposed concerns about Dr. Edelman's patient care, Defendants obviously did not believe they had "Cause" to terminate her employment until her contract expired,[10] leaving them no option but to wait until the term of the agreement expired to terminate her.

To be sure, Defendants' management began laying the groundwork for termination almost immediately after Dr. Edelman made the Complaint. Management, acting through Ms. Ruiz, made the first entry in the Issues Log on November 13, 2019. (*See* Kataev Decl., Ex. M (D001100)), just weeks after Dr. Edelman's Complaint. As discussed above, this log documented supposed "issues" concerning Dr. Edelman and her practice. (*See id*).

---

[10] "Cause" was defined in the Employment Agreement as:

- an intentional act of fraud, embezzlement, theft or any othere material violation o flaw that occurs during or in the course of your employment with NYU Langone Medical;
- Intentional breach of NYU Langone Medical Center's Code of Conduct;
- Intentional disclosure of NYU Langone Medical policies;
- Breach of your obligations under this agreement; including but not limited to the loss or suspension of your license to practice medicine in the State of New York, your exclusion from Medicare, Medicaid or any successor program, loss or resignation of your faculty appointment, loss or resignation of your NYU Langone Medical Center medical staff privileges; or your failure to qualify for malpractice insurance;
- Intentional violation of NYU Langone Medica center's conflict of interest policies, which includes intentional engagement in any competitive activity without prior review and approval; or
- The willful and continued failure to substantially perform your duties for NYU Lange Medical Center (other than as a result of incapacity due to physical or mental illness).

It was clearly designed to try to create pretexts for terminating Dr. Edelman's employment at the end of her contract term, in retaliation for her Complaint. This is evidenced by the fact that no such log was kept regarding Dr. Edelman's actions prior to her Complaint, and no such log was maintained for male physicians.

After laying the groundwork, Defendant, as discussed above, terminated at the first opportunity to arise, the end of her current contract term. Accordingly, Dr. Edelman can show a causal connection between the protected activity of her Complaint and the adverse employment action, and thus meets all the elements of a *prima facie* case of retaliation.

The burden therefore shifts to Defendants to articulate a legitimate, non-retaliatory reason for the challenged action. As discussed above, Defendants claim they terminated Dr. Edelman due to "poor performance and inappropriate behavior." (Def. Mem., p. 22).  Dr. Edelman establishes above, in Section III, that Defendants' proffered reasons for termination are pretextual. Accordingly, Dr. Edelman's retaliation claim under Title VII and the NYSHRL must survive the summary judgment motion.

   B.  Dr. Edelman's NYCHRL Claim Must Survive Summary Judgment
       Pursuant to the Less Demanding Requirements of that Statute

Under the NYCHRL, the plaintiff must make a *prima facie* case of retaliation by showing membership in a protected class and an adverse employment action under circumstances giving rise to an inference of discrimination. *See Bennett v. Health Mgt. Sys., Inc*., 92 A.D.3d 29, 936 N.Y.S.2d 112, 117 (1st Dep't 2011).  The burden then shifts to the defendant to produce evidence of non-discriminatory reason behind the adverse action. "[S]ummary judgment is proper only if the defendant shows there is 'no evidentiary route that could allow a jury to believe that discrimination played a role in the challenged action.'" *Thompson v. Corizon Health*, 2021 U.S. Dist. LEXIS 6107, *14, 2021 WL 105767 *Bennett*, 936 N.Y.S. 2d at 118.

Here, Dr. Edelman can clearly show membership in a protected class and an adverse action. Defendant, however, cannot establish that there is *no* evidentiary route that could lead a jury to believe that retaliation played a role in Dr. Edelman's termination.

As shown above in Section IV(A), Dr. Edelman can establish temporal proximity between the protected activity and the adverse action, thus creating an inference of retaliation. *See Warmin* at *23-24.

Thus, because Defendants cannot establish that there is no evidentiary route upon which a jury could find retaliation played a role in Dr. Edelman's termination, Defendants' motion for summary judgment on Dr. Edelman's claim of retaliation under the NYCHRL must be denied.

## CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment must be denied in its entirety, and Plaintiff should be given her day in court.

Dated:     Lake Success, New York
             April 1, 2022

**MILMAN LABUDA LAW GROUP PLLC**

By:_____/s/_____
  Joseph M. Labuda, Esq.
  Emanuel See Kataev, Esq.
  3000 Marcus Avenue, Suite 3W8
  Lake Success, New York 11042
  (516) 328-8899 (office)
  (516) 328-0082 (facsimile)
  joe@mllaborlaw.com
  emanuel@mllaborlaw.com
