UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
DR. SARI EDELMAN,                                            :
                                        Plaintiff,           :
                                                             :           21 Civ. 502 (LGS)
              -against-                                       :
                                                             :        **OPINION AND ORDER**
NYU LANGONE HEALTH SYSTEM, ET AL.,                           :
                                        Defendants.          :
                                                             :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

        Plaintiff Dr. Sari Edelman brings this employment discrimination action against NYU

Langone Health System, NYU Langone Hospitals, NYU Langone Medical Center, NYU

Langone Nassau Rheumatology, NYU School of Medicine and NYU Hospitals Center

(collectively, "NYU"), and individuals Andrew T. Rubin, David Kaplan, Joseph Antonik and

Joshua Swirnow (collectively, the "Individual Defendants").  Plaintiff alleges unequal pay in

violation of the Equal Pay Act ("EPA") and sex discrimination and retaliation in violation of

Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law

("NYSHRL") and the New York City Human Rights Law ("NYCHRL").  Defendants move for

summary judgment on all of Plaintiff's claims.  For the reasons below, Defendants' motion is

granted in part and denied in part.

## I.      BACKGROUND

        The following facts are drawn from the parties' Rule 56.1 statements and other

submissions on this motion.  The facts are undisputed or based on record evidence drawing all

reasonable inferences in favor of Plaintiff as the non-moving party.  *See N.Y. State Teamsters

Conf. Pension & Ret. Fund v. C & S Wholesale Grocers, Inc.*, 24 F.4th 163, 170 (2d Cir. 2022).

### A.      Facts Concerning Plaintiff's Equal Pay Act Claim

Plaintiff is a licensed, board-certified physician specializing in rheumatology.  Up to 2014, Plaintiff co-owned and operated a successful rheumatology practice for approximately six years with a partner, Dr. Kavini Mehta.  In 2014, Plaintiff and Dr. Mehta were recruited to join NYU's Faculty Practice Group ("FGP"), where she was employed until 2021.  NYU has grown its Ambulatory Care Practices of the FGP largely by hiring physicians out of private practice. Consistent with its usual practice, NYU negotiated the salaries of Plaintiff and Dr. Mehta, and NYU assumed the assets and debts of their practice, including its lease and loan obligations. Plaintiff was represented by counsel throughout these negotiations.

In general, NYU prepares a business plan based upon financial information supplied by each physician and her practice.  NYU measures physician production in terms of work relative value units ("wRVUs").   wRVUs are the basic component of the methodology that the Centers for Medicare and Medicaid Services use to assign a relative value to each medical procedure, patient visit and other clinical function.

NYU sets an initial wRVU target for each physician hired from private practice based on the wRVUs generated by that physician while in private practice.  If a physician overperforms their wRVU target or underperforms outside of a certain margin, their salary will increase or decrease in direct proportion to their performance.  Physician salaries are set based on factors in addition to the wRVU target, however, and do not necessarily correlate with wRVUs.

When Plaintiff first joined the FGP, NYU negotiated her salary and wRVU target based at least in part upon financial and productivity data about her former private practice.  The decisionmakers concerning Plaintiff's salary were Andrew Rubin, Senior Vice President of Clinical Affairs and Ambulatory Care for NYU Langone Health, and Joshua Swirnow, Vice

President of Ambulatory Care at NYU Langone Health.  Plaintiff was expected to expend all work-related effort on, and receive all compensation for, clinical functions.  Plaintiff was employed as a Staff Physician and appointed as a Clinical Assistant Professor at NYU, but she did not have any administrative title.  Plaintiff's time and compensation remained dedicated 100% to clinical functions throughout her tenure at NYU.

Plaintiff worked in the same practice group, as a rheumatologist, under substantially the same conditions as Dr. Avram Goldberg, Dr. Andrew Porges and Dr. Anang Modi.  In addition to his salary and wRVU target, Dr. Goldberg's contract provided him several benefits that Plaintiff's did not.  Dr. Goldberg held the same academic appointment as Plaintiff, as well as the administrative title of Clinical Director, NYU Langone Nassau Rheumatology.  Dr. Goldberg was to devote a prescribed portion of his work to his administrative role, for which he was separately compensated.  Dr. Goldberg was the first rheumatologist hired for NYU's Ambulatory Care network on Long Island and was charged with growing NYU Langone's rheumatology practice.  Dr. Goldberg recruited Plaintiff to NYU.  When Dr. Goldberg's employment contract was renewed, his salary and wRVU target also increased.  At all times, Dr. Goldberg's salary was higher than Plaintiff's, both in absolute terms and on a per-wRVU basis.

Dr. Porges has been a Board-certified rheumatologist since 1992 and was in private practice from 1993 until joining NYU in 2014.  Dr. Porges's initial salary and wRVU target were set based on data about his private practice.  Dr. Porges received several benefits other than his salary that Plaintiff did not.  Dr. Porges initially was to devote all of his effort to, and receive all of his compensation for, clinical functions.  When Dr. Porges's contract was renewed, his total salary remained the same, but some of his time and compensation were allocated to his new administrative role.  When Dr. Porges's contract was renewed again, his clinical salary increased

both in absolute terms and on a per-wRVU basis.  At all times, Dr. Porges's salary was higher than Plaintiff's in absolute terms, and at most times it was higher on a per-wRVU basis as well.

Plaintiff's contract was renewed in 2017 for a three-year term.  Her salary and wRVU target both increased.  Dr. Modi was hired by NYU in May 2017.  Dr. Modi's salary and wRVU target were set based on his employment in his prior position.  At all times, Dr. Modi's salary was higher than Plaintiff's, both in absolute terms and on a per-wRVU basis.

**B.      Facts Concerning Plaintiff's Discrimination and Retaliation Claims**

**1.  Plaintiff's Transition to and Employment at NYU**

At Plaintiff's first meeting with NYU management, Mr. Rubin and Mr. Swirnow expressed surprise that Plaintiff is a woman.  When space at Marcus Avenue first became available, Dr. Porges and Dr. Lenore Brancato, a female rheumatologist, were the first to move into the space.  Plaintiff and Dr. Mehta were told that they could not bring their own office furniture, medical equipment or personal items to the new space, but Dr. Porges had brought his belongings.  Office-management practices from Dr. Porges's prior private practice were adopted while Plaintiff's were not.  Plaintiff's requests for administrative assistance were delayed relative to requests made by her male colleagues.  Plaintiff's suggestions about how to improve procedures were not taken seriously, but Dr. Porges's suggestions were adopted.  Plaintiff consistently met or exceeded productivity goals and requirements and was never written up or reprimanded until late 2019.

In approximately 2017, Mr. Rubin and Mr. Swirnow met with Plaintiff about her purportedly deteriorating relationships with her colleagues.  At that meeting, Mr. Rubin and Mr. Swirnow counseled Plaintiff that she should smile more at work.  NYU renewed Plaintiff's contract in 2017.

### 2.  The Dispute Over Plaintiff's Office

On September 16, 2019, Joseph Antonik, Site Director of the Marcus Avenue office,
approached Plaintiff about sharing her office on Thursdays and Fridays with a male doctor.
Plaintiff did not use her office on Thursdays, and while she used her office on Fridays, her
schedule showed that Fridays were "personal days."  Plaintiff objected to sharing her office,
particularly on Fridays, and argued that her contract guaranteed her exclusive use of her office.
Plaintiff's contract refers to "[s]pace provided to you," for her employment.  Shortly thereafter,
Plaintiff locked her office to ensure others could not access it.

Limited office space at Marcus Avenue made office-sharing for physicians common, and
it became more common in late 2019 when the rheumatology practice consolidated to a single
suite.  At or around that time, Dr. Porges shared his office with his wife; a female physician used
Dr. Goldberg's on Tuesdays when Dr. Goldberg worked at another site; and another male doctor,
Dr. William Given, occasionally shared his office on Fridays when he was offsite.  Because the
Marcus Avenue location did not have a dedicated lactation room, lactating employees were
permitted to use any empty office, without regard to the sex or gender of its usual occupant.  At
least one employee used Plaintiff's office for that purpose when she was not occupying it.

During the meeting about sharing office space, Mr. Antonik waved his arms around
making Plaintiff feel threatened, called Plaintiff a "bitch" and threatened to call the "powers that
be" about the issue.  On September 17, 2019, Plaintiff made a complaint about Mr. Antonik's
behavior with Employee Labor Relations ("ELR") Manager Kathleen Pacina, who made notes of
the call.

On September 25, 2019, Plaintiff discussed the office-space issue with David Kaplan, to
whom Mr. Antonik reported.  Mr. Kaplan apologized for Mr. Antonik's actions, but after

Plaintiff again objected to sharing her office, Mr. Kaplan began speaking to her in a mocking

tone, making inappropriate gestures and implying that she was being histrionic, though he did

not explicitly mention Plaintiff's sex.

Following her discussion with Mr. Kaplan, Plaintiff emailed Ms. Pacina a further

complaint, in which she specifically complained about the "male chauvinism" displayed in her

discussions with both Mr. Antonik and Mr. Kaplan and objected to "being discriminated against

to accommodate another physician, particularly a male physician."  Plaintiff followed up again

the next day to ask for an HR representative to be on any conference calls with Mr. Kaplan or

Mr. Swirnow.

On October 8, 2019, Ms. Pacina responded and stated her understanding that Plaintiff and

Mr. Swirnow had met to discuss the reason for sharing her office.  In her discussion with Mr.

Swirnow, Plaintiff told him she would not drop her complaint.  Plaintiff followed up on her

"harassment complaint" on October 23 and November 1, 2019.  The November 1 email made

clear that Plaintiff's complaint pertained to "implicit bias in how [she] was 'managed' and

spoken to" inappropriately about her office space, not to sharing office space per se.  On

November 18, 2019, the new ELR manager responsible for the FGP reached out to Plaintiff to

follow up on her complaint, but Plaintiff did not see or respond to the email.

### 3.  NYU's Decision Not to Renew Plaintiff's Contract in 2020

Plaintiff's 2017 contract became effective on January 1, 2018, for a three-year term.

During that term, Plaintiff could be fired only for "Cause," which was defined narrowly and

excluded substandard performance.

Beginning in November 2019, shortly after Plaintiff complained about sex discrimination

arising out of her disagreement with sharing her office, FGP Manager Miriam Ruiz began

6

compiling a list of "issues" with Plaintiff.  On November 6, 2020, Mr. Antonik emailed Dr.

Porges, copying Ms. Ruiz, with the subject line "Edelman Issues," stating that "David [Kaplan]

requested all information on Edleman [*sic*] to be sent to him today.  We need a clear, convincing

summary with examples sent. . . . Ideally we want recent examples of inappropriate behavior and

communicates [*sic*] between Edelman, staff and patients."  Mr. Antonik made a couple of

general negative statements about Plaintiff's performance.  About two hours later, Mr. Antonik

sent another email to Dr. Porges with more specific notes, some of which resemble Ms. Ruiz's

list.  Minutes later, Dr. Porges sent Mr. Antonik's list of "issues" to Mr. Kaplan with additional

narrative and supporting documentation.  Mr. Kaplan forwarded their concerns to Mr. Swirnow,

who raised them with Mr. Rubin.

The lists of "issues" prepared by Ms. Ruiz, Mr. Antonik and Dr. Porges, and sent to

management including Mr. Kaplan, Mr. Swirnow and Mr. Rubin, contained concerns about

Plaintiff's clinical practices and interactions with her coworkers.  The list included an interaction

between Plaintiff and Ms. Ruiz on November 13, 2019; a note placed in a patient's chart on

September 8, 2020; a request made of her medical assistant on October 6, 2020; complaints

about Plaintiff's ordering excessive or unnecessary tests and general complaints about long wait

times for appointments and responses to messages, with some specific examples and

documentation attached.  Plaintiff disputes each of the issues -- whether it occurred and/or the

characterization.  While not recounted on the list provided to management, Plaintiff received at

least one complaint about excessive tests in 2015 and one complaint about being difficult to

reach in 2016, and had an inappropriate interaction with her medical assistant in March 2020.

Mr. Rubin spoke with Dr. Porges and Dr. Goldberg about Plaintiff's clinical practices and had

them look into the complaints about Plaintiff.  Mr. Rubin asked the doctors whether it would be possible to fix Plaintiff's clinical practices, and they each said no.

In December 2020, Plaintiff was advised that her employment would be extended to May 2021 and then not renewed.  Mr. Rubin told Plaintiff that her employment was not renewed simply because NYU was going in a different direction, that it did not have to do with her care as a physician, that she was well-liked and a great doctor, and that Mr. Rubin wished her well and would share her resume with other NYU departments.  When Plaintiff left NYU, many patients reached out to express how much they valued her and wished to remain under her care.

## II.    STANDARD

Summary judgment is appropriate where the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for a nonmoving party."  *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 148 (2d Cir. 2017).

In evaluating a motion for summary judgment, a court must "construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021).  When the movant properly supports its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing particular parts of materials in the record.  *See* Fed. R. Civ. P. 56(c)(1)(A).  "A party opposing summary judgment normally does not show the existence of a

genuine issue of fact to be tried merely by making assertions that are based on speculation or are conclusory." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021).

## III.   DISCUSSION

Plaintiff brings claims for unequal pay under the EPA, for discrimination in several forms under Title VII, the NYSHRL and the NYCHRL, and for retaliation under Title VII, the NYSHRL and the NYCHRL leading to the non-renewal of Plaintiff's contract and, effectively her firing.  Plaintiffs' discrimination claims are broken down further into the adverse employment actions Plaintiff allegedly suffered and are addressed below in turn.

### A.   Equal Pay Act

Summary judgment is denied on Plaintiff's EPA claim.  "To prove a violation of the EPA, a plaintiff must demonstrate that (1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions." *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254-55 (2d Cir. 2014) (cleaned up); *accord Wu v. Good Samaritan Hosp. Med. Ctr.*, 815 F. App'x 575, 580-81 (2d Cir. 2020) (summary order); *see Chiaramonte v. Animal Med. Ctr.*, No. 13 Civ. 5117, 2016 WL 299026 at *8 (S.D.N.Y. Jan. 22, 2016) (finding that *E.E.O.C. v. Port Auth. of N.Y. & N.J.* is instructive at summary judgment as well as the pleading stage), *aff'd*, 677 F. App'x 689 (2d Cir. 2017).  "Under the EPA, proof of the employer's discriminatory intent is not necessary for the plaintiff to prevail on her claim. Thus, a prima facie showing gives rise to a presumption of discrimination." *Belfi v. Prendergast*, 191 F.3d 129, 136 (2d Cir. 1999) (citation omitted), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000); *accord Eng v. City of New York*, 715 F. App'x 49, 51 (2d Cir. 2017) (summary order).

"Once a plaintiff makes out a prima facie case under the EPA, the burden of persuasion shifts to the defendant to show that the wage disparity is justified by one of the affirmative defenses provided under the Act . . . ." *Belfi*, 191 F.3d at 136; *accord Boatright v. U.S. Bancorp*, No. 18 Civ. 7293, 2020 WL 7388661, at *11 (S.D.N.Y. Dec. 16, 2020), *aff'd*, No. 20-4236-cv, 2022 WL 351059 (2d Cir. Feb. 7, 2022), *cert. denied*, 142 S. Ct. 2816 (2022). Affirmative defenses under the EPA include showing a "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). "Once the employer proves that the wage disparity is justified by one of the EPA's four affirmative defenses, the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination." *Ryduchowski v. Port Auth. of N.Y. & N.J.*, 203 F.3d 135, 142 (2d Cir. 2000) (internal quotation marks omitted); *accord Boatright*, 2020 WL 7388661, at *11.

### 1. Prima Facie Case

Plaintiff and her purported male comparators were paid differently and worked under similar conditions within the same practice. Defendants dispute only the "equal work" element of Plaintiff's prima facie case, which "requir[es] evidence that the jobs . . . are 'substantially equal.'" *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d at 255 (citations omitted). In order to satisfy this "demanding" standard, "a plaintiff must establish that the jobs compared entail common duties or content." *Id.* "[B]road generalizations drawn from job titles, classifications, or divisions, and conclusory assertions of sex discrimination, cannot suffice." *Id.* at 256.

Contrary to Defendants' argument, that two of three male comparators had administrative roles that Plaintiff did not have does not make their work unequal. Because NYU

explicitly compensated physicians separately for administrative work, comparators' pay for the "substantially equal" work of being a clinical rheumatologist can be compared with Plaintiff's. *See Melanson v. Rantoul*, 536 F. Supp. 271, 289 (D.R.I. 1982) (finding that where a comparator "received a separate and identifiable stipend for his Chairman's duties, above and beyond his faculty base salary . . . base salaries for those years, exclusive of the stipend, can be compared"); *accord Earl v. Norfolk State Univ.*, No. 13 Civ. 148, 2016 WL 1078280, at *9 (E.D. Va. Mar. 17, 2016); *Puchakjian v. Twp. of Winslow*, 804 F. Supp. 2d 288, 296 (D.N.J. 2011); *Zinn-Hoshijo v. Comm. for Cath. Secondary Educ. in Colo. Springs*, No. 11 Civ. 1360, 2012 WL 1582784, at *2 (D. Colo. May 7, 2012). Defendants do not offer any evidence or argument that Plaintiff's rheumatology practice requires less "skill, effort [or] responsibility" than her comparators'. *Mitchell v. Ceros, Inc.*, No. 21 Civ. 1570, 2022 WL 748247, at *6 (S.D.N.Y. Mar. 10, 2022) (internal quotation marks omitted). Plaintiff has established a prima facie case of unequal pay on the basis of sex, shifting the burden to Defendants to justify that inequality.

### 2. Nondiscriminatory Explanation for the Pay Differential

Defendants' motion for summary judgment on Plaintiff's EPA claim is denied because a reasonable jury could find that NYU's pay practices are discriminatory, i.e., are not based on a "factor other than sex." 29 U.S.C. § 206(d)(1). Defendants set Plaintiff's salary based on a business plan built using financial information about Plaintiff's productivity and salary in private practice, and similar negotiations took place with Drs. Porges, Goldberg and Modi. Defendants argue that these negotiations are sex-neutral and backed by a "legitimate business reason" because they could not otherwise recruit doctors from private practice. *See Belfi*, 191 at 136; *Knox v. John Varvatos Enters. Inc.*, 512 F. Supp. 3d 470, 483 (S.D.N.Y. 2021). As explained

below, Defendants' shifting explanations for how and why that system was implemented gives rise to a triable issue as to the legitimacy of Defendants' proffered reasons.

In their opening memorandum of law, Defendants argue that they use data about doctors' private practice to set productivity targets. That cannot explain why Plaintiff was paid substantially less per unit of productivity (per wRVU) than her comparators. Defendants also argue that Dr. Goldberg's and Dr. Porges's administrative duties justify the differential, but that fails to account both for the third comparator, Dr. Modi, and for the separate compensation for administrative duties, discussed above. Comparing clinical pay on an apples-to-apples basis, Plaintiff was at all times paid less per unit of productivity than her male comparators.

In their reply, Defendants shift their focus from the setting of productivity targets (in the form of wRVUs) to their efforts to match salaries to the amounts physicians paid themselves in private practice, even though two of the three comparators -- Dr. Goldberg and Dr. Modi -- were not hired from private practice. Defendants also argue that salaries are set independently from productivity targets, so that comparing salaries on a per-wRVU basis is not informative.

To the extent that Defendants argue that salary matching alone justifies the pay differential between Plaintiff and her comparators, the argument is unpersuasive. A pay disparity that reflects employees' prior salaries may reflect legitimate non-discriminatory reasons that one employee contributes greater value than another -- such as more experience or relevant education; or it may simply perpetuate prior discrimination. Defendants have not argued that Plaintiff and her comparators' prior unequal salaries reflect any difference in value. If prior salary always justified unequal pay, the EPA would entrench rather than remedy pay inequalities. New York bars employers from engaging in salary-matching for that very reason, in an effort to enforce the EPA. N.Y. Lab. Law § 194-A; Sponsors Mem., 2019 S.B. 6549 (N.Y.) ("[Salary-

matching] is used by employers to justify their lower pay rate and/or marginal pay increase for employees. This practice is a root cause of continued wage inequality.  Banning this practice should be the first step in enforcing equal pay laws passed by the federal government almost 50 years ago.").

The Second Circuit has yet to weigh into the circuit split over whether salary-matching alone can justify unequal pay.  *See Boyer v. United States*, 159 Fed. Cl. 387, 403 (2022) ("To summarize, the circuits are split between prior salary alone being an acceptable factor other than sex (Fourth and Seventh), prior salary being an acceptable factor when combined with other factors (Eighth, Tenth, and Eleventh), and prior salary never being an acceptable factor to consider (Ninth).").  District Courts in this Circuit have considered salary matching as one of several permissible factors that may warrant disparate pay, but typically in conjunction with factors that pertain more directly to job worth.  *See, e.g.*, *Husser v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 253, 269 (E.D.N.Y. 2015); *Setelius v. Nat'l Grid Elec. Servs. LLC*, No. 11 Civ. 5528, 2014 WL 4773975, at *31 (E.D.N.Y. Sept. 24, 2014).  *But see Talwar v. Staten Island Univ. Hosp.*, No. 12 Civ. 33, 2014 WL 5784626, at *12 (E.D.N.Y. Mar. 31, 2014) (finding salary matching to be a "legitimate factor other than gender" to justify a difference in pay), *aff'd in part, vacated in part on other grounds,* 610 F. App'x 28 (2d Cir. 2015).

None of the other purported differences between Plaintiff and her comparators warrants or explains the pay disparity between Plaintiff and her comparators.  For example, Dr. Modi was hired three years after Plaintiff, but that was around the time Plaintiff's contract was renewed at a lower salary than Dr. Modi's.  Dr. Modi was a medical director at his prior office for twelve years, but Defendants do not explain why that justifies a higher salary than a successful private-practice doctor.  Dr. Porges's prior practice had been more lucrative than Plaintiff's, but

Defendants do not argue that his practice would therefore be more lucrative for NYU, particularly because the pay gap persists when adjusting for productivity. Even assuming, as Defendants argue, that Dr. Goldberg is properly compensated for the risk he assumed as the FGP's first rheumatologist, Defendants do not point to a general seniority system that justifies pay gaps between Plaintiff and other comparators. Defendants have not carried their burden of establishing a legitimate, non-discriminatory reason for pay disparities that is beyond dispute at trial; so summary judgment on this claim is denied.

### B.    Title VII Discrimination

The Complaint and Plaintiffs' filings in opposition to Defendant's motion for summary judgment raise a number of complaints about the conditions of Plaintiffs' employment, but those filings are unclear about which are alleged to be actionable adverse employment actions and which are offered as evidence of discriminatory intent. The Court construes Plaintiffs' claims as raising four factual theories of how Defendants discriminated against her:  (1) declining to renew her contract, effectively firing her, (2) paying her less than male comparators, (3) requiring her to share an office with a male coworker and (4) subjecting her to various other inferior terms, conditions and privileges of employment. The latter category is a catch-all for all of the other gender-based mistreatment Plaintiff alleges. Defendants' motion for summary judgment on Plaintiff's Title VII discrimination claim is granted on each of these theories.

#### 1.    Burden-Shifting Framework

Title VII makes it unlawful for employers "to discharge . . . or otherwise to discriminate against any individual" in his or her employment "because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1). Title VII "discrimination claims are governed at the summary judgment stage by the burden-shifting analysis first established in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973)." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *accord Smith v. N.Y. & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 328 (S.D.N.Y. 2020).

"Under this framework, a plaintiff bears the initial burden of establishing a prima facie case of discrimination." *Smith*, 440 F. Supp. 3d at 328 (citing *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)). "[P]laintiff must establish a prima facie case of sex discrimination by demonstrating that '(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.'" *Walsh v. N.Y.C. Housing Auth.*, 828 F.3d 70, 75 (2d Cir. 2016). Plaintiff's burden at this step is "minimal." *Id.* (internal quotation marks omitted).

"Once a plaintiff has established a prima facie case, a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015). "At that point, the burden of production shifts to the employer to 'articulate some legitimate, nondiscriminatory reason for the disparate treatment.'" *Smith*, 440 F. Supp. 3d at 328 (quoting *Vega*, 801 F.3d at 83) (internal quotation marks omitted); *accord Walsh*, 838 F.3d at 75.

"If the employer carries that burden, 'the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" *Walsh*, 838 F.3d at 75. "To avoid summary judgment in an employment discrimination case, 'the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only

reasons and that the prohibited factor was at least one of the "motivating" factors.'" *Holcomb*, 521 F.3d at 138; *accord Smith*, 440 F. Supp. 3d at 328.

### 2. The Alleged Adverse Employment Actions

As noted, Plaintiff's discrimination claims are construed to be based on four theories arising from four separate adverse employment actions. The first two elements of Plaintiff's prima facie case are the same for each theory and are satisfied. First, Plaintiff is a member of a protected class because she is a woman. Second, beyond one conclusory assertion in their memorandum of law, Defendants do not dispute that Plaintiff was qualified for her role as rheumatologist, based on her education and experience before, during and after her employment at NYU. The third and fourth elements of Plaintiff's prima facie case and the remaining steps of the burden-shifting analysis for each theory are addressed below.

### a. Wrongful Termination

At the prima facie case stage, Defendants' decision not to renew Plaintiff's contract -- effectively firing her -- constitutes an adverse employment action. *See Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 71-72 (2d Cir. 2019) ("An adverse employment action . . . might be indicated by a termination of employment . . . ." (internal quotation marks omitted)); *see also, e.g., James v. Borough of Manhattan Cmty. Coll.*, No. 20 Civ. 10565, 2021 WL 5567848, at *5 (S.D.N.Y. Nov. 29, 2021) (declining to renew employment and award an employment contract found to be an adverse employment action); *Branch v. State Univ. of N.Y.*, No. 18 Civ. 9516, 2020 WL 4057594, at *3 (S.D.N.Y. July 20, 2020) (non-renewal of employment contract found to be an adverse employment action). The Court assumes Plaintiff has made a prima facie case that "the adverse action occurred under circumstances giving rise to an inference of discrimination." *Walsh*, 838 F.3d at 75.

At the second step, Defendants proffer Plaintiff's poor performance and complaints from staff and patients as legitimate, nondiscriminatory reasons for her firing. *See Walsh*, 838 F.3d at 75.

Summary judgment is granted because, at the third step, Plaintiff points to no evidence "to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Id.* (internal quotation marks omitted). While many controlling cases frame the question as whether Defendants' proffered rationale is "pretext," Plaintiff need not "show that the employer's proffered reasons were false or played no role in the employment decision," only that discrimination was also a "motivating" factor. *Holcomb*, 521 F.3d at 138 (internal quotation marks omitted); *accord Smith*, 440 F. Supp. 3d at 328. Nonetheless, Plaintiff first argues that Defendants' proffered rationale *must* be pretext because it is false that Plaintiff's performance was substandard. This argument is unavailing because many of the facts supporting Defendants' rationale are undisputed, as discussed above. As evidence that, notwithstanding Defendants' proffered reason, discrimination also played a role, Plaintiff points to: her unequal pay, Defendants' surprise at her being a woman, denials of requests to bring her belongings to the office as male physicians did, failure to adopt her procedures and protocols in favor of those of male physicians, failure to provide timely administrative assistance as was provided to men, a remark that she should smile more, the demand that she share her office with a male physician and several inappropriate interactions after that incident, including being called a "bitch."

Plaintiff's proffered evidence is insufficient to raise a triable issue of fact about whether discrimination specifically motivated Plaintiff's firing. Almost all of the allegedly discriminatory conduct took place before NYU renewed Plaintiffs' contract for a three-year term

in 2017 and bears no apparent relation to the decision not to renew Plaintiff's contract in 2020.

No reasonable jury could find from such attenuated evidence that Defendants were motivated by

discrimination when firing Plaintiff in 2020.  *See, e.g.*, *Luka v. Bard College*, 263 F. Supp. 3d

478, 487 (S.D.N.Y. 2017) (finding no discriminatory intent where allegedly discriminatory

remark preceded denial of tenure by three years and did not relate to the denial); *see also*

*Bentley-Ammonds v. Northwell Health, Inc.*, No. 21-835-cv, 2022 WL 893716, at *2 (2d Cir.

Mar. 28, 2022) (summary order) (finding that "stray remarks" would not support a finding of

discriminatory intent).  The latest incident, concerning Plaintiff's office, even if assumed to be

discriminatory, took place more than a year before Plaintiff's firing and is insufficient to give

rise to an inference of discriminatory animus.  *See, e.g.*, *Smith*, 440 F. Supp. 3d at 338 (finding a

one-year lapse, and even "a few months," between a remark and alleged adverse action to be too

temporally removed to be probative).

### b.  Unequal Pay

While there is a triable issue of fact whether Defendants' pay practices violate the EPA,

as discussed above, Defendants' motion is granted with respect to Plaintiff's claim that her

unequal pay constituted intentional discrimination under the different standard that governs Title

VII.

First, the Court assumes that Plaintiff has made a prima facie case of discrimination.

Unequal pay is actionable as an adverse employment action under Title VII.  *Lenzi v. Systemax,*

*Inc.*, 944 F.3d 97, 108-09 (2d Cir. 2019).  The pay disparity with Plaintiffs' male comparators,

discussed above, "permit[s] an inference of discrimination."  *Id.* at 111.

Second, Defendants have proffered a non-discriminatory reason for the pay disparity --

NYU generally sets physician compensation, including for Dr. Porges and Dr. Modi, based on a

business plan constructed using financial data from their prior practice.  In the EPA context

discussed above, Plaintiff's prima facie case caused the burden of persuasion to shift to

Defendants, and they failed to meet that burden for purposes of summary judgment.  Under Title

VII, on the other hand, Defendants bear only a burden of production, to proffer a non-

discriminatory reason for the disparate pay, and they have met it.  In other words, under the EPA

a pay disparity is sufficient for liability unless the defendant can prove that the reason for the

disparity is non-discriminatory.  Under Title VII, disparate pay gives rise to liability only if the

plaintiff can prove that the reason was discriminatory.  *Lavin-McEleney v. Marist Coll.*, 239 F.3d

476, 483 (2d Cir. 2001) ("[A] Title VII disparate treatment claim requires a showing of

discriminatory intent, while an [EPA] claim does not."); *accord Annunziata v. Int'l Bhd. of Elec.*

*Workers Loc. Union # 363*, No. 15 Civ. 3363, 2018 WL 2416568, at \*10 (S.D.N.Y. May 29,

2018).

Of the allegedly discriminatory incidents enumerated in the preceding section, none

points to discrimination motivating any decision to set Plaintiff's pay.  Plaintiff has pointed to no

record evidence that NYU implemented its salary-matching practice *because* it results in lower

pay for women, rather than for commercial reasons.  To the contrary, Plaintiff asserts that her

compensation initially was set when Defendants assumed she was male, prior to the meeting at

which they expressed surprise at learning her gender.

Similarly, the evidence is insufficient to support a finding of discriminatory intent when

Plaintiff's contract was renewed with a new salary.  Some of the allegedly discriminatory

treatment described above occurred closer in time to the renewal, but Plaintiff received a

substantial raise in 2017 -- both in absolute and productivity-adjusted terms.  Drs. Goldberg and

Porges both received smaller raises than Plaintiff, on a per-wRVU basis, and Dr. Porges's

clinical pay was decreased the first time his contract was renewed.[1]  Any pay disparity after

Plaintiff's contract was renewed is fully explained by the initial decision about Plaintiff's

compensation, and there is no evidence from which a reasonable jury could find that

discrimination was a motivating factor in failing to give Plaintiff an even larger raise.

### c.  Required Office-Sharing

At the prima facie stage, it is doubtful that forced office-sharing, principally on days that

Plaintiff was off-site, is "more disruptive than a mere inconvenience" as it must be in order to be

an adverse employment action under Title VII.  *Fox*, 918 F.3d at 71-72 (internal quotation marks

omitted); *see also Dowrich-Weeks v. Cooper Square Realty, Inc.*, 535 F. App'x 9, 11-12 (2d Cir.

2013) (summary order) (holding that being "moved from an office to a cubicle" was not "a

materially adverse change in the terms and conditions of employment" (internal quotation marks

omitted)); *Harge v. City of New York*, No. 16 Civ. 5160, 2021 WL 3855305, at *9 (S.D.N.Y.

Aug. 26, 2021) (noting that being "transferred to another office that 'resulted in a longer

commute'" is merely an inconvenience); *Whitley v. Montefiore Med. Grp.*, No. 13 Civ 4126,

2016 WL 1267788, at *7 (S.D.N.Y. Mar. 30, 2016) (holding that "failure to receive a computer

or office" was a "mere inconvenience" (internal quotation marks omitted)).  Even assuming that

Plaintiff has carried her minimal prima facie burden, the evidence does not support an inference

of discriminatory intent at the third step of the burden shifting analysis.

At the second stage of the analysis, Defendants have offered a non-discriminatory reason

for requiring office-sharing:  Space was limited, and became more limited when the practice

---

[1] If the Court were to consider the renewal of Dr. Modi's contract, raised for the first time in Plaintiff's letter at Dkt. Nos. 147-148, Dr. Modi's raise also was smaller than Plaintiff's, both in absolute and per-wRVU terms.  That Plaintiff did not receive a raise in 2020 for the last six months of her employment is not pertinent, because Defendants did not renew her contract at that time and did not make a new compensation decision.

consolidated, so office-sharing was common when doctors did not come in on certain days.  At least two male doctors, Dr. Goldberg and Dr. Given, shared their offices when they were off-site. Plaintiff was asked to share her office only on days she did not use it or that her calendar showed her not using it.  Similarly, any doctor's office was available for use by lactating employees when vacant, and Plaintiff's office was not used for this purpose more often than any other.

At the third stage of the analysis, Plaintiff offers no evidence to dispute Defendants' motives.  Plaintiff does not suggest that she was afforded office space on less favorable terms than any male, nor that Defendants chose to require her to share because of her sex.  Defendants' reaction to Plaintiff's initial refusal to go along with the change was likely sexist, but it sheds no light on the reason for the decision to put another doctor part-time in Plaintiff's office.  Based on the record, no reasonable jury could find that Defendants were motivated by anything other than a need to manage space constraints, the burden of which fell on men and women equally.

### d.  Other "Inferior Terms, Conditions and Privileges of Employment"

None of the other purportedly inferior terms, conditions and privileges that Plaintiff endured constitute adverse employment actions under Title VII.  Negative remarks to or about Plaintiff, declining to let her bring personal belongings or preferred procedures from her old practice and delays in providing administrative assistance are all mere "inconvenience[s]" and not "a material loss of benefits."  *See Fox*, 918 F.3d at 72 ("Harsh reprimands do not rise to the level of an adverse employment action . . . ."); *see also, e.g.*, *Dowrich-Weeks*, 535 F. App'x at 11-12 (holding that a "vice-present ma[king] negative remarks about [plaintiff] to a client" and her "not [being] permitted to take advantage of an alternative work schedule that allowed periodic work from home" were not adverse employment actions); *DeAngelo v. Maximus/NY Medicaid Choice*, No. 19 Civ. 7957, 2022 WL 3043665, at *19 n.20 (S.D.N.Y. Aug. 2, 2022)

(holding that all of the following were mere inconveniences: "denial of [plaintiff's] requests for a meeting with upper management; denial of work on [certain] projects and (initially) a transfer . . . ; being without a keyboard tray for a week; being asked to provide site coverage after her transfer . . . ; being instructed . . . to attend a holiday party; the temporary absence of her 'original' keyboard and preferred ergonomic chair; being given 'urgent' assignments; and a co-worker putting personal effects in Plaintiff's workspace while she was on leave").

These issues had no "tangible effect on employment" because they did not "result[] in disciplinary action or a reduction in salary, benefits, or other responsibility." *Fox*, 918 F.3d at 72. In fact, Plaintiff asserts that she has never been written up or disciplined in any way and notes that her contract could not be modified until it was up for renewal. Therefore, it is unnecessary to consider whether Defendants had legitimate, nondiscriminatory reasons for that conduct and whether discrimination nonetheless was a motivating factor.

### C.    Title VII Retaliation

Defendants' motion for summary judgment on the Title VII retaliation claim is denied. Title VII prohibits retaliation "against any . . . employee[ ] . . . because [she] has opposed any practice" made unlawful by Title VII. 42 U.S.C. § 2000e–3(a). "[R]etaliation claims . . . are analyzed using the *McDonnell Douglas* burden-shifting framework." *Smith*., 440 F. Supp. 3d at 340 (citing *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013)); *see Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015). To establish a prima facie case of retaliation, a plaintiff must show "(1) that [she] participated in a protected activity, (2) that [she] suffered an adverse employment action, and (3) that there was a causal connection between [her] engaging in the protected activity and the adverse employment action." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 391 (2d Cir. 2020) (internal quotation marks omitted). "Once a plaintiff makes out a

prima facie case of retaliation under the burden-shifting framework, the defendant may rebut the presumption of retaliation by articulating a legitimate, non-retaliatory reason for the adverse employment action.  If the defendant provides an explanation, the plaintiff must prove that the desire to retaliate was the but-for cause of the challenged employment action." *Id.* at 392 (cleaned up).

### 1.  Prima Facie Case

Plaintiff has made a prima facie case of retaliation.  There is no dispute that Plaintiff's firing constitutes an adverse employment action.  Defendants dispute the first and third elements of the prima facie case -- Plaintiff's engagement in protected activity and a causal connection between that activity and her firing -- but those arguments are unavailing.

Contrary to Defendants' argument, Plaintiff's communications with Defendants' HR professionals throughout October and November 2019 made clear that she was complaining of sex discrimination, which is a protected activity under Title VII.  *See Rasmy*, 952 F.3d at 391.  In determining whether Plaintiff's superiors fired her in retaliation for making that complaint, it is irrelevant whether NYU's HR department separately responded appropriately.

At the prima facie stage, "even without direct evidence of causation, a plaintiff can indirectly establish a causal connection to support a retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action."  *Kwan*, 737 F.3d at 845 (cleaned up); *accord Postell v. Fallsburg Library*, No. 20 Civ. 3991, 2022 WL 1092857, at *10 (S.D.N.Y. Apr. 8, 2022).  While the lapse of a bit more than one year is longer than a typical temporal-proximity case, Plaintiff was not an at-will employee, and her conduct did not fit into any of the narrow categories of cause for which she could be fired immediately. Defendants began making a record of purportedly non-discriminatory reasons to discharge

Plaintiff within weeks after she made her discrimination complaint and then fired her at the first

opportunity, when her contract came up for renewal.  Under those circumstances, the temporal

proximity between Plaintiff's protected activity and her firing is sufficient to raise an inference

of causation at the first step.  *See Rasmy*, 952 F.3d at 391 ("Questions regarding the time gap and

causal connection of an alleged retaliatory termination may entail special consideration of the

size and complexity of a defendant employer, where termination of employment may involve

multiple layers of decisionmakers . . . .").

### 2.   Defendants' Purportedly Legitimate, Nondiscriminatory Reason

In response, Defendants point to the long list they compiled of purported concerns with

Plaintiff's clinical and interpersonal conduct as non-discriminatory reasons for declining to

renew her contract, at least some of which are supported by affidavits.  This is sufficient to

satisfy Defendants' burden of production at this stage and shift the burden back to Plaintiff.

### 3.   Evidence of But-For Causation

Plaintiff offers evidence from which a reasonable jury could find that retaliation was a

but-for cause of her firing.  At this third stage of the burden-shifting analysis, "[t]emporal

proximity alone is insufficient to defeat summary judgment," but "a plaintiff may rely on

evidence comprising her prima facie case, including temporal proximity, together with other

evidence such as inconsistent employer explanations, to defeat summary judgment at that stage."

*Kwan*, 737 F.3d at 847 (citation omitted); *accord Naemit v. Village of Spring Valley*, No. 20 Civ.

1882, 2022 WL 1443675, at *12 (S.D.N.Y. May 6, 2022).

A jury could conclude from the timing of Defendants' compiling of a list of "issues" that

it was "a mere pretext for retaliation."  *Kwan*, 737 F.3d at 845; *Rasmy*, 952 F.3d at 392

("[Plaintiff] argues (and a jury could agree) that this proffered reason is mere pretext, and the

decision to terminate his employment was due to his repeated complaining . . . about ongoing discrimination.").  Ruiz testified that she was not specifically aware of Plaintiff's complaint when she began compiling the list of issues with Plaintiff's performance, but there is a dispute of fact whether Ruiz's actions were part of management's overall response to the incident.  After Plaintiff lodged her initial complaint, NYU's HR professional discussed it with at least Plaintiff's supervisor Mr. Kaplan and seemingly also with Mr. Swirnow.

A jury also could find that, even if Plaintiff truly had performance issues, Plaintiff's complaint was a but-for cause of her firing, because it is the reason Defendants took notice and used those issues against her.  Defendants apparently did not compile lists of her faults (or any other doctor's) before Plaintiff complained of discrimination.  The parties also dispute whether the list accurately reflects Plaintiff's performance.  *See Dodd v. City Univ. of N.Y.*, 489 F. Supp. 3d 219, 247-48 (S.D.N.Y. 2020) ("A plaintiff may show but-for causation by 'demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.'" (quoting *Kwan*, 737 F.3d at 846)).  There is also some direct evidence of retaliatory animus in the record, in Mr. Kaplan's reaction to Plaintiff's complaint about Mr. Antonik.  *See White v. Dep't of Corr. Servs.*, 814 F. Supp. 2d 374, 390 (S.D.N.Y. 2011) ("Negative reactions by an employer to a plaintiff's complaints of discrimination have been deemed indicative of retaliatory animus.").

Summary judgment is denied on the Title VII retaliation claim because the evidence is sufficient for a jury reasonable jury to find that retaliatory intent was a but-for cause of Plaintiff's termination.  *See Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018) ("Causation may be shown by direct evidence of retaliatory animus or inferred through temporal proximity to the protected activity.").

### D.        NYCHRL Discrimination

The NYCHRL is less demanding of plaintiffs than Title VII, and Plaintiff may prove an adverse employment action simply by showing that she was treated "less well." *Emamian v. Rockefeller Univ.*, 971 F.3d 380, 390 (2d Cir. 2020) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013)); *accord Hamburg v. N.Y. Univ. Sch. of Med.*, 62 N.Y.S.3d 26, 32-33 (1st Dep't 2017); *Sanderson- Burgess v. City of New York*, 102 N.Y.S.3d 678, 680 (2d Dep't 2019). "Under this standard, the conduct's severity and pervasiveness are relevant only to the issue of damages." *Mihalik*, 714 F.3d at 110; *accord Aiken v. MTA N.Y.C. Transit*, No. 18 Civ. 11756, 2021 WL 6621579, at *13 (S.D.N.Y. Sept. 2, 2021), *report and recommendation adopted*, 2021 WL 4481094 (S.D.N.Y. Sept. 29, 2021). Nevertheless, the NYCHRL requires Plaintiff to show that "the conduct is caused by a discriminatory motive" and that she was "treated less well at least in part because of her gender." *Emamian*, 971 F.3d at 390 (quoting *Mihalik*, 715 F.3d at 110); *accord Brown v. Montefiore Med. Ctr.*, No. 19 Civ. 11474, 2021 WL 1163797, at *8 (S.D.N.Y. Mar. 25, 2021). Even under the NYCHRL's more forgiving standard, Defendants' motion for summary judgment is granted with respect to Plaintiff's NYCHRL discrimination claim.

#### 1.   Burden-Shifting Framework

New York courts considering NYCHRL claims on summary judgment have adopted a modified version of the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Bennett v. Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d 112, 117 (1st Dep't 2011); *accord Sanderson-Burgess*, 102 N.Y.S.3d at 680. Under the *Bennett* framework, a plaintiff must first make a prima facie showing of membership in a protected class and an adverse employment action under circumstances giving rise to an inference of discrimination.

*See Bennett*, 936 N.Y.S. 2d at 118.  Plaintiff's burden to show a prima facie case at the summary

judgment stage is minimal.  *See id.*  *Bennett* notes that the prima facie case stage may be

unnecessary, particularly where the "defendant has moved for summary judgment and has

offered evidence . . . of one or more non-discriminatory motivations for its actions." *Id.* at 120.

If a court does engage in the prima facie case inquiry, it should ask only "whether the initial facts

described by the plaintiff, *if not otherwise explained*, give rise to the *McDonnell Douglas*

inference of discrimination." *Id.* at 119, 124.

Following that minimal showing, a burden of production shifts to the defendant to "put

forward evidence of one or more non-discriminatory motivations for its actions." *Id.* at 124.

If the Defendant makes that showing, "the court should turn to the question of whether

the defendant has sufficiently met its initial burden as the moving party of showing that there is

no evidentiary route that could allow a jury to believe that discrimination played a role in the

challenged action." *Id.* at 120.  Summary judgment is appropriate only if "no jury could find

defendant liable under any of the evidentiary routes -- *McDonnell Douglas*, mixed motive,

'direct' evidence, or some combination thereof." *Id.* at 124; *see also id.* at 121.  "If the plaintiff

responds with some evidence that at least one of the reasons proffered by defendant is false,

misleading, or incomplete, a host of determinations properly made only by a jury come into play,

and thus such evidence of pretext should in almost every case indicate to the court that a motion

for summary judgment must be denied." *Id.* at 124.  In essence, "[u]nder the NYCHRL,

unlawful discrimination must play 'no role' in an employment decision." *Lefort v. Kingsbrook*

*Jewish Med. Ctr.*, 164 N.Y.S.3d 183, 188 (2d Dep't 2022) (internal quotation marks omitted).

### 2. Alleged Adverse Employment Actions

#### a. Wrongful Termination, Unequal Pay and Required Office-Sharing

Summary judgment is granted under the NYCHRL with respect to the each of the adverse employment actions that survived the prima facie case stage under Title VII. At step one of the *Bennett* analysis, Plaintiff necessarily has made a prima facie case of discrimination under the NYCHRL for each of the adverse employment actions that survived the more stringent prima facie case requirements under Title VII. At step two, Defendants have offered evidence of nondiscriminatory reasons for each of those actions, as described above. Turning to step three, Plaintiff has failed to raise a triable issue of fact whether discrimination played *any* role in those actions, for the same reason that she failed to raise a jury question about whether discrimination was a "motivating factor." As discussed above, all of Plaintiffs' evidence of discriminatory intent is too distant in time to be probative of discrimination at the time of Plaintiff's firing, and Plaintiff points to no connection between the evidence she offers and any decision to set her compensation or to require her to share an office.

#### b. Differential Treatment in Setting up NYU's Rheumatology Practice

Summary judgment is granted with respect to Plaintiff's claim that, when she joined the practice, she was treated differently than Dr. Porges in that she was not permitted to bring certain of her belongings, procedures and protocols from her old practice. At step one of the *Bennett* analysis, the Court assumes that this is an instance of Plaintiff being treated less well and, if unexplained, could suggest discrimination. At step two, Defendants offer a nondiscriminatory reason. The record shows that Plaintiff was treated differently from Dr. Porges who, along with Dr. Brancato, was one of the first doctors to move into the office. It is reasonable that they had

more leeway in setting up the practice.  At step three, Plaintiff offers no evidence that discrimination played any role in her being treated less well than Dr. Porges in this respect.

### c.  Administrative Delays

Summary judgment is granted with respect to Plaintiff's claim that, because Defendants refused to adopt her office-management procedures, she received administrative assistance in a less timely manner than certain male colleagues.  This factual theory fails at the prima facie case stage because, even under the NYCHRL's liberal standard, "a reasonable jury could not interpret the alleged [actions] as anything 'more than petty slights or trivial inconveniences.'"  *Mihalik*, 715 F.3d at 114.  Having to look through "piles" of papers and deal with brief delays in scanning is trivial, and according to Dr. Goldberg's affidavit the experience was not unique to Plaintiff. Plaintiff points to no evidence of how often this problem recurred, but her testimony suggests that it was rectified relatively quickly.

### d.  Allegedly Sexist Remarks

Summary judgment is denied on one branch of Plaintiff's NYCHRL discrimination claim because a reasonable jury could find based on several insensitive remarks that Defendants treated Plaintiff less well because of her sex.  While "the NYCHRL should not operate as a general civility code," it is also true that "a single comment may be actionable in appropriate circumstances."  *Mihalik*, 715 F.3d at 114 (internal quotation marks omitted).  "Construing the evidence in its totality and in [Plaintiff's] favor, we conclude that a jury could reasonably find that [Defendants'] behavior constituted more than 'petty slights or trivial inconveniences,' and that it was sexually-charged conduct that subjected [Plaintiff] to a different set of employment conditions than her male colleagues."  *Id.* at 114-15.  For example, Defendants offer no reason to think that a male doctor who was short with coworkers would be reprimanded at all, including

being told to "smile more" at work, or that a male doctor who objected to sharing his office would be belittled the same way Plaintiff was.  Defendants deny the comments at issue were ever made and attack Plaintiff's credibility, but that factual dispute must be resolved by a jury.

  **E.**  **NYCHRL Retaliation**

  Plaintiff's retaliation claim is subject to a more lenient standard under the NYCHRL than under Title VII.  *See Ya-Chen Chen*, 805 F.3d at 76 ("[W]e note that NYCHRL's retaliation provision is broader than Title VII's -- protecting plaintiffs who oppos[e] any practice forbidden under the law from conduct reasonably likely to deter a person engaging in such action." (internal quotation marks omitted)).  Because Defendants' motion on Plaintiff's retaliation claim is denied as to Title VII it is denied as to the NYCHRL as well.

  **F.**  **NYSHRL Discrimination**

  The NYSHRL makes it unlawful "[f]or an employer . . . because of an individual's . . . sex . . . to discharge from employment such individual or to discriminate against such individual."  N.Y. Exec. Law § 296(1)(a).  Until October 11, 2019, discrimination claims under the NYSHRL and Title VII were "generally treated as 'analytically identical,' and addressed together."  *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 323 (S.D.N.Y. 2020) (quoting *Lenzi*, 944 F.3d at 107 n.7).  The only conduct that Plaintiff alleges constituted an adverse employment action or less favorable treatment that occurred after October 11, 2019, was Plaintiff's firing.  Accordingly, for the reasons Defendant's motion is granted as to the analogous Title VII claims above, Defendant's motion is granted as to Plaintiff's NYSHRL discrimination claim related to Plaintiff's other theories:  unequal pay, office-sharing and other inferior terms, conditions and privileges of employment.

The NYSHRL was amended in 2019.  The amendments did not change the text of the anti-discrimination provision under which Plaintiff brings this action but, among other things, the amendment provided that the NYSHRL should be construed liberally "regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of this article, have been so construed."  N.Y. Exec. Law § 300; *see* A.B. 8421, 2019-2020 Reg. Sess. (N.Y. 2019).  For claims that accrued on or after the effective date of the legislation -- in the case of the section above, August 12, 2019 -- "the standard for [NYSHRL] claims [is] closer to the standard of the NYCHRL."  *Livingston v. City of New York*, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021).  However, even analyzing Plaintiff's firing under the more liberal NYCHRL standard, Defendant's motion is granted, for the reasons discussed above.

### G.     NYSHRL Retaliation

In both its pre- and post-amendment forms, the NYSHRL makes it unlawful for "any employer . . . to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article."  N.Y. Exec. Law § 296(1)(e).  Plaintiff's claim that she was fired in retaliation for protected activity under the NYSHRL accrued after that statute was amended to liberalize the standard for such claims.  Because this claim is now subject to less stringent standards than Plaintiff's Title VII retaliation claim, which survived summary judgment for the reasons discussed above, this claim also survives summary judgment.

### H.     Individual Liability

To the extent Plaintiff asserts Title VII claims against the Individual Defendants, the motion for summary judgment is granted as to those claims against those Defendants.  In general, "individuals are not subject to liability under Title VII."  *Sassaman v. Gamache*, 566

31

F.3d 307, 315 (2d Cir. 2009) (cleaned up); *accord Accely v. Consolidated Edison Co. of N.Y.*, No. 19 Civ. 5984, 2022 WL 973415, at *5 (S.D.N.Y. Mar. 31, 2022).

Plaintiff's EPA, NYSHRL and NYCHRL claims against the Individual Defendants largely survive summary judgment because, with one exception, Defendants have not presented any evidence or argument for dismissal.

"Although the Second Circuit Court of Appeals has not addressed whether the EPA provides for individual liability . . . district court[s] in this Circuit ha[ve] held that it does." *Setelius*, 2014 WL 4773975, at *35 n.33 (internal quotation marks omitted).  Defendants do not argue that the Court should depart from persuasive precedent.

The NYCHRL creates liability for individual defendants who "participate in the conduct giving rise to a discrimination claim" by making it unlawful "[f]or an employer or an employee or agent thereof, because of . . . gender . . . to discriminate against such person in . . . terms, conditions or privileges of employment."  N.Y.C. Admin. Code § 8-107(a); *see Feingold v. New York*, 366 F.3d 138, 158-59 (2d Cir. 2004); *accord Deveaux v. Skechers USA, Inc.*, No. 19 Civ. 9734, 2020 WL 1812741, at *5 (S.D.N.Y. Apr. 9, 2020).

Under the NYSHRL, "an individual who has an ownership interest in the relevant organization or the power to do more than carry out personnel decisions made by others" is liable as a principal, but under the "aiding and abetting provision . . . personal liability may be imposed on an individual who does not have such authority, but who also 'actually participates in the conduct giving rise to the discrimination.'"  *Deveaux*, 2020 WL 1812741, at *5 (quoting *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 57 (2d Cir. 2012); and then quoting *Feingold*, 366 F.3d at 158).

Defendants argue only that Mr. Kaplan and Mr. Antonik had nothing to do with the setting of Plaintiff's salary, which is undisputed. Defendants' motion for summary judgment on Plaintiff's EPA claims against Mr. Kaplan and Mr. Antonik is granted. Because all claims based on Plaintiff's salary other than the EPA claim are dismissed as discussed above, individual liability for those claims is moot. Defendants' motion is denied as to individual liability for all other claims that survive summary judgment as discussed above.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part, and Defendants' motion to strike Plaintiff's supplemental submission is DENIED as moot. Specifically, summary judgment is granted as to the following: (i) EPA unequal pay claims against Kaplan and Antonik; (ii) Title VII and NYSHRL discrimination claims on all factual theories against all Defendants; (iii) Title VII retaliation claims against the Individual Defendants and (iv) NYCHRL discrimination claims on each factual theory against all Defendants except to the extent based on allegedly sexist remarks.

For clarity, Defendants' motion is denied as to the following claims, which survive: (i) unequal pay under the EPA against NYU, Swirnow and Rubin; (ii) Title VII retaliation against NYU; (iii) NYCHRL discrimination based on allegedly sexist remarks against all Defendants and (iv) NYCHRL and NYSHRL retaliation against all Defendants.

The Clerk of Court is respectfully directed to close the motion at Docket Number 108. A trial scheduling order will follow.

Dated: September 28, 2022
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE