**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Defendants*
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

DR. SARI EDELMAN,

                Plaintiff,

-against-

NYU LANGONE HEALTH SYSTEM, NYU
LANGONE HOSPITALS, NYU LANGONE
MEDICAL CENTER, NYU LANGONE
NASSAU RHEUMATOLOGY, NYU SCHOOL
OF MEDICINE, NYU GROSSMAN SCHOOL
OF MEDICINE, NYU HOSPITALS CENTER,
ANDREW T. RUBIN, DAVID KAPLAN,
JOSEPH ANTONIK, and JOSHUA SWIRNOW,

                Defendants.

-------------------------------------------------------------x

Case No. 1:21-cv-502 (LGS)(GWG)

**DECLARATION OF
ANDREW J. PORGES, MD,
IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

      **ANDREW J. PORGES, MD**, under penalties of perjury, hereby declares pursuant to 28 U.S.C. § 1746:

      1.    I am the Medical Director of NYU Langone Ambulatory Care – Lake Success and a Clinical Assistant Professor in the Department of Medicine at NYU Grossman School of Medicine.

      2.    I am not a defendant in this action.

      3.    I have been Board Certified in rheumatology since 1992 and in internal medicine since 1989. (A true copy of my curriculum vitae is annexed at Exhibit A.)

      4.    I was in private practice from 1993 through November 1, 2014, when I joined NYU as a Staff Physician from my own private practice.

5. From in or about 1992 until 2014, when my employment with New York University Grossman School of Medicine f/k/a New York University School of Medicine ("NYUGSOM" or "NYU") became effective, I served as an Instructor of Medicine at Cornell University Medical College; Assistant Professor of Medicine, Cornell University Medical College and Assistant Scientist, The Hospital for Special Surgery. Further, from 1994 until I joined NYUGSOM in 2014, I was an Adjunct Assistant Professor of Medicine, Cornell University Medical College.

6. In addition, prior to joining NYU, I engaged in clinical research as Principal Investigator for such well-known companies as Merck, P&G, Genentech, Roche, Abbot, Pfizer, Novartis, Astra Zeneca, and Lilly regarding patients with medical conditions such as rheumatoid arthritis, osteoporosis, gout, psoriasis, osteoarthritis/pain, and lupus.

7. In connection with the negotiations surrounding my hire by NYU, NYU requested, and I provided, certain financial data concerning my private practice. I negotiated my salary based upon my income in my private practice. Further, a production expectation measured by work relative value units ("wRVUs") was set for me based upon my production, again measured in wRVUs, from my private practice. My initial employment agreement with NYU included a research revenue target in addition to my salary. ████████████████████████ ████████████████████████ ████████ (A true copy of my employment agreement with NYU dated August 11, 2014, with a commencement date of November 1, 2014, is annexed at Exhibit B.) I did not have any business loans that needed to be paid off.

8. After my employment with NYUGSOM commenced, I at first continued to practice in my former private practice office under a month-to-month lease for which NYU paid a premium. This was because, although my office lease had expired, construction delays prevented me from

2

moving to Marcus Avenue as scheduled. When the space at Marcus Avenue became available, I was the first rheumatologist to move into the space together with my associate, Dr. Lenore Brancato, a female rheumatologist.

9. I have shared an office with my wife, Dr. Deborah Porges, a female dermatologist at NYU, except for during my first one or two years at Marcus Avenue.

10. Beginning in or about 2016, Alicia Delavore, then Site Manager of Marcus Avenue, approached me to assist with concerns that had been raised about the clinical practices of certain physicians there. In response, I evaluated their clinical practices, including a review of their patient records and any complaints about them, and discussed them with Andrew Rubin ("Mr. Rubin").

11. I subsequently spoke with Mr. Rubin about continuing to perform these types of duties at Marcus Avenue. A member of Mr. Rubin's staff contacted me thereafter regarding the renewal of my employment agreement and to assign me administrative leadership responsibilities as Clinical Director of Ambulatory Rheumatology on Long Island, I was to receive additional compensation for performing responsibilities that included, but were not limited to, the following:

    i. Oversee the activities of NYU Langone Rheumatology Long Island physicians and clinical staff;
    ii. Oversee the activities related to the delivery of medical care and clinical services such as cost management, utilization review, quality assurance, and medical protocol development;
    iii. Review and provide feedback on physician productivity;
    iv. Review and ensure that quality patient care is delivered by all clinicians according to evidence based (EB) guidelines;
    v. Ensure all safety guidelines and trainings are carried out by the practice;
    vi. Provide educational opportunities for medical staff;
    vii. Explore the delivery of new services and disease-oriented programs;
    viii. Handle confidential information as defined by NYULMC's policies;
    ix. Participate in program activities as appropriate.

(A true copy of my renewal employment agreement with NYU dated August 3, 2017, effective November 1, 2017, is annexed at Exhibit A.)

3

### Plaintiff's Suggestions

12. At some point, Plaintiff recommended hiring a new nurse practitioner for rheumatology practice. NYU accepted Plaintiff's recommendation, and a nurse practitioner was hired for the practice.

13. When candidates were interviewed the female nurse practitioner Plaintiff preferred was only available four days per week. However, the male nurse practitioner who was interviewed and ultimately hired was available five days per week.

14. Although the nurse practitioner hired had a good background, he needed training. Plaintiff urged NYU to adopt an outside training program that would have required the nurse practitioner to receive training offsite in addition to onsite training. Further, NYU's School of Medicine had the in-house clinical ability to train a rheumatology nurse practitioner. Accordingly, Plaintiff's suggestion in this regard was not accepted.

15. Subsequently, the male nurse practitioner hired was terminated.

16. I was not consulted about the decision to terminate such nurse practitioner.

### Concerns About Plaintiff's Clinical Practice

17. Over the years, I became aware of patient complaints about excessive testing ordered by Plaintiff and a troubling lack of follow-up on her part.

18. I even recall an instance in which an NYU physician who was being treated by Plaintiff complained to me of Plaintiff's having ordered tests excessively and asked me to assume responsibility for their care

4

19. I also recall Dr. Deborah Porges, who was treating one of Plaintiff's patients, brought to my attention that the patient's chart reflected what she perceived to be an unusual number of lab tests.

20. Upon reviewing the chart in question, I agreed that Plaintiff's patient chart reflected an unusual amount of lab tests.

21. In or around November 2020, and at the direction of NYU leadership, I prepared a summary of information obtained from Marcus Avenue's Site Manager, FGP Manager, and FGP Nurse Manager, and from my personal knowledge, regarding concerns about Plaintiff. (A true copy of the summary is annexed at Exhibit C.)

22. During this process, I discovered several issues concerning Plaintiff's practice and patient care that included, but were not limited to, Plaintiff's not reading and responding to email correspondence in a timely manner.

23. I was also able to personally observe Plaintiff's practices when I saw her patients for purposes of providing them with a second opinion. I also reviewed certain of Plaintiff's medical charts.

24. I determined that Plaintiff had a pattern of ordering lab tests inconsistent with the usual standards of our rheumatology practice.

25. X-ray technicians also complained to me about Plaintiff ordering excessive x-rays.

26. It was and is my opinion that Plaintiff was not meeting NYU's clinical standards for patient care, which exceed the standards of the medical community in general.

27. I met with Andrew Rubin ("Mr. Rubin") and Joshua Swirnow ("Mr. Swirnow") following the preparation of my summary report of concerns regarding Plaintiff's practice to discuss what should be done.

28. I did not believe that Plaintiff's failures to meet NYU's high clinical practice standards rose to the level of "Professional Misconduct," such that they required reporting to regulators.

29. However, when Mr. Rubin asked if it would be feasible to monitor Plaintiff's performance moving forward so that her practice could be brought in line with NYU's clinical standards, I told him that I did not believe it would be.

30. The annexed exhibits are business records of NYU maintained in the ordinary course of business.

All of the above testimony is true to the best of my knowledge and recollection. I have not been pressured in any way or promised anything to make the statements set forth above. I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 17, 2022.

_____
ANDREW J. PORGES, MD

6