# EXHIBIT C

```
     N7CCede1
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   DR. SARI EDELMAN,

 4                  Plaintiff,

 5             v.                           21 Civ. 502 (LJL)

 6   NYU LANGONE HEALTH SYSTEM, et
     al.,
 7
                    Defendants.
 8                                          Trial
     ------------------------------x
 9                                          New York, N.Y.
                                            July 12, 2023
10                                          9:00 a.m.

11   Before:

12                        HON. LEWIS J. LIMAN,

13                                          District Judge
                                            -and a Jury-
14

15                            APPEARANCES

16   MILMAN LABUDA LAW GROUP PLLC
          Attorneys for Plaintiff
17   BY:  JOSEPH M. LABUDA
          EMANUEL S. KATAEV
18
     TARTER KRINSKY & DROGIN LLP
19        Attorneys for Defendants
     BY:  RICHARD C. SCHOENSTEIN
20        RICHARD L. STEER
          INGRID J. CARDONA
21

22

23

24

25
```

Case 1:21-cv-00502-LJL   Document 268-3   Filed 08/23/23   Page 3 of 11    343
N7cWede2                          Edelman - Cross

1  Q.  Now, you said yesterday on the stand that you felt
2  intimidated by Mr. Antonik; you mentioned his height, right?
3  A.  Yes.
4  Q.  He's much taller than you?
5  A.  Yes.
6  Q.  And you agree with me that's not because he's a man; the
7  height differential is not because of his gender?
8  A.  No.
9  Q.  A six-foot-five woman could have come into your office and
10 been just as intimidating, correct?
11 A.  Correct.
12 Q.  You said he waved his arms a lot as he spoke to you?
13 A.  I -- I believe I showed the court the gestures that he
14 performed.
15 Q.  Do you agree with my characterization of waving arms?
16 A.  Yes.  He moved his entire body around and moved his arms,
17 yes.
18 Q.  Had you ever seen him interacting with anybody else?
19 A.  Is -- is there more context to this question?
20 Q.  Well, there will be another question after that question,
21 but for now the only question is --
22 A.  Have I ever --
23 Q.  Have you ever seen --
24 A.  Have I ever seen him interact with another human being,
25 yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  Q.  And 1999 Marcus Avenue is one of those sites, and you had
2  three other sites as well, correct?
3  A.  Yes.
4  Q.  It's fair to say, isn't it, that you are responsible for
5  many operational aspects of those sites, correct?
6  A.  Yes.
7  Q.  You're involved in the logistics of making the practice
8  work and run, correct?
9  A.  Yes.
10 Q.  For example, you keep the lights on and ensure efficiency,
11 correct?
12 A.  Yes.
13 Q.  Those operational aspects also include managing doctors'
14 office space and moving them sometimes; yes?
15 A.  Yes.
16 Q.  But you don't decide who moves where, right?
17 A.  No.
18 Q.  That comes up from leadership, correct?
19 A.  Yes.
20 Q.  So if you're told to make something happen in terms of a
21 change, that's a change that was communicated to you by either
22 Mr. Rubin, Mr. Swirnow, or both of them, correct?
23 A.  It would --
24          MR. SCHOENSTEIN:  Objection, your Honor.
25          THE COURT:  Overruled.

1  A.  It would normally come from my immediate boss.

2  Q.  And that's Mr. Swirnow, correct?

3  A.  David Kaplan.

4  Q.  I apologize.  Yes.

5      And as you know, Dr. Edelman is a physician that worked at
6  NYU, isn't that correct?

7  A.  Yes.

8  Q.  And you knew that she had her own practice before coming to
9  NYU, isn't that right?

10 A.  I became aware of that at some point.

11 Q.  Mr. Kaplan provided you information about her and all the
12 other doctors when you became a site director of 1991 Marcus,
13 right?

14 A.  Yes.

15 Q.  And you recognize Dr. Edelman as someone qualified for her
16 position, correct?

17 A.  Because she was already working there at the time that I
18 arrived, I assumed so.

19 Q.  And you have no ability to determine whether a doctor is
20 qualified, correct?

21 A.  Correct.

22 Q.  Now, Dr. Edelman's role was to provide physician services
23 as a rheumatologist to patients, correct?

24 A.  Correct.

25 Q.  Those responsibilities and her position never changed until

1  Q.   And in this email, you say to them, "we need a clear,
2  convincing summary with examples sent," correct?
3  A.   Correct.
4  Q.   And you did this for the purpose of facilitating the
5  gathering of information, correct?
6  A.   Correct.
7  Q.   And you were gathering this information because Mr. Kaplan
8  told you to do that, correct?
9  A.   Correct.
10  Q.   And Mr. Kaplan told you to do that because you came to him
11  about, quote/unquote, issues with Dr. Edelman, correct?
12  A.   I don't quite remember that being part of it.
13            MR. KATAEV:  Well, let's see what you testified to to
14  refresh your recollection.
15            191, your Honor.
16            THE COURT:  191?  I don't think there is a 191.
17            MR. KATAEV:  Sorry, your Honor.
18  Q.   At your December 21, 2021, deposition, I asked you the
19  following questions and you gave the following answers,
20  correct?
21  "Q.  How did you first become aware of any issues related to
22  Dr. Edelman's performance?
23  "A.   There were comments made to me by Miriam Ruiz.
24  "Q.  What did she say to you and what did you say to her?
25  "A.   I don't remember exactly.

1  with her after she was finished seeing patients.
2  Q.  And when you failed to achieve this objective, you also
3  informed Mr. Swirnow; correct?
4          MR. STEER:  Objection.
5          THE COURT:  Basis?
6          MR. STEER:  Foundation.  I don't know that we have any
7  testimony as to what that question meant, frankly, your Honor.
8          THE COURT:  Overruled.
9  A.  Please repeat the question.
10 Q.  When you failed to secure Dr. Edelman's cooperation in
11 sharing office space, you reported to Kaplan.  My question is
12 did you also report it to Mr. Swirnow?
13 A.  I did not.
14 Q.  But based on your knowledge of the way things work at NYU,
15 you understood that because it's a directive from leadership,
16 Swirnow and Rubin, that Mr. Kaplan would report it to
17 Mr. Swirnow; correct?
18 A.  I did expect that.
19 Q.  And it's fair to say that whatever Mr. Swirnow learns about
20 things like this, he would tell Mr. Rubin; right?
21         MR. STEER:  Objection.
22         THE COURT:  He can testify to what he would understand
23 from the language NYU conducts business.
24 A.  I don't know.
25 Q.  Now, Mr. Rubin and Mr. Swirnow work at One Park; right?

1  A.  Yes.
2  Q.  And that's true even if there is no merit to the actual
3  complaint of discrimination; correct?
4  A.  Can you please rephrase the question.
5  Q.  It's unlawful to retaliate against someone, even if the
6  complaint about discrimination ultimately has no merit;
7  correct?
8  A.  It is unlawful to retaliate against a person.
9  Q.  Even if it has no merit; correct?
10           MR. STEER:  Objection, your Honor.
11           THE COURT:  Overruled.
12 A.  Correct.
13 Q.  And you knew that; right?
14 A.  Uh-huh.  Yes.
15 Q.  And so, the only way to have Dr. Edelman terminated was to
16 have a valid reason; correct?
17 A.  I don't know.
18 Q.  In your email from November 2020 in Plaintiff's Exhibit 86
19 is a compilation of the valid reasons to terminate Dr. Edelman;
20 correct?
21 A.  I don't know.
22           MR. KATAEV:  I'd like to offer Plaintiff's Exhibit 79.
23 I don't believe it's been admitted.
24           THE COURT:  Any objection to 79?
25           MR. STEER:  No objection, your Honor.

1  before immediately forwarding it to leadership was a breach of
2  that protocol; correct?
3            MR. STEER:  Objection, your Honor.
4            THE COURT:  Sustained.
5  Q.  You understood that Dr. Edelman's complaint had really
6  nothing to do with office space; correct?
7  A.  Correct.
8  Q.  Her complaint was about the way that you spoke to her;
9  right?
10 A.  Correct.
11 Q.  And you were upset about the fact that she complained and
12 you wanted her gone; correct?
13 A.  I was bothered by it.
14           MR. KATAEV:  Can I have one or two minutes, your
15 Honor?  I may be done.
16 Q.  Isn't it true that during your meeting with Dr. Edelman in
17 September of '19 that you called her a bitch under your breath?
18 A.  No.
19 Q.  But how can you say that if you repeatedly testified that
20 you don't recall what was said between the two of you?
21 A.  I don't recall testifying that.  And I did not call her a
22 bitch during the meeting at any point.
23 Q.  You never sent an email like the November 6th, 2020 email
24 before the complaint; correct?
25 A.  Not that I recall.

1  Q.  Now, I know counsel asked you -- withdrawn.
2      Did you ever see Dr. Edelman's full contract?
3  A.  No.
4  Q.  Did you know whether Dr. Edelman's contract had a renewal
5  date?
6           MR. KATAEV:  Objection.
7           THE COURT:  Overruled.
8  A.  I was not familiar with the terms of her contract.
9  Q.  Did you even have access to Dr. Edelman's contract?
10 A.  I did not.
11 Q.  Did you know what the bases were for her for termination,
12 if any?
13 A.  No.
14 Q.  And now, did you buy your time and just wait to find a way
15 to have her contract nonrenewed?
16          MR. KATAEV:  Objection.  Leading.
17          THE COURT:  Overruled.
18 A.  No.
19 Q.  Did you do anything to try to get Dr. Edelman fired?
20 A.  No.
21 Q.  Were you afraid that you were going to lose your job
22 because Dr. Edelman had made a complaint about you?
23          MR. KATAEV:  Objection.  Relevance.
24          THE COURT:  Overruled.
25 A.  No.

1  Q.  Why not?
2  A.  At the time the complaint came in and was reported back to
3  me, when I heard it, I had just thought that the complaint was
4  very inconsistent with my work and performance and behavior
5  history at NYU up until that time, so I didn't think it would
6  weigh negatively against me because it just seemed so far out
7  of what my normal work behavior was and how I communicated with
8  people.
9  Q.  Now, you discussed during your examination by plaintiff's
10 counsel an incident that occurred on September 16, 2019;
11 correct?
12 A.  Yes.
13 Q.  Do you know when Dr. Edelman was advised that her contract
14 would not be renewed?
15 A.  I don't know -- at the time, I didn't know.  I wasn't
16 involved, so I don't know exactly when.  I had heard of it
17 later, much later.
18 Q.  If I represent to you that that occurred on December 1,
19 2020, you have no reason to dispute that; right?
20         MR. KATAEV:  Objection.  Leading.
21         THE COURT:  Overruled.
22 A.  Can you please repeat the question.
23 Q.  Sure.  If I represented to you that there's been evidence
24 in this case that on December 1, 2020, that's the date of a
25 nonrenewal letter that was sent to Dr. Edelman, do you have any