# EXHIBIT F

N7ECede1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DR. SARI EDELMAN,

              Plaintiff,

        v.                              21 Civ. 502 (LJL)

NYU LANGONE HEALTH SYSTEM, *et al.*,

              Defendants.
                                        Trial
------------------------------x
                                        New York, N.Y.
                                        July 14, 2023
                                        8:45 a.m.

Before:

                HON. LEWIS J. LIMAN,

                                        District Judge
                                        -and a Jury-


                    APPEARANCES

MILMAN LABUDA LAW GROUP PLLC
     Attorneys for Plaintiff
BY:  JOSEPH M. LABUDA
     EMANUEL S. KATAEV

TARTER KRINSKY & DROGIN LLP
     Attorneys for Defendants
BY:  RICHARD C. SCHOENSTEIN
     RICHARD L. STEER
     INGRID J. CARDONA

1   A.  Yes.
2   Q.  For what purpose?
3   A.  To keep documentation of things that were either going --
4   that were not, *per se*, going the right way.
5   Q.  And the spreadsheet and the documentation you've compiled,
6   did you do that at anybody's request?
7   A.  Yes.
8           MR. KATAEV:  Objection.  Leading.
9           THE COURT:  Overruled.
10  Q.  Who, if anyone, asked you to do that?
11  A.  Joseph Antonik.
12  Q.  What did he ask you to do?
13  A.  Keep records of anything that happens within the suite.
14  Q.  And when did he ask you to do that?
15  A.  That's always been part of my job.
16  Q.  Did that first happen in 2019?
17  A.  Before 2019 when I first started working for NYU, I kept
18  spreadsheets of all types of complaints.
19  Q.  Let's look at the spreadsheet we have on the screen here.
20  Do you see there's an undated entry at the top?
21  A.  Yes.
22  Q.  Says:  "Dr. Edelman has the tendency of documenting
23  information in a patient's chart, re: inner office issues, she
24  chastises the staff in these messages that become the patient
25  medical records."  Do you see that?

1          MR. KATAEV:  Objection.  Best evidence.
2          THE COURT:  Overruled.
3          MR. KATAEV:  And hearsay.
4          THE COURT:  Overruled.  It's not coming in for the
5  truth of the underlying complaint, but just for the fact that
6  there were complaints.  Go ahead.
7  A.  Can you repeat the question, please.
8  Q.  Sure.  Are you able to assess the volume of complaints you
9  heard about from patients of Dr. Edelman compared to the
10 general volume of other doctors?
11 A.  Yes.
12 Q.  And what is that, how do you assess that?
13 A.  There was a lot more complaints that came from
14 Dr. Edelman's patients compared to the other providers in the
15 practice.
16 Q.  And you've worked with loads of doctors in the course of
17 your career; is that correct?
18 A.  Yes, that's correct.
19 Q.  Some are easy to get along, some are not so easy, some are
20 really rough?
21 A.  Some can be challenging.
22 Q.  Are you able to rank Dr. Edelman on a scale like that from
23 your personal experience?
24         MR. KATAEV:  Objection.
25         THE COURT:  Basis.

(Jury present)

THE COURT:  Counsel, you may inquire.

BY MR. SCHOENSTEIN:

Q.  Ms. Ruiz, you know that log we looked at, you looked at with opposing counsel and then we looked at the log of complaints?

A.  Yes.

Q.  I just want to make sure I'm clear on this.  What, if any, logs like that did you keep related to other doctors?

MR. KATAEV:  Objection.  Cumulative.

THE COURT:  Overruled.

A.  Similar logs.  So again, patient complaints, workflow issues, anything that, for example, if the doctor didn't complete something that needed to be completed, just keeping track of things so that way I had a recollection of what was going on.

Q.  Were there logs in the same format for other doctors in the suite that you kept?

A.  Yes.

MR. KATAEV:  Objection.  Best evidence.

THE COURT:  Overruled.

Q.  The instruction for Mr. Antonik, you mentioned Mr. Antonik told you to keep logs.  Do you recall that?

A.  I started keeping logs just as a manager because it was the best way to keep track of things.

1   Q.  Did he give you any instruction in terms of keeping track?
2   A.  No, not in that instance, no.
3   Q.  Let me ask you, since we mentioned Mr. Antonik, did you
4   work with him on a day-to-day basis?
5   A.  Yes.
6   Q.  And how was he to get along with?
7   A.  Great.
8   Q.  Did he ever do anything you found unprofessional,
9   inappropriate, or demeaning?
10             MR. KATAEV:  Objection.  Relevance.
11             THE COURT:  Overruled.
12  A.  Never.
13  Q.  Did he ever raise his voice at you in a conversation?
14             MR. KATAEV:  Same objection.
15             THE COURT:  Overruled.
16  A.  Never.
17  Q.  Did he ever wave his arms wildly and mutter a curse word
18  under his breath?
19             MR. KATAEV:  Objection.
20             THE COURT:  Overruled.
21  A.  No, Joe was very professional all the time.
22             MR. KATAEV:  Move to strike.
23             THE COURT:  Overruled.
24             MR. SCHOENSTEIN:  Thank you for coming today,
25  Ms. Ruiz.