**EXHIBIT A**

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DR. SARI EDELMAN,

                Plaintiff,

          v.                        21 Civ. 502 (LJL)

NYU LANGONE HEALTH SYSTEM, et
al.,

                Defendants.                     Trial
------------------------------x
                                    New York, N.Y.
                                    July 18, 2023
                                    9:00 a.m.
Before:

                    HON. LEWIS J. LIMAN,

                                    District Judge
                                    -and a Jury-


                         APPEARANCES

MILMAN LABUDA LAW GROUP PLLC
     Attorneys for Plaintiff
BY:  JOSEPH M. LABUDA
     EMANUEL S. KATAEV

TARTER KRINSKY & DROGIN LLP
     Attorneys for Defendants
BY:  RICHARD C. SCHOENSTEIN
     RICHARD L. STEER
     INGRID J. CARDONA
```

1   patients.  I think there were patients from the x-ray tech,
2   which would have come up in the emails because I received those
3   emails from the x-ray techs, but there were other cases which I
4   think were -- that I provided as exhibits to counsel that were
5   not included in the email, as swell.
6   Q.  And Mr. Antonik also sent you emails about patients;
7   correct?
8   A.  So as I testified yesterday, I was given two or three days
9   to prepare an email in November 2020 reviewing specific
10  concerns and specific patient problems.  That was the point
11  that I reached out to the office nurse, as well as to the suite
12  manager, as well as to Joe Antonik so that I could obtain the
13  records that I believe that they had accumulated over the past
14  few years regarding patient problems.
15          MR. KATAEV:  Your Honor, pages 18 to 19, line 22
16  through line 5 on the next page.
17          MR. SCHOENSTEIN:  Objection.  Improper.
18          THE COURT:  Sustained.
19  Q.  So the answer is Mr. Antonik did email you patient names;
20  correct?
21  A.  I requested a -- the answer is that I requested specific
22  records of previous problems that had been documented that he
23  would have access to and that I believe that had been recorded
24  by the person preceding him, Alicia DiLavore, who was the site
25  manager before Joe Antonik came on site.

A.   As I said, I was given only two days, and I'm sure at the end of patient care on Friday is when I was desperately trying to compile the best records that I could.  So that was all happening on Friday afternoon and I was only given, to my recollection, about two days.

Q.   Your email was preordained, wasn't it?

          MR. SCHOENSTEIN:  Objection.

          THE COURT:  Overruled.

A.   My email was an attempt to objectify something I had spoken to David Kaplan about previously.  So I don't know what "preordained" means exactly, but it was not -- it was establishing something that -- based upon my experience in the office over the preceding two or three years.

Q.   You knew, Dr. Porges, that you were going to send this email before you ever got any email from Mr. Antonik; correct?

A.   As I said, I was asked two or three days before to prepare an email.

Q.   And you coordinated with Mr. Antonik and Mr. Kaplan to present these issues to Mr. Swirnow and Mr. Rubin; correct?

A.   I would say I coordinated with Mr. Kaplan.  I would say that mister -- I asked Mr. Antonik to assist me.

Q.   Mr. Kaplan is not listed on these emails to you, is he?

A.   Correct, but he is the one who asked me to prepare the email before he met with Andrew Rubin and Josh Swirnow.

Q.   Based on these emails, it's fair to say that you would not

1        (Jury not present)

2        THE COURT:  All right.  Be seated.

3        I take it defendants have a motion.

4        MR. SCHOENSTEIN:  Yes, your Honor.

5        THE COURT:  Mr. Schoenstein.

6        MR. SCHOENSTEIN:  Your Honor, defendants move for a
7   directed verdict on pretty much the entirety of the case for
8   the record.  I'm going to go issue by issue for the record so
9   we have it down.

10       The Court is familiar with the standards for a
11  directed verdict motion, as set forth in *Casmento v. Volmar*
12  *Construction*, 2022 WL 15773966.  In this case, under Rule 50,
13  directed verdict is appropriate because the evidence in favor
14  of movant is so overwhelming that reasonable and fair-minded
15  persons could not arrive at a verdict against it.

16       Let me start with the parties.

17       Of the corporate parties, the only correct party here
18  is NYU Grossman School of Medicine.  That is the employer of
19  plaintiff as it is currently known.  None of those other
20  entities employ her.  There is no evidence of any involvement
21  of any of them, other than she read their names in some of the
22  documents.  And that's not evidence of what any of them did.
23  They're not needed for the case.  NYU Grossman School of
24  Medicine is a division of NYU itself, so we don't need any of
25  these other corporations.  They confuse and confound the jury.

1  They should all be eliminated.
2              THE COURT:  And I take it that if a verdict was
3  returned against NYU Grossman School of Medicine -- is that a
4  legal entity that could satisfy a judgment?
5              MR. SCHOENSTEIN:  That is a division of NYU itself,
6  which is a legal entity, and there is zero question about
7  judgment satisfaction in this case, your Honor.  Zero.  I mean
8  hopefully there won't be one, but if there was.
9              THE COURT:  OK.
10             MR. SCHOENSTEIN:  Now, the Equal Pay Act claim, your
11 Honor, has not been substantiated.
12             First of all, she was not doing a substantial -- a job
13 with substantially equal skill, effort and responsibility of
14 the comparators.  She was below all three of them in
15 productivity.  Two of them, Goldberg and Porges, had different
16 jobs and responsibilities.  Modi was much more productive.  She
17 was not doing substantially equal work, which is the second
18 factor, because her RVUs were substantially less than the
19 others.  But really where this case turns on the Equal Pay Act
20 is the affirmative defense of a factor other than sex.
21             Respectfully, your Honor, there is no evidence that
22 sex played any role in this, so the only factors that went into
23 a determination of the pay were factors other than sex, and no
24 reasonable juror could disagree about that.  The evidence is
25 uniform that salary setters considered financial circumstances;

1  experience; reputation; business plans, where they had them;
2  compensation needs, where they were advanced by the applicants;
3  etc.  Those are factors other than sex, and no other jury -- no
4  reasonable jury could decide otherwise.
5         Separately, your Honor, the willfulness part of the
6  Equal Pay Act must be dismissed.  I cite *McLaughlin v. Richland*
7  *Shoe*, 486 U.S. 128.  Willfulness depends on a finding that the
8  employer either knew or showed reckless disregard for the
9  matter of whether its conduct was prohibited by the statute.
10 There is zero evidence of disregard by any of the defendants.
11 In fact, the evidence is that they cleared salaries with legal.
12 They cleared salaries with HR.  They did outside surveys of
13 salary, both to benchmark and to check gender disparity.  There
14 is no evidence that anybody intentionally ignored or willfully
15 ignored law.  And the willfulness part should be dropped even
16 if you leave in the Equal Pay Act claims.
17         Now, your Honor asked yesterday why should you do this
18 now instead of after the jury decides, and the answer is
19 simple:  Prejudice.  It is prejudicial to have claims go to the
20 jury that are not supported by the evidence.  They may consider
21 them in rendering verdicts on the other parts of the case.  It
22 makes them more likely to find discrimination if they're
23 thinking about equal pay than if the equal pay part is taken
24 out.  So it needs to be addressed now.
25         It will also shorten our closing arguments

1    considerably.  But that's not really a factor.  The fact is the
2    prejudice.  It increases the chance, your Honor, of a
3    compromised verdict if we leave in the case claims that don't
4    belong there.  If we leave stuff like willfulness that doesn't
5    belong there, it increases the possibility that the jury will
6    compromise on something in the middle, when the far end of the
7    spectrum has no support whatsoever and should not go to the
8    jury.
9             I want to turn to retaliation.
10            THE COURT:  I suppose that argument turns upon me
11   finding that there is some part of the plaintiff's case that
12   would survive a renewed motion.
13            MR. SCHOENSTEIN:  Oh, yes.
14            THE COURT:  If there's not, then even a compromise
15   verdict wouldn't stand.
16            MR. SCHOENSTEIN:  Well, that's true, your Honor.
17   That's true.
18            Retaliation, your Honor.
19            There was no protected activity, and I say that
20   because the complaints here were about office space, not about
21   discrimination.  I'm going to cite a case called *Robinson v.*
22   *DeNiro*, recently decided, on May 25, 2023 --
23            THE COURT:  I'm aware of it.
24            MR. SCHOENSTEIN:  -- by a very good judge.
25            You will see at pages 90 to 91 of your decision, your

1  Honor, you addressed that buzz words like "harassment" and
2  "toxic work environment" do not establish protected activity.
3         Now, remember, plaintiff's communications never said
4  anything about anyone calling her a bitch.  Her communications
5  were that she felt slightly intimidated because a tall guy came
6  into her office and waved his arms.  Those were not complaints
7  about discrimination, fairly read.  They were not understood by
8  NYU to be complaints about discrimination.  There is no
9  testimony that NYU regarded those as actual discrimination, so
10 it was not protected activity on the part, which is a predicate
11 for the retaliation claim.
12        Secondly, it did not cause an adverse employment
13 action.  All iterations of retaliation claims, be they Title
14 VII, state law or city law, require proof of causation.  There
15 is no such proof in this case.  Temporally, it's not close.
16 The allegations, the complaints end in November of 2020, 14
17 months -- well, at least 12 months -- before the alleged
18 adverse employment actions.  And the testimony uniformly --
19 every single witness -- was that the prior complaints about
20 office space had nothing to do with the decision to nonrenew
21 the contract, your Honor.
22        The decision was made, agree with it or not, based on
23 the assessment of her clinical practice.  So retaliation should
24 be dismissed against everybody, but let me also break it down
25 by defendant, because there are individual defendants here, and

1 they do not belong in the case.

2 I should add, by the way, that all of the arguments on
3 Equal Pay Act are even stronger as against the individual
4 defendants, Mr. Rubin and Mr. Swirnow, that they should be
5 taken out of the Equal Pay Act claims and the willfulness
6 claims whether or not you take out the others.

7 But on retaliation, Antonik didn't do anything to
8 retaliate. He was asked to put forward some emails, and he
9 did. He actually took notes from another employee, Ms. Ruiz,
10 the most credible witness I've ever seen, and gave them to
11 somebody else, as requested. That's not retaliation.

12 Mr. Kaplan, he didn't do anything. He said stop, put
13 it in writing and send it to the people who make these
14 decisions. If that is retaliation, we are going down a really
15 bad path.

16 Mr. Swirnow didn't do anything. He was involved in
17 discussions, but he didn't take an action or make a decision or
18 do anything that would be retaliation.

19 And Mr. Rubin, although he was the ultimate
20 decision-maker, he was the most removed from the complaints
21 that were supposedly being retaliated against. And his
22 testimony is unimpeachable that he didn't take any of the prior
23 complaints into consideration. He was considering only the
24 clinical factors, and you can't have a retaliation claim
25 against Mr. Rubin.

1          THE COURT: Could you on a cat's-paw-type theory?  I
2     mean assume that there is evidence that Dr. Porges was aware of
3     the complaint and assume that there's evidence that Dr. Porges
4     was motivated by some animus to the plaintiff and that
5     Mr. Rubin was manipulated.  Would that support a claim against
6     him or just against NYU?
7          MR. SCHOENSTEIN: I think just against NYU.  If
8     Mr. Rubin is manipulated by others that he is considering in
9     good faith, I don't think there's any claim against Mr. Rubin.
10    I think he would have to be out.  And the evidence is just
11    overwhelming that he was basing his decision, in good faith, on
12    what he was told by the people he relies upon at NYU.
13         Mr. Steer's handing me a note about cat's-paw.  Of
14    course, there is no evidence of animus by Dr. Porges, but I
15    know your Honor was giving me a hypothetical.
16         So let me turn to what's left in the case, which is
17    the discrimination claim itself, which on summary judgment has
18    been limited to the issue of sexist remarks.  That is the issue
19    that brings us a case on discrimination.  And your Honor here,
20    too, there is no evidence sufficient to have a discrimination
21    claim.
22         Let me start with "smile," "fake it till you make it"
23    and "calm down."  Those are not gender-specific comments, and I
24    cite *Cadet-Legros v. N.Y. Univ. Hosp. Ctr.*, 135 A.D.3d 196,
25    from the First Department.  Generic terms like "tirade" and "a

1  leopard does not change its spots" were not racially coded
2  language in the context of that case, and "smile" is not
3  racially coded in this case.  I cite for your Honor also
4  *Marseille v. Mount Sinai Hosp.*, 2022 WL 1470098.  In that it
5  was the term "aggressive."  It was a race-neutral term it would
6  not support.  Telling somebody to smile is not discrimination.
7       As I'm going to say to the jury tomorrow, if I have
8  to, we should all smile more.
9       Now, that leaves the alleged "bitch" comment.
10       THE COURT:  Just refresh me.  "Smile" and "fake it
11  till you make it," were these Rubin and --
12       MR. SCHOENSTEIN:  Smile --
13       THE COURT:  -- presence?
14       What's the evidence?
15       MR. SCHOENSTEIN:  Yes.  The evidence is that there was
16  a meeting in 2017, where Dr. Edelman's issues with her staff
17  first came to the attention, and she went in to see Mr. Rubin
18  and Mr. Swirnow.  And she testifies -- and no one else really
19  confirmed or expressly denied it -- that Mr. Rubin suggested
20  she smile and that she fake it till she makes it.  And
21  Mr. Rubin did not recall saying that, but --
22       THE COURT:  I remember his testimony.
23       MR. SCHOENSTEIN:  The "calm down" comment is the only
24  comment attributed to Mr. Kaplan.  That's his conversation with
25  her in 2020.  She says he called her doctor and told her to

1  calm down and that that somehow was discriminatory.

2  So if we take out all of those, we are left with the
3  allegation that Mr. Antonik muttered the word "bitch," not that
4  he called her a bitch, not that he yelled bitch at her but that
5  he muttered it.  As your Honor knows, the laws do not impose a
6  general civility code.  Petty slights are not enough to
7  substantiate a discrimination claim.  I point again to the
8  *Robinson* case, at page 115, and also *Williams v. N.Y. City*
9  *Hous. Auth.*, 61 A.D.3d 62, another First Department case, under
10 the New York City law, which your Honor mentioned yesterday.
11 And it's "petty slights and trivial inconveniences" are not
12 enough to sustain a discrimination count even under the city
13 claim.

14 Similarly, stray remarks are not enough.  I cite for
15 the Court *Fruchtman v. City of N.Y.*, 129 A.D.3d 500.  "Stray
16 derogatory remarks, without more," do not constitute evidence
17 of discrimination; and *Harris v. Forklift Systems*, 510 U.S. 17,
18 "mere utterance of an...epithet which engenders offensive
19 feelings in an employee does not sufficiently affect conditions
20 of employment to implicate Title VII."  So the Supreme Court
21 case is a Title VII case.  Title VII claims should go, but also
22 the city claims.

23 THE COURT:  There is no Title VII discrimination
24 claim.  It's only the city claim.

25 MR. SCHOENSTEIN:  Oh, you're right.  Fair enough.

1                    Also, your Honor, with respect to the 2017 comments,
2     they would be time-barred, right?  Because the complaint wasn't
3     filed until January of 2021, so none of the 2017 remarks could
4     come in.
5                    THE COURT:  Does that include the "calm down" from Mr.
6     Kaplan?
7                    MR. SCHOENSTEIN:  No.  "Calm down" from Mr. Kaplan is
8     2020.  The 2020 remarks are Mr. Kaplan saying, "Calm down,
9     Doctor," or "Doctor, calm down," and Mr. Antonik allegedly
10    muttering the word "bitch."
11                   Let me go here again for the Court by individual
12    defendant, because all four defendants are named on this claim.
13                   Mr. Swirnow, there's no proof that he said anything
14    ever at any time that was considered discriminatory, in 2017,
15    2020, or ever.  So he's out.
16                   Mr. Kaplan simply said "calm down," allegedly, in a
17    conversation where he was very polite and left immediately when
18    he was requested to do so by plaintiff.  So he has to be out.
19                   Mr. Rubin said only, in 2017, allegedly, "smile more"
20    and "fake it till you make it."  Those are out by statute of
21    limitations.  They are also out because they are not sufficient
22    to set forth a discrimination claim.
23                   That leaves Mr. Antonik, and the sole basis, the only
24    basis is this claim that he muttered the word "bitch."  And I
25    know your Honor will not take out that part of the case simply

1   because it's not an allegation that was made anytime while
2   plaintiff was employed by NYU or in the complaint or in the
3   amended complaint or in the second amended complaint.  That's
4   for argument to the jury.  But existing alone, that one-word
5   muttering cannot support a discrimination claim under any of
6   the laws at issue in this case.
7            Finally, your Honor, I turn to damages.
8            Whether or not you leave any claims in the case will
9   affect this, but let me address a few specific things.
10           Plaintiffs are still claiming back pay and front pay.
11  There is no back pay proof in the case.  There's no loss of
12  revenue.  She didn't go a day unemployed or miss a check.  So
13  they have only front pay, and the front pay, as I understand
14  it, is based on retirement benefits.  And I'll say to the
15  plaintiff the same thing that I've been saying to all of our
16  witnesses:  Where are the documents?
17           There's no proof of any retirement benefits that she
18  had or lost.  There's no documentary proof that she doesn't get
19  retirement benefits now.  It is very short, unspecific
20  testimony by her, so front pay should be out.
21           The pain and suffering claim was limited to $50,000 in
22  the pretrial submission.  Suddenly, in the amended disclosures
23  we got the other night, it had a $250,000 number.  They're not
24  going to give the jury a number, but for the record, that
25  portion of their case must be limited to the 50,000 that was in

1   their pretrial submission.

2   And that leaves us, your Honor, with punitive damages.

3   Respectfully, no jury could award punitive damages on
4   this record.  There is no evidence of the type of gross
5   behavior or conduct that willfully or wantonly causes harm to
6   another.  They don't approach meeting the standard of punitive
7   damages, and it should be removed from the charge if any of
8   these claims remain, again, so that there's no risk of a
9   compromise verdict, so there's no risk of the jury saying,
10  well, we won't give her punitive damages, but we'll give her
11  some compensatory damages.  It's prejudicial to go forward
12  without an evidentiary basis.

13  Thank you, your Honor.

14  THE COURT:  Thank you.

15  All right.  I'll hear from the plaintiff responses
16  with respect to anything that the plaintiff wants to respond to
17  but, in particular, why any corporate defendant, if anybody
18  stays in the case, should stay in other than the NYU Grossman
19  School of Medicine; why willfulness should stay in the case;
20  why any of the individuals should stay in the case; and why, in
21  particular, any of the individuals with respect to the
22  discrimination claim, other than perhaps Antonik; and then
23  finally, why I should instruct on punitive damages.

24  MR. KATAEV:  I'll address each of them *seriatim*, your
25  Honor.

1     is at issue, and I think --

2              THE COURT:  But that conduct wouldn't support a claim
3     of discrimination.  It's not gender discrimination for somebody
4     to be intimidating, whether that person is a male or a female.
5     Put another way, the fact that somebody happens to have the
6     genetic features of a male and the physical features of a male
7     doesn't make the threatening activity to be gender
8     discrimination.

9              MR. KATAEV:  I respectfully disagree, your Honor.  I
10    think there was testimony on this point, that Mr. Antonik would
11    not have acted that way if it was a male doctor.  And I believe
12    Dr. Edelman testified that were it not for the fact that she
13    was a female, he would have never spoken to her that way.

14             THE COURT:  You're not going to support a verdict on
15    that basis.

16             MR. KATAEV:  That brings me to my second point on this
17    issue, your Honor, and you have to keep in mind that Ms. Pacina
18    wrote this while she was speaking to Dr. Edelman, and she did
19    not write everything down.  And there's this factual issue
20    about the March 13 date and no original date being set there.
21    So there's some potential inference that things could have been
22    edited.

23             Dr. Edelman clearly testified that Mr. Antonik
24    muttered the word "bitch" during this confrontation.  Coupled
25    with this comment and his conduct, there could be a finding

```
 1              THE COURT:  Good afternoon.
 2              The Court is prepared to give you its ruling on
 3   defendants' motions for judgment as a matter of law.  The Court
 4   assumes familiarity with the applicable legal principles as set
 5   forth in Casmento v. Volmar Construction, Inc., 2022 WL
 6   15773966 (S.D.N.Y. Oct. 28, 2022).
 7              The Court grants judgment as a matter of law to
 8   defendants on the issue of willfulness under the Equal Pay Act
 9   and New York Equal Pay Act claims.  I am convinced by
10   plaintiff's letter that if there was evidence to support
11   willfulness, it should go to the jury.  However, the evidence
12   in the record is insufficient for a reasonable jury to find
13   that defendants knew that they were violating the law or showed
14   reckless disregard for whether they were violating the law.
15   Negligent conduct is not willful conduct.  Although Rubin
16   testified that he did not know the requirements of the Equal
17   Pay Act, he also testified that he relied on the HR and legal
18   departments, which reviewed all contracts before they were
19   permitted to be signed and go into effect, and that all
20   contracts were benchmarked and surveyed for gender equality.
21              The Court grants judgment as a matter of law for
22   Kaplan on all claims of retaliation.  There is insufficient
23   evidence in the record for a reasonable jury to conclude that
24   Kaplan had any retaliatory intent or that he had any
25   involvement in any adverse action.
```

1    The Court also grants judgment as a matter of law for
2    defendants Kaplan, Rubin and Swirnow on the discrimination
3    claims.  The evidence shows, at most, that Rubin stated to
4    plaintiff, in Swirnow's presence, to "smile more" and "fake it
5    till you make it" during a meeting to counsel her on
6    interpersonal relations, but those claims are barred on statute
7    of limitations grounds, and the continuing violation doctrine
8    does not apply.  In addition, at most, they constitute petty
9    slights.  In addition, plaintiff does not dispute an award of
10   judgment for Swirnow.  The statement attributed to Kaplan that,
11   when plaintiff got upset he said "calm down" is, at most, a
12   mere petty slight and petty inconvenience, and keeping the
13   claim in would otherwise turn the city human rights law into a
14   civility code.  There is no evidence from which a jury could
15   find that it was discriminatory.
16       On damages, defendants are granted judgment on the
17   claim for punitive damages.  There is no evidence from which a
18   reasonable jury could find that defendants engaged in gross
19   misbehavior or conduct that willfully or wantonly caused hurt
20   to another or engaged in willful or wanton negligence or
21   reckless conduct or consciously disregarded the rights of the
22   plaintiff.
23       The jury will not be charged on back pay, as agreed by
24   the plaintiff.
25       The charge will be amended to reflect these