# EXHIBIT M

**CONFIDENTIAL**

ARTHRITIS AND RHEUMATISM ASSOCIATES, PL

EMPLOYMENT AGREEMENT

THIS AGREEMENT is made this day __16 February__ 2021, by and between ARTHRITIS & RHEUMATISM ASSOCIATES, PL., hereinafter referred to as EMPLOYER, and Sari Edelman DO hereinafter referred to as EMPLOYEE.

WITNESSETH:

WHEREAS: EMPLOYER requires the leadership and expertise of trained and skilled physicians to provide medical services to meet the health care needs of the residents of its community and service area; and,

WHEREAS, EMPLOYEE has applied to the Florida Board of Osteopathic Medicine to become duly licensed to practice medicine in the State of Florida and will apply for and once received maintain hospital privileges at the same hospitals as the partners of Employer and upon procurement of the Florida license desires to provide medical care and services in EMPLOYEE'S specialty of Rheumatology and,

WHEREAS, EMPLOYER and EMPLOYEE desire to enter into this Agreement on the terms and conditions set forth herein,

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties do understand and agree as follows:

1. COMMENCEMENT OF WORK: Subject to the provisions for termination as set forth in this Agreement and the conditions set forth below, the term of this Agreement shall be the later of date of the issuance of Florida medical license to Employee and confirmation that Employee is covered under the Employer's Malpractice Insurance or TBD_____2021 , or as otherwise agreed between the parties ("Effective Date"). This Agreement shall continue for a total period of two (2) years from the Effective Date or until terminated pursuant hereto.

The effectiveness of this Agreement is expressly conditioned on (i) Employee moving to Pinellas County, Florida; (ii) the Employee obtaining and maintaining an unrestricted license to practice medicine in the State of Florida; (iii) the Employee obtaining medical staff and/or other appropriate clinical privileges at all hospitals, surgery centers and other health care facilities required by the Employer, (iv) the Employee's successful completion of credentialing with all of the Employer's payors.

The rights, responsibilities, and duties of the parties to this Agreement, and the covenants and agreements contained in this Agreement, shall continue to bind the parties, shall continue in full force and effect until each and every obligation of the parties pursuant to this Agreement (and any document or agreement incorporated herein by reference) shall have been fully performed, and shall be binding upon the Employer's successors and assigns of the parties.

Plaintiff's Exhibit 88                                                                                      P1

2. COMMITMENT OF EFFORT: EMPLOYEE accepts employment with EMPLOYER on the terms and conditions herein set forth and agrees during the period of employment, to devote full business time and attention to the rendition of professional medical and surgical services on behalf of EMPLOYER and to the furtherance of the best interests of EMPLOYER. EMPLOYEE, in the rendition of such professional medical and surgical services and in all aspects of this employment, agrees to comply with such reasonable policies, and regulations of EMPLOYER as are from time-to-time established by the Executive Committee of the EMPLOYER (and uniformly applied to all professional employees of EMPLOYER), the standards of medical practice then prevailing in Pinellas County, Florida, and will carry out Employee's duties as a physician to the best of the professional ability of EMPLOYEE. EMPLOYEE agrees to carry out any duties that EMPLOYER may give EMPLOYEE, provided that such duties are consistent with Employee's standing as a physician specializing in Rheumatology and not in conflict with applicable standards of medical practice in Pinellas County, Florida. This does not preclude the EMPLOYEE from participating in any non-substantial (not requiring any major time commitments) business endeavors.

3. EXTENT OF SERVICES: During the period of employment by EMPLOYER, EMPLOYEE shall not undertake any professional medical and surgical business except for the benefit of EMPLOYER, unless EMPLOYER shall consent thereto.

4. INDEMNITY: As a material inducement to EMPLOYER'S initial and continuing employment of EMPLOYEE, except as otherwise covered by insurance, EMPLOYEE hereby agrees to indemnify and hold EMPLOYER harmless from any loss, costs, settlements, judgments, damages, or other expenses, including reasonable attorneys 'fees, actually incurred by EMPLOYER as a result of a claim or claims (causes of actions, disputes, or the like) against EMPLOYER by any third party arising out of EMPLOYEE'S acts or omissions in performing services on behalf of EMPLOYER except to the extent this provision would negate EMPLOYEE's malpractice insurance coverage (whether carried by Employer for Employee or otherwise). This covenant shall survive the termination of this Agreement. EMPLOYER hereby agrees to indemnify and hold EMPLOYEE harmless from any loss, costs, settlements, judgments, damages, or other expenses, including reasonable attorneys 'fees, incurred by EMPLOYEE as a result of a dispute between EMPLOYER and any third parties, or EMPLOYEE and any third parties, arising out of the acts or omissions of other employees or agents of EMPLOYER (and excluding and the acts and/or omissions of Employee while performing services on behalf of Employer). This covenant shall survive the termination of this Agreement. These covenants shall be construed as an agreement independent of any other provision of this agreement, and the existence of any claims or cause of action by one party against the other whether predicated upon this agreement or otherwise, shall not constitute a defense to the enforcement of these covenants.

5. "On CALL": EMPLOYEE agrees to generally share equally with other physician employees of EMPLOYER after-hour call responsibility. EMPLOYEE will also share hospital call service in respect of other physician employees of EMPLOYER and those in EMPLOYER's "call group". Inequity in equal call may exist because of differing lengths of vacation and continuing medical education leave involving all of the physicians in the call group, but Employer shall take reasonable steps to avoid any such inequities when scheduling the ON-Call services amongst all of Employer's physicians.

Case 1:21-cv-00502-LJL   Document 269-13   Filed 08/23/23   Page 4 of 14
CONFIDENTIAL

6. EMPLOYER OWNERSHIP: The EMPLOYEE/EMPLOYER relationship between EMPLOYER and EMPLOYEE in this Agreement is an exchange of professional effort by EMPLOYEE on behalf of EMPLOYER of the following stated salary and bonus; therefore, all fees collected and that are receivable for any medically related services rendered by the employee are the property of the EMPLOYER.

7. MEDICAL AND FINANCIAL RECORDS: All medical and financial records pertaining to patients treated by EMPLOYEE within the scope of EMPLOYEE'S employment including, but not limited to, charts, x-rays, medical reports, fees, billings, and payment of fees, and all personnel records pertaining to compensation and expenses of EMPLOYEE within the scope of EMPLOYEE'S employment, shall at all times be the property of EMPLOYER, EMPLOYER being the records owner thereof as defined in Florida Statute 456.057. Notwithstanding the foregoing, Employer shall make those records available to Employee, subject to federal and Florida regulations governing medical records, for litigation or pre litigation claims or proceedings and/or regulatory and/or licensing matters ("Proceedings") that accrued while Employee was employed by Employer, whether or not such Proceedings are pending following the expiration of the term of this Agreement.

8. COLLECTION ASSISTANCE: EMPLOYEE will provide thorough documentation regarding the medical services EMPLOYEE has provided in an expedient manor so that fees can be collected efficiently. EMPLOYEE will also provide in an expedient manner any additional documentation requested by patient's insurance company or EMPLOYER.

In connection with the productivity compensation due the EMPLOYEE hereunder, the EMPLOYEE shall assist the EMPLOYER in collecting its billings in all reasonable ways (typical of a physician); however, the primary responsibility for the collection of such billings shall be that of the EMPLOYER. Notwithstanding the preceding sentence, the EMPLOYER shall not be liable to the EMPLOYEE for any compensation under this Agreement to the extent that the billings for the EMPLOYEE'S services are declared uncollectible by EMPLOYER after its reasonable and diligent efforts to collect the same. It shall be the EMPLOYER'S sole determination as to what collection procedures should be followed, including the referral of delinquent billings to collection agencies and attorneys; and the EMPLOYER shall have the sole discretion in determining when such bills are uncollectible and determining when collection efforts should be terminated.

9. PATIENT RECORDS: All physical patient records shall remain on the premises and in the possession of EMPLOYER (subject to Employee's right to access the digital files off premises when office is closed). All medical records are the property of EMPLOYER. Should any patient desire to have their records transferred to any doctor, the patient shall notify in writing specifically stating to whom and where their records are to be sent. EMPLOYER will comply promptly with that written request. EMPLOYER will transfer to EMPLOYEE an adequate number of patient records to assist EMPLOYEE in securing board certification. Employee agrees to comply with the requirements of the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191 (commonly known as "HIPAA") and the regulations promulgated thereunder with respect to the privacy and security of Employer's medical and financial records.

3

Plaintiff's Exhibit 88                                                                                                         P3

10. PATIENTS: EMPLOYER shall have the authority to determine who will be accepted as patients of EMPLOYER. To the extent possible, EMPLOYER shall have the authority to designate, or, to establish a procedure for designating, which employee shall be required to perform services for EMPLOYER. An authorized officer of EMPLOYER shall meet with EMPLOYEE from time to time with respect to the establishment of schedules for the performance of services to patients of the EMPLOYER. EMPLOYEE shall have completed all approved medical educational programs in respect of EMPLOYEE'S services hereby contracted.

11. PROFESSIONAL PROCEDURES: EMPLOYER reserves the right to determine policies and procedures involving office operations and patient care, but those policies and procedures must be equal to or exceed accepted standards of medical care.

12. FEES: Unless determined by a proper governmental agency, or, any other third party whose determination shall be binding upon EMPLOYER, EMPLOYER (which may be in conjunction with any hospital with which EMPLOYER is associated) shall have exclusive authority to determine the fees, or, a procedure for establishing the fees, to be charged patients of EMPLOYER, and all sums paid by any patient of EMPLOYER in the way of fees, compensation or otherwise for services rendered by EMPLOYEE shall be and remain the property of EMPLOYER and shall be included in EMPLOYER'S income.

13. ASSIGNMENTS: EMPLOYEE may neither assign nor delegate any of EMPLOYERS'S rights or obligations in this Agreement without first obtaining the written consent of EMPLOYER. Any and all rights of the EMPLOYER under this Agreement may be assigned by EMPLOYER and the restrictive covenants set forth herein may be enforced by the EMPLOYER'S successors and/or assigns.

14. COMPENSATION: EMPLOYER will compensate EMPLOYEE for EMPLOYEE's professional rheumatology services a first year's salary of THREE HUNDRED THOUSAND DOLLARS ($300,000). The second year salary will be THREE HUNDRED TWENTY-FIVE THOUSAND DOLLARS (325,000).  The salary will be paid pro rata in equal semi-monthly with appropriate federal withholding taxes deducted.  The employee will be provided, upon acceptance and signing of the contract moving expense allowance in the amount of $25,000.00 (TWENTY-FIVE THOUSAND DOLLARS).  In the event the employee does not complete the first year of employment this allowance shall be repaid in full.

15. BONUS: EMPLOYEE will receive incentive compensation in an amount equal to TWENTY PERCENT (20%) of EMPLOYEE's GROSS COLLECTIONS in excess of 200% of the base salary for the first completed year of employment, and then TWENTY-FIVE (25%) of EMPLOYEE's GROSS COLLECTIONS in excess of the 200% of the base salary for the ensuing completed years of employment covered by this contract multiplied Contract Year of this Agreement starting with EMPLOYEE'S commencement of work measured for the next ensuing twelve months and annually thereafter. Beginning on the Effective Date, each twelve month period shall be considered a "Contract Year."  No bonus shall be paid for partial years of employment.

Such bonus shall be paid annually within sixty (60) days after the close of the Contract Year starting with date of Effective Date. For purposes of this Agreement, the term "Employee's Gross Collections shall mean, with respect to any particular period, the total amount of fee revenues which are received and collected by the EMPLOYER during such period and which are directly attributable to billings for the professional services rendered by the EMPLOYEE <u>less</u> any charge backs or other refunds, recoupments, rebates, or discounts and <u>without consideration</u> of (i) any ancillary services ordered by the EMPLOYEE (including, but not limited to, x-rays, dexa-scans, MRIs, EMGs, DME and therapies), (ii) any services provided by any physician extenders who may be supervised by the EMPLOYEE or (iii) any bonus payments received by the EMPLOYER that are attributable to any shared savings or similar programs of any third party payer (whether government or private). For example, if the gross collections were in the first Contract Year are $700,000, the bonus to EMPLOYEE would be $20,000: (700,000-(300,000 x 2) = $100,000 x 20% = $20,000. If the collections in the second Contract Year are $800,000, the bonus would be $30,000: (800,000-(325,000 x 2) = $150,000 x 20% = $30,000.

EMPLOYER shall provide EMPLOYEE with monthly billing and collection reports within fifteen days of the expiration of the applicable month.

16. VACATION; PAID TIME OFF: EMPLOYEE shall have the right to vacation time or paid time off during which EMPLOYEE shall not be required to provide medical services or coverage on behalf of EMPLOYER. Such total days of vacation time/paid time off shall be TWENTY (20) days during each year of employment, plus all Federal and State Holidays, in accordance with the EMPLOYER'S regular employment practices.

In addition to the above, the EMPLOYEE shall be entitled to sick leave, the same as all other employees (see employee handbook).

In addition to the above, the EMPLOYEE shall be entitled to three (3) non-cumulative (see below) compensated days for continuing education leave per fiscal year of this Agreement. Such paid time off includes typical week work days. All paid time off shall be non-cumulative, being used within the fiscal year applicable, or otherwise deemed abandoned at the expiration of each fiscal year. All paid time off shall require pre-approval by EMPLOYER upon reasonable notice.

17. LIMITATIONS ON AUTHORITY: Unless EMPLOYER shall have given its consent, under no circumstances shall EMPLOYEE have apparent or implied authority to:

a. Pledge the credit of EMPLOYER or any of its employees.

b. Bind EMPLOYER under any contract, agreement, note, mortgage or otherwise.

c. Release or discharge any debt due EMPLOYER unless EMPLOYER has received the full amount thereof.

d. Sell, mortgage, transfer or otherwise dispose of any assets of EMPLOYER.

18 EXPENSES: EMPLOYER will pay for EMPLOYEE in addition to EMPLOYEE'S "ordinary practice expenses" the following: Malpractice insurance will be provided in a minimum amount of or greater than two

hundred fifty thousand dollars ($250,000.00) per occurrence and seven hundred fifty thousand dollars ($750,000.00) in the aggregate Malpractice insurance will be provided in such amounts and in such limits, deductibles and other provisions as the EMPLOYER in its sole discretion shall determine; provided that such malpractice insurance covering EMPLOYEE shall, to the extent available, be in such amount and in such limits and deductibles as the malpractice insurance that the EMPLOYER maintains for its other physician employee(s).

Major medical insurance covering EMPLOYEE is provided by EMPLOYER and will be the same as all other employees of the practice. Additional medical coverage for EMPLOYEE's spouse and EMPLOYEE's children should they exist will be at EMPLOYEE'S expense. EMPLOYEE may opt out of EMPLOYER's plan and in lieu of participating in such plan, EMPLOYER shall pay to EMPLOYEE the premiums that EMPLOYER would have paid for EMPLOYEE's enrollment had EMPLOYEE participated in the benefit plan.

EMPLOYER will pay continuing Medical Education Leave of three (3) days. Expenses for EMPLOYEE to attend continuing medical education are a cost to the EMPLOYEE.

Premiums for the above insurance coverage paid by EMPLOYER are to be at a normal insurable premium rate. Should the premium charged to cover EMPLOYEE be above the normal insurable premium rates, EMPLOYEE will pay the difference between EMPLOYER'S premium rate and the normal premium rate. EMPLOYEE will be enrolled in all applicable insurance programs upon commencement of work by EMPLOYEE although the probationary period of insurance(s) may not have lapsed.

19. AUTOMOBILE INSURANCE: EMPLOYEE will provide EMPLOYER verification at EMPLOYER'S request that EMPLOYEE maintains a minimum automobile liability insurance coverage of $1 00,000/$3 00,000 on any vehicle in which EMPLOYEE may use in transit to perform duties for EMPLOYER. Automobile expense is an expense to the EMPLOYEE.

20. RETIREMENT PROGRAM: EMPLOYEE will be entitled to participate in any retirement program offered by EMPLOYER according to that program's regulations.

21. OWNERSHIP PROPOSAL: EMPLOYER, during the second year of employment will in good faith enter in to discussions with EMPLOYEE and offer EMPLOYEE the opportunity to become a stockholder in EMPLOYER for a price and under terms and conditions as satisfactory to EMPLOYER. The offer will be based on multiple factors including but not limited to past and present production, business development initiative, business acumen and potential benefits to the EMPLOYER the EMPLOYEE brings based on her past business behaviors. It is anticipated that EMPLOYEE would purchase the interest over a five year period beginning with the third Contract Year so that EMPLOYEE would become an equal equity owner with the other equity owners of the EMPLOYER at such time. It is anticipated that the purchase price will be based upon the net book value of the Company (adjusted for accelerated depreciation and excluding accounts receivable existing at the date of purchase). The determination of the value of the Company shall be determined by the certified public accountant for the Company. The equity interests in the Company owned by EMPLOYEE will be subject to transfer restrictions under an Operating Agreement.

**CONFIDENTIAL**

If EMPLOYEE becomes an equity owner of EMPLOYER, on the date the EMPLOYEE becomes an equity owner in EMPLOYER the accounts receivable of EMPLOYER will be determined. Those accounts receivable will be credited to the equity owners who were the owners prior to EMPLOYEE becoming an owner. Those accounts receivable will not be considered as an asset for EMPLOYEE'S purchase price.

Goodwill may be considered an asset of EMPLOYER in respect of EMPLOYEE's purchase price.

22. TERMINATION WITHOUT CAUSE: Either party of this Agreement may elect to terminate this Agreement without cause by notifying the other party in writing of such termination with not less than a sixty (60) days 'notice. Compensation will be the normal monthly-prorated income to the termination date. EMPLOYER shall have the right, in whole and in part, to accelerate date of termination and would then be responsible for paying the compensation outstanding days accelerated.

23. TERMINATION FOR CAUSE: Anything contained in this entire Agreement to the contrary notwithstanding, if EMPLOYEE for any reason ceases to be an active member of the medical profession in good standing and duly licensed or otherwise is no longer legally authorized within the State of Florida to render the same professional service as EMPLOYER, then, in any such event, all employment and relationship of EMPLOYEE with EMPLOYER shall automatically and immediately stand completely severed and terminated.

The following circumstances will be events that are considered additional grounds for termination for cause at the discretion of EMPLOYER:

a. In the event EMPLOYEE shall fail or refuse to comply with the policies, standards and regulations of EMPLOYER, established from time-to-time by EMPLOYER, provided that such policies, standards and regulations are not in conflict herewith and uniformly adopted for all physicians of Employer to abide by; or

b. In the event EMPLOYEE shall fail or refuse to faithfully or diligently perform the provisions of this Agreement or the usual and customary duties of EMPLOYEE's employment; or

c. In the event that demonstrative evidence exists to the satisfaction of EMPLOYER acting reasonably in respect of EMPLOYEE having committed a fraud, being dishonest, or any other act of misconduct in the rendering of professional medical services on behalf of EMPLOYER, or any evidence exists to the satisfaction of EMPLOYER acting reasonably of criminal acts which if resulted in a conviction would be a felony under any applicable law; or

d. In the event of a bona fide determination by EMPLOYER to sell or reduce to cash substantially all of the assets of EMPLOYER, or to distribute EMPLOYER'S assets in liquidation, to discontinue the practice of medicine by EMPLOYER, provided the termination of Employee is likewise applicable to all other similarly situated physicians of Employer; or

e. In the event EMPLOYER after reasonable efforts cannot obtain at standard insurance rates medical malpractice insurance coverage for EMPLOYEE to protect EMPLOYER'S interest with the malpractice

Plaintiff's Exhibit 88

P7

insurer then insuring the other physician employees of EMPLOYER and Employee does not elect to pay the differential for her premium as contemplated in Section 18 above, resulting in the ability to procure and maintain malpractice insurance; or

f. In the event EMPLOYEE fails to obtain and/or maintain staff privileges or fails to maintain staff privileges in good standing in the Employee's service area at substantially all the hospitals where the other physicians of EMPLOYER in the same service area maintain such privileges.

g. In the event EMPLOYEE makes an assignment for the benefit of creditors.

h. If Employee is suspended or prohibited for ten (10) or more days from participation in the Medicare or Medicaid programs or under any material managed care agreement of the Corporation.

EMPLOYER shall give at least ten (10) days notice of a violation of the provision of subparagraphs a and b immediately above. During such period EMPLOYEE may cure such violations, except in instances where, in the sole discretion of EMPLOYER, the failure or refusal, if continued by EMPLOYEE, threatens to affect adversely the business of EMPLOYER or the health or safety of the patients of EMPLOYER.

No prior notice shall otherwise be provided in regard of subparagraphs c, d, e, f, and g immediately set out above respecting EMPLOYER'S termination of EMPLOYEE.

24. POST TERMINATION OBLIGATIONS:

a. Return of Property: The EMPLOYEE agrees that all property, including, without limitation, all equipment owned by Employer, tangible confidential information, documents books, records, reports, notes, contracts, lists, computer disks (and other computer-generated files and data), and copies thereof, created on any medium and furnished to, obtained by, or prepared by the EMPLOYEE in the course of or incident to his employment, belongs to the EMPLOYER and shall be returned promptly to the EMPLOYER upon termination of the Employment period.

b. Cooperation with EMPLOYER: Following any termination of the employment. The EMPLOYEE shall fully cooperate with the EMPLOYER in all matters relating to the winding up of pending work and pending patient matters on behalf of the EMPLOYER and the orderly transfer of work and patient matters to other employees of the EMPLOYER. The EMPLOYEE shall also cooperate in the defense of any action brought against the EMPLOYER that relates in any way to the EMPLOYEE'S acts or omissions (actual or alleged) while employed by the EMPLOYER.

c. Cessation of Payments Upon Certain Breaches: Notwithstanding any other provision hereof, and without limiting any other rights or remedies of the EMPLOYER, if the EMPLOYEE breaches in any material respects any provision hereof which is not cured within 10 days after written notice to the EMPLOYEE, that all of the EMPLOYER'S obligations under this Agreement shall automatically cease; and, without limiting the generality of the foregoing, from and after the occurrence of any such breach, the EMPLOYEE shall have no right to receive from the EMPLOYER any salary, incentive compensation, benefits or other amounts whatsoever.

Plaintiff's Exhibit 88

**P8**

25. DEATH AND DISABILITY: Unless otherwise addressed, the following terms and conditions shall govern the event of the EMPLOYEE'S death or disability:

a. If EMPLOYEE dies during the period of active employment, EMPLOYER shall pay to the estate of EMPLOYEE the compensation that would otherwise be payable to EMPLOYEE up to the end of the month in which EMPLOYEE'S death occurs.

b. If EMPLOYEE is unable to perform EMPLOYEE'S services for a period of not more than fourteen (14) days by reason of illness or incapacity, EMPLOYEE'S compensation shall be continued during such period. Thereafter, the compensation otherwise payable to EMPLOYEE during a continuing period of illness or incapacity shall be terminated . Unless this Agreement is otherwise terminated, EMPLOYEE'S full compensation shall be reinstated upon EMPLOYEE'S return to employment and the discharge of EMPLOYEE'S full duties hereunder. Any periods of absence from work, which are not separated by a return to full-time work for at least three (3) consecutive months, shall be considered one period of disability.

26. TAIL COVERAGE: Should EMPLOYEE cease to be employed by EMPLOYER, EMPLOYEE agrees to carry a "tail" malpractice insurance policy at EMPLOYEE's expense should a "tail" insurance liability occur. Upon the termination of this Agreement, if EMPLOYEE shall not be continuing as an employee of EMPLOYER, to the extent EMPLOYER'S malpractice coverage existing as of the date of termination of this Agreement does not provide continuing professional liability insurance for EMPLOYER and EMPLOYEE relating to claims made following the termination of EMPLOYEE'S employment hereunder for EMPLOYEE'S acts or omissions occurring during the period of employment of EMPLOYEE (so called "Tail Coverage") in an amount at least equal to the amount of coverage then required of all physicians then practicing medicine in a similar specialty as employees of EMPLOYER, EMPLOYEE shall obtain such continuing coverage for the benefit of EMPLOYER and EMPLOYEE. If EMPLOYER'S policy contains Tail Coverage which is less than the amount of coverage provided to EMPLOYEE pursuant to this paragraph prior to termination of employment, then EMPLOYEE shall obtain a policy supplementing EMPLOYER'S policy or pay a supplemental premium to the insurance carrier of EMPLOYER so that the amount of such Tail Coverage will equal the amount of coverage provided to EMPLOYEE pursuant to this paragraph prior to termination of employment. Such insurance shall be in an amount of coverage equal to difference between the coverage provided under EMPLOYER'S existing policy for both of EMPLOYER and EMPLOYEE, if any, and the total amount of coverage then required of all physicians the practicing medicine in a similar specialty as employees of EMPLOYER.

27. CONTINUED INSURANCE COVERAGE AFTER TERMINATION:
EMPLOYEE will be able to retain after termination insurability under any insurance coverages extended by EMPLOYER under COBRA or otherwise  if the policy so allows; however, EMPLOYEE will be responsible for any premiums after termination.

28. RESTRICTIVE COVENANTS: Applies to the following:

Plaintiff's Exhibit 88

a. Non-Competition. Except as set out herein below, EMPLOYEE agrees that during the period that EMPLOYEE is an Employee and for the two (2) years immediately following the date of termination of EMPLOYEE as an employee, whether such termination shall be voluntary or involuntary or with or without cause EMPLOYEE will not, within ten (10) miles from any office of EMPLOYER routinely used by EMPLOYEE in the practice of medicine within the twelve (12) month period prior to the date of termination (i) engage in a business or professional practice competitive with that of EMPLOYER's specialty, or (ii) directly or indirectly become a proprietor, partner, trustee, beneficiary, stockholder, officer, director, employee, agent, licensee or franchisee, or be employed by, or render aid or advice to, any organization that is engaged in, or proposes to engage in a business or professional practice competitive with that of EMPLOYER's specialty. In addition to the foregoing, EMPLOYEE agrees that during such period, EMPLOYEE will not accept "call" nor provide services at any hospitals which are within the restricted area described above.

b. Non-Solicitation. Except as set out herein below, EMPLOYEE further agrees that during EMPLOYEE'S employment with EMPLOYER and for two (2) years immediately following the termination of EMPLOYEE'S employment with EMPLOYER, whether the termination shall be voluntary or involuntary, or with or without cause, or whether the termination is solely due to the expiration of the term of this Agreement, EMPLOYEE will not, in any manner or at any time, solicit or encourage any person, firm, corporation or other business entity who are patients or referral sources of EMPLOYER, an/or other employees of EMPLOYER to change his, her or its professional affiliation or cease doing business with EMPLOYER and/or other employees of EMPLOYER, whether for the benefit of EMPLOYEE or for the benefit of others.

c. Covenants Independent. Each restrictive covenant on the part of EMPLOYEE set forth in this Agreement shall be construed as a covenant independent of any other covenant or provision of this Agreement or any other agreement which EMPLOYER and EMPLOYEE may have, fully performed and not executory, and the existence of any claim or cause of action by EMPLOYEE against EMPLOYER whether predicated upon another covenant or provision of this Agreement or otherwise, shall not constitute a defense to the enforcement by EMPLOYER of any other covenant.

Notwithstanding the above, the EMPLOYER's ability to enforce the restrictive covenants is subject to EMPLOYER'S performance of the covenants, representations, and warranties as set out herein (i.e. payment of compensation, etc.).

d. Divisibility of Covenant Areas and Periods. If any portion of the restrictive covenants contained herein is held to be unreasonable, arbitrary or against public policy, each covenant shall be considered divisible both as to time and, if applicable, geographic area; and each month of the specified period shall be deemed to be a separate period of time and each one-quarter (1/4) mile radius segment of the geographic area shall be deemed to be geographic area, so that the maximum lesser time and geographic area shall remain effective so long as the same is not unreasonable, arbitrary or against public policy.

Plaintiff's Exhibit 88                                                                                         **P10**

e. Injunctive and Equitable Relief. EMPLOYEE and EMPLOYER recognize and expressly agree that the extent of damages to EMPLOYER in the event of a breach by EMPLOYEE of any restrictive covenant set forth herein would be impossible to ascertain and that the remedy at law for any breach will be inadequate to compensate EMPLOYER. Consequently, EMPLOYEE agrees that in the event of a breach of any such covenant, in addition to any other relief to which EMPLOYER may be entitled, EMPLOYER shall be entitled to enforce the covenant by injunctive or other equitable relief ordered by a court of competent jurisdiction.

f. Venue; Court Proceedings. In any action or proceeding by EMPLOYEE relating to or involving the enforcement of the covenant, and any counterclaim, cross claim or other litigation which may be asserted or brought against EMPLOYER, EMPLOYEE and EMPLOYER hereby expressly waive any and all right to a trial by jury with respect to the action, proceeding or other litigation resulting from or involving the enforcement of this Agreement and the restrictive covenant, including, but not limited to, any counterclaim or other actions related or unrelated to the terms and conditions of this Agreement. EMPLOYEE hereby agrees that the venue of any action, proceeding, counterclaim, cross claim, or other litigation relating to, involving, or resulting from the enforcement of the covenants contained herein shall lie exclusively in Pinellas County, Florida. Further, in any action or proceeding by EMPLOYER to obtain a temporary restraining order and/or preliminary injunction to enforce the covenants contained herein, EMPLOYEE hereby agrees that One Thousand Dollars ($1,000) will be an adequate injunction bond in order to obtain the temporary restraining order and/or preliminary injunction. Should a temporary restraining order and/or motion for preliminary injunction be granted in whole or in part and should EMPLOYER be ultimately unsuccessful in obtaining a permanent injunction to enforce the covenant, EMPLOYEE hereby waives any and all rights EMPLOYEE may have against EMPLOYER for any injuries or damages, including consequential damages, sustained by EMPLOYEE and arising directly or indirectly from the issuance of the temporary restraining order and/or preliminary injunction.

g. Option of the Employee. Upon payment to EMPLOYER of the sum of TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00) prior to any violation of any provision set forth in this section titled RESTRICTIVE COVENANT of this Agreement, EMPLOYEE shall be released from the restrictive covenants set forth herein. Payment can be made no later than ten (10) business days following termination of this Employment Agreement. However, the restriction will prevail that EMPLOYEE shall not solicit or attempt to influence any employees of EMPLOYER to terminate employment with EMPLOYER or will not directly solicit any patients of EMPLOYER.

29. FOUNDER'S RIGHTS: Should a dissolution of relationship at any time in the future occur between EMPLOYER and EMPLOYEE, the ownership of the publicly known practice name, legal name, telephone number(s) and ownership of the land and buildings will be retained by EMPLOYER (subject to any rights that Employee may obtain in a shareholder or similar form of partnership agreement, if any). Should any of those assets have been purchased prior to dissolution by EMPLOYEE, then EMPLOYER will repurchase those assets from EMPLOYEE using the same formula as EMPLOYEE originally used to purchase those assets from EMPLOYER.

30. INVALID PROVISION: Any term(s) or provision(s) of this Agreement that is deemed by any court of law to be invalid or unenforceable will not invalidate or make unenforceable any other term(s) or provision(s) of this Agreement.

31. WAIVER: The failure of either party to enforce or insist upon the strict performance of any provision of this Agreement shall not be deemed to be a waiver of any breach of this Agreement or of any right of such party to insist upon strict performance of such provision in the future.

32. APPLICABLE LAWS: This Agreement shall be construed and regulated under and the by the laws of the State of FLORIDA with venue in a court of competent jurisdiction in Pinellas County, Florida, and shall inure upon the parties of this Agreement and their heirs, personal representatives, successors, and assigns.

33. TITLES: The titles and captions in this Agreement are for convenience of reference only and shall not control or affect the interpretation or construction of any of its terms or conditions.

34. MODIFICATION: No change or modification of this Agreement shall be valid unless the same is in writing and signed by the parties of this Agreement.

35. Entire AGREEMENT: This Agreement and any attachments or incorporations hereto represents the entire Agreement between the parties with respect to the subject matter hereof and supersedes any oral or written agreements previously entered into by the parties.

36. MUTUAL CONSTRUCTION: The parties acknowledge that this Agreement is the product of mutual efforts by the parties and their respective agents. This Agreement shall be interpreted neither more favorably in favor of one party, nor less favorably in favor of another party.

Furthermore, EMPLOYEE acknowledges that EMPLOYEE has been advised to seek the advice of independent counsel, and EMPLOYEE hereby acknowledges that EMPLOYEE has had ample opportunity to seek the advice of independent counsel.

37. COSTS AND ATTORNEYS 'FEES: If either party shall breach any of the terms of this Agreement, the non-breaching party shall be entitled to recover from the breaching party all reasonable costs and attorneys 'fees incurred by the non-breaching party in connection with the enforcement of the obligations of this Agreement.

IN WITNESS HEREOF, the parties hereto have agreed and executed this Agreement as of.          ,

2020.

Plaintiff's Exhibit 88                                                                                    **P12**

WITNESSES:                                              ARTHRITIS AND RHEUMATISM ASSOCIATES, PL

_____                         _____
Witness Signature                                       Adam M Rosen, MD (President)


_____                         _____
Witness Signature                                       (Employee)

Plaintiff's Exhibit 88                                                                    P13