N7ACede1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DR. SARI EDELMAN,

                    Plaintiff,

            v.                          21 Civ. 502 (LJL)

NYU LANGONE HEALTH SYSTEM, *et
al.*,

                    Defendants.         Trial
------------------------------x
                                        New York, N.Y.
                                        July 10, 2023
                                        9:00 a.m.

Before:

                    HON. LEWIS J. LIMAN,

                                        District Judge
                                        -and a Jury-

                        APPEARANCES

MILMAN LABUDA LAW GROUP PLLC
        Attorneys for Plaintiff
BY:   JOSEPH M. LABUDA
      EMANUEL S. KATAEV
      -and-
      GLORIA GODSELL
      CLAUDIA AZEVEDO

TARTER KRINSKY & DROGIN LLP
        Attorneys for Defendants
BY:   RICHARD C. SCHOENSTEIN
      RICHARD L. STEER
      INGRID J. CARDONA
      -and-
      DAN DRIESEN
      ANNETTE JOHNSON

1        (Case called)

2        MR. LABUDA:  Good morning, your Honor.  Joseph Labuda

3   and Emanuel Kataev, Milman Labuda Law Group.  To our left is

4   Dr. Sari Edelman.  To the left of Dr. Sari Edelman is Gloria

5   Godsell, and to the left is Claudia Azevedo.

6        THE COURT:  And I assume the last two people that you

7   mentioned are with your firm?

8        MR. LABUDA:  Yes, correct.  I'm sorry, your Honor.

9   Yes.

10        THE COURT:  Thank you.  You may be seated.

11        And for defendant.

12        MR. SCHOENSTEIN:  Good morning, your Honor.  Richard

13   Schoenstein from Tarter Krinsky & Drogin, with my partner

14   Richard Steer, and our colleague, Ingrid Cardona.  Down the

15   table I have Dan Driesen and Annette Johnson from NYU's general

16   counsel office.  Behind me, I have the defendants, Mr. Antonik,

17   Mr. Rubin, Mr. Swirnow, and Mr. Kaplan.  Behind them, I have

18   Samara Ward, who is a summer clerk with us this summer who is

19   attending to observe.

20        THE COURT:  I gather the parties have items they want

21   to raise with the Court.  Just looking around the courtroom at

22   counsel table, it looks like there may be some more names to

23   mention of folks who are associated with the respective law

24   firms, but let me hear from plaintiff and then I'll hear from

25   defendant.

N7ACede1

| 1 | MR. LABUDA:  Yes, your Honor.  There was one issue we |

1          MR. LABUDA:  Yes, your Honor.  There was one issue we

2     wanted to raise with you with respect to if the Court could add

3     in the names Gloria Godsell, G-o-d-s-e-l-l --

4          THE COURT:  Give me one moment.

5          (Pause)

6          So it would be:  "Dr. Edelman's represented at trial

7     by Joseph M. Labuda and Emanuel Kataev from the law firm of

8     Milman Labuda Law Group PLLC, and also by Gloria Godsell."

9          MR. LABUDA:  Gloria Godsell and Claudia Azevedo,

10    A-z-e-v-e-d-o.  And there's one other gentleman who's going to

11    be popping in at some point in time, he's not going to be doing

12    any testimony or anything like that, but he will be appearing

13    at the table, which is Jeremy Koufakis, that's K-o-u-f-a-k-i-s.

14         There was one other issue, if I could before I

15    forget --

16         THE COURT:  Does that complete it with respect to the

17    jury questionnaire?

18         MR. LABUDA:  Yes.

19         THE COURT:  Is there anything on the jury

20    questionnaire for defendants, any updates?  Are there more

21    names that I need to mention?

22         MR. SCHOENSTEIN:  Your Honor, it's up to you if you

23    want to mention Ms. Ward.  I don't think she was listed.  I

24    think all the defendants and the other counsel were --

25         THE COURT:  Ms. Ward is with your firm?

N7ACede1

1        MR. SCHOENSTEIN:  Yes, your Honor, Samara Ward.

2        THE COURT:  Is she going to be at counsel table?

3        MR. SCHOENSTEIN:  She'll probably be sitting right

4    behind us most of the time, but she'll be with us.  I don't

5    have a view one way or the other.  I just mentioned it for the

6    Court.

7        THE COURT:  Give me one moment.

8        (Pause)

9        So what I'm thinking about is that, after Friday, we

10   printed out the jury questionnaires.  It's not a huge issue to

11   redo the questionnaires, but it's killing some trees and it

12   will take some time.

13       If any party wants me to redo the questionnaires,

14   again, it's easy enough to do it and I'll do it.  If not, what

15   I'm going to do is mention in the portion of the *voir dire*

16   where I talk about who's representing the parties, I'll mention

17   the additional names, including the additional name for

18   defendant, but I won't change the questionnaire.

19       Let me ask plaintiff if they care about that and then

20   I'll ask defendant.

21       MR. LABUDA:  That's fine, your Honor.  It's acceptable

22   to just mention them verbally.  I don't think you need to

23   change the printed version.

24       THE COURT:  How about from defendant's perspective.

25       MR. SCHOENSTEIN:  Save the trees, your Honor.  Mother

N7ACede1

1   Nature is taking out enough of them.

2              THE COURT:  We'll put that into my prepared remarks,

3   but not into what we give the jurors.

4              MR. LABUDA:  I did have one other comment.

5              THE COURT:  Go ahead.

6              MR. LABUDA:  Dr. Edelman's husband is going to be

7   sitting in the back.  He should be here -- he's not going to be

8   testifying or anything like that, but he will be here I would

9   think every day.  I don't know what the Court's opinion is on

10  that, but I just do mention that.

11             THE COURT:  Does defendant have a view?  The husband,

12  it seems like there's not a problem with him being in the

13  gallery.

14             MR. SCHOENSTEIN:  There's no problem with him being in

15  the gallery.  What I was thinking was whether you should

16  mention his name, too, to the jurors, and I would appreciate if

17  you would, your Honor, just to make sure none of the jurors

18  know the husband.

19             MR. LABUDA:  We don't have an objection to that.

20             THE COURT:  What is the husband's name?

21             MR. LABUDA:  Bryant Edelman.

22             THE COURT:  What I'm going to do, again, is in my oral

23  remarks, I'm going to add for myself whether anybody's had any

24  dealings with the plaintiff, Sari Edelman, or her husband,

25  Bryant Edelman.

N7ACede1

1        Any problem with that from plaintiff's perspective?

2        MR. LABUDA:  That's fine.

3        THE COURT:  Defendant's perspective.

4        MR. SCHOENSTEIN:  Fine with us, your Honor.

5        THE COURT:  Anything else from plaintiff before I step

6   off the bench and the next time you're going to see me is when

7   we have the jury venire here.

8        MR. LABUDA:  The question we had, I wanted to confirm,

9   juror No. 1 is going into the --

10       THE COURT:  Juror No. 1 will be closest to the court

11  reporter.

12       MR. LABUDA:  Got it.  So that's 1 through 6.  You're

13  going to start 7 on the back left?

14       THE COURT:  Back left, again, closest to the court

15  reporter.

16       MR. LABUDA:  Are we impaneling, I think it's 16?

17       THE COURT:  I think it is 14.  My intention is to give

18  you a very limited period of time to decide how you want to

19  exercise your peremptories because we are keeping the jurors

20  waiting.  So give some thought to those questions, obviously,

21  as we go through jury selection.  After we've qualified the

22  requisite 14 jurors, I'll give you, again, 10 minutes and tell

23  the jurors that we're going to be in my robing room and then

24  we'll be back out.

25       MR. LABUDA:  That's fine.

1          One last question, just with respect to the process

2      for the trial, I don't remember us talking about this, but with

3      respect to objections, would you like us to stand, do you want

4      us to just state "objection"?

5          THE COURT:  You should stand and no speaking

6      objections.  It's fine to say:  "Objection.  Hearsay."  Give me

7      a word for what is the basis of your objection.  If it is a

8      matter that requires more extended discussions, you can tell me

9      that.  In all likelihood, what I would do in that instance is

10     not to have a sidebar, but to see if counsel who is doing the

11     questioning could move on to another subject and then we'll

12     address it during a break, but I may not do that, I may

13     actually have you up to sidebar.

14         MR. LABUDA:  Thank you.

15         THE COURT:  Anything else from defendant?

16         MR. SCHOENSTEIN:  Yes, your Honor.  Two issues.

17         One, I thought we talked the other day about having

18     the podium being --

19         THE COURT:  We're going to move the podium so that

20     it's facing the jury for your openings.

21         MR. SCHOENSTEIN:  Thank you.

22         The only substantive issue, we received demonstrative

23     exhibits from the plaintiff last night at 5 o'clock, and I

24     think the Court received them, too.  They are, in our

25     estimation, misleading for a number of reasons and not the kind

N7ACede1

1    of thing that should be used in opening.  They are

2    argumentative, they assume facts that are obviously not in

3    evidence because we haven't had any evidence, they're

4    prejudicial, and they're prejudicial really in two respects I

5    want to highlight for the Court --

6              THE COURT:  Let me stop you for a second.  I received

7    an email at 4:53 p.m. with a link to an electronic portfolio

8    containing all of the plaintiff's exhibits.  Is the

9    demonstrative you're talking about in that portfolio?

10             MR. SCHOENSTEIN:  No, your Honor.  It was emailed to

11   us separately as a Power Point presentation.

12             MR. KATAEV:  And that was sent at 4:45 p.m., your

13   Honor, preceding the email you just discussed.

14             THE COURT:  I see it.  Give me one moment to look

15   through.

16             (Pause)

17             Tell me what issues you've got with the demonstrative.

18             MR. SCHOENSTEIN:  First, your Honor, you'll see the

19   header has the logo of NYU Langone Health on most of the pages,

20   which runs the risk of confusing the jury that this is some

21   kind of formal NYU document.  As I said, the thing in its

22   entirety is much more akin to a closing argument.  It's making

23   substantive arguments about the case based on evidence that we

24   haven't seen yet and it has some incendiary images.  There's a

25   graphic on page 4 of a man pointing -- I mean, it almost looks

1    like a gun at a woman who is cowering, which is not anything

2    that happened in this case.  We have substantive issues with

3    some of the facts as they have presented, but I don't think we

4    need to get into that.  That would be a fair subject for

5    debate.  But I just don't think the demonstrative as a whole

6    would be a proper use at opening statement, your Honor.

7              THE COURT:  Let me hear from plaintiff.

8              MR. LABUDA:  Sure.  So this is our opening statement

9    that expectation for the jury in the opening statement is to

10   provide a roadmap of where this case is going and what we

11   intend to present in evidence.  Of course it's not evidence,

12   the trial hasn't started, but this is the story of Dr. Edelman

13   and what happened here.  So it's not argumentative, it's simply

14   the facts of what happened here.  So I think any factual

15   statement in here is perfectly fine.

16             With respect to the NYU logo, it's an NYU logo.

17   They're a part of this case.  I don't think there's any

18   prejudice to having them in there.  I think it will actually

19   aid the jury to understand what this case is about.

20             And with respect to any type of images that are

21   associated here, this is an opening statement, it's not

22   evidence.  The Court is going to direct them it's not evidence.

23   It's not going into the jury room.  I think it will aid, again,

24   the jury with an understanding of what this case is about and

25   we don't believe they're incendiary, they're simply images

N7ACede1

1  about the story that we plan on telling.  We should have

2  latitude to present our case as we deem fit.  We think it would

3  be prejudicial if we were not allowed to.

4        THE COURT:  First of all, with respect to the logo, it

5  does convey something of a misleading impression that these

6  slides are NYU Langone's slides, so I'd be inclined to tell the

7  jury that they should disregard the logo.

8        With respect to the images, can you get rid of the

9  images?

10       MR. LABUDA:  We can, your Honor.  We can get rid of

11  the image with respect to, let's say, for instance --

12       THE COURT:  I'm thinking about on page 4, the image,

13  on page 5, the "you're fired," on page 6, the "you're fired,"

14  on page 7, the "you're fired," page 8, "you're fired," and

15  page 9, the "equal pay for equal work" image, all of which seem

16  to me to be argumentative.

17       MR. LABUDA:  I would like to use those in the closing

18  which is more the argument, just to raise it with the Court

19  now, but we can remove it.  It will take a bit of time.

20       MR. KATAEV:  We're doing it right now.

21       Is the target permitted?

22       THE COURT:  Get rid of the target, also.

23       MR. KATAEV:  Understood.

24       THE COURT:  Let me hear from defendant.  Do you have a

25  problem with or would you like me to tell the jury that these,

N7ACede1

| | |
|---|---|
| 1 | when I say what opening statements are, that the logo on the |
| 2 | slides that are being used, they should disregard? |
| 3 | MR. SCHOENSTEIN:  That's fine, your Honor.  If you can |
| 4 | do that and just give a general instruction that demonstrative |
| 5 | exhibits are not evidence and the changes that you just asked |
| 6 | for are made, I think we would be okay to go forward. |
| 7 | MR. KATAEV:  Does the Court wish for a new Power Point |
| 8 | to be sent via email? |
| 9 | THE COURT:  Sure. |
| 10 | Anything else from defendant? |
| 11 | MR. SCHOENSTEIN:  No, your Honor. |
| 12 | THE COURT:  We should have the jury in about half an |
| 13 | hour, maybe it's sooner than that, it might be a little bit |
| 14 | later, so stay around the courtroom. |
| 15 | MR. LABUDA:  Your Honor, just a sense, do you have any |
| 16 | sense in terms of what generally the *voir dire* takes, from your |
| 17 | perspective?  Every case is different, but -- |
| 18 | THE COURT:  I mean, it all varies.  I really don't |
| 19 | know how many people will know NYU Langone and have experiences |
| 20 | with NYU Langone.  You can end up with a venire with a whole |
| 21 | bunch of people who have relatives who are doctors who are |
| 22 | associated with the hospital.  It's a big employer in the city |
| 23 | and that could make the proceedings a little bit more delayed. |
| 24 | If that's not the case, maybe we're done in an hour and a half |
| 25 | or so. |

N7ACede1

| | |
|---|---|
| 1 | MR. LABUDA:  Thank you. |
| 2 | THE COURT:  One additional item, in looking at the |
| 3 | calendar and also keeping in mind that comment that was made by |
| 4 | the parties about trial time, I can run Wednesday until about |
| 5 | 4:30 or so, 4:30 or 5:00 p.m., and give the jurors a lunch |
| 6 | break, that way we get a little more time. |
| 7 | Let me hear from plaintiff about that and from |
| 8 | defendant. |
| 9 | MR. LABUDA:  I know that Mr. Kataev has a childcare |
| 10 | issue, but I'll let him address that based on what the schedule |
| 11 | was. |
| 12 | MR. KATAEV:  For this week, your Honor, it will work. |
| 13 | Next week, it may be an issue.  I'm trying to work it out such |
| 14 | that it won't be. |
| 15 | THE COURT:  What about from defendant's perspective. |
| 16 | MR. SCHOENSTEIN:  We think it's a good idea, your |
| 17 | Honor. |
| 18 | THE COURT:  So we'll do Wednesday until 5:00, |
| 19 | otherwise every trial date will end at 2 o'clock and there |
| 20 | won't be a lunch break, and it will just be this week. |
| 21 | MR. LABUDA:  That's perfect.  Thank you, your Honor. |
| 22 | (Jury selection followed) |
| 23 | (A jury of eight was impaneled and sworn) |
| 24 | (Continued on next page) |
| 25 | |

N7aWede2

1              (Jury not present)

2              THE COURT:  Any reason I can't bring in the jury?

3              From plaintiff's perspective.

4              MR. LABUDA:  No, your Honor.

5              THE COURT:  From defendants' perspective.

6              MR. SCHOENSTEIN:  No, your Honor.

7              THE COURT:  All right.  Let's bring in the jury.

8              I'll give them preliminary instructions, and then

9      we'll proceed to openings.

10             (Jury present)

11             THE COURT:  Members of the jury, now that you have

12     been sworn, I'm going to give you some preliminary instructions

13     to guide you in your participation in the trial.

14             To begin with, you are here to administer justice in

15     this case according to the law and the evidence.  You are to

16     perform this task with complete fairness and impartiality, and

17     without bias, prejudice or sympathy, for or against the

18     plaintiff or the defendants.

19             It will be your duty to find from the evidence what

20     the facts are.  You, and you alone, will be the judges of the

21     facts.  You will then have to apply those facts to the law as

22     the Court will give it to you.  You must follow that law

23     whether you agree with it or not.  Nothing the Court may say or

24     do during the trial is intended to indicate, or should be taken

25     by you as indicating, what your verdict should be.

N7aWede2

1          The evidence from which you will find the facts will

2    consist of the testimony of witnesses, documents and other

3    things received into the record as exhibits as well as any

4    facts that the parties agree to, or stipulate to, or that the

5    Court may instruct you to find.

6          Certain things are not evidence and must not be

7    considered by you.  I will list them for you now.

8          First, statements, arguments and questions by lawyers

9    are not evidence, nor are my own statements to you evidence.

10   Only the answers given by the witnesses and the documents

11   admitted as exhibits are evidence.

12         Second, objections to questions are not evidence.  The

13   lawyers have an obligation to their clients to make an

14   objection when they believe evidence being offered is improper

15   under the rules of evidence.  You should not be influenced by

16   the Court's ruling on an objection.  If the objection is

17   sustained, ignore the question.  If it is overruled, treat the

18   answer like any others.  If you are instructed that some item

19   of evidence is received for a limited purpose only, you must

20   follow that instruction.

21         Third, testimony that the Court has excluded or told

22   you to disregard is not evidence and must not be considered.

23         Finally, anything you may have seen or heard outside

24   the courtroom is not evidence and must be disregarded.  You are

25   to decide the case solely on the evidence presented here in the

N7aWede2

courtroom.

        When you are determining the facts, keep in mind that there are two kinds of evidence: direct and circumstantial. Direct evidence is direct proof of a fact, such as the testimony of an eyewitness.  Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.  The word "infer" or the expression "to draw an inference" means to find that a fact exists from proof of another fact.  An inference is to be drawn only if it is logical and reasonable to do so and not by speculation or guesswork.

        In deciding whether to draw an inference, you must look at and consider all the facts in the light of reason, common sense and experience.  Whether a given inference is or is not to be drawn is entirely a matter for you, the jury, to decide.  Circumstantial evidence does not necessarily prove less than direct evidence, nor does it necessarily prove more.

        Here is an example to help you think about the difference between direct and circumstantial evidence.

        Assume that when you came into the courthouse this morning the sun was shining and it was a nice day outdoors. Also assume that the courtroom blinds were drawn and you could not look outside.  Assume further that, as you were sitting here, someone walked in with an umbrella that was dripping wet and then, a few moments later, somebody else walked in with a

N7aWede2

raincoat that was also dripping wet.

Now, because you could not look outside the courtroom and you could not see whether it was raining and because no witness has testified that it is raining, you would have no direct evidence of the fact that it was raining. But on the combination of facts that I've asked you to assume, it would be reasonable and logical for you to conclude that it was raining.

That is all there is to circumstantial evidence. You infer on the basis of reason, experience and common sense from one established fact the existence or nonexistence of some other fact. I will give you further instructions on these as well as other matters at the end of the case, but keep in mind that you may consider both kinds of evidence.

One of your most important tasks as jurors is to evaluate the credibility of the witnesses who will testify before you; that is, how believable and truthful they are. Listen carefully as each witness testifies during both direct and cross-examination and consider whether the witness is telling the truth. It will be up to you to decide which witnesses to believe, which witnesses not to believe and how much of any witness's testimony to accept or reject.

Now, how do you decide what to believe and what not to believe? You are to listen to the witnesses, observe their testimony and then decide as you would decide such questions in your own life. Did they know what they were talking about?

1   Were they candid, honest, open and truthful?  Did they have a

2   reason to falsify, exaggerate or distort their testimony?

3   Sometimes it is not what a witness says but how he or she says

4   it that may give you a clue as to whether or not to accept that

5   witness's version of an incident or an event as credible or

6   believable.

7          In short, the way a witness testifies may play an

8   important part in your reaching a judgment as to whether or not

9   you can accept the witness's testimony as reliable.

10          Now, a few words about your conduct as jurors.

11          First, during the trial, you are not to discuss the

12   case with anyone, nor are you to permit anyone to discuss it

13   with you.  This includes posting anything on the internet about

14   the case, whether it be personal blogs, Facebook or Twitter.

15   Until you retire to the jury room at the end of the case to

16   deliberate, you simply are not to talk about this case with

17   anyone, including your spouse or partner, family or close

18   friends.  Do not even discuss the case with each other until

19   you begin your actual deliberations at the end of trial.

20          Second, please do not, while you are serving as jurors

21   in this trial, have any conversations with the parties, the

22   attorneys or any witnesses in this case, whether in the

23   courtroom, in the hallways, in the elevators, outside or

24   anywhere else.  By this I mean not only to avoid talking about

25   the case, do not talk at all, even to say good morning or to

acknowledge any of these people.  Someone seeing a juror in

conversation with a party, lawyer or witness might think that

something improper was being discussed.  To avoid even the

appearance of impropriety then, avoid any such contact or

conversations.  So I can tell you that when the parties,

lawyers or witnesses pass you in the halls without even

acknowledging your presence, they do not mean to be rude.  They

are simply following my instruction.

Third, do not read or listen to anything outside the

courtroom that relates to this case in any way.  Similarly, you

are not to allow anyone to speak to you about the case.  If you

are approached by anyone to speak about it, politely but firmly

tell them that the judge has directed you not to do so.  If any

person seeks to contact you about the case, you are required to

report the incident promptly to me by sending me a note through

my courtroom deputy, Mr. Fishman.

Also, be sure that I am informed if any person that

you know comes into this courtroom.  This is a public trial, so

that could happen, but it is important that you do not hear

from them what may have happened in the court while the jury

was not present.  If you should see a friend or relative come

into the court, please send me a note through Mr. Fishman at

your first opportunity.

Fourth, do not try to do any research or make any

investigation about the case or the issues presented by the

N7aWede2

case.  For example, do not go on to the internet tonight and
research any matters relating to the case.  Do not call up your
lawyer friends or family to ask about the type of matters at
issue in the case.

Fifth, I know that many of you use cell phones,
smartphones, social media, the internet and other tools of
technology.  You must not use these tools to communicate
electronically with anyone about the case.  This includes your
family and friends.  You may not communicate with anyone about
the case on your cell phone, which includes smartphones,
through emails, text messaging, Twitter, any blog or website,
any internet chatroom or by way of any other social networking
websites, including Facebook, LinkedIn and YouTube.

Finally, do not form any opinion until all the
evidence is in.  A case can be presented only step by step,
witness by witness, until all the evidence is before you.  Keep
an open mind until you start your deliberations at the end of
the case.

You are permitted to take notes during the trial.
Mr. Fishman has given each of you a notepad and pen.  Please
write your name on the cover of the pad.  If you do take notes,
please do so only in these pads.

Remember that any notes you take are for your use
only, and they are only to be used as an aid for your memory.
Your memory controls.  If you do take notes, be careful not to

1   get so involved in taking notes that you are not listening to

2   the evidence.  Once you are in your deliberations, if there is

3   a disagreement between one juror's notes and another juror's

4   notes or between one juror's notes and another juror's

5   recollection, you can ask to have the court reporter read back

6   the testimony or to have that portion of the transcript sent to

7   you, for it is the official court transcript that controls, not

8   any particular juror's notes.

9          During the course of the trial, exhibits will be

10  received into evidence.  They will be marked by exhibit number.

11  If there is an exhibit you are particularly interested in

12  seeing during your deliberations, write down the exhibit

13  number.  At the end of the trial, as you begin your

14  deliberations, we will provide each of you a list with all of

15  the witnesses who testified during the trial as well as a list

16  of the exhibits that have been received into evidence.

17         We will now begin the trial.  As I told you earlier,

18  the trial is expected to be done by the end of next week.

19         Let me tell you about the trial day.

20         We will begin each day at 9 a.m.  Please be on time.

21  To help ensure that we start on time, please be in the jury

22  room by 8:45 at the latest so we can begin without delay.  I

23  will add that a light breakfast will be available in the jury

24  room each morning at 8:30 a.m.  You're not required to take us

25  up on that hospitality, but in my experience, many jurors do.

N7aWede2

The key thing is not to be late.

If any of you are late, we will have to wait, for we cannot start the trial unless all of you are here, and all of us -- myself, the lawyers, the parties, the witnesses, and your fellow jurors -- will have to wait.  If we lose 10 or 20 minutes every day, we may not be able to get the trial completed on time.

As to the rest of the trial day, we will take a brief, midmorning break with refreshments provided for you.  With the exception of this Wednesday, we will not take a lunch break, as we intend to end around 2 p.m. every day.

Now, let me tell you how the trial will proceed.

In a moment, we will have opening statements.  An attorney for the plaintiff will make an opening statement.  Then the attorney for defendants will do so.  The opening statements are neither evidence nor argument.  They are simply outlines of what the attorneys believe the evidence will show, and they are given to help you follow the evidence as it is presented.

Same thing, if anybody, any lawyer wants to use a demonstrative exhibit during their opening statements, the demonstrative exhibits are not evidence.  They're simply aids in terms of the opening statements.

After the opening statements, the plaintiff will present her case.  The plaintiff will call her witnesses, and

1    after each witness testifies on direct examination, counsel for

2    the defendants will have an opportunity to cross-examine the

3    witness.  After the cross-examination, there may be a little

4    bit of what we call redirect and recross-examination?

5           Following the plaintiff's case, the plaintiff will

6    rest.  The defendants will then present their case.  The

7    defense witnesses will testify, and the plaintiff will have the

8    opportunity to cross-examine them.

9           I should tell you that some of the defense case will

10   come in during the cross-examination during the plaintiff's

11   case.

12          After the evidence is cleated and all the sides have

13   rested, the attorneys will give their summations.  This is the

14   opportunity for the lawyers to summarize the evidence and to

15   give their closing arguments.

16          Following the summations, I will give you instructions

17   on the law.  You will then, finally, retire to deliberate on

18   your verdict.

19          Members of the jury, you have a tremendously important

20   task as jurors.  It is to determine the facts.  You, and not

21   the Court, are the sole judges of the facts.  The Constitution

22   itself recognizes your unique role in our system of justice, so

23   please pay careful attention to the witnesses and the evidence

24   received at trial as well as my instructions on the law.

25          We will now begin with opening statements.

1              Plaintiff will go first.

2              MR. LABUDA:  **Thank you, your Honor**.

3              Good afternoon, ladies and gentlemen of the jury.  My

4     name is Joe Labuda.  Part of our team is Emanuel Kataev, Gloria

5     Godsell and Claudia Azevedo.  Together we represent Dr. Sari

6     Edelman in this case.

7              Dr. Sari Edelman is the plaintiff in this case.  She

8     has brought this action against NYU Langone Health System and

9     other defendants, and the defendants here within the NYU

10    Langone system.  Along with other individuals who also work for

11    NYU Langone Health System, I'm going to, generally speaking,

12    call them all NYU, just to keep things moving.  Otherwise,

13    we'll be here until August.

14             So, this is a story of Dr. Edelman, Dr. Sari Edelman.

15    As with a lot of stories, there are three chapters to this

16    particular story.

17             The first chapter in this story is that Dr. Sari

18    Edelman, who graduated from medical school, she passed her

19    boards in internal medicine and rheumatology, she went into

20    private practice in 2008 to 2014, in Lake Success, New York,

21    out on Long Island –– New Hyde Park it's also known as –– and

22    then was recruited and joined NYU Langone Health System in

23    2014, where she continued to work until 2021.

24             What's important to note is when she worked for NYU

25    Langone, she was under contract there.  She was under contract

1   when she first started working there, in 2014.  It was a

2   three-year contract.  That contract expired, and then in '18

3   through the end of 2020, she was under a different contract.

4   And the reason I bring that up is because, under her contract,

5   and you'll see evidence about this and you'll hear testimony

6   about it, is that she was, she had a termination for cause only

7   clause in her contract.  And that's important to note.  And

8   we'll get into that later, but she could only be fired for

9   cause when she was under contract.

10          In this situation, the story begins, in terms of this

11  case, is that in September of 2019, there was an incident

12  involving two NYU male employees who created a hostile work

13  environment for Dr. Edelman.  So that's chapter one in a

14  nutshell.  We'll get into it in further detail, but I wanted to

15  give you a little background.

16          Chapter two is Dr. Sari Edelman, after this hostile

17  work environment was created, she contacted human resources and

18  filed a complaint about the hostile work environment and the

19  discrimination.  As a result of her filing this complaint, NYU,

20  including the people who she was accusing of harassing her,

21  terminated her as soon as her contract expired.  And so that's

22  the retaliation aspect of it.

23          And chapter three is that NYU willfully violated the

24  Equal Pay Act by paying male doctors more than her for the same

25  work.  And you're going to hear and see evidence about that as

N7aWede2                       Opening — Mr. Labuda

1    well.  So that's a summary of the three chapters that are

2    involved in Dr. Edelman's story here.

3            So now, with every story, there's a cast of

4    characters.  I want to introduce you to the cast of characters

5    involved here in this case.

6            As we talked about a second ago, you have Dr. Sari

7    Edelman.  She's a rheumatologist, and for purposes here she was

8    working at NYU out in Long Island, in Lake Success, New Hyde

9    Park.

10           Another person in this story is Dr. Kavini Mehta.  She

11   also is a rheumatologist, and she was actually business

12   partners with Dr. Edelman in the private practice from '08 and

13   to '14, and they, together, got recruited by NYU and joined the

14   NYU practice there.

15           Mr. Joseph Atonik, he is a site director.  He oversaw

16   four -- and oversees four -- Lake Success/New Hyde Park

17   offices, including the one where Dr. Edelman worked.  And he

18   was a direct report to Mr. David Kaplan.

19           So, Mr. David Kaplan, the regional director, he

20   oversees approximately 80 to 100 NYU sites in Queens and Nassau

21   County, including where Dr. Edelman worked as well.  And

22   Mr. David Kaplan, he was the direct report to another

23   individual who you'll meet in this cast characters, Joshua

24   Swirnow.

25           The individual who, Ms. Kathleen Pacina is a manager

1   of employee relations and human resources at NYU.  She's the

2   individual who Dr. Edelman complained to about the hostile work

3   environment.  OK?

4           Next in this cast is Ms. Miriam Ruiz.  She is the

5   office manager where Dr. Edelman worked out in Lake Success for

6   NYU.

7           The next person is Joshua Swirnow.  He's the assistant

8   vice president of business strategy, and he is the direct

9   report to the next individual in the cast, which is Mr. Andrew

10  Rubin, and he's the senior vice president of clinical affairs

11  in ambulatory care.  He's the individual who hired and

12  ultimately fired Ms. Edelman.  He runs the faculty group

13  practice for NYU, the operations, the revenue and sees all the

14  individuals in the doctor and faculty practice group, including

15  Dr. Edelman.

16          And you also have Dr. Avram Goldberg.  He is also a

17  rheumatologist in the faculty group practice.

18          Dr. Andrew Porges, he also is a rheumatologist in the

19  same group.

20          And Dr. Anang Modi, and he also is a rheumatologist in

21  this group.

22          So you'll see in this case there's a lot of doctors

23  between the parties and even on the jury.  So if anybody has

24  any health issues, I think we're in pretty good hands.

25          I will say, let me also introduce NYU Langone Health.

N7aWede2                          Opening - Mr. Labuda

1   As you may know, NYU Langone Health System is a company that

2   provides health services, medical services to individuals.

3   It's a large institution and has over 8,000 employees.

4           Let's go into chapter one a little bit more, in a more

5   detail.

6           So as I was saying before, in September of 2016 --

7   September 16 of 2019, sorry, Mr. Joseph Atonik, who was the

8   site supervisor, comes into Dr. Edelman's office.  He directs

9   her that she's going to be sharing her office with another

10  doctor there.  Dr. Edelman is resistant of that because she has

11  contractual rights under her contract for office space.  He

12  does not like that.  He raises his voice, shouts at her, and

13  starting frantically raising his arms, and he leans in on Dr.

14  Edelman and physically intimidates her.

15          He also, as they're talking, he also calls her a bitch

16  under his breath.  He demeans, degrades and is chauvinistic to

17  her, and he belittles her valid concerns about her contractual

18  rights.

19          Next what happens is on September 25, 2019, David

20  Kaplan, who, again, is Mr. Atonik's direct report, he comes

21  into the office -- again, to Dr. Edelman's office -- and raises

22  the same issue.  When she gives him the same answer about her

23  contractual rights, he's dismissive of her again.  He doesn't

24  take her seriously, treats her like a child and tells her to

25  calm down.

1          So that's what happens in chapter one.  Dr. Edelman's

2     upset about what happened there, so much so that you'll hear

3     testimony that she couldn't sleep for months afterward and

4     that, in fact, Dr. Edelman avoided any further contact with

5     either Mr. Atonik or Kaplan for the rest of her time, and they

6     never spoke again.

7          Now let's go on to chapter two.

8          So, chapter two, NYU targets and fires Dr. Edelman.

9     On September 17, 2019, which is the day after the initial

10    incident with Mr. Atonik, Dr. Edelman engages in protected

11    activity by taking the brave step of calling NYU HR to complain

12    about the hostile work environment that was created on

13    September 16, 2019.  She speaks to Kathleen Pacina, who we

14    talked about before, over the phone.  Then on September 25,

15    2019, through November 12, 2019, Dr. Edelman sends multiple

16    emails to human resources about the status of her inquiry,

17    because she wants to know what's going on.

18         And then, on November 13 of 2019, less than two months

19    after Dr. Edelman makes the complaint, Ms. Miriam Ruiz, who's

20    the office manager, and who is a direct report to Joe Atonik,

21    begins to keep a log called Edelman issues and continues the

22    log until October 28, 2020.  So instead of taking Dr. Edelman's

23    claims seriously, management responds negatively.  And you'll

24    see no evidence about a log ever existing in the six years that

25    Dr. Edelman was working before she filed her complaint.  And

N7aWede2                          Opening – Mr. Labuda

1   there are also no other logs for any other doctors, other than

2   Dr. Edelman.

3              So, November 6 of 2020, which is, again, a year

4   later -- but you have to remember that there's this contract

5   issue, where she can't be fired for cause until the end of

6   2020 -- Joseph Atonik targets Dr. Edelman by emailing

7   Dr. Andrew Porges, Miriam Ruiz and others in an email entitled

8   Edelman issues -- sounds familiar -- and soliciting them to

9   provide him with clear and convincing examples from the group

10  of alleged improper behavior between Dr. Edelman, staff,

11  patients.  And he gives examples there.  There are no other

12  emails from Mr. Atonik or anyone else asking for negative

13  feedback for any other doctors, other than Dr. Edelman.

14             November 6, the same day -- in fact, 12 minutes

15  later -- at the behest of Joseph Atonik, Dr. Porges emails

16  David Kaplan, who, again, is the direct report of Mr. Atonik

17  and one of the alleged harassers, cutting and pasting

18  Mr. Atonik's email and criticizing, for the first time, in six

19  years that they had worked together Dr. Edelman's work.  That

20  email is forwarded by David Kaplan to his direct report, Josh

21  Swirnow, who passes on that information to Andrew Rubin.

22             And then on December 1, 2020, Andrew Rubin decides,

23  and you'll see a letter, not to renew Dr. Edelman's contract

24  and letting her know that she's being terminated effective May

25  31, 2021, based on the Atonik and Porges emails.  We.

N7aWede2                    Opening – Mr. Labuda

1          Believe this shows a clear pattern of retaliatory

2    action following her complaint about a hostile work

3    environment, with NYU ultimately dismissing her.  There are no

4    checks, balances, no talking or no process at all, and you

5    won't hear about, any testimony about any of these individuals

6    talking to Dr. Edelman before the termination.

7          So, as an aside, as I was saying before, a couple

8    things.  Just like in her first contract, from 2014 to 2017,

9    you'll see that her contract was only, she could only be

10   terminated for cause.  That same language followed in the

11   subsequent contract, from 2017 until December 31 of 2020, which

12   only permits NYU to terminate her for cause.  And you're going

13   to hear testimony that NYU acknowledges that it did not have

14   cause to terminate Dr. Edelman while she was under contract.

15         You're also going to hear from NYU that they fired Dr.

16   Edelman for alleged interpersonal issues or purported poor

17   performance as a doctor but nonetheless kept her on for an

18   additional six months after her contract expired.  You're also

19   going to hear evidence that before the termination, neither

20   Andrew Rubin, who made the decision to terminate, Mr. Swirnow,

21   Dr. Porges, Dr. Goldberg, Mr. Kaplan, Mr. Atonik nor Ms. Ruiz

22   ever spoke or discussed any of the issues with Dr. Edelman

23   before they terminated her.  There were no complaints raised,

24   either written or verbal, by anyone at NYU to Dr. Edelman about

25   her interpersonal or performance issues.

1              So, we're going to move on to chapter three.

2              Chapter three has to do with our claim that NYU

3     violated the Equal Pay Act by paying male doctors more.  So,

4     you're going to hear testimony in this case that Dr. Edelman

5     performed equal or substantially similar work as male doctors,

6     her male counterparts, part of the people that we heard about

7     in the cast.

8              You will also hear evidence that NYU willfully paid

9     Dr. Edelman less than the male doctors for the same work.

10             You'll also hear testimony that there was no Equal Pay

11    Act compliance training by Mr. Rubin, who set the salaries for

12    the doctors; that there were no evaluations of the salaries

13    between the male and female doctors; and that there was no

14    consultation with HR, human resources, about the salaries of

15    male and female doctors.

16             You will hear, effectively you will hear no testimony

17    that NYU had a legitimate reason to pay Dr. Edelman less.

18             NYU, you will hear testimony that NYU says that they

19    paid doctors and set their salaries based on a business plan

20    that was created by NYU, that included the doctor's prior

21    salaries from prior employment.  In reality, no system existed

22    setting salaries, and they were, in fact, set arbitrarily.  In

23    fact, NYU didn't even create these business plans for some of

24    the doctors.

25             Now, going on with chapter three, we're going to get

into the actual pay of the doctors, so you can see the
difference in pay.

        In 2014, when Dr. Edelman worked, you have Dr. Porges.
You'll hear testimony about Dr. Porges, that he was on top with
$340,000; Dr. Avram Goldberg, that he was second with $315,000,
Dr. Mehta and Dr. Edelman were in third and fourth,
respectively, and they were paid $207,000.  And the difference
between Dr. Porges is $133,000, between Dr. Edelman, and the
difference between Dr. Goldberg and Dr. Edelman is $108,000.

        You're going to hear testimony that all of these
doctors, they all see patients.  They treat patients for
rheumatology.  They're all doing the exact same work, and they
all have the same hours.

        And you're also going to hear testimony about the fact
that in addition to the clinical pay, there can be a component
of their pay for administrative or research work, and that some
doctors got paid for administrative or research work on top of
their clinical pay.  But the evidence is that NYU, when
somebody took on an additional role, what they did is they
actually reduced the clinical pay and then added some pay for
the administrative pay, so your pay was the same.  So there was
no difference in the pay; it just went down.  They added that
difference, the admin pay, so from our perspective, they were
paid the same regardless of the clinical pay that they got and
the administrative pay that they received.  And in fact, you'll

1    hear testimony that Dr. Edelman was approached to take on one

2    of these roles for research and specifically asked am I going

3    to get paid anything extra for doing this research role, and

4    they said no.  So I think all that they were going to do was

5    rejigger her pay.

6            So that's in 2014.

7            Now let's get to the end, when she got terminated, in

8    2020.  So this is the pay that existed in 2020, with

9    Dr. Goldberg on top at 535,000.  Dr. Porges, he was at 400,000.

10   Dr. Modi, who we haven't talked about that much, he was new to

11   the practice, I think, starting in 2017, he was third, at

12   370,000; Dr. Edelman, 278; and Dr. Mehta at 270.  And then the

13   difference here with respect to Dr. Edelman, from Goldberg to

14   Edelman is $257,000, so the difference between Dr. Porges and

15   Dr. Edelman is $122,000 and the difference between Dr. Modi and

16   Dr. Edelman is $92,000.  And that was the last -- that was the

17   year that she was terminated.

18           So, we'll go through it quickly just so you have some

19   sense.

20           In 2014 we talked about, these are the pay rates

21   there.  In 2015, it's effectively the same, and 2016, Porges,

22   Goldberg, Mehta and Edelman, those salaries.  2017, that was

23   the last year her -- 2017, so this is Goldberg, Modi, Porges,

24   Edelman and Mehta.  2018 was, again, the same and the pattern

25   continues.  2019, 2020, and then, as I said before, after she

was terminated on December 1, 2020, they told her that she was,

they notified her that she was being terminated on November,

December 1, 2020, effective May 31, 2021.  So she continued to

work in 2021 at those rates of pay and, again, at the bottom.

          As I told you before, this story has three chapters

with the hostile work environment and the discrimination that

she suffered under while at NYU.  She was retaliated against

when she complained about the hostile work environment by

ultimately being terminated.  And she was paid less than her

male counterparts, in violation of the Equal Pay Act.

          So that's the story.  Those are the three chapters of

the story, but with a lot of stories, there's a postscript.

OK?  And the postscript here is that because of the unlawful

conduct that NYU subjected Dr. Edelman to, she was damaged.

She suffered from emotional distress.  She had to move to

Florida -- sorry.  She was born and bred in New York, and they

took that away from her.  She had to move her family down to

Florida, and she was paid less than what she was making in New

York.  And so those are some of the damages that she suffered.

She lost the ability to be around her friends and family up in

New York as well, and we trust that you're going to listen to

the evidence here in this case and provide a just determination

here.

          We respectfully believe that you should hold NYU

accountable for its actions and award Dr. Edelman the damages

1   that you deem to be appropriate.

2          I appreciate the time, and again, I thank you all for

3   being here today and for being with us for the next couple

4   weeks.

5          Thanks.

6          THE COURT:  Thank you, Mr. Labuda.

7          Members of the jury, I should instruct you that

8   demonstrative exhibits are not evidence.

9          I should also instruct you that you may have seen NYU

10  Langone legends on the slides.  The slides obviously are not

11  NYU Langone slides.  They're prepared by counsel to assist in

12  the opening statements.

13         The defense will open now.

14         MR. SCHOENSTEIN:  Thank you, your Honor.

15         Ladies and gentleman of the jury, I didn't bring any

16  slides.  I brought witnesses.  I brought documents.  I bring

17  facts and evidence, and that's what we're going to show you

18  over the next week or so -- witnesses, documents, evidence --

19  to establish that defendants did not create a hostile work

20  environment or discriminate against the plaintiff in any way.

21  Defendants did not retaliate against the plaintiff, and

22  defendants did not pay the plaintiff less because she is a

23  woman.

24         I'm never going to ask you to take my word for that.

25  We're going to present evidence.  You're going to see as many

N7aWede2                    Opening – Mr. Schoenstein

as 14 witnesses take that witness stand, many of the people on the cast of characters you just saw.  And they're going to testify about their perspectives.

You know, if you're going to tell a story, you need to tell all the chapters.  You may pick three and cast them as you like, but you have to start a book at the beginning.  You have to tell everything that happened in the middle, and you have to tell the end.  And respectfully, the story plaintiff is trying to tell you doesn't do that.  They start their story way late, and they leave out way too much.

As New Yorkers, I assume you guys are all familiar with NYU; there's a big university here by that name.  But there's also NYU Langone Health, which is associated with the medical school.  That's a huge organization in New York.  They have more than 3,000 doctors.  They have thousands and thousands of employees.  And the defendants here, the individuals, Mr. Atonik, Mr. Rubin, Mr. Swirnow, Mr. Kaplan, they were all employed by NYU and doing their jobs when the events that are at issue in this case happened.

Plaintiff has sued them all individually, including two people she only met once.  She has sued in this federal court.  She has sued seven different corporations.  Some of them don't even exist.  Most of them had no connection with her ever, but she has sued everybody and brought them all into this court.

N7aWede2                      Opening – Mr. Schoenstein

1                For now, I'm going to do what my colleague did.  I'm

2    just going to refer to NYU as NYU in the hope of simplifying

3    this a little bit, but at some point we're going to have to

4    break down the companies.  And I can't stand here and tell you

5    in an opening statement everything you're going to hear in the

6    next week or so, because that would be way too much of me

7    talking, but let me try to highlight what we think some of the

8    evidence is going to show so you understand where we're coming

9    from.

10               Dr. Edelman joined NYU in 2014.  That's when the story

11   starts.  She joined to work out at a facility of NYU's on

12   Marcus Avenue out in New Hyde Park, in Long Island.  She is a

13   rheumatologist.  If you're not familiar, that's a doctor that

14   treats stuff like arthritis, muscle issues and inflammatory

15   disease.

16               Before joining NYU, she had her own private practice

17   that she started with another doctor, Dr. Mehta, who you also

18   saw listed on that cast of characters.  And the evidence is

19   going to show you that their private practice was not

20   profitable.  They weren't making the kind of money they wanted

21   to, and they were in hundreds of thousands of dollars of debt,

22   because they had taken out loans just to start their practice.

23   They tried joining a larger medical institution, but you're

24   going to hear that shop was going to go into bankruptcy, so

25   they needed new jobs.

1           That's how they came to NYU, with a private practice

2    that wasn't doing that well, looking for a new job.

3           Now, when we go to the doctors, we don't really think

4    how did this doctor end up here.  Right?  We just go to a

5    doctor; we don't think how she or he was hired or ended up

6    there.  But it's quite a process, and you're going to hear

7    about this in the trial.

8           Dr. Edelman and Dr. Mehta were jointly introduced to

9    NYU, and they met with Mr. Rubin and Mr. Swirnow, back there.

10   Their jobs involved hiring these thousands of doctors who work

11   at NYU all over the New York area.  And you'll hear about how

12   Dr. Edelman was hired.  It's not a situation where there was,

13   like, a want ad in the paper and said "rheumatologist, pays

14   $200,000 a year."  That's not the process.  All of the doctors

15   at NYU are paid on a case-by-case basis.  It's decided by

16   negotiation between the doctor and NYU.

17          NYU, when they're looking at doctors, they consider

18   all the things you'd expect -- the doctor's experience,

19   professional stature, accomplishments, specialties, all that

20   stuff.  And then to figure out the money part, they have a

21   business team.  And if a doctor's coming in from private

22   practice, what they do is they get information from the doctor

23   about their business.

24          And that's what they did.  They got information from

25   Dr. Edelman and Dr. Mehta about their private practice, how

much money were they bringing in, how much were their expenses, and then they could compute that and figure out if we brought them into NYU, how much is left over to pay them?  That's how they establish a salary, and you'll hear about that in the testimony.

So here, NYU put together a business plan based on information provided by Dr. Edelman and Dr. Mehta -- I can't stress that enough.  And then all of them negotiated and agreed on an agreement.  Dr. Edelman, by the way, was represented by a lawyer the whole time in the negotiations.  And you'll get to see the details of the deal.  We'll show you the contract.

Plaintiff ended up getting a very large pay raise. NYU agreed to take over her 20-year office lease, agreed to take over her other expenses, for her staff, and agreed to pay off hundreds of thousands of dollars of debt that her practice had, which you don't see in any of the numbers that the plaintiff just showed you.  They want to ignore the payoff of the debt.

In the end, the deal Dr. Edelman got was worth well more than $250,000 a year.  It was a substantial raise from what she was getting, and the evidence will show that the fact that she was a woman had nothing to do with any of those negotiations.  It was business, business, business at NYU. That's what they looked at.  That's what they based the negotiation on.

N7ACede3                      Opening - Mr. Schoenstein

1          So, there's an excessively negotiated deal and

2   plaintiff came to work at NYU.  At first, everything went

3   mostly fine.  You see, plaintiff's story doesn't pick up until

4   2019, she started working there in 2014.  Everything went fine,

5   she did three years.  The contract had a three-year term, so it

6   would get renewed or not every three years, and the first time,

7   they renewed it.

8          So what went wrong?  Believe it or not, this whole

9   case originates in a spat about office space.  That is right —

10  office space.  In 2019, plaintiff was working just three days a

11  week at the Marcus Avenue location I mentioned.  She worked

12  another week out on Huntington, Long Island, seeing patients.

13         You will hear in the testimony NYU doesn't have enough

14  offices for all its doctors, that's just the way it is.  So

15  they had some doctors coming in and Mr. Antonik went to see

16  plaintiff in her office to ask her if she would mind if another

17  doctor used her office on days she wasn't there.  When we say

18  share an office, I'm not talking about putting two doctors in

19  side-by-side, I'm talking about you use it Monday, Tuesday,

20  Wednesday and we let Dr. Smith use it Thursday.  She said no.

21  She said my contract guarantees me a private office.  She said

22  you'll have to talk to my lawyer.  That's what she said in the

23  conversation with Mr. Antonik.  And Mr. Antonik you will hear,

24  because he will take the stand, did not do the things that she

25  accuses him of doing.

N7ACede3                    Opening - Mr. Schoenstein

1          Now, you'll see the employment contract, it doesn't

2     guarantee her a private office, it doesn't guarantee her an

3     office, it doesn't guarantee anything that she was saying it

4     guaranteed her in that conversation.  But the next day she

5     complained to NYU's employee and labor relations department.

6     Plaintiff says HR or human resources, at NYU they call it

7     employee and labor relations department.

8          She complained about Dr. Antonik's conduct, so the

9     employee and labor relations department elevated the concern to

10    Mr. Antonik's supervisor, Mr. Kaplan.  Mr. Kaplan went to see

11    plaintiff to try to explain the situation and to say to her is

12    it okay please, could we have someone else use your office, and

13    she threw him out of her office and was very rude to him and to

14    Mr. Antonik.

15         Then she sends another email complaining about

16    Mr. Kaplan because she didn't like his mannerisms or his tone.

17    She objected to the person who she threw out of her office.

18    That caused the situation to get elevated even further and

19    Mr. Swirnow, who you will hear from, called plaintiff up on the

20    phone to try to talk her through this, to explain why they

21    needed the office space on some other days and he thought

22    everything was resolved.  He thought they had a good

23    conversation, they resolved the issue.  As it turned out,

24    you'll hear she decided to stop going to Huntington to do

25    full-time or four days a week in the Marcus Avenue location

1    which sort of rendered the issue moot.  But, in any event, he

2    thought it was resolved.

3           She did send some additional emails.  There are

4    emails, you'll see, there are chains of emails back and forth

5    between her and the employee and labor relations department.

6    For the most part, and you'll hear from Kathleen Pacina, the

7    first employee of the employee and labor relations department

8    that plaintiff talked to, she thought it was just a dispute

9    about office space.  Eventually, as plaintiff complained a

10   little bit more, she elevated it to somebody who worked

11   directly with the department that plaintiff was employed by to

12   an employee named Rashidat Ogbara.  And she emailed plaintiff

13   to try to follow up about the complaint.  This is back in

14   November of 2019, plaintiff never responded.

15          The last email plaintiff sent with any kind of

16   complaint about hostile work environment, discrimination or

17   anything was in November of 2019.  She didn't email anybody

18   after that, she didn't call anybody after that, she didn't go

19   to see anybody after that, she didn't say anything else until

20   this lawsuit was filed in 2021.

21          Now, you will remember 2020, it was quite a year with

22   COVID, and you can imagine the effect it had on all of you, I'm

23   sure, and on me, the effect it had on a healthcare company like

24   NYU.  It was really hard to work around and get around, and

25   everybody involved is going to tell you that in 2020, they were

N7ACede3                    Opening - Mr. Schoenstein

very focused on the COVID pandemic and how to deal with it.
Nobody was focused or concerned about this complaint that had
been made and dropped in November of 2019.

So, flashforward a year to November of 2020 where the
COVID situation is stabilized somewhat, people are back to
work.  There is a doctor you will meet on the witness stand,
Dr. Andrew Porges, who is the medical director for the
department that Dr. Edelman worked at.  And he had concerns.
He had seen some of the patients she had seen, he had reviewed
charts of other patients she had seen, and he had concerns
about her treatment, her clinical care.  He raised those by
himself.  Nobody told him to raise the issues, nobody asked him
to look for them, he raised the issues because it was his job
as medical director.  He will tell you about that and he will
show you specifically some of the patient records at issue and
what he was concerned about, he'll show you.  And he raised
that issue.  And as it happened, plaintiff's contract was up
for renewal.  So the administrator said write it down, write
down your concerns, gather the documents we should look at,
show it to us all, and that's what he did.

He'll tell you specifically, among other things, he
had concerns that plaintiff was ordering way too many lab tests
for her patients, just excessive amounts of testing.  There
were complaints from plaintiff's colleagues and patients, and
even from x-ray technicians you'll hear about.  There were

N7ACede3                    Opening - Mr. Schoenstein

1   complaints about the treatment plans and that she was having

2   patients come back way too often, more often than they needed.

3   And Dr. Porges will tell you about that and tell you how

4   concerned he was.  And when asked to document and discuss his

5   concerns, that's exactly what he did.  And then he gave

6   information to Mr. Rubin and Mr. Swirnow, and they spoke with

7   him, and they also spoke to Dr. Goldberg.  You'll hear about

8   Dr. Goldberg.  He was the clinical director and you'll hear his

9   testimony, too.

10          The clinical director and the medical director and the

11   administrators concluded that her clinical care did not reach

12   the high standards of NYU and they decided not to renew her

13   contract.  They weren't firing her for cause, they were not

14   renewing the contract.  You'll read the contracts.  They had a

15   right every three years to renew or not renew and they decided

16   to not renew.  And you'll see, when you hear all the evidence,

17   when you see all of the witnesses, you're going to know this

18   wasn't retaliation for some fight about an office a year ago.

19   You may agree with the decision, you may disagree with the

20   decision, but you will see that it was not related to what had

21   happened earlier.  It was not retaliation.

22          So she was informed in December of 2020 that NYU was

23   not renewing her contract, and in January of 2021, plaintiff

24   filed this lawsuit and raised these issues about her treatment

25   during the fight about the office space and about retaliation.

N7ACede3                    Opening - Mr. Schoenstein

1         And she also raised the third issue that plaintiffs

2    talked to you about, the Equal Pay Act.  She said for the first

3    time she wasn't paid fairly because male doctors were paid

4    more.  And with this issue and with all the legal issues in the

5    case, your Honor will give you very extensive instructions at

6    the end of the case about the law and how you figure out this

7    kind of stuff, but I'm going to preview a little bit the

8    evidence because the evidence is going to show that the

9    differences in pay had nothing to do with the gender of the

10   doctors.  There were very significant differences between the

11   doctors on those charts that they show you.

12         Now, you'll hear again from Mr. Rubin and Mr. Swirnow

13   and they will tell you that gender never comes in as a factor

14   in how to pay a doctor.  None of that stuff comes in.  They

15   look at the business, they look at the doctors' credentials,

16   they don't look at other factors.

17         You'll also hear, and I don't think this will surprise

18   any of you, that NYU would like to have as many female doctors

19   as possible.  That is good business.  That is what they want.

20         And you will hear, as I said a while ago, that

21   plaintiff's salary was negotiated based on the economic data

22   she provided, meaning that, in large part, she set her own

23   salary by telling NYU how her practice was doing before she got

24   there so they could figure out how much to pay her.

25         And it is true, some doctors are paid more than

1    others.  I'm sure you understand as a general matter going

2    through life, sometimes people get paid differently.  Someone

3    more senior generally gets paid more than someone more junior.

4    Someone with more experience or better credentials will get

5    paid better than someone with less experience.  A supervisor

6    gets paid more than subordinates.  I think these are common

7    things we will agree on.

8            So plaintiff's going to point to these three specific

9    doctors that are men and say she wasn't paid as much as them,

10   but there are very good reasons for that.  Two of the doctors

11   on that list, Dr. Goldberg and Dr. Porges, are substantially

12   senior to plaintiff.  They were doctors while she was still in

13   high school.  They have years and years more experience than

14   she did.  Two of the doctors at issue came to NYU not from

15   private practice at all, but from big medical institutions

16   where they were already making big salaries that NYU had to

17   compete with.  And none of the other doctors, not Dr. Porges,

18   not Dr. Goldberg, not Dr. Modi had debt that NYU was agreeing

19   to assume.  NYU took on way more risk and cost associated with

20   hiring Dr. Edelman.

21           Dr. Goldberg, by the way, was a very well known

22   medical professor on Long Island.  He was recruited to be the

23   first rheumatologist in NYU's Long Island office and to grow

24   the practice.  He's actually who recruited the plaintiff and

25   was sort of her boss.  And essentially, she is here now

N7ACede3                    Opening – Mr. Schoenstein

1    complaining she wasn't paid as much as her boss.

2         So we think the evidence will show that none of the

3    three physicians were paid differently because they were men.

4    There were very good reasons that they were paid slightly more.

5    And that will cover all three aspects of the case that

6    plaintiff laid out to you.  Defendants did not create a hostile

7    work environment or discriminate against plaintiff, it was a

8    fight about office space.  Defendants did not retaliate against

9    plaintiff, her contract was not renewed because of substantial

10   concerns about the way she practiced.  And plaintiff was not

11   paid less because she is a woman, there were other important

12   distinctions between her and the doctors she's talking about.

13        Now, if you were to find liability on any of the

14   theories in this case, as plaintiff alluded to, you would have

15   to consider damages.  Some of you may know this is a civil

16   lawsuit, so if you find that the defendants are liable, then

17   you have to figure out how much to pay the plaintiff and the

18   Judge will explain to you detail by detail how to do that.  But

19   the evidence is going to show you the plaintiff didn't really

20   sustain any economic damage.  She got a new job right away down

21   in Florida where, actually, she got a pay raise.  And as far as

22   we know, we'll ask her when she takes the stand, is still there

23   practicing medicine on a partner track to be part of that firm

24   making more money in Florida.  She claims there was a

25   difference between her salary and the other doctors, but as

1   I've said, there were good and valid reasons for that and

2   that's not money she should recover.  There are additional

3   damages she will seek, the Judge will instruct you about those,

4   and I'll talk to you more about that in closing argument.  So

5   just like the opening statements that just happened, plaintiff

6   gets to go first, she gets to present her case.

7           So I just want to say two things about that.

8           One, for those of you who run, this is a marathon, not

9   a sprint.  There is no winner of a marathon until you get to

10  the end.  So I ask you to stay with us for the whole race,

11  listen to plaintiff, of course, listen to us cross examine her,

12  but listen to all of the other witnesses.  Don't judge a book

13  by its cover, don't read only three chapters of a book, read

14  all the chapters.  Take it all in and then you can make a

15  decision.  I'm sure some of you who have experience with

16  litigation know just because somebody is accused of something

17  does not mean they did it, and these defendants vehemently deny

18  they did the things that this plaintiff says.  So we're going

19  to show you a lot of evidence, we'll try to get through it as

20  expeditiously as possible.  Eventually, I will come back up

21  here for a closing argument, which might be a little longer,

22  and I will reiterate these points.

23          I thank you very much for being here today and the

24  days that come.  I thank you on behalf of my team and my

25  clients for paying attention and I look forward to talking to

1    you again in closing argument.

2              Thank you.

3              THE COURT:  Thank you.

4              We've got a few minutes, why don't we start with the

5    plaintiff's case.

6              Plaintiff, call your first witness.

7              MR. LABUDA:  We're going to call Dr. Sari Edelman.

8              THE COURT:  Doctor, please step up in the witness box,

9    remain standing, my courtroom deputy will administer the oath.

10             Members of the jury, if you want to take a quick

11   stretch break, you're welcome to.

12    SARI EDELMAN,

13        called as a witness by the Plaintiff,

14        having been duly sworn, testified as follows:

15             THE DEPUTY CLERK:  Please state your full name for the

16   record and spell out your first and last name.

17             THE WITNESS:  It's Sari S-a-r-i, Edelman

18   E-d-e-l-m-a-n.

19             THE COURT:  Ms. Edelman, you may be seated.  Please

20   try to keep your voice up, speak into the microphone.

21             Counsel, you may inquire.

22   DIRECT EXAMINATION

23   BY MR. LABUDA:

24   Q.  Good afternoon, Dr. Edelman.  What do you do for a living?

25   A.  I am a rheumatologist, which is a type of doctor who

N7ACede3                              Edelman - Direct

 1    specializes in treating arthritis.  I also treat autoimmune

 2    diseases.  This, for people who aren't familiar with

 3    rheumatology, includes different types of diseases like lupus,

 4    rheumatoid arthritis, as well as some rarer conditions that a

 5    lot of people haven't heard about, like relapsing

 6    polychondritis, vasculitis.  There are all different severities

 7    of the diseases I treat, some could be extremely severe and

 8    aggressive and need immediate treatment and care, and some are

 9    more chronic conditions like osteoarthritis and gout.

10    Q.  And did you go to college?

11    A.  Yes.  I went to college in New York State up in Binghamton,

12    New York.  I followed my sister, who is also an alumni, and my

13    younger sister followed me.  I graduated in 1996 with honors,

14    magna cum laude.  I was a dual major in both English as well as

15    mathematics.  And I went on from Binghamton to pursue a career

16    in actuarial science.

17    Q.  I would like to show you what's been marked as Exhibit 15

18    for identification.

19              MR. KATAEV:  Your Honor, I believe it's been admitted.

20    Is it okay to publish to the jury?

21              THE COURT:  Is any objection to Exhibit 15 being

22    received?  Why don't you post it for defense counsel and for

23    the Court.

24              MR. SCHOENSTEIN:  No objection, your Honor.

25              THE COURT:  Exhibit 15 is received and may be

1   published to the jury.

2            Members of the jury, it should show up on your

3   monitors.  Sometimes it takes a minute or two.

4            (Plaintiff's Exhibit 15 received in evidence)

5   Q.  We were talking about SUNY Binghamton.  With respect to

6   after SUNY Binghamton, what did you do after you graduated

7   there?

8   A.  So I was working in Manhattan as an actuary for a company

9   called Watson Wyatt Worldwide.  I was there for probably

10  between one and two years, at which time I decided that I

11  wanted to go back and pursue a career in medicine.  I guess --

12  Q.  Hold on one second.  Let me ask you, what's an actuary?  My

13  sister is an actuary, but not everybody knows what an actuary

14  is.

15  A.  An actuary is a mathematician who works within corporations

16  and does statistical analysis and programming.

17  Q.  So then you were saying, before I rudely interrupted you,

18  you said after doing that for two years, you decided --

19  A.  I wanted to pursue a career in medicine, so I decided to

20  apply for my post baccalaureate at NYU which is a specialized

21  program to do all of your prerequisites to apply to medical

22  school.  So I spent a year at NYU taking all of my premed

23  courses, which is orgo and biochem.  I completed it in one

24  year, it's typically a two-year program.  Once that's

25  completed, I worked at Saint Francis Hospital for a year, after

1   which I attended medical school.

2   Q.  And where did you attend medical school?

3   A.  I went to the New York College of Osteopathic Medicine,

4   which is in Old Westbury on Long Island, New York.

5   Q.  Did you graduate there?

6   A.  Yes, I did graduate from NYCOM.  I graduated on the dean's

7   list every semester.

8   Q.  And what year did you graduate?

9   A.  I graduated from medical school in 2003.

10  Q.  And after you graduate from medical school, what was the

11  next step in your professional career?

12  A.  So I obtained a residency position at Winthrop University

13  Hospital NYU in Mineola where I attended for three years.  And

14  from there, I applied or I continued on to do my rheumatology

15  fellowship at NYU Winthrop under the tutelage of Steve Carsons,

16  who is one of the world renowned experts in rheumatology.

17  Q.  After you do your internal medicine residency, do you have

18  to take any tests or anything like that?

19  A.  Yes.  So after you graduate or after I graduated from my

20  internal medicine residency, I sat for the American Board of

21  Internal Medicine and I became board certified as an internist.

22  And when I completed my fellowship in rheumatology, I passed my

23  ABIM, or the American Board of Internal Medicine boards for

24  rheumatology.

25  Q.  When did you do that with respect to rheumatology boards?

1    A.   That was completed in 2008.  And then there's another round

2    of recertification that is done approximately 10 years later,

3    which I did while I was at NYU.  So I'm board certified or

4    recertified in both internal medicine and rheumatology.

5    Q.   And is that something that you have to continue to

6    recertify for during your career as a doctor?

7    A.   Yes.

8    Q.   And that's, you said, approximately every 10 years or so?

9    A.   The guidelines have changed a little bit now.  So based on

10   when you were certified, it shifted a little bit.  There's like

11   different types of testing now.

12   Q.   Just briefly, what's the certification process?

13   A.   There are exams that you take.  So you study and prepare

14   and you go in, there's an online exam.  It's several hours long

15   over the course of a day and they ask you questions in every

16   subspecialty in rheumatology.

17   Q.   And you have to pass the exam?

18   A.   Yes, you have to pass to maintain your certification.

19   Q.   Have you published any articles?

20   A.   During my fellowship, I was involved in a lot of research.

21   My particular field that I was interested in through my

22   fellowship was in cardiovascular health and autoimmune disease.

23   I did research looking at different medications, including

24   cyclooxygenase inhibitors, which are a pain reliever medicine

25   and how it affects cholesterol transport, as well as

N7ACede3                    Edelman - Direct

1    Methotrexate.  I'm published in Arthritis and Rheumatism, which

2    is the largest and most recognized journal in rheumatology.

3             THE COURT:  Dr. Edelman, can I ask you to try to go a

4    teeny bit slower.  It will be easier for the jury and I think

5    the court reporter.

6             THE WITNESS:  Sure.

7             THE COURT:  Go ahead, counsel.

8    Q.  After you finished your rheumatology fellowship and were

9    board certified, what did you do after that?

10   A.  So during my last year of fellowship, I decided that I

11   wanted to go into private practice and I wanted to open my own

12   office.  I am one of four girls, and my mom was a business

13   owner my whole life, and I have three sisters who are business

14   owners and professionals, and that seemed like the next logical

15   step for me, was to open my own office.  I had a vision of

16   making a space that was very comfortable and providing for

17   patients.  So I started to develop that business while I was in

18   the end of my fellowship and then opened the office upon

19   graduation.

20   Q.  Other than going to private practice, are there other

21   fields that rheumatologists go into after they graduate from

22   school, medical school?

23   A.  There are different tracks that you can take.  Some people

24   do an academic track where you work for a hospital and you

25   spend some of your time teaching and educating the residents

1    and fellows.  And there is some clinic time, as well, where

2    you're taking care of and treating patients.  Some people

3    choose to do more of a research track where they might work for

4    an industry like a big pharmaceutical company and there is more

5    limited patient care, maybe just to see your clinic, your trial

6    patients.  And then there's clinical practice where the

7    majority of your time is dedicated to treating and taking care

8    of your patients.  And for me, that's what drew me back into

9    medicine, was to take care of people and treat people.  I loved

10   the problem solving of being a diagnostician in rheumatology

11   and I wanted 100 percent of my time focused into doing that.

12   Q.  And so you were in private practice from 2008 until when?

13   A.  Until 2014.

14   Q.  And then just briefly, and we'll get into this in more

15   detail, but briefly, after being in private practice, where did

16   you work?

17   A.  So the private practice in 2014, my primary doctor,

18   Dr. Mehta, we joined NYU Langone Faculty Group Practice, part

19   of their ambulatory care center in Lake Success, New York.

20   Q.  And that was from 2014 until when?

21   A.  Until May of 2021.

22   Q.  And then what did you do professionally after NYU?

23   A.  From that time to present, I'm working at Arthritis and

24   Rheumatism, which is a private practice rheumatology group in

25   Clearwater, Florida.

1    Q.  Tell me a little bit about yourself, Dr. Edelman.  Where
2    were you born?
3    A.  I was born in Queens, New York.  I grew up on Long Island
4    in East Meadow, New York.  I met my husband in high school, at
5    East Meadow High School and we went on to college together.
6    And when I went -- started medical school, we had just gotten
7    married and we started a family while I was in fellowship.  And
8    we have stayed and lived in New York our entire lives.  So most
9    of my family is from New York.  All of my sisters are living
10   presently in New York.  And we raised our kids in Syosset, very
11   close to my younger sister and all my nieces and nephews.
12   Q.  Do you have any other family, parents or anything like that
13   in New York?
14   A.  I have a very big family between my three sisters, lots of
15   nieces and nephews, I think there's 19 of us all together.
16   Both of my parents are in New York, as well, my mom and dad and
17   my father-in-law and mother-in-law, as well as my
18   sister-in-law, and my nieces and nephews with my sister-in-law.
19   Q.  Do you have any kids?
20   A.  I have two children.
21   Q.  What are their names?
22   A.  My daughter Lexi and my daughter Haley.  Haley is 20 years
23   old.  She is presently going into her senior year of college.
24   And Lexi is 16 years old and she's a freshman in high school.
25   Q.  If you have any spare time, what do you do?  This is not a

1    jury question.

2    A.   So I do enjoy gardening and I like to bake — I'm not a very

3    good cook.   And I really enjoy reading.   I participate in a

4    book club whenever I can get a chance.

5    Q.   So I want to turn back to the private practice.   So you

6    said you had started that in 2008 with Dr. Kavini Mehta?

7    A.   Yes.

8    Q.   How did you know Dr. Mehta?

9    A.   Dr. Mehta and I both went to our fellowship program

10   together.   She had completed one year prior to me and she went

11   into a practice on Long Island.   When I was starting up going

12   into private practice, she had reached out to me and said that

13   she was unhappy at her present location and she would be

14   interested in going into partnership with me.   So we went in

15   50/50 into the partnership for our business, which was called

16   Rheumatology Associates of New York.

17   Q.   And that was in 2008?

18   A.   That was in 2008 that we opened our doors for our very

19   first patient.

20   Q.   Where was that located, where was the offices?

21   A.   The location was 1991 Marcus Avenue in Lake Success.

22            THE COURT:   Mr. Labuda, it's just about 2 o'clock, so

23   when you get to a convenient breaking point, why don't we break

24   for the day.

25            MR. LABUDA:   Sure.

1   Q.   Just briefly, describe the staff that you had there at your

2   private practice.

3   A.   So we had our admin staff, which was an office manager, as

4   well as billing, and we had our reception team and we had

5   medical assistants and we had infusion nurses.  We had an

6   infusion suite, so we had nursing staff to support that.

7   Q.   When you started the practice in '08, how many patients did

8   you have?

9   A.   So we started with zero, we built it up.  I remember going

10  door to door to physicians in the community to meet people and

11  introduce ourselves.  By the time we joined NYU in 2014, we had

12  6,000 patients approximately.

13  Q.   That's in about six years?

14  A.   Six years, yes.

15  Q.   In the offices over at 1991, what was the setup in terms of

16  how you treated patients and did your business there?

17  A.   So we had designed the build-out.  We met with architects.

18  The space that we had looked for for the office, it originally

19  had no build-out at all, so we designed the space.  It had a

20  total of six exam rooms so each doctor can float three rooms to

21  see patients.  We each had private consult rooms, as well, when

22  we first met with our patients.  We had our infusion suite, we

23  had an area for phlebotomy, as well as our front desk waiting

24  room.  It really was designed quite beautifully.  We had very

25  nice furniture and it felt more like a spa, which was the

N7ACede3                          Edelman - Direct

1    intent of what we had wanted.  It felt very comfortable for our

2    patients.

3              THE COURT:  It's now 2 o'clock.

4              MR. LABUDA:  I will end now, your Honor, unless your

5    Honor -- I'll end now.

6              THE COURT:  I think 2 o'clock is the convenient

7    breaking time.

8              Members of the jury, we're going to let you go for the

9    day.  During the break, during the afternoon and evening,

10   please follow my instructions.  Don't do any research about the

11   case, don't do any investigation, don't speak to anybody about

12   the case, no going on the internet about the case or issues

13   related to the case.  We'll start again tomorrow morning at

14   9 o'clock and end by 2 o'clock.

15             As a reminder, please try to be here by 8:45 a.m. and

16   we'll have breakfast for you at 8:30 for those who want to

17   partake in breakfast that we offer.

18             Have a good afternoon, everybody.

19             (Continued on next page)

20

21

22

23

24

25

N7ACede3                          Edelman – Direct

1              (Jury not present)

2              THE COURT:  Dr. Edelman, you may step down.

3              You may all be seated.

4              Anything from plaintiff before we break for the day?

5              MR. KATAEV:  I have one thing.  It's very hard to see

6      the witness with the computer in front of her.  When we get

7      back tomorrow morning, is it okay for me to adjust it so that

8      she's more visible?

9              THE COURT:  I think that's fine.  Just work with my

10     courtroom deputy and with defense counsel.  Get here early in

11     order to do that.

12             Anything else from defendants?

13             MR. SCHOENSTEIN:  Not for the Court, your Honor.  We

14     need to discuss with opposing counsel some witness scheduling

15     issues and hope they can do that afterwards.

16             THE COURT:  I have got parties here on my next case,

17     so maybe what you'll do is there's a witness room out back, why

18     don't you meet back there if you collect your stuff.

19             Who is the next witness going to be?

20             MR. KATAEV:  It will be Dr. Kavini Mehta, your Honor.

21             THE COURT:  See you all tomorrow by 8:45 a.m.

22             (Adjourned to July 11, 2023 at 8:45 a.m.)

23                              * * *

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    SARI EDELMAN

 4   Direct By Mr. Labuda . . . . . . . . . . . . .49

 5                        PLAINTIFF EXHIBITS

 6   Exhibit No.                              Received

 7    15    . . . . . . . . . . . . . . . . . . .51

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

N7BCede1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DR. SARI EDELMAN,

      Plaintiff,

     v.           21 Civ. 502 (LJL)

NYU LANGONE HEALTH SYSTEM, *et al.*,

      Defendants.
                  Trial
------------------------------x
                  New York, N.Y.
                  July 11, 2023
                  9:00 a.m.

Before:

                  HON. LEWIS J. LIMAN,

                District Judge
                -and a Jury-

                  APPEARANCES

MILMAN LABUDA LAW GROUP PLLC
    Attorneys for Plaintiff
BY:  JOSEPH M. LABUDA
     EMANUEL S. KATAEV

TARTER KRINSKY & DROGIN LLP
   Attorneys for Defendants
BY:  RICHARD C. SCHOENSTEIN
     RICHARD L. STEER
     INGRID J. CARDONA

N7BCede1

```
 1                    (In open court; jury not present)
 2                    THE COURT:    We've got the jurors here.
 3                    Is there anything the plaintiff has before we bring
 4     the jurors in?
 5                    MR. KATAEV:    No, your Honor.
 6                    THE COURT:    What about from defendants?
 7                    MR. SCHOENSTEIN:    Nothing from us, your Honor.
 8                    THE COURT:    Two things I want to put on the record
 9     just briefly.  It occurred to me as I was going through the
10     voir dire that I should mention that I have a daughter who goes
11     to NYU undergraduate, she's not receiving any kind of financial
12     aid to my knowledge, she has no interest in medicine.  I've
13     considered the question of whether it presents any kind of
14     conflict or appearance issue.  I don't believe that it does,
15     but parties are free to mention to me if they think that it
16     does, I thought I would just mention it.
17                    The other thing is that in terms of the charge
18     conference, we would do that at 2:30 today.  So we'll finish
19     with the jury at 2 o'clock, I'll give you a half an hour break,
20     and we'll come back for the charge conference.
21                    Make sense from the plaintiff's perspective?
22                    MR. LABUDA:    Yes, your Honor.
23                    THE COURT:    And from defendants' perspective?
24                    MR. SCHOENSTEIN:    That's fine, your Honor.
25                    Do you have something between 2:00 and 2:30?  Do we
```

N7BCede1

1    need to clear off?

2              THE COURT:    No, you can use the courtroom.

3              MR. SCHOENSTEIN:    Appreciate it.

4              THE COURT:    All right.  Let's have the witness take

5    the stand.

6              MR. LABUDA:    And I can take the podium?

7              THE COURT:    You'll stand where you are and then you'll

8    move to the podium once the jury comes in.

9              MR. LABUDA:    Okay.

10             THE COURT:    Let's bring the jury in.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N7BCede1                    Edelman - Direct

```
 1              (Jury present)
 2              THE COURT:    Good morning, members of the jury.  I hope
 3    you all had a pleasant afternoon or pleasant evening.  Welcome
 4    back.  We'll continue with the testimony of Dr. Edelman.
 5              Dr. Edelman you're reminded you're still under oath.
 6              Counsel, you may inquire.
 7              MR. LABUDA:    Thank you.
 8     SARI EDELMAN, resumed.
 9    DIRECT EXAMINATION CONTINUED
10    BY MR. LABUDA:
11    Q.    Good morning, Dr. Edelman.
12    A.    Good morning.
13    Q.    When we broke yesterday, we were talking about your private
14    practice.  And then I wanted to ask you, when you started the
15    private practice, you indicated you started with zero patients.
16    How is it that you were able to start the practice without any
17    type of revenue stream in the beginning?
18    A.    We acquired a small business loan, my husband and I
19    collateralized the house for the loan and we used that money to
20    purchase the build-out of the space, to buy the office
21    equipment, the early inventory to treat patients, as well as to
22    cover the first year of salaries.
23    Q.    And when you talk about the build-out, what do you mean by
24    that?
25    A.    The office space was an empty blank space.  There was
```

1    not -- there was no -- there were no flooring, no lighting.  So

2    it included putting the entire -- putting in bathrooms, exam

3    rooms, building out the waiting room, the front desk.  We did

4    everything from going over to the granite yard and picking

5    granite to put on the front desk when we walked in, to putting

6    up the signage for the office up front.  We had a custom sign

7    so that when you came into the building, it was on the first

8    floor.  It was a huge glass window that you could see

9    "Rheumatology Associates of New York."  We went to purchase our

10   furniture in Manhattan.  We got beautiful waiting room chairs

11   that the patients could be super comfortable on.  We got all

12   high-end equipment for the exam rooms.

13   Q.    Let me remind the witness, if you could slow down a little

14   bit just for the jury and for the court stenographer, as well.

15   Thank you.

16   A.    Sorry.

17   Q.    So with respect to the build-out of the space, did you have

18   to hire any contractors to perform that work for you?

19   A.    Yeah, there were contractors.  There was an architect that

20   worked with us, and we also worked with a designer who helped

21   with choosing all of the different textiles to use in the

22   office.

23   Q.    Did you pay for those services for the contractor?

24   A.    Yes.

25   Q.    Was that from the business loan?

1   A.   Yes.

2   Q.   And with respect to the practice before you joined NYU, how

3   was the practice doing?

4   A.   So the practice was doing very well.  We had buildup from

5   no patients up to 6,000 patients.  We were busy, we had a wait

6   list going out -- to get in as a new patient was out two, three

7   months.  We had a very strong referral basis from a lot of

8   doctors in the community.  We were one of the first tenants in

9   the 1991 Marcus Avenue location.  And from the time that we

10  started in that space to when we joined NYU, it was now filled

11  with other tenants and we had referrals from the

12  gastroenterology office across the hall, from the oncology

13  offices in the other buildings, as well as the cardiology

14  suites.  There was an OB/GYN downstairs, which is obstetrics

15  and gynecology.  We were doing very nicely.

16  Q.   And before you moved on to NYU, were you affiliated with

17  any other group?

18  A.   Yeah, there was a short period of time where we had an

19  affiliation with Nassau Radiology.  They are a radiology group

20  that was on Long Island that affiliated with different

21  multi-specialists for a period of time.  So we had joined with

22  them and they had done some of the billing for our group so

23  that we could put in for higher insurance rates as being part

24  of a larger group for reimbursements.

25  Q.   And were you under contract with that group?

N7BCede1                    Edelman - Direct

1   A.    Yes.

2   Q.    And when that contract ended, that's when you joined NYU?

3   A.    Yes.

4   Q.    And with that group, when you were with that group before

5   you joined NYU, did you understand any type of financial

6   distress they were under, had they filed for bankruptcy or

7   anything like that?

8   A.    No, they had not filed for bankruptcy.  Our decision to

9   move over to NYU occurred after Dr. Goldberg approached us and

10  had said that NYU was looking to expand a rheumatology group

11  for NYU within the 1991 Marcus Avenue locations.

12  Q.    Just to be clear, who reached out to whom about joining

13  NYU?

14  A.    Dr. Goldberg reached out to Dr. Mehta and myself.

15  Q.    Dr. Goldberg at that point in time was working for NYU?

16  A.    I believe he had just joined or he was about to join.  So

17  he was working at the 1999 Marcus Avenue suite.  There's two

18  buildings at Marcus Avenue, they're sister buildings, they're

19  almost identical.  So he was in the first floor oncology suite

20  when he first started.  He was the first rheumatologist brought

21  on board at that location by NYU.  And we had a strong working

22  relationship with the hematology oncology group in that office

23  where he was working.  So he was well aware of our practice in

24  the building next door and I think that's what prompted him to

25  reach out to us.

1   Q.    And when he reached out to you about joining NYU, what was

2   your reaction, I guess your partner's reaction, Dr. Mehta?

3   A.    It was something that we were going to strongly consider.

4   We were very familiar with NYU as an entity.  Dr. Mehta and I

5   both trained at Winthrop University Hospital, which also had an

6   affiliation with Nassau University Medical Center, which was

7   more like a county hospital.  And during our time working at

8   that hospital, we had worked closely with some of the doctors

9   at NYU.  They would come down from the rheumatology group at

10  NYU, they would come down to see patients for their clinics.

11  We were comfortable with them from our fellowship from doing

12  research.  So there was a draw to be part of that.

13          We were also interested in this concept that was presented

14  to us by Dr. Goldberg of the musculoskeletal center which was

15  going to mimic what was in Manhattan.  So this would be more

16  like a bone and joint center.  So he discussed with us a

17  concept where we would have a rheumatology group, a suite, and

18  there would also be orthopedics on site.  There would be

19  on-site radiology, an ultrasound technician, and there would be

20  a nice collaboration as a musculoskeletal center.  So that

21  piqued our interest, as well.

22  Q.    And other than NYU, were there any other avenues that you

23  were considering when this other contract was expiring?

24  A.    We were at the time.  There was a group of rheumatologists

25  on Long Island who was looking to form a supergroup, so for

N7BCede1            Edelman - Direct

1    rheumatologists all across the state to join to try to have

2    power in numbers for negotiating insurance contracts.  So we

3    had had a meeting with those doctors.  I think we might have

4    met with them twice.  So we were in discussions about that.

5            We had also met with another hospital -- another healthcare

6    organization, ProHealth at the time.  And we were, also, you

7    know, contemplating also going back to our individual

8    self-practice where we wouldn't be affiliated, you know, with

9    someone else's tax ID.

10   Q.    After Dr. Goldberg approached you about joining NYU, did

11   you take any further steps about working with NYU and

12   affiliating with NYU?

13   A.    So we did.  He put us in touch with a recruiter from NYU.

14   Her name was Marianna and we had had some discussions with her,

15   we had some meetings at that time.  So she had explained some

16   other benefits about joining the organization.  There would be

17   the ability to offer our employees benefits for medical

18   insurance, there would be retirement benefits for ourselves, as

19   well, as well as they would do a lot of administrative

20   responsibilities.  And for Dr. Mehta and I, we had younger

21   children at the time, and that was an incentive maybe for

22   work-life balance.

23   Q.    After you spoke with Marianna several times, did you take

24   any further steps about affiliating with NYU?

25   A.    So we arranged for a meeting to meet with Mr. Rubin and

N7BCede1                Edelman - Direct

1    Mr. Swirnow at Park Avenue in Manhattan.

2    Q.    This is Mr. Andrew Rubin and Joshua Swirnow?

3    A.    Yes.

4    Q.    And so you arranged for a meeting with them.  What happened

5    at this meeting, do you have any recollection of when that

6    meeting took place?

7    A.    I don't know the exact date that it took place.

8    Q.    So why don't you tell us what happened during that meeting,

9    what was said?

10   A.    So when we went into the offices and we first walked into

11   the offices, the first thing that Mr. Andrew Rubin had said

12   when he had first seen us was, "oh, you're women," and I

13   remember kind of being taken aback.  We went, we sat down in

14   the chair and we began to, you know, sit down and discuss, you

15   know, potentially joining the organization.

16   Q.    And were there any discussions at that time in terms of the

17   economics or somewhat better details of the affiliation,

18   employment?

19   A.    Yes.  So some of that discussion was about the economics.

20   I believe that Dr. Mehta and I had wanted a salary around

21   $260,000.  We were definitely interested in the benefits

22   packaging for retirement.  What we discussed was we wanted all

23   of our staff to be brought over, as well, and for them to

24   maintain their salaries, as well, and to have the ability for

25   medical benefits.  We discussed that they would assume our

1    lease if we went into this agreement.  We had had a 20-year

2    lease that we signed when the building first opened.  It was an

3    excellent rate.  It was probably one of the lowest rates

4    because we were one of the first tenants in.  And that was

5    something during those discussions, I think, that was

6    attractive to them because they really weren't looking to

7    expand their footprint on Long Island and we had a prime real

8    estate for them in that building, which was where they were

9    building out and expanding their other groups, as well.

10   Q.    And was there discussions about them taking over the lease

11   that you had in your private practice?

12   A.    Yes.

13   Q.    And was there any discussions about the benefit of taking

14   over that lease, other than I think you had said the beneficial

15   rent rates that you had, was there anything else that was a

16   benefit that you discussed with them about them taking over the

17   lease?

18   A.    So the space was completely built out.  We were already

19   functioning and working out of it, we had all of our equipment

20   there, so there was no additional cost at that point to NYU for

21   us to continue to be in that space and move forward.

22   Q.    So you had some costs in and they were taking it over

23   without in-costs?

24   A.    Yes.

25   Q.    And was there also discussion about them seamlessly taking

N7BCede1              Edelman - Direct

1   over the medical equipment, the furniture, exam rooms and

2   everything like that?

3   A.     Yes, everything would stay pretty much exactly the same.

4   The only, probably, major difference for our day-to-day

5   practice was that NYU was building -- and I'm not sure at that

6   point, it might not have been completed, but in the 1999

7   building right next door, they were building something called

8   an Article 28 space, it might have been up already, which is an

9   infusion center.  So that is a place where patients go to get

10  like IV infusions for medications, but it's billed out because

11  it's deemed a hospital space.  So it's billed out at hospital

12  rates.  So NYU was interested, you know, in our practice

13  particularly because rheumatology does a lot of infusion

14  services.  So they were recruiting practices like our own for

15  infusion services for that suite.  So that piece of it, because

16  we had had our own infusion chairs in our office, our patients

17  would be referred next door to their suite so that way they

18  would get higher rates for our infusible services.

19  Q.     And with respect to the loan, you still had a business loan

20  outstanding at the time that you were in discussions with NYU;

21  is that correct?

22  A.     That's correct.

23  Q.     And was there any discussions about what would happen with

24  that loan?

25  A.     So NYU said that they would assume the loan for the

N7BCede1                Edelman - Direct

1    build-out of the space, knowing that they were getting our

2    office fully built out and that would be theirs for future use.

3    Q.    And I know you had mentioned that you had asked initially

4    for a salary of $260,000.  Do you have any recollection of what

5    your salary was that you were giving yourselves in the private

6    practice?

7    A.    I think it was around $200,000.

8    Q.    Were there any discussions, emails, email discussions about

9    the negotiations, the contract negotiations?

10   A.    So yes, there were.  There were multiple emails.  After

11   that initial meeting at Park Avenue, there were -- the rest of

12   the negotiation was done via email.  So there were multiple

13   emails that went back and forth between myself, Dr. Mehta,

14   Mr. Swirnow, and Mr. Rubin.  And I believe that Jon -- there

15   was a Mr. Jonathan Crow, as well, who might have been involved

16   in some of those emails.

17   Q.    I'm going to show you what's been marked into evidence

18   as -- I'm going to show you what's been marked as exhibit 11

19   and it's --

20             MR. KATAEV:    Publish to the witness and the Court.

21             THE COURT:    You can show it to the witness and to

22   counsel.  You don't have to ask permission if you just want to

23   show it to the witness.

24             MR. LABUDA:    Yes.  There is another document that we

25   agreed is in evidence.

N7BCede1                Edelman - Direct

1            THE COURT:    Is that so?  Maybe you can tell me which

2    exhibits you've agreed on as in evidence, otherwise you'll

3    offer them and the other side will tell me if they've got an

4    objection.

5            MR. SCHOENSTEIN:    No objection.

6            THE COURT:    Exhibit 11 is received.

7            (Plaintiff's Exhibit 11 received in evidence)

8            MR. KATAEV:    May I publish it to the jury?

9            THE COURT:    You may publish it to the jury.

10   Q.    If you look on what's marked as D73, I think it's the third

11   page of this exhibit, at the top there is an email that your

12   partner Kavini Mehta wrote to Joshua Swirnow on August 4th,

13   2014 at 5:25 p.m.; correct?

14   A.    Yes.  I'll correct that we wrote the email together at the

15   same time, it was just sent from her email and it's signed from

16   both of us.

17           THE COURT:    Can the jurors make it out?  It's small.

18   Okay.

19           MR. LABUDA:    If you can scroll down to the next page,

20   please.

21   Q.    Can you read the section about "We were a brand new startup

22   practice."

23   A.    We wrote that we were a brand new startup practice.  The

24   loan was paid to use office overhead.  This included rent for

25   the office space, the office build-out, furniture, which was

N7BCede1              Edelman - Direct

1   for five exam rooms, one bone density machine, three consult

2   rooms, a lab area, a break room, and the reception area, as

3   well as a waiting room, buying and leasing equipment, bone

4   density machine and leasing the musculoskeletal sonogram and

5   printer/fax.

6   Q.    And for providing this space that had already been built

7   out, what was your understanding what NYU was doing with

8   respect to your loans?

9   A.    They were assuming the loan in exchange for this.  And I

10  believe it's in our contract, as well, that's how it's stated

11  on our contracts.

12  Q.    Let's actually get to your contract.

13          I'm going to show you what's been marked for identification

14  as exhibit 8.

15              THE COURT:    Is there an agreement that 8 is in

16  evidence?

17              MR. SCHOENSTEIN:    No objection.

18              THE COURT:    I take it you're offering 8?

19              MR. LABUDA:    Yes, we're offering 8.

20              THE COURT:    8 is received.

21              (Plaintiff's Exhibit 8 received in evidence)

22              MR. KATAEV:    Publishing to the jury.

23              THE COURT:    You may publish to the jury.

24  Q.    This is a copy of your contract that you had with NYU back

25  in 2014; is that correct?

N7BCede1                Edelman - Direct

1    A.    That's correct.

2    Q.    Now, with respect to just jumping back with the contract

3    negotiations, who was involved in negotiating the economic

4    terms with NYU?

5    A.    So Dr. Mehta and I did that ourselves.  We talked amongst

6    ourselves.  After the contracts were drawn up and we got the

7    final drafts, we consulted with an attorney who was a family

8    member just to review some of the language in the contract.  We

9    didn't have any assistance in negotiating the terms for our

10   salaries.

11   Q.    So your attorney wasn't involved in speaking to NYU about

12   negotiating the --

13   A.    Not at all.  It was a family member and it wouldn't have

14   been appropriate for us to have those conversations with that

15   person.

16   Q.    This document is dated September 5th, 2014.  Do you see

17   that?

18   A.    Yes.

19   Q.    Do you remember when you actually started with NYU?

20   A.    So we started with NYU, I believe it was December of 2014

21   or January of 2014.  Both of our contracts I think were

22   slightly different because Dr. Mehta was pregnant, so I think

23   she started a month later after she delivered.

24          THE COURT:   Excuse me.  You said "December of 2014 or

25   January of 2014."

1                    THE WITNESS:    Sorry.  January of 2015.

2     Q.     So if you scroll down, we'll go through each one of these.

3     In terms of the second page, it has a section about "Space."

4     can you read that, please.

5     A.     It says: "Space.  Space provided to you for your NYU

6     Langone Medical Center responsibilities is for performing

7     services for NYU Langone Medical Center only.  You may not use

8     such space for purposes of any other organizations, unless

9     approved in writing by the dean of the School of Medicine."

10    Q.     What did you understand that to mean in terms of the space

11    for you?

12    A.     That I would be provided a space to do my consultation work

13    when patients came in to see me to have a consult room, to meet

14    with the patient first, as well as examination rooms, and that

15    the space was for me, that I would have space.  The email

16    correspondence during our negotiations, we had a very clear

17    understanding that we would -- Dr. Mehta and myself, being that

18    we had had consult rooms presently, that if there would be a

19    change in space later, that we would each have our own consult

20    rooms as long as we were full-time employees.

21    Q.     And who was that email correspondence with?

22    A.     That was with Mr. Joshua Swirnow.

23    Q.     And just so I understand, when you started with NYU, where

24    were you located?

25    A.     We stayed in our 1991 Marcus Avenue location.  When we

1  started, I don't know the approximate time we had stayed there,

2  but the new space that they were building in the 1999 space

3  wasn't complete, so we were at the 1991 space probably for a

4  year-plus.

5  Q.    So you didn't have to -- there was no moving whatsoever.

6  Did you even have to change keys?

7  A.    No.

8  Q.    No change, it was seamless?

9  A.    Right.

10 Q.    Friday you were working for your private practice, Monday

11 you worked for NYU?

12 A.    Yes.  They came in and they changed the sign.  So they

13 changed it from Rheumatology Associates of New York and they

14 put up the NYU Rheumatology sign in the front.  And our

15 electronic medical record was Epic at the time, which was the

16 same electronic medical record as NYU, but we did have to

17 switch over to their system.  So that was changed over.  They

18 did send in some people for training, I believe, for a short

19 period, but my staff was pretty much already trained on it.

20 Q.    And above that in Section 3, it references "Benefits."

21 What benefits did you have when you worked at NYU, other than

22 let's say your compensation?

23 A.    So we had an expense of $3,000, which was for going to

24 conferences or paying for societies.  We had retirement

25 benefits.  So we had a match, they had a 10-percent match of

1    your salary each year, which was not based on my contribution,

2    they just -- they matched up to 10 percent.  So if you were

3    making $200,000 a year, they put in $20,000 for you.  There was

4    an additional pension fund that you could put money into.  I

5    think it was called a 403B.  And then there was also the 401D

6    that you could put in based on the maximal allowable, you know,

7    what the government allowed each year, which changed, which

8    could be $18,000 or whatever it was.

9    Q.    And I just want to clarify, the first retirement vehicle

10   you were talking about, you mentioned matching.  Did you have

11   to put money into that retirement account or was that something

12   that NYU put in solely?

13   A.    I believe they matched it to what I put in.  So if I put in

14   the 20, they put in the other 20.  So it was $40,000 a year tax

15   free.

16   Q.    Let's go down to page 46.

17            MR. KATAEV:    D46?

18            MR. LABUDA:    D46, yes.

19   Q.    You received an academic appointment at NYU; is that

20   correct?

21   A.    Yes.

22   Q.    And what was your appointment?

23   A.    It's an assistant professor of medicine.

24   Q.    And you were a faculty member at the NYU School of

25   Medicine; is that correct?

N7BCede1                Edelman - Direct

1    A.    Yes, and you're considered a staff physician.

2              MR. LABUDA:    And if you want to scroll down to

3    page D49, please.

4    Q.    At for being employed at NYU and providing services, you

5    received compensation; correct?

6    A.    Yes.

7    Q.    And I think you had said you had asked for a $260,000.

8    Ultimately, the agreed upon amount was $207,000; is that right?

9    A.    Yes.

10   Q.    And that was to provide clinical services?

11   A.    Yes, it was 100 percent clinical services, which would be

12   outpatient, seeing patients.  We did have some hospitals, as

13   well.  So we had privileges at the hospital.  So we did see

14   some patients at Winthrop as well as Northwell.

15             MR. LABUDA:    And if you scroll down to Section 49,

16   expenses.

17   Q.    I think this was what you were referring to before in terms

18   of $3,000 for expenses?

19   A.    That's correct, yes.

20             MR. LABUDA:    If you move to D50, please.

21   Q.    This is where it lists your faculty appointment as clinical

22   assistant professor in the department of medicine; is that

23   right?

24   A.    Yes.

25   Q.    And the academic track is clinical, and it's a nontenured

1    position?

2    A.    That's correct.

3              MR. LABUDA:    If you scroll down to the bottom of this

4    page.

5    Q.    Your employment status, your employment title was staff

6    physician?

7    A.    That's correct.

8    Q.    And your employment status was full-time; correct?

9    A.    That's correct.

10             MR. LABUDA:    And if you go to D51.

11   Q.    At the top of it, this was for a three-year term; correct?

12   A.    Yes.

13   Q.    So you were employed by NYU from December of 2014 until,

14   that would be December of 2017; is that right?

15   A.    Yes.

16   Q.    And below it, it says unless in the renewal, unless this

17   agreement is explicitly renewed in writing, if you continue to

18   provide services following the expiration of this agreement,

19   you will become an employee at will.  Do you see that?

20   A.    Yes.

21   Q.    Did you have any understanding what that meant?

22   A.    Yes.  My understanding is if they don't -- if your contract

23   isn't renewed, then basically after that, anything in this

24   contract is not in existence.  They can be let go just because.

25   Q.    And then below that is a termination for cause.  Do you see

N7BCede1              Edelman - Direct

1    that?

2    A.    Yes.

3    Q.    And they list reasons why, during the term of the contract,

4    you could be terminated; correct?

5    A.    Yes, that's correct.

6    Q.    And that includes intentional acts of fraud, breach of

7    NYU's code of conduct, intentional disclosure of patient

8    information, breach of your obligations under this agreement,

9    intentional violation of NYU conflict of interest policies, and

10   willful and continued failure to substantially perform your

11   duties for NYU; correct?

12   A.    That's correct.

13   Q.    So those are the reasons why NYU, during your term, could

14   terminate you; correct?

15   A.    Yes.

16   Q.    Below that, there's a reference in the second to last line,

17   it says:  "Failure to meet your performance standards or

18   objectives by itself does not constitute cause."  Do you see

19   that?

20   A.    Yes.

21   Q.    Do you have any understanding of what that meant?

22   A.    Yes.  That was something that our attorney revised or

23   addended our contract to include meaning that if you don't

24   necessarily meet a performance standard, like at a given time,

25   that they couldn't terminate you for that, it had to be for the

1    causes listed above.

2              MR. LABUDA:    If you turn to page D52, please.

3    Q.    There is a section called clinical responsibilities.  Do

4    you see that?

5    A.    Yes.

6    Q.    And you were part of the NYU Langone Nassau Rheumatology

7    faculty group practice; is that right?

8    A.    That's correct.  And NYU, throughout the contract, has many

9    titles and names of pieces of the organization that we're

10   listed under.  So this is one of the entities, the faculty

11   group practice.

12   Q.    And below that is FGP Expectations.  Do you see that?

13   A.    Yes.

14   Q.    And for your services, you were to provide clinical patient

15   care in the specialty of rheumatology on a full-time basis;

16   correct?

17   A.    Yes.

18   Q.    That's what they hired you to do; correct?

19   A.    Yes, they hired me to do clinical outpatient rheumatology

20   on a full-time basis.

21   Q.    And again, it references your salary and there's a

22   reference to a work RVU.  Do you see that?

23   A.    Yes.

24   Q.    What is a work RVU?

25   A.    So a work RVU is a relative value unit.  It's a measure

1   that assigns a point system for each of the services that you

2   provided medicine.  The main values are through the Medicare

3   sites or through the government.  They're published and changed

4   yearly.

5           So, to give examples, if were you to do like a followup

6   visit or a 99213, there would be a work RVU value assigned of

7   like 1.2.  And these are just made up numbers because there are

8   a lot of numbers, so I couldn't give you exacts, but every time

9   you provide a service, there is a work RVU assigned to that

10  service.  So whether it be seeing a patient in followup, seeing

11  a new patient consult, doing a procedure like if you do a joint

12  injection, if you do something like -- like sometimes certain

13  procedures with, like, a musculoskeletal ultrasound might have

14  a work RVU assigned to it.

15  Q.    Were these -- I'm going to call them RVUs, just to save a

16  half a second.

17  A.    Sure.

18  Q.    So with these RVUs, did NYU keep track of these?

19  A.    Yes.  So this is how they measured your performance

20  standards.  So every month at the end of the month, you would

21  get an email with your measures showing you exactly, broken

22  down by each code, how many RVUs, and then you've got a summary

23  for the end of the month together so you could see where you

24  were at.

25  Q.    When you say you got them, were they emailed to you or sent

1   to you or something like that?

2   A.    They were sent through an email.  So there was a specific

3   person in the organization who was responsible for that who

4   sent it every month.

5   Q.    I'm going to ask you to look at exhibit 89 and specifically

6   page 311, but let's just look at -- I'm going to have you look

7   at 89 for identification.

8            MR. KATAEV:    Your Honor, there is no dispute as to

9   admissibility.

10            THE COURT:    I'm going to hear from one lawyer.  I'm

11   only go to hear from one lawyer during the examinations.

12            Go ahead, Mr. Labuda.

13            MR. LABUDA:    We're offering this exhibit.

14            MR. SCHOENSTEIN:    No objection.

15            THE COURT:    89 is received.

16            (Plaintiff's Exhibit 89 received in evidence)

17            MR. KATAEV:    Publishing.

18            THE COURT:    That rule also applies to objections.  So

19   one lawyer makes objections, one lawyer does the examination.

20   Go ahead.

21            MR. LABUDA:    Understood.

22   Q.    If you look at page 311 of this document, can you just

23   briefly describe what this page is showing.

24   A.    This is a summary of everything that I had done by month

25   from September -- looks like from June of 2019 — so that's in

N7BCede1              Edelman - Direct

1   the first column — to November of 2019.  It breaks it down by

2   each visit or procedure.  So the CPT code is just the code

3   that's assigned for whatever the service is.

4           So the first one, like arthrocentesis of a small joint is a

5   joint injection.  Going down, each one is for an intermediate

6   joint or like a larger joint or a major joint, which is an even

7   bigger joint like a knee or a hip.  There's, for other

8   procedures like ganglion cysts and for things like vaccinations

9   is on here.  If you do an injection, like a steroid injection

10  in the office or sometimes you can give other types of

11  medication injections.  There's for each of the visits, so

12  there's different levels for new as well as established.  So

13  those are the codes that go down from 99203 down to 99245.  And

14  if you look out to the right, it tells you for each month how

15  many you did, it tells you your average of each type of

16  procedural code, and then it tells you on the end, the last

17  column summarizes for each one what the value is.

18  Q.    And this was provided to you each month by NYU while you

19  worked there; is that right?

20  A.    Yes.

21  Q.    And that continued on until you stopped working in May of

22  2021; is that right?

23  A.    Yes.  So what you'll see on this is that for each month on

24  the summaries at the bottom, that my target RVU for my contract

25  is -- I believe it's 4996.  So each month, what I'm looking at

1    when this is emailed to me, am I meeting my target so by the

2    end of the year, I'm going to meet my productivity standards.

3    I know this is medicine and I'm a doctor and you don't like to

4    think like this, but this is how I'm contracted, so I do have

5    to look at it and make sure that I am billing appropriately to

6    continue to practice with NYU.

7    Q.    Let's just jump back to exhibit 8 then.  If you go back to

8    that page, D52, the reference there is the target 4966, that

9    was your RVU target?

10   A.    Yes.

11   Q.    That was set by NYU; is that right?

12   A.    Yes.

13   Q.    There is a section below that about a 1 percent

14   productivity incentive compensation.  Do you see that?

15   A.    Yes.

16   Q.    And how did that work?

17   A.    These are -- this is an excerpt provision they put for

18   bonus.  So if you go above, you would get a bonus payment for

19   every 1 percent above the 4996.

20   Q.    So if you had a productivity -- if you had an additional

21   10 percent of your RVUs, you would get an additional 10 percent

22   of your pay; is that right?

23   A.    Yes.

24             MR. LABUDA:    Could we scroll down further.

25   Q.    You have hospital responsibilities on page 53.  Do you see

1    that section?

2    A.    Yes.

3    Q.    And it says in here, all attending physicians at NYU

4    Hospital Center are required to perform their responsibilities

5    set forth in the hospital responsibilities at NYU Center as set

6    forth in various links.  Do you see that?

7    A.    Yes.

8    Q.    You understood that you, as an attending physician, were

9    required to perform those responsibilities?

10   A.    Yes.

11   Q.    Was it your understanding from this section that that

12   applied to all the physicians?

13   A.    Yes.

14             MR. SCHOENSTEIN:    Objection.  Leading.

15             THE COURT:    Sustained.

16   Q.    What was your understanding as to the application of this

17   clause to the other rheumatologists in your group?

18             MR. SCHOENSTEIN:    Objection.  Foundation.

19             THE COURT:    Sustained.

20   Q.    Let's look at page 55.  Is there a section for sublease?

21         You had talked before about the sublease.  Can you just

22   briefly -- can you read this section for me, please.

23   A.    "In connection with this agreement, upon commencement date,

24   NYU will accept an assignment and assumption (the "Assignment")

25   of the current lease for your office.  You represent to NYU

N7BCede1              Edelman - Direct

1    that you have substantially complied with the terms set forth

2    in current lease for the office, and that you are not aware of

3    any default by the landlord.  As of the commencement date, NYU

4    shall assume or sublease all of the office leases, equipment

5    leases, utility contracts, maintenance contracts, service

6    contracts, and similar contracts relating to the day-to-day

7    operations of the practice, including outstanding loan payments

8    on your business loan for the build-out of the practice."

9    Q.    And this is a section where they're assuming the loan

10   payments that you used for the build-out of the practice?

11   A.    Yes.

12   Q.    And do you have any recollection about the amount of the

13   outstanding loans when you started working for NYU and they

14   assumed that business loan?

15   A.    So the majority of it was paid off because we only had

16   about three years left on it.  So --

17   Q.    It was -- how long was the loan?

18   A.    It was a 10-year SBA.  So we started the practice in 2008

19   and it was 2014.  The loan was being paid all along.  There was

20   no default on the loan.

21   Q.    How long was the lease for, how many years were remaining

22   when you started working for NYU and they assumed the lease?

23   A.    The lease went to 2028.  It's actually still in effect and

24   NYU is using this space for another medical group.

25   Q.    And I think you said -- so you continued working at the

N7BCede1              Edelman - Direct

1   same office suite that was in 1991 Marcus Avenue; is that

2   right?

3   A.   Yes.

4   Q.   And when you started working for NYU, what was the setup in

5   terms of offices and medical rooms, was there any change or

6   anything like that?

7   A.   Are you referring to in the 1991 space?

8   Q.   Yeah, when you first started working at NYU.

9   A.   So nothing really changed.  Like Mehta had her own consult

10   office, I had my own consult office.  We had a third consult

11   office which we subleased part-time to a pain physician.  We

12   had our infusion suite.  We had six exam rooms so we could each

13   float three exam rooms at a time.  We had another specialized

14   exam room which had a capability for disabilities.  So the

15   chair went all the way down if someone needed to transfer from

16   a wheelchair.  We had the front desk, the waiting room, and we

17   had a phlebotomy area.  So everything stayed exactly the same.

18   Q.   And you said you had built up the practice to about 6,000

19   patients.  Were there any patients that followed you to NYU

20   when you started working for them?

21   A.   I would say the vast majority followed us.  We were in the

22   same location, the same spot.  I think for most of our patients

23   until the sign changed, they didn't have any -- they weren't

24   aware that we were now part of NYU.

25   Q.   And in terms of the work that you performed, was there any

1    change in the work that you performed in private practice

2    versus when you started working at NYU?

3    A.    So in terms of the clinical work inpatient care, no, it was

4    all exactly the same.  Patients come in, we see our patients,

5    we do our procedures.  Some of the administrative work shifted

6    because now we were sending things out differently for billing

7    and our staff was reporting for different administrative duties

8    through the organization, like certain classes and things they

9    have to take and comply with.

10   Q.    And were there any hours, office hours or anything like

11   that that were set at NYU?

12   A.    So NYU didn't set any specific hours, we continued our

13   hours that were already in place.  So we would see patients

14   Monday, Tuesdays, and Thursdays 9:00 to 5:00, sometimes it

15   would be 8:00 to 4:00 based on Dr. Mehta and myself, our

16   schedules.  On Wednesdays we would do what we call our late

17   night.  So we would start hours at 11:00 and we could see

18   patients until 9:00 p.m.  And in the morning on Wednesdays, we

19   would attend the hospital, run rounds over at Winthrop NYU,

20   which is an educational conference for doctors.  On Fridays I

21   think the hours ended a little bit sooner by 3 o'clock.

22   Q.    Was there any type of work that you did specifically on

23   Fridays, generally?

24   A.    So over time, when we first started, we had zero patients.

25   So if someone wanted appointments on Fridays, of course we used

1     our Fridays for office hours, but as we built and got busier,

2     we needed an administration day, which is common for a lot of

3     doctors to take one day a week where you're doing other types

4     of admin duties, which, for a physician, that means, you know,

5     reviewing labs, radiology, calling other doctors, it could be

6     writing notes, it could be doing research, it could be taking

7     classes that are required by the hospital, it could be taking

8     your own CME, which is your continuing medical education

9     credits.  So over time, the work we shifted and the Friday

10    became an admin day.  We also used the Fridays as a float day.

11    Dr. Mehta and I both having young children, sometimes if there

12    was an event or something that came up and we needed to cancel

13    patients on a Tuesday, we would open our Friday hours again so

14    we could continue to see patients timely.

15    Q.    And when you started with NYU, how many doctors were there

16    in the rheumatology group practice?

17    A.    So when we first joined, there was Dr. Avram Goldberg and

18    myself and Dr. Mehta, and Dr. Porges joined on or about the

19    same time that we joined, I don't know his exact contract date,

20    with Dr. Brancato, who is his part-time associate.

21    Q.    So in the very beginning when you moved over there, it was

22    you and Dr. Mehta and Dr. Avram Goldberg; is that right?

23    A.    When we first, like, signed, when we were in 1991, yes.

24    Q.    And were there any part-time doctors when you started?

25    A.    Dr. Brancato was part-time when Dr. Porges came on board.

N7BCede1                    Edelman - Direct

1    Q.     And then when you stopped working in 2021, how many

2    full-time and part-time doctors were there at NYU?

3    A.     So at that time, there was -- there was Dr. Goldberg,

4    Dr. Porges, myself, Dr. Mehta, who were all full-time.  And

5    then there was part-time.  They brought on Dr. Bill Given, and

6    then they brought on Dr. Li, and Dr. Brancato continued to be

7    part-time.  So I believe there were seven of us total.

8    Q.     So there were five full-time and two part-time when you

9    left?

10   A.     Yes.  I'm sorry.  There's also Dr. Modi who's is full-time.

11   That's the fifth doctor who worked out of the Huntington

12   rheumatology location.  Then there's another part-time

13   rheumatologist at the Huntington suite, Dr. Raminfard.

14   Q.     But within the faculty group practice of rheumatology for

15   Nassau County, there were five; is that right?

16   A.     I believe that was four.  Am I missing someone?

17   Q.     We'll go through the numbers later.

18          In the course of this litigation, did you get an

19   opportunity to review the contracts of Dr. Modi, Dr. Porges,

20   and Dr. Goldberg?

21   A.     Yes.

22   Q.     And what was your understanding of their positions, faculty

23   positions at NYU?

24   A.     So similar to myself, they have the faculty position at

25   NYU, they're staff physicians, they have the same appointments

1    that I do.

2    Q.    And I forgot, Dr. Mehta, too.  Did you review her contract,

3    as well?

4    A.    Yes.  Dr. Mehta negotiated our contracts together in 2014

5    as well as in 2017.

6    Q.    And then in reviewing their contracts, did you have an

7    understanding of whether or not the other doctors were staff

8    physicians, as well as yourself?

9    A.    Yes, we were all staff physicians, all of the

10   rheumatologists.

11   Q.    And did you have an understanding, after reviewing the

12   contracts, of their academic tracks?

13   A.    Yes, we were all academic appointments, but non-tenure.

14   Q.    And was it a clinical track?

15   A.    Yes, clinical.

16   Q.    With respect to the other doctors that I just mentioned and

17   reviewing their contracts, did you understand whether or not

18   they were full-time, part-time, as well?

19   A.    Yes, there were -- everyone was full-time with the

20   exception of Dr. Brancato at that time.

21   Q.    In your observations, working with these other doctors, did

22   you observe what they were doing as compared to you?

23   A.    Yes.  So everyone was seeing outpatient rheumatology

24   patients Monday through Friday.  A lot of the doctors, like

25   myself, had an admin day, as well.  Dr. Porges had a research

1      division that he was largely involved in in his private group

2      before he came in.  So when we first came on board at NYU, he

3      continued to run that research division as well as his

4      outpatient clinic patients.

5      Q.    And you had mentioned earlier in your testimony about

6      certifications.  What was your understanding in working with

7      these other doctors in terms of the certifications that they

8      had?

9      A.    So everyone has the same certifications, we're all

10     certified through the American Board of Internal Medicine in

11     our specialty of rheumatology.  Some of the doctors also

12     continued to maintain their internal medicine board

13     certification, as well, I don't believe everybody did, but

14     those were the two certifications to work in rheumatology.

15     Q.    If I remember, you said you continued your certification in

16     internal medicine?

17     A.    Yes, I did.

18     Q.    As a rheumatologist, are there any restrictions that you

19     and other rheumatologists had in terms of practicing medicine?

20     A.    No, you could practice everything as deemed by our

21     licensing.  We don't do surgery.  We're not surgeons.

22                      (Continued on next page)

23

24

25

N7bWede2            Edelman - Direct

1    BY MR. LABUDA:

2    Q.  In reviewing all of the other doctors' contracts, did you

3    have any understanding of -- one second.

4        I'm going to show you exhibit 47 for identification.  And

5    what is this document, Doctor?

6    A.  Oh.  It's not on my screen now.

7             MR. LABUDA:  OK.

8             MR. SCHOENSTEIN:  No objection.

9             THE COURT:  Are you offering it?

10            MR. LABUDA:  We're offering it.

11            THE COURT:  It's received.

12            (Plaintiff's Exhibit 47 received in evidence)

13   A.  This document is a page out of the human resources policies

14   and procedures discussing workplace conduct.  This is provided

15   to all employees when you join NYU with your contracts, and it

16   discusses the policies of NYU.  And this particular section

17   discusses workplace harassment and discrimination.

18   Q.  And in reviewing the other doctors' contracts, did you

19   understand that they were also subject to this NYU handbook

20   like you?

21            MR. SCHOENSTEIN:  Objection.  Foundation.

22            THE COURT:  I'll permit it.  Overruled.

23   A.  Yes.

24   Q.  During this, during your contract from the '14, '15, '16,

25   '17, did NYU perform any verbal performance evaluation of you?

N7bWede2                Edelman - Direct

1   A.  No.

2   Q.  Did NYU perform any written performance evaluation?

3   A.  No.

4   Q.  Did anyone raise any issues to you verbally about your

5   performance?

6   A.  No.

7   Q.  Did anyone raise any issues with you in writing about your

8   performance?

9   A.  No.

10  Q.  Did you ever, after your initial meetings with Mr. Rubin,

11  did you ever have an opportunity during this first contract to

12  speak with him?

13  A.  Yes.  Prior to the renewal of my 2017 contract, we had met

14  at the Park Avenue offices, Mr. Rubin and Mr. Swirnow and

15  Ms. Fran Drummond were present at that meeting.

16  Q.  OK.  And do you have any recollection as to when that

17  happened?

18  A.  It was sometime in 2016.

19  Q.  And what was discussed during this meeting?

20  A.  So, the beginning of the meeting, we discussed, you know,

21  my time at NYU.  I'd been there about two years.  We discussed

22  how things were going in the office.  This was a new suite for

23  NYU expanding to Long Island, so they wanted some feedback from

24  me as to what was happening in the suite.  They asked me how

25  things were going, just some general talk about that.

1    Then they asked me a question about a specific date and

2    time about patients that had to be rescheduled on a particular

3    date.

4    Q.  OK.  Was there something where, an incident where patients

5    had to be rescheduled because you couldn't work that day, or

6    something?

7    A.  There -- there was.  There was, and sometimes -- my

8    youngest daughter has a medical condition with epilepsy.  So

9    sometimes I did have to cancel patients, you know, abruptly.

10   Most of the time my husband would be the person to go or a

11   close family member would go to the school, but on this

12   particular date that they questioned, I was the one person -- I

13   was the only person who was available to go, and I did have to

14   halt patient hours to get to her location.

15          MR. SCHOENSTEIN:  Objection, your Honor.  May we

16   approach?

17          THE COURT:  How much more on this particular subject?

18          MR. LABUDA:  Nothing.  I was going to move on in terms

19   of the next, you know, in terms of a resolution for this issue,

20   if there was one.

21          THE COURT:  OK.  We can address any issues at

22   sidebar --

23          MR. SCHOENSTEIN:  OK.

24          THE COURT:  At sidebar during the break.

25          Go ahead.

1    BY MR. LABUDA:

2    Q.  Was there a discussion of a resolution in terms of this?

3    A.  Yeah, for sure.  I had already been trying to work on a

4    resolution myself.  You know, I knew it was a tremendous burden

5    for the staff to have to reschedule.  I was seeing probably 20,

6    25 patients a day, so, you know, I understood the -- what this

7    meant to them in terms of their time and having to stop their

8    other work responsibilities.  I had already tried to put in an

9    IT ticket to try to give myself the ability to help reschedule

10   patients.  NYU's policy for physicians, and I don't know if

11   this has since changed, but at the time, the policy was that

12   the doctors can't touch the schedule; like, our log-ins didn't

13   physically allow us to do it.  So it had to be done by a

14   manager or another assistant in the office.

15       So one of the discussions we had in the city was whether,

16   you know, they could help, assist with getting that ticket,

17   which I do think that that was -- a note was made on the

18   minutes of that meeting -- that meeting was documented with

19   minutes -- to put in for a ticket so that I could help with the

20   rescheduling.

21       They also, you know, had discussed with me, you know,

22   that -- perhaps, you know, if I smiled more in the office that

23   my staff would be more responsive, that I should fake it until

24   I make it so that I can get -- get the appropriate support.

25   Q.  And who said that?

1  A.  Mr. Andrew Rubin said that to me.

2  Q.  And when he told you to smile more and fake it until you

3  make it, did you have any reaction to that, like either

4  externally or internally?

5  A.  Probably both externally and internally.  I was taken -- I

6  was taken aback.  I'm a doctor.  I see -- I see patients with

7  serious health conditions day in and day out, and when I walk

8  in and out of an exam room, my focus is on taking care of that

9  person.  I am friendly in the office, always have been.  I say

10  hello to people.  I have kind relationships with people.  But

11  to ask a physician that I should be bubbly and overly friendly

12  to people in order to get the things I need, it didn't feel

13  good to me.

14  Q.  Did you say anything to Mr. Rubin when he said that to you,

15  to smile more and fake it till you make it?

16  A.  I did not.  I smiled, and then I went back to the office.

17  Q.  OK.  Did Mr. Rubin say anything to you when you were

18  talking to him about that, being a physician is serious work?

19  A.  Yeah, so we had talked -- we had talked about the

20  seriousness of the work that I was doing in the office and

21  there were going to be some changes happening in that space

22  moving forward.  So he asked me at that time what else he can

23  do to help to expand and grow my practice.

24      So, there was an orthopedic group that was presently on the

25  floor.  So we talked about whether I wanted to move downstairs

N7bWede2          Edelman - Direct

with the orthopedics or stay upstairs with an oncology group

coming in, and I expressed that I wanted to stay in, on that

same floor with the oncologists when they came in; that I felt

it was a good match for me as a rheumatologist.  It was a

quieter subspecialty to work side by side with.

We talked about hiring a nurse practitioner, and the

discussion was that he would allow me the -- or he wanted me to

help in the administrative piece of hiring that nurse

practitioner, so he -- the position would be posted and résumés

would come in and I would be involved in the interview process

and selection process of that nurse practitioner, who would

then work with all of the rheumatologists moving forward.

And then we discussed that the Huntington medical group

location, which was a newer site for them, would in the

beginning, or was in the beginning phases; he had asked me if I

wanted to expand out my practice one day a week to work in

Huntington.  I had already had a very strong following from out

East.  I had patients that drove all the way from Stony Brook

to see me, so I thought it would be great for my patients, for

that group of patients to have a short commute time.  And it

would be good way also for me to reestablish some of my

referral basis that I had had from working out East.

**When we first opened our offices way back in 2008, we had**

**worked part time out of an office out East to help to establish**

**more patients.  So I had already had internal medicine groups**

1   that I had worked with and had relationships with.  So it made

2   it closer for those doctors to refer more patients to me.

3   Q.  And I just want to flip back to exhibit 89 for one minute,

4   and the last page of that.  So I note -- I forgot to ask you

5   this earlier.  I note that in some of these RVUs, in the far

6   right column there's a zero in terms of the RVU value.  Can you

7   explain why there would be a zero value?

8   A.  So, some of the coding you don't get credit for doing.  So,

9   like, things like venipuncture, you don't get any.

10  Venipuncture, like a blood stick, when they stick you to get

11  your blood.

12       The other procedures, like if -- like, all the other things

13  are medication.  So, like, I'm not getting any payment or, or,

14  or pay for administering prednisone.  I'm getting payment for

15  the actual administration but not for the drug.  So there's a

16  couple of drugs listed, the B12 injection, which is, I believe,

17  for the medicine itself, and that the Eufflexa is for -- and

18  all those -- Eufflexa, Gel-Ones, Monovisc, those are all the

19  actual medications, like when you do knee injections.

20  Q.  So those are procedures you may be prescribing for patients

21  or things that are done for your patients, but you're not

22  receiving credit from NYU for those particular things, correct?

23  A.  You're not receiving credit for the actual medication

24  itself.

25  Q.  OK.

1    A.  Yeah.

2    Q.  Are there other things that you prescribe for patients

3    where you're not receiving credit for from NYU?

4    A.  There were certain procedural codes that we weren't getting

5    credit for, but I'm not sure if I see them on here.

6    Q.  But generally, what were those?  What would be procedures

7    that you would prescribe to patients that you didn't receive

8    credit for?

9    A.  So, if patients are getting, like, IV infusion-type

10   medications we weren't getting credit, and I believe for Prolia

11   injections as well we weren't getting credit.

12   Q.  What about radiation?

13   A.  So, for all the support services, like -- so, for any

14   radiology, testing, patient having an MRI, an x-ray, a CAT

15   scan, there's no, no revenue unit that's assigned for those

16   types of testing.

17   Q.  OK.  And during this contract, the '14 to '17 contract,

18   were there any other services that you rendered anywhere that

19   expanded your scope of practice?

20   A.  During, during my time at NYU, I did, I did spend time.  I

21   went on a medical mission down to Ecuador, and I spent time

22   practicing rheumatology there.  And it, it was definitely, you

23   know, an education for me and learning different diseases that

24   affected that area of the world.  Very tiresome, you know,

25   busloads of patients from 7 a.m. until midnight every day for

1    two straight weeks, but very rewarding.  And we managed to

2    sneak in some trips to, just to see some of the sights.

3    Q.  And did you have any discussions about, with Dr. Porges

4    about taking on any type of expanded role during your first

5    contract?

6    A.  So, Dr. Porges approached me and had asked me if I wanted

7    to be more involved in the research piece of the work that he

8    was doing at NYU, which I was interested in during my

9    fellowship.  I really enjoyed doing medical -- the research in

10   trials.  So I'd spoken with his clinical investigators, and

11   they provided me all of the protocols to read through.  I had I

12   gave them my résumé, which they would need to allow to put me

13   on the RVUs for these research roles.  And it looked like we

14   were moving forward.

15        When I approached Dr. Porges about pay, he had told me, oh,

16   you don't get paid for that.

17   Q.  OK.  And as a result of him telling you you're not getting

18   paid for this additional work, what did you do?

19   A.  It was not something I could take on.  I had a contractual

20   obligation to meet my productivity standards, to see my

21   patients, and to be involved in a clinical trial like this

22   would be seeing patients during the day who were part of the

23   trial, so it would take time away from my office hours.  So

24   there was no way to meet both without me taking a pay cut by

25   not meeting my productivity standards.

N7bWede2            Edelman - Direct

1   Q.  All right.  So then your contract expires at the end of

2   2017.  Were there any discussions about renewing your contract

3   at that time?

4   A.  Yes.  So, the -- we started negotiations again via email,

5   both Dr. Mehta and myself.  You know, we negotiated together,

6   and we started that process for the 2017 renewal.

7            MR. LABUDA:  I'd like to show you exhibit 12.

8            MR. KATAEV:  Publish to the witness.

9            THE COURT:  I said only one lawyer can speak.

10           Are you offering it?

11           MR. LABUDA:  Yes, we're offering it.

12           THE COURT:  Any objection to exhibit 12?

13           MR. SCHOENSTEIN:  No, your Honor.

14           THE COURT:  Exhibit 12 is received and may be

15   published to the jury.

16           (Plaintiff's Exhibit 12 received in evidence)

17   BY MR. LABUDA:

18   Q.  And this outline -- and what is this?

19   A.  These are email correspondence between myself and

20   Mr. Swirnow regarding the 2017 contract.  You could see there's

21   also correspondence with Dr. Mehta.

22   Q.  And again, Dr. Mehta and you jointly drafted these emails,

23   and she sent them, is that right?

24   A.  Some of them look like I drafted it, but we're -- you can

25   see we're kind of cc'ing each other on the emails.

1    Q.  OK.  And did these contract negotiations end in a

2    successful contract; did you enter into a contract?

3    A.  Yes.

4            MR. LABUDA:  OK.  I'd like you to look at exhibit 9

5    and offer exhibit 9 into evidence.

6            THE COURT:  Any objection?

7            MR. SCHOENSTEIN:  No objection, your Honor.

8            THE COURT:  Exhibit 9 is received.  It may be

9    published to the jury.

10           (Plaintiff's Exhibit 9 received in evidence)

11   BY MR. LABUDA:

12   Q.  This is a letter, dated November 17, 2017, is that right?

13   A.  Yes.

14   Q.  And this contract -- if you turn to page D59, this contract

15   is effective January 1, 2018, correct?

16   A.  Yes.

17   Q.  And the term of it is another three-year term, correct?

18   A.  Yes.

19   Q.  OK.  So this contract would go through 2018, 2019 and 2020

20   and expire on December 31, 2020, is that correct?

21   A.  Yes.

22   Q.  And in this contract, your mission is clinical and

23   compensation of $278,000, correct?

24   A.  That's correct.

25   Q.  And that was an increase from your last contract, correct?

1    A.  That's correct.

2    Q.  And if you look on the next page, D60, your RVU target was

3    5,200, is that right?

4    A.  That's correct.

5    Q.  So it went up a little bit from the prior contract,

6    correct?

7    A.  Yes.  I had been exceeding my prior contract's RVU goals,

8    so my target was increased on this contract.

9    Q.  And it has that same bonus structure of the 1 percent

10   increase for every 1 percent of productivity, is that right?

11   A.  That's correct.

12   Q.  OK.  I know you had talked about going to the Huntington

13   offices with Mr. Rubin.  Did that actually happen?  Did you

14   start going to the Huntington offices?

15   A.  I did.  It was not immediate after that meeting in the

16   city.  It took some time for, administratively to get that

17   moving, but within that year, I believe I started seeing

18   patients in Huntington -- in 2018, about.

19   Q.  OK.  And in 2018, did you receive any performance

20   evaluations, written or verbal?

21   A.  No.

22   Q.  Were any issues, performance issues raised with you in

23   2018?

24   A.  No.

25   Q.  And that's both in writing or verbal?

1    A.  That's correct.

2    Q.  And did you receive any performance evaluations the next

3    year?  Let's go to the next year.  Did you receive any

4    performance evaluations, either written or verbal, in 2019?

5    A.  No.

6    Q.  And were there any work issues raised with you in 2019,

7    either written or verbal?

8    A.  No.

9    Q.  OK.  So let's get to -- actually, let me just show you

10   exhibit 117 for identification.  And I'm going to ask you what

11   these documents are.

12   A.  These are photographs of my office in 1991 Marcus Avenue,

13   suite 306.

14   Q.  Did you take these photos?

15   A.  I did.

16   Q.  OK.  And do they accurately represent what is contained in

17   these pictures?

18   A.  Yes.

19           MR. LABUDA:  We would offer them into evidence.

20           THE COURT:  Any objection?

21           MR. SCHOENSTEIN:  We need one second, your Honor.

22   Apologies.

23           No objection, your Honor.

24           THE COURT:  117 is received.

25           (Plaintiff's Exhibit 117 received in evidence)

1   BY MR. LABUDA:

2   Q.  All right.  So we had talked a little bit earlier about

3   Joseph Atonik in this case.  Who is Joe Atonik, Joseph Atonik?

4   A.  Joe -- Mr. Joe Atonik was the, one of the directors at the

5   1999 Marcus Avenue location.  He was a manager.

6   Q.  All right.  And prior to September of 2019, had you had any

7   interaction with him?

8   A.  Very limited interaction.  He attended some of the

9   rheumatology meetings, but he was newer to the organization in

10  management.

11  Q.  OK.  So he wasn't there when you started in '14?

12  A.  He was within the organization, but not within the scope of

13  where I was practicing.  I didn't know him for very long.

14  Q.  OK.  And there's also been mention of a Mr. David Kaplan.

15  What was his role?

16  A.  I believe he's senior to Mr. Atonik.  He is a senior site

17  director for, for, for NYU faculty group practice.

18  Q.  And prior to September of 2019, did you have any

19  interaction with Mr. Kaplan?

20  A.  Even more limited interaction than Mr. Atonik.

21  Q.  OK.  I'm going to focus your attention on September 16,

22  2019.  Do you remember that day?

23  A.  I do remember that day.

24  Q.  OK.  And with respect to Mr. Atonik, did you have -- did

25  you see Mr. Atonik that day?

1    A.  I did.

2    Q.  OK.  Can you describe what happened and, like, when it

3    happened?

4    A.  That day was a Monday, and I was seeing patients, my

5    typical workday, and I finished office hours, you know, late

6    afternoon.  I went from my exam rooms back into my office.

7    Usually at the end of the day, my daughter would call me to

8    touch base when she got home from school, and I was on the

9    phone with her when Mr. Atonik came into my office.  And while

10   I was on the phone, he said I need to speak with you.

11        So I got off the phone.  He came into my office.  He sat

12   down, and he started to discuss that there would be a new

13   doctor coming on board at NYU, Bill Givens, a new

14   rheumatologist, and he would be starting after the new year

15   and, as part of this transition, that my office would be

16   assigned two days a week to, to another rheumatologist so that

17   they could accommodate Mr. Givens.

18        At that point in time, I discussed that this was something

19   that I needed to review to see if, in my contract, this was

20   contractually appropriate.

21   Q.  And just for a time perspective, was this a scheduled or

22   unscheduled meeting?

23   A.  This was unscheduled.

24   Q.  So you didn't know that Mr. Atonik was coming in, and you

25   didn't know anything about him discussing any office issue with

1   you?

2   A.  No.  I had -- I had no assumption.  There was nothing that

3   was brought up at any of our rheumatology meetings about any of

4   these transitions that would be taking place at this point in

5   time.

6   Q.  OK.  So continue on.  I'm sorry.

7   A.  So, I had discussed with him at that point -- I said I need

8   to really, you know, take a look at what you're asking of me,

9   look at my contract with my attorneys and review it, because

10  I'm a full-time rheumatologist, and my understanding, per my

11  contract negotiations, is that I'm afforded full-time use of my

12  office.  I had concerns about having my space utilized on days

13  when I was using my office on Fridays for administrative work,

14  and I had concerns about my office being assigned to someone

15  else when I was at the Huntington group on Thursdays.

16      I didn't get that far in the conversation.  As soon as I

17  expressed that this was something that I would have to review

18  with my attorneys, Mr. Atonik's demeanor changed.

19  Q.  OK.  And how did it change?

20  A.  He moved himself closer, and you could see by the picture

21  of my desk, my desk wasn't that -- that big.

22  Q.  Let me ask you, when you were having this conversation with

23  Mr. Atonik, where are you and where was he?

24  A.  I was sitting in my office chair, and he was sitting in one

25  of the -- one of the striped chairs.

N7bWede2            Edelman - Direct

1   Q.   And your office chair is the chair closest to the window?

2   A.   Yes.

3   Q.   And he was sitting on the striped chairs.  OK.

4        And so you said his demeanor changed, and how is it that

5   his demeanor changed?

6   A.   He started to say to me you think that because you put this

7   stuff in your office -- and he started to go like this and

8   point to the picture on my desk and this on my desk and that on

9   my desk.  And I'm right there, and he's flailing his arms, and

10  he's a big guy and I'm a small person.  And he was very close

11  to me, and he started saying:  Because you put all your stuff

12  here, this doesn't belong to you.  This all belongs to NYU.

13  All of it belongs to NYU, this whole office.  None of it's

14  yours.  We -- we own you.

15       And at that point I backed myself up and I said you need to

16  leave.  During his rant he uttered, under his breath, bitch.  I

17  was so shaken up at that point because he was in my space.  I

18  felt like he completely lost his composure, and I needed to end

19  the conversation.  And I said you need to leave, and he left.

20       And after he walked out, I kind of called my husband at

21  that point.  He calmed me down enough that I could drive home,

22  and when I got home that night, I was physically shaken.  And I

23  understand this was a verbal altercation, but I'd been working

24  in medicine for 20 years at that point, and nobody has come at

25  me like that.  And I understand it was a short incident, but in

1    that few minutes, I thought he was coming at me.  I thought he

2    was going to hurt me.  And I was shaking when I got home.  I

3    didn't sleep, and the next day, when I woke up, I said this is

4    not something for me to just let go.  And I went back into work

5    and I went to my manager at the time, who was out for the day,

6    and she -- I went to the other side where the oncology suite

7    was, where the manager was covering, and I asked her for the

8    number for human resources.

9    Q.  OK.  Just going back, how did the meeting end with that --

10   well, first of all, how long was the, this incident with

11   Mr. Atonik?

12   A.  Might have been like a, like a ten-minute meeting, total.

13   Q.  OK.

14   A.  But he wasn't berating me or condescending me or shouting

15   at me like that for ten minutes.  I ended it very quickly once

16   it started, because I had -- I had that fight-flight response

17   where I knew, I knew it had to end.

18   Q.  OK.  And how did you end it?

19   A.  I asked him to leave.

20   Q.  Why did you ask him to leave?

21   A.  I thought he was going to hurt me.  I needed to end the

22   conversation.

23   Q.  And with respect to your office and this conversation, was

24   the office door open, closed, something else?

25   A.  I believe he closed the door when he came in and sat down.

1   He raised -- he raised his voice, and I think if someone -- if

2   the door was open, somebody would have heard it.

3   Q.  And you had said that Mr. Atonik is a big guy.  Can you

4   describe him?

5   A.  Well, he's here.

6   Q.  Can you describe him in terms of --

7   A.  He's, he's six foot-plus.

8   Q.  And how tall are you?

9   A.  I'm five foot.

10  Q.  And in terms of weight?

11  A.  Well, I weigh around a hundred pounds, and I'm sure he

12  weighs way upwards of that.

13  Q.  OK.  Like more or less -- not that I'm on a scale, but I'm

14  215 pounds.

15  A.  I would say he's a bigger guy than you.

16  Q.  OK.  And when he was saying this to you, what was your

17  reaction to it?

18  A.  I think I was -- I was shocked at the same time as scared.

19  I didn't really understand what triggered this.  I didn't know

20  him at all.  So I -- I really didn't understand the behavior.

21  I, you know -- he kind of just lost it.

22  Q.  OK.  And you said you went home, you were shaken up.  Did

23  you contact anyone at NYU about this incident?

24  A.  The next day I got the number from Enid Papa.

25  Q.  Who is she?

1    A.  She's the oncology manager on the other side of my suite,

2    and she gave me a number for human resources.  It was

3    incorrect.  I believe that there was some text messaging to get

4    the correct number afterwards, which was -- then I reached out

5    to employee labor relations, which is the other title NYU uses

6    for human resources.

7    Q.  And just one last question.  I'm sorry for bouncing around

8    a bit.

9        When this incident happened and you described him flailing

10   his arms, how close was he to you?

11   A.  He was close enough that I felt if something knocked over,

12   because he was trying to get at the things on my desk, it could

13   have flown at me or could have potentially actually reached out

14   to me.

15   Q.  All right.  So then you said you got the contact for

16   someone at human resources at NYU.  Is that right?

17   A.  Yes.  They gave me the number for Kathleen Pacina.

18   Q.  OK.  And did you speak to -- did you call Ms. Pacina -- or

19   Pacina?

20   A.  It might be Pacina.

21       Yes.  I reached out to her, and I -- I, I put in a human

22   resources complaint that day with Ms. Pacina.

23   Q.  And was that verbal, in writing, something else?

24   A.  It was verbal.  It was over -- over the phone.

25   Q.  And why did you make a complaint with Ms. Pacina the next

1    day?

2    A.   My complaint was about the, the hostile and abusive

3    behavior that had occurred the day before with Mr. Atonik; that

4    I didn't feel safe and I wanted it rectified; that I felt that

5    it was a sexist, discriminatory, chauvinistic attack and it

6    needed to be addressed with HR.  We went through the events of

7    what happened on the phone.  I was probably on the phone with

8    her for 20, 30 minutes.  She took everything down.  There was a

9    case number assigned, and she said that she would get back to

10   me.

11   Q.   Why did you think that it was a sexist, chauvinistic

12   incident with Mr. Atonik?

13   A.   The way he was speaking to me, telling me that nothing in

14   that office belongs to me.  There were my diplomas on the wall.

15   It was space that I had negotiated with NYU to see and treat my

16   patients based on my experience as a rheumatologist.  There was

17   no seniority that he had over me to say that he, he had -- that

18   it belonged to him more than me.  The only difference was that

19   he was a male, and he was saying he owned me.

20        I was with the organization at that space longer than him.

21   I had more years of training than him, and he's telling me that

22   this is his.

23        Yes, NYU employs me, but he doesn't own me.  He doesn't own

24   the things in my office.  He doesn't own the right to tell

25   me -- to say you're going to do what we tell you to do.  This

1   was chauvinistic.  I mean this wasn't a conversation about hey,

2   I want to, you know, we're thinking about using your space.

3   This was:  No.  You're going to do what we tell you to do, and

4   if you don't, this is how it's going to go down.

5   Q.  So -- and did you -- what did you explain briefly to

6   Ms. Pacina, or -- withdrawn.

7       Did you explain to Ms. Pacina what you just described to

8   the jury over the last couple minutes?

9   A.  I did.

10  Q.  In terms of the next incident, I want to move to September

11  25, 2019.  Had you heard from Ms. Pacina at all between

12  September 17 and September 25?

13  A.  I don't believe I did.

14  Q.  OK.  So what happens on September 25, 2019?

15  A.  So, it's a Wednesday, which is my late night.  So during

16  the course of that day, while I'm seeing patients, I'm

17  informed -- I don't remember initially who, which manager it

18  was, but I'm informed that Mr. Kaplan wants to have a meeting

19  with me.  So I replied back, you know, I'm seeing patient hours

20  today until around 9 o'clock, that let's schedule a meeting and

21  we'll sit down and talk.

22  Q.  And were you informed that day that he wanted to have a

23  meeting with you.

24  A.  Yes.

25  Q.  OK.

1   A.  That he needed to see me that day.  You know, it was an

2   urgent meeting and he needed to see me.

3   Q.  There wasn't anything scheduled?

4   A.  There was nothing scheduled.

5   Q.  OK.  Continue on.

6   A.  So at some point during the course of the day, an associate

7   who works with Mr. Atonik came up to the floor; her name is

8   Ms. Nicole Lucca.  And she came outside my exam room, and she

9   was standing in the hallway and they knocked to get me out to

10  come and speak with her.  And she said I was told that you're

11  refusing to meet with Mr. Atonik.  And I repeated I'm not

12  refusing any meeting.  I'm asking if it's urgent.  If he needs

13  to meet with me urgently, I will need to go and explain to my

14  patients that we need to reschedule, but I'm seeing patients

15  today until 9 o'clock.  And if it needs to be today, I could

16  meet with him at the end of hours.  And she said, well, you

17  know, he'll be up later, you know, at the end of hours.

18  Q.  Did he come back after hours?

19  A.  He did not come back after hours.  He came back before my

20  hours finished, which was around, like, 8 o'clock, 8:30, and I

21  still had patients in the exam room.  And he knocked on the

22  door to my exam room, you know, told me that he needed to speak

23  with me.  I said I still have patients left to see; could we

24  wait until I finish hours.  And he said --

25  Q.  Sorry.  Just to clarify this.  I think you may have said it

1    was Mr. Atonik.  Was this Mr. Atonik or Mr. Kaplan?

2    A.  Sorry.  Mr. Kaplan.

3    Q.  OK.

4    A.  Sorry.

5    Mr. Kaplan said, you know, come, come now, we need to talk now.

6    So I informed the patient that I needed to go and meet with

7    Mr. Kaplan and that it would be some minutes where he would be

8    waiting for me in the exam room.  And then we walked back down

9    to my office together.

10   Q.  OK.  And did you meet with Mr. Kaplan in your office?

11   A.  Yes, in my office.  We walked down together.  I sat at my

12   desk in my chair, and he sat similarly in the seat across from

13   me.

14   Q.  OK.  And what was said during this conversation?

15   A.  He started by saying, you know, I'm sorry or something in

16   that regard, about what had happened with Mr. Atonik, and you

17   know, I'm here now to discuss, you know, the -- the office

18   space.  And the issue is that you -- you're going to need to

19   give your space up Thursdays and Fridays, and we looked at your

20   contract and this is what it says, and, like, this is going to

21   be what it's going to be at this point.

22   Q.  What was your reaction when he said that?  What did you

23   say, if anything?

24   A.  It's nine -- it's close to 9 o'clock.  I'd been seeing

25   patients all day.  I made it very clear that I needed to speak

with my attorneys to review my contract, and I spoke with

Mr. Atonik the week before, as well as to discuss it with the

two people, Mr. Swirnow and Mr. Rubin, who had signed my

contract with me.

Now it's late in the day.  I'm being forced into a meeting,

and I'm similarly being told you're going to do what we tell

you to do.  So I was upset.  I was upset at that point, and --

and I said I'm not discussing this with you further now at this

point.  And I said I've been through this already.  I explained

that it needs to be discussed further.  I have concerns about

moving the space.

Q.  And what were the concerns you had about moving the space?

A.  My, my hours in Huntington were going on for, maybe, about

a year at that point, and I had already had experiences in

Huntington where if a holiday fell out on a Thursday that if I

needed to reschedule patients a different day of the week in

Huntington they didn't have the space.  There were times where

I might have a school meeting for my daughter and it needed to

be during the day on a Thursday, and I would say can I come in

to see patients on Friday instead, and they just didn't have

that flexibility in that office.

So my concern was if a new doctor came on in Huntington

full time, they might not have the space for me on Thursdays,

and then if I went back to my office in Lake Success on

Thursdays, it's now being used by another doctor and I have no

1    place to work.

2        So this conversation eventually happened with Mr. Swirnow,

3    and we discussed this.  But both my conversations with

4    Mr. Atonik and Mr. Kaplan, I didn't have a chance to even

5    explain any of this before they attacked me and told me you're

6    going to listen to me, you're going to do what we tell you to

7    do.  And when I started to get upset when Mr. Kaplan was in the

8    room with me, he started to say:  Doctor.  Doctor, calm down.

9    Calm down, Doctor.

10       It was very -- it was very demeaning.  It was patronizing

11   to me, and I stood up and I said:  You're going to leave my

12   office now.  I'm not having this conversation.  You're leaving.

13   You're not going to treat me like that, which is where I draw

14   the line.

15       I am not a child.  I'm a doctor.  I'm entitled to an

16   opinion, and I'm allowed to get upset.  I'm a physician and I'm

17   a woman, and a woman can get upset.  I'm allowed to have a

18   dispute in my office and be upset, and it is sexist to say to a

19   woman calm down.  I can be upset at work, the same way

20   Dr. Forte in the office next to me might shout at his assistant

21   sometimes because he's really frustrated about something.  I

22   don't have to calm down.  That's sexist.

23   Q.  Had you ever seen male doctors get upset?

24   A.  Of course.  All the time.

25   Q.  Had they ever been told to calm down?

1    A.  No.  There's:  What can we do to help you?  Let's make this

2    better.

3        You know, that's not the response I'm getting here.  I'm

4    getting the response:  You're overreacting.  You shouldn't be

5    upset.  You're being histrionic, dramatic, hysterical.

6        This is the sexist attitude in a workplace.

7    Q.  So that incident ends and Mr. Kaplan -- after Mr. Kaplan

8    and you separate, do you do anything with respect to contacting

9    anyone at NYU?

10   A.  That night I -- before I left I sent another email up to

11   Ms. Pacina, and I explained the events that happened.  Now, you

12   know, it's been a week and the initial complaint from the

13   September 16 incident still hasn't been addressed through HR at

14   all.  And now a week later, I'm -- I'm experiencing a similar

15   hostile work environment, and nothing's been done.

16       And this is the email that I sent up; that this needs to be

17   addressed; that I don't feel, feel comfortable working in the

18   office knowing that at any moment that this type of thing can

19   continue to happen.

20            MR. LABUDA:  OK.  And I'm going to show you what's

21   been marked as exhibit 59.

22            THE COURT:  Exhibit 59?

23            MR. LABUDA:  Yes.

24            THE COURT:  Any objection to 59?

25            MR. SCHOENSTEIN:  No, your Honor.

1              THE COURT:  Are you offering 59?

2              MR. LABUDA:  Yes, we're offering it.

3              THE COURT:  59 is received and may be published to the

4     jury.

5              (Plaintiff's Exhibit 59 received in evidence)

6     BY MR. LABUDA:

7     Q.  And this is the email that you sent to Kathleen Pacina?

8     A.  That's correct.

9     Q.  OK.  And that was at 9:01 p.m.?

10    A.  Yes.

11    Q.  OK.  And you were in the office?

12    A.  Yes.

13    Q.  And can you read that, please?

14    A.  It says:  "Good evening.  I am following up on our

15    discussion from last week.  Tonight our office manager David

16    Kaplan requested to speak with me and he apologized for Joe

17    Atonik's behavior stating it was not an appropriate request and

18    wanted to clear the air on any miscommunication.  This was a

19    matter of inappropriate conduct in the workplace in mannerism

20    with which I was treated.  And I am not sure this discussion

21    with Joe's senior manager was even appropriate as the issue was

22    received with HR and has not been addressed as HR matter.

23         "In addition, he again raised the request I was not in

24    agreement with, and when stated such he would bring it to

25    senior management of Joshua Swirnow, which again was done in a

manner to threaten any opinion I may have on the matter.  There
was no discussion as to my concerns of the request.  It was
presented as a matter of fact with no regard for my
professional opinion or contractual concerns.  I consider this
a form of bullying in the workplace.  I offered alternate
solution to terminate hours in Huntington since the shared
space they are demanding is based on my part-time status.

"I stated that any requests and agreements to acknowledge
part-time employment, when I was indeed full time, I consider
agreement a breach of my entire contract.  I am unwilling to
risk my professional career and growth at NYU.

"On completing my discussion with" -- it should say David;
it was a mistake -- "with David he took on similar mannerisms
of condescending tone, raising his voice to child-like manner
to placate my disagreement with his request.  When I stated
such, he proceeded to refer to me as doctor in an attempt to
correct himself, which was further demeaning.  I terminated the
meeting at that time and returned to patient care hours, which
I had been requested to halt for this unscheduled meeting.
Again, an attempt to corner me in conversation to pressure me
without allowing for more appropriate time frame and a team to
discuss a matter which demands higher level solutions.

"On returning to seeing my patients, I was distracted and
remained upset about the conversation.  I had difficulty
concentrating on patient care.  It took me some time to refocus

in the examination room to ensure I was providing appropriate

opinions and decision-making.  This is my utmost concern.  I

need to be able to work in a nonhostile environment.

"As a female physician in the organization, I am

disappointed that it is 2019, approaching 2020, in a major

hospital organization in New York, and I still have to contend

with male chauvinism.  While both Joe and David have agreed to

allow me to see patients on Fridays, David again stated that

the space in which I would be able to do so would likely not be

in my present office space.  It remains unclear to me why I am

being discriminated against to accommodate another physician,

particularly a male physician, who will be joining the

practice, which is the stated reason I will be pushed out to

another space.  I have been here for five years and was one of

the first physicians to help build faculty group practice to

the incredible place it is today.  I have worked with amazing

men and women over the years, all of whom have supported my

growth and practice.  This is the first time in all these years

where I feel my growth as a physician is being deliberately

infringed on by senior male managers.

"I appreciate a prompt response."

Q.  After you sent this email, was there any further email

exchange between you and Ms. Pacina?

A.  There were follow-up emails asking for a reply or a

response to Ms. Pacina.

1   Q.  OK.  Did you have occasion to email Ms. Pacina the next

2   day?

3   A.  I don't -- I don't recall.

4   Q.  OK.

5   A.  Looks like I sent her a follow-up email on September 26.

6   Q.  OK.

7   A.  So I wanted to make sure that, that she received it.  And

8   then there was a request for a phone call, so I had sent this

9   email just because I wanted to have a conversation with an HR

10  representative.  I still wanted this addressed through HR.

11  Q.  Why -- this email is saying that Mr. Swirnow and Kaplan

12  requested a phone conference at one the next day, correct?

13  A.  Yes.

14          MR. LABUDA:  I'm going to offer this into evidence.

15          MR. SCHOENSTEIN:  No objection.

16          THE COURT:  What's the exhibit number?

17          MR. LABUDA:  58.

18          THE COURT:  58's received.

19          MR. LABUDA:  Thank you.

20          (Plaintiff's Exhibit 58 received in evidence)

21  BY MR. LABUDA:

22  Q.  So, this is an email that you sent to Ms. Pacina the next

23  day after you sent the one at 9:01 p.m. on the 25th, correct?

24  A.  Yes.

25  Q.  OK.  And why is it that you sent this follow-up email the

1   next day?

2   A.   There was a request for a phone conference from Mr. Swirnow

3   and David -- Mr. David Kaplan.

4   Q.   OK.

5   A.   So, I sent just a request -- that I didn't feel comfortable

6   taking the call without HR being present on the call.

7   Q.   And did you receive a response from Ms. Pacina as to your

8   request?

9   A.   I don't believe I did.

10  Q.   On September 27, did you have occasion to speak with

11  Mr. Swirnow?

12  A.   Yes.

13  Q.   And was that in person, over the phone, something else?

14  A.   That was over the phone.

15  Q.   OK.   Other than you and Mr. Swirnow, was there anyone else

16  on the phone?

17  A.   As far as I know, I was not made aware or told that there

18  was anyone else on that call.

19  Q.   OK.   So this was a conversation between you and

20  Mr. Swirnow?

21  A.   Yes.

22  Q.   And who calls who?

23  A.   I -- I don't recall who, who initiated the initial phone

24  call.

25  Q.   OK.   And was there any HR rep, as you had requested?

1    A.   No.

2    Q.   And what was said during this conversation that you had

3    with Mr. Swirnow on September 27?

4    A.   We discussed my concerns for the office space.  I expressed

5    that I wanted to ensure that I would continue to have a space

6    to work on Thursdays if something should happen in Huntington

7    as well as that I used my office on Fridays for urgent visits

8    and to do administrative work and I wanted to be able to make

9    sure that that space was still ensured to me.

10        There was some discussion about my not using -- that he was

11   reported that I was not using the space on Fridays.  I had

12   reviewed with him that that was a temporary situation due to a

13   health situation with my daughter's condition and that I have

14   been working temporarily out of the Huntington library on

15   Fridays for a period of time so that I could reprieve my

16   husband of having to go to the school if my daughter needed to

17   be picked up.  And because my Fridays were mostly

18   administrative work, it was the only day that I could really

19   kind of take over that role.

20   Q.   Was there any conversation about the incidents that you

21   described with Mr. Atonik and Kaplan?

22   A.   I did not go into the details.  Mr. Swirnow is not from HR,

23   so I did not go into, into that.  I did inform him during the

24   conversation.

25   Q.   Did he say anything about Mr. Kaplan or Atonik in that

1  conversation, that you recall?

2  A.  He did say -- he did make motion of the fact that he -- he

3  was apologetic for how they handled it.  He felt they

4  mishandled it; that the issue with space should have been

5  presented to the group as a whole and that I shouldn't have

6  been targeted in that way.  And we worked to rectify what my

7  needs were and what the organization's needs -- needs were, and

8  we came to a solution of how, how to work this out.

9  Q.  And what was the solution?

10  A.  That, that I would no longer go to Huntington; that I would

11  stay in New Hyde Park on Thursdays, stay in Lake Success on

12  Thursdays and not go to Huntington, and then Fridays I would

13  continue to use as my admin day in the office in Lake Success.

14      I requested that if they put in writing that if something

15  happened in Huntington that I would get my space back in Lake

16  Success so that if, in the course of six months or a year,

17  Huntington couldn't afford me my Thursday days that if it was

18  in writing that I would have priority to go back to Lake

19  Success.  And Mr. Swirnow informed me that he couldn't do that;

20  he could only verbally assure me.  He couldn't put it in

21  writing.  And I wasn't comfortable with it, and I, you know,

22  suggested, well -- I said what do I have to do to ensure that

23  I'm a full-time rheumatologist here and maintain this space?

24      And he said you would have to be in one location five days

25  a week, and that's what we agreed on.  I would give up

1   Huntington starting when Bill Givens came and that was in the

2   new year.

3   Q.  You talked about this office space and came up with a

4   solution?

5   A.  Yeah.

6   Q.  Was there any discussion that you had about the HR

7   complaint that you had filed with Ms. Pacina on September 17?

8   A.  At the end of the conversation, I did bring it up to

9   Mr. Swirnow, that I was going to maintain or keep the HR

10  complaint; that the issue of office space was an independent

11  situation to the HR complaint; and that I expressed to him,

12  similar to what I wrote in the email, that it was very

13  concerning to me that this, this type of behavior was going on

14  within the organization, and I felt that we were moving into a

15  new decade in 2020, and that it was something that needed to be

16  remedied within NYU.

17  Q.  And when you said this to Mr. Swirnow, what was his

18  reaction?

19  A.  His reaction was OK.  He was not happy with it.  And after

20  that he didn't say anything.  And it was a moment in time where

21  I realized I wasn't going to have the support of upper level

22  administration in following this through.  There were so many

23  other options that he could have said to me on the phone at

24  that moment:  Let me look into it further; let me know how it's

25  going with HR; I don't really know the details of this HR

1   complaint, you know, let -- let me find out more.

2       He didn't express any sort of support at that time.  It was

3   more like, ugh, now I have to deal with this now.

4   Q.  And based on his reaction, did you have any feeling about

5   the support and your longevity at NYU at that time?

6   A.  I think in that moment I -- I felt like I was, you know,

7   potentially a target, like they were -- they were not going to

8   support me through this, and when you're expressing something

9   of this magnitude and they're not taking it to the level that

10  they should be, I felt like they most likely were going to fire

11  me.  And at that point in time I kind of walked around, from

12  then forward kind of always, you know, wondering when it was

13  coming.

14  Q.  Did you have any further -- after this conversation with

15  Mr. Swirnow, did you have any email correspondence with

16  Ms. Pacina again?

17  A.  There were some follow-up emails about the HR complaint to

18  check on the status, stating that I hadn't heard back.

19          MR. LABUDA:  OK.  And I'm going to show you exhibit 52

20  and offer that into evidence.

21          THE COURT:  Any objection to 52?

22          MR. SCHOENSTEIN:  No, your Honor.

23          THE COURT:  52 is received and may be published to the

24  jury.

25          (Plaintiff's Exhibit 52 received in evidence)

1  BY MR. LABUDA:

2  Q.  At the bottom of it -- this is an email chain between you

3  and Ms. Pacina, correct?

4  A.  Yes.

5  Q.  And at the bottom of it, that's the September 26 one that

6  we went over before, correct?

7  A.  Correct.

8  Q.  And then on October 8, Ms. Pacina emails you back, correct?

9  A.  Yes.

10  Q.  And what does she say?  Can you read that?

11  A.  She -- she wrote:  "I wanted to follow up with you

12  regarding our last conversation.  I understand that you met

13  with Mr. Swirnow and he explained the rationale for office use

14  one day a week when you are not at Marcus Avenue.  Please let

15  me know if you would like to discuss further."

16  Q.  OK.  And then you responded back to her on October 23,

17  2019, is that correct?

18  A.  Yes.

19  Q.  OK.  And what did you say?

20  A.  I wanted to follow up.  I said the case number on the

21  complaint, "requesting investigation of workplace harassment.

22  I have not heard any response from HR since October 8.  If I am

23  sending these inquiries to the incorrect person, please let me

24  know.  I believe you are the HR contact person for this case.

25      "Thank you.  Dr. Edelman."

 1   Q.  And is that accurate, you had not heard from anyone in HR

 2   about the status of your complaint?

 3   A.  Not since the October 8 -- on October 8 she replied about

 4   the office space, but there was no, no follow-up or recognition

 5   of the HR complaint.

 6   Q.  OK.  And then after October 23, did you follow up with

 7   Ms. Pacina on November 1?

 8   A.  I did.

 9   Q.  OK.  And had you received any correspondence, any emails

10   from Ms. Pacina, to your recollection, between October 23, when

11   you were raising the issue again about HR, and November 1?

12   A.  I did not.

13   Q.  OK.  And so you sent her this email?

14   A.  Yes.

15   Q.  OK.  Can you read that email, please?

16       THE COURT:  Do we have to have the email read in in

17   its entirety?  I'm just concerned about the jury's time.

18       MR. LABUDA:  OK.

19       THE COURT:  It's in evidence.

20       MR. LABUDA:  It's in evidence.  OK.

21   Q.  And why, why is it that you wrote this email on November 1?

22   A.  So, to date, the harassment complaint has not been

23   addressed, so this email is to ask Ms. Pacina, you know, what's

24   going on with the harassment complaint.  There were detailed

25   letters that were sent about bullying and abusive behavior.

N7bWede2                 Edelman - Direct

1    I'm reiterating what the original complaint was about to ask

2    why isn't this being addressed.

3    Q.   OK.

4    A.   I addressed in this email, you know, my concerns with being

5    a female.  I expressed that I didn't feel that this was a

6    professional environment; I wanted to continue to work in a

7    bias-free environment.  And I'm stressing when is this going to

8    be addressed?

9              (Continued on next page)

1   BY MR. LABUDA:

2   Q.    Okay.

3   A.    The last part of the email, you know, I'm making it very

4   clear because the email before, she only addressed the

5   workplace -- that the office space.  So the very last sentence

6   I wrote, as for the issue of space, this is not an HR issue.

7   My manager, who is Karen Oberlander, as well as Miriam Ruiz,

8   were working with me to establish the plan moving forward.

9   Q.    I'm going to show you what's been marked as exhibit 68 and

10  offer that into evidence.

11                THE COURT:    Any objection to 68?

12                MR. SCHOENSTEIN:    No objection.

13                THE COURT:    68 is received and may be published.

14                (Plaintiff's Exhibit 68 received in evidence)

15  Q.    So on November 5th, Ms. Pacina emails you after you had

16  emailed her on November the 1st; correct?

17  A.    Yes.

18  Q.    And she states in her email that her understanding is the

19  matter was closed.  Do you see that?

20  A.    Yes.

21  Q.    Had you ever asked her to close the matter?

22  A.    I did not and I had never received any correspondence from

23  her showing any sort of address about the complaint or any type

24  of closure about the complaint.

25  Q.    The last sentence says, "I will share this with the ELR

1   manager that now supports the FGP group and will get back to

2   you regarding next steps."  Do you see that?

3   A.   Yes.

4   Q.   What was your understanding of who would contact who next

5   after you received this email from Ms. Pacina?

6   A.   Ms. Pacina, and I will get back to you.

7   Q.   If you scroll up, on November 12, you responded back to

8   Ms. Pacina; is that correct?

9   A.   Yes.

10   Q.   Now this is referencing the Huntington transition and you

11   felt that it was retaliatory.  What are you referencing here in

12   had this email.

13   A.   So the initial discussion with Mr. Swirnow is that the new

14   doctor would be starting after the new year and we would

15   transition out of my Huntington space at that time.  After

16   these events that transpired, I was notified by Mr. Antonik and

17   Mr. Kaplan, I believe that I needed to -- they were going to

18   move another doctor into my office effective immediately on

19   Thursdays.

20   Q.   Whereas with Mr. Swirnow, your understanding was what?

21   A.   That we would do a transition out of the Huntington office

22   to give patients time to reschedule after the new year.  So we

23   had maybe two, maybe three months, because I believe Bill Given

24   was starting in February, so I could see my patients in

25   Huntington, tell them I wouldn't be seeing them there anymore,

1   let them know they could see me at the Lake Success location.

2   For any patients that that might be too difficult, that I could

3   then transition their care to one of the other rheumatologists

4   at Huntington and have time to discuss the patient cases with

5   those doctors.

6   Q.    And you were notified by Mr. Antonik and Kaplan that they

7   were going to use your office for a couple months; is that

8   right?

9   A.    They -- I'm sorry.  I don't understand.

10  Q.    You say in this email that as of November 21st, you're

11  going to be having to share your office?

12  A.    Yes.  As of November 21st, they're going to have another

13  doctor use my space in New Hyde Park in Lake Success starting

14  on that date.

15  Q.    Why did you feel that was retaliatory?  These were the two

16  gentlemen that you complained about; correct?

17  A.    Yes.

18  Q.    Okay.

19  A.    So we had a clear understanding when I spoke to Mr. Swirnow

20  about the timing of this and how it would transition.  What

21  instead is happening is Mr. Antonik saying, well, we're still

22  going to use your space up until then, we're going to put this

23  other doctor in.

24       So here's my situation.  If I continue to go to Huntington,

25  the new doctor comes into my space — what happens in February

1    when I need to come back?  Are we having the same conversation

2    again?  Excuse me, doctor so and so, I'm moving back into my

3    office on Thursdays, now you don't have a place to work.

4    That's not a very nice collegiate relationship with another

5    doctor.  I wasn't going to put myself in that situation at that

6    point.  He was moving the patients back to try to remanipulate

7    to use the space knowing it would be difficult in three months

8    from now for me to navigate that to get the space back and I

9    would be forced to give up the day without any contractual

10   changes to maintain a working space on Thursdays.

11   Q.    Did you have any concerns about being able to come back to

12   New Hyde Park, Lake Success full-time if somebody's occupying

13   your office?

14   A.    Of course.  You know, at that point, if they didn't have

15   another place for the doctor, if things had changed or shifted,

16   then they could have said, oh, you have to wait, you have to

17   wait another month, you have to wait another two months.  There

18   was nothing said in writing at that point, so the decision was

19   then made to move immediately.  I had to transition all of my

20   patients in two weeks.

21   Q.    And with any of the conversations that you had with

22   Ms. Pacina, did she ever provide you with any type of written

23   complaint to sign or fill out or anything like that?

24   A.    Never.

25   Q.    Did she ever provide you with any notes that she took about

1    this case?

2    A.    Never.

3    Q.    After you brought this lawsuit against NYU, did you receive

4    a copy of the notes that Ms. Pacina took concerning the

5    incidents that we just talked about?

6    A.    Yes, I was made aware of notes made by Ms. Ruiz during

7    discovery of this case.

8    Q.    Ms. Pacina, you mean?

9    A.    I'm sorry.  You have to go back.

10    Q.    So with respect to -- I'm going to show you exhibit 21 and

11    offer that into evidence.

12           MR. SCHOENSTEIN:    No objection.

13           THE COURT:    No objection to 21?

14           MR. SCHOENSTEIN:    No objection.

15           THE COURT:    21 is received.  It may be published to

16    the jury.

17           (Plaintiff's Exhibit 21 received in evidence)

18    Q.    These are notes from Ms. Pacina that you received in

19    discovery in this case; correct?

20    A.    Yes, in discovery.

21    Q.    And I note that the date up top is March 13, 2020.  Do you

22    see that?

23    A.    Yes.

24    Q.    When is it that you actually spoke to Ms. Pacina about the

25    incident?

1    A.    9/17 of 2019.

2    Q.    So this is about six months later; right?

3    A.    Yes.

4    Q.    And in the contents of this email, there's a description,

5    looks like with respect to the first line talks about Joe

6    Antonik.  Do you see that?

7    A.    Yes.

8    Q.    Does this email memorialize every facet of the conversation

9    that you had with Ms. Pacina?

10   A.    No, this is a very, very brief summary of a long

11   conversation I had with her.

12   Q.    And later on down, if you scroll down about three quarters

13   of the way, there's a reference to -- you see Paul with Joe

14   about seven lines up?  Do you see that?

15   A.    I'm looking for it.  Yes.

16   Q.    You see that?

17   A.    Yes.

18   Q.    You didn't say anything about -- you didn't have any call

19   with Joe; correct?

20   A.    No, I didn't have any call with Joe.

21   Q.    Below that it says -- you see "resolution notes"?

22   A.    Yes.

23   Q.    And then below, it says, system, closed case, October 8,

24   2019.  Do you see that?

25   A.    Yes.

N7BCede3                    Edelman - Direct

1    Q.    And again, you didn't ask Ms. Pacina to close your

2    complaint out; correct?

3    A.    No, I had done the exact opposite.  I sent multiple

4    followup emails stating that the complaint was still open,

5    trying to have it addressed.

6    Q.    I'm going to show you exhibit XX and offer that into

7    evidence.

8                THE COURT:    Any objection?

9                MR. SCHOENSTEIN:    No objection.

10               THE COURT:    XX is received.

11               (Defendant's Exhibit XX received in evidence)

12               THE COURT:    It may be published to the jury.

13   Q.    This is an email from Rashidat Ogbara, dated November 18,

14   2019 to you; correct?

15   A.    Yes.

16   Q.    When you were working at NYU, did you ever see this email?

17   A.    I did not.

18   Q.    After this case was started, did you receive this email in

19   discovery?

20   A.    Yes.

21   Q.    And is that the first time that you saw this?

22   A.    Yes.

23   Q.    And do you have any understanding of who Ms. Ogbara is?

24   A.    I understand it from the context of the email that I did

25   not -- I don't know who this person is from my time working at

1   NYU.

2   Q.    From the contents of this email, you understand that

3   Ms. Ogbara worked with Ms. Pacina; is that right?

4   A.    That's what the email is implying, yes.

5   Q.    Did Ms. Pacina ever tell you that Ms. Ogbara would be

6   reaching out to you?

7   A.    No.  Our last email said that she will get back to me.

8   Q.    Is it fair to say because you did not see this email, you

9   didn't respond to Ms. Ogbara?

10              MR. SCHOENSTEIN:    Objection.  Leading.

11              THE COURT:    Sustained.

12   Q.    Did you ever respond to this email?

13   A.    I never saw it, so I couldn't respond to it.

14   Q.    Other than this email, dated November 18, did Ms. Ogbara

15   ever reach out to you again, as far as you know?

16   A.    No.

17              And ELR, Ms. Pacina had all of my contact information, my

18   phone number, she knew my office contact.  They were aware of

19   how to reach me.

20   Q.    After November 12th, did you have any further contact with

21   Ms. Pacina?

22   A.    I don't believe so.

23   Q.    With the remainder of 2019 and your time at NYU, did you

24   receive any verbal or written performance evaluation for the

25   year 2019?

N7BCede3                    Edelman - Direct

1    A.    No.

2    Q.    Were any issues raised to you in 2019, either verbal or

3    written, about your performance?

4    A.    No.

5    Q.    And with respect to 2020, was there any performance

6    evaluation done in 2020?

7    A.    No.

8    Q.    Any issues raised to you in 2020?

9    A.    No.

10   Q.    2020 was the year of COVID; is that right?

11   A.    Yes.

12   Q.    And was there any discussions about how COVID was affecting

13   the practice when you were working at NYU?

14   A.    So there were a lot of meetings about COVID starting

15   probably like into the early part of January, maybe in late

16   December where the organization started to focus on the

17   pandemic that was worldwide.  There were -- I'm sorry.  What

18   was the question?

19   Q.    Were there discussions about how COVID was affecting the

20   practice in terms of treating patients within NYU?  You said

21   there were meetings?

22   A.    Yes.  So we started to have some meetings where they

23   started to lay out algorithms if a patient came in with a cough

24   or a fever of what we would do.  So we were discussing that in

25   meetings, that there would be certain centers set up first in

N7BCede3                    Edelman - Direct

1     Manhattan if somebody needed COVID testing when it became

2     available, at the time it wasn't available yet, but the

3     organization was already getting ahead of it to have a protocol

4     in place, so we started to focus on that.

5     Q.    During COVID, was there any type of change in treatment?

6     You were saying you were going to the office five days a week,

7     one day with the admin.  Did that change within the advent of

8     COVID?

9     A.    Yes.  So all of the outpatient shut down by March 20th of

10    2020.  I had gotten COVID on March 19th, so I was already out

11    as of the 19th, but by the next day, there was a mass shutdown.

12    Q.    Let's move on.  COVID starts.  In 2020, your contract is

13    expiring; correct?

14    A.    Yes.

15    Q.    So did you have any discussions with any colleagues about

16    your contract expiring in terms of renewing it and things of

17    that nature?

18    A.    I did.

19    Q.    Who did you have conversations with?

20    A.    I spoke with Dr. Mehta.  We had done our contract

21    negotiations, our two previous contracts and we had been

22    business partners prior and we had always done our business

23    plans together.  So I met with her or spoke with her in the

24    office about the upcoming contracts.

25    Q.    Just pause that for one quick second.

1          Other than Dr. Mehta, did you speak with any of your other

2     colleagues about contracts?

3     A.    I did.  I briefly spoke with Dr. Goldberg.

4     Q.    And what did you and him discuss and how did that

5     conversation happen?

6     A.    We had discussed, you know, he had brought up, you know,

7     that he had done some counseling or training for Dr. Anang Modi

8     for contract negotiation to increase salary, and he had brought

9     it up that if it was something I was interested in, he would

10    talk to me.  And he gave me a couple just kind of pointers

11    during that conversation about things I might want to consider

12    for my next salary negotiation.

13    Q.    Do you have any recollection of when that happened?

14    A.    I don't know the dates.

15    Q.    Jumping back to Dr. Mehta, you said you started discussing

16    with her the contract negotiations for the upcoming contract

17    just like you had jointly negotiated '14 and '17.  What did you

18    discuss this time?

19    A.    I discussed with her that I thought for the first time we

20    shouldn't do contract negotiations together, that I had --

21    Q.    Why is that?

22    A.    I had a strong suspicion that they might retaliate against

23    me for the HR complaint that was never addressed and I didn't

24    want to put her in a position where she might be subject to the

25    same retaliation.

1    Q.    And so what happened in terms of the contract negotiations,

2    did you do it jointly, separately, something else?

3    A.    She sent separate emails up herself and she negotiated her

4    contract and I sent a separate email up myself, you know, to do

5    the negotiations.

6    Q.    And when you sent an email to talk about your negotiations,

7    what was the response from NYU?

8    A.    The response was an email back from Mr. Andrew Rubin,

9    "We'll let you know our plans."

10   Q.    Around that time, did you have any understanding where

11   Dr. Mehta was with her negotiations?

12   A.    So I wasn't privy to the emails she was sending back and

13   forth, but she was checking in with me routinely to see if I

14   had heard anything back because she had been speaking with them

15   and moving forward with her contract.

16   Q.    Let's forward to December 1st, 2020.  Look at exhibit 7.

17   We're going to offer this into evidence.

18                  THE COURT:    Any objection?

19                  MR. SCHOENSTEIN:    No.

20                  THE COURT:    Exhibit 7 is received and may be published

21   to the jury.

22                  (Plaintiff's Exhibit 7 received in evidence)

23   Q.    And around December 1st, December 2nd, did you receive this

24   letter?

25   A.    I did.

1    Q.    And how is it that you found out about this letter?

2    A.    This letter was delivered to my home and my daughter -- my

3    older daughter opened it, not being aware of what it was.  And

4    then she brought it up to give it to my husband who called me

5    at work to tell me I was fired.

6    Q.    What happened after that once you found out, once your

7    husband told you that you were fired?

8    A.    I left, I left the office.  I don't remember the time of

9    day, but I'm assuming it was later in the day if my daughter

10   had opened the mail, she must have been home.  And I drove home

11   and I was in a state of mixed shock and acknowledgement because

12   I knew it was coming, I just didn't think that an organization

13   of this size would decide that they could not follow the law,

14   that they were somehow above it and that they could get away

15   with this.

16   Q.    Did they provide you any explanation as to why you were

17   terminated in this letter?

18   A.    They did not.

19   Q.    And you got home, you saw the letter, and what did you do

20   after that?

21   A.    I called Mr. Andrew Rubin.

22   Q.    Did you speak with Mr. Rubin?

23   A.    I did.

24   Q.    And what did Mr. Rubin say to you?

25   A.    He told me that -- I asked him why, you know, I was

N7BCede3                  Edelman - Direct

1   terminated and he told me that the organization was going in a

2   different direction, that this had nothing to do with my care

3   as a physician, that my patients loved me and I was a very,

4   very good doctor.  And he offered to help me -- I asked if

5   there was any other position for me within NYU as an

6   organization and he had offered to take my résumé and to pass

7   it on.

8   Q.    I want to jump back to exhibit 8 at page D51.  With respect

9   to the cause in your termination clause, did Mr. Rubin say

10  anything about being terminated for cause under any of these

11  factors?

12  A.    No.

13  Q.    Did Mr. Rubin ever tell you that you were being fired for

14  cause?

15  A.    No.

16  Q.    I'd like to turn to exhibit 84, please, and offer that into

17  evidence.

18                  THE COURT:    Any objection?

19                  MR. SCHOENSTEIN:    Nope.

20                  THE COURT:    84 is received and may be published to the

21  jury.

22                  (Plaintiff's Exhibit 84 received in evidence)

23  Q.    When you worked at NYU, did you ever see this document

24  before?

25  A.    I did not.

1   Q.   After the lawsuit began, you got a copy of this through the

2   discovery in this case; right?

3   A.   Yes.

4   Q.   And what do you understand this to be?

5   A.   I understand this to be a log kept by Ms. Miriam Ruiz, the

6   office manager.

7   Q.   I note that the first entry in this log is November 13th,

8   2019; is that correct?

9   A.   Yes, there is an entry prior with no date.

10   Q.   And that's approximately two months after you made your

11   complaint to HR; is that right?

12   A.   That's correct.

13   Q.   Are there any other entries prior to that date, any dated

14   entries prior to that date?

15   A.   No.

16   Q.   At that time, you had worked for NYU for about seven years?

17   A.   Yeah, like six and a half years.

18   Q.   And no entries in here; correct?

19   A.   Yes.

20   Q.   And then there are entries that continue on through this

21   until October 26th, 2020.  Actually, I take that back.  October

22   28th, 2020; correct?

23   A.   Yes.

24   Q.   And during this time, did Ms. Ruiz ever speak to you about

25   any of these entries that she put into this log?

1    A.    No.

2    Q.    Did anyone speak to you about any of these entries that she

3    put into the log?

4    A.    No.

5    Q.    I want to talk about a few of the entries that are listed

6    in here.  If you look at June 15, 2020, do you see an entry?

7    A.    Yes.

8    Q.    It's talking about a video, a patient had a video visit

9    with you and made a complaint.  Can you explain what happened

10   on that -- do you remember the incident that they're

11   referencing here?

12   A.    I do remember this incident that they're referencing.

13   Q.    What happened?

14   A.    So in June of 2020, NYU had done an announcement that they

15   were reopening all of the offices, like wide open, like

16   everyone should be back to work.  Some of us were still doing

17   part telehealth to protect some of our patients who were higher

18   risk or who didn't feel comfortable coming into the office.  So

19   this particular visit in June was a video visit.  I had set up

20   my office space in one of the few rooms of my house that had

21   double doors to close and I was doing video visits knowing my

22   children were still home from school at times when I could do

23   it without being interrupted.  I was on a video visit with a

24   patient and the bell rang.  I believe it was in the earlier

25   morning hours.  I went to go and get the door and I put the

1     video visit on mute and I didn't turn the camera off.  I was

2     seeing the patient myself directly, there was nobody else in

3     the room at that time.  Everyone else in my family was in

4     different rooms at that point in time.  When I went to get the

5     door, unbeknownst to me, my younger daughter had woken up and I

6     guess she came down to find me and she saw the camera on and

7     she waved at the patient.

8     Q.    And that's what happened?

9     A.    That's what happened.  And I was aware of it because the

10    patient had emailed me directly.

11    Q.    Did Ms. Ruiz ever talk to you about that particular

12    incident?

13    A.    No.

14    Q.    Or a patient complaint or anything like that?

15    A.    No.

16    Q.    There's an entry for September 9?

17    A.    Yes.

18    Q.    Can you explain what happened on that particular day.

19    A.    This is a little tricky for me when I first saw it because

20    I wasn't quite sure because when I first read it, it said that

21    I texted at 11:25 that I was running an hour and a half behind.

22    And I thought back to myself, "I was late to work an hour and a

23    half?  Like, what's happening?  Like, I don't recall that

24    happening."  But when I actually kind of looked at the date and

25    sought it out for myself, I realized what I had done was I was

1    running behind on patients that morning so I was about an hour

2    and a half back on patient care.  So sometimes in the office,

3    because it's easier than running to find your manager, I would

4    just text and say, "Hey, this is what's going on.  Can you help

5    me out with this?"  So it's a text message to say I'm running

6    behind, can you help me out and let the patients know we're

7    coming in later, we're running behind and move up their

8    appointments.  And I explained in that text message, which I

9    don't believe is listed here, they didn't write it, but there's

10   text messages between me and Ms. Ruiz where I explained why I

11   was running behind, that there were a couple of patients who

12   were mis-scheduled in the morning who were really new patients

13   that were only given shorter time slots.  For that particular

14   day, for some reason, I had more procedures.  Usually you get

15   procedures mixed in, it might throw your time off a little bit,

16   but that day there were multiple procedures, so I was much

17   further back and I wanted to accommodate my patients and give

18   them a heads up.

19   Q.    And then there's an entry for September 15?

20   A.    Yes.

21   Q.    And can you explain what happened on this day.

22   A.    So I was in a room with a patient, you know, and I -- I

23   dropped my gloves on the floor and when -- during COVID, you

24   know, we were short supplies, so -- and you were wearing gloves

25   and you were wearing masks and you were wearing a face shield

1   and I had a hair thing on and I -- you had full PPE on.  So I

2   was in a room and I took a glove out, and when I took it out of

3   the box, a glove dropped on the floor.  So instead of picking

4   it up with the present gloves I had on and then dirtying those

5   gloves and having to throw those gloves out too, I waited until

6   after the patient visit and I had done the patient exam when I

7   was going to throw out the gloves on my hands to pick up the

8   glove and put it in the garbage.  That's what happened.

9   Q.    And were there any directives from any governmental

10  agencies about trying to minimize the use of the PPEs?

11  A.    Yeah, as an organization, we were all very aware of the

12  fact that PPE was in short supply and we all needed to be

13  cognizant of how we were using PPE.

14          THE COURT:    Mr. Labuda, we're nearing on 11:30.  Why

15  don't you ask a couple more questions and we'll take our break

16  at 11:30.

17          MR. LABUDA:    Yes.

18  Q.    With respect to the September 9 entry here and the

19  September 15, did Ms. Ruiz or anyone speak to you about any of

20  these situations?

21  A.    No.

22  Q.    And last one and I got one followup question.  October

23  20th, can you explain what happened on this day.

24  A.    So on that particular day, I had seen a patient who had

25  seen one of the oncologists in the morning.  I don't know the

1  exact patient because everything's redacted, so I can't recall

2  the details of who the patient was, but I could speak to the

3  fact that it was very -- it was very often, because we shared

4  the space with oncology and many other specialists, that a

5  patient would come in and maybe they would see their

6  gastroenterologist and then come see me or see the oncologist

7  and then come see me.  So on this particular day what had

8  happened was the patient had seen the oncologist and had labs

9  done and then saw me, and it looks like she had put in a

10  complaint that I had redrawn the blood after she had drawn the

11  blood in the morning.  Very often, the hematologist would run a

12  quick CBC in the office and that would be all they were doing.

13  As rheumatologists, we do run different types of lab testing.

14  So it's unclear, without me being able to see the chart, if it

15  was even the same blood work.  Most likely, it was not, or I

16  wouldn't have redone it.

17  Q.    And one last question I forgot to ask you before.  This

18  Miriam Ruiz, who did she direct report to?

19  A.    To Mr. Joe Antonik.

20              THE COURT:    Members of the jury, it's now just about

21  11:30.  We'll take our break now.  We'll take a break for about

22  15 minutes.  I'll see you back here around 11:45.  Have a good

23  break.

24              (Continued on next page)

25

N7BCede3                    Edelman - Direct

1              (Jury not present)

2              THE COURT:    Does defense counsel still wish to see me

3       at sidebar?

4              MR. SCHOENSTEIN:    Yes, your Honor.

5              THE COURT:    Let's go to sidebar.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N7BCede3          Edelman - Direct

1              (At the sidebar)

2              MR. SCHOENSTEIN:    Your Honor, we had a motion *in*

3    *limine* and an express ruling in this case that her daughter's

4    medical condition was not going to be admitted, and she slipped

5    in, in the middle of one her narrative answers, that her

6    daughter suffers from epilepsy.  I think they did that on

7    purpose because they know one of the jurors has a connection

8    with an epilepsy charity, I think it was an intentional breach

9    of what your Honor decided on the motion *in limine*.  Whether it

10   was intentional or not intentional, it's improper.

11             At a minimum, we're going to need a corrective

12   instruction at some point that the medical condition of the

13   daughter is not relevant to the case.  I really don't want to

14   highlight it, but I also want to make absolutely sure this

15   doesn't happen again in plaintiff's testimony.

16             MR. LABUDA:    Your Honor, with respect to the motion *in*

17   *limine*, the motion was with respect to her condition as

18   autistic, had nothing to do with epilepsy.  A lot of people

19   suffer from epilepsy.  My sister suffers from epilepsy.  And

20   she was simply explaining -- we are following your Honor's

21   ruling on it.  She was simply explaining why she had to leave

22   that day and she had to give some explanation to it.

23             MR. STEER:    Your Honor, if I may, the motion was

24   actually to both her daughters' medical conditions, we didn't

25   specify.  And the juror in question not only apparently has an

N7BCede3            Edelman - Direct

1    epileptic daughter, but she's on the national foundation for

2    epilepsy.  So it's even, we would suggest, more sensitive.

3            THE COURT:    Do you have what I said on the motion *in*

4    *limine*?

5            MR. STEER:    Right here, your Honor.

6            THE COURT:    You can redress it later.

7            Are you expecting to come back to the daughter's

8    medical condition at any point during the remainder of your

9    direct examination?

10           MR. LABUDA:    No.  I don't foresee that, no.

11           THE COURT:    So I'll address this when you request a

12   corrective instruction.

13           How much longer are you expecting on direct

14   examination?

15           MR. LABUDA:    I'd probably say, I think I'm on page 14

16   of, I think, 23.

17           MR. KATAEV:    16, two-thirds to.

18           MR. LABUDA:    Maybe another hour, hour and a half.

19           THE COURT:    Hopefully we'll get through it and well

20   into cross examination.

21           In terms of the jury's time, when you've got long

22   documents that are in evidence, I expect that you'll highlight

23   whatever it is that you want to bring the jury's attention to

24   and not have the witness read the whole thing verbatim.  I

25   think it's not the most efficient use of the jury's time.

N7BCede3                    Edelman - Direct

1              MR. LABUDA:    Yes, your Honor.

2              MR. STEER:    Your Honor, if I may, you also had

3    reserved decision on the question of the Ecuador trip.  We have

4    that here if your Honor would like to see it.

5              THE COURT:    I know, and there was no objection when

6    there was testimony about it.

7              MR. STEER:    That's fine then.

8              THE COURT:    It came into evidence.

9              See you back here in a little bit.

10             (Recess)

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N7BCede3                Edelman - Direct

1              (In open court; jury not present)

2              THE COURT:    Anything from plaintiff before we bring in

3     the jury?

4              MR. LABUDA:    No, your Honor.

5              THE COURT:    What about from defendant?

6              MR. SCHOENSTEIN:    No, your Honor.

7              THE COURT:    Let's bring in the jury.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:   Dr. Edelman, you're reminded you're still

3   under oath.

4          Counsel you may inquire.

5   BY MR. LABUDA:

6   Q.   I'd like you to look at exhibit 86, please.  And I'd offer

7   that into evidence.

8          THE COURT:   Any objection?

9          MR. SCHOENSTEIN:   No.

10         THE COURT:   86 is received and may be published to the

11  jury.

12         (Plaintiff's Exhibit 86 received in evidence)

13  Q.   And this is an email chain between Mr. Joseph Antonik and

14  Andrew Porges, Dr. Andrew Porges, Miriam Ruiz, and Priscilla

15  Faslowich starting on November 6th of 2020; is that correct?

16  A.   Yes.

17  Q.   And if you look at the bottom of it, like with all emails,

18  it starts at the bottom, there's an email from Mr. Antonik to

19  Andy, Trish, and Miriam.  Do you see that?

20  A.   Yes, the 2:20 November 6th email.

21  Q.   Yes.  It says:  "Hi Andy, Trish, Miriam.  David requested

22  all information on Edelman to be sent to him today."  Do you

23  see that?

24  A.   Yes.

25  Q.   Is it your understanding the "David" referenced here is

1   Kaplan?

2   A.    Yes.

3   Q.    The next says:  "We need clear convincing summary with

4   examples sent."  Do you see that?

5   A.    Yes.

6   Q.    And the next paragraph, it says:  "Ideally, we want recent

7   examples of inappropriate behavior and communicates between

8   Edelman staff and patients."  Do you see that?

9   A.    Yes.

10  Q.    As a result of Mr. Antonik's request here, subsequently,

11  that day, do you see another email from Mr. Antonik a few hours

12  later at 4:19 p.m.?

13  A.    Yes.

14  Q.    And in that email chain, there are additional examples that

15  he puts in into this exhibit; is that correct?

16  A.    Yes.

17  Q.    And the subject, the title of this email is Edelman emails

18  or Edelman issues.  That's the same title that was in the Ruiz

19  log; is that right?

20  A.    Yes, it's the same subject matter.

21  Q.    And the notes, the summary here, are these also the same

22  incidents that are referenced in Ms. Ruiz's log?

23  A.    Yes, they're all identical to what's in her log.

24  Q.    So the ones that are in Ms. Ruiz's logs are placed into

25  this email for the group; correct?

N7BCede3              Edelman - Direct

1    A.    Yes.

2    Q.    And that's November 6th, 2020, that's about two months

3    before your contract is up; is that right?

4    A.    It's a month before my contract is up, like less than a

5    month.  This is where there's a date discrepancy because the

6    contract date from the previous contract went to January where,

7    normally, it went to December.  So you could say it's a little

8    short of two months then, couple weeks.

9    Q.    And I want you to look at exhibit KKK next.  And I'd offer

10   that into evidence.

11                THE COURT:    I assume no objection to KKK

12                MR. SCHOENSTEIN:    Correct.

13                THE COURT:    KKK is received and may be published.

14                (Defendant's Exhibit KKK received in evidence)

15   Q.    Just with the last one, had you ever seen that email chain,

16   was that ever forwarded to you while you were working there?

17   A.    No, I was not aware of any such email chains between any of

18   these individuals.

19   Q.    And any of the things that are listed in the Antonik email

20   listing all the issues, that was never discussed between you

21   and Mr. Antonik?

22   A.    No one spoke to me at all about any type of issues,

23   concerns, staff issues, patient issues, no one addressed me

24   with anything.

25   Q.    And with KKK, this is an email from Dr. Porges; is that

1   right?

2   A.    Yes.

3               MR. LABUDA:    Can you scroll up.

4   Q.    And it's to David Kaplan; correct?

5   A.    Yes.

6   Q.    And the email, the one below, November 6th at 4:30 p.m.,

7   that's a few minutes after the Joseph Antonik email that

8   contained all the incidents; is that correct?  That was at 4:19

9   and the Porges one was at 4:31, so this is about 12 minutes

10  later?

11  A.    Yes.

12              MR. LABUDA:    If you can close that out.  Thank you.

13  Q.    This email, again, was this email ever shared to you during

14  the time that you were working at NYU?

15  A.    No, never.

16  Q.    You received it afterwards in this case?

17  A.    Yes.

18  Q.    This litigation.  Okay.

19        And did Dr. Porges ever discuss any of the issues that are

20  raised in this email?

21  A.    No, he never discussed anything with me.

22  Q.    And do you see in the email, in the email there are issues

23  that he raises about how you're practicing medicine; correct?

24  A.    Yes.

25  Q.    And can you just briefly address those issues that he's

1    raising.  It's talking about ordering lab tests?

2    A.    Yes.

3    Q.    Okay.

4    A.    So in his anecdotal observations, he addresses ordering too

5    many lab tests, as well as x-rays, as reported by an x-ray

6    tech.

7    Q.    With respect to ordering tests, what's the significance of

8    ordering tests as a rheumatologist?

9    A.    Rheumatologists notoriously are known for ordering a lot of

10   tests to begin with.  A lot of our autoimmune diseases have

11   panels or labs.  So that's pretty routine care for a

12   rheumatologist, that there will be a significant amount of

13   tests, perhaps on a first visit and then even on the routine

14   followup visits because of the autoantibody testing, it might

15   require several more tubes to follow disease progression,

16   disease activity.

17        So, to give you an example, even on a lupus patient, at

18   quarterly visits, we're assessing something called complements,

19   inflammatory markers, which that, in and of itself, is two

20   tests, plus there's two tests for inflammation.  We assess the

21   double-stranded DNA which is an antibody that trends the

22   activity of lupus.  So that's an additional test.  We assess

23   urine studies because lupus can attack the kidneys and have no

24   symptoms.

25        So typically, quarterly, every three, four months, a

1    followup.  We do labs, including urine, to make sure there's no

2    protein and there's no blood so that we could be preemptive if

3    lupus decides to impact somebody's kidney.  If we intervene

4    sooner, we save a life, we save an organ.  If we don't do these

5    types of tests, then patients can flare and they can become

6    much more serious.

7    Q.    Did you have any specialty within rheumatology, is there

8    anything that you had a particular focus on?

9    A.    My patient population I think varied from my colleagues,

10   that I trained specifically with Steven Carsons, who is a

11   rheumatologist at Winthrop NYU, and he -- I followed in his

12   footsteps in the sense of being a rheumatology diagnostician.

13   I was known in my community for solving complex, difficult

14   cases.  And I would often get referred patients who had been to

15   many, many doctors, even other rheumatologists who didn't have

16   clear-cut diagnoses and continued to suffer with symptoms.  So

17   some of my patients did require more extensive testing, a

18   subset of those types of consults, but that was different in my

19   practice, having these types of referrals.

20         And when I think about how I've grown as a rheumatologist

21   in that sense, my background in math and being an actuary in

22   problem solving, that kind of worked its way into how I

23   practiced medicine.  I liked the difficult cases, I liked the

24   challenges, and over the years, you know, I've gotten so much

25   feedback from patients and other clinicians about the changes

N7BCede3            Edelman - Direct

1    I've made and how I've impacted people's lives and being able

2    to really make a diagnosis and move to get people well.

3              THE COURT:    Counsel and witness, in the future, let's

4    try to keep the answers just to the questions that are asked

5    and conserve the jury's time and ensure that we abide by the

6    rules.

7              MR. LABUDA:    Yes.  Yes.

8    Q.    There's also a reference to x-rays being used, that he had

9    concerns about your use of x-rays on patients?

10   A.    Yes.

11   Q.    How are x-rays used on patients and do they vary from

12   patient to patient?

13   A.    They definitely vary.  I mean, someone who's coming in for

14   osteoporosis, we're not ordering an x-ray.  They might get a

15   bone density per Medicare guidelines every two years.  For

16   certain diagnoses, like rheumatoid arthritis, it's standard of

17   care to run x-rays of the bilateral hands, wrists, feet, and

18   ankles.  And those are done yearly or every two years based on

19   how active the disease is to see what's going on

20   radiographically, is the disease progressing, are my

21   medications working.  Even patients who are in remission

22   sometimes may have progression radiographically and we have to

23   change the medicines around.

24   Q.    And then subsequent to that paragraph that's there, do you

25   see it says:  "Please note the following issues and examples."

1    Do you see that?

2    A.    Uh-huh.

3    Q.    And that's the exact same language that was in the Antonik

4    email; correct?

5    A.    Yes.

6    Q.    So that was copied and pasted from the Antonik email and

7    put into this email from Dr. Porges; correct?

8    A.    Yes.

9                    MR. SCHOENSTEIN:    Objection.

10                   THE COURT:    Sustained.  Testimony is stricken.

11   Q.    The email from Dr. Porges goes to David Kaplan; is that

12   right?

13   A.    Yes.

14   Q.    And David Kaplan then sends that email with the Porges

15   email to Mr. Joshua Swirnow on November 18th; is that right?

16   A.    Yes.

17   Q.    And his email is "Here you go."  Is that right?

18   A.    Yes, "Here you go."

19                   (Continued on next page)

20

21

22

23

24

25

1   BY MR. LABUDA:

2   Q.   OK.

3   A.   Here you go.

4   Q.   And then there's an email on the same day from Mr. Swirnow,

5   acknowledging the email from Kaplan containing the Porges

6   email, correct?

7   A.   Yes.

8   Q.   And then that same day, there's an email between Mr. Kaplan

9   and Swirnow, asking how did the call go with Dr. Porges, with

10  the re being you, correct?

11  A.   Yes.

12  Q.   And then Mr. Swirnow responds back:  "Give me a call.

13  We'll fill you in."  Correct?

14  A.   Yes.

15  Q.   So the contents of that call are not in the email, correct?

16  A.   Yes.

17  Q.   OK.  And then it's, I think, 13 days later that the

18  termination letter is sent, is that correct?

19  A.   Yes.

20  Q.   OK.  When you left NYU, did you receive any type of

21  correspondence, and I should say did NYU receive any

22  correspondence from any of your patients when you were leaving,

23  when there was an announcement about you leaving?

24  A.   So, while I was still at NYU, because the announcement

25  about my departure went out while I was still at NYU, hundreds

1    of emails poured in through the electronic medical records

2    system and Epic as well as personally to me at my direct

3    contacts.

4    Q.  And the Epic System, that's a system that NYU used,

5    correct?

6    A.  Yes, that's correct.

7            MR. LABUDA:  OK.  I'd like to show you exhibit 93 for

8    identification.

9            MR. SCHOENSTEIN:  Your Honor, give us one second,

10   please?

11           OK.  No objection.

12           THE COURT:  Any objection to 93?

13           MR. SCHOENSTEIN:  No, your Honor.

14           THE COURT:  OK.  93 is received.

15           (Plaintiff's Exhibit 93 received in evidence)

16   BY MR. LABUDA:

17   Q.  And I'm just going to have you look at one.  This is an

18   email that was sent to NYU that says, "I consider myself

19   fortunate to be under Dr. Edelman's care."  Correct?

20   A.  Yes.

21   Q.  And that's dated April 22, 2021, correct?

22   A.  Yes.

23   Q.  OK.  (inaudible) "Lovely to speak with."

24       So I'm curious.  After the emails that, Dr. Porges's email

25   had been sent to Mr. Rubin, did he ever call you up to discuss

1    with you any of the concerns that Dr. Porges had raised in his

2    email?

3    A.  No.

4    Q.  And the termination letter that we looked at before, that

5    was dated December 1, 2020, correct?

6    A.  Yes.

7    Q.  OK.  But it said you were going to be terminated effective

8    May 31, 2021, is that right?

9    A.  Yes.

10   Q.  I want to pivot to another claim that you have -- with

11   respect to pay.

12       When you were at NYU, did you have any suspicions or

13   concerns that you were being paid less than your male

14   colleagues?

15   A.  I had suspicions I was being paid less.

16   Q.  And did you share those suspicions with anyone?

17   A.  I spoke, I spoke to Dr. Mehta about my suspicions.

18          MR. LABUDA:  OK.  I'd like you to look at exhibit 108.

19   That's been marked or identified, and I'd like to offer this

20   into evidence.

21          THE COURT:  Just a moment.

22          MR. SCHOENSTEIN:  No objection, your Honor.

23          THE COURT:  108 is received and may be published to

24   the jury.

25          (Plaintiff's Exhibit 108 received in evidence)

1   BY MR. LABUDA:

2   Q.  So, in the first page of it, there's a text exchange in

3   October.  Just out of curiosity, who's -- who's the gray and

4   who's the green?

5   A.  The gray is Dr. Mehta, and -- do I have it right?  And I

6   think I'm the green.

7   Q.  OK.

8   A.  Yes, I'm the green.

9   Q.  She texts you, on October 16:  "Our contracts will be for

10  renewal soon.  We should find out how much the other rheums are

11  making per RVU."

12  A.  Right.

13  Q.  Do you see that?

14  A.  Yes.

15  Q.  OK.  Did you have any sense in terms of how you were being

16  paid per RVU versus your colleagues?

17  A.  I had a sense that after a conversation I had had with Dr.

18  Modi at the Huntington location -- he's a rheumatologist

19  there -- where he kind of said, you know, in a normal kind of

20  conversation, we were talking about other things and he brought

21  up how many RVUs were his targets and how many patients, you

22  know, he had been seeing, and when I kind of did the math in my

23  head, it occurred to me that he had to be making more money

24  than me.

25  Q.  And you have had an opportunity to review all your male

1   colleagues' contracts, correct?

2   A.  Yes.

3   Q.  And were you being paid less per RVU?

4   A.  Yes.

5   Q.  OK.

6   A.  That's the reference to the conversation.  Anang is Dr.

7   Modi.

8   Q.  OK.  All right.  And on the next page, there's a reference,

9   it looks like from Dr. Mehta:  "We should negotiate for same

10  RVU but have to see if making equivalent per RVU moving

11  forward.

12      "Not expecting bonus."

13      Do you see that?

14  A.  Yes.

15  Q.  OK.  So that's a reference to the difference in terms of

16  the RVU pay?

17  A.  Yes.

18  Q.  OK.  And then you respond back, "for some reason Anang" --

19  that's Dr. Modi, is that right?

20  A.  Yeah.

21  Q.  And he's a male doctor there?

22  A.  Yes.

23  Q.  "Higher goal RVU is a factor equivalent is higher so

24  basically if my goal is 5,000 typically see 4,000 visits a year

25  my RVU base 1.25.  For him if seeing same 4,000 patient visits,

1    which like 100 week for ten months, averaged with vacation and

2    CME dates, holidays, etc., then his RVU base is 1.5."  Correct?

3    A.  Yeah, this is just my kind of trying to figure it out, but

4    there are multiple ways someone could be paid more.

5    Q.  OK.  And that was through a conversation you had with Dr.

6    Modi?

7    A.  Yes.

8    Q.  Is that right?

9    A.  Yes.

10   Q.  OK.  And then subsequently, in this text chain, you texted,

11   at 12:03 p.m., "If you want answer for equal pay need ask

12   transparency."  Was that the pay --

13            MR. LABUDA:  I think you have to scroll down.

14   A.  Yeah.

15            MR. LABUDA:  Thank you.

16   Q.  Was there any -- did NYU tell you what the other doctors

17   were being paid?

18   A.  No.

19   Q.  OK.  Did they tell you how much they were paying on a

20   relative RVU basis, or anything like that?

21   A.  No.

22   Q.  OK.  And were you raising issues about gender with Ms. --

23   with Dr. Modi -- or, I'm sorry -- Dr. Mehta?

24   A.  Yes.  We both had concerns at that point that we weren't

25   being paid equivalent to our male colleagues.

1  Q.  OK.  There's also a reference to the titles, male titles.

2  What were you referencing there?

3  A.  The male rheumatologists in Lake Success both had

4  administrative titles, and we felt there was likely going to

5  be -- there was likely compensation associated with those

6  titles to, to allow for higher pay.

7  Q.  And then down below, the response from Dr. Mehta is:  "Yup.

8  NYU will not disclose or be transparent about salaries.  Gender

9  and age discrimination in salary compensation exists, 100

10  percent, but so hard to prove since no one helping.  I was

11  hoping Anang would be more helpful."

12      That was her response?

13  A.  Yes.

14  Q.  And this was in October of 2020, is that right?

15  A.  I -- I believe so, but I can't -- I don't see the year, but

16  I would believe so.

17  Q.  OK.

18  A.  Yes.

19  Q.  And so with respect to -- when you stopped working in 2021,

20  Dr. Goldberg was there, correct?

21  A.  Yes.

22  Q.  OK.  And you were both being hired by NYU to perform

23  clinical services for patients, correct?

24  A.  Yes, we were hired as outpatient rheumatology --

25  rheumatologists who see patients in the office.

1    Q.  OK.  And when you started working for NYU, how many years

2    of clinical experience did you have treating patients?

3    A.  Well, I would say from the start of my fellowship through

4    to that year, so from 2006 onward.

5    Q.  OK.  So that would be eight years?

6    A.  Yes.

7    Q.  OK.  And with respect to Dr. Goldberg -- you had said, I

8    think, he joined NYU just before you -- what was his experience

9    before he joined NYU in terms of clinical?

10   A.  Yes.

11           MR. SCHOENSTEIN:  Objection.  Foundation.

12           THE COURT:  Sustained.

13   BY MR. LABUDA:

14   Q.  Have you reviewed his CV in the course of this case?

15   A.  Yes.

16   Q.  OK.  And was there reference in terms of his work

17   experience as a doctor?

18   A.  Yes.  He had worked --

19   Q.  Hold on.  Hold on.

20   A.  OK.

21   Q.  And is that also true with the other doctors as well, you

22   reviewed their résumés, their CVs, that referenced their

23   clinical experience?

24   A.  Yes.

25   Q.  With respect to Dr. Goldberg, what was his clinical

```
 1    experience?

 2              MR. SCHOENSTEIN:  Objection.

 3              THE COURT:  Sustained on hearsay grounds.

 4    BY MR. LABUDA:

 5    Q.  Did you ever speak to Dr. Goldberg about his experiences --

 6    A.  Yes.

 7    Q.  -- his experience as clinical?

 8    A.  Yes.

 9    Q.  OK.  And what did he tell you?

10              MR. SCHOENSTEIN:  Objection.  Hearsay.

11              THE COURT:  Sustained.

12    BY MR. LABUDA:

13    Q.  With respect to Dr. Modi, do you know, what was his

14    experience prior to working at -- working at NYU?

15              MR. SCHOENSTEIN:  Objection.  Foundation.

16              THE COURT:  Sustained.

17              MR. LABUDA:  OK.  Let's pull up -- all right.  Let me

18    do it this way.

19              Bear with me.  It's going to take a little longer,

20    but -- OK.  I'd like you to look at exhibit 41.

21              MR. SCHOENSTEIN:  No objection.

22              THE COURT:  41's received and may be published to the

23    jury.

24              (Plaintiff's Exhibit 41 received in evidence)

25    BY MR. LABUDA:
```

1   Q.  OK.  This is Dr. Goldberg's C -- curriculum vitae, correct?

2   A.  Yes.

3   Q.  And that outlines the experience that he has as a

4   rheumatologist, correct?

5   A.  Yes.

6   Q.  OK.  And from this CV, what was the experience, what was

7   the clinical experience that Dr. Goldberg had prior to working

8   at NYU?

9   A.  You have to scroll down further.

10       Thank you.

11  Q.  You may want to just --

12  A.  You have to go back up.  All right.  925.

13       Yeah, that's right.  Yeah.

14       So Dr. Goldberg worked at -- scroll back to the top.  I'm

15  sorry.

16       Yeah.

17            MR. LABUDA:  It's a multiple-page document.  It may be

18  easier if the witness sees it.

19            THE COURT:  Do you want to have someone direct her

20  attention to it?

21            MR. LABUDA:  Well, it's hard because it's not on that

22  page.

23            THE COURT:  All right.  You can approach the witness

24  with a physical exhibit.

25            MR. LABUDA:  OK.  Thank you.

1          THE COURT:  The witness has the exhibit in front of

2     her, exhibit No. 41.

3          MR. LABUDA:  Right.

4     Q.  And if you could explain the clinical experience that

5     Dr. Goldberg had that he had prior to NYU?

6          MR. SCHOENSTEIN:  Same objection, your Honor, as to

7     foundation.

8          THE COURT:  That objection's overruled.  She can give

9     lay opinion testimony about what the résumé means.

10          MR. SCHOENSTEIN:  OK.

11     A.  His clinical, his clinical experience was from 2001 until

12     present, and that was at North Shore University Hospital Long

13     Island Jewish.  He had worked in academic medicine, which is

14     shared responsibilities, so a lot of his experience is in

15     teaching and less time in clinical, at a hospital-based center.

16     Q.  OK.  And that's because at a hospital-based center, as an

17     assistant professor of medicine, is there any academic type of

18     component to that?

19     A.  Yes.

20          MR. SCHOENSTEIN:  Objection.

21          THE COURT:  Sustained.

22     BY MR. LABUDA:

23     Q.  What is the -- are you familiar with, with academic

24     appointments at hospitals for rheumatologists?

25     A.  Yes.

1    Q.  And what's your familiarity based on?

2    A.  Based on my, my training in an academic institution or

3    hospital for rheumatology.

4    Q.  OK.  And what do assistant professors of medicine do at

5    schools of medicine vis-à-vis the clinical?

6    A.  Their time is spent teaching residents.  Sometimes there's

7    time spent with medical students.  There's some time spent

8    doing research related to the academia of that department and

9    some time spent in clinical practice.  Usually clinical hours

10   for an attending at a hospital, attending at a hospital,

11   academic rheumatology practice is usually limited to two, two

12   and a half days a week to see their own patients.

13   Q.  Whereas in a private practice it's seeing patients how many

14   times?  Five?

15   A.  Five.  Five days a week.

16           MR. LABUDA:  OK.

17           All right.  With Dr. Modi, if you could look at his

18   exhibit or his CV.

19           I'd like you to take a look at 46, and we'd offer that

20   into evidence.

21           THE COURT:  Any objection to 46?

22           MR. SCHOENSTEIN:  No, your Honor.

23           THE COURT:  46 is received and may be published to the

24   jury.

25           **(Plaintiff's Exhibit 46 received in evidence)**

1   BY MR. LABUDA:

2   Q.  All right.  This is the CV of Dr. Modi, is that correct?

3   A.  Yes.

4   Q.  OK.  And what was his clinical experience prior to working

5   at NYU?

6   A.  So, he -- you have to -- same thing.  You have to scroll.

7   Q.  If you look in the hard book --

8   A.  Oh.

9   Q.  -- you have all of the exhibits there.

10  A.  Oh.

11  Q.  You can look through that, and I can adjust the binder so

12  it's not as cumbersome.

13          THE COURT:  My copy of 46 just has a single page.

14          MR. LABUDA:  Yes, if you look at 46.

15          THE COURT:  It's just one page.  I would think it

16  could be published.

17          THE WITNESS:  Oh, OK.  It is one page.  I didn't know

18  there was a second page.

19          MR. LABUDA:  Make it bigger.

20  Q.  What was his clinical experience?

21  A.  Dr. Modi's clinical experience is from his fellowship time

22  at Winthrop.  He attended fellowship with me.  He graduated in

23  2006, and then his additional clinical experience was at the

24  Queens Long Island Medical Group, where he saw patients as part

25  of the HIP Center, or Queens Long Island Medical Group.

1    Q.  OK.  So let's just go back.

2        He graduated from the New York College of Osteopathic

3    Medicine, correct?

4    A.  Yes.

5    Q.  And that's the same medical school that you graduated from,

6    correct?

7    A.  Yes.

8    Q.  You graduated in 2003, is that right?

9    A.  Yes.

10   Q.  So he was two years before you, right?

11   A.  Yes.

12   Q.  OK.  And then the internal medicine residency, that was the

13   same internal medicine residency you did at Winthrop, correct?

14   A.  Yes, correct.

15   Q.  OK.  And then the same with the rheumatology fellowship at

16   Winthrop; the only difference is he's two years before you,

17   correct?

18   A.  Yes, correct.

19   Q.  OK.  And then after that he went to -- you said he went to

20   HIP?

21   A.  Yes, the Queens Long Island Medical Group.

22   Q.  Did you have, as a rheumatologist, did you have any

23   understanding of what HIP was or is?

24   A.  HIP is an -- it's a facility that is owned by the insurance

25   company, where they employ their own doctors and then you see

1    patients all who have the same insurance under HIP.

2    Q.  OK.  And did you have any understanding when Dr. Modi came

3    to HIP how many HIP patients that he was treating followed him

4    over to NYU?

5    A.  His location -- his office location was in Queens, and my

6    understanding, when he came over, from conversations that I had

7    with him, was that he, he didn't -- he didn't have a strong

8    following because you needed to see a HIP doctor.  So once he

9    left HIP, he was no longer a HIP doctor.  So, and then the

10   patients that did come are now driving from Queens to Long

11   Island, all the way out East.  It was a very far distance, so

12   he had expressed to me that he was having difficulty, like,

13   retaining and establishing a patient base in Huntington.  So I

14   don't think many followed him.

15   Q.  In contrast, you said that you and Dr. Mehta had about

16   6,000 patients that followed you to NYU?

17   A.  Yes.

18   Q.  And Dr. Andrew Porges, did you get an opportunity to review

19   his CV in the course of this litigation?

20   A.  Yes.

21          THE COURT:  Why don't you wait until the lawyer shows

22   you a document before you look at documents yourself.

23          THE WITNESS:  Oh, I'm sorry.

24          MR. LABUDA:  I'd ask you to look at exhibit 48, and

25   we'd offer that into evidence as well.

1          THE COURT:  Any objection?

2          MR. SCHOENSTEIN:  No objection.

3          THE COURT:  OK.  48 is received and may be published.

4          (Plaintiff's Exhibit 48 received in evidence)

5   BY MR. LABUDA:

6   Q.  This is the CV for Dr. Porges, is that right?

7   A.  Yes.

8   Q.  So he went to medical school as well in 1986, correct?

9   A.  Yes.

10  Q.  At Cornell New York, correct?

11  A.  Yes.

12  Q.  And then in terms of his training, what clinical training

13  did he have in accordance with his résumé or CV before he

14  joined NYU?

15  A.  So, a lot of his early career he is an instructor in

16  medicine at Cornell.  He's an assistant scientist at the

17  Hospital for Special Surgery.  He's an assistant professor at

18  Cornell University, which is an academic position as well.  He

19  goes into clinical medicine in 1993 in his -- in a partnership

20  with Dr. Cohen.  And then he continued practicing in clinical

21  at his own practice in 2002.  And part of that practice or a

22  large part of it was engaged in research.

23  Q.  OK.

24  A.  Yeah.

25  Q.  And that's not clinical?

A.   The clinical activity with research is just limited to your

patients in clinical trials, so it's different than seeing a

patient who comes in and you're establishing a diagnosis and

developing a treatment plan.

   A clinical trial patient has to meet criteria, to already

have the diagnosis and then they're treated with whatever the

trial protocol is, whatever drug they're testing.  So it's a

different type of patient visiting.  You're monitoring side

effects, how the patient's doing.  But it's different than

being a clinician and evaluating, diagnosing and treating.

Q.   OK.  Is it fair to say that in a research component, you're

more focused on the interaction of the drug with the patient as

opposed to the patient treatment?

        MR. SCHOENSTEIN:  Objection.

        THE COURT:  Sustained.

BY MR. LABUDA:

Q.   What's the primary focus in a research position --

        MR. SCHOENSTEIN:  Objection.

BY MR. LABUDA:

Q.   -- in rheumatology?

        THE COURT:  Sustained on foundation grounds.

BY MR. LABUDA:

Q.   Do you have any understanding of what rheumatologists do

when they are performing research with respect to rheumatology?

A.   Yes.

1    Q.  And what's the basis of your knowledge?

2    A.  During my fellowship, I engaged in clinical trials with the

3    attending doctors that I worked with, and I saw patients with

4    them who were involved in clinical trials.

5    Q.  And what is the main focus of a rheumatologist when they're

6    doing research work vis-à-vis a drug?

7             MR. SCHOENSTEIN:  Objection.

8             THE COURT:  Sustained.

9    BY MR. LABUDA:

10   Q.  What is the main focus of a rheumatologist when they're

11   performing their research work?

12            MR. SCHOENSTEIN:  Objection.

13            THE COURT:  Sustained.

14   BY MR. LABUDA:

15   Q.  Based on your experience in dealing with research in

16   rheumatology, what's the main focus of that, of the research

17   that a rheumatologist performs?

18            MR. SCHOENSTEIN:  Objection.

19            THE COURT:  Is there a single thing in academia that

20   rheumatologists always do?

21            THE WITNESS:  There's a -- there are, there are

22   several things that they always do.

23            THE COURT:  But does every rheumatologist in academia

24   do the same thing?

25            THE WITNESS:  They can do different things.  They

1    don't all have to do exactly the same thing.

2             THE COURT:  Objection sustained.

3    BY MR. LABUDA:

4    Q.  With respect to Dr. Mehta, did you have an opportunity to

5    review her CV?

6    A.  Yes.

7             MR. LABUDA:  OK.  And I'd like you to look at exhibit

8    42.  And we'd offer that into evidence.

9             THE COURT:  Any objection?

10             MR. SCHOENSTEIN:  No.

11             THE COURT:  42 is received and may be published.

12             (Plaintiff's Exhibit 42 received in evidence)

13    BY MR. LABUDA:

14    Q.  OK.  And this is the CV of Dr. Mehta, correct?

15             And again, she was your business partner in private

16    practice, correct?

17    A.  Yes.

18    Q.  OK.  And in terms of her clinical work, what is her

19    clinical work?

20    A.  So, Dr. Mehta worked from her fellowship in clinical work,

21    and then she worked for one year doing clinical work as an

22    outpatient rheumatology with Dr. Chatpar, and then she worked

23    with me in our private practice up until the time I left NYU.

24    Q.  In reviewing the contracts of your -- well, withdrawn.

25             In your contract, initial contract, you had an expense

N7bWede4                Edelman - Direct

1    allocation of $3,000, is that correct?

2    A.  That's correct.

3    Q.  OK.  In reviewing your male colleagues', did they have any

4    expense outpatient cap?

5    A.  It was --

6              MR. SCHOENSTEIN:  Objection.

7              THE COURT:  Basis.

8              MR. SCHOENSTEIN:  Relevancy.

9              THE COURT:  Overruled.

10   A.  There was -- there was no caps in their contracts.  They

11   had unlimited expenses.

12   Q.  And what was your allocation for expenses?

13   A.  $3,000 in my first contract.  And there was no expenses

14   allotted to me in my second.

15   Q.  OK.  And with respect to your colleagues, just to be clear,

16   Dr. Avram Goldberg, he's a male, correct?

17   A.  Yes.

18   Q.  Dr. Anang Modi is male, correct?

19   A.  Yes.

20   Q.  And Dr. Andrew Porges is male, correct?

21   A.  Yes.

22   Q.  And you and Dr. Mehta are female, correct?

23   A.  Correct.

24             MR. LABUDA:  I'd like you to look at exhibit 24.

25             THE COURT:  Any objection to receipt of 24?

1          MR. SCHOENSTEIN:  No, your Honor.

2          THE COURT:  24 is received and may be published to the

3   jury.

4          (Plaintiff's Exhibit 24 received in evidence)

5   BY MR. LABUDA:

6   Q.  This is a copy of a contract for Dr. Goldberg, dated

7   November 22, 2013, is that correct?

8   A.  Yes.

9   Q.  And just for the sake of expediency, prior to this lawsuit,

10  had you seen any of these contracts before?

11  A.  No.

12  Q.  You only received them after the lawsuit began in the

13  course of discovery?

14  A.  Yes.

15  Q.  With respect to Dr. Goldberg's contract, if you turn to

16  page D792, at the top, his commencement date with NYU was March

17  1, 2014, correct?

18          MR. LABUDA:  D792.

19  A.  Yes, correct.

20  Q.  OK.  And he had a five-year contract, is that right?

21  A.  Yes.

22  Q.  OK.  And your contract was three years --

23  A.  Yes.

24  Q.  -- correct?

25  A.  Mine was three.

1  Q.  In terms of the next page, D793, his faculty appointment

2  was clinical assistant professor of medicine, correct?

3  A.  Yes.

4  Q.  OK.  And that's the same as yours?

5  A.  Yes.

6  Q.  And his academic track was clinical, just like yours,

7  correct?

8  A.  Yes.

9  Q.  OK.  The tenure was just like yours, nontenured, correct?

10  A.  Yes.

11  Q.  And his appointment title was the same as yours, staff

12  physician, correct?

13  A.  Yes.

14  Q.  And he had an administrative title, clinical director, NYU

15  Langone Nassau Radiology.  Do you see that?

16  A.  Yes.

17  Q.  That was not an administrative title that you had, correct?

18  A.  No.

19  Q.  He's also listed as being a full-time staff physician,

20  correct?

21  A.  Yes.

22  Q.  OK.  His compensation for the clinical is $290,000,

23  correct?

24  A.  Yes.

25  Q.  And the administration compensation is 25,000, correct?

1    A.  Yes.

2    Q.  OK.  And his total compensation was $315,000, correct?

3    A.  Yes.

4    Q.  If you turn to D795, there's, again, a reference to his

5    compensation for the clinical of $290,000, correct?

6    A.  Yes.

7    Q.  And his target RVU is 3,481 RVUs, correct?

8    A.  Yes.

9    Q.  OK.  And your target for your 207,000, in 2014, was 4,966

10   RVUs, is that right?

11   A.  It was 4,996.

12   Q.  Nine --

13   A.  I thought it was 996.

14   Q.  OK.

15       He also has that same bonus incentive, right, with the 1

16   percent --

17   A.  Yes.

18   Q.  -- is that right?

19       OK.  And on page 796, there's a reference to clinical

20   research, that any clinical research that he had done before is

21   assigned over to NYU, correct?

22   A.  Yes.

23            MR. LABUDA:  All right.  If you turn to -- I'm sorry.

24            If you could look at 25, and we'd offer that into

25   evidence as well.

N7bWede4              Edelman - Direct

1           MR. SCHOENSTEIN:  No objection.

2           THE COURT:  25 is received and may be published.

3           (Plaintiff's Exhibit 25 received in evidence)

4    BY MR. LABUDA:

5    Q.  So, 25 is Dr. Goldberg's contract, dated January 13, 2017,

6    correct?

7    A.  Yes.

8    Q.  OK.  And even though it was a five-year contract, after

9    three years, there was a new contract for Dr. Goldberg,

10   correct?

11   A.  Yes.

12   Q.  Did NYU ever offer you to renew your contract and increase

13   your pay while you were under contract?

14   A.  No, I was not.

15   Q.  OK.  Dr. Goldberg, he was making $290,000 in his first

16   contract, right?

17   A.  Yes.

18   Q.  And he -- NYU was contractually required to pay him and he

19   was contractually required -- obligated to receive that 290 for

20   the five years, correct?

21           MR. SCHOENSTEIN:  Objection.

22           THE COURT:  Sustained.

23   BY MR. LABUDA:

24   Q.  Contractually, for those five years, how much did NYU --

25   how much was NYU required to pay Dr. Goldberg from 2014 to

 1    2019?

 2              MR. SCHOENSTEIN:  Objection.

 3              THE COURT:  Sustained.  The witness is not a lawyer.

 4    She can testify to what she read in a document.

 5              MR. LABUDA:  OK.

 6              THE COURT:  What it says.

 7    BY MR. LABUDA:

 8    Q.  What did his contract read in terms of how much he was

 9    going to be paid in the next five years?

10    A.  $290,000.

11    Q.  And three years later, NYU entered into a new agreement

12    with him, correct?

13    A.  Yes.

14    Q.  And they agreed to pay him $500,000, correct?

15    A.  Yes.

16    Q.  OK.  And in addition to that, they also agreed to pay him

17    $25,000 for administrative compensation, correct?

18    A.  Yes.

19    Q.  If you look at D800, the next page, his compensation was

20    tied to a new RVU target, right; 5,850?  Is that correct?

21    A.  Yes.

22              MR. LABUDA:  OK.  And then if you look at -- I'm going

23    to have you look at exhibit 26, and I'd offer that into

24    evidence.

25              THE COURT:  Any objection?

1            MR. SCHOENSTEIN:  No objection.

2            THE COURT:  26 is received and may be published.

3            (Plaintiff's Exhibit 26 received in evidence)

4    BY MR. LABUDA:

5    Q.  All right.  This is another contract that Dr. Goldberg

6    entered into with NYU, dated January 16, 2019, correct?

7    A.  Yes.

8    Q.  OK.  And his FGP compensation was increased from 500 to

9    510,000, correct?

10   A.  Yes.

11   Q.  And his administrative component stayed at $25,000 --

12   A.  Yes --

13   Q.  -- correct?

14   A.  -- it stayed the same.

15           MR. LABUDA:  I'd like you to look at exhibit 31, and

16   I'd offer that into evidence as well.

17           THE COURT:  Any objection to 31?

18           MR. SCHOENSTEIN:  No.

19           THE COURT:  31's received and may be published.

20           (Plaintiff's Exhibit 31 received in evidence)

21   BY MR. LABUDA:

22   Q.  This is a contract between Dr. Porges and NYU, dated August

23   11, 2014, correct?

24   A.  Yes.

25   Q.  And if you look on the second page of this, D855, his

1    academic appointment is a faculty member of the NYU School of

2    Medicine, correct?

3    A.  Yes.

4    Q.  And that's the same as you, correct?

5    A.  Yes.

6    Q.  And if you look at page D858, in the effort and

7    compensation, for his clinical work, his compensation was

8    $340,000, correct?

9    A.  Yes.

10   Q.  OK.

11   A.  His --

12   Q.  And that that same year, in 2014, you were getting paid

13   $207,000 for your clinical work, correct?

14   A.  Yes.

15   Q.  And there's no administrative/leadership role for him in

16   this contract, correct?

17   A.  That's correct.

18   Q.  It's just 340 for clinical, correct?

19   A.  Yes.

20   Q.  On the next page, D859, in the academic appointment,

21   Dr. Porges had the faculty appointment of clinical assistant

22   professor in the department of medicine, correct?

23   A.  Yes.

24   Q.  And that was the same as you, correct?

25   A.  Yes.

1   Q.  And academic track was clinical, just like you, correct?

2   A.  Yes.

3   Q.  And the tenure status is nontenure eligible, just like you,

4   correct?

5   A.  Yes.

6   Q.  And on the next page, D860, the employment status is staff

7   physician, full time, correct?

8   A.  Yes, correct.

9   Q.  Just like you?

10   A.  Yes.

11   Q.  On page D862, his salary for the clinical compensation,

12   again, is listed, and it lists his RVU target of 6,524,

13   correct?

14   A.  Yes.

15          MR. LABUDA:  If you look at the next one, 32, and we'd

16   offer that into evidence.

17          THE COURT:  Any objection?

18          MR. SCHOENSTEIN:  No objection.

19          THE COURT:  32 is received and may be published.

20          (Plaintiff's Exhibit 32 received in evidence)

21   BY MR. LABUDA:

22   Q.  This is a contract with Dr. Porges, dated April 3, 2017,

23   correct?

24   A.  Yes.

25   Q.  And if you look on the third page, the percent, effort and

1   compensation section, the clinical actually went down to 323

2   from 340, correct?

3   A.  Yes.

4   Q.  And the administration went to 17, correct?

5   A.  Yes.

6   Q.  The total pay remained the same, at 340,000, correct?

7   A.  Yes.

8           MR. LABUDA:  And if you look at exhibit 33 --

9           MR. SCHOENSTEIN:  No objection.

10          THE COURT:  Received and may be published.

11          (Plaintiff's Exhibit 33 received in evidence)

12  BY MR. LABUDA:

13  Q.  A year later there was an amendment to his employment

14  agreement, correct?

15  A.  Yes.

16  Q.  There was amendment to his agreement, correct?

17  A.  Yes.

18  Q.  His contract was for three years, correct?

19          MR. LABUDA:  If you look at exhibit 32.

20  A.  Yes.

21  Q.  OK.  But they amended it a year later, correct?

22  A.  Yes.

23  Q.  And in this contract, on the second page, there's an

24  additional compensation of $25,000 for him being the medical

25  director at NYU Langone Ambulatory Care, correct?

1    A.  Yes.  That's additional salary to the 340,000.

2              MR. LABUDA:  Correct.  OK.

3              And then if you look at exhibit 34, we'd offer this

4    into evidence.

5              THE COURT:  Any objection?

6              MR. SCHOENSTEIN:  None.

7              THE COURT:  34 is received in evidence.

8              (Plaintiff's Exhibit 34 received in evidence)

9    BY MR. LABUDA:

10   Q.  For this, Dr. Porges's clinical compensation is $358,000,

11   correct?

12   A.  Yes.

13   Q.  His administration/leadership is $42,000, correct?

14   A.  Yes.

15   Q.  And he's got a total pay of $400,000, correct?

16   A.  Yes.

17   Q.  And in contrast, in 2020, how much were you earning?

18   A.  $278,000.

19   Q.  And if you continue on to exhibit 34, page D879 --

20             THE COURT:  Any objection?

21             I'm sorry.  It's not a new document.

22             Go ahead.

23   BY MR. LABUDA:

24   Q.  D879, his status is still the same, full-time staff

25   physician, correct?

1    A.  Yes.

2    Q.  OK.  And his RVU targets on this contract are 6,250,

3    correct?

4    A.  Yes.

5              MR. LABUDA:  And with exhibit 35, this -- I'll have

6    you look at exhibit 35 and offer this into evidence.

7              THE COURT:  Any objection?

8              MR. SCHOENSTEIN:  No.  No objection.

9              THE COURT:  35 is received and may be published to the

10   jury.

11             (Plaintiff's Exhibit 35 received in evidence)

12   BY MR. LABUDA:

13   Q.  And this is the contract between NYU and Dr. Modi, correct,

14   Anang Modi?

15   A.  You'd have to scroll down, because the first page is not

16   clear.

17        Yes, correct.

18   Q.  OK.  And this is dated February 10, 2017, correct?

19   A.  Yes.

20   Q.  And on page 884, Dr. Modi is being appointed as a faculty

21   member of the NYU School of Medicine, same as you, correct?

22   A.  Yes.

23   Q.  And on page D888, his clinical effort compensation is

24   600 -- I'm sorry, $360,000, correct?

25   A.  Yes.

1  Q.  And there's no admin or research or education leadership

2  pay, correct?

3  A.  Yes.

4  Q.  OK.  And in contrast, in 2017, how much were you earning?

5  A.  $278,000.

6  Q.  In 2017?

7  A.  I was $207,000.

8      2017 was the -- it depends on the date because the contract

9  was up in December.  It started in January.

10  Q.  In May of 2017 --

11  A.  On --

12  Q.  -- what was your pay?  Your first contract.

13  A.  My first contract was $207,000 for four years, and that was

14  up in -- it was '14, '15, '16.  So in 2017, that should have

15  been the second contract.

16  Q.  Just, do you want to take a look at your first contract?

17         THE COURT:  It's in the record.  Why don't you move

18  on.

19         THE WITNESS:  Yeah.

20  BY MR. LABUDA:

21  Q.  If you look at D889 --

22  A.  OK.

23  Q.  -- your -- Dr. Modi's faculty appointment is the same as

24  yours, clinical instructor in the department of medicine, and

25  his tenure status is nontenure eligible, correct?

1    A.  Yes.

2    Q.  And in had D890, his employment title and status was staff

3    physician, full time, same as you, correct?

4    A.  Yes, correct.

5    Q.  And D892, it references his pay again at 360,000, and his

6    RVU target is 6,108, correct?

7    A.  Yes, correct.

8    Q.  Based on the contracts that you reviewed, in 2020, the year

9    that you were told that you were being terminated, the pay for

10   the doctors was as follows, correct?

11             MR. SCHOENSTEIN:  Objection, your Honor.

12             THE COURT:  Sustained.

13             MR. SCHOENSTEIN:  This is leading.

14             THE COURT:  What's being posted to the jury -- or to

15   the witness?

16             There's something up on the screen.  Take it down.

17             MR. LABUDA:  It's a demonstrative of the testimony.

18             THE COURT:  If it's demonstrative, you don't need to

19   put it in.  You can ask the witness the question without it.

20   And if she doesn't remember, you can ask to refresh her

21   recollection, but you can't just have her read from a

22   demonstrative exhibit into evidence.

23             MR. LABUDA:  As she testifies, I was going to put up

24   the testimony.  She's testified to all these numbers, your

25   Honor.

N7bWede4          Edelman - Direct

1          THE COURT:  Then you don't need to have her sum it up.

2     You can move on.  Or you can ask her summary questions and see

3     if she remembers, but you can't show a demonstrative exhibit to

4     the witness and just have her read it into the record.

5          MR. LABUDA:  OK.  Fine.

6          THE COURT:  That's not permitted by the rules.

7          MR. LABUDA:  OK.  Fine.

8     Q.  In 2020, the year that you were told about being

9     terminated, what was Dr. Goldberg's pay?  And if you want to

10    look at the contract, you can.

11    A.  I would need the exhibit number.

12         THE COURT:  If you're just going to have her read

13    something that's in the record, you can move on.

14         THE WITNESS:  It was upwards, I believe, of 500,000,

15    but --

16    BY MR. LABUDA:

17    Q.  And what was your pay in 2020?

18    A.  It was two -- 278,000.

19    Q.  And in 2020, what was Dr. Modi's pay?

20    A.  It was in the $300,000 range.

21    Q.  And what was Dr. Porges's pay in 2020?

22    A.  I would have to look at it.  I don't want to guess.

23    Q.  OK.

24    A.  Upwards of Dr. Modi.

25    Q.  OK.  It was over $300,000?

1    A.  Yes.

2    Q.  OK.  And there was reference in the contract to an

3    administrative role; you saw that?

4    A.  Yes.

5    Q.  Did you have any understanding of how that worked in terms

6    of pay at NYU?

7    A.  So, from my understanding of looking at the administrative

8    pay in the contracts is that when you were assigned an

9    administrative title, your clinical responsibility work went

10   down.  So your salary for that work went down, and then your

11   administrative pay made the difference so your base salary

12   stayed the same.

13   Q.  And we saw that in Dr. Porges's contract, correct?

14   A.  Yes:

15   Q.  In addition to compensation, was there any additional -- in

16   addition to salary, was there any other additional compensation

17   components that were offered by NYU?

18   A.  The -- there are benefits packages.  There's health care,

19   retirement.  And there were the expense accounts offered.

20   Q.  OK.  And NYU is a university, correct?

21   A.  Yes.

22   Q.  Was there any, any compensation associated with being part

23   of a university?

24   A.  Yes.

25   Q.  What was that?

1    A.  You had, you had -- if you wanted, if you were a full-time

2    physician and you had a child who went to NYU undergraduate or

3    graduate, either/or, not both, you got free tuition for that

4    child for the completion of their four years.

5              MR. LABUDA:  OK.

6              MR. SCHOENSTEIN:  Objection.  Relevance.  Move to

7    strike.

8              THE COURT:  Overruled.  I'll permit it.

9    BY MR. LABUDA:

10   Q.  And you mentioned that you have a daughter in college, is

11   that right?

12   A.  I do.

13   Q.  Where is she at school?

14   A.  Yale University.

15   Q.  And what is she studying?

16   A.  She is studying molecular and cellular developmental

17   biology and neuroscience.

18   Q.  What's her GPA?

19   A.  GPA is 3.9 presently.

20   Q.  And is she considering medical school?

21   A.  She most definitely is.

22   Q.  And is she considering NYU?

23   A.  Yes.

24   Q.  And I think you said she's going to be a senior this year?

25   A.  Yes, she's going into her senior year.

1   Q.  OK.  There was reference to the RVUs in the contracts,

2   right; and I know you had said that you, that you received

3   those from NYU on a monthly basis?  Correct?

4   A.  Yes.

5   Q.  During the course of this litigation, did you ask for the

6   RVUs from, for the male doctors?

7   A.  Yes, we did.

8   Q.  And what happened?

9   A.  They were not produced.

10  Q.  Do you know that -- there were targets listed in there.  Do

11  you know what the male doctors received or actually what they

12  did in RVUs?

13  A.  I do not know.  I only know from conversations that two,

14  two different rheumatologists expressed to me that they were

15  having trouble hitting their target RVUs, and that was

16  Dr. Goldberg as well as Dr. Modi.

17  Q.  Now, with respect to -- now I want to move on to another

18  topic here.

19      With respect to the incidents that happened that you

20  described in September of 2019, did you have any -- were there

21  any type of emotional issues that you had as a result of the

22  incidents that happened in September?

23  A.  It, it definitely impacted my life in a very profound way.

24  After the events, I was very upset and shaken up by it.  When

25  it had happened and after the termination, my entire life got

N7bWede4          Edelman - Direct

1   upended.  I tried to seek a position in New York to stay close

2   to my family and to not have to transition my children's

3   education and be away from the people and friends that I loved.

4   And in my endeavors to secure a position in the New York area,

5   I was not successful, which forced a relocation down to

6   Florida.

7   Q.  So where did you look in New York for work after you were

8   terminated?

9   A.  I used headhunters to look for positions in all of the New

10  York tristate area.  I spoke to the Catholic Health systems, to

11  Northwell hospital.  I spoke to -- I had interviews with Yale

12  New Haven Health.

13  Q.  OK.  And did any of those local interviews pan out?

14  A.  Nothing panned out, and the interview with Northwell

15  extended for almost five months.  I was still interviewing

16  while I was packing up to move to Florida, hoping that I would

17  be able to get an offer.  But it just seemed like every time I

18  got to the last stages, to put a contract on the table and they

19  would say we're going to reach out to your former employer,

20  things went dark.

21  Q.  Other than in the New York area, did you -- in terms of the

22  headhunters, where else were you looking for work to relocate?

23  A.  I applied for positions in Colorado, in Pennsylvania, in

24  Connecticut.  There was the -- Tennessee, and for -- and

25  different -- and different areas of Florida as well.

1   Q.  With respect to your emotional state, did you ever seek any

2   type of professional help?

3   A.  I did.  When I got down to, to -- the period of time from

4   the termination to securing a job was really focused on

5   resilience and moving forward and figuring out how to make this

6   work for my family and our financial needs.  And when I got

7   down to Florida, I think that's when the emotional wave hit me

8   of everything I left behind.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N7BCede5                    Edelman - Direct

1    BY MR. LABUDA:

2    Q.    And you sought help?

3    A.    I did.

4    Q.    And who did you seek help from?

5    A.    I met with a therapist, a social worker in a nearby town.

6    Q.    How often did you do that?

7    A.    I went once a week for several months, I think about six

8    months.

9    Q.    Had you ever sought any type of emotional help from a

10   professional before your termination with NYU?

11   A.    No.

12   Q.    And just with respect to while you were working at NYU, was

13   there any -- with respect to your interactions with Mr. Antonik

14   and Kaplan, what did you do with respect to those, if anything?

15   A.    So after the events that happened at NYU, once I didn't

16   hear anything back about any sort of support or followthrough

17   on what had happened, I went to selfhelp, which was to avoid

18   them both, you know, when they were on the floor, in my office,

19   I closed the door and locked it.  If I had to walk down a

20   hallway where they might be, I made sure to avoid or go a

21   different direction.  That's how I handled it at that point.

22   Q.    After you found out you were no longer working at NYU, did

23   you have a preference as to where you'd want your next job to

24   be?

25   A.    I wanted to stay in New York.  My support system is in New

1    York and I really needed that from my family.  It was very,

2    very challenging to try to navigate those changes without my

3    family nearby.  My business that I built, my patient

4    relationships, you know, some of my patients had been with me

5    since I was a fellow.  It was just very saddening to me to be

6    getting an outpouring of emails from people of where are you

7    going, I don't want you to leave, you're my doctor.  It was

8    twofold, things all happening at once where I was kind of

9    grieving the loss of all these relationships I had built and a

10   career I built here that was just stripped away from me for

11   nothing that I did wrong, basically for trying to protect my

12   rights.  And then I was trying to protect my family and make

13   sure that I could pay my daughter's tuition, that I could

14   support my younger daughter's needs, so my husband could still

15   work --

16                  THE COURT:    I'm going to strike the testimony.

17                  You could ask a new question.

18   Q.    Ultimately, you found a position down in Clearwater,

19   Florida; is that right?

20   A.    Yes.

21   Q.    Who was that with?

22   A.    That was with Arthritis and Rheumatism in Clearwater.

23   Q.    And you entered into a contract with them in February of

24   2021; correct?

25   A.    Yes.

1   Q.    When were you planning on starting work down there?

2   A.    Around July of 2021.

3   Q.    Was that start date accelerated?

4   A.    Yes.

5   Q.    And what happened there?

6   A.    The doctor that I was coming in to replace had left earlier

7   on leave.  So the physicians in the practice had called and

8   urged if I could come sooner because they had a demand to have

9   me there sooner.

10  Q.    And when did you start there?

11  A.    I started May 1st of 2021.

12  Q.    And with respect to the new position down in Florida, when

13  you started there, how much were you making?

14  A.    $300,000.

15  Q.    And with respect to the retirement plans that they offered,

16  what did they offer in terms of retirement plans?

17  A.    You're asking Florida?

18  Q.    Yes, in Florida.  Sorry.

19  A.    They didn't offer any retirement plan for my first year.

20  Q.    And then after that, what was the retirement plan?

21  A.    It was a typical 401K, there was no matching.

22  Q.    So you could contribute into it?

23  A.    Yes.

24  Q.    For pretax dollars?

25  A.    Yes.

1    Q.    What about health insurance?

2    A.    That health insurance plan was not a good plan, it was very

3    expensive, and we ended up needing to use my husband's.  So NYU

4    had great health insurance.  And that was something that we

5    always struggled with when we got to Florida because there were

6    high out-of-pockets and deductibles and finances that hit us.

7    Q.    Just to be clear, when you worked at NYU, you used their

8    plan, not your husband's?

9    A.    Yes, we used my plan through NYU.

10   Q.    And was there any type of free tuition, were they

11   affiliated with any college where you could get free tuition

12   for medical school?

13   A.    No.

14   Q.    And you moved down to Florida, was there any stressors that

15   you had down when you moved to Florida?

16   A.    So there was the stresses of starting my life there.  We

17   didn't have a home when we got there, we lived out of a hotel

18   for three months with the stresses of adjusting my younger

19   daughter to school.  And she was -- I'm not sure what I'm

20   allowed to say.

21   Q.    That's fine.

22   A.    My husband was adjusting to a new job, as well.  He was

23   working with the same bank, but it was with different

24   management.

25   Q.    One last line of questioning, one thing I forgot.  I wanted

N7BCede5                    Edelman - Direct

1     you to look at exhibit HH.  We'd offer this into evidence.

2                    THE COURT:    Any objection?

3                    MR. SCHOENSTEIN:    No objection.

4                    THE COURT:    HH is received and may be published.

5                    (Defendant's Exhibit HH received in evidence)

6     Q.    During your employment -- actually, prior to your

7     employment with NYU, had you ever seen this document before?

8     A.    No.

9     Q.    While you were employed at NYU, had you ever seen this

10    document?

11    A.    No.

12    Q.    You only saw this document, after the lawsuit began, in

13    discovery; is that right?

14    A.    Yes.

15    Q.    And based on this case, do you have an understanding of

16    what this is?

17    A.    This is the proforma.  It's a draft copy.  It's NYU's

18    projected business plan for me and Dr. Mehta projecting what

19    our revenue stream and what our net losses and gains will be

20    over the next five years from joining NYU prior to when we

21    joined.

22    Q.    Is this something that you created?

23    A.    No, this is created internally by NYU.

24    Q.    And along with this document, it has all sorts of figures,

25    revenue and all that stuff.  Is there any documentation

1   supporting any of these figures in here that you received?

2   A.    No, there is no documentation with it to support where

3   these numbers come from.

4   Q.    So in the first column, it says Edelman 2013; correct?

5   A.    Yes.

6   Q.    It lists you're a physician, faculty-based salary.  Is that

7   how much you were earning in private practice, it was $182,500?

8   A.    I believe it was closer to 200, I thought it was $200,000.

9   Q.    Below it shows at the bottom an operating profit/loss in

10  parentheses.  It has a figure of $15,490 in loss.  Do you see

11  that?

12  A.    Yes.

13  Q.    Did you have any understanding of whether or not your

14  business, before you joined NYU when you were operating the

15  private business in 2013, was profitable or not?

16  A.    We were profitable in the sense we were making payroll and

17  paying ourselves.  We were paying for everything.  We didn't

18  owe debt in that sense.

19  Q.    So you weren't losing money?

20  A.    No.

21  Q.    And the same is true with Dr. Mehta, as well, there is a

22  column next to that, as well, for her?

23  A.    Yes.

24  Q.    You were partners, 50/50; right?

25  A.    Yes.

1   Q.    And then year 1 through year 5, do you see those columns?

2   A.    Yes.

3   Q.    And you see those are projections from NYU for the next

4   five years while you worked at NYU; correct?

5   A.    Yes.

6   Q.    And the operating profit/loss column, they are projecting a

7   loss on you from somewhere in the neighborhood of $171,000 in

8   year 1 to $140,000 in loss in year 5; correct?

9   A.    Yes, for both me and Dr. Mehta combined.  So each year that

10  number is combined.

11  Q.    Now, I wanted you to contrast that with Dr. Porges.  You

12  never saw this document while you were employed at NYU;

13  correct?

14  A.    No.

15  Q.    So let's look at exhibit EE.

16              THE COURT:    Any objection to EE?

17              MR. LABUDA:    We'd offer it.

18              MR. SCHOENSTEIN:    No objection.

19              THE COURT:    EE is received.  It may be published to

20  the jury.

21              (Defendant's Exhibit EE received in evidence)

22  Q.    Did you ever see this document while you were working at

23  NYU?

24  A.    No.

25  Q.    This is a proforma draft for Dr. Porges; correct?

1    A.    Yes.

2    Q.    For him, it lists physician faculty base salary of $290,654

3    in 2013; correct?

4    A.    Yes.

5    Q.    You had said before that when Dr. Porges joined, there was

6    an assistant that came with him -- I'm sorry.  Not an

7    assistant, but a part-time rheumatologist?

8    A.    Yeah, a part-time rheumatologist.

9    Q.    It doesn't have a specific line item for Dr. Porges;

10   correct?

11   A.    For -- if I -- are you asking for -- not -- they didn't

12   break it down between Dr. Porges and Dr. Brancato.

13   Q.    Your understanding is that is a combined combination of pay

14   between the two of them; correct?

15   A.    That's an assumption, based on the revenue from the top,

16   that it's combined.

17   Q.    It didn't break it down between Brancato and Porges like

18   the other one did for you and Dr. Mehta; correct?

19   A.    Yes.

20   Q.    With respect to -- and with this proforma, are there any

21   supporting documentations that these numbers are accurate at

22   all?

23   A.    No, there's nothing submitted with this.

24   Q.    And then let's just go back down to the loss, income loss

25   line.  In 2013, they listed $106,928 in operating profit for

1   Dr. Porges; correct?

2   A.    Yes.

3   Q.    And then the projections for year 1 to year 5, they have

4   projected losses for Dr. Porges of $443,650 in year 1 to

5   $452,147 in year 5; correct?

6   A.    Yes.

7   Q.    And just going back, Dr. Porges was paid more than you;

8   correct?

9   A.    Yes.

10  Q.    In each year; correct?

11  A.    Yes.

12              MR. LABUDA:    I don't have any other questions, your

13  Honor.

14              THE COURT:    Why don't you retrieve the binder, proceed

15  to cross examination.

16              Members of the jury, now would be a good time for a

17  stretch break.  I'm going to take one, you might as well, also.

18              Proceed to cross examination.

19  CROSS-EXAMINATION

20  BY MR. SCHOENSTEIN:

21  Q.    Dr. Edelman, I'm going to go a little out of order so we

22  cover some topics in our last 45 minutes and then maybe restart

23  tomorrow morning at the beginning.

24              You mentioned NYU Medical School; right?

25  A.    Yes.

1   Q.    You have a daughter who's at Yale and doing very well and

2   is interested in NYU Medical School?

3   A.    Yes.

4   Q.    Your testimony, I think, is that an NYU education was free

5   while you were employed by NYU?

6   A.    Yes.

7   Q.    What would an NYU Medical School education cost now?

8   A.    For right now, NYU is offering free tuition if you go into

9   internal medicine or primary care, not if you go into specialty

10  care, which she would, that's her intention.

11  Q.    But your daughter could go to NYU Medical School free if

12  she got qualified and got accepted; right?

13  A.    Only if she chooses not to become a specialist.

14  Q.    Your daughter could go to NYU Medical School for free;

15  correct?

16                MR. LABUDA:    Objection.

17                THE COURT:    Overruled.

18  A.    I think I answered the question.

19                THE COURT:    Why don't you answer directly the question

20  that you're being asked.

21  A.    She could go to NYU Medical School for free if she goes

22  into primary care internal medicine.

23  Q.    What's the acceptance rate at NYU Medical School, do you

24  know that?

25  A.    2 percent, 2.1 percent.

1   Q.   So if she's in the 2.1 percent and she gets accepted, she

2   can go free, whether or not you're employed by NYU?

3              MR. LABUDA:    Objection.

4              THE COURT:    Overruled.

5   A.   Only if she chooses to go for internal medicine or for

6   primary care.

7   Q.   You know that that's not true anymore, you know that the

8   specialties are also free tuition at NYU?

9   A.   I don't know that.

10  Q.   When was the last time you checked, because you're here

11  telling the jury right now it would cost money, so when was the

12  last time --

13  A.   Like two weeks ago.

14             MR. LABUDA:    Objection.

15             THE COURT:    Overruled.

16  Q.   Are you currently employed?

17  A.   Yes.

18  Q.   By the Arthritis and Rheumatism Associates Group we

19  mentioned?

20  A.   Yes.

21  Q.   What is your current salary?

22  A.   $325,000.

23  Q.   Do you make bonuses on top of that?

24  A.   I can.

25  Q.   How much did you make in 2022, total?

1    A.    I believe $330,000.

2    Q.    And that was the most you've ever been paid for a year of

3    pay in your career; correct?

4    A.    I can't -- I don't know if that's true.

5    Q.    Is there any other year you can remember where you earned

6    more than $330,000 at any job?

7    A.    I might have when I was working earlier in my career.

8    Q.    Earlier than NYU?

9    A.    Yes.

10   Q.    In private practice?

11   A.    No.

12   Q.    So let's look at that.  You went to medical school, you had

13   a fellowship, you weren't making more than $330,000 then;

14   correct?

15   A.    No.

16   Q.    And then you opened a private practice; correct?

17   A.    No.  You're missing years after my college, you're

18   backwards.  I worked outside of medicine for two years before I

19   went back to medical school.

20   Q.    So I'll stay in medicine.  Is $330,000 the most you made

21   for a year of pay in medicine?

22   A.    Yes.

23   Q.    You started at that shop in May of 2021?

24   A.    Yes.

25   Q.    So there was no gap between employment at NYU and your

1   employment in Florida, you went from one job to another?

2   A.    Yes.

3   Q.    You didn't miss a paycheck?

4   A.    I can't answer that 100 percent based on when the paychecks

5   came in.

6   Q.    But you're not aware of missing a paycheck?

7   A.    I don't know the answer to that.

8   Q.    And you've remained employed continuously ever since May of

9   2021, right, same employer, same job?

10  A.    Yes.

11  Q.    They have you on a partnership track there?

12  A.    Not as of yet.

13  Q.    Is it anticipated you will be on a partnership track?

14  A.    I am hopeful, yes.

15  Q.    If that works out, you could be a part owner of that

16  business in Florida?

17  A.    In several years.

18  Q.    By the way, there's no state income tax in Florida; right?

19          MR. LABUDA:    Objection.

20          THE COURT:    Overruled.

21  A.    Yes.

22  Q.    So $300,000 in Florida is worth more than $300,000 in New

23  York; fair to say?

24          MR. LABUDA:    Objection.

25          THE COURT:    Overruled.

1   A.   Yes.

2   Q.   Now I want to talk a little bit about the move to Florida.

3   You indicated that you were forced to relocate; is that

4   correct?  That's what you said in your testimony?

5   A.   Yes.

6   Q.   You had talked with your family about moving to Florida

7   before your contract was not renewed; correct?

8   A.   That is not correct.

9   Q.   You mentioned to Dr. Mehta being interested in moving to

10  Florida; correct?

11  A.   I did not.

12  Q.   Your husband had posted on social media about being upset

13  about the high costs of New York State taxes; isn't that

14  correct?

15          MR. LABUDA:    Objection.  Hearsay.

16          THE COURT:    Overruled.

17  A.   I have no idea.

18  Q.   Let's look at some documents.

19       You received notice of nonrenewal of the NYU contract on

20  December 1, 2021.  Do you agree with that?

21  A.   Yes.  Well, I received it on December 2 of 2021.

22  Q.   You received it on December 2?

23  A.   Yes.

24  Q.   Was it on that day that you called Andrew Rubin?

25  A.   Yes.

N7BCede5              Edelman - Cross

1    Q.    And in that conversation with Andrew Rubin, you discussed

2    whether he might be able to help you look for a job in Florida?

3    A.    I asked him to help me find a job at any NYU location to

4    stay with NYU knowing that there was a location in Florida.

5    Q.    You specifically mentioned the State of Florida in that

6    first conversation with Mr. Rubin; right?

7    A.    I do not recall if I specifically said Florida.

8            MR. SCHOENSTEIN:    Can we pull up exhibit 90, please.

9    This is already in evidence.

10           THE COURT:    Is 90 in evidence?

11           MR. SCHOENSTEIN:    No, I have the wrong document.

12   Sorry, your Honor.  Take down exhibit 90, please.  Take it

13   down.

14           THE COURT:    Mr. Schoenstein, do you have a question?

15           MR. SCHOENSTEIN:    Sorry, your Honor.  We were confused

16   about an exhibit number.  It's exhibit 88 is what I'm looking

17   for, and Ms. Cardona is going to help me find it.

18           Can we scroll up to the top of that, please.

19           THE COURT:    88 is not in evidence.

20           MR. SCHOENSTEIN:    I know, your Honor.

21           THE COURT:    Is there an objection to 88?

22           MR. KATAEV:    We need to see it, your Honor.

23           THE COURT:    Are you offering 88?

24           MR. SCHOENSTEIN:    I'm offering 88.  88 is in

25   plaintiff's binder.

1          THE COURT:   Any objection to 88?

2          MR. LABUDA:    No objection, your Honor.

3          THE COURT:    88 is received.  Can be published to the

4    jury.

5          (Plaintiff's Exhibit 88 received in evidence)

6    Q.    There is a lot of material in 88 and I'm going to ask you

7    to look at specific things, Dr. Edelman.

8          Do you recall producing a lot of materials regarding your

9    job search and the job you took in Florida?

10   A.    Yes.

11         MR. SCHOENSTEIN:    Can we go to page P167.

12   Q.    Now, do you see this email, this is Friday, December 4?

13   A.    Uh-huh.

14   Q.    Do you see that, Dr. Edelman?

15   A.    I do.

16   Q.    And that's two days after receiving notice of nonrenewal?

17   A.    Yes.

18   Q.    And you're writing to a recruiter saying "I am currently

19   employed at NYU and looking to make a move to Florida."  Do you

20   see that?

21   A.    Yes, I do.

22   Q.    So that is what you were telling recruiters as of

23   December 4, 2020, that you were looking to make a move to

24   Florida?

25   A.    I was saying that to every recruiter in every state with

1    the same message that I sent it to.

2    Q.    I only asked you about Florida.  You were telling

3    recruiters, as you did in this email, that you were looking to

4    make a move to Florida; correct?

5    A.    Yes, I was letting them know if I get a job, I will be

6    moving from New York to Florida.

7                MR. SCHOENSTEIN:    Move to strike the last part of that

8    answer, your Honor.

9                THE COURT:    Overruled.

10               Dr. Edelman, I'm going to instruct you to answer the

11   questions that are being asked.  You will have an opportunity

12   during redirect examination to clarify any answers that you've

13   given if there are additional things that should be brought to

14   the jury's attention in the view of your lawyer.

15               THE WITNESS:    Okay.

16               MR. SCHOENSTEIN:    Ms. Cardona, please turn to P178.

17   Q.    This is another email exchange on December 4, and you say:

18   "We are looking to relocate to Florida, Delray Beach, West Palm

19   Beach, Clearwater, Tampa area."  Do you see that?

20   A.    Yes.

21   Q.    So by the 4th of November, you had not only identified

22   Florida, you had identified specific locations in Florida that

23   you were interested in; is that correct?

24               THE COURT:    I think you said 4th of November.  Did you

25   mean the 4th of December?

1                    MR. SCHOENSTEIN:    I did, your Honor.  Thank you.

2      A.    Yes.

3      Q.    And you got some pretty fast responses to these inquiries

4      and your inquiries in general; is that correct?

5      A.    The document I'm looking at -- I'm sorry.  What's your

6      question?

7      Q.    The question is a little more general.  You got some pretty

8      quick responses to your inquiries about job positions in

9      Florida?

10     A.    Yes, I got quick inquiries to all my job -- everything I

11     put out.

12                    MR. SCHOENSTEIN:    Scroll down, please, to page 189.

13     A.    I just want to go back to this document because everything

14     lists Albany, Syracuse, New York, like what you're showing me

15     on the screen.

16                    MR. SCHOENSTEIN:    Your Honor, move to strike.

17                    THE COURT:    The testimony is stricken.

18                    Members of the jury, let me instruct you.  The way

19     that the examination proceeds is each lawyer asks the questions

20     that they think will elicit the information that will be

21     helpful for you in making a decision, so that's what happens on

22     direct examination, on cross examination.  The lawyer asks the

23     questions that the lawyer believes will bring out the

24     information that will be helpful to you from their perspective

25     and then there'll be an opportunity on redirect examination, as

1     I mentioned, if the lawyer things there should be additional

2     things that should be brought to your attention for the lawyer

3     to ask those questions.

4                    Go ahead, Mr. Schoenstein.

5     BY MR. SCHOENSTEIN:

6     Q.    At the bottom of page 189, do you see a header for an email

7     on December 7th, 2020 from Mr. Stanford?

8     A.    What's the question?

9     Q.    Do you see that where the email starts on Monday, December

10    7th, 2020, at 1:19 a.m.?

11    A.    Yes.  I'm sorry.  You said 1:19 a.m.?  I see 5:23 a.m.

12    Q.    No, below that.  See, 1:19 a.m., the bottom line?

13    A.    Yes.

14                    MR. SCHOENSTEIN:    If you'll scroll below that,

15    Ms. Cardona.

16    Q.    That's an email that says:  "Dr. Edelman, thank you for

17    applying to our rheumatology opportunities in Florida through

18    our online portal and health careers."  So by December 7th, you

19    had already applied to positions in Florida online and were

20    already getting responses?

21    A.    Yes.

22    Q.    And then later that month or the next month, you actually

23    went down to Florida to have some interviews?

24    A.    You have to be more specific.

25    Q.    Let's turn to page 200, please.  Do you see this email

1    about coming on site on January 18th?

2    A.    I don't see a January 18th date.

3    Q.    There's an email --

4    A.    Oh, okay.

5    Q.    That you write to Danielle, and Ms. Cardona just

6    highlighted the 1/18, they would like you to come on site 1/18?

7    A.    Yes, and Daniel is Danielle, it's a female.

8    Q.    Thank you.

9          And was that an opportunity in Florida?

10   A.    Yes.

11   Q.    And did you go down there in January?

12   A.    I don't recall the exact dates of when I went down.

13   Q.    At some point, you went?

14   A.    Yes.

15          MR. SCHOENSTEIN:    Turn, please, Ms. Cardona, to P49.

16   Scroll down a little bit.  I want to see this December 3rd

17   email.

18   Q.    Do you see that you're writing to Austin Ali on

19   December 3rd, and you say:  "I am also open to looking in the

20   St. Petersburg area."  Right?

21   A.    That's what it says.

22   Q.    That's another location in Florida that you had identified

23   by December 3rd you might be interested in?

24   A.    May I answer the question fully?

25          THE COURT:    You can answer the question that's asked

1   with everything that is responsive to the questions.  You're

2   not being asked why you're interested in St. Petersburg, just

3   whether you were interested in St. Petersburg by December 3rd.

4   A.    I was open to all locations in Florida.  That's how I sent

5   out my recruitment.  You pick locations based on search

6   engines, that's how they go out.  Whatever wrote back, I wrote

7   back.  I was looking for a job.  If they wrote me back from

8   Tallahassee, I would have said, "Great.  Looking for a job in

9   Tallahassee."

10  Q.    Are there any emails in this collection that you produced

11  about job opportunities in Tallahassee?

12  A.    I would have to look through it.  I don't remember.

13  Q.    Because I've seen Florida, I've seen Yale, and I've seen

14  some opportunities in New York.  So are there any other

15  documents that you produced that you remember relating to

16  specific opportunities in other states?

17  A.    Yes, I believe that there were.  I believe there was

18  Tennessee, there was some other sites.

19          MR. SCHOENSTEIN:    Turn, please, to P29.  Can you go to

20  the bottom, Ms. Cardona.

21  Q.    Right after the warning, this is a Friday, January 8th

22  email from you to Kendra Thompson?

23  A.    It looks like, from the email, she is a recruiter or a

24  headhunter.

25  Q.    And you had received a contract.  Was that a contract

1   relating to the job you ultimately took in Florida?

2   A.   I would have to see the contract and -- is there something

3   attached to this?

4   Q.   No, these are in the order that they were produced by your

5   lawyers.  If you go to the next page, if that helps you,

6   there's a discussion there.  Does that help you identify what

7   contract you had received by January 8th?

8   A.   Yes, that was the proposed contract from Dr. Rosen.

9   Q.   Which was where?

10  A.   That was in Clearwater, Florida.

11  Q.   So you already had a job offer and a proposed contract by

12  January 8th?

13  A.   I had a proposed contract by January 8th.  This is from the

14  recruiter, this is not from the doctor himself.

15           MR. SCHOENSTEIN:    Go please to P1, the top of this

16  exhibit.

17  Q.   This is the actual contract that you ultimately signed with

18  your employer, Arthritis and Rheumatism Associates; correct?

19  A.   Yes.

20  Q.   And you signed it on or before February 16, 2021?

21  A.   Yes.

22  Q.   So about two and a half months after you received notice of

23  nonrenewal?

24  A.   Yes.

25  Q.   And let's take a look at page 4.  Under "compensation,"

1    your compensation was $300,000 when you started there; correct?

2    A.    Yes.

3    Q.    And increasing to $325,000 in the second year; correct?

4    A.    Yes.

5    Q.    With eligibility for a bonus as set forth in paragraph 15;

6    correct?

7    A.    Yes.

8    Q.    So the result of leaving NYU is you got an immediate raise,

9    the financial result; correct?

10   A.    I think that's relative.

11   Q.    Sorry?

12   A.    I think that's a relative question.

13   Q.    Well, it's relative, okay.  You'd agree with me that 300 is

14   more than 278?

15   A.    If we're talking about finances and compensation and what

16   my household income looked like, then no, I didn't increase in

17   pay, my expenses changed.

18   Q.    No, I'm asking you a very specific question.  300 is more

19   that happen 278; correct?

20   A.    Yes, 300 is more than 278.

21   Q.    They also paid you $25,000 towards your relocation to

22   Florida; is that correct?

23   A.    Yes.

24   Q.    And paragraph 21, if we look on P6, that is the ownership

25   proposal that we talked about a little bit before; correct?

N7BCede5            Edelman - Cross

1   A.    That's not a partnership track, that's a clause in my

2   contract to allow for discussion for partnership in future

3   contracts.

4   Q.    I see.  And what you now have -- and what you're now hoping

5   is to advance to the partnership track?

6   A.    Yes.

7             MR. SCHOENSTEIN:    Let's mark exhibit OOO for

8   identification.

9             MR. LABUDA:    No objection.

10            THE COURT:    I don't think it's been offered yet.  Are

11  you offering it?

12            MR. SCHOENSTEIN:    Yes, I am offering it.

13            THE COURT:    OOO is received and may be published to

14  the jury.

15            (Defendant's Exhibit OOO received in evidence)

16  Q.    This is your résumé that you put together to look for a new

17  job; is that correct?

18  A.    You have to scroll through the whole document.

19            MR. SCHOENSTEIN:    Sure.  Can you scroll through it for

20  her, please.

21  A.    I believe this is the updated résumé.

22  Q.    If you look back at the top, it speaks of your NYU

23  experience, which is listed as 2014 through present.  Does that

24  verify for you that this is the latest version of the résumé

25  that you shared with us in this action?

1    A.    I'm not sure, there's a lot of discovery, but I would

2    surmise likely.

3    Q.    And you received notice of nonrenewal on December 2nd,

4    2020.  Did you already have your résumé together or did you

5    have to put it together?

6    A.    I did it that very day or the next day.  I updated my

7    résumé to get on the recruiting sites.

8    Q.    So you had to put your résumé together and start getting it

9    on recruiting sites, and then you were very focused on finding

10   a new job; correct?

11   A.    Yes.

12   Q.    Now, on January 8th, 2021, about a month after, you filed

13   this lawsuit; right?

14   A.    I don't recall the direct date of filing of the lawsuit.

15   Q.    Let's take a look, please, at exhibit QQQ.

16              MR. SCHOENSTEIN:    We're going to offer exhibit QQQ if

17   there's no objection, your Honor.

18              THE COURT:    Any objection?

19              MR. LABUDA:    Objection.  Hearsay.

20              THE COURT:    It's the complaint in this case?

21              MR. SCHOENSTEIN:    It's the EEOC complaint and the

22   attached complaint in this case.

23              THE COURT:    The basis of the objection is hearsay; is

24   that right?  Basis of the objection is hearsay?

25              MR. LABUDA:    Yes.

1              THE COURT:    Overruled.

2              MR. SCHOENSTEIN:    So that's accepted into evidence,

3    your Honor?

4              THE COURT:    Correct.  It may be published.

5              (Defendant's Exhibit QQQ received in evidence)

6    Q.    So this document, this is a charge of discrimination that

7    was filed with the EEOC.  Do you recognize that?

8    A.    You'd have to scroll through the whole document for me,

9    please.

10   Q.    Sure.  If now or at any time you need a physical copy of a

11   document in front of you, we have those and would be more than

12   happy to provide them.

13             THE COURT:    Do you have the question that you're being

14   asked?

15             THE WITNESS:    Yes.

16             THE COURT:    Can you answer it?

17   A.    Yes.

18             MR. SCHOENSTEIN:    Can you scroll down to the last

19   page --

20             THE COURT:    This is a document that you filed with the

21   EEOC; is that correct?

22             THE WITNESS:    Yes.

23   Q.    And I see a correspondence date, it was filed on January 6,

24   2021; is that correct?

25   A.    That's what it says.

1    Q.    And is that consistent with your recollection of how

2    quickly you brought an EEOC complaint and litigation?

3    A.    Yes, I believe I filed the complaint very quickly.

4    Q.    Now, in addition to Florida, you interviewed at Northwell

5    Health here in New York; correct?

6    A.    Yes.

7    Q.    You were not turned down by Northwell Health; correct?

8    A.    I wasn't offered a contract.

9    Q.    But you might have been able to go forward and stay in New

10   York at Northwell Health, that was a possibility?

11                MR. LABUDA:    Objection.

12                THE COURT:    Overruled.

13   A.    I had no determination from them on my last conversation

14   with them in the last week of May that there would be an

15   opportunity to move forward with them.

16   Q.    You didn't know one way or the other if there was an

17   opportunity to move forward, is that what you're saying?

18   A.    They gave me no -- I asked them for some form of -- some

19   form of contract stating that there would be future employment

20   at X said date as of the last week in May and they could not

21   offer that to me at that time.

22   Q.    At what time?

23   A.    The last week in May, like the last week in April leading

24   to when I was leaving.

25   Q.    So you interviewed with Northwell Health and a decision

1    hadn't been made about whether they were going to hire you or

2    not as of the end of April, is that what you're saying?

3    A.    I believe that conversation, in my understanding, was that

4    there was a decision made that they couldn't offer me any

5    employment.

6    Q.    Do you remember being deposed in this matter?

7    A.    Yes.

8    Q.    You were sworn to tell the truth like you were today and

9    you were questioned by my partner, Mr. Steer?

10   A.    Yes.

11              MR. SCHOENSTEIN:    I'm going to open the deposition,

12   please, for the Court and counsel to page 47, line 22.  It's

13   day 2 of the deposition, because there was a two-day

14   deposition.

15              THE COURT:   Which line number?

16              THE WITNESS:   He's looking for where I said --

17              THE COURT:   You're not being asked a question at the

18   moment.

19              THE WITNESS:   Okay.

20   Q.    Page 47, line 22, do you recall being asked the following

21   questions and giving the following answers:

22   "Q.    And did you apply at any point for a position with

23   Northwell Health?

24   "A.    I did.

25   "Q.    Were you interviewed?

N7BCede5              Edelman - Cross

1    "A.    Yes, I interviewed for several months.

2    "Q.    And were you turned down by Northwell Health?

3    "A.    I wasn't turned down.  They just couldn't put a job offer

4    on the table in the timing that I needed it in time for my

5    termination with NYU.  I left the negotiation table because of

6    the timing."

7    Q.    Do you recall giving that answer?

8    A.    My deposition was dated what date?

9    Q.    November 19th, 2021.

10   A.    Okay.

11            THE COURT:    Were you asked those questions and did you

12   give those answers?

13            THE WITNESS:    Yes.

14   Q.    So you left the negotiation with Northwell; correct?

15   A.    Per my --

16            MR. LABUDA:    Objection.  Asked and answered.

17            THE COURT:    Overruled.

18   A.    Yes.  I've not -- so your question is what?

19   Q.    You left the negotiation with Northwell, there was an

20   ongoing negotiation about you moving to Northwell Health and

21   you left it and moved to Florida?

22   A.    I think the answer I gave in my deposition is correct.

23   They didn't put a contract on the table and I left, and when I

24   pressured them for a contract before I left, there was no

25   contract presented.

1   Q.    You were, in fact, offered a job at Yale New Haven Health;

2   is that correct?

3   A.    I was verbally offered a job at Yale New Haven Health, yes.

4   Q.    And that would have been in Connecticut?

5   A.    That would have been in Connecticut, yes.

6   Q.    And you turned that down; correct?

7   A.    That's difficult for me to answer.  I did not -- I did not

8   continue with that job offer.

9   Q.    Well, you didn't go to work for Yale, so you didn't accept

10  the position; is that fair to say?

11  A.    I never got a formal contract, but they verbally offered me

12  the position, yes.

13  Q.    And you walked away from the negotiation?

14  A.    Yes, when we were negotiating, there were terms that I

15  walked away from.

16  Q.    So we saw that you received notice of your nonrenewal on

17  December 2nd, 2020, you filed your EEOC complaint on January

18  6th, 2020, and you had a job offer that you ended up taking on

19  February -- I'm sorry.  Let me start that over because I messed

20  up two of the dates.  Withdrawn.

21        You received notice of nonrenewal from NYU on December 2nd,

22  2020, you filed your EEOC charge and complaint on January 6th,

23  2021, you received a job offer that you ended up taking on

24  February 16th, 2021; correct?

25  A.    The -- I don't want to say yes to that contract because I'm

1    not sure of when that contract was dated, was the official

2    signing for the Florida location.

3    Q.    But that was the date, February 16th was the date we saw on

4    the contract?

5    A.    That was the date when they -- yeah, that they released the

6    contract to me.

7    Q.    Now, in terms of seeing a social worker about therapy, that

8    didn't happen until the middle of 2021; correct?

9    A.    It was in July or August of 2021.

10   Q.    So that was more than six months after receiving notice for

11   nonrenewal; correct?

12   A.    Yes.

13   Q.    And how many times did you speak to your lawyers before you

14   spoke to a therapist in Florida?

15            MR. LABUDA:    Objection.

16            THE COURT:    Overruled.

17   A.    I don't know the answer to that question.

18   Q.    You spoke to them in conjunction with putting together the

19   complaint that was filed in this court and the EEOC; correct?

20   A.    Yes.

21   Q.    Met with them in person?

22   A.    I don't think so.

23   Q.    You didn't meet with them in person.  Did you speak to them

24   more than ten times?

25   A.    I don't know.  I'm not going to be able to answer a number

1    on this.

2    Q.    So you don't know if you spoke to them more than 10 times

3    before a complaint was filed in this court against NYU and

4    these four individual defendants?

5    A.    You're asking me to guess.  I don't know how many times I

6    spoke to them.

7    Q.    As of the deposition we took in this case, you had only

8    seen a social worker less than five times; is that correct?

9    A.    Yes, in September -- September 19th of 2021.

10   Q.    And you had never seen a psychiatrist about any issue

11   emanating from this dispute; right?

12   A.    Can you rephrase the question.

13   Q.    You've never been to a psychiatrist about the issues in

14   dispute here today; right?

15   A.    No.

16             MR. SCHOENSTEIN:    Your Honor, I'm going to turn to an

17   entirely new topic.  It is 1:52.  I will plod on if you like.

18             THE COURT:    Is there something you can get done with

19   five minutes?

20             MR. SCHOENSTEIN:    There's nothing I can get done in

21   five minutes.  There's really nothing I can get done in five

22   minutes.

23             THE COURT:    Members of the jury, we're going to have a

24   long day tomorrow, so you're going to be released early today,

25   not terribly early, I apologize about that.  It is now 1:53, so

1      we're going to excuse you for the day.

2                  As a reminder, tomorrow is a long day, we're going to

3      start at 9 o'clock.  Tomorrow is the one day we're going until

4      5:00 p.m.  We're going to take a lunch break probably around

5      1 o'clock for an hour.  We'll also try to take a short

6      midmorning break and a short midafternoon break.

7                  During this break, this afternoon, this evening,

8      please don't do any research about the case, don't go onto

9      social media, don't go onto Twitter, don't go onto Threads,

10     don't go onto the internet, and don't talk to anybody else

11     about the issues in this case.  Enjoy your afternoon, enjoy

12     your evening, and we'll see you all tomorrow morning.

13                 (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (Jury not present)
 2                THE COURT:    Dr. Edelman, you may step down.
 3                Counsel, you may be seated.
 4                We're going to reconvene at 2:30.  If there is
 5     anything that requires extended discussion, we can raise it at
 6     2:30.
 7                While the jury is collecting their materials and
 8     leaving the building, is there anything that plaintiff has to
 9     raise I should address right now?
10                MR. LABUDA:    No, your Honor.
11                THE COURT:    What about from defendant's perspective?
12                MR. SCHOENSTEIN:    Your Honor, I would like the
13     plaintiff reminded that she is on the stand and under oath and
14     not to consult with her lawyers about the substance of her
15     testimony between now and the resumption of cross examination.
16                THE COURT:    I will give that instruction.
17                While you're on cross examination, you're not to
18     consult with your lawyers about the substance of your
19     testimony, either the testimony that you've given or any
20     testimony that you are expected to give.  You can talk to them
21     about logistics, but not about anything else.
22                MR. LABUDA:    Your Honor, I'm assuming the same
23     directive will be given to the NYU witnesses, as well.
24                THE COURT:    Correct.  Every witness while they're on
25     cross examination is not to talk to the lawyers about the
```

N7BCede5              Edelman - Cross

1    substance of the case.  They can talk about logistics.

2                   Just as a matter of housekeeping, if witnesses are to

3    be shown documents, ask permission from me to have a document

4    displayed to the witness, "I'd like to have the witness shown

5    this or that, that document."

6                   MR. KATAEV:    Your Honor, with respect to the

7    demonstrative that plaintiff wished to show, we did not publish

8    that to the witness or the jury.

9                   THE COURT:    That's what I assumed and I appreciate you

10   making that clear for the record.

11                  I think that's all that I've got for you right now, so

12   I'll see you all at 2:30.  If you happen to run into any of the

13   jurors as they're leaving the building, you are under

14   instruction from me not to get in the elevator with them, to

15   just turn around, go the other way.  That applies to the

16   parties and that applies to the lawyers, anybody associated

17   with the case.

18                  So see you back here at 2:30.

19                  (Recess)

20                  (Continued on next page)

21

22

23

24

25

AFTERNOON SESSION

2:30 p.m.

1  
2  
3          (Jury not present)

4          THE COURT:  OK.  We're here for the beginning of the

5   charge conference.

6          Before we get to that, is there anything that the

7   plaintiff wants to raise, either with respect to anything that

8   happened today or with respect to tomorrow?  And then I'll ask

9   defendants the same question.

10         MR. LABUDA:  No, your Honor.

11         THE COURT:  OK.

12         What about from defendants' perspective?

13         MR. SCHOENSTEIN:  No.  I just note for the Court we

14  tried to -- we are dealing with some scheduling issues with our

15  witnesses.  We tried to work with plaintiffs on plugging some

16  witnesses who have availability problems into particular spots,

17  and we were told no and no.  So we're going to try hard with

18  the witnesses to find if there's some other time that they

19  might be available, but the process of scheduling witnesses for

20  their convenience is not going as we would like.

21         THE COURT:  How much longer do you expect on the

22  cross-examination of Dr. Edelman?

23         MR. SCHOENSTEIN:  I'd say two hours.

24         THE COURT:  OK.

25         And then I'm figuring there's going to be some

1    redirect examination.  I'm now addressing myself to plaintiff.

2    Who else is on for tomorrow?

3         MR. KATAEV:  Dr. Kavini Mehta, your Honor.

4         THE COURT:  Is that a doctor you've got control over,

5    or is that through NYU?

6         MR. KATAEV:  We don't have control over her, but

7    defendants do.  She is still employed there.

8         THE COURT:  Directing Mr. Schoenstein, Dr. Mehta will

9    be here, is that correct?

10        MR. SCHOENSTEIN:  Yes, Dr. Mehta will be here.

11        THE COURT:  Who's after Dr. Mehta?

12        MR. KATAEV:  Defendant Joseph Atonik, which we advised

13   them of as well.

14        THE COURT:  OK.  I assume he's going to be here.

15        MR. SCHOENSTEIN:  Yes, your Honor.

16        THE COURT:  OK.  All right.

17        MR. KATAEV:  We've also advised them defendant David

18   Kaplan was going to be after that, and I believe that could

19   take us through Thursday, Friday.

20        The availability provided for the two witnesses that

21   were referenced, Ms. Ruiz was not available the 12th through

22   the 14th.  So that's, you know, this Wednesday through Friday.

23   So we told them we'll have her appear next week.  They didn't

24   say that she's not available next week.

25        Same thing for Ms. Pacina.  I believe two dates were

1    provided that she's not available.  She will be called on a day

2    that she is available.

3            THE COURT:  OK.  Hopefully we will have more witnesses

4    than just the three that you've mentioned plus Dr. Edelman to

5    finish out the week, but we'll see what happens.

6            All right.  The parties have the draft jury

7    instructions that I sent out by email.  I received by email a

8    markup of the jury instructions from the defendants.  I've not

9    looked at what the defendants sent me today.  I assume that the

10   plaintiff has a copy of it.  I am going to make the defendants

11   go through the edits that are in what was sent to me by email

12   as we go through the charge right now, if there are edits that

13   the defendants would like me to make.  And what I'm going to do

14   is go charge by charge, first ask the plaintiff if they have

15   any exceptions to the charge and then the defendants.  We'll

16   just plow through it.

17           MR. LABUDA:  And your Honor, just so you understand,

18   we got these late last night after we left.  We don't have a

19   printed copy, but we do have an electronic version that we can

20   work off of.  We just have to scroll through.

21           THE COURT:  Of what the defendants sent.

22           MR. LABUDA:  Of what the defendants sent, correct.

23           THE COURT:  All right.  But you've got what I sent to

24   you, and what I'm looking at right now is what I sent to you.

25           With respect to the introduction, any exceptions from

1    the plaintiff?

2              MR. LABUDA:  No.

3              THE COURT:  What about from the defendants as to the

4    introduction?

5              MR. SCHOENSTEIN:  No, your Honor.

6              THE COURT:  All right.  The general instructions.

7    1.1.

8              Anything from plaintiff?

9              MR. LABUDA:  No.

10             THE COURT:  Anything from defendants?

11             MR. SCHOENSTEIN:  No, your Honor.

12             THE COURT:  1.2, role of the jury.

13             Anything from plaintiff?

14             MR. LABUDA:  No.

15             THE COURT:  Defendants.

16             MR. SCHOENSTEIN:  No.

17             THE COURT:  1.3, role of counsel.

18             Anything from plaintiff?

19             MR. LABUDA:  No.

20             THE COURT:  Defendants.

21             MR. SCHOENSTEIN:  No.

22             THE COURT:  1.4, oath.

23             Anything from plaintiff?

24             MR. LABUDA:  No.

25             THE COURT:  Defendants.

1              MR. SCHOENSTEIN:  No.

2              THE COURT:  1.5, all persons equal under the law.

3              Anything from plaintiff?

4              MR. LABUDA:  No.

5              THE COURT:  From defendants.

6              MR. SCHOENSTEIN:  No.

7              THE COURT:  1.6, burden of proof.

8              Anything from plaintiff?

9              MR. LABUDA:  No.

10             THE COURT:  From defendants.

11             MR. SCHOENSTEIN:  No.

12             THE COURT:  1.7.

13             Anything from plaintiff?

14             MR. LABUDA:  No.

15             THE COURT:  From defendants?

16             MR. STEER:  Your Honor, on page 11, we do have a

17   change that we've inserted that we've asked your Honor to

18   consider.

19             THE COURT:  All right.  Tell me where it is and tell

20   me what you'd like.

21             MR. STEER:  Ours is a redline.  Are you able to see

22   the redline?

23             THE COURT:  I'm not working off of your redline.

24             MR. STEER:  Oh, I'm sorry, your Honor.  I apologize.

25             It's at the bottom of page 11, the very last

N7bWede6

1    paragraph.

2              THE COURT:  OK.

3              MR. STEER:  And I can explain.

4              THE COURT:  Well, just tell me what you want me to do.

5              MR. STEER:  What we'd ask you to do is add:  "Earlier

6    in this case a judge decided that NYU did not intentionally set

7    plaintiff's pay lower than the pay of men based on her gender.

8    Thus, you are not being asked to decide whether that happened,

9    and you may not speculate as to that."

10             THE COURT:  All right.  Why should I give that charge?

11             MR. STEER:  Because I believe it's been determined now

12   as a matter of law.  It's the law of the case in the summary

13   judgment motion.  Originally when we raised this issue with

14   your Honor, we had raised it in terms of willfulness, and your

15   Honor had said no, it's different.  But now we're looking at,

16   in essence, the factual underpinning in the Court's decision on

17   the summary judgment motion, and the Court made this finding.

18   So I believe that's the law of the case and that that is now

19   not a fact question for the jury anymore.

20             THE COURT:  What's the plaintiff's position with

21   respect to this language?

22             MR. KATAEV:  This issue was already raised and

23   decided.  It was the whole issue about willfulness being

24   applied to the Equal Pay Act.

25             THE COURT:  What is your position with respect to

N7bWede6

| | |
|---|---|
| 1 | whether I should give this language? |
| 2 | MR. KATAEV:  We object. |
| 3 | THE COURT:  Why? |
| 4 | MR. KATAEV:  Because it doesn't matter what a federal |
| 5 | judge decided on a summary judgment motion standard.  It's a |
| 6 | different standard, and the jury should decide that on their |
| 7 | own.  They're the ones that are charged with the facts. |
| 8 | THE COURT:  Well, let me ask this question of |
| 9 | plaintiff.  I don't think I have a charge anywhere that asks |
| 10 | the jury to determine whether NYU acted intentionally with |
| 11 | respect to the pay of the plaintiff.  Is that correct? |
| 12 | MR. LABUDA:  That's correct.  And I wouldn't |
| 13 | anticipate that being on the verdict sheet either, your Honor. |
| 14 | THE COURT:  And are you planning to argue in your |
| 15 | summation that NYU acted intentionally in terms of the pay? |
| 16 | MR. LABUDA:  No, no.  We're going to follow the EPA |
| 17 | that your Honor has in terms of the instruction, that it |
| 18 | doesn't require intent. |
| 19 | THE COURT:  OK. |
| 20 | All right.  I'm going to take this under advisement, |
| 21 | but if there is law that defendants have that I've not |
| 22 | otherwise considered, that wasn't in your papers, that would |
| 23 | support me giving this charge, you'll submit it to me by 5 |
| 24 | o'clock tomorrow. |
| 25 | MR. STEER:  Thank you, your Honor. |

N7bWede6

```
 1          I believe we had raised the issue in our pretrial
 2     memorandum of law on the issue of law in the case.
 3          THE COURT:  I think you did also, and let me tell you
 4     why I'm disinclined to use the language.  It's severalfold.
 5          First of all, I think there's actually great force to
 6     the argument plaintiffs make that what was decided at summary
 7     judgment doesn't necessarily control in terms of trial when the
 8     evidence is not being offered with respect to a claim that has
 9     been dismissed.  In other words, what was decided at summary
10     judgment was that a claim based upon intentional discrimination
11     would not go to the jury.  The claim based on intentional
12     discrimination is not going to the jury.
13          Second, I wouldn't ordinarily instruct a jury what not
14     to consider unless somebody has improperly introduced evidence
15     into the case, an argument into the case that would prejudice
16     the jury's determination with respect to the issues that it is
17     to consider.  There's nothing in this charge that asks the jury
18     to consider intentional discrimination, and I've heard from the
19     plaintiff that they don't intend to argue that the defendants
20     engaged in intentional discrimination.
21          I don't know whether I will give this charge if the
22     plaintiff made arguments about intentional discrimination, but
23     given that plaintiff isn't intending to argue that the
24     disparity was the product of intentional discrimination, I
25     think the issue may be moot.
```

```
 1              That's my thinking.  You might convince me otherwise,

 2     but you haven't yet.

 3              MR. STEER:  OK.

 4              THE COURT:  1.8.

 5              Anything from plaintiff?

 6              MR. LABUDA:  No.

 7              THE COURT:  Anything from defendants?

 8              MR. STEER:  I'm sorry, your Honor.  1.8?

 9              No, your Honor.

10              THE COURT:  1.9.

11              Anything from plaintiff?

12              MR. LABUDA:  No.

13              THE COURT:  Anything from defendants?

14              MR. STEER:  No.

15              THE COURT:  1.10.

16              Anything from plaintiff?

17              MR. LABUDA:  No.

18              THE COURT:  Anything from defendants.

19              MR. STEER:  No.

20              THE COURT:  1.11.

21              Anything from plaintiff?

22              MR. LABUDA:  No.

23              THE COURT:  Anything from defendants?

24              MR. STEER:  No.

25              THE COURT:  1.12.
```

N7bWede6

```
 1              Anything from plaintiff?

 2          MR. LABUDA:  No.

 3          THE COURT:  Anything from defendants?

 4          MR. STEER:  No.

 5          THE COURT:  All right.  Now we move to the substantive

 6   instructions.

 7              No. 2, on the substantive instructions, pages 19 to

 8   20, of what I circulated.

 9              Anything from plaintiff?

10          MR. LABUDA:  Bear with me one second, your Honor?

11          No.

12          THE COURT:  Anything from defendants?

13          MR. STEER:  Yes, your Honor.

14          THE COURT:  OK.

15          MR. STEER:  At the bottom of the charge, 2,

16   substantive instructions, we're asking that your Honor add

17   to -- after it talks about "you may find defendant violated the

18   law but another defendant did not violate the law; I will

19   explain the law that you may apply with respect to each claim,"

20   I would just ask that your Honor add "you may also find that

21   there were no violations of any laws set forth in this case."

22          THE COURT:  I may incorporate something like that.

23              Let me hear from plaintiff on that.

24          MR. LABUDA:  We object.  I think it's just redundant.

25   I think it's pretty clear in the instructions that the only way
```

that they can find a violation is if plaintiff meets her burden

of proof.  So I don't think there's any reason to compound the

point.

THE COURT:  What I think I might do is, in the

sentence that says "you may also find that a particular

defendant violated all of these laws or none of these laws" is

to add -- well, what I might do is say, at the very end, "you

may also find that all of the defendants violated all of the

laws or none of the defendants violated any of the laws" and

just make it balanced in that respect.  I don't think that that

harms anybody.  Right now what the defendants have given me is

not balanced, but I can make it balanced.

2.1, corporate defense.

Anything from plaintiff?

MR. LABUDA:  No, your Honor.

THE COURT:  Anything from defendants?

MR. STEER:  No, your Honor.

THE COURT:  2.2, federal Equal Pay Act claim.

Anything from the plaintiff?  It's a several page --

MR. LABUDA:  Yes.

THE COURT:  Let's go through it.

MR. LABUDA:  It's more so with the affirmative

defenses, your Honor.  I think that's on page, on our version

it's 25, but it's D.

THE COURT:  Give me a second.

N7bWede6

```
 1              All right.  What would plaintiff have me do?

 2              MR. LABUDA:  We would like the definition that's in

 3    the law as to what a business necessity is, so we'd like to add

 4    in, in the fourth line, after "consistent with business

 5    necessity," we'd like a sentence that reads --

 6              THE COURT:  Hold on for a second.  This is what page?

 7              MR. LABUDA:  This is --

 8              THE COURT:  Of what I circulated.

 9              MR. LABUDA:  Oh, I'm sorry.  I mixed up in my version

10    versus this one.

11              No.  We're OK with that.

12              Let's see if there's anything else.

13              We're fine, your Honor, on the federal Equal Pay Act.

14              THE COURT:  OK.

15              What about defendants?

16              MR. STEER:  Your Honor, under 2.2, we believe that

17    after, under the affirmative defenses -- and I think we had

18    spoken about this briefly at the last charging conference.  We

19    would ask that your Honor add, after the first sentence, where

20    it says, when it talks about the affirmative defenses, that it

21    says that "you must consider defendants' affirmative defenses,"

22    we would ask that the language -- your Honor had it further in

23    the New York State charge, that "these defenses are (i) a

24    seniority system; (ii) merit system; (iii) a system which

25    measures earnings by quantity and quality of production; or
```

N7bWede6

1    (iv) a bona fide factor other than sex, such as education,

2    training, experience," and we added reputation.

3         THE COURT:  That's the language out of the statute, is

4    that right?

5         MR. STEER:  The factor, the statute does not say,

6    doesn't go on with the "such as" language.  We gave the

7    examples, such as education and training.  But otherwise, yes.

8    That's from the statutory affirmative defense.

9         THE COURT:  OK.  And I'll get to the "such as

10   education, experience, training" in a moment, but is there an

11   affirmative defense in this case based upon a seniority system

12   or merit system or a system which measures earnings by quantity

13   or quality of production?

14        MR. STEER:  Are you asking me, your Honor?

15        THE COURT:  Yes.

16        MR. STEER:  There is not a formal seniority system.

17   There is not a merit system *per se*.  However, there is a system

18   which measures earnings by quantity and quality of production,

19   because in the case we have this system for incentive

20   compensation, which is based on meeting your production

21   standards.  So we believe there is a quantity and quality of

22   production element in the case, and certainly we've

23   consistently maintained that there's a factor other-than-sex

24   defense.

25        THE COURT:  So if seniority system, merit system are

1     not one of the affirmative defenses being offered by the

2     defendants, why should I mention those to the jury?

3          MR. STEER:  I don't have any objection to those being

4     taken out, your Honor.  I think, your Honor, they may be also

5     in the New York State labor law part as well, and I think we

6     actually may have taken this from what your Honor had there.

7          THE COURT:  OK.  It may have been a mistake I made

8     earlier.

9          All right.  Let me hear from -- actually, I gather

10    that there are a couple of edits that you've got on this

11    charge.  You also ask that, later on, I say the defendants have

12    the burden of showing that a business-related practice was, in

13    fact, followed and that adherence to that practice served their

14    legitimate business purpose as opposed to policy.

15         Let me hear from plaintiff with respect to those

16    edits.

17         MR. LABUDA:  The first set that we were talking about,

18    your Honor?

19         THE COURT:  The first one would have me say the

20    defenses are, No. 1, a system which merits earnings by quantity

21    or quality of production; or (2) a bona fide factor other than

22    sex, such as education, training, experience and reputation.

23         MR. LABUDA:  Well, first off, let me note that

24    defendants never raised any issue about measuring quantity and

25    quality, and what I've just heard from the defendants -- and

N7bWede6

1    again we've just seen this today, but what defendant was

2    talking about was this incentive.  That's the 1 percent that

3    seemed to be, you know, consistent throughout.  But that

4    doesn't deal with the actual base, original salary that they

5    earned.  So there's a system in terms of that, but if the

6    underlying pay is based on sex, the fact that there's some

7    equal incentive of 1 percent but you're getting 1 percent of

8    something less doesn't seem appropriate here.  On top of it, I

9    mean I think we can wait and see what the evidence shows, but I

10   mean we can proffer that there's testimony from the defendants

11   that they didn't use quantity or quality in terms of setting

12   pay.

13           THE COURT:  OK.  And what about the charge with

14   respect to saying these defenses are a bona fide factor other

15   than sex, such as education, training, experience and

16   reputation?

17           MR. LABUDA:  I'd have to look at the actual statute

18   itself on that point.

19           THE COURT:  We're doing the charge conference now, and

20   the statute does refer to a bona fide factor other than sex.

21   The education, training, experience and reputation is not in

22   the statute itself.

23           MR. LABUDA:  Right.

24           THE COURT:  I gather from defendants that that is

25   based upon their reading of the case law.

N7bWede6

1          MR. STEER:  Your Honor, if I could be heard on that?

2          THE COURT:  Yes.

3          MR. STEER:  I could explain perhaps more fully.

4          THE COURT:  Yes.

5          MR. STEER:  On that particular point, the law's very

6     clear that Congress passed the factor other-than-sex defense

7     because it was impossible for them to try to itemize all the

8     different factors that could cause a difference in pay that was

9     not based on sex, and so there are literally thousands of

10    reasons.  We have illustrated it by asking, naming some grilled

11    into the case, but there is no -- you know, there's no statute

12    you're going to find here that says education is or reputation

13    is.  Those are what the factor other-than-sex defense is meant

14    to deal with.

15         MR. LABUDA:  We'd just object to those then and just

16    leave it with a bona fide factor other than sex.

17         THE COURT:  OK.  I'll consider that.

18         Let me hear from the defendants with respect to a

19    system which measures earnings by quantity or quality.  As I'm

20    looking through the final joint pretrial order, there is a

21    reference to factors other than sex.  I don't see there being a

22    reference to a system which measures earnings by quantity or

23    quality of production.

24         MR. STEER:  We had, I believe, raised it earlier in

25    the case, your Honor.  I don't know that we put it in the

N7bWede6

```
 1    pretrial order, but that also would be subsumed under the
 2    factor other than sex because any factor that is not based on
 3    gender that causes a distinction that's bona fide makes it
 4    lawful.  And so, here, throughout the case -- I mean there's no
 5    surprise here; throughout the case it has been said that this
 6    incentive compensation system was based on RVUs.  RVUs are a
 7    measure of production.
 8             THE COURT:  OK.  I think I've got your argument.  All
 9    right.  I'll take those edits under advisement.
10             MR. STEER:  Thank you.
11             THE COURT:  2.3, the New York Labor Law, Section 194
12    claim.
13             Anything from the plaintiff on that?
14             MR. LABUDA:  Yes.
15             That, your Honor --
16             MR. STEER:  Your Honor, excuse me.  If I may, before
17    we go there?
18             There was one other issue your Honor had raised that
19    we didn't get to, which was the question of policy versus
20    practice, that change wording.
21             THE COURT:  What's the reason for that change?
22             MR. STEER:  There's no claim that there's a written
23    policy.  It's the practice, and so that's why we'd make the
24    change.
25             THE COURT:  That seems to me to be appropriate.
```

N7bWede6

| | |
|---|---|
| 1 | Plaintiff, do you have a view? |
| 2 | MR. LABUDA:  That seems fine, your Honor. |
| 3 | THE COURT:  OK. |
| 4 | All right. |
| 5 | MR. LABUDA:  I did have one other comment on that, the |
| 6 | EPA, your Honor.  I apologize. |
| 7 | THE COURT:  OK. |
| 8 | MR. LABUDA:  With respect to this, with respect to the |
| 9 | EPA, the *Ryduchowski v. Port Authority* case, 203 F.3d 135, and |
| 10 | it references the fact that not only do you have to have this |
| 11 | system in place but that it has to be -- I think this is a |
| 12 | quote from the court, that it has to be systematically |
| 13 | administered.  So not only is it, you know, that you not only |
| 14 | have the system but you actually apply it systematically.  So |
| 15 | we'd like language of that sort, that it's not only having a |
| 16 | system, but it's implemented. |
| 17 | THE COURT:  That would only be if I give a charge with |
| 18 | respect to a system which measures earnings.  If I don't give |
| 19 | that charge, then you're not getting that language, right? |
| 20 | MR. LABUDA:  Yes.  It would be -- well, yes, that, I |
| 21 | think, is accurate.  Correct. |
| 22 | THE COURT:  Yes.  OK.  I've got your point. |
| 23 | MR. LABUDA:  OK. |
| 24 | THE COURT:  And I've got defendants' point. |
| 25 | New York Labor Law, Section 194 claim. |

1            MR. LABUDA:  Although I will say, your Honor, just

2       thinking it through, I mean there may be some other, you know,

3       potential, although it's not called a system, but I mean I

4       think that that would tend to apply to any type of factor as

5       well, that that factor has to be applied systematically as

6       well, I would think.

7            THE COURT:  Well, you cited to me the *Ryduchowski*

8       case.  I'll take a look at it.  Is *Ryduchowski* about an

9       instruction on a factor other than sex?

10            MR. LABUDA:  It's just about the fact -- the systems.

11            THE COURT:  OK.

12            MR. LABUDA:  But I would say it seems that that

13       ruling, my reading of it is that it would apply to any type of

14       factor that they're using.  They can't just have a factor and

15       then not apply it evenly.  I think that's basically the general

16       holding, if anything.  So even if you have a factor, it would

17       still have to be applied evenly.

18            THE COURT:  I would have thought that the right

19       question with respect to factor other than sex is what I am

20       instructing the jury, which is whether the factor is a pretext

21       and whether the defendants used a factor reasonably in light of

22       the employer's stated purpose as well as its other practices.

23            MR. LABUDA:  That might be sufficient language, your

24       Honor.  I don't have a photographic memory, so --

25            THE COURT:  All right.

1              Let's get on to 2.3, New York Labor Law claims.

2              Anything from plaintiff on this?

3              MR. LABUDA:  Yes.

4              With respect to the New York, so with New York, there

5    is, we have that same issue we were just talking about, in

6    terms of that same language as the systematic application, if

7    there was some type of -- well, let me -- I'll withhold that

8    for a second.

9              THE COURT:  It would be helpful if you tell me which

10   portion of the charge, what page, and --

11             MR. LABUDA:  Yes.  There's a paragraph that says "if

12   plaintiff has proved by -- proved these elements."

13             MR. KATAEV:  Page 30, your Honor, I believe.

14             MR. LABUDA:  Page 30.  We have a redline version, so

15   it might be off.  "If plaintiff has proved these elements, a

16   defendant can avoid liability if a defendant has" -- that

17   paragraph?

18             THE COURT:  Yes.

19             MR. LABUDA:  In there, there's a reference to business

20   necessity in the fourth line, and we'd like to have that

21   defined as it is in the statute, and we'd like to add in, after

22   it says "consistent with business necessity," period, we'd like

23   the following language added:  "A business necessity is a

24   factor that bears a manifest relationship to the employment in

25   question."

1                THE COURT:  And you said that comes directly out of

2       the statute?

3                MR. LABUDA:  Correct, from 194.

4                THE COURT:  Anything else you've got on this charge?

5                MR. LABUDA:  Yes.

6                One other thing is, also directly from the statute --

7       well, let me say this.

8                After, I guess at the end of the paragraph, where it

9       says "successful performance of that job," we wanted the

10      following language that's from the statute as well:  "However,

11      the business necessity defense does not apply if plaintiff

12      demonstrates:  (1) that a defendant's employment practices

13      caused a disparate impact on the basis of sex or gender; (2) an

14      alternative employment practice exists that would serve the

15      same business purpose and not produce such a differential; and

16      (3) a defendant has refused to adopt such alternative

17      practice."

18               THE COURT:  I'm going to move back to that in a

19      second.

20               Anything else?

21               MR. LABUDA:  That's it, your Honor.

22               THE COURT:  And is there evidence that the plaintiff

23      intends to offer with respect to an alternative business

24      practice?

25               MR. LABUDA:  I believe that there will be testimony

N7bWede6

1    about whether or not there were other alternatives that were

2    available to NYU in setting the pay for the doctors, yes.

3              THE COURT:  OK.  Let me raise one other thing.

4              I'm going to hear from defendants with respect to

5    those as well as anything else.

6              Before I turn to defendants, I am contemplating, on 28

7    to 29, the carryover paragraph, after I go through the various

8    affirmative defenses, to say, "Here, as I will explain, the

9    pertinent affirmative defense is a bona fide factor other than

10   sex, such as education, training or experience," language to

11   that effect.

12             I assume the plaintiff has no objection to me giving

13   that instruction.  That's on the assumption that I decide not

14   to charge the jury with respect to a system which measures

15   earnings by quantity or quality.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1                    MR. LABUDA:    Right.  That's language from the statute,

2       194; right?

3                    THE COURT:    Correct.

4                    MR. LABUDA:    Yes, that's fine.

5                    THE COURT:    Let me turn to defendants.

6                    Does defendant have any objections?

7                    MR. STEER:    Yes.  The first thing, your Honor, is we

8       believe that it's -- with respect to absolutely improper for

9       there to be a disparate impact charge in this case.  The reason

10      is, is first of all, it's mentioned in the statute that that's

11      true, but it's not a substantive right.  The disparate impact

12      analysis is an order and allocation of proof in a

13      discrimination case.  It goes all the way back to the *Griggs*

14      case in '71, *Griggs v. Duke Power*.  I could say, your Honor,

15      I've litigated this issue in this court a number of times.

16                    The first element of a disparate impact analysis is a

17      facially neutral standard, has an adverse impact on a protected

18      group.  The second, and perhaps most important here, the next

19      element is that it has an adverse impact on a protected group.

20      You don't do an adverse impact analysis with four people, it's

21      too small a sample size.  So I believe it's improper to give

22      this charge when you only have three comparators and one

23      plaintiff and you can do an adverse impact analysis.  It's just

24      wrong.  That's before you get to the issue of whether or not

25      there's some alternative that's been requested.  And also, I

1    don't know that a facially neutral standard has ever been

2    identified *per se* in this case.

3              So the other reason we object is that this whole

4    question of Section 194 of the labor law was only brought up

5    after summary judgment, after discovery closed when plaintiff

6    advised the Court there had been a mistake and they had left

7    that out and the complaint was allowed to be amended.  There

8    has been no discovery on disparate impact.  In fact, if the

9    discovery would have been broadened out beyond what we produced

10   in discovery in the case we had before us, it's conceivable we

11   may have produced statistical evidence on disparate impact.  So

12   it's just wrong, your Honor.  That's all I can say.

13             THE COURT:    Anything else that you've got on 2.3?

14             MR. STEER:    Excuse me one moment, your Honor.  There

15   was one line where it talks about a clinical compensation.  It

16   says:  "All amounts earned for work performed at NYU related to

17   clinical compensation, including salary loans, repayments,

18   incentive comp, and we're just saying that the word "clinical,"

19   it should be taken out there."  It's compensation.  That's --

20   those other things are not necessarily clinical compensation

21   *per se*.

22             THE COURT:    Let me ask you this, I understand there

23   may be some issue about clinical compensation.  What if it said

24   "related to such substantially similar work, including salary,

25   loan repayments, and incentive compensation bonuses"?

N7BCede7

1              MR. STEER:    Let me have a moment, your Honor.  I need

2      to look where the language --

3              THE COURT:    Plaintiff might look at that, also.

4              MR. STEER:    Your Honor, I think it kind of confuses

5      the issue to add "clinical" there --

6              THE COURT:    I'm not suggesting adding "clinical."

7      What I'm suggesting is "all amounts earned for work performed

8      at NYU related to such substantially..."  The language, "you

9      should examine all amounts earned for such substantially

10     similar work performed at NYU."  What you would have me charge

11     is that it's all compensation.  What the charge says now is

12     "clinical compensation."  Do I need to get into that?  Should I

13     just say "substantially similar work performed at NYU"?

14             MR. STEER:    Your Honor, it seems to us that it's

15     already come out through -- this issue has already come out

16     through their demonstrative in the opening, that it included

17     all compensation, not just clinical compensation.  I'm still

18     uncomfortable, frankly, with the change your Honor suggested,

19     respectfully.

20             THE COURT:    Anything else that defendant has on this

21     charge?

22             MR. STEER:    Thank you, your Honor.  Nothing more.

23             THE COURT:    Let me hear from the plaintiffs with

24     respect to striking the word "clinical" and why I should give a

25     disparate impact charge.

1            MR. LABUDA:    With respect to the "clinical" as in the

2     charge, before we think it's fine to keep it in there, it

3     shouldn't be struck out.  So we don't think that it should be

4     struck at all.  You have "salary" in there as well.  We think

5     it's clear enough for the jury.  We're fine with it as is and

6     we don't think "clinical" should get struck out.

7            With respect to the disparate impact, the evidence has

8     already shown that there was a disparate impact on them, they

9     were paid less.  We're talking about -- in an EPA case, you're

10    only talking about a very narrow scope to begin with in terms

11    of sample size because you have to compare individuals within a

12    county is what they kind of are looking at as to not compare

13    Nassau to doctors in New York City.  It's directly from the

14    statute and that language -- that statute and that cause of

15    action is part of this case.  They had objected to that statute

16    coming in and the Court had ruled that it was permitted to come

17    in.  So that's where we are in the case.  So we think that it's

18    appropriate to keep in the disparate impact charge.

19            THE COURT:    Do you want to put in a writing for me

20    explaining that there's case law that supports your view that

21    the sample size is appropriate and that, given the way in which

22    the issue has arisen in the case, it's appropriate to give that

23    charge?  You're not required to.  I can hear you now and make a

24    decision on the basis of it, but this seems to me to be

25    something of a consequential issue.  If you want to put in

1   something, I would welcome it.

2                  MR. LABUDA:    Yes, we would welcome the opportunity to

3   do that, as well, your Honor.

4                  THE COURT:    5 o'clock tomorrow okay?

5                  MR. LABUDA:    That's fine, your Honor.

6                  THE COURT:    From defendants, 5 o'clock on Friday for a

7   response.

8                  MR. STEER:    Thank you.

9                  THE COURT:    I'll take the other edits under

10  advisement.

11                 Title VII retaliation claim against NYU.  Again, it's

12  something of a lengthy charge.  This is 2.4.

13                 What does plaintiff have on that, if anything?

14                 MR. LABUDA:    Your Honor, just one logistics, since

15  we're going late tomorrow, can we have until midnight tomorrow?

16                 THE COURT:    That's fine.

17                 MR. LABUDA:    Thank you.

18                 MR. STEER:    Your Honor --

19                 THE COURT:    But you're only getting until 5 o'clock

20  because we're not going late on Friday.

21                 MR. STEER:    No, I'm talking about for the prior

22  letter, your Honor.  If we even decide to submit it, you had

23  given us a 5 o'clock deadline.

24                 THE COURT:    Midnight is okay.

25                 MR. STEER:    Okay.

N7BCede7

```
 1              THE COURT:   2.4.
 2              MR. LABUDA:   No, your Honor.
 3              THE COURT:   What does defendant have under 2.4?
 4              MR. STEER:   Your Honor, we had some proposed edits
 5    under 2.4 because we respectfully disagree with the second
 6    element of the knowledge of plaintiff's protected activity.
 7              THE COURT:   While I'm looking at that, you can also
 8    put on the record what you want.
 9              MR. STEER:   So first of all, defendants dispute that
10    plaintiff actually engaged in good faith and protected
11    activity.  So instructing the jury "there is no dispute that
12    NYU knew of plaintiff's protected activity," we believe would
13    be erroneous.  But also, we think the charge should be also "if
14    you find plaintiff engaged in protected activity, you must
15    determine whether NYU knew of plaintiff's protected activity."
16    We agree with that.  However, there is also law under the cat's
17    paw theory that an employer may not be held liable simply
18    because it acts on information provided by a biased co-worker.
19    Thus, an employer -- and we would ask that this be part of the
20    charge.  Thus, an employer who non-negligently and in good
21    faith relies on a false and malign report of an employee who
22    acted out of an unlawful animus cannot be held accountable or
23    said to have been motivated by the employee's animus, and that
24    is from case law on the cat's paw theory, your Honor.
25              THE COURT:   What does the plaintiff have to say?
```

1              MR. LABUDA:    Again, we just saw this, but it's not

2      our -- I'll say this, with cat's paw, this is not what cat's

3      paw is.  Cat's paw is just the opposite.  When an employee

4      passes on false information that ultimately results in the

5      cat's paw being burnt, which is the fable behind it, and in

6      this case you've got a manager who's passing on information to

7      another manager, who passes on information along with a doctor,

8      who passes it on to another manager, who passes it on to

9      another manager.  So we believe that cat's paw theory is that

10     they can be responsible for that, especially since there's a

11     retaliatory motive here, you know, with this retaliatory motive

12     from Mr. Santana and Kaplan.

13             THE COURT:    From defendants' perspective, who is the

14     employee who provides the false malign report?

15             MR. STEER:    We don't believe there are any, your

16     Honor, but the alleged individuals are primarily from plaintiff

17     Joseph Antonik and then David Kaplan, neither of whom

18     participate in the decision in any way to terminate plaintiff,

19     the evidence will show, and who basically gathered information

20     on an instruction from their bosses.  So we think that the

21     quote I read is really the appropriate statement of the law.

22     And assuming, arguendo, it can be found that they even acted

23     improperly.

24             THE COURT:    Let me ask you one other question.  Is

25     there any dispute that the letter that the plaintiff sent would

1    constitute protected activity?  She specifically mentions

2    discrimination on the basis of gender.

3              MR. STEER:    The question I think is whether that is

4    something that could be found to be a good faith complaint or I

5    could explain what our position is, your Honor, give you a

6    better understanding.

7              Basically, the evidence is going to show that she

8    complained to Kathleen Pacina and doesn't mention gender,

9    certainly doesn't mention the comment, and Ms. Pacina

10   understands that she is dealing with an office dispute, that's

11   what she thinks she's dealing with.  So she has these facts to

12   investigate.  Plaintiff does not get the result she wanted,

13   that the idea that someone waved his hands and all of the

14   testimony you've heard about that was gender based.  So she

15   then starts throwing buzz words into the emails, "this is

16   discrimination, this is male chauvinism."  And again, there is

17   nothing for Ms. Pacina to investigate.

18             And we raised the question of whether or not a

19   reasonable person could have concluded that this conduct that

20   was testified to today was really gender based.  Just because a

21   man and a woman were speaking when it happened, I mean, would

22   it have been different if it was a woman that did this to her?

23   So we request whether there was a good faith attempt to raise

24   protected activity and --

25             THE COURT:    I think I understand that.  And actually,

N7BCede7

1    my charge with respect to protected activity I think covers

2    that, which is the reason why we don't have edits.

3              With respect to the knowledge of the protected

4    activity, on the assumption that the jury concludes that

5    Dr. Edelman's report was made in good faith, is there any

6    dispute that NYU knew of that activity?  It strikes me that

7    what you're asking me to insert in terms of cat's paw

8    doesn't -- it fits pretty imperfectly, if at all, with respect

9    to knowledge of the protected activity.

10             MR. STEER:    To impute it to the decision makers I

11   think is the issue because that's where the cat's paw issue

12   comes in.

13             THE COURT:    The cat's paw issue comes in in terms of

14   imputing motive to the decision maker.

15             MR. STEER:    Correct.

16             THE COURT:    Which really wouldn't go to whether they

17   knew of the protected activity.

18             MR. STEER:    One of the problems, though, your Honor,

19   here is I think the evidence is going to show that the

20   investigator did not believe that this was something that --

21   well, let me back up.

22             We don't believe there'll be any evidence to show that

23   Andrew Rubin knew that there was a discrimination claim here.

24   We don't believe -- and he's the decision maker.  So, to try

25   and then impute NYU that they should be liable because of what

N7BCede7

1  was sent here in these emails and when they figured out that

2  there was a complaint going on, they sent it to Ms. Ogbara who

3  then plaintiff didn't respond to.  So, because of the kind of

4  strange circumstances of this case, we don't think that should

5  happen.

6              THE COURT:    I hear what you're saying, but I don't

7  hear it in terms of cat's paw or in terms of the second

8  element.  You can correct me if I'm wrong, but I would have

9  thought that your argument is really captured by the notion of

10  causal connection, that if NYU took the action that it took

11  without regard to whether the person in question was aware of

12  the protected activity, and even if NYU was aware of it, there

13  would be no causal connection.

14              I'm still not sure about your cat's paw theory

15  generally because, as I understand the law, even if there was

16  no merit whatsoever to the plaintiff's complaint of

17  discrimination, if she believed in good faith that there was

18  merit, she just got the wrong law and your client retaliated on

19  the basis of it.  There might not have been anything for HR to

20  investigate.  HR could have concluded that this was bullying

21  that was not based upon gender, but it still wouldn't have the

22  right to terminate her employment because she invoked gender

23  discrimination.

24              MR. STEER:    Unless it wasn't in good faith, your

25  Honor.

```
 1              THE COURT:    Right, unless it wasn't in good faith.
 2              Listen, midnight tomorrow, if you want to give a cat's
 3  paw instruction, then you'll give me the authority for that.
 4  The plaintiff will respond by 5 o'clock on Friday.
 5              I think that takes us to the New York State Human
 6  Rights law retaliation claim.  Let me ask plaintiff if they
 7  have anything on that.
 8              MR. STEER:    I'm sorry, your Honor.
 9              THE COURT:    I'm asking plaintiff.
10              MR. STEER:    One more thing I left out on the last
11  charge.
12              THE COURT:    What do you want to raise with me?
13              MR. STEER:    We wanted to raise the fact that we
14  thought at the end of this charge, there should be something
15  that at least tells the jury that if you -- this is after it
16  says, you know, whether we subjected -- adverse employment
17  action, so include -- so agrees is talked about.  Then I
18  thought it should say at the end there, if your Honor would
19  agree, "if you merely disagree, merely disagree with NYU's
20  decision not to renew plaintiff's employment contract, that
21  alone is not sufficient to find that NYU subjected plaintiff to
22  an adverse employment action for having engaged in protected
23  activity."  And then I would ask that what be added there is
24  "courts and juries do not sit as a super personnel department
25  to evaluate an employer's business decisions."
```

N7BCede7

         1          THE COURT:    Is there any disagreement with respect to

         2    the law on that language?

         3          MR. LABUDA:    Well, yes.  If you merely disagree with

         4    NYU's decision, which we're asserting is retaliatory, then it's

         5    not alone sufficient to find that NYU subjected her to adverse

         6    employment.  That's not accurate at all.  So our theory is that

         7    they retaliated against her for making the complaint, their

         8    decision was not to renew her contract, that's an adverse

         9    employment action.  The law is very clear that that is an

        10    adverse employment action.  So yeah, the law does not

        11    accurately reflect what is put in here at all.

        12          And we don't believe that the second line about "super

        13    personnel department" is appropriate either.  I think your

        14    Honor had indicated before I think somewhere in the

        15    instructions, there's some language not like this and not

        16    nearly as inflammatory as this that talks about something along

        17    those lines that's in there already, but I don't think there's

        18    any need for encouragement like this.

        19          THE COURT:    I'm inclined to include something like

        20    this.  Although, I'm not sure about the placement or exactly

        21    the words.  "Super personnel department" does come straight out

        22    of the Second Circuit.  It's been repeated a number of times,

        23    as you know.  I'm going to try to weave in something to the

        24    effect that if the reasons for the actions were non-retaliatory

        25    and not discriminatory, it's not for the jury to determine

N7BCede7

1    whether the jurors would have made the same decisions from

2    business reasons.  The question for them is whether it's

3    retaliatory.

4                   MR. LABUDA:    The only issue, though, your Honor, is

5    you've got this mixed motive --

6                   THE COURT:    I understand that and I'll try to weave

7    in --

8                   MR. LABUDA:    That's a hard line to, I guess --

9    something about threading.

10                  THE COURT:    I get that point.  I get that point.

11   You'll see how I do.

12                  MR. LABUDA:    You've done pretty well, your Honor, so

13   far.

14                  THE COURT:    New York State Human Rights Law

15   retaliation claim.

16                  MR. LABUDA:    We don't have any -- there's no changes

17   for us, your Honor.

18                  THE COURT:    What about from the defendants?

19                  MR. STEER:    Your Honor, I think in this we had also

20   added the cat's paw language again.  That I think your Honor is

21   taking under advisement.

22                  THE COURT:    Then I'll wait to see what you tell me.

23                  And New York City Human Rights Law.  Anything from

24   plaintiff?

25                  MR. LABUDA:    No.

```
 1                THE COURT:    And from defendants?

 2                MR. STEER:    Your Honor, we do have one other thing on

 3     that.

 4                THE COURT:    On the New York City claim?

 5                MR. STEER:    New York State claim, your Honor.  At the

 6     end, it says "if you find that any of the individual

 7     defendants — Mr. Rubin, Mr. Kaplan, Mr. Antonik, or

 8     Mr. Swirnow — aided and abetted that decision in that they

 9     actually participated in the decision to not renew," I think

10     it's a little unclear if I was a juror, so it would be unclear

11     to me what it means, "participated in the decision."  So I

12     would ask that your Honor make it say "actually participated in

13     making the decision."

14                THE COURT:    Remind me where this is.

15                MR. STEER:    It's on the third element, adverse action,

16     at the bottom under C towards the last line there, under aiding

17     and abetting.

18                THE COURT:    Did plaintiff see that, "participated in

19     making the decision"?

20                MR. LABUDA:    Your Honor, we would object to it.  We

21     don't think it's needed.  I think the law is, in terms of them

22     aiding and abetting, that they participated in it, and it's

23     clear that they passed on information.  So they may not have

24     been involved in that decision-making, but they were -- they

25     aided and abetted in that decision by providing information,
```

1    material.  They gave the fuel for the fire.

2                THE COURT:    I'm going to take a look at the law on

3    this.  I don't need you to put in additional briefing, but I'm

4    going to give this language a little bit more thought.  I'm not

5    sure which way I'm going to come out.  I think for the

6    individuals, it's obviously an important issue.

7                New York City.  I think I was at the point where I was

8    asking plaintiff about the New York City Human Rights Law

9    retaliation claim.

10               MR. LABUDA:    We don't have any changes, your Honor.

11               THE COURT:    What about from the plaintiff on the New

12   York City Human Rights Law discrimination claim?

13               MR. LABUDA:    No, your Honor.

14               THE COURT:    From the defendant on the New York City

15   rights law discrimination?

16               MR. STEER:    We have nothing, your Honor.

17               THE COURT:    Damages.  No. 3.  Anything from plaintiff

18   on the general damages instruction?

19               MR. LABUDA:    No, your Honor.

20               THE COURT:    From the defendant on the general damages

21   instruction?

22               MR. STEER:    Nothing, your Honor.

23               THE COURT:    3.1, damages under the Equal Pay Act.

24   Anything from plaintiff?

25               MR. LABUDA:    No.

1          THE COURT:   Anything from defendant?

2          MR. STEER:   No, your Honor.

3          THE COURT:   3.2, damages under New York Labor Law

4    Section 194.  Anything from plaintiff?

5          MR. LABUDA:   No.

6          THE COURT:   From defendant?

7          MR. STEER:   No, your Honor.

8          THE COURT:   3.3, front and back pay under Title VII.

9    I went back and forth, frankly, on whether to give this

10   instruction.  I concluded that it would be useful here just to

11   tell the jury that it's not for them to decide front and back

12   pay under Title VII because, otherwise, they might have a

13   question as to why it's not on the verdict form.  That's the

14   reason I included that.

15          Does plaintiff have a view?

16          MR. LABUDA:   No, your Honor.  No.

17          MR. STEER:   No objection, your Honor.

18          THE COURT:   3.4, any objections from plaintiff?

19          MR. LABUDA:   No.

20          MR. STEER:   No, your Honor.

21          THE COURT:   3.5, compensatory damages.  Anything from

22   plaintiff?

23          MR. LABUDA:   No, your Honor.

24          THE COURT:   From defendant?

25          MR. STEER:   No, your Honor.

N7BCede7

1              THE COURT:    3.6, punitive damages.  I know I've got

2      something from defendant on that.  Anything from plaintiff?

3              MR. LABUDA:    No, your Honor.

4              THE COURT:    Let me hear from defendants, what do you

5      want me to do?

6              MR. STEER:    We just want it to be made clear to the

7      jury, if possible, your Honor, that we add "please note that

8      punitive damages are not available for claims under the Equal

9      Pay Act and New York Labor Law Section 194" because those have

10     liquidated damages, so you don't get punitive damages where you

11     can get liquidated is our position.

12             MR. LABUDA:    Your Honor, you make it pretty clear in

13     the first sentence, "if she prevails on her claims of

14     retaliation, you may or are required to award punitive

15     damages."  It seems kind of redundant.  It's one of these

16     things where it's already laid out there.  I don't think

17     there's any need to say it in the verdict sheet.  Presumably

18     it's not going to have a component for punitive damages in the

19     Equal Pay Act section.

20             THE COURT:    I take it you don't disagree with the

21     proposition of law?

22             MR. LABUDA:    Correct, yes.

23             THE COURT:    Let me think about that, read the

24     instructions as a whole, and I'll obviously let you know what I

25     intend to do.

1          Let me ask about the final instructions generally as a

2     whole.

3          Anything under final instructions from plaintiff?

4          MR. LABUDA:    No, your Honor.

5          THE COURT:    Anything from defendant on the final

6     instructions?

7          MR. STEER:    No, your Honor.

8          THE COURT:    My hope is to get you something on Monday

9     morning or on Sunday night or sometime during the day on Monday

10    that will have my revisions.  I want to wait until I get the

11    pieces of paper from you with respect to the issues that I've

12    identified.  I'll also try to get you around then a copy of the

13    verdict form.

14          I raised this earlier, and parties should give some

15    thought to it, I will certainly give thought to it, how to

16    handle the fact that there are a lot of different NYU entities

17    in terms of the verdict form and a lot of other different

18    defendants in terms of trying to make the verdict form

19    something that a jury can handle.  I realize that goes to a

20    substantive question of which entity is going to be asked to be

21    held liable, and some of that also might be resolved at the end

22    of plaintiff's case depending on what the proof shows, but give

23    it some thought.

24          MR. LABUDA:    Yes, your Honor.

25          THE COURT:    Anything else from plaintiff for the rest

1    of the day?

2                MR. LABUDA:    No, your Honor.

3                THE COURT:    Anything from defendant?

4                MR. STEER:    No, your Honor.  Thank you.

5                THE COURT:    All right.  I will see you tomorrow

6    morning.  It's going to be a long day.  Try to get here by

7    quarter of 9:00.

8                Have a good afternoon, everybody.

9                (Adjourned to July 12, 2023, at 9:00 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                  Page

 SARI EDELMAN

Direct By Mr. Labuda . . . . . . . . . . . . . .65

Cross By Mr. Schoenstein . . . . . . . . . . 216

PLAINTIFF EXHIBITS

Exhibit No.                                Received

 11    . . . . . . . . . . . . . . . . . . . .75

 8   . . . . . . . . . . . . . . . . . . . .76

 89    . . . . . . . . . . . . . . . . . . .86

 47    . . . . . . . . . . . . . . . . . . .97

 12    . . . . . . . . . . . . . . . . . . 106

 9   . . . . . . . . . . . . . . . . . . . 107

 117   . . . . . . . . . . . . . . . . . . 109

 59    . . . . . . . . . . . . . . . . . . 124

 58    . . . . . . . . . . . . . . . . . . 127

 52    . . . . . . . . . . . . . . . . . . 132

 68    . . . . . . . . . . . . . . . . . . 136

 21    . . . . . . . . . . . . . . . . . . 140

 7   . . . . . . . . . . . . . . . . . . . 147

 84    . . . . . . . . . . . . . . . . . . 149

 86    . . . . . . . . . . . . . . . . . . 161

 93    . . . . . . . . . . . . . . . . . . 170

 108   . . . . . . . . . . . . . . . . . . 171

 41    . . . . . . . . . . . . . . . . . . 177

| | | |
|---|---|---|
| 1 | 46 . . . . . . . . . . . . . . . . . . 180 | |
| 2 | 48 . . . . . . . . . . . . . . . . . . 184 | |
| 3 | 42 . . . . . . . . . . . . . . . . . . 187 | |
| 4 | 24 . . . . . . . . . . . . . . . . . . 189 | |
| 5 | 25 . . . . . . . . . . . . . . . . . . 192 | |
| 6 | 26 . . . . . . . . . . . . . . . . . . 194 | |
| 7 | 31 . . . . . . . . . . . . . . . . . . 194 | |
| 8 | 32 . . . . . . . . . . . . . . . . . . 196 | |
| 9 | 33 . . . . . . . . . . . . . . . . . . 197 | |
| 10 | 34 . . . . . . . . . . . . . . . . . . 198 | |
| 11 | 35 . . . . . . . . . . . . . . . . . . 199 | |
| 12 | 88 . . . . . . . . . . . . . . . . . . 223 | |

DEFENDANT EXHIBITS

Exhibit No.                          Received

XX . . . . . . . . . . . . . . . . . . 142

KKK . . . . . . . . . . . . . . . . . . 163

HH . . . . . . . . . . . . . . . . . . 212

EE . . . . . . . . . . . . . . . . . . 214

OOO . . . . . . . . . . . . . . . . . . 231

QQQ . . . . . . . . . . . . . . . . . . 233

N7CCede1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

DR. SARI EDELMAN,

                    Plaintiff,

          v.                            21 Civ. 502 (LJL)

NYU LANGONE HEALTH SYSTEM, *et
al.*,

                    Defendants.
                                        Trial
------------------------------x
                                        New York, N.Y.
                                        July 12, 2023
                                        9:00 a.m.

Before:

                    HON. LEWIS J. LIMAN,

                                        District Judge
                                        -and a Jury-


                         APPEARANCES

MILMAN LABUDA LAW GROUP PLLC
     Attorneys for Plaintiff
BY:  JOSEPH M. LABUDA
     EMANUEL S. KATAEV

TARTER KRINSKY & DROGIN LLP
     Attorneys for Defendants
BY:  RICHARD C. SCHOENSTEIN
     RICHARD L. STEER
     INGRID J. CARDONA

N7CCede1

1           (In open court; jury not present)

2           THE COURT:  Anything from plaintiff before we bring in

3     the jury?

4           MR. LABUDA:  Your Honor, there was one issue with

5     respect to the jury charge I was thinking of last night.  I

6     don't know if you want to save that.

7           THE COURT:  Do we need to address it before we bring

8     in the jury?

9           MR. LABUDA:  No, that was the only thing, it was in my

10    head.

11          THE COURT:  So keep it in your head or put it back

12    into your head at the lunch break and we'll address it when we

13    come to a convenient break.

14          What about from defendant?

15          MR. SCHOENSTEIN:  No, your Honor.  Ready to go.

16          THE COURT:  Can we put Dr. Edelman on the stand.

17          Let's bring in the jury.

18          Dr. Edelman, let me remind you that you're still under

19    oath.

20          THE WITNESS:  Thank you.

21          (Continued on next page)

22

23

24

25

N7CCede1                          Edelman – Cross

1                (Jury present)

2                THE COURT:  Welcome back, members of the jury.  I hope

3      you all had a restful afternoon and evening.  We'll continue

4      with the cross examination of Dr. Edelman.

5                Counsel, you may proceed.

6                MR. SCHOENSTEIN:  Thank you, your Honor.

7       SARI EDELMAN, resumed.

8      CROSS-EXAMINATION CONTINUED

9      BY MR. SCHOENSTEIN:

10     Q.  Good morning, Dr. Edelman.

11     A.  Good morning.

12     Q.  Let's go back now to the beginning of the story here.

13                MR. SCHOENSTEIN:  I'd like to show the witness

14     Plaintiff's Exhibit 15, which is already in evidence, your

15     Honor, and show it to the jury.

16                THE COURT:  You may do so.

17     Q.  This is your résumé as it existed prior to joining NYU; is

18     that correct, doctor?

19     A.  Yes.  Can you please scroll down.  Thank you.

20                MR. SCHOENSTEIN:  Ms. Cardona.  Hold right there, if

21     you could.

22     Q.  And this reflects the dates that you went to college and

23     medical school and were board certified?

24     A.  I guess.

25                MR. SCHOENSTEIN:  And scroll down to the next page,

1    please.

2    Q.   That reflects your publications that you had listed on your

3    résumé prior to joining NYU?

4    A.   Yes.

5    Q.   And prior to joining NYU, you had not been involved in any

6    clinical trials or grants; correct?

7    A.   Correct.

8    Q.   You had no administrative experience at a hospital;

9    correct?

10   A.   Correct.

11   Q.   And you had no research experience as a doctor?

12   A.   Incorrect.

13   Q.   What research experience did you have as a doctor?

14   A.   I did research -- these publications are part of research

15   at Winthrop University Hospital with Dr. Allison Reis.

16   Q.   And beyond these articles listed here, did you have any

17   research role prior to joining NYU?

18   A.   I will also work with Dr. Rosenblum on research during my

19   fellowship that I didn't publish with him.

20   Q.   And when you were in private practice from the years 2008

21   to 2014, were you doing any research?

22   A.   I was -- the only research we had done in the office was a

23   small study that someone asked us to be involved in collecting

24   for -- I forgot what it was, but there was a trial going on and

25   we were involved with collecting blood samples to submit to the

N7CCede1                    Edelman - Cross

1  trial.

2  Q.  Other than that, you don't recall any?

3  A.  I don't recall any others.

4  Q.  You started your private practice in 2008; correct?

5  A.  Correct.

6  Q.  And that's when you did the office build-out that you

7  talked about yesterday?

8  A.  Yes, around that time, 2007, 2008.

9  Q.  And the practice was owned 50/50 by you and Dr. Mehta?

10  A.  Correct.

11  Q.  And we'll meet her next, she's the next witness in this

12  case?

13  A.  I believe so.

14  Q.  And you two were the main physicians in the practice, you

15  were the only full-time physicians in the practice?

16  A.  Yes.

17  Q.  You had rented offices on a 20-year lease; correct?

18  A.  I'm sorry.  Can you rephrase the question.

19  Q.  The private practice that you ran was in an office that you

20  rented; right?

21  A.  Yes, we leased the space.

22  Q.  And you said it was a 20-year lease.  Was it 20-year or

23  15-year?

24  A.  I believed it was 20 years.  I might have been mistaken.

25  Q.  You said yesterday that the lease was on favorable terms.

N7CCede1                          Edelman - Cross

1    Do you recall saying that?

2    A.  Yes.

3    Q.  Do you have experience in commercial real estate?

4    A.  I have more exposure to experience in commercial real

5    estate.  My husband works in real estate and banking.

6    Q.  Your husband is a mortgage loan originator; right?

7    A.  Yes.

8    Q.  He helps people get mortgages for their homes?

9              MR. LABUDA:  Objection.  Relevance.

10             THE COURT:  Overruled.

11   A.  Yes.

12   Q.  Do you personally have experience in commercial real

13   estate?

14   A.  I do not.

15   Q.  And do you know how much was the monthly rental for this

16   office space?

17   A.  I believe it was around $8,000 a month.

18   Q.  How much was that per square foot?

19   A.  About $30 at the time, if I remember correctly.

20   Q.  How many tenants were in the building?

21   A.  At the time we moved in from the time -- what I could

22   remember back, because this is a long time back, I don't

23   believe there was anybody on the first floor.  In the

24   downstairs, the obstetrician group might have been in the

25   building.  I believe the dentist moved in after us.

N7CCede1                         Edelman - Cross

Q.  Did you ever see any of the leases for any of the other

tenants?

A.  No, most of them came in after us.

Q.  Did you know what any of the other tenants were paying per

square foot?

A.  No.

Q.  Did you know what the average cost of commercial real

estate was on a per-square-foot basis in New Hyde Park?

A.  At the time I did, at the time we researched it.

Q.  Were you personally obligated on the lease?

A.  I don't recall.

Q.  Do you believe you were?

A.  I don't recall.

Q.  Do you know, if your practice had not succeeded, let's say

you'd gone out of business after three years, would you still

have been obligated to lease the space for 15 or 20 years?

A.  I believe we had the ability to sublease built in if we no

longer wanted to use the space.

Q.  But if you couldn't sublease and you couldn't use the

space, you were obligated on a 15- or 20-year lease; right?

That's the way a lease works?

A.  I don't have the lease in front of me, so I can't answer to

how it was --

Q.  Do you disagree with my premise that you would have

remained obligated on the lease?

1              MR. LABUDA:  Objection.

2              THE COURT:  Overruled.

3    A.  I would assume I would have been obligated.

4    Q.  And to start your business, you took out business loans;

5    correct?

6    A.  Correct.

7    Q.  You said yesterday you took out a small loan?

8    A.  I said I took out a $500,000 small business loan.

9    Q.  I thought you said a small loan.  But it was a half a

10   million dollars; right?

11   A.  Yes.

12   Q.  And you took that as a mortgage on your house?

13   A.  As a lien on my house.  I didn't mortgage my house, it's a

14   lien.

15   Q.  But you were liable on that loan no matter what happened to

16   your business?

17   A.  Yes.

18   Q.  And that was a lien on your family's primary residence of a

19   half a million dollars; correct?

20   A.  Yes.

21   Q.  And at the time you were talking to NYU in 2014, that loan

22   had not been paid off; right?

23   A.  Yes.

24   Q.  You still had several hundred thousand dollars that you

25   owed on that loan?

N7CCede1                          Edelman - Cross

1    A.  About $300,000.

2    Q.  Now, I want to talk about the time you were in private

3    practice before you associated with Nassau Radiology.  So from

4    2008 to 2012, that period of time.  Okay?

5    A.  I was not associated with -- I'm sorry.  Repeat the

6    question because I don't think I heard it correctly.

7    Q.  I'm focusing on the period -- let me ask it this way.  In

8    or about 2012, you began some sort of association with a group

9    called Nassau Radiology; right?

10   A.  Yes, correct.

11   Q.  So let's talk about the four years before that from when

12   you started your practice in '08 to 2012.

13        You and Dr. Mehta were paying for the lease; right?

14   A.  Yes.

15   Q.  You were paying for all of your equipment?

16   A.  Yes.

17   Q.  You were paying for your staff?

18   A.  Yes.

19   Q.  You were paying for office supplies and any other overhead

20   you had in the business; right?

21   A.  Correct.

22   Q.  And you were getting revenue from patients?

23   A.  Correct.

24   Q.  How did you decide how much to pay you and Dr. Mehta?

25   A.  We made those decisions together based on what was

N7CCede1                         Edelman - Cross

1   happening with the practice at the time.  Sometimes we took the

2   money as salary, sometimes we invested it back into the

3   practice.

4   Q.  In those four years, the salary you took was about $60,000

5   a year; correct?

6   A.  I don't remember that far back.  I don't know the exact

7   numbers.

8   Q.  Does that sound in the right ballpark?

9   A.  I know at the beginning we were taking about $60,000.  I

10  don't know if it was straight through the four years, but the

11  very beginning.

12  Q.  And you determined that amount by looking at your revenues

13  and your expenses and figuring out what you could pay

14  yourselves.  Is that fair to say?

15  A.  And determining what we wanted to invest back into the

16  business.

17  Q.  And then in 2012, you became affiliated with Nassau

18  Radiology; right?

19  A.  Yes.

20  Q.  Did they buy your practice?

21  A.  No.

22  Q.  Did you become employed at Nassau Radiology?

23  A.  I have to look back at how the contract was structured.  It

24  wasn't really viewed as you were employed by them.  There was

25  an agreement where they did billing and collections and we

1    billed under their tax ID.

2    Q.  Did that increase your salary?

3    A.  From the third year to the fourth year, I think when we

4    joined them, I think it did go up.

5    Q.  By the way, when you were in private practice and you were

6    paying yourselves somewhere in the vicinity of $60,000, did you

7    factor in how many RVUs you were producing to determine your

8    salary?

9    A.  We didn't use an RVU base point, we were using accounts

10   receivable and collections, revenue streams.

11   Q.  So you didn't look at RVUs at all in your private practice?

12   A.  No.

13   Q.  Were there any male doctors in your private practice?

14   A.  No.

15   Q.  And Nassau Radiology, you agree with me, ultimately did go

16   into bankruptcy?

17   A.  In 2015.

18   Q.  And you guys knew it was heading into bankruptcy and that's

19   why you were looking at other opportunities; correct?

20   A.  That is not correct.

21   Q.  Is it correct that you thought you had to leave your

22   affiliation with Nassau Radiology or do you deny that?

23   A.  No, we wanted to leave Nassau Radiology.

24   Q.  Why did you want to leave Nassau Radiology?

25   A.  Just the management wasn't good, like, we constantly

1   struggled with them.

2   Q.  Your first discussions about joining NYU were with

3   Dr. Avram Goldberg; right?

4   A.  Yes.

5   Q.  And he was working at NYU when you had those discussions?

6   A.  Yes.

7   Q.  And you understood that he had been hired by NYU in part to

8   build out the rheumatology practice on Long Island; correct?

9   A.  From my -- from speaking with him, his role was going to

10  be, like, director of rheumatology to lead up the division.

11  Q.  Which you understood included building up the team?

12  A.  I did not know if he was doing the recruitment or if the

13  city -- their city recruiter was doing the recruitment

14  directly.  I know he approached us because he knew us.

15  Q.  You knew he was recruiting you?

16  A.  Yes, that I knew.

17  Q.  And he put you in touch with another recruiter who put you

18  in touch with Mr. Rubin and Mr. Swirnow?

19  A.  Correct.

20  Q.  In agreeing to join NYU, you negotiated the terms of your

21  contract; right?

22  A.  Yes.

23  Q.  And you and Dr. Mehta provided financial information about

24  your practice to NYU?

25  A.  I believe we did.

N7CCede1                        Edelman - Cross

1    Q.  She did most of that; right?

2    A.  No, we did most of that.

3    Q.  NYU wanted to know about your revenues and your costs and

4    how many patients you had, they wanted all that information;

5    right?

6    A.  Yes.

7              MR. LABUDA:  Objection.

8    Q.  They asked you for all that information?

9              THE COURT:  The objection to NYU wanting to know is

10   sustained.  You can then ask the question about what they asked

11   for is a proper question.  Go ahead.

12   Q.  NYU asked you for all of that kind of financial

13   information; right?

14   A.  I believe so.

15   Q.  And you understood that NYU would be relying on the

16   financial information you provided them to make decisions about

17   your employment?

18   A.  Yes.

19   Q.  And to set your salary?

20   A.  Yes.

21   Q.  And NYU did make an offer for you to join; is that correct?

22   A.  Yes.

23   Q.  It did not have to do that, you would agree with me?

24   A.  Yes.

25   Q.  And you made the decision to accept that offer?

N7CCede1                         Edelman - Cross

1    A.  Yes.

2    Q.  And you did not have to do that, you would agree with me?

3    A.  Yes.

4    Q.  Now, you had a lawyer at the time of your negotiations with

5    NYU; right?

6    A.  Yes.

7    Q.  What was the lawyer's name?

8    A.  I don't know.  It was someone related to Dr. Mehta.  I

9    don't -- it was one of her relatives.  I forgot his name.

10   Q.  Oh, so when you said it was a family relation yesterday,

11   you meant it was a family relation of Dr. Mehta?

12   A.  Yes.

13   Q.  And I think you told us on direct that the lawyer you had,

14   whoever it was, actually reviewed the contract with NYU and

15   made comments about the language of that contract that ended up

16   getting incorporated; right?

17   A.  Yes.

18   Q.  So you had a lawyer help you write the contract you had

19   with NYU.  Is that fair to say?

20   A.  We had a lawyer review the final contracts before we signed

21   it and they made some additional changes in the language.  They

22   weren't present through the negotiating process.

23   Q.  But was present during the contracting process?

24   A.  Yes.

25   Q.  Did you get other advice on negotiations?

N7CCede1                         Edelman – Cross

A.  Not in terms of negotiation for salary at the time.

Q.  And you ended up with a three-year contract with NYU;

right?

A.  Yes.

         MR. SCHOENSTEIN:  Can we put up Plaintiff's Exhibit 8.

         This is already in evidence, your Honor, so I'm going

to show it to the jury, if that's okay.

         THE COURT:  Go ahead.

         MR. SCHOENSTEIN:  Ms. Cardona, let's please scroll

down to the first page of the contract part.  I want to see the

date.

Q.  This is a September 5th, 2014 contract that you entered

with NYU Langone Medical Center; is that right?

A.  Yes.

Q.  And your counsel showed you information in this contract

about your salary and about your RVU target.  Do you remember

that?

A.  Yes.

         MR. SCHOENSTEIN:  Could we show the RVU target,

please.

Q.  You had an RVU target of 4966 RVUs a year; right?

A.  Yes.

Q.  And you don't know what role RVUs played, if any, in

setting your initial compensation?

A.  I do not.

1   Q.  Is that fair to say?

2   A.  I do not.

3   Q.  Your initial salary was $207,000 plus a $3,000 expense

4   allowance; is that right?

5   A.  That's correct.

6   Q.  And you said yesterday that the work you did at NYU was

7   essentially the same work you had been doing in your private

8   practice; correct?

9   A.  Correct.

10  Q.  So in joining NYU, you received a raise to do the same work

11  you had been doing in your private practice; is that fair to

12  say?

13  A.  Yes.

14  Q.  NYU paid you more for the same work than you were able to

15  pay yourself?

16  A.  Correct.

17          MR. LABUDA:  Objection.  Asked and answered.

18          THE COURT:  Overruled.

19  Q.  NYU also assumed the $300,000 business loan that was left;

20  right?

21  A.  Yes, for the build-out.

22  Q.  And because you were personally liable on that business

23  loan, you considered that part of your compensation?

24  A.  I did not.

25  Q.  The lease was signed over to NYU; right?

N7CCede1                        Edelman – Cross

```
1    A.  Yes.

2    Q.  And so you were no longer personally liable on the lease,

3    it was now NYU's responsibility?

4    A.  Yes.

5    Q.  And NYU would have to make all the payments for rent and

6    for staff and for office supplies and for all that stuff was

7    now on NYU?

8    A.  Yes.

9    Q.  They also took over a lot of the administrative work.  Is

10   that fair to say?

11   A.  Yes.

12   Q.  And you were paid all of the money required in this

13   contract we're looking at; right?

14   A.  Yes.

15   Q.  You understood that the three-year contract could be

16   renewed or not at the end of the three-year term?

17   A.  Yes.

18   Q.  You understood that was completely at NYU's discretion?

19           MR. LABUDA:  Objection.

20           THE COURT:  Overruled.

21   A.  Yes.

22   Q.  And at the end of the first three-year term, you did indeed

23   negotiate a renewal; is that right?

24   A.  Yes.

25           MR. SCHOENSTEIN:  Let's turn to
```

N7CCede1                        Edelman - Cross

1   Plaintiff's Exhibit 12, please.

2           Also already in evidence, your Honor.

3           THE COURT:   Okay.   You can publish it.

4   Q.   This is the email chain that we looked at yesterday that

5   you had with Mr. Swirnow.   I think you said the negotiation for

6   your renewal was mostly done by email; is that right?

7   A.   Yes.

8   Q.   There were no big issues requiring an in-person sitdown or

9   anything like that?

10  A.   I don't recall.

11          MR. SCHOENSTEIN:   Let's go to the bottom of page D150.

12  Q.   You see the email from your partner, Dr. Mehta, and she

13  wrote:   "We both believe that a fair base salary would be

14  $280,000;" correct?

15  A.   Correct.

16  Q.   And you wrote that email with her?

17  A.   You'd have to scroll down, but I believe, yes, because I'm

18  cc'd on it.

19  Q.   Yes, it's signed:   "Kavini, I'm sorry."

20  A.   Yes.   That means we both wrote it.

21  Q.   As of November 10, 2017 you and Dr. Mehta believed a fair

22  base salary was $280,000?

23  A.   Yes, that's what we agreed to.

24          MR. SCHOENSTEIN:   Let's turn to Plaintiff's Exhibit 9,

25  also already in evidence.

N7CCede1                        Edelman – Cross

1              It's already in evidence, your Honor.  We're going to

2    publish it if that's okay.

3              THE COURT:  Plaintiff's Exhibit 9 is in evidence.  You

4    may publish it to the jury.

5    Q.  This is your renewal contract in 2017?

6    A.  Yes.

7              MR. SCHOENSTEIN:  Let's take a look at page D60.

8    Q.  The salary you ended up agreeing to was $278,000?

9    A.  Correct.

10   Q.  And that was pretty close to the $280,000 you and Dr. Mehta

11   had requested; right?

12   A.  Yes.

13   Q.  And your RVU target went up to 5200?

14   A.  Correct.

15   Q.  So your salary went up from 207 to 278, that's about a

16   25-percent increase; would you agree?

17   A.  I'll have to trust you on the math.

18   Q.  I did use a calculator.

19   A.  Okay.

20   Q.  Your RVU target went from 4966 to 5200, and that was just a

21   4.5-percent increase; right?

22   A.  Okay.

23   Q.  So your salary increase did not directly correlate to your

24   RVU increase.  Is that fair to say?

25   A.  Yes.

N7CCede1                          Edelman – Cross

1            MR. SCHOENSTEIN:  You can take down that exhibit.

2    Q.  During the years prior to 2019 and the events we'll discuss

3    later, did you have any issues getting along with staff at NYU?

4    A.  I'm sorry.  Could you repeat the question.

5    Q.  In the years prior to the 2019 issues that we're going to

6    talk about, did you have any problems getting along with staff

7    at NYU?

8    A.  I didn't have any problems getting along with staff at NYU

9    throughout my tenure there.

10   Q.  And you never applied for an administrative position at

11   NYU; is that fair to say?

12   A.  I applied for a research investigator position.

13   Q.  I said administrative position.  Did you ever apply for an

14   administrative position?

15   A.  No.

16   Q.  The renewal contract we just looked at, that was also a

17   three-year contract; right?

18   A.  Yes.

19   Q.  And you were paid all the monies that you were promised on

20   that contract?

21   A.  Yes.

22   Q.  And NYU had the option to not renew it at the end of three

23   years; right?

24   A.  Yes.

25   Q.  And you received notice in December of 2020 that your

N7CCede1                          Edelman - Cross

1    contract was nonrenewed, we looked at that yesterday?

2    A.  Yes.

3    Q.  And upon receiving that, you called Andrew Rubin; right?

4    A.  Yes.

5    Q.  Did you ask him why it would be nonrenewed?

6    A.  Yes.

7    Q.  Did you mention to him your complaint to the employee

8    relations department?

9    A.  I did.

10   Q.  You did, in that phonecall?

11   A.  In that phonecall.  I said this is because of my HR

12   complaint.

13   Q.  And you asked if he might help you look for a new job?

14   A.  I did.

15   Q.  Did you tell him that about a month later, you would be

16   suing him in federal court when you asked for his help finding

17   a new job?

18            MR. LABUDA:  Objection.

19            THE COURT:  Overruled.

20            MR. SCHOENSTEIN:  I don't think we got an answer, your

21   Honor.

22   A.  No.  No.  Repeat the question again.  Did I tell him?

23   Q.  When you were asking for his help finding a new job on or

24   about December 2nd, did you tell him that in a month, you were

25   going to sue him in federal court?

1   A.  You're asking me if I predicted in a month I'd be suing him

2   in federal court.  I think in that point in time on December

3   2nd, there was no decision made to sue.

4   Q.  My question was did you tell him, that was my question.

5   A.  No, there was nothing to tell him at that point.

6   Q.  You claim in this case that you were not paid the same as

7   some other doctors who worked in rheumatology on Long Island;

8   correct?

9   A.  Correct.

10  Q.  The equal pay claim is not something you raised while you

11  were employed at NYU; right?

12          MR. LABUDA:  Objection.

13          THE COURT:  Overruled.

14  A.  I didn't raise it with administration, no.

15  Q.  And you didn't raise it with HR?

16  A.  No.

17  Q.  You didn't raise it with any of the defendants?

18  A.  No.

19  Q.  And you didn't raise it until a complaint was filed in

20  January of 2021?

21  A.  Yes.

22  Q.  Now, let me see if you and I -- I think we're going to have

23  a lot we can agree on right here, so let's see.

24      You would agree with me that not everybody in the world

25  should be paid the same?

N7CCede1                    Edelman - Cross

1    A.  Yes.

2    Q.  And you accept that there are valid reasons to distinguish

3    and pay certain people differently?

4    A.  For the same work, I would say that they should be getting

5    the same pay.

6    Q.  I didn't get to that.  I didn't get to that question yet.

7    A.  Okay.

8    Q.  I'm just saying as a general matter --

9    A.  Then yes.

10   Q.  So some jobs pay more than other jobs; right?

11   A.  Yes.

12   Q.  Being a doctor pays more than being a judge?

13   A.  I don't know.

14          MR. LABUDA:  Objection.

15          MR. SCHOENSTEIN:  Sorry, but --

16          THE COURT:  Sustained.

17   Q.  Some employers pay more than other employers; right?

18   A.  Yes.

19   Q.  Some businesses are more profitable so they can pay their

20   employees more than a less profitable business; right?

21   A.  Yes.

22   Q.  Now let's talk about employees for the same employer.  Even

23   at the same employer, people who do different jobs get paid

24   differently; right?

25   A.  Sometimes.

N7CCede1                         Edelman - Cross

1   Q.  I mean, you got paid as a doctor more than anyone on your

2   staff probably?

3           MR. LABUDA:  Objection.

4           THE COURT:  Overruled.

5   A.  Repeat the question.

6   Q.  As a doctor, you got paid more than your staff; right?

7   A.  I believe there was a question before that.

8           THE COURT:  It's a new question.  You can answer that

9   question.

10          THE WITNESS:  Oh, okay.

11  A.  Yes.

12  Q.  And there's no problem with that, that's fair?

13  A.  Yes.

14  Q.  And you you'd agree that highly skilled employees sometimes

15  get paid more than less skilled employees?

16  A.  Yes.

17  Q.  Doctors get paid more than nurses as a general matter;

18  right?

19  A.  I wouldn't be privy to all of that financial information.

20  I would assume, but there might be nursing physicians that get

21  paid substantially.

22  Q.  I hope so.

23  A.  Yes.

24  Q.  But as a general matter, doctors get paid more than nurses;

25  right?

A.  Yes.

Q.  And some doctors get paid more than others, brain surgeons get paid more than general practitioners; correct?

A.  Again, I don't have people's salaries, but I would assume based on being a neurosurgeon or that type of surgery, you might get paid more.

Q.  Now, if there are employees at the same employer that do the same thing, would you agree that there might be circumstances where it's okay to pay one more than the other?

MR. LABUDA:  Objection.

THE COURT:  Basis.

MR. LABUDA:  Speculation, hypothetical.

THE COURT:  Overruled.

THE WITNESS:  I'm sorry.  What was the ruling, your Honor?

MR. SCHOENSTEIN:  I think it means you can answer. Judge will correct me if I'm wrong.

THE COURT:  When I say overruled, you can answer.

THE WITNESS:  I didn't hear you.  I'm sorry.

A.  Could you repeat it.

Q.  Sure.  Even at the same employer where there are employees doing the same job, there may be circumstances where it's appropriate to pay one employee more than the other?

A.  I'm having difficulty answering.  I'm not sure, based on a specific situation, how that would play out.

1   Q.  You can't agree or disagree with my general statement?

2   A.  Yes.

3   Q.  For employees who do the same job, if one of them is more

4   experienced, is it okay to pay that person more?

5   A.  Yes, I would agree with that.

6   Q.  If one person has better credentials, is it okay to pay

7   that person more?

8   A.  Again, I wouldn't say that I would agree with that.

9   Q.  You're not sure if you'd agree with that one?

10  A.  Yes.

11  Q.  What if they're better educated, would it be okay to pay

12  them more if they're better educated?

13  A.  If they're doing the same work and they're going to be

14  providing the same service at the same skill level, then I

15  wouldn't agree with that.

16  Q.  What if they're doing the same work, but they're bringing

17  in more revenue, would it be okay then to pay them more if they

18  do the same thing, but they bring more money to the employer?

19  A.  I would have to look at that specific situation.

20  Q.  Well, let me give you, if the Judge will allow, a

21  hypothetical.  Two employees do the exact same thing, the exact

22  same thing, employee A generates $1 million for the employer,

23  employee B generates $10 million for the employer.  Is it okay

24  to pay employee B more than employee A?

25  A.  If it was structured as a compensation model, then yes,

1   based on sales, based on revenue.

2   Q.  Can the employer also consider if the cost of employee A is

3   less than the cost of employee B in determining how much to pay

4   them?

5   A.  Yes.

6   Q.  Now, in this case, promised you we'd get back to this case,

7   you're talking about the other rheumatologists who worked on

8   Long Island; right?

9   A.  Yes.

10  Q.  And of the rheumatologist group on Long Island, there were

11  some that were paid more than you and some that were paid less

12  than you; right?

13  A.  Yes.

14  Q.  And there were some men that were paid more than you and

15  there were men that were paid less than you?

16  A.  I don't believe that's true.

17  Q.  Dr. Given was paid less than you?

18          MR. LABUDA:  Objection.

19          THE COURT:  Overruled.

20  A.  Dr. Given was a part-time physician.

21  Q.  But he was paid less than you?

22  A.  For working part-time, yes.

23  Q.  Because the amount of work is a fair distinguisher between

24  how you pay persons?

25  A.  Yes.

N7CCede1                        Edelman - Cross

1    Q.  So it's okay to pay a person more if they work harder, you
2    agree with me?
3    A.  I mean, it's based on how your salary structure is set up.
4    It's a generalization.
5    Q.  Can you agree with that generalization or not, it's okay to
6    pay someone more if they work harder?
7              MR. LABUDA:  Objection.
8    A.  It could be okay.
9              THE COURT:  Basis?
10             MR. LABUDA:  Ambiguous in terms of the word "harder."
11             THE COURT:  Overruled.
12   A.  It could be okay.
13   Q.  Is it your position that all of the rheumatologists on Long
14   Island should have been paid exactly the same?
15   A.  It's in my opinion we should have been paid the same for
16   the same work that we were doing, yes.
17   Q.  Did you have an opportunity to observe the work that
18   Dr. Goldberg did on a daily basis?
19   A.  I was in the office with him every day, I was seeing
20   patients side-by-side in exam rooms, so yes.
21   Q.  Let's just talk about a typical day at the office.  In a
22   typical day at the office, how many days were you there?
23   A.  I was there typically five days and Huntington on the one
24   day.
25   Q.  When you were in the office, what hours were you in the

N7CCede1                        Edelman – Cross

1    office?

2    A.  It varied.  It could be 9:00 to 5:00, it could be 8:00 to

3    4:00.  It varied.

4    Q.  Let's take a 9:00 to 5:00 day.  Is that more typical than

5    others?

6    A.  Yes.

7    Q.  So on a typical 9:00 to 5:00 day, how much of those eight

8    hours did you spend seeing patients?

9    A.  Other than like the last hour, the whole day.

10   Q.  The whole day.  And while you were seeing patients,

11   Dr. Goldberg wasn't in the room with you, was he?

12   A.  No, he was in and out of his exam rooms all in the same

13   hallway.

14   Q.  Dr. Porges wasn't in the room with you and your patients?

15   A.  No.

16   Q.  And Dr. Modi, he was mostly often in an entirely different

17   office?

18   A.  Yes, I saw him on Thursdays.

19   Q.  So while you were with your patients during most of the

20   9:00 to 5:00 day, you were not observing what any of those

21   other doctors did?

22   A.  Not inside the exam rooms, no.

23   Q.  And you had your own office; right?

24   A.  Yes.

25   Q.  And they had their own offices?

N7CCede1                        Edelman – Cross

 1  A.  Yes.

 2  Q.  So you didn't get to observe what they did in their own

 3  offices?

 4  A.  I got to observe them walking by their offices, stopping

 5  in, talking to them.

 6  Q.  But my question was, did you get to observe what they did

 7  in their offices?

 8  A.  I would say yes.

 9  Q.  How much time, on a 9:00 to 5:00 day, did you spend inside

10  Dr. Goldberg's private office?

11  A.  Very limited, just speaking to him at the door.

12  Q.  Right.  So most of the day you didn't get to see what he

13  did inside his private office; right?

14  A.  Yes.

15  Q.  Same with Dr. Porges, same with Dr. Modi?

16  A.  Yes.

17          MR. SCHOENSTEIN:  Let's put up, please, exhibit 41.

18  This has already been entered in evidence, your Honor, if I

19  could publish it.

20          THE COURT:  You may publish it.

21  Q.  This is the CV for Dr. Goldberg, right, you've seen this

22  document before, you talked about it yesterday?

23  A.  Yes.

24  Q.  Dr. Goldberg graduated medical school in 1993; right?

25  A.  Correct.

N7CCede1                            Edelman - Cross

1   Q.  What were you doing in 1993?

2   A.  I graduated high school.

3   Q.  So Dr. Goldberg graduated med school the year you graduated

4   high school?

5   A.  Yes.

6   Q.  He had an internal medicine -- he did his internal medicine

7   at North Shore University Hospital; right?

8   A.  Yes.

9   Q.  And if you scroll down a little, please, he received his

10  New York State license for medicine in 1995, you were a

11  sophomore in college in 1995; right?

12  A.  I have to think about it.

13  Q.  Well, you were in college in 1995?

14  A.  Yes.

15  Q.  And you see Dr. Goldberg, from 2010 to whenever this CV was

16  written, had an assistant professor of medicine position at

17  Hofstra?

18  A.  Yes.

19  Q.  Prior to NYU, had you had any faculty appointments

20  anywhere?

21  A.  No.

22  Q.  He also had had an assistant professor of medicine position

23  at Albert Einstein College of Medicine; right?

24  A.  Yes.

25  Q.  That is another prominent New York area med school; right?

N7CCede1                         Edelman - Cross

1    A.   That's an opinion.

2    Q.   Well known, at least?

3    A.   Yes.

4         MR. SCHOENSTEIN:   Turn to the next page, please.

5    Q.   Since 2001, Dr. Goldberg had been full-time faculty at

6    North Shore University Hospital; right?

7    A.   Yes.

8    Q.   Under major committee assignments, you see there that

9    Dr. Goldberg was a director of the scleroderma and Raynaud

10   Treatment Center; right?

11   A.   Yes.

12   Q.   What is scleroderma?

13   A.   Scleroderma is an autoimmune disease that causes systemic

14   changes internally.   It could either cause -- affect the eye

15   system or the skin, it can affect the lung and cause breathing

16   issues, circulatory issues.   And Dr. Goldberg took a particular

17   area of interest in that and he was known in the community for

18   treating patients with scleroderma.

19   Q.   Do you know when NYU hired Dr. Goldberg, if he had any

20   loans that NYU had to overtake?

21   A.   I don't believe -- I don't believe I had access to that

22   information --

23   Q.   So you don't know one way or the other?

24   A.   I don't know.

25   Q.   And you don't know if NYU had to assume any costs of lease

N7CCede1                              Edelman - Cross

1   or staff or equipment when they hired Dr. Goldberg?

2   A.  He came strictly from an academic institution, so I would

3   believe no.

4   Q.  You came from private practice, he came from an academic

5   institution, so there was no business expense associated with

6   hiring him; correct?

7   A.  Correct.

8   Q.  Do you know what he was being paid prior to joining NYU?

9   A.  No.

10  Q.  Do you know what salary he insisted on to join NYU?

11  A.  I was not part of his negotiations, no.

12  Q.  And you said before that Dr. Goldberg became the clinical

13  director for the rheumatology group on Long Island?

14  A.  I believe that was his title.

15  Q.  Did you view him as your boss when you joined NYU?

16  A.  No.

17  Q.  Was he senior to you, would that be fair to say?

18  A.  I would not say that.

19  Q.  Do you know, in terms of clinical production, if he was

20  more or less productive than you while at NYU?

21  A.  I know from his discussions with me that he had troubles

22  meeting his targets early on.  So I believe, based on what he

23  told me, he was not productive.

24  Q.  What was his target?

25  A.  It's what's in his contract.

1   Q.  Okay.

2   A.  And it was lower than mine.

3   Q.  Let's take a look at that.

4   A.  In his first contract.

5           MR. SCHOENSTEIN:  Let's look at exhibit 25.  This is

6   his 2017 contract, and if you'll scroll to page 2, please.

7           I'm sorry.  Your Honor, this is already in evidence.

8   I'd like to publish it to the jury.

9           THE COURT:  You may do so.

10  Q.  So this, you see, is Dr. Goldberg's 2017 contract with NYU?

11  A.  This is his second contract, yes.

12  Q.  Right, it's his second contract.  Now take a look at the

13  top of the second page.

14      By the way, there's all these responsibilities listed under

15  "clinical director" at the top of the page.  You didn't have

16  any of those responsibilities in your contract, did you?

17  A.  I did not.  I was not aware that he had those

18  responsibilities either.  It was not apparent to me.

19  Q.  I see.  You didn't know what all of those responsibilities

20  were when you filed a complaint in court saying that you should

21  have been paid as much as him?

22  A.  I wouldn't agree with that statement.

23  Q.  Well, wait a minute.  You just said you didn't know what

24  all his responsibilities were; right?

25  A.  No, I said that I was not aware that he was doing all these

N7CCede1                         Edelman - Cross

1   things while he was in that position when I worked with him.

2   There was no -- there was nothing that he had done that showed

3   me he was actually doing these things while I was working with

4   him.

5          MR. SCHOENSTEIN:  Scroll down a little more,

6   Ms. Cardona.

7   Q.  So his RVU target in this contract is 5850; right?

8   A.  That's correct.

9   Q.  Which is higher than your RVU target was in any contract

10  you ever had with NYU; right?

11  A.  Yes.

12  Q.  So at least as of the beginning of 2017, his productivity

13  target was higher and he had administrative responsibilities

14  that you did not have; right?

15  A.  Yes.

16  Q.  Did you ever do any review of Dr. Goldberg's performance as

17  a doctor?

18  A.  I did no formal review of Dr. Goldberg's work.

19  Q.  You did not have any authority at NYU to review his work.

20  Is that fair to say?

21  A.  Yes.

22         MR. SCHOENSTEIN:  Let's talk about Dr. Porges and

23  let's pull up, please, exhibit 48.  This, I think, is already

24  in evidence.

25         THE COURT:  It is in evidence.  You want to publish

1    it?

2              MR. SCHOENSTEIN:  Yes, your Honor.

3              THE COURT:  You may do so.

4    Q.  You say you should have been paid as much as Dr. Porges for

5    the same work you were doing; correct?

6    A.  Yes.

7    Q.  Now, Dr. Porges, if you see, he graduated medical school in

8    1986?

9    A.  Yes.

10   Q.  What grade were you in in 1986?

11   A.  I don't know.

12   Q.  Sorry?

13   A.  I don't know.

14   Q.  Well, was it elementary school, middle school, were you in

15   school yet in 1986?

16   A.  Yes, I was in school.  I was a child.

17   Q.  He graduated medical school.  Okay.

18             MR. SCHOENSTEIN:  Turn to the next page, please.

19   Q.  Let's look at his board certification.  He became board

20   certified to practice medicine in 1989.  You were in high

21   school; right?

22   A.  Yes.

23   Q.  And you see all of his publications listed on the

24   publications below, you agree that's a much longer list than

25   the publications you had on your résumé?

N7CCede1                        Edelman - Cross

1   A.  Yes, he had a tremendous amount of research experience.

2   Q.  He had a tremendous amount of research experience.  And on

3   the next page, it reflects exactly what you just said, a

4   tremendous amount of clinical research experience from 1999

5   through 2012; right?

6   A.  Yes, and those are all the pharmaceutical companies that he

7   worked for and with in all those years.

8   Q.  Now, do you know how profitable his practice was prior to

9   joining NYU?

10  A.  The only information I know is the proforma that was

11  presented.

12         MR. SCHOENSTEIN:  Let's look at that.  I think it's

13  exhibit EE, which is already in evidence, your Honor.

14         THE COURT:  You may publish it to the jury.

15  Q.  This is the proforma, you looked at this yesterday when you

16  testified; right, doctor?

17  A.  Yes.

18  Q.  And according to this, his total patient revenue in 2013,

19  prior to joining NYU, was in excess of $2 million?

20  A.  That's what it says.

21         MR. SCHOENSTEIN:  And let's go to exhibit HH, which

22  was already admitted.  And I'd like to publish.

23         THE COURT:  You may do so.

24  Q.  And this was the proforma for your private practice with

25  Dr. Mehta; correct?

N7CCede1                          Edelman - Cross

1    A.  Correct.

2    Q.  And it shows the combined -- it shows your patient revenue

3    in 2013 as $323,000?

4    A.  Correct.

5    Q.  So if it were correct that Dr. Porges had $2 million of

6    business and you had $300,000 worth of business, you would

7    understand why someone would pay Dr. Porges more; right?

8    A.  I don't know those numbers are correct.  I don't know what

9    the $2 million represents because he had other income to his

10   practice, he had another part-time --

11   Q.  I asked you if it was correct and I would like you to

12   answer my question.

13           MR. LABUDA:  Objection, your Honor.  The witness

14   wasn't finished answering the question.

15           MR. SCHOENSTEIN:  She hadn't started answering.

16           THE COURT:  No, she had.  Let the witness finish

17   answering her question.

18           MR. LABUDA:  Thank you, your Honor.

19   A.  I don't know if that revenue was Dr. Porges' revenue or if

20   that revenue belongs to the revenue of his office from other

21   factors.  He had a huge research division, he had another

22   part-time position, and his wife way a dermatologist working at

23   the same space.  So I don't know what that $2 million actually

24   reflects.

25           (Continued on next page)


SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N7cWede2                    Edelman - Cross

1    BY MR. SCHOENSTEIN:

2    Q.  This pro forma that we're looking at says Sari Edelman and

3    Kavini Mehta, right?

4    A.  Yes.

5    Q.  Because it reflects both of you?

6    A.  Yes.

7           MR. SCHOENSTEIN:  Go back, please, to exhibit EE.

8    Q.  The only person listed on EE is Andrew Porges, correct?

9    A.  That's what it says at the top.

10   Q.  Correct.

11   A.  Again, this is their draft.  I don't actually have the

12   numbers.  I don't know.  I can't speak to it.

13   Q.  So if -- if -- it was true that he had $2 million of

14   business and you had $300,000 of business, you would understand

15   why someone would pay him more than you, isn't that correct?

16          MR. LABUDA:  Objection.  Hypothetical.

17          THE COURT:  Overruled.

18   A.  I mean it's an if and someone, so if you're asking me to

19   generalize, I could say maybe.  And there's clearly other

20   factors that are present here.

21          MR. SCHOENSTEIN:  Let's take a look at Dr. Porges's

22   contract, which we entered into evidence yesterday as

23   plaintiff's 31.  And I'd like to publish, your Honor.

24          THE COURT:  You may do so.

25   BY MR. SCHOENSTEIN:

N7cWede2                          Edelman - Cross

1    Q.  You see Dr. Porges was hired on August 11, 2014.  Do you

2    see that, Dr. Edelman?

3    A.  Yes.

4    Q.  So that was before you were hired?

5    A.  Yes -- actually, we were negotiating at the same time.  He

6    might have signed his contracts, but when we met with Mr. Rubin

7    and Mr. Swirnow in the city, they were in talks exactly at the

8    same time as us.

9    Q.  Well, the contract was earlier than yours; that was my

10   question.

11   A.  Yeah, he might have just signed it earlier than us.

12           MR. SCHOENSTEIN:  OK.  Now, let's turn, please, to

13   page 862.

14   Q.  And you see there that Dr. Porges had a clinical

15   compensation of $340,000, right?

16   A.  Yes.

17   Q.  Which was higher than yours, right?

18   A.  Yes.

19   Q.  And you see that he had an RVU target of 6,524?

20   A.  Yes.

21   Q.  And that was higher than your RVU target?

22   A.  Yes.

23   Q.  So it was anticipated that he would be more productive than

24   you?

25           MR. LABUDA:  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE COURT:  Sustained.

2     BY MR. SCHOENSTEIN:

3     Q.  Do you know if NYU had to assume any loans when they hired

4     Dr. Porges?

5     A.  I have to look back at his actual documents to tell you

6     that.  I don't -- I don't know.  I can't -- I don't know

7     offhand.

8     Q.  I just mean sitting here today, testifying in the case you

9     brought, do you know if NYU had to assume any loans for

10    Dr. Porges?

11    A.  I'm not aware.

12    Q.  And do you know if they assumed any costs -- of a lease, of

13    a staff or of office supplies or of any of that stuff -- when

14    they hired Dr. Porges?

15    A.  I believe they did.

16    Q.  You think they -- why; what office do you think they

17    required?

18    A.  They -- for a period of time they worked out of the Roslyn

19    office, so there was a lease on that space, and then his

20    staffing, too, came over when he came over to NYU.

21    Q.  OK.

22    A.  And then he had equipment as well that came over.

23    Q.  So he had equipment and staff that came over.  Did they

24    keep his space?

25    A.  They kept his space in Roslyn for a period of time.

N7cWede2                        Edelman - Cross

1    Q.  In Roslyn, for how long?

2    A.  I don't know the exact dates, for how long.

3    Q.  Do you have any idea what NYU expended in that regard?

4    A.  No.

5    Q.  Dr. Porges became the medical director of rheumatology,

6    correct?

7    A.  At some point in time, yes.

8    Q.  And he had research work that he did throughout?

9    A.  He did research for the first couple of years, and then

10   that -- that -- that relationship stopped.

11   Q.  OK.  So at first, your knowledge is he was doing clinical

12   work at a target of 6,500 RVUs and he was doing research work?

13   A.  Yes.  He had two clinical investigators that worked with

14   him.

15   Q.  And then at some point the research work stopped and he

16   started doing administrative duties in addition to his clinical

17   work, right?

18   A.  Yes.

19           MR. SCHOENSTEIN:  All right.  Let's talk about Dr.

20   Modi and turn to exhibit 46, please.  That's already been

21   entered, your Honor, and I'd like to publish.

22           THE COURT:  Permission granted.

23           I was privileged to have a number of students visit

24   with me this morning, so they're now exiting the courtroom.

25   I'd like to thank them for attending.  One of the privileges of

N7cWede2                         Edelman - Cross

1   being a judge is you get to occasionally entertain young

2   people.

3           Go ahead.

4           MR. SCHOENSTEIN:  We're publishing plaintiff's 46,

5   your Honor.  It's already been entered.

6           THE COURT:  You may do so.

7   BY MR. SCHOENSTEIN:

8   Q.  All right.  Dr. Modi was two years' senior to you, correct?

9   A.  Yes.

10  Q.  And he had been medical director at the Hempstead medical

11  office, as listed on his résumé?

12  A.  Yeah, as on his résumé.

13  Q.  And he had been chief of rheumatology for the former Queens

14  Long Island Medical Group?

15  A.  That's what his résumé says, yes.

16  Q.  And he was vice president of the Asian American

17  Rheumatologists of North America?

18  A.  That's what he wrote, yes.

19  Q.  OK.  Do you have any knowledge of the profitability of his

20  private practice prior to joining NYU?

21  A.  He didn't have a private practice.

22  Q.  Right.  He worked for a big medical outfit?

23  A.  Yeah, he worked for a HIP Center.

24  Q.  And do you have any knowledge of the amount of business he

25  generated in that role?

N7cWede2                          Edelman - Cross

1    A.  I -- I don't know.

2    Q.  Since he came over from a HIP Center, you're not aware of

3    him -- of NYU having to assume any loans in connection with

4    hiring Dr. Modi, right?

5    A.  No.

6    Q.  And NYU didn't take on a lease or any office space or any

7    staff or anything like that to hire Dr. Modi?

8    A.  No.

9            MR. SCHOENSTEIN:  Let's turn to exhibit 35, please.

10   That's been published -- that's been entered, your Honor, and

11   I'd like to publish.

12           THE COURT:  You may do so.

13           MR. SCHOENSTEIN:  This is Dr. Modi's initial contract

14   with NYU, and let's turn to D892 and go down to the

15   expectations.

16           There you are.

17   Q.  You see Dr. Modi's contract, he was being paid $360,000 and

18   his RVU target was 6,108, correct?

19   A.  That's what it says.

20   Q.  So more than a thousand RVUs more than your target?

21   A.  My target listed, yes.

22   Q.  Now, do you know -- you weren't involved in the

23   negotiations to bring Dr. Modi to NYU, right?

24   A.  No.

25           I said no.

N7cWede2                        Edelman - Cross

1    Q.  OK.  And he was hired in 2017, so you'd already been at NYU

2    for a couple years?

3    A.  Yes.

4    Q.  But you didn't -- are you aware of what his salary demands

5    were coming to NYU?

6    A.  No.

7    Q.  Are you aware of what he was being paid at HIP prior to

8    joining NYU?

9    A.  No.

10   Q.  OK.  So with respect to Dr. Goldberg, Dr. Porges and Dr.

11   Modi, would you agree with me that all three had been doctors

12   longer than you had?

13   A.  Yes.

14   Q.  You would agree that all three of them had higher

15   productivity targets than you?

16   A.  Targets, yes.

17   Q.  And two of them had administrative jobs that you didn't

18   have, right?

19   A.  Yes.

20   Q.  There were some other doctors in the office on a part-time

21   basis, is that correct?

22   A.  Yes.

23   Q.  For various reasons, some doctors want to work a part-time

24   schedule, right?

25   A.  Yes.

N7cWede2                        Edelman – Cross

1    Q.  I mean at some point you stopped seeing patients on Friday,

2    but you still considered that a full-time schedule, right?

3              MR. LABUDA:  Objection.

4              THE COURT:  Overruled.

5    A.  Yes.

6    Q.  Did -- and NYU didn't have a time clock; you didn't punch

7    in in the morning and punch out at night, right?

8    A.  No.

9    Q.  They kept track of your productivity by keeping track of

10   RVUs?

11   A.  Yes.

12             MR. SCHOENSTEIN:  So, I'd like to offer into evidence

13   exhibit DD.

14             THE COURT:  Any objection?

15             MR. LABUDA:  See what DD is.

16             Yes, we'd object, if you want to have a sidebar.  We'd

17   ask for a sidebar on this issue.

18             THE COURT:  OK.  Let's do a quick sidebar.

19             (Continued on next page)

20

21

22

23

24

25

N7cWede2                          Edelman – Cross

1            (At sidebar)

2            MR. SCHOENSTEIN:  So, I intend to offer contracts for

3    Dr. Given, Dr. Li and Dr. Raminfard.  They're all other

4    rheumatologists who were working in the office, just like

5    Goldberg, Porges, Mehta.  They were all on our exhibit list.

6    They were all produced in discovery.  They are other potential

7    comparators.

8            THE COURT:  They're all in the same office?

9            MR. SCHOENSTEIN:  They're all in the same office.

10           MS. CARDONA:  Your Honor, also, we were required to

11   make objections in our final pretrial order.  These objections

12   weren't made for this.

13           MR. LABUDA:  All these other doctors, Given, etc.,

14   they're all part-time doctors.  They're not anyone that we're

15   alleging that there's a comparator to.  So I think they're just

16   irrelevant, and they're going to be confusing for the jury.

17   It's repetitive and simply not relevant, and it's confusing.

18           MS. CARDONA:  Respectfully, but you --

19           THE COURT:  The objection is overruled.  You can

20   inquire into that on redirect examination.

21           MR. LABUDA:  OK.

22           (Continued on next page)

23

24

25

1          (In open court)

2          THE COURT:  We're going to take a short, midmorning

3   break right now, a comfort break, and be back in about ten

4   minutes.

5          (Continued on next page)

1           (Jury not present)

2           THE COURT:  You may step down, Dr. Edelman.  During

3    the break, you're not to have conversations with plaintiff's

4    counsel about the substance of the case.

5           I had gotten word that the jurors wanted a comfort

6    break, so I'll see you back here in about ten minutes.

7           MR. LABUDA:  Thank you, your Honor.

8           MR. SCHOENSTEIN:  Thank you, your Honor.

9           (Recess)

10          THE COURT:  Please be seated.

11          I'll have Dr. Edelman take the stand.

12          My plan would be to try to keep going until about

13   12:45 and then take our lunch break for an hour at 12:45, as

14   long as the jury doesn't need a break earlier than that.

15          Let's bring in the jury.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

N7cWede2                          Edelman – Cross

```
 1                    (Jury present)
 2                    THE COURT:  Be seated.
 3                    Counsel, you may inquire.
 4                    MR. SCHOENSTEIN:  Thank you, your Honor.
 5                    We are offering exhibit DD into evidence, and we'd
 6        like to publish to the jury.
 7                    THE COURT:  You may do so.
 8                    (Defendants' Exhibit DD received in evidence)
 9        BY MR. SCHOENSTEIN:
10        Q.  That is the contract for Dr. Given, correct?
11        A.  Correct.
12        Q.  And he is a rheumatologist who began working on Long Island
13        in 2019?
14        A.  Yes.
15                    MR. SCHOENSTEIN:  And let's take a look at --
16        A.  I'm sorry.  Can you -- I said yes to the last question.
17        Can you scroll down in the contract?
18        Q.  Well, we're going to scroll down to page 766.
19        A.  I did want to addend my last answer.
20        Q.  Addend away.
21        A.  You asked me when he began working.  I don't know if the
22        date that the contract was signed was his start date.
23        Q.  Fair enough.
24        A.  Thank you.
25        Q.  But he did start working while you were still employed
```

N7cWede2                          Edelman – Cross

1    there?

2    A.  Yes.

3    Q.  You overlapped somewhat?

4    A.  Yes.

5    Q.  And you see he was hired at a clinical compensation rate of

6    $150,000?

7    A.  Yes.

8    Q.  And he had an RVU target of 4,050?

9    A.  Yes, that's what it says.

10   Q.  And he was a man?

11   A.  Yes.

12   Q.  So you should have been paid the same as Mr. Given?

13            MR. LABUDA:  Objection.

14            THE COURT:  Basis.

15            MR. LABUDA:  Speculation.

16            THE COURT:  Sustained.

17            MR. SCHOENSTEIN:  Let's mark exhibit BB.

18            Your Honor, I'd like to offer BB into evidence and

19   publish to the jury.

20            THE COURT:  Received.

21            (Defendants' Exhibit BB received in evidence)

22   BY MR. SCHOENSTEIN:

23   Q.  Dr. Edelman, this is the contract for Dr. Margaret Li?

24   A.  Yes.

25   Q.  And she was hired beginning of 2020, correct?

N7cWede2                          Edelman - Cross

1   A.  That's the -- yes, the date of the contract.

2            MR. SCHOENSTEIN:  And let's scroll down to 821.

3   Q.  Dr. Li is female, correct?

4   A.  Yes.

5   Q.  And like Dr. Given, she was being paid $150,000, correct?

6   A.  Yes.

7   Q.  But her RVU target was 2,734?

8   A.  Yes.

9   Q.  So she was getting the same pay as Dr. Given for a lower

10  RVU target, right?

11           MR. LABUDA:  Objection.

12           THE COURT:  Give me one moment.

13           Overruled.

14  A.  Yes, for the target.

15           MR. SCHOENSTEIN:  I'd like to mark exhibit X and offer

16  it into evidence and publish to the jury, your Honor.

17           THE COURT:  Received.

18           (Defendants' Exhibit X received in evidence)

19  BY MR. SCHOENSTEIN:

20  Q.  This is the contract for Louise Raminfard, and that was

21  another rheumatologist who joined your group in February, in or

22  about February of 2020?

23  A.  Yes.

24           MR. SCHOENSTEIN:  And let's take a look at page 852.

25  Q.  Dr. Raminfard was paid $265,000 for an RVU target of 3,900.

N7cWede2                    Edelman – Cross

1   Do you see that?

2   A.   Yes.

3   Q.   Now, did you participate in any of the negotiations for the

4   salaries of Dr. Given, Dr. Li or Dr. Raminfard?

5   A.   No.

6   Q.   Did you have any role while you were at NYU in negotiating

7   doctor compensation?

8   A.   No.

9   Q.   Do you know anything about it other than what you've

10   learned in this lawsuit?

11   A.   From what I've just read personally on my own over the

12   years.

13          MR. SCHOENSTEIN:   OK.   We can take down that exhibit,

14   please.

15   Q.   We saw before -- well, let me ask you this question.   Who

16   was your employer?

17   A.   Repeat the question?

18   Q.   Who was your employer?

19   A.   When?

20   Q.   From 2014 until May of 2021.

21   A.   There are multiple entities at NYU on my contract, so New

22   York School of Medicine, Nassau Health, New York University

23   Grossman School of Medicine.

24          MR. SCHOENSTEIN:   OK.   Since you mentioned your

25   contract, let's pull it up again.   That was previously marked

N7cWede2                    Edelman - Cross

 1   as exhibit 8, and I'd like to publish to the jury, your Honor.

 2              THE COURT:  You may do so.

 3              MR. SCHOENSTEIN:  Actually, we should use exhibit 9,

 4   because that is the renewal that was in effect in 2020.  Can we

 5   pull up exhibit 9.  Also, it has been marked, your Honor.

 6              THE COURT:  You may do so.

 7   BY MR. SCHOENSTEIN:

 8   Q.  And the header on that is NYU School of Medicine, NYU

 9   Langone Medical Center.  Do you see that?

10   A.  Yes.

11   Q.  And in the first paragraph, it says NYU School of Medicine

12   is an administrative division of NYU University and a component

13   of NYU Langone Health.  Do you see that?

14   A.  Yes.

15   Q.  And it says NYU School of Medicine and NYU Langone

16   Hospitals are collectively referred to as NYU Langone Health?

17   A.  Yes.

18   Q.  And that is what you regarded as your employer?

19   A.  Yes.  There's also the faculty group practice, and there's

20   the rheum -- Nassau Rheumatology.

21   Q.  What is NYU Langone Hospitals?

22   A.  That refer -- that refers to the hospital system owned by

23   NYU.

24   Q.  You sued an entity called NYU Langone Nassau Rheumatology.

25   Does that appear in this contract?

N7cWede2                          Edelman - Cross

1    A.  That appears in one of the contracts.

2    Q.  Well, this is the contract that was operative at the time

3    of your departure from NYU, correct?

4    A.  Yes.

5    Q.  You sued NYU Grossman School of Medicine.  Are they in this

6    contract?

7    A.  They are on the contracts.

8    Q.  On other contracts?

9    A.  I have to scroll through this contract.

10   Q.  I'm sorry?

11   A.  I have to look through the entire contract on this one.

12   Q.  OK.  So presumably -- there are seven corporate defendants

13   in this case, right?

14   A.  I would have to look at the original paperwork.  I don't

15   know the exact number.

16   Q.  OK.  And all of the corporate entities you sued you sued

17   because they are on the contract, according to you?

18   A.  Yes.

19   Q.  That is the basis of your lawsuit against them?

20   A.  Yes, they're all part of my employment.

21   Q.  And if we look at the contract and find they're not in

22   there, did you have some separate basis for suing any of those

23   corporate entities?

24   A.  I don't think so.

25   Q.  Who paid you?  What did it say on your paycheck?

N7cWede2                        Edelman - Cross

1    A.  I, I, I don't remember.

2    Q.  All right.  Let's focus now on September of 2019, which we

3    talked about, you talked about a little bit yesterday.  You

4    were under this contract that we just looked at in September of

5    2019, correct?

6    A.  What are you referring to?

7    Q.  The exhibit we were just looking at, exhibit 9, that's the

8    contract that was in effect in September of 2019?

9    A.  The November 17, 2017, contract, yes.

10   Q.  OK.  And you were working -- you had an office at Marcus

11   Avenue and you were seeing patients there regularly on Mondays,

12   Tuesdays and Wednesdays, correct?

13   A.  Yes.

14   Q.  And on Thursdays you were seeing offices in the Huntington

15   location of NYU?

16   A.  Correct.

17   Q.  Huntington was closer to your home?

18   A.  It was.

19   Q.  And it was, therefore, convenient to you one day a week to

20   go to Huntington?

21   A.  Either way.

22   Q.  And Fridays were mostly devoted to administrative work; for

23   the most part, you did not see patients on Fridays as of

24   September 2019, correct?

25   A.  Yes.

Q.  On or about September 15, 2019, Mr. Antonik, Joe Antonik,
came to your office to talk to you, right?

A.  Correct.

Q.  And he came to your office; he didn't summon you to another
office or to a conference room?  He came to you?

A.  He walked into my office, yes.

Q.  And he walked in after your office hours had concluded, I
think, you said yesterday, right?

A.  Yes.

Q.  And you told him that your contract guarantees you an
office solely for your use?

A.  I don't know if I used that exact language.

Q.  What was the language you recall using?

A.  I said that I believe that in my negotiation I was assigned
a con -- I was assigned a private office space as long as I was
full time.

Q.  You said your contract, right?

A.  Yes.

Q.  And you told him that because you thought it was in your
contract it was something you would need to look over with your
lawyer?

A.  Yes.

Q.  And you also told him that you would need to speak with
Mr. Rubin and Mr. Swirnow about the issue, right?

A.  Yes.

N7cWede2                          Edelman - Cross

Q.  Now, you said yesterday on the stand that you felt

intimidated by Mr. Antonik; you mentioned his height, right?

A.  Yes.

Q.  He's much taller than you?

A.  Yes.

Q.  And you agree with me that's not because he's a man; the

height differential is not because of his gender?

A.  No.

Q.  A six-foot-five woman could have come into your office and

been just as intimidating, correct?

A.  Correct.

Q.  You said he waved his arms a lot as he spoke to you?

A.  I -- I believe I showed the court the gestures that he

performed.

Q.  Do you agree with my characterization of waving arms?

A.  Yes.  He moved his entire body around and moved his arms,

yes.

Q.  Had you ever seen him interacting with anybody else?

A.  Is -- is there more context to this question?

Q.  Well, there will be another question after that question,

but for now the only question is --

A.  Have I ever --

Q.  Have you ever seen --

A.  Have I ever seen him interact with another human being,

yes.

N7cWede2                          Edelman - Cross

1    Q.  OK.  How often?

2    A.  Not -- very limited.  Very limited.  I couldn't even recall

3    when.

4    Q.  So you wouldn't have known prior to that meeting what his

5    ordinary mannerisms were like?

6    A.  I would be quite sure that those mannerisms would not be

7    his ordinary mannerisms.

8    Q.  But you did not know prior to that meeting what his

9    ordinary mannerisms were like?

10   A.  In my other interactions with him, I did not see him waving

11   his arms around frantically.

12   Q.  But you did not know prior to that meeting what his

13   ordinary mannerisms were like?

14            MR. LABUDA:  Objection.  Asked and answered.

15            THE COURT:  No, I don't think it's been answered.

16   Overruled.

17   A.  No.

18   Q.  You never saw him argue with a man, did you?

19   A.  No.

20   Q.  Now, you quickly ended the conversation with him and told

21   him his behavior was inappropriate, correct?

22   A.  Yes.

23   Q.  You said yesterday he lost his composure?

24   A.  Yes.

25   Q.  Did you tell him to calm down?

N7cWede2                              Edelman - Cross

A.  I did not.

Q.  Would it have been appropriate for you to tell him to calm down?

A.  No.

Q.  Well, you told him his behavior was inappropriate; isn't that, in sum and substance, the same thing as telling him to calm down?

A.  No.  I said his behavior was inappropriate and I needed to end the conversation because I thought he was going to hurt me.

Q.  And you asked him to leave?

A.  Yes.

Q.  And he immediately left?

A.  He did.

Q.  Now, you said in your testimony yesterday that at some point he muttered the word "bitch"?

A.  Yes.

        MR. SCHOENSTEIN:  And apologies, I'm going to say that word a few times because I have to do a lot of questioning about this.

Q.  We looked at several emails that you wrote to people in the employee labor relations department yesterday, and you agree with me that none of those emails refer to anybody calling you a bitch?

A.  Yes.

Q.  And we looked at a complaint you filed in the EEOC and

N7cWede2                      Edelman – Cross

1    federal court in January of 2021 yesterday, right?

2    A.  Yes.

3    Q.  And you filed that after hiring lawyers, meeting with them

4    and figuring out how to best present your case, right?

5                MR. LABUDA:  Objection.

6                THE COURT:  So, you can just answer that question yes

7    or no, or you can't answer it, but don't reveal the substance

8    of your conversations with counsel.

9    A.  I can't -- I can't answer it.

10               THE COURT:  You can answer the question.  I'm just

11   cautioning you not to reveal the substance of your

12   conversations with counsel, the advice that you got.

13               MR. LABUDA:  We'd just object, your Honor.  The form

14   of the question included the substance.

15               MR. SCHOENSTEIN:  I'll break it down, your Honor.

16   I'll withdraw and break it down.  OK?

17   Q.  You filed --

18               MR. SCHOENSTEIN:  In fact, let's put it up.  Let's put

19   what's already been admitted in evidence as QQQ.

20   Q.  We talked about this document --

21               MR. SCHOENSTEIN:  We'd publish to the jury, your

22   Honor.  Is that OK?

23               THE COURT:  That's OK.

24   BY MR. SCHOENSTEIN:

25   Q.  We talked about this document yesterday, Dr. Edelman.  This

1   was -- there's a submission to the New York State Division of

2   Human Rights and New York City Commission of Human Rights and

3   the EEOC.  Do you see that?

4   A.  Yes.

5   Q.  That's a submission you made to the city of New York, the

6   state of New York and the federal government in January of

7   2021?

8   A.  Yes.

9        MR. SCHOENSTEIN:  And if you scroll, Ms. Cardona, to

10   page P360.

11   Q.  It attached the initial complaint you filed in this case,

12   right?

13   A.  Yes.

14   Q.  And that was filed in this court also in January of 2021,

15   right?

16   A.  Yes.

17   Q.  And you see in the handwriting there it has Mr. Kataev.

18   That's the lawyer sitting right there.  You had worked with him

19   on this complaint?

20   A.  Correct.

21   Q.  And nowhere in the complaint that you filed in January 2021

22   with the city of New York, the state of New York, the federal

23   government and this court did you refer to anybody calling you

24   a bitch?

25   A.  I didn't draft this, so I don't know what gets included and

N7cWede2                          Edelman - Cross

1   what doesn't, so I can't answer to that.

2   Q.  Well, would you agree with me that it's not in this

3   document?

4   A.  It's not in the document.

5        MR. SCHOENSTEIN:  Let's mark exhibit TTT.

6   Q.  Actually, let me, before we go through the process of

7   putting in more exhibits, you recall that you filed two amended

8   complaints in this action, right?

9   A.  I don't recall that.

10  Q.  Do you recall amending the complaint a year later, in

11  January of 2022?

12  A.  I don't recall the details of that.

13       MR. SCHOENSTEIN:  Let's mark it then.  I'm going to

14  offer exhibit TTT.

15       THE COURT:  Any objection?

16       MR. LABUDA:  No objection.

17       THE COURT:  TTT is received and may be published to

18  the jury.

19       (Defendants' Exhibit TTT received in evidence)

20  BY MR. SCHOENSTEIN:

21  Q.  You see that's the first amended complaint?

22  A.  Yes.

23  Q.  And it was filed on January 22, 2022, right?

24  A.  OK.  Yes.

25  Q.  And this pleading, too, does not say anything about anybody

1    calling you a bitch?

2    A.   And I didn't draft it.  I don't know what goes in the

3    document and what doesn't, the way you might not know what goes

4    in a medical note.

5    Q.   I'm sorry.  My question was if the document refers to

6    anyone calling you a bitch.  That was just my question.

7    A.   Oh, I would have to read the whole thing.  I don't recall.

8            MR. SCHOENSTEIN:  OK.  Let's mark exhibit VVV and

9    offer it into evidence, your Honor.

10           THE COURT:  Any objection to VVV?

11           MR. LABUDA:  No, your Honor.

12           THE COURT:  VVV is received and may be published.

13           (Defendants' Exhibit VVV received in evidence)

14   BY MR. SCHOENSTEIN:

15   Q.   VVV is a second amended complaint that was filed in

16   December of 2022.  Do you see that?

17   A.   Yes.

18   Q.   And I will represent to you that this, too, does not say

19   anything about anyone calling you a bitch.  Is that consistent

20   with your recollection?

21   A.   I would have to review the document to see if that's

22   correct.

23   Q.   Now, I think you said that Mr. Antonik muttered the word?

24   A.   Yes.

25   Q.   So what was he doing when he muttered it?  Was he muttering

1    it -- was he walking out of the office?  Was he still in the

2    office?  Was he outside?

3    A.  I don't recall if it was at the beginning or the end of the

4    conversation.

5    Q.  OK.  Did he say any other words besides the word "bitch"?

6    A.  He said lots of other things.

7    Q.  At that time.

8    A.  At that time.

9    Q.  I'm sorry?

10   A.  He said lots of other things during that interaction.

11   Q.  Well, I'm talking about when he muttered the word.  When

12   you say he muttered the word "bitch," did he mutter any other

13   word --

14   A.  Oh.  No.

15   Q.  Have you ever called anyone a bitch in any context?

16           MR. LABUDA:  Objection.

17           THE COURT:  Overruled.

18   A.  I don't recall.

19   Q.  And other than that word, did he say anything in the

20   meeting with you that referred to your gender?

21   A.  I thought that his actions and how he was coming at me

22   referred to my gender, and I felt he was treating me that way

23   because of my gender.  And when he muttered that word, he

24   injected sexism into that altercation.

25   Q.  So it wasn't until he muttered that word that he injected

1  sexism into the conversation?

2  A.  I felt all of it was sexist, but that word defined it.

3  Q.  And what other words did he say, if any, that referred to

4  your gender?  Just the words.

5  A.  I don't recall if he called me a she or a her while he was

6  yelling at me.

7  Q.  So you don't know if there were any other words in that

8  conversation that referred to your gender?

9  A.  I don't recall specifically if he said she or her.

10 Q.  Following the meeting with Mr. Antonik, you called employee

11 labor relations to complain about the conversation?

12 A.  I did.

13 Q.  Now, before you did that, did you look at your contract to

14 see if you were right about it providing you office space?

15 A.  I don't remember the timing of when I actually pulled the

16 contract out.

17 Q.  I think yesterday you said when you met with Mr. Kaplan you

18 still hadn't looked at the contract.  Is that consistent with

19 your recollection?

20 A.  I believe he brought a copy of the contract to that.  There

21 might have been a printout that he handed to me.  I can't -- I

22 don't remember for sure, but I remember there being something

23 that might have been produced at that time.

24 Q.  Well, let me ask this, because there's the September 15

25 meeting with Mr. Antonik, and then there's a meeting with

N7cWede2                          Edelman - Cross

1    Mr. Kaplan ten days later, on September 25?

2    A.  Yes.

3    Q.  During that ten days, do you have a specific recollection

4    of you looking at the contract to see if you were right about

5    office space?

6    A.  I believe --

7             MR. LABUDA:  Objection.  Objection, your Honor.  In

8    fact, I think it's not ten days.  The meeting was on -- the

9    incident happened on the 16th, so it's nine days.

10             THE COURT:  Do you want to ask the question again?

11             MR. SCHOENSTEIN:  Sure.  I'll assume it was nine days.

12   I probably wrote down the wrong number.

13   Q.  In the nine days, do you have a specific recollection of

14   looking at the contract to see if you were right?

15   A.  I believe I did look at it, but I hadn't reviewed it yet

16   with my attorney.

17   Q.  OK.  That was my next question.  You hadn't yet talked to

18   your attorney about it, right?

19   A.  Yes.

20   Q.  And you hadn't yet called Mr. Rubin or Mr. Swirnow, like

21   you told Mr. Antonik you would need to do?

22   A.  Yes.  I believe that this would -- needed to be resolved

23   before January per our discussions.

24   Q.  So you thought you had some time to look at it?

25   A.  Yes.

N7cWede2                         Edelman - Cross

1    Q.   When you spoke to Ms. Pacina, you told her that the

2    contract guaranteed you space, right?

3    A.   I don't recall if I used that specific language.

4    Q.   In any event, following your conversation with Ms. Pacina,

5    Mr. Kaplan came to your office on or about September 25, 2019,

6    right?

7    A.   Yes.

8    Q.   And Nicole Lucca, an administrator, administrative

9    assistant with the group, told you that he wanted to see you?

10   A.   Yes.

11   Q.   And again, he came to your office; he didn't make you come

12   to his office; he didn't invite you to a conference room.  He

13   came to you, right?

14   A.   It would have been nice if he invited me for a meeting,

15   yes.

16   Q.   OK.  But he came to you?

17   A.   Yes.  He interrupted my hours and he came to me.

18   Q.   And you know that he went through Miriam Ruiz to schedule

19   this --

20   A.   No.

21   Q.   You know that he tried to schedule a meeting with you --

22   A.   No, I do not.

23   Q.   -- before just showing up; you know that?

24   A.   I did not know that.

25   Q.   Well, we'll hear some testimony.

N7cWede2                          Edelman - Cross

1    A.  First time I'm hearing of that.

2    Q.  In any event, you finally spoke with him in your office,

3    right?

4    A.  Yes.

5           MR. SCHOENSTEIN:  OK.  Now, since you don't think

6    necessarily you'd looked at your contract yet, let's look at it

7    right now.

8           I'd like to pull back up, your Honor, exhibit 8.

9           THE COURT:  8 is the original contract?

10          MR. SCHOENSTEIN:  It is.

11          THE COURT:  You may publish it.

12   BY MR. SCHOENSTEIN:

13   Q.  The original contract is the only one that says anything

14   about office space, right?

15   A.  Yes.

16   Q.  And let's look at that together.  It's on page D46, and

17   it's paragraph 4, and it says space, right?

18          And you see it says space provided to you -- well, I won't

19   read it into the record per the judge's comments yesterday, but

20   you see what it says about space there in paragraph 4, right?

21   A.  Yes.

22   Q.  And that doesn't say you get your own office, does it?

23   A.  No.  It says space provided to you, meaning me.

24   Q.  And in fact, there was space being provided to you on

25   Marcus Avenue and there was space being provided to you also in

N7cWede2                          Edelman - Cross

1   Huntington, right?

2   A.   I wouldn't say I could agree with that statement.

3   Q.   Well, when you went to Huntington, there was a place for

4   you to work?

5   A.   At the time that we were having this conversation, yes,

6   there was.

7           MR. SCHOENSTEIN:  Now, I'd like to scroll down to the

8   next page, D47, and let's look at the bottom paragraph.

9   Q.   And you see it says there you agree that "this agreement

10  together with schedule A, which is incorporated herein, is the

11  complete and exclusive statement of the agreement among you and

12  NYU Langone Medical Center, and shall supersede and merge all

13  prior proposals, understandings and other agreements, oral and

14  written, relating to your employment"?

15  A.   Yes.

16  Q.   So you understood that there was no agreement about an

17  office or space other than what was written in this contract?

18          MR. LABUDA:  Objection.

19          THE COURT:  Overruled.

20  A.   At the time we had this conversation, my understanding was

21  that we had a verbal agreement as well as to the understanding

22  of space.  After I spoke with Dr. Swirnow, it became more

23  apparent to me that -- what the expectation of the organization

24  was in terms of the space.

25  Q.   I'm talking about the contract.  The contract doesn't say

N7cWede2                          Edelman – Cross

1   you get your own office and says there are no other agreements

2   about this topic, right?

3   A.  Other than schedule A.

4   Q.  OK.  And this is the contract that you and Dr. Mehta and a

5   lawyer looked at and worked on in 2014?

6   A.  Yes.

7   Q.  At any point did you call Mr. Antonik to apologize to him

8   for misrepresenting what your contract said?

9              MR. LABUDA:  Objection.

10             THE COURT:  Sustained.

11  BY MR. SCHOENSTEIN:

12  Q.  Now, you know at NYU there are not enough offices to go

13  around for all the doctors; is that a fair statement?

14  A.  Yes, they had a space-utilization issue.

15  Q.  And some doctors actually have to double up in offices,

16  right; there are some doctors that are two in an office?

17  A.  Part-time doctors, yes, do do that.

18  Q.  And you were never asked to do that?

19  A.  One time they asked me to do that.

20             (Continued on next page)

21

22

23

24

25

BY MR. SCHOENSTEIN:

Q.  But you didn't?

A.  That day, I did.  Just one day.

Q.  And other doctors, besides you, used offices on different days of the week?

A.  Yes.

Q.  Let's get back to the conversation with Mr. Kaplan on September 25th.

    Now, Mr. Kaplan didn't raise his voice; correct?

A.  Yes.

Q.  And he referred to you as "doctor;" right?

A.  He did not refer to me as "doctor."  He said "doctor," but he wasn't saying "Dr. Edelman" in that sense.

Q.  He said the word "doctor"?

A.  He said the word "doctor."

Q.  And you told him you were not amenable to sharing the office?

A.  I told him that I still needed to look and determine what I needed to discuss about how this would impact my career and how it impacted my practice.

Q.  And you would agree with me that Mr. Kaplan didn't do anything that made you feel physically threatened or intimidated?

A.  No.

Q.  But you also asked him to leave?

N7CCede3                          Cross - Edelman

1   A.  Yes.

2   Q.  And immediately upon asking Mr. Kaplan to leave, he got up

3   and left?

4   A.  Yes.

5   Q.  And you never had another conversation in your entire life

6   with Mr. Antonik or Mr. Kaplan?

7   A.  I tried to, but they did not show up for the meeting, so

8   no.

9   Q.  Now, I was interested in something you said on the stand

10  yesterday.  It's on page 122 of yesterday's transcript.

11          MR. SCHOENSTEIN:  I want to read it to her, your

12  Honor, so I can ask her a question about it with leave of

13  Court.

14          THE COURT:  Okay.

15  Q.  You said in your testimony yesterday talking about this

16  meeting with Dr. Kaplan:  "I am not a child.  I'm a doctor.

17  I'm entitled to an opinion, and I'm allowed to get upset.  I'm

18  a physician and I'm a woman, and a woman can get upset.  I'm

19  allowed to have a dispute in my office and be upset, and it is

20  sexist to say to a woman calm down.  I can be upset at work,

21  the same way Dr. Forte in the office next to me might shout at

22  his assistant sometimes because he's really frustrated about

23  something.  I don't have to calm down.  That's sexist."

24      Do you recall saying that?

25  A.  Yes.

N7CCede3                          Cross - Edelman

1   Q.  And you feel very strongly about that; correct?

2   A.  I do.

3   Q.  You're entitled to your opinions and you're entitled to be

4   upset; right?

5   A.  As a female, I'm allowed to get upset at work without

6   someone treating me like I'm acting childlike and being

7   patronizing to me.

8   Q.  And you would agree men are entitled to their opinions and

9   to get upset at work?

10  A.  Yes.

11  Q.  So you would agree with me that Mr. Antonik would have

12  every right to have an opinion and get upset at work just like

13  you had the right?

14  A.  Right, but he doesn't have the right to physically

15  intimidate me, shout at me, wave his arms in front of me and

16  call me a bitch.

17  Q.  But he had a right to get upset?

18  A.  Yes, 100 percent.

19  Q.  And he didn't lose that right because he's a man?

20  A.  No.

21  Q.  And he didn't lose that right because he's tall?

22  A.  No.

23  Q.  And when Mr. Antonik exercised his right to get upset, you

24  threw him out of your office?

25  A.  I threw him out of my office because I thought he was going

N7CCede3                          Cross - Edelman

1   to hurt me.  I felt physically threatened.

2   Q.  Well, you threw Mr. Kaplan out of his office without any of

3   that happening; right?

4   A.  And I'd like to addend the wording.  I never said "threw."

5   I asked them both to leave to deescalate the situation.

6   Q.  And now you're here suing Mr. Antonik and asking this jury,

7   telling this jury that he should pay you money; right?

8   A.  I'm not -- I'm not agreeing with that statement.

9   Q.  Why aren't you agreeing with that statement?  What part

10  don't you agree with?

11  A.  I'm suing.  I'm not saying anything about anybody paying

12  money.  That's a legal issue with the law.  I don't know.

13  Q.  Hold on.  You're here, this lawsuit is in your name;

14  correct?

15  A.  Yes.

16  Q.  Are you telling the jury that Mr. Antonik should pay you

17  money or not?

18  A.  I'm asking the jury to make a decision as to whether he was

19  culpable for the things that happened.

20  Q.  Are you asking the jury to make him pay you money?

21  A.  That determination will be made at the end of the trial.

22  Q.  Right, but if you don't ask it, they don't have to decide

23  it?

24  A.  Yes.

25  Q.  So I'm asking you if you're asking this jury to make

1   Mr. Antonik pay money?

2               MR. LABUDA:  Objection.

3   A.  Most likely, yes.

4               MR. LABUDA:  Objection.

5               THE COURT:  Overruled.

6   Q.  And Mr. Kaplan, who didn't yell at all and didn't

7   intimidate you at all, you're asking the jury to make him pay

8   you money; right?

9               MR. LABUDA:  Objection.

10              THE COURT:  Overruled.

11  A.  Yes.  I'm not sure how to answer it.

12  Q.  And then later you had a phone conversation with

13  Mr. Swirnow where you ironed out the office issue for the most

14  part; right?

15  A.  Yes.

16  Q.  And Mr. Swirnow was perfectly pleasant, didn't raise his

17  voice, didn't intimidate you in any way; correct?

18  A.  Correct.

19  Q.  And you're suing him and you're asking the jury to make

20  Mr. Swirnow pay you money?

21  A.  I'm asking for culpability for not actually doing their

22  jobs when someone is harassed in workspace.

23  Q.  And you're asking the jury to make Mr. Swirnow pay you

24  money; correct?

25  A.  Yes.  I believe he's culpable for not stepping up and doing

1   what was asked of him and his code of conduct.

2   Q.  And Mr. Rubin who wasn't involved in this office fight at

3   all.  You want money from him, too; right?

4   A.  He is the senior position to all of the other defendants.

5   Q.  But he wasn't involved in the office space spat at any

6   moment; right?

7   A.  I'm not aware of his involvement.

8       I'll refer back.  It's about the HR discrimination

9   complaint, not the office space.

10  Q.  Okay.  I want to take a last look at a couple of emails on

11  that topic.

12          MR. SCHOENSTEIN:  Let's put up, please, plaintiff's

13  68.  That was admitted, your Honor, and I would like to publish

14  to the jury.

15          THE COURT:  You may do so.

16  Q.  This is part of the email exchange you had with Ms. Pacina?

17  A.  Correct.

18  Q.  And so there's a November 12th email from you to

19  Ms. Pacina.  Do you see that?

20  A.  Yes.

21  Q.  And the first line says:  "I did not receive the 10/8 email

22  reply for some reason."

23      So you had missed an email from Ms. Pacina?

24  A.  Yeah, for some reason, I only saw it when I went in the old

25  reply chain and it connected.

N7CCede3                          Cross - Edelman

1   Q.  You hadn't seen it to November, you missed it back in
2   October?
3   A.  I saw it November -- actually, I sent this November 12th.
4   So I don't know when I had realized it, but I sent this email
5   November 12th.
6   Q.  But you hadn't seen it October 8th, you hadn't seen it
7   until sometime later?
8   A.  I had corresponded in between because there's a November
9   5th email.
10  Q.  But you had missed an email from Pacina?  That's all I'm
11  asking.
12  A.  Yes.  Yeah.
13          MR. SCHOENSTEIN:  Let's put up exhibit XX.  This was
14  also previously admitted and I would like to publish, your
15  Honor.
16          THE COURT:  You may do so.
17  Q.  And this is an email directed to you from Ms. Ogbara on
18  November 18; correct?
19  A.  Yes.
20  Q.  And your testimony is you missed this email, too?
21  A.  Yes, but this --
22  Q.  This human rights issue that you were raising was very
23  important to you?
24  A.  Yes.
25  Q.  But you missed at least two emails on the issue, just

N7CCede3                         Cross - Edelman

1   missed them?

2   A.  I missed one.

3   Q.  Looks like you missed one on October 8th and it looks like

4   you missed this one on November 18th --

5   A.  The one on November 18th was not sent to me regarding from

6   Kathleen Pacina, who was my HR representative.  So even after I

7   searched for it, because after I missed the first one, I kept

8   going back and searching to make sure that the same thing

9   didn't happen, and I didn't see hers because it wasn't from

10  Kathleen.

11  Q.  It has a subject headline "HR Matter;" correct?

12  A.  Correct.  But I searched by Kathleen Pacina because that's

13  who had been contacting me.

14          THE COURT:  Ma'am, just answer the question.

15          THE WITNESS:  Sorry.

16  Q.  And it has Ms. Pacina's name in it; correct?

17  A.  Correct.

18  Q.  That was on November 18th, 2019?

19          MR. SCHOENSTEIN:  Ms. Cardona told me we hadn't had

20  that exhibit up the entire time we've been talking about it, so

21  I'm going to give her a second because I got ahead of her.

22          I'd go on to a new topic, your Honor, but I'm not

23  going to have a new topic.

24          There it was, XX.  There, published to the jury.

25          Everybody sees?  All right.

1    Q.  Just to reiterate, you see the subject was "HR Matter;"

2    right?

3    A.  It's no longer on my screen.

4    Q.  You see it, the subject, HR matter?

5    A.  Yes.

6    Q.  And you see Ms. Pacina is mentioned in the first four or

7    five words of the email?

8    A.  Yes, that's sent from her to me, yes.

9    Q.  And that was on November 18th, 2019?

10   A.  Yes.

11   Q.  And you made the point yesterday that the employee and

12   labor relations department had your phone number and your

13   email; right?

14   A.  I believe they did, yes.

15   Q.  And they could have called you at any time?

16   A.  Yes.

17   Q.  And you had the phone number and the email for the employee

18   labor relations department, didn't you?

19   A.  Yes, I had the contact for Kathleen Pacina.

20   Q.  But you did not send another email on this topic subsequent

21   to November 18th, 2019; right?

22   A.  No, I did not.

23   Q.  And you did not call Ms. Pacina again?

24   A.  No.  After I had, like, five or six emails, no, I thought

25   it was futile at that point.

1    Q.  So you didn't call or email -- by the way, do you know

2    where the employee labor and relations department was located,

3    was there a branch in your building?

4    A.  I'm not aware of one.  If they were, I would have been

5    there.

6    Q.  But you didn't call or email them the rest of November or

7    December or January, February, or any time in 2020; correct?

8    A.  I felt it was futile at that point.  Management was not

9    going to do anything about this.

10   Q.  Didn't ask you what you felt, I asked you what you did.

11   A.  That's funny.

12   Q.  Did you call, email, or otherwise try to contact anyone, an

13   employee in labor relations between November 18th, 2019 and

14   January of 2021?

15   A.  No.

16          MR. SCHOENSTEIN:  Pass the witness.

17          THE COURT:  Redirect examination.

18          THE WITNESS:  Your Honor, can I have a restroom break?

19          THE COURT:  Let's go into the redirect examination.

20          MR. LABUDA:  Just bear with us a second, your Honor.

21   We're just loading up with our technology.

22   REDIRECT EXAMINATION

23   BY MR. LABUDA:

24   Q.  Good morning, Dr. Edelman.

25   A.  Good morning.

1   Q.  I want to follow up on some questions you were asked

2   yesterday as well as today.

3       You were asked some questions about taxes yesterday.  Do

4   you remember that?

5   A.  I'm not sure.

6   Q.  When you worked in New York, did you pay federal taxes?

7   A.  Yes, I did.

8   Q.  When you started working in Florida, did you pay federal

9   taxes?

10  A.  Yes.

11  Q.  Did you have an understanding that in every state that you

12  work, you have to pay federal taxes?

13  A.  Yes.

14  Q.  Do you remember some questions yesterday about Northwell, a

15  Northwell job opportunity?

16  A.  Yes.

17  Q.  Did they ever make you a formal job offer?

18  A.  Never.

19  Q.  Did you ever receive any written contract from them?

20  A.  Never.

21  Q.  Is it fair to say that most of the interviews that you had

22  after you were terminated from NYU were in New York?

23  A.  Yes.

24  Q.  Why is it that you also looked in Florida and other states

25  for a job when you were unemployed?

A.  I was looking to get a job anywhere.  I had a lot of
responsibility, I had bills and my daughter was in college, and
part of that, I had medical insurance.  So I really needed to
get a job immediately.  I didn't have the luxury of waiting.  I
needed to secure a position.

Q.  And do you remember some questions about Yale Health Group?

A.  Yes.

Q.  Were you ever given a written contract from Yale Health
Group?

A.  I didn't receive a written contract.

Q.  Do you remember being asked some questions about seeking
some therapy from a social worker?

A.  Yes.

Q.  And I believe you said you started seeing the social worker
in or around July of 2021; is that right?

A.  Correct, yes.

Q.  Why is it that you started doing that in July as opposed to
say December or January?

A.  When I was fired, I was sort of in crisis mode.  There was
a lot of things I had to attend to.  I needed to get a job, I
most likely needed to relocate my family if I couldn't get a
job where I was.  And my focus was really on trying to ensure
that I could get appropriate schooling for my children, be able
to pay for my older daughter's tuition, be able to make sure my
husband could still make a living, as well, as well as for me

N7CCede3                          Edelman - Redirect

1   to continue practice as a physician.  I think it was after I

2   got down to Florida and we were settled down a little bit more

3   was when I really had more of a full breakdown.  It was sort of

4   like the calm after a storm and you look around and you're

5   like, wow, I can't believe my whole life was turned upside

6   down.  That was really when I was in a tough place.  There were

7   moments where I really felt that I was having not okay thoughts

8   and that's what drove me to seek counseling.

9   Q.  I want to pivot to some of the questions that you were

10  asked today, and I'll try and go in *ad seriatim* and sequential

11  order so it's easier for me.  So we may jump around a little

12  bit.

13      Do you remember some conversations about the contract

14  negotiations with NYU and them taking over the lease, your

15  lease?

16  A.  Yes.

17  Q.  Was NYU required to take over your lease?

18  A.  No.

19  Q.  They could have chosen not to take over your lease;

20  correct?

21  A.  Correct.

22  Q.  Did you understand that when NYU took over your lease, they

23  actually got value for that?

24  A.  Yes.

25  Q.  And that value was -- included a below-market rent;

1    correct?

2              MR. SCHOENSTEIN:  Objection.  Leading.

3              THE COURT:  Overruled.

4    A.  Correct.

5    Q.  And that also included the build-out, the hundreds of

6    thousands of dollars you spent on furnishing the space what you

7    considered to be spa space; correct?

8    A.  Correct.

9              THE COURT:  Try to avoid the leading.

10             MR. LABUDA:  Yes, your Honor.

11   Q.  With doctors Goldberg, Porges, and Modi, those are all

12   full-time colleagues of yours; correct?

13   A.  Correct.

14   Q.  Who was paid more between you and your male colleagues?

15   A.  Dr. Goldberg and Dr. Porges.

16   Q.  And what about Dr. Modi?

17   A.  Dr. Modi was paid more, yeah.

18   Q.  And with respect to the part-time doctors, what's the

19   difference between a full-time doctor and a part-time doctor in

20   terms of their either services or the hours they worked?

21   A.  Like, I can't speak to it at all.  I never negotiated for a

22   part-time position, I don't know how they worked.  I really --

23   I don't -- I don't know how any of -- how the benefits work

24   into their contracts and all of the other things that are

25   considered compensation.  So I can't speak to that.

1    Q.  Do you recall that in the Dr. Given contract that was shown

2    to you earlier, it indicated he was part-time; correct?

3    A.  Yes.

4    Q.  And do you have a recollection of the hours that were

5    listed?

6    A.  Of how many days he worked in the office?

7             MR. LABUDA:  Your Honor, do you have --

8             THE COURT:  You can publish it if you want.

9             MR. LABUDA:  Thank you.  Exhibit 22.

10            MR. KATAEV:  Publishing 22.

11   Q.  With Dr. Given, if you would look at page D764, his

12   employment status was part-time, 32 hours per week for

13   compensation.  Do you see that?

14   A.  Yes.

15   Q.  And with your employment status in each contract, it said

16   full-time; correct?

17   A.  Correct.

18   Q.  It did not list any hours on it; correct?

19   A.  Correct.

20   Q.  Approximately how many hours a week did you work between

21   your servicing of your patients and other related things did

22   you work for NYU on a full-time basis?

23   A.  Typically, I'd get in at 8:00 and I would leave between

24   6:30 and 7:00.  When we did late nights, I would be there from

25   10:00 in the morning until like 9:00, 9:30 at night.  And then

on Fridays for clinical, if I was doing administrative work, I
would usually leave by 3 o'clock and come in between 8:00 and
9:00.  So it was a lot more than 32 hours.

Q.  Was there also any continuing education that you did that
took time as a full-time rheumatologist?

A.  Yes.

Q.  And what was that?

A.  You always have to do continuing medical education.  So it
could be online courses and classes where you're doing reading
or watching presentations.

Q.  And with respect to the loan, is there any reference in
your contract that NYU was reducing your pay because of the
loan?

A.  There's no indication of that in my contract.

Q.  You would agree that's something that NYU could put into
the contract; correct?

A.  Correct.

Q.  And who drafted the contract, was that you or were you
given the contract by NYU?

A.  It was drafted by NYU.

Q.  You were shown some of the emails about contract
negotiations that you were asking for $280,000.  Do you
remember that?

A.  Yes.

Q.  When you were having these negotiations with NYU about your

1   salary and salary increases, did you know what the male doctors

2   were making?

3   A.  No.

4   Q.  Would that have affected your negotiations if you knew that

5   the male doctors were making more than you?

6   A.  Of course.

7   Q.  Did NYU ever tell you that?

8   A.  No.

9   Q.  You'd agree with me they could tell you that if they wanted

10  to; correct?

11  A.  Yes.

12  Q.  But they did not say anything about what the other doctors

13  were making during the negotiations; correct?

14  A.  No, they did not.

15  Q.  With respect to administrative positions, were you ever

16  offered any type of administrative position at NYU?

17  A.  I was not.  I was also not made aware of any positions that

18  were available to apply for.

19  Q.  If you look at exhibit 8 --

20          THE COURT:  You may publish it.

21          MR. LABUDA:  Yes.

22          THE COURT:  If you want to publish it, you can.

23          MR. LABUDA:  If we can publish it, your Honor.

24  Q.  There was a conversation that you did have with Dr. Porges

25  about performing research at NYU; correct?

N7CCede3                          Edelman - Redirect

1    A.  Correct.

2    Q.  And you declined that because he told you you weren't going

3    to receive any extra pay; correct?

4    A.  Yes.

5    Q.  And if you look at page D49, there's a chart about the

6    compensation.  Do you see that?

7    A.  Yes.

8    Q.  And it's broken down into four different components;

9    correct?

10   A.  Yes.

11   Q.  One is clinical; correct?

12   A.  Yes.

13   Q.  And you and all the male doctors and the female doctors, as

14   well, Dr. Mehta, received compensation for clinical work;

15   correct?

16   A.  Correct.

17   Q.  Then there's a component of pay for education leadership;

18   correct?

19   A.  Yes.

20   Q.  Research and administration leadership; correct?

21   A.  Yes.

22   Q.  So there is a component in your contract for pay for

23   research, but you were told you weren't going to get any extra

24   pay if you got involved in research; correct?

25   A.  Yes.

N7CCede3                        Edelman - Redirect

Q.  And in reviewing the contracts, you see that for the

administrative component that's listed below "research," you

saw that other male doctors were paid for that component of

their effort; correct?

A.  Yes.

Q.  You said, when you spoke to Mr. Rubin after you were

terminated, that you mentioned your human resource complaint;

correct?

A.  Yes.

Q.  And what did he say when you indicated that you referenced

your human resource complaint to him?

A.  He said "I don't know anything about that."

Q.  Now, the last email that you sent to Kathleen Pacina was on

November 12th, 2019; correct?

A.  Yes.

Q.  The last email that you received from Kathleen Pacina was

dated November 5th, 2019; correct?

A.  Yes.

Q.  Did you ever receive any response from Ms. Pacina to your

November 12th email?

A.  No.

Q.  And jumping back to your conversation with Mr. Rubin after

you were terminated, did you believe him when he said he didn't

know anything about the complaint?

A.  No, I didn't believe him.

N7CCede3                        Edelman - Redirect

```
 1   Q.  And why not?
 2   A.  Because he works directly with Josh Swirnow and directly
 3   with Mr. David Kaplan, and it just seemed very unbelievable to
 4   me that it wouldn't have been brought to his attention at some
 5   time.
 6   Q.  You were asked about RVUs.  Do you remember some of those
 7   questions?
 8   A.  Yes.
 9   Q.  And there's a target that's pegged with each doctor's
10   compensation in their agreements; correct?
11   A.  Yes.
12   Q.  It does not -- the contract does not say you're going to
13   get paid X amount of dollars per RVU; correct?
14   A.  Correct.
15   Q.  There's no, like, bonus program or commission program for a
16   certain number of RVUs; correct?
17   A.  The bonus is built in above -- it's exceeding your target
18   RVU, but not for the targeted RVU.
19   Q.  NYU could have chosen to pay doctors in that method;
20   correct?
21   A.  Yes.
22   Q.  They chose not to; correct?
23   A.  Yes.
24   Q.  That was not anything in any of the contracts; correct?
25   A.  Yes, correct.
```

1   Q.  When you interviewed at NYU and spoke to Mr. Rubin and

2   Mr. Swirnow, did you present your résumé to them?

3   A.  I don't remember.

4   Q.  Do you know if they asked you where you went to medical

5   school?

6   A.  I believe they did, yes.  I think we submitted it through

7   the liaison, the recruiter, the résumé.

8   Q.  And did you go through your years of experience in clinical

9   practice?

10   A.  Yes.

11   Q.  You were being hired as a clinical physician; correct?

12   A.  Yes.

13   Q.  Is it fair to say that there was a focus on your experience

14   as a clinical physician in your discussions with Mr. Rubin and

15   Swirnow?

16   A.  Yes, I believe their interest was that we were a busy

17   rheumatology practice.

18   Q.  And do you know whether or not these CVs that you saw

19   before, if any of those were provided to Mr. Rubin or Swirnow

20   when Dr. Modi, Porges, or Goldberg were interviewing with NYU?

21   A.  I don't know.

22   Q.  You saw these other doctors on a day-to-day basis; correct?

23   A.  Yes.

24   Q.  Would you ever speak to them?

25   A.  Yes.

N7CCede3                        Edelman - Redirect

1   Q.  And what would you speak about when you were in the office?

2   A.  Sometimes we speak about common day-to-day stuff, sometimes

3   we would talk about specific patients, what was going on, an

4   interesting case, upcoming seminars, what's going on with

5   family, that type of stuff.

6   Q.  And I want to focus your attention on, you were talking

7   about cases.  Are you talking about patient treatment?

8   A.  Yeah, sometimes if there's an interesting case, we might

9   sidebar each other and have a conversation.

10  Q.  From these conversations that you had with the other

11  doctors, did you get a sense as to what they were doing

12  compared to you?

13  A.  Yes.

14  Q.  And what was your conclusion?

15  A.  They're doing similar work, seeing patients, diagnosing and

16  treating pneumatic diseases.

17  Q.  Just jumping back to the lease, sorry for jumping around a

18  little bit, but when NYU assumed the lease, they actually took

19  the space; correct?

20  A.  Yes.

21  Q.  They didn't have to take the space if they didn't want to,

22  they could have subleased that; correct?

23          MR. SCHOENSTEIN:  Objection.  Speculation.

24          THE COURT:  Overruled.  Goes to her understanding.

25  It's received for her understanding.

1   A.  Yes, they -- I'm sorry.  Could you repeat back the

2   question.

3   Q.  I think you said you were allowed to sublease the space

4   yourself in your original lease; correct?

5   A.  Yeah, so we could have continued to sublease the space on

6   our own if NYU chose not to take the space.

7   Q.  And did you have an understanding that NYU could do the

8   same thing, as well?  They could have subleased out the space

9   if they wanted to; correct?

10  A.  Yes, of course.

11  Q.  But they chose to actually take the space and you actually

12  stayed where you were working at 1991 Marcus Avenue; correct?

13  A.  Yes.

14  Q.  That's that seamless transition we talked about yesterday;

15  correct?

16  A.  Yes.

17  Q.  Did you believe that your lease was an asset when you were

18  in private practice?

19  A.  Yeah --

20          MR. SCHOENSTEIN:  Objection.

21          THE COURT:  Sustained.

22  Q.  Let me ask you some questions again about the RVUs.

23      You were asked some questions and shown the contract for

24  Dr. Goldberg on cross examination.  Do you remember that?

25  A.  Yes.

N7CCede3                          Edelman - Redirect

1    Q.  That was exhibit 25 that defense counsel showed you; is

2    that right?

3    A.  I don't remember the number of the exhibit.

4         MR. LABUDA:  Your Honor, if the witness could -- if we

5    could publish exhibit 25 to the witness.

6         THE COURT:  You can publish 25 to the witness.

7         MR. LABUDA:  Thank you.

8    Q.  Dr. Edelman, this is Dr. Goldberg's 2017 contract; correct?

9    A.  Yes.

10   Q.  This is the one defense counsel showed you; correct?

11   A.  Yes.

12   Q.  And this is the one where he's making $500,000 a year for

13   the clinical; correct?

14   A.  Yes.

15   Q.  And in 2017, you were still making $207,000; correct?

16   A.  Yes.

17   Q.  So now, let me show you one of the other contracts from

18   Dr. Goldberg that was not shown to you, and I want you to pay

19   attention to the RVUs, particular attention to the RVUs.

20        In exhibit 24 --

21        THE COURT:  You may publish it to the jury and to the

22   witness.

23        MR. LABUDA:  Thank you.

24   Q.  In exhibit 24, this is Dr. Goldberg's 2014 contract;

25   correct?

1    A.  Correct.

2    Q.  And on page D795, at the top, he is getting paid for his

3    clinical $290,000; correct?

4    A.  Correct.

5    Q.  And you were at $207,000 at that time in '14; correct?

6    A.  Yes.

7    Q.  And your RVUs were 4966 and his are 3481; correct?

8    A.  Correct.

9    Q.  And the RVUs are for services rendered, so the harder you

10   work, you remember those questions, you agreed you would get

11   paid more; correct?

12   A.  Correct.

13   Q.  In this instance, you would agree that Dr. Goldberg, he

14   didn't have to work as hard as you and he got paid more;

15   correct?

16   A.  Correct.

17   Q.  There was some discussion about the publications that you

18   had; correct?

19       Do you remember speaking to Mr. Rubin or Swirnow about the

20   publications that you had prior to working at NYU?

21   A.  Not at all.

22   Q.  Were any of them physicians?

23   A.  No.

24   Q.  Was there any discussion about RVUs when you were meeting

25   with them?  This is in your negotiations, the verbal

1    negotiations.

2    A.  I believe we start -- yes, we did discuss that, yes.  I

3    think it was more in the general sense of how they -- so that

4    we would be aware of it.

5    Q.  We talked about Dr. Given before.  He was part-time;

6    correct?

7    A.  Yes.

8    Q.  Dr. Li, she was also part-time; correct?

9    A.  Yes.

10   Q.  And Dr. Raminfard was also part-time, as well; correct?

11   A.  Yes.

12   Q.  You had also mentioned that you believe that the employers

13   listed in exhibit -- I'm sorry.  The entities listed in

14   exhibit 8, you also considered to be your employer; correct?

15   A.  Yes.

16           MR. LABUDA:  I'd like exhibit 8 published to the

17   witness, your Honor.

18           THE COURT:  You may do so.

19   Q.  Let's go through that quickly, because I don't think we

20   went through that before.

21       With exhibit 8, it lists at the top, NYU School of

22   Medicine; correct?

23   A.  Yes.

24   Q.  It also lists NYU Langone Medical Center; correct?

25   A.  Yes.

1    Q.  And then it also lists on the first page NYU School of

2    Medicine; correct?

3    A.  You have to scroll -- yes, NYU School of Medicine, correct.

4    Q.  And it also lists NYU Hospital Center; correct?

5    A.  Yes.

6    Q.  And did you believe that since they're listed on your

7    contract, that they were all connected with your employment

8    with NYU?

9            MR. SCHOENSTEIN:  Objection.  Leading.

10           THE COURT:  Sustained.

11   Q.  What did you understand these entities were in connection

12   with your employment?

13   A.  That they were all connected with my employment, they were

14   all part of my employer.  The contract was in agreement with

15   all of these employers.

16   Q.  Have you ever heard of the Grossman School of Medicine?

17   A.  Yes.

18   Q.  And what is that?

19   A.  That's NYU's School of Medicine.  I think someone

20   interchangeably changed the name.

21   Q.  So when it says NYU School of Medicine, you also understand

22   that to mean the Grossman School of Medicine?

23   A.  That's my understanding.  I mean, they might have separate

24   entities, but that's beyond my expertise.

25   Q.  I note on D48 that your contract, back in '14, was signed

N7CCede3                         Edelman - Redirect

1    by Steven B. -- I'm sorry.  Robert I. Grossman?

2    A.  Yes.

3    Q.  Do you know if he's connected at all with that Grossman

4    School of Medicine?

5    A.  Yes.

6    Q.  What's your understanding of its connection?

7    A.  He's the dean of NYU School of Medicine, yes, Grossman.

8    Q.  So it's named after him?

9    A.  Yes.

10   Q.  There was reference on page D52 to the faculty practice

11   group in this document.  Did you have any understanding of the

12   role of the faculty practice group with respect to your

13   employment with NYU?

14   A.  Yes.  My understanding was a subdivision of the department

15   of medicine that was primarily focused on outpatient ambulatory

16   care.

17   Q.  You were asked questions about the September 16, 2019

18   incident; correct?

19   A.  Yeah.

20   Q.  And you were asked about the height of Mr. Antonik;

21   correct?

22   A.  Yes.

23   Q.  And I think counsel had indicated that he's six-five?

24   A.  Yes.

25   Q.  How many women do you know that are six-five?

N7CCede3                        Edelman - Redirect

1   A.  My daughter's crew team.

2   Q.  Really?

3   A.  Maybe close, but not quite.

4   Q.  Is it fair to say that most of the people you know that are

5   six-five are men?

6   A.  Yes.

7   Q.  You were asked some questions about the complaint that was

8   filed in this case; correct?

9   A.  Yes.

10  Q.  Do you have a law degree?

11  A.  No.

12  Q.  Do you know what goes into filing of a federal lawsuit?

13  A.  I have -- no.

14  Q.  Do you have any sense as to whether or not there's any

15  restrictions that are placed by the court in terms of what

16  content can go in and what can't go in?

17  A.  I'm not aware of those types of things.

18  Q.  Did you draft the complaint?

19  A.  No.

20  Q.  There were some other questions about you bringing

21  Mr. Antonik into this lawsuit.  Do you remember those

22  questions?

23  A.  Yes.

24  Q.  And about seeking compensation from him?

25  A.  Yes.

N7CCede3                        Edelman - Redirect

1    Q.  To your knowledge, does the complaint have any dollar

2    amounts that you're seeking with respect to Mr. Antonik,

3    Kaplan, Swirnow, or Rubin?

4    A.  No.

5    Q.  You also are bringing a claim against them for retaliation;

6    correct?

7    A.  Yes.

8    Q.  For their involvement in your termination; correct?

9    A.  Yes.

10   Q.  And you remember the email that Mr. Antonik wrote on

11   November 6th of 2020 asking for negative feedback for you;

12   correct?

13           MR. SCHOENSTEIN:  Objection.  Leading.

14           THE COURT:  Sustained.

15   Q.  But you recall the emails that were published yesterday

16   with respect to your employment from Mr. Antonik and Dr. Porges

17   and Dr. Kaplan and Mr. Swirnow; correct?

18   A.  I do.  I recall their involvement and all of those email

19   chains asking and soliciting for information.

20           MR. LABUDA:  If we could publish exhibit 86, your

21   Honor.

22           THE COURT:  Is it in evidence?

23           MR. LABUDA:  Yes.

24           THE COURT:  That's fine.

25   Q.  On the second page of this, this is the November 6th email

1   from Mr. Antonik to Dr. Porges and others; correct?

2   A.  Yes.

3   Q.  And then there was a second email from him later that day

4   with additional exemplars; correct?

5   A.  Yes.

6   Q.  And then shortly after this email, you were notified by

7   Mr. Rubin that you were terminated; correct?

8   A.  Yes.

9        MR. LABUDA:  I don't have any other questions, your

10  Honor.

11       THE COURT:  Any recross examination?

12       MR. SCHOENSTEIN:  Yes, your Honor.  Less than five

13  minutes.

14       THE COURT:  Go ahead.

15       MR. SCHOENSTEIN:  I shouldn't promise that, but --

16       Can we put back up, please, exhibit 31.

17  RECROSS EXAMINATION

18  BY MR. SCHOENSTEIN:

19  Q.  You just testified on redirect that men got paid for

20  research and women didn't; right?

21  A.  I testified that Mr. Porges -- Dr. Porges got paid for

22  research and I was not offered to get paid.

23  Q.  Let's look at that.  Let's look at Exhibit 31.

24       MR. SCHOENSTEIN:  Hey, can you guys switch off so we

25  can put up our exhibits.  Thanks.

N7CCede3                          Edelman - Recross

1              THE COURT:  You can publish 31.

2              MR. SCHOENSTEIN:  My five-minute estimate did not

3     include tech time.

4              We have the exhibit, page 858, please.

5     Q.  This was Dr. Porges' contract that we looked at before.

6     There you go.

7     A.  He had a separate addendum to this contract because --

8     Q.  I'm asking the questions, okay.  The contract here, his

9     research is blank; right?  He doesn't have compensation in this

10    2014 contract for research; correct?

11    A.  I don't believe I'm looking at the entire contract.

12    Q.  The page I'm showing you is exactly the chart your lawyer

13    showed you on your contract ten minutes ago and made a big

14    point that your research number was zero percent and

15    Dr. Porges' research number is zero percent, too; correct?

16    A.  I don't agree with that statement.

17    Q.  Is that what the document says?

18    A.  I can't speak to part of a contract.  You have to show me

19    the entire contract, as well as his second contract, because I

20    don't know at the time we discussed it if it was in this

21    contract period or additional contracts.

22    Q.  Have you ever seen a contract that paid Dr. Porges for his

23    research?

24    A.  Yes.

25    Q.  You've seen one?

1    A.  Yes, there's one produced where there's a $250,000

2    compensation.

3    Q.  For research?

4    A.  For research.

5          MR. SCHOENSTEIN:  Scroll down, please, to page 863.

6    It says "Research Revenue Target."

7    Q.  Now, do you see that he had a target of revenue of

8    $228,000?  That's what you're thinking of; right?  He had a

9    revenue target of $228,000, meaning he had to generate research

10   revenue for the school, that's what you're thinking of; right?

11   A.  No, that's not what I'm thinking of.

12   Q.  But you agree that this contract has a research revenue

13   target and your contracts never did?

14   A.  Yes.

15   Q.  And you agreed --

16         MR. SCHOENSTEIN:  If you scroll up a little bit,

17   Ms. Cardona.

18   Q.  -- that he had an RVU target of 6198 RVUs?

19   A.  We're on a different page, so I can't agree -- I can't

20   agree or disagree.  Okay.  It's there.

21   Q.  6198 RVUs.  So according to this contract, he had to

22   produce over six thousand RVUs and research revenue; correct?

23   A.  Yes, and he had two PIs working with him to produce that

24   revenue.

25   Q.  And he was at least 15 to 20 years senior to you; right?

N7CCede3                        Edelman - Recross

1    A.  He was 15 to 20 years older than me.

2    Q.  And you still maintain you should have been paid the same

3    as him?

4    A.  I should have been paid the same based on the equal work we

5    were doing.

6    Q.  Did you do any research work, ever?

7    A.  I wanted to.  I wasn't offered compensation.

8    Q.  Did you do it?

9    A.  I did not.

10   Q.  You were asked some questions at the end about the

11   complaint that was filed, your counsel asked if you wrote the

12   complaint and you said you didn't; right?

13   A.  Yes.

14   Q.  I assume, before you filed a complaint with New York City

15   Human Rights Division, the New York State Human Rights

16   Division, the federal government and this court that you read

17   it?

18   A.  I read it.

19   Q.  And you made sure it was accurate; correct?

20   A.  Correct.

21   Q.  And the events written in that complaint were accurate to

22   the best of your knowledge?

23   A.  Correct.

24   Q.  As they were in the first amended complaint, you read that

25   before it was filed?

1   A.  Yes.

2   Q.  And the second amended complaint, you read that before it

3   was filed?

4   A.  Yes.

5   Q.  And you understood it was important to tell your story in

6   its entirety in those filings?

7   A.  Yes.

8   Q.  And you were deposed in this action; right?

9   A.  Yes.

10  Q.  And the whole first day, there was an eight-hour deposition

11  of you on the first day where you were asked about your

12  conversation with Mr. Antonik, and the whole first day you

13  never said anything about him calling you a bitch; isn't that

14  correct?

15          MR. LABUDA:  Objection, your Honor.  Beyond the scope.

16          THE COURT:  Overruled.

17  A.  I wasn't asked.

18  Q.  Did you say during the eight hours of your first day of

19  deposition anything about him calling you a bitch?

20  A.  I wasn't asked.  I told Mr. Steer at my second deposition

21  when he asked me.

22  Q.  Now, your lawyer said aren't you also suing these for

23  gentlemen for retaliation; right?

24  A.  Yes.

25  Q.  And he showed you some emails?

1   A.   Yes.

2   Q.   That you're relying on in your retaliation case; correct?

3   A.   Yes, they're being used, yes.

4   Q.   Now, you didn't have those emails in January of 2021?

5   A.   Correct.

6   Q.   You didn't have any of that evidence?

7   A.   No.

8   Q.   But that's when you sued Mr. Antonik, Mr. Kaplan,

9   Mr. Swirnow, and Mr. Rubin before you even saw any of those

10  emails; right?

11  A.   Yes.

12           MR. SCHOENSTEIN:   Thank you.

13           THE COURT:   Any redirect?

14           MR. LABUDA:   One moment, your Honor.

15           No questions.

16           THE COURT:   You're excused as a witness, Dr. Edelman.

17           It's now 11:57, we'll take a five-minute comfort break

18  while the plaintiff sets up for its next witness.  For planning

19  purposes, you should assume we'll go until about 12:45 or 1:00,

20  depending on when counsel has a break.

21           (Continued on next page)

22

23

24

25

N7CCede3                                Edelman – Recross

 1            (Jury not present)

 2            THE COURT:  Mr. Labuda, your client indicated to me

 3    that she might need a comfort break.  I didn't think it was

 4    appropriate during the examination to break up the examination,

 5    but she or anybody else who needs a comfort break is welcome

 6    to, but please be back here by no later than five minutes from

 7    now.

 8            MR. LABUDA:  Thank you, your Honor.

 9            (Recess)

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Put the witness on the stand.

3          MR. LABUDA:  Your Honor, all the witnesses that we're

4    going to call now have all been deemed to be adverse witnesses.

5          THE COURT:  Right.  I ruled that you could question

6    her in that fashion.

7          Let's put her on the stand.

8          There was also a question asked of me by somebody from

9    plaintiff's firm about the exhibit list.  It would be helpful

10   to get a cumulative exhibit list at the end of each day with a

11   column indicating the day on which the exhibit was received

12   into evidence.

13         Let's bring the jury in.

14         (Jury present)

15         THE COURT:  Plaintiff, call your next witness.

16         MR. KATAEV:  The plaintiff calls Dr. Kavini Mehta,

17   your Honor.

18         THE COURT:  Please stand in the witness box as my

19   deputy administers the oath.

20         MR. SCHOENSTEIN:  If I can just make sure the witness

21   has a water, your Honor?  I'm sorry.

22         THE COURT:  Yes.  My deputy will retrieve the water

23   from you and bring it to the witness.

24    KAVINI MEHTA,

25       called as a witness by the Plaintiff,

N7cWede4                          Mehta - Direct

1          having been duly sworn, testified as follows:

2                    THE COURT:  Counsel, you may inquire.

3                    Dr. Mehta, let me instruct you to try to keep your

4     voice up and speak into the microphone, please.

5     DIRECT EXAMINATION

6     BY MR. KATAEV:

7     Q.  Good afternoon, Dr. Mehta.

8     A.  Good afternoon.

9     Q.  You are a doctor licensed in the state of New York,

10    correct?

11    A.  Correct.

12    Q.  And you obtained your bachelor of arts at NYU in chemistry,

13    right?

14    A.  Correct.

15    Q.  And you graduated from NYU in 1993, correct?

16    A.  Correct.

17                   MR. KATAEV:  I've placed up on the screen what has

18    been premarked Plaintiff's Exhibit 42.

19    Q.  Do you recognize this document?

20    A.  Yes.

21    Q.  And this is your curriculum vitae, correct?

22    A.  Correct.

23                   MR. KATAEV:  Your Honor, I offer this into evidence as

24    exhibit 42.  I understand there's no objection from defendants.

25                   MR. SCHOENSTEIN:  Correct.

 1                THE COURT:  OK.  Exhibit 42 is received.

 2                (Plaintiff's Exhibit 42 received in evidence)

 3     BY MR. KATAEV:

 4     Q.  This is your curriculum vitae, right?

 5     A.  Yes.

 6     Q.  And you went to medical school at Ross University, correct?

 7     A.  Yes.

 8     Q.  And you became a doctor for the first time in 1999,

 9     correct?

10     A.  Yes.

11     Q.  Among other jobs that you held, you were a research fellow

12     and a clinical fellow at Winthrop for four to five years,

13     correct?

14     A.  Yes.

15     Q.  And that is where you met Dr. Sari Edelman, isn't that

16     right?

17     A.  Yes.

18     Q.  And you eventually partnered with Dr. Edelman to form a

19     private practice, correct?

20     A.  Yes.

21     Q.  And you opened this practice with her in 2008, correct?

22     A.  Yes.

23     Q.  And you both had an equal share in that practice, is that

24     right?

25     A.  Yes.

1   Q.  Now, initially, when you first started, you were working

2   out of 1981 Marcus, correct?

3   A.  1991.

4   Q.  Isn't it true that you went to 1991 after starting at 1981,

5   while renovations were ongoing?

6   A.  Yes.

7   Q.  So my question was you started initially in 1981, correct?

8   A.  Correct.

9   Q.  And in order to build out that space in 1991 Marcus, Dr.

10  Edelman took out a loan to provide the start-up capital for

11  that practice, correct?

12  A.  Correct.

13  Q.  And Dr. Edelman placed her home up as collateral to get

14  that loan, right?

15  A.  Yes.

16  Q.  And you did not place any collateral to get that loan,

17  correct?

18  A.  No.

19  Q.  And it took a great amount of trust between the two of you

20  to do that, correct?

21  A.  Yes.

22  Q.  And you worked with Dr. Edelman on a daily basis in your

23  practice, correct?

24  A.  Yes.

25  Q.  And eventually, when you went to NYU together, you worked

N7cWede4                          Mehta – Direct

1    together on a daily basis there as well, correct?

2    A.  Yes.

3    Q.  You worked together day in and day out, right?

4    A.  We worked in the same practice.

5    Q.  Day in and day out, correct?

6    A.  Daily, yes.

7    Q.  And ultimately, before you went to NYU, the salaries at

8    your private practice were $200,000 a piece, correct?

9    A.  Can you say that question again?

10   Q.  Your salary, before you left for NYU, in your private

11   practice was $200,000, correct?

12   A.  Not from the beginning, no.

13   Q.  My question was before you left for NYU, your salary was

14   $200,000, correct?

15   A.  Yes.

16   Q.  OK.  And you were able to pay yourselves those salaries and

17   meet all the obligations that the practice had, correct?

18   A.  We were not paying ourselves.  We were with Nassau

19   Radiology before we joined NYU.

20   Q.  When you had your practice together with Dr. Edelman, you

21   were able to pay all of the obligations of the practice from

22   the revenue you made, correct?

23   A.  Yes.

24   Q.  You were not in default on any obligations, correct?

25   A.  No.

1   Q.  You were not a sinking ship in that practice, correct?

2           MR. SCHOENSTEIN:  Objection.

3           THE COURT:  Basis.

4           MR. SCHOENSTEIN:  Sinking ship.

5           THE COURT:  Overruled.

6           You can answer if you understand the question.

7   A.  We were paying ourselves part of our salary when we --

8   before we merged with NRad was being paid off, some of it, from

9   the business loans.

10  Q.  The ship remained afloat throughout your time at the

11  practice, correct?

12  A.  Yes.

13  Q.  And it was smooth sailing in the practice, correct?

14  A.  What do you mean by smooth sailing?

15          MR. KATAEV:  I'll withdraw the question.

16  Q.  The obligations that you paid included the SBA loan of

17  $500,000 in principal, correct?

18  A.  Yes.

19  Q.  And that was a loan that you received from the government,

20  isn't that right?

21  A.  From the bank, yes.

22  Q.  The Small Business Administration is a federal agency,

23  correct?

24  A.  Yes.

25  Q.  And you received that loan with their assistance, correct?

1    A.  Yes.

2    Q.  Now, you had met Dr. Edelman in or about 2006, and thus,

3    you've known her for almost 20 years, correct?

4    A.  Since 2006, yes.

5    Q.  And you were very close with Dr. Edelman and saw her as a

6    friend, right?

7    A.  Yes.

8    Q.  Now, because of market circumstances, you two decided

9    together to seek employment with a larger group, right?

10   A.  Say it again?

11   Q.  Because of market circumstances, you and Dr. Edelman

12   decided to seek employment with a group, isn't that right?

13   A.  Yes.

14   Q.  And that's because a group receives better compensation

15   from insurance companies, correct?

16   A.  Yes.

17   Q.  And when you two decided to do this, you didn't jump

18   straight to NYU, right?

19   A.  When we first started to seek employment somewhere else?

20   Q.  When you started evaluating your options to move away from

21   a private practice, you explored lots of available options,

22   correct?

23   A.  We first merged with Nassau Radiology.

24   Q.  And that was one of the options that you explored and acted

25   on, correct?

N7cWede4                          Mehta – Direct

1    A.  That was an option, yes.

2    Q.  And you explored other options that you did not act upon,

3    correct?

4            THE COURT:  Is there a time period?  The question is a

5    bit ambiguous.  I'm not sure whether you're referring to at the

6    time they decided to merge with Nassau Radiology or you're

7    referring to a later point in time, when they decided to sell

8    the business to NYU.  Maybe you can clarify the question.

9            MR. KATAEV:  I'll clarify, your Honor.

10           MR. LABUDA:  Your Honor --

11           THE COURT:  You may ask the question.  Go ahead.

12   BY MR. KATAEV:

13   Q.  You were involved with Dr. Edelman in a private practice

14   from 2008 until about 2014, correct?

15   A.  2008 to 2012.

16   Q.  But you only went to NYU in 2014, correct?

17   A.  2015.

18   Q.  OK.  Now, at the time that you stopped working at the

19   private practice in or about 2012, before that point, you were

20   looking into other available options to have a better lifestyle

21   than working in a private practice, correct?

22   A.  We only started looking in 2012 or the end of 2011.  I

23   can't remember now.

24   Q.  And when you started looking, you looked at a whole host of

25   available options, correct?

1    A.  I think we -- at that time we looked at, maybe, two

2    practices.

3    Q.  Now, you came across NYU because of Dr. Goldberg, correct?

4    A.  In 2014, correct.

5    Q.  And you know Dr. Goldberg because he worked in the same

6    suite as a hematology practice that you referred patients to in

7    your private practice, correct?

8    A.  I know Dr. Goldberg because he's a rheumatologist, and I

9    knew him from just being a local rheumatologist in Nassau

10   County.

11   Q.  And you know him through that hematology practice because

12   both you and Dr. Edelman made a point of networking with other

13   physicians in order to build a referral base, correct?

14   A.  Yes.

15   Q.  And you did that in order to receive referrals to your

16   practice, correct?

17   A.  It was networking.

18   Q.  And you also referred patients to other practices, correct?

19   A.  Yes.

20   Q.  And that is how you built a successful practice, isn't that

21   right?

22   A.  Sure.

23   Q.  Now, Dr. Goldberg told you and Dr. Edelman about the

24   opportunity to work at NYU, right?

25   A.  Yes.

1  Q.  And eventually, you and Dr. Edelman met with Andrew Rubin

2  and Joshua Swirnow, correct?

3  A.  Yes.

4  Q.  And you were with Dr. Edelman when both of you first met

5  Andrew Rubin and Joshua Swirnow, correct?

6  A.  Yes.

7  Q.  Swirnow was present at the meeting with you and Rubin?

8  A.  Yes.

9  Q.  And Mr. Swirnow reports to Mr. Rubin, correct?

10  A.  From what I understand.

11  Q.  And the first time that you met both of them, Mr. Rubin

12  expressed surprise that both of you were females, didn't he?

13  A.  I don't know if it was both of us or one of us.  I don't

14  remember.

15  Q.  He expressed some surprise that you were females, correct?

16  A.  I don't remember.  Maybe.  I think it was my name, that it

17  was -- I don't know.

18  Q.  Prior to today's trial, you were deposed in this case,

19  correct?

20  A.  Yes.

21          THE COURT:  Would you provide me a transcript.

22          MR. KATAEV:  Yes, your Honor.  I'll do that.

23          THE COURT:  Page and line, sir.

24          MR. KATAEV:  Page 60, your Honor.  Page 60, line 21,

25  through 61, line 6.

1            Permission to publish to the jury?

2            THE COURT:  No.  You can just ask the questions.

3            MR. KATAEV:  OK.

4   Q.  Do you see the transcript on your screen?

5   A.  I don't.  My screen is off right now.

6       Oh, now I do.  OK.

7   Q.  You testified in this deposition on November 22, 2021,

8   correct?

9   A.  Yes.

10  Q.  And I asked you questions there and you answered them,

11  correct?

12  A.  Yes.

13  Q.  And you swore to tell the truth then, correct?

14  A.  Yes.

15  Q.  And when I asked you whether Mr. Rubin ever made any

16  remarks about the fact that you or Dr. Edelman were women, you

17  initially said you don't recall, correct?

18          THE COURT:  Why don't we do it the traditional way:

19  Were you asked the following questions and did you give the

20  following answers.

21  BY MR. KATAEV:

22  Q.  And at that deposition, Were you asked the following

23  questions and did you give the following answers:

24  "Q.  Did Mr. Rubin ever make any remarks about the fact that

25  you or Dr. Edelman are women?

N7cWede4                          Mehta - Direct

1   "A.  I don't recall.

2   "Q.  Do you recall whether Mr. Rubin expressed surprise that

3   you or Dr. Edelman are or is a woman?

4   "A.  I think he mentioned surprise just based on the name.  I

5   didn't think twice about it."

6        Do you see that?

7   A.  Yes.

8   Q.  And that's what you testified to at your November

9   deposition, correct?

10  A.  Yes.

11  Q.  So Mr. Rubin did express some sort of comment about the

12  fact that you were female?

13  A.  I think.  I think that's what happened.

14  Q.  Now, at that meeting, you two -- you and Dr. Edelman --

15  discussed with Messrs. Rubin and Swirnow your prospective

16  contract with NYU, correct?

17  A.  What was the question?  What did we discuss?

18  Q.  At that meeting, the same meeting where Mr. Rubin expressed

19  surprise that you were female, you talked about your contract,

20  correct?

21  A.  I don't remember the specifics of the contract that was

22  discussed.  That was 12 years ago.

23  Q.  And you told Mr. Rubin and Mr. Swirnow that you had an

24  established practice, correct?

25  A.  Yes.

N7cWede4                          Mehta - Direct

1    Q.  You didn't tell him at that meeting that it was a sinking

2    ship, right?

3    A.  I don't use the words "sinking ship" about my practice.

4    Q.  You didn't refer to the practice as a business that's

5    failing, correct?

6    A.  I don't believe I mentioned that.

7    Q.  And you also talked about the fact that you had an

8    established referral base, correct?

9    A.  I -- I may have.  I don't remember.

10   Q.  I'm going to refer to your transcript, on page 71.

11             THE COURT:  What line?

12             MR. KATAEV:  71, line 17, through 72, line 14, your

13   Honor.

14             THE COURT:  Any objection?

15             MR. SCHOENSTEIN:  71:17 through what?

16             MR. KATAEV:  71:14.

17             MR. SCHOENSTEIN:  I object.  I think it's improper

18   impeachment to put that all in.

19             THE COURT:  Sustained.  You haven't established an

20   inconsistency.

21   BY MR. KATAEV:

22   Q.  The fact that you had an established patient base and

23   referral base is what made your practice, your private practice

24   profitable, correct?

25   A.  Yes.

N7cWede4                         Mehta – Direct

1  Q.  And in your discussions with Messrs. Swirnow and Rubin, it

2  was anticipated that a vast majority of your patients would

3  follow you to NYU, correct?

4  A.  Yes.

5  Q.  In addition, you had an infusion center in your private

6  practice?

7  A.  Yes.

8  Q.  And you anticipated that a lot of the patients that would

9  come to NYU would also need those infusions, correct?

10  A.  Yes.

11  Q.  Even though you or Dr. Edelman would not receive any wRVU

12  credit for those infusions, correct?

13  A.  Yes.

14  Q.  So there was an added benefit to NYU, separate and apart

15  from your production, with those infusions, correct?

16  A.  Yes.

17          MR. SCHOENSTEIN:  Objection.  Foundation.

18          THE COURT:  Sustained.

19  BY MR. KATAEV:

20  Q.  And we just referred --

21          THE COURT:  Sustained as to form.

22  BY MR. KATAEV:

23  Q.  We referred to wRVUs.  I'll refer to them as RVUs going

24  forward.

25      They are a unit of measure for the productivity of a

1   physician, correct?

2   A.   Yes.

3   Q.   And you typically earn those RVUs by seeing patients,

4   right?

5   A.   Yes.

6   Q.   And you get different amounts of credit in RVUs for

7   different types of tasks, correct?

8   A.   Different types of texts?

9   Q.   Tasks.

10  A.   Tasks, yes.

11  Q.   And the value of the RVU earned depends on the complexity

12  and the time spent, correct?

13  A.   Yes.

14  Q.   Whether you perform the task or another doctor performs the

15  task, both of you earn the same amount of wRVUs for the

16  relative task, correct?

17  A.   What do you mean both of us?

18  Q.   If you performed an injection, for example, and you would

19  receive, hypothetically, 15 RVUs, if another doctor performed

20  the same injection, that doctor would also receive the same

21  amount of RVUs, correct?

22  A.   I assume.  It's supposed to be standardized.

23  Q.   OK.  Another doctor would not receive more RVUs because

24  they have more experience, correct?

25  A.   I -- I only know about my RVUs.  I don't know about anybody

1   else's RVUs.

2   Q.  But you have no basis to believe that another doctor would

3   receive more in RVUs for the same task than you would just

4   based on experience, correct?

5   A.  I don't have knowledge of that.

6   Q.  But you do know that the RVU system is a standardized

7   system, correct?

8   A.  It's supposed to be.

9   Q.  The value of the RVU earned also depends on the CPT code

10  that you enter for billing, is that right?

11  A.  I assume.

12  Q.  Isn't that what you testified in your --

13          THE COURT:  Just testify to what you know.

14          Go ahead.

15  BY MR. KATAEV:

16  Q.  Isn't that what you testified to at your deposition?

17  A.  Can you show me what I testified to?

18  Q.  Sure.

19          MR. KATAEV:  Page 22.  Permission to show it to the

20  witness, your Honor?

21          THE COURT:  Let me look at page 22.

22          What lines?

23          MR. KATAEV:  It's starting at line 3 on page 22 -- I'm

24  sorry.  On page 21, line 13, through page 22, line 16.

25          MR. SCHOENSTEIN:  Objection.  Improper.

N7cWede4                          Mehta – Direct

1          THE COURT:  What's the basis on which you want to show

2     it to the witness?

3          MR. KATAEV:  To refresh her recollection as to what

4     she testified to about the CPT codes.

5          THE COURT:  Well, no.  That's conflating two different

6     things.  You can show it to her without displaying it to the

7     jury to refresh her recollection, to see if her recollection is

8     refreshed.  I'll permit you to do that.

9          MR. KATAEV:  To clarify, that's all I wanted to do,

10    not for the jury, just for the witness.

11         THE COURT:  But it's not for impeachment.  It's to

12    refresh recollection.

13         MR. KATAEV:  Fair enough, your Honor.

14         MR. LABUDA:  Can we show it to the jury, your Honor --

15    I'm sorry, to the witness?

16         THE COURT:  To the witness.

17         And the question is going to be look at these pages

18    and see if it brings back a memory to you as to whether the

19    value of an RVU earned depends on the CPT code that you enter

20    for billing.  If it brings back a recollection, then tell the

21    jury your refreshed recollection.

22    BY MR. KATAEV:

23    Q.  Please start reading from line 17, at the top, and let me

24    know when I can scroll down.

25    A.  OK.

N7cWede4                          Mehta – Direct

1        OK.  Yes.

2   Q.  So do you recall testifying at your --

3            THE COURT:  No, no.  Objection sustained.  You're not

4   going to ask her about what she testified to previously.

5   That's impeachment.  Just ask her whether this brings back a

6   memory as to the relationship of CPTs to RVUs.

7   BY MR. KATAEV:

8   Q.  Based on what you've read, do you recall now that a wRVU is

9   earned depending on the CPT code entered for billing?

10  A.  Yes.

11  Q.  And CPT stands for current procedural terminology, correct?

12  A.  Yes.

13  Q.  You also received monthly reports regarding RVUs earned

14  from NYU, correct?

15  A.  Yes.

16  Q.  After you started working there?

17  A.  Yes.

18  Q.  And those reports showed you the tasks you performed and

19  the RVUs earned for each task, correct?

20  A.  Yes.

21  Q.  And throughout your time at NYU, you were paid based on

22  your RVUs earned, correct?

23  A.  Yes.

24            MR. KATAEV:  I'd like to show to the jury Plaintiff's

25  Exhibit 11, which I believe is admitted.

N7cWede4                          Mehta – Direct

1         THE COURT:  It may be published.

2    BY MR. KATAEV:

3    Q.  These are the emails that you exchanged with Messrs. Rubin

4    and Swirnow, together with Dr. Edelman, about your contract,

5    correct?

6    A.  Yes.

7    Q.  And as of this date, you remain employed by NYU, correct?

8    A.  I remain employed by NYU.

9    Q.  And you work at NYU five days a week and always have,

10   correct?

11   A.  Say that again?

12   Q.  And you work at NYU five days a week and always have,

13   correct?

14   A.  Yes.

15         THE COURT:  You mean since she began her employment

16   with NYU.

17         MR. KATAEV:  Yes, your Honor.

18         THE COURT:  OK.

19   BY MR. KATAEV:

20   Q.  You've worked there five days a week since you began

21   working at NYU, correct?

22   A.  Yes.

23   Q.  And in the same way Dr. Edelman worked at NYU five days a

24   week, correct?

25   A.  Yes.

N7cWede4                          Mehta - Direct

Q.  And you usually saw patients for four of those days and
spent another day as an admin day, correct?
A.  For a couple of years.
Q.  But sometimes when you had an admin day, you nonetheless
saw patients on that fifth day, correct?
A.  Yes.
Q.  Urgent patients and difficult-to-schedule patients and
stuff like that, right?
A.  Yes.
Q.  And Dr. Edelman saw patients late on Wednesdays, correct?
A.  Yes.
Q.  And other doctors saw patients late on other days, correct?
A.  Yes.
Q.  And you have a private office at NYU, correct?
A.  Yes.
Q.  Your office remains private and unshared, correct?
A.  I think it's been used by some physicians when I'm not
there, but --
Q.  Having a private, unshared office is something that you
negotiated for together with Dr. Edelman, correct?
A.  Yes.
Q.  And you understood that your office was to be unshared,
correct?
A.  At the time that we started the practice, yes.
Q.  Now, when you negotiated your contract, you agreed to a

1   three-year term, right?

2   A.  Yes.

3   Q.  And you initially sought more in compensation than what you

4   actually contractually agreed to, correct?

5   A.  Can you repeat that?

6   Q.  When you first started negotiations, you sought more in

7   compensation than what you were ultimately given, correct?

8   A.  Yes.

9   Q.  Would I be right to say you sought $280,000 as a salary?

10  A.  Yes.

11  Q.  And that's the same compensation that Dr. Edelman sought,

12  correct?

13  A.  Yes.

14  Q.  And the reason why you were told you were being paid

15  $207,000 was because of the loan that was being assumed by NYU,

16  correct?

17  A.  Yes.

18  Q.  You weren't told anything about your level of experience,

19  correct?

20  A.  Correct.

21  Q.  You weren't told anything about your ability to produce,

22  correct?

23  A.  Correct.

24  Q.  Do you have an understanding as to the remaining principal

25  balance of that loan?

N7cWede4                         Mehta – Direct

1   A.  Current remaining balance?

2   Q.  No.  As of the time you were negotiating this contract.

3   A.  I don't remember.  Off the top of my head, no.

4   Q.  NYU received things of value for assuming the lease,

5   correct?

6   A.  Can you clarify?

7   Q.  When they assumed your lease, they had the right to use

8   that space to make profit in another practice, correct?

9   A.  They assumed the lease of our practice.

10  Q.  And it's your understanding that they ultimately placed

11  another group of doctors there, right?

12  A.  They used it for other -- I don't know who they placed

13  there.

14  Q.  But you know that they used it?

15  A.  Yes.

16  Q.  OK.  And if you were unable to have them assume that lease,

17  you would have subleased that space to someone, correct?

18  A.  Yes.

19  Q.  Because you viewed that lease as an asset, correct?

20  A.  As an asset?

21  Q.  Correct.

22  A.  I don't know if I viewed it as an asset.  It was a lease

23  that we were responsible for, for the duration of the term.

24  Q.  When you negotiated that lease, you got a very favorable

25  rent rate, correct?

1    A.  It was the going rate.  I don't know if it was a favorable

2    rate.

3    Q.  Now, going back to the loan, you used the proceeds of that

4    loan to build out that practice, correct?

5    A.  We used the loans to build out the practice.

6    Q.  In other words, to buy equipment and furniture and things

7    of that nature, correct?

8    A.  Yes.

9    Q.  And you did it so that the space was presentable for

10   patients when they came in, is that right?

11   A.  Yes.

12   Q.  You also hired a designer to build out that space, correct?

13   A.  Yes.

14   Q.  And there were construction costs involved in building that

15   practice out, isn't that right?

16   A.  I'm not sure if we beared the cost of the constructions or

17   if the landlord assumed some of the construction costs.  I

18   don't remember now.

19   Q.  Either way, you received the value of the construction,

20   right?

21   A.  Yes.

22   Q.  Even better if the landlord paid for it, correct?

23   A.  Sure.

24          MR. KATAEV:  I'm going to show Plaintiff's Exhibit 37.

25   Permission to show it to the witness?

 1              THE COURT:  Yes.  Is there an objection to 37?

 2              MR. SCHOENSTEIN:  No, your Honor.

 3              THE COURT:  Are you offering it, counsel?

 4              MR. KATAEV:  Yes, your Honor.

 5              THE COURT:  37 is received and may be published to the

 6      jury if you would like.

 7              (Plaintiff's Exhibit 37 received in evidence)

 8      BY MR. KATAEV:

 9      Q.  This is your contract with NYU, right?

10      A.  Yes.

11      Q.  And whatever the terms are that you have in here, they're

12      the same terms, in sum and substance, as Dr. Edelman's,

13      correct?

14      A.  Yes.

15      Q.  Whenever you negotiated any addition, removal or change in

16      these terms, you sought it equally, correct?

17      A.  Yes.

18      Q.  I'm going to point to you the bottom of the page of D911 in

19      this exhibit.  It's entitled lease/sublease/business loan.  Do

20      you see that?

21      A.  Yes.

22      Q.  And it says in here that NYU accepted an assignment and

23      assumption of that lease for your office, correct?

24      A.  Yes.

25      Q.  And in addition, it assumed the sublease of all the office

1   leases, the equipment leases, utility contracts, maintenance

2   contracts, service contracts and similar contracts relating to

3   the day-to-day operations of the practice, correct?

4   A.  Yes.

5   Q.  And it included the outstanding loan payments on your

6   practice -- on your business loan, for the buildout of the

7   practice, correct?

8   A.  Yes.

9   Q.  Going back to the amount that you ultimately agreed to

10  accept for your compensation, that was the number that NYU

11  originally offered you, correct?

12  A.  Yes.

13  Q.  So even though you attempted to negotiate a much higher

14  amount, NYU refused, correct?

15  A.  This is what they had offered, and we accepted.

16  Q.  But they refused to give you the amount that you sought

17  that you testified about earlier, 280,000, correct?

18  A.  Yes.

19  Q.  And you sought numbers in between 207 and 280, and they

20  still refused, correct?

21  A.  I think they -- yes.

22  Q.  OK.  And this salary of 207,000 remained the same for you

23  all three years of this term, correct?

24  A.  Yes.

25  Q.  Focusing on the reimbursement of business expenses

1   provision, you were capped at $3,000, right?

2   A.   Yes.

3   Q.   And you learned at your deposition in October of '21, when

4   you reviewed the contracts of the male doctors, that they did

5   not have such a cap, correct?

6   A.   That's what was presented to me during the deposition.

7   Q.   And you read that for yourself at the deposition, correct?

8   A.   Yes.

9   Q.   And prior to that time, you had no idea that there was no

10  cap on the male doctors' business expenses, correct?

11  A.   I didn't.

12  Q.   Focusing on the bottom of D908 of this exhibit, in exchange

13  for the $207,000 you were offered and accepted, you had to

14  produce 4,912 RVUs, correct?

15  A.   Yes.

16  Q.   And when you divide your salary into those RVUs, you only

17  got $42.14, assuming you met your target, correct?

18  A.   If that's what it comes out to with the math.

19  Q.   You were told by NYU that they did a business analysis to

20  come up with this target and your salary, correct?

21  A.   Yes.

22  Q.   But they never shared this business plan with you, did

23  they?

24  A.   I don't believe so.

25  Q.   And to your knowledge, did that business plan have any

N7cWede4                         Mehta – Direct

1    reference to RVUs in it?

2    A.   We were not RVU-based before we met with NYU.

3    Q.   When you met with NYU, they asked you for the data so that

4    they could see how many RVUs you produced, didn't they?

5    A.   They asked to see -- I guess the analysis was based on the

6    patient volume and our reimbursement rates or collections,

7    because we were not RVU-based before.  That was their analysis.

8    Q.   And you discussed this analysis with them during the

9    negotiations, correct?

10   A.   I don't remember.

11   Q.   After your first three years, you renewed your agreement

12   with NYU, correct?

13   A.   Yes.

14   Q.   And you again negotiated your contract together with Dr.

15   Edelman, isn't that right?

16   A.   Yes.

17        MR. KATAEV:  I'll place up on the screen what will be

18   marked as Plaintiff's Exhibit 12.

19        THE COURT:  I think 12 is in evidence.

20        MR. SCHOENSTEIN:  Yes, your Honor.

21        THE COURT:  You can put it on the screen and publish

22   it to the jury if you'd like.

23        MR. KATAEV:  Thank you, your Honor.

24   Q.   In these emails, whatever Dr. Edelman sent was sent on

25   behalf of herself and for you, correct?

N7cWede4                          Mehta - Direct

1    I'm focusing your attention on this part.

2              THE COURT:  Why don't you start the question again,

3    because you had asked a question about all of the emails, and

4    now you're focusing her just on one.

5    BY MR. KATAEV:

6    Q.  With respect to the email that Dr. Edelman sent to

7    Mr. Swirnow on November 13 of 2017 --

8              THE COURT:  At 7:31 p.m.

9    BY MR. KATAEV:

10   Q.  -- 7:31 p.m., you negotiated this contract together with

11   Dr. Edelman, correct?

12   A.  We -- we started the negotiations together, yes.

13   Q.  And you sought to negotiate certain aspects of your

14   agreement, right?

15   A.  Yes.

16   Q.  You wanted your RVU target to remain the same, for example,

17   right?

18   A.  Yes.

19   Q.  And you also wanted a higher salary than what they offered

20   you, correct?

21   A.  Yes.

22   Q.  And the only way they gave you a higher salary was by

23   removing the business expense reimbursement and adding it into

24   your salary, isn't that right?

25   A.  I believe so.

N7cWede4                         Mehta - Direct

1    Q.  Now, NYU told you that they could increase your salary to

2    270 only because your loans had already been paid off, correct?

3    A.  Yes.

4    Q.  That was the sole reason that you got an increase, correct?

5    A.  That was a part of the initial negotiations in 2014, is

6    that when the business loan was paid off, that amount would be

7    added back into our salaries.

8            MR. KATAEV:  I want to mark for identification

9    Plaintiff's Exhibit 38.  I believe it's already been admitted.

10           MR. SCHOENSTEIN:  It's not been admitted, your Honor.

11           THE COURT:  Any objection to 38?

12           MR. SCHOENSTEIN:  No.

13           THE COURT:  38 is received and may be published to the

14   jury.

15           (Plaintiff's Exhibit 38 received in evidence)

16   BY MR. KATAEV:

17   Q.  Now, this is your second contract with NYU, right?

18   A.  Yes.

19   Q.  And it's for another three-year term, correct?

20   A.  Yes.

21   Q.  And in here, your compensation is increased to 270,000,

22   right?

23   A.  Yes.

24   Q.  But your RVU target decreased by, I believe, 12 RVUs,

25   correct?

1   A.   That's what the number says.

2   Q.   And that was because you did not earn as many RVUs,

3   correct?

4   A.   I don't think the 12 RVUs is significant.

5   Q.   It was reduced, though, wasn't it?

6   A.   Yes.

7   Q.   Are you aware as to how many RVUs Dr. Edelman produced

8   during the same three-year period?

9   A.   No.

10   Q.   Are you aware that she earned 5,200 RVUs, and her target

11   increased?

12   A.   No.

13            MR. KATAEV:   I'm going to go back to exhibit 12, which

14   is already admitted.

15   Q.   In the November 13, 2017, email on the bottom, at 11:23

16   a.m., Josh Swirnow -- well, read that and just tell me when

17   you're done.

18   A.   OK.

19   Q.   Based on this email, it's fair to say, isn't it, that Dr.

20   Edelman earned 5,200 RVUs during the same period?

21   A.   Yes.

22   Q.   So she was more productive than you, correct?

23   A.   More productive?   Her RVUs were higher than mine.

24   Q.   Which means she was more productive, correct?

25   A.   It means her RVUs were higher than mine.

N7cWede4                        Mehta – Direct

1   Q.   Because she did more tasks that earned her more RVUs,

2   correct?

3   A.   Maybe she had more office hours than I had and was able to

4   see more patients.

5   Q.   And that would make her more productive, correct?

6   A.   That would make it a higher RVU.

7   Q.   You next negotiated your agreement with NYU after this

8   contract expired, correct?

9   A.   Say it again?

10  Q.   You next negotiated a third agreement with NYU after the

11  second contract expired, correct?

12  A.   Yes.

13  Q.   And that occurred in or about February 2021, correct?

14  A.   Yes.

15  Q.   And that was about a month after Dr. Edelman filed this

16  lawsuit in January of '21, correct?

17  A.   I don't know when she filed the lawsuit.

18  Q.   I'm going to show you what's already been received in

19  evidence as plaintiff's complaint, exhibit RRR.  I'll represent

20  to you that this is the as-filed complaint in this case.  Do

21  you see the date on top?

22  A.   Yes.

23  Q.   And so it's true that Dr. Edelman filed her complaint in

24  January of '21, correct?

25  A.   That's what it says.

N7cWede4                          Mehta – Direct

1    Q.  And you negotiated your contract in February of '21,

2    correct?

3    A.  Negotiations started earlier.

4    Q.  But the agreement was signed in February of '21, correct?

5    A.  My contract, initial contract, had expired the end of

6    January of 2021, and the contract was to be renewed February of

7    2020, but the negotiations started the end of 2020.

8    Q.  And that's because of Covid, correct?

9    A.  That's not because of Covid.

10   Q.  For this third contract, you did not negotiate together

11   with Dr. Edelman, correct?

12   A.  Correct.

13             MR. KATAEV:  I'd like to offer exhibit 39.

14             THE COURT:  Dr. Mehta, you testified, or the reporter

15   got it down, that the contract was to be renewed February of

16   2020.

17             Did you mean to say February of 2021?

18             THE WITNESS:  February of 2021, correct.

19             THE COURT:  Go ahead, counsel.

20             MR. KATAEV:  I'd like to offer exhibit 39.

21             MR. SCHOENSTEIN:  No objection.

22             THE COURT:  39 is received and may be published to the

23   jury.

24             (Plaintiff's Exhibit 39 received in evidence)

25             THE COURT:  I'm not sure RRR is in evidence.  I think

N7cWede4                         Mehta – Direct

1    it was offered into evidence, but is there any dispute that RRR

2    is in evidence.

3            MR. KATAEV:  No, your Honor.

4            THE COURT:  OK.

5            And I see defendants shaking their head that there's

6    no dispute that RRR is in evidence.

7            MR. SCHOENSTEIN:  It can be in evidence.  I don't

8    think we actually did offer it, but we can put it in evidence.

9            THE COURT:  OK.  So RRR is received.

10           (Defendants' Exhibit RRR received in evidence)

11   BY MR. KATAEV:

12   Q.  Showing you Plaintiff's Exhibit 39, this indicates that you

13   received a $10,000 raise, correct?

14   A.  Yes.

15   Q.  And it did, in fact, occur in February of 2021, correct?

16   A.  That was the effective date.

17   Q.  And to your knowledge, you have the same RVU target?

18   A.  Yes.

19           MR. KATAEV:  I'd like to offer Plaintiff's Exhibit 40

20   in evidence.

21           THE COURT:  Any objection?

22           MR. SCHOENSTEIN:  No.

23           THE COURT:  40 is received and may be published to the

24   jury.

25           (Plaintiff's Exhibit 40 received in evidence)

1    BY MR. KATAEV:

2    Q.  Now, this is the third renewal, correct?

3    A.  Yes.

4    Q.  And it says November 24, 2020, at the top, right?

5    A.  Yes.

6    Q.  But it reflects your increased compensation from February

7    of '21, correct?

8    A.  Correct.

9    Q.  Do you have any knowledge as to why there's a discrepancy

10   in these dates?

11   A.  Can you clarify?

12   Q.  Well, the previous exhibit says February '21, but this

13   contract is dated November 2020, preceding it?

14   A.  Sure.  That's when the negotiations started, but the

15   effective date was to begin after the end of my previous

16   contract.

17   Q.  OK.  And like Dr. Edelman, you could not be terminated

18   except for cause, correct?

19   A.  Correct.

20   Q.  But in this contract, NYU inserted a provision that allowed

21   them to terminate you for cause if you disparaged them,

22   correct?

23   A.  Yes.

24   Q.  It says in here that you could be terminated for cause if

25   you engaged in conduct, such as speech, that would have a

1   detrimental effect upon the reputation of NYU, right?

2   A.   Does it say speech?  I'm not reading it correctly?

3           MR. KATAEV:  I'm going to read it into the record.

4           MR. SCHOENSTEIN:  Objection.  Relevance.

5           THE COURT:  Overruled.

6   BY MR. KATAEV:

7   Q.   At the top it says, "your employment, faculty appointment

8   and this agreement may be terminated by NYU for cause."

9       I'm going to skip the tenured part because I believe you're

10  not tenured.

11      It says here, NYU has determined that the following are

12  instances of cause and of "conduct of a character seriously

13  prejudicial to a faculty member's teaching or research or to

14  the welfare of the university."  and then it lists several

15  bullet points, correct?

16  A.   Yes.

17  Q.   To your knowledge, these initial bullet points were always

18  in your contract, correct?

19  A.   I believe so.

20  Q.   But this provision was added after Dr. Edelman filed her

21  lawsuit, correct?

22  A.   That I don't know.

23  Q.   You weren't aware that NYU slipped this provision in in

24  your latest contract?

25          MR. SCHOENSTEIN:  Objection.

N7cWede4                          Mehta – Direct

1          THE COURT:  Sustained.

2     BY MR. KATAEV:

3     Q.  You didn't read the contract fully before you signed it?

4     A.  I read it.  I don't remember all the details of the

5     contract.

6     Q.  It's fair to say that you're prohibited from saying

7     anything bad about NYU, correct?

8               MR. SCHOENSTEIN:  Objection.

9               THE COURT:  It goes to her understanding.  I'll permit

10    it.

11              What's your understanding?

12              THE WITNESS:  I can say whatever I want.  It's my

13    opinion.

14    BY MR. KATAEV:

15    Q.  Did you have this agreement reviewed by an attorney?

16    A.  Can you -- can you say it again and clarify?

17    Q.  This agreement that's in front of you, did you have it

18    reviewed by an attorney?

19    A.  Yes.

20    Q.  Now, in October of 2020, you and Dr. Edelman discussed via

21    text message your renewal, correct?

22    A.  We had several text messages, and we were discussing

23    renegotiations.

24    Q.  OK.  And in October of 2020, both of you understood that

25    you would be renewed, correct?

1              MR. SCHOENSTEIN:  Objection.

2              THE COURT:  Sustained.

3    BY MR. KATAEV:

4    Q.  In October of 2020, it was your understanding that your

5    contract would be renewed, correct?

6    A.  Yes.

7    Q.  And you had no basis to believe that Dr. Edelman's contract

8    would not be renewed, correct?

9    A.  I didn't have any understanding of whether she was going to

10   be renewed or not renewed.

11   Q.  In your text messages you discussed learning about what

12   other doctors make per RVU, correct?

13   A.  I didn't know any of the other doctors' salaries or

14   compensation.

15   Q.  But you discussed learning about it in order to position

16   yourself for negotiations, correct?

17   A.  We were texting about inquiring about other doctors' RVUs

18   and compensations.

19   Q.  And that was for the purpose of positioning yourself to

20   negotiate, correct?

21   A.  Yes.

22   Q.  And learning that information would have helped you to get

23   a higher salary potentially, right?

24   A.  Potentially.

25   Q.  And it was your understanding that the higher the RVU

N7cWede4                          Mehta – Direct

1    target the higher the pay, correct?

2    A.  The higher the RVU cost –– yes.

3    Q.  You also discussed which of the male doctors would be or

4    would not be willing to share the information that you sought

5    to learn, correct?

6    A.  Yes.

7    Q.  And you determined that Dr. Porges was unlikely to share

8    the information, correct?

9    A.  Correct.

10   Q.  But you thought that Dr. Goldberg might because he was the

11   doctor that referred you there, correct?

12   A.  I believe so.

13   Q.  And you also talked about Dr. Modi being willing to share

14   information because he went to fellowship with you and Dr.

15   Edelman, correct?

16   A.  Yes.

17   Q.  That was at Winthrop, right?

18   A.  Yes.

19   Q.  During your discussions via text message with Dr. Edelman,

20   you assumed that you were not being paid equally in comparison

21   to the male doctors, correct?

22   A.  That was the assumption.

23   Q.  And in fact, you discussed obtaining equal salaries for the

24   same productivity, correct?

25   A.  Correct.

N7cWede4                          Mehta - Direct

```
 1   Q.  That's why you wanted to find out the dollar value per RVU
 2   target, correct?
 3   A.  Yes.
 4   Q.  Now, what work do you do as a rheumatologist?
 5   A.  What is your question?
 6   Q.  Is it fair to say that you see patients as part of your
 7   duties as a rheumatologist?
 8   A.  I see patients.
 9   Q.  And you evaluate and consult with them, correct?
10   A.  Yes.
11   Q.  And to your knowledge, all the other rheumatologists do the
12   same type of work, correct?
13   A.  Yes.
14   Q.  You did the same work that Dr. Edelman did when you were at
15   NYU, correct -- when she was at NYU?
16   A.  We all saw patients, yes.
17   Q.  And you all diagnosed them, correct?
18       And you discussed the cases together, isn't that right?
19   A.  We discussed some cases together.
20   Q.  And that forms the basis for your knowledge that the
21   doctors that you worked with did the same work as you, correct?
22   A.  As rheumatologists, your practices are similar.  You see a
23   similar subset of patients.
24   Q.  Is it fair to say that the work --
25           THE COURT:  Counsel, it's 12:58, so when you get to a
```

N7cWede4                              Mehta - Direct

1    convenient breaking point, let's take our lunch break.

2              MR. KATAEV:  Sure.  One or two minutes.

3    Q.  Is it fair to say that the work that you did as doctors --

4    that's including you, Dr. Edelman, Dr. Porges, Dr. Modi and

5    Dr. Goldberg -- that your work was substantially similar to

6    each other?

7    A.  Yes.

8              MR. KATAEV:  OK.  We could stop now.

9              THE COURT:  OK.  Members of the jury, it is just about

10   1 o'clock, so we're going to take our lunch break.  We're going

11   to reconvene promptly at 2 o'clock.

12             Have a good lunch.  Please do not talk about the case

13   amongst yourselves during the break.  Don't talk about the case

14   with anyone else.  Don't do any research.  We're still

15   receiving all the evidence, so until all the evidence is in and

16   until after I give you your instructions, you're not to discuss

17   the case among yourselves.

18             Have a good lunch.  See you back here by 2 o'clock.

19             (Continued on next page)

20

21

22

23

24

25

N7cWede4

1          (Jury not present)

2          THE COURT:  Dr. Mehta, you may step down.

3          During the break, you're not to have any conversations

4     about the substance of the case with counsel for the

5     defendants.  And please try to be back here, maybe, at ten of

6     two.

7          Same thing with all counsel.  Please be back here at

8     ten of two.

9          You may be seated.

10         Now, plaintiff's counsel had something that they

11    wanted to mention to me about the jury charge.

12         MR. LABUDA:  Yes, your Honor.

13         I wanted to just say with respect to the issue of the

14    super HR department that was --

15         THE COURT:  Super personnel department, I think, is

16    the quote from the Second Circuit.

17         MR. LABUDA:  Again, with the mixed motive, I think I

18    would just ask the Court to consider adding in some type of

19    language about a pretext involved there, that just because they

20    come up with some reason doesn't mean that that's sufficient.

21         That was one thing.

22         And I would note, just from the conversation -- the

23    testimony today, there's some concern about the defendants

24    raising the seniority system, because there's a lot of

25    testimony on cross-examination about the other doctors and

N7cWede4

```
 1   their seniority.  So we'd just ask the Court to consider that

 2   in terms of the revised instructions.

 3            THE COURT:  OK.  Anything else from plaintiff before

 4   we break for lunch?

 5            MR. LABUDA:  No, your Honor.

 6            THE COURT:  What about from defendants?

 7            MR. SCHOENSTEIN:  No, your Honor.

 8            THE COURT:  OK.  Again, please try to get here by ten

 9   of two, and we're going to go until 5 o'clock today.

10            Thanks, everybody.

11            (Luncheon recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    AFTERNOON SESSION

2                         2:01 p.m.

3          (In open court; jury not present)

4          THE COURT:  Let's have the witness resume her seat.

5          And let's bring the jury in.

6          Dr. Mehta, I want to remind you you're still under

7     oath.

8          THE WITNESS:  Yes.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (Jury present)

 2              THE COURT:  Counsel, you may inquire.

 3   BY MR. KATAEV:

 4   Q.  Welcome back, Dr. Mehta.

 5   A.  Hi.

 6   Q.  The salary of $280,000 that you receive now is the salary

 7   you sought six years ago; correct?

 8   A.  Yes.

 9   Q.  It took you six years to get the salary that you originally

10   wanted; right?

11   A.  Yes.

12   Q.  And it's fair to say, isn't it, that you report directly to

13   Joseph Antonik, who is the site director?

14   A.  I don't report to Joseph Antonik.

15   Q.  But he's viewed as someone who had some managerial

16   authority over you?

17   A.  No.

18   Q.  He can't have you fired; correct?

19   A.  Not that I'm aware of.

20   Q.  Same thing with David Kaplan, right, he doesn't have the

21   power to have you fired; correct?

22   A.  No.

23   Q.  And that would apply equally to Dr. Edelman; correct?

24   A.  I would assume, yes.

25   Q.  It's Mr. Rubin and Swirnow that have the ability to hire

1   and fire physicians; correct?

2   A.  I believe so.

3   Q.  They're the ones that on-boarded you and hired you;

4   correct?

5   A.  Yes.

6   Q.  They were the only people that you met with in order to get

7   a job at NYU; correct?

8   A.  We met with some of the rheumatologists in the NYU faculty.

9   Q.  But those rheumatologists did not have the ability to hire

10  or fire you; correct?

11  A.  I don't believe so.

12  Q.  Just Rubin and Swirnow had the ability to do that; correct?

13  A.  I believe.

14  Q.  And those individuals are here today in the courtroom;

15  correct?

16  A.  Who are you referencing?

17  Q.  Mr. Rubin and Mr. Swirnow.

18  A.  They're not here right now.

19  Q.  They were here today; correct?

20  A.  Yes.

21  Q.  Earlier, we talked about infusions.  Do you recall that

22  testimony?

23  A.  Yes.

24  Q.  In your private practice when you performed infusions or

25  when Dr. Edelman performed infusions, you received that money

N7CCede5                         Mehta - Direct

1   directly to your precise practice; correct?

2   A.  Yes.

3   Q.  You enjoyed the benefit of that production; correct?

4   A.  Sure.

5   Q.  In NYU, you did not enjoy the benefit of any production of

6   infusions; correct?

7   A.  Correct.

8   Q.  NYU enjoyed that; correct?

9   A.  Sure.

10  Q.  So that's a benefit that you lost in moving over to NYU;

11  correct?

12  A.  It was not a great benefit.  There was not a lot of revenue

13  generated from infusions.

14  Q.  But NYU nonetheless got that benefit?

15  A.  Yes.

16  Q.  Going back to the text message exchange we were discussing

17  before, do you recall -- withdrawn.

18      You recall that Dr. Edelman informed you that Dr. Modi's

19  RVU target was over 6000 RVUs; correct?

20  A.  Yes.

21  Q.  And both of you expressed surprise and disbelief he was

22  actually meeting that target; correct?

23  A.  I think we questioned it, yes.

24  Q.  You wanted to -- either you or Dr. Edelman characterized

25  that as impossible; correct?

N7CCede5                         Mehta - Direct

1    A.  I don't know which one of us said it was impossible -- or

2    was it possible or impossible.

3            MR. KATAEV:  I'd like to publish what was previously

4    admitted as Plaintiff's Exhibit 108.

5            THE COURT:  You may do so.

6            MR. KATAEV:  We can show it to the jury; right?

7            THE COURT:  Yes.

8    Q.  These are the text messages from October 2020 that we've

9    been discussing; correct?

10           THE COURT:  Do the jurors have it up on their screens?

11           JUROR:  No.

12           THE COURT:  Let's wait for them.

13           Jurors have it now?

14           JUROR:  Yes.

15           THE COURT:  All right.  Go ahead.

16   Q.  These are the October 2020 text messages that we've been

17   discussing; correct?

18   A.  Yes.

19   Q.  At the bottom of this text message exchange, Dr. Edelman

20   said I know -- I know his RVU -- I'm paraphrasing.  I know his

21   RVU because he slipped up his goal last year.  Impossible he's

22   seeing that many more visits per year.

23       That's what she said; correct?

24   A.  Yes.

25   Q.  And you agreed with that statement at the time you two

N7CCede5                          Mehta – Direct

1    discussed it; correct?

2    A.  Yes.

3    Q.  You also discussed the fact that every male physician had a

4    title at NYU; correct?

5    A.  Not every male physician.

6    Q.  Dr. Modi didn't; right?

7    A.  Not that I know of.  He's at a different practice.  I don't

8    know his title there.

9    Q.  And he started later; isn't that right?

10   A.  Yes.

11   Q.  Three years later than you, Dr. Edelman, Porges, and

12   Goldberg?

13   A.  I believe so.

14   Q.  But you were never offered any such title, were you?

15   A.  No.

16   Q.  And you were never even informed about the availability of

17   such a title?

18   A.  No.

19   Q.  And this kind of administrative title would be perfect for

20   you in a sense, wouldn't it?

21   A.  No.

22   Q.  Isn't it true that you ran a private practice and managed

23   employees?

24   A.  Sure.

25   Q.  And so you were qualified to do that work, weren't you?

N7CCede5                          Mehta - Direct

A.  Just because I was qualified didn't mean I wanted it.

Q.  If you wanted it, you would have been qualified to do it;
correct?

A.  I would be qualified to do it.

Q.  But you were never given that opportunity, were you?

A.  I was never given the opportunity nor did I seek the
opportunity.

Q.  At the near end of this text message exchange, you state
that "NYU will not disclose or be transparent about salaries.
Gender and age discrimination in salary compensation exists,
100 percent, but so hard to prove."  Do you see that?

A.  Yes.

Q.  You still maintain that position today; correct?

A.  Yes.

Q.  At the time that you negotiated your contract with NYU, all
three times, you never knew what the male doctor salaries were
up until -- withdrawn.

    You never knew what the male doctor salaries were at any
time; correct?

A.  I did not.

Q.  You knew what Dr. Edelman's salary was because you
negotiated together; correct?

A.  I knew the salaries for the first two contracts.  The last
contract, her salary -- her contract was sent to her
separately, it wasn't sent to me.

N7CCede5                         Mehta – Direct

1   Q.  So it's fair to say that you were really in the dark about

2   what the males earned; right?

3   A.  I was not aware of anyone's salaries, either male or female

4   physicians.

5   Q.  But you became aware of what those salaries were at your

6   November 2021 deposition; correct?

7   A.  Yes.

8          THE COURT:  You're not posting something to the

9   witness or anybody?

10          MR. KATAEV:  No.

11          THE COURT:  You're free to post stuff, just if you ask

12   permission and I grant it.

13          MR. KATAEV:  Of course.

14          THE COURT:  Same rule for everybody.

15   Q.  And you're aware of those salaries because I showed them to

16   you during your deposition; right?

17   A.  Yes.

18   Q.  And you learned during that deposition that Dr. Goldberg

19   made $315,000 a year and only had to earn 3481 RVUs, correct?

20   A.  Yes.

21          MR. KATAEV:  I'd like to place up for the jury

22   exhibit 24.  I believe it's been received.

23          THE COURT:  You may do so.

24   Q.  Dr. Goldberg had to earn approximately 1500 less in RVUs;

25   correct?

N7CCede5                          Mehta – Direct

```
 1   A.  Yes.
 2   Q.  But he was paid $80,000 more than you at that time;
 3   correct?
 4   A.  Yes.
 5   Q.  Effectively, he was paid more to do less; correct?
 6           MR. SCHOENSTEIN:  Objection.
 7           THE COURT:  Sustained.
 8   Q.  You would agree with me that Dr. Goldberg is not more
 9   qualified than you; correct?
10   A.  We're both board certified rheumatologists.
11   Q.  So you would say you're equal in qualifications; correct?
12   A.  Yes.
13   Q.  And you were fully capable of performing the same work that
14   Dr. Goldberg was; correct?
15   A.  Yes.
16   Q.  And that includes the administrative items that he
17   performed; correct?
18   A.  Can you repeat that question.
19   Q.  The work that you could also do that Dr. Goldberg does
20   includes any administrative work that he did; correct?
21   A.  I would be qualified to do that, yes.
22   Q.  But NYU did not offer you the opportunity to be more
23   productive and earn more; correct?
24   A.  It was not presented.
25   Q.  That was something that was presented to Dr. Goldberg,
```

1   wasn't it?

2   A.  That I don't know about because I was not a part of that

3   discussion.

4   Q.  Well, he is the clinical director at NYU, isn't he?

5   A.  I don't know if that's his title.  I think he's the

6   clinical director of the infusion center.

7   Q.  Had you been given the opportunity to earn more, you would

8   have taken it; correct?

9   A.  What do you mean by "opportunity to earn more"?

10  Q.  In line with what we've been discussing before.

11  A.  Would that mean more hours or --

12  Q.  Earning more for being more productive.

13  A.  If that would have included more hours, I would not have

14  accepted it.

15  Q.  It was unfair for Dr. Goldberg to earn more than you did;

16  correct?

17  A.  Yes.

18  Q.  You also learned during the deposition that I took of you

19  in November of '21 that Dr. Porges also earned more; correct?

20  A.  His base compensation was higher as was his targeted RVU.

21          MR. KATAEV:  I'd like to present to the jury

22  exhibit 31.  I believe it's been received.

23          THE COURT:  You may do so.

24  Q.  Before we look at the numbers, I want to focus your

25  attention on the 1-percent bonus that I've highlighted.  Do you

1    see that?

2    A.  Yes.

3    Q.  That's the same bonus that you're offered; correct?

4    A.  It's the same productivity bonus.

5    Q.  The same formula; right?

6    A.  Correct.

7    Q.  1-percent increase in RVUs equals a 1-percent increase in

8    compensation; correct?

9    A.  Correct.

10   Q.  I'd like to try and do a comparison of what you would earn

11   had you performed the same number of RVUs that Dr. Porges was

12   expected to do.

13       Now, you see here that the target for Dr. Porges is 6524;

14   correct?

15   A.  Correct.

16   Q.  And in order to get his salary of $340,000, he had to meet

17   that target of 6524; correct?

18   A.  Yes.

19       MR. KATAEV:  Your Honor, with your permission, I would

20   like to use the calculator for the Court to take judicial

21   notice of some math.

22       THE COURT:  You can ask the witness questions, use the

23   calculator and bring it.  I'm not going to take judicial

24   notice, but if there is testimony that you can establish,

25   you'll do it that way.

N7CCede5                      Mehta - Direct

Q.  Dr. Mehta, if we take 6524 RVUs and divide that into your

target of 4912, that comes out to 32.8 percent more in RVUs

than Dr. Porges was expected to earn as compared to you;

correct?

          MR. SCHOENSTEIN:  Objection.

          THE COURT:  Basis.

          MR. SCHOENSTEIN:  I didn't follow the question.

          THE COURT:  Why don't you ask the question again.

Q.  If you take 6524 RVUs and divide that into 4912, which you

were expected to earn, that comes out to 32.8 percent more in

RVUs, correct, based on the math that I showed you on the

calculator?

          MR. SCHOENSTEIN:  I still don't follow the question,

your Honor.

          THE COURT:  I'll sustain it.

Q.  If I take 4912 RVUs and add on 32.81 percent, I get

6524 RVUs, correct, as demonstrated on the calculator?

A.  That's what the math shows.

Q.  And so since it's 32.81 percent, you would receive a bump

in your salary of 32.81 percent, correct, according to that

bonus formula?

A.  I don't understand how you do the formula.  So if that's

what the number is --

Q.  I just want to be clear, it says here in Dr. Porges'

contract, as it does in yours, that you will receive as

N7CCede5                          Mehta – Direct

1    incentive compensation 1 percent of your clinical compensation,

2    that's $207,000, for every 1 percent of your actual

3    productivity exceeding the RVU target.  So if you had earned

4    6524, that means that you had earned 32 percent more, correct,

5    based on the math?

6                MR. SCHOENSTEIN:  Objection.

7                THE COURT:  Sustained.

8    Q.  Taking your salary of $207,000 and multiplying it by

9    32 percent would make your bonus and your salary together

10   $274,000 and change; correct?

11   A.  I guess that's what the math says.

12   Q.  And you agree with me, basic premise, without any math, for

13   every 1 percent that you exceed your RVU target, you get an

14   equal 1 percent as a bonus; right?

15   A.  That's what the formula said.

16   Q.  So if you did 32 more percent in RVUs, you would get 32

17   percent more in salary; correct?

18   A.  I don't understand the formula.  I don't understand your

19   question.  So if that's what the math comes out to, you can --

20   Q.  Accepting my premise that you would have received as a

21   bonus $274,000 for 6524 RVUs, you recognize you would still be

22   paid less than Dr. Porges for the same amount of RVUs; correct?

23   A.  Can you do me a favor, can you do something like generate

24   what per RVU I made for the -- for my salary compensation and

25   then can you compare it side by side.

1    Q.  Sure.  So $207,000 in salary divided by 4912 in RVUs comes

2    out to $42.14; correct?

3    A.  Okay.

4    Q.  So if you multiple that by the 6524 that Dr. Porges had to

5    make, you would get $274,000; correct?

6    A.  Yes.

7    Q.  So if you had done 6524 RVUs just like Dr. Porges, you

8    would still make substantially less than he made; correct?

9    A.  Yes.

10       Can I just add something to that?

11   Q.  There's no question pending, Dr. Mehta.

12           THE COURT:  If it's necessary to clarify your

13   testimony, yes.  If not, you wait for cross examination.

14           THE WITNESS:  Okay.

15   Q.  Now, Dr. Porges has worked at NYU since about the same time

16   that you started there, right, give or take a few months?

17   A.  Yes.

18   Q.  He only became a director a few years later, didn't he?

19   A.  Yes.

20   Q.  And you only learned about his role after he got it; right?

21   A.  Yes.

22   Q.  Dr. Porges never spoke to you about any patient complaints

23   in his role as director, did he?

24   A.  No.

25   Q.  Prior to 2021 after your deposition, you had no sense that

N7CCede5                        Mehta – Direct

1   Dr. Porges had any ability to supervise you as a doctor; right?

2   A.  Correct.

3   Q.  You saw him more as a peer and a colleague; right?

4   A.  Yes.

5   Q.  So you found it strange when you looked at a review that

6   Dr. Porges had done of Dr. Edelman at your deposition, didn't

7   you?

8   A.  I was surprised.

9   Q.  You did not even know he had the ability to review the work

10  of other doctors; right?

11  A.  I didn't, no.

12  Q.  You had no knowledge that he ever reviewed your work, did

13  he?

14  A.  No.

15  Q.  And again, you were never offered such a role that

16  Dr. Porges had; correct?

17  A.  No.

18  Q.  Even though he was working there at the same time you were,

19  he got that role while you had no idea about it; correct?

20  A.  I didn't know if it was offered or if he seeked the role,

21  and I was not offered.

22  Q.  There was no job posting for that role; correct?

23  A.  None that I read.

24  Q.  There was no flyer, nothing; right?

25  A.  Usually there's no flyer.

1   Q.  And NYU has an intranet; right?

2   A.  What?

3   Q.  NYU has an intranet; right?

4   A.  Internet service?

5   Q.  Yes.

6   A.  Yes.

7   Q.  Something that you log into and you get notifications about

8   things; right?

9   A.  Yes.

10  Q.  You never got any notice on that intranet, did you?

11  A.  It was not emailed to me.

12  Q.  Now, focusing on Dr. Modi, you went to fellowship together

13  with him; correct?

14  A.  Yes.

15  Q.  You were there together with him and Dr. Edelman; right?

16  A.  Yes.

17  Q.  And this fellowship is something that's a prerequisite to

18  going into practice; am I right about that?

19  A.  It's additional training to become board certified in

20  rheumatology.

21  Q.  And it's common for doctors to go into fellowships before

22  they go into private practice; right?

23  A.  If you want to practice that particular subspecialty, yes.

24  Q.  In fact, it's required if you want to practice that

25  specialty; right?

1    A.  If you want to be a rheumatologist, you have to do

2    rheumatology training.

3    Q.  So all three of you were the same out the gate in terms of

4    experience and qualifications; right?

5    A.  Yes.

6    Q.  You learned at your deposition that Dr. Modi earned

7    substantially more than you, didn't you?

8    A.  I learned that he made more.

9    Q.  And he made $360,000; correct?

10   A.  With a higher RVU.

11   Q.  That's correct.  You would agree with me that there's a

12   discrepancy in pay between you and Dr. Edelman as females and

13   the male doctors; correct?

14   A.  I can't make that generalization because I don't know what

15   all of the other male physicians make.

16   Q.  I'd like to show you your deposition transcript at page

17   142.

18            THE COURT:  Lines?

19            MR. KATAEV:  Is it okay to show it to the witness?

20            THE COURT:  Just tell me what lines first.

21            MR. KATAEV:  I believe it starts at line 19 on 142 and

22   goes to page 143 at line 22, 143.

23            MR. SCHOENSTEIN:  Objection.  Improper.

24            THE COURT:  What's the basis for using this?

25            MR. KATAEV:  Impeachment.  She said an answer that's

N7CCede5                          Mehta – Direct

1   different than what she said in the transcript.

2          THE COURT:  I don't see the inconsistency.  You can

3   ask a couple more questions to see if you can establish the

4   inconsistency.

5          MR. KATAEV:  Can we go to 185, your Honor, starting at

6   line 20, going through 186, line 4.

7          MR. SCHOENSTEIN:  Same objection.

8          THE COURT:  There's not any consistency based upon the

9   question that you asked her.  If you want to ask a different

10  question to establish an inconsistency, you can, but the

11  objection is sustained.

12         MR. KATAEV:  Okay, your Honor.  I'll move on.

13         I'd like to show the jury an exhibit that was

14  previously admitted, it's exhibit HH, defendants'.

15         THE COURT:  You may do so.

16  Q.  Dr. Mehta, you're familiar with this business plan from

17  your deposition; correct?

18  A.  Yes.

19  Q.  You only first saw this at your deposition and you had

20  never been shown it before in your negotiations with NYU;

21  correct?

22  A.  Correct.

23  Q.  And in here, all the way at the bottom, there's a footnote

24  that references an outstanding business loan of $326,000;

25  correct?

1  A.  Yes.

2  Q.  And is it fair to say that of the $500,000 you had borrowed

3  at the time you had started negotiating with NYU, you had paid

4  off such that only 326 was remaining?

5  A.  Can you repeat that.

6  Q.  Is it fair to say that of the $500,000 that was borrowed,

7  only $326,000 was left when you were switching over to NYU?

8  A.  Yes.

9  Q.  And that number played a role in your salary negotiations;

10  correct?

11  A.  Yes.

12  Q.  Now, it's fair to say that that loan was divided equally

13  between the two of you; right?

14  A.  Correct.

15  Q.  And so, taking the 326 and dividing it by two, that leaves

16  $163,000 between the two of you that NYU had assumed; right?

17  A.  Correct.

18  Q.  And they had paid off that loan within the first three

19  years from the first contract; right?

20  A.  I don't remember how long it took them, to be honest.

21  Q.  Well, for purposes of your increase in salary for the

22  second year, they had assumed that it was paid off; correct?

23  A.  Yes.

24  Q.  So it took them three years, conceivably, to pay it off; is

25  that right?

N7CCede5                          Mehta - Direct

1   A.  Yes.

2   Q.  And if you divide that number by three years, you come up

3   with $54,333 per year; correct?

4   A.  Correct.

5   Q.  For your half; right?  And it would be the same number for

6   Dr. Edelman's half; right?

7   A.  Yes.

8   Q.  So from your initial ask of 280, if they subtracted this

9   $54,000, you would have earned more than 207, wouldn't you?

10  A.  Can you repeat that.

11  Q.  Sure.  I'll use the calculator to aid your testimony.

12      $280,000 minus the $54,000 per year would have come to

13  $225,000 and change, wouldn't it?

14  A.  Okay.

15  Q.  So it's not fair to say -- for NYU to say to you that your

16  loan is the reason why your salary was 207; correct?

17  A.  Okay.

18  Q.  Based on these principles of math; right?

19  A.  What is your question?  Can you clarify, please.

20  Q.  You testified that the only reason you received the bump

21  from 207 to 270 was because of this loan?

22  A.  207 to 270 -- yes.

23  Q.  But the value of the loan per year is much less than what

24  they took from you in terms of the negotiations; isn't that

25  right?

N7CCede5                        Mehta - Direct

1    A.  Can you do the math again for me.

2    Q.  Sure.

3    A.  I just want to make sure --

4    Q.  You take the $326,000 and you divide it by two because

5    there's two of you and you get 163; correct?

6    A.  Uh-huh.

7    Q.  And it was paid off in the first three years such that you

8    got the increase; correct?

9    A.  Yes.

10   Q.  And they paid you 207 because of that loan for three years;

11   correct?

12   A.  Yes.

13   Q.  So you divide that number by three for each year and it's

14   only $54,300 and change; correct?

15   A.  Yes.

16   Q.  And if you take that away from the 280 you asked for, you

17   get 225, you don't get 207, do you?

18   A.  No.

19   Q.  I think we had talked earlier about the fact that

20   Dr. Edelman's RVU target was higher than yours for the first

21   renewal because she was more productive; correct?

22   A.  Her RVU target was higher.

23   Q.  And that's because she also saw more patients; right?

24   A.  Yes.

25   Q.  And you have, over the course of the entire time that you

1    worked with Dr. Edelman, you referred your patients to her for

2    second opinions, didn't you?

3    A.   I have referred for second opinions to Dr. Edelman.

4    Q.   You trusted her judgment as a doctor; right?

5    A.   Yes.

6    Q.   And you did so frequently throughout your employment at

7    NYU; correct?

8    A.   Frequently did what?

9    Q.   Referred patients to her of yours.

10   A.   What is your definition of "frequent"?

11   Q.   You tell me, how often did you refer patients to her?

12   A.   I don't remember how often I referred, but it's not every

13   day.

14   Q.   And you're also aware of Dr. Edelman's humanitarian mission

15   to Ecuador; correct?

16   A.   Yes.

17   Q.   It's fair to say that everyone at NYU applauded Dr. Edelman

18   for doing that because it spoke to NYU's mission; correct?

19            MR. SCHOENSTEIN:  Objection.

20            THE COURT:  Sustained.

21   Q.   You view Dr. Edelman as equal to you in terms of

22   qualification, skill, and expertise; correct?

23   A.   Yes.

24   Q.   But you learned that her contract was not renewed in

25   December of 2020; right?

N7CCede5                        Mehta - Direct

1    A.  Yes.

2    Q.  Dr. Edelman told you about this fact; right?

3    A.  Yes.

4    Q.  Because as friends, you two shared everything with each

5    other; right?

6    A.  Everything?

7    Q.  Most things.

8    A.  Most things?

9    Q.  You tell me, did you at least share things that went on at

10   NYU together?

11            THE COURT:  I guess the record should reflect that in

12   the last two answers, there was a question mark at the end of

13   the witness's answer.

14            I take it you agree with that, Mr. Kataev?

15            MR. KATAEV:  Yes.  I'll withdraw the questions and

16   I'll re-ask.

17   Q.  Dr. Edelman shared things of this nature with you, yes?

18   A.  She shared with me that her contract was not renewed.

19   Q.  And you were surprised to learn her contract was not

20   renewed; correct?

21   A.  Yes.

22   Q.  And that's because Dr. Edelman was always productive, to

23   your knowledge; right?

24   A.  What do you mean, "productive"?

25   Q.  At NYU, she did a good job for NYU; right?

N7CCede5                         Mehta – Direct

1    A.  She met her targeted RVUs.

2    Q.  Now, as far as you know, Dr. Edelman told you about this in

3    December of 2020; right?

4    A.  Yes.

5    Q.  But she didn't leave until April of '21; right?

6    A.  Yes.

7    Q.  And you were not made aware of any concerns at the time

8    that she was nonrenewed in December of 2020 concerning any

9    patient care issues; right?

10   A.  That's not shared with me.

11   Q.  And you had no such concerns; right?

12   A.  I had no concerns, I don't review her charts, and nor was

13   anything brought to my attention.

14   Q.  You had no concerns because you referred her patients;

15   right?

16   A.  I've referred some of my patients to her for second

17   opinions.

18   Q.  And it's fair to say, based on the October 2020 text

19   messages that, at that time, Dr. Edelman had no awareness that

20   she was going to be terminated; right?

21   A.  At some point, I think she questioned whether or not her

22   contract would be renewed.

23   Q.  And she questioned that because she made a complaint to

24   human resources; right?

25             MR. SCHOENSTEIN:  Objection.

1        THE COURT:  Sustained.

2   Q.  Dr. Edelman told you about her complaint against Joseph

3   Antonik and David Kaplan, didn't she?

4   A.  Yes.

5   Q.  She told you around the time she made the complaint; right?

6   A.  I think it was the time, yes.

7   Q.  And she also told you that she didn't believe her contract

8   would be renewed because of her complaint; right?

9   A.  Yes.

10  Q.  Dr. Edelman also told you that she was very uncomfortable

11  being in the presence of Joseph Antonik and David Kaplan after

12  their meetings with each other?

13  A.  Yes.

14  Q.  She also complained to you that nothing was done about her

15  human resources complaint; correct?

16  A.  Yes.

17  Q.  If you had made any complaint to human resources, you would

18  expect it to be investigated; correct?

19        MR. SCHOENSTEIN:  Objection.

20        THE COURT:  Sustained.

21  Q.  Is it fair to say that Dr. Kaplan had no managerial

22  authority over you?

23  A.  Yes.

24  Q.  And the same would be true about Dr. Edelman; correct?

25  A.  I assume, yes.

N7CCede5                          Mehta – Direct

1    Q.  His role was limited to logistical issues at NYU; right?

2    A.  Yes.

3    Q.  He dealt with the practice's operations, making sure the

4    lights were on and things of that nature; right?

5    A.  You'd have to ask him his role, but that's what I believe.

6    Q.  We'll get there.

7        In the course of your experience working with Dr. Edelman,

8    she was pleasant to work with, wasn't she?

9    A.  Not always.

10   Q.  And is it fair to say that, for the most part, she got

11   along with Ms. Ruiz, the office manager?

12   A.  Yes.

13   Q.  Do you have any recollection about Dr. Edelman telling you

14   about a meeting she had in 2017 with Rubin and Swirnow?

15   A.  Yes.

16   Q.  She had to go to One Park; correct?

17   A.  Yes.

18   Q.  One Park is headquarters for NYU; right?

19   A.  Yes.

20   Q.  And that's located at One Park Avenue in Manhattan?

21   A.  Yes.

22   Q.  It must be a really important meeting if you're going

23   there; right?

24              MR. SCHOENSTEIN:  Objection.

25              THE COURT:  Sustained.

1   Q.  Do you recall that, following that meeting, Dr. Edelman

2   told you that Andrew Rubin told her to smile more; right?

3   A.  I don't remember the conversation.  That was so long ago.

4   Q.  You are aware in this case that NYU is claiming that

5   Dr. Edelman had patient care issues; right?

6           MR. SCHOENSTEIN:  Objection.

7           THE COURT:  Sustained.

8           MR. KATAEV:  I want to show Plaintiff's Exhibit 1 for

9   identification.  I'm not sure whether it's been admitted yet.

10  I believe that it was.

11          THE COURT:  I don't think 1 has been admitted.  It

12  looks like there's no objection.

13          Is there any objection to Plaintiff's Exhibit 1?

14          MR. SCHOENSTEIN:  Nope.

15          THE COURT:  All right.  That's received and may be

16  published to the jury.

17          (Plaintiff's Exhibit 1 received in evidence)

18  Q.  Dr. Mehta, you recall me showing you this chain of emails

19  in your deposition; right?

20  A.  If you showed it to me, I don't remember it today.

21  Q.  I'll represent to you that this is an email that Dr. Porges

22  sent to David Kaplan about his alleged concerns with

23  Dr. Edelman.  I want to focus your attention on this particular

24  section here about 10 tubes of blood.  Do you see that?

25  A.  Yes.

1    Q.  Just take a second to read the paragraph about that point

2    and let me know when you're done.  I'd like to ask you some

3    questions about it.

4    A.  Yes.

5    Q.  It's not unreasonable, based on what you read, is it, to

6    draw more than 10 tubes of blood for a new lupus diagnosis?

7    A.  No.

8            MR. SCHOENSTEIN:  Objection.

9            THE COURT:  Sustained.

10   Q.  In the course of your practice as a rheumatologist, it's

11   routine for you to take many tests for new patients; correct?

12   A.  Yes.

13   Q.  Prior to your second renewal in which you had the $280,000

14   salary bump, to your knowledge, your performance was not

15   reviewed, was it?

16   A.  Not that I was made aware of.

17   Q.  And in terms of Ms. Ruiz, she no longer works at NYU;

18   correct?

19   A.  Correct.

20   Q.  And to your knowledge, she has relocated to Maryland;

21   correct?

22   A.  Correct.

23   Q.  But she's flying in from Maryland to testify in this case;

24   correct?

25           MR. SCHOENSTEIN:  Objection.  Foundation.

1             THE COURT:  Sustained as to foundation.

2             Do you know whether she's flying in from Maryland?

3             THE WITNESS:  Now I do.  I didn't know that before.

4             MR. KATAEV:  Withdrawn.

5             THE COURT:  Then that testimony is stricken.

6             Members of the jury, I think I previously gave you the

7     instruction that lawyers' questions are not evidence.

8             So, go ahead.

9             MR. KATAEV:  Just one second, your Honor.

10    Q.  Dr. Mehta, in the course of your practice as a

11    rheumatologist, entire practice, have you ever drawn more than

12    10 tubes of blood for any one patient?

13            MR. SCHOENSTEIN:  Objection.

14            THE COURT:  Overruled.

15    A.  If the patient's symptoms and diagnoses requires it, then

16    it has been done.

17    Q.  So the answer is yes, you have; right?

18    A.  Yes.

19    Q.  Now, as part of your duties for NYU and to maintain your

20    license, you're required to take boards; correct?

21    A.  Yes.

22    Q.  And in the course of your preparation for boards and taking

23    them, you have unfortunately not succeeded several times in

24    passing those boards; correct?

25    A.  Which boards are you talking about?

1   Q.  The recertification, I believe.

2   A.  For which?

3   Q.  For rheumatology.

4   A.  No, I've passed it every time I've taken it.

5   Q.  There were boards that you took that you didn't pass;

6   correct?

7   A.  Yes.

8   Q.  And when that happened, you had to take it four times

9   before you passed; correct?

10  A.  Three.

11  Q.  Three times.

12      Also, to your knowledge, did Dr. Edelman ever have any

13  malpractice suit brought against her?

14          MR. SCHOENSTEIN:  Objection.  Relevance.

15          THE COURT:  Sustained.

16  Q.  In terms of your practice while at NYU, there has been at

17  least one malpractice suit brought against you; correct?

18          MR. SCHOENSTEIN:  Objection.

19          THE COURT:  Sustained.

20  Q.  Despite the trouble that you had with passing the boards,

21  you remain employed by NYU; correct?

22          MR. SCHOENSTEIN:  Objection.

23          THE COURT:  Sustained as to form.

24  Q.  You remain employed by NYU to this day; correct?

25  A.  Yes.

N7CCede5                        Mehta – Cross

1    Q.  And you never filed any complaint of discrimination or

2    harassment, did you?

3    A.  No.

4              MR. KATAEV:  I have no further questions.

5              THE COURT:  Defense examination.

6              Members of the jury, I'm going to do a stretch break

7    while defense counsel sets up.  You might do the same.

8              The witness is also welcome to have a stretch break.

9              Counsel, you may proceed.

10   CROSS-EXAMINATION

11   BY MR. SCHOENSTEIN:

12   Q.  Thank you for being here today.  With apologies to you and

13   everyone involved, I'm going to start with some math.

14        Counsel was asking you some questions to compare

15   Dr. Porges' compensation to your compensation.  Do you recall

16   that?

17   A.  Yes.

18   Q.  And at the beginning of your tenure at NYU, what was your

19   salary?

20   A.  $207,000.

21   Q.  And there was this $3,000 expense number.  How did that

22   come about?

23   A.  I believe we requested based on our assumption of what cost

24   for conferences would be, maybe cellphone usage, et cetera.

25   Q.  So the $3,000 expense number, am I hearing you, that's

N7CCede5                          Mehta – Cross

1   something you and Dr. Edelman requested?

2           MR. KATAEV:  Objection.  Leading.

3           THE COURT:  Overruled.

4   A.  Yes.

5   Q.  And did NYU agree to it?

6   A.  Yes.

7   Q.  So if I add 207 and $3,000, what do I get?

8   A.  $210,000.

9   Q.  Now, was the repayment of the loan something you considered

10  to be part of your salary?

11  A.  Yes.

12  Q.  And counsel did a bunch of math and came up with $54,000 a

13  year; right?

14  A.  Yes.

15  Q.  And let's not do the loose change, let's just add 54 to

16  210, what do you get?

17  A.  264.

18  Q.  So the value of your initial deal with NYU was at least

19  $264,000?

20  A.  Correct.

21          MR. KATAEV:  Objection.

22          THE COURT:  I realize it's leading, but it's really

23  just summarizing what the witness has testified to.  So

24  overruled.

25  Q.  Now, Ms. Cardona is going to help me because I need both a

1   calculator and help.  264 divided by 4912, that was your RVU

2   target at the beginning?

3   A.  Yes.

4   Q.  And what do we get?  You'll look on the screen and

5   Ms. Cardona is doing it.  So that's $53.74; is that right?

6   A.  Yes.

7   Q.  And let's multiply $53.74 times Dr. Porges' RVU target,

8   which was 6524.  So that would have been $350,000.  Do you see

9   that?

10  A.  Yes.

11          MR. KATAEV:  Objection.  I don't think anyone sees

12  anything because we don't see anything.

13          THE COURT:  Is it on a screen?

14          MR. SCHOENSTEIN:  No.  I guess I didn't publish the

15  math to the jury.  I can just ask it as a question.

16          THE COURT:  Just ask the question.

17  Q.  If you got $53.74 per RVU, at Dr. Porges' RVU target level

18  of 6524, it would have been in excess of $350,000?

19  A.  Yes.

20  Q.  And that was more than Dr. Porges was being paid at the

21  time; right?

22  A.  Yes.

23  Q.  What was he being paid at the time, if you remember?

24  A.  I don't remember.  I can't remember.  There are a lot of

25  numbers up here.

1           MR. KATAEV:  Your Honor, I apologize.  If anything's

2     being presented, we don't see it.

3           MR. SCHOENSTEIN:  No, I was just asking questions,

4     your Honor.

5           MR. KATAEV:  Okay.

6  Q.  350 is more than the 340 Dr. Porges was being paid; right?

7  A.  Correct.

8  Q.  So if you take into consideration the loan and the

9     expenses, was your deal richer than Dr. Porges'?

10          MR. KATAEV:  Objection.  Asked and answered.

11          THE COURT:  Overruled.

12 A.  Yes.

13 Q.  And did you have any requirement to do research like

14    Dr. Porges did?

15 A.  No.

16 Q.  Do you have any reason to believe you worked harder than

17    Dr. Porges?

18 A.  No.

19          MR. KATAEV:  Objection.

20 Q.  I'm going to turn now and ask some questions about the

21    private practice.  Let's back up to 2008.

22        That's when you went into private practice with

23    Dr. Edelman; right?

24 A.  Yes.

25 Q.  And there's already been testimony from everyone, there

1  were some loans taken out at the beginning; right?

2  A.  Yes.

3  Q.  And was the business profitable at the beginning?

4  A.  No.

5  Q.  And why wasn't it profitable?

6  A.  It was a startup practice.  We didn't have an established

7  patient basis.  We were both newly graduated fellows.

8  Q.  Is it easy or difficult to open a private medical practice

9  in the State of New York these days?

10  A.  It's very difficult.

11          MR. KATAEV:  Objection.  Foundation.

12          THE COURT:  Sustained.

13  Q.  Did you find it easy or difficult to open a private medical

14  practice in New York?

15          MR. KATAEV:  Same objection.

16          THE COURT:  Overruled.

17  A.  It was difficult.

18  Q.  And the loans, just to be clear, were you personally

19  obligated on those loans?

20  A.  Yes.

21  Q.  And the lease, were you personally obligated on the lease?

22  A.  Yes.

23  Q.  And did you and Dr. Edelman share all of those obligations

24  50/50?

25  A.  Yes.

1    Q.  And if the business hadn't been successful, did you know

2    whether you would still be obligated on the loans?

3    A.  We would still be obligated on the loans.

4    Q.  And if the business hadn't been successful, would you still

5    be obligated on the lease?

6    A.  Yes.

7    Q.  And that lease was for at least 15 or 20 years?

8    A.  15 years.

9    Q.  During the time period you were in private practice before

10   Nassau Radiology, so from 2008 to 2012, what was your take home

11   pay?

12           MR. KATAEV:  Objection.  Beyond the scope of cross.

13           THE COURT:  Overruled.  I take it that you're going to

14   be treating this testimony as part of your direct examination

15   of the witness.

16           MR. SCHOENSTEIN:  Yes, your Honor.  We're hoping to

17   have Dr. Mehta here one day.

18           THE COURT:  Pursuant to the agreement pretrial, the

19   objection is overruled.

20   A.  We were taking home $5,000 a month and that was coming out

21   of our business loan.

22   Q.  The business loan was funding your monthly salary?

23   A.  Yes.

24   Q.  So the business loan wasn't all used for renovation of the

25   offices?

N7CCede5                          Mehta - Cross

1    A.  No.

2    Q.  It was used for operations?

3    A.  Yes.

4    Q.  And eventually, you were going to run out of business loan?

5    A.  Yes.

6    Q.  Is that part of why you started looking to join a bigger

7    outfit?

8            MR. KATAEV:  Objection.  Leading.

9            THE COURT:  Sustained.

10   Q.  Why did you start looking to join a bigger outfit?

11   A.  Because we weren't really profitable.

12   Q.  And when did you start looking?

13   A.  We started looking in 2011 or -- I don't know if it's end

14   of 2011 or early 2012.

15   Q.  And did there come a time where you entered into a business

16   arrangement with Nassau Radiology?

17   A.  Yes.

18   Q.  And tell the jury, because I'm not sure anybody's really

19   said yet, what is Nassau Radiology?

20   A.   It's a radiology group and they were looking to become a

21   multi specialty group.  So they were recruiting private

22   practices.

23   Q.  And how big an outfit were they?

24   A.  I'm sorry?

25   Q.  Like how many employees, if you know, how many doctors?

N7CCede5                        Mehta - Cross

1   A.  They were primarily radiologists.  And I assume many.  I

2   don't know the exact number employed.

3   Q.  Do you know if it was bigger or smaller than NYU?

4   A.  Smaller.

5   Q.  Was it bigger than your private practice?

6   A.  100 percent.

7   Q.  So what was the deal you reached --

8           THE COURT:  When you say "100 percent," you mean

9   you're 100 percent certain that it was bigger than your private

10  practice?

11          THE WITNESS:  Yes.

12          THE COURT:  Okay.  Go ahead.

13  Q.  What was the deal you reached with Nassau Radiology?

14  A.  What do you mean, "the deal"?

15  Q.  Well, you came to an agreement with them to start working

16  with them in 2012; right?

17  A.  Correct.

18  Q.  So what was the arrangement between you and Nassau

19  Radiology?  Did you become their employee?  Did you sell the

20  practice to them?  What was the deal?

21  A.  We were an employee and they did an analysis and they

22  offered us a salary and they assumed they would pay our lease

23  and they would help to pay our loan, too.

24  Q.  So Nassau Radiology offered you a salary.  How much did

25  they offer you?

N7CCede5                         Mehta - Cross

1   A.  I believe it was $200,000.

2   Q.  And they were going to pay your loan?

3   A.  Yes.

4   Q.  And did they make payments on the loan from 2012 to 2014?

5   A.  Yes.

6   Q.  So for two years prior to NYU, the payments on the loan

7   were made not by you and Dr. Edelman, but by Nassau Radiology?

8   A.  Yes.

9   Q.  And same thing with the lease, they started making payments

10  on the lease?

11  A.  Yes.

12  Q.  Now --

13          THE COURT:  Can you avoid the leading.

14          MR. SCHOENSTEIN:  I'll really try.

15  Q.  Did there come a time where you explored leaving Nassau

16  Radiology?

17  A.  We had to.  NRad was going into bankruptcy.

18  Q.  Tell me a little more about that, when did that come to

19  your attention?

20  A.  2014.

21  Q.  And what was your understanding about -- by the way, when

22  you say NRad, that's the same thing as Nassau Radiology?

23  A.  NRad is short for Nassau Radiology.  N is Nassau, Rad is

24  Radiology.

25  Q.  What was your understanding in 2014 about NRad and

N7CCede5                          Mehta - Cross

1   bankruptcy?

2   A.  That they would no longer be able to keep us employed under

3   their group.

4   Q.  Did you have an understanding as to whether you would be

5   required to find a different employment?

6   A.  Yes.

7   Q.  And what was that understanding?

8   A.  We had to find different employment.

9   Q.  Now, did you and Dr. Edelman consider just going back into

10  private practice like you had been?

11  A.  No.

12  Q.  Is there any particular reason you didn't consider that?

13  A.  Reimbursement rates under private practices for small

14  groups are not enough to keep business afloat to pay our loans,

15  pay ourselves, pay employees, et cetera.

16  Q.  What, if any, alternatives did you look at in or about

17  2014?

18  A.  We looked at ProHealth.

19  Q.  What is ProHealth?

20  A.  ProHealth is another large group, multi-specialty group in

21  Nassau County.

22  Q.  And you looked at NYU, obviously.  Did you look at any

23  others?

24  A.  We looked at -- we started to look at Northwell or North

25  Shore at the time.

1   Q.  What became of that inquiry?

2   A.  It didn't lead to anything.

3   Q.  And the ProHealth, what became of that inquiry?

4   A.  It didn't lead to anything.

5   Q.  Did you get an offer from ProHealth?

6   A.  I believe there was an offer.  I'm not sure how it just

7   died down, whether it was on our end or whether it was on their

8   end.

9   Q.  What about Northwell, did you get an offer?

10  A.  No.

11  Q.  Did you go about at all, in or about 2014, trying to figure

12  out how much you should be paid?

13  A.  Yes.

14  Q.  What did you do in that regard?

15  A.  I think my husband had done some type of analysis as best

16  as he could to try to figure out what the average

17  rheumatologist should earn or, you know, should be paid per RVU

18  because that was the structure for NYU.

19  Q.  When you were in private practice, how did you figure out

20  how much to pay yourself?

21  A.  I think we just came up with a number that seemed feasible

22  to kind of help us with our own personal expenses.

23  Q.  And when you were at Nassau Radiology, did they consider

24  RVUs in connection with your salaries or compensation?

25  A.  Their compensation was not based on RVU.

N7CCede5                              Mehta - Cross

1   Q.   Do you know how Nassau Radiology determined what to pay

2   you?

3   A.   They analyzed --

4           MR. KATAEV:   Objection.   Relevance.

5           THE COURT:   Overruled.

6   A.   They analyzed our business based on our billing, meaning

7   what -- how many patients we saw, either per year or per month,

8   and what our reimbursement was, and they used that to calculate

9   what our compensation should be.

10  Q.   Let's talk about your negotiations with NYU a little bit.

11  Who did you meet with at NYU?

12  A.   At NYU, we met with Andy Rubin and Josh Swirnow.

13  Q.   Did you provide NYU with any information in the process of

14  negotiating with them?

15  A.   I believe we gave them whatever analysis we had received

16  from NRad in a way to determine what our compensation would be.

17  Q.   What was in that analysis, if you could recall?

18  A.   It should be patients -- number of patients that we had

19  seen, it should be procedures that we had done, it should be

20  level of visits that we were billing for.   That's usually what

21  goes into the analysis.

22          MR. KATAEV:   Your Honor, move to strike.   Speculation.

23          THE COURT:   Overruled.

24  Q.   Now, when you met with Mr. Rubin and Mr. Swirnow, counsel

25  asked you a question about somebody making a comment about

1    either you or Dr. Edelman being a woman.  Do you recall that?

2    A.  Yeah.

3    Q.  Now, first of all, do you recall which of you the comment

4    was directed to?

5    A.  I don't, but I think it was me because my name is unusual,

6    and that's an assumption at this point because I don't

7    remember.

8    Q.  Your name, what name do you mean?

9    A.  Kavini, my first name.

10   Q.  Whatever he said, did it bother you at the time?

11          MR. KATAEV:  Objection.  Relevance.

12          THE COURT:  Overruled.

13   A.  It doesn't bother me because I don't remember it much at

14   this point.

15   Q.  Now, counsel showed you a non-disparagement provision in

16   your last renewal of your contract.  Do you remember seeing

17   that?

18   A.  Yes.

19          MR. SCHOENSTEIN:  So let's show, please, exhibit 35.

20   That's been previously entered, your Honor.  I'd like to

21   publish.

22          THE COURT:  You may publish.

23   Q.  This is the February 10, 2017 contract with Dr. Modi.

24          MR. KATAEV:  Your Honor, we don't see anything on the

25   screen.

N7CCede5                          Mehta – Cross

1              THE COURT:  Excuse me?

2              MR. KATAEV:  We don't see anything on the screen.

3              THE COURT:  You have to wait.

4              MR. SCHOENSTEIN:  You guys have it now?

5              MR. KATAEV:  Yes, thank you.

6    Q.  This is the 2017 contract with Dr. Modi.

7              MR. SCHOENSTEIN:  Would you, Ms. Cardona, go to

8    page 891.

9    Q.  Do you see that last bullet point, "You engage in..."  Is

10   that the same non-disparagement provision we looked at in your

11   contract?

12   A.  I believe so.

13   Q.  Do you have any reason to believe that this was a new

14   clause that NYU slipped into your contract because of this

15   litigation?

16             MR. KATAEV:  Objection.  Argumentative.

17             THE COURT:  Sustained as to form.

18   Q.  Do you have any reason to believe this was a brand new

19   clause that was created for you?

20   A.  No.

21   Q.  And does the existence of that clause in your contract

22   change one iota of the testimony you have given today?

23   A.  No.

24             MR. SCHOENSTEIN:  One second, your Honor.

25             Thank you, Dr. Mehta, very much.

1          THE COURT:  Any reexamination by plaintiffs?

2          MR. KATAEV:  Briefly.

3          THE COURT:  Parties might get the next witness ready.

4     REDIRECT EXAMINATION

5     BY MR. KATAEV:

6     Q.  Dr. Mehta, the business expenses that you talked about that

7     were rolled into your salary to form 210, do you recall that

8     testimony?

9     A.  Yes.

10    Q.  There was no rolling up of the business expenses for the

11    male doctors, were there?

12    A.  I wouldn't have known that.

13    Q.  At your deposition and during your trial testimony today, I

14    showed you their contracts and they had no limit on their

15    business expenses; correct?

16    A.  It didn't show that there was a business expense on there.

17    Q.  You had a limit with Dr. Edelman, but the male doctors did

18    not have any limit; correct?

19    A.  That's what it was, yes.

20    Q.  Now, you testified about the private practice and the fact

21    that it was a startup and it's difficult.  Remember that?

22    A.  Yes.

23    Q.  And at the time that you were working with NRad and even

24    before that time, you were meeting all your obligations and

25    things were going well; correct?

A.  You mean paying loans or paying utilities or -- what do you
mean by "obligations"?

Q.  Meaning all the obligations that the business had plus your
salaries.

A.  We were paying for a lot of those with business loans that
we've had and then with some of the RVUs or some of the revenue
that we generated.

Q.  In the beginning when you first started, you had zero
patients; correct?

A.  Correct.

Q.  By the time you got to the point when you were going to
NYU, you had thousands of patients; correct?

A.  Yes.

Q.  So you made a lot more revenue than you did initially;
correct?

A.  Yes.

Q.  Conceivably, you would have -- you could have stayed in
business and everything would have been fine; correct?

A.  Everything would have been fine?  I don't know how to
answer that question.

Q.  To your knowledge, were you and Dr. Edelman an eminent risk
of failing in your business at the time that you made the move?

A.  I don't know how to answer that question because I don't
know how we would have -- I couldn't have foreseen how we would
have been in two or three or five years from then.

1  Q.  You talked about the fact that Nassau Radiology had assumed

2  some of the loan obligations that you had.  Do you recall that

3  testimony?

4  A.  Yes.

5  Q.  Those loan obligations were paid based on your production;

6  correct?

7  A.  No.

8  Q.  You also talked about the fact that NRad filed for

9  bankruptcy in 2014?

10 A.  Yes.

11         MR. KATAEV:  I'd like to show to the witness a

12 publicly available document, your Honor.

13         THE COURT:  What exhibit number?

14         MR. KATAEV:  There's no exhibit, it's just a publicly

15 available document, your Honor.

16         MR. SCHOENSTEIN:  Objection if there's no exhibit

17 number, your Honor.

18         MR. KATAEV:  Sidebar.

19         THE COURT:  I'll see you at sidebar.

20         Do you have a copy of the document?

21         (Continued on next page)

22

23

24

25

1          (At sidebar)

2          MR. KATAEV:  I'd like to show her, your Honor, the

3     petition for bankruptcy filed in 2015.

4          MR. LABUDA:  To refresh her recollection.

5          MR. SCHOENSTEIN:  It's not on the pretrial order.

6     It's never been designated a witness; that strikes it

7     automatically.  It's misleading.  She testified she was aware

8     they were going to bankruptcy in 2014.  When they filed the

9     document doesn't change that awareness.  It's completely

10    misleading to go on the internet and suggest she's somehow

11    lying about it.

12         THE COURT:  You want to use this to refresh her

13    recollection.

14         MR. LABUDA:  Yes.

15         THE COURT:  I'm going to permit you to ask her the

16    question about wasn't the bankruptcy filed in 2015.  If she

17    doesn't know the answer to it, you can use the document to

18    refresh her recollection.

19         I recognize that it's not on the pretrial order.  On

20    the other hand, as to this bit of testimony, it's

21    cross-examination because this was raised for the first time in

22    the examination of defense counsel, so I'm going to permit that

23    line of examination.

24         MR. SCHOENSTEIN:  Your Honor, she said in her

25    deposition it was going into bankruptcy.  This is not new

1    testimony they're hearing for the first time today.  They could

2    have been prepared for this.

3              THE COURT:  They could have, but you brought it out,

4    that it was 2014.  They can ask the question whether the filing

5    was, in fact, 2015 and you'll ask the question on further

6    examination whether she was aware before that that they were

7    going to file.

8              I've ruled.

9              (Continued on next page)

1              (In open court)

2              THE COURT:  Mr. Kataev, let's go.

3    BY MR. KATAEV:

4    Q.  Dr. Mehta, you testified earlier that Nassau Radiology went

5    into bankruptcy in 2014.  Isn't it true that they actually went

6    into bankruptcy in mid-2015?

7    A.  I don't know the dates.  They don't tell me the dates.

8    This is what our -- that's what's told to us, that they were

9    probably heading towards bankruptcy.  My interpretation was

10   they were in bankruptcy.

11   Q.  I'd like to show you, since you don't know the date, a

12   document to refresh your recollection.

13             THE COURT:  Just publish it to the witness and to

14   counsel.

15             You're being shown the document to see whether it

16   brings back a memory in your mind.  You're not being asked to

17   read the document but just to see whether it sparks a

18   recollection, since you testified that you don't remember the

19   date of the bankruptcy.

20             Go ahead, Mr. Kataev.

21   BY MR. KATAEV:

22   Q.  And just reading this document based on the file date on

23   top and the name in the box, does that refresh your

24   recollection as to when NRad went into bankruptcy?

25   A.  No, because we were employed by them until 2014.  So when

N7cWede6                         Mehta - Redirect

1    they had their discussions with us, it was that they were not

2    going to continue to employ us because of bankruptcy.  So that

3    was my understanding.

4    Q.  But based on this document that I've shown you, the

5    bankruptcy was actually filed in 2015, correct?

6              MR. SCHOENSTEIN:  Objection.

7              THE COURT:  Sustained.

8    BY MR. KATAEV:

9    Q.  With respect to your negotiations with Northwell, do you

10   recall whether it was you that stopped negotiating with them or

11   whether they withdrew?

12   A.  I don't remember.  I -- it may have been on their end.

13   Q.  Same question with ProHealth?

14   A.  I don't remember that part.

15   Q.  Now, in your employment agreement with NYU, there's no

16   reference to the fact that your salary is less because of your

17   loan, correct?

18   A.  In the contract?

19   Q.  In the contract itself.  It's not written there, right?

20   A.  I don't believe so.

21             MR. KATAEV:  Your Honor, I'd like to publish exhibit

22   37.  It's previously been admitted.

23             THE COURT:  You may do so.

24   BY MR. KATAEV:

25   Q.  Focusing your attention on the highlighted provision, you

N7cWede6                         Mehta - Recross

1   would agree with me, wouldn't you, that everything that you

2   agreed to with NYU is incorporated in this agreement and in

3   this agreement alone?

4   A.  Yes.

5   Q.  And NYU is the one that drafted this agreement, right?

6   A.  Yes.

7   Q.  And you had very little ability to change the terms of this

8   agreement, correct?

9          MR. SCHOENSTEIN:  Objection.

10          THE COURT:  Overruled.

11   A.  We could have made some modifications, but I don't know if

12   there was much here that we could have changed.

13   Q.  And NYU did not put any language in this agreement that

14   said your salary was less because of your loan, correct?

15   A.  I don't believe that wording was in there.

16          MR. KATAEV:  I have nothing further.

17          THE COURT:  Anything further from the defense?

18          MR. SCHOENSTEIN:  Could we just put up that last

19   exhibit, 37, that we were just looking at.

20          MR. KATAEV:  Looks like we're having some IT issues,

21   your Honor.

22          THE COURT:  I see that.

23   RECROSS EXAMINATION

24   BY MR. SCHOENSTEIN:

25   Q.  This is exhibit 37, and do you see we've put before you, at

N7cWede6                          Mehta - Recross

1    the end of -- I don't know what page this is, for the record --

2    page 911, was there a specific provision in your initial

3    contract talking about the fact that NYU was assuming the lease

4    and the business loan?

5    A.  Say it again?

6    Q.  Was there a provision in your initial contract with NYU

7    talking about the fact that as part of the deal, NYU was

8    assuming the lease and the business loan?

9    A.  Yes.

10          MR. SCHOENSTEIN:  Nothing further.

11          THE COURT:  All right.  Dr. Mehta, you're excused as a

12   witness.  You may step down.

13          (Witness excused)

14          THE COURT:  Members of the jury, it's now 3:17.  We'll

15   take our midafternoon break until 3:30.  That will give the

16   parties time to set up for the next witness.  So have a good

17   break.  Please don't discuss the case amongst yourselves during

18   the break.

19          (Continued on next page)

20

21

22

23

24

25

N7cWede6

1                    (Jury not present)

2                    THE COURT:  All right.  See you back here at 3:30.  At

3     3:30, the next witness should be on the witness stand.  And if

4     there's a deposition transcript that might be used, please

5     provide it to me.

6                    (Recess)

7                    THE COURT:  All right.  Let's bring in the jury.

8                    Counsel, I plan to tell the jury that we are on

9     schedule.

10                   Any objections from plaintiff?

11                   MR. LABUDA:  No, your Honor.

12                   (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

 1            (Jury present)

 2            THE COURT:  Be seated.

 3            Plaintiff, call your next witness.

 4            MR. KATAEV:  The plaintiff calls defendant Joseph

 5   Antonik, your Honor.

 6            THE COURT:  Mr. Antonik, please stand up in the

 7   witness box.  My deputy will administer the oath.

 8    JOSEPH ANTONIK,

 9        Defendant, called as a witness by the Plaintiff,

10        having been duly sworn, testified as follows:

11            THE COURT:  Mr. Antonik, you may be seated.

12            Please keep your voice loud.  Speak into the

13   microphone.

14            Counsel, you may inquire.

15   DIRECT EXAMINATION

16   BY MR. KATAEV:

17   Q.  Good afternoon, Mr. Antonik.

18   A.  Good afternoon.

19   Q.  You received your associate's degree from Queensboro

20   Community College, right?

21   A.  Yes.

22   Q.  You also went to Borough of Manhattan Community College and

23   received a degree there as well, correct?

24   A.  A certificate of completion.

25   Q.  And after working at various other hospitals, you began

1   working at NYU in 2013, correct?

2   A.   Yes.

3   Q.   And you started off at NYU as a site director, right?

4   A.   Yes.

5   Q.   And you were then promoted to a regional-director position

6   just a few years later, right?

7   A.   Yes.

8   Q.   But then you became a site director again, correct?

9   A.   Yes.

10  Q.   And you've been a site director, not a regional director,

11  since 2018, correct?

12  A.   Through June 2, 2023.

13  Q.   So you recently changed your position, but that's not

14  relevant here.  For our purposes, we're focusing on your

15  position as a site director since 2018, correct?

16  A.   Yes.

17  Q.   Now, when you became a site director again in 2018, your

18  site became 1999 Marcus Avenue, correct?

19  A.   Yes.

20  Q.   One of your four sites, correct?

21  A.   Yes.

22  Q.   Prior to that time, when you were a site director, you were

23  in Queens and other locations, correct?

24  A.   Yes.

25  Q.   Not at 1999 Marcus, right?

N7cWede6                    Antonik - Direct

1    A.  No.

2    Q.  And when you went back to being a site director, you began

3    performing the same functions and duties that you performed as

4    a site director before, correct?

5    A.  Yes.

6    Q.  And you report to Mr. David Kaplan, correct?

7    A.  Yes.

8    Q.  And Mr. Kaplan is here with us today, correct?

9    A.  Yes.

10   Q.  He's the gentleman sitting all the way in the back, to the

11   left, right?

12   A.  Yes.

13   Q.  And that, for all intents and purposes, is one of your

14   bosses, correct?

15   A.  Yes.

16   Q.  And Mr. Kaplan has a boss as well at NYU, doesn't he?

17   A.  Yes.

18   Q.  And that individual is Mr. Swirnow, correct?

19   A.  Yes.

20   Q.  And Mr. Swirnow was with us earlier today, wasn't he?

21   A.  Yes.

22   Q.  Now, focusing on your responsibilities as site director, is

23   it fair to say that you oversee the day-to-day operations and

24   management of the services at NYU sites?

25   A.  Yes.

1   Q.  And 1999 Marcus Avenue is one of those sites, and you had

2   three other sites as well, correct?

3   A.  Yes.

4   Q.  It's fair to say, isn't it, that you are responsible for

5   many operational aspects of those sites, correct?

6   A.  Yes.

7   Q.  You're involved in the logistics of making the practice

8   work and run, correct?

9   A.  Yes.

10   Q.  For example, you keep the lights on and ensure efficiency,

11   correct?

12   A.  Yes.

13   Q.  Those operational aspects also include managing doctors'

14   office space and moving them sometimes; yes?

15   A.  Yes.

16   Q.  But you don't decide who moves where, right?

17   A.  No.

18   Q.  That comes up from leadership, correct?

19   A.  Yes.

20   Q.  So if you're told to make something happen in terms of a

21   change, that's a change that was communicated to you by either

22   Mr. Rubin, Mr. Swirnow, or both of them, correct?

23   A.  It would --

24            MR. SCHOENSTEIN:  Objection, your Honor.

25            THE COURT:  Overruled.

N7cWede6                        Antonik - Direct

1   A.  It would normally come from my immediate boss.

2   Q.  And that's Mr. Swirnow, correct?

3   A.  David Kaplan.

4   Q.  I apologize.  Yes.

5       And as you know, Dr. Edelman is a physician that worked at

6   NYU, isn't that correct?

7   A.  Yes.

8   Q.  And you knew that she had her own practice before coming to

9   NYU, isn't that right?

10  A.  I became aware of that at some point.

11  Q.  Mr. Kaplan provided you information about her and all the

12  other doctors when you became a site director of 1991 Marcus,

13  right?

14  A.  Yes.

15  Q.  And you recognize Dr. Edelman as someone qualified for her

16  position, correct?

17  A.  Because she was already working there at the time that I

18  arrived, I assumed so.

19  Q.  And you have no ability to determine whether a doctor is

20  qualified, correct?

21  A.  Correct.

22  Q.  Now, Dr. Edelman's role was to provide physician services

23  as a rheumatologist to patients, correct?

24  A.  Correct.

25  Q.  Those responsibilities and her position never changed until

1  she was terminated, correct?

2  A.  Correct.

3  Q.  And her position as a doctor was on par with all the other

4  rheumatologists at the office, correct?

5  A.  Some of the other rheumatologists had different titles.

6  Q.  But they nonetheless performed services as rheumatologists,

7  correct?

8  A.  Yes.

9  Q.  And those duties were the same, correct?

10  A.  They all saw patients in the office.

11  Q.  You also had the additional responsibility of overseeing

12  Dr. Edelman and the other doctors in terms of their operations,

13  right?

14  A.  Yes.

15  Q.  These include the operational aspects of the doctor's role,

16  such as the number of patients seen and the RVUs earned, right?

17  A.  Yes.

18  Q.  And you did, in fact, review Dr. Edelman's RVUs earned to

19  measure her performance while she worked there, correct?

20  A.  Yes.

21  Q.  And there was never a problem in that regard, correct?

22  A.  Not that I recall.

23  Q.  Now, Dr. Edelman is just one of 85 other doctors that you

24  oversaw in that regard, correct?

25  A.  Correct.

1    Q.  That includes Dr. Porges; you oversaw him as well, correct?

2    A.  Correct.

3    Q.  And that includes Dr. Goldberg?

4    A.  Correct.

5    Q.  And Dr. Modi, right?

6    A.  No.

7    Q.  And that's because Dr. Modi was in Huntington, correct?

8    A.  Correct.

9    Q.  Now, you also oversaw Dr. Mehta, who just testified,

10   correct?

11   A.  Yes.

12   Q.  One of the other ways in which you monitor the performance

13   metrics of a doctor, other than RVUs, is through patient

14   satisfaction surveys, correct?

15   A.  Correct.

16   Q.  And you were responsible in this case as a defendant to

17   search for documents relevant to this case, correct?

18   A.  Correct.

19   Q.  You located and submitted any relevant documents to your

20   attorneys, right?

21   A.  Yes.

22   Q.  And it's fair to say, isn't it, that whatever you had you

23   produced, right?

24   A.  Yes.

25   Q.  And in order to obtain what you had, you engaged in the

1    search process by searching your emails and your paper files,

2    correct?

3    A.   Correct.

4    Q.   You also asked your office manager, Ms. Ruiz, for any

5    documents she had related to this case, correct?

6    A.   Yes.

7    Q.   And you did that in the beginning of the case, before any

8    depositions, right?

9    A.   Can you repeat the question?

10   Q.   You did that search and spoke to Ms. Ruiz before any

11   deposition in this case, correct?

12   A.   Yes.

13   Q.   Now, it's fair to say, isn't it, that you did not produce a

14   single patient satisfaction survey?

15   A.   I don't recall.

16   Q.   You prepared with your attorneys for your testimony today,

17   correct?

18   A.   Yes.

19   Q.   And when you had your deposition -- there were two of them,

20   right?

21   A.   Yes.

22   Q.   In preparation -- in advance of both of those depositions,

23   you prepared for those depositions with your attorneys as well,

24   correct?

25            MR. STEER:  Objection, your Honor.

1                THE COURT:  Overruled.

2     BY MR. KATAEV:

3     Q.  Answer?

4     A.  Yes.

5     Q.  In the course of your preparation for those depositions and

6     at this trial, did you review any patient satisfaction surveys

7     of Dr. Edelman?

8     A.  Not that I recall.

9     Q.  As part of the day-to-day functions in the performance of

10    your duties, you sent emails to others at NYU concerning the

11    performance of doctors, right?

12    A.  Yes.

13    Q.  Same question with respect to preparation for trial and

14    those depositions; there were no emails, other than the

15    November 2020 email, about Dr. Edelman's performance, correct?

16    A.  I don't remember.

17    Q.  Now, Dr. Edelman was terminated at the end of 2020, right?

18    A.  Yes.

19    Q.  And it's fair to say that you have no knowledge or

20    recollection as to why she was terminated?

21    A.  Correct.

22    Q.  And you don't remember providing any information about Dr.

23    Edelman in relation to her termination, do you?

24    A.  There was some information that I had worked with Miriam to

25    prepare and submit to, through a request to David Kaplan.

N7cWede6                         Antonik - Direct

Q.  In terms of the patient satisfaction surveys, you do not

have any such patient satisfaction surveys with you today,

correct?

A.  Correct.

Q.  And the same question about emails; other than the November

2020 email, you don't have any emails about Dr. Edelman's

performance, correct?

A.  Correct.

Q.  Now, you said you don't recall anything about why Dr.

Edelman was terminated or your involvement in it, but you were

present, weren't you, during this jury trial, when we showed

the November 2020 email that you drafted?

A.  Yes.

          MR. KATAEV:  I want to place up for the jury 86, which

was previously admitted.

          THE COURT:  You may do so.

BY MR. KATAEV:

Q.  This is an email that you sent to Dr. Porges, Ms. Ruiz and

Patricia Feslowich, correct?

A.  Yes.

Q.  And you sent this on November 6 of 2020, correct?

A.  Yes.

Q.  And this was following a September 17, 2019, complaint

against you, correct?

A.  It occurred after that.

1    Q.  And in this email, you say to them, "we need a clear,

2    convincing summary with examples sent," correct?

3    A.  Correct.

4    Q.  And you did this for the purpose of facilitating the

5    gathering of information, correct?

6    A.  Correct.

7    Q.  And you were gathering this information because Mr. Kaplan

8    told you to do that, correct?

9    A.  Correct.

10   Q.  And Mr. Kaplan told you to do that because you came to him

11   about, quote/unquote, issues with Dr. Edelman, correct?

12   A.  I don't quite remember that being part of it.

13           MR. KATAEV:  Well, let's see what you testified to to

14   refresh your recollection.

15           191, your Honor.

16           THE COURT:  191?  I don't think there is a 191.

17           MR. KATAEV:  Sorry, your Honor.

18   Q.  At your December 21, 2021, deposition, I asked you the

19   following questions and you gave the following answers,

20   correct?

21   "Q.  How did you first become aware of any issues related to

22   Dr. Edelman's performance?

23   "A.  There were comments made to me by Miriam Ruiz.

24   "Q.  What did she say to you and what did you say to her?

25   "A.  I don't remember exactly.

1    "Q.  What, if anything, did you do upon discussing Dr.

2    Edelman's performance issues with Miriam Ruiz?

3    "A.  I don't remember.

4    "Q.  Did you inform David Kaplan about your conversation with

5    Miriam Ruiz?

6    "A.  Yes."

7         Do you recall that testimony?

8    A.  Yes.

9    Q.  And so it's fair to say, isn't it, that the only reason

10   Dr. Kaplan asked for information about Dr. Edelman was because

11   you came to him about Dr. Edelman issues?

12   A.  I can't say if that's the only reason, but it -- it may be

13   part of it.

14   Q.  Now, going back to this email, which I would like to

15   republish to the jury, you're looking for clear and convincing

16   summary with examples sent; you were looking for negative

17   feedback about Dr. Edelman, correct?

18   A.  We were looking for a summary of the issues that had been

19   reported in the practice.

20   Q.  But you didn't ask over here for anything positive about

21   Dr. Edelman, did you?

22   A.  It was a request for issues being reported in the practice.

23   Q.  And it's fair to say, isn't it, that this was not the

24   request for an objective review of Dr. Edelman?

25   A.  It was a request for issues that occurred within the

N7cWede6                        Antonik - Direct

1  practice.

2  Q.  A request by Mr. Kaplan, correct?

3  A.  Correct.

4  Q.  Which was prompted by you, correct?

5  A.  I don't know if it was just me or if anybody else.

6  Q.  Now, you had to be deposed a second time because you failed

7  to produce this document the first time around, correct?

8           MR. STEER:  Objection, your Honor.

9           THE COURT:  Sustained.

10  A.  I was deposed a second time --

11          THE COURT:  Sir, if there's an objection, pause for a

12  second.  If I say overruled, you answer the question.  If I say

13  sustained, then the lawyers move on to a new question.

14          I said sustained, so plaintiff's counsel will move to

15  a new question.

16  BY MR. KATAEV:

17  Q.  It's fair to say, isn't it, that the request for this

18  information from Mr. Kaplan was prompted, at least in part, by

19  you?

20  A.  Yes.

21          (Continued on next page)

22

23

24

25

1    BY MR. KATAEV:

2    Q.  So it's fair to say that you do have an understanding of

3    the circumstances behind plaintiff's termination; correct?

4              MR. STEER:  Objection.

5              THE COURT:  He can answer that question.

6              Do you have an understanding of the circumstances that

7    led to the plaintiff's termination?  From your own knowledge,

8    not from what you learned in the litigation.

9    A.  From my own knowledge, at the time, I did not know that any

10   of this would be used for termination.

11   Q.  This email shows that you had direct involvement in

12   Dr. Edelman's termination, doesn't it?

13             MR. STEER:  Objection.

14             THE COURT:  Sustained.

15   A.  Can you repeat the question.

16             THE COURT:  Again, remember, listen to if there's an

17   objection, then listen to me.  If I say "sustained," that means

18   the lawyer moves on.  If I say "overruled," you answer the

19   question.

20             THE WITNESS:  Okay.

21   Q.  Going to the later-sent email at 4:19 the same day, you had

22   provided a lot more information than you provided in your

23   original email; correct?

24   A.  Yes.

25   Q.  And you did that approximately two hours later; correct?

1   A.  Yes.

2   Q.  And in that two hours, you searched for this information;

3   correct?

4   A.  I don't remember exactly.

5   Q.  The first entry in this log is November of '19; correct?

6   A.  Yes.

7   Q.  And that was just about a month and a half after

8   Dr. Edelman made a complaint against you; correct?

9   A.  Yes.

10  Q.  There's not one single entry here that predates her

11  complaint against you; correct?

12  A.  Not that I see here.

13  Q.  And when you sent this email, you did not have personal

14  knowledge as to any of these things, did you?

15  A.  I had been made aware of some issues from the office

16  manager, Miriam Ruiz, prior to this being sent.

17  Q.  And Mr. Kaplan is the regional director; correct?

18  A.  Mr. Kaplan is a senior director.

19  Q.  And he's responsible for about 80 to 100 sites; correct?

20  A.  Yes.

21  Q.  So he would not be privy to any of these kind of details,

22  would he?

23  A.  I don't know.

24  Q.  The contents of this email were taken by Dr. Porges and

25  provided him so that he could send an email to Mr. Kaplan about

N7CCede7                          Antonik - Direct

1    Dr. Edelman; correct?

2    A.   Correct.

3    Q.   That was done to disguise your involvement in this;

4    correct?

5             MR. STEER:  Objection.

6             THE COURT:  Sustained.

7    Q.   In this email, you served as the judge and the jury for

8    Dr. Edelman; correct?

9             MR. STEER:  Objection.

10            THE COURT:  Sustained.

11   Q.   In this email, you raised issues about patient care;

12   correct?

13   A.   Yes.

14   Q.   But you have no firsthand knowledge of these alleged issues

15   with patient care; correct?

16   A.   I wasn't directly involved in the issues.

17   Q.   Now, NYU being a medical institution obviously trains

18   everyone about patient welfare and the duty to report issues

19   with patient care; correct?

20   A.   Yes.

21   Q.   There's a special compliance department to report these

22   kind of issues internally; correct?

23   A.   There is a department to report compliance-related issues.

24   Q.   And you've been an employee with NYU now for 10 years;

25   correct?

N7CCede7                          Antonik - Direct

1    A.  Correct.

2    Q.  And part of your -- because you're employed by NYU, you

3    receive an ID card from NYU; correct?

4    A.  Correct.

5    Q.  Do you happen to have that ID card on your person today?

6    A.  No.

7    Q.  It's true, isn't it, that on the back of the NYU ID card,

8    there's a special hotline for compliance issues; correct?

9    A.  I don't recall.

10   Q.  These alleged patient issues that you wrote about here, you

11   never reported them to compliance or to any hotline; correct?

12           MR. STEER:  Objection, your Honor.

13           THE COURT:  Overruled.

14   A.  Not that I recall.

15   Q.  You created this email for the purpose of having

16   Dr. Edelman terminated, didn't you?

17           MR. STEER:  Objection.

18           THE COURT:  Overruled.

19   A.  No.

20   Q.  But you acknowledge that with Dr. Edelman gone, the

21   productivity of the faculty group practice decreased; correct?

22   A.  When she left, there were less patients being seen.

23   Q.  And therefore, NYU was less productive; correct?

24           MR. STEER:  Objection.

25           THE COURT:  Overruled.

1    A.   Yes.

2    Q.   With respect to any of these issues listed here, you never

3    even spoke to Dr. Edelman; right?

4    A.   Not that I recall.

5    Q.   Now, you don't have the power to actually terminate any

6    physicians; right?

7    A.   Correct.

8    Q.   That's above your pay grade?

9    A.   Correct.

10   Q.   That's something that only Mr. Rubin can decide; correct?

11   A.   That is my understanding.

12   Q.   And that's why this information was provided to leadership,

13   so that she could be fired; correct?

14   A.   I did not know that at the time.

15   Q.   You sent this email because you lacked the power to fire

16   Dr. Edelman; correct?

17   A.   No.

18   Q.   Dr. Edelman was ultimately replaced; right?

19   A.   Please repeat the question.

20   Q.   Dr. Edelman was replaced with another doctor, wasn't she?

21   A.   I do recall of another rheumatologist joining the practice

22   over time.

23   Q.   That was Dr. Yaich; right?

24   A.   He was hired at the location.

25   Q.   And he's a male doctor, isn't he?

1    A.  Yes.

2    Q.  And part of your duties involved on-boarding him as a

3    physician; correct?

4    A.  Correct.

5    Q.  And he was hired before Dr. Edelman was terminated;

6    correct?

7    A.  I don't remember.

8    Q.  Now in September of '19, you had met with Dr. Edelman to

9    discuss the need to rearrange offices; correct?

10   A.  Correct.

11   Q.  You told her she needs to share her space going forward;

12   correct?

13   A.  What I stated was that there was a leadership directive to,

14   one, consolidate the practices, the practice of rheumatology

15   into the suite, and two, that we also needed office space for

16   another doctor coming in.

17   Q.  And you understood the directive to be an order; correct?

18   A.  It was a directive.

19   Q.  And that directive was to you; right?

20   A.  Uh-huh.

21   Q.  Was that a yes?

22   A.  Yes.

23   Q.  And your role was to carry out that directive; right?

24   A.  Yes.

25   Q.  So when you had a conversation with Dr. Edelman, you

1   weren't asking her anything, you were telling her, weren't you?

2   A.  I was explaining to her the directive, and I met with her

3   as a courtesy to her.

4   Q.  But you did not hear any of her concerns when she raised

5   them to you, did you?

6               MR. STEER:  Objection.

7               THE COURT:  Overruled.

8   A.  Please repeat the question.

9               MR. KATAEV:  Is it possible to have it read back?

10              THE COURT:  Why don't you ask the question again.

11  Q.  When you had this conversation with Dr. Edelman, you did

12  not hear any of her concerns, did you?

13              THE COURT:  Let me ask.  Did she express concerns to

14  you when you had the conversation?

15  A.  No.

16  Q.  Didn't she tell you that she didn't believe that you could

17  contractually -- based on her contract, she could be moved out

18  of her office?

19  A.  She stated that it was in her contract that the office was

20  hers.

21  Q.  And that was a concern that she raised, isn't it?

22              MR. STEER:  Objection.

23              THE COURT:  Sustained.

24  Q.  It's fair to say, isn't it, that you were not even aware as

25  to whether there were other doctors who were not using their

1    office space that were willing to share?

2    A.  I don't remember.

3    Q.  You heard Dr. Mehta testify today that she would have been

4    willing to share her office, didn't you?

5    A.  Dr. Mehta was in her office five days per week at the time.

6    Q.  But you weren't aware that Dr. Edelman does use her office

7    on Fridays, were you?

8    A.  I was not.

9    Q.  And you never observed who's in and who's not in on Fridays

10   by actually going up to the suite, did you?

11   A.  I would round in the practice occasionally, sometimes on

12   Fridays.

13   Q.  And you worked on the first floor of the building outside

14   of the suite where the doctors practice; right?

15   A.  Correct.

16   Q.  The suite is on the third floor in suite 306; right?

17   A.  Right.

18   Q.  So you generally don't have any understanding of who's in

19   and who's out on any particular day, do you?

20   A.  No, I would -- I was familiar with the schedule, which

21   providers would work on which days and which rooms they would

22   use, which exam rooms they would use and which consult rooms

23   they would use.

24   Q.  Based on patient schedules; right?

25   A.  Well, we had provider schedules and patient schedules.

1   Q.   But those patient schedules don't say anything about

2   administrative days, do they?

3   A.   Not the patient schedules.

4   Q.   And you didn't investigate that, did you?

5   A.   Please rephrase that.

6   Q.   You did not investigate that aspect, did you?

7   A.   Which aspect?

8   Q.   The days, the doctor being in for administrative days?

9   A.   I don't remember.

10  Q.   It's fair to say, isn't it, that when you didn't succeed in

11  convincing Dr. Edelman she had to share a space, you had to

12  report it up to Mr. Kaplan; right?

13  A.   Yes.

14  Q.   Because when any issues arise, you report directly up to

15  Mr. Kaplan; right?

16  A.   Correct.

17  Q.   And you told Mr. Kaplan what happened, didn't you?

18  A.   I had sent him an email.

19  Q.   And at the time that you approached Dr. Edelman, you did it

20  as an impromptu meeting; correct?

21  A.   Correct.

22  Q.   She had no idea you were coming to discuss this with her?

23  A.   I don't know.  I asked Miriam to let me know when she was

24  finished with her patient hours and I didn't know if Miriam

25  mentioned it to her, but I did it with the intention of meeting

1    with her after she was finished seeing patients.

2    Q.  And when you failed to achieve this objective, you also

3    informed Mr. Swirnow; correct?

4            MR. STEER:  Objection.

5            THE COURT:  Basis?

6            MR. STEER:  Foundation.  I don't know that we have any

7    testimony as to what that question meant, frankly, your Honor.

8            THE COURT:  Overruled.

9    A.  Please repeat the question.

10   Q.  When you failed to secure Dr. Edelman's cooperation in

11   sharing office space, you reported to Kaplan.  My question is

12   did you also report it to Mr. Swirnow?

13   A.  I did not.

14   Q.  But based on your knowledge of the way things work at NYU,

15   you understood that because it's a directive from leadership,

16   Swirnow and Rubin, that Mr. Kaplan would report it to

17   Mr. Swirnow; correct?

18   A.  I did expect that.

19   Q.  And it's fair to say that whatever Mr. Swirnow learns about

20   things like this, he would tell Mr. Rubin; right?

21           MR. STEER:  Objection.

22           THE COURT:  He can testify to what he would understand

23   from the language NYU conducts business.

24   A.  I don't know.

25   Q.  Now, Mr. Rubin and Mr. Swirnow work at One Park; right?

1   A.  Yes.

2   Q.  That's in Manhattan at One Park Avenue; is that correct?

3   A.  Yes.

4   Q.  They work on the same floor; right?

5   A.  Uh-huh.

6   Q.  They work in the same suite, too; right?

7   A.  Yes.

8   Q.  In fact, their offices are right next door to each other,

9   aren't they?

10  A.  I don't recall.

11  Q.  It's fair to say that Mr. Swirnow is Mr. Rubin's right

12  hand; correct?

13  A.  They work closely together.

14  Q.  And it's fair to say that Mr. Swirnow reports directly to

15  Mr. Rubin; correct?

16  A.  Correct.

17  Q.  And you have been to One Park; correct?

18  A.  I have.

19  Q.  Is it fair to say that you would go at least once a month?

20  A.  I haven't been there in a long time.  At the time when I

21  was going there, it was approximately once a month.

22  Q.  If you need to speak to Mr. Rubin, you can't reach him.

23  The way to do it is to reach out to Mr. Swirnow; right?

24  A.  I would do it through David Kaplan.

25  Q.  Now, Mr. Swirnow ultimately spoke to Dr. Edelman and

1    resolved this issue; correct?

2    A.  Correct.

3    Q.  Mr. Swirnow is capable of resolving the issue you couldn't

4    resolve; right?

5    A.  Correct.

6    Q.  And you understood that Mr. Swirnow reached an alternative

7    solution to what was originally desired by NYU; correct?

8    A.  Correct.

9    Q.  Dr. Edelman stopped going to Huntington on Thursdays and

10   remained at Lake Success all five days; correct?

11   A.  Correct.

12   Q.  Now, you were involved in establishing the plan with moving

13   around all the doctors to achieve the goal of NYU; correct?

14   A.  Correct.

15   Q.  And the goal of NYU is to have all the rheumatologists in

16   the same suite; correct?

17   A.  Correct.

18   Q.  Dr. Edelman was already in the suite; right?

19   A.  She was.

20   Q.  And you had Dr. Goldberg, who was not in the suite, in a

21   different suite on the same floor; correct?

22   A.  Correct.

23   Q.  And prior to that, Dr. Goldberg was in a suite on the

24   second floor; correct?

25   A.  At the time he was in an adjacent suite, but on the same

1    floor.

2    Q.  He was in a suite with the oncologists; correct?

3    A.  Correct.

4    Q.  And he was in that suite because that's where he wanted to

5    be; correct?

6    A.  I don't remember.

7    Q.  It's fair to say, isn't it, that Dr. Edelman's decision to

8    stop going to Huntington and come back to the Lake Success

9    location complicated your directive?

10   A.  It presented a challenge.

11   Q.  And initially, she was supposed to stop going to Huntington

12   in January; right?

13   A.  I don't remember exactly when.

14   Q.  Well, if I could refresh your recollection, the reason why

15   she needed to share the office space was because Dr. Given was

16   going to be on-boarded; correct?

17   A.  I recall that we were making -- we were planning the space

18   for Dr. Li to come in, as well as Dr. Given.

19   Q.  And Dr. Goldberg; right?

20   A.  And Dr. Goldberg.

21   Q.  There were three doctors coming in and you needed to make

22   space for them; right?

23   A.  Uh-huh.

24   Q.  After the complaint in September of '19, in November of

25   '19, you nonetheless decided to put Dr. Li in Dr. Edelman's

1    office; correct?

2    A.  I don't remember where we put her exactly at that time when

3    she started.

4    Q.  Isn't it true that you intended to place Dr. Li in

5    Dr. Edelman's office in November after the complaint?

6    A.  Well, the plan was for Dr. Li -- the thought was -- excuse

7    me.  The thought was to have Dr. Li use doctor -- use the

8    office that Dr. Edelman was using when she wasn't there.

9    Q.  And Dr. Edelman prevented that from happening; that's fair

10   to say; right?

11   A.  Dr. Edelman's schedule changed.

12   Q.  But you made that decision without discussing with

13   Dr. Edelman; correct?

14   A.  Sorry.  Which decision?

15   Q.  The decision to place Dr. Li in Dr. Edelman's office in

16   November after the complaint?

17   A.  I don't remember exactly where Dr. Li went at that point in

18   time.

19   Q.  The question is, you didn't discuss that with Dr. Edelman;

20   correct?

21   A.  No.

22   Q.  You just did it and then she stopped it?

23   A.  I don't remember.

24   Q.  Do you remember that Dr. Edelman locked the door to her

25   office so no one could access it?

1    A.  No.

2    Q.  It's fair to say that after the incident you had with

3    Dr. Edelman, you no longer spoke to her after that?

4    A.  I recall the contact to be limited, if any.

5    Q.  Are you aware that she closed her door every time you

6    entered the suite?

7    A.  No.

8    Q.  It's fair to say that you did not respect Dr. Edelman

9    enough to ask for a meeting to discuss this issue; correct?

10             MR. STEER:  Objection.

11             THE COURT:  Overruled.

12   A.  Please repeat the question.

13   Q.  It's fair to say that you did not respect Dr. Edelman

14   enough to schedule a meeting with her to discuss issues like

15   this?

16   A.  That is not true.

17   Q.  It was easier for you to catch her off guard and corner

18   her; correct?

19   A.  Not true.

20             MR. STEER:  Objection.

21             THE COURT:  Overruled.

22   Q.  It's fair to say that because this directive to move the

23   offices came from leadership, Mr. Rubin and Mr. Swirnow, that

24   they were involved in these decisions and you kept them abreast

25   of what was going on?

N7CCede7                        Antonik - Direct

1    A.  I communicated more so with David Kaplan regarding this

2    objective.

3    Q.  Isn't it true that when Dr. Edelman refused to share a

4    space, you had to inform all of them?

5    A.  I don't remember.

6    Q.  But it's fair to say that, ultimately, Mr. Rubin knew that

7    this was an issue?

8           MR. STEER:  Objection.

9           THE COURT:  Sustained.

10   Q.  You were eventually able to accomplish the goal of moving

11   all the rheumatologists into suite 306; correct?

12   A.  Correct.

13   Q.  But Dr. Edelman made that move difficult for you; right?

14   A.  We were able to accomplish the goal eventually.

15   Q.  Did she make it difficult for you?

16   A.  It prevented it for a period of time.

17   Q.  Now, isn't it true that part-time doctors are the ones that

18   are more prone to having their offices shared?

19   A.  Yes.

20   Q.  Focusing on the employees that report to you, Ms. Ruiz was

21   the office manager in suite 306; correct?

22   A.  Correct.

23   Q.  That's where Dr. Edelman worked; right?

24   A.  Correct.

25   Q.  And you spoke to Ms. Ruiz about Dr. Edelman's complaint;

N7CCede7                        Antonik – Direct

1    correct?

2    A.  I believe so.

3    Q.  And you knew that Ms. Ruiz maintained documents about

4    Dr. Edelman because she's the office manager; right?

5    A.  Correct.

6    Q.  But at the same time, you have no knowledge as to whether

7    Ms. Ruiz maintained similar documents for other doctors?

8    A.  I don't recall.

9    Q.  As far as you know, Ms. Ruiz moved out of New York to

10   Maryland for personal reasons; yes?

11   A.  Yes.

12   Q.  And she needed a job when she moved to Maryland; correct?

13   A.  Correct.

14   Q.  And you gave her a glowing review to land her that job;

15   correct?

16   A.  I gave her a -- I gave her a reference.

17   Q.  And she was successful in obtaining a job at Luminous

18   Health; correct?

19   A.  Yes.

20   Q.  And to your knowledge, Ms. Ruiz is being represented by

21   your attorneys in this case; correct?

22   A.  Correct.

23        MR. KATAEV:  I'd like to place up for the jury

24   Plaintiff's Exhibit 84.  It's been admitted.

25        THE COURT:  You may do so.

1    Q.  This is a spreadsheet that Ms. Ruiz prepared; correct?

2    A.  I don't recall.

3    Q.  You asked Ms. Ruiz to prepare this spreadsheet, didn't you?

4    A.  I don't recall.

5    Q.  And again, Ms. Ruiz reports directly to you; correct?

6    A.  She did.

7    Q.  She was your eyes and ears in the office of 306, wasn't

8    she?

9    A.  She was the office manager of suite 306.

10   Q.  She told you everything that went on; correct?

11   A.  She would regularly report matters to me.

12   Q.  So you knew to go to her when you needed documents relevant

13   to this case; correct?

14   A.  Correct.

15   Q.  And you knew that she had documents regarding Dr. Edelman,

16   but not about any other doctors; correct?

17   A.  I don't recall.

18   Q.  Let's see what you testified to at your deposition.

19            MR. KATAEV:  Page 13 of the first transcript.

20            THE COURT:  Which transcript?

21            MR. KATAEV:  The October 2021 transcript, your Honor.

22   Starting at line 8, going into the next page, I believe at 14.

23            THE COURT:  What do you want to ask?

24            MR. KATAEV:  From line 16.

25   Q.  At your deposition --

N7CCede7                          Antonik - Direct

1          MR. STEER:  Objection, your Honor.

2          THE COURT:  Basis?

3          MR. STEER:  It's improper when you look at the

4    transcript of what was testified by the witness.

5          THE COURT:  It's not a speaking objection.  What's the

6    basis of the objection without the speaking objection?

7          MR. STEER:  It's improper.  I think it assumes

8    something that has not been presented, your Honor.

9          THE COURT:  What's the basis --

10         MR. STEER:  It's improper impeachment.

11         THE COURT:  What's the basis for the use of the

12   testimony?

13         MR. KATAEV:  To impeach him.

14         THE COURT:  Where's the inconsistency?

15         MR. KATAEV:  He testifies about maintaining documents

16   regarding doctors.

17         THE COURT:  Which line and page?

18         MR. KATAEV:  Starting at page 13, line 16 going to 24,

19   just that section.

20         THE COURT:  I'm going to sustain the objection.  You

21   can do more to bring out if there's an inconsistency, but right

22   now there's not one.

23   Q.  You know for a fact that Ms. Ruiz maintained a file about

24   Dr. Edelman; correct?

25   A.  I know this now.

N7CCede7                          Antonik - Direct

1    Q.  But you have no knowledge of Ms. Ruiz maintaining any such

2    files for any other doctors; correct?

3    A.  I don't recall.

4              MR. KATAEV:  Can I show it to refresh his

5    recollection?

6              THE COURT:  Just 13, lines 20 to 24.

7              MR. KATAEV:  I highlighted it for the witness.

8              THE COURT:  You can do it to refresh recollection or

9    to impeach, whichever you want.

10   Q.  At your deposition in October 2021, Mr. Antonik, did I ask

11   you the following questions and did you give the following

12   answers:

13   "Q.  To your knowledge, did Ms. Ruiz maintain similar files for

14   other doctors?

15   "A.  I don't know."

16   Q.  Do you recall that testimony?

17   A.  I do now because you're showing it to me.

18   Q.  So it's fair to say that the only files that you're aware

19   of that Ms. Ruiz maintained was for Dr. Edelman; correct?

20   A.  I don't know.

21             THE COURT:  You don't know of any other files that she

22   maintains for any other doctors; correct?

23             THE WITNESS:  Correct.

24   Q.  You also spoke with Dr. Porges about Dr. Edelman's

25   complaint against you; correct?

1   A.  I don't remember the conversation with Dr. Porges.

2   Q.  You're aware of NYU's policies regarding discrimination,

3   harassment, or retaliation; correct?

4   A.  Correct.

5   Q.  You learned about these policies during orientation and

6   annual training that you took; correct?

7   A.  Correct.

8   Q.  And, of course, you paid attention during those annual

9   trainings because you're required to; right?

10  A.  Yes.

11  Q.  Now, HR contacted you about Dr. Edelman's complaint, didn't

12  they?

13  A.  Yes.

14  Q.  You spoke to Ms. Kathleen Pacina?

15  A.  Yes.

16  Q.  That's when you first learned about Dr. Edelman's

17  complaint?

18  A.  Yes.

19  Q.  And you don't have any recollection of what you and her

20  discussed, do you?

21  A.  With Ms. Pacina?

22  Q.  Correct.

23  A.  I recall we had a conversation, she had explained the

24  nature of the complaint, I had explained my understanding of

25  what happened, my version of it, and that's what I recall about

1    it.

2    Q.  And after that conversation with Ms. Pacina, nothing ever

3    happened; correct?

4            MR. STEER:  Objection, your Honor.

5            THE COURT:  Overruled.

6    A.  I don't quite remember.

7            MR. KATAEV:  I'd like to present 21.  I believe it's

8    in evidence.

9            THE COURT:  Go ahead.  You may.

10   Q.  I'll represent to you, Mr. Antonik, that this is an entry

11   made by Ms. Pacina in a system maintained by NYU to record

12   employee complaints.  I want to focus your attention on a

13   particular portion.

14       In reviewing this part that says "Call with Joe," please

15   read and confirm whether this reflects the nature of the

16   conversation you had with Ms. Pacina.

17   A.  Yes, this appears to reflect the conversation I had with

18   Ms. Pacina.

19   Q.  And this was the only conversation you ever had with

20   Ms. Pacina?

21   A.  I don't remember if there were any others.

22   Q.  During your call with Ms. Pacina, you called Dr. Edelman

23   defensive and snide; correct?

24   A.  It says this in this, so I would say yes.

25   Q.  In this log, it says you threatened to call the powers that

N7CCede7                          Antonik - Direct

1   be to address this issue; correct?

2   A.  I'm sorry.  What are you referring to?

3   Q.  There's a reference in here that you would bring this up to

4   the powers that be to address it.

5   A.  Yes.

6   Q.  That's what you told Dr. Edelman during your conversation;

7   correct?

8   A.  As I exited the office, I told her I would let leadership

9   know.

10  Q.  And that was a threat to her; right?

11  A.  No, it was informing her that I would let the leadership

12  know.

13  Q.  Now, besides the employee labor relations department, which

14  is located at One Park; is that right?

15  A.  I believe so.

16  Q.  The faculty group practice that you work under as a human

17  resources department, as well; correct?

18  A.  Not on our site, not on site.

19  Q.  Is it somewhere on Long Island?

20  A.  I believe the -- I recall the HR department to be located

21  at One Park Avenue.

22  Q.  And that's backed by madams Hall and Rose; correct?

23  A.  Correct.

24  Q.  That's Tisa Hall and Claudia Rose?

25  A.  Correct.

N7CCede7                          Antonik – Direct

1    Q.  At least with Ms. Rose, she's an individual that you speak

2    to every other week, isn't she?

3    A.  I would communicate with her as needed, sometimes frequent,

4    sometimes not.

5    Q.  In your day-to-day responsibilities and managing practices,

6    you speak to Ms. Rose every now and then; correct?

7    A.  Correct.

8    Q.  And you do that regarding employee issues, not related to

9    Dr. Edelman, but general employee issues; right?

10   A.  HR-related issues.

11   Q.  So you're familiar with HR processes; correct?

12   A.  Correct.

13   Q.  You're familiar with the complaint investigation process;

14   is that right?

15   A.  Correct.

16   Q.  In fact, you even participated in making determinations in

17   such investigations; correct?

18   A.  Can you please be more specific.

19   Q.  I can show you a transcript to refresh your recollection,

20   if that helps.

21             MR. KATAEV:  It's page 52, your Honor.

22             THE COURT:  Of the first day?

23             MR. KATAEV:  First one, yes.  I think the cutoff for

24   the second day is 168, something like that.

25             THE COURT:  What are you using this for?

1              MR. KATAEV:  Refresh his recollection.

2              THE COURT:  You can show it to him and ask the

3    question whether this refreshes his recollection as to

4    something.

5              Sir, you're being shown a piece of paper to see

6    whether it refreshes your recollection, it's not for you to

7    read the document out loud, the document's not in evidence, but

8    just to see if it triggers a memory with respect to the

9    question you're being asked.

10   A.  Please repeat the question.

11   Q.  Is it fair to say, based on your prior testimony and your

12   experience working at NYU, that you've been involved in making

13   determinations in various investigations in conjunction with

14   Ms. Rose?

15   A.  I worked with Ms. Rose on various HR-related issues.

16   Q.  But you were never provided any training on how to do these

17   kind of investigations; correct?

18             MR. STEER:  Objection.

19             THE COURT:  Overruled.

20   A.  Not that I remember.

21   Q.  You don't remember being advised by Ms. Pacina or anyone

22   else about the fact that you can't retaliate against

23   Dr. Edelman following her complaint; right?

24   A.  I was aware of the anti-retaliation policy.

25   Q.  You are aware that's the law; correct?

N7CCede7                          Antonik – Direct

1   A.  Yes.

2   Q.  And that's true even if there is no merit to the actual

3   complaint of discrimination; correct?

4   A.  Can you please rephrase the question.

5   Q.  It's unlawful to retaliate against someone, even if the

6   complaint about discrimination ultimately has no merit;

7   correct?

8   A.  It is unlawful to retaliate against a person.

9   Q.  Even if it has no merit; correct?

10          MR. STEER:  Objection, your Honor.

11          THE COURT:  Overruled.

12  A.  Correct.

13  Q.  And you knew that; right?

14  A.  Uh-huh.  Yes.

15  Q.  And so, the only way to have Dr. Edelman terminated was to

16  have a valid reason; correct?

17  A.  I don't know.

18  Q.  In your email from November 2020 in Plaintiff's Exhibit 86

19  is a compilation of the valid reasons to terminate Dr. Edelman;

20  correct?

21  A.  I don't know.

22          MR. KATAEV:  I'd like to offer Plaintiff's Exhibit 79.

23  I don't believe it's been admitted.

24          THE COURT:  Any objection to 79?

25          MR. STEER:  No objection, your Honor.

1          THE COURT:  79 is received and may be published.

2          (Plaintiff's Exhibit 79 received in evidence)

3    Q.  This is an email chain, I'll represent to you, Mr. Antonik,

4    between Ms. Pacina and Ms. Rose.  It starts on September 17,

5    2019.

6          In this email, Ms. Pacina is asking Ms. Rose to discuss an

7    issue raised by Dr. Edelman; correct?

8    A.  Yes.

9    Q.  Ms. Rose then responds to her and says that faculty issues

10   will need to be escalated to leadership; correct?

11   A.  That's what it says.

12   Q.  Ms. Pacina then says that she wanted to discuss it with

13   Ms. Rose before bringing it to leadership's attention because

14   it involved you; correct?

15   A.  Correct.

16   Q.  So Ms. Pacina did not follow protocol in immediately

17   bringing to leadership's attention; isn't that right?

18          MR. STEER:  Objection, your Honor.

19          THE COURT:  Sustained.

20   Q.  Based on your experience dealing with HR complaints with

21   Ms. Rose from time to time, isn't it true that issues such as

22   this should go to leadership immediately?

23   A.  Leadership is generally informed of any HR-related issues

24   going on in the practice.

25   Q.  And therefore, Ms. Pacina's request to speak to Ms. Rose

N7CCede7                              Antonik - Direct

1  before immediately forwarding it to leadership was a breach of

2  that protocol; correct?

3              MR. STEER:  Objection, your Honor.

4              THE COURT:  Sustained.

5  Q.  You understood that Dr. Edelman's complaint had really

6  nothing to do with office space; correct?

7  A.  Correct.

8  Q.  Her complaint was about the way that you spoke to her;

9  right?

10  A.  Correct.

11  Q.  And you were upset about the fact that she complained and

12  you wanted her gone; correct?

13  A.  I was bothered by it.

14              MR. KATAEV:  Can I have one or two minutes, your

15  Honor?  I may be done.

16  Q.  Isn't it true that during your meeting with Dr. Edelman in

17  September of '19 that you called her a bitch under your breath?

18  A.  No.

19  Q.  But how can you say that if you repeatedly testified that

20  you don't recall what was said between the two of you?

21  A.  I don't recall testifying that.  And I did not call her a

22  bitch during the meeting at any point.

23  Q.  You never sent an email like the November 6th, 2020 email

24  before the complaint; correct?

25  A.  Not that I recall.

1  Q.  And you've never done such an email about any other doctor,

2  have you?

3  A.  Not that I recall.

4  Q.  Focusing back on Plaintiff's Exhibit 21, which is in

5  evidence, it says at the top here that Dr. Edelman had a

6  conversation with you around 3:30 to 3:35; correct?

7  A.  Correct.

8  Q.  And that's not in line with what you testified previously,

9  that you wished to speak to her after patient hours; correct?

10  A.  I had a meeting with her after patient hours.

11  Q.  This complaint says 3:30 to 3:35, doesn't it?

12  A.  Yes.

13  Q.  And she said here that you insinuated who was moving where,

14  and she told you that you don't dictate who made that decision;

15  correct?

16  A.  I don't remember.

17  Q.  She told you that she does use the office on Fridays to do

18  clinical work and you challenged her and said how often are you

19  really here; correct?

20  A.  I don't remember that.

21  Q.  You were pointing at things in her office and intimidating

22  her, weren't you?

23  A.  No.

24  Q.  You challenged her and said you really think this office is

25  yours; is that right?

1    A.  No.

2    Q.  You threw your arms around and pointed at things during

3    this conversation?

4    A.  No.

5    Q.  You told her that you'll bring this up to the powers that

6    be and then left; correct?

7    A.  I told her that I would inform leadership and that was it.

8    And then I left.

9    Q.  She asked you to leave her office; right?

10   A.  I don't remember that part.

11   Q.  You told her that any request to change her schedule had to

12   be approved by you, didn't you?

13   A.  I don't recall telling her that myself.  I believe that was

14   communicated through Enid Papa.

15   Q.  Prior to November of 2020 with respect to any doctor, had

16   you ever emailed Dr. Porges about issues with any other doctor?

17   A.  Not that I remember.

18              MR. KATAEV:  I have nothing further.

19              THE COURT:  Defense examination.

20              MR. STEER:  Thank you, your Honor.  May I have a

21   moment, please.

22              THE COURT:  If the jury wants to stretch for a minute.

23   CROSS-EXAMINATION

24   BY MR. STEER:

25   Q.  Good afternoon, Mr. Antonik.

N7CCede7                          Antonik - Cross

```
 1   A.  Good afternoon, Mr. Steer.
 2   Q.  Now, are you presently employed by NYU?
 3   A.  No.
 4   Q.  And since when haven't you been employed by them?
 5   A.  June 2nd, 2023 was my last day.
 6   Q.  How did that come about?
 7   A.  I resigned.
 8   Q.  And --
 9          MR. KATAEV:  Objection.  Relevance.
10          THE COURT:  Overruled.
11   Q.  Now, Mr. Antonik, I'm five-five, everybody looks tall to
12   me, but there's been some speculation here about how tall you
13   are.  So let me ask you, please, how tall are you?
14   A.  Six feet, four inches.
15   Q.  Thank you.
16          And how many times in your life have you spoken with
17   Dr. Edelman?
18   A.  Few.
19   Q.  More than three times, would you say?
20   A.  Yes.
21   Q.  And for how long?
22   A.  Maybe a few minutes at a time.
23   Q.  And with regard to those times, did she ever make any kind
24   of complaints about you?
25   A.  No.
```

1   Q.  Now, I know counsel asked you -- withdrawn.

2       Did you ever see Dr. Edelman's full contract?

3   A.  No.

4   Q.  Did you know whether Dr. Edelman's contract had a renewal

5   date?

6           MR. KATAEV:  Objection.

7           THE COURT:  Overruled.

8   A.  I was not familiar with the terms of her contract.

9   Q.  Did you even have access to Dr. Edelman's contract?

10  A.  I did not.

11  Q.  Did you know what the bases were for her for termination,

12  if any?

13  A.  No.

14  Q.  And now, did you buy your time and just wait to find a way

15  to have her contract nonrenewed?

16          MR. KATAEV:  Objection.  Leading.

17          THE COURT:  Overruled.

18  A.  No.

19  Q.  Did you do anything to try to get Dr. Edelman fired?

20  A.  No.

21  Q.  Were you afraid that you were going to lose your job

22  because Dr. Edelman had made a complaint about you?

23          MR. KATAEV:  Objection.  Relevance.

24          THE COURT:  Overruled.

25  A.  No.

N7CCede7                      Antonik - Cross

1    Q.  Why not?

2    A.  At the time the complaint came in and was reported back to

3    me, when I heard it, I had just thought that the complaint was

4    very inconsistent with my work and performance and behavior

5    history at NYU up until that time, so I didn't think it would

6    weigh negatively against me because it just seemed so far out

7    of what my normal work behavior was and how I communicated with

8    people.

9    Q.  Now, you discussed during your examination by plaintiff's

10   counsel an incident that occurred on September 16, 2019;

11   correct?

12   A.  Yes.

13   Q.  Do you know when Dr. Edelman was advised that her contract

14   would not be renewed?

15   A.  I don't know -- at the time, I didn't know.  I wasn't

16   involved, so I don't know exactly when.  I had heard of it

17   later, much later.

18   Q.  If I represent to you that that occurred on December 1,

19   2020, you have no reason to dispute that; right?

20            MR. KATAEV:  Objection.  Leading.

21            THE COURT:  Overruled.

22   A.  Can you please repeat the question.

23   Q.  Sure.  If I represented to you that there's been evidence

24   in this case that on December 1, 2020, that's the date of a

25   nonrenewal letter that was sent to Dr. Edelman, do you have any

1   reason to disagree with that?

2   A.  No.

3   Q.  Was anything happening at work between September 16, 2019,

4   and December 1, 2020 that you had to spend a lot of your time

5   dealing with at work, if any?

6   A.  Yes.  That was the COVID pandemic.

7   Q.  What was your role in dealing with the COVID pandemic?

8   A.  So my role in dealing with the COVID pandemic was to ensure

9   that the day-to-day services were running as we had planned

10  them out to be.  We implemented many safety measures to keep

11  the patients and employees safe.  The policies were being

12  revised regularly.  We had put in place screeners who would

13  screen for temperature and for symptoms, we had opened up a

14  COVID testing unit.  Towards the end of 2020, we were planning

15  and we did open up a vaccine clinic right in the office,

16  literally right outside my door, we had people coming in and

17  out.  We converted our conference room to a vaccine unit.  So I

18  was working nonstop in the office that whole time.  I did not

19  have any remote hours, I reported to work every -- just about

20  every day during that whole first year with the pandemic and

21  then in the subsequent years.

22  Q.  Did the offices at Marcus Avenue, the medical offices, the

23  ambulatory care offices, did they remain open throughout the

24  pandemic or were they closed?

25  A.  They remained open.

1    Q.  And you were part of making that happen?

2    A.  Yes.

3    Q.  And during this time that you were dealing with all this,

4    did you find time to enter into a conspiracy to have

5    Dr. Edelman fired?

6              MR. KATAEV:  Objection.  Argumentative.

7              THE COURT:  Sustained.

8    Q.  Did you have a vendetta against Dr. Edelman?

9    A.  No.

10             MR. KATAEV:  Same objection.

11             THE COURT:  Overruled.

12   Q.  Now, you were asked a little bit about your background and

13   I'm not going to take the jury's time to go through your

14   background in great detail, but you mentioned you attended

15   college and you received an AA from Queensborough Community;

16   correct?

17   A.  Correct.

18   Q.  What did you do after that?

19   A.  I worked for a little while in a hospital and then I

20   started the respiratory therapy program at Borough of Manhattan

21   Community College.

22   Q.  Did you get certified?

23   A.  Yes, I became a registered respiratory therapist in 1991.

24   Q.  And after you got that, what did you do?

25   A.  I worked as a respiratory therapist at Einstein Hospital in

N7CCede7                          Antonik – Cross

1   the Bronx and at New York Hospital Queens simultaneously.

2   Q.   How long did you do that for?

3   A.   I worked at Montefiore.  I ended up working there for 19

4   years in the capacity of respiratory therapy, and I had a per

5   diem position at New York Hospital Queens from 1991 until about

6   1999.

7   Q.   Did there come a time when you attended college again?

8   A.   Yes.

9   Q.   What did you get in the way of a degree?

10  A.   I went back to school while I was working.  I got a

11  bachelor of science degree in organizational management from

12  Nyack College in 1996.  Then, a few years later, I went to the

13  Metropolitan College of New York and I obtained a master's in

14  business administration.

15  Q.   Did you ever do any teaching?

16  A.   I did.  When I was a respiratory therapy director at

17  Montefiore, I had been promoted a few times while I was there.

18  I had became adjunct faculty from the Borough of Manhattan

19  Community College and they would send their students up to the

20  Bronx and I would plan for their, you know, their clinical

21  rotations.

22  Q.   What did you do after that?

23  A.   After I left Montefiore, I went to New York Hospital Queens

24  and I was the administrator for the department of medicine.

25  Q.   And what did you do next?

N7CCede7                        Antonik - Cross

A.   Two years later, I was hired by Northwell Health to become

the practice administrator for Cardiovascular Associates, a

cardiology practice located -- who had multiple offices in

Queens.

Q.   And what did you do next?

A.   Two years after that, I had moved with the cardiology

group -- the cardiology group parted ways with Northwell Health

and signed an agreement with NYU Langone Health system, and I

went with them to help manage the practice and to help the

transition over to NYU.

Q.   And as of September 16, 2019 when you spoke with

Dr. Edelman, where was she working?

A.   1999 Marcus Avenue.

Q.   And was she working at any place else at that time, as

well?

A.   Not that I recall.

Q.   Do you know whether Dr. Edelman ever worked in the

Huntington ambulatory care offices?

A.   Yes.

Q.   And was that during that same time period?

A.   Yes.

Q.   And when doctors would be scheduled at Marcus Avenue at the

suite that you've told us about for the rheumatologists and

other doctors, what role did the doctors' schedules, the

patients' schedules play in determining when they would be in

1   the office?

2   A.  When the doctors were in the office, they had clinical

3   hours and there were schedules that were maintained.  The

4   doctors would basically be using their offices and the exam

5   rooms while seeing patients.

6   Q.  If you wanted to know whether a doctor was not going to be

7   in their office, what would you do to figure that out?

8   A.  I would look at the schedules that I had used as reference.

9   Q.  Do you recall what days of the week Dr. Edelman was not in

10  her office at Marcus Avenue based on what you were looking at?

11  A.  Based on what I was looking at, she was not in the office

12  on Thursdays and Fridays.

13  Q.  Did there come a time when there was a move to consolidate

14  the rheumatologists into a single suite at Marcus Avenue?

15  A.  Yes.

16  Q.  Do you know why?

17  A.  Just so they could be together as a practice so it would be

18  easier for the patients to find the rheumatologists and they

19  could access the resources that were available to them.

20  Q.  And there's already been testimony, correct, that you were

21  directed to find a way to make that happen?

22  A.  Yes.

23  Q.  And so what did you do to try to make that happen?

24  A.  I looked at the schedule that I had of who worked on what

25  days, I saw where there was availability, and we had planned to

1    use whatever availability there was for consolidation and for

2    the incoming new physicians.

3    Q.  In looking at the physicians, what days they were in the

4    office, and what days offices might be available for someone

5    else to sit in.  Did the gender of the doctor play any role?

6    A.  No.

7    Q.  So let me clarify the question even more.

8         Did it matter whether the person who was generally sitting

9    in the office was male or female when you determined whether

10   their office could be used?

11              MR. KATAEV:  Objection.

12              THE COURT:  Overruled.

13   A.  No.

14   Q.  Did it matter the sex of the doctor who needed to use the

15   office, whether it was a male or a female, when you were

16   considering whether to put that doctor into someone's office

17   because they needed a place to sit?

18   A.  No.

19              MR. STEER:  Your Honor, I would ask to mark for

20   identification Defendant's Exhibit OO.

21              THE COURT:  Any objection to OO?

22              MR. KATAEV:  No objection, your Honor.

23              THE COURT:  OO is received.

24              (Defendants' Exhibit OO received in evidence)

25              MR. STEER:  May I publish it to the jury, your Honor?

1          THE COURT:  It may be published.

2  Q.  Mr. Kaplan, would you take a look at the -- withdrawn.

3          Would you take a look at the second email on the page that

4  is dated September 16, 2019?

5  A.  Yes.

6  Q.  Was that an email that you sent to David Kaplan?

7  A.  Yes.

8  Q.  And if you take a look at that email, does that fairly and

9  accurately reflect what occurred when you went to speak to

10 Dr. Edelman on September 16, 2019?

11 A.  Yes.

12 Q.  And this is an email then that you sent to David Kaplan,

13 who was your supervisor?

14 A.  Yes.

15 Q.  Now, did Dr. Edelman's sex or gender have anything to do at

16 all with asking her to share an empty office?

17         MR. KATAEV:  Objection.  Asked and answered.

18         THE COURT:  Overruled.

19 A.  No.

20 Q.  As of this time that we're talking about, were there any

21 males in the Marcus Avenue rheumatology suites sharing, by that

22 I mean sitting in someone else's office that was empty at the

23 time?

24 A.  Yes.

25 Q.  What males were sharing offices, using that term?

1          MR. KATAEV:  Objection.  Relevance.

2          THE COURT:  Overruled.

3    A.  Dr. Andy Porges was sharing his office.

4    Q.  What was his position at the time?

5    A.  He was the medical director and a rheumatologist.

6    Q.  And he was male?

7    A.  Correct.

8    Q.  And who else, if anyone?

9    A.  I don't remember.

10   Q.  Do you know who Dr. Deborah Porges was?

11   A.  Yes.

12   Q.  And who is she?

13   A.  She was -- she is a dermatologist for NYU Langone Health.

14   Q.  Do you know if she's married to anyone that was at NYU

15   Langone at the time in that suite?

16   A.  Yes, she is the wife of Dr. Andrew Porges.

17   Q.  And what was his position at this time?

18   A.  He was medical director.

19   Q.  Do you know where Dr. Deborah Porges sat?

20         MR. KATAEV:  Objection.  Relevance.

21         THE COURT:  Overruled.

22   A.  She sat in the same office with Dr. Andrew Porges.

23   Q.  And your email that we showed mentions a Dr. Li having to

24   use the office on Thursdays and Fridays.  What was Dr. Li's

25   sex?

N7CCede7                        Antonik - Cross

1    A.  Female.

2    Q.  Now, did you ever state to plaintiff in this September 16th

3    discussion with Dr. Edelman that you owned her?

4    A.  No.

5    Q.  Is that something that you would ordinarily say to someone?

6            MR. KATAEV:  Objection.

7            THE COURT:  Overruled.

8    A.  No.

9    Q.  When you're speaking with Dr. Edelman during this September

10   2016 discussion, did she raise her voice to you at all?

11   A.  No.

12   Q.  Did you raise your voice to her?

13   A.  No.

14   Q.  Did you lean over and try to intimidate her?

15   A.  I did not.

16   Q.  When you spoke with Dr. Edelman, were you sitting or

17   standing?

18   A.  I was sitting.

19   Q.  Just so the record, again, is clear, did you call

20   Dr. Edelman a bitch?

21   A.  I did not.

22   Q.  Did you mutter it under your breath?

23   A.  I did not.

24   Q.  After speaking with Dr. Edelman, what did you do?

25   A.  I stood up and I left the office.

1          MR. STEER:  Could we scroll down on Exhibit OO,

2    please, the other way.

3    Q.  Before, during the cross by plaintiff, they mentioned

4    communicating with Mr. Rubin.  Did you ever have direct

5    communications with Andrew Rubin?

6    A.  No.

7    Q.  Did you ever have direct communications with Andrew

8    Swirnow?

9    A.  With Joshua Swirnow?

10   Q.  I'm sorry.  Joshua Swirnow.

11   A.  No.

12   Q.  Did you have an ordinary practice that you followed of what

13   to do when a physician raised an issue in the workplace?

14   A.  Yes.

15   Q.  What was it?

16   A.  If an issue was raised that I couldn't resolve with the

17   physician, I would escalate it to David Kaplan.

18   Q.  Did there come a time that you learned that plaintiff filed

19   a complaint with the employee labor relations people about your

20   September 16th discussion?

21   A.  I don't remember exactly when.

22   Q.  Do you recall having any discussions with someone named

23   Kathleen Pacina?

24   A.  Yes.

25   Q.  And again, just referring to that September 16th meeting,

N7CCede7                    Antonik - Cross

1    were you in court when plaintiff was testifying?

2    A.  Yes.

3    Q.  Were you able to see when she gave the testimony where she

4    was waving her arms and demonstrating for the jury what she

5    alleges you had done, did you see that?

6    A.  Yes.

7    Q.  Did you do what she was showing the jury in claiming you

8    did?

9    A.  Absolutely not.

10   Q.  When you spoke with Ms. Pacina, what did she say to you,

11   what did you say to her?

12   A.  I had explained to Ms. Pacina what happened when I met with

13   Dr. Edelman and she informed me that Dr. Edelman had made this

14   complaint, and that's basically what I recall of the

15   conversation at this point in time.

16   Q.  Did there come a time that you learned that Dr. Edelman

17   wanted to phase out working in NYU's Huntington office?

18   A.  Yes.

19   Q.  Do you know whose decision that was for plaintiff to phase

20   out working in Huntington and to move everything back to Marcus

21   Avenue?

22   A.  Any changes of that nature would be coordinated and

23   approved by senior leadership.

24   Q.  Did you do anything to make that happen in terms of

25   demanding it of Dr. Edelman?

N7CCede7                    Antonik - Cross

1    A.  I did not.

2    Q.  Did you ask anyone else to demand that of Dr. Edelman?

3    A.  No.

4    Q.  Did you rush the idea of placing Dr. Li in Dr. Edelman's

5    office in order to retaliate against her in some way because

6    she complained to human resources?

7    A.  No.

8    Q.  Why did Dr. Li have to start sitting in Dr. Edelman's

9    office as was testified in your cross examination?

10   A.  I don't remember the specifics about, you know, where

11   Dr. Li sat when she started, there was a lot of moving pieces

12   at the time.  I just know we were planning to make space for

13   her.

14           THE COURT:  How much more do you have?  We're just

15   about at 5:00, and if you have one or two more questions to

16   finish the examination, we can do that.

17           MR. STEER:  I have a bit more, your Honor.

18           THE COURT:  All right.  Members of the jury, it is

19   just about 5 o'clock, it's been a long day, you've been very

20   attentive throughout the day.  We're going to break for the

21   day.

22           As a reminder, tomorrow is a 9:00-to-2:00 day, so

23   we'll take a midday break, a comfort break, and a snack break.

24   Please try to be here by 8:45 in the morning.  We'll have

25   breakfast available for you at 8:30.

N7CCede7                        Antonik – Cross

1          During the break, no research on the case, looking at

2     social media and the like, no talking amongst yourselves or to

3     others about the case.  Enjoy your afternoon, enjoy your

4     evening.

5          See you back here tomorrow morning.

6          (Continued on next page)

N7cCede7

```
 1                   (Jury not present)

 2                   THE COURT:  Sir, you may step down.

 3                   MR. LABUDA:  Your Honor, if you could remind the

 4       witness.

 5                   THE COURT:  He's on examination, but from defense

 6       counsel, so he can talk to defense counsel during the break.

 7                   MR. LABUDA:  I thought that was --

 8                   THE COURT:  Not while somebody's on cross examination,

 9       you can't talk to the lawyer for the other side.  If you've got

10       a witness who's on the stand, you can talk to the witness.  You

11       could have talked to Dr. Edelman, I assume you did while she

12       was on direct examination during breaks; they can do the same.

13                   MR. LABUDA:  Thank you, your Honor.

14                   THE COURT:  Anything from plaintiff before we break

15       for the day?

16                   MR. LABUDA:  No, your Honor.

17                   THE COURT:  Who's next after this witness?

18                   MR. KATAEV:  Defendant David Kaplan.

19                   THE COURT:  How long do you expect to go with

20       Mr. Kaplan?

21                   MR. KATAEV:  We expect to finish Antonik and

22       Mr. Kaplan tomorrow, and we already advised we anticipate

23       calling Mr. Swirnow, who is a defendant, who has also been

24       here.

25                   THE COURT:  How much longer, Mr. Steer, do you have
```

N7cCede7

1    with Mr. Antonik?

2                MR. STEER:  I have a number of exhibits, your Honor.

3    I'd say maybe an hour.  It could be less.  I'll try to see what

4    I could do to cut it down.

5                THE COURT:  I realize he's a defendant.  There are

6    some questions that are repetitive, and I've tried to be

7    patient with the lawyers on both sides, but I think you can cut

8    it down quite a bit.

9                MR. STEER:  I'll try to, your Honor.

10               THE COURT:  Try to work this evening on doing that.

11               Then I expect that you'll have Mr. Kaplan and

12   Mr. Swirnow tomorrow.

13               Anything else from defendants?

14               MR. STEER:  No, your Honor.

15               THE COURT:  See you all tomorrow.

16               (Adjourned to July 13, 2023, at 9:00 a.m.)

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examination of:                         Page

3     SARI EDELMAN

4    Cross By Mr. Schoenstein . . . . . . . . . . 288

5    Redirect By Mr. Labuda . . . . . . . . . . . 366

6    Recross By Mr. Schoenstein . . . . . . . . . 387

7     KAVINI MEHTA

8    Direct By Mr. Kataev . . . . . . . . . . . . 395

9    Cross By Mr. Schoenstein . . . . . . . . . . 466

10   Redirect By Mr. Kataev . . . . . . . . . . . 480

11   Recross By Mr. Schoenstein . . . . . . . . . 487

12    JOSEPH ANTONIK

13   Direct By Mr. Kataev . . . . . . . . . . . . 490

14   Cross By Mr. Steer . . . . . . . . . . . . . 532

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFF EXHIBITS

Exhibit No.                                                          Received

42    . . . . . . . . . . . . . . . . . . . 396

37    . . . . . . . . . . . . . . . . . . . 417

38    . . . . . . . . . . . . . . . . . . . 422

39    . . . . . . . . . . . . . . . . . . . 425

40    . . . . . . . . . . . . . . . . . . . 426

1    . . . . . . . . . . . . . . . . . . . 462

79    . . . . . . . . . . . . . . . . . . . 529

```
 1                          DEFENDANT EXHIBITS

 2    Exhibit No.                                    Received

 3    DD      . . . . . . . . . . . . . . . . . . . 335

 4    BB      . . . . . . . . . . . . . . . . . . . 336

 5    X   . . . . . . . . . . . . . . . . . . . . . 337

 6    TTT     . . . . . . . . . . . . . . . . . . . 348

 7    VVV     . . . . . . . . . . . . . . . . . . . 349

 8    RRR     . . . . . . . . . . . . . . . . . . . 426

 9    OO      . . . . . . . . . . . . . . . . . . . 541

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

N7DCede1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DR. SARI EDELMAN,

                 Plaintiff,

          v.                          21 Civ. 502 (LJL)

NYU LANGONE HEALTH SYSTEM, *et
al.*,

                 Defendants.          Trial
------------------------------x
                                      New York, N.Y.
                                      July 13, 2023
                                      8:55 a.m.

Before:

                  HON. LEWIS J. LIMAN,

                                      District Judge
                                      -and a Jury-


                     APPEARANCES

MILMAN LABUDA LAW GROUP PLLC
     Attorneys for Plaintiff
BY:  JOSEPH M. LABUDA
     EMANUEL S. KATAEV

TARTER KRINSKY & DROGIN LLP
     Attorneys for Defendants
BY:  RICHARD C. SCHOENSTEIN
     RICHARD L. STEER
     INGRID J. CARDONA


                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

N7DCede1

 1                    (In open court; jury not present)

 2                    THE COURT:  Good morning, everybody.

 3                    We received an email last night from one of the

 4     jurors, juror No. 5, who indicates that she's got some personal

 5     issues for tomorrow morning.  I'm going to provide a copy of

 6     the email to the parties — it's got some personal information

 7     in it — for you to look at.  And I propose to talk to her

 8     during the midmorning break to understand the nature of her

 9     conflict and whether it can be resolved.

10                    Let's put the witness on the stand.  Mr. Antonik, why

11     don't you step up.

12                    MR. KATAEV:  Your Honor, I do have one issue I'd like

13     to raise.  Can we do it at sidebar?

14                    THE COURT:  No.  Does it involve Mr. Antonik?

15                    MR. KATAEV:  Yes, your Honor.

16                    THE COURT:  Then Mr. Antonik will just step outside

17     for a moment.

18                    Okay, what is it?

19                    MR. KATAEV:  Mr. Antonik's first deposition in October

20     of 2021, he testified very clearly that he was responsible for

21     collecting documents relevant to this case, that he did a

22     search and he produced all documents in his possession.  After

23     the plaintiff's second day of deposition, she referenced a log

24     that was maintained, that a medical assistant informed her

25     about that was being made for the purpose of having her fired.

1          After his deposition, this log was produced.  This

2     prompted a letter by me to Judge Schofield who ordered

3     Mr. Antonik to come back to discuss the contents of this

4     letter, which I didn't get an opportunity to depose him on.

5     I'd like to be able to question him about the fact that he did

6     not initially produce the email, given the sworn testimony that

7     he did conduct a search and produced all documents available.

8          When I tried to do that yesterday, the objection was

9     sustained.  I think it's relevant to the issues at hand because

10     it goes to culpability.  He refused to produce it initially

11     because it shows he had a hand in her termination.  So I wanted

12     to raise that to the Court's attention because I wasn't able to

13     get into that yesterday.

14          THE COURT:  Is there a reason why, at the end of the

15     day yesterday, you didn't raise it with me?  You had plenty of

16     time and now we're wasting the jurors' time.

17          MR. KATAEV:  I can't recall, your Honor, but I took

18     the opportunity to raise it now.

19          THE COURT:  What's the defendants' position?

20          MR. STEER:  Your Honor, there were many rulings on

21     many items --

22          THE COURT:  Leave aside the timeliness of the

23     objection.

24          MR. STEER:  We asked -- the witness testified he

25     searched for documents, we believe we complied with Judge

N7DCede1

Schofield's order.  I don't recall exactly what order we're

referring to.  And I think it would be improper at this late

date to start going into a discovery issue that wasn't --

       THE COURT:  Here's what we're going to do:

Mr. Antonik is a defendant.  If you need to recall him to ask

the questions and if I decide that the testimony is relevant

and that you're raising it timely, then we'll handle it at that

time, but I'm not going to waste the jury's time right now.

       MR. KATAEV:  Understood.

       THE COURT:  How much time does the defendant have

for -- let's bring Mr. Antonik in.  How much more time do you

have on your examination?

       MR. STEER:  I'm hoping 15 -- I cut it down, your

Honor.  I'm hoping 15 minutes.

       THE COURT:  Good.

       MR. STEER:  Maybe a half hour at the most, but I'm

hoping not to even go there.  I knocked things out.  I'm hoping

it will be faster.

       THE COURT:  Let's put him on the stand.

       Let's bring in the jury.

       (Continued on next page)

1           (Jury present)

2           THE COURT:  Mr. Antonik, you're reminded you're still

3    under oath.

4           Counsel, you can inquire.

5           MR. STEER:  Thank you, your Honor.

6     JOSEPH ANTONIK, resumed.

7    CROSS-EXAMINATION CONTINUED

8    BY MR. STEER:

9    Q.  Mr. Antonik, let me ask you about two things that came up

10   in your cross examination yesterday.

11          Do you recall testifying about looking at certain schedules

12   to determine what doctors' offices were empty?

13   A.  Yes.

14   Q.  Did any of those schedules reflect on them whether someone

15   was taking a clinical day?

16   A.  No, it just showed the days the physician was in the office

17   and the hours, and if they weren't in the office, there would

18   be a blank.

19   Q.  There was also testimony yesterday about a Dr. Yaich.  Do

20   you recall that testimony?

21   A.  Yes.

22   Q.  And who is Dr. Yaich?

23   A.  Dr. Yaich was a -- he was a fellow in rheumatology who had

24   just completed his training and he was hired to work both at

25   the Marcus Avenue location where I worked, he was also hired to

1   work in our Mineola office and the Bethpage office.

2   Q.  There was a question to you yesterday of whether he was a

3   replacement for Dr. Edelman.  What did you understand that

4   question to mean?

5   A.  I understood the question to mean was he a direct

6   replacement for her position.

7   Q.  Was he?

8   A.  No, I wouldn't characterize it as such because he was also

9   assigned to work in other locations.

10          MR. STEER:  Your Honor, we were asked to mark Exhibit

11  VV, Defendant's Exhibit VV.

12          THE COURT:  Any objection to VV?

13          MR. KATAEV:  Just one second, your Honor.

14          THE COURT:  Are you offering it?

15          MR. STEER:  I am, your Honor, if there's no objection.

16          MR. KATAEV:  No objection.

17          THE COURT:  VV is received and may be published to the

18  jury.

19          (Defendants' Exhibit VV received in evidence)

20          MR. STEER:  May we publish it to the jury, your Honor?

21          THE COURT:  That's what I just said.

22  Q.  Mr. Antonik, calling your attention to the email from you

23  sent Thursday, October 17th, 2019, can you explain to the jury

24  just what the language means, "We are opening up Fridays moving

25  forward," what does that mean?

1    A.  That means we are opening up a clinical schedule to provide

2    physician services.

3    Q.  And when you do that, are there things that you have to

4    make sure of, if at all, to support the physicians coming in

5    that you have available?

6    A.  Yes, we need to ensure there was support staff in place,

7    both a medical assistant, as well as front desk staff, and that

8    there is an availability of exam room space.

9    Q.  Is this fair to say "MA" means "medical assistant"?

10   A.  Yes.

11   Q.  Did you do anything to block this happening?

12   A.  I did not.  When I was --

13             MR. KATAEV:  Objection, your Honor.

14             THE COURT:  Basis.

15             MR. KATAEV:  Leading.

16             THE COURT:  Overruled.  You may answer the question.

17   A.  Can you please repeat the question.

18   Q.  Yes.  Did you do anything to block this happening?

19   A.  I did not.  When I was advised that Dr. Edelman was going

20   to be adding, you know, Thursdays and Friday hours, my task at

21   that point was to just ensure we had everything in place to be

22   able to accommodate those hours.

23   Q.  Did there come a time that you learned that there was some

24   type of a complaint from one of the staff about Dr. Edelman?

25   A.  Yes.

N7DCede1                    Antonik – Cross

| | |
|---|---|
| 1 | MR. STEER:  Your Honor, at this time, we would like to |
| 2 | mark exhibit WW. |
| 3 | THE COURT:  Any objection? |
| 4 | MR. KATAEV:  No, your Honor. |
| 5 | THE COURT:  WW is received. |
| 6 | (Defendants' Exhibit WW received in evidence) |
| 7 | MR. STEER:  May I publish it to the jury, your Honor? |
| 8 | THE COURT:  You may. |
| 9 | Q.  Looking at exhibit WW, can you identify it for us. |
| 10 | A.  Yes.  It's an email from Miriam Ruiz to me about an |
| 11 | interaction she with Dr. Edelman. |
| 12 | Q.  Does it fairly and accurately reflect what Ms. Ruiz |
| 13 | communicated to you? |
| 14 | A.  Yes. |
| 15 | Q.  Would you read the last line of -- withdrawn. |
| 16 | Who was the person involved in this incident, if anyone? |
| 17 | A.  This was between Miriam Ruiz and Dr. Edelman. |
| 18 | Q.  And Miriam Ruiz was the office manager; correct? |
| 19 | A.  Yes. |
| 20 | Q.  Would you read the last line for the jury, please. |
| 21 | A.  "I find this to be very unprofessional, inappropriate, and |
| 22 | demeaning.  I am here to fully support Dr. Edelman, but not |
| 23 | under these circumstances.  I appreciate your time." |
| 24 | Q.  What did you do, if anything, when you got this email? |
| 25 | A.  I had forwarded it to David Kaplan. |

N7DCede1                    Antonik - Cross

1    Q.  Did there come a time you learned of another staff

2    complaint about Dr. Edelman?

3    A.  Yes.

4              MR. STEER:  Your Honor, I'd like to mark for

5    identification exhibit YY, Defendant's Exhibit YY.

6              THE COURT:  Are you offering it?

7              MR. STEER:  I'd like to, your Honor, yes.

8              THE COURT:  Any objection to YY?

9              MR. KATAEV:  No objection, your Honor.

10             THE COURT:  YY is received and may be published to the

11   jury.

12             (Defendants' Exhibit YY received in evidence)

13   Q.  Showing what's been received in evidence as exhibit YY,

14   Mr. Antonik, can you identify that for us, please.

15   A.  This is an email from Miriam Ruiz to myself and Nicole

16   Lucca.

17   Q.  Who's Nicole?

18   A.  She was the assistant site director for the practices at

19   Marcus Avenue.

20   Q.  Looking at the first bullet point, it mentions someone

21   named Tiffany.  If you can refresh the jury's recollection who

22   that was, please?

23   A.  Tiffany, you know, at the time was a medical assistant in

24   the practice who primarily supported Dr. Edelman.

25   Q.  Does this email fairly and accurately reflect what Ms. Ruiz

1    communicated to you about an incident with Tiffany?

2    A.   Yes.

3    Q.   And she was a member of the staff; correct?

4    A.   Correct.

5    Q.   Could you just briefly read the first three bullet points.

6    A.   "At approximately 1:10 p.m., Tiffany walked into my office

7    very upset, shaking, and with tears in her eyes.  Tiffany

8    states she was in the room with Dr. Edelman and Dr. Edelman

9    asked her where the wipes were.  Tiffany replies 'In the

10   cabinet.  We want to keep them from patients and need to keep

11   the tops closed.'  Apparently, Dr. Edelman likes to leave the

12   tops open."

13   Q.   Would you go down to the seventh bullet point, please.

14   A.   Can you scroll up, please.

15   Q.   I'm sorry.

16   A.   I see it.  Thank you.

17   Q.   I'm sorry.  Would you read after where the "leave the tops

18   open" is.  That's the third bullet point.  Would you also read

19   for the jury the next bullet point.

20   A.   "Dr. Edelman, according to Tiffany, stated to her, 'I need

21   my wipes.  I don't know where you have been or who you have

22   touched.'"

23   Q.   And then next bullet point, please.

24   A.   "Tiffany did not reply to the statement and stormed out of

25   the room into my office."

1    Q.  And then would you read the seventh bullet point.

2    A.  "I asked -- Tiffany states that she was very much offended

3    by Dr. Edelman's statements and her overall rudeness that she

4    encounters every day."

5    Q.  What did you do, if anything, when you received this email?

6    A.  I recall discussing this with Miriam.

7    Q.  Do you recall doing anything else, if at all?

8    A.  No, I don't.

9             MR. STEER:  Your Honor, I'd like to publish to the

10   jury Defendants' Exhibit 86 in evidence.

11            THE COURT:  You may do so.

12            MR. STEER:  Oh, Plaintiff's 86 in evidence.  Sorry.

13   Q.  Mr. Kaplan, showing you Plaintiff's 86 in evidence, did you

14   write -- withdrawn.

15        Showing you Plaintiff's 86 in evidence, do you believe that

16   any of the statements in this exhibit are untrue?

17   A.  No.

18   Q.  Did you believe they were true at the time you sent this

19   forward?

20   A.  Yes.

21   Q.  Were you asked to gather information to put forward about

22   things that had happened in the practice?

23   A.  Yes.

24   Q.  Did you prepare this in an effort to get Dr. Edelman fired?

25   A.  No.

N7DCede1                    Antonik – Cross

1    Q.  Did you know even whether her contract was up for renewal?

2              MR. KATAEV:  Objection.  Leading.

3              THE COURT:  Sustained.

4    Q.  Did you have any motive to retaliate against Dr. Edelman

5    when you gathered the information you were instructed to get

6    and pass on to your superior?

7              MR. KATAEV:  Same objection.

8              THE COURT:  Overruled.

9    A.  I did not.

10             MR. STEER:  No further questions, your Honor.

11             THE COURT:  Any redirect examination?

12             MR. KATAEV:  Briefly, your Honor.

13             THE COURT:  Meanwhile, the parties should get the next

14   witness ready.

15             MR. STEER:  Your Honor, may I step back for a moment?

16             THE COURT:  Yes, you may, except if you step out,

17   you're the only one being permitted to object.

18             MR. STEER:  I was trying to get some exhibits ready

19   for the next witness, your Honor.

20             THE COURT:  You're the only one who's going to be

21   permitted to object.  If you want to step out, you're welcome

22   to, but nobody else will take your place.

23             Go ahead with your examination, Mr. Kataev.

24             Mr. Steer, I thought you said "step out."  I now see

25   you said "step back."

1          MR. STEER:  Thank you, your Honor.

2     REDIRECT EXAMINATION

3     BY MR. KATAEV:

4     Q.  Mr. Antonik, you testified earlier that you resigned from

5     NYU recently; correct?

6     A.  Correct.

7     Q.  And that's because you had some other issue with another

8     employee that you had a problem with?

9     A.  No.

10    Q.  You testified about the fact that NYU remained open during

11    COVID; correct?

12    A.  Correct.

13    Q.  But isn't it true that instead of maintaining regular

14    office hours, all the doctors had telehealth visits

15    incorporated?

16    A.  Not true.

17    Q.  Isn't it true that shorter schedules were maintained for

18    all the doctors to minimize contact with people in the office?

19    A.  Schedules did change.  There was a mix of both virtual

20    appointments, as well as in-office appointments during that

21    time.

22    Q.  As a result, the schedules in the office became shorter;

23    correct?

24    A.  In some instances.

25    Q.  You testified yesterday that you became aware of an issue

1    with Dr. Edelman based on an email from Mr. Kaplan.  Do you

2    recall that testimony?

3    A.  Can you please refresh me on that.

4    Q.  I'm going to move ahead and come back to that.

5         After Dr. Edelman hampered your efforts to make the changes

6    in the office that you were directed to make, you did explore

7    other options with other doctors; correct?

8              MR. STEER:  Objection, your Honor.

9              THE COURT:  Sustained as to the use of the word

10   "hampered."  You can ask the question in somewhat of a

11   different way.

12             MR. STEER:  Excuse me, your Honor.  I'm having a

13   little trouble hearing.

14             THE COURT:  I sustained your objection and I think

15   counsel heard what I said.  Go ahead.

16             MR. STEER:  Thank you so much.

17   Q.  After you were unable to effect the office changes with

18   Dr. Edelman, you did explore options with other doctors;

19   correct?

20   A.  Yes.

21   Q.  And you enlisted the help of Dr. Porges to do so; correct?

22   A.  I don't recall that.

23   Q.  Isn't it true that Dr. Porges spoke to Dr. Forte about him

24   sharing his office?

25   A.  No, I don't remember that.

1          MR. STEER:  Objection, your Honor.

2    Q.  Isn't it true Dr. Porges was just asked, "Would you be

3    willing to?"  And when he said "no," you left it alone?

4          MR. STEER:  Objection, your Honor.

5          THE COURT:  Overruled.

6    A.  I don't remember that.

7          MR. KATAEV:  I'd like to mark exhibit 55 for

8    identification.

9          THE COURT:  Any objection to 55?

10         MR. STEER:  No objection, your Honor.

11         THE COURT:  55 is received and may be published to the

12   jury.

13         (Plaintiff's Exhibit 55 received in evidence)

14   Q.  Focusing on the top email from Ms. Ruiz to Ms. Pacina, it

15   says here that you already escalated Dr. Edelman's complaint to

16   David Kaplan; correct?

17   A.  Correct.

18   Q.  And this is just one day after she made the complaint;

19   correct?

20   A.  I believe it was two days.

21   Q.  It was two days since the incident; correct?

22   A.  Well, the date of this email is two days after the alleged

23   incident.

24   Q.  And she made a complaint the following day; correct?

25   A.  That's what I recall.

N7DCede1                         Antonik - Redirect

1    Q.  It says here that you already escalated to Mr. Kaplan

2    because the doctor asked Enid Papa for ELR's number.  Do you

3    see that?

4    A.  I see that.

5    Q.  And Enid Papa is the equivalent of Ms. Ruiz for the

6    oncologists; correct?

7    A.  Enid Papa is a practice manager.  She does have a

8    higher-level title.

9    Q.  And she supports the oncologists like Ms. Ruiz supports the

10   rheumatologists; correct?

11   A.  Yes, Ms. Ruiz also did support several oncologists, a

12   dermatologist, and a podiatrist in her suite.

13   Q.  And Ms. Papa alerted you to the fact that Dr. Edelman asked

14   for ELR's number; correct?

15   A.  Correct.

16   Q.  You knew, before she even made the complaint, about that

17   fact; correct?

18   A.  Yes.

19   Q.  Now, there was some testimony about other doctors sharing

20   office space, such as Dr. Porges with his wife, Dr. Deborah

21   Porges; correct?

22   A.  Correct.

23   Q.  Dr. Porges was a full-time doctor; right?

24   A.  Correct.

25   Q.  But Dr. Deborah Porges only worked part-time; isn't that

1    true?

2    A.  Yes.

3            MR. KATAEV:  I'd like to publish Plaintiff's

4    Exhibit 49 for identification.

5            THE COURT:  Any objection?

6            MR. STEER:  No objection, your Honor.

7            THE COURT:  49 is received and may be published.

8            (Plaintiff's Exhibit 49 received in evidence)

9    Q.  Focusing your attention on the September 17th, 2019 email

10   that Ms. Pacina sent to Ms. Ruiz, this is where Ms. Pacina said

11   she wanted to discuss this issue with you before bringing it to

12   leadership because it's about you; correct?

13           MR. STEER:  Objection, your Honor.

14           THE COURT:  Sustained as to form.

15   Q.  In this email, Ms. Pacina references the fact that she

16   wants to discuss this issue with Ms. Ruiz before bringing it to

17   leadership as it is about you; correct?

18           MR. STEER:  Objection, your Honor.

19           THE COURT:  Overruled.

20   A.  That's what I'm reading.

21   Q.  It doesn't say here that it's about the office issue;

22   correct?

23   A.  No.

24   Q.  It says that it's about you; correct?

25   A.  Yes.

1          MR. KATAEV:  I'm going to put up on the screen what's

2     been admitted into evidence already as WW.

3          THE COURT:  You may do so.

4     Q.  In this email, this is the first time that you ever bring

5     to Mr. Kaplan's attention any issue with Dr. Edelman; correct?

6     A.  I don't remember if it was the first or what time, you

7     know, what instance this was.

8     Q.  You have no emails in which you ever referenced Dr. Edelman

9     in any email to Mr. Kaplan prior to this date, do you?

10    A.  Not that I recall.

11    Q.  And you never had any conversation with Dr. Edelman about

12    this issue, did you?

13    A.  I don't remember having a conversation with her about this.

14    Q.  You testified, didn't you, that the only time you ever

15    spoke to her was on September 16th, 2019; isn't that right?

16    A.  I have spoken to her on that date.

17    Q.  Other than that, you never spoke to her ever again;

18    correct?

19    A.  I don't remember.

20    Q.  Your attorneys have made arguments that you've only spoken

21    to her once; correct?

22          MR. STEER:  Objection, your Honor.

23          THE COURT:  Sustained.

24    Q.  To your knowledge, Ms. Ruiz never spoke to Dr. Edelman

25    about this issue either; correct?

1           MR. STEER:  Objection, your Honor.

2           THE COURT:  Overruled.

3    A.   I don't remember that.

4    Q.   In this email, there's only one side of the story; correct?

5           MR. STEER:  Objection.

6           THE COURT:  Sustained.

7    Q.   In this email, you don't have Dr. Edelman's version the

8    story; correct?

9           MR. STEER:  Objection, your Honor.

10          THE COURT:  Sustained.

11   Q.   This email is what is the first dated issue in Ms. Ruiz's

12   spreadsheet; correct?

13   A.   Yes.

14   Q.   You recall that; correct?

15   A.   Yes.

16          MR. KATAEV:  I'd like to place up YY.  It's already

17   been admitted in evidence.

18          THE COURT:  You may do so.

19   Q.   With respect to the last exhibit, did you speak to

20   Dr. Edelman about the issues raised in this email?

21   A.   I'm not seeing the exhibit.

22   Q.   That's it.

23          THE COURT:  Which exhibit are you showing him, for the

24   record.

25          MR. KATAEV:  WW.

1  Q.  You did not speak to Dr. Edelman about the issues raised in

2  this email; correct?

3  A.  Correct.

4  Q.  Going back to YY, this email is dated March 11, 2020;

5  correct?

6  A.  Correct.

7  Q.  That's right when the pandemic started; correct?

8  A.  Just about.

9  Q.  And everyone reacted very differently to the fear caused by

10 the virus; correct?

11         MR. STEER:  Objection, your Honor.

12         THE COURT:  Overruled.  I'll permit it.

13 A.  Yes.

14 Q.  And that's why Dr. Edelman told Tiffany "I need my wipes.

15 I don't know where you have been or who you have touched;"

16 correct?

17         MR. STEER:  Objection, your Honor.

18         THE COURT:  Sustained.

19 Q.  It's reasonable to infer that the reason why Dr. Edelman

20 said that was because of her fears of contracting the virus?

21         MR. STEER:  Objection, your Honor.

22         THE COURT:  Sustained.

23 Q.  This is also an email that made it into the list of issues

24 that Ruiz created a spreadsheet of; correct?

25 A.  Yes.

1    Q.  And by the time you brought this to the attention of

2    leadership in November of 2020, eight months later, you had

3    never gotten Dr. Edelman's side of the story; correct?

4              MR. STEER:  Objection, your Honor.

5              THE COURT:  Overruled.

6    A.  I don't remember.

7    Q.  But you do remember that you only spoke to her once ever;

8    correct?

9    A.  I remember I spoke to her that one time.

10   Q.  And you spoke to her about the office issue, but not this

11   issue; correct?

12   A.  Correct.

13   Q.  And it would be reasonable to look to maintain a sanitary

14   environment with COVID; correct?

15             MR. STEER:  Objection, your Honor.

16             THE COURT:  Overruled.

17   A.  I mean, our goal was to maintain a safe and clean

18   environment during the -- always, especially during the

19   pandemic.

20   Q.  So it would be reasonable for Dr. Edelman to seek to do so;

21   correct?

22   A.  Yes.

23             MR. KATAEV:  I'd like to publish Defendants'

24   Exhibit OO.  I believe it's been admitted, but I'm not sure.

25             THE COURT:  OO is in evidence.  You can publish it.

N7DCede1                          Antonik – Redirect

```
 1    Q.  You testified that you spoke to Dr. Edelman at the end of

 2    her patient hours on September 16th; right?

 3    A.  Yes.

 4    Q.  But this email, the timestamp on it is 3:56 p.m. on the

 5    date of the incident; isn't it?

 6    A.  Yes.

 7              MR. STEER:  Objection, your Honor.

 8              THE COURT:  Overruled.

 9    Q.  And you sent this email to David Kaplan; correct?

10    A.  Yes.

11    Q.  And in response to the fact that you told Mr. Kaplan about

12    her issues, David informed Mr. Swirnow that -- David informed

13    Mr. Swirnow about this issue; correct?

14    A.  Yes.

15              MR. KATAEV:  I'd like to publish Plaintiff's

16    Exhibit 55.

17              THE COURT:  You may do so.

18    Q.  Starting with the bottom of this email, this is something

19    that defendant, David Kaplan, sent --

20              MR. STEER:  Objection, your Honor.

21    Q.  -- to Dr. Swirnow; correct?

22              MR. STEER:  We don't see the exhibit, your Honor.

23              MS. CARDONA:  It says SS, it's not 55.  Plaintiff's

24    Exhibit 55 is completely different than what I'm seeing on the

25    screen.
```

1          MR. KATAEV:  I apologize.  I looked at SS and assumed

2     it was 55.  I meant SS.

3          THE COURT:  SS is not in evidence.  Any objection to

4     SS?

5          MR. STEER:  No objection, your Honor.

6          THE COURT:  SS is received.  You may publish SS to the

7     jury, if that's what you were intending to do.

8          (Defendants' Exhibit SS received in evidence)

9          MR. KATAEV:  Yes, Judge.  It was a long night.

10    Q.  In this email starting from the bottom, David Kaplan sends

11    to Mr. Swirnow a recap of his conversation with Ms. Pacina;

12    correct?

13    A.  I'm not seeing it.

14         MR. KATAEV:  We can publish to the jury; correct?

15         THE COURT:  Yes.

16    Q.  In this email, David Kaplan sends to Mr. Swirnow a recap of

17    his conversation with Ms. Pacina; correct?

18         THE COURT:  You're looking at the bottom email with a

19    timestamp of 2:23 p.m.; is that right?

20         MR. KATAEV:  That's correct, your Honor.

21         THE COURT:  Maybe that will help you, Mr. Antonik.

22         MR. KATAEV:  I've also highlighted it for you.

23    A.  What's the question?

24    Q.  Did Mr. Kaplan send to Mr. Swirnow an email about his

25    conversation with Ms. Pacina?

1   A.  Yes.

2   Q.  And he says in here that Dr. Edelman filed a complaint

3   against you for being aggressive and retaliating for not

4   allowing her to expand her hours; correct?

5           MR. STEER:  Objection, your Honor.

6           THE COURT:  Overruled.  He's just reading the email.

7   A.  Yes.

8   Q.  And he says here that this was related to you speaking to

9   her about sharing her office space; correct?

10  A.  Yes.

11  Q.  And he refers to this complaint as "totally ridiculous,"

12  doesn't he?

13  A.  Yes.

14  Q.  In the 11:48 a.m. email in response to Mr. Swirnow's email,

15  he references the fact that you received Dr. Edelman's request

16  to open up Fridays for her going forward so she could remain in

17  Lake Success; correct?

18          MR. STEER:  Objection, your Honor.  Foundation.

19          THE COURT:  You're just reading the email, is that

20  what you're doing?

21          MR. KATAEV:  Yes, your Honor.

22          THE COURT:  The witness is not on this document, he

23  has no personal knowledge, so I hope you're leading up to

24  something other than laying a foundation for a question that

25  comes later that goes to the witness's personal knowledge.

N7DCede1                    Antonik – Redirect

1   Q.  Throughout the time that this was going on, on September

2   18th, you were in contact with Mr. Kaplan, weren't you?

3   A.  I don't remember.

4   Q.  And this email doesn't refresh your recollection as to the

5   discussions you had with him?

6   A.  I don't remember.

7   Q.  Do you recall the fact that you told Dr. Edelman that any

8   changes had to be approved by you following your incident with

9   her just two days prior?

10  A.  No.  That, I believe, was communicated through Enid Papa.

11          MR. KATAEV:  I'd like to place up on the screen

12  Plaintiff's Exhibit 86 and 84 side by side.  They're both in

13  evidence.

14          THE COURT:  You may do so.

15          MR. STEER:  Objection, your Honor.

16          THE COURT:  Basis.

17          MR. STEER:  I believe it goes beyond the scope, if I'm

18  not mistaken.

19          THE COURT:  I'll permit it, but I'll permit limited

20  amount.

21          MR. STEER:  Thank you.

22  Q.  Looking at your November 2020 email to Dr. Porges and

23  comparing it to the spreadsheet, you obtained the information

24  for the email from the spreadsheet; correct?

25  A.  It has much of the same information.

N7DCede1                      Antonik - Redirect

1          THE COURT:  How is this within the scope of the

2     examination that was conducted by the defense?

3          MR. KATAEV:  Your Honor, the witness testified that he

4     was so busy with COVID that he didn't have time to deal with

5     any of this and I want to address that aspect, if I could have

6     a little bit of leeway, this is my final point.

7          THE COURT:  If you keep it short.  It's beyond the

8     scope, but if you keep it short, I'll relax the rules.

9     Q.  For the November 13th, 2019 entry that Ms. Ruiz made, she

10    wrote:  "Conversation took place between Dr. Edelman and Miriam

11    Ruiz."  Correct?

12    A.  I see that.

13    Q.  But you wrote in your email to Dr. Porges:  "Edelman

14    berated Miriam after Miriam asked her basic questions about the

15    schedule."  Correct?

16    A.  Yes.

17    Q.  You were not present during that conversation, were you?

18    A.  No.

19    Q.  So you were not in a position to editorialize this;

20    correct?

21          MR. STEER:  Objection, your Honor.

22          THE COURT:  Sustained as to form.  You can ask in a

23    different form without the "editorialized."

24    Q.  It wouldn't be appropriate for you to change what she wrote

25    because you were not there; correct?

1          MR. STEER:  Objection, your Honor.

2          THE COURT:  Sustained as to form.

3   Q.  And you said that you were busy during COVID to even focus

4   on Dr. Edelman; correct?

5   A.  Correct.

6   Q.  But Miriam Ruiz was nonetheless taking the time to make all

7   of these entries during the COVID pandemic; correct?

8          MR. STEER:  Objection, your Honor.

9          THE COURT:  Overruled.

10  A.  Ms. Ruiz had multiple responsibilities during that time.

11  Q.  And she was also busy with the COVID pandemic, wasn't she?

12  A.  Yes.

13  Q.  And while you were busy dealing with the pandemic, you had

14  delegated this task to her; correct?

15         MR. STEER:  Objection.

16         THE COURT:  Overruled.

17         MR. STEER:  Foundation.

18  A.  Miriam Ruiz was the office manager for that suite, so she

19  oversaw all the activities that occurred in that suite.

20  Q.  And you knew that she did that; correct?

21  A.  I knew that she had done her job and that she had, you

22  know, handled multiple tasks simultaneously.

23  Q.  You decided not to place the August 28th, 2020 entry into

24  your email; correct?

25  A.  Correct.

1    Q.  And it's fair to say, isn't it, that you have no personal

2    knowledge about any of the entries that Ms. Ruiz made; correct?

3    A.  Only by how Ms. Ruiz explained it to me.

4    Q.  So you had no basis to change the facts that are listed in

5    the log in your email; correct?

6            MR. STEER:  Objection.

7            THE COURT:  Sustained.

8    Q.  You wrote in the September 8th, 2020 entry that Dr. Edelman

9    created an inappropriate chart note; correct?

10   A.  Correct.

11   Q.  In the corresponding entry in the spreadsheet, it just says

12   that Dr. Edelman expressed concerns about her messaging;

13   correct?

14           MR. STEER:  Objection, your Honor.

15           THE COURT:  Sustained and beyond the scope.

16   Q.  You never physically saw the allegedly inappropriate chart

17   note; correct?

18   A.  I believe that I did.

19           THE COURT:  How much more do you have, Mr. Kataev?

20           MR. KATAEV:  I believe less than five minutes.

21           THE COURT:  Why don't you keep it to two or three.

22           MR. KATAEV:  I'm done with this exhibit.

23           MR. STEER:  No further questions, your Honor.  Oh, I'm

24   sorry.  It was the exhibit.  I misheard.  Sorry.

25           MR. KATAEV:  I thought he was speaking for me for a

N7DCede1                    Antonik – Redirect

1    second.

2            I have just one more line of questioning.

3    Q.  With respect to RVUs, part of your duties included

4    reviewing RVU reports?

5            MR. STEER:  Objection, your Honor.

6            THE COURT:  Basis.

7            MR. STEER:  Beyond the scope.

8            THE COURT:  Sustained.

9            MR. KATAEV:  I have nothing further, your Honor.

10           THE COURT:  Anything further?

11           MR. STEER:  No further questions, your Honor.

12           THE COURT:  Mr. Antonik, you're excused as a witness.

13   You may step down.

14           (Witness excused)

15           Plaintiff will call the next witness.

16           MR. KATAEV:  Plaintiff calls David Kaplan.

17           THE COURT:  Mr. Kaplan, step up into the witness box.

18   Remain standing as my deputy administers the oath.

19           Members of the jury, you can take a stretch break if

20   you want.

21    DAVID KAPLAN,

22        called as a witness by the Plaintiff,

23        having been duly sworn, testified as follows:

24           THE DEPUTY CLERK:  Please state your name for the

25   record and please spell your first and last name.

1           THE WITNESS:  Sure.  David D-a-v-i-d, Kaplan

2      K-a-p-l-a-n.

3           THE COURT:  Mr. Kaplan, you may be seated.  Please try

4      to keep your voice up.

5           Counsel, is there a deposition transcript that you

6      might intend to use?

7           MR. KATAEV:  Yes.

8           THE COURT:  You may inquire.

9      DIRECT EXAMINATION

10     BY MR. KATAEV:

11     Q.  Good morning, Mr. Kaplan.

12     A.  Good morning.

13     Q.  You attended college in Syracuse and graduated with a

14     political science degree in 1995; correct?

15     A.  That's correct.

16     Q.  And you aspired to go to law school and wisely chose not

17     to; correct?

18     A.  That is true also.

19     Q.  This is all the courtroom experience you need; correct?

20     A.  More than enough.

21     Q.  Afterwards, you did go to NYU for a master's in public

22     administration; correct?

23     A.  That is correct.

24     Q.  And you graduated from there in '97?

25     A.  Also correct.

N7DCede1                          Kaplan - Direct

1    Q.  Now, you have extensive experience in working in various

2    medical facilities; right?

3    A.  I do.

4    Q.  And initially, one of the medical facilities that you

5    worked in was NYU, right, you were a division administrator for

6    cardiology?

7    A.  That is correct.

8    Q.  And you worked at NYU from 2001 to 2003; correct?

9    A.  It was roughly -- I think it was a little later than that,

10   but yes, around that timeframe.

11   Q.  And you left from there and then worked at Stony Brook and

12   Mount Sinai, as well; right?

13   A.  Correct.

14   Q.  And you then went to Northwell, but it was very brief, you

15   worked there for only six months; right?

16   A.  Also correct.

17   Q.  Throughout this time after you left NYU in 2003, you

18   maintained a good relationship with Mr. Rubin; right?

19   A.  We did keep in touch.

20   Q.  And you networked with him and you viewed him as a friend

21   and a colleague; correct?

22   A.  Certainly a colleague, yes.

23   Q.  Mr. Rubin personally recruited you in late 2016 or early

24   2017; correct?

25   A.  It was mid '17, yes.

1    Q.  Mr. Rubin is a powerful man at NYU; correct?

2             MR. STEER:  Objection, your Honor.

3             THE COURT:  It goes to his perception.  You can answer

4    what your perception is.

5    A.  Mr. Rubin is a dynamic leader in the organization.

6    Q.  And that would mean that he's powerful; correct?

7             MR. STEER:  Objection.

8             THE COURT:  Sustained.

9    Q.  It's fair to say that because of your rapport with him, you

10   have his ear; correct?

11            MR. STEER:  Objection.

12            THE COURT:  Overruled.

13   A.  I would like to think, as a senior director in the

14   organization, that he listens to all of his employees.

15   Q.  Including you; correct?

16   A.  Including me.

17   Q.  Because you have a good relationship with him; correct?

18   A.  Yes, sir.

19   Q.  Now, you're currently employed by NYU Langone Health

20   system; isn't that right?

21   A.  Yes.

22   Q.  And Dr. Edelman was employed by the NYU Grossman School of

23   Medicine; correct?

24   A.  She was employed by the Grossman School of Medicine,

25   correct.

1    Q.  And prior to the time that NYU named the School of Medicine

2    after Mr. Grossman, the School of Medicine was just referred to

3    as the NYU School of Medicine; correct?

4    A.  To my knowledge.

5    Q.  To your knowledge, the NYU School of Medicine is the

6    predecessor to the Grossman School of Medicine; correct?

7    A.  Correct.

8    Q.  And besides working -- you worked as a regional director

9    when you came back to NYU; right?

10   A.  I did not.  I worked as a senior director.  I've always

11   been a senior director.

12   Q.  And in your role as senior director, you oversaw about 80

13   to 100 sites in the faculty group practice; right?

14   A.  That is correct.

15   Q.  And there are approximately 350 faculty group practice

16   centers; correct?

17   A.  Roughly.

18   Q.  You managed a substantial portion of them; correct?

19   A.  Correct.

20   Q.  Now, most days, you're working at 1999 Marcus Avenue right

21   next door to Mr. Antonik; correct?

22   A.  I do have an office in that location.

23   Q.  And you're typically there four days a week; right?

24   A.  It varies week to week.

25   Q.  But most of the week is spent there?

1   A.  I spend time at that office each week, yes.

2   Q.  Together with Mr. Antonik; correct?

3   A.  There are times he's there, there are times that I am not

4   there.

5   Q.  And it's fair to say, isn't it, that you're the direct link

6   between Antonik and Mr. Swirnow and Rubin; correct?

7           MR. STEER:  Objection as to form.

8           THE COURT:  Sustained.

9   Q.  It's fair to say that the reporting relationship at NYU is

10  such that Antonik reports to you and you report to Mr. Swirnow

11  and Rubin; correct?

12  A.  I technically report to Fran Drummond, who is the vice

13  president for operations.

14  Q.  But you also have a dotted line, so to speak, to --

15  A.  I have a relationship, of course, with Mr. Swirnow.

16  Q.  And you report to him, as well; correct?

17  A.  I have a direct reporting relationship to Fran Drummond.

18  Q.  And you also have a reporting relationship to Mr. Swirnow;

19  correct?

20  A.  Well, by hierarchy, he is a higher title than I am, yes.

21  Q.  Now, your work at NYU is more business-related rather than

22  medical; right?

23  A.  That is correct.

24  Q.  And one example of a problem that you solve day-to-day at

25  NYU is getting a team out to fix a flooding issue at a site;

1   correct?

2   A.  Sure.

3   Q.  And from time to time, you deal with HR issues, but only

4   tangentally because site directors are charged with that task;

5   correct?

6   A.  Correct.

7   Q.  They're the ones that are on site, correct, that's why

8   they're called site directors?

9   A.  Correct.

10  Q.  Now, NYU has equal employment opportunity policies

11  regarding discrimination, harassment, or retaliation; correct?

12  A.  They do.

13  Q.  And you're aware of those; right?

14  A.  Of course.

15  Q.  And NYU also has annual trainings that you're required to

16  take by video; correct?

17  A.  That is correct.

18  Q.  And you take those trainings?

19  A.  I do.

20  Q.  And so you're aware about the laws involved with

21  discrimination, harassment, or retaliation; correct?

22  A.  Indeed.

23  Q.  And you're also aware in this case that there was a

24  so-called investigation with Dr. Edelman; correct?

25          MR. STEER:  Objection.

1           THE COURT:  Sustained.

2      Q.  You're aware of an investigation of Dr. Edelman's complaint

3      in this case; correct?

4      A.  I was made aware of a complaint against him.

5      Q.  And you were made aware of the complaint against

6      Mr. Antonik because Ms. Pacina contacted you via email about

7      it; correct?

8      A.  Yes.

9      Q.  And at the time that she contacted you about this incident,

10     you didn't know anything about it; right?

11     A.  Did not.

12     Q.  So you learned then from Ms. Pacina that Mr. Antonik got

13     into an argument with Dr. Edelman; correct?

14          MR. STEER:  Objection as to form.

15          THE COURT:  Sustained.

16     Q.  You didn't learn about this issue from Mr. Antonik first;

17     correct?

18     A.  Correct.

19     Q.  Which means he didn't contact you after 3:56 p.m. on

20     September 16th; correct?

21     A.  Actually, I don't recall.  It was -- he did send an email

22     to me.

23     Q.  Upon learning about this, naturally, your reaction was to

24     investigate; correct?

25     A.  Upon learning about it -- from whom?

1    Q.  From Ms. Pacina.

2    A.  She notified me about the complaint as I assumed as part of

3    her investigation.

4    Q.  In response, you decided to speak to Mr. Antonik about it;

5    correct?

6    A.  As I said, Mr. Antonik sent me an email about his

7    experience.

8    Q.  Let's look at your deposition transcript at pages 37 to 39,

9    please.

10        At your deposition on October 26th, 2021, did I ask you the

11   following questions and did you give the following answers:

12            THE COURT:  Page and line.

13            MR. KATAEV:  37, line 10 through 18.

14            MR. STEER:  Objection, your Honor.

15            THE COURT:  Overruled.  I'll permit it.

16   "Q.  What did you do to find out more information?

17   "A.  I spoke to Joseph Antonik.

18   "Q.  What did you say to him and what did he say to you?

19   "A.  Simply asked him what happened.  He explained to me his

20   conversation that he had with Dr. Edelman about the office and

21   sharing her office while she was not in the office."

22   Q.  Do you recall that?

23   A.  This was subsequent to my discussion with Kathleen Pacina,

24   correct.

25   Q.  So I was correct in stating you then spoke to Mr. Antonik

```
 1   UPON about learning about it from Ms. Pacina; correct?
 2   A.  Correct.
 3   Q.  And you had this conversation with Mr. Antonik in person;
 4   correct?
 5   A.  Correct.
 6   Q.  And that's because his office was right next door to yours;
 7   correct?
 8   A.  Also correct.
 9   Q.  After you spoke to Mr. Antonik, you naturally went to
10   Mr. Swirnow; right?
11   A.  I had contacted Mr. Swirnow, yes, about the incident.
12   Q.  You frequently go to Mr. Swirnow for advice on such
13   employee issues; right?
14           MR. STEER:  Objection.
15           THE COURT:  Overruled.
16   A.  I do go and discuss physician-retired issues with Josh
17   Swirnow, yes.
18   Q.  And Mr. Swirnow, as your superior, told you to handle it
19   yourself and speak to Dr. Edelman; right?
20   A.  He suggested followup conversation with her.
21   Q.  So you went to meet with her and that was the first time
22   you ever met her; right?
23   A.  That was the first time I've met with her, yes, in person.
24   Q.  And when you met with her, it was on September 25th of
25   2019; correct?
```

N7DCede1                          Kaplan - Direct

1    A.  Correct.

2    Q.  And the conversation started smoothly enough because you

3    exchanged pleasantries and got to know each other a little bit;

4    right?

5    A.  That's correct.

6    Q.  But then you told her the directive was she has to share

7    her space and that's that; right?

8    A.  Not correct.

9    Q.  She got upset during your conversation, didn't she?

10   A.  She did.

11   Q.  And she told you that she did not appreciate the way that

12   Mr. Antonik spoke to her, didn't she?

13   A.  We didn't really spend so much time on her experience with

14   Mr. Antonik at all.

15           MR. KATAEV:  Give me one second, your Honor.

16           THE COURT:  If you're looking through the transcript,

17   you should just be looking through it for yourself and not for

18   anybody else.

19           MR. KATAEV:  I'd like to mark for ID 77.  I believe

20   it's in evidence already.

21           THE COURT:  77?

22           MR. STEER:  We do not believe it's in evidence, your

23   Honor.

24           THE COURT:  Any objection to 77?

25           MR. STEER:  No objection, your Honor.

N7DCede1                        Kaplan - Direct

1          THE COURT:  77 is received and may be published to the

2     jury.

3          (Plaintiff's Exhibit 77 received in evidence)

4     Q.   Following your meeting with Dr. Edelman, she immediately

5     wrote a complaint to HR; correct?

6     A.   That's my understanding.

7     Q.   And you understand that after she made a complaint about

8     Mr. Antonik, she was expecting some sort of involvement by HR

9     in this issue; correct?

10          MR. STEER:  Objection, your Honor.

11          THE COURT:  Sustained.

12    Q.   At this point in time with this September 25th meeting you

13    had with her, this was the second time that Dr. Edelman was

14    approached impromptu without scheduling a meeting; correct?

15          MR. STEER:  Objection.

16          THE COURT:  Sustained.

17    Q.   You did not schedule anything with Dr. Edelman prior to

18    meeting with her; correct?

19    A.   I'm sorry.  I don't understand that question.

20    Q.   When you went -- prior to you meeting with her on September

21    25th, you did not schedule that meeting with her; right?

22    A.   I had requested my team to let me know when she was

23    available for me to be able to meet with her that day.

24    Q.   But she did not know that you did that; correct?

25          MR. STEER:  Objection, your Honor.

N7DCede1                          Kaplan – Direct

1          THE COURT:  Do you know whether she knew?

2    A.  All I could tell you is I had asked my staff to work with

3    her to find time in her day for me to meet with her.

4    Q.  You don't know whether that actually happened, do you?

5    A.  I'm pretty sure it did.

6    Q.  You didn't email Dr. Edelman directly to ask for her

7    availability, did you?

8    A.  She was in the middle of patient hours.  I wasn't going to

9    bother her.  That's why I go through her staff and my assistant

10   site director who was, in previous testimony, named Nicole

11   Lucca.

12   Q.  So you went to see her at the end of the day; is that

13   correct?

14   A.  I went to see her at some point in the day, I can't recall

15   the exact time.  It was the time that my team told me she was

16   available to meet with her.

17   Q.  But she was still with patients when you went to see her,

18   wasn't she?

19   A.  Again, my team told me she was available at the time I went

20   upstairs to meet with her.

21   Q.  And they were mistaken; correct?

22   A.  I do not believe they were mistaken.

23   Q.  Dr. Edelman asked you to leave after your meeting; correct?

24   A.  She yelled at me to get out of her office.

25   Q.  And you threatened her that you would bring this to

1    Mr. Swirnow's attention; correct?

2              MR. STEER:  Objection, your Honor.

3              THE COURT:  Overruled.

4    A.   There was no threat.  Merely, after the conversation, and

5    she said that she was not, you know, considering the

6    opportunity to share the office on the days that she was not

7    there, I told her I would need to elevate this to my bosses, to

8    notify them.

9    Q.   Ms. Pacina then reached out to you a second time concerning

10   Dr. Edelman's September 25th complaint; correct?

11   A.   She notified me that there was a complaint made against me.

12   Q.   And you informed Ms. Pacina about your version of the

13   events; right?

14   A.   I did.

15   Q.   And you distinctly recall that Ms. Pacina was taking notes

16   on that conversation; correct?

17   A.   I suspected she was.

18   Q.   That's what you would expect an HR person to do; right?

19   A.   I would assume as part of an investigation.

20             MR. KATAEV:  I'd like to mark Plaintiff's Exhibit 21.

21             THE COURT:  Any objection?

22             MR. STEER:  21's in evidence.

23             THE COURT:  21's in evidence already.  You may show it

24   to the jury.

25   Q.   In reviewing this exhibit, there's no mention about any

1    conversation that Ms. Pacina had with you; correct?

2              MR. STEER:  Objection, your Honor.

3              MR. KATAEV:  I've highlighted it for you to help you

4    with a portion where Ms. Pacina wrote down --

5              MR. STEER:  Overruled.

6    A.  Yeah, it doesn't appear that, but I can't say if there have

7    been other reports or, you know, compilations of my

8    conversation.  But in this particular one, there is not.

9    Q.  You're not aware of any other written document from

10   Ms. Pacina about your conversation with her; correct?

11   A.  I don't believe so, and I don't think I would be.

12   Q.  And you didn't write down what happened with your

13   conversation with Ms. Pacina; correct?

14   A.  No.

15   Q.  So your assumption that she would have taken it down, while

16   a valid one, is incorrect; right?

17             MR. STEER:  Objection.

18             THE COURT:  Sustained.

19             (Continued on next page)

20

21

22

23

24

25

1   BY MR. KATAEV:

2   Q.  Ms. Pacina's failure to record her interaction with you,

3   similar to her failure to immediately forward to --

4               THE COURT:  Sustained.

5               MR. STEER:  Objection.

6               THE COURT:  And counsel, please don't ask questions

7   you know are improper.

8               Go ahead.

9               MR. KATAEV:  Understood, your Honor.

10  Q.  You worked with Mr. Antonik prior to his time as site

11  director in June of '18, correct?

12  A.  I've worked with him since I arrived.

13  Q.  And when was it that you arrived again?

14  A.  It was the middle of 2017.

15  Q.  And at the time that you arrived, he was a regional

16  director, correct?

17  A.  He was.

18  Q.  And you worked with him then, right?

19  A.  I did.

20  Q.  And you have no knowledge as to why Mr. Antonik was demoted

21  from a regional director --

22              MR. STEER:  Objection.

23  Q.  -- to a site director, correct?

24              MR. STEER:  Objection to leading.

25              THE COURT:  Overruled.

1    A.   Yeah.  He was not demoted.  He was shifted into a role, an

2    opportunity that I actually thought he would be quite good at.

3    Q.   And you were present during testimony today, in the

4    email -- when you reviewed the email that you called Dr.

5    Edelman's complaint ridiculous, correct?

6    A.   I'm not sure which -- what are you referring to?

7    Q.   Exhibit SS.

8            THE COURT:  You may publish it to the jury.

9    A.   Uh-huh.  What's your question?

10   Q.   You called Dr. Edelman's complaint totally ridiculous,

11   didn't you?

12   A.   My comment of totally ridiculous was actually related to

13   her unwillingness to share space on the two days that, at the

14   time, she was not using the office.

15   Q.   But this email was sent before your interaction with Dr.

16   Edelman, correct?

17   A.   It was still in reaction to learning that she was not

18   willing to share the office on the two days that she was not

19   there.

20   Q.   But you understood that Dr. Edelman's complaint was not

21   about the office space; it was about the way that she was

22   spoken to by Mr. Antonik, correct?

23           MR. STEER:  Objection.

24   A.   I did not --

25           THE COURT:  Overruled.

N7dWede2                         Kaplan - Direct

1   A.  I did not understand it as such.

2   Q.  At your October 26, 2021, deposition, lines 20 through 25,

3   on page 65 --

4          MR. STEER:  What lines, your Honor, if I might?

5          MR. KATAEV:  20 to 25.

6   Q.  -- I asked you this question, and you gave this answer,

7   correct?

8   A.  I don't see it on my screen.

9          MR. KATAEV:  Permission to publish it to the witness,

10  your Honor, only?

11         THE COURT:  Give me one moment.

12         MR. STEER:  Objection, your Honor.

13         THE COURT:  Overruled.  It's adverse examination.

14  BY MR. KATAEV:

15  Q.  I asked you this question and you gave this answer, didn't

16  you?

17  "Q.  Were you ever made aware that Dr. Edelman's chief

18  complaint was not about the office space but about the way she

19  was spoken to?

20  "A.  I was aware that the conversation about the office space

21  led her to believe she was spoken to inappropriately as part of

22  that conversation."

23     Do you recall now whether you understood the nature of Dr.

24  Edelman's complaint?

25  A.  I knew that the complaint at the time I wrote that email

1   was -- when I stated totally ridiculous was about her lack of

2   willingness to share the office on days she was not there.

3   Q.  During your meeting with her on September 25, you attempted

4   to placate her and calm her down, didn't you?

5   A.  I did not.

6   Q.  Dr. Edelman was not expecting you to appear out of nowhere,

7   correct?

8              MR. STEER:  Objection, your Honor.

9              THE COURT:  Sustained.

10  BY MR. KATAEV:

11  Q.  Mr. Antonik told you about the fact that she had filed this

12  complaint when you spoke to him in person, correct?

13  A.  I learned about the complaint being filed from Kathleen

14  Pacina.

15  Q.  And that was before the September 25 meeting, correct?

16  A.  That was, indeed, before the 25th meeting.

17  Q.  And you were present at this office -- you were present in

18  this courtroom when Dr. Edelman testified about male doctors

19  yelling at the office, correct?

20             MR. STEER:  Objection, your Honor.

21             THE COURT:  Overruled.

22  A.  I was here, and I heard that.

23  Q.  And you've never told any male doctors to calm down when

24  they did so, correct?

25  A.  I don't tell doctors to calm down, period.

 1   Q.  And you recognize when these office changes occur that a

 2   lot of doctors are sometimes unhappy about them, correct?

 3            MR. STEER:  Objection, your Honor.

 4            THE COURT:  Sustained.

 5   BY MR. KATAEV:

 6   Q.  In the course of performing your duties at NYU, you were

 7   sometimes involved in moving doctors around, correct?

 8   A.  On a regular basis we do this.

 9   Q.  And oftentimes the doctors that you have to move around are

10   not happy about the move, correct?

11   A.  There are times that doctors are not always happy with

12   moves we make.

13   Q.  But your view is that these changes have to occur because

14   they have to occur, correct?

15   A.  When there are reasons and strategic reasons to do so.

16   Q.  And that's because NYU does not negotiate when it comes to

17   things like this, correct?

18            MR. STEER:  Objection, your Honor.

19            THE COURT:  Overruled.

20   A.  Yeah, we work very closely with our physician partners.

21   Q.  You have a do-as-we-say approach at NYU, correct?

22            MR. STEER:  Sorry.  I didn't hear that, your Honor, if

23   it could just be repeated.

24            MR. KATAEV:  More than happy.

25   Q.  You have a do-as-we-say approach at NYU, correct?

1              MR. STEER:  Objection.

2              THE COURT:  Overruled.

3   A.  We do not.

4   Q.  It's fair to say that you did not hear from Dr. Edelman

5   about any of her concerns during that conversation, did you?

6   A.  During which conversation?

7   Q.  On September 25.

8   A.  We had a discussion around the fact that she wasn't willing

9   to share the office on the days she was there.

10  Q.  And NYU's inflexibility --

11             THE COURT:  You said --

12             THE WITNESS:  Was not there.

13             THE COURT:  -- discussion around the fact that she

14  wasn't willing to share the office on the days --

15             THE WITNESS:  Not there.

16             THE COURT:  -- she was there or was not there?

17             THE WITNESS:  Was not there.

18             Thank you, your Honor.

19  BY MR. KATAEV:

20  Q.  And NYU's inflexibility about office space changes is

21  similar to its inflexibility in salary negotiations, isn't that

22  right?

23             MR. STEER:  Objection, your Honor.

24             THE COURT:  Sustained.

25  BY MR. KATAEV:

1   Q.  After your conversation with Dr. Edelman, you reached out

2   to Mr. Swirnow to inform him of what was going on, correct?

3   A.  Correct.

4   Q.  He was the individual who gave you the directive to make

5   these office changes, correct?

6   A.  We were working together to make the office changes, yes.

7   Q.  And initially, your conversation with him was that he told

8   you the changes nonetheless need to be implemented, correct?

9   A.  Our objective was to try to make them, to get that

10  implemented.

11  Q.  And that's because NYU's goal is to pack physicians into as

12  many suites as possible --

13          MR. STEER:  Objection.

14  Q.  -- to maximize profit, correct?

15          THE COURT:  Sustained.

16  BY MR. KATAEV:

17  Q.  It's fair to say, isn't it, that during the time you were

18  working to resolve this issue, you were focused more on the

19  space issue rather than Dr. Edelman's complaint about

20  discrimination and harassment?

21          MR. STEER:  Objection, your Honor.

22          THE COURT:  Sustained.

23  BY MR. KATAEV:

24  Q.  It's fair to say, isn't it, that if a site director has any

25  issue with a physician, that site director has to report it to

1    you, correct?

2    A.   That is correct.

3    Q.   That's the site director's job, right?

4    A.   That's correct.

5    Q.   In this case, Mr. Antonik failed to report this issue to

6    you, and you learned it from someone else, correct?

7    A.   Well, we spoke about it, as you indicated, and refreshed my

8    own memory that he did raise it with me.

9    Q.   But you didn't learn about it from him first, right?

10   A.   I learned about it from him as well as HR.

11   Q.   Throughout your tenure at NYU, from 2017 on, you had never

12   heard about any concerns with Dr. Edelman as a physician,

13   correct?

14   A.   I'm sorry.  Repeat that question one more time?

15   Q.   I'll rephrase it.

16        Prior to the time that Dr. Porges spoke to you about his

17   concerns with Dr. Edelman, you had never known about any issues

18   with Dr. Edelman's clinical performance, correct?

19   A.   Correct.

20   Q.   And Dr. Porges did raise some concerns with you, didn't he?

21   A.   He did.

22   Q.   And he sent you an email about his concerns, correct?

23   A.   He did.

24        MR. KATAEV:  I'd like to publish Plaintiff's Exhibit

25   1.  I believe it's already in evidence.

N7dWede2                          Kaplan - Direct

1              THE COURT:  It is in evidence.  You may do so.

2    BY MR. KATAEV:

3    Q.  This is the email that Dr. Porges sent to you, correct?

4    A.  That is correct.

5    Q.  And this is the only email that Dr. Porges ever sent you

6    regarding any physician's employment, correct?

7    A.  I don't know if it was the only email ever.  He is the

8    medical director for the Marcus Avenue campus, so there are

9    times occasionally.  But this is the -- an email about, that

10   you see here that he did send to me.

11             MR. KATAEV:  Your Honor, page 56, lines 6 through 10.

12             THE COURT:  Hold on a second.

13             You may examine.

14   BY MR. KATAEV:

15   Q.  At your deposition on October 26, 2021, I asked you the

16   following question, and you gave the following answer, correct?

17   "Q.  The email that you referred to that Dr. Andrew Porges sent

18   you, was that the only email he has ever sent you regarding a

19   physician's performance?"

20   A.  Well, it was a very specific question, but the answer --

21             THE COURT:  No.  Sir, you're just asked the question

22   were you asked these questions and did you give these answers?

23   BY MR. KATAEV:

24   "A.  To my recollection, yes."

25   A.  Yes.

N7dWede2                        Kaplan - Direct

1   Q.  So it's then true that that was the only email that you'd

2   ever received from Dr. Porges about any physician, right?

3   A.  About physician's performance, sir.

4              MR. STEER:  Objection.

5              THE COURT:  The objection's overruled.

6              I want to make sure the reporter gets the answer, so,

7   sir, the witness should speak into the microphone so the court

8   reporter can get it down.

9              Do you have the question?

10             THE WITNESS:  If he could just repeat that question.

11             THE COURT:  Can you do the question again, counsel.

12  BY MR. KATAEV:

13  Q.  Sure.  So it's true then that this was the only email

14  Dr. Porges sent you about any physician?

15  A.  About a physician's performance.

16  Q.  Yes.

17  A.  Yes.

18  Q.  Now, Ms. Pacina is a human resources employee, correct?

19  A.  Correct.

20  Q.  And one of her functions is, in your words, to adjudicate

21  labor relations issues, correct?

22  A.  Correct.

23  Q.  And adjudicate means to resolve, right?

24  A.  To investigate -- my assumption is to investigate and get

25  to a resolution.

1   Q.  And a resolution could be this complaint has no merit or

2   this complaint has merit, correct?

3   A.  Presumably.

4   Q.  To your knowledge, Ms. Pacina never made any such

5   adjudication, correct?

6   A.  I was not privy to that.

7   Q.  Now, you're familiar with what an RVU is, given your

8   extensive background with hospitals, right?

9   A.  I know what they are.

10  Q.  And you're aware that there is some correlation between the

11  number of RVUs earned and salary earned, correct?

12  A.  I'm familiar with how they work.

13  Q.  And generally speaking, the higher the RVU target the

14  higher the pay, correct?

15  A.  I can't speak to that in -- at our institution.

16  Q.  **And generally speaking, the higher the RVUs actually earned**

17  **higher the pay, correct?**

18          MR. STEER:  Objection, your Honor.

19          THE COURT:  Basis.

20          MR. STEER:  Foundation.

21          THE COURT:  Overruled.  The witness can answer if he

22  knows the answer.

23  A.  Say the question one more time, please.

24  Q.  Generally speaking, the higher the RVUs earned by the

25  physician the higher the pay, correct?

N7dWede2                          Kaplan - Direct

1   A.  One would assume so.

2   Q.  Focusing back on exhibit 1, you received this email from

3   Dr. Porges because you asked Mr. Antonik to ask him to send it,

4   correct?

5   A.  That is not correct.

6   Q.  Well, Dr. Porges called you prior to sending you this

7   email, didn't he?

8   A.  He did.

9   Q.  And he told you that he had some alleged concerns about Dr.

10  Edelman, didn't he?

11  A.  He started to tell me about his concerns.

12  Q.  And you stopped him from telling you those concerns, didn't

13  you?

14  A.  I did.  I told him to put it in writing.

15  Q.  And you needed it in writing so you could use to send it to

16  Mr. Swirnow, correct?

17  A.  I wanted it in writing so it was documented so that I would

18  be able to forward it to my leadership.

19  Q.  And you never asked Dr. Porges how he came to learn about

20  these issues, correct?

21  A.  It wasn't my place to do so.

22  Q.  So that means you didn't, right?

23  A.  I did not.

24  Q.  Now, based on your experience in hospitals and working with

25  various other institutions, there are multiple factors that go

1   into compensation for a doctor, correct?

2   A.  Yes.

3   Q.  And every physician has different arrangements when it

4   comes to CPT codes and RVUs earned, right?

5   A.  Yes.

6   Q.  And in fact, some institutions have models where a

7   physician earns RVUs but it doesn't count towards their target,

8   correct?

9           MR. STEER:  Objection, your Honor.  Foundation, his

10  experience.

11          THE COURT:  Why don't you establish the foundation.

12  Sustained.

13  BY MR. KATAEV:

14  Q.  In your experience working with hospitals, you learned

15  about physician compensation, didn't you?

16  A.  In past experiences at other institutions, not here at NYU.

17  Q.  And you're aware that in at least other medical

18  institutions there are circumstances where a physician can

19  technically earn RVUs but it will not count towards their

20  target, correct?

21  A.  There are different models for different specialties in

22  different organizations.

23          MR. KATAEV:  I'd like to publish WW, your Honor.

24          THE COURT:  You may do so.  Go ahead.

25  BY MR. KATAEV:

N7dWede2                        Kaplan - Direct

1    Q.  This email is dated November 13, 2019, correct?

2    A.  It is.

3    Q.  And it's after Dr. Edelman's September 17, 2019, complaint,

4    correct?

5    A.  I'm sorry.  You said the date.  Say that date.

6    Q.  September 17, 2019.

7    A.  Yes.

8    Q.  And this is the first time that Mr. Antonik ever sent you

9    any email about Dr. Edelman, correct?

10   A.  Correct.

11   Q.  Now, to your knowledge, Mr. Antonik and Ms. Ruiz ultimately

12   worked this issue out between themselves, right?

13            MR. STEER:  Objection.

14            THE COURT:  Overruled.

15   A.  I assume so.

16   Q.  And this was just as much a spat as what your attorneys

17   have called the office issue a spat, correct?

18   A.  I can't speak to the level, but my assumption is that it

19   was -- would be resolved.

20   Q.  You nonetheless elevated this issue to Mr. Swirnow, didn't

21   you?

22   A.  I did.

23   Q.  And you did that because you had already been speaking to

24   Mr. Swirnow about issues with Dr. Edelman, correct?

25   A.  Correct.

1            MR. KATAEV:  I'd like to go back to exhibit 1, which

2    is in evidence.

3            THE COURT:  You may do so.

4    BY MR. KATAEV:

5    Q.  Now, Dr. Porges decided to tell you about these clinical

6    performance issues with Dr. Edelman, correct?

7    A.  That is correct.

8    Q.  To your knowledge, he didn't call the compliance

9    department, right?

10           MR. STEER:  Objection, your Honor -- withdrawn.

11   A.  I can't speak to who else he spoke to.

12   Q.  You don't know whether he called the compliance

13   department --

14   A.  No.

15   Q.  -- right?

16       And you don't know whether he called any hotline, right?

17   A.  I do not.

18   Q.  And you have no knowledge as to whether Dr. Porges reported

19   this issue to the Office of Professional Medical Conduct?

20   A.  I do not.

21   Q.  And that office is for doctors what a grievance committee

22   is to lawyers, correct?

23           MR. STEER:  Objection, your Honor.

24           THE COURT:  Sustained.

25   BY MR. KATAEV:

N7dWede2                         Kaplan - Direct

1    Q.   Instead, Dr. Porges sent you, a facilities person, this

2    email, correct?

3              MR. STEER:  Objection, your Honor.

4              THE COURT:  Sustained as to form.

5    BY MR. KATAEV:

6    Q.   Dr. Porges sent you this email even though you don't deal

7    with physicians' clinical performance, correct?

8    A.   He sent me these concerns.

9    Q.   And Dr. Porges, as the clinical director, he had a line to

10   Mr. Swirnow and Mr. Rubin, didn't he?

11   A.   As the medical director, he has a relationship with -- yes.

12   The answer's yes.

13   Q.   And in fact, he got his title as the medical director years

14   after he started at NYU by directly asking Mr. Rubin for it,

15   didn't he?

16   A.   I can't speak to that.

17   Q.   If Dr. Porges had any real concerns about Dr. Edelman's

18   clinical performance he could have easily gone directly to

19   Mr. Rubin, couldn't he?

20             MR. STEER:  Objection, your Honor.

21             THE COURT:  Sustained.

22   BY MR. KATAEV:

23   Q.   It's fair to say, isn't it, that you don't often meet with

24   Dr. Porges at all?

25   A.   I don't meet with him often.

N7dWede2                        Kaplan - Direct

1   Q.  And in fact, it's rare for him to contact you about any

2   issue, correct?

3   A.  It is.

4   Q.  So it was strange that he contacted you about this issue,

5   wasn't it?

6           MR. STEER:  Objection.

7           THE COURT:  Overruled.

8   A.  I can't speak to strange.  He felt comfortable and a need

9   to communicate this to me.

10  Q.  And to your knowledge, Dr. Porges has never raised issues

11  like this with any other doctor, correct?

12  A.  Correct.

13  Q.  Now, you received this email on November 6, but you only

14  forwarded it to Mr. Swirnow on November 18, didn't you?

15  A.  That's not correct.

16  Q.  Prior to the time that you received this email from

17  Dr. Porges, you told Dr. Porges that he has to send you this

18  email by November 6, right?

19  A.  I gave him no such deadlines.

20  Q.  Your testimony is that you did not tell Dr. Porges he

21  should send you an email within one to two days?

22  A.  I told him that if he had concerns, that he needed to put

23  them in writing and send them to me.

24  Q.  And your testimony is you did not give him any deadlines?

25  A.  I gave no deadlines.  I believe he sent it to me within a

N7dWede2                          Kaplan - Direct

1   couple days.

2               MR. KATAEV:  Pages 78 to 79, your Honor.  I'll give

3   you the line numbers shortly.

4               THE COURT:  Lines?

5               MR. KATAEV:  Hang on one second.  Page 79, lines 4

6   through 7.

7               MR. STEER:  Through where, your Honor?  I'm sorry.

8               THE COURT:  Lines 4 through what?

9               MR. KATAEV:  9 -- sorry.  7.

10              THE COURT:  Any objection?

11              MR. STEER:  One moment, if I may, your Honor?

12              I believe it's improper.

13              THE COURT:  All right.  Sustained.

14              MR. STEER:  Objection.

15              THE COURT:  Objection sustained.

16              MR. KATAEV:  I'll show you what's marked as exhibit

17   86.  It's already admitted, your Honor.  I'd like to publish.

18              THE COURT:  You may publish it to the jury.

19   BY MR. KATAEV:

20   Q.  I'm showing you Mr. Antonik's email from November 6, time

21   stamped 2:20.  In this email, Mr. Antonik says, "David

22   requested all information on Edelman to be sent to him today."

23   Do you see that?

24   A.  I do.

25   Q.  You communicated that deadline to Mr. Antonik and

1   Dr. Porges, didn't you?

2   A.  I did not.

3   Q.  You wanted this email to be sent to you by November 6,

4   2020, because it was a Friday and that was the day you worked

5   at One Park, right?

6   A.  I did not.

7   Q.  You directed this email to be sent by November 6, 2020,

8   because you wanted to address it with Mr. Rubin and

9   Mr. Swirnow, correct?

10  A.  I did not.

11  Q.  But you agree with me that this email says that David

12  requested all information to be sent today?

13  A.  It does say that.

14  Q.  And you did, in fact, receive an email from Dr. Porges on

15  that day, correct?

16  A.  I did.

17  Q.  But it was only sent at 4:31 p.m., towards the end of the

18  day, correct?

19  A.  It was sent at 4:31 p.m.

20  Q.  And so it was too late to discuss this issue with Mr. Rubin

21  or Mr. Swirnow?

22          MR. STEER:  Objection.

23          THE COURT:  Sustained.

24  BY MR. KATAEV:

25  Q.  It's fair to say, isn't it, that Dr. Porges raised concerns

1    about Dr. Edelman's clinical care?

2    A.   It's whatever he included in this email.

3    Q.   And ultimately, Dr. Edelman got terminated shortly after

4    this email, right?

5    A.   I can't speak to that.

6    Q.   To your knowledge, isn't it true that Dr. Edelman remained

7    at NYU until April of 2021, five months later?

8    A.   To my knowledge.

9    Q.   And you have no explanation as to why Dr. Edelman stayed

10   until April of 2021 if there were any concerns about patients,

11   correct?

12            MR. STEER:  Objection, your Honor.

13            THE COURT:  Overruled.

14   A.   I can't speak to that.

15   Q.   In your email to Mr. Swirnow, forwarding the November 6

16   email, on November 18 you just say to him "here you go,"

17   correct?

18   A.   Correct.

19   Q.   And you deny that this is the first time you sent this to

20   Mr. Swirnow, correct?

21   A.   That's correct.

22   Q.   Where is the email that you sent to Mr. Swirnow prior to

23   November 18?

24   A.   I printed this and, and handed it to him.

25   Q.   And you don't recall when?

N7dWede2                          Kaplan - Direct

```
1    A.  Shortly after this, but I don't recall when.

2    Q.  When you said "here you go," this was because you did not

3    want to put anything in writing about what you were forwarding

4    him, correct?

5              MR. STEER:  Objection, your Honor.

6              THE COURT:  Why did you say "here you go"?

7              THE WITNESS:  I said "here you go" because I had

8    printed it to him, and then I had subsequently forwarded it to

9    him in email, as seen here.

10   BY MR. KATAEV:

11   Q.  He requested it?  He requested that you forward it to him?

12   A.  Yes.

13   Q.  You later spoke to Dr. -- I'm sorry.

14       You later spoke to Mr. Swirnow, as set forth in this email,

15   correct?

16   A.  Yes.

17   Q.  And he told you we'll take it from here, correct?

18   A.  Correct.

19   Q.  And by we, he meant Mr. Swirnow and himself, correct -- I'm

20   sorry -- Mr. Rubin and himself, correct?

21   A.  I assumed as such.

22   Q.  But to your knowledge, it's likely that Mr. Swirnow

23   discussed this issue with Mr. Rubin?

24             MR. STEER:  Objection, your Honor.

25             THE COURT:  Sustained.
```

N7dWede2                        Kaplan - Direct

1    BY MR. KATAEV:

2    Q.  Separate from these concerns -- withdrawn.

3        Mr. Swirnow told you to give you -- to give him a call to

4    discuss this, correct?

5    A.  He did.

6    Q.  And that's because he didn't -- that's because, to your

7    knowledge, he did not want to put anything that he was saying

8    to you in writing, correct?

9            MR. STEER:  Objection.

10           THE COURT:  Sustained.

11   BY MR. KATAEV:

12   Q.  You never ultimately memorialized this conversation,

13   correct?

14   A.  I did not.

15   Q.  And to your knowledge, neither did Mr. Swirnow, correct?

16           MR. STEER:  Objection, your Honor.

17           THE COURT:  Overruled.

18   A.  I can't speak to if he put something in writing or not.

19   Q.  You're not aware of anything in writing by him, right?

20   A.  I'm not.

21   Q.  Prior to this exchange, you had also spoken to Mr. Swirnow

22   about resolving the office space issue, right?

23   A.  Correct.

24   Q.  And the focus of your conversation with Mr. Swirnow was

25   whether the contract actually permitted Dr. Edelman to have

N7dWede2                    Kaplan - Direct

1    exclusive space, right?

2    A.  Correct.

3    Q.  But Mr. Swirnow told you that NYU has the right to move

4    doctors around except if there's a burden to the doctor, isn't

5    that right?

6    A.  Correct.

7    Q.  And Dr. Edelman did, in fact, raise concerns about a

8    burden, didn't she?

9              MR. STEER:  Objection, your Honor.

10             THE COURT:  Overruled.

11   A.  She raised a concern only in the fact that she was

12   unwilling to share her office on the days she was not there.

13   Q.  But isn't it true that she said that it would be hard for

14   her to maintain her RVU targets and meet them if this change

15   occurred?

16   A.  She did say that.

17   Q.  Isn't it fair to say that she had a concern that would

18   cause her a burden in moving the space?

19   A.  But she was not --

20             MR. STEER:  Objection.

21             THE COURT:  Overruled.

22   A.  She was not in the space those days when we had the initial

23   conversation.  She --

24   Q.  But she informed you that there are times when Huntington

25   is closed on Thursdays and she moves her patients to Lake

1    Success, doesn't she?

2    A.   No, we did not talk about -- we talked about her concerns

3    around Huntington; we did talk about that.

4    Q.   OK.   And ultimately, those concerns were resolved by

5    permitting her to remain at one location so she could meet her

6    targets, right?

7    A.   We did.

8    Q.   And so Dr. Edelman's concerns fit within the exception to

9    this rule, didn't they?

10             MR. STEER:   Objection, your Honor.

11             THE COURT:   Overruled.

12   A.   Which is why, ultimately, when she made those requests we

13   fulfilled them to remain at Marcus Avenue.

14   Q.   And that issue could have easily been resolved with

15   Mr. Antonik, couldn't it?

16   A.   I can't say.

17             MR. KATAEV:   I'd like to place up on the screen what's

18   been marked as OO.   I believe it's in evidence already.

19             THE COURT:   It's in evidence, so you can do so.

20   BY MR. KATAEV:

21   Q.   In this September 16 email, Mr. Antonik wrote to you about

22   this issue with Dr. Edelman, correct?

23   A.   Correct.

24   Q.   And at the end of this email, Mr. Antonik raises an option

25   to make the changes work by having Dr. Li use Dr. Klaus

N7dWede2                          Kaplan - Direct

 1   Dittmar's office on Thursdays and Fridays, correct?

 2   A.  I see that.

 3   Q.  Dr. Dittmar was an oncologist in the same suite, and he was

 4   a senior partner, right?

 5   A.  Correct.

 6   Q.  Dr. Dittmar is a male, correct?

 7   A.  He is.

 8   Q.  And the senior partner is just another title that's used to

 9   pay male doctors more, correct?

10          MR. STEER:  Objection.

11          THE COURT:  Sustained.

12   BY MR. KATAEV:

13   Q.  And you said that Dr. Dittmar was very busy, right?

14   A.  He was the senior partner in his -- he was the senior

15   member of his group.

16   Q.  And you said he was very busy, right?

17   A.  Busy.

18   Q.  Well, busier than Dr. Edelman?

19   A.  I don't compare doctors that way.

20   Q.  But you didn't investigate who was busier, did you?

21          MR. STEER:  Objection.

22          THE COURT:  Sustained.  And I think we're done on this

23   particular line.

24          MR. KATAEV:  Just one more question on it?

25   Q.  You said, you determined that it was not appropriate to

N7dWede2                          Kaplan - Direct

 1    limit Dr. Dittmar in performing his duties, right?

 2              MR. STEER:  Objection.

 3              THE COURT:  Sustained.

 4    BY MR. KATAEV:

 5    Q.  You acknowledge that Dr. Edelman had a very busy practice

 6    with lots of patients, correct?

 7    A.  She had a busy practice.

 8    Q.  NYU only accommodated Dr. Edelman's request to move

 9    entirely to Lake Success and stop going to Huntington because

10    you collectively figured out another way to make the office

11    changes work, correct?

12              MR. STEER:  Objection.

13              THE COURT:  Sustained on 401 grounds.  And 403.

14    BY MR. KATAEV:

15    Q.  It's fair to say that Dr. Edelman frustrated your plans

16    with the office move, correct?

17              MR. STEER:  Objection.

18              THE COURT:  Sustained on 401 and 403.

19    BY MR. KATAEV:

20    Q.  Going back to the phone call that you had with Dr. Porges,

21    where you stopped him from speaking and told him to send you an

22    email, you did not ask -- Dr. Porges did not tell you about any

23    interpersonal issues, correct?

24              MR. STEER:  Objection, your Honor.

25              THE COURT:  Overruled.  I'll permit it.

1   A.  I'm sorry.  I couldn't hear the end of your question.

2   Q.  Dr. Porges did not inform you during this phone call about

3   any interpersonal issues with Dr. Edelman, correct?

4   A.  He did not.

5            MR. KATAEV:  I'd like to publish to the jury exhibit

6   SS.  It's already been admitted in evidence.

7            THE COURT:  You may do so.

8            Counsel, how much longer do you have?

9            MR. KATAEV:  Two pages left, your Honor.

10           THE COURT:  OK.

11  BY MR. KATAEV:

12  Q.  In this email you wrote to Mr. Swirnow, you informed him

13  that Dr. Edelman filed a complaint against Mr. Antonik for

14  being aggressive and retaliating, correct?

15  A.  That is what was reported to me.

16  Q.  You didn't write in here about any issue with office space;

17  you wrote about Mr. Antonik's conduct, correct?

18  A.  I reported what was reported to me.

19  Q.  Your focus in this email after what you're reported was

20  solely on the office space issue and not Dr. Edelman's

21  complaint about Mr. Antonik's aggression, correct?

22           MR. STEER:  Objection.

23           THE COURT:  Sustained.

24  BY MR. KATAEV:

25  Q.  You don't address anything in here about Mr. Antonik's

N7dWede2                            Kaplan – Direct

1    alleged aggression, correct?

2              MR. STEER:  Objection.

3              THE COURT:  Overruled.

4    A.  I shared what was reported to me.

5    Q.  But you didn't address it in any way, did you?

6    A.  I elevated it to my boss, or one of my bosses.

7    Q.  It's fair to say that you ignored this issue and focused on

8    the space issue, correct?

9              MR. STEER:  Objection.

10             THE COURT:  Overruled.

11   A.  I shared what was reported to me.

12   Q.  In fact, you called Dr. Edelman's complaint totally

13   ridiculous, right?

14   A.  I said what was totally ridiculous was her not willingness

15   to share the office space on the days she wasn't in the office

16   at the time.

17   Q.  Mr. Swirnow echoed your sentiment that this was ridiculous,

18   correct?

19   A.  That is correct.

20   Q.  This is an example of how you address HR complaints

21   regarding harassment and discrimination?

22             MR. STEER:  Objection.

23             THE COURT:  Sustained.

24   BY MR. KATAEV:

25   Q.  Mr. Swirnow acknowledges that Dr. Edelman was busy here,

N7dWede2                          Kaplan - Direct

1    correct?

2    A.   She -- she was a busy practitioner.

3    Q.   Even though you knew about Dr. Edelman's complaint against

4    Mr. Antonik when you went to speak to her on September 25, you

5    did not ask Dr. Edelman anything about it, did you?

6    A.   I was there to speak about the office space.

7    Q.   Fair to say, again, you ignored the complaint and focused

8    on your issues --

9                THE COURT:  Sustained.

10               MR. STEER:  Objection.

11               THE COURT:  One more, and you're done.

12               MR. KATAEV:  I apologize, your Honor.

13               THE COURT:  One more like that.

14   BY MR. KATAEV:

15   Q.   Now, ultimately, Mr. Swirnow was the one who took a step

16   back and looked at the big picture, right?

17   A.   We worked together, yes, on that.  But, yes.

18   Q.   This email reflects his desire to assess things before

19   acting, right?

20   A.   As he often does.

21   Q.   And Mr. Swirnow was ultimately able to have a conversation

22   with Dr. Edelman and resolve this issue, correct?

23   A.   I believe they spoke.

24   Q.   But you were not able to do so, right?

25   A.   I was not part of that.

1  Q.  You're familiar with the Epic System, correct?

2  A.  Yes.

3  Q.  That's what we call an EMR, right?

4  A.  An EMR, yes.

5  Q.  And that stands for electronic medical records?

6  A.  Correct.

7  Q.  And this is the system that's used to provide RVU reports,

8  right?

9  A.  It's actually -- it's our electronic medical record and

10  it's our billing -- our billing system.

11  Q.  To your knowledge, that system could be used to pull up RVU

12  reports, right?

13  A.  I believe it's used for billing.

14  Q.  There is some system that's used to pull up RVU reports,

15  isn't there?

16  A.  There is a process to calculate RVUs, yes.

17  Q.  And you can do so with the click of a button, correct?

18  A.  I think it's a little more involved than that.

19  Q.  To your knowledge, NYU has not provided any RVU reports for

20  all the doctors in this case, correct?

21          MR. STEER:  Objection.

22          THE COURT:  Sustained.

23          The jury's instructed that questions are not evidence

24  in the case.  When I sustain an objection, you're to just

25  entirely disregard it.

1            MR. KATAEV:  I'd like to place up on the screen

2      Plaintiff's Exhibit 71.

3            MR. STEER:  No objection, your Honor.

4            THE COURT:  Received and may be published.

5            (Plaintiff's Exhibit 71 received in evidence)

6      BY MR. KATAEV:

7      Q.  This is a November 1, 2019, email from Dr. Edelman to

8      Ms. Pacina, correct?

9      A.  OK.

10           THE COURT:  Is the witness on this email?

11           MR. KATAEV:  No, your Honor.

12           THE COURT:  Do you have a foundation?

13           MR. KATAEV:  Yes.  He was shown it during his

14     deposition, your Honor.

15           THE COURT:  But to ask this witness about this email.

16           MR. KATAEV:  Yes, he addressed this email during his

17     deposition.

18           THE COURT:  That doesn't establish a foundation.

19           All right.  One or two questions.

20           MR. KATAEV:  Just one.

21     Q.  Dr. Edelman sent this email on November 1, correct?

22     A.  Looks like that.

23     Q.  And she says at the end of this paragraph that she wants to

24     know when and how the issue will be addressed, correct?

25     A.  I see that.

1            MR. STEER:  Objection, your Honor.

2    Q.  But Ms. Pacina --

3            THE COURT:  Basis.

4    Q.  -- never contacted you after she received this email on

5    November 1, correct?

6            MR. STEER:  Objection, your Honor.

7            THE COURT:  Overruled.

8    A.  Repeat that question?

9    Q.  Ms. Pacina never contacted you other than the two times

10   with the incident with Mr. Antonik and with the incident with

11   you on September 25, correct?

12   A.  Correct.

13   Q.  In fact, you're not aware of any action whatsoever by

14   Ms. Pacina after your conversation with her on September 25,

15   correct?

16   A.  I was not.

17           THE COURT:  Mr. Kataev, are you done?

18           MR. KATAEV:  Just a few more questions, your Honor.

19   Q.  You were here when Mr. Antonik referred to an email that

20   you had sent him, correct?

21   A.  Which email are you referring --

22           MR. STEER:  Objection, your Honor.

23           THE COURT:  Overruled.

24           What email are you referring to, sir?

25           MR. KATAEV:  There's an email that Mr. Antonik

1    testified about yesterday that he received from Mr. Kaplan

2    about Dr. Edelman.

3            THE COURT:  You can answer that question if you

4    understand it.  Otherwise, the objection is sustained.

5            THE WITNESS:  I don't.

6            THE COURT:  Objection sustained.

7    BY MR. KATAEV:

8    Q.  Based on your training concerning discrimination and

9    harassment and your understanding of Dr. Edelman's complaint,

10   you understood that you could not retaliate against her,

11   correct?

12   A.  Correct.

13           MR. KATAEV:  I have nothing further.

14           THE COURT:  OK.

15           Members of the jury, it's now a little bit after

16   10:45, so we're going to take our midmorning break now for

17   about 15 minutes.  Have a good break.  Don't talk about the

18   case amongst yourselves or do any research.  I'll see you back

19   here in a little bit.

20           (Continued on next page)

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  The witness may step down.

3          Mr. Kataev, you understand that when you ask a

4    question and you get an answer that you don't like you're not

5    permitted to incorporate into your follow-up question the

6    answer you wish you would have received but that is the

7    complete opposite of the one that you did receive.

8          MR. KATAEV:  Yes, your Honor.  I apologize.

9          THE COURT:  And then with respect to using the

10   transcript to impeach, you have complete leeway to use that

11   whenever there is a statement that the witness gives from the

12   stand that is inconsistent with what the witness testified

13   during deposition, but when the testimony is consistent, then

14   it constitutes hearsay unless it's offered by the other side to

15   rebut a charge of recent fabrication, and the like.

16         All right.  So what I propose to do is -- hold on for

17   a second -- is to bring juror No. 5 into the robing room.  I'll

18   have one lawyer from each side with me, and I'm going to just

19   inquire into what her personal circumstances are.

20         She asked me in the email whether it would be possible

21   for her to miss tomorrow morning and just catch up on what

22   happened by reading the transcript.  The answer to that

23   question is obviously no, and I propose to tell her that the

24   answer is no and then to inquire with her whether it would be

25   possible for the appointment that is scheduled for tomorrow

N7dWede2                          Kaplan - Direct

1   morning either to be moved to the afternoon or for somebody

2   else to cover it and see what her personal situation is.  And I

3   will keep that portion of the transcript under seal, available

4   to the parties but not to the public unless there's a further

5   application, in order to protect the juror's privacy.

6            OK.  The parties are welcome to meet me in the robing

7   room.

8            (Pages 632 to 635 SEALED)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  I gather defense counsel has asked the

2     question whether I considered starting the trial later tomorrow

3     in light of juror No. 5's issues.  I did consider that, but for

4     two reasons, I don't think that will work.

5              First of all, there's no assurance if I started later

6     that that would solve the issues for juror No. 5.  Second, it

7     would have the effect of inconveniencing all of the other

8     jurors.

9              The witness is on the stand.  Let's bring in the jury.

10             (Continued on next page)

1               (Jury present)

2               THE COURT:  Counsel, you may inquire.

3               Mr. Kaplan, you're reminded you're still under oath.

4               MR. STEER:  Your Honor, I would like to mark for

5      identification Defendants' RR.

6               THE COURT:  Any objection to RR?

7               MR. KATAEV:  I believe it's already admitted.

8               THE COURT:  RR is received and may be published to the

9      jury.

10              (Defendant's Exhibit RR received in evidence)

11     CROSS-EXAMINATION

12     BY MR. STEER:

13     Q.  Mr. Kaplan, I'm showing you Defendants' RR.  Does that

14     confirm the date when Ms. Pacina reached out to you?

15     A.  Yes.

16     Q.  Now, when you spoke with plaintiff, did she say anything to

17     you about Mr. Antonik calling her a bitch?

18     A.  She did not.

19     Q.  When you spoke with Ms. Pacina, did saying to you about

20     calling her a bitch?

21     A.  She did not.

22     Q.  Did anyone else say anything else to you about whether

23     plaintiff was called a bitch?

24     A.  Did not.

25     Q.  When you were speaking with Ms. Pacina, did she say

1    anything about this being discrimination against women?

2    A.  No.

3    Q.  When you spoke to Dr. Edelman, did she tell you this was

4    discrimination against women?

5    A.  No.

6    Q.  And did there come a time that you learned that

7    Dr. Edelman's contract was not renewed?

8    A.  Repeat the question.

9    Q.  I'm sorry.  Did there come a time when Dr. Edelman's

10   contract was not renewed?

11   A.  I don't have knowledge of that.

12   Q.  If I represent to you that her contract was not renewed,

13   did anyone consult with you about that happening?

14   A.  Absolutely not.

15   Q.  Did anyone ask you for any input into the decision whether

16   Dr. Edelman's contract should not be renewed?

17   A.  Absolutely not.

18   Q.  Did you speak with anyone about the nonrenewal before the

19   decision was made?

20   A.  Absolutely not.

21   Q.  Did you conspire with Joe Antonik to get plaintiff fired?

22           MR. KATAEV:  Objection.

23           THE COURT:  Overruled.

24   A.  Absolutely not.

25   Q.  When you were having information gathered at Mr. Swirnow's

1   request, what, if anything, did you expect would happen with

2   plaintiff, if anything?

3               MR. KATAEV:  Objection.  Hypothetical.  Speculation.

4               THE COURT:  Overruled.

5   A.   The information that was provided to me I simply handed off

6   to my boss, one of my bosses.

7   Q.   Anyone tell you why the information was wanted?

8   A.   No.

9   Q.   Could you tell the jury, did you do anything to

10  discriminate against Dr. Edelman?

11  A.   I did not.

12              MR. KATAEV:  Objection.

13              THE COURT:  Overruled.

14  Q.   Did you try to get her fired?

15  A.   Absolutely not.

16  Q.   Did you retaliate against her?

17  A.   Absolutely not.

18              MR. KATAEV:  Objection.

19              THE COURT:  Overruled.

20  Q.   Did you try to do your job to the best of your ability?

21  A.   100 percent.

22  Q.   Do you have any understanding of why you're sitting here

23  today as an individual defendant in this lawsuit?

24  A.   I do not.

25              MR. STEER:  No more questions, your Honor.

```
 1              THE COURT:  Anything further from the plaintiff?

 2              MR. KATAEV:  Just one or two.

 3              THE COURT:  Let's get the next witness ready.

 4              MR. KATAEV:  I'd like to publish exhibit 1, which is

 5   already in evidence.

 6              THE COURT:  Okay.

 7   REDIRECT EXAMINATION

 8   BY MR. KATAEV:

 9   Q.  You testified earlier today that you sometimes handle human

10   resources complaints; correct?

11              MR. STEER:  Objection, your Honor.

12              THE COURT:  Overruled.

13   A.  When I'm inquired to do so.

14   Q.  And you were inquired to do so here; correct?

15   A.  I was not inquired, I was informed.

16   Q.  You played a role in providing information concerning this

17   complaint against Dr. Edelman; correct?

18              MR. STEER:  Objection.

19              THE COURT:  Overruled.

20   A.  I provided -- I learned of the information from HR.

21   Q.  And Plaintiff's Exhibit 1, which is in front of you --

22   A.  I don't have anything on the screen.  Now I see it.

23   Q.  Plaintiff's Exhibit 1, you inquired about the conversation

24   that Dr. Porges had with Mr. Swirnow; correct?

25   A.  I did.
```

1   Q.  So it's not fair to say that you had no knowledge regarding

2   the nonrenewal; correct?

3              MR. STEER:  Objection, your Honor.

4              THE COURT:  Overruled.

5   A.  No knowledge of nonrenewal.

6   Q.  This email is dated November 18, 2020; correct?

7   A.  Correct.

8   Q.  And the notice of nonrenewal is dated December 1st;

9   correct?

10  A.  I don't know.

11             MR. KATAEV:  I'd like to publish to the witness

12  Plaintiff's Exhibit 6.

13             Withdrawn.

14             Plaintiff's Exhibit 7, your Honor.

15             THE COURT:  Okay.

16             MR. STEER:  No objection, your Honor, if it's not in

17  evidence.

18             THE COURT:  7 is received.

19             (Plaintiff's Exhibit 7 received in evidence)

20  Q.  Based on this letter regarding the nonrenewal of

21  Dr. Edelman's employment, it is dated December 1st; correct?

22  A.  It appears so.

23  Q.  And between November 18th and December 1st, there's

24  Thanksgiving; correct?

25  A.  That is correct.

1    Q.  It's fair to infer that a decision was made not to renew

2    Dr. Edelman's contract before Thanksgiving; correct?

3              MR. STEER:  Objection.

4              THE COURT:  Sustained.

5              MR. KATAEV:  Nothing further.

6              THE COURT:  Anything further?

7              MR. STEER:  One very fast question, your Honor.

8              THE COURT:  You can ask from where you are.

9              MR. STEER:  Thank you so much.

10   RECROSS EXAMINATION

11   BY MR. STEER:

12   Q.  You were just shown an exhibit that asked the question how

13   did your call go with Dr. Porges.  What did that relate to?

14        Withdrawn.

15        The line in that email, "How did the call go with

16   Dr. Porges," did that have anything at all to do with the idea

17   of plaintiff being nonrenewed?

18   A.  Not at all.

19             MR. STEER:  No further questions, your Honor.

20             THE COURT:  You're excused as a witness.

21             (Witness excused)

22             Please call your next witness.

23             MR. KATAEV:  Plaintiff calls defendant Joshua Swirnow.

24             THE COURT:  Mr. Swirnow, please step forward into the

25   witness box, remain standing as my deputy administers the oath.

 1    JOSHUA SWIRNOW,

 2         called as a witness by the Plaintiff,

 3         having been duly sworn, testified as follows:

 4              THE DEPUTY CLERK:  Please state your full name for the

 5    record and please spell out your first and last name.

 6              THE WITNESS:  Joshua J-o-s-h-u-a, Swirnow

 7    S-w-i-r-n-o-w.

 8              THE COURT:  Mr. Swirnow, you probably know the routine

 9    by now, but please try to speak into the microphone and keep

10    your voice up.

11              Plaintiff have a transcript that you want me to have?

12              MR. KATAEV:  Yes, your Honor.

13              THE COURT:  Try to give that to me during the breaks.

14              You may inquire.

15    DIRECT EXAMINATION

16    BY MR. KATAEV:

17    Q.  Good morning, Mr. Swirnow.

18    A.  Good morning.

19    Q.  By way of background, you have a bachelor's of science in

20    both biology and business; correct?

21    A.  That's correct.

22    Q.  You earned those degrees in 1998; correct?

23    A.  Yes.

24    Q.  And you're also the -- you also earned a master's in

25    business administration; correct?

1    A.  That's correct.

2    Q.  You then worked at a hospital in Baltimore for six years

3    before going to NYU; correct?

4    A.  Yes.

5    Q.  And at NYU, when you were hired there, you worked your way

6    up from administrative practice manager to currently vice

7    president; correct?

8    A.  Yes.

9    Q.  You have been the vice president since early 2020; isn't

10   that right?

11   A.  Approximately.

12   Q.  But for the relevant time period here with Dr. Edelman, you

13   were the assistant vice president; correct?

14   A.  For part of that time, yes.

15   Q.  And you were the assistant vice president for clinical

16   affairs and business development; is that right?

17   A.  I don't remember the specific titles, but something about

18   that.

19   Q.  And in your role, you report directly to Mr. Rubin;

20   correct?

21   A.  Yes.

22   Q.  In your role, you will receive the faculty group practice

23   with others since 2005; correct?

24   A.  Portions of it, yes.

25   Q.  And the fact that a group practice consists of 350 sites;

1     right?

2     A.   Approximately.

3     Q.   And 1999 Marcus Avenue is one such site; correct?

4     A.   Yes.

5     Q.   Part of your role involves overseeing the business

6     functions of the ambulatory care network and the physician

7     organization; correct?

8     A.   Yes.

9     Q.   And you know that Dr. Edelman is a doctor at NYU; correct?

10    A.   She was.

11    Q.   And you first met Dr. Edelman with Dr. Mehta for what you

12    referred to as an offer meeting; correct?

13    A.   Yes.

14    Q.   And at that meeting with you was Mr. Rubin; right?

15    A.   Yes.

16    Q.   That meeting was held at One Park Avenue in Manhattan;

17    correct?

18    A.   Yes.

19    Q.   At your office?

20    A.   Sorry?

21    Q.   At your office.

22    A.   At our offices, yes.

23    Q.   You also once met Dr. Edelman with Mr. Rubin in 2016 or

24    2017 at One Park; right?

25    A.   Yes.

1    Q.  And the reason she was called in was because many

2    appointments were rescheduled; right?

3    A.  I'm not sure if that was part of it.  I remember there

4    being concerns about her relationship with the staff in the

5    office.

6    Q.  And do you recall any discussions about the fact that there

7    were patients rescheduled?

8    A.  No.

9    Q.  You don't recall any concerns about the fact that numerous

10   patients were rescheduled and you inquired as to why?

11   A.  I don't recall.

12   Q.  During that meeting, you also counseled Dr. Edelman on how

13   to better get along with staff; correct?

14   A.  Yes.

15   Q.  And during that meeting, Mr. Rubin told Dr. Edelman to

16   smile more; isn't that right?

17   A.  I don't recall that being said.

18   Q.  During that meeting, Mr. Rubin told Dr. Edelman to fake it

19   till she makes it; right?

20   A.  I do not recall that being said.

21   Q.  But you do remember discussions about Mr. Rubin telling

22   Dr. Edelman to form relationships with staff; correct?

23   A.  I remember him telling her, coaching her on how to get

24   along better with staff, being nice to the staff.

25   Q.  And you haven't counseled any male physicians about how to

1   better get along with staff, have you?

2   A.   Yes.

3   Q.   One of your roles at NYU is to monitor a physician's

4   performance and productivity; correct?

5   A.   Yes.

6   Q.   And part of your role involved reviewing Dr. Edelman's

7   performance and productivity; correct?

8   A.   That's correct.

9   Q.   And it's fair to say Dr. Edelman was a busy doctor; right?

10  A.   Yes.

11  Q.   In fact, you cannot recall any time in which she was not

12  productive in her reviews; correct?

13  A.   I would have to look at the numbers, but I don't recall.

14  Q.   You're also not aware of any qualifications that

15  Dr. Edelman lacked while working at NYU; correct?

16  A.   That's correct.

17  Q.   And, in fact, you participated in the decision to hire

18  Dr. Edelman based on her qualifications; correct?

19  A.   I don't review the clinical qualifications of physicians.

20  Q.   NYU has a clinical team that -- a team of clinicians that

21  vets doctors; right?

22  A.   The leadership of the departments in the School of Medicine

23  for the particular specialty would review the clinical

24  qualifications.

25  Q.   And no physician would get to you if they haven't been

1   vetted beforehand; correct?

2   A.  That's correct.

3   Q.  So it's fair to say since you met with her, she was vetted

4   and everything went well with that; correct?

5   A.  Yes.

6   Q.  Now, you made a decision to hire Dr. Edelman based on her

7   business plan; correct?

8   A.  We being NYU, yes.

9   Q.  And in order to get the business plan, you asked

10  Dr. Edelman and Dr. Mehta for information concerning their

11  private practice; correct?

12  A.  That's correct.

13  Q.  They provided you that information; yes?

14  A.  They did.

15  Q.  And you used that information to make the business plan;

16  correct?

17  A.  Yes.

18  Q.  But you did not share that business plan with either

19  Dr. Edelman or Dr. Mehta; correct?

20  A.  We don't share business plans with physicians.

21  Q.  Now, the business plan itself is based on assumptions and

22  projections; correct?

23  A.  The business plan is based on the information that the

24  physicians provide us.

25  Q.  You don't make any assumptions within the business plan?

1    A.  Potentially, if there's information that was not submitted.

2    Q.  And the business plan does, in fact, have projections;

3    right?

4    A.  Yes.

5    Q.  And projections is another way of saying that you believe

6    things will happen in the future based on the information at

7    hand today; correct?

8    A.  We make projections on what the practice will look like

9    when it's part of NYU.

10   Q.  The projections don't always reflect the reality, do they?

11   A.  It's a projection.

12   Q.  They're not always accurate, are they?

13   A.  Not always.

14   Q.  And at times, if you look at the actual data and compare it

15   to the projections you made then, it differs from time to time;

16   correct?

17   A.  It's possible.

18          MR. KATAEV:  I'd like to place up on the screen

19   Defendants' Exhibit HH.  I believe it's in evidence already.

20          THE COURT:  Go ahead.

21   Q.  This is Dr. Edelman's business plan; correct?

22   A.  Drs. Edelman and Mehta.

23   Q.  And you prepared this business plan; correct?

24   A.  No.

25   Q.  Members of your team did?

1    A.  Yes.

2    Q.  And you review it for accuracy; correct?

3    A.  Yes.

4    Q.  Focusing on the top, on the right side of the line, there's

5    years 1 through years 5; correct?

6    A.  Yes.

7    Q.  And the 3 percent on top of each year assumes a 3-percent

8    growth every year; correct?

9    A.  Yes.

10   Q.  And that's why every year, starting with year 1, the

11   numbers increase slightly; correct?

12   A.  Yes.

13   Q.  And this is the projection part, this is where you

14   effectively try to tell the future; correct?

15   A.  Year 1 is an interpretation of the data that they provided.

16   Q.  And year 1 is year 1 at NYU; right?

17   A.  Correct.

18   Q.  Whereas on the left side of the chart, it reflects the past

19   data that you reviewed; correct?

20   A.  Yes.

21   Q.  For fringe benefits, you put in parentheses -- well, it

22   says in parentheses 25 percent; correct?

23   A.  Yes.

24   Q.  That's an assumption that fringe benefits are 25 percent of

25   salary; correct?

1    A.   That is the internal charge that the faculty group practice

2    pays to the institution.

3    Q.   So your understanding is that this is the actual --

4         Withdrawn.

5         The fringe benefits are what NYU pays in fringe benefits to

6    its employees; right?

7    A.   No.

8    Q.   You're saying that the fringe benefits is what Dr. Edelman

9    paid to her employees; correct?

10   A.   No.

11   Q.   Can you explain why it says "25 percent" next to "fringe

12   benefits"?

13   A.   The individual practices that the physicians are part of

14   are charged 25 percent of the salaries toward the benefit

15   costs.

16   Q.   Of NYU?

17   A.   At NYU.

18   Q.   And you don't have any of an actual backup for the data

19   that's listed on the left side; correct?

20   A.   What do you mean by "left side"?

21   Q.   I'm going to highlight it for you.

22        On this portion, it consists of the data that Dr. Edelman

23   and Dr. Mehta provided you; right?

24   A.   Yes, except for the other direct expenses line, every piece

25   of information came directly from materials that the doctors

1   provided.

2   Q.  And my question is that we don't have those documents here

3   at trial; correct?

4           MR. SCHOENSTEIN:  Objection.

5           THE COURT:  Sustained.

6   Q.  Are you aware as to whether those documents that form this

7   data were produced in this case?

8           MR. SCHOENSTEIN:  Objection.

9           THE COURT:  Sustained.

10  Q.  Do you have the documents that form the basis for these

11  numbers with you today?

12  A.  No.

13  Q.  Who drafted this business plan, to your knowledge?

14  A.  I have no idea.

15  Q.  It was one of the members of your business team; correct?

16  A.  At that time 10 years ago.

17  Q.  And the top-right of this document says that it's a draft;

18  correct?

19  A.  That's what it says.

20  Q.  This is not the final business plan, is it?

21  A.  I believe it is.

22  Q.  In this analysis, NYU determined that by employing

23  Dr. Edelman, it would lose $171,000 in year 1; correct?

24  A.  That's what the document shows.

25  Q.  And so it's fair to say that, according to this document,

1   NYU would not make any profit from hiring Dr. Edelman; correct?

2   A.  It shows that the projection of Drs. Edelman and Mehta's

3   practice would generate a loss.

4   Q.  And you based the decision on Dr. Edelman's salary on this

5   document; correct?

6   A.  Mostly, yes.

7   Q.  Isn't it true that you solely determined Dr. Edelman's

8   compensation based on this business plan?

9   A.  Could you clarify your question, please.

10  Q.  Besides this business plan, there are no other factors in

11  your determination of what the salary should be; correct?

12  A.  I wouldn't say that.

13  Q.  I'd like to show you your transcript on pages 64 to 65.

14      At your deposition on November 9th, 2021, I asked you these

15  questions and you gave these answers, didn't you?

16  "Q.  Were there any other factors, other than the business

17  plan, that played a role in determining her starting salary?

18  "A.  Repeat that, please."

19  "A.  No."

20          MR. KATAEV:  After it was repeated.

21  Q.  Do you see that?

22  A.  I do.

23  Q.  Isn't it fair to say that this decision to set

24  Dr. Edelman's salary was based solely on that business plan?

25  A.  No.

1    Q.  So what you're saying is that you lied at your deposition?

2              MR. SCHOENSTEIN:  Objection.

3              THE COURT:  Sustained.

4    Q.  What you said at your deposition was not true?

5              MR. SCHOENSTEIN:  Objection.

6              THE COURT:  Sustained.

7    Q.  I'd like to also show you pages 145 to 146 of your

8    deposition, lines 12 on page 145 through 146, line 16.

9              MR. KATAEV:  With your permission, I'd like to publish

10   it to the witness, your Honor.

11             THE COURT:  Any objection?

12             MR. SCHOENSTEIN:  I don't know what he means by

13   "publishing."  I don't have an objection to him reading it.

14             THE COURT:  You can show it to the witness and examine

15   on it.  Go ahead.

16   Q.  At your deposition on November 9th, 2021, I asked you the

17   following questions and you gave the following answers;

18   correct?

19   "Q.  It states in here that I will call -- in what I will call

20   paragraph 1 that, amongst other things, that we are an

21   established practice with a large patient and referral base.

22   Do you see that?

23   "A.  I see it.

24   "Q.  What role, if any, does that play with respect to making a

25   salary decision about Drs. Edelman and Mehta?

1   "A.  I know we discussed this earlier.  The salary is based on

2   the business plan that's done for the practice.

3   "Q.  Is it fair to say that in this email, Drs. Edelman and

4   Mehta are selling themselves to you.

5           MR. KATAEV:  "Objection."

6   "A.  I don't know that I would categorize it that way.

7   "Q.  Is it fair to say that Drs. Mehta and Edelman are

8   explaining in this email why they should be entitled to certain

9   compensation?

10  "A.  Yes, they are negotiating.

11  "Q.  My question is --

12          MR. SCHOENSTEIN:  Objection, your Honor.  It's gone

13  beyond proper impeachment.

14          THE COURT:  He asked permission and I gave him without

15  there being an objection.  Go ahead.

16  "Q.  My question is what role, if any, did the fact that they

17  are an established practice with a large patient referral base

18  play with respect to the salary?

19  "A.  Those are words.  So I think I explained our process.  We

20  look at the business plan based on their practice.  So

21  descriptive words don't play a part in the business plan.

22          THE COURT:  Did you give those answers?

23          THE WITNESS:  Yes.

24  Q.  So again, it's fair to say that solely the business plan

25  made -- well, what you used to make a decision on salary;

1   correct?

2   A.   Part of Dr. Edelman and Mehta's practice, their drug

3   infusion volume is not represented on this plan because that

4   was going to be done in the hospital service, in a hospital

5   setting facility, but yes, the business plan drives the

6   salaries.

7   Q.   So this business plan, what you're saying, it's not

8   complete; correct?

9   A.   It's a complete picture as a physician practice as it would

10  look as part of NYU.

11  Q.   You never received any formal training on setting salaries

12  and compliance with the Equal Pay Act, did you?

13  A.   I don't know specifically.

14  Q.   When you set the salaries of physicians, you use a business

15  plan for all doctors; isn't that right?

16  A.   For physicians coming from private practice.

17  Q.   And one such other physician coming from private practice

18  was Dr. Porges; correct?

19  A.   Could you clarify which Dr. Porges you're talking about.

20  Q.   Fair enough.  Dr. Andrew Porges.

21  A.   Yes, that's correct.

22  Q.   Now, besides meeting with Dr. Porges to onboard him as a

23  physician at NYU, you also spoke to him after he became a

24  physician at NYU; correct?

25  A.   Yes, I've spoken to Dr. Porges.

1   Q.  And one of the conversations you had with Dr. Porges was

2   about his interest in an administrative role; correct?

3   A.  Yes.

4   Q.  And you were instrumental in helping him obtain an

5   administrative role at NYU; correct?

6            MR. SCHOENSTEIN:  Objection.

7            THE COURT:  Overruled.

8   A.  Could you ask that again, please.

9   Q.  You were instrumental in assisting Dr. Porges in obtaining

10  an administrative role; correct?

11  A.  I would say I was part of the process.

12  Q.  And it's fair to say, isn't it, that based on this

13  encounter with Dr. Porges, he was able to reach you directly?

14  A.  I'm sorry.  I don't understand.

15  Q.  Dr. Porges was able to contact you directly, he did not

16  have to go through someone to reach you; right?

17  A.  Any doctor can reach me at any time.

18            MR. KATAEV:  I'd like to publish to the jury

19  Defendants' Exhibit EE.  It's already in evidence.

20            THE COURT:  If it's in evidence, you may do so.

21  Q.  I'll represent to you, Mr. Swirnow, that this is

22  Dr. Porges' business plan.  Do you recognize it?

23  A.  Yes.

24  Q.  This business plan follows a similar outline to what we saw

25  with Dr. Edelman; correct?

1    A.  Correct.

2    Q.  But this business plan doesn't split up Dr. Porges from any

3    other doctor, does it?

4    A.  Dr. Porges was the sole owner of his practice and this

5    business plan represents that.

6    Q.  And Dr. Porges employed other doctors at his practice,

7    didn't he?

8    A.  He employed one part-time doctor.

9    Q.  And he also employed his wife as a dermatologist; correct?

10   A.  That is not correct.

11   Q.  I'd like to direct you to page 74 of your transcript,

12   please.

13            MR. KATAEV:  Lines 15 through 18, your Honor.

14            MR. SCHOENSTEIN:  Objection.  Improper.

15            THE COURT:  Sustained.

16            MR. KATAEV:  Through 25, your Honor.

17            MR. SCHOENSTEIN:  Same objection.

18            THE COURT:  Sustained.

19   Q.  Scrolling to the bottom of this business plan, you

20   similarly have projections in here --

21   A.  There's nothing on my screen.

22   Q.  Scrolling to the bottom of this business plan, you

23   similarly have a net profit or loss analysis for Dr. Porges;

24   correct?

25   A.  Yes.

1    Q.  And in your analysis for year 1, you projected $443,000 in

2    losses; correct?

3    A.  That's what it says.

4    Q.  And even though Dr. Porges had three times the amount of

5    loss that Dr. Edelman had, you still paid Dr. Porges more;

6    correct?

7    A.  I'm not sure I understand the question.

8    Q.  Dr. Porges was paid more than Dr. Edelman, despite the fact

9    that the losses projected for his practice were more than

10   Dr. Edelman's; correct?

11   A.  Dr. Porges' salary was higher than Dr. Edelman's.

12   Q.  Even though the projected loss was almost three times

13   greater than Dr. Edelman's; correct?

14   A.  Whatever the business plan reflects.

15   Q.  If you look at year 5, the projected losses actually

16   increased; correct?

17   A.  Yes, it's a higher number.

18   Q.  Whereas if you go back to exhibit HH, Dr. Edelman's

19   projected losses decreased; correct?

20   A.  On this document.

21   Q.  This is the only business plan that you had for Dr. Edelman

22   and for Dr. Porges; correct?

23   A.  Yes.  I'm saying on this document, it shows a lower number.

24   Q.  Now, focusing back on Dr. Porges' business plan, his

25   business plan included the salary, compensation, and cost of

1   all the physicians in his practice; correct?

2   A.  The two physicians, yes.

3   Q.  And in year 1, you projected a total revenue of $722,000 to

4   NYU, correct, for Dr. Porges?

5   A.  As part of his office-based practice.

6   Q.  Meanwhile, in year 1 of Dr. Edelman's business plan, you

7   projected $792,000; correct?

8   A.  For both Drs. Edelman and Mehta combined.

9   Q.  As was in here for both doctors at the practice; correct?

10  A.  For Dr. Porges and a part-time doctor.

11  Q.  And that part-time doctor was Dr. Lenore Brancato; correct?

12  A.  Yes, correct.

13  Q.  So it's fair to say that the projected losses for

14  Dr. Edelman's practice were much less than Dr. Porges'

15  projections; correct?

16  A.  For their office-based practices.

17  Q.  And the projected revenue for Dr. Edelman was greater than

18  for Dr. Porges; correct?

19  A.  That's not correct.

20  Q.  As reflected on the total revenue line, it is greater;

21  correct?

22  A.  It is greater for both Drs. Mehta and Edelman combined.

23  Q.  As it is for both Dr. Porges and Dr. Brancato combined;

24  correct?

25  A.  Yes.

1    Q.  Now, these top line numbers don't really matter, do they?

2    A.  I'm sorry?

3    Q.  The top line numbers here are not as important as the

4    numbers on the bottom, the FGP net profit or loss; right?

5    A.  No, I think the numbers on the top are important.

6    Q.  Isn't that where the saying comes from, "what's the bottom

7    line?"

8    A.  I have no idea where that saying comes from.

9    Q.  The bottom line here is that Dr. Porges was less profitable

10   than Dr. Edelman; correct?

11   A.  The bottom line, I see, shows total MD compensation.

12   Q.  And that's done by taking the actual salary paid and adding

13   in any profit or loss; correct?

14   A.  Yes, that's correct.  No, that's not correct.  I'm sorry.

15   Q.  Could you explain it.

16   A.  It adds the physician salaries plus the incentive

17   compensation line.

18   Q.  It's fair to say, isn't it, that salaries are determined by

19   what the practice generates and what the business plan shows?

20   A.  That's one piece of it.

21   Q.  But you had no business plan for Dr. Goldberg; correct?

22   A.  That's correct.

23   Q.  He didn't come from private practice, did he?

24   A.  That's correct, he was employed by another institution.

25   Q.  Going back to exhibit HH, can you show me anywhere in here

1   where the decision was made to pay Dr. Edelman $207,000 or

2   based on what it is?

3   A.   It was based on their existing compensation as a starting

4   point.

5   Q.   Together with setting the salary, you also were involved in

6   setting the RVU part of it; correct?

7   A.   Yes.

8   Q.   And you set the RVU target also based on the business plan;

9   correct?

10  A.   RVUs are not part of the business plan.

11  Q.   In fact, there are no RVUs referenced in this business plan

12  whatsoever; right?

13  A.   That's correct.

14  Q.   Is it fair to say that Dr. Edelman's initial RVU target was

15  4966?

16  A.   Yes.

17  Q.   And where is it that you obtained that target from?

18  A.   It is a calculation of the data that she provided and what

19  she was doing in her private practice in the year immediately

20  preceding joining NYU.

21  Q.   Do you have any of that data available with you here?

22            MR. SCHOENSTEIN:   Objection.

23            THE COURT:   Overruled.

24  A.   No, I don't have any data on me.

25  Q.   And it's not reflected in this document; correct?

1    A.  RVUs are not part of a business plan.

2    Q.  Now, when a doctor's contract gets renewed after the

3    initial contract, you no longer use a business plan to

4    determine the compensation; correct?

5    A.  That's correct, we have actual experience.

6    Q.  And you work off the basic productivity; correct?

7    A.  Productivity is used as a target expectation based on the

8    contract terms.

9    Q.  And part of your duties involved reviewing

10   Dr. Edelman's RVUs to measure her performance against her

11   contractual requirements; right?

12   A.  Yes.

13   Q.  And you asked your business team to regularly produce RVU

14   reports to you to do so; right?

15   A.  I review performance of each physician annually or when

16   there's a need to.

17   Q.  Is it fair to say that someone like Mr. Antonik reviews

18   them more regularly, like on a monthly basis?

19   A.  I don't know what Mr. Antonik does.

20   Q.  You're not aware that Dr. Edelman -- I'm sorry.  That

21   Mr. Antonik receives monthly reports of RVUs earned by

22   physicians that he oversees?

23   A.  I know the physicians receive their individual reports

24   monthly.

25   Q.  In order for you to obtain an RVU report, you use the Epic

1    system; correct?

2    A.  Epic is the source of the information, but the reports come

3    out of another system.

4    Q.  And that system that you use, in order to obtain an RVU

5    report, you do so at the click of a button; correct?

6    A.  I don't know the technical aspects of it.

7    Q.  You have your business team obtain those reports?

8    A.  They produce the reports, if they're not automated.

9    Q.  And they do so using the program and system that's in place

10   for it; right?

11   A.  Yes.

12   Q.  As far as you know, this report that gets printed is fully

13   customizable with various data; correct?

14   A.  No, it's a standard report.

15   Q.  These reports that you obtain yearly, they are available to

16   you on request anywhere from the same day to several days

17   later; isn't that right?

18   A.  Are you referring to how long after I request them do I get

19   them?

20   Q.  Yes.

21   A.  Depends on the question.

22   Q.  But you obtain them within a few days of asking for them;

23   right?

24   A.  I obtain them within a reasonable time period.

25   Q.  It's fair to say that you're able to obtain these reports

N7DCede3                         Swirnow - Direct

1    upon request; right?

2    A.   Yes.

3              MR. KATAEV:  I'd like to publish 19.  I believe it's

4    in evidence already.

5              THE COURT:  Go ahead.

6              MR. SCHOENSTEIN:  19's not in yet.  We don't have an

7    objection.

8              MR. KATAEV:  I'd like to offer it.

9              THE COURT:  19 is received and may be published.

10             (Plaintiff's Exhibit 19 received in evidence)

11   Q.   This is an example of a report obtained from the system

12   concerning medical information; correct?

13   A.   I recognize the information, but not the report.

14   Q.   The information that's listed here concerns the number of

15   patient visits; correct?

16   A.   I see a list that looks to me like a schedule.

17   Q.   And this report solely relates to Dr. Edelman; correct?

18   A.   That page, yes.

19   Q.   To your knowledge, no such reports concerning the RVUs

20   are -- any of the doctors referenced in this case have been

21   produced; correct?

22             MR. SCHOENSTEIN:  Objection.

23             THE COURT:  Sustained.

24   Q.   Do you have any of the actual RVU reports for the doctors?

25             MR. SCHOENSTEIN:  Objection.

1          THE COURT:  Sustained.

2          Counsel, there's no subpoena asking the witness to

3    bring documents with this witness, was there, today?

4          MR. KATAEV:  Not for the trial, no.

5          THE COURT:  The objection is sustained.

6          MR. KATAEV:  I apologize.  I stand corrected.  There

7    is a subpoena.  I would like to pull that up.

8          THE COURT:  You can show it to me.

9          MR. KATAEV:  Yes, your Honor.  I believe the subpoena

10   is now visible just to the Court, not to the witness or the

11   jury.

12         THE COURT:  The objection is sustained because the

13   subpoena doesn't call for those documents.

14         MR. KATAEV:  Sidebar, your Honor?

15         THE COURT:  No.

16   Q.  You didn't bring with you to this trial any monthly RVU

17   statements for Dr. Edelman, did you?

18         MR. SCHOENSTEIN:  Objection.

19         THE COURT:  Overruled.

20   A.  No.

21   Q.  And you didn't bring any such statements for Drs. Porges,

22   Goldberg, and Modi, did you?

23         MR. SCHOENSTEIN:  Objection.

24         THE COURT:  Overruled.

25   A.  No.

1    Q.  And those RVU reports would show the actual RVUs earned

2    against the targets; correct?

3    A.  Not the report you just showed me.

4    Q.  No RVU reports that we discussed after that?

5    A.  Could you clarify what reports.

6    Q.  You testified that you review, annually, RVU reports to

7    measure productivity compared to the contractual requirements

8    of each doctor; right?

9    A.  I review the annual RVUs.  I don't review the individual

10   physician RVU reports.

11   Q.  And my question is you didn't bring any of those with you?

12   A.  No.

13              MR. SCHOENSTEIN:  Objection.

14              THE COURT:  Overruled.

15              MR. KATAEV:  Your Honor, I'd like to mark for

16   identification Plaintiff's Exhibit 124.  It's not on the

17   exhibit list, but it has been referenced in the joint pretrial

18   order separately per Judge Schofield's rules.

19              MR. SCHOENSTEIN:  Objection, your Honor.

20              MR. KATAEV:  Can we have a brief sidebar to make this

21   faster?

22              THE COURT:  Give me one moment.  Is it in my exhibit

23   book?

24              MR. KATAEV:  No, your Honor.

25              THE COURT:  You can hand it up to Mr. Fishman.

1           MR. KATAEV:  I apologize, your Honor.  Let me check if

2    I have a physical copy.

3           I apologize, your Honor.  I don't have a physical

4    copy.  I can only produce it --

5           THE COURT:  You'll move on to another line then and

6    I'll reserve.

7           MR. KATAEV:  I'd like to publish Defendants'

8    Exhibit SS.  It's already in evidence.

9           THE COURT:  Permission granted.

10   Q.  In this email, Mr. Kaplan informed you about Dr. Edelman's

11   complaint; correct?

12   A.  Yes.

13   Q.  And you refer to her complaint as "ridiculous;" correct?

14   A.  No, I'm referring to the fact that she refused to allow us

15   to use the office on the days that she was not there as being

16   ridiculous.

17   Q.  You spoke to Dr. Edelman about this issue; correct?

18   A.  I did.

19   Q.  And she explained to you the basis of her concerns;

20   correct?

21   A.  I recall having an amicable conversation with her about our

22   needs for using the office when she was not there and

23   explaining the rationale as to why we wanted to use the office.

24   Q.  And she similarly explained the rationale as to why she was

25   opposed to it; correct?

1    A.  I don't recall specifically.

2    Q.  She didn't raise her voice at you during this conversation;

3    correct?

4    A.  No.

5    Q.  She didn't hang up the phone on you?

6    A.  No.

7    Q.  She didn't ask you to stop this conversation; correct?

8    A.  No, it was a pleasant conversation in terms of tone.

9    Q.  And you ultimately resolved the problem in her favor;

10   correct?

11   A.  I think we resolved the issue mutually.

12          MR. KATAEV:  I'd like to publish exhibit 78.  I don't

13   recall whether it's been admitted yet.

14          THE COURT:  I don't have my list in front of me.  Is

15   78 in?

16          MR. KATAEV:  Seven zero.  Sorry.

17          THE COURT:  Any objection to 70?

18          MR. SCHOENSTEIN:  No objection, your Honor.

19          THE COURT:  70 is received and may be published.

20          (Plaintiff's Exhibit 70 received in evidence)

21   Q.  Following your conversation with Dr. Edelman, you spoke to

22   Tisa Hall; correct?

23   A.  Yes.

24   Q.  She's an individual that works in HR as reflected in the

25   "from" section of this email; correct?

1   A.   She's the director of human resources for the physician

2   organization, the faculty group practice.

3   Q.   And she works at One Park with you; correct?

4   A.   Yes.

5   Q.   This email reflects a conversation that you had with her

6   about the issue with Dr. Edelman; correct?

7   A.   Yes.

8   Q.   You explained to Ms. Hall, as reflected in this email, that

9   the communication Dr. Edelman received about the office space

10  issue was not clear and that the practice leadership team

11  should have spoken to all of the physicians in suite 306;

12  right?

13  A.   Yes, I felt that the communication could have been handled

14  differently.

15  Q.   And had that happened, Dr. Edelman would not have felt

16  singled out; correct?

17          MR. SCHOENSTEIN:   Objection.

18          THE COURT:   Sustained.

19  Q.   At the end of the first paragraph, Ms. Hall states that you

20  apologized for the miscommunication; correct?

21  A.   I see that.

22  Q.   You deny that you apologized to Dr. Edelman; correct?

23  A.   I don't recall using those word specifically.

24  Q.   Ms. Hall drafted this email based on your conversation with

25  her; correct?

1        MR. SCHOENSTEIN:  Objection.

2        THE COURT:  Sustained.

3   Q.  Ms. Hall asks Ms. Pacina in this email to round back with

4   Dr. Edelman to see if she still wanted to pursue her complaint;

5   right?

6   A.  Yes.

7   Q.  You had a conversation with Dr. Edelman about this during

8   the call that led to this email; correct?

9        MR. SCHOENSTEIN:  Objection.  Form.

10       THE COURT:  Sustained.

11  Q.  During your conversation with Dr. Edelman that precedes

12  this email, there was a discussion about her complaint to human

13  resources; correct?

14  A.  She mentioned the presence of a complaint.

15  Q.  And she specifically told you that she's not withdrawing

16  the complaint; correct?

17  A.  I don't remember the specific words.

18  Q.  She expressed that in sum and substance; correct?

19  A.  Sorry.  Expressed what?

20  Q.  She expressed the fact that she's not going to withdraw her

21  complaint; correct?

22  A.  Something along those lines.

23  Q.  Dr. Edelman is no longer employed by NYU; correct?

24  A.  That's correct.

25  Q.  And you played a role in terminating her based on

1    information gathered about her; right?

2    A.  No.

3           MR. KATAEV:  On pages 37 to 38, your Honor.  I'll give

4    you a line number shortly.  Lines 8 through 13.

5           THE COURT:  Which page?

6           MR. KATAEV:  I'm sorry.  Page 38.

7           MR. SCHOENSTEIN:  Objection.  Improper.

8           THE COURT:  Sustained.

9    Q.  You don't decide the issue of whether a contract gets

10   renewed alone; correct?

11   A.  Depends on the situation.

12   Q.  You discussed the decision not to renew Dr. Edelman's

13   contract with Mr. Rubin; correct?

14   A.  I was part of discussions in terms of gathering

15   information.

16   Q.  Mr. Rubin made the decision not to renew Dr. Edelman's

17   contract; correct?

18   A.  I think he was part of the decision-making process.

19   Q.  And you discussed that issue with him; right?

20   A.  I discussed the issues that were raised, I did not discuss

21   the decision of whether or not to renew her contract.

22   Q.  Now, if a contract is due to expire at the end of the year,

23   when is it typically that you start the discussion about

24   renewal negotiations?

25   A.  It could be any time.

N7DCede3                        Swirnow - Direct

1    Q.  Is it fair to say it would be at least two months before?

2    A.  Not necessarily.

3    Q.  You never reached out to Dr. Edelman about renewing her

4    contract a second time in 2020; correct?

5    A.  I don't recall.

6              MR. KATAEV:  Go to pages 92 to 93, your Honor.

7              THE COURT:  What lines?

8              MR. KATAEV:  Line 22 on page 92, ending at line 6 on

9    93.

10             MR. SCHOENSTEIN:  Objection.  Improper.

11             THE COURT:  Sustained for the same reasons under

12   801(d)(1)(A), second word under (d)(1)(A).

13             MR. KATAEV:  Understood.

14   Q.  When you go through the process of renewing a physician's

15   contract in general, you look at the physician's productivity

16   and any other issues involving the physician; correct?

17   A.  That's correct.

18   Q.  And you were involved in the process of renewing

19   Dr. Mehta's contract; correct?

20   A.  Yes.

21   Q.  Yet, you were not made aware of a malpractice suit against

22   Dr. Mehta; correct?

23             MR. SCHOENSTEIN:  Objection.

24             THE COURT:  Sustained.

25   Q.  You were not aware about Dr. Mehta's failure to pass the

1    boards two or three times?

2              MR. SCHOENSTEIN:  Objection.

3              THE COURT:  Sustained.

4    Q.  Dr. Mehta remains employed at NYU; correct?

5    A.  Yes.

6    Q.  But Dr. Edelman was more productive than Dr. Mehta, wasn't

7    she?

8    A.  I believe so, slightly.

9    Q.  You're aware of NYU's policies against discrimination,

10   harassment, or retaliation; correct?

11   A.  Yes.

12             MR. KATAEV:  I'd like to publish exhibit 1, already in

13   evidence.

14             THE COURT:  You may do so.

15   Q.  It's fair to say that this email precipitated Dr. Edelman's

16   termination and nonrenewal; correct?

17             MR. SCHOENSTEIN:  Objection.

18             THE COURT:  Overruled.

19   A.  This email precedes the notice of nonrenewal.

20   Q.  Following the receipt of this email, you had a telephone

21   conference with Dr. Porges and Mr. Rubin; correct?

22   A.  I believe it was on the same day that I received the email.

23   Q.  November 18th?

24   A.  I believe so.

25   Q.  And Dr. Porges reiterated the concerns you raised in this

1   email over the phone; correct?

2   A.  He raised concerns over Dr. Edelman's clinical practice.

3   Q.  You didn't report those concerns to the compliance

4   department at NYU; correct?

5   A.  No, I did not.

6   Q.  Nor did you report it to any hotline that NYU maintains;

7   correct?

8   A.  No.

9   Q.  And you did not report Dr. Edelman's clinical concerns to

10  the office of professional misconduct; correct?

11  A.  That wouldn't be something that I do.

12  Q.  Which means that you didn't; correct?

13  A.  That's correct.

14  Q.  It's fair to say that you took what Dr. Porges said as

15  gospel; right?

16          MR. SCHOENSTEIN:  Objection.

17          THE COURT:  Sustained.

18  Q.  It's fair to say that you did not investigate what

19  Dr. Porges told you; correct?

20  A.  That wouldn't be something I do.  I don't get involved in

21  clinical issues.

22  Q.  In assessing what Dr. Porges told you, you did not account

23  for the fact that there was any bias based on the complaints

24  she filed against Mr. Antonik; correct?

25  A.  Could you repeat that.

1    Q.  In hearing Dr. Porges out on the issues he's raised, you

2    did not account for the fact that there might be bias in what

3    he's telling you because she complained about Mr. Antonik;

4    correct?

5    A.  My understanding of the complaint was that it was related

6    to the office space and that had been resolved and I never

7    thought about it again.

8    Q.  Nor did you consider the fact that Dr. Porges reports to

9    Mr. Antonik; correct?

10   A.  That's not correct.  He does not report to Mr. Antonik.

11   Q.  Were you not here when Mr. Antonik testified and he talked

12   about 85 doctors that report to him?

13   A.  I don't believe you are explaining that correctly.

14   Q.  You did not conduct any independent investigation into what

15   Dr. Porges told you; correct?

16   A.  I don't get involved in clinical matters.

17   Q.  Other than the clinical issues raised in this email,

18   Dr. Porges told you about -- told Mr. Kaplan about

19   interpersonal conflicts; correct?

20   A.  Yes, that's in the email, as well.

21   Q.  You did not investigate those either, did you?

22   A.  No, I did not.

23   Q.  It's fair to say, based on what we heard at trial,

24   Mr. Antonik told Dr. Porges about some of these concerns;

25   correct?

1   A.   If that's what was said.  I don't recall specifically.

2   Q.   And then Dr. Porges told Mr. Kaplan as reflected in this

3   email; correct?

4   A.   That's what's in the email.

5   Q.   And you heard testimony that Mr. Kaplan asked Dr. Porges to

6   write this email; correct?

7   A.   After Dr. Porges expressed his concerns to Mr. Kaplan.

8   Q.   And Mr. Kaplan then forwarded this email to you; correct?

9   A.   After showing me a printed out version of them.

10  Q.   And you then discussed this issue with Mr. Rubin and

11  Dr. Porges; correct?

12  A.   That's correct.

13  Q.   And shortly after that, a decision was made to fire

14  Dr. Edelman; correct?

15  A.   We also spoke to Dr. Goldberg about the concerns.

16  Q.   The reporting line of the concerns raised here begin with

17  Mr. Antonik and end with Mr. Rubin; correct?

18  A.   No, I believe they originate with Dr. Porges.

19  Q.   This is the first and only review that Dr. Porges ever did

20  of a doctor that you're aware of; right?

21  A.   That I'm aware of, but it was part of his job

22  responsibilities as medical director.

23  Q.   At the top of this email, you asked Mr. Kaplan to give you

24  a call to fill him in on your discussion with Dr. Porges;

25  correct?

 1   A.  Yes.

 2   Q.  And you asked him to call you because you did not want to

 3   memorialize the discussion in writing; correct?

 4   A.  No.

 5   Q.  You never memorialized your discussion with Dr. Porges or

 6   Mr. Kaplan; correct?

 7   A.  No.

 8   Q.  What was memorialized was this email from Dr. Porges;

 9   correct?

10           MR. SCHOENSTEIN:  Objection.

11           THE COURT:  Sustained.

12   Q.  And you're not aware of any such similar review conducted

13   for Dr. Mehta; correct?

14   A.  No, I'm not aware.

15   Q.  It's fair to say that Mr. Kaplan complained to you about

16   the challenges he faced with the directive to move all the

17   rheumatologists to a single spaced based on Dr. Edelman's

18   refusal to cooperate; correct?

19           MR. SCHOENSTEIN:  Objection.

20           THE COURT:  Overruled.

21           Did Mr. Kaplan complain to you about the challenges,

22   saying that he faced challenges with the directive based on

23   Dr. Edelman's refusal to cooperate?

24   A.  I think we discussed what steps to take next if the

25   original plan was not working out.

1   Q.  Did Mr. Kaplan complain to you about the challenges he

2   faced?

3   A.  I wouldn't categorize it as complaining.

4          MR. KATAEV:  I'm starting with page 107, line 24, and

5   ending on the next page, 108, line 12.

6          MR. SCHOENSTEIN:  Objection.  Improper.

7          THE COURT:  Objection sustained under, again,

8   801(d)(1)(A).

9          MR. KATAEV:  May I use it to refresh the witness's

10  recollection?

11         THE COURT:  No, because he didn't testify to a lack of

12  recollection.  You can try to bring out a contradiction, you're

13  welcome to.

14  Q.  Isn't it true that Mr. Kaplan was unhappy about the

15  challenges he faced because of Dr. Edelman?

16  A.  I don't know what his state of mind was.

17  Q.  Did he ever express to you that he had challenges with this

18  issue?

19  A.  I don't recall.

20  Q.  I'd like to show you your --

21         THE COURT:  Now you can use the testimony.

22  Q.  I'd like to show you your deposition transcript, and I'm

23  going to read into the record the following questions and

24  answers I asked to you.

25         THE COURT:  108, lines 8 through 12.

1          MR. KATAEV:  That's fine, your Honor.

2     "Q.  Did David Kaplan ever express to you any discontent or

3     unhappiness with respect to Dr. Edelman?

4     "A.  He expressed challenges about the issues that were present

5     in the office."

6     Q.  Do you recall making that testimony?

7     A.  I don't recall, but that's what it says, so I'm sure that's

8     what I said.

9     Q.  So it's fair to say Mr. Kaplan complained to you about the

10    challenges he faced with the directive; right?

11    A.  That's not what it says.

12    Q.  You also spoke about this issue about Dr. Edelman with

13    Mr. Antonik; correct?

14    A.  No, never.

15          MR. KATAEV:  Your Honor, lines 23 to 25 on page 109

16    for impeachment.

17          MR. SCHOENSTEIN:  Objection.

18          THE COURT:  Sustained.

19          Ask the questions and then you can try to use the

20    transcript.

21    Q.  What conversations, if any, did you have with Mr. Antonik

22    about Dr. Edelman?

23    A.  I don't recall having any conversations directly with

24    Dr. Antonik -- I mean Mr. Antonik.  I'm sorry.

25    Q.  It's possible that you had conversations with him; correct?

1    A.  I rarely, if ever, spoke to Mr. Antonik.

2    Q.  Anything that Mr. Antonik had to tell you was reported up

3    through Mr. Kaplan; correct?

4    A.  Anything that he told Mr. Kaplan that Mr. Kaplan felt

5    important for me to know I would have heard about.

6    Q.  One of those things was Dr. Edelman's complaint; correct?

7    A.  I heard about Dr. Edelman being unhappy that we were asking

8    to use her office.

9            MR. KATAEV:  I'm publishing exhibit 1 again, your

10   Honor.  It's in evidence.

11           THE COURT:  Okay.

12   Q.  Fair to say, isn't it, that Dr. Edelman, her contract was

13   not renewed due to the contents of this email?

14   A.  This was the initial source of the information that led to

15   that decision.

16   Q.  And then this paragraph that I'm highlighting here, there

17   are concerns raised about patient care; correct?

18       Do you need it read back?

19   A.  Yes, but I'm just reading this.

20   Q.  Take your time.

21   A.  Thank you.  I'm ready for the question.

22   Q.  This email contains concerns about patient care; right?

23   A.  Yes, concerns regarding patient care.

24   Q.  You would agree with me those concerns are paramount at

25   NYU; right?

1   A.  Critical quality standards are very important at NYU.

2   Q.  And based on what's written here, there was a risk to

3   patients, wasn't there?

4           MR. SCHOENSTEIN:  Objection.

5           THE COURT:  Overruled.  Goes to the witness's

6   understanding.

7   A.  My understanding there are concerns about the quality of

8   the patient care, not the risk to the patients necessarily.

9   Q.  But you kept Dr. Edelman on as an employee for six months

10  after non-renewing her; correct?

11  A.  Faculty guidelines are that we give six-month notice to

12  physicians.

13  Q.  That's not written anywhere in the contract; correct?

14  A.  It is referenced with a link to the faculty guidelines.

15  Q.  After Dr. Edelman had her contract not renewed, she spoke

16  to Mr. Rubin by phone; correct?

17          MR. SCHOENSTEIN:  Objection.  Foundation.

18  Q.  To your knowledge?

19          THE COURT:  Overruled.

20  A.  Yes.

21  Q.  And you overheard that phonecall between her and Mr. Rubin;

22  correct?

23  A.  Part of it.

24  Q.  What was it that you heard?

25  A.  I heard him explaining to her that we were moving in

1    another direction.

2    Q.  He did not tell her about any of these clinical concerns;

3    correct?

4    A.  Not that I recall.

5    Q.  He did not raise any of the interpersonal issues; correct?

6    A.  Not that I heard.

7    Q.  After you received this November 6th, 2020 email, did you

8    ever ask Dr. Porges to speak to Dr. Edelman about these issues?

9    A.  We asked if he felt that he could -- him and Dr. Goldberg

10   could mentor Dr. Edelman to improve her quality standards.

11   Q.  And both Dr. Goldberg and Dr. Porges said they could not do

12   so; correct?

13   A.  That's correct.

14   Q.  And, in fact, they said that these issues were ones that

15   could not be remediated; correct?

16   A.  They did not think that they could mentor her to improving

17   the standards.

18   Q.  One of the complaints raised here is that she took too many

19   tests and labs; correct?

20   A.  That's what it says.

21   Q.  But to your knowledge, Dr. Edelman was never asked to take

22   less tests and less labs, was she?

23   A.  I don't know.

24   Q.  And you personally never spoke to Dr. Edelman about the

25   issues raised here, only about the office space issue; correct?

1    A.  Correct, I don't get involved with clinical matters.

2    Q.  Did you ever ask Dr. Porges to ask Dr. Edelman for her side

3    of the story?

4    A.  No, he's the clinical leader, the medical director of the

5    area.

6              MR. KATAEV:  I'd like to publish to the jury

7    exhibit 86.  It's already in evidence.

8              THE COURT:  It is in evidence already, is that what

9    you said?

10             MR. KATAEV:  Yes.

11             THE COURT:  You may do so.

12   Q.  Focusing your attention on the email dated 2:20 p.m.,

13   Mr. Antonik wrote here that "We need a clear convincing summary

14   with examples sent."  Correct?

15   A.  That's what it says.

16   Q.  To your knowledge, who was Mr. Antonik trying to convince?

17             MR. SCHOENSTEIN:  Objection.

18             THE COURT:  Sustained.

19   Q.  Do you have any knowledge as to anyone that Mr. Antonik was

20   trying to convince about Dr. Edelman's performance?

21             MR. SCHOENSTEIN:  Objection.

22             THE COURT:  Overruled.

23   A.  No.  This case is the first time I've seen this email.

24   Q.  Fair to say, based on a reading of this email, that there

25   was no attempt to look at Dr. Edelman objectively; correct?

1            MR. SCHOENSTEIN:  Objection.

2            THE COURT:  Sustained.

3   Q.  Did you ask Mr. Kaplan to obtain clear and convincing

4   evidence of Dr. Edelman's performance issues?

5   A.  Never.

6            MR. KATAEV:  I have nothing further, your Honor.

7            THE COURT:  Defense examination.

8            Members of the jury, I'm going to take a stretch

9   break.

10            Mr. Schoenstein, you ready?

11            MR. SCHOENSTEIN:  I am, your Honor.

12            THE COURT:  Okay.  You may examine.

13   CROSS-EXAMINATION

14   BY MR. SCHOENSTEIN:

15   Q.  Mr. Swirnow, just because you're a named defendant in the

16   case, I want you to tell us a little bit about yourself.

17        Where are you from?

18   A.  I was originally born just outside of New York in

19   New Jersey, I lived there until I was about 8, and then my

20   family moved down to Maryland.

21   Q.  And how long have you lived back in New York?

22   A.  About 18 years.

23   Q.  Have you been working for NYU that entire time?

24   A.  Yes.

25   Q.  You have a family, sir?

1   A.  I do.  I'm married for 12 years and I have two sons, 10

2   and 7.

3   Q.  Does your wife work for a living?

4   A.  She does.  She is an HR consultant.

5   Q.  Does she work on a full-time basis?

6   A.  She does.

7   Q.  You are a two-working-parent home?

8   A.  That's correct.

9   Q.  You said before, you're vice president of ambulatory care

10  and business strategy at NYU Langone Health?

11  A.  Yes.

12  Q.  I don't think any witness yet has explained, what is

13  ambulatory care?  Could you tell the jury just so we're all

14  clear.

15  A.  Sure.  It's all of the activity that sits outside of the

16  hospitals, so all of the doctors' offices and facilities

17  throughout the region that are not the hospitals.

18  Q.  So if I go see a doctor at an office building, that's

19  ambulatory care?

20  A.  Correct.

21  Q.  And if I go to the hospital, that's not in your purview?

22  A.  Correct.

23  Q.  And how many ambulatory care centers does NYU manage?

24  A.  Around 350.

25  Q.  How many doctors work at those facilities?

1    A.  About 3600.

2    Q.  Do you have both male and female doctors?

3    A.  Yes.

4    Q.  Plenty of each?

5    A.  Plenty of each.

6    Q.  And how long has NYU had a facility on Marcus Avenue, any

7    facility?

8    A.  About 10 years.

9    Q.  So preceding the plaintiff joining?

10   A.  Yes.

11   Q.  There was already an NYU facility on Marcus Avenue?

12   A.  Yes.

13   Q.  And was it next door to where plaintiff worked?

14   A.  It was in the 1999 building.  I believe plaintiff was in

15   the 1991 building.

16   Q.  Now, do you have responsibility for negotiating the terms

17   and conditions of employment of physicians joining NYU's

18   ambulatory care network?

19   A.  Yes.

20   Q.  And in your tenure at NYU, how many doctors have you helped

21   employ?

22   A.  Well over a thousand.

23   Q.  So, would you just tell us, generally speaking, what's your

24   process for figuring out if you want to hire a doctor and what

25   to pay her or him?

N7DCede3                          Swirnow – Cross

A.  The first part is the clinical review of their

qualifications, which is done by the clinical leadership of

that particular specialty in the School of Medicine.  And then

depending on where the physician is coming from, we review the

financial information of their private practice or we look at

other information that they may have provided if they're coming

from another institution.

Q.  What kind of factors do you look at in assessing the value

of any particular doctor?

A.  We look at the financial information from the practice, we

also look at their experience, if they have done other things

like research, clinical research and things like that, their

reputation in the community, and any potential leadership

abilities that they show, have shown.

Q.  And do you analyze what the cost and financial risk would

be to NYU of taking on a particular doctor?

A.  Yes.

Q.  Is that an important part of the hiring process?

A.  Yes.

                (Continued on next page)

1    BY MR. SCHOENSTEIN:

2    Q.  Now, when you hire doctors to come into NYU, do you ever

3    consider their gender?

4    A.  Never.

5    Q.  Do you consider their race or national origin?

6            MR. KATAEV:  Objection.  Relevance.

7            THE COURT:  Overruled.

8    A.  No.

9    Q.  Does NYU have any particular objectives in terms of

10   diversity in their doctor workforce?

11   A.  Yes.  We like our doctors to be representative of the

12   communities in which they serve.

13   Q.  And the New York area is a pretty diverse community, right?

14   A.  Yes.

15   Q.  Does NYU generally have a lot of female patients?

16   A.  Yes.

17   Q.  And would it like to have a lot of female doctors?

18   A.  Yes.

19   Q.  I want to turn your attention now to the employment of Dr.

20   Edelman in 2014.  Were you involved in negotiating agreements

21   with Dr. Edelman and Dr. Mehta?

22   A.  Yes.

23           MR. SCHOENSTEIN:  Can we put back up on the screen

24   exhibit HH.  That's the business plan we looked at previously.

25           THE COURT:  You may do so.

1            MR. SCHOENSTEIN:  Thank you, your Honor.

2            We're going to publish, if that's OK.

3   Q.  You've already discussed a little bit, this is a business

4   plan that was prepared by your staff?

5   A.  Yes.

6   Q.  And where did the data come from that underlies this

7   business plan?

8   A.  All of the data except, I believe, the other direct expense

9   line, came directly from Drs. Edelman and Mehta.

10  Q.  And who did the calculations reflected on this?

11  A.  One of the analysts on my team.

12  Q.  When you spoke to plaintiff about coming to NYU, did she

13  ever tell you that in private practice she had only been able

14  to pay herself about $60,000 a year?

15  A.  I don't remember.

16            MR. KATAEV:  Objection.

17  Q.  Did she give you anything other than the information about

18  her employment at Nassau Radiology?

19  A.  She gave us information that was from Nassau Radiology.

20  Q.  Did you, at the time of negotiating with plaintiff, have

21  any knowledge about the status, the future status of Nassau

22  Radiology?

23  A.  Yes.  We had been in direct discussions with Nassau

24  Radiology.  They were both a radiology group and they also had

25  hired different physicians in different specialties.  And they

1    were looking to get out of that side of the business, in terms

2    of employing physicians.

3    Q.  Did you have an understanding of the financial status of

4    Nassau Radiology at that time?

5    A.  Yes.  They explained that they were not doing well.

6              MR. KATAEV:  Objection.  Hearsay.

7              THE COURT:  Who is the they, when you say they

8    explained they were not doing well?

9              THE WITNESS:  Nassau Radiology.

10             THE COURT:  Nassau Radiology explained that to you.

11             THE WITNESS:  Yes, correct.

12             THE COURT:  That comes in not for the truth of the

13   matter but for the understanding of the witness.

14   BY MR. SCHOENSTEIN:

15   Q.  Focusing your attention back to the business plan, so

16   there's a line that says total patient revenue.  Do you see

17   that?

18   A.  Yes.

19   Q.  And for 2013, there are three different numbers, if you

20   see, 323,000, then 402,000 and 726,000.  Can you explain what

21   those numbers are?

22   A.  Yes.  Those numbers reflect the amount of revenue that each

23   of the physicians had generated in their practice in that year,

24   and the total is the sum of both doctors.

25   Q.  So in 2013, how much revenue had Dr. Edelman generated,

N7dWede4                          Swirnow - Cross

1    according to the information she gave NYU?

2    A.  $323,704.

3    Q.  And the information below that, in terms of base salary,

4    was that what they told NYU their base salary was at the time?

5              MR. KATAEV:  Objection.  Hearsay.

6              MR. SCHOENSTEIN:  I'll rephrase, your Honor.

7              THE COURT:  Yes, please do.

8    BY MR. SCHOENSTEIN:

9    Q.  Where did NYU get the figure of $182,500, if you know?

10   A.  The doctors provided a W-2 statement, which showed that was

11   their annual salary.

12             THE COURT:  The objection's overruled.

13   BY MR. SCHOENSTEIN:

14   Q.  And did other costs information for staff come from the

15   doctors?

16   A.  Yes.

17   Q.  Now, counsel asked you about -- oh, I have a question.

18       All the way down on the footnotes, it says outstanding

19   business loan of $326,000.  Do you see that?

20   A.  I do.

21   Q.  And do you know what that refers to?

22   A.  Yes.  The -- Drs. Mehta and Edelman had taken out a

23   business loan in order to both start up their practice, do some

24   renovations to the office to get it going and pay their

25   salaries.

1    Q.  And was that part of the negotiation with NYU, the business

2    loan; did that come into play?

3              MR. KATAEV:  Objection.  Hearsay.

4              THE COURT:  Overruled.

5    A.  Yes, it did.

6    Q.  How so?

7    A.  It was -- we agreed to pay off the business loans on their

8    behalf as part of the negotiation.

9    Q.  By the way, are the payments of the business loan reflected

10   in the numbers above the footnotes?

11   A.  No.

12   Q.  So there would be additional costs to NYU other than the

13   expenses in that chart?

14   A.  That is correct.

15   Q.  Now, I want to ask you about this operating loss, I guess

16   second row from the bottom of the chart.  Do you see that; it

17   says net profit loss?

18   A.  Yes.

19   Q.  And it was projected that the practice would sustain a loss

20   if it joined NYU.  Do you see that?

21   A.  Yes.

22             MR. KATAEV:  Objection.  Leading.

23             THE COURT:  I assumed you were leading up to an

24   open-ended question.

25             MR. SCHOENSTEIN:  I am.  I'm not a businessperson.

1    That's why I became a lawyer.

2    Q.  Why would NYU want to bring on a practice that there was a

3    projected loss?

4    A.  Well, there's a couple reasons.  One is at that time we

5    were trying to build up our network and add different

6    physicians in different specialties to be able to take care of

7    the needs of the community.  And the other piece is that this

8    business plan represents the physician practice.  It doesn't

9    represent the activity that would have gone to the hospital.

10   Q.  Could you explain that a little more?  When you say it

11   doesn't reflect the activity that would go to the hospital,

12   what does that mean?

13   A.  Yes.  As part of Dr. Mehta and Edelman's private practice,

14   they did infusions in the office, where they would deliver

15   drugs to patients that needed it.  When they joined NYU, those

16   infusions were to be done in the hospital facility, so they

17   were no longer part of their practice.

18   Q.  And that would have been in the -- withdrawn.

19       Was that kind of data in the information they provided to

20   you about their finances?

21   A.  The volume of infusions that they were doing, yes.

22             MR. SCHOENSTEIN:  All right.  And you can put down the

23   exhibit for now.

24   Q.  Did you meet with plaintiff about her potential employment

25   at NYU?

N7dWede4                         Swirnow - Cross

```
 1   A.  In conjunction with Dr. Mehta, yes.

 2   Q.  Meaning Dr. Mehta was there too?

 3   A.  Correct.

 4   Q.  And Mr. Rubin was there too?

 5   A.  Yes.

 6   Q.  And then following that meeting -- do you remember, did you

 7   propose a salary to them at that meeting?

 8   A.  I believe we did.

 9   Q.  Do you remember what it was?

10   A.  I believe it was $190,000 plus the payment of the business

11   loans plus a 10 percent retirement contribution that NYU would

12   make on their behalf plus $3,000 of business expenses.

13   Q.  Did you consider the repayment of the loan to be part of

14   their initial salary?

15   A.  Yes.

16   Q.  Was that discussed with them?

17   A.  Yes.

18   Q.  What did you say to them about whether the business loan

19   was relevant to their salary, if you remember?

20   A.  Well, we said that we would pay off the loans on their

21   behalf, and then when the loans were paid off, we would add

22   that money into their salaries.

23   Q.  And do you recall how they responded to that?

24   A.  Not specifically.

25           MR. SCHOENSTEIN:  OK.  Let's put up, please, exhibit
```

1    plaintiff, plaintiff's 11.

2            That's already in evidence, so we're going to publish

3    it, your Honor.

4            MR. KATAEV:  No objection.

5            THE COURT:  OK.  Let me just check.

6            MR. SCHOENSTEIN:  Is it not?

7            THE COURT:  It's in evidence, but you can publish it.

8            MR. SCHOENSTEIN:  Ms. Cardona, let's go down to D74.

9    It's an email chain, so you have to read backwards.  And go up

10   to the top of that email, please.

11   Q.  Do you see here, sir, August 1, 2014, an email to you and

12   Andrew from Dr. Mehta, signed by Dr. Mehta and Dr. Edelman?

13   A.  Yes.

14   Q.  And at the end of paragraph 1, do you see where it says,

15   "Sari and I would like you to meet us in the middle with

16   salary: 210 total composition; $207,000 salary; and $3,000

17   expenses."  Do you see that?

18   A.  Yes.

19   Q.  That was the proposal you received on August 1 from Dr.

20   Edelman and Dr. Mehta?

21   A.  Yes, that's correct.

22   Q.  Whose idea was it to put a $3,000 expense number in the

23   contract?

24   A.  Drs. Mehta and Edelman.

25           MR. KATAEV:  Objection.

1              THE COURT:  Overruled.

2    BY MR. SCHOENSTEIN:

3    Q.  And was that a cap on expenses they could charge?

4    A.  No.  It was a guideline.

5    Q.  OK.  So if they had legitimate business expenses north of

6    $3,000, was that barred by the contract, as you understood it?

7    A.  No.  If it was reasonable, we would have approved it.

8    Q.  By the way, did they ever utilize that $3,000 expense

9    allowance?

10   A.  No.

11   Q.  So they never went at or over the limit?

12   A.  No.

13   Q.  Did they ever come to you and say we need more money in

14   expenses?

15   A.  No.

16   Q.  Did they ever ask for you to buy something and you refused?

17   A.  No.

18              MR. KATAEV:  Objection.  Leading.

19              THE COURT:  Overruled.

20   BY MR. SCHOENSTEIN:

21   Q.  Now, paragraph 2 says, "Our other concern is how NYU will

22   structure payment of our business loan to the Community

23   National Bank."  Do you see that?

24   A.  I do.

25   Q.  Do you recall what that concern was?

1    A.  Yes.  At the time of the offer meeting, when we presented

2    the offer, we weren't sure if we could pay the bank directly or

3    if we needed to pay it through the doctors.

4    Q.  And did the doctors have a preference in that regard?

5    A.  They would prefer that we pay the bank directly.

6               MR. SCHOENSTEIN:  Can we scroll up, please, to page

7    D73.

8               Yes.  Right there.

9    Q.  Do you see paragraph 1?  This is now an email from you in

10   response, right?

11   A.  Yes.

12   Q.  And paragraph 1 says, "We will agree to increase the

13   salaries to 2010 each, but the increase would net against the

14   future conversion of the loan to salary when it expires."  Did

15   you write that?

16              MR. KATAEV:  Objection to form.

17              THE COURT:  He's just asking whether he wrote it.

18              MR. KATAEV:  He said 2010, your Honor.

19              MR. SCHOENSTEIN:  I'm sorry.  Let me withdraw the

20   question --

21              THE COURT:  Yes.  Why don't you ask --

22              MR. SCHOENSTEIN:  -- and try again, your Honor.

23   Q.  Do you see paragraph 1 that I just read mostly accurately

24   to the jury?

25   A.  Yes.

1    Q.  Did you write that?

2    A.  I did.

3    Q.  OK.  What does it mean?

4    A.  It means that we were agreeing to their proposal for their

5    salaries and that when the loan would expire, we would add that

6    amount to the hospital, we would reduce that additional amount

7    that the loan was by the increase in compensation.

8    Q.  Could we --

9    A.  So --

10   Q.  I'm sorry.  Were you finished?

11   A.  Yes.  So I believe we added about $10,000 to their salary.

12   I believe I explained this further in this email, but -- so,

13   for example, if the loan was $50,000 that we were converting to

14   salary, when it expired, we would have reduced it by that

15   10,000, so we would have added $40,000 to the salary.

16           MR. SCHOENSTEIN:  And could we scroll up.  I want to

17   see paragraph 5.

18   Q.  Do you see that statement, "As already stated, there is

19   much added pressure from ProHealth?

20   A.  Yes, I see it.

21   Q.  That's in a response email you got from Dr. Mehta and Dr.

22   Edelman?

23   A.  Yes.

24   Q.  Do you recall what that refers to, the pressure from

25   ProHealth?

N7dWede4                         Swirnow - Cross

1    A.  I don't.

2              MR. SCHOENSTEIN:  Go up to the first page, please.

3              A little bit down.

4    Q.  On Wednesday, August 6, you wrote back to the doctors.  Do

5    you see that?

6    A.  Yes.

7    Q.  And there's where you explain that you'll be able to pay

8    the loan directly to the bank?

9    A.  Yes.

10   Q.  And does the rest of that paragraph comport with your

11   understanding of what the agreement was about repaying the

12   loan?

13   A.  Yes, and I give an example of how it would work, as I just

14   did.

15             MR. SCHOENSTEIN:  Now, scroll up to the very top,

16   please.

17   Q.  So you see Dr. Mehta's email to you, and she says, "we

18   spoke with our attorney and want to add -- want to following

19   added."  Do you see that?

20   A.  Yes.

21   Q.  And so Dr. Mehta, with advice of her counsel, proposed a

22   contractual term to add to the contract that was being written?

23   A.  Yes.

24   Q.  Did you understand at the time that Dr. Mehta and Dr.

25   Edelman were represented by counsel?

1    A.  Yes.

2    Q.  And did you take comments from them regarding the language

3    in the contract?

4    A.  Yes.

5    Q.  Did you incorporate some of their comments?

6    A.  Yes.

7    Q.  Now, below that it says, "We're mailing out the lease to

8    you today."  Do you see that?

9    A.  I do.

10   Q.  What lease does that refer to, if you know?

11   A.  The lease for their office in 1991 Marcus Avenue.

12   Q.  And how was the lease for the office relevant to these

13   contract negotiations, if at all?

14   A.  As part of becoming employed by NYU, we would take over all

15   the financial obligations that the doctors had in their private

16   practice so they would no longer have to pay any expenses once

17   they joined us.  So we wanted to get an understanding of what

18   those expenses were, including the lease for the office space.

19   Q.  Is that a common structure when NYU brings in doctors from

20   private practice?

21           MR. KATAEV:  Objection.  Relevance.

22           THE COURT:  What's the relevance?

23           MR. SCHOENSTEIN:  I'm just establishing the process

24   for bringing them in.  We're going to compare it to some of the

25   other doctors later.

1          THE COURT:  OK.  I'll permit it.

2     A.  Yes.

3     Q.  From NYU's point of view, was the lease an attractive asset

4     that you were looking to acquire?

5     A.  No.  It was actually a burden.

6     Q.  And explain to the jury why it would have been a burden.

7     A.  First, I believe there was a 15-year-and-six-month lease,

8     and it actually sat empty for the two years following Dr. Mehta

9     and Edelman moving into NYU office.  And then when we found a

10    use for it, we actually had to do renovations because the group

11    that we were moving in to the office, it did not comport with

12    how the office was originally set up.  Dr. Mehta and Edelman's

13    office was set up for their practice.  We were moving in a

14    child psychiatry office, which doesn't use exam rooms, doesn't

15    use infusion suites.  They only use private counsel offices,

16    and we also had to make it kid-friendly.

17    Q.  And at the time of the negotiations, was the lease

18    something NYU viewed as valuable that it wanted to acquire?

19         MR. KATAEV:  Objection.

20    A.  No.

21    Q.  At the time of the negotiations, was it in NYU's financial

22    interest to become obligated on $300,000 of loans?

23    A.  No.

24    Q.  Was it in NYU's financial interest to become obligated to

25    pay the staff, the supplies and the other overhead of Dr.

N7dWede4                          Swirnow - Cross

1    Edelman's practice?

2              MR. KATAEV:  Objection.  Foundation.

3              THE COURT:  Do you know what was in NYU's financial

4    interest?

5              THE WITNESS:  Yes.

6              THE COURT:  How do you know that?

7              THE WITNESS:  Because I'm responsible for the

8    financial performance of the practices.

9              THE COURT:  OK.  Overruled.

10   A.  Could you repeat the question?

11   Q.  Was it in NYU's financial interest to take over staff

12   salaries, overhead, supplies and all the other things relating

13   to that office?

14   A.  It was in our interest to provide the doctors the resources

15   they needed as part of their practice.

16   Q.  Could NYU have provided resources like that without taking

17   over the actual physical space?

18   A.  Yes.

19             MR. SCHOENSTEIN:  Let's put up, please, Plaintiff's

20   Exhibit 8.

21             THE COURT:  You may do so.

22             MR. SCHOENSTEIN:  Sorry, your Honor.  I meant to ask

23   permission.

24   Q.  This is the contract that was agreed to on or about

25   September 5, 2014?

N7dWede4                        Swirnow – Cross

1    A.   Yes.

2    Q.   And does that date reflect the date that it was signed by

3    the parties; do you know?

4    A.   No.   That would reflect the date the contract was probably

5    sent out in order to be signed.

6    Q.   OK.   And do you have a recollection of how long it took to

7    be signed?

8    A.   No, but there should be a date of when they were signed by

9    each individual party in the contract.

10            MR. SCHOENSTEIN:   I see.   So -- oh, yeah.   Go to page

11   D48.   There are some signature lines.

12            Excuse me.

13            Technical issue.

14   Q.   Do you see D48 now?

15   A.   I see the signatures, yes.

16            MR. SCHOENSTEIN:   Scroll up just a little higher.

17   Q.   Do you see it's signed by Jill Buyon M.D.?

18   A.   Yes.

19   Q.   Who is that?

20   A.   She's the director of the division of rheumatology at the

21   School of Medicine.

22   Q.   And how long has Dr. Buyon been with NYU, if you know?

23   A.   I don't know.

24            MR. SCHOENSTEIN:   The screen went to sleep again.   Am

25   I boring the display?

1                All right.  And --

2                THE COURT:  There's a problem.

3                MR. SCHOENSTEIN:  All right.  Scroll to the bottom of

4      that page, please.

5    Q.  And do you see Dr. Edelman's signature is dated September

6    22, 2014?

7    A.  Yes.

8                MR. SCHOENSTEIN:  Take a look at -- if you go up to

9    page D46, please, Ms. Cardona, paragraph 4.

10   Q.  Do you see that provision, space?

11   A.  Yes.

12   Q.  Did you agree in this contract to give Dr. Edelman a

13   private office for her exclusive use?

14   A.  We never guarantee exclusive use of space for physicians.

15   Q.  Did you do so in this contract?

16   A.  No.

17   Q.  Now, you say you never do.  Why?  Why don't you ever do

18   that?

19   A.  Because things change and things happen, and we can't

20   guarantee what's going to happen in the future.

21   Q.  The contract -- I don't need to show you the language, but

22   you're familiar with this contract, right?

23   A.  Yes.

24   Q.  You've seen lots of contracts like this, because it's in a

25   familiar form?

1     A.  More than you can imagine.

2     Q.  So let's talk for a minute about RVUs.  OK?

3     A.  Sure.

4     Q.  The contract has a target for RVUs, right?

5     A.  It does.

6     Q.  And what is, from your perspective, sir, what is an RVU?

7     A.  An RVU is a numerical value assigned by Medicare to the

8     services that a physician performs in order to measure

9     productivity or the amount of work that the physician does.

10    Q.  Now, you say it's assigned by Medicare.  Explain that a

11    little more.  What is Medicare?

12    A.  Medicare is the government agency that provides health

13    insurance to seniors.

14    Q.  So does NYU have any role in assigning the value of an RVU?

15    A.  No.

16    Q.  And you get the list from Medicare?

17    A.  Yes.  Medicare publishes it.

18    Q.  And what does NYU use those numbers for?

19    A.  To measure physician productivity.

20    Q.  And how is it that an RVU can measure productivity?

21    A.  Because it assigns a numerical value to all of the services

22    that the physician performs.

23    Q.  At a visit, a patient comes into an office and sees a

24    doctor, does that visit have an RVU value?

25    A.  Yes.  Every service that a physician provides, they submit

1    a CPT code, which I think had been mentioned previously.  That

2    CPT code describes the service that was performed by that

3    physician.  Each of those CPT codes has a numerical value

4    assigned by Medicare.  So when you look at a physician's

5    productivity, you look at all of the CPT codes that they

6    submitted for billing and you add up the individual values for

7    each of those codes to get to the total number.

8    Q.  In an office visit, can there be multiple CPT codes and

9    multiple RVUs?

10   A.  Yes.

11   Q.  So it's different from measuring the number of patients or

12   the number of visits; this is something more specific?

13   A.  That's correct.  It's measuring all of the work that the

14   physician did.

15   Q.  If a doctor orders a test for a patient, does that result

16   in an RVU?

17   A.  If the physician did something associated with that test,

18   like interpret the results, the interpretation of the results

19   would have an RVU value for the physician.

20   Q.  And if the doctor ordered more tests, in theory, they could

21   do more interpretations, correct?

22   A.  That's correct.

23   Q.  And that would lead to more RVUs?

24   A.  Yes.

25   Q.  Now, do you base the salary given to a doctor on the RVUs?

N7dWede4                       Swirnow – Cross

1   A.   No.

2   Q.   And what role, if any, do the RVUs play -- did they play in

3   this employment contract for Dr. Edelman?

4   A.   The RVUs are solely a measure of productivity.  They have

5   nothing to do with setting the salary for the physician.

6   Q.   Following the employment of Dr. Edelman, she began on or

7   after the September 22, 2014, date?

8   A.   Yes.  I believe it was December or January.

9   Q.   And were you cognizant of how her practice went over the

10  years?

11  A.   Yes.  We would review her productivity numbers annually, as

12  we do with every single doctor we have.

13  Q.   And do you recall reviewing her productivity numbers over

14  the years?

15  A.   Yes.

16  Q.   The contract was for a three-year term, right?

17  A.   Yes, that's correct.

18  Q.   Is that the standard of the contracts that NYU has with its

19  new doctors?  Is that ordinary?

20  A.   I would say it's the most usual term.

21  Q.   Are there other terms sometimes?

22  A.   Sometimes.

23  Q.   Are there any contracts with doctors that are not term

24  contracts?

25  A.   No.

1   Q.  Why does NYU put doctors on term contracts as opposed to an

2   unlimited contract?

3           MR. KATAEV:  Objection.  Relevance.

4           THE COURT:  Overruled.

5   A.  It gives us an opportunity to review the situation after

6   that initial term.  It gives the doctor the opportunity to come

7   back to us with whatever things that they may need or may

8   concern them.  So it's an opportunity to review the situation

9   and determine how we want to proceed at that point.

10  Q.  And at the end of the three-year term of the 2014 contract

11  with Dr. Edelman, was there a consideration of renewal?

12  A.  Yes.  We renewed the contract.

13  Q.  And was there any kind of negotiation or discussion with

14  the doctor?

15  A.  Yes.

16  Q.  Do you recall how that was done?  Did you have a meeting?

17  Did you have a phone call?  Do you recall what you did?

18  A.  I believe it was done through email.

19          MR. SCHOENSTEIN:  Let's put up exhibit 12, please,

20  previously introduced, so we'll publish, your Honor.

21          THE COURT:  Permission granted.

22  BY MR. SCHOENSTEIN:

23  Q.  Do you see, this is an email chain from November of 2017.

24  Do you see that?

25  A.  I do.

N7dWede4                          Swirnow – Cross

1   Q.  Does that seem right in terms of timing of the renewal

2   discussions?

3   A.  Yes, it was about three years later.

4         MR. SCHOENSTEIN:  Ms. Cardona, please go to page 154,

5   at the bottom.

6   Q.  And do you see the email there where they're proposing a

7   base salary of $280,000?

8   A.  Yes.

9   Q.  And do you remember the salary you ended up agreeing to

10  with Dr. Edelman for that renewal?

11  A.  I believe it was $278,000.

12  Q.  Now, did the renewal contract include $3,000 of expenses?

13  A.  We added those expenses into the salary.

14  Q.  And why did you do that?

15  A.  At the -- at the doctors' request.

16  Q.  So they put it directly in the salary rather than having a

17  direct expense line?

18  A.  That's correct.

19  Q.  And were they still allowed to have expenses?

20  A.  Yes.  If they needed things, we would have approved them.

21  Q.  Was there any kind of cap on their expenses after the

22  renewal contract?

23        MR. KATAEV:  Objection.  Leading.

24  BY MR. SCHOENSTEIN:

25  Q.  What, if any, cap was in place --

N7dWede4                         Swirnow - Cross

1            THE COURT:  The objection is sustained.

2   BY MR. SCHOENSTEIN:

3   Q.  What, if any, cap would have been in place in the renewal

4   contract?

5   A.  We would have reviewed each individual request based on the

6   appropriateness.

7            MR. SCHOENSTEIN:  And can we put up, please, exhibit

8   9?

9            THE COURT:  OK.

10            MR. SCHOENSTEIN:  That's been entered, your Honor.

11            THE COURT:  You may do so.

12   BY MR. SCHOENSTEIN:

13   Q.  And that's the renewal contract.  Do you see that?

14   A.  Yes.

15            MR. SCHOENSTEIN:  Scroll to the bottom of the first

16   page.

17   Q.  That's signed by Dr. Buyon again?

18   A.  Yes.

19   Q.  All right.  I want to talk about some of the other doctors

20   that have been mentioned at this trial, who you may or may not

21   know.

22       Do you know Dr. Goldberg?

23   A.  Yes.

24   Q.  Were you personally involved in hiring Dr. Goldberg and

25   negotiating the terms of his employment contract?

1    A.  Yes.

2    Q.  Now, how did Dr. Goldberg come to your attention, if you

3    recall?

4    A.  At the time, we were working on building our network out in

5    Long Island, specifically in the Nassau County and Lake Success

6    area, and we didn't have any rheumatologists in the area.  So

7    we were looking for someone who had a great reputation in the

8    practice, demonstrated leadership abilities, that could help us

9    build up the program and brought a lot of assets to the table.

10   And Dr. Goldberg fit that bill perfectly.

11            MR. SCHOENSTEIN:  Can we put up, please, Plaintiff's

12   Exhibit 41 and publish to the jury, your Honor?

13            THE COURT:  It is in evidence.  Go ahead.  That's

14   fine.

15   BY MR. SCHOENSTEIN:

16   Q.  Do you see the curriculum vitae for Dr. Goldberg?

17   A.  I do.

18   Q.  Would you have reviewed that in or about the time of his

19   hire?

20   A.  I would have received it, but I wouldn't have reviewed the

21   clinical components of it.

22   Q.  Well, I don't mean the clinical components.  I just mean

23   the qualifications, the training, the licensures.

24   A.  Yes.

25   Q.  You would have reviewed that?

N7dWede4                        Swirnow - Cross

1    A.  Yes, I would have.

2    Q.  And do you recall what your reaction was to reviewing that

3    information at the time?

4    A.  I thought he was the person we'd been looking for.

5    Q.  And what was his role -- what was the expectation of the

6    role he would assume?

7    A.  He would have a clinical practice.  He would bring with him

8    his extensive clinical research activity, and he would serve as

9    the director of the rheumatology group in that area and help us

10   build up the program.

11   Q.  Was that at all different from the expectations you had for

12   Dr. Edelman?

13   A.  Yes.

14   Q.  How so?

15   A.  The expectations for Dr. Edelman was just to have a

16   clinical practice.

17   Q.  Now, did Dr. Goldberg provide financial information about

18   his private practice?

19   A.  He didn't have a private practice.  He worked at another

20   institution.

21   Q.  So how did you go about, if you did, reviewing his

22   financial data?

23   A.  I don't recall whether he provided his current compensation

24   or not, but that would be typical.

25   Q.  Where was he employed prior to NYU, if you remember?

1    A.  I believe it was at Northwell.

2    Q.  And what is Northwell?

3    A.  Northwell is a hospital system.  I think they have 23

4    hospitals throughout the region.

5    Q.  And was that -- did that have any attraction to NYU, that

6    he had been employed at Northwell?

7    A.  The attraction were more his individual credentials, his

8    demonstrated leadership roles, things of that nature.

9              MR. SCHOENSTEIN:  Let's put up -- hold on one second.

10   Q.  When you bring in somebody who's not from private practice,

11   what do you use as the jumping-off point to try to determine

12   salary?

13   A.  The salary demands of the candidate.

14   Q.  And then how do you assess whether that's reasonable or you

15   should counterbid; how do you think about it?

16   A.  We think about it in terms of what role that physician is

17   playing, all the different components that we talked about, his

18   clinical practice, his clinical research activity, his

19   leadership role and an investment in the future of building out

20   a practice and a specialty that we felt was essential in that

21   area.

22             MR. SCHOENSTEIN:  Let's go, please, to exhibit 24,

23   which is already in evidence, your Honor.

24             THE COURT:  OK.

25   BY MR. SCHOENSTEIN:

1  Q.  This is the November 22, 2013, contract with Dr. Goldberg?

2  A.  Yes.

3  Q.  And he came to NYU about a year before plaintiff?

4  A.  Yes.

5  Q.  His RVU target was 3,700 or so; we can turn to it if you

6  need to see.  What was that based on, if you remember?

7  A.  I don't, specifically, but it would have been based on the

8  amount of time and effort he would have spent seeing patients,

9  given his other activities that he was doing.

10  Q.  Because he would have -- when you say other activities,

11  what do you mean?

12  A.  His clinical research, his leadership role.

13  Q.  Did you review Dr. Goldberg's RVU performance on an annual

14  basis?

15  A.  Yes.

16  Q.  So how did he do in the early years, if you remember?

17            MR. KATAEV:  Objection.  Best evidence.

18            THE COURT:  Overruled.

19  A.  He significantly exceeded his RVU expectations.

20  Q.  And did that have any consequences?

21  A.  Yes.  The contract lays out provisions for receiving

22  incentive compensation if you exceed your target.

23            MR. SCHOENSTEIN:  Let's put up, please, exhibit 25.

24            That was previously introduced, and we'll publish,

25  your Honor.

1           THE COURT:  You may do so.

2     BY MR. SCHOENSTEIN:

3     Q.  That's a 2017 contract with Dr. Goldberg?

4     A.  Yes.

5     Q.  It's been pointed out -- I think you were here -- that this

6     was renewed prior to the expiration of the first contract.  Do

7     you recall that?

8     A.  Yes.  It also states it on the No. 1 section below.

9     Q.  And why did that happen?  Why was there a renewal at this

10    time?

11    A.  We felt Dr. Goldberg had been doing a great job.  He had

12    really built up the program.  We had added several additional

13    rheumatologists to the group, and he was personally exceeding

14    his RVU expectations.

15           MR. SCHOENSTEIN:  And let's scroll down to the second

16    page.

17    Q.  You see there that his RVU target was raised to 5,850?

18    A.  Yes.

19    Q.  And was that reflective of the performance he had in the

20    first couple of years?

21    A.  Yes.  That would have been what he had been producing in

22    that preceding year.

23    Q.  Did he continue to meet RVU targets over the years that

24    followed?

25    A.  Yes.  I believe he got even busier.

1  Q.  And to be clear, did Dr. Edelman also meet her RVU targets?

2  A.  She did.  She earned a bonus in at least some of the

3  initial years of the first contract.

4  Q.  Do you know -- well, we'll get to them.

5       Let's talk about Dr. Porges.  Are you familiar with

6  Dr. Porges, Dr. Andrew Porges?

7  A.  Yes.

8             MR. SCHOENSTEIN:  I don't want to make that mistake

9  again.  Let's put up plaintiff's 48, already in evidence, your

10  Honor.

11            THE COURT:  OK.

12  BY MR. SCHOENSTEIN:

13  Q.  Were you personally involved in hiring and negotiating an

14  employment agreement with Dr. Andrew Porges?

15  A.  Yes.

16  Q.  And exhibit 48, in front of you, is that his curriculum

17  vitae prior to joining NYU?

18  A.  Yes.

19  Q.  And would you have reviewed this at the time of his hire?

20  A.  Yes.

21  Q.  What, if anything, made Dr. Porges -- well, withdrawn.

22       Was Dr. Porges an attractive candidate?

23            MR. KATAEV:  Objection.

24            THE COURT:  Basis.

25            MR. KATAEV:  Form.

1            THE COURT:  Overruled.

2      A.  Yes.  Very.

3      Q.  Why?

4      A.  He had an excellent reputation in the community.  He had a

5      very busy practice.  He had a significant amount of clinical

6      research revenue that he brought into his practice.  Those were

7      the main things.

8            MR. SCHOENSTEIN:  Now, I'm going to ask Ms. Cardona to

9      put up exhibit EE, which has already been entered, your Honor.

10           THE COURT:  OK.

11     BY MR. SCHOENSTEIN:

12     Q.  And do you recognize this to be Dr. Porges's business plan?

13     A.  Yes.

14     Q.  Was this business plan compiled using the same methodology

15     as the business plan for Dr. Edelman and Dr. Mehta?

16     A.  Yes.  I believe Dr. Porges provided more comprehensive

17     information than Drs. Mehta and Edelman.

18     Q.  But the underlying methodology is doctors provided the

19     info, and then your team prepared a plan; that's what happened,

20     right?

21     A.  That's correct.

22     Q.  So at the top it says it's for the Andrew Porges pro forma.

23     Do you see this?

24     A.  I do.

25     Q.  Can you help us clarify?  Was this for one doctor or more

1    than one doctor?  What did this business plan reflect?

2    A.  It was for Dr. Andrew Porges and Dr. Lenore Brancato, who

3    was a part-time employee of Dr. Porges's in his practice.

4    Q.  Did you have an understanding of the breakup of the work

5    between Dr. Porges and Dr. Brancato prior to coming to NYU

6    based on what they told you?

7              MR. KATAEV:  Objection.  Best evidence.

8              THE COURT:  Overruled.

9    A.  Yes, we knew exactly what each doctor was doing.

10   Q.  And who was doing the bulk of the work, if you knew?

11   A.  Dr. Porges was doing the majority.  I would say upwards of

12   80 percent.

13   Q.  OK.  So Dr. Edelman and Dr. Mehta had about a 50-50

14   practice, right?

15   A.  Yes.

16   Q.  And your understanding of the Porges-Brancato practice was

17   more like 80-20?

18   A.  Approximately, yes.

19   Q.  OK.  Now, at the top of this, in revenue, it has the number

20   of $2 million.  Do you see that?

21   A.  I do.

22   Q.  What does that reflect, 2013, the 2 million-plus number?

23   A.  That's how much revenue Dr. Porges's practice was

24   generating.

25   Q.  Was that an attractive amount of revenue for NYU?

1   A.  Yes.

2   Q.  Now, when it's broken out in years one through five, it

3   shows much smaller amounts?

4   A.  Yes.

5   Q.  Do you know why that is?

6   A.  Yes, because the years one through five is reflective of

7   what their practice would look like with NYU, and as I

8   explained earlier, the infusions would be going to the hospital

9   service facility.  So they're not included in our projections

10  because they would no longer be part of the physician's

11  practice.

12          THE COURT:  Mr. Schoenstein, when you come to a

13  convenient break, we're going to take a five-minute-or-so

14  comfort break.

15          MR. SCHOENSTEIN:  Well, why don't we do it right now,

16  your Honor.

17          THE COURT:  OK.  All right.  Good.

18          Members of the jury, we're going to take a quick

19  break.  It's now 1:13, maybe be back around 1:20 or so, and

20  we'll finish up for the day.

21          (Continued on next page)

22

23

24

25

1           (Jury not present)

2           THE COURT:  Sir, you can step down.

3           THE WITNESS:  Thank you.

4           THE COURT:  Be seated.

5           I raised a question in the robing room to the parties.

6      Any objection with respect to my contemplated action for juror

7      No. 5?

8           From plaintiff.

9           MR. LABUDA:  I don't think we've seen the email.  I

10     haven't seen it.

11          THE COURT:  All right.

12          MR. LABUDA:  I'm sorry.  We did get it.

13          THE COURT:  OK.  Why don't you look at it.  You can

14     all take a quick comfort break also and be back here at 1:20.

15          Mr. Schoenstein.

16          MR. SCHOENSTEIN:  I just wanted to let the Court know

17     something about our witness order.

18          I'm not going to quite finish Mr. Swirnow today.  I'll

19     be close.  He's not available tomorrow.  We're going to have a

20     new witness, Ms. Ruiz, who is coming in from out of town

21     they're going to call and we're going to examine, and we'll

22     have to reconvene Mr. Swirnow on Monday and then into

23     Mr. Rubin.

24          It's all been worked out.

25          THE COURT:  I take it that's been worked out with the

N7dWede4                          Swirnow – Cross

1    plaintiff.

2              MR. KATAEV:  It has, your Honor, except I was

3    expecting to finish Mr. Swirnow.

4              THE COURT:  OK.  If Ms. Ruiz does not take the full

5    day tomorrow, then we're going to need a witness because we're

6    going to go until 2 o'clock tomorrow.  So you'll work that out.

7              See you back here in a couple minutes.

8              (Recess)

9              THE COURT:  My plan with respect to juror No. 5 would

10   be to excuse her from appearing tomorrow and to ask her to be

11   in touch.  I'm not going to officially relieve her as a juror

12   in the case unless something happened tomorrow and we can

13   proceed tomorrow and we could call her back.  But the plan

14   would be that on the assumption that we're going to go forward

15   tomorrow, which there would have to be an extraordinary event

16   where we were not going forward tomorrow, towards the end of

17   the day we would officially relieve her.

18             Any objection from plaintiff?

19             MR. LABUDA:  No objection, your Honor.

20             The only thing I would ask is to ask her to make, if

21   there's any change in her schedule that she let the Court know

22   in the event that she can come tomorrow so we don't excuse her.

23             THE COURT:  That makes sense to me.

24             From the defense perspective.

25             MR. SCHOENSTEIN:  Concur, your Honor.

N7dWede4                         Swirnow – Cross

1              THE COURT:  OK.  Let's bring the jury in.

2              MR. KATAEV:  Your Honor, just one more thing before

3    the jury comes in?

4              The Court reserved decision on one of the exhibits I

5    wanted to show this witness.

6              THE COURT:  We're not going to finish, I think, with

7    Mr. Schoenstein's examination.

8              Correct?

9              MR. SCHOENSTEIN:  Correct.  Correct, your Honor.

10             THE COURT:  You'll raise it at 2 o'clock.

11             MR. KATAEV:  Fine.

12             THE COURT:  Is there any problem with raising it at 2

13   o'clock?

14             MR. KATAEV:  No.

15             THE COURT:  OK.  Let's bring the jury in.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Be seated.

3              Mr. Schoenstein, you may continue.

4              MR. SCHOENSTEIN:  Thank you, your Honor.

5              We were looking at exhibit EE, and we're publishing,

6     your Honor, alongside exhibit HH, which is also admitted.

7     These are the two business plans.  We're going to publish them

8     both simultaneously, if that's OK?

9              THE COURT:  That's fine.

10    BY MR. SCHOENSTEIN:

11    Q.  And you see before you the two business plans, one for

12    Dr. Porges, one for Dr. Edelman and Dr. Mehta, right?

13    A.  Yes.

14    Q.  Now, in terms of Dr. Porges, by the way, when you were in

15    the process of hiring him, did he have any loans that NYU would

16    be assuming, any loans at all?

17    A.  No.

18    Q.  Was NYU assuming an office lease for his space?

19    A.  We did assume his lease, but it expired, I believe, three

20    or four months after he joined us.

21    Q.  So is that less of an obligation than the 15-year lease you

22    assumed for the plaintiff?

23              MR. KATAEV:  Objection.  Leading.

24              THE COURT:  Overruled.

25    A.  Significantly.

N7dWede4                          Swirnow - Cross

1    Q.  In Dr. Porges's, counsel pointed you to --

2              MR. SCHOENSTEIN:  Scroll down a little bit in

3    Dr. Porges's.

4    Q.  -- the net profit and loss lines and said, you know, don't

5    those show a greater net profit or loss than the Edelman-Mehta

6    practice.  Do you recall those questions?

7    A.  I do.

8    Q.  Now, first of all, in terms of the profit and loss

9    reflected on the Porges business plan, did that reflect the

10   totality of the economic impact his hiring would have had on

11   NYU?

12             MR. KATAEV:  Objection.  Best evidence.

13             THE COURT:  Overruled.

14   A.  No.

15   Q.  Why not?

16   A.  Because it only reflects his physician office practice as

17   it would look as part of NYU.  It did not include any of the

18   activity that went to the hospital facility.

19             MR. SCHOENSTEIN:  Scroll back up, please, in that

20   exhibit.

21   Q.  By that are you referring to the patient revenue numbers?

22   A.  Yes.

23             THE COURT:  Why don't you try some of those questions

24   without leading.

25             MR. SCHOENSTEIN:  All right.  Let me do this.  I'm

1    going to forget about top line, bottom line.

2    Q.  You considered both of these business plans, right?

3    A.  Yes.

4    Q.  Did you have a view as to which practice was more

5    attractive to NYU?

6    A.  Yes.

7    Q.  What was that view?

8    A.  Dr. Porges's practice was significantly larger and brought

9    more things to NYU with it.  He had clinical research revenue

10   and he had a more robust practice that generated significantly

11   more revenue.

12              MR. KATAEV:  Objection to relevance, your Honor.

13              THE COURT:  Overruled.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1           MR. KATAEV:  Objection to relevance, your Honor.

2           THE COURT:  Overruled.

3    Q.  Was it even close?

4    A.  No.

5           MR. STEER:  Objection.

6           THE COURT:  Overruled.

7           Mr. Kataev, I can't always hear you when you say

8    "objection."  I always see it from the transcript, but keep

9    your voice up.

10          MR. KATAEV:  I will, your Honor.  Thank you.

11   Q.  How did you come up with a salary proposal for Dr. Porges?

12   A.  We looked at the business plan, we looked at what the

13   business plan principal could support, and we looked at other

14   factors, as well, including his clinical research revenue that

15   he was bringing with him, as well as his experience and his

16   reputation.

17   Q.  And when he came to you -- by the way, Dr. Porges and

18   Dr. Edelman, they both came to NYU in 2014; right?

19   A.  Yes.  I believe they moved into the 1999 right about the

20   same time.

21   Q.  And prior to joining you, they were both engaged in private

22   practice?

23   A.  Correct.

24   Q.  Do you know which of them had been making more money prior

25   to coming to NYU?

1    A.  Yes.

2    Q.  Which one?

3    A.  Dr. Porges.

4    Q.  Was that close?

5    A.  No.

6         MR. SCHOENSTEIN:  We could put away those two charts.

7    Q.  You mentioned research.  Did NYU have any expectation as to

8    whether or not Dr. Porges would perform research when he

9    joined?

10   A.  Clinical research, yes, as part of his clinical practice.

11   Q.  You stressed the word "clinical."  To what do you mean by

12   that?

13   A.  Yes.  Clinical research are those activities that are done

14   as part of providing clinical services.  So in his situation,

15   he was a part of clinical trials.  So while he was treating his

16   patients, he would try to identify those patients that were

17   appropriate for some of the clinical trials and could benefit

18   from those trials.

19        MR. SCHOENSTEIN:  Could we put up, please, and publish

20   to the jury Exhibit 31 already in evidence.

21        THE COURT:  Permission granted.

22        MR. SCHOENSTEIN:  We're going to show you, when we get

23   it on the screen, the contract — here it is — with Dr. Porges.

24   Q.  Are you familiar with this document?

25   A.  Yes.

1   Q.  And you were familiar with all the contracts with

2   Dr. Porges and NYU?

3           MR. KATAEV:  Objection.  Leading.

4           THE COURT:  Overruled.

5   A.  Yes.

6           MR. SCHOENSTEIN:  So let's scroll down, please, to

7   D858.

8   Q.  Do you see that chart, "Mission Effort Compensation"?

9   A.  Yes, that's in every one of our agreements.

10  Q.  Does it reflect any compensation to Dr. Porges for

11  research?

12  A.  Clinical research is part of his clinical compensation.

13  Q.  And do you know whether he received any other monies in

14  excess of the $340,000 for his research at NYU?

15  A.  No, it was included in that number.

16  Q.  There was no other payment?

17  A.  That's correct.

18          MR. SCHOENSTEIN:  Scroll down, please, to page D862.

19  Let's go to the top of that page.

20  Q.  Do you see there, there was an RVU target?

21  A.  Yes.

22  Q.  And that was 6524?

23  A.  Yes.

24  Q.  That was higher than Dr. Edelman's RVU target?

25  A.  Yes.

1   Q.  Why was it higher?

2   A.  That was what he was doing in his practice before he joined

3   us.

4            MR. SCHOENSTEIN:  And then go to the next page,

5   please.

6   Q.  Do you see that research revenue target?

7   A.  I do.

8   Q.  Can you explain what that provision means.

9   A.  Yes.  This is the revenue that Dr. Porges generated from

10  his clinical research activities, and he was required to not

11  only meet that 6500-and-change RVU target, but also generate

12  $228,000 of research revenue.  So he had two expectations from

13  his clinical activity.

14  Q.  Did that differ from the expectations of Dr. Edelman?

15  A.  Yes, she just had an RVU target.

16  Q.  Are you familiar with Dr. Porges' performance with respect

17  to RVUs?

18  A.  I'm not going to be able to recollect the specific numbers,

19  but I recall him meeting or exceeding the RVU target.

20  Q.  And is that true throughout his tenure at NYU?

21  A.  Yes.

22  Q.  Are there any years that would be exceptions to that?

23  A.  Yes.  During the pandemic and COVID, it was difficult for

24  physicians, obviously.  Everybody was home and not coming into

25  the doctors' offices, so we kept paying all of our physicians

1    salaries regardless of their RVU productivity during that time.

2    Q.  Was Dr. Porges under the RVU target for the COVID year?

3    A.  I don't recall.

4         MR. SCHOENSTEIN:  Now, let's turn, please, to exhibit

5    27.  I'm sorry.  Exhibit 32, which is already in evidence.  And

6    we're going to publish, your Honor.

7         THE COURT:  That's okay.

8    Q.  Did there come a time where Dr. Porges' role changed in any

9    way?

10   A.  Yes.

11   Q.  How so?

12   A.  He took on some leadership responsibilities.

13   Q.  How did that come about?

14   A.  He first demonstrated his abilities in terms of showing

15   leadership abilities, and then he requested to take on the

16   role.

17   Q.  Who did he make that request to?

18   A.  I don't remember specifically, but it would have come to

19   myself or Mr. Rubin.

20   Q.  And who, if anyone, had to approve that request?

21   A.  Depending on the nature of the request, it could be a

22   number of different people.  For him specifically, Mr. Rubin,

23   and potentially his boss, Dr. Brotman.

24   Q.  His boss, doctor --

25   A.  Dr. Andrew Brotman.  He's the chief clinical officer for

1  the health system.

2  Q.  In the 2017 contract, do you recognize this as his renewal

3  contract in 2017?

4  A.  Yes.

5  Q.  And scroll down, please, to page H71.  And do you see a

6  $17,000 administration number?

7  A.  Yes.

8  Q.  Did that have any relation to his new role?

9  A.  Yes, that was directly tied to his new role with clearly

10  defined job responsibilities associated with that.

11  Q.  And his clinical number went down to 323?

12  A.  Yes.  Essentially, what we were doing was saying you're

13  going to be taking on this role with these expectations, which

14  is going to take you away from being able to provide clinical

15  time.

16  Q.  I see.

17      And tell me, what was his title?

18  A.  Clinical director of ambulatory rheumatology in Long

19  Island.

20  Q.  Did there come a time where his title changed?

21  A.  Yes.

22  Q.  When did that happen, if you know?

23  A.  I don't recall, but I know that he became the medical

24  director of the ambulatory care site in Lake Success.

25  Q.  How did that come about?

1   A.  Dr. Porges expressed interest in taking on that role and

2   sent us a proposal of what he would accomplish in that role.

3   Q.  How did the medical director role differ, if at all, from

4   the clinical director role?

5   A.  The clinical director role was solely in rheumatology.  The

6   medical director role was for all specialties.

7   Q.  And it covers the whole Marcus Avenue practice?

8   A.  Yes, we had offices, I believe, at that time in three

9   different buildings right on that campus.  So it encompassed

10  the entirety of what we would call Ambulatory Care Lake Success

11  of those three buildings.

12          MR. SCHOENSTEIN:  Let's put up, please, exhibit 34,

13  which has been previously entered.

14  Q.  This is the 2020 renewal of Dr. Porges.  Do you recognize

15  it?

16  A.  If you could scroll down, it's the cover page.  Yes.

17          MR. SCHOENSTEIN:  And let's go to page 878.  Stop at

18  the top of page 878 for a minute.

19  Q.  Do you see that bullet point that non-disparagement clause

20  at the top of page 878?

21  A.  I do.

22  Q.  Are you familiar with that provision?

23  A.  It's in all of our agreements.

24  Q.  With all of your doctors?

25  A.  Yes.

1    Q.  Did there come a time where that was added to all of the

2    agreements?

3    A.  Yes.

4    Q.  Do you know why that happened?

5    A.  I believe it was in relation to more information being

6    posted on social media, Twitter and things like that.  So we

7    wanted to make sure that if anybody was posting on those sites,

8    it is from their personal capacity and having nothing to do

9    with the organization.

10   Q.  Did the inclusion of a non-disparagement provision come

11   about for any reason relating to this case or this dispute?

12   A.  No.

13           MR. SCHOENSTEIN:  Scroll down, please, to the

14   compensation part.

15   Q.  Is that reflective of Dr. Porges' current compensation?

16   A.  I believe so.

17           MR. KATAEV:  Objection to relevance.

18           THE COURT:  Overruled.

19   Q.  Well, as of December 2020 when plaintiff was still employed

20   by NYU, that was Dr. Porges' compensation?

21   A.  Yes.

22   Q.  And if you go to the next page, what was his RVU

23   expectation in that 2020 contract?

24   A.  6250.

25   Q.  And he had that expectation, as well as his duties as

1    medical director?

2    A.   That's correct.

3    Q.   Is Dr. Porges still part of the team?

4    A.   Yes.

5    Q.   Was that a successful hire from the point of view of where

6    you sit?

7    A.   Very.

8    Q.   Is Dr. Goldberg still part of the team?

9    A.   Yes.

10   Q.   Was that a successful hire?

11   A.   Yes.

12   Q.   Were you involved in hiring Dr. Modi, Dr. Anang Modi?

13   A.   Yes.

14   Q.   Did you negotiate his employment and his employment

15   contract?

16   A.   Yes.

17         MR. SCHOENSTEIN:   Let's put up, please, exhibit 46 and

18   publish to the jury.   That's been entered, your Honor.

19         THE COURT:   Okay.

20   Q.   Do you recognize Dr. Modi's CV?

21   A.   Yes.

22   Q.   And what did you know about him when he came discussing

23   potential employment with NYU?

24   A.   I know he was a very busy rheumatologist.   I knew he had a

25   good reputation in the community, and I knew he had held

1    multiple leadership roles in both different places he worked at

2    and some organizations he was part of.

3    Q.  What was your understanding of where he was working

4    immediately before coming to NYU?

5    A.  He was working at Advantage Care Physicians, which is a

6    large, multi-specialty group that is owned by Emblem Health.

7    Q.  You heard plaintiff describe it as Dr. Modi worked for HIP,

8    did you hear that testimony yesterday?

9    A.  I heard it.

10   Q.  Is that accurate?

11   A.  No.

12   Q.  Why not?

13   A.  Because he worked at Advantage Care Physicians.

14   Q.  And what is Advantage Care Physicians?

15   A.  It's a large multi-specialty group that is owned by Emblem

16   Health.

17   Q.  So he was not in private practice; is that right?

18   A.  That's correct.

19   Q.  So did you do a business plan for Dr. Modi?

20   A.  No.

21   Q.  Was your evaluation of him consistent with the way you

22   evaluate other doctors who come from not from private practice?

23              MR. KATAEV:  Objection.  Leading.

24              THE COURT:  Sustained.

25   Q.  Do you recall what Dr. Modi was earning prior to joining

1   NYU, did you know that at the time?

2   A.  Yes, $340,000.

3           MR. KATAEV:  Objection.  Best evidence.

4           THE COURT:  Overruled.

5   Q.  Did he have any demands that he made or communicated to you

6   regarding salary if he were to join NYU?

7   A.  Yes, he wanted an increase and I believe he asked for

8   $360,000.

9   Q.  I don't think I asked you this about Dr. Goldberg.  Did he

10  have a salary demand when he joined NYU?

11  A.  Yes.

12  Q.  What was that?

13  A.  $290,000.

14  Q.  Was Dr. Modi attractive to NYU?

15  A.  Yes.

16  Q.  Why, what reasons do you recall, sitting here today?

17  A.  I remember him being a busy rheumatologist, I remember him

18  having a good reputation in the community, and I remember him

19  having had demonstrated leadership positions and that we were

20  recruiting him to our Huntington Medical Group practice, which

21  was a large existing group, about 50 physicians in that

22  practice.  But we didn't have any rheumatology services at that

23  practice and we wanted to add that because our patients in that

24  area needed that service, so we identified Dr. Modi as someone

25  that could help -- come in and help see those patients for us.

1   Q.  In hiring Dr. Modi, did NYU have to assume any loans?

2   A.  No.

3   Q.  Did NYU have to take over an office lease?

4   A.  No.

5   Q.  Did NYU have any expenses that it had to take over for

6   staff or office supplies or overhead?

7   A.  No.

8           MR. SCHOENSTEIN:  Let's put up Plaintiff's 35, which

9   is already in evidence.

10  Q.  Do you recognize that to be the 2017 contract with

11  Dr. Modi?

12  A.  Yes.

13          MR. SCHOENSTEIN:  And let's go to page 888.

14  Q.  His compensation was set at $360,000?

15  A.  Yes.

16  Q.  Was that consistent with his demand at the time?

17  A.  Yes.

18          MR. SCHOENSTEIN:  Let's go to page 892, if we can get

19  it back on the screen.

20  Q.  Do you see his RVU target was 6108?

21  A.  Yes.

22  Q.  Do you know if Dr. Modi generally met or exceeded his RVU

23  targets?

24          MR. KATAEV:  Objection.  Best evidence.

25          THE COURT:  Overruled.  It's not being used to prove

1   the contents of the written communication.  Go ahead.

2   A.  Yes, he exceeded his target.

3   Q.  Is Dr. Modi still with the team?

4   A.  Yes.

5   Q.  Do you view that as having been a successful hire?

6   A.  Yes.

7   Q.  In hiring Dr. Goldberg, Dr. Porges, and Dr. Modi, did their

8   gender come into play in any of your discussions or

9   considerations?

10  A.  Not at all.

11  Q.  Did it matter to you at all that they were men?

12  A.  No.

13  Q.  There was some testimony, some questions about a meeting in

14  2017 that you were involved in with Dr. Edelman.  Do you recall

15  that?

16  A.  I do.

17  Q.  Who, if anyone, do you recall being at that meeting?

18  A.  Dr. Edelman, myself, Andrew Rubin, and Fran Drummond.

19  Q.  Who is Fran Drummond?

20  A.  She's the vice president of operations with the

21  organization.  She's my peer.

22  Q.  And what is her area, what does she do?

23  A.  She's responsible for the day-to-day operations of all of

24  the ambulatory care network.

25  Q.  Do you know why that meeting was held?

1   A.  Yes.

2   Q.  Why?

3   A.  We were made aware of some issues between Dr. Edelman and

4   the staff.

5   Q.  To the best of your recollection, what were the nature of

6   those issues?

7   A.  I think they were not getting along, there were complaints

8   about the way Dr. Edelman communicated or didn't communicate

9   with the staff.

10  Q.  And do you know, was that meeting scheduled and calendared

11  with everybody and then held?

12  A.  Yes.

13  Q.  Do you recall what happened at that meeting?

14  A.  I recall talking to doctor -- we, as a group, talking to

15  Dr. Edelman about the issues and coaching her a little bit

16  about how to better get along with the staff, giving her some

17  advice and pointers on how to develop better relationships with

18  the staff.

19  Q.  Did you speak at that meeting?

20  A.  I don't recall.

21  Q.  Did Mr. Rubin?

22  A.  Yes.

23  Q.  Did Ms. Drummond?

24  A.  Most likely.

25  Q.  Do you recall specifically anything Mr. Rubin said?

1   A.  Just the general themes, nothing specific.

2   Q.  And what was the result of the meeting, if any?

3   A.  I think things got better after that with Dr. Edelman and

4   the staff for some period of time at least.

5   Q.  Do you recall anything else about the nature of the issues

6   between her and the staff that came to your attention?

7   A.  Not specifically, no.

8   Q.  Now, a meeting like that with the doctor having issues with

9   staff, is she the only doctor you've ever had a meeting like

10  that with?

11  A.  No.

12  Q.  How often, if any, does a meeting like that happen?

13           MR. KATAEV:  Objection.  Relevance.

14           THE COURT:  Overruled.

15  A.  Between phonecalls about the topic and meetings, I'd say

16  monthly.

17  Q.  Do you recall other in-person meetings with doctors,

18  coaching them on how to get along with staff?

19  A.  Yes, many.

20  Q.  Do you have meetings like that with male doctors?

21  A.  Yes.

22  Q.  And female doctors?

23  A.  Yes.

24  Q.  Are there more with men or more with women or do you

25  recall?

N7DCede5                    Swirnow - Cross

1   A.  Gender has nothing to do with it.

2   Q.  And did gender have anything to do with that meeting with

3   Dr. Edelman in 2017?

4   A.  No.

5          MR. SCHOENSTEIN:  Your Honor, moving to my last two

6   topics, I would rather do them --

7          THE COURT:  You might rather, but you've got

8   10 minutes.

9          MR. SCHOENSTEIN:  That's why I asked.

10  Q.  Let's talk about 2019.  Dr. Edelman came to your attention

11  in 2019; is that correct?

12  A.  Yes.

13  Q.  So, what do you recall about how that arose?

14  A.  I remember there was a plan to try to bring all of the

15  rheumatologists together in the same space.  There were

16  different doctors in different areas and wanted to bring them

17  together, one, so they could work more closely together, but

18  also to use the space and the office more efficiently.  We

19  don't want to have space sitting empty because it costs us

20  money to rent the space and we want to be able to use it and

21  generate revenue from the resources.

22  Q.  Does NYU have enough office space so every doctor could

23  have a private office five days a week, even when they're not

24  coming to work?

25  A.  No.

1   Q.   Is this issue with plaintiff the only time an office space

2   issue like that has come up?

3   A.   No.  I never imagined I'd be dealing with space as much as

4   I do.

5   Q.   So it comes up a lot?

6   A.   Yes.

7   Q.   Who raised the issue with you, if you recall?

8   A.   David Kaplan.

9   Q.   And what, if anything, did he tell you about it?

10  A.   He told me that Dr. Edelman was refusing to allow her

11  office to be used on the days that she was not at that site.

12          MR. KATAEV:  Objection.  Hearsay.

13          THE COURT:  It's coming in as background, so

14  overruled.

15  Q.   And you said on direct that you also heard about it from

16  Ms. Pacina?

17  A.   I never heard anything directly from Ms. Pacina.

18  Q.   I see.

19      So what was your role, what did you do?

20  A.   I told David Kaplan that he should try to speak to her and

21  see if, you know, he could resolve the issue.

22  Q.   And did Mr. Kaplan report back to you on that meeting?

23  A.   Yes.

24  Q.   And what do you remember being told?

25  A.   That Dr. Edelman was still refusing to allow us to use the

1   office on those days.

2   Q.  And did you do anything?

3   A.  Yes, I scheduled a call with her and spoke with her.

4               THE COURT:  The evidence that you've elicited so far

5   with respect to what the witness has heard about Dr. Edelman's

6   reaction is just as background in terms of the witness's

7   understanding going into this meeting; is that correct?

8               MR. SCHOENSTEIN:  100 percent, your Honor.

9               THE COURT:  That's how it's to be treated.  Go ahead.

10  Q.  Tell us now, you had a telephone call with plaintiff;

11  right?

12  A.  Yes.

13  Q.  So tell the jury everything you remember about that

14  telephone call.

15  A.  I remember explaining to Dr. Edelman why we wanted to use

16  the space when she was not there and that we needed to use the

17  space efficiently.  If we have open exam rooms we need for the

18  physicians to use, we also need an office for them to work out

19  of while they're seeing those patients.  I remember us talking

20  through the issues.  We talked a little bit about the fact that

21  she was working at Huntington Medical Group one day a week,

22  which was the day that we wanted to use the office.  And we

23  talked through the plans going forward, that we would either

24  use the office on that day or if she would consider moving back

25  from Huntington to Lake Success and use the office on that day

1  herself, which I said was up to her.  It was her decision to go

2  to Huntington Medical Group in the first place, and if she no

3  longer wanted to go there and wanted to work four days or five

4  days in the Lake Success office, that was totally fine with us

5  and we would make it work.

6  Q.  What was the tone of the conversation?

7  A.  Mostly pleasant, as far as I recall.

8  Q.  Did either side raise their voice, to your recollection?

9  A.  Not at all.

10  Q.  And did Dr. Edelman say anything about an HR complaint that

11  you remember?

12  A.  At the end, she mentioned that there was an HR complaint,

13  but we never got into any details about what the complaint was

14  about.

15  Q.  And what, if anything, did you say to her about that?

16  A.  My understanding was the complaint was about the use of the

17  office space, so I was a little bit confused when she said she

18  was still going through with the complaint because I thought we

19  had just resolved the issue.  So I think I said something like,

20  okay, every employee is within their rights to file a complaint

21  and if that's what you want to do, go ahead.

22  Q.  Were you concerned about that complaint after talking with

23  her?

24  A.  No, because I thought, again, that we had resolved the

25  issue.

1  Q.  Did she bring it to your attention any time after that

2  call?

3  A.  No.

4  Q.  Did anyone bring it to your attention, that you remember,

5  after that call?

6  A.  After I relayed the information to Tisa Hall, our human

7  resources director, I really never thought about it again.

8  Q.  And when was the conversation that you had with

9  Dr. Edelman, the telephone conversation, you said it was in or

10 about September of 2019?

11          MR. KATAEV:  Objection.  Leading.

12          THE COURT:  Overruled.

13 A.  It was, I believe, a couple days after David Kaplan's

14 conversation with her.

15 Q.  Did you form any opinion at that time about what would

16 happen when Dr. Edelman came up for renewal?

17 A.  No.

18 Q.  Did you think at all about when her contract was coming up

19 for renewal?

20 A.  No.

21 Q.  Did you consider at all having any kind of adverse action

22 on her employment?

23 A.  Definitely not.

24 Q.  And did you consider any of that between that telephone

25 conversation and November of 2020?

N7DCede5                    Swirnow – Cross

A.  No.

          THE COURT:  It's 1:58 now, are you at a convenient

breaking point?

          MR. SCHOENSTEIN:  Yes, your Honor.

          THE COURT:  Members of the jury, we're going to break

for the day.  We'll reconvene tomorrow morning at 9 o'clock.

Please try to be here by 8:45 and we'll have breakfast for you

at 8:30.

          I noticed that you all have been paying careful

attention.  I'm going to ask you to continue to do that.

          Please don't talk about the case or do any research

about the case during the evening break or in the afternoon.

          I would like to inform you that through the hard work

of the parties, we are very much on schedule.  The parties have

really made a lot of progress in the case and so, the update is

that we're not going to finish this week, but we will finish

next week, and we are very much on schedule.

          So have a good afternoon and evening, everybody.

We'll see you all tomorrow morning.

          (Continued on next page)

N7DCede5                    Swirnow – Cross

1              (Jury not present)

2              THE COURT:  You may step down.

3         I'm going to have juror No. 5 brought into the

4    courtroom and I'll give her the instructions with respect to

5    tomorrow that we all discussed.

6         There was one thing that the plaintiff wanted to raise

7    with respect to an exhibit, so refresh me, which exhibit do you

8    want to use?

9              MR. KATAEV:  Your Honor, plaintiff wants to introduce,

10   with this witness, defendants' objections and responses to

11   plaintiff's first request for the production of documents.  In

12   the joint pretrial order, that document is listed as something

13   that could be used at trial, and it's with respect to request

14   No. 10, which requests for information regarding RVUs, and I

15   want to ask the witness, you're aware that these requests are

16   made and you're aware that you did not produce the RVU reports.

17             THE COURT:  And what's the defendants' position?

18             MR. SCHOENSTEIN:  We think that's improper, your

19   Honor.  That was a discovery matter that should have been

20   resolved at discovery.  If there was an issue about production,

21   there could have been a motion to compel.

22             THE COURT:  We'll stop for a moment.  We'll address

23   that in a moment.

24        Do we have juror No. 5?

25             MR. STEER:  Your Honor, do we rise when she comes in?

1          THE COURT:  Yes.

2          Ms. Goldberg, step forward, step into the jury box.

3          (Juror present)

4          The parties can be seated.

5          Ms. Goldberg, I'm going to excuse your appearance

6     tomorrow.  I'm not officially relieving you as a juror.  There

7     are a couple of reasons for that.

8          JUROR:  Okay.

9          THE COURT:  One is one never knows what happens in

10    trials, and if there was something that happened that meant we

11    were not going forward or some other issue with respect to the

12    jury, I might need you to come back and to participate in the

13    jury.

14          I would also ask you to stay in touch with Mr. Fishman

15    if something happens with respect to your schedule, then my

16    hope would be that you would be able to attend tomorrow, but

17    you don't need to contact us to tell us that your schedule

18    hasn't changed.

19          JUROR:  Okay.

20          THE COURT:  You're relieved from having to appear

21    tomorrow morning.

22          I would ask you a couple of things.

23          One is to check in with Mr. Fishman at the end of the

24    day tomorrow about whether your appearance will continue to be

25    required or whether we can excuse you as a juror.

N7DCede5                        Swirnow – Cross

1              The second thing I'm going to ask you while you still

2       are considered to be a juror is to follow my instructions,

3       which means don't do any research about the case, don't talk to

4       anybody else about the case.  Do whatever you need to do for

5       yourself and for your family, but don't investigate or talk

6       about the case.

7              JUROR:  Understood.

8              THE COURT:  Does all of that work for you?

9              JUROR:  Yes.

10             THE COURT:  And I would like to thank you for bringing

11      the matter to our attention and I wish you best wishes.

12             JUROR:  And I appreciate your understanding very much.

13             THE COURT:  Thank you.

14             (Juror not present)

15             I'm going to need to look at the document, so why

16      don't you send me a copy of the document by email tonight or

17      this afternoon when you get back to your office.

18             Then, why don't I get one page from each side as to

19      why the plaintiff thinks that the document is relevant and

20      admissible and why the questioning is admissible and then the

21      defendants' position and I'll let you know tomorrow morning.

22             Is there anything else from plaintiff's perspective

23      that we should address?  There was from plaintiff's

24      perspective, as an open item, the bit of testimony from

25      Mr. Antonik.  If that's something that you are continuing to

1    press, maybe we can address that at the end of the day

2    tomorrow, and if there are any other evidentiary issues, we can

3    address them at the end of the day tomorrow after we let the

4    jury go.  But anything else from plaintiff?

5              MR. KATAEV:  Does the Court wish to know what the

6    parties have discussed concerning witness order?

7              THE COURT:  Sure.

8              MR. KATAEV:  Ms. Ruiz is flying in from Maryland, I

9    understand, and she will be here tomorrow.  We're going to

10   finish with Mr. Swirnow.  Originally, he wasn't available

11   tomorrow, but he changed his plans.  And we'll finish him

12   first.  We expect to finish Ms. Ruiz and then we will begin

13   with Mr. Andrew Rubin tomorrow, who also made himself available

14   after not being available tomorrow.

15             THE COURT:  Excellent.  That's good news.

16             I talk it with respect to Ms. Ruiz that the parties

17   resolved the issue about her travel expenses; is that right?

18             MR. KATAEV:  I think that what's appropriate, your

19   Honor, we haven't discussed it actually, but --

20             MR. SCHOENSTEIN:  Our issue, your Honor, it seemed to

21   me from what happened a couple days ago that they're to --

22             THE COURT:  Your issue is that you don't want Ms. Ruiz

23   to be cross examined on the notion that you paid for her travel

24   expenses if, as a courtesy to the plaintiffs, you've paid for

25   her travel expenses.  I've got it.

1              What's the plaintiff's position?

2              MR. KATAEV:  A, we won't raise the issue.

3              THE COURT:  Doesn't that resolve it from defendants'

4    perspective?

5              MR. SCHOENSTEIN:  Yes, your Honor.

6              The only other issue is they shouldn't lead this

7    witness.  She she's a nonparty witness, she's no longer

8    employed by NYU.  They should not be permitted to lead.

9              THE COURT:  I will address that tomorrow morning, but

10   I think it's kind of late in the day on that.

11             There was a request made by the plaintiffs at the

12   pretrial conference to be able to ask leading questions and to

13   treat as hostile witnesses every witness other than the

14   plaintiff.  There is no objection to that.  I ruled.  Why don't

15   you all get here 15 minutes early and then I can address that

16   question.

17             Anything else from defendant?

18             MR. SCHOENSTEIN:  No, thank you.

19             THE COURT:  I will see you all tomorrow morning.

20   We'll try to start around 8:45 or 8:50.  Thank you.

21             (Adjourned to July 14, 2023, at 8:45 a.m.)

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

 JOSEPH ANTONIK

Cross By Mr. Steer . . . . . . . . . . . . . 558

Redirect By Mr. Kataev . . . . . . . . . . . 566

 DAVID KAPLAN

Direct By Mr. Kataev . . . . . . . . . . . . 583

Cross By Mr. Steer . . . . . . . . . . . . . 637

Redirect By Mr. Kataev . . . . . . . . . . . 640

Recross By Mr. Steer . . . . . . . . . . . . 642

 JOSHUA SWIRNOW

Direct By Mr. Kataev . . . . . . . . . . . . 643

Cross By Mr. Schoenstein . . . . . . . . . . 685

```
1                        PLAINTIFF EXHIBITS

2    Exhibit No.                                    Received

3     55    . . . . . . . . . . . . . . . . . . 568

4     49    . . . . . . . . . . . . . . . . . . 570

5     77    . . . . . . . . . . . . . . . . . . 593

6     71    . . . . . . . . . . . . . . . . . . 627

7     7   . . . . . . . . . . . . . . . . . . . 641

8     19    . . . . . . . . . . . . . . . . . . 665

9     70    . . . . . . . . . . . . . . . . . . 669

10                       DEFENDANT EXHIBITS

11   Exhibit No.                                    Received

12    VV    . . . . . . . . . . . . . . . . . . 559

13    WW    . . . . . . . . . . . . . . . . . . 561

14    YY    . . . . . . . . . . . . . . . . . . 562

15    SS    . . . . . . . . . . . . . . . . . . 576

16    RR    . . . . . . . . . . . . . . . . . . 637

17

18

19

20

21

22

23

24

25
```

N7ECede1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DR. SARI EDELMAN,

                Plaintiff,

        v.                            21 Civ. 502 (LJL)

NYU LANGONE HEALTH SYSTEM, et
al.,

                Defendants.           Trial
------------------------------x
                                      New York, N.Y.
                                      July 14, 2023
                                      8:45 a.m.

Before:

                    HON. LEWIS J. LIMAN,

                                      District Judge
                                      -and a Jury-


                        APPEARANCES

MILMAN LABUDA LAW GROUP PLLC
        Attorneys for Plaintiff
BY:  JOSEPH M. LABUDA
        EMANUEL S. KATAEV

TARTER KRINSKY & DROGIN LLP
        Attorneys for Defendants
BY:  RICHARD C. SCHOENSTEIN
        RICHARD L. STEER
        INGRID J. CARDONA
```

N7ECede1

 1                (In open court; jury not present)

 2                THE COURT:  I gather that plaintiff has one item that

 3       they want to raise with the Court.

 4                MR. LABUDA:  Yes, your Honor, one item.  With respect

 5       to the witness, Miriam Ruiz, there was testimony about the

 6       flight and the pay, we said we're not going to bring that up.

 7                I had one caveat, I did speak with defense counsel

 8       before.  We had tried to subpoena her, issue a subpoena and

 9       she's coming up from Maryland.  We didn't think it was really

10       appropriate if we're not going to be able to raise the pay, the

11       fact she's being paid to come up here, flown up by NYU.  We

12       just don't think the issue that she's coming from Maryland is

13       really necessary for it.  I think I have a concurrence with

14       defense counsel that that's just not an issue that will be

15       raised.

16                THE COURT:  That she is traveling up here from

17       Maryland?

18                MR. LABUDA:  Correct.  Correct.  I mean, it's not

19       contiguous to New York, it's an effort to come up from

20       Maryland.

21                THE COURT:  I'm sorry.  Do you want to go into that?

22                MR. LABUDA:  No.  No.  That would be excluded.

23                THE COURT:  I think you actually had raised that issue

24       in terms of some of your questions to other witnesses, but I

25       take it defendant has no disagreement that where she's

N7ECede1

1    traveling from is irrelevant to any issue.

2              MR. SCHOENSTEIN:  We'll leave it out.  I was going to

3    ask you, your Honor, she is coming voluntarily because she was

4    under subpoena power and I do think it's relevant to

5    credibility that she's here voluntarily today and I might ask

6    her that, but I don't need to ask where she's coming from or

7    how she got here or anything like that.

8              THE COURT:  Any dispute as to --

9              MR. LABUDA:  We didn't receive a subpoena from NYU for

10   her, so --

11             THE COURT:  And then I also had asked the parties for

12   their time estimates.

13             Does the plaintiff have a sense as to when it's going

14   to end its case?

15             MR. LABUDA:  We believe that we're going to be done

16   around Tuesday with all the witnesses, your Honor.  I would

17   think Tuesday, maybe conservatively Wednesday at the very

18   latest, but I think we're moving along pretty well.

19             THE COURT:  Good.  And what's the sense of how long a

20   defense case would be after that?

21             MR. SCHOENSTEIN:  Your Honor, so, first of all, we

22   anticipate asking your Honor to bring a directed verdict motion

23   at the end of plaintiff's case.

24             THE COURT:  But on the assumption that I don't grant

25   that.

N7ECede1

1          MR. SCHOENSTEIN:  We will have somewhere between

2     nothing and not very much.

3          THE COURT:  In the back of my mind is setting aside a

4     bit of time for argument on what I anticipated would be

5     defendants' motion just by virtue of nothing else, the vigor

6     with which they're pressing their point.  If the timing works

7     out, we might do that at the end of the day on Tuesday.

8          I have to step off the bench for a minute to get on a

9     conference call and then we'll bring in the jury.

10         (Recess)

11         Let's get the witness on the stand.

12         Let's bring in the jury.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Good morning, members of the jury.  I hope

3     you all had a restful evening.

4          You will notice juror No. 5 is not with us this

5     morning.  You're to pay no regard to the reasons why she's not

6     with us this morning.  I don't know whether she will be back or

7     not, but, again, that should be no matter of concern for all of

8     you.

9          We'll continue with the examination of Mr. Swirnow.

10         Counsel, you may inquire.

11         MR. SCHOENSTEIN:  Thank you, your Honor.

12    JOSHUA SWIRNOW, resumed.

13    CROSS-EXAMINATION CONTINUED

14    BY MR. SCHOENSTEIN:

15    Q.  Good morning, Mr. Swirnow.

16    A.  Good morning.

17    Q.  In connection with your duties at NYU, are you familiar

18    with the concept of physician administrative time?

19    A.  Yes.

20    Q.  And can you explain what that is to the jury.

21    A.  Sure.  Every physician that has a clinical practice has

22    administrative tasks that they need to accomplish as part of

23    that practice — writing notes after seeing patients, reviewing

24    test results, reviewing lab results, calling the patient with

25    those lab results, filling prescriptions, things of that

1    nature.  That's what we call administrative time that all

2    clinical physicians have.

3    Q.  Is that the same thing as an administrative title, like

4    clinical director?

5    A.  No, they're completely different things.  An administrative

6    job has clearly defined responsibilities and they would be in

7    that physician's contract completely separate from

8    administrative time from your clinical practice.

9    Q.  If a doctor has a clinical job, an administrative job, do

10   they still have the regular administrative tasks associated

11   with their own practice?

12   A.  Absolutely, yes.

13   Q.  I want to focus your attention now on the end of 2020.

14   A.  Okay.

15   Q.  We're going to discuss the nonrenewal of plaintiff's

16   contract.

17       Prior to November 2020, what, if any, conversations had you

18   had about whether or not plaintiff's contract would be renewed?

19   A.  None.

20   Q.  Prior to November of 2020, what, if any, plan did you have

21   with respect to whether or not plaintiff's contract would be

22   renewed?

23   A.  We didn't have a plan.

24   Q.  Had you discussed the matter at all with Mr. Rubin,

25   Mr. Antonik, or Mr. Kaplan prior to November 2020?

1    A.  No.

2    Q.  Now, did there come a time when you became aware of some

3    issues raised by Dr. Porges?

4    A.  Yes.

5    Q.  Tell the jury, please, when and how that happened.

6    A.  David Kaplan told me about the concerns that Dr. Porges had

7    approached him about.  He had a printed out copy of an email

8    from Dr. Porges that went through all of the concerns that

9    Dr. Porges had.

10   Q.  And what, if anything, did you say to David Kaplan on that

11   topic?

12   A.  I don't recall specifically saying anything, other than

13   being very concerned about the contents of the email.

14   Q.  Did you address the issues raised in that email in any way?

15   A.  I shared them with Andrew Rubin.

16   Q.  And what, if any, discussion did you have with Mr. Rubin

17   about that?

18   A.  We were both very concerned about what was in that email

19   and we scheduled a phonecall with Dr. Porges to discuss it.

20   Q.  Did that phonecall go forward?

21   A.  It did.

22   Q.  And can you tell us, in sum and substance, the discussion

23   on that call?

24       Actually, first of all, who was on that call?

25   A.  Dr. Porges, myself, Andrew Rubin.

1   Q.  And can you tell us the sum and substance of that

2   conversation.

3   A.  Yes.  Dr. Porges was concerned after reviewing some of

4   Dr. Edelman's clinical practice that her practice patterns did

5   not meet the quality standards at NYU.  NYU Langone Health is

6   one of the top ranked academic medical centers in the country,

7   we have very high clinical quality standards.  Dr. Porges felt,

8   from his experience, that Dr. Edelman's practice did not meet

9   those standards.

10  Q.  What was Dr. Porges' position at NYU at the time of this

11  discussion?

12  A.  He was the medical director of the Lake Success practice.

13  Q.  Did that position have any bearing on how you thought about

14  his concerns?

15  A.  Yes, he's the clinical leader of the practice.  It's part

16  of his job responsibilities to ensure the quality of the care

17  that's being provided.

18  Q.  Did you have any further discussions regarding the clinical

19  issues that had been raised by Dr. Porges?

20  A.  Yes.  We asked Dr. Porges if he felt that he could mentor

21  Dr. Edelman to raise her quality and he did not think he could.

22  Q.  Did you discuss the issue with anybody else?

23  A.  Yes.  We also had a phonecall with Dr. Goldberg to discuss

24  the matter.

25  Q.  What was Dr. Goldberg's position at the time?

1   A.  He agreed with Dr. Porges both on the substance of the

2   concerns and the fact that he did not think he could mentor

3   Dr. Edelman.

4   Q.  And what was his job, what was his job title at the time?

5   A.  He was the clinical director of rheumatology.

6   Q.  Did his position as clinical director of rheumatology

7   affect how you thought about his recommendation on the topic?

8   A.  Yes.  It was also part of his role to be focused on the

9   clinical care being delivered in that practice.

10  Q.  Now, did you and Mr. Rubin discuss the matter further after

11  talking to Dr. Porges and Dr. Goldberg?

12  A.  I don't recall the specific discussions that he and I had.

13  I know that he discussed it with other clinical leaders in the

14  organization and the determination was made not to renew

15  Dr. Edelman's contract.

16  Q.  Did you make that determination?

17  A.  No.

18  Q.  Did you have any vote whatsoever?

19  A.  No.

20  Q.  Did you offer an opinion in regard as to whether the

21  contract should be renewed or not?

22  A.  I agreed with the decision.

23  Q.  And did you tell that to Mr. Rubin?

24  A.  I don't recall.

25          MR. SCHOENSTEIN:  I pass the witness, your Honor.

1    REDIRECT EXAMINATION

2    BY MR. KATAEV:

3    Q.  Good morning, Mr. Swirnow.

4    A.  Good morning.

5    Q.  In your testimony with Mr. Schoenstein, you talked about

6    the financial information related to Dr. Porges; correct?

7    A.  Yes.

8    Q.  And you essentially testified that the financials related

9    to Dr. Porges were greater than that of Dr. Edelman's; correct?

10   A.  Could you define "greater."

11   Q.  In essence, Dr. Porges' practice was more profitable than

12   Dr. Edelman's; correct?

13   A.  To NYU Langone in totality, yes.

14   Q.  That's your testimony based on infusions; correct?

15   A.  It's based on a number of factors.

16   Q.  But the business plan does not show that, does it?

17   A.  The business plan is for the physician's office-based

18   practice.

19   Q.  There is no documentary evidence that we've seen today

20   concerning what you testified about; correct?

21            MR. SCHOENSTEIN:  Objection.

22            THE COURT:  Overruled.

23   A.  There's been no documents today.

24   Q.  And you don't have those documents; correct?

25            MR. SCHOENSTEIN:  Objection.

1              THE COURT:  Sustained.

2     Q.   There was also testimony about NRad; correct?

3     A.   Yes.

4     Q.   Isn't it true that NYU ultimately purchased NRad?

5     A.   I don't know the exact nature of the transaction, but there

6     was a relationship for the radiology component of Nassau

7     Radiology.

8     Q.   So even though it was going through a bankruptcy, NYU found

9     value in NRad, too; correct?

10             MR. SCHOENSTEIN:  Objection.

11             THE COURT:  Overruled.

12    A.   You would have to talk about what you mean by value.

13    Q.   It was valuable enough for NYU to want to buy it, as well;

14    correct?

15    A.   There are many reasons to do transactions and grow.

16    Q.   You wouldn't buy it if it wasn't valuable; correct?

17    A.   I didn't say we bought it.

18    Q.   You wouldn't enter into a relationship with NRad if it was

19    not valuable, correct, to NYU?

20    A.   I'm not sure I know how to answer that question.

21    Q.   With respect to infusions, NYU did not introduce any

22    documents relating to the value of those infusions; correct?

23    A.   I don't know.

24    Q.   The only thing we have to know that Dr. Porges' infusion

25    practice was more valuable than Dr. Edelman's is your word;

N7ECede1                           Swirnow - Redirect

1    correct?

2              MR. SCHOENSTEIN:  Objection.

3              THE COURT:  Sustained.

4    Q.  You also testified that Dr. Porges earned more salary in

5    his prior practice; correct?

6    A.  Yes.

7    Q.  But you don't have his W2 with you today, do you?

8              MR. SCHOENSTEIN:  Objection.

9              THE COURT:  Sustained.

10   Q.  Dr. Porges' W2 was not offered during your testimony;

11   correct?

12   A.  Correct.

13             MR. KATAEV:  I'd like to place up on the screen what's

14   already been admitted in evidence as Defendants' Exhibit EE.

15             THE COURT:  You may do so.

16             MR. KATAEV:  I apologize, your Honor.  HH.

17             THE COURT:  You may do so.

18   Q.  Scrolling to the top of this document, this is

19   Dr. Edelman's and Dr. Mehta's business plan; correct?

20   A.  Yes.

21   Q.  And on the bottom, there are five footnotes, let's call

22   them; correct?

23   A.  Yes.

24   Q.  With respect to footnotes 1 through 4, they have a

25   corresponding -- a place within the business plan; correct?  1

1    through 4 is listed up top here as well as on the bottom here?

2    A.  Correct.

3    Q.  Footnote 5 does not have any place in this, correct, in

4    this business plan?

5    A.  It has a note on the bottom because there's no

6    corresponding number on the top.

7    Q.  In exchange for the assumption of Dr. Edelman's loan, you

8    obtained all of the equipment that Dr. Edelman owned in her

9    practice; correct?

10   A.  I don't know.  We took over any lease agreements for any

11   equipment that they had.

12        MR. KATAEV:  I'll put up on the screen Plaintiff's

13   Exhibit 8, which was already admitted in evidence.

14        THE COURT:  You may do so.

15   Q.  I'll represent to you, Mr. Swirnow, that this is

16   Dr. Edelman's first contract, and referring you to the

17   provision that's labeled D, lease, sublease business loan.  In

18   here, there's a reference to equipment leases, isn't there?

19   A.  Yes.

20   Q.  And NYU assumed those equipment leases together with the

21   lease for the space in which Dr. Edelman's practice operated;

22   correct?

23   A.  Yes, that would be equipment leases that still had payments

24   that needed to be made.

25   Q.  And you received that asset; correct?

1   A.  No.  There was a liability on the equipment that we assumed

2   that we then had to pay.

3   Q.  And NYU utilized that equipment, didn't it?

4   A.  I have no idea.

5   Q.  NYU had the option to utilize it; correct?

6   A.  Sure.  We were paying for it.

7   Q.  And the same thing with office space; correct?  You had an

8   ability to utilize that any way you saw fit; correct?

9   A.  We were paying the lease, yes.

10  Q.  So if you wanted to, you could sublease it and receive

11  money from someone else that would pay you rent for it;

12  correct?

13  A.  Sure.

14  Q.  And you could and in fact did place another practice there

15  in order to make profit for NYU; correct?

16  A.  I would argue about the profit component of it, but we put

17  another practice in there over two years later after renovating

18  the space, which cost us money.

19          THE COURT:  Mr. Swirnow, let me direct you to just

20  answer the question that you're being asked.

21          THE WITNESS:  Yes, your Honor.

22          THE COURT:  Go ahead, counsel.

23  Q.  Is it true, isn't it, to this day, NYU is using that space?

24  A.  I believe so.

25  Q.  So NYU received the value of that space and also deducted

1    it from Dr. Edelman's compensation; correct?

2              MR. SCHOENSTEIN:  Objection.

3              THE COURT:  Sustained as to form.

4    Q.  It's true that in exchange for the assumption of the lease

5    and related contracts, you received value from the lease;

6    correct?

7    A.  I don't view it that way.  We would have had to lease space

8    for that practice, so we would have had to pay for them to be

9    an office space.

10   Q.  You recall testimony about Dr. Modi and his desired salary;

11   correct?

12   A.  Yes.

13   Q.  He asked for $360,000 and he received $360,000; correct?

14   A.  Yes.

15   Q.  But Dr. Edelman and Dr. Mehta asked for $280,000 and they

16   did not receive what they asked for; correct?

17   A.  I don't recall when their ask was, but they did not receive

18   $280,000.

19   Q.  There was also testimony about the fact that NYU assumed

20   the lease for Dr. Porges' practice on Northern Boulevard in

21   Roslyn; correct?

22   A.  Yes.

23   Q.  NYU did not deduct that from Dr. Porges' compensation, did

24   it?

25   A.  Could you ask that question again.

1   Q.  When NYU assumed the lease for Dr. Porges' practice, it

2   incurred the cost of paying the rent on that space; correct?

3   A.  Yes.

4   Q.  But NYU did not deduct that cost from Dr. Porges'

5   compensation, did it?

6   A.  We don't deduct the cost of leases to anybody's

7   compensation.

8   Q.  But you deducted the cost of the loans that you assumed for

9   Drs. Edelman and Mehta, didn't you?

10  A.  We didn't deduct anything, we paid the loan on their

11  behalf.

12  Q.  But you took a deduction from Dr. Edelman's salary in order

13  to do that; correct?  That's how you negotiated it, didn't you?

14  A.  No, we negotiated a salary and we agreed to pay the

15  business loans.

16  Q.  Based on your testimony, is it fair to say that you justify

17  the fact Dr. Edelman was paid less because of the assumption of

18  the loans?

19  A.  No.

20  Q.  There was testimony about whether NYU contractually agreed

21  with Dr. Edelman to have her office be unshared; correct?

22  A.  Are you asking me if we did?  I'm not sure what you're

23  asking.

24  Q.  There was testimony on the subject; correct?

25  A.  Yes.

1   Q.  And you testified that you never agreed to guarantee office

2   space dedicated to Dr. Edelman; correct?

3   A.  That's correct.  As a matter of principle, we never

4   guarantee space to any physician.

5              MR. KATAEV:  I'd like to mark for identification

6   Plaintiff's Exhibit 121.

7              THE COURT:  Any objection?

8              MR. SCHOENSTEIN:  Yes.  Sidebar.

9              THE COURT:  Why don't you display it to me.

10              MR. KATAEV:  Is it okay to lay the foundation first,

11   your Honor?

12              THE COURT:  Let me look at it.

13              What's the nature of the objection?

14              MR. SCHOENSTEIN:  Not on the exhibit list, not

15   produced in discovery, and I have a problem with the document.

16              THE COURT:  Let's go to sidebar.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              MR. KATAEV:  Your Honor, the witness testified that he

3      didn't guarantee office space.

4              THE COURT:  I understand the relevance of the

5      document.

6              MR. KATAEV:  It's for impeachment purposes.  It

7      doesn't have to be shown to the jury.  I'm just going to ask

8      him questions on this email.  Did he say this is what we agreed

9      to, but can't be --

10             MR. LABUDA:  It should be shown to the jury.

11             THE COURT:  You're asking him about the contents of a

12     document that is -- and do you want to put it into evidence or

13     do you want to just add?

14             MR. KATAEV:  I would prefer to put it into evidence.

15             THE COURT:  Let's address all of that now.  There's an

16     objection made that it was not on the exhibit list, it wasn't

17     produced in discovery.  Is that my understanding?

18             MR. SCHOENSTEIN:  Both accurate, your Honor.

19             THE COURT:  So what's the response?

20             MR. KATAEV:  I have two points on that.  First of all,

21     they produced negotiation emails during the course of

22     discovery, it was requested and they failed to produce that

23     document.  They were in possession of that document.  And we

24     were under, I believe, similar obligation, I don't recall

25     whether they specifically asked for them, but because they

1     failed to produce it, we have the right to use it.

2               THE COURT:  And what's your answer on the exhibit

3     list?

4               MR. KATAEV:  That was something that was found after

5     the joint pretrial order was made and we did give it to them

6     quite some time ago, so they've been aware of it.  They had the

7     opportunity to prepare the witness for it.

8               MR. LABUDA:  And it's just for impeachment purposes,

9     your Honor.  We didn't try to introduce it in our case in

10    chief.

11              THE COURT:  Did you request this document from the

12    plaintiffs?

13              MR. SCHOENSTEIN:  I think we requested documents

14    related to negotiations of the contract, wouldn't we?  Yeah, we

15    would have requested emails for negotiations.

16              I have one other point, your Honor.  It's inadmissible

17    parole evidence.  There's an unambiguous contract and has a

18    merger clause, and they want to introduce a prior email

19    communication to alter the terms of that contract.

20              THE COURT:  I'm going to permit the document in.  It's

21    for impeachment.  He did testify that there was never any such

22    agreement as a matter of policy and you can then redirect on

23    it, but it impeaches his testimony on the defendants'

24    examination.

25                    (Continued on next page)

1                  (In open court)

2     BY MR. KATAEV:

3     Q.  Mr. Swirnow, part of your job responsibilities at NYU is to

4     negotiate with incoming physicians about on-boarding at NYU;

5     correct?

6     A.  Yes.

7     Q.  In the course of performing your duties, you exchange

8     emails with doctors to do that; correct?

9     A.  Yes.

10    Q.  In front of you right now is an email from Dr. Mehta on

11    behalf of herself and Dr. Edelman concerning some of those

12    negotiations; correct?

13                  THE COURT:  For purposes of the record, when you're

14    saying before him, it's a document that you marked as PX 121;

15    is that right?

16                  MR. KATAEV:  That's exactly right, your Honor.  Thank

17    you.

18                  THE COURT:  Do you recognize this document?

19                  THE WITNESS:  I don't, but I see it in front of me.

20    Q.  And there's an email exchange here in which you received an

21    email and in which you responded; correct?

22    A.  Yes.

23    Q.  And this email was sent and received in the ordinary course

24    of the business of NYU; correct?

25    A.  Yes.

1          MR. KATAEV:  I offer this document in evidence as

2     Plaintiff's Exhibit 121, your Honor.

3          THE COURT:  It's received.

4          (Plaintiff's Exhibit 121 received in evidence)

5          THE COURT:  It may be published to the jury.

6     Q.  In this email, it's dated August 22nd of 2014; correct?

7     A.  Yes.

8     Q.  This was before the time that Dr. Edelman actually came to

9     work at NYU; correct?

10    A.  Yes.

11    Q.  And Dr. Edelman is copied on this email; correct?

12    A.  She's in the "to" line.

13    Q.  And in No. 2, she states:  "As for office space, we spoke

14    with Josh before and he guaranteed us individual unshared

15    offices, but we do not see it in the revised contract."

16    Correct?

17    A.  That's what it says.

18    Q.  And you responded to that email on the same day that it was

19    sent; correct?

20    A.  Yes.

21    Q.  And in essence, you said that this office space issue is as

22    we discussed previously, but that it's not appropriate to enter

23    that into the contract; correct?

24    A.  That's what it says, but what we discussed previously was

25    not that they would be guaranteed exclusive space for

1    themselves.

2    Q.  Her email below does not say "exclusive," does it?

3    A.  It does not.

4    Q.  It says "unshared."  Correct?

5    A.  Correct.  But "unshared" means one person in an office, not

6    two people in an office.

7              MR. KATAEV:  Move to strike as nonresponsive.

8              THE COURT:  That's granted.

9              Just answer the questions that you're being asked.

10   Your lawyer will bring out anything that the lawyer believes to

11   be appropriate for the jury's consideration when your lawyer

12   gets up to ask questions.

13             THE WITNESS:  Understood.  I apologize.

14             MR. KATAEV:  Curative instruction to the jury, your

15   Honor, please.

16             THE COURT:  No.  The motion is granted to strike the

17   testimony.  Go ahead.

18   Q.  So it says in this email that the office space is as we

19   discussed previously, but it's not appropriate to put that in

20   the contract; right?

21   A.  That's what it says.

22   Q.  Based on this email exchange, it was reasonable for

23   Dr. Edelman to understand that she had unshared office space;

24   correct?

25             MR. SCHOENSTEIN:  Objection.

1              THE COURT:  Sustained.

2   Q.  It's fair to say that what was discussed between you and

3   Dr. Edelman is different than what's in the contract; correct?

4              MR. SCHOENSTEIN:  Objection.

5              THE COURT:  Sustained.

6   Q.  It's fair to say that what you discussed is not what

7   ultimately happened; correct?

8              MR. SCHOENSTEIN:  Objection.

9              THE COURT:  Sustained.

10  Q.  There was also testimony from your examination with

11  Mr. Schoenstein that there's no real correlation between RVUs

12  and salary.  Do you recall that testimony?

13  A.  There's no correlation -- I think the testimony was about

14  that, yes.

15  Q.  That the RVU target is independent from the salary;

16  correct?

17  A.  That's correct.

18             MR. KATAEV:  I'm going to publish to the jury

19  Plaintiff's Exhibit 8 already in evidence, your Honor.

20             THE COURT:  You may do so.

21  Q.  Under the FGP expectations portion of this contract, it

22  says in exchange for $207,000, Dr. Edelman has to produce

23  4966 RVUs; correct?

24  A.  It says she has to maintain that level of RVUs, yes.

25  Q.  And if she exceeded those RVUs, she would get more money;

1  correct?

2  A.  She could earn a bonus, yes.

3  Q.  As an example here, if she earned 5463 RVUs, she would

4  receive 10 percent more in compensation; correct?

5  A.  That's correct.

6  Q.  But if she did not meet that target within a margin of

7  error of 5 percent, she would have a reduction in her RVUs;

8  correct?  I'm sorry.  In her salary.

9  A.  Yes, that's what the contract states.

10  Q.  Going back to the email exchange that we looked at, it's

11  fair to say that you did not disagree with Dr. Mehta and

12  Dr. Edelman about their understanding of the office space;

13  correct?

14          MR. SCHOENSTEIN:  Objection.

15          THE COURT:  Overruled.

16  A.  I did disagree.

17  Q.  It says in the email it's as you discussed; correct?

18  A.  That's right.

19          MR. KATAEV:  I'd like to place Plaintiff's Exhibit 12

20  on the screen.

21          THE COURT:  You may do so.

22  Q.  The bottom of this email chain refers to the first renewal

23  negotiations with Drs. Edelman and Dr. Mehta; correct?

24  A.  Yes.

25  Q.  And it's dated November 10th of '17; correct?

1   A.   Yes.

2   Q.   And you started having these discussions in November of '17

3   because the contract was expiring at the end of December 2017;

4   correct?

5   A.   I believe Drs. Mehta and Edelman were on different

6   timelines.

7   Q.   They were close to each other, though?

8   A.   Yeah, within a month or two.

9   Q.   So it's fair to say the renewal negotiations typically

10  start around a month prior; correct?

11  A.   It's all over the map depending on the individual

12  circumstances.

13  Q.   There was testimony about Dr. Goldberg's research?

14  A.   Yes.

15  Q.   That research is paid by pharmaceutical companies, isn't

16  it?

17  A.   No.

18  Q.   Who pays for that research?

19  A.   NYU pays Dr. Goldberg his total compensation.

20  Q.   Isn't it true that Dr. Goldberg also receives funds from

21  pharmaceutical companies for such research?

22  A.   I have no idea.

23  Q.   You would not be involved in something like that; correct?

24  A.   I'm only involved in what NYU pays their physicians.

25  Q.   When I examined you, you confirmed that the business plan

1   is what decides a doctor's salary; correct?

2   A.  Yes.

3   Q.  And we looked at your deposition testimony and you

4   confirmed that there were no other factors that went into that

5   calculation; correct?

6   A.  That's what was in the deposition.

7   Q.  But on your testimony yesterday with Mr. Schoenstein, you

8   talked about all these other factors, didn't you?

9   A.  For doctors coming from other institutions.

10  Q.  Dr. Goldberg was brought in to build a physician base on

11  Long Island; correct?

12  A.  To build a rheumatology practice.

13  Q.  And one of the ways he did so is by bringing in

14  Dr. Edelman; correct?

15  A.  Yes.

16  Q.  And Dr. Edelman was similarly capable of bringing in

17  physicians, wasn't she?

18  A.  I don't know that to be true.

19  Q.  You know that Dr. Edelman had a large referral base;

20  correct?

21  A.  I know that she had a practice and I knew information about

22  the practice.

23  Q.  You never asked Dr. Edelman to bring in any rheumatologists

24  to the practice, did you?

25  A.  No.

1  Q.  So it's fair to say you don't know whether she would have

2  been capable to do so; right?

3  A.  I think that's what I said, yes.

4  Q.  Referring to both business plans for Dr. Edelman and for

5  Dr. Porges, it's fair to say, isn't it, that the salary was not

6  based on the amount of infusions they bring in?

7  A.  It was about the business plan.

8  Q.  And the business plan had no data about infusions; correct?

9  A.  I wouldn't say no data.

10  Q.  There's no line item as to the value of the infusions;

11  correct?

12  A.  There's nothing labeled "infusions," that's correct.

13  Q.  Now, it's fair to say, isn't it, that Dr. Goldberg was only

14  making about $200,000 prior to coming to NYU?

15  A.  I don't know.

16      MR. KATAEV:  I'll publish 31, your Honor.  It's

17  already in evidence.

18      THE COURT:  You may do so.

19  Q.  This is Dr. Porges' initial employment agreement; correct?

20  A.  Yes.

21  Q.  And in the effort and compensation section, there's a table

22  itemizing the various efforts that he could undertake; correct?

23  A.  Yes.

24  Q.  Rather than listing Dr. Porges' research work in the

25  research section, you chose to -- NYU chose to include it in

1   his clinical; correct?

2   A.   That was the appropriate place for it.

3   Q.   Because it was done this way, there's no way to segregate

4   how much a percentage of time Dr. Porges spent on research;

5   correct?

6   A.   "Research," as defined in this table, means something

7   completely different than the type of research Dr. Porges was

8   doing.

9   Q.   When Dr. Porges was doing that research, he was not seeing

10  patients; correct?

11  A.   I don't believe that to be a true statement.

12  Q.   When Dr. Porges was doing research work with respect to any

13  patients, he was not earning RVUs, was he?

14  A.   I don't know the details about that.  His clinical research

15  was part of his clinical practice.  It was embedded as part of

16  his practice.

17  Q.   In the FGP expectations portion of this contract,

18  Dr. Porges was required to meet the target of 6524 RVUs per

19  year; correct?

20  A.   That was his RVU target, yes.

21  Q.   And is it your testimony that Dr. Porges met this target?

22  A.   When?

23  Q.   In any year that he worked.

24  A.   I believe so, yes.

25  Q.   And your testimony is based on a review of RVU reports that

1    are maintained in NYU's systems; correct?

2    A.  It's based on my recollection of events from many years

3    ago.

4    Q.  It's fair to say that the reports themselves would be more

5    accurate than your memory; correct?

6    A.  Yes.

7    Q.  For example, you can't tell me today how many RVUs

8    Dr. Porges actually earned in 2014; correct?

9    A.  No.

10   Q.  Nor can you do that for any year that Dr. Porges worked;

11   correct?

12   A.  Correct.

13   Q.  And you can't tell me how many RVUs any doctor earned in

14   any year; isn't that right?

15   A.  I don't think that's true.

16   Q.  Can you tell me how many RVUs Dr. Edelman earned in 2019?

17   A.  2019?  No.

18   Q.  So it's fair to say that if you had the reports in front of

19   you, you would be able to tell us that information; right?

20   A.  Yes.

21   Q.  And without these reports in front of you, we have no way

22   to verify that what you're saying is true; correct?

23             MR. SCHOENSTEIN:  Objection.

24             THE COURT:  Sustained.

25   Q.  Without these reports in hand, your testimony can't be

1    verified; correct?

2              MR. SCHOENSTEIN:  Objection.

3              THE COURT:  Sustained.

4    Q.  It's fair to say, isn't it, that the RVU reports would

5    verify what you're saying?

6              MR. SCHOENSTEIN:  Objection.

7              THE COURT:  Overruled.

8    A.  It would tell the exact number of RVUs a physician did in a

9    specific year.

10   Q.  And you don't have those documents with you today; correct?

11             MR. SCHOENSTEIN:  Objection.

12             THE COURT:  Overruled.

13   A.  Correct.

14   Q.  And these documents were not introduced by NYU at this

15   trial; correct?

16             MR. SCHOENSTEIN:  Objection.

17             THE COURT:  Overruled.

18   A.  I don't know what was provided.

19   Q.  These documents were not provided during your testimony;

20   correct?

21   A.  Correct.

22   Q.  Going back to Dr. Goldberg and his requested salary, it's

23   fair to say that he asked for $290,000 and he got $290,000,

24   that was your testimony; correct?

25   A.  That's my recollection.

1   Q.  Going back to this chart, there's no way to tell how much

2   of Dr. Porges' compensation went to clinical and how much went

3   to medical research; correct?

4   A.  His compensation was for the totality of his practice.

5   Q.  So my question is there's no way to split the two up;

6   correct?

7   A.  We would not split it up.

8   Q.  When Dr. Porges was seeing patients, he was not doing

9   medical research; right?

10  A.  That's not a true statement.

11  Q.  When Dr. Porges was seeing patients for the clinical

12  practice at NYU, he was not doing research; right?

13  A.  That's not correct.

14  Q.  When Dr. Porges was doing medical research, he wasn't

15  seeing regular patients outside of the clinical work; right?

16  A.  That's not correct.

17  Q.  You also testified about the fact that Dr. Porges obtained

18  an administrative title because he demonstrated the ability to

19  do that kind of work; correct?

20  A.  He demonstrated leadership abilities.

21  Q.  In fact, he previously assisted NYU in having another

22  doctor terminated; correct?

23  A.  I don't know what you're referring to.

24  Q.  When Dr. Porges allegedly demonstrated this ability, you

25  did not review anyone else's ability to do this type of work,

1  as well; correct?

2  A.  We didn't conduct a review of every physician, no.

3  Q.  And he became a director several years after he first

4  started at NYU; correct?

5  A.  I don't remember the specific timeline, but yes.

6  Q.  And there was no such medical director prior to Dr. Porges

7  becoming the medical director; correct?

8  A.  That's correct.

9  Q.  So that title was essentially created; right?

10  A.  That title is very common across our network for practices

11  once they get to a certain size.

12  Q.  At the time that Dr. Porges obtained that title, the size

13  of the practice at 1999 Marcus was 80 to 100 doctors; correct?

14  A.  I don't know the specifics, but it reached a size where we

15  felt we needed a medical director.

16  Q.  And what size, in terms of the number of doctors, is

17  usually the starting point to obtain a medical director?

18  A.  There's not a set number.  It depends on the practice,

19  what's happening in the practice, and what our needs are.

20  Q.  At that site, there were different types of doctors;

21  correct?

22  A.  Define "different types of doctors," please.

23  Q.  For example, there were rheumatologists, oncologists, and

24  pediatrists; correct?

25  A.  Different specialists, yes.

N7ECede1                    Swirnow - Redirect

1    Q.  Dr. Porges was just a rheumatologist; correct?

2    A.  He was a rheumatologist.

3    Q.  He still is; right?

4    A.  Sorry?

5    Q.  He still is a rheumatologist; correct?

6    A.  Yes.  You had said he was just a rheumatologist.  I'm

7    saying he is a rheumatologist, yes.

8    Q.  He's not an oncologist; correct?

9    A.  That's correct.

10   Q.  And he's not a podiatrist; right?

11   A.  That's correct.

12   Q.  He wouldn't be qualified to review the work of a oncologist

13   or podiatrist, would he?

14   A.  Review the work in what manner?

15   Q.  The way Dr. Edelman's work was reviewed.

16   A.  He's a rheumatologist.

17   Q.  Would he be qualified to review the work of an oncologist

18   the same way he reviewed Dr. Edelman's clinical performance?

19   A.  Part of it, yes.

20   Q.  But not fully and properly; correct?

21   A.  Not every component of it.

22   Q.  In this initial employment agreement in exhibit 31, there's

23   no administration or leadership effort; correct?

24   A.  Correct.

25   Q.  And Dr. Porges' salary was just $340,000 total; correct?

1    A.   That was his salary.

2    Q.   And the entirety of that salary was for clinical; correct?

3    A.   Correct.

4           MR. KATAEV:  Your Honor, with your permission, I'd

5    like to publish 32.  It's already admitted.

6           THE COURT:  You may do so.

7           MR. KATAEV:  I'm actually going to have 31 and 32 next

8    to each other, your Honor.  Is that okay?

9           THE COURT:  Yes.

10   Q.   Focusing on the left for exhibit 31, that's the one we just

11   reviewed; right?

12   A.   Sorry.  You said the left side?

13   Q.   Yes.

14   A.   Yes.

15   Q.   And on the right side is the renewal agreement from 2017;

16   correct?

17   A.   Yes.

18   Q.   And in the percent of efforts summary, the table lists the

19   same total compensation of $340,000; correct?

20   A.   The total compensation, yes.

21   Q.   So it's fair to say that even though Dr. Porges received an

22   additional role in administration, the salary remained the

23   same; correct?

24   A.   His total compensation was the same.

25          MR. KATAEV:  I'd like to go to 34, your Honor, also in

N7ECede1                        Swirnow – Redirect

1    evidence.

2              THE COURT:  You may do so.

3              MR. KATAEV:  May I publish?

4              THE COURT:  Yes.

5    Q.  Focusing on the termination for cause provision, do you see

6    it?

7    A.  Yes.

8    Q.  This contract, the second renewal for Dr. Porges, is dated

9    December 8th, 2020; correct?

10   A.  Yes.

11   Q.  And Dr. Edelman was terminated on December 1st, 2020;

12   correct?

13   A.  She was given a notice that we were non-renewing her

14   contract.

15   Q.  And this provision was added for the first time in the

16   doctor's contract following her termination; correct?

17   A.  It was added to all physician contracts.  I don't know the

18   timeline.

19             MR. KATAEV:  Move to strike as nonresponsive.

20             THE COURT:  Overruled.

21   Q.  This provision was added seven days after her contract was

22   nonrenewed; correct?

23   A.  This contract is dated seven days after that notice.

24   Q.  Focusing on Dr. Modi, you testified, with Mr. Schoenstein

25   questioning you, that he was a busy rheumatologist and had a

N7ECede1                    Swirnow – Redirect

1    good reputation, so NYU decided to hire him; correct?

2    A.   Partially, yes.

3    Q.   And those factors were considered as to whether to hire

4    him; right?

5    A.   Yes.

6    Q.   But that was not a factor that was considered in setting

7    his compensation, was it?

8    A.   Yes.

9    Q.   But you testified before that you look at just the business

10   plan and no other factors; isn't that right?

11   A.   For private practice doctors who have an existing practice

12   I believe is what I said.

13   Q.   There was also testimony about Dr. Modi working for HIP

14   before; right?

15   A.   Yes.

16   Q.   And you clarified that he actually worked for, I believe it

17   was advanced care physicians; is that right?

18   A.   Advantage Care, yes.

19   Q.   Advantage Care.  And that was owned by Emblem Health;

20   correct?

21   A.   Yes.

22   Q.   Isn't it true that Emblem bought HIP?

23   A.   At some point, yes.

24   Q.   So Dr. Modi was, in fact, a, quote-unquote, HIP doctor;

25   right?

1    A.  No.

2    Q.  You testified about a meeting held in 2017 with

3    Dr. Edelman; correct?

4    A.  I don't remember the exact date, but yes, there was a

5    meeting.

6    Q.  And you provided details about that meeting; didn't you?

7    A.  Yes.

8    Q.  But when I asked you at your deposition, you could not

9    remember; correct?

10   A.  Could not remember what?

11   Q.  The details of that meeting.

12   A.  I still can't remember all the details.

13   Q.  And you deny that Mr. Rubin told Dr. Edelman to smile more;

14   correct?

15   A.  I don't remember hearing that being said.

16   Q.  And you also deny that Mr. Rubin told her to fake it till

17   she makes it; correct?

18   A.  I also don't think I've ever heard him say that.

19   Q.  With respect to the concerns that were brought to your

20   attention by Dr. Porges concerning Dr. Edelman's clinical care,

21   you don't know who brought those issues to Dr. Porges'

22   attention, do you?

23   A.  I believe they came from Dr. Porges.

24   Q.  But you don't know how he found out, do you?

25   A.  I know he told us that he had patients in common and that

1    he reviewed some of the charts.

2    Q.  And you testified that you spoke to Dr. Porges first and

3    then Dr. Goldberg; correct?

4    A.  I believe that was the order, yes.

5    Q.  It was two separate telephone conversations; correct?

6    A.  I know we spoke to both of them.

7    Q.  And you have nothing in writing memorializing any of those

8    phonecalls, do you?

9    A.  No.

10   Q.  Nor do you have anything in writing memorializing the

11   decision-making process concerning Dr. Edelman's termination;

12   correct?

13          MR. SCHOENSTEIN:  Objection.

14          THE COURT:  Overruled.

15   A.  Could you repeat the question, please.

16   Q.  You have nothing memorializing the decision-making process

17   concerning Dr. Edelman's termination; correct?

18   A.  The process, no.

19   Q.  It's fair to say that the termination of a doctor at NYU is

20   a significant event; correct?

21   A.  Yes.

22   Q.  It's significant to NYU because it affects them and their

23   operations; right?

24   A.  Yes.

25   Q.  And, of course, it's significant to Dr. Edelman because it

N7ECede1                    Swirnow - Redirect

1   affects her; correct?

2   A.  Yes.

3   Q.  And you testified that you were very concerned about what

4   Dr. Porges told you?

5   A.  Yes.

6   Q.  But you never personally spoke to Dr. Edelman about these

7   concerns, did you?

8   A.  These were clinical concerns.  I wouldn't have that

9   discussion.

10  Q.  You also talked about the conversation you had with

11  Dr. Porges about whether he could remediate Dr. Edelman's

12  practices; correct?

13  A.  I believe I said mentor, but yes.

14  Q.  You didn't provide any details during your testimony about

15  what those clinical concerns were; right?

16  A.  No, I didn't.

17  Q.  Let's delve into that a little bit.

18      The clinical concerns were that she was ordering too many

19  lab tests, correct, and blood work?

20  A.  I believe that was part of it.

21  Q.  There was also a concern that she was ordering too many

22  x-rays; is that right?

23  A.  I remember seeing that in his email.

24  Q.  Do you remember any other clinical concerns that were

25  brought to your attention?

1    A.   I don't remember the specific details of the clinical

2    nature.

3    Q.   It's fair to say, isn't it, that one way to remediate such

4    concerns is to speak to Dr. Edelman and see if she could order

5    less tests?

6    A.   I don't get involved in clinical matters.

7    Q.   Dr. Goldberg could have done so; correct?

8    A.   That would be his decision.

9    Q.   And he didn't do that, did he?

10   A.   I don't know what he did.  I know what he told us.

11   Q.   He didn't tell you he spoke to Dr. Edelman about these

12   issues, did he?

13   A.   No.

14   Q.   Did you have any conversations with Dr. Jill Buyon about

15   this issue?

16   A.   I did not.

17   Q.   She's the director of rheumatology at NYU, isn't she?

18   A.   For the School of Medicine, yes.

19   Q.   Had Dr. Edelman been spoken to and she told you "I'll order

20   less tests and I'll do less x-rays," would she have had her

21   contract renewed?

22             MR. SCHOENSTEIN:  Objection.

23             THE COURT:  Overruled.

24   A.   That's not my decision.

25   Q.   And no one took the time to ask her that; correct?

1    A.  I don't know if anyone else spoke to her.

2    Q.  To your knowledge; correct?

3    A.  I don't know.  I don't believe so.

4            MR. KATAEV:  I'd like to place 31 back up on the

5    screen.

6            THE COURT:  You may do so.

7            MR. KATAEV:  I apologize, your Honor.  32.

8            THE COURT:  Okay.  You can place 32 up.

9    Q.  Dr. Porges' administrative role was only 5 percent of his

10   effort at NYU; correct?

11   A.  In this contract.

12   Q.  It's fair to say that he was primarily devoted to the

13   clinical aspect of his work; right?

14   A.  Yes.

15   Q.  And you testified with Mr. Schoenstein that you did not

16   have any discussions about Dr. Edelman prior November of 2020;

17   right?

18   A.  Could you be more clear.

19   Q.  There were no discussions about terminating Dr. Edelman

20   prior to November of 2020; right?

21   A.  No.

22   Q.  And that's because you only received any information about

23   Dr. Edelman's alleged clinical concerns after November 6th,

24   2020; correct?

25   A.  That's when we received the information.

1  Q.  You also talked about the quality standards of NYU?

2  A.  Yes.

3  Q.  Where are those quality standards written down?

4  A.  The quality standards are -- what I was referring to was

5  the rankings and different organizations that rank hospital

6  systems and medical centers, use quality, data, and information

7  in order to rank those hospitals.

8  Q.  My question is where are those written down?

9  A.  I don't know.

10 Q.  You don't have anything in writing about quality standards,

11 do you?

12         MR. SCHOENSTEIN:  Objection.

13         THE COURT:  Sustained.

14 Q.  Can you show me any written quality standards?

15         MR. SCHOENSTEIN:  Objection.

16         THE COURT:  Sustained.

17 Q.  Were any written quality standards introduced during your

18 testimony with Mr. Schoenstein?

19 A.  No.

20 Q.  The phonecalls that you had with Dr. Porges and

21 Dr. Goldberg were two separate phonecalls; correct?

22 A.  I don't recall.

23 Q.  You didn't have any conversations with Dr. Porges and

24 Dr. Goldberg together, did you?

25 A.  I don't recall.  I know we spoke to both of them.

1   Q.  And to your recollection, you didn't meet with them, did

2   you?

3   A.  I don't believe we met with them in person.

4   Q.  You also reference when Dr. Edelman was told on December

5   1st, 2020, that NYU was no longer going to work for her, you

6   referenced that as a nonrenewal; correct?

7   A.  She was given notice that her contract was being

8   nonrenewed, yes.

9   Q.  In that same letter, she was told that her last day of work

10  would be May 31st; correct?

11  A.  I believe that was the date.

12  Q.  In essence, that means she was terminated; correct?

13  A.  Her contract was not renewed.

14  Q.  And focusing on the issue with the blood tests and x-rays,

15  NYU has not introduced any comparisons of how many blood tests

16  and x-rays the other doctors performed; correct?

17           MR. SCHOENSTEIN:  Objection.

18           THE COURT:  Sustained.

19  Q.  During your testimony, there was no documentation about how

20  many blood tests other doctors performed; correct?

21  A.  Correct.

22  Q.  During your testimony, there was no documents about how

23  many x-rays other doctors performed; correct?

24  A.  Correct.

25  Q.  You did not do any such comparison, did you?

N7ECede1                         Swirnow – Recross

1    A.  No.

2    Q.  And to your knowledge, neither did Dr. Porges; correct?

3    A.  I have no idea.

4            MR. KATAEV:  Just one second, your Honor.

5            Nothing further.

6            THE COURT:  Anything further from the defense?

7            MR. SCHOENSTEIN:  Yes, your Honor.

8    RECROSS EXAMINATION

9    BY MR. SCHOENSTEIN:

10   Q.  Mr. Swirnow, are doctors at NYU encouraged to pass on

11   information about other doctors they know outside of NYU who

12   might be interested?

13           MR. KATAEV:  Objection.  Leading.

14           THE COURT:  Overruled.

15   A.  Could you ask again, please.

16   Q.  Are doctors at NYU encouraged to pass on to NYU information

17   about other doctors outside of NYU that might be interested?

18   A.  Yes.

19   Q.  In the six years that plaintiff worked for NYU, did she

20   ever send you a résumé or send you an email with a name of a

21   doctor or suggest a doctor who might come to work at NYU, ever

22   once?

23   A.  No.

24   Q.  Now, you were asked questions about how come the research

25   component of Goldberg's contract isn't listed in that research

1    column.  Could you just one more time explain the kind of

2    research that Dr. Porges was doing.

3    A.  Dr. Porges was doing clinical research as part of his

4    practice, meaning while he was seeing his patients, he was

5    determining whether they were appropriate for any type of

6    clinical trial or something like that.

7    Q.  And while he was seeing his patients, was he

8    recording RVUs?

9    A.  Potentially.  I think when you're seeing a patient and

10   you're treating them in the normal course of care, you

11   receive RVUs for that.  If part of that treatment is related to

12   the clinical trial, then you might not get RVUs for that, but

13   it really depends on what treatment was formed in that

14   interaction.

15   Q.  Is it possible to split out the clinic component and the

16   research component and list them in two different columns with

17   two different sets of numbers for that kind of research?

18   A.  No.

19          MR. SCHOENSTEIN:  Can we put back up Plaintiff's 121,

20   please.

21          While we get that up, your Honor, we're going to

22   publish it, but I'll ask a few predicate questions.

23   Q.  Do you recall in the 2014 negotiations with Dr. Edelman and

24   Dr. Mehta discussing offices?

25   A.  Yes.

N7ECede1                    Swirnow – Recross

Q.  What do you recall about that, what was that discussion as
you remember it sitting here today?
A.  I remember that they had their own office -- their own
practice, their own office space, and their own offices within
that space, and they wanted to make sure that when they were
practicing they wouldn't have somebody else in the office with
them.
Q.  So we're looking at this exhibit, 121, and we're looking at
the same language that counsel showed you.  It says:
"Guaranteed us individual unshared offices."

     So what was the discussion, as you recall it, about whether
or not offices would be shared?
A.  They wouldn't be.  "Shared office," to us, means two
doctors in the same office at the same time.
Q.  Does that happen at NYU, are there offices where there are
two doctors in at the same time?
A.  Yes, all the time, a lot of places.
Q.  Did that ever happen with the rheumatologists, Marcus
Avenue?
A.  No.
          MR. SCHOENSTEIN:  Scroll back up, please, to
Mr. Swirnow's response.
Q.  "Office space, as we have discussed previously," do you
have anything to add, other than what you just said about what
was discussed previously?

1    A.  No, it meant they would have use of their own office by

2    themselves when they were practicing.

3    Q.  And then you said that is not appropriate for the contract

4    and will not be included.  What did you mean by that?

5    A.  We don't make any contractual commitments to office space

6    in our agreements.

7    Q.  And was that discussed with Dr. Edelman and Dr. Mehta in

8    2014?

9    A.  Yes.

10   Q.  And was that reflected in the contract that she signed in

11   August of 2014 as you remember it?

12   A.  Yes.

13   Q.  You were asked some questions about the office lease?

14   A.  Yes.

15   Q.  Does NYU still have that space?

16   A.  I believe so.

17   Q.  Is NYU still paying the lease?

18   A.  Yes.

19   Q.  If there's any office equipment in there that was from

20   Dr. Edelman's practice, is NYU still paying for that?

21   A.  If there is an active lease.

22   Q.  Dr. Edelman has moved to Florida.  Does she have any

23   continuing obligation, as you understand it, under the office

24   lease at issue?

25            MR. KATAEV:  Objection.  Foundation.

1          THE COURT:  Overruled.

2   A.  She didn't have any obligations from the day she joined us.

3   Q.  And does she have any now?

4   A.  No.

5   Q.  With NYU?

6   A.  Yes.

7          MR. SCHOENSTEIN:  Thank you.

8          THE COURT:  Anything further?

9          MR. KATAEV:  I have a sticky, your Honor.

10         THE COURT:  Okay.

11  REDIRECT EXAMINATION

12  BY MR. KATAEV:

13  Q.  Every task that a doctor performs that's clinical has a CPT

14  code for that task; correct?

15  A.  Could you be more specific.

16  Q.  Any task that a doctor performs, it gets billed out using a

17  CPT code; correct?

18  A.  Any task?  No.

19  Q.  Clinical tasks have a CPT code associated with them;

20  correct?

21  A.  Clinical services provided have a CPT code.

22  Q.  And those CPT codes translate to a designated number

23  of RVUs; correct?

24  A.  Correct.

25  Q.  And when clinical research work is done, that gets billed

1    under an RVU code that's related to research; correct?

2    A.   There are no RVU codes for research.

3    Q.   You talked about the fact that other doctors at NYU,

4    generally, doctors at NYU shared their office space; correct?

5    A.   There are doctors that share space, yes.

6    Q.   It's common; right?

7    A.   Yes.

8    Q.   But it's common mostly with, if not virtually exclusively,

9    with part-time doctors; is that right?

10   A.   No.

11   Q.   Your testimony today is that a full-time doctor who's in

12   the office every day, Monday to Friday, shares their space?

13   A.   Yes, that's correct.

14   Q.   But in this case, with Dr. Edelman, there were verbal

15   discussions about not having shared space and it was agreed to;

16   correct?

17   A.   There were discussions about having use of this office by

18   herself when she practiced.

19   Q.   And in fact, with the email that we saw, there were written

20   discussions on that subject; correct?

21   A.   Yes.

22            MR. KATAEV:  I have nothing further.

23            THE COURT:  You're excused as a witness.  You may step

24   down.

25            (Witness excused)

1              Plaintiff will call its next witness.

2              MR. KATAEV:  Plaintiff calls nonparty Miriam Ruiz to

3    the stand.

4              THE COURT:  Let's bring her in.

5              Members of the jury, if you want to stand and stretch,

6    now is a good time.

7              Ms. Ruiz, why don't you step forward into the witness

8    stand, just come up here.  Remain standing.  My courtroom

9    deputy will administer the oath to you.

10    MIRIAM RUIZ,

11        called as a witness by the Plaintiff,

12        having been duly sworn, testified as follows:

13             THE DEPUTY CLERK:  Please state your full name for the

14    record and spell your first and last name.

15             THE WITNESS:  Miriam, M-i-r-i-a-m, last name is Ruiz,

16    R-u-i-z.

17             THE COURT:  Mr. Ruiz, you may be seated.  Please try

18    to keep your voice up and speak into the microphone.

19             Counsel may inquire.

20             Is there a transcript that you want me to have?

21             MR. KATAEV:  Thank you for reminding me.

22             MR. SCHOENSTEIN:  Could your deputy pass up a water

23    for the witness?

24             THE DEPUTY CLERK:  Yes.

25             THE COURT:  Counsel, you may inquire.

1    DIRECT EXAMINATION

2    BY MR. KATAEV:

3    Q.  Good morning, Ms. Ruiz.

4    A.  Good morning.

5    Q.  You no longer work at NYU; correct?

6    A.  That's correct.

7    Q.  And you haven't worked at NYU since February of 2021; isn't

8    that right?

9    A.  That's correct.

10   Q.  You were deposed in this case, weren't you?

11   A.  Can you be a little bit more specific, please.

12   Q.  Sure.  In November of 2021, I conducted a deposition where

13   you answered questions under oath; correct?

14   A.  Yes, that is correct.

15   Q.  And that occurred after you had already left NYU; right?

16   A.  Yes, that is correct.

17   Q.  And because of that, you were subpoenaed to testify in that

18   deposition; correct?

19            MR. SCHOENSTEIN:  Objection.

20            THE COURT:  Overruled.

21   Q.  You received a subpoena to come and testify at that

22   deposition in November 2021; correct?

23   A.  Yes.

24   Q.  And upon receiving that subpoena, the first thing you did

25   was contact Mr. Antonik; right?

N7ECede1                    Ruiz - Direct

1   A.  Correct.

2   Q.  And in response to that, NYU then contacted you to offer

3   representation by these attorneys; correct?

4   A.  Correct.

5   Q.  And you did not pay these attorneys any money for those

6   services; correct?

7   A.  That is correct.

8   Q.  In fact, you were offered representation by NYU the very

9   same day you received that subpoena; correct?

10          MR. SCHOENSTEIN:  Objection.

11          THE COURT:  Overruled.

12  A.  Incorrect.

13  Q.  Shortly thereafter?

14  A.  Correct.

15  Q.  And NYU in fact represented you in connection with your

16  deposition in November 2021; correct?

17  A.  Correct.

18  Q.  And NYU prepared you for that deposition; correct?

19  A.  Correct.

20  Q.  And they are representing you right now in connection with

21  your testimony at this trial; correct?

22  A.  Correct.

23  Q.  Going to the time that you worked at NYU, you started there

24  in June of '17; right?

25  A.  Can you repeat the question, please.

1  Q.  You first started working at NYU in June 2017; right?

2  A.  That is correct.

3  Q.  And when you worked at NYU, it's fair to say that you

4  managed a lot of doctors; right?

5  A.  That is correct.

6  Q.  Your title at NYU was office manager, wasn't it?

7  A.  That is correct.

8  Q.  And you previously worked, before working with NYU, at

9  North Shore Hematology; right?

10 A.  Yes, that's correct.

11 Q.  And at North Shore Hematology, you managed four doctors; am

12 I right about that?

13 A.  Five doctors.

14 Q.  And they were oncologists?

15 A.  That is correct.

16 Q.  And NYU bought that practice; right?

17 A.  No, that is incorrect.

18 Q.  They assumed that practice, didn't they?

19 A.  Correct.

20 Q.  And because NYU assumed that practice, that's the reason

21 you started working at NYU; right?

22 A.  An offer was made, correct.

23 Q.  And when the offer was made, you received the exact same

24 salary that you received when working at North Shore

25 Hematology; right?

N7ECede1                         Ruiz – Direct

```
 1   A.  Incorrect.
 2   Q.  When you initially started working at NYU, you only managed
 3   the oncologists; correct?
 4   A.  That is correct.
 5   Q.  And initially, you had no responsibility for any of the
 6   rheumatologists; isn't that right?
 7   A.  That is correct.
 8   Q.  But eventually, there came to be a time when you were told
 9   you had to manage both the rheumatologists and the oncologists;
10   right?
11   A.  Correct.
12   Q.  And there were five rheumatologists at NYU at the time;
13   right?
14   A.  That is correct.
15   Q.  That would be Dr. Goldberg, Dr. Porges, Dr. Edelman,
16   Dr. Mehta, and Dr. Modi; correct?
17   A.  Incorrect.
18   Q.  Who were the doctors?
19   A.  Dr. Brancato was present, also.
20   Q.  So it's fair to say that your work effectively doubled;
21   right?
22   A.  Yes, that is correct.
23   Q.  And then you also had to manage the podiatrists; right?
24   A.  Incorrect.
25            MR. KATAEV:  Your Honor, I'd like to impeach, page 58,
```

N7ECede1                       Ruiz - Direct

1   line 7 through 16.

2           THE COURT:  You may do so.

3   Q.  At your deposition in November of 2021, you swore to tell

4   the truth, didn't you?

5   A.  I did.

6   Q.  And I asked you these questions and you gave the following

7   answers; correct?

8   A.  Correct.

9   "Q.  Other than managing rheumatologists in addition to

10  oncologists during your employment with NYU, did your

11  responsibilities or duties change in any other way?

12  "A.  Yes.

13  "Q.  How so?

14  "A.  We had another specialty join or ambulatory care site.

15  "Q.  What specialty was that?

16  "A.  Pediatry."

17  A.  Correct.

18  Q.  So it's fair to say your testimony today was not accurate;

19  right?

20  A.  Incorrect.

21  Q.  Your testimony during deposition was inaccurate; is that

22  what you're saying?

23          MR. SCHOENSTEIN:  Objection.

24          THE COURT:  Overruled.  You can answer that question.

25          So when there's an objection, you wait until I rule on

1   it.  If I say "sustained," it means you don't answer the

2   question.  If I say "overruled," you have to answer the

3   question.

4        The question is, when you testified at your

5   deposition, was that testimony accurate?

6   A.  Correct.

7   Q.  It's fair to say it was stressful managing so many doctors;

8   right?

9   A.  Absolutely.

10  Q.  Your job responsibilities at NYU included managing the

11  doctors, the staff, the schedules, and the timecards; right?

12  A.  Correct.

13  Q.  And among other doctors, you helped Dr. Edelman manage her

14  schedule; right?

15  A.  Correct.

16  Q.  You facilitated questions from patients; right?

17  A.  Correct.

18  Q.  And you handled billing and complaints; right?

19  A.  Correct.

20  Q.  And while working at NYU, you worked extensively with

21  Mr. Antonik; correct?

22  A.  Yes.

23  Q.  You reported to him, didn't you?

24  A.  Yes.

25  Q.  And it's fair to say that you worked with him on a

1    day-to-day basis; right?

2    A.  Yes.

3    Q.  And he remained your supervisor from the beginning when you

4    started until -- withdrawn.

5        He remained your supervisor until you left your employment

6    with NYU; correct?

7    A.  Correct.

8    Q.  And, in fact, you spoke to not only him, but also Mr. David

9    Kaplan regularly while working at NYU; correct?

10   A.  Yes.

11   Q.  And when you left your job with NYU, you obtained a

12   reference from Mr. Antonik; correct?

13   A.  Correct.

14   Q.  Now, your performance was evaluated annually at NYU, wasn't

15   it?

16   A.  Correct.

17   Q.  And the person who did your review was Mr. Antonik;

18   correct?

19   A.  Correct.

20   Q.  To your recollection, you never had any negative review,

21   did you?

22   A.  Correct.

23   Q.  And you worked in suite 306 with Dr. Edelman and the other

24   rheumatologists and oncologists; right?

25   A.  Correct.

808 of 1503

N7ECede1                         Ruiz - Direct

1    Q.  The space in suite 306 is fairly large, isn't it?

2    A.  Correct.

3    Q.  It has 10 offices; right?

4    A.  Correct.

5    Q.  And 22 exam rooms; right?

6    A.  Correct.

7    Q.  And Dr. Edelman was very busy with patients as all the

8    other doctors were; correct?

9    A.  Correct.

10   Q.  You observed all the doctors on a day-to-day basis

11   primarily seeing patients; right?

12   A.  Correct.

13   Q.  You also recall that Dr. Edelman made a humanitarian trip

14   to Ecuador; correct?

15   A.  Correct.

16   Q.  And she did that to help patients in poverty and facilitate

17   their rheumatological needs; right?

18           MR. SCHOENSTEIN:  Objection.  Foundation.

19           THE COURT:  Overruled.

20   A.  Correct.

21   Q.  And you discussed this trip with Mr. Antonik in the course

22   of your duties; correct?

23   A.  Correct.

24   Q.  And the trip was encouraged, wasn't it?

25   A.  Correct.

1   Q.   In fact, Dr. Edelman was commended for it by the entire

2   team at NYU; correct?

3            MR. SCHOENSTEIN:  Objection.

4            THE COURT:  Overruled.

5   A.   Correct.

6   Q.   And you said that it was a noble thing that she did; right?

7   A.   Correct.

8   Q.   You frequently received messages for Dr. Edelman with

9   praise; correct?

10  A.   Correct.

11  Q.   And in your role as managing complaints from patients, you

12  would have to write those down; right?

13  A.   Correct.

14  Q.   So whenever you received any complaint from a patient, you

15  were required, as part of your job duties, to write it down;

16  correct?

17  A.   That is correct.

18  Q.   And any such complaints were also documented in the

19  patient's chart; correct?

20  A.   Correct.

21  Q.   And you used the Epic system to make notes in patient

22  charts; correct?

23  A.   Correct.

24  Q.   You personally did that?

25  A.   Correct.

1    Q.  And you're aware that during the time you worked there,

2    Dr. Porges became the medical director of the entire building

3    at 1999 Marcus; right?

4    A.  Yes, that is correct.

5    Q.  And he wasn't initially the medical director when you

6    started there; right?

7    A.  I don't recall that being the situation.

8    Q.  When you first started in June of '17, he wasn't the

9    medical director?

10   A.  No, he wasn't.

11   Q.  Later on, after your time there, he became that; right?

12   A.  Yes, that is correct.

13   Q.  But you only first learned of his title in 2020, didn't

14   you?

15   A.  I don't recall specifically the date.

16   Q.  I'd like to show you your deposition transcript to refresh

17   your recollection.

18          MR. KATAEV:  Page 112, your Honor.

19          I apologize, your Honor.  Withdrawn.

20   Q.  Earlier in your testimony about patient communications,

21   those are patient messages; right?

22   A.  Correct.

23   Q.  In the Epic system; right?

24   A.  Correct.

25   Q.  And when you received praise from patients, it was through

1    the Epic system; right?

2    A.   Not always.

3    Q.   Sometimes they were handwritten notes?

4    A.   A lot of times it was verbal communication that was given,

5    as well.  Patients would always come through the office and

6    always see that my office was an open door and would walk in

7    and give all types of feedback.

8    Q.   Dr. Goldberg also had a director title; right?

9    A.   When I left NYU, yes.

10   Q.   Based on what you observed while you were there, is it fair

11   to say that both Dr. Porges and Dr. Goldberg did not do much

12   work as it relates to their administrative roles?

13   A.   I disagree.

14   Q.   It's fair to say, though, the majority of their time was

15   spent seeing patients; correct?

16   A.   Of course, yes.

17   Q.   Now, you're aware of this office space issue that happened

18   with Dr. Edelman; right?

19   A.   Yes, I am.

20   Q.   NYU wanted all their rheumatologists in suite 306; right?

21   A.   I'm sorry.  Can you please rephrase the question.

22   Q.   Sure.  NYU wanted all the rheumatologists to be located in

23   the single suite, in suite 306; right?

24   A.   Yes, that is correct.

25   Q.   But there were only 10 offices; correct?

1    A.   Correct.

2    Q.   And there were at least five oncologists; right?

3    A.   Yes, that is correct.

4    Q.   And there were already five or six rheumatologists; right?

5    A.   Correct.

6    Q.   And it's fair to say that Dr. Edelman did not want to share

7    her space; correct?

8    A.   That is correct.

9    Q.   In the course of preparing a move such that all

10   rheumatologists could be in suite 306, you were required to

11   prepare a grid of the office space to help in that effort;

12   correct?

13   A.   That is correct.

14   Q.   And you emailed that grid to Mr. Antonik, didn't you?

15   A.   That is correct.

16   Q.   But you don't have this email with you today; correct?

17   A.   No, I do not.

18   Q.   And when you left NYU, that email was stored and remained

19   stored on NYU's computers and systems; correct?

20            MR. SCHOENSTEIN:   Objection.

21   Q.   To your knowledge.

22            THE COURT:   Sustained.

23   Q.   In the course of your duties working for NYU, you sent and

24   received emails; correct?

25   A.   Yes.

1    Q.  And when you received that email from Mr. Antonik, it was

2    through your NYU email; correct?

3    A.  Yes.

4    Q.  Now, in terms of scheduling patients, you played a big part

5    in calendaring and putting patients in the calendar; right?

6    A.  I played a part in troubleshooting patients that couldn't

7    get appointments with providers.  So it would be escalated to

8    give me the opportunity to speak with physicians and see where

9    we can accommodate patients as best as possible if I couldn't

10   figure it out.

11   Q.  And you were aware of the flexible office policy at NYU;

12   right?  In other words, if the office was closed on a Monday,

13   for example, you were able to have patients scheduled on

14   another day that doctors don't normally see patients; correct?

15   A.  With permission with the providers, yes.

16   Q.  If the doctor said, "I don't see patients on Friday, but in

17   this case, it's urgent, let's schedule them for Friday," you

18   would do that; right?

19   A.  Absolutely.

20   Q.  If the office was closed on Monday, you would similarly be

21   able to schedule a patient with the provider's permission on

22   the day that they don't normally see patients; correct?

23   A.  That is correct.

24   Q.  Dr. Edelman frequently had to reschedule patients, didn't

25   she?

1   A.  Yes, that is correct.

2   Q.  And that was a cause of stress for you, wasn't it?

3   A.  Not really.  It was more of an inconvenience for patients.

4   Q.  Do you know the reason why that happened every so often?

5   A.  I'm sorry.  Can you be more specific with your question.

6   Q.  Do you know the reason why Dr. Edelman had to reschedule

7   her patients every so often?

8   A.  It was not my concern to know why or the reasons.  I just

9   followed what was instructed.

10  Q.  You never had any discussions with Dr. Edelman about the

11  reasons why?

12  A.  Sometimes, but not always.

13  Q.  What did she say to you?

14  A.  I don't remember specifically.  There would always be

15  either -- usually personal issues or personal requests.  It

16  wasn't about anything necessarily specific.  Sometimes that was

17  shared, sometimes it wasn't.

18  Q.  And when she did share those things with you, what did she

19  say?

20  A.  Sometimes it would be about family, sometimes it would be

21  about things that she had prior commitments for.  There was an

22  array of things just like all the other providers in the

23  office.

24  Q.  With respect to Dr. Edelman concerning this flexible office

25  discussion, Dr. Edelman's flexible day was Friday; correct?

1   A.  Yes, that is correct.

2   Q.  She couldn't put other patients in Monday through Thursday

3   because her schedule was already booked up with patients during

4   that time; correct?

5   A.  Sometimes there would be extended exceptions on those other

6   days.  As long as she gave permission, if she was able to stay

7   longer on those days, we would put patients on those days, as

8   well.

9   Q.  To your knowledge, Dr. Edelman was never disciplined in any

10  way; correct?

11  A.  Not that I was aware of, no.

12          MR. KATAEV:  I'd like to place up Plaintiff's

13  Exhibit 84.  It's already admitted.

14          THE COURT:  You may do so.

15          MR. KATAEV:  Publish to the jury.

16  Q.  Ms. Ruiz, you drafted this spreadsheet of issues with

17  Dr. Edelman, didn't you?

18  A.  Yes, that is correct.

19  Q.  And as you testified before, if you had a complaint about

20  any physician, you would write it down; correct?

21  A.  Yes, that is correct.

22  Q.  And that is a practice that you did from the beginning of

23  your employment in June 2017; correct?

24  A.  That is correct.

25  Q.  Therefore, if you did not write anything down, that means

1   there was no complaint; correct?

2   A.  Not necessarily.

3           MR. KATAEV:  I'd like to show the witness her

4   transcript for impeachment, page 132.

5           THE COURT:  Go ahead.

6   Q.  At your deposition, November 21, I asked you the following

7   questions and you gave the following answers:

8   "Q.  You testified earlier that if you did have a complaint

9   about any physician, you would write it down; correct?

10  "A.  Yes.

11  "Q.  Therefore, if you didn't write down the complaint that you

12  had, there was no complaint; right?

13  "A.  Yes."

14  Q.  That's what you said at your deposition, isn't it?

15  A.  Yes, that is correct.

16  Q.  What you're saying right now is different from what you

17  testified to before; correct?

18  A.  I misunderstood the question.  My apologies.

19  Q.  In what way did you misunderstand?

20  A.  I assumed — my apologies, again — that any complaint that

21  was given by any patient, not necessarily related to a

22  physician, was written down.  So we would have patients

23  complain about the suite being too cold or if there was no

24  toilet paper in the bathroom or there was a draft that was

25  coming in when they were cold, so we get them a blanket.  Those

N7ECede1                        Ruiz - Direct

1    are the types of complaints that I didn't write down because

2    those were things I was able to troubleshoot right away.  So I

3    misunderstood your question.  My apologies.

4    Q.  At the beginning of your deposition on November 20, '21, I

5    went over ground rules with you; right?

6    A.  Yes, that is correct.

7    Q.  And I asked you -- I provided you the following ground

8    rules and confirmed you understood; correct?

9    A.  Yes, that is correct.

10   "Q.  Please allow me to complete my question before you answer.

11   I will give you the same courtesy.  This will also help the

12   court reporter in doing her job.  If you don't understand a

13   question, I want you to tell me so I can rephrase the question.

14   If you answer, I will assume that you understood the question.

15   Okay?

16   "A.  Yes."

17   Q.  That's what you said; right?

18   A.  Yes, that is correct.

19            MR. SCHOENSTEIN:  Objection.

20            THE COURT:  Sustained.

21   Q.  Going back to exhibit 84, you testified that you prepared a

22   spreadsheet for every doctor in suite 306 like this one;

23   correct?

24   A.  Yes.

25   Q.  But you don't have any of those spreadsheets with you

1    today; correct?

2    A.  No, I do not.

3    Q.  When you left NYU, you left any of those spreadsheets with

4    NYU; correct?

5    A.  Yes, that is correct.

6    Q.  You're aware that Dr. Edelman made a complaint with human

7    resources in September 2019; correct?

8    A.  I was not aware.

9    Q.  The first date in this log is dated November 13, 2019;

10   correct?

11   A.  I don't have the log in front of me.  I'm sorry.

12   Q.  I apologize.  Do you see it now?

13   A.  Now I do, yes.

14   Q.  The first date entry in this log is November of 2019;

15   correct?

16   A.  Yes, that is correct.

17   Q.  And you're not aware of any such logs maintained by any

18   other office personnel; correct?

19   A.  No, I am not.

20   Q.  For example, Connie, who worked with you, she didn't

21   maintain any such logs that you're aware of; right?

22   A.  I don't know.

23   Q.  Same question with Doreen, she didn't maintain any such

24   logs; correct?

25   A.  I don't know.

1   Q.  And you deny that Mr. Antonik asked you to prepare this

2   log; right?

3   A.  That is correct.

4          MR. KATAEV:  I'd like to publish 86, already in

5   evidence.

6          THE COURT:  Okay.

7   Q.  You received this email from Mr. Antonik in November of

8   2020; correct?

9   A.  Yes.

10  Q.  And in this email, there's a list of various issues with

11  Dr. Edelman; correct?

12  A.  Correct.

13  Q.  And those issues relate to exactly what you wrote in your

14  log; correct?

15  A.  Correct.

16  Q.  Earlier that day at 2:20 p.m., Mr. Antonik wrote to you;

17  right?

18  A.  Yes.

19  Q.  And he told you there that David requested all information

20  on Dr. Edelman to be sent to him; correct?

21  A.  That's correct.

22  Q.  And within two hours of that email, he supplemented his

23  original email with all the issues; correct?

24  A.  Correct.

25  Q.  It's also fair to say, isn't it, that the contents of your

1  log that you drafted are different than what Mr. Antonik wrote

2  in this email; correct?

3           MR. SCHOENSTEIN:  Objection.

4           THE COURT:  Sustained.

5           MR. KATAEV:  I'm going to place the two exhibits side

6  by side so that you can answer some questions.

7  Q.  For the September 16th, 2020 entry for the log that you

8  created, there's reference to a patient who was tired and not

9  feeling well and did not want to wait for Dr. Edelman; correct?

10 A.  Correct.

11 Q.  And you noted in here the patient did not want to switch

12 physicians; right?

13 A.  Correct.

14 Q.  To your knowledge, based on what you wrote, the patient

15 wanted to remain with Dr. Edelman; right?

16 A.  That is correct.

17 Q.  Mr. Antonik wrote in his entry, corresponding to the same

18 date, that this patient switched to another provider, didn't

19 he?

20 A.  That is -- yes, that is correct.

21 Q.  It's fair to say that what he wrote in his email is not

22 consistent with what you wrote in your log; correct?

23           MR. SCHOENSTEIN:  Objection.

24           THE COURT:  Overruled.

25 A.  That is correct.

1   Q.  It's fair to say that he redrafted what you wrote; correct?

2   A.  Yes, that is correct.

3   Q.  It's fair to say that he editorialized what you wrote;

4   correct?

5           MR. SCHOENSTEIN:  Objection.

6           THE COURT:  Sustained.

7   Q.  It's fair to say that Mr. Antonik wrote the exact opposite

8   of what you wrote in your spreadsheet; right?

9           MR. SCHOENSTEIN:  Objection.

10          THE COURT:  Sustained.

11          MR. KATAEV:  I'd like to go to WW.  I believe it's in

12  evidence.

13          THE COURT:  It may be published.

14  Q.  In November of 2019, there was some issue that you had with

15  Dr. Edelman; correct?

16  A.  Yes, that is correct.

17  Q.  And the purpose of this email was to document that

18  Dr. Edelman was, in your words, unprofessional; correct?

19  A.  Correct.

20  Q.  And this November 2019 complaint is the first entry in your

21  log; correct?

22  A.  That is correct.

23  Q.  You never spoke to Dr. Edelman about this issue, did you?

24  A.  No, I did not.

25          MR. KATAEV:  I'd like to publish Plaintiff's Exhibit 1

1   already in evidence.

2               THE COURT:  You may do so.

3   Q.  Ms. Ruiz, I showed you this November 6th, 2020 email during

4   your deposition in November of 2021; correct?

5   A.  Yes.

6   Q.  If you scroll down in this email, it contains, in sum and

7   substance, the same entries from your log and from

8   Mr. Antonik's email, doesn't it?

9   A.  Yes, that is correct.

10  Q.  Did you not provide this log to Dr. Porges, did you?

11  A.  I spoke to Dr. Porges about it.

12  Q.  You provided this log to Mr. Antonik; correct?

13  A.  That is correct.

14  Q.  In this email, Dr. Porges effectively reviews Dr. Edelman;

15  correct?

16  A.  Dr. Porges reviewed all practitioners.

17  Q.  But isn't it true that he did not perform any similar

18  reviews of other doctors that you ever saw?

19  A.  I would not be aware of that.

20              MR. KATAEV:  137, your Honor.

21              THE COURT:  Is it in evidence?

22              MR. KATAEV:  I'm sorry.  I mean transcript page.

23  Lines 7 through 9.

24              MR. SCHOENSTEIN:  Objection.

25              THE COURT:  I'll allow it.

1   Q.  At your deposition on November 21, I asked the following

2   question and you gave the following answer:

3   "Q.  Have you ever seen Dr. Porges performing a similar review

4   of another doctor at NYU?

5   "A.  No."

6   Q.  That was your testimony at your deposition; correct?

7   A.  Yes, that is correct.

8   Q.  And part of your duties at NYU when you worked there was to

9   deal with patient complaints.  We went over that before; right?

10  A.  Yes, that's correct.

11  Q.  You would therefore know if Dr. Porges was involved in a

12  patient complaint issue; right?

13  A.  Yes, that's correct.

14  Q.  Now, Mr. Antonik was the one who informed you about

15  Dr. Edelman's termination; correct?

16  A.  No, that's incorrect.

17          MR. KATAEV:  Let's go to 97, your Honor.

18          THE COURT:  What do you want to go to?

19          MR. KATAEV:  Page 97 of the transcript.

20  Q.  At your deposition in --

21          THE COURT:  You can ask about it.  Go ahead.

22          MR. KATAEV:  Thank you, your Honor.  Sorry about that.

23  Q.  At your deposition in November of 2021, I asked you the

24  following question and you gave the following answer:

25  "Q.  How did you learn that Dr. Edelman's contract would not be

1   renewed?

2   "A.  I was informed by Joseph Antonik."

3   Q.  Do you see that?

4   A.  Yes, I do.

5   Q.  Does that refresh your recollection?

6   A.  Yes.  I apologize.  Yes.

7   Q.  You gained a little bit of experience in terms of patient

8   care while assisting rheumatologists at NYU; right?

9   A.  Yes, I did.

10  Q.  Fair to say that you learn a few things when you work with

11  doctors; right?

12  A.  Absolutely.

13  Q.  And you knew, in your experience working with those

14  doctors, that it is important to sometimes run a lot of labs;

15  correct?

16  A.  Would not really be my scope of practice.

17          MR. KATAEV:  185, your Honor.  Actually, sorry, 186 --

18  187, lines 20 through 24.

19          THE COURT:  Of page 187?

20          MR. KATAEV:  I apologize, your Honor.  186.  It says

21  187 in the PDF.

22          THE COURT:  Any objection?

23          MR. SCHOENSTEIN:  Yeah, improper.

24          THE COURT:  Sustained.

25  Q.  At your deposition, I showed you a letter, and based on the

1    letter, you understood why it was sometimes important for a

2    doctor to run many tests, didn't you?

3            MR. SCHOENSTEIN:  Objection.

4            THE COURT:  Sustained.

5    Q.  Now, part of your duties, again, is that you scheduled

6    patients; correct?

7    A.  Yes, that's correct.

8    Q.  And throughout your tenure at NYU, you scheduled patients

9    for Dr. Edelman; right?

10   A.  Yes, that's correct.

11   Q.  And you did the same thing with Dr. Porges, Goldberg, and

12   Mehta; right?

13   A.  I did it for all 10 physicians, yes.

14   Q.  And you did this through the end of your employment; right?

15   A.  Yes, that's correct.

16   Q.  There were times when Dr. Porges' patients were scheduled

17   with Dr. Edelman instead; correct?

18   A.  Can you repeat the question, please.

19   Q.  Sometimes a patient of Dr. Porges was scheduled with

20   Dr. Edelman, she would cover that appointment, wouldn't she?

21   A.  Yes.

22   Q.  And the same thing for Dr. Goldberg; right?

23   A.  Yes.

24   Q.  And the same thing for Dr. Mehta; right?

25   A.  Yes.

N7ECede1                          Ruiz – Cross

1    Q.  And, in fact, sometimes Dr. Edelman was asked to conduct a

2    second opinion for a patient, wasn't she?

3    A.  I would not be aware of that.

4    Q.  But, in any event, through the end of your employment in

5    February of '21, you would sometimes schedule with Dr. Edelman

6    a patient of another doctor in suite 306; right?

7    A.  Yes, and vise-versa.

8    Q.  All the way through then; right?

9    A.  Yes.

10           MR. KATAEV:  One second, your Honor.

11           Nothing further, your Honor.

12           THE COURT:  Defense examination.

13   CROSS-EXAMINATION

14   BY MR. SCHOENSTEIN:

15   Q.  Ms. Ruiz, you're not a party to this action; right?

16   A.  No.

17   Q.  Are you here today voluntarily?

18   A.  Yes.

19   Q.  And are you telling this jury the truth?

20   A.  Yes, I am.

21   Q.  To the best of your ability?

22   A.  As to the best of my abilities, yes.

23   Q.  Tell the jury a little bit about your professional

24   background.

25   A.  Sure.

1    Q.  Education and what led you up to NYU.

2    A.  Absolutely.

3        So I originally started with North Shore Hematology

4    Oncology as a file clerk.  I eventually decided that I wanted

5    to go to nursing school.  I worked myself through being a

6    secretary and going to school full-time and at nighttime and

7    working full-time during the day.

8        During my time at North Shore Hematology Oncology, I was

9    then promoted to become an office manager at the time.  Due to

10   unforeseen circumstances with our administrator at the time, he

11   unfortunately passed away very suddenly, so I had to step in

12   and take reins of managing the practice on all aspects,

13   learning about everything pretty much on my own without any

14   mentorship.

15       During my time as an administrator at North Shore

16   Hematology Oncology, NYU and the office decided to partnership.

17   And so, we had the honor of becoming part of NYU's team, which

18   was in June of 2017.  We were all very excited about it because

19   it was a new thing, going from private practice to a bigger

20   world was something that was pretty cool for all of us.  So we

21   really enjoyed the transition, even with the growing pains that

22   we had, but --

23   Q.  I'll ask you another question.

24   A.  Sure.  Sorry.

25   Q.  No, I appreciate it.

1    As of the time you started working with the rheumatology

2    group, what was your position?

3          THE COURT:  Let me ask a question before you answer

4    that.

5          You said you went to nursing school.  Did you become a

6    nurse?

7          THE WITNESS:  I did, and I found that healthcare

8    administration was more of my passion than direct patient care.

9          THE COURT:  Go ahead.

10   Q.  So as of the time you started interacting with the

11   rheumatology group, what was your title and your role?

12   A.  I was the office manager for the ambulatory suite.

13   Q.  And so, on a day-to-day basis, what was your job, what

14   would an office manager do?

15   A.  A little bit of everything.  It was making sure that we

16   handled the day-to-day operations of what happens in an office,

17   scheduling, staff, making sure that providers are running on

18   time, making sure that patients were happy, making sure they

19   were having an overall good experience, troubleshooting, any

20   staffing issues, and then also being compliant with policy and

21   procedure and reporting to leadership.

22   Q.  Now, prior to leaving NYU in February of 2021, were you

23   aware of the existence of this lawsuit?

24   A.  No, I was not.

25   Q.  Were you aware that any kind of HR complaint had been made

1    by Dr. Edelman?

2    A.  No, I was not.

3    Q.  Had anyone ever mentioned that to you at all?

4    A.  No, nobody ever did.

5    Q.  In all your daily interactions with Mr. Antonik, day, after

6    day, after day, did he ever say anything about an HR complaint

7    by Dr. Edelman?

8    A.  No, he was always very professional.

9    Q.  Did he ever engage you in any effort to get Dr. Edelman

10   fired?

11   A.  No, not at all.

12   Q.  Did anybody at NYU do that at any time?

13   A.  No, not at all.

14   Q.  Now, in connection with your role as an office manager, did

15   you interact directly with the plaintiff?

16   A.  Yes.

17   Q.  Did you observe her conduct in the office on a day-to-day

18   basis?

19   A.  Yes.

20   Q.  Did you interact with her on a day-to-day basis?

21   A.  Yes, as much as we could.  Yes, it was a busy practice.  So

22   whatever interactions we had, we did, yes.

23   Q.  Were you in the same suite together?

24   A.  Yes.

25   Q.  Was there more than one restroom in the suite?

1    A.  Yes, there was.

2    Q.  But did you see her in the suite on a daily basis?

3    A.  Yes, for the most part.

4    Q.  Now, you mentioned Dr. Goldberg.  He was in the suite, as

5    well?

6    A.  Yes, when I left.

7    Q.  Did he ever share his office with another physician?

8    A.  Yes.

9           MR. KATAEV:  Objection.  Relevance.

10          THE COURT:  Overruled.

11   Q.  Who did Dr. Goldberg share an office with?

12   A.  On the days that he wasn't there, we would sometimes put, I

13   believe, doctor -- I don't recall at this moment.  I just know

14   that every office was pretty much shared.

15   Q.  And was it Dr. Brancato, does that --

16   A.  Yes, it was Dr. Brancato.  Tuesdays was his day in

17   Huntington.  So yes, I think it was Dr. Brancato.

18   Q.  Dr. Brancato, who was she?

19   A.  She was one of the other rheumatologists on the floor.

20   Q.  Did you ever hear Dr. Goldberg object to Dr. Brancato using

21   his office on days he wasn't there?

22   A.  No.

23          MR. KATAEV:  Objection.  Hearsay.

24          THE COURT:  Overruled.

25   Q.  Do you know Dr. Given?

N7ECede1                      Ruiz - Cross

```
 1    A.  Yes.

 2    Q.  Who is he?

 3    A.  He was another rheumatologist that came on board, as well.

 4    Q.  Did anyone else ever use the office utilized by Dr. Given?

 5    A.  Yes.

 6    Q.  Who was that, if you remember?

 7    A.  Dr. Li.

 8    Q.  Dr. Margaret Li?

 9    A.  Yes, that's correct.

10    Q.  Did you ever hear Dr. Given complain about someone else

11    using his office on days he wasn't there?

12    A.  No.

13            MR. KATAEV:  Objection.  Hearsay.

14            THE COURT:  Overruled.  It's not for the truth.

15    Q.  Were office assignments in suite 306 done by gender?

16    A.  No.

17    Q.  Was gender of the doctors considered the all in determining

18    who would go into what office when?

19            MR. KATAEV:  Objection.  Calls for the state of mind

20    for another person.

21            THE COURT:  Overruled.

22    A.  No.

23    Q.  To the extent you prepared a grid or had anything to do

24    with office assignments, did it matter to you in the least the

25    gender of the doctor?
```

1  A.  No, I just wanted doctors somewhere and patients to be

2  seen.

3  Q.  Do you recall a time where Dr. Edelman was asked to share

4  an office with another physician?

5  A.  Yes.

6  Q.  And did you personally have any observations as to what

7  happened in that regard?

8  A.  Can you rephrase the question, please.

9  Q.  Yeah.  I'll try to ask a better question.  That was pretty

10 bad.

11      What did you know about that yourself, I don't want you

12 telling what you heard from anybody, just what did you know

13 about that?

14 A.  That there was going to be a conversation that was going to

15 be had --

16          MR. KATAEV:  Objection.  Foundation.

17          THE COURT:  The objection is sustained.

18 Q.  Did you observe anything relating to plaintiff being asked

19 to share her office?

20 A.  No.

21 Q.  Did you see anything she did in reaction to that request?

22 A.  No.

23 Q.  Do you know what, if anything, she did with respect to her

24 door?

25 A.  Yes.

N7ECede1                        Ruiz – Cross

1    Q.  What was that?

2    A.  She locked it.

3    Q.  And as to your observation, was that in connection with a

4    request being made for her to share the office?

5    A.  I assume after the request was made.

6              MR. KATAEV:  Objection.

7              THE COURT:  Overruled.  Actually, the objection is

8    sustained.  The testimony is stricken that's based on an

9    assumption.

10             MR. SCHOENSTEIN:  We want to mark, your Honor,

11   Exhibit JJJ.  I don't think this one's been previously

12   introduced, so I will offer it.

13             THE COURT:  Any objection to JJJ?  It's got a double

14   asterisk, what you gave me.

15             MR. KATAEV:  Yes, your Honor.  No objection.

16             THE COURT:  JJJ is received.

17             (Defendants' Exhibit JJJ received in evidence)

18             MR. SCHOENSTEIN:  We're going to publish to the jury,

19   your Honor.

20             THE COURT:  You may do so.

21   Q.  This document is a little clunky, so we're showing you the

22   first page here.  Do you know what this is?

23             MR. KATAEV:  Objection, your Honor.  Sidebar.

24             THE COURT:  No.  Identification of a document that's

25   in evidence?

1          MR. KATAEV:  I'll hold off.

2          THE COURT:  Okay.  Go ahead.

3   A.  I'm not really sure what I'm looking at right now.

4          MR. SCHOENSTEIN:  Scroll down a little more.  Show the

5   witness a little more of this and see if that helps.  And

6   scroll down a little more.  Let's scroll down to D1100.

7   Q.  Do you see that, do you recognize that?

8   A.  Yes.

9   Q.  That's the chart we were looking at before; right?

10  A.  Yes, that's correct.

11  Q.  And this exhibit has some other information, it has some

12  texts and emails.  Does that refresh your recollection as to

13  what the exhibit is in its entirety?

14  A.  Yes.

15  Q.  So tell the jury, what are we looking at overall in this

16  exhibit?

17  A.  In the spreadsheet that I created?

18  Q.  Yeah.

19  A.  Different types of instances that had occurred during the

20  time that I was there.

21  Q.  And to the extent there are emails or texts in this

22  exhibit, do those relate to the spreadsheet?

23  A.  Yes.

24  Q.  And what was the purpose -- did you compile them along with

25  the spreadsheet?

1    A.  Yes.

2    Q.  For what purpose?

3    A.  To keep documentation of things that were either going --

4    that were not, *per se*, going the right way.

5    Q.  And the spreadsheet and the documentation you've compiled,

6    did you do that at anybody's request?

7    A.  Yes.

8              MR. KATAEV:  Objection.  Leading.

9              THE COURT:  Overruled.

10   Q.  Who, if anyone, asked you to do that?

11   A.  Joseph Antonik.

12   Q.  What did he ask you to do?

13   A.  Keep records of anything that happens within the suite.

14   Q.  And when did he ask you to do that?

15   A.  That's always been part of my job.

16   Q.  Did that first happen in 2019?

17   A.  Before 2019 when I first started working for NYU, I kept

18   spreadsheets of all types of complaints.

19   Q.  Let's look at the spreadsheet we have on the screen here.

20   Do you see there's an undated entry at the top?

21   A.  Yes.

22   Q.  Says:  "Dr. Edelman has the tendency of documenting

23   information in a patient's chart, re: inner office issues, she

24   chastises the staff in these messages that become the patient

25   medical records."  Do you see that?

1    A.  Yes.

2    Q.  Do you know the date upon which that concern arose?

3    A.  That was just a consistent problem.

4    Q.  And tell the jury a little more about that.  What was the

5    problem that you memorialized here?

6    A.  So the problem would be because patients had access to

7    portal, they had the ability to message anything at any given

8    time, and a lot of the times, Dr. Edelman would fault the staff

9    for something not being done instead of bringing it to an

10   escalation of my awareness and then allowing us to address it.

11   It would never be that there was an issue going on or try to

12   pacify the situation, it's would always be a targeted instance

13   where she would blame sort of somebody else for whatever the

14   patient was complaining about.

15             MR. KATAEV:  Objection.  Narrative.

16             THE COURT:  Overruled.

17   Q.  Did you put in this chart every single instance of

18   something like that happening?

19   A.  To the best of my abilities.

20   Q.  Let's look at the entry on 9/9/2020.  Do you see that?

21   A.  Yes.

22   Q.  It says:  "Dr. Edelman notified me via text at 11:25 that

23   she was running an hour and a half behind.  She requested her

24   last hour patients from 12:00 to be rescheduled or moved down

25   to 2:00 p.m."  Do you recall that?

1    A.  Yes.

2    Q.  And that's a note of an interaction you had with the

3    plaintiff?

4    A.  Yes, that's correct.

5    Q.  I want to go down to the 9/16 entry because I think counsel

6    asked you about this one.  You see at the end it says:

7    "Patient did not want to switch physician"?

8    A.  Yes.

9    Q.  And then the next entry, there's an undated entry in the

10   next row.  Do you see that?

11   A.  Yes.

12   Q.  And did that relate to the same patient?

13           MR. KATAEV:  Objection.  Leading.

14           THE COURT:  Overruled.

15           Do you know whether that related to the same patient?

16   A.  I don't know if that was the same patient or not.  I would

17   assume so, but I can't say at 100 percent.  I did put in

18   parentheses "see tab 9/16" so I would make a reference that

19   maybe it was regards to the comment that I made prior to that.

20           MR. SCHOENSTEIN:  Let's turn to page D1103.

21   Q.  In this exhibit you compiled is an email that you wrote on

22   or about November 13th, 2019.  Do you see that?

23   A.  Yes, I do.

24   Q.  Do you recall the event that this refers to?

25   A.  Yes.

1   Q.  Can you describe for the jury what you remember about that.

2   A.  Dr. Edelman wanted to discuss her hours that she was

3   supporting Marcus Avenue.  She was originally seeing patients

4   in a different location on Thursdays, and she wanted to move

5   those patients over to the Marcus Avenue schedule for

6   Thursdays, and if I recall correctly, Fridays, as well.  When I

7   asked her about what time she wanted to start or what time --

8   because her hours in Huntington were very different from Marcus

9   by almost an hour.  I had asked her at that time, like, what

10  time did she want to start here at Marcus, did she want to

11  start at her normal 8:45 appointments whereas, at Huntington,

12  she was starting, I believe, between 8:00 and 8:15.  She

13  replied to me that she was going to honor whatever it is that

14  the patients were scheduled for.  I asked her just in case if

15  there was a specific preference, just because we wanted to make

16  sure we didn't have to remove and schedule patients again since

17  we were moving them from one location to another, she said to

18  me that she wasn't going to give me set hours because she

19  didn't want people putting everybody in at different hours when

20  other patients, who were already scheduled, had that priority,

21  which I completely understood, but I had the ability to hold

22  the schedule so that I can manually put patients in to

23  accommodate the patient's needs, which is why most of the

24  issues with patients' appointments always got escalated to me.

25  She was very abrupt and loud when she was asked further

1   questions.  She almost wanted me to understand where she was

2   coming from, but I really didn't, and all I really wanted was

3   clarity so that I didn't have to re-work the schedule again.

4   Q.  And what happened at the end of the conversation?

5   A.  I simply said "okay" because I didn't really know what else

6   to do or how else to move from there.  I just stormed out of

7   the office and I felt very uncomfortable with the way she had

8   spoken to me because at no given point was I unprofessional or

9   loud or snooty with her or snarky, and that's how she came off

10  to me for no reason.

11  Q.  You wrote in No. 6 here:  "She replied in a very loud,

12  demeaning tone, 'you are not understanding me.  I want the

13  patients to just be moved over.'"  Do you recall that?

14  A.  Yes, I do.

15  Q.  Did that, in fact, happen?

16  A.  Yes.

17  Q.  And then you wrote at the bottom:  "I find this to be very

18  unprofessional, inappropriate, and demeaning.  I am here to

19  fully support Dr. Edelman, but not under these circumstances."

20  Do you see that?

21  A.  Yes, I do.

22  Q.  Do you stand by what you wrote there?

23  A.  Absolutely.

24         MR. SCHOENSTEIN:  Let's turn to page D1105 in the same

25  exhibit.

1    Q.  Now here's an email exchange from August of 2020.  This is

2    between you and Dr. Edelman; right?

3    A.  Yes.

4    Q.  And what was the purpose of your email to her?

5    A.  So this was actually not an email.  The original was an

6    email that was sent to her on 8/27, but Dr. Edelman never

7    really read her emails, and so I always took it an extra step

8    to try to inform her of important things that were happening or

9    needed to be done through the Epic system.  So this message

10   actually is in the Epic system that I used to remind her that

11   her compliance training was due and it hadn't been completed.

12   Q.  And what compliance training was that?

13   A.  It was a mandatory compliance training that all NYU

14   employees had to complete.

15   Q.  And she wrote back:  "I am aware and appreciate the

16   reminder and, of course, threat of my loss of privileges."  Do

17   you see that?

18   A.  Yes, I do.

19   Q.  Were you threatening Dr. Edelman when you wrote that?

20   A.  No.  I think the email was pretty professional.

21   Q.  You mentioned in your testimony she never read her emails.

22   What did you mean by that?

23   A.  Anything that was sent out to the providers or important

24   information of things that they needed to do was always sent

25   via email.  It was the best form of communication through the

1    entire system.  Plenty of times, there was stuff that was done,

2    and she had basically told me at one point during my time there

3    that she doesn't read all her emails and so I don't -- I didn't

4    want her to miss anything that was super important, so I would

5    sometimes either print them up and leave them in her inbox or

6    send them through Epic message to make sure that she was

7    getting the information she needed.

8    Q.  Could you just explain briefly the difference between the

9    email system and the Epic system, because you've mentioned both

10   and I want the jury to understand.

11   A.  Sure.  So email is basically used through Microsoft

12   Outlook, the system we use all the time.  Then Epic, we had

13   internal messaging.  It was really supposed to be related to

14   patient use because you would attach messages that were coming

15   to the patient and directly send them to the providers' inbox.

16   Q.  Did Dr. Edelman communicate with you through both systems?

17   A.  Generally never through email, it was always through the

18   Epic system.

19   Q.  And was that an appropriate place for the communications?

20   A.  No, not necessarily, but I was happy I was getting

21   communication.

22            MR. SCHOENSTEIN:  Let's turn to page 1108.

23   Q.  Now here's an email from you on September 1st, 2020 where

24   you're talking about workflow.  Do you recall this?

25   A.  Yes, I do.

```
 1   Q.  And what was the purpose of you sending that email, if you
 2   remember?
 3   A.  Dr. Edelman had came to me to complain that she was not
 4   receiving certain Epic messages from patients in the Epic
 5   system.  And so, in response to that, we started to do an
 6   investigation to try to troubleshoot the issue.
 7              MR. SCHOENSTEIN:  Now scroll up, please, to
 8   Dr. Edelman's response.
 9   Q.  Do you see this email she sent to you?
10   A.  Yes.
11   Q.  She says:  "FYI, I have been giving you patient MR now for
12   months to rectify this.  I feel like someone trying
13   deliberately set me up for major patient care error.  I am
14   ready.  Call HR, as well, to protect myself if someone trying
15   to harass me.  Serious concern and seems not addressing actual
16   issue."  Do you see that?
17   A.  Yes, I do.
18   Q.  Were you trying to set up Dr. Edelman?
19   A.  No, not at all.
20   Q.  Were you trying to harass her?
21   A.  No, not at all.
22   Q.  What did you think, if anything, about her response to you?
23   A.  I thought it was a little excessive, but that was nothing
24   new for me.
25   Q.  Did the issue regarding Epic --
```

1          MR. KATAEV:  Move to strike as to the last comment.

2          THE COURT:  Overruled.

3   Q.  Did the issue involving receipt of messages in the Epic

4   system get worked out, if you know?

5   A.  Yes.

6   Q.  What happened in that regard?

7   A.  The issue was that her medical assistant, inadvertently,

8   was done-ing the messages because both parties were being cc'd

9   on the Epic message and didn't realize that when one person was

10  completing the message, it would erase from the other person's

11  inbox.

12         MR. SCHOENSTEIN:  I'd like to mark -- is exhibit YY in

13  evidence?

14         MS. CARDONA:  YY is in evidence, yes.

15         MR. SCHOENSTEIN:  I'd like to publish YY to the jury.

16         THE COURT:  You may do so.

17  Q.  Exhibit YY is a message you wrote to Mr. Antonik and Nicole

18  Lucca on March 11th, 2020; is that correct?

19  A.  Yes.

20  Q.  Who is Nicole Lucca, to remind the jury.

21  A.  She was the assistant site director at the time that I was

22  at NYU.

23  Q.  Did she work with Mr. Antonik?

24  A.  Yes.

25  Q.  And why did you write this email?

N7ECede1                              Ruiz - Cross

A.   There was an incident that had happened with Dr. Edelman's

medical assistant.

Q.   And can you describe for us the incident as best you recall

it?

         MR. KATAEV:  Objection.  Best evidence.

         THE COURT:  Overruled.

A.   The incident happened where Tiffany had walked into my

office very upset because Dr. Edelman had made a statement to

Tiffany, which she felt very offended by.

     The policy at the time, because we were in the height of

COVID, was to not keep any of the sanitary wipes out on the

counters because we were very scarce with supplies to still

have patients come in and treat them and do what we needed to

do for them, so the protocol was to keep the sani wipes in the

cabinet so patients wouldn't steal them because we were finding

that patients started stealing supplies because everybody was

in the same predicament.

     Apparently, the protocol was to wipe down every single room

after every single patient to make sure that we would avoid as

much contact as possible, spread of anything because we didn't

know much about anything at that point still.

     Dr. Edelman, from what Tiffany had recalled or told me, was

that Dr. Edelman came into the room and asked Tiffany where the

wipes were.  Tiffany said to Dr. Edelman that the wipes were in

the cabinet --

1          THE COURT:  So, this is hearsay and I'm going to

2    sustain the objection.

3          MR. SCHOENSTEIN:  Okay.

4    Q.  The email that you wrote, that's exhibit YY and has been

5    admitted into evidence, you wrote that in the regular course of

6    your work as an operations manager?

7    A.  Yes, that's correct.

8    Q.  And you provided that to record the incident; right?

9    A.  Yes, that's correct.

10   Q.  By the way, this March 20 email, that's not reflected, is

11   it, in the chart that we were looking at before?

12   A.  No.

13   Q.  Is there any particular reason you didn't put that in your

14   chart?

15   A.  Not that I recall of, just -- but this is why I always sent

16   emails of incidents that happened because, again, it was a very

17   busy practice, managed a lot of providers, a lot of things

18   happened, so I did my best to try to email what ever I could as

19   much as I could.

20         MR. SCHOENSTEIN:  Thank you.  We're going to offer

21   exhibit BBB.

22         THE COURT:  Any objection?  It's got a double

23   asterisk.

24         MR. KATAEV:  No objection.

25         THE COURT:  BBB is received and may be published to

N7ECede1                          Ruiz - Cross

 1   the jury.

 2              (Defendants' Exhibit BBB received in evidence)

 3              MR. SCHOENSTEIN:  Thank you, your Honor.  I guess I

 4   should do that before I ask a question.

 5   Q.  This is an email exchange you had with Dr. Edelman in

 6   August of 2020?

 7   A.  Yes.

 8   Q.  Were you familiar with Tiffany?

 9   A.  Yes.

10   Q.  Did you work with her every day?

11   A.  Yes, I managed her.

12   Q.  And as her manager, did you have an assessment of her

13   working capabilities?

14   A.  Yes.

15   Q.  What was that?

16              MR. KATAEV:  Objection.  Relevance.

17              THE COURT:  Overruled.

18   A.  There were -- she was a competent MA.

19   Q.  Now, do you see, in the second paragraph, Dr. Edelman's

20   email where she says "she," that refers to Tiffany; right?

21   A.  Yes.

22   Q.  "Is falling behind as she is not getting up to look to see

23   when I am done and getting caught up to her desk other things.

24   All of her workflows have changed.  I do not have same support

25   used to from nursing either and means I need afternoons to do

1    work usually completed by other team members."

2        Do you recall Dr. Edelman making that complaint to you?

3    A.  Yes, I do.

4    Q.  And then on the penultimate paragraph in that email,

5    begins:  "Basically, she needs to be invested in triaging

6    patients for first half of day and only on that and labs.  All

7    afternoon she can catch up on messaging and faxes."

8        Do you see that?

9    A.  Yes.

10   Q.  Do you recall Dr. Edelman raising those concerns with you?

11   A.  Yes.

12   Q.  And do you know what became of this, do you remember?

13   A.  I don't remember, to be honest.

14   Q.  As an office manager, you were privy to complaints raised

15   by patients on a day-to-day basis?

16   A.  Yes.

17   Q.  And did those more often get communicated orally or in

18   writing?

19            MR. KATAEV:  Objection.

20            THE COURT:  Overruled.

21   A.  Both.

22   Q.  Was one more frequent than the other?

23   A.  I would say they're about the same.

24   Q.  Would you be able to assess the volume of complaints you

25   heard about Dr. Edelman compared to other doctors in the suite?

1              MR. KATAEV:  Objection.  Best evidence.

2              THE COURT:  Overruled.

3              MR. KATAEV:  And hearsay.

4              THE COURT:  Overruled.  It's not coming in for the

5      truth of the underlying complaint, but just for the fact that

6      there were complaints.  Go ahead.

7      A.  Can you repeat the question, please.

8      Q.  Sure.  Are you able to assess the volume of complaints you

9      heard about from patients of Dr. Edelman compared to the

10     general volume of other doctors?

11     A.  Yes.

12     Q.  And what is that, how do you assess that?

13     A.  There was a lot more complaints that came from

14     Dr. Edelman's patients compared to the other providers in the

15     practice.

16     Q.  And you've worked with loads of doctors in the course of

17     your career; is that correct?

18     A.  Yes, that's correct.

19     Q.  Some are easy to get along, some are not so easy, some are

20     really rough?

21     A.  Some can be challenging.

22     Q.  Are you able to rank Dr. Edelman on a scale like that from

23     your personal experience?

24              MR. KATAEV:  Objection.

25              THE COURT:  Basis.

1          MR. KATAEV:  Foundation.  Opinion testimony.

2          THE COURT:  Overruled.

3    A.  Can you repeat the question.

4    Q.  Where does Dr. Edelman fall on the scale of easy to get

5    along with for doctors?

6    A.  I don't necessarily have a personal scale, but she was one

7    of my challenging providers.

8    Q.  Do you recall David Kaplan coming to meet with plaintiff at

9    some point?

10   A.  Yes, I do.

11   Q.  Were you involved in any way in arranging for that meeting?

12   A.  Just making sure that the doctor was available to see

13   David.

14   Q.  So tell us what you remember about how that happened.

15   A.  David asked to have a few moments with Dr. Edelman and what

16   was the best time to do so.  I would always ask the providers,

17   when a meeting request was asked of David Kaplan, to see when

18   it would be best for the providers to meet with him.  I did ask

19   her, Dr. Edelman specified -- I do remember it was a Wednesday.

20   I asked Dr. Edelman, Dr. Edelman gave me a specific time, I

21   don't remember the exact time it was.  I informed Mr. Kaplan.

22   Mr. Kaplan came to the suite and was waiting for Dr. Edelman

23   after some time, maybe five or ten minutes.  Dr. Edelman was in

24   a room with a patient at the time.  I did go knock on the door

25   to ask her how much longer it would be or was there a better

1    time and she replied, "I am with patients, can he please come

2    back at a different time later that evening."  And that was

3    probably around 7:00 p.m., if I'm not mistaken, because it was

4    usually a late night on a Wednesday.

5    Q.  And then what happened, did the meeting go forward, do you

6    remember?

7    A.  Yes, David did leave the suite.  He said, "I'll come back."

8    He did come back to the suite and then waited again.  And then,

9    eventually, they went to her office.

10   Q.  You mentioned that Wednesdays were a late night for

11   Dr. Edelman?

12   A.  Yes.

13   Q.  Did that create any issues that affected you?

14   A.  Yes.  I, for the most part, was always there --

15            MR. KATAEV:  Objection, relevance.

16            THE COURT:  Overruled.  I assume it's going to lead

17   somewhere.

18            MR. SCHOENSTEIN:  Yes, your Honor, I believe so.

19            THE COURT:  Go ahead.

20   A.  Yes, Wednesdays were our late evening days and we would

21   leave the office anywhere between 8:00 and 8:30 at night.

22   Q.  And did you express to Dr. Edelman any concerns about the

23   timing of those evenings?

24   A.  No, it was just kind of what it was.  The staff and I, we

25   all just sort of adjusted to it.

N7ECede1                          Ruiz – Cross

1              MR. SCHOENSTEIN:  Your Honor, I'm approaching the end.

2     Suggest maybe our midmorning break right now, I can come back

3     and finish up probably more quickly.

4              THE COURT:  It's 11:30, so we'll take a 15-minute

5     break now and then we'll come back for the rest of the day.

6              Don't talk about the case amongst yourselves, don't do

7     any research, and enjoy your break.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  See you all back here in 15 minutes.

3           Ms. Ruiz, you can step down, but make sure you're back

4    here in about 10 minutes.

5           (Recess)

6           Let's have Ms. Ruiz retake the witness stand.

7           Let's bring in the jury.

8           Ms. Ruiz, you're reminded you're still under oath.

9           THE WITNESS:  Yes, thank you.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Counsel, you may inquire.

3   BY MR. SCHOENSTEIN:

4   Q.  Ms. Ruiz, you know that log we looked at, you looked at

5   with opposing counsel and then we looked at the log of

6   complaints?

7   A.  Yes.

8   Q.  I just want to make sure I'm clear on this.  What, if any,

9   logs like that did you keep related to other doctors?

10          MR. KATAEV:  Objection.  Cumulative.

11          THE COURT:  Overruled.

12  A.  Similar logs.  So again, patient complaints, workflow

13  issues, anything that, for example, if the doctor didn't

14  complete something that needed to be completed, just keeping

15  track of things so that way I had a recollection of what was

16  going on.

17  Q.  Were there logs in the same format for other doctors in the

18  suite that you kept?

19  A.  Yes.

20          MR. KATAEV:  Objection.  Best evidence.

21          THE COURT:  Overruled.

22  Q.  The instruction for Mr. Antonik, you mentioned Mr. Antonik

23  told you to keep logs.  Do you recall that?

24  A.  I started keeping logs just as a manager because it was the

25  best way to keep track of things.

N7ECede1                         Ruiz - Cross

1    Q.  Did he give you any instruction in terms of keeping track?

2    A.  No, not in that instance, no.

3    Q.  Let me ask you, since we mentioned Mr. Antonik, did you

4    work with him on a day-to-day basis?

5    A.  Yes.

6    Q.  And how was he to get along with?

7    A.  Great.

8    Q.  Did he ever do anything you found unprofessional,

9    inappropriate, or demeaning?

10          MR. KATAEV:  Objection.  Relevance.

11          THE COURT:  Overruled.

12   A.  Never.

13   Q.  Did he ever raise his voice at you in a conversation?

14          MR. KATAEV:  Same objection.

15          THE COURT:  Overruled.

16   A.  Never.

17   Q.  Did he ever wave his arms wildly and mutter a curse word

18   under his breath?

19          MR. KATAEV:  Objection.

20          THE COURT:  Overruled.

21   A.  No, Joe was very professional all the time.

22          MR. KATAEV:  Move to strike.

23          THE COURT:  Overruled.

24          MR. SCHOENSTEIN:  Thank you for coming today,

25   Ms. Ruiz.

1              THE COURT:  Further examination.

2    REDIRECT EXAMINATION

3    BY MR. KATAEV:

4    Q.  You testified just now with Mr. Schoenstein that you had

5    certain incidents with Dr. Edelman; correct?

6    A.  Can you please rephrase the question.

7    Q.  You testified about some incidents that occurred with

8    Dr. Edelman; correct?

9    A.  Yes.

10   Q.  You had incidents with other doctors, didn't you?

11   A.  Yes.

12   Q.  It's fair to say that sometimes working with doctors can be

13   challenging; right?

14   A.  Yes.

15   Q.  You also testified about sharing office space.  Do you

16   remember that?

17   A.  Yes.

18   Q.  You're not privy to what NYU agreed to with any physicians;

19   correct?

20   A.  Correct.

21   Q.  You have never seen any contract that NYU had with a

22   physician; right?

23   A.  Correct.

24   Q.  So you would not be aware as to any negotiations that went

25   on between a doctor and NYU; correct?

1  A.  Correct.

2  Q.  And you don't know about negotiations that Dr. Edelman had

3  with NYU; correct?

4  A.  Correct.

5  Q.  On any terms; right?

6  A.  Correct.

7  Q.  You testified that you were not aware of Dr. Edelman's

8  September 2019 complaint at the time you were working at NYU;

9  correct?

10  A.  Yes, that's correct.

11  Q.  But you did become aware of this complaint at your

12  deposition on November of 2021; right?

13  A.  Yes, that's correct.

14  Q.  I showed it to you, yes?

15  A.  Yes, you did.

16  Q.  And you saw that the complaint occurred in September of

17  2019 at the deposition; right?

18  A.  Yes.

19  Q.  And every single incident and complaint that you've

20  discussed in your testimony with Mr. Schoenstein occurred after

21  that complaint; correct?

22  A.  Correct.

23  Q.  It's fair to say that the log you created took some effort

24  to prepare; right?

25  A.  Yes.

```
1    Q.  You had to write everything down in the log; right?

2    A.  Yes, correct.

3    Q.  And then you had to also substantiate what you wrote in the

4    log with some sort of evidence; right?

5    A.  Correct.

6    Q.  You took screenshots on your phone, for example?

7    A.  Correct.

8    Q.  And you took images of what's on the computer with what was

9    written to support what you wrote in the log; right?

10   A.  Yes, I printed them directly from the system itself.

11   Q.  You testified about the incident in which Dr. Edelman, in

12   your words, got loud with you; right?

13   A.  Yes, that's correct.

14   Q.  Other doctors in suite 306 also got loud with you, didn't

15   they?

16   A.  Yes.

17            MR. KATAEV:  I'd like to offer GGG.  I don't believe

18   it's been admitted.

19            THE COURT:  Any objection?

20            MR. SCHOENSTEIN:  No.

21            THE COURT:  GGG is received and may be published to

22   the jury.

23            (Defendants' Exhibit GGG received in evidence)

24   Q.  In your testimony with Mr. Schoenstein, you were shown an

25   email from Dr. Edelman dated September 1st, 2020, about IT
```

1    issues; right?

2    A.  Yes.

3    Q.  And in that email, Dr. Edelman told you she's been reaching

4    out about this issue for months; right?

5    A.  Yes.

6            MR. STEER:  Your Honor, we don't see the screens on.

7            MS. CARDONA:  Neither does the witness.

8            MR. KATAEV:  Permission to publish it.

9            THE COURT:  Yes.

10   Q.  In this email, it shows what's referred to as an IT ticket;

11   right?

12   A.  That's correct.

13   Q.  And it says that this issue that Dr. Edelman had has been

14   resolved; correct?

15           MR. SCHOENSTEIN:  Objection.  Foundation.

16           THE COURT:  Overruled.  The document is in evidence.

17   A.  Yes, that's correct.

18   Q.  And the date that it was resolved was October 16th, 2020;

19   right?

20   A.  That's correct.

21   Q.  It's fair to say that if patients are reaching out to

22   Dr. Edelman and she is not seeing those messages, that's a

23   concern for NYU; right?

24   A.  That is correct.

25   Q.  And it's also a concern for Dr. Edelman, of course; right?

1    A.   That's correct.

2    Q.   It did, in fact, take months to resolve this issue, didn't

3    it?

4    A.   I don't recall the amount of time it took, but yes, it took

5    some investigating.

6    Q.   And you saw the email where there's a discussion about the

7    threat, that Dr. Edelman doesn't appreciate the threat; right?

8    A.   Yes.

9    Q.   And in that email, you did say that if you don't perform X,

10   Y, Z tasks, you'll lose your privileges; right?

11   A.   That was email generated by Mr. Antonik.  I just simply

12   forward the message.

13   Q.   The loss of privileges by a doctor is a very serious thing;

14   right?

15   A.   Absolutely.

16   Q.   A doctor could not work at NYU if they lost their

17   privileges; right?

18   A.   That is correct.

19   Q.   And similarly, all of these IT issues that were discussed

20   occurred after Dr. Edelman's September 2019 complaint; correct?

21   A.   I'm sorry.  Can you repeat the question.

22   Q.   The IT issues that we just discussed in September of '20

23   and October 16th of '20?

24   A.   Yes.

25   Q.   They occurred after the September '19 complaint; correct?

1   A.   Yes.

2   Q.   Dr. Edelman had been working at NYU for years at this

3   point; right?

4   A.   Yes.

5   Q.   She was working for years before you even started in June

6   of '17; right?

7   A.   That was my understanding, yes.

8   Q.   And you have no knowledge about any such IT issues before;

9   right?

10   A.   No, I do not.

11   Q.   You had some testimony about done-ing.  Do you recall that?

12   A.   Yes.

13   Q.   Done-ing is a reference to the action of clicking "done" on

14   a message; right?

15   A.   Yes, that's correct.

16   Q.   When you click "done" on a message, it goes away; right?

17   A.   Yes, that's how the system was set up.

18   Q.   It was determined that Dr. Edelman's medical assistant was

19   clicking "done" and that's why she couldn't see the messages;

20   right?

21   A.   That's correct.

22   Q.   You testified about certain patient complaints during your

23   testimony with Mr. Schoenstein; right?

24   A.   That's correct.

25   Q.   But the items that you testified were not in your log, were

1    they?

2    A.   No.

3    Q.   And you testified at your deposition that if you didn't

4    write it down, there was no complaint; correct?

5    A.   Correct.

6    Q.   With reference to Dr. Edelman's meeting with Mr. Kaplan on

7    September 25th of '19, you recall that testimony with

8    Mr. Schoenstein?

9    A.   Yes.

10   Q.   When Mr. Kaplan returned later in the evening, it was on a

11   Wednesday; right?

12   A.   Yes, that's correct.

13   Q.   And that was Dr. Edelman's late day; right?

14   A.   Yes, that's correct.

15   Q.   And when Mr. Kaplan returned, Dr. Edelman was still with

16   the patient, wasn't she?

17   A.   Yes, she was.

18   Q.   And you came to Dr. Edelman to tell her that Mr. Kaplan

19   wished to speak to her while Dr. Edelman was with a patient;

20   correct?

21   A.   That is correct.

22   Q.   And you effectively interrupted her; right?

23   A.   Yes.  Of course.  Yes.

24   Q.   Dr. Edelman's not the only doctor that has late days;

25   correct?

1   A.  Correct.

2   Q.  For example, Dr. Porges has a late day on Thursday, doesn't

3   he?

4   A.  That is correct.

5   Q.  And if you're working that Thursday, you would have to stay

6   late for him, too; right?

7   A.  That's correct.

8   Q.  And the same with Dr. Goldberg; correct?

9   A.  That's correct.

10          MR. KATAEV:  I have nothing further.

11          THE COURT:  Anything further, Mr. Schoenstein?

12          MR. SCHOENSTEIN:  No, your Honor.

13          THE COURT:  Ms. Ruiz, thank you for coming.  You're

14  excused as a witness.

15          (Witness excused)

16          Plaintiff will call their next witness.

17          MR. KATAEV:  Plaintiff calls defendant Andrew Rubin,

18  your Honor.

19          THE COURT:  Mr. Rubin, please step into the witness

20  box.  Remain standing as my deputy administers the oath.

21   ANDREW RUBIN,

22       called as a witness by the Plaintiff,

23       having been duly sworn, testified as follows:

24          THE DEPUTY CLERK:  Please state your full name for the

25  record and please spell out your first and last name.

1          THE WITNESS:  My name is Andrew Todd Rubin,

2     A-n-d-r-e-w R-u-b-i-n.

3          THE COURT:  Mr. Rubin, as you're questioned, please

4     keep your mouth to the microphone and speak loudly just as you

5     did a moment ago.

6          Counsel, you may inquire.

7     DIRECT EXAMINATION

8     BY MR. KATAEV:

9     Q.  Good afternoon, Mr. Rubin.

10    A.  Good afternoon.

11    Q.  You've been working at NYU since January of 2000; correct?

12    A.  Correct.

13    Q.  You are 23 years now at NYU; right?

14    A.  I am.

15    Q.  You're the senior vice president of clinical affairs and

16    ambulatory care; correct?

17    A.  I am.

18    Q.  You started off as the chief operating officer, didn't you?

19    A.  I did.

20    Q.  And you've worked your way up through various titles to

21    your position now; right?

22    A.  Sort of.

23    Q.  And you oversee the faculty group practice at NYU; correct?

24    A.  No.  I run the operations of the medical group.

25    Q.  And that medical group consists of over 8,000 employees,

N7ECede1                         Rubin - Direct

1   including doctors; right?

2   A.  About 10,000.

3   Q.  And you also have 3500 physicians under your supervision;

4   correct?

5   A.  About that, right, yeah.

6   Q.  Now, NYU is a very large institution, isn't it?

7   A.  It is.

8   Q.  And NYU's most recent revenue is over $6 billion; correct?

9           MR. SCHOENSTEIN:  Objection.  Relevance.

10          THE COURT:  Overruled.

11  Q.  Is that right?

12  A.  I couldn't speak to the revenue of the health system, I can

13  only speak to the revenue of my division.

14  Q.  The revenue in your division is in the billions of dollars,

15  isn't it?

16  A.  It is.

17  Q.  The last operating profit was $457 million, wasn't it?

18  A.  I don't know the answer to that question.

19  Q.  And your division has an operating profit in the millions;

20  correct?

21  A.  My division does not have an operating profit.

22  Q.  Now, the faculty group practice is a division of NYU School

23  of Medicine, isn't it?

24  A.  It is.

25  Q.  It employs physicians for the purpose of delivering care to

N7ECede1                          Rubin - Direct

1    patients outside a hospital setting; right?

2    A.  Outside and inside.

3    Q.  And you deal with the physician group of the NYU Langone

4    Health system; right?

5    A.  I deal with all the physicians, yes.

6    Q.  But there are other divisions within the NYU School of

7    Medicine; correct?

8    A.  I don't follow the question.  I'm sorry.

9    Q.  The faculty group practice is a division of NYU's School of

10   Medicine; right?

11   A.  Correct.

12   Q.  There are other divisions, aren't there?

13   A.  There are other elements of the School of Medicine, yes.

14   Q.  What elements are those?

15   A.  There are research divisions, there are academic groups.

16   Q.  That's it?

17   A.  I really -- I really couldn't know.  I don't exactly know

18   what you're asking.

19   Q.  Mr. Swirnow reports to you; correct?

20   A.  He does.

21   Q.  And you were here and present when Mr. Swirnow was

22   testifying?

23   A.  Absolutely, yes.

24   Q.  And your duties at NYU include running the physician and

25   group operations; right?

1    A.  Yes.

2    Q.  You deal with hiring and firing physicians; right?

3    A.  I do.

4    Q.  Revenue cycle, which is billing and collections?

5    A.  I do.

6    Q.  And you generally run the whole group; right?

7    A.  Correct.

8    Q.  Anything that has to do with physicians is within your

9    purview; right?

10   A.  Mine and others.

11   Q.  And you've had these same duties the entire time that

12   you've worked at NYU; correct?

13   A.  For the most part.

14   Q.  And it's fair to say that you know Dr. Edelman; right?

15   A.  I know her more now, yes.

16   Q.  You met her first in 2014 for the purpose of hiring her;

17   correct?

18   A.  Correct.

19   Q.  Speaking to your duties and as it relates to physicians,

20   your duties concern the physicians' performance and all their

21   work as it relates to their employment; right?

22   A.  I have many, many, many duties, but that would be certainly

23   one of them.

24   Q.  You're aware, as a senior vice president, of NYU's policies

25   concerning discrimination and harassment and retaliation;

1  right?

2  A.  Unequivocally, yes.

3  Q.  You take annual trainings for it; right?

4  A.  Without a doubt.

5  Q.  And you have to pay attention to those because you have to

6  watch an entire segment in order to advance to the next one;

7  right?

8  A.  We have lots of compliance trainings and, all of them, you

9  have to sit through all of them.

10  Q.  And you do sit through those; right?

11  A.  You have to.  You can't advance them.  You can't even take

12  a break.

13  Q.  You would agree with me, generally speaking, if any sort of

14  discrimination or retaliation was going on, it would be a

15  problem, wouldn't it?

16  A.  Absolutely.

17  Q.  But it's fair to say that you don't know exactly how these

18  NYU policies are enforced; correct?

19  A.  I don't understand the question.

20  Q.  In terms of NYU's discrimination, harassment, or

21  retaliation policies, you're not generally aware of how NYU

22  enforces those policies; correct?

23  A.  Not correct, but I'm not sure I understand the question

24  either.

25  Q.  It's fair to say that the employee and labor relations

1    department and human resources enforce those kind of policies;

2    right?

3    A.   No, I don't think I would say that.

4    Q.   Generally speaking, if an employee violated these policies,

5    you would imagine that they would suffer some sort of

6    disciplinary action; correct?

7    A.   Yes, and I would know about it.

8    Q.   These complaints come to your attention from time to time;

9    correct?

10   A.   They all come to my attention.

11   Q.   And you handle those kind of complaints; right?

12   A.   I don't understand what "handle" means in this case.

13   Q.   You review the complaint and you take a role in

14   investigating and determining whether it has merit; right?

15   A.   I do not investigate the complaint.  I'm informed of the

16   complaint.

17   Q.   Moving on to administrative titles.  You decide whether to

18   appoint a doctor with an administrative title; right?

19   A.   I am involved with others in deciding if someone should

20   have an administrative role.

21   Q.   And you decide whether a doctor should be given such a

22   title based on what you refer to as "administrative ability."

23   Right?

24   A.   Ask me that again.

25   Q.   You decide whether a doctor should receive an

1   administrative title based on their administrative ability;

2   right?

3   A.  Same answer.  I, with others, make that decision.

4   Q.  Do you recall conducting your deposition in October of

5   2021?

6   A.  I do.

7   Q.  And you said that you decide this based on your pretty good

8   instincts; right?

9   A.  Amongst other things.

10  Q.  You didn't mention anything else when I asked you that at

11  your deposition; correct?

12  A.  I don't recall.

13              MR. KATAEV:  87, your Honor.

14              THE COURT:  I would look at 87 if you give me the

15  transcript.

16              MR. KATAEV:  We did, your Honor.  We prepared in

17  advance, but we didn't tell you.

18              THE COURT:  I do have it.  Okay.  Page 87.

19              MR. KATAEV:  Lines 2 to 4.

20              MR. SCHOENSTEIN:  Objection.  Improper.

21              THE COURT:  Objection sustained.

22  Q.  Now, you're aware prior to meeting Dr. Edelman in 2014,

23  that she had her own practice that she managed; correct?

24  A.  I was, yes.

25  Q.  And it's fair to say, isn't it, that managing one's own

1   practice is indicative of someone who has administrative

2   ability?

3   A.  Absolutely not.

4   Q.  You never offered Dr. Edelman any such position in an

5   administrative role, did you?

6   A.  Not that I'm aware of.

7   Q.  When you met with Dr. Edelman in 2014, you did have an

8   interest in having her join NYU; right?

9   A.  We did.

10   Q.  And she came to you based upon the recommendation of

11   Dr. Goldberg, didn't she?

12   A.  I don't recall.

13   Q.  You determined that the volume of Dr. Edelman's practice

14   warranted NYU hiring her; correct?

15   A.  Ask me the question again.  I'm sorry.

16   Q.  You determined, after reviewing data that Dr. Edelman

17   provided you in connection with her coming over to NYU, that

18   the volume of her practice warranted NYU hiring her; correct?

19   A.  I reviewed the business plan in the context of what we were

20   doing in Long Island and decided to proceed with making an

21   offer.

22   Q.  And part of what you reviewed dealt with the volume of her

23   practice; right?

24   A.  Amongst many factors.

25   Q.  And you made the determination that it is warranted for NYU

1    to hire her in spite of her lease and loan obligations that she

2    had; correct?

3    A.   Not correct.

4    Q.   The lease and loan obligations that Dr. Edelman had did not

5    pose an obstacle to NYU hiring her; correct?

6    A.   It was part of the discussion and negotiation.

7    Q.   And you nonetheless chose to hire her, despite those

8    obligations; right?

9    A.   We hired her.

10   Q.   Now, there was some testimony about infusions and how they

11   play a role and whether NYU wants to hire someone; right?

12   A.   Ask -- I don't know what you're asking me.  I'm sorry.

13   Q.   The volume of infusions from a private practice that NYU is

14   looking to assume plays a role in whether NYU wants to assume

15   that practice; correct?

16   A.   There are multiple factors that -- there are multiple

17   factors of which that would be one of.

18   Q.   And that's a factor that you used to determine whether to

19   bring that person in; correct?

20   A.   Incorrect.

21   Q.   Infusions do not play a role in setting a doctor's salary;

22   correct?

23   A.   I'm going to have to ask you to ask the question

24   differently.  I'm sorry.

25   Q.   The volume of infusions that a doctor coming from private

 1   practice has does not play a role in setting that doctor's

 2   salary; correct?

 3   A.  Again, we look at the totality of the information in

 4   determining whether we're going to make an offer.

 5            THE COURT:  Did that include the infusions?

 6            THE WITNESS:  It did include them.

 7   Q.  But you testified that the only thing that is relevant to

 8   setting salary is the business plan, didn't you?

 9   A.  Actually, I didn't testify to that.

10   Q.  In order to determine the salary of a physician, NYU looks

11   at the RVUs that a doctor earns; correct?

12   A.  Amongst other things.

13   Q.  You heard some testimony about Nassau Radiology or NRad.

14   Do you recall that testimony?

15   A.  I do.

16   Q.  You recall there was testimony about it going into

17   bankruptcy; correct?

18   A.  I recall the testimony, yes.

19   Q.  NYU assumed that business, as well, didn't it?

20   A.  We did not assume that business.

21   Q.  You entered into a business relationship with that entity;

22   correct?

23   A.  We actually did not enter into a business relationship with

24   that entity.

25   Q.  Going back to determining compensation, you never look at a

1    doctor's curriculum vitae to determine a salary for a doctor;

2    correct?

3    A.   Ask the question again, differently.

4    Q.   In determining the compensation of a doctor, you do not

5    look at the doctor's curriculum vitae; correct?

6    A.   Incorrect.

7              MR. KATAEV:  147, your Honor, lines 15 through 24.

8              THE COURT:  Go ahead.

9    Q.   At your deposition on September 27, 2021, I asked you the

10   following question and you provided the following answer.

11   "Q.  You don't review a doctor's curriculum vitae in

12   determining compensation?

13   "A.  I don't."

14   A.   This is a piece of the deposition.  It's not --

15             THE COURT:  Sir, can you just answer the question.

16   Were you asked those questions and did you give those answers.

17             THE WITNESS:  This is what I said to these lines of

18   questions.

19             THE COURT:  You've been here during the trial.  You

20   understand that your lawyer will have an opportunity to ask

21   questions to bring out what your lawyer thinks the jury should

22   hear.  This is the opportunity for the plaintiff to ask

23   questions and bring out what the plaintiff wants to have the

24   jury hear.

25             THE WITNESS:  Got it.

1          THE COURT:  Go ahead, counsel.

2     Q.   Doctors are paid based on the business plan; correct?

3     A.   Doctors are paid?

4     Q.   Based on the business plan.

5     A.   Amongst other things.

6     Q.   The business plan is used to determine the total revenue

7     and the total expenses to see what's left over for salary;

8     isn't that right?

9     A.   Amongst other things.

10    Q.   Switching over to research roles, that's something that you

11    have to approve for a doctor to perform; correct?

12    A.   No.

13          MR. KATAEV:  101, your Honor, lines 3 to 8.

14          MR. SCHOENSTEIN:  Objection.  Improper.

15          THE COURT:  I'll permit it.  Go ahead.

16    Q.   At your deposition, I asked you the following question, you

17    provided the following answer, didn't you?

18    "Q.  Is it fair to say that prior to any doctor having any

19    research role in the faculty group practice, you would know

20    about it and you would have to clear it?

21    "A.  I would have to approve their research role if it impacted

22    their clinical time."

23          THE COURT:  Were you asked that question, did you give

24    that answer?

25    A.   I gave that answer, yes.

N7ECede1                         Rubin – Direct

1    Q.  And that's because a doctor who has a research role has

2    their ability to earn RVUs impacted; correct?

3    A.  Incorrect.

4    Q.  It's fair to say, isn't it, that a doctor performs both

5    clinical work and administrative work does not always receive

6    separate compensation for the administrative work?

7    A.  You're going to have to ask that question again.  I'm

8    sorry.  I'm not sure what you're referring to.

9    Q.  I'll rephrase.

10       If a doctor performs both clinical work and administrative

11   work, it's fair to say that the doctor does not always receive

12   separate compensation for the administrative work; correct?

13   A.  I would need you to define "administrative work" to answer

14   the question.  I can't answer that question as it's asked.

15   Q.  I'll give you an example.  Like Dr. Goldberg's medical

16   director role and Dr. Porges medical director role.

17   A.  So what's the question?

18   Q.  It's fair to say that they do not always receive separate

19   compensation for administrative work; correct?

20   A.  Them specifically, I believe they did.

21            THE COURT:  Are there circumstances where doctors

22   don't receive separate compensation for administrative work?

23            THE WITNESS:  I'm not aware off the top of my head.

24   Q.  With respect to research roles, it's fair to say that

25   sometimes those research roles are paid and other times,

1    they're not; correct?

2    A.  Incorrect.

3           MR. KATAEV:  105, your Honor, lines 2 through 8.

4           MR. SCHOENSTEIN:  Objection.

5           THE COURT:  Overruled.

6    Q.  At your deposition, I asked the following question and you

7    gave the following answer; correct?

8    "Q.  With respect to any research role offered to a physician

9    that performs clinical work, does NYU offer additional

10   compensation for the research role?

11   "A.  I don't -- I don't know.  It would depend on the

12   circumstances.  I don't know the answer to that question."

13   A.  That's what I said, yes.

14   Q.  Focusing on benefits that doctors receive, other than their

15   salary, it's fair to say that physicians at NYU's faculty group

16   practice receive extensive benefits; right?

17   A.  They do.

18   Q.  There's a 401K matching program; correct?

19   A.  Incorrect.

20   Q.  They do have a retirement benefit; right?

21   A.  Correct.

22   Q.  And also, the children of employees of NYU get tuition for

23   free for their children; right?

24   A.  You would need to ask that differently.

25   Q.  The children of NYU employees receive free tuition at the

1    School of Medicine; correct?

2    A.   No.

3              (Continued on next page)

1                MR. KATAEV:  Your Honor, page 212, I believe, 17

2    through 22.

3                THE COURT:  Go ahead.

4    BY MR. KATAEV:

5    Q.  At your deposition, I asked you the following question, and

6    you gave the following answer, didn't you?

7    "Q.  What is the policy with respect to tuition at school for

8    employees of NYU?

9    "A.  I don't know the details of the policy, but I believe

10   their children can attend university for no charge for the

11   tuition, for their educational portion of the tuition."

12       Is that correct?

13   A.  That is a correct statement.

14   Q.  That refers to the undergraduate school, correct?

15   A.  This is a correct statement, yes.

16   Q.  And you'll agree with me that NYU has done no research on

17   gender-pay disparity at NYU, correct?

18   A.  I don't know.

19   Q.  And you received no training on how to set initial salaries

20   or pay, correct?

21   A.  Incorrect.

22               MR. KATAEV:  157, lines 6 through 9.

23               THE COURT:  Go ahead.

24   BY MR. KATAEV:

25   Q.  At your deposition, I asked you the following question, and

1    you provided the following answer, didn't you?

2    "Q.  Have you ever received any training on how to set initial

3    salaries or pay?

4    "A.  Have I received training?  No."

5         You testified to that, correct?

6    A.  That statement is also correct.

7    Q.  So, were you telling the truth at your deposition, or are

8    you telling the truth now?

9    A.  I was then and I am now.

10   Q.  NYU does not have any written policies or guidelines

11   regarding pay increases, correct?

12   A.  Not correct.

13   Q.  It's fair to say that while Dr. Edelman was employed at

14   NYU, you were not familiar with the Equal Pay Act, correct?

15   A.  I'm not -- I mean no, I'm not totally versed on the Equal

16   Pay Act.  I know there's been some updates to it, so I'm as

17   versed as I think I can be.

18           MR. KATAEV:  Your Honor, page 165, lines 23 to 25.

19           THE COURT:  Go ahead.

20           Go ahead.

21   BY MR. KATAEV:

22   Q.  At your deposition, I asked you the following question, and

23   you gave the following answer, correct?

24   "Q.  Are you familiar with the Equal Pay Act?

25   "A.  I am not."

1    A.  At this time I was not.

2    Q.  And your deposition was taken after Dr. Edelman was

3    terminated, correct?

4    A.  Yes.

5    Q.  And you're the one who decides whether a physician's salary

6    is increased upon renewal, correct?

7    A.  Amongst others.

8    Q.  You testified earlier today that you're made aware of

9    complaints by physicians, right?

10   A.  Yes.

11   Q.  And you were, in fact, made aware of Dr. Edelman's

12   complaint, weren't you?

13   A.  You need to be more specific.  Which complaint?

14   Q.  The complaint that she filed with HR on September 17, 2019.

15   A.  I -- I don't recall being made aware of that complaint, no.

16          MR. KATAEV:  Page 150 -- I'm sorry.  175, lines 8

17   through 13.

18          THE COURT:  Go ahead.

19          MR. KATAEV:  Your Honor, permission to publish to the

20   jury -- I'm sorry, to the witness.

21          THE COURT:  Yes.  To the witness, yes.

22          MR. SCHOENSTEIN:  Objection.  Improper.

23          THE COURT:  Overruled.

24   BY MR. KATAEV:

25   Q.  At your deposition, I asked you the following question, and

1    you gave the following answer, didn't you?

2    "Q.  Withdrawn.  I'll ask the question again.

3    "Are you aware of, as highlighted in paragraph 10" -- I'll

4    represent that it's paragraph of the complaint -- "that Dr.

5    Edelman complained about the issue of office space to David

6    Kaplan and Joseph Antonik

7    "A.  I vaguely recall her complaining about this, but not in

8    much detail."

9    A.  This wasn't the question.

10   Q.  You were made aware of a complaint, right?

11   A.  You asked me an HR complaint.  I was not made aware of an

12   HR complaint.  I was aware of a complaint relating to an office

13   dispute.  Your question said HR complaint.

14         MR. KATAEV:  Move to strike as unresponsive.

15         THE COURT:  I'm going to strike the last bit where he

16   says "your question said an HR complaint" and instruct the

17   witness not to argue with counsel.

18   BY MR. KATAEV:

19   Q.  You know, as we sit here today -- you've been here through

20   the whole trial, correct?

21   A.  I'm sorry.  I didn't hear that.

22   Q.  You've been here through the whole trial, correct?

23   A.  Most of it.

24   Q.  So you know that Dr. Edelman's complaint was made in

25   September of 2019, correct?

N7eWede2                          Rubin - Direct

1   A.   Only through the trial.

2   Q.   After this complaint was made, Dr. Porges and Dr. Goldberg

3   made you aware of alleged clinical issues with her, correct?

4   A.   I became aware of a complaint through them, yes.

5   Q.   And you had an in-person meeting with Drs. Porges and

6   Goldberg about this, didn't you?

7   A.   I don't remember if it was in person, but I know I had a

8   meeting with both of them.

9   Q.   And Mr. Swirnow was present with you, correct?

10   A.   He was.

11              MR. KATAEV:   137, your Honor, lines 6 through 11.

12              THE COURT:   Go ahead.

13   BY MR. KATAEV:

14   Q.   I asked you the following question, and you gave the

15   following answer at your deposition in this case, didn't you?

16   "Q.   And in what manner did you discuss Dr. Edelman with Joshua

17   Swirnow; was it in person, on the phone?

18   "A.   Yeah, it would have been in person.  He was with me when I

19   met with Porges and Goldberg."

20        You gave that answer at your deposition, correct?

21   A.   I guess I did, yes.

22   Q.   And you, in fact, had an in-person meeting, didn't you?

23   A.   I must have.

24   Q.   But you were here when Mr. Swirnow testified that there was

25   no in-person meeting, correct?

N7eWede2                        Rubin - Direct

1    A.  I was here when he said he didn't recall.  I don't recall.

2    Q.  Mr. Swirnow testified to a phone call with Dr. Porges by

3    himself and then a phone call with Dr. Goldberg by himself,

4    didn't he?

5    A.  I don't know what Mr. Swirnow testified to.

6    Q.  Weren't you here when he was testifying?

7    A.  Yes, but I don't know what he said.

8    Q.  OK.

9    A.  I didn't hear every word he said.

10   Q.  You weren't paying attention?

11   A.  I must not have been.

12   Q.  Prior to the email that Dr. Goldberg sent in November of

13   2020, no one else raised any issues with Dr. Edelman's clinical

14   performance, correct?

15   A.  Ask that again?  I'm sorry.

16   Q.  Prior to the November 6, 2020, email that Dr. Porges sent,

17   nobody else raised any issues regarding Dr. Edelman's clinical

18   performance, correct?

19   A.  Not to me.

20   Q.  And Dr. Edelman was working at NYU for over six years at

21   the time this issue was brought to your attention, correct?

22   A.  That is correct.

23   Q.  During your discussion with Drs. Porges and Goldberg,

24   whether it was in person or over the phone, you did not get

25   into too much detail during your discussion, correct?

1   A.  In the -- on the call with Dr. Porges?  Are you -- or the

2   meeting with Dr. Porges?  I'm sorry.  I didn't hear.

3   Q.  You tell me.  Was it the phone call, or was it the meeting?

4   A.  I don't recall whether it was a phone call or a meeting, so

5   I would have listened to what they said --

6   Q.  OK.

7   A.  -- which is what I did.

8   Q.  OK.  But you didn't get into all that much detail, did you?

9   A.  I would have listened to what they said, so if they got

10  into detail -- I mean I don't know what detail means.  So

11  they -- I listened to what they said.

12          MR. KATAEV:  Page 217, your Honor, lines 15 through

13  25.

14          MR. SCHOENSTEIN:  Objection.

15          THE COURT:  Sustained.

16  BY MR. KATAEV:

17  Q.  Now, you have no recollection of Dr. Porges ever telling

18  you about any problems with any other doctors, do you?

19  A.  Not today, no, I don't recall.

20  Q.  And with respect to the clinical performance issues raised

21  by Dr. Porges in his November 2020 email, you never discussed

22  any of those issues with Dr. Edelman, correct?

23  A.  I did -- I did not.

24  Q.  You told Dr. Edelman, after she was terminated, that NYU

25  was going in a different direction, correct?

1    A.  Something like that.

2    Q.  And you heard testimony that Dr. Porges and Dr. Goldberg

3    each said that the issues with Dr. Edelman could not be

4    remediated, right?

5    A.  Something like that.

6    Q.  You did not ask Dr. Porges whether he had spoken to Dr.

7    Edelman to fix these issues, correct?

8    A.  I don't recall.

9    Q.  You did not ask Dr. Goldberg whether he had spoken to Dr.

10   Edelman to fix these issues, correct?

11   A.  I don't -- I don't recall.

12   Q.  And you just accepted what they said -- that they could not

13   be fixed, right?

14   A.  Wrong.  I'm going to say that I accepted what they said but

15   asked them to substantiate what they were saying.  I mean

16   not -- not clinically.  I'm not clinical, but these people are

17   our -- one is a medical director of an entire site.  The other

18   is the director of rheumatology.  So I listened to what they

19   said.

20          MR. KATAEV:  Move to strike as nonresponsive.

21          THE COURT:  Overruled.

22   BY MR. KATAEV:

23   Q.  Now, the issues that were raised were too many blood tests,

24   right?

25   A.  Amongst other things.  I don't recall all the details.

1              MR. KATAEV:  OK.  Let's go to the email.

2              Permission to publish 86, your Honor.

3              THE COURT:  Granted.

4              MR. KATAEV:  I apologize, your Honor.  It's

5     Plaintiff's Exhibit 1.

6              THE COURT:  That's also granted.

7     BY MR. KATAEV:

8     Q.  You were made aware of this email that Dr. Porges sent to

9     Mr. Kaplan, correct?

10    A.  I mean yes, I recall there was an email.

11    Q.  Focusing on what I have highlighted, this is where

12    Dr. Porges lists his clinical concerns --

13    A.  Right.

14    Q.  -- right?

15         Yes?

16    A.  Yes.

17    Q.  And Dr. Porges refers to anecdotal observations, doesn't

18    he?

19    A.  Correct.

20    Q.  And he says in here that he hasn't performed any formal

21    review, right?

22    A.  Correct.

23    Q.  He says in here that Dr. Edelman has a pattern of ordering

24    lab tests and a pattern not in keeping with the usual standards

25    of rheumatology practice, right?

1    A.  That's what -- that's what it says.

2    Q.  And he says in here that that pattern is that she routinely

3    needs more than ten tubes of blood to run a long list of

4    obscure tests, right?

5    A.  That's what it says.

6    Q.  He did not provide any of the backup for this statement,

7    did he?

8    A.  Not to me.

9    Q.  So you had no actual evidence that what he was saying was

10   true, correct?

11          MR. SCHOENSTEIN:  Objection.

12          THE COURT:  Overruled.

13   A.  I -- I don't know what evidence means in this case.

14   Q.  There were no actual patient charts that he provided to

15   you, correct?

16   A.  It would be inappropriate for him to provide me patient

17   charts.

18   Q.  So he didn't provide you any, right?

19   A.  It would be inappropriate for me to look at a patient

20   record.

21   Q.  And you have no personal knowledge if what he said in here

22   is true, right?

23   A.  I have no clinical knowledge.

24   Q.  But it makes sense, doesn't it, that if Dr. Edelman could

25   order less tests, the issue would be resolved, correct?

1   A.  No, that is not correct.

2   Q.  And what do you base that on?

3   A.  I base it on the allegation here that there were multiple

4   issues, and this was one of the examples.

5   Q.  What other examples are there?  You have it open in front

6   of you.

7   A.  X-ray -- texts have come in expressing concerns regarding

8   excessive x-ray tests.

9   Q.  And the same logic applies there, right; if you spoke to

10  Dr. Edelman and she agreed to do less x-rays, the problem --

11  A.  I would never speak to Dr. Edelman about ordering tests.

12  That's not my role.

13  Q.  You didn't ask Dr. Goldberg to do that or Dr. Porges to do

14  that, did you?

15  A.  I asked them if her -- I asked them a different question.

16  Q.  It's fair to say that no one ever told her about these

17  issues before she was terminated, correct?

18  A.  I honestly couldn't recall.

19  Q.  And you never in any way investigated the issues that

20  Dr. Goldberg and Dr. Porges raised, correct?

21  A.  I investigated the issues that were reported to me with the

22  people, Drs. Goldberg and Porges, who are empowered to do that

23  investigation.

24  Q.  Other than those doctors, you did not investigate in any

25  other way to corroborate what they said, correct?

N7eWede2                                Rubin - Direct

1   A.  I had discussions with other clinicians.

2   Q.  Dr. Porges told you here that he did not perform a formal

3   review, right?

4   A.  In this email?

5   Q.  Yes.

6   A.  That's what it says in this email.

7   Q.  You never asked him to perform a formal review, did you?

8   A.  I don't recall the details of my conversation with him.

9   Q.  To your knowledge, nobody spoke to Dr. Edelman about these

10  clinical issues, correct?

11  A.  I -- I really don't know.

12  Q.  Now, generally speaking, moving on to the human resources

13  complaints, you have familiarity with those human resources

14  complaints, right?

15  A.  I do.

16  Q.  Generally speaking, once a complaint is filed, there's an

17  investigation conducted, right?

18  A.  With an HR complaint?  Yes.

19  Q.  And someone speaks to the person who complained, right?

20  A.  Yes.

21  Q.  And that same person speaks to whoever the person

22  complained about, right?

23  A.  Correct.

24  Q.  And sometimes there are witnesses, and those people are

25  spoken to as well, correct?

N7eWede2                          Rubin - Direct

1    A.  Correct.

2    Q.  And in general practice at NYU, a report is created, right?

3    A.  That I couldn't speak to -- the actual steps of how HR does

4    their investigations.  But I assume they would do something

5    like that.

6              MR. KATAEV:  Page 65, your Honor, lines 5 through 13.

7              MR. SCHOENSTEIN:  Objection.

8              THE COURT:  Sustained.

9    BY MR. KATAEV:

10   Q.  You never received any reports from employee labor

11   relations or human resources related to the complaint Dr.

12   Edelman made, correct?

13   A.  I did not.

14   Q.  When a doctor is served with a malpractice suit, that is

15   something that's brought to your attention, correct?

16   A.  It is not.

17             MR. KATAEV:  121, your Honor, line 22 through 25.

18             THE COURT:  Sure.  Go ahead.

19   BY MR. KATAEV:

20   Q.  At your deposition, I asked you the following question, and

21   you gave the following answer, isn't that right?

22   "Q.  Whenever a physician in the faculty group practice is sued

23   for medical malpractice, is that something that comes to your

24   attention?

25   "A.  Sometimes, not always."

1        Do you recall providing that answer?

2   A.   I do.

3   Q.   So what you just testified was not true, correct?

4   A.   I think I just said the same thing, but -- this, this

5   statement is the answer.

6   Q.   I just asked you this question before I showed you this

7   testimony, and you said it is not something that's brought to

8   your attention, isn't that right?

9   A.   This statement is the correct statement.

10  Q.   The one in the deposition?

11  A.   In the deposition.

12  Q.   What you just testified to is not true, correct?

13            MR. SCHOENSTEIN:   Objection.

14  A.   I'm going to disagree.

15            THE COURT:   Sustained.   And stop arguing with the

16  witness.

17  BY MR. KATAEV:

18  Q.   You don't perform a full review of a doctor when there's a

19  malpractice suit against them, correct?

20  A.   You cut out.   I couldn't hear you.

21  Q.   You do not perform a full review of a physician when a

22  malpractice suit is brought against them, correct?

23  A.   I do not perform a review, no.

24  Q.   And you don't ask anyone to perform a review when it's

25  brought to your attention that there's a medical malpractice

1   suit?

2   A.   I don't, but it's done.

3   Q.   Going to credentialing of doctors, there's a medical staff

4   office that's responsible for that, right?

5   A.   Correct.

6   Q.   And the medical staff office deals with recertifying

7   physicians with respect to their boards, correct?

8   A.   They deal with collecting the documentations and making

9   sure everything is up to date.

10  Q.   And that includes anything in relation to the boards,

11  right?

12  A.   Yeah, if they need to be board certified, that would be in

13  there.

14  Q.   If a doctor fails his or her boards, that's something you

15  would be notified of, wouldn't you?

16  A.   No, not always.

17          MR. KATAEV:  139, your Honor, 5 through 8.

18          MR. SCHOENSTEIN:  Objection.  Improper.

19          THE COURT:  Sustained.

20  BY MR. KATAEV:

21  Q.   Prior to terminating Dr. Edelman, and without divulging the

22  actual discussions held, you consulted with NYU's attorneys

23  concerning firing Dr. Edelman, correct?

24  A.   We -- non -- before we nonrenew any physician, including

25  Dr. Edelman, I consult with NYU legal counsel, correct.

N7eWede2                          Rubin - Direct

1    Q.  And you did do that with respect to --

2    A.  Absolutely.

3    Q.  -- right?

4        Now, you were -- withdrawn.

5        It was brought to your attention early on in Dr. Edelman's

6    career at NYU about some alleged interpersonal issues, right?

7    A.  Yes.

8    Q.  And you actually had a meeting with Dr. Edelman at One

9    Park, at your offices, correct?

10   A.  Yes, I believe that's the meeting that was with Josh

11   Swirnow and Fran Drummond.

12   Q.  And it was important for you to take the time to counsel

13   her on these issues, correct?

14   A.  Absolutely.

15   Q.  But you didn't take the time to counsel her on these issues

16   with clinical performance, did you?

17   A.  Wouldn't be my job.

18   Q.  You didn't take the time to have anyone else, to delegate

19   that task to somebody else, right?

20   A.  I spent a lot of time on this issue.

21   Q.  But you testified that no one spoke to Dr. Edelman --

22   A.  I testified I don't know if someone spoke to her.

23   Q.  You're not aware of that?

24   A.  Not aware.

25   Q.  Going back to that 2017 meeting, you did tell her that she

N7eWede2                        Rubin - Direct

1    should be more pleasant, didn't you?

2    A.   Someone's going to have to tell me if I do this wrong.

3         The purpose of the meeting was to address behavioral issues

4    she was having with the staff.  My goal in any of those

5    meetings is to find common ground so that the physician can go

6    back to the office and be successful.  So, I thought Dr.

7    Edelman was a good doctor, and I wanted her to be successful.

8    She had conflict, interpersonal conflict in her interactions

9    with staff and managers, and I told her to try to be nicer to

10   them.

11   Q.   You also told her to be more polite, right?

12   A.   I -- I don't know what words I used, but if she was

13   impolite, I would have encouraged her to be more polite, as I

14   would any physician.  I --

15   Q.   But --

16        Go ahead.

17   A.   No.  I'm good.  That's fine.

18   Q.   But you denied telling her to smile more, right?

19   A.   I really -- I really don't know.  I think people should

20   smile more, so it's not inconceivable that if she wasn't

21   smiling I would have told her to smile.  I would have told

22   anyone to smile.

23   Q.   You deny telling her to fake it till she makes it, right?

24   A.   Yeah.  That's just not a word I would use, a phrase I would

25   use, but everything you're describing is close to that, so I

N7eWede2                        Rubin - Direct

1    could see how she might have thought that's what I said.

2    Q.  Now, Sharon Kurtz is someone that led, or still leads

3    possibly, NYU's compliance department, correct?

4    A.  She does.

5    Q.  She handled EEO policies -- I'm sorry.  She handled equal

6    employment opportunity policies, correct?

7    A.  I don't -- she's our chief compliance officer.  I don't

8    know that that's who handles that.  HR handles ELR and labor

9    relations.

10   Q.  And you're not aware of any involvement by Ms. Kurtz in Dr.

11   Edelman's complaint, right?

12   A.  As it relates to which complaint?

13   Q.  The complaint about harassment and discrimination.

14   A.  I don't know what -- I don't -- I still don't know exactly

15   what the complaint was.  I've learned a lot, but I don't know,

16   at the time.

17   Q.  Did anyone ever tell you that Dr. Edelman refused to try to

18   reduce the number of blood tests that she did?

19   A.  I'm sorry.  Ask that again?

20   Q.  Did anybody ever tell you that Dr. Edelman refused to try

21   to reduce the number of blood tests she did?

22   A.  No.

23   Q.  Did anyone ever tell you that Dr. Edelman refused to try to

24   reduce the number of x-rays she performed?

25   A.  No.  Again, not me.

1   Q.  Now, you conduct a business review of every doctor every

2   year, correct?

3   A.  For the most part.  If I don't -- if I can't do it,

4   Mr. Swirnow would do it, but a review is done for sure.

5   Q.  And part of the review is generating a report, right?

6   A.  I get a summary of -- I mean we have 3,600 doctors, and I

7   have lots of responsibilities so there are lots of different

8   documents I use.  But I try -- I usually get a summary.

9   Q.  And that summary consists of the number of RVUs --

10              MR. KATAEV:  Hold on.  Withdrawn.

11  Q.  When you do a business review, your review consists of the

12  number of RVUs earned against the target, correct?

13  A.  Yeah.

14  Q.  It also deals with attendance, right?

15  A.  No.  In the context of if someone's not meeting their RVUs,

16  attendance may come up, but we don't -- physicians don't have

17  attendance.  They don't, they don't do that.  They're based on

18  productivity.

19  Q.  And your business review also consists of looking at

20  patient satisfaction scores, right?

21  A.  My business reviews don't.  We do look at them, but I don't

22  look at them as part of the annual review.  I could, but I

23  don't.

24  Q.  And you have an entire business team of about ten people at

25  your disposal to assist you with this task, correct?

N7eWede2                          Rubin - Direct

1    A.  With which task?

2    Q.  Business reviews.

3    A.  Business reviews I couldn't speak to.  It's pretty big

4    right now.

5    Q.  The business team produces the data for each doctor that

6    worked there, at NYU, under your purview, correct?

7    A.  Correct.

8    Q.  And you monitor the RVUs of all the doctors to make sure

9    that they meet the contractual requirements, right?

10   A.  I wouldn't -- I would say annually I review them.  I can't

11   monitor 3,600 doctors on a daily basis.

12   Q.  When you do look at the business reviews of a doctor, do

13   you determine whether the doctor meets their RVU target?

14   A.  I do.  Well, the data determines whether they meet them.

15   Q.  And to your knowledge, do the doctors meet their targets?

16   A.  Most do.  Some don't.

17   Q.  Would it be fair to say that when some don't, that's an

18   issue of concern for NYU, correct?

19   A.  Not necessarily.  There can be lots of factors that would

20   cause someone to not meet their targets.

21   Q.  And your testimony that some doctors do and some doctors

22   don't meet their targets is based on the RVU reports that you

23   receive, correct?

24   A.  Yes.  And just to clarify, I said most do, some don't.

25   Q.  And those RVU reports contain the name, specialty,

1    practice, location, and the actual RVUs earned, correct?

2    A.  I'm not -- I don't use that report.  I don't know what

3    report that is.  It may exist.  I use a manually prepared table

4    that gives me the summary of large blocks of doctors, just

5    because there's too many for me to review.

6             MR. KATAEV:  295, your Honor, lines 6 through 12.

7             MR. SCHOENSTEIN:  Objection.  Improper.

8             THE COURT:  No.

9             Go ahead.

10            MR. KATAEV:  Permission to publish to the witness

11   only?

12            THE COURT:  Yes.

13   BY MR. KATAEV:

14   Q.  At your deposition on October 25, 2021, I asked you the

15   following question, and you gave the following answer, correct?

16   "Q.  When reviewing a doctor's performance on an annual basis,

17   when you personally do it, what kind of data do you see?

18   "A.  Usually I will see their name, their specialty, their

19   practice, location, their RVUs, their RVU target and their

20   compensation and the date of their renewal."

21       You provided that answer to that question, correct?

22   A.  Yes, and this is exactly what I was referring to.

23   Q.  When it says here their RVUs, you're referring to the

24   actual RVUs they earn for that year, right?

25   A.  What's on the sheet is -- yes, and what's on the sheet is

1    that and their target.

2    Q.  OK.  And that way you can compare and see whether they met

3    their target --

4    A.  Correct.

5    Q.  -- right?

6        Fair to say the reports themselves and any other documents

7    you use would be more accurate than your memory as to whether

8    doctors met their targets, correct?

9    A.  I'm -- 100 percent.  I wouldn't know a single doctor's RVU

10   today.

11   Q.  And your testimony about whether doctors met their RVU

12   targets would be more accurate if you had the actual reports in

13   hand, correct?

14   A.  Not really.  I mean I know in general who's making their

15   numbers and who's not -- I don't know their actual number.  If

16   you ask me their actual number, of course I would need their

17   actual number.  But if you're asking me in general is Dr. X

18   making their number, I -- it's not a guarantee, but I'm more

19   likely to know than not know.

20   Q.  But without the reports, no one can verify that what you're

21   saying is true --

22   A.  But I --

23   Q.  -- correct?

24   A.  Well, that -- no.  You would have to take my word.

25   Q.  And we're taking your testimony now about whether doctors

1    meet their RVU targets, but you have these documents available

2    in your office, right?

3           MR. SCHOENSTEIN:  Objection.

4    A.  Well, I actually don't have them in my office.  After the

5    meeting they leave my office.  It's just a spreadsheet.  So I

6    don't have them.

7    Q.  But if you were in your office, you could have these

8    reports pulled up, couldn't you?

9    A.  Absolutely.

10   Q.  So if you had the reports you could tell to the T for any

11   doctor in any year how many RVUs that doctor earned, correct?

12   A.  Absolutely.

13   Q.  But again, you don't have any of these reports with you

14   today?

15   A.  No.  Just me here alone.

16   Q.  And to your knowledge, your attorneys won't be showing you

17   those reports today, correct?

18   A.  I --

19          MR. SCHOENSTEIN:  Objection.

20          THE COURT:  Sustained.

21   BY MR. KATAEV:

22   Q.  Dr. Edelman is no longer employed by NYU, correct?

23   A.  No, she's not.

24   Q.  And Dr. Edelman was under a contract and could not be

25   terminated except for cause, correct?

1   A.  I believe that's what it said, yes.

2   Q.  And you agree with me that Dr. Edelman was not terminated

3   for cause, correct?

4   A.  I do agree with you.

5   Q.  And she did not fit any of the for-cause definitions laid

6   out in her contract, right?

7   A.  Correct.

8   Q.  And you're not aware of any failure of Dr. Edelman to meet

9   her performance standards or objectives as it relates to the

10  wRVU target, correct?

11  A.  I'm not aware of her not meeting her targets, correct.  In

12  fact, I believe she exceeded them.

13  Q.  And you made the decision not to renew Dr. Edelman's

14  contract, right?

15  A.  I -- I did, with consultation from others, yes.

16  Q.  And prior to determining whether to -- withdrawn.

17      Prior to determining that her contract will not be renewed,

18  you did not provide Dr. Edelman any opportunity to address the

19  clinical concerns raised to you, correct?

20  A.  That wouldn't be my role, so no, I -- I personally did not.

21  Q.  And you didn't ask anyone to do so, correct?

22  A.  I personally did not ask them, no.

23  Q.  And it's fair to say that you do not have any knowledge as

24  to how the issues that Drs. Goldberg and Porges raised to you

25  came to their attention, correct?

N7eWede2                          Rubin - Direct

1   A.  Well, I know what they told me how they came.

2   Q.  But you don't know how they came to their attention, right?

3   A.  No.  I know some, some of it.

4   Q.  And you don't have the full picture, right?

5   A.  I have a picture, a big enough picture to ask -- to have

6   asked for the meeting I Dr. Goldberg.  Whether that be on the

7   phone or in person, I don't recall.

8   Q.  And to your knowledge, Mr. Swirnow did not discuss these

9   performance issues with her, correct?

10  A.  Did -- ask the question again?  I'm sorry.

11  Q.  To your knowledge, Mr. Swirnow did not discuss these

12  performance issues with her before the termination?

13  A.  Dr. Edelman?

14  Q.  Yes.

15  A.  I don't believe so.

16  Q.  Same question of Mr. Kaplan.

17  A.  Definitely not David.

18  Q.  And same question of Dr. Porges.

19  A.  I can't -- I don't know if Dr. Porges and Dr. Edelman spoke

20  about it.

21  Q.  You're not aware of any such discussions, correct?

22  A.  I'm not.

23  Q.  Same question with Dr. Goldberg.

24  A.  Same answer.  I'm not aware.

25  Q.  And same question with Mr. Antonik, correct?

N7eWede2                        Rubin - Direct

1    A.  Definitely not Joe Antonik.

2    Q.  And Ms. Ruiz definitely didn't discuss --

3    A.  Definitely not.

4    Q.  It's fair to say that these concerns brought to your

5    attention from the November 6, 2020, email is what led to Dr.

6    Edelman's nonrenewal, correct?

7    A.  It's the only thing that led to the nonrenewal.

8    Q.  And at the time that you received this email in November of

9    2020, you were not aware that Dr. Porges's email was a

10   cut-and-paste job of Mr. Antonik's email, correct?

11          MR. SCHOENSTEIN:  Objection.

12          THE COURT:  Sustained.

13   BY MR. KATAEV:

14   Q.  At the time you that received Dr. Porges's email, you were

15   not aware that Mr. Antonik played a role in giving information

16   to Dr. Porges, correct?

17   A.  I don't even think I got an email from Dr. Porges.  I

18   had -- I had a conversation with Mr. Swirnow that Dr. Porges

19   had raised some -- some serious concerns.  Maybe I got an

20   email.  I don't recall.  But I -- I said let's get on the phone

21   or have a meeting -- again, I don't know if it was in person or

22   on the phone -- with Dr. Porges to hear what's going on.

23   Q.  It's fair to say that you had no knowledge of Mr. Antonik's

24   involvement in providing information about --

25   A.  Definitely not, definitely not.

N7eWede2                           Rubin - Direct

1          MR. KATAEV:  Just one second, your Honor?

2     Q.  When you set salaries for physicians coming to NYU, there

3     was no seniority system in place, correct?

4     A.  I -- define -- I don't -- I don't think I understand the

5     question.

6     Q.  For example, you didn't have a system where if you're a

7     doctor at NYU for five years you get this kind of salary and if

8     you're a doctor at NYU for ten years you get this type of

9     salary.  Correct?

10    A.  There are certain areas within the health system there

11    where doctors -- that's a -- that's a factor, but it's not a

12    hard -- you know, we don't pay people years one and two as X,

13    years three and four as Y.  No.  There could be departments or

14    divisions where that's part of it, but that wouldn't be

15    exclusively it.

16    Q.  Dr. Edelman was not part of any such system, right?

17    A.  No, she was not.

18    Q.  And you don't pay any physicians based on the quality or

19    quantity of the RVUs, correct?

20    A.  We pay physicians using a multiple -- a multitude of

21    reasons.  One, as we've pointed out, is the business plan, and

22    then others are years in practice or how long they've been

23    practicing, their credentials.  It could also be a need we

24    have, if there's a shortage of physicians of a certain type.

25    There could be -- there could -- they could have academic

1   interests, nonacademic interests, clinical interests,

2   nonclinical.  There's research interests.  There's a whole

3   multitude of things that we factor in to how people get paid.

4   Q.  But Dr. Edelman, her compensation was not --

5   A.  Dr. Edelman was a clinical recruit.

6   Q.  And with respect to these items that you just testified

7   about, there's nothing in writing concerning that, correct?

8   A.  Writing in terms of what?

9   Q.  In terms of how the compensation formula is made, on

10  quality or quantity system.

11  A.  Well, I think every -- every person in the United States is

12  hired the same way.

13          MR. KATAEV:  Move to strike as not responsive.

14  A.  I'm not sure I understand the question.  I'm happy to

15  answer.  I just don't understand it.

16  Q.  There's no merit system with respect to the setting of

17  salaries for physicians, correct?

18  A.  I don't know what a merit -- I don't know what merit system

19  means in this case.

20  Q.  It would be fair to say that there is no such system in

21  place for setting salaries, correct?

22          MR. SCHOENSTEIN:  Objection.

23          THE COURT:  Sustained.

24  BY MR. KATAEV:

25  Q.  It's fair to say that incoming doctors are not paid based

N7eWede2                          Rubin - Direct

1    on seniority, correct?

2    A.   They could be paid on seniority if they have seniority.

3    Just because they're incoming doesn't mean they don't have

4    seniority, because I just said seniority could be -- you know,

5    someone could be incoming from another state, filling a need we

6    have, with 20 years of experience.  And that person, if they

7    have the academic credentials and fill the need, whatever the

8    programmatic need is we have, we would recruit them at a salary

9    that could be high or low, depending on the circumstances.

10   Q.   But there's no written system in place, is there?

11   A.   Written -- I don't know what -- I just -- I don't know what

12   written means in this case.

13   Q.   Well, if you don't know what it means, that means there's

14   nothing in writing concerning this?

15   A.   Do I refer to a document, a checklist when I recruit?  No,

16   I don't, if that's what you mean.

17              MR. KATAEV:  Your Honor, permission to publish 24?

18   It's already in evidence.

19              THE COURT:  Permission granted.

20   BY MR. KATAEV:

21   Q.   Showing you Dr. Goldberg's initial employment agreement.

22   Are you familiar with it?

23        Yes.

24   A.   Yes, I could see it.  I could see it.

25   Q.   Dr. Goldberg was paid $315,000 when he first came to NYU,

1    correct?

2    A.  Yeah, that's what it says.

3    Q.  And he was only, his clinical compensation consisted of

4    $290,000, correct?

5    A.  Yes.

6    Q.  And when he negotiated with you, he asked for $290,000,

7    correct?

8    A.  I -- I genuinely don't recall my negotiation with

9    Dr. Goldberg.

10   Q.  When Dr. Goldberg came to NYU, he was working at another

11   practice, right?

12   A.  That I know.  I believe he was at Northwell.

13   Q.  And he told you what his salary was at Northwell, right?

14   A.  I assume so.

15   Q.  And to your knowledge, that salary was approximately

16   $200,000, correct?

17   A.  I, I, I just told you I don't know what he was making or

18   any of the circumstances at the time of his recruit.

19   Q.  Dr. Goldberg was only required to earn 3,481 RVUs for the

20   $290,000, correct?

21   A.  That's what this says, yes.

22           MR. KATAEV:  I'd like to place up exhibit 8.  It's

23   already in evidence.

24           THE COURT:  Go ahead.

25   BY MR. KATAEV:

1   Q.  This is Dr. Edelman's initial employment agreement,

2   correct?

3   A.  Yes.

4   Q.  She was paid $207,000, correct?

5   A.  Yes.

6   Q.  And her RVU target was 4,966, correct?

7   A.  That's what this says, yes.

8   Q.  And she had to earn more RVUs, but she was paid less than

9   Dr. Goldberg, correct?

10  A.  That -- well, that's what these documents say, yes.

11         MR. KATAEV:  31, your Honor.  It's already in

12  evidence.

13         THE COURT:  Go ahead.

14  BY MR. KATAEV:

15  Q.  And this is Dr. Porges's initial employment agreement,

16  right?

17  A.  Yes.

18  Q.  He was paid $340,000, correct?

19  A.  Yes, that's what this says.

20  Q.  And for that $340,000, he was required to earn 6,524 RVUs,

21  correct?

22  A.  Again, that's what this says, yes.

23  Q.  And you were here when we showed Dr. Mehta what she would

24  earn in compensation?

25  A.  Actually, I wasn't here for Dr. Mehta's testimony.

1          MR. KATAEV:  No further questions, your Honor.

2          THE COURT:  OK.  Defense examination.

3          Members of the jury, if you want to take a final

4   stretch break, we're going till 2 o'clock and then we'll break

5   for the weekend.

6          MR. SCHOENSTEIN:  Permission to water the witness?

7          THE COURT:  Mr. Fishman.

8          MR. SCHOENSTEIN:  Oh, he has.

9          THE COURT:  Mr. Schoenstein.

10  CROSS-EXAMINATION

11  BY MR. SCHOENSTEIN:

12  Q.  All right.  Mr. Rubin, let's learn a little bit about you.

13  OK?  Can you tell the jury where you're from, where you grew

14  up, that kind of thing?

15  A.  Sure.  I'll be brief, though, because I can talk a lot.

16      I was born in New York.  My dad was in the army.  He's a

17  surgeon, retired surgeon.  We moved to New Jersey after the

18  army, a few years in Louisiana.  So I've been around health

19  care my whole life.  I went to Skidmore College, where I was an

20  accountant, worked for Ernst & Young, Price Waterhouse and got

21  into healthcare consulting, went to Tulane University

22  Healthcare System for my master's in health administration.

23      Married 25 years this November to my husband, and we have

24  an amazingly perfect two and a half-year-old Goldendoodle.

25  Q.  Did that experience, growing up in health care, did that

N7eWede2                          Rubin - Cross

1    correlate to you ending up in the career you ended up in?

2    A.  I'm glad you asked.  This is not rehearsed.

3        Yes, it did.  I went to the hospital on weekends, made

4    rounds with my father.  I think he wanted me to be a doctor,

5    but he always complained about being a doctor, so subliminally

6    sending messages not to be a doctor.  But I really liked the

7    field.  Never did I imagine that I would -- my healthcare

8    career would take me in the direction it did, where I would be

9    running a physician group of almost 3,600 doctors now.

10   Q.  Is your husband full time employed as well?

11   A.  Yes.  He works in communications.

12   Q.  And you've been with NYU, I think, you said since 2000?

13   A.  Yeah, technically, since this is a court, I've been with

14   NYU since 1998.  I was a consultant working on various projects

15   with them for two years prior to going to them full time.

16       When I started, this physician group didn't exist, so I

17   knew they wanted to build the physician group.  They hired a

18   physician from Boston, who has then been -- his name is Andrew,

19   as is my name.  My husband's name is Andrew as well, so I'm

20   surrounded by Andrews.  I've worked for him for 23 years.

21   Q.  And so you've been involved in building that physician

22   group from the beginning of your tenure?

23   A.  From scratch.  All of it.  Infrastructure, everything.

24   Q.  How many physicians have you been involved in hiring?

25   A.  The 3,600 we have now is misleading, because, you know, we

1   hire 300 a year, but 200 leave.  So the number's actually much

2   larger.  I probably individually negotiated deals with, I'm

3   going to say with Mr. Swirnow, who's been with me a long time

4   as well, at least, at least a thousand to 1,200.  Some, you

5   know, an anesthesiologist, radiologist would just get a

6   contract.  They wouldn't have an individual meeting or

7   negotiation.  So I'm going to say a thousand to 1,200, give or

8   take.

9   Q.  And the faculty group practice, what's the geographic scope

10  for that practice?

11  A.  It's Manhattan, Brooklyn, Queens, Staten Island, Nassau and

12  Suffolk counties.  We do not go into the Bronx or Westchester.

13  Our competitors are, are heavily entrenched there, so that --

14  that territory we ceded to Northwell and Mount Sinai and New

15  York-Presbyterian.

16  Q.  What about Long Island; do you go all the way East?

17  A.  We go all the way East out to the very, very tip on the

18  north and south forks.

19  Q.  A couple quickies here as we begin.  I want a little help

20  with you understanding something about NYU Medical School.

21      Are you familiar with the NYU Medical School?

22  A.  I am.

23  Q.  OK.  So I'm going to quit being a lawyer after this trial

24  and try to go to medical school.

25  A.  That would be a good idea.

N7eWede2                          Rubin - Cross

1    Q.   If I get in, if I can get in -- and how many people get

2    into the medical school?

3    A.   That's a -- I'm going to say 200 -- we have two medical

4    schools.  We have one on Long Island --

5    Q.   Yup.

6    A.   -- which is a three-year primary care medical school.  And

7    then we have one in Manhattan, which is a four-year accredited

8    medical school, which is all the specialties.

9         The acceptance rate is exceptionally low.  I think it's 200

10   on -- on the main, in the Manhattan medical school and around

11   60 on Long Island.

12   Q.   But if I get in -- I'm really smart.  If I get into the

13   Manhattan school, do I have to pay tuition?

14   A.   You do not have to pay tuition in either medical school.

15   Q.   And what if I want to take a specialty; do I have to pay

16   tuition?

17   A.   In Manhattan, you do not.  Medical school is free for

18   everyone at NYU.  We have a very nice donor who funded that.

19   Q.   All right.  Another thing I want to clear up, when we're

20   talking about pay for the doctors at NYU, you're eminently

21   involved in compensation issues for doctors, right?

22   A.   Correct.

23   Q.   You have a good working knowledge of that?

24   A.   25 years' worth, yes.

25   Q.   So let's talk for a minute about pay for research, because

1    there have been a lot of questions today of you and others

2    about doctors getting paid for research.

3         When does a doctor get paid separately for research, and

4    when doesn't it happen?  Can you clarify that?

5    A.   Yes.  This is very important to understand because we've

6    seen a lot of tables on -- charts on our screens.

7         The research that you see on the chart on the screen, when

8    it's, when it's shown to you is for true -- what I would use

9    the word "true" research.

10        So you're not actually in a practice running clinical

11   trials on patients and seeing patients as part of your day.

12   It's when you actually have a paid component of your job, where

13   you're in a laboratory, actually conducting, writing research

14   grants, performing lab tests, using lab equipment, studying

15   different cells and genomes.  That's what we call research at

16   NYU.  And those jobs are paid completely separately from the

17   clinical enterprise.  They are funded by grants.  They are

18   funded by donors.  They are funded by the NIH.  And when you

19   see somebody who has that job, they would have -- and they

20   could be clinicians too, but on their table, it would have a

21   percentage research effort and a dollar associated with it.

22        So when we talk about clinicians who do research in their

23   practice, that's not actual academic research, funded research.

24   That's clinical research that's funded through clinical trials

25   and part of their clinical practice.

1    Q.  And if I go to a doctor, sometimes there would be a form

2    that says do I agree to take part in this, that or the other

3    research thing, is that what you're talking about?

4    A.  That would --

5              MR. KATAEV:  Objection.  Leading.

6    A.  That could be --

7              THE COURT:  Overruled.

8    A.  That could be either.  So you can -- you know, I was in the

9    Covid Pfizer study, phase 1.  That was actually true research.

10   As the study expanded and it got moved out into practices, when

11   they wanted, as they are now, still doing Covid research and

12   the like, some of that can be done in a practice where a

13   physician is seeing patients.  They're doing an office visit.

14   They're sending out a bill, but they have a component of their

15   time in the exam room where they are doing a research

16   something, and the patient would fill out that form you just

17   described to say they understand they're part of a research

18   study.  The doctor would do that.  That would be -- that

19   portion of their salary would come through what we call

20   clinical research because money would be coming in to fund that

21   effort.

22   Q.  And Dr. Porges, of those two different types of research,

23   what was he involved in?

24   A.  He was in the latter.  He was in the clinical research.  He

25   was not being paid to sit in the laboratory, write grants and

N7eWede2                          Rubin - Cross

1   do the other types of research.  He was working with

2   pharmaceutical companies, clinical trial organizations on

3   treatments for rheumatological diseases where those patients

4   were part of his clinical practice.  Some of those patients

5   were on research studies.  Some of them were not.

6   Q.  Does that clinical research add value to a doctor, from

7   NYU's perspective?

8   A.  100 percent add -- 1,000 percent.

9        Clinical trials is how we advance health care.  You know,

10  every, every time a new drug comes out, you need a mechanism to

11  test its efficacy -- not so much is it safe, because by the

12  time it gets into a practice it's already been proven safe.

13  But you want large numbers of people trying these new drugs

14  because each new drug that is successful treats the next

15  problem that we have or have not been able to cure.

16       So it is highly regarded and highly encouraged, but at the

17  same time not everybody wants to do it because it's

18  time-consuming, and people who want to do research tend to want

19  to do research and make that a big part of their lives.  And,

20  and candidly, many of our clinicians in our network don't do it

21  just for that reason.

22  Q.  OK.

23  A.  The places you tend to see it most is cancer, and cancer

24  has a lot of clinical trials.

25  Q.  Stick with me on my question.

1    A.  Sorry.

2    Q.  That's OK.

3    A.  I told you I talk too much.

4    Q.  I know.  I know.  Me too.

5        Let's look to the same kind of analysis for the

6    administrative work.  right?  We've heard about administrative

7    work.

8        There are two different types of administrative work, is

9    that right?

10   A.  Correct.

11   Q.  And what are those?

12   A.  So, I think Mr. Swirnow talked about it a little bit.  When

13   a physician has a practice, part of their job is seeing

14   patients.  Part of their job is doing everything else related

15   to that -- following up with patients, documenting the patient,

16   calling them at home.  Anything involving patient care that's

17   not when they're in the exam room, that's called

18   administrative.  And I believe Dr. Edelman had an

19   administrative-time day.

20       Some doctors now only see patients four days a week, and

21   they use the fifth day to get caught up on that administrative

22   time.  Other doctors see patients five days a week, and they do

23   it in the evening.  In fact, it's a big challenge in the

24   healthcare system, because there's is so much of this work.

25   But it's part of the clinical practice.

1          Administrative time that's paid for, as it relates to what

2     you see in those charts, again, is for specific jobs, managing

3     a specific item of work that we need managed.  That's

4     administration.

5          I'm an administrator.  If I had a contract, which I don't,

6     you would see my salary on the line that says administrative.

7     Q.  OK.  Thank you for that.  Now let's talk more generally.

8          What is your role in determining what physicians are hired

9     and how much they get paid?

10    A.  I'm part of a team.  So the business plan, which we've all

11    seen --

12    Q.  No, no.  What is your role?

13    A.  My role?  I hire the person.  I make the offer.

14    Q.  OK.  And what is your process for determining what offer to

15    make?

16    A.  I'm going to look at the business plan that we've all seen.

17    I'm going to look at their credentials.  I'm going to look at

18    the need in the network.  I'm going to look at how many years'

19    experience they have.  I'm going to look at their external

20    activities, if they have them.  And again, some do, some don't.

21    I'm going to look at the geography, where we're putting them.

22    And then based on all those factors, when I meet with the

23    physician, with that business plan as sort of the foundation,

24    we would present an offer.

25    Q.  That business plan gives you some of the economic

1  information?

2  A.  Business plan -- I used the word "foundation" on purpose.

3  It sets the baseline for what we think, you know, gives us the

4  guide point, the starting point of where we think we need to

5  go.

6  Q.  Is it the only relevant factor?

7  A.  No.  That's what I was saying.  There's lots of other

8  factors, and those, again, can be academic versus nonacademic;

9  years of experience; the reputational status in the community;

10  do we have a need in the community that we can't meet?  Do we

11  have a geography that we can't cover?  So there are all sorts

12  of factors that go into compensation of how we pay a physician

13  beyond just the economics of a business plan.

14          MR. KATAEV:  Objection.  Narrative.

15          THE COURT:  What's the basis of your objection?

16          MR. KATAEV:  Narrative.

17          THE COURT:  Overruled.

18  BY MR. SCHOENSTEIN:

19  Q.  Is there any kind of formula that you utilize to come up

20  with an offer?

21  A.  No.  I think -- I think I answered that with Mr. Kataev.  I

22  don't have a checklist, a written checklist.

23  Q.  Does NYU do any benchmarking of physician salaries that

24  you're aware of?

25  A.  We do.  We have a -- we have a couple check -- checks and

1    balances in the system.

2        First, every contract that I negotiate goes then from my --

3    once we get it, the terms, once we have a handshake deal, it

4    goes to our legal department.  And our legal team, depending on

5    the circumstances, will either internally or externally have it

6    evaluated for what we call fair market value.  We're a

7    not-for-profit health system.  We have to make sure we're

8    paying people appropriate salaries for the work they're doing.

9    It's called fair market value, so we do a fair market value

10   check.

11       And then it goes to the executive vice president of human

12   resources at NYU Langone Health.  That's the top HR position.

13   And she actually checks it to make sure that we're paying --

14   not underpaying or not overpaying based on external benchmarks

15   that we use, provided by either Sullivan Cotter, which is an

16   external benchmarking agency, or the AAMC, which is another

17   benchmarking agency.  So we have two -- two  checks to make

18   sure that the contracts are fair.

19   Q.  Would Dr. Edelman's contract have gone through those

20   checks?

21   A.  Yes.

22   Q.  And you say not overpaying or underpaying.  Does that mean

23   to make sure that the salary's not too low or too high?

24   A.  A salary can be too high.  We just have to be able to -- we

25   have to go through more checks to justify it, to make sure it

1   passes compliance.  A salary cannot be too low because we are

2   bound by -- we will not pay any physician below the 25th

3   percentile within the northeast region of the AAMC or Sullivan

4   Cotter.  I don't recall for some reason now.  But we will

5   not -- that we cannot do.

6   Q.  Do you have any personal knowledge of a surveying done by

7   NYU about their physician salaries, just as a more general

8   matter?

9   A.  Well, every year we submit our -- I don't think this is

10  what you're asking.  You'll have to ask me again.

11  Q.  Do you --

12  A.  Do we have -- I know in the past we have.

13          THE COURT:  If you don't understand the question,

14  counsel will ask a new question.

15  BY MR. SCHOENSTEIN:

16  Q.  Are you aware of any surveys done of physician salaries by

17  NYU as a general matter?

18  A.  I'm aware that one has been done in the past.  I don't

19  remember exactly when, and I don't know if they do it on a

20  regular basis, but I know it's been done.

21  Q.  OK.  All right.  And you mentioned the processes go through

22  both legal and HR, is that right?

23  A.  Yes.

24          MR. KATAEV:  Objection.  Leading.

25          THE COURT:  Sustained.

N7eWede2                          Rubin - Cross

BY MR. SCHOENSTEIN:

Q.   Let me ask you a question.  When you're setting salaries,
do you take into account the gender of the physician in any
way?

A.   Absolutely not.

Q.   Do you take into account race or national origin?

A.   Absolutely not.

Q.   Do you take any other personal identifying characteristics
into account?

A.   Absolutely not.

Q.   Do you have a belief as a personal matter as to whether men
and women should be paid the same?

A.   100 percent they should be paid the same.

Q.   And what's the basis of that personal belief?

A.   Well, it's pretty -- it's pretty deep.  I mean I'm 55 years
old.  I grew up in a different time.  I'm a member of a
protected class, and I feel very strongly that people should be
paid the same for the work they're doing.

            MR. KATAEV:  Objection.  Opinion testimony.

            THE COURT:  It's a little late, so overruled.

BY MR. SCHOENSTEIN:

Q.   All right.  I don't want to send this jury home for the
weekend without talking a little more about RVUs, so I'm going
to ask you a few more questions about it.

            THE COURT:  Or the judge.

1         MR. SCHOENSTEIN:  Yeah.  Everybody.

2    Q.  From your point of view, sir, and your position, which

3    you've described, what do RVUs measure?

4    A.  It -- they measure -- it's -- it only does one thing.  An

5    RVU only has one purpose.  It's to measure productivity.

6    Q.  And is every RVU worth the same amount?

7    A.  This has been asked a lot.  Every RVU is assigned to a

8    service and has a different amount based on the service that's

9    being provided.  And what's unique about RVUs, which hasn't

10   been said, so I'll say it, is that it measures physician work,

11   and it removes any geographical boundary that may exist.  So a

12   doctor who sees a patient in their office in New York City has

13   the same work-RVU as someone who sees it in Columbus, Ohio.  So

14   it's a standardized, universal in the United States, measure of

15   physician productivity.

16   Q.  Now, I'm going to try to ask you this question, and make

17   sure you follow it, please.

18        From NYU's perspective, when doctors are earning RVUs, is

19   the first RVU worth the same to NYU as the 6,000th RVU?  Do you

20   understand my question?

21   A.  I do understand your question, but I -- I think it's going

22   to confuse people.

23        So, when you generate work, you're generating, for lack of

24   a better word, work then translates to income, but there is

25   more cost associated with us providing the infrastructure for

1    the physician to do the work if -- on that first RVU.

2         So when you get to 6,000 RVUs, in counsel's example, you've

3    already got the infrastructure built.  You've got the space.

4    You've got the nurses.  You've got the computer system.  You've

5    got the medical systems in place.  So the concept is the more

6    RVUs the more efficient the practice is, and therefore, the

7    more economic -- positive economic value there is to the health

8    system.

9         MR. SCHOENSTEIN:  My question may have been confusing,

10   but your answer wasn't.

11        MR. KATAEV:  Objection.

12   BY MR. SCHOENSTEIN:

13   Q.  Does NYU have a dollar amount it associates with wRVU?

14   A.  No.  In fact, it, it -- it troubles me when people use

15   that.  It's, it's, it's a false calculation, but I'm fully

16   conscious of the fact that it's used by -- by physicians to

17   compare themselves.

18   Q.  Does NYU pay doctors by the RVU, in your view?

19   A.  We do not.  We do not.  We do not discuss it.  We do not

20   pay it.  It is not calculated.  It is not reviewed.  For all

21   the reasons I testified earlier.

22   Q.  And what, if any, role then does the RVU calculation play

23   in compensating doctors?

24   A.  It measures productivity.  That's it.

25   Q.  And why don't you measure productivity by, like, the number

1   of hours they work or the number of patients they see; why use

2   RVUs?

3   A.   Because everybody works different hours.  Dr. Edelman works

4   four days a week, and she's very, very busy in those four days.

5   We have other doctors who work five days a week who are even

6   busier.  We have doctors who work five days a week and who are

7   less busy.  So the only measure we can use that's universally

8   accepted and fair for everyone is the work-RVU.  It removes all

9   other factors and styles on how physicians choose to practice.

10  Q.   Now --

11  A.   It's the equalizing number.

12  Q.   Now, based on your experience, your position and

13  experience, and as a defendant in this action -- you're an

14  individual defendant; you understand --

15  A.   Yeah.

16  Q.   -- right?

17  A.   Believe me, I'm aware.

18  Q.   And you understand that plaintiff, to some extent, is

19  making an argument that she was paid less per RVU than other

20  doctors may have been paid per RVU.  Do you understand that

21  argument?

22          MR. KATAEV:  Objection, your Honor.

23  A.   I am --

24          THE COURT:  Overruled.

25  A.   It's, in my mind, a completely invalid argument.

N7eWede2                        Rubin - Cross

1    Q.  Well, all right.  I guess I want to first --

2    A.  Do I understand it?  Yes.

3    Q.  -- you understand the argument.

4            (Indiscernible cross-talk)

5    A.  Yes, I understand it.

6    Q.  All right.  Now I'm going to ask you to respond to it,

7    please, and let the jury know --

8    A.  It's not a fair calculation because we don't use it.

9    Q.  Any other reason that occurred to you it wouldn't be a fair

10   calculation?

11   A.  Because it doesn't take into fact -- account any of the

12   other reasons I said how we pay physicians.  We pay physicians

13   on, as I've said numerous times now, experience, academic,

14   nonacademic, geography, research, credentials, a whole -- and

15   I'm probably leaving a long list out.  So that RVU payment

16   scheme is irrelevant to us.

17   Q.  Let's talk specifically about Dr. Edelman now.  I'm going

18   to jump right into it because I think we've heard so much about

19   the process of the negotiation.

20       There's been some testimony that you said something in a

21   meeting with Dr. Edelman and Dr. Mehta about somebody being

22   female.  First, do you recall hearing that testimony earlier

23   this week?

24   A.  I do.

25   Q.  So what do you recall specifically about that conversation

1    and any comment you made in that regard?

2    A.  So, I didn't recall any of it until Dr. Mehta -- when she

3    came in, I was leaving and I saw her.  I hadn't seen her in a

4    long time.  When Dr. Mehta and Dr. Edelman first came to my

5    office, one of the things -- I'm negotiating a salary,

6    potentially a business relationship that's going to tie us

7    together for, for a very long time, and it's a personal thing.

8    So when I -- and we have -- I travel extensively.  We actually

9    have some, some things that we do in, off in Southeast Asia.

10        So when I met Dr. Mehta, I had never heard her first name

11   before, and I commented on her first name and said I wasn't

12   sure if this was a male or female name.  I assure you that I

13   know Sari Edelman is a female name.  And I would certainly --

14   if I had offended anybody, would apologize.  But I don't

15   believe the doctor, based on her testimony, was offended.  I

16   was inquiring to the nature of her name, not -- or commenting

17   on the nature of her name, not her gender.

18   Q.  Did anybody indicate at the meeting that they were

19   offended?

20   A.  No.

21   Q.  Did anyone indicate, prior to someone filing this lawsuit,

22   that they were offended by that comment?

23   A.  I never heard it before or after and hope to never hear it

24   again.

25   Q.  In the course of the negotiations with Dr. Edelman and Dr.

N7eWede2                          Rubin - Cross

1    Mehta, was it a pro or a con for NYU that you would be assuming

2    a lease?

3    A.   It was a con.

4    Q.   And why is that?

5    A.   Because I didn't want their space.

6    Q.   Why not?

7    A.   Because I didn't need it.

8    Q.   And did the duration of the lease have any impact on that

9    being a negative?

10   A.   Yes.  It was a -- I don't recall now, but -- I recall now

11   because I didn't recall then, you know, last year, but it was a

12   15-year lease, and I didn't need the space.

13   Q.   Was assuming a loan, a business loan that Dr. Mehta and Dr.

14   Edelman had taken on, was that a pro or a con for NYU?

15   A.   That was a -- that was a con as well.

16   Q.   And how about taking over the other salaries and expenses

17   of their practice?

18   A.   I'm going to call that neutral.

19   Q.   Why is that neutral?

20   A.   Because I was happy to be able to offer employment to their

21   staff.  And in -- you know, in fact, as in most cases, their

22   staff, when we hire them, they have better advancement, you

23   know, advancement opportunities, and usually their salaries are

24   increased and they get the same -- similar benefits to the

25   physicians.

1    Q.  From your point of view, as the head of that negotiation

2    for NYU, other than securing the employment of Dr. Edelman and

3    Dr. Mehta, did NYU obtain any assets of value in that deal?

4    A.  Not that I'm aware of.

5    Q.  Now, sir, based on your knowledge, having negotiated it and

6    taking into account everything you've heard in this trial

7    during your attendance, do you believe the salary you

8    negotiated with Dr. Edelman was fair and appropriate?

9    A.  I do.

10            MR. KATAEV:  Objection.  Leading.

11            THE COURT:  Overruled.

12   BY MR. SCHOENSTEIN:

13   Q.  Why do you say that?

14            THE COURT:  I'm going to sustain it to the extent that

15   you're asking the witness about everything that he's heard in

16   this trial.

17            MR. SCHOENSTEIN:  OK.

18            THE COURT:  Just ask whether at the time or today he

19   believes that the salary was fair and appropriate, but not

20   based upon testimony he heard.  That's for the jury.

21            MR. SCHOENSTEIN:  Fair enough.

22   Q.  So as the person who negotiated the contract, do you

23   believe it was fair and appropriate?

24   A.  I do.

25   Q.  And what is the basis for that belief?

N7eWede2                          Rubin - Cross

1   A.   I recall the economics of the transaction.  I knew what --

2   I knew what the practice was.  I knew who the people were.  I

3   knew what we were paying them.  I knew what their credentials

4   were.  I knew the -- the -- I knew what we were trying to

5   accomplish, and I knew I needed to attract them to our

6   organization, which is why we had a negotiation, that they

7   agreed to, and we hired them.

8   Q.   Did the fact that Dr. Edelman and Dr. Mehta were female

9   move your offer even a dollar in either direction?

10  A.   Absolutely -- absolutely not.

11  Q.   Let's talk about a few of the other doctors that we've

12  talked about.

13       You know Dr. Goldberg?

14  A.   I know him, yes.

15  Q.   And what do you recall about his -- well, let me ask a more

16  specific question.  Has his hiring worked out OK for NYU, in

17  your estimation?

18  A.   It has.

19  Q.   Has he accomplished what you hoped he would accomplish?

20  A.   More than.

21  Q.   Do you believe, sir, that the salary you negotiated for

22  Dr. Goldberg was fair and appropriate?

23            MR. KATAEV:   Objection.

24            THE COURT:   Sustained.

25  BY MR. SCHOENSTEIN:

1    Q.  Well, did you negotiate the salary for Dr. Goldberg?

2    A.  I believe -- I -- I believe I did.

3    Q.  And you took into account the kind of factors we've talked

4    about today?

5    A.  I definitely did that.

6    Q.  OK.

7            MR. KATAEV:  Same objection.

8            THE COURT:  Objection's overruled.

9    BY MR. SCHOENSTEIN:

10   Q.  And on the basis of your involvement in those activities,

11   do you believe the salary you negotiated was fair and

12   appropriate?

13           MR. KATAEV:  Objection.

14           THE COURT:  Sustained.

15   BY MR. SCHOENSTEIN:

16   Q.  Was Dr. Goldberg hired to do the same job as Dr. Edelman?

17   A.  No.

18   Q.  How were they different?

19   A.  Dr. Goldberg was hired to build out our network, help us

20   establish a footprint in, in that part of the Long Island and,

21   quite frankly, rheumatology in all of Long Island.  We had

22   planned and then delivered on, at this point, building more

23   programs beyond rheumatology.  We have a lot of orthopedists

24   who now work in that facility; those specialties can sometimes

25   be linked.  And we hired him to help us do that.  And he came

1    with very good credentials to do that.

2    Q.  You were involved in the recruitment, hiring and salary of

3    Dr. Porges?

4    A.  I was.

5    Q.  He came from private practice, right?

6    A.  He did.

7    Q.  So just to be, just so everybody's clear, we're talking

8    about Dr. Edelman, Dr. Goldberg, Dr. Porges and Dr. Modi.  So

9    of those four, who came from private practice?

10   A.  Mehta, Edelman, Porges and Brancato came from private

11   practice.  Goldberg and Modi came from academic or group-based

12   practice.

13   Q.  OK.  And so for Goldberg and Modi, did you have business

14   plans?

15   A.  No.

16   Q.  And you had to use other factors that we've discussed?

17   A.  Correct.

18           MR. KATAEV:  Objection.  Leading.

19           THE COURT:  Try not to lead.

20           MR. SCHOENSTEIN:  Trying to move it along, your Honor.

21   I'll try not to.

22   Q.  For Dr. Porges, would you have approved his appointments as

23   clinical director and medical director?

24   A.  Would I have approved it or --

25   Q.  Yes.

1    A.  Ask the question again?  I'm sorry.

2    Q.  Did you approve his appointments as clinical director and

3    later medical director?

4    A.  I consulted with my boss, who's a physician, as well as the

5    chair of medicine, who happens to be a rheumatologist, and told

6    him that he would like the role, and we thought he was a good

7    pick for it.  So I was part of the team that approved it.

8    Q.  What, if any, importance did the medical director position

9    have, from your point of view?

10   A.  It's -- it's actually --

11              MR. KATAEV:  Objection.

12   A.  -- extremely important role, and it -- I'm sorry.  Did

13   someone object?

14              MR. KATAEV:  Objection.  Opinion testimony.

15              THE COURT:  Overruled.

16   A.  It's an extremely important position in our network as we,

17   as we build a site, as we grow a site and add physicians to a

18   site -- in this case Marcus Avenue.  And I don't recall how

19   many physicians were in it at the time.  But clinical issues

20   come up within a practice, similar to what we're here

21   discussing.  So we need clinical leadership to help us sort of

22   resolve clinical issues as they come up, help us with medical

23   staff issues as they come up.

24       I, as a nonphysician, may have administrative credibility,

25   but I don't have clinical credibility.  So we partner with a

N7eWede2                          Rubin - Cross

1    medical director to help us resolve conflicts or issues when

2    they arise.

3    Q.  From your point of view, sir, was Dr. Porges hired to do

4    the same job as Dr. Edelman?

5             MR. KATAEV:  Objection.  Opinion testimony.

6             THE COURT:  Overruled.

7    A.  No.

8    Q.  How is it different?

9    A.  Well, I mean Dr. Porges had a large practice.  He was doing

10   clinical research.  We weren't doing a lot of that at the time.

11   So he brought something to the table that other practitioners

12   that we were recruiting at the time did not bring to the table.

13   Q.  Were you directly involved in hiring Dr. Modi?

14   A.  Yes.

15   Q.  And you were involved in negotiating his salary?

16   A.  I was.

17   Q.  And he did not have a business plan, correct?

18   A.  He did not.

19   Q.  So what do you recall about figuring out Dr. Modi's salary?

20   A.  A couple, couple things.  One, he had been referred to us

21   from -- we had been having discussions at the time with

22   AdvantageCare Physicians about doing some collaboration

23   services, and his name had come up as a very strong and capable

24   rheumatologist.

25       We have a large medical group, very large medical group in

1    Huntington, Long Island, with a huge patient population.  We

2    did not have rheumatology services there, so we were looking to

3    fill a hole that we had in our network to be able to provide

4    that care.  So that would be an example where I was telling you

5    why another -- a salary may be different in that case is

6    because we had a hole to fill, patients that we needed to take

7    care of, so we needed to get someone in there.

8    Q.  Is Dr. Edelman the only doctor whose contract has not been

9    renewed since you've been in your position?

10            MR. KATAEV:  Objection.  Relevance.

11            THE COURT:  Overruled.

12   A.  Unfortunately not, no.  There are many -- not many.  There

13   are some.  It's an unfortunate thing when it happens.

14   Q.  And on your watch, has any physician ever been terminated

15   for cause?

16   A.  A couple.

17   Q.  Tell us what you remember about how the issues came up in

18   or about November 2020.

19   A.  So, my memory is, is pretty clear on that.  It was brought

20   to my attention through Mr. Swirnow, who I rely on heavily

21   for -- for things like this, to keep his pulse on the network,

22   because I have a lot of other things that I'm doing.  And it

23   had come to his attention that there were some clinical

24   concerns with Dr. Edelman's practice.

25       I said -- you know, I said OK.  I said I don't know what

1    that means.  So where are they coming from?

2         They're coming from Dr. Porges.

3         I said we need to speak with Dr. Porges.  I need to hear

4    more about what this is about.

5         So again, whether it was a call or meeting, I don't recall,

6    but we had a meeting, or we had a discussion.  Dr. Porges went

7    through me with what the clinical issues were -- practice

8    style, and just rattled off a whole bunch of stuff.

9         I said I can't rely on just you.  We need to do more.  We

10   need to go deeper.

11        So we set up a call with Dr. Goldberg, or a meeting.

12   Again, I don't remember.  And I don't believe they were

13   together.  I just don't remember.  It was a long time ago.

14        And I asked him to assess the clinical competency -- in his

15   opinion, what he thought was the clinical competency of Dr.

16   Edelman and what their recommendations were.  And they --

17   Q.  Let me ask the next question.

18   A.  OK.

19   Q.  What did they recommend?

20   A.  They recommended that we nonrenew her.

21   Q.  Did you discuss with them whether or not there were other

22   options --

23   A.  Yes.

24   Q.  -- besides nonrenewing?

25   A.  Yes, I did.

1   Q.   What did you discuss --

2   A.   Because we don't want --

3   Q.   -- in that regard?

4   A.   We don't like doing this.

5   Q.   No, no.  We spoke over each other just then.

6   A.   Sorry.

7   Q.   You've got to let me finish --

8   A.   OK.

9   Q.   -- even if you know what the question is.

10   A.   OK.  Ask the question again then.

11   Q.   Did you consider other options besides nonrenewal?

12   A.   Yes.  Well, the options we considered were pushing back on

13   Dr. Porges and Dr. Goldberg to see if there was a way to

14   resolve the situation.  Was this something that was fixable?

15   Is this something you could say, listen, you're -- you're

16   ordering too many tests, or whatever?  And it was -- I didn't

17   ask that, but it would be something like that.  I don't recall

18   what we discussed.

19       And it was their professional opinion that it couldn't be

20   resolved.

21   Q.   Did you do anything further before making a final decision

22   on renewal?

23   A.   I did.  I -- I spoke to our attorneys internally to say

24   that the contract --

25   Q.   Don't tell us what you said to your attorneys.

1      You spoke to your attorneys?

2  A.  Spoke to our attorneys.

3  Q.  OK.  What else?

4  A.  I spoke to the chair of medicine and my boss, who's a

5  physician, explained the situation and they supported

6  nonrenewal.

7              MR. KATAEV:  Objection.

8              THE COURT:  Overruled.

9  BY MR. SCHOENSTEIN:

10  Q.  At the time this was going on, did you have personal

11  knowledge of any complaint by Dr. Edelman pending in the

12  employee and labor relations department?

13  A.  None whatsoever.

14  Q.  Had you ever heard of such a complaint at this time or

15  previously?

16  A.  None whatsoever.

17  Q.  Now, you ultimately sent a letter informing Dr. Edelman

18  that her contract would not be renewed, right; we've seen that?

19  A.  Yes.

20  Q.  OK.  Did you -- there was -- the contract wouldn't be

21  terminated for six months, right?

22  A.  Correct.

23  Q.  Why was that?  Why was there going to be a six-month gap?

24  A.  Because our contracts, our physician group bylaws require

25  we give six months unless there's a real reason not to.  It was

1    the opinion of the clinicians that there was no -- while the

2    practice didn't meet our standard of care for rheumatology at

3    NYU, there was no inherent danger to a patient by letting her

4    stay.  So they supported giving her an opportunity to find

5    another job.

6    Q.  Would this have been something you would have reported to

7    compliance?

8    A.  No.  I think -- I think people confuse compliance.

9        Compliance is when there's fraudulent billing or unethical

10   activity going on.  This was -- this was a clinical concern

11   that had been raised by a physician, investigated and validated

12   by people who have experience in looking into these matters.

13   So as long as there was no risk or -- to a patient's safety, it

14   would never have gone to compliance.  And it would never have

15   gone to HR.

16   Q.  And did you report it outside of the organization?  Did you

17   report it to the medical board or any --

18   A.  There was nothing to report.

19   Q.  Why not?  Explain that.

20   A.  An investigation was done on the clinical practice by

21   clinicians who were experienced in reviewing the practice, that

22   person -- Dr. Edelman's practice.  They did not meet our

23   standards for delivering health care to our patients.  That is

24   not -- that -- had they uncovered activity that was dangerous

25   or irresponsible or problematic to the point where a patient's

N7eWede2                        Rubin - Cross

1    safety was at risk, we would have had an obligation to report

2    that to OPMC, this organization you're talking about.

3        This case did not rise to that level.  It rose to the level

4    of not meeting our own internal clinical standards for how our

5    rheumatology division wanted to deliver the care.  So we

6    nonrenewed.

7    Q.  In the process of determining whether or not to renew Dr.

8    Edelman's contract, did you consult at all with David Kaplan?

9    A.  Absolutely not.

10   Q.  Did you consult at all with Joe Antonik?

11   A.  I did not.

12   Q.  Did you consult with anybody other than the folks who you

13   mentioned in your testimony today?

14   A.  I did not.

15   Q.  After providing Dr. Edelman with notice of nonrenewal, did

16   she contact you?

17   A.  She did.

18   Q.  And tell us what, if anything, you remember about that

19   conversation.

20   A.  I remember very little, except for one thing.  I'm sure --

21   I'm going to tell you what I remember specifically.  She asked

22   me -- she had told me she wanted -- she was looking for a

23   job -- she wanted to move to Florida.  She and her husband had

24   been talking about moving to Florida.  Did I know anybody or

25   could I help her find any job in Florida?

1    Q.  And what did you say about that?

2    A.  I said -- we happened to have an office in Florida at the

3    time.  I believe we were building it.  Obviously we couldn't

4    have her there, but I said I will -- I didn't commit, but I

5    said I will do my best to help you try and find a job.

6    Q.  Did you take any action in that regard?

7    A.  I did.  I am -- at the time was, had a relationship with

8    the, the, the senior executive, the dean and CEO of the

9    University of Miami Health System, and I sent him a reference

10   email saying that we had a physician -- I referred to her as a

11   good physician, because I was trying to be nice and helpful.

12   And I said she's looking to move to Florida, and I'd like to

13   help her find a job.

14   Q.  Was that inconsistent with what your directors had reported

15   about her clinical practice?

16          MR. KATAEV:  Objection.  Leading.

17          THE COURT:  Sustained.

18   BY MR. SCHOENSTEIN:

19   Q.  Did the information you had received about her practice

20   impact at all your willingness to help her in Florida?

21   A.  It's hard -- it's hard for me --

22          MR. KATAEV:  Objection.  Relevance.

23          MR. SCHOENSTEIN:  I'll withdraw it, your Honor.  I'll

24   withdraw it.

25   Q.  To the best of your -- well, let me ask you.  Did that

N7eWede2

| | |
|---|---|
| 1 | nonrenewal of the contract have anything to do with any animus |
| 2 | you held against Dr. Edelman? |
| 3 | MR. KATAEV:  Objection.  Leading. |
| 4 | THE COURT:  Overruled. |
| 5 | A.  I had no animus against Dr. Edelman.  I was, as I am today, |
| 6 | saddened by the situation.  This is not how we like these |
| 7 | things to go.  We had to do what we did.  We had to |
| 8 | nonreview -- new, and like any physician who we hire into our |
| 9 | network when it doesn't work out, as long as there's no risk to |
| 10 | patient safety, I would try to help them find another job. |
| 11 | Q.  Did you have any reason to believe that anyone on your team |
| 12 | had animus against Dr. Edelman at the time you were considering |
| 13 | nonrenewal? |
| 14 | A.  I did -- I do not -- I did not, no.  And to this day I know |
| 15 | Josh Swirnow did not.  I don't believe anyone else did either. |
| 16 | Q.  And sitting here today, Mr. Rubin, do you stand by the |
| 17 | decision not to renew Dr. Edelman's contract? |
| 18 | A.  Unequivocally. |
| 19 | MR. SCHOENSTEIN:  Your Honor, I pass the witness. |
| 20 | THE COURT:  OK, but -- |
| 21 | MR. SCHOENSTEIN:  I know. |
| 22 | THE COURT:  -- plaintiff's counsel's not going to take |
| 23 | the witness today.  It's now 2 o'clock. |
| 24 | Members of the jury, I'm going to let you go for the |
| 25 | weekend.  You've been very attentive throughout the whole week. |

N7eWede2

1    I thank you for that.  So, I'm sure, do the parties.  I am

2    pleased to report that the case is moving along speedily and

3    that the evidence in this case will conclude in the early part

4    of next week, in the first half of next week.

5          Have a good weekend.  Please don't talk amongst

6    yourselves or to anybody else about the case.  Do not do any

7    research about the case.  Don't go onto social media about any

8    issues in the case.

9          We'll start on Monday morning at 9 a.m.  We'll have

10   breakfast available for you at 8:30.  Please be here by 8:45

11   a.m.  And again, have a good weekend.

12         Thank you, all.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

N7eWede2

1          (Jury not present)

2          THE COURT:  Mr. Rubin, you may step down, and counsel

3     may be seated.

4          One thing to bring to the parties' attention.  I was

5     informed by a member of my staff that at some point during the

6     day today, a person who we understand to be the husband of the

7     plaintiff approached two of my interns.  I've got interns who

8     have been attending the trial from time to time.

9          He asked questions including about their roles, where

10    they went to law school and their thoughts on the trial.  They

11    answered him that they were my interns and where they went to

12    school, but they said that they were not permitted to talk

13    about the trial, which is appropriate.

14         I am assuming that this was an innocuous approach and

15    a friendly approach, with no ill will or bad motivations, but I

16    wanted to make the parties aware of it and to ask whether

17    anybody requires any further inquiry.

18         I will instruct counsel and the parties and the

19    relatives of the parties that they should not be approaching

20    any of the members of my staff to ask them really any questions

21    other than to ask my deputy or my law clerk, who is here,

22    questions.

23         Is there anything the plaintiff would have me do?

24         MR. LABUDA:  No, your Honor.

25         THE COURT:  Defendant.

N7eWede2

1          MR. SCHOENSTEIN:  I would just ask, your Honor, that

2     you add to that instruction that they should also not approach

3     any witnesses or adverse parties.

4          THE COURT:  Any problem with that?

5          MR. LABUDA:  No.  No, your Honor.

6          THE COURT:  That instruction applies to witnesses and

7     to adverse parties.

8          OK.  At the end of the day yesterday, I indicated that

9     I would want to hear from the parties with respect to any

10    evidentiary issues that I should address.

11         Is there anything, from the plaintiff's perspective,

12    that remains open and not addressed that plaintiff wants to

13    press?

14         MR. LABUDA:  No, your Honor.

15         THE COURT:  OK.

16         What about from defendants' perspective?

17         MR. SCHOENSTEIN:  No, your Honor.

18         THE COURT:  OK.

19         On the plaintiff's case, we'll finish this witness.

20    And then is it Dr. Porges?  What remains on the plaintiff's

21    case?

22         MR. KATAEV:  We'll be calling Ms. Kathleen Pacina on

23    Monday right after Mr. Rubin is done.

24         THE COURT:  OK.

25         MR. KATAEV:  I have a list, your Honor.

1          MR. LABUDA:  Then I believe we're going to go to

2     Dr. Goldberg.

3          Hold on one second, your Honor.

4          MR. KATAEV:  We sent an email last night.  Let me try

5     and pull that up.

6          MR. LABUDA:  I think Modi is not available on Monday.

7     We were going to do Pacina and then, I think, Goldberg and

8     Porges.

9          THE COURT:  Pacina, Goldberg, Porges.

10         MR. LABUDA:  And then -- presumably that would take up

11    the day on Monday, and then we would do Modi when he's

12    available, on Tuesday.

13         THE COURT:  OK.  Will that complete plaintiff's case?

14         MR. LABUDA:  That would complete our case, correct.

15         THE COURT:  OK.  All right.

16         Any further update from defendants as to what their

17    case would look like?

18         MR. SCHOENSTEIN:  Currently, it looks like nothing

19    additional.

20         THE COURT:  OK.  My intention right now would be that

21    if the plaintiff finishes before the end of the day on Tuesday

22    and there are witnesses whom the defendants want to present,

23    that the plaintiff can make their Rule 29 -- I said Rule 29.

24    They can make their motion at the end of plaintiff's case, but

25    I would prefer to do argument after the end of the trial day,

to use the jury's time efficiently.  So you'll let me know

Monday morning whether you see an obstacle with respect to

that.

My hope is to get you the charge sometime over the

I also would envision that we would do the charge

conference on Tuesday after the conclusion of all of the

evidence, and then I would charge the jury on Wednesday and

they would get the case on Wednesday.

My hope is to get you the charge sometime over the

weekend.  It may not be until Monday, so in terms of your

planning, you should plan that once we're done with the trial

on Monday at 2 o'clock, you may have a bunch of time that

you'll have to spend reviewing the charge and seeing whether

there are any exceptions.

Is there anything else?

From plaintiff's perspective.

MR. LABUDA:  Yes, just one other thing, your Honor --

if you have an anticipated amount of time for the closing.

THE COURT:  How much time do you think you'll need,

from the plaintiff's perspective?

MR. LABUDA:  I think an hour would be good, your

Honor.  There's a lot of different moving parts to this, so

we'd ask for an hour.

THE COURT:  What about from defendants' perspective?

MR. SCHOENSTEIN:  I'll take an hour too.

THE COURT:  OK.

1          MR. SCHOENSTEIN:  You're still intending to do defense

2     and then plaintiff?

3          THE COURT:  Yes.  Defendants will go first and then

4     plaintiff, unless plaintiff wants to do it differently.

5          MR. LABUDA:  No.  That's fine, your Honor.

6          THE COURT:  OK.

7          All right.  You can have an hour each.  My hope would

8     be that you both realize that sometimes shorter is better than

9     longer in terms of the jury's attention.  But no more than an

10    hour.

11         Anything else, from plaintiff's perspective?

12         MR. LABUDA:  Yes, your Honor.  Just with respect to

13    juror No. 5, is there any official determination?

14         THE COURT:  Yes.  I think I should let juror No. 5 go.

15    Any objection from plaintiff?

16         MR. LABUDA:  No, your Honor.

17         THE COURT:  All right.

18         Any other issues from defendants?

19         MR. SCHOENSTEIN:  I think I just want to note -- the

20    schedule all sounds fine; I think Tuesday could actually be a

21    very short day for the jury, because if we get through

22    everybody and only have Dr. Modi on Tuesday, I can't imagine

23    he's more than an hour or so for both sides.  And I don't have

24    any solution to that.  I just wanted to make the Court aware of

25    it.

N7eWede2

1          It may be a good thing because it gives us a lot of

2     time Tuesday to address the other stuff we need to.  But it

3     might be a bit of a bummer for the jury.

4          MR. LABUDA:  I just don't think, your Honor, we'd be

5     able to cram everybody -- well, we can't cram everybody in on

6     Monday anyway --

7          MR. SCHOENSTEIN:  Yes.

8          MR. LABUDA:  -- because Dr. Modi's not available.

9          THE COURT:  The only question -- well, we'll have to

10    see, because I need to give you a charge conference, and if I

11    was able to get everything done so that we could do closings on

12    Tuesday, that would be ideal.  Plan your schedule so that

13    you're ready to do closings as soon as Tuesday, and again,

14    we'll see how things go.  It's either going to be closings on

15    Tuesday or on Wednesday and we'll do the charge conference, as

16    the rules require, before closings.

17          Anything else from defendants?

18          MR. SCHOENSTEIN:  Your Honor, respectfully, do you

19    know when we might see the verdict sheets?

20          THE COURT:  Probably also on Monday morning.  Sunday

21    night or Monday morning.

22          MR. SCHOENSTEIN:  OK.  That's fine.

23          I think that I would probably like to do closing on

24    Wednesday.  That's an awful lot to cover in two days.

25          THE COURT:  I understand that, and I'm sure the

N7eWede2

1     plaintiff feels the same way.

2                MR. LABUDA:  I'm fine with that too, your Honor.

3                THE COURT:  All right.  My deputy has just handed me a

4     note, which we'll make part of the record and you'll all have

5     access to.

6                It's 2:02 p.m.  It's from juror No. 7, I believe.  I'm

7     not going to read her name into the record, but it is on the

8     note.

9                It reads as follows:

10               "Your Honor, I appreciate your interest in moving this

11    trial along in a timely manner.  With respect to both counsels'

12    line of questioning, is there a way to ask that questions be

13    asked more directly and perhaps less redundantly.  If the

14    purpose of examining witnesses is to provide the jury with

15    relevant information, simple, quick questions will suffice and

16    help (at least this juror) stay focus and engaged."

17               So I offer that for your benefit.  I think I will come

18    up with something to tell all of the jurors on Monday morning

19    that will be responsive to this note, without indicating that

20    it is responsive to the note, to the effect that, you know, the

21    lawyers are asking questions to bring out the information that

22    they each believe that is appropriate and that I'm asking them

23    to pay attention to the evidence.

24               If anybody has any further thoughts about it –- maybe

25    I might say that at some point the questioning might seem to be

N7eWede2

1    repetitive or redundant, but that may be because there's a

2    particular point that the parties want to make sure that the

3    jurors understand and that the important thing, from their

4    perspective, is to know, first of all, that the parties are

5    doing their best to make things efficient for you, and second,

6    from your perspective, you should be paying attention to what

7    you hear.

8              MR. LABUDA:  That's fine, your Honor.

9              MR. KATAEV:  I would just ask, your Honor, if the

10   Court would agree, that to the extent evidence is repetitive,

11   it serves through multiple witnesses to corroborate what was

12   said.

13             THE COURT:  That I'm not going to do because that is

14   making it unbalanced.  The way I view this note is not that

15   different witnesses are being asked the same questions.  I view

16   this note as being addressed to the fact that, in some

17   instances, from both sides, as the juror points out -- and I,

18   frankly, have tried to emphasize from time to time -- there are

19   one too many questions and the jurors seem to get the point.

20             All right.  I'll come up with something.  I'll let you

21   know what I'm going to say.

22             Have a good weekend, everybody.

23             (Adjourned to July 17, 2023, at 9 o'clock a.m.)

24

25

1                      INDEX OF EXAMINATION

2    Examination of:                              Page

3     JOSHUA SWIRNOW

4    Cross By Mr. Schoenstein . . . . . . . . . . 759

5    Redirect By Mr. Kataev . . . . . . . . . . . 764

6    Recross By Mr. Schoenstein . . . . . . . . . 798

7    Redirect By Mr. Kataev . . . . . . . . . . . 802

8     MIRIAM RUIZ

9    Direct By Mr. Kataev . . . . . . . . . . . . 805

10   Cross By Mr. Schoenstein . . . . . . . . . . 830

11   Redirect By Mr. Kataev . . . . . . . . . . . 859

12    ANDREW RUBIN

13   Direct By Mr. Kataev . . . . . . . . . . . . 867

14   Cross By Mr. Schoenstein . . . . . . . . . . 913

15                     PLAINTIFF EXHIBITS

16   Exhibit No.                              Received

17    121   . . . . . . . . . . . . . . . . . . . 775

18                     DEFENDANT EXHIBITS

19   Exhibit No.                              Received

20    JJJ   . . . . . . . . . . . . . . . . . . . 837

21    BBB   . . . . . . . . . . . . . . . . . . . 850

22    GGG   . . . . . . . . . . . . . . . . . . . 861

23

24

25

N7HCede1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   DR. SARI EDELMAN,

 4                 Plaintiff,

 5           v.                          21 Civ. 502 (LJL)

 6   NYU LANGONE HEALTH SYSTEM, et
     al.,
 7
                  Defendants.
 8                                       Trial
     ------------------------------x
 9                                       New York, N.Y.
                                         July 17, 2023
10                                       9:00 a.m.

11   Before:

12                   HON. LEWIS J. LIMAN,

13                                       District Judge
                                         -and a Jury-
14

15                       APPEARANCES

16   MILMAN LABUDA LAW GROUP PLLC
          Attorneys for Plaintiff
17   BY:  JOSEPH M. LABUDA
          EMANUEL S. KATAEV
18
     TARTER KRINSKY & DROGIN LLP
19        Attorneys for Defendants
     BY:  RICHARD C. SCHOENSTEIN
20        RICHARD L. STEER
          INGRID J. CARDONA
21

22

23

24

25
```

N7HCede1

1              (In open court; jury not present)

2              THE COURT:  Anything before we bring in the jury?

3              MR. LABUDA:  Your Honor, there is one small issue

4      regarding Mr. Rubin's testimony, if we could just have a moment

5      without Mr. Rubin being present.

6              THE COURT:  Mr. Rubin can step out.

7              MR. LABUDA:  Your Honor, there's one document that we

8      planned on introducing, which is an email that Mr. Rubin sent

9      in December of 2020 about a reference for the plaintiff at

10     another job.  That document was not on our exhibit list, but it

11     was produced by the defendants on June 30th of this year, so I

12     don't believe that they would have any issue with this, but I

13     wanted to raise it with the Court in terms of an objection.

14             THE COURT:  Does the defendant know what the document

15     is?

16             MR. SCHOENSTEIN:  We do, your Honor, but we object.

17     It wasn't on the exhibit list, it's not being used for

18     impeachment as far as I've heard, so it shouldn't be

19     introduced.

20             THE COURT:  You want to pass it up to me.

21             MR. LABUDA:  Sure.

22             THE COURT:  How soon are we going to get to that

23     document?

24             MR. LABUDA:  We're going to do his cross examination

25     now, so we were going to bring it up during that time.

N7HCede1

1          MR. SCHOENSTEIN:  Also, your Honor, I wanted to

2     mention, we hadn't started cross yet.  I had just a couple more

3     questions for Mr. Rubin I didn't ask I'd like to ask first and

4     then hand him over.

5          THE COURT:  Of course.

6          MR. LABUDA:  I have a copy of the email that we

7     received from the defendants for June 30th, indicating that

8     they did not produce this document, it was requested, but they

9     didn't produce the document.  There was an inadvertence, we're

10    not seeking any sanction or anything like that, we just want to

11    be able to use the document.

12         MR. SCHOENSTEIN:  Your Honor, we withdraw the

13    objection.  With that addition, I think it's okay.

14         THE COURT:  Let's get Mr. Rubin, put him on the stand.

15    Mr. Schoenstein, you'll ask your couple of questions, then

16    we'll go to cross examination.

17         Mr. Rubin, why don't you step forward into the witness

18    box while we bring in the jury.

19         (Continued on next page)

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Mr. Schoenstein, I understand you have a

3     couple more questions before we get to cross examination.  You

4     may proceed.

5              MR. SCHOENSTEIN:  I do, your Honor.

6      ANDREW RUBIN, resumed.

7     CROSS-EXAMINATION CONTINUED

8     BY MR. SCHOENSTEIN:

9     Q.  Good morning, Mr. Rubin.

10    A.  Good morning.

11    Q.  In connection with your job, sir, and your oversight of

12    doctors, are you aware of any surveys conducted by NYU

13    addressing potential gender disparity in compensation for

14    physicians?

15    A.  Yes.  I think I alluded to it.  A couple of years ago,

16    three years ago, I believe, the HR department hired an external

17    compensation consultant to come in and survey all faculty,

18    which includes all the physicians in the physician group to

19    make sure that there were no pay-related issues for any

20    potential issue, including gender.

21    Q.  And as a result of that surveying, what, if any,

22    adjustments did your department have to make to the salary of

23    any physician?

24    A.  None.

25              MR. KATAEV:  Objection.  Relevance.

1                  THE COURT:  Overruled.

2    Q.  I'm sorry.  Could you say that again.

3                  THE COURT:  Overruled.

4                  MR. SCHOENSTEIN:  I meant the witness, your Honor.

5    A.  There were no adjustments needed to have been made for any

6    physician in the group.

7    Q.  Now, at the time of plaintiff's departure from NYU at the

8    end of 2020, who was the head of NYU's employment labor

9    department?

10   A.  Employment labor department is human resources.

11   Q.  Yes.

12   A.  So that would be Nancy Sanchez.

13   Q.  Is that a man or a woman?

14   A.  That's a woman.

15   Q.  At the time, who was the head of NYU's legal department?

16   A.  Annette Johnson, and she still is the head.

17   Q.  Do you see Ms. Johnson in the courtroom today?

18   A.  I do.

19   Q.  Can you point her out for the jury.

20   A.  In the back corner.

21   Q.  And at the time plaintiff left NYU's employment, who was

22   the head of NYU's rheumatology department?

23   A.  Jill Buyon.

24   Q.  Is Dr. Buyon a male or a female?

25   A.  Female.

1              MR. SCHOENSTEIN:  I pass the witness.

2              THE COURT:  Plaintiff's examination.  Counsel, you may

3      proceed.

4      REDIRECT EXAMINATION

5      BY MR. KATAEV:

6      Q.  Good morning, Mr. Rubin.

7      A.  Good morning.

8      Q.  You just testified about a report that you received

9      concerning gender disparity; correct?

10     A.  Yes.

11     Q.  That report was in writing, wasn't it?

12     A.  I'm sorry.  Which report?

13     Q.  The report that you testified did not show any changes

14     needed to be made with gender pay; correct?

15     A.  I did not get the final report, no.

16     Q.  But there was some report in writing, wasn't there?

17     A.  I would assume so.

18     Q.  And your attorneys did not introduce that report in

19     evidence during your testimony; correct?

20     A.  I don't know.

21     Q.  During your testimony --

22     A.  Oh, just now.  No, he didn't.

23     Q.  And NYU maintains a website, doesn't it?

24     A.  Yes.

25     Q.  That website is publicly accessible; right?

N7HCede1                          Rubin - Redirect

1    A.  Yes, for sure.

2    Q.  And NYU posts information about itself on that website;

3    correct?

4    A.  It does.

5            MR. KATAEV:  Your Honor, I'd like to mark for

6    identification Plaintiff's Exhibit 124.  I only have a hard

7    copy.  I'm going to pass it up to the witness and to your

8    deputy, with permission.

9            THE COURT:  Any objection?

10           MR. SCHOENSTEIN:  Yes, your Honor.  We don't have a

11   124 on the pretrial.

12           THE COURT:  This was not on the pretrial order.

13   What's the basis for using it?

14           MR. KATAEV:  A, it's publicly accessible, your Honor,

15   so it's something that should go into evidence.

16           THE COURT:  Any other basis?

17           MR. KATAEV:  The witness testified about it and that

18   was permitted to go in.  Just to provide clarity on the prior

19   testimony, your Honor.

20           THE COURT:  Is there a particular page or line you

21   want me to look at?

22           MR. KATAEV:  The first page, your Honor, that chart.

23           THE COURT:  What's the defendants' position?

24           MR. SCHOENSTEIN:  If it's publicly available, there

25   was no reason not to have it on the pretrial order, your Honor.

1    It's not appropriate to add exhibits at this late stage.

2              THE COURT:  Sustained.

3              MR. KATAEV:  I'll use it to refresh his recollection.

4              THE COURT:  You could do that, but you have to first

5    establish a lack of recollection.

6              MR. KATAEV:  Okay.

7    BY MR. KATAEV:

8    Q.  You recall during your testimony on Friday that you could

9    not specifically state how much revenue NYU made; correct?

10   A.  Correct.

11   Q.  You were only able to testify that it was in the billions,

12   but you could not specify the numbers; right?

13   A.  Correct.

14   Q.  And that's because you don't recall specifically how much

15   NYU made in revenue; correct?

16   A.  It's not because I don't recall, it's because I don't know.

17             MR. KATAEV:  I'd like to refresh the witness's

18   recollection using this document.

19             THE COURT:  You may do so.

20             The way refreshing recollection works is that counsel

21   can show you any document.  If it brings memory to your mind

22   that permits you to answer the question, you can use the

23   document to bring back that memory.

24             Go ahead, counsel, and ask the question.

25   Q.  Based on your review of this document, do you now recall

 1   how much the School of Medicine made in revenue for the fiscal

 2   period of September 1st, 2021 through August 31st, 2022?

 3   A.  I don't recall.  I mean, I've never seen this before.

 4   Q.  But does this document state what that is?

 5   A.  The document states what it is, yes.

 6   Q.  And could you tell us that number.

 7              MR. SCHOENSTEIN:  Objection.

 8              THE COURT:  No, he can't.  Objection is sustained.

 9   Q.  Does it refresh your recollection as to approximately the

10   revenue that NYU made?

11   A.  It doesn't refresh my recollection only because I've never

12   known it.

13   Q.  You also testified on Friday about the lack of any

14   agreement with NRad; correct?

15   A.  I'm sorry.  I didn't hear the latter part of the question.

16   Q.  You also testified on Friday regarding the lack of any

17   agreement with NRad; correct?

18   A.  I don't exactly recall the question from last week.

19   Q.  Isn't it true that NYU has a licensing agreement with

20   Meridian?

21   A.  I'm not aware -- I'm going to say yes, I think we do have a

22   licensing agreement with it, but I don't know what it says.

23   Q.  And the majority of Meridian is owned by accompany called

24   Blue Dot; correct?

25   A.  I don't know what --

1      MR. SCHOENSTEIN:  Objection.  Foundation.

2      THE COURT:  Overruled.

3  A.  I don't know what Meridian is.  I'm sorry.

4      MR. KATAEV:  I'd like to present the witness with

5  another set of documents to refresh his recollection, your

6  Honor.

7      MR. SCHOENSTEIN:  Objection.

8      THE COURT:  The objection is sustained.  If he lacks a

9  recollection, then you can use the document to refresh

10  recollection.

11  Q.  Do you have any recollection as to whether Meridian is

12  owned by Blue Dot?

13  A.  I don't know what Blue Dot is and I don't know what

14  Meridian is as it relates to an entity of any kind.

15  Q.  Isn't it true that Blue Dot is a wholly owned subsidiary of

16  NRad?

17  A.  I have no idea what Blue Dot is.

18  Q.  Isn't it true that your licensing agreement with Meridian

19  that you just testified about permits you to use NRad's

20  facilities?

21  A.  I don't know enough about the nature of the agreement.

22  Q.  Is it fair to say that through an agreement with Meridian,

23  you are permitted to use the facilities that NRad has?

24  A.  I just don't know what the deal with Meridian does or is.

25  Q.  Do you deny that NYU uses NRad's facilities?

1  A.  We have a relationship with NRad.  I don't know what it is.

2  It's done through radiology.

3  Q.  Now, Dr. Edelman's main role was treating patients for

4  rheumatological issues; correct?

5  A.  I believe so, yes.

6  Q.  And that was Dr. Porges' role, as well; correct?

7  A.  Dr. Porges had many roles.

8  Q.  And one of his main roles was treating patients for

9  rheumatological issues; correct?

10  A.  Yes.

11  Q.  And that was also Dr. Goldberg's role; correct?

12  A.  Amongst his many roles, yes.

13  Q.  But his primary goal was treating patients for

14  rheumatological issues; correct?

15  A.  Yes, as physicians, yes, that's what they do.

16  Q.  And that's true of Dr. Modi, as well; correct?

17  A.  Yes, correct.

18  Q.  They would not be able to meet their high RVU targets

19  without that being their main duty; correct?

20  A.  I don't follow the question.  I'm sorry.

21  Q.  Drs. Porges, Goldberg, and Modi had RVU targets?

22  A.  They did.

23  Q.  In order for them to meet their targets, they had to see

24  patients; right?

25  A.  They did.

N7HCede1                         Rubin - Redirect

Q.   And with respect to Dr. Porges and Dr. Goldberg, they had

administrative duties, as well; correct?

A.   Yes, they did.

Q.   And in their contracts, those administrative duties were

only 5 percent or 10 percent of their effort; correct?

A.   If that's what it said in their agreements.  I don't know

off the top of my head what percentage efforts they had.

Q.   Dr. Porges was also responsible for doing clinical

research; right?

A.   Clinical research, yes.

Q.   And he received compensation for that clinical research in

his clinical pay; correct?

A.   Yes, it was part of his compensation.

Q.   Now, you testified that Dr. Edelman was nonrenewed because

she did not meet NYU's clinical standards; right?

A.   I did.

Q.   But those clinical standards are written down in NYU's

policies and procedures, aren't they?

A.   I don't believe so.

Q.   And your attorneys did not offer any documents of those

standards during your testimony; correct?

A.   Not during my testimony, no.

Q.   Now, you learned about these clinical concerns of

Dr. Edelman by meeting with Dr. Porges; right?

A.   I did, yes.

N7HCede1                          Rubin - Redirect

```
 1   Q.  And that was in a face-to-face meeting; correct?
 2   A.  As I mentioned last week, it was either face-to-face, Zoom,
 3   or phone.  I just don't recall the nature of the meeting, other
 4   than there was a meeting.
 5            MR. KATAEV:  Page 111, your Honor, lines 11 through
 6   15.
 7            THE COURT:  Go ahead.
 8            MR. KATAEV:  Permission to show the witness the
 9   transcript.
10            THE COURT:  Yes.
11   Q.  At your September 2021 deposition, I asked you the
12   following questions and you gave the following answers;
13   correct?
14   "Q.  How did Dr. Porges raise the concern to you?
15   "A.  He told me.
16   "Q.  Face-to-face?
17   "A.  Yes."
18   Q.  Did you provide that testimony?
19   A.  I did.
20   Q.  You also referenced during your testimony on Friday some
21   benchmarking companies.  Do you recall that?
22   A.  I do.
23   Q.  And those benchmarking companies provide written
24   evaluations concerning salaries; right?
25   A.  They do.
```

1   Q.   And those evaluations are primarily done to deal with

2   something called stark laws; correct?

3   A.   Not true.

4   Q.   Those evaluations are not done for the purpose of measuring

5   whether there's any gender pay disparity due to gender;

6   correct?

7   A.   I'm sorry.  I didn't understand what you were asking.

8   Q.   The benchmarking evaluations are not done for the purpose

9   of evaluating the disparity in pay between male doctors and

10   female doctors; correct?

11   A.   I don't know, honestly.

12   Q.   But those evaluations are in writing; correct?

13   A.   Yeah, they're public -- I mean, you can buy them.  They're

14   surveys you can buy.

15   Q.   And you also testified about a fair market value analysis;

16   right?

17   A.   Correct.

18   Q.   And the analysis that's done for fair market value is also

19   in writing; correct?

20   A.   I don't know.  They're done by our legal department.

21   Q.   Your attorneys have not offered any documents during your

22   testimony of the evaluations for benchmarking; correct?

23   A.   Not during my testimony, no.

24   Q.   Nor did they provide any written documents about fair

25   market value analysis; correct?

1    A.  No, not to me.

2    Q.  You also mentioned that doctors fall within a certain

3    percentile for the benchmarks; correct?

4    A.  I said that, yes, they have to be paid a minimum of the

5    25th percentile.

6    Q.  Those reports that contain the percentile are also in

7    writing, aren't they?

8    A.  Yes, it's the same -- they're publicly available if you

9    want to buy them.

10   Q.  But your attorneys didn't offer any documents as to what

11   percentile any doctor fell in at NYU; correct?

12   A.  I'm sorry.  Can you ask me again.  I didn't hear clearly.

13   Q.  During your testimony with Mr. Schoenstein, no documents

14   were offered about what percentile any doctor fell in; correct?

15   A.  Correct.

16   Q.  You testified on Friday that you spoke to other clinicians

17   after speaking to Dr. Porges and Dr. Goldberg concerning

18   Dr. Edelman.  Do you recall that testimony?

19   A.  I do.

20          MR. KATAEV:  131, your Honor, line 19 through line 4

21   on the next page.

22          THE COURT:  Go ahead.

23   Q.  At your deposition, I asked you the following question and

24   you gave the following answer --

25   A.  I can't see it on my screen.  There you go.

1    Q.  You can see it now?

2    A.  What line are you on?

3    Q.  I'm going to read it to you, line 19 through line 4 on the

4    next page.

5    "Q.  Other than what Drs. Goldberg and Porges told you -- had

6    no other information about Dr. Edelman's performance -- you had

7    no other information about Dr. Edelman's performance; correct?

8    "A.  The medical director of the facility and the medical

9    director of the practice are all the clinical judgment I need

10   to make a decision like we made."

11   Q.  Did you provide that answer?

12   A.  I did.

13   Q.  And based on that answer, you did not consult with any

14   other clinicians; correct?

15   A.  Not correct.

16   Q.  So when you answered this question during your deposition,

17   you did not tell the full story; correct?

18   A.  I answered the question in the deposition.  I also spoke

19   with my boss, who is a physician, and I spoke with the head of

20   the department of medicine, but they're administrative.

21   Q.  But when I asked you this question at your deposition, you

22   did not state that; correct?

23   A.  No, I didn't state it.

24   Q.  Now, the clinical judgment that you referenced was that

25   Dr. Edelman's practices were not in keeping with clinical

1   standards of NYU; right?

2   A.  I'm sorry.  Are you -- ask me again.  I don't understand

3   the question.

4   Q.  When you spoke to Dr. Porges and Dr. Goldberg, they

5   provided their clinical judgments; correct?

6   A.  Correct.

7   Q.  And their clinical judgment was that Dr. Edelman's

8   practices were not in keeping with NYU's clinical standards;

9   right?

10  A.  That's what they said, correct.

11  Q.  But you never reviewed those clinical standards to confirm

12  what Dr. Porges and Dr. Goldberg were saying; right?

13  A.  That's not my role to review them.

14  Q.  So you concluded based on conversations with Dr. Porges and

15  Dr. Goldberg that Dr. Edelman is a bad doctor; right?

16  A.  Wrong.

17  Q.  Are you saying that Dr. Edelman was a good doctor?

18  A.  I'm saying what I've said all along, she didn't meet our

19  standards according to the physicians that are in the roles

20  that they're in to make that determination.

21  Q.  And based on that, was she a good doctor or was she a bad

22  doctor?

23  A.  You're going to have to ask them that.

24  Q.  Isn't it fair to say that you concluded that Dr. Edelman

25  was a bad doctor based on what Dr. Porges and Dr. Goldberg told

1    you?

2    A.  It is not fair to say that.

3    Q.  Is it fair to say that Dr. Edelman was a poor performing

4    doctor at NYU based on what Dr. Porges and Dr. Goldberg told

5    you?

6    A.  I think the answer to the question is that Dr. Edelman

7    didn't meet our clinical standards.  I can't answer specific

8    adjectives.  It's just -- it is what it is.

9    Q.  Based on what Dr. Porges and Dr. Goldberg told you, you

10   decided that you had to fire Dr. Edelman without speaking to

11   her; correct?

12   A.  We -- not correct.  We nonrenewed Dr. Edelman's contract

13   based on the recommendations of the people who are in the

14   position to make those recommendations.

15   Q.  And so you nonrenewed Dr. Edelman's contract and informed

16   her that her last day is six months from the date of

17   nonrenewal; correct?

18   A.  That is correct.

19   Q.  Dr. Edelman remained with NYU for several months after

20   nonrenewal; correct?

21   A.  That is correct.

22   Q.  And your testimony on Friday was that this is due to NYU's

23   guidelines for its doctors; right?

24   A.  I don't remember what words I used on Friday, but we do

25   give physicians six months' notice if they've been with us for

1    a certain amount of time.

2    Q.  And that's based on NYU's guidelines; right?

3    A.  I don't honestly know where it comes from, how it's

4    administered.  That's handled by our legal department.

5    Q.  Aren't those guidelines in writing?

6    A.  I assume so.  I don't know.

7    Q.  And your attorneys did not introduce any documents

8    concerning those guidelines during your testimony, did they?

9    A.  They did not.

10   Q.  You also testified regarding your conversation with

11   Dr. Edelman with you when she was not renewed.  Do you recall

12   that testimony?

13   A.  I do.

14   Q.  And you testified about what you and her discussed when she

15   called you that day; right?

16   A.  Correct.

17   Q.  On Friday, you were able to recall your testimony.  I'm

18   sorry.  You were able to recall your conversation with

19   Dr. Edelman; right?

20   A.  I think I said I recall most of it.  Again, I don't

21   remember my words on Friday, exact words.

22           MR. KATAEV:  Page 140, your Honor, 6 through 9.

23           THE COURT:  Go ahead.

24   Q.  At your deposition in September 2021, I asked you the

25   following question, you provided the following answer; correct?

N7HCede1                         Rubin – Redirect

1    "Q.  Are you aware that you had a telephone conversation with

2    Dr. Edelman about the nonrenewal?

3    "A.  I don't recall.  It's possible."

4    Q.  Did you give that answer?

5    A.  I did.

6    Q.  Was not your memory in September 2021 better than last

7    Friday concerning this conversation?

8    A.  My memory got a lot clearer when all the documents were

9    produced and I found the email that I sent.

10   Q.  So it's your testimony that your memory has improved since

11   the September 2021 deposition; correct?

12   A.  My testimony is I saw the email where I sent a notice to a

13   physician in Florida on her behalf and then I remembered her

14   asking me to do it.

15   Q.  And you recall that Dr. Edelman asked you for help;

16   correct?

17   A.  She did.  That's why I sent the email.

18   Q.  And you did, in fact, send an email to one Edward Abraham

19   at the Miller School of Medicine at the University of Miami;

20   correct?

21   A.  Yes.  At the time, I thought he was the dean.  He had

22   apparently been let go a week or two prior before I knew that.

23          MR. KATAEV:  I'd like to mark for identification

24   Plaintiff's Exhibit 123, your Honor.

25          THE COURT:  Okay.  This is the document I assume that

1    we discussed this morning?

2              MR. KATAEV:  Yes, your Honor.

3              THE COURT:  Do you want to describe what it is for

4    purposes of identification, what is 123?

5              MR. KATAEV:  I could publish it to the witness.

6              THE COURT:  You can publish it to the witness.  Have

7    him identify it, that's fine.

8    Q.  Mr. Rubin, this is an email that you sent to Mr. Abraham on

9    December 4th, 2020; correct?

10   A.  Correct.

11             MR. KATAEV:  I'd like to offer this into evidence as

12   Plaintiff's Exhibit 123.

13             THE COURT:  Any objection?

14             MR. SCHOENSTEIN:  No, your Honor.

15             THE COURT:  123 is received.

16             (Plaintiff's Exhibit 123 received in evidence)

17             MR. KATAEV:  Permission to publish to the jury.

18             THE COURT:  Yes.

19   Q.  In this email, you refer to Dr. Edelman as a very good

20   doctor; correct?

21   A.  I referred to her as a very good doctor, yes.

22   Q.  And you told Mr. Abraham that she produces; right?

23   A.  I did.

24   Q.  And you also stated that she has a very good practice,

25   didn't you?

1   A.   She did.

2   Q.   But your testimony here on Friday and today is that she was

3   nonrenewed because of alleged patient care issues; right?

4   A.   My testimony has been very clear that she was nonrenewed

5   because she didn't meet NYU's clinical standards.

6   Q.   And is it your testimony that University of Miami's medical

7   school standards are less than NYU's?

8   A.   That is definitely my testimony.

9   Q.   You also stated during your testimony on Friday that you

10  had no discriminatory animus to Dr. Edelman; correct?

11  A.   I didn't then and I don't today.

12  Q.   And you testified unequivocally that you had no knowledge

13  of her complaint; correct?

14  A.   I have no knowledge of an HR complaint from Dr. Edelman.

15            MR. KATAEV:   Page 175, your Honor, line 25 through

16  line 4 on the next page.

17            MR. SCHOENSTEIN:   Objection.

18            THE COURT:   No, I'll permit it.

19  Q.   At your September 2021 deposition, I asked you the

20  following question and you gave the following answer, didn't

21  you?

22  "Q.   Were you not made aware of the complaint she made to human

23  resources?

24  "A.   I don't recall if I would have been made aware of it or

25  not."

1    Q.  Do you recall that testimony?

2    A.  I do.

3    Q.  So wasn't your memory in September 2021 better than your

4    memory last Friday?

5    A.  I don't understand the question.  I'm sorry.

6    Q.  You testified unequivocally on Friday that you had no

7    knowledge whatsoever of Dr. Edelman's complaint to human

8    resources; right?

9    A.  Correct.

10   Q.  But at your deposition, you weren't sure one way or the

11   other whether she made any such complaint; isn't that true?

12   A.  I said I don't recall.

13   Q.  And so what you're saying that is your memory has improved

14   since September 2021?

15   A.  No, I'm not saying that.  I'm saying I don't recall.

16   Q.  So it's fair to say that, as of today, you don't recall

17   whether you knew of Dr. Edelman's complaint; correct?

18   A.  I neither recall or am aware of an HR complaint.  In my

19   mind, those are the same.

20   Q.  You didn't investigate whether anyone else had any

21   discriminatory animus toward Dr. Edelman, did you?

22   A.  I don't understand that question.

23   Q.  When Dr. Porges came to you about issues with Dr. Edelman,

24   you did not ascertain whether anyone would have any reason to

25   complain about her; correct?

N7HCede1                      Rubin - Redirect

1   A.  I investigated the complaint, so I never take one person's

2   word over another's.  You have to be more thorough than that.

3   Q.  You knew that Mr. Antonik had operational responsibilities

4   over Dr. Edelman with respect to office space; correct?

5   A.  I know that Mr. Antonik oversees that site, yes.

6   Q.  And you also heard Mr. Swirnow testify that he spoke to the

7   plaintiff about an office space issue complaint by Dr. Edelman

8   against Mr. Antonik; correct?

9   A.  I did hear that, yes.

10  Q.  And you did not consider whether something may have

11  occurred between the two of them that led to this complaint

12  about her clinical practices, did you?

13  A.  I would not have considered it because it's, as I think

14  you've heard, it's absurd.  So when it was resolved, I assumed

15  it was over.  The notion that someone could ensure an office

16  never occurred to me would result in an HR complaint.

17  Q.  You wouldn't take one person's word over another in a

18  dispute, would you?

19           MR. SCHOENSTEIN:  Objection.

20           THE COURT:  Overruled.

21  A.  Ask me more -- I don't understand that question.

22  Q.  If there's a dispute between two people, you wouldn't take

23  one person's word over another, would you?

24  A.  I would have to understand the circumstances of the

25  dispute, but in general, I'd like to have more facts when

1    deciding my opinion on whether there's a dispute or not.

2    Q.  But you effectively took one person's word over Dr. Edelman

3    when you nonrenewed her without speaking to her; correct?

4    A.  That is absolutely not true.

5    Q.  But you didn't speak to Dr. Edelman about these issues, did

6    you?

7    A.  I did not speak to Dr. Edelman, but as I testified, I spoke

8    to others.

9    Q.  As you sit here today, you do not know whether Mr. Antonik

10   told Dr. Porges about these alleged clinical issues; correct?

11   A.  I don't interact with Joe Antonik, Mr. Antonik, so I don't

12   know anything he and Dr. Porges spoke about.

13   Q.  You negotiated with Dr. Goldberg concerning his

14   compensation when he first came in 2013; correct?

15   A.  Yeah, I don't remember the specifics of that at all, but

16   I'm sure I would have been the guy who did it.

17   Q.  And when Dr. Goldberg asked for $290,000, he received

18   $290,000; correct?

19   A.  I think I said this last week, I don't recall the terms of

20   our negotiation.

21        MR. KATAEV:  I'd like to present a document to refresh

22   the witness's recollection, your Honor.

23        THE COURT:  What is it?

24        MR. KATAEV:  It's a declaration from Mr. Goldberg.

25   I'd like to place it on the screen just for him.

1          THE COURT:  Is it marked?

2          MR. KATAEV:  It's not, your Honor.

3          THE COURT:  You should mark it for identification

4     purposes.

5          So this is 125?

6          MR. KATAEV:  I think we should mark it 128, your

7     Honor.

8          THE COURT:  128, okay.

9     Q.  I'm showing you a declaration from Mr. Goldberg.  I'm going

10    to highlight some portions for you to read, without saying

11    anything, just to see if you can refresh your recollection as

12    to those negotiations, okay.  Just let me know when you're done

13    reading paragraph 4 and we can continue.

14    A.  I'm done.  I'm done.

15    Q.  I apologize.

16       Based on your review of this document, do you now recall

17    what Dr. Goldberg's salary was before he came to NYU?

18    A.  I think I said this last week and earlier, I negotiate with

19    literally thousands of doctors.  This does not refresh my

20    memory in the slightest, but I'm sure this is what happened

21    if --

22          THE COURT:  The rule with respect to refreshing

23    recollection is that a lawyer can show a witness a plate of

24    spaghetti and say does that plate of spaghetti bring back a

25    memory with respect to salary, the document may not bear any

1    relationship to what you're being asked about other than

2    whether it sparks a recollection.

3    A.  It does not then.

4    Q.  Is there any gender neutral metric used by NYU based on

5    academic credentials as it relates to setting salaries?

6    A.  I don't understand that question.  I'm sorry.

7    Q.  You testified about academic credentials when talking about

8    bringing in doctors and how much to pay them; correct?

9    A.  Correct.

10   Q.  Is there any gender neutral metric based on academic

11   credentials that you use in setting salaries?

12   A.  I guess I don't know what a gender neutral metric is.

13   Q.  So, for example, if a doctor went to an ivy league school,

14   you would mark that as 10 points internally, and if they went

15   to a regional school, you would mark that as only 5 points.  Do

16   you have a system like that at NYU?

17   A.  No.

18   Q.  Is there any gender neutral metric used by NYU based on

19   years of experience as it relates to setting salaries?

20   A.  Still not following the gender neutral part, but -- I'm

21   sorry.

22   Q.  Do you use a point system as it relates to years of

23   experience when setting salaries?

24   A.  No.

25   Q.  Is there any gender neutral metric used by NYU based on

1  patient satisfaction scores when setting salaries?

2  A.  Still not sure I understand the question, but if you're

3  going to ask -- I'm going to say no.

4  Q.  There's no point system?

5  A.  There's no point system, no.

6  Q.  And there's no point system or gender neutral metric that

7  NYU uses based on education; correct?

8  A.  There's no point systems.

9  Q.  And the same applies with training?

10 A.  I don't understand what that means.

11 Q.  There's no point system that's gender neutral that NYU uses

12 based on education in setting salaries?

13 A.  No, no point system.

14 Q.  And there's no point system with respect to the training

15 that a doctor has; correct?

16 A.  Training -- I think I'm getting stuck on the word

17 "training."

18 Q.  Training and experience?

19 A.  There's no point system.

20 Q.  And there is this no such metric for the quality of

21 production; correct?

22 A.  We do have quality metrics.

23 Q.  And what quality metrics do you use in setting salaries?

24 A.  None.

25 Q.  And the same thing in terms of quantity of production,

1    there's no point system related to that?

2    A.  No, we don't use a point system.

3    Q.  Same questions for renewals and pay raises, you don't use

4    any point system related to the topics we just covered;

5    correct?

6    A.  Yeah, I mean, I can -- yes, we don't use any point systems.

7    Q.  And you mentioned that seniority played a role in your pay

8    decisions; correct?

9    A.  Seniority is one of many factors we use.

10   Q.  You would agree with me that Dr. Porges is a lot more

11   senior than Dr. Modi; correct?

12   A.  I would.

13   Q.  Dr. Porges became a doctor in 1986 based on his curriculum

14   vitae; correct?

15   A.  I don't know what year -- if that's written on his CV, I

16   assume that's the date.

17   Q.  Meanwhile, Dr. Modi started residency in 2001 based on his

18   CV; correct?

19   A.  I don't know when he started his residency.

20           MR. KATAEV:  I'd like to place up exhibit 46, which is

21   already in evidence, your Honor.

22           THE COURT:  You may do so.

23   Q.  This is Dr. Modi's curriculum vitae; correct?

24   A.  Yes.

25   Q.  And it says here that he started his residency in 2001;

1    correct?

2    A.  It says that, yes.

3    Q.  So Dr. Porges is approximately 15 years more experienced

4    than Dr. Modi; correct?

5    A.  If that's what the math is, yes.

6    Q.  But when Dr. Porges first started at NYU, he received

7    $340,000; correct?

8    A.  I don't know what he received, but that sounds like the

9    number I've been hearing.

10            MR. KATAEV:  Permission to place Plaintiff's

11    Exhibit 31.  It's already in evidence.

12            THE COURT:  You may do so.

13   Q.  I'll represent to you, Mr. Rubin, that this is Dr. Porges'

14   initial contract.  It says $340,000 was his pay; correct?

15   A.  It's not on my screen, but I'm assuming -- there it is.

16   Yes, that's what it says.

17   Q.  Yet, Dr. Modi received $360,000 when he first started at

18   NYU; correct?

19   A.  I don't recall, but I'm guessing you're going to show me a

20   document that says that he did, so --

21   Q.  Just to be thorough, let's do that.

22            MR. KATAEV:  Your Honor, exhibit 35 already in

23   evidence.

24            THE COURT:  Go ahead.

25   Q.  I'll represent to you, Mr. Rubin, that this is Dr. Modi's

1    initial employment agreement.  He did, in fact, receive

2    $360,000; correct?

3    A.   That's what it says, yes.

4    Q.   So it's fair to say that Dr. Porges' seniority over

5    Dr. Modi did not result in a lower salary for Dr. Modi;

6    correct?

7    A.   I'm sorry.  Ask me that again.

8    Q.   You said that doctor –- I'm sorry.  You said that seniority

9    played a role in setting compensation; correct?

10   A.   Amongst many factors, yes.

11   Q.   And in this case, Dr. Porges' 15 years of seniority did not

12   result in higher pay for Dr. Porges over Dr. Modi, did it?

13   A.   I'm not saying that at all.

14   Q.   Now, you recall during your testimony that you mentioned

15   that there was a special need at Huntington; correct?

16   A.   I did, yes.

17   Q.   And that's part of what justified the high salary for

18   Dr. Modi, isn't it?

19   A.   I'm not going to say whether Dr. Modi's salary is high or

20   not.  What I'm going to say is we paid the salary we paid him

21   to fill the role we had at Huntington.

22   Q.   Is it fair to say, also, that Dr. Edelman was already

23   working Huntington one day a week when Dr. Modi joined; isn't

24   that right?

25   A.   I believe she was there one a day a week, correct.

N7HCede1                    Rubin - Redirect

1   Q.  You didn't ask Dr. Edelman if she'd move over to Huntington

2   for $360,000, did you?

3   A.  I did not have any conversations with Dr. Edelman.

4   Q.  And to your knowledge, didn't Dr. Edelman live near

5   Huntington?

6   A.  I don't know where Dr. Edelman lives.  I still don't.

7           MR. KATAEV:  I'd like to place up exhibit 7.  I

8   believe it's already in evidence, your Honor.

9   Q.  Mr. Rubin, in front of you is the December 1st, 2020

10  termination letter; correct?

11  A.  Yes.

12  Q.  And you signed this letter; correct?

13  A.  Yes.

14  Q.  And Dr. Edelman's address is listed at the top here, isn't

15  it?

16  A.  It is.

17  Q.  And Dr. Edelman lives in Syosset, doesn't she?

18  A.  That's what it says.

19  Q.  And Syosset is fairly close to Huntington, isn't it?

20  A.  I have no idea.

21  Q.  NYU did not have any system concerning merit in setting

22  compensation; correct?

23  A.  I don't know what "merit" means in this context.

24  Q.  As you testified before, there's no point system as it

25  relates to patient satisfaction scores; correct?

1    A.  Well, patient satisfaction scores are a point system.

2    Q.  But you don't use that point system in setting salaries, do

3    you?

4    A.  No, we don't.

5    Q.  And there's no quality system for setting salaries for the

6    same reason; correct?

7              MR. SCHOENSTEIN:  Objection.

8              THE COURT:  Overruled.

9    A.  There's no point system, but if there are quality issues,

10   we'll have to investigate and that could determine a change in

11   employment status, including salary or nonrenewal.

12   Q.  It's fair to say that RVUs, in general, are considered

13   uniform and identical to each other; right?

14   A.  RVUs are not identical to each other.  They're a unit of

15   productivity.  It's a measurement of productivity.

16   Q.  One doctor's RVU cannot be qualitatively better than

17   another doctor's RVUs, can it?

18   A.  No, definitely not.  So if a doctor does the same service

19   and bills the same code, it would have the same RVU value.

20   Q.  With respect to the contracts that we've gone over, those

21   contracts don't reference any seniority system, do they?

22   A.  No.

23   Q.  And they don't reference any merit system, do they?

24   A.  No.

25   Q.  But the contract does reference the quantity of RVUs as it

1  relates to compensation, doesn't it?

2  A.  It's the -- yeah, it's the benchmark we use for

3  productivity.

4  Q.  Let's dig into that a little bit.

5      It's fair to say, isn't it, that the number of RVUs assists

6  in determining compensation; correct?

7  A.  The RVUs are set after we set the compensation.

8  Q.  But it's true, isn't it, that if you make 1 percent more

9  than what your actual target is in RVUs, you get 1 percent more

10 in your pay; correct?

11 A.  For some providers.

12 Q.  Let's look at the example of Dr. Porges.  He has a $340,000

13 salary; correct?

14 A.  Yes.

15 Q.  If he generated 1 percent more in RVUs, in this case about

16 650 RVUs, he would get $3400 more; correct?

17 A.  He would only get the percentage increase on his clinical

18 salary.  So if he had other components of his salary, it would

19 not be on that portion.

20 Q.  Focusing with Dr. Edelman, if she received 1 percent more

21 in RVUs, I'll represent to you that was 4966, so about --

22 A.  Yeah, I remember that number.

23 Q.  About 496 RVUs more, she'd receive 1 percent more in

24 compensation; correct?

25 A.  That's correct.

1   Q.  And that would be $2,070; correct?

2   A.  And change, but yes.

3   Q.  When Dr. Porges does 1 percent or more, he gets $3400, but

4   when Dr. Edelman does, she only gets $2,070 and change;

5   correct?

6   A.  That's correct.

7   Q.  It's fair to say, based on that, that the quantity system,

8   as applied to NYU's compensation scheme, is not equal between

9   the doctors; correct?

10  A.  The incentive system that we use is designed to reward

11  increased productivity based on that doctor's individual

12  contract.

13  Q.  Just so I'm clear on this point, your testimony is that NYU

14  does not pay by the RVU; correct?

15  A.  We do not pay dollars per RVU, no.

16  Q.  Focusing on the business plan, the use of the business plan

17  is the system or process by which you pay doctors; correct?

18  A.  Amongst other things.

19  Q.  And on Friday, you testified as to all these other things;

20  right?

21  A.  I believe so, yes.

22          MR. KATAEV:  I'd like to show page 146 for

23  impeachment, lines 4 through 14 on the next page.

24          THE COURT:  Go ahead.

25  Q.  At your deposition, I asked you the following questions and

1  you gave the following answers, didn't you?  Just bear with me,

2  there's quite a few questions here.

3  A.  It's not on my screen.

4          MR. KATAEV:  Permission.

5          THE COURT:  Yes.

6  "Q.  Does NYU have any salary, pay salary or pay ranges or

7  grades or scales with respect to a staff physician?

8  "A.  I don't know.  I don't understand the question or the

9  context of the question, so I can't answer it.

10  "Q.  You testified earlier to a formula that's used for RVUs.

11  Do you remember that testimony?

12  "A.  I don't know what the context is, so I can't answer that.

13  I know I explained the definition of RVUs to you.

14  "Q.  How does NYU determine how much to pay a physician?

15  "A.  It depends.

16  "Q.  What does it depend on?

17  "A.  Lots of factors.

18  "Q.  Please outline the factors.

19  "A.  There's an unlimited number of scenarios.  It's an

20  impossible question to answer.  If there's a specific question

21  you want to ask me, please do, I'll be happy to answer it.

22  "Q.  Generally speaking, what are the factors you consider in

23  determining compensation for a physician?

24  "A.  Since the question is very broad and vague, I will say

25  that a physician who is joining us from private practice, we

N7HCede1                          Rubin - Redirect

1   look at their business plan which is based on their activity in

2   private practice and then make them an offer."

3   Q.  Do you recall giving that testimony?

4   A.  I do.

5   Q.  Based on this testimony, the only thing you look at for a

6   doctor coming in from private practice is the business plan;

7   correct?

8   A.  Incorrect.

9   Q.  You don't look at all those other factors, do you?

10  A.  I just said it's incorrect.  So I look at everything.

11  Q.  You didn't say that in your deposition testimony, did you?

12        MR. SCHOENSTEIN:  Objection.

13        THE COURT:  Overruled.

14  A.  I definitely said it, just not in this paragraph.

15  Q.  You'd agree with me, Mr. Rubin, that you did not

16  intentionally pay Dr. Edelman less than the male doctors;

17  correct?

18  A.  We didn't -- I'm sorry.  Ask that question again.

19  Q.  You did not intentionally pay Dr. Edelman less than the

20  male doctors; correct?

21  A.  We didn't pay Dr. Edelman less than the male doctors.

22  Q.  You didn't intentionally pay Dr. Edelman less because of

23  her sex; right?

24  A.  I just said we didn't intentionally pay Dr. Edelman less.

25  Q.  And you testified that you've had training on setting

1    initial salaries on Friday; correct?

2    A.  I don't think I used the word "training."  I may have, but

3    you'd have to show me.  I don't recall the word "training."

4    Q.  At the time of your deposition, though, you had no such

5    training; correct?

6    A.  I don't know what the word "training" means in this case.

7    I have 25 years of experience, Mr. Swirnow has an additional

8    18.  So, collectively, with the guardrails I discussed in my

9    testimony earlier with the parameters that we have, I think we

10   have a lot of experience in setting salary.

11   Q.  Is it fair to infer that you have had training on setting

12   salaries after your deposition was conducted in September 2021?

13   A.  I've had no training.  Like, I don't -- again, I don't know

14   what "training" means in your question, but I don't have

15   training on it.

16   Q.  You never compared the salaries of physicians at NYU to see

17   if there was any -- withdrawn.

18       You never compared the salaries of physicians at NYU to see

19   if there was any disparate impact that existed for females

20   based on the way you set salaries; correct?

21   A.  Our HR department does that.

22   Q.  But you personally never did that; correct?

23   A.  I rely on our legal department and HR department to make

24   sure that that does not happen.

25   Q.  You would agree with me that there are multiple systems

1   with which NYU could pay physicians; correct?

2   A.  I don't know what that means.

3   Q.  Well, you heard Mr. Kaplan testify during his testimony

4   that different hospitals use different systems for

5   compensation; correct?

6   A.  I don't recall what David -- Mr. Kaplan testified.

7   Q.  There are different ways that doctors could be paid;

8   correct?

9   A.  Of course.

10  Q.  The way that you decide to pay them is not the only way

11  that you could go about paying them; right?

12  A.  The way we pay our doctors at NYU is the way we pay them.

13  Q.  But there are different ways to do that; right?

14  A.  I couldn't tell you.

15  Q.  You oversee approximately 3600 doctors at NYU; correct?

16  A.  I do.

17  Q.  And you're involved in setting the pay for those doctors;

18  right?

19  A.  I am.

20  Q.  And approximately half of those 3600 doctors are female;

21  correct?

22  A.  I don't -- I don't know the percentages.

23  Q.  A fair portion are female; correct?

24  A.  I don't know the percentages.

25  Q.  Now, at the time of your deposition, you were not aware of

1   the existence of the Equal Pay Act; correct?

2   A.  I know that it exists, I don't know the time of it.  I'm

3   not really fully aware of the legal language in it, but I

4   believe there is an equal -- I know there is an Equal Pay Act

5   now.

6   Q.  But you were not aware of it during the time you entered

7   into contract negotiations with Dr. Edelman; correct?

8   A.  Still not 100 percent sure I'm aware of the language that's

9   in the Equal Pay Act, other than you have to pay people.  I

10  assume it says you have to pay people equally, which we do.

11  Q.  Going back to the discussion we had about the revenue for

12  NYU, what is the approximate revenue for the School of

13  Medicine?

14  A.  I don't know.

15  Q.  Is the revenue over $1 billion?

16  A.  It would have to be because I only know what my division

17  is.

18  Q.  Is it over two?

19  A.  Yes.

20  Q.  Is it over three?

21  A.  Currently, yes.

22  Q.  Is it over $4 billion?

23  A.  Yes.

24  Q.  Is it over $5 billion?

25  A.  I have no idea.

1   Q.   And in terms of your division?

2   A.   You'd have to specify which division.   I run many

3   divisions.

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   BY MR. KATAEV:
 2   Q.   The faculty group practice?
 3   A.   What component of -- I need you to be specific.  Because
 4   the faculty group practice has lots of different buckets.
 5   Q.   The bucket that Dr. Edelman is in.
 6   A.   That's about 2.6 billion.
 7            MR. KATAEV:  I have nothing further.
 8            THE COURT:  Anything further, Mr. Schoenstein?
 9            MR. SCHOENSTEIN:  Yes, please.
10            MR. KATAEV:  Your Honor, may we take a quick break?
11            THE COURT:  No.
12   RECROSS EXAMINATION
13   BY MR. SCHOENSTEIN:
14   Q.   Let me start with this revenue question.  You said the
15   other day New York University is a not-for-profit organization?
16   A.   That is correct.
17   Q.   Can you explain to the jury what that means?
18   A.   Yes.  Not for profits are -- it's a portion of the tax
19   code, and it essentially means all of our -- we don't call it
20   profit.  We call it surplus.  And we don't -- like private
21   businesses, we don't pay taxes; not for profits don't pay taxes
22   on what's left.
23       The reason we get that status is because the intent is for
24   us to reinvest any of our surpluses back in the business, into
25   the -- in this case, it would be the healthcare delivery
```

1   system.  So with distinction to say a for-profit hospital

2   chain, they pay shareholders.  They pay -- they pay, you know,

3   outside investors.  We -- we do not.  We reinvest our money

4   back into the health system to grow the -- in our case, to

5   grow -- you know, new facilities, new doctors, those type of

6   things, new programs, more research.

7   Q.  So surplus, is that the money left after the revenues and

8   the expenses?

9   A.  Yes.

10             MR. KATAEV:  Objection.  Leading.

11             THE COURT:  Overruled.

12  BY MR. SCHOENSTEIN:

13  Q.  Do you remember that email that counsel showed you that you

14  sent to the doctor down in Florida?

15  A.  I do.

16  Q.  Was there anything that -- what, if anything, in that email

17  was inconsistent with your views of Dr. Edelman?

18             MR. KATAEV:  Objection.  Leading.

19             THE COURT:  Overruled.

20  A.  I -- when Dr. Edelman asked me to help her, as I would with

21  any physician in this situation, I tried to help her.  Had I

22  known I was going to end up sitting here, I probably wouldn't

23  have done that.  But at the time, she wanted to move to

24  Florida.  I was not aware that she was a risk to the healthcare

25  system; she didn't meet our standards.  So I sent an old

1   friend, who happened to have a very senior role in Florida,

2   where Dr. Edelman told me she wanted to work and move with her

3   family, an introduction to say I have a rheumatologist who

4   could be, I think -- I don't -- my intent was to find her a

5   role in the community in Florida, similar to where she landed.

6   Q.  And the date of that email was December 4, 2020, so how

7   close was that after the nonrenewal?

8   A.  It was immediately after.

9   Q.  And by then, you had had the discussion with Dr. Edelman

10  about her desire to move to Florida and her request that you

11  assist her?

12  A.  Yes.

13  Q.  And you did that at her request?

14  A.  I did.

15  Q.  You were asked some questions comparing the salaries of

16  Dr. Porges and Dr. Modi.  When did Dr. Porges join?

17  A.  Early, early on.  I'm going to say -- I don't know -- I

18  don't, and I don't want to make you pull up the contract.  But

19  I'm going to say 2014, 2015.  I don't -- I don't recall.

20  Q.  And when did Dr. Modi join?

21  A.  After that.

22  Q.  And where did Dr. Porges come from?

23  A.  His private practice.

24  Q.  And where did Dr. Modi come from?

25  A.  AdvantageCare Physicians, which is a group practice.

Q.  And did you consider what each was earning in their prior

situation in determining what to pay them at NYU?

A.  We did.

Q.  Now, doctors who have administrative roles, is that

valuable for NYU?

A.  Highly.

Q.  How so?

A.  They -- they need to do -- depending on the nature of the

role, it's a function that needs to be done, and in a case of a

physician, it can't be done by someone like me or Mr. Swirnow,

Mr. Kaplan, Mr. Antonik.  It's done by people who have the

requisite skills to be able to perform those functions.  So

they can be very valuable to us.

Q.  And doctors who have research roles, does that bring value

to NYU?

A.  Absolutely.  They enhance the stature of the organization.

They, quite frankly, generate hopefully benefit for all

providers.  The research that any physician does that results

in improvements in how we deliver and treat clinical outcomes

benefits all the doctors, including those who don't do

research.

Q.  And if you have a doctor who has a great reputation in the

community, is that of value to NYU?

A.  Extraordinary.

Q.  Why is that?

1    A.  Multiple, multiple reasons.  One is other physicians will

2    want to join our network.  Other physicians will refer.  It

3    enhances the overall stature of the group and the network,

4    which benefits all physicians in the group.  So having a strong

5    clinical leadership, strong clinicians with good stature,

6    reputations in the community, the health system benefits, the

7    patients benefit, and quite frankly, all the doctors who don't

8    have that stature benefit.

9    Q.  Now, counsel asked you a bunch of questions about point

10   systems.  Do you recall that?

11   A.  I do.

12   Q.  OK.  So do you have a process for considering and hiring

13   physicians who come to your attention?

14   A.  We do.

15   Q.  All right.  And in that process, what, if any,

16   consideration do you give their educational background?

17   A.  Well, a lot.

18   Q.  Why is that?

19   A.  Why is that?

20   Q.  Yeah.

21   A.  Because where they went to school enhances, again, the

22   reputation and the stature within the organization and the

23   practice itself.

24   Q.  And what, if any, consideration do you give to their years

25   of experience?

N7hWede2                        Rubin - Recross

1  A.  Tremendous, for the same reasons.

2  Q.  And what, if any, consideration do you give to the training

3  they received?

4  A.  Same.  Same answer.

5  Q.  Do you give any consideration to whether or not the doctors

6  have specialties and subspecialties?

7  A.  We do.

8  Q.  Why is that?

9  A.  Because a physician who has more subspecialties or, or a

10  broader scope of practice can -- can deliver a more broad

11  spectrum of healthcare services to the patients, again,

12  benefiting the provider, the health system, and all the

13  providers who work in that group.

14  Q.  Do you regard the educational background and years of

15  experience as impacting the quality of a physician?

16  A.  Can you ask me that again?  I don't --

17  Q.  Sure.  Does coming from a better school impact the quality

18  of the physician, from your perspective, when you're hiring?

19          MR. KATAEV:  Objection.  Leading.

20          THE COURT:  Overruled.

21  A.  I think --

22          THE COURT:  Let me ask the question.

23          What impact, if any, does the quality of the

24  physician, does the education of a physician have on the

25  quality of the care that the physician is delivering, from your

N7hWede2                          Rubin - Recross

1    perspective?

2            THE WITNESS:  From my perspective, it -- it -- it

3    shouldn't.  You know, if they've gone through their training, I

4    don't -- I don't -- I don't think it does.  I didn't go to an

5    Ivy League school, and I think I'm a good administrator.  So I

6    don't think -- I think that's my answer.

7    BY MR. SCHOENSTEIN:

8    Q.  OK.  And in considering physicians for salary -- well, we

9    talked a lot about how you look at the business plans of

10   doctors who are in private practice, right?

11   A.  We did.

12   Q.  And do you look at the topline of those business plans?

13   A.  I look at all the lines.

14   Q.  OK.  You look at revenue?

15   A.  I do.

16   Q.  Does the revenue tell you the quantity of dollars their

17   medical practices bring in?

18   A.  Yes.

19   Q.  And is the quantity of the money they bring in relevant to

20   you determining salary?

21   A.  It's part of it.

22   Q.  OK.  And for a doctor not in private practice, do you look

23   at the quantity of what they were being paid prior to coming to

24   NYU?

25   A.  I look at the salaries, yes.

N7hWede2                          Rubin - Recross

1  Q.  Yeah.  And is the quality of that salary relevant to you

2  determining what to pay them?

3  A.  100 percent, yes.

4  Q.  Now, as doctors go through the NYU system and they're up

5  for renewal and they're up for bonuses, they have RVU targets

6  to meet, right?

7  A.  Correct.

8  Q.  Does that assess the quantity of their productivity?

9  A.  It does.

10 Q.  And does NYU also keep an eye on the quality of the

11 physician's performance?

12 A.  We do.

13 Q.  And does that ever impact bonuses, renewals and increases?

14 A.  It can.

15 Q.  OK.  Why?

16 A.  Because we have -- there are various governmental quality

17 programs out there that we use.  NYU's, in the ambulatory care

18 setting has been ranked No. 1 in the past eight out of nine

19 years that the survey's been out there.  And if there are

20 individuals who -- and we track that, obviously, very closely.

21 That's how we maintain our reputational status.  And if there

22 are physicians who are having trouble achieving some of those

23 metrics, we're going to have conversations.  We'll send out,

24 you know, we have clinicians who have administrative roles, and

25 they will meet with those physicians and talk to them about it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    to try and get them to improve their scores.

2    Q.  And is hiring physicians one of the goals to get more

3    patients at NYU?

4    A.  It's one of them, yes.

5    Q.  And does the reputation of a physician play into that goal

6    in any way?

7    A.  Absolutely, sure.

8    Q.  How so?  Explain that to the jury.

9    A.  Well, several reasons -- many reasons.  One is a physician

10   with a good reputation is going to have, usually is going to

11   have a bigger practice of patients.  People want to see that

12   doctor.  I think we've all experienced that.  Who is the best

13   doctor I can see for this?  And you know, there's a finite

14   number of patients a physician can see, so if that physician is

15   busy and the patient needs to be seen, we're going to schedule

16   that patient with someone else in the practice who may have

17   availability.  So again, the health system benefits, the

18   patient benefits by getting seen sooner by another physician

19   within the practice.

20   Q.  In respect to your determination regarding the nonrenewal

21   of plaintiff's contract, did a complaint she submitted to HR

22   more than a year before that nonrenewal play any role in your

23   consideration whatsoever?

24   A.  None whatsoever.

25            MR. SCHOENSTEIN:  Pass the witness.

N7hWede2                    Rubin - Redirect

1              THE COURT:  Anything further?

2              MR. KATAEV:  Your Honor, I apologize.  I implore the

3      Court for a break.

4              THE COURT:  What's that?

5              MR. KATAEV:  I need a break.

6              THE COURT:  Are you done with the witness?

7              MR. KATAEV:  I just have four questions.

8              THE COURT:  Why don't you ask the four questions.

9      Then you'll be excused, and your colleague can call the next

10     witness.

11     REDIRECT EXAMINATION

12     BY MR. KATAEV:

13     Q.  Mr. Rubin, you testified that had you known Dr. Edelman

14     would have sued you, you would not have helped her in the

15     lead-in, correct?

16     A.  I don't know my exact words, but -- but probably not.

17     Q.  And you recognize that that would be retaliatory, correct?

18             MR. SCHOENSTEIN:  Objection.

19             THE COURT:  Sustained.

20     BY MR. KATAEV:

21     Q.  You talked about a doctor's reputation during your

22     testimony just now with Mr. Schoenstein, right?

23     A.  I'm sorry.  I didn't understand that.

24             THE COURT:  You called him Schoenstein.  I don't think

25     you meant that.

1    BY MR. KATAEV:

2    Q.  You talked about reputation during your testimony with Mr.

3    Schoenstein, correct?

4    A.  I did.

5    Q.  And reputation is relevant as to whether NYU wants to bring

6    a doctor in, correct?

7    A.  Yes.

8    Q.  But reputation is not a factor you consider on the setting

9    of salary, is it?

10   A.  It's part of it.

11   Q.  I asked you whether you had any system in place that

12   decides how much you pay a doctor based on their reputation,

13   and you could not provide me an answer, correct?

14   A.  I said we didn't use a point system.

15   Q.  And you don't use any other metric to measure reputation in

16   terms of setting salary, correct?

17   A.  It's part of the whole sort of evaluation of the candidate,

18   so there's, you know, there's -- there's a range.  It's not a

19   huge range, but there are -- there is some discretion, as there

20   is in any industry, as to how you set someone's pay.  So you

21   have a business plan.  You have education.  You have years of

22   experience.  You have that whole list that I've been talking

23   about, and you can, in fact, pay someone slightly more if they

24   bring other factors to the table.

25   Q.  And you do that process subjectively, correct?

N7hWede2                    Rubin - Redirect

1    A.  We do it based on the experience that we have in doing it.

2    Q.  You testified about specialties and how that plays a role

3    as well.  Do you recall that testimony?

4    A.  I do.

5    Q.  In this case, with respect to Drs. Goldberg, Porges, Modi,

6    Mehta and Edelman, all five had the same specialties, correct?

7    A.  They're all rheumatologists, yes.

8    Q.  You also talked about the school and the training and

9    background, correct?

10   A.  I did.

11   Q.  With respect to Dr. Modi, he went to the exact same school

12   and had the exact same fellowship as Dr. Edelman, didn't he?

13   A.  I don't know, but I'm going to accept that you know and

14   that that's true.

15          MR. KATAEV:  I would just -- give me one second.  I'd

16   like to place up exhibit 46, which I believe should be in

17   evidence, Dr. Modi's CV.

18          THE COURT:  Go ahead.

19          MR. KATAEV:  And exhibit 5, which I believe is

20   plaintiff's résumé, which should also be in evidence.

21          THE COURT:  I'm not sure 5 is in evidence.

22          MR. SCHOENSTEIN:  5 is not as such, but as the CV of

23   plaintiff, it is in evidence under some number.

24          THE COURT:  So I take it no objection to 5, and we'll

25   just take care of the exhibit number.

N7hWede2                        Rubin - Redirect

1            MR. SCHOENSTEIN:  Yeah.

2            THE COURT:  No. 5 is received.

3            (Plaintiff's Exhibit 5 received in evidence).

4            MR. KATAEV:  Permission to publish 46 side by side

5    with 5?

6            THE COURT:  Yes.  Go ahead.

7    BY MR. KATAEV:

8    Q.  Dr. Modi went to the New York College of Osteopathic

9    Medicine, correct?

10   A.  Is that the highlight -- yeah -- where is that?

11       Yes.

12   Q.  As did Dr. Edelman, correct?

13   A.  Correct.

14   Q.  And Dr. Modi went to the rheumatology fellowship at

15   Winthrop, correct?

16   A.  Correct.

17   Q.  As did Dr. Edelman, correct?

18   A.  Correct.

19           MR. KATAEV:  I have nothing further.

20           THE COURT:  All right.  Mr. Rubin, you're excused as a

21   witness.

22           (Witness excused)

23           THE COURT:  Mr. Kataev, is the next witness yours?

24           MR. KATAEV:  It is mine, your Honor, but I'll be very

25   quick.

N7hWede2

1     THE COURT:  All right.  Let me keep the jury here.

2  We're going to take a stretch break while you step out.

3     MR. SCHOENSTEIN:  We'll bring her in, your Honor.

4  She'll need a minute to get on the stand.

5     THE COURT:  OK.

6     MR. LABUDA:  Your Honor, could we have a sidebar,

7  please?

8     (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N7hWede2

1           (At sidebar)

2           MR. LABUDA:  I was informed Mr. Kataev is in the

3    bathroom, but I think he -- at least what I heard is that he's

4    having some type of, I don't know if it's an illness or

5    something like that, I don't know if he's getting sick or

6    whatever the issue is.  I would just go check on him and just

7    report back.

8           THE COURT:  Who is the next witness?

9           MR. LABUDA:  The next witness after that would be

10   Dr. Goldberg.

11          MR. SCHOENSTEIN:  Yes.

12          Are they all his witnesses?

13          MR. LABUDA:  No, no.  He's mine.  Is he around?

14          MR. SCHOENSTEIN:  He's here.

15          THE COURT:  Let's do Dr. Goldberg.

16          MR. LABUDA:  OK.  That's fine.

17          Sorry about that, your Honor.

18          (Continued on next page)

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Mr. Labuda, do you want to announce your

3     next witness?

4              MR. LABUDA:  Yes.  Dr. Avram Goldberg.

5              THE COURT:  OK.  Bring Dr. Goldberg to the stand.

6      AVRAM Z. GOLDBERG,

7          called as a witness by the p,

8          having been duly sworn, testified as follows:

9              THE COURT:  Counsel, you may inquire.

10             MR. LABUDA:   Thank you.

11    DIRECT EXAMINATION

12    BY MR. LABUDA:

13    Q.  Good morning, Dr. Goldberg.

14    A.  Good morning.

15    Q.  Dr. Goldberg, you're a rheumatologist, correct?

16    A.  Correct.

17    Q.  And just briefly, explain what a rheumatologist does.

18    A.  A rheumatologist is a, is a physician who cares for

19    patients with rheumatic diseases, which include all forms of

20    arthritis, autoimmune diseases and certain related conditions.

21    Q.  And you were hired by NYU to treat patients with rheumatoid

22    issues, is that correct?

23    A.  Correct.

24    Q.  At NYU, you had occasion to discuss, interact or consult

25    with the other doctors in the faculty group practice about

1    patient treatment, correct?

2    A.  Yes.

3    Q.  And based on those interactions, it's fair to say that all

4    the doctors at NYU faculty practice group perform the same type

5    of work, treating patients with rheumatoid issues, correct?

6    A.  Yeah, in their clinical roles, yes.

7    Q.  Yes.  In the clinical aspect.

8        When -- during the time period of 2014 to 2021, that would

9    include you, Dr. Porges, Dr. Modi, Dr. Edelman and Dr. Mehta,

10   amongst others, correct?

11   A.  Yeah, amongst others.

12   Q.  And you were all doing the same type of work, treating

13   patients with rheumatoid issues, correct?

14   A.  Overall, yeah.

15              MR. LABUDA:  I wanted to turn to your CV, if we could

16   pull up exhibit 41?

17              THE COURT:  You may do so.  And that's in evidence.

18   It can be published to the jury.

19   BY MR. LABUDA:

20   Q.  With respect to your CV, you finished your rheumatology

21   fellowship in 1999, correct?

22   A.  Yes.

23   Q.  OK.  And you worked at North Shore hospital from 2001 to

24   2013, correct?

25   A.  Yes.

 1   Q.  And from 2010 to 2013 --

 2              MR. LABUDA:  If you could expand it out.

 3   Q.  2010 to 2013, you were an assistant professor of medicine

 4   at Hofstra, is that right?

 5   A.  Yes.

 6   Q.  And you also were at the North Shore school of medicine and

 7   full-time faculty at North Shore University Hospital, correct?

 8   A.  That's correct.

 9   Q.  Just out of curiosity, is there a distinction between you

10   being an assistant professor of medicine at Hofstra and being

11   on the faculty at North Shore University Hospital?

12   A.  The, the practical part of it was my roles as faculty at

13   North Shore, at the hospital.  The associate professorship was

14   the academic title that I was given based on the affiliation of

15   the hospital and the medical school.

16   Q.  Was it the same type of duties you were doing at both

17   places?

18   A.  No.  The duties at the hospital were training residents and

19   fellows and giving lectures to them.  The duties at the medical

20   school would be things like giving lectures to medical students

21   and things like that.

22   Q.  At both places, there was a teaching component to your job,

23   correct?

24   A.  Correct.

25   Q.  And at both places, you also saw patients clinically as

N7hWede2                         Goldberg - Direct

1   well, correct?

2   A.  Yes -- well, at North Shore.  I didn't see any patients at

3   Hofstra.  That was strictly an academic appointment.

4   Q.  OK.  And, but at both places, it was a teaching position in

5   terms of residents, correct?

6   A.  I would explain it as my main teaching role was at the

7   hospital with the residents and fellows but based on the

8   affiliations of the two institutions.  So I carried this title

9   of assistant professor at the medical school.

10          MR. LABUDA:  All right.  Let me pivot to NYU and your

11  first contract at NYU.  If we could pull up, I'm going to use

12  exhibit 24 and publish that to the witness.

13          THE COURT:  You may do so.

14          MR. LABUDA:  OK.

15          THE COURT:  Go ahead.

16  BY MR. LABUDA:

17  Q.  And just let me know -- do you have it up on your screen,

18  Dr. Goldberg?

19  A.  I do.  I can only see part --

20          MR. LABUDA:  OK.  He can only see part of it.  I don't

21  know if we can zoom it out.  Apologies to your eyes, if you

22  can't see, and let me know if you can't.

23  Q.  But this is a contract that you received from NYU, and it's

24  dated November 22, 2013, correct?

25  A.  Yes.

1   Q.  If you look at page D790, at the bottom of it, there is a

2   section that talks about -- the last paragraph talks about "you

3   agree."  Do you see that paragraph?

4   A.  Yeah.

5   Q.  And it's what we as lawyers would typically call a merger

6   clause, but it indicates that this, the contents, everything

7   that's in the agreement, it supersedes and merges all the prior

8   understandings and proposals and agreements, oral or written,

9   between you and the hospital prior to that time, correct?

10  A.  I'm not a lawyer, so I don't -- you know --

11  Q.  OK.

12  A.  I don't know how to answer that question.

13  Q.  You see where it says supersedes -- you understand what

14  superseding means, right?

15  A.  Yes, I do.

16  Q.  It's indicating that anything that you had discussed,

17  either in writing or orally, with NYU was being superseded by

18  this agreement that they provided to you, correct?

19  A.  OK.  Correct, yeah.

20  Q.  And you didn't draft this agreement; this is something that

21  NYU drafted, correct?

22  A.  Correct.

23  Q.  And it's your understanding, based on this superseding and

24  merger clause, that if it's not in your agreement, then there

25  was no understanding or agreement between the parties on that

1   particular issue, correct?

2            MR. SCHOENSTEIN:  Objection.  Foundation.

3            THE COURT:  Overruled.

4   A.  Again, I'm not a lawyer, so I -- you know --

5   Q.  OK.  But this is your agreement, correct?

6   A.  This was my agreement.

7   Q.  OK.  And what I'm asking, as you're reading it here -- you

8   may not have read it in a long time, but as you're reading it

9   here, you understand, your understanding is that, based on this

10  clause, that if it's not in your agreement, there's no

11  agreement between the parties, correct; that's what it says?

12  A.  That's what it says.

13  Q.  OK.  Now, there's no mention about your prior pay at North

14  Shore or Hofstra as being a factor in how much NYU paid you,

15  correct?

16  A.  I don't think that was in the contract, no.

17  Q.  Right?

18       And there's no mention about your prior experience being a

19  factor in how NYU paid you, correct?

20  A.  You're asking me if there's no mention in the contract of

21  that?

22  Q.  Correct.

23  A.  I don't believe so.

24  Q.  And there's no mention about your stature in the medical

25  community as being a factor in your pay at NYU, correct?

1    A.  It was not mentioned in the contract.

2    Q.  Now, if you look at page D792, your employment with NYU was

3    effective March 1, 2014, correct?

4    A.  Correct.

5    Q.  And it's a five-year contract, correct?

6    A.  Correct.

7    Q.  And that would mean it would go through February 28,

8    depending on if it's a leap year, to 2019, correct?

9    A.  Correct.

10   Q.  And if you look at the next page, D793, your employment

11   title is staff physician, correct?

12   A.  Correct.

13   Q.  And your status is full time, correct?

14   A.  Correct.

15   Q.  And it also has for your compensation that you would get

16   paid $290,000, correct?

17   A.  Yeah, as 90 percent of it, yes.

18   Q.  Right.  And for that $290,000, your effort for that

19   component, for the clinical component, FGP -- which stands for

20   faculty practice group, right?

21   A.  Right.

22   Q.  For the 90 percent of effort, you got $290,000, right?

23   A.  Right.

24   Q.  And then you also received another 25,000 for

25   administration work, which was listed as 10 percent of your

N7hWede2                         Goldberg – Direct

1  effort, correct?

2  A.  Correct.

3  Q.  And that leadership administration role was the clinical

4  director of Nassau's rheumatology, correct?

5  A.  Correct.

6  Q.  And you held that administrative position from 2014 through

7  2021, is that correct?

8  A.  Yes.  I still have that position.

9  Q.  OK.  So you have had it for now nine years?

10  A.  Yeah.

11  Q.  And your total pay was $315,000, correct?

12  A.  Correct.

13  Q.  Now, on the next page, D794, it lists your clinical

14  director responsibilities, correct?

15  A.  Correct.

16  Q.  And one of the responsibilities, the first one is that

17  you're responsible for the coordination and oversight of all

18  medical care and for the quality of services rendered at NYU

19  rheumatology, correct?

20  A.  Correct.

21  Q.  Another component of your responsibilities was to provide

22  clinical leadership and ensure high quality services for all

23  patients, correct?

24  A.  Correct.

25  Q.  And then another component of your responsibilities was to

1   lead recruitment efforts for new physicians, correct?

2   A.  Correct.

3   Q.  And for these, for these responsibilities, you were paid an

4   extra $25,000 per year by NYU, correct?

5   A.  Correct.

6   Q.  And you fulfilled those responsibilities, correct?

7   A.  I believe I did.

8   Q.  OK.  Did you ever perform any written evaluations of the

9   doctors in the rheumatology department?

10  A.  Not -- no, not that I recall.

11          MR. LABUDA:  I was going to have you turn to page 795,

12  the next page.

13  Q.  Now, in this, again, at the top it talks about the $290,000

14  for the clinical work, correct?

15  A.  Correct.

16  Q.  OK.  And in this paragraph it also references an RVU target

17  of 3,481 per year, correct; you see that?

18  A.  Yes.

19  Q.  So that was the target that you and NYU agreed for your

20  compensation of $290,000, for the clinical component of your

21  pay, correct?

22  A.  Yes.

23  Q.  There's also a reference to a 1 percent in the paragraph

24  below that, correct?

25  A.  Yes.

N7hWede2                         Goldberg - Direct

1   Q.  And it goes on to give different examples in the paragraphs

2   below that, correct?

3   A.  Yes.

4   Q.  And with respect to your target, was that something that

5   you and NYU negotiated, or was that something that was set by

6   NYU, or something different?

7   A.  I don't remember all the details.  There was a little bit

8   of -- it was a little bit of negotiation, but basically, it was

9   based on my previous RVU production.

10  Q.  OK.  But it was something that ultimately you and NYU

11  negotiated and agreed to, correct?

12  A.  Yes.

13  Q.  Now, with respect to the 1 percent structure, the way that

14  it works is that if you increased your RVU target that's set in

15  your contract by 1 percent, you'd get an extra 1 percent pay,

16  correct?

17  A.  Correct.

18  Q.  And if you increased your RVU target by 10 percent, you

19  would get an extra 10 percent in your pay, correct?

20  A.  Correct.

21  Q.  All right.  So, and the 10 percent, just to make it a

22  little easier, that would be an added, that would be an added

23  348 RVUs, correct?

24  A.  Correct.

25  Q.  Right.  And then you would get an additional $29,000 in

1    pay, correct?

2    A.   Correct.

3              MR. LABUDA:  If we can pull up Dr. Edelman's first

4    contract, I think it's exhibit 8.

5              THE COURT:  You may do so.  It's in evidence.

6    BY MR. LABUDA:

7    Q.   With exhibit 8, if you look at Dr. Edelman's contract --

8    and this is her first contract -- look at page D52.  So Dr.

9    Edelman's pay at that time, in 2014, was $207,000, correct?

10   A.   Correct.

11   Q.   And her RVU target was 4,966, correct?

12   A.   Correct.

13   Q.   And you see below that she's got that 1 percent thing too,

14   right?

15   A.   Yes.

16   Q.   OK.  So for Dr. Edelman, in order for her to get 1 percent

17   extra pay, she had to produce 496 extra RVUs, correct?

18   A.   Correct.

19   Q.   And if she did that for an extra 10 percent, she would get

20   $20,000, right?

21   A.   Right.

22   Q.   OK.  That's about two-thirds of your incentive bonus,

23   correct?

24   A.   Correct.

25   Q.   So she would have to work -- she would have to produce more

1    RVUs but get paid less, correct?

2    A.   She would have to produce more RVUs than me for that, yes.

3    Q.   And she would be paid less for that, correct?

4    A.   Yeah, exactly what the math -- you know.

5    Q.   Right.  Math doesn't lie, right?

6    A.   No.  The math is the math.

7    Q.   Now, in addition to your compensation -- turn back to your

8    contract.  Sorry for jumping back and forth, but to go back to

9    your contract, which is exhibit 24, and page D795, there's a

10   section for bonus.  Do you see that?

11   A.   Yes.

12   Q.   OK.  And for you, you received an additional $23,000 bonus

13   for staying on with NYU for a year, correct?

14   A.   Correct.

15   Q.   And do you know whether or not Dr. Edelman was offered a

16   bonus, or anything like that, similar to yours?

17   A.   I do not.

18   Q.   If you look at the next page, D796, it references clinical

19   research.  Do you see that?

20   A.   Yes.

21   Q.   OK.  And there's a component of your practice that involved

22   clinical research, correct?

23   A.   Correct.

24   Q.   OK.  And for the clinical research, NYU received revenue

25   for that, correct?

1   A.   The contract was if I were to engage in clinical research

2   and there was revenue; in the event an annual revenue was

3   generated.

4   Q.   OK.   And if it was generated, any revenue above and beyond

5   the expenses associated with that research was available to you

6   to either reinvest as, in clinical research or to be paid to

7   you as additional compensation, correct?

8   A.   Correct.

9   Q.   OK.   Do you know if Dr. Edelman was offered that same role?

10   A.   I don't know.   I don't know if she was involved in clinical

11   research before she came to us.   I was.   That's why that was in

12   there.

13   Q.   Did you actually perform clinical research?

14   A.   I did, but on a very limited basis.   Not enough to generate

15   any revenue.

16   Q.   OK.   Do you know if Dr. Edelman was ever offered an

17   opportunity to perform clinical research for additional income?

18   A.   I don't know.

19   Q.   Did you ever hear that Dr. Porges had offered Dr. Edelman

20   to do clinical research?

21   A.   I don't know.   I know Dr. Porges did do clinical research.

22   I don't know what his relationship in terms of that was with

23   Dr. Edelman.

24   Q.   OK.   Thank you.

25        Now, in your contract with the $290,000, that was a

```
 1   compensation component that was set and didn't increase over
 2   the course of the five-year contract, correct?
 3   A.  I renegotiated after three years.
 4   Q.  Right.  But in the actual contract that you agreed to and
 5   NYU agreed to, there wasn't any set increases, correct?
 6   A.  Correct.  No.
 7   Q.  OK.  So if you were going to continue working at NYU for
 8   five years, they had a contractual right to continue paying you
 9   the same amount for five years, correct?
10   A.  Correct.
11   Q.  And I think you had said that at some point you did, in
12   fact, renegotiate your salary, correct?
13   A.  Correct.
14   Q.  And NYU agreed to do that early, before your contract was
15   up, correct?
16   A.  Yes.
17   Q.  When you were at North Shore, did you have any type of
18   restrictive covenants, noncompetes, patient solicitations or
19   anything like that?
20   A.  No.
21   Q.  Now, when you were at North Shore, your last earnings
22   before you jumped over to NYU were $201,000, correct?
23   A.  Correct.
24   Q.  OK.  And you were able to negotiate with NYU a salary
25   increase from the 201 to $290,000, correct?
```

N7hWede2                      Goldberg - Direct

1    A.  Correct.

2    Q.  OK.  And when you were at NYU, you didn't have any

3    responsibilities attendant with your Hofstra University School

4    of Medicine academic role, correct?

5    A.  Correct.

6    Q.  And other than your clinical work at NYU, your only other

7    responsibility was as the clinical director of rheumatology,

8    correct?

9    A.  Correct.

10   Q.  Do you know what your total RVU production was for 2014?

11   A.  I -- I don't remember the exact number, no.

12   Q.  Do you have any recollection of the amount of incentive pay

13   that you received that year?

14   A.  I -- I recall somewhere between -- I don't know.  $15,000,

15   maybe.  I don't remember.

16   Q.  And the RVUs would be provided, RVU production would be

17   provided to you by NYU on a monthly basis, is that right?

18   A.  No.  It was -- it's once a year.

19   Q.  Oh, once a year.  OK.  You were told at the end of the year

20   what your actual production was, but that was something that

21   was provided to you by NYU, correct?

22   A.  Correct.  They kept track of that.

23   Q.  OK.  And they maintained records with respect to your RVUs

24   for billing and compensation purposes, correct?

25   A.  Yes.  I did receive -- I knew every month where I was in

N7hWede2                    Goldberg – Direct

1    terms of RVUs.  Just the compensation was at the end of the

2    year.

3    Q.  OK.  So I'm just curious about that.  I know you said

4    earlier it was at the end of the year, but you got a monthly

5    report of your RVU production from NYU, correct?

6    A.  Correct.

7    Q.  So it was monthly and then you got a total at the end of

8    the year, right?

9    A.  Correct.

10   Q.  Same question with respect to 2015; do you recall your

11   total RVU production for 2015?

12   A.  I don't recall exactly.  I think it was higher in 2015 than

13   2014.  I do remember that.

14   Q.  OK.  And so your incentive pay would have been more,

15   correct?

16   A.  Right.  The bonus pay, I believe, was higher at the end of

17   2015.

18   Q.  Do you have any recollection at the end of 2015 what your

19   bonus pay was?

20   A.  I may be confusing 2015 and 2016, but I think it was about

21   a hundred thousand dollars in 2015.

22   Q.  A hundred thousand dollars extra, on top of the 290,

23   correct?

24   A.  Correct.

25   Q.  And then same question for 2016; the RVUs and your bonus

N7hWede2                         Goldberg - Direct

1   pay, do you recall?

2   A.  I remember 2016 it was less, I think.

3   Q.  Less RVUs?

4   A.  Yeah.  There were -- there was one year I went down a

5   little bit, and -- but I may be -- I don't remember the dates.

6   Or maybe it was 2016 that was the hundred thousand.  I don't

7   remember which one.

8   Q.  OK.  And in the other year, whichever it was, '15 or '16,

9   do you have a recollection of what your incentive or bonus pay

10  was?

11  A.  I think it was in the 20,000 to 30,000 range.  I think that

12  may -- I think it may be the first year was, like, less, was

13  maybe like six or 8,000.  The second year, I guess, which would

14  have been 2015, was more like 30 and maybe the third year,

15  2016, was over a hundred.  I think that's how it shakes out,

16  now that I think about it.

17  Q.  OK.  And let me ask you -- I'm going to pivot for one quick

18  second -- with respect to standards of care for physicians.  Is

19  there, are there any standards of care for physicians at NYU

20  for the physicians to follow?

21  A.  Of course there's standards of care.

22  Q.  Is that something that's published and disseminated by NYU?

23  A.  No.  I mean it's a very broad term, "standard of care."

24  There are, obviously, certain, you know -- there are certain

25  standards as a practicing physician that people in a specialty

N7hWede2                          Goldberg - Direct

1   are expect to upheld --

2   Q.  Right.

3   A.  Uphold.

4   Q.  That's true with all physicians, right?

5   A.  Yes, of course.

6   Q.  And it doesn't matter if you're in New York or California;

7   as a physician, you're held to a very high standard of care

8   because of what you're working with -- humans -- right?

9   A.  Absolutely.

10  Q.  But that standard of care doesn't change between here and

11  California, does it?  I mean it's the same standard of care,

12  correct?

13  A.  Well, I think at NYU we demand a certain, you know, bar of,

14  level of care.

15  Q.  Well -- and that's what I'm asking you.  Is that in writing

16  anywhere, where you're demanding a higher standard of care at

17  NYU as opposed to at North Shore?

18  A.  So, I'm not aware of a specific, you know, code of standard

19  of care that's written out for NYU physicians versus others.

20  Q.  And if you're not aware of any written standard of care

21  from NYU, it's fair to say that you're not aware of any such

22  written document being published or disseminated to the

23  physicians, the rheumatologists at NYU, correct?

24  A.  Correct.

25          MR. LABUDA:  Let's pivot over to your next contract

1   that we were talking about before, exhibit 25.  It's been

2   admitted, your Honor, so I'd like to publish?

3          THE COURT:  You may do so.

4   BY MR. LABUDA:

5   Q.  All right.  Now, this is your next contract at NYU,

6   correct?

7   A.  Correct.

8   Q.  And like we said before, the last contract expired on

9   February 28, 2019, but you were able to renegotiate early on

10  this, correct?

11  A.  Correct.

12  Q.  And you got a fairly sizeable increase in your salary,

13  correct?

14  A.  Yes.

15  Q.  And NYU wasn't contractually obligated to renegotiate your

16  contract two years early, correct?

17          MR. SCHOENSTEIN:  Objection.

18          THE COURT:  Give me one moment.

19          It goes to his understanding.  I'll permit it.

20  A.  Sorry.  Can you repeat that question?

21  Q.  Yes.  Your understanding is based on your prior contract,

22  NYU was not contractually negotiated to renegotiate your

23  contract two years early, right?

24  A.  No.  I requested it.

25  Q.  Right.  And they could have said no, we're not going to

1  increase your -- we're not going to renegotiate, we're not

2  giving you an increase, right?

3  A.  Correct.

4  Q.  And without NYU's consent to renegotiate, you would not

5  have been able to renegotiate, correct?

6      They had to be willing to do that, right?

7  A.  Obviously, yeah.

8  Q.  As in any contract, right?

9  A.  Yeah.

10 Q.  It takes two to tango, correct?

11 A.  Exactly.

12 Q.  Now, in this contract, your salary went from 290,000 per

13 year for being a staff physician to $500,000, correct?

14 A.  Correct.

15 Q.  And just like the old contract, you received an additional

16 $25,000 for administrative work, correct?

17 A.  Correct.

18 Q.  So now, in 2017, your total salary was $525,000, correct?

19 A.  Correct.

20 Q.  And you had a new RVU target listed in here, if you look at

21 page D800, of 5,850, correct?

22 A.  Correct.

23 Q.  And Dr. Edelman's we saw that last time, hers was about

24 5,000, correct?

25 A.  Correct.

N7hWede2                         Goldberg - Direct

1    Q.  So now, do you have -- well, withdrawn.

2        Had you ever had such high RVU in the years before that

3    your incentive pay was almost as much as your base pay of the

4    $290,000?  I take it -- in other words, did you ever receive

5    close to $290,000 in incentive pay at NYU?

6    A.  I believe that last year, the bonus, when I mentioned the

7    bonus was very high, I believe I was close to that number, the

8    5,850.

9             (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N7HCede3                          Goldberg - Direct

1    BY MR. LABUDA:

2    Q.  You said that that was $100,000, right, that's what you got

3    in your highest out of the three years; right?

4    A.  Yeah, it was over a hundred.  I don't remember the exact

5    number, but I remember it being close to that number of RVUs.

6    Q.  So if you got incentive pay based on what you said before,

7    that would have been pay around $390,000, not 500; right?

8    Total pay for your clinical component; correct?

9    A.  So total pay would have been -- remember, there is the

10   315 -- you're just going on the 290 as compared to the 500.  So

11   the 290, it was over a hundred.  So figure -- it may have been

12   about -- may have been about 460 in my final year before

13   renegotiating.  I think I had made, you know, somewhere into

14   the 400s all total with the bonus.  Again, it's hard for me to

15   remember the exact --

16   Q.  I understand we're talking about 10 years ago, but your

17   recollection before was it was somewhere around 8 the first

18   year, 30 the second year, and about a hundred the third year

19   was your previous testimony; correct?

20   A.  Yes, probably in the -- I said over a hundred.  So

21   probably -- I don't remember where, but probably in the mid

22   hundreds somewhere.

23   Q.  And do you have any recollection of your RVU production for

24   2017 and the incentive pay you got for that year?

25   A.  Meaning the year following this contract?

1  Q.  Well, I think it's the year of that contract, it's 2017,

2  because you jumped up to the 500 starting in March 1st of 2014,

3  so I'm assuming that 2014 would be prorated; right?

4  A.  Right.

5  Q.  So what I'm asking is, do you have any recollection of what

6  your production was or what the incentive pay was for 2017?

7  A.  Right.  So you're saying the year after I signed this

8  contract.

9  Q.  The contract was signed -- let's just go back to the first

10  page of the contract just to make it easy for you,

11  Dr. Goldberg.

12     So the contract says that -- it's dated January 13, 2017;

13  right?

14  A.  Right.

15  Q.  And its effective March 1st, 2017; right?  So what I'm

16  asking you -- and so you were getting paid $500,000 from March

17  until the end of December; right?

18  A.  From March till the next March.  My contracts went from

19  year to year.  The bonus was --

20  Q.  Fair point.  But the RVU production, is that based on an

21  annual thing or a contractual year?

22           THE COURT:  A calendar year or a contractual year?

23  Q.  Yeah, a calendar year or a contractual year, if you know?

24  A.  It was a contractual year.  I would receive my bonus after

25  March 1st of the --

1   Q.  Now I understand the confusion.  Let me step back.

2       For that, that contractual year that started on March 1 and

3   ended on February 28th of 2018, do you have any recollection

4   for that contractual year what your RVU production was and your

5   incentive pay?

6   A.  My recollection was that I did get a small bonus.

7   Q.  And when you say "small," are you talking --

8   A.  Less than $10,000, I believe.

9   Q.  It's all relative, right, in terms of the size of the

10  bonus; right?

11  A.  I'm saying in terms of the percentage, it was small.

12  Q.  In 2018, do you have any recollection of your RVU target as

13  well as your incentive pay for that year, the next year, 2018

14  to 2019?

15  A.  I mean, the RVU target was the same.  This contract

16  remained in effect.

17  Q.  Right.  What I'm asking you is, do you have any

18  recollection of what your RVU production was for that contract

19  year and what your incentive pay was, like a small bonus, no

20  bonus?

21  A.  Again, it was a small amount above it, a small percentage

22  bonus.

23  Q.  So somewhere around $10,000?

24  A.  Yeah, probably like seven or eight.

25  Q.  I wanted to turn to your next contract in 2019.  It's

1   exhibit 26.

2              THE COURT:  You may publish.

3              MR. LABUDA:  Thank you.

4   Q.  So in this contract, it is dated January 16, 2019, and it's

5   effective on March 1, 2019; correct?

6   A.  Correct.

7   Q.  And this one you got an additional bump in your clinical

8   compensation to $510,000; correct?

9   A.  Correct.

10  Q.  And your administrative pay was still in there and you

11  received $25,000 for those attendant duties; correct?

12  A.  Correct.

13  Q.  Same questions for 2019 in terms of RVU production and

14  incentive pay.  Do you have any recollection about that?

15  A.  2019, also small percentage, like six or eight thousand.

16  Q.  And 2020?

17  A.  No bonus in 2020.

18  Q.  That's when COVID started --

19  A.  Exactly.

20  Q.  -- reaping its ugly head; right?

21  A.  Yeah, business was down low.

22  Q.  Right.  There were other things to deal with; right?

23  A.  Correct.

24  Q.  And you had a child that attended NYU; correct?

25  A.  Yes, I have a child at NYU.

N7HCede3                        Goldberg - Direct

1    Q.  Good.  Good for you.  Good school.

2        For working as a staff physician for NYU, you received free

3    tuition; correct?

4    A.  It was about 95 percent off.

5    Q.  And what was the tuition, what's the full tuition, you paid

6    5 percent on that?

7    A.  I would get a bill each semester for about $27,000 and

8    after the NYU discount, it usually would be about $1400.

9    Q.  Not bad.  Not bad.

10       I'm going to ask you some questions about Dr. Edelman.

11       In 2014 when Dr. Edelman joined NYU, how many

12   rheumatologists did you know?

13   A.  Did I know?

14   Q.  Yeah, did you know, was it a dozen, was it a hundred, five

15   hundred?

16   A.  I don't know how to answer that.  Over the years, I've met

17   hundreds of rheumatologists, you know, I attend meetings and go

18   across the country.  If you mean in the New York area or --

19   Q.  We could even winnow it down to the New York area, New York

20   City area.

21       Approximately how many rheumatologists do you know?

22   A.  Again, how many rheumatologists had I met?

23   Q.  Yeah, that you were familiar with.  Hundreds?

24   A.  In the New York area?  No.  In the New York area, 50.

25   Q.  And you had suggested to Dr. Edelman to join NYU; correct?

N7HCede3                    Goldberg - Direct

1   A.  Correct.

2   Q.  She didn't reach out to you, you reached out to her;

3   correct?

4   A.  I had received word from one of my colleagues, Dr. Kurzyna,

5   not a rheumatologist, one of the subspecialists.

6          MR. LABUDA:  I'm going to move to strike as hearsay,

7   your Honor.

8          THE COURT:  Overruled.

9   A.  Dr. Kurzyna, one of my colleagues had worked with

10  Dr. Edelman and mentioned that she might be interested in

11  someone I should talk to.

12  Q.  So you reached out to Dr. Edelman; correct?

13  A.  Correct.

14  Q.  And she was one of your first recruits at NYU; correct?

15  A.  Correct.

16  Q.  Did you receive any compensation for recruiting

17  Dr. Edelman?

18  A.  No, unless you count, you know, my clinical director role.

19  Q.  That was fixed?

20  A.  Correct.

21  Q.  It wasn't a headhunter or something like that?

22  A.  Correct, there was no extra fees for that.

23  Q.  And it's fair to say that you thought Dr. Edelman would be

24  an asset to NYU; correct?

25  A.  Correct.

N7HCede3                          Goldberg - Direct

1    Q.  You thought that Dr. Edelman and her practice would benefit

2    NYU; correct?

3    A.  Correct.

4    Q.  And when you recruited Dr. Edelman to join NYU, you

5    believed that Dr. Edelman was a good doctor; correct?

6    A.  I did.

7    Q.  At some point in time while Dr. Edelman was working,

8    Mr. Rubin reached out to you; correct?

9    A.  Reached out to me?

10   Q.  He reached out to you about Dr. Edelman; correct?

11   A.  Correct.

12   Q.  And that was in and around December of 2020; correct?

13   A.  Yes.

14   Q.  And prior to Mr. Rubin reaching out to you, you had no

15   reason to change your opinion about Dr. Edelman as a doctor;

16   correct?

17   A.  You know, obviously my opinion had evolved about her over

18   the years.

19   Q.  Prior to December 2020, you didn't have any issues with

20   Dr. Edelman's clinical work; correct?

21   A.  If I did, they were minor issues.

22   Q.  You thought that Dr. Edelman was intelligent; correct?

23   A.  I did think she was intelligent, yes.

24   Q.  And you thought that she was fully capable of treating

25   patients with rheumatoid issues; correct?

1   A.  I did.

2   Q.  And, in fact, you asked Dr. Edelman on occasion to cover

3   your clinical shifts that you were unable to handle; correct?

4   A.  Occasionally I asked her to cover for me with inpatients in

5   the hospital.

6   Q.  You would ask her to see your patients that were in the

7   hospital; correct?

8   A.  Yes, occasionally, I did.

9   Q.  Would it be fair to say that a patient that is hospitalized

10  with some type of rheumatoid issue would be in more severe

11  condition than somebody that would come through the ambulatory

12  center, generally speaking?

13  A.  Well, the inpatient consultation, usually it's just that

14  the patient is more severely ill with some kind of medical

15  illness, that's why they're hospitalized, and you're calling a

16  rheumatologist because there's some kind of rheumatic issue

17  that needs to be addressed that requires input from a

18  specialist.  So I wouldn't say their rheumatological issue is

19  more severe, I would say the patient is in a more severe

20  medical state at that time and the rheumatic issue needs to be

21  covered.

22  Q.  There's some type of significant medical issue with the

23  patient if they're in the hospital as opposed to somebody who's

24  ambulatory and you're seeing at 1991 Marcus; correct?

25  A.  Presumably, yes.

1   Q.  And it may not be a rheumatoid issue, but there's a

2   rheumatoid component to that patient's treatment; correct?

3   A.  Correct.  I mean, a rheumatologist can be consulted in the

4   hospital for any number of reasons, but very often it's because

5   there's a rheumatic disease that exists.

6   Q.  While Dr. Edelman was working at NYU, she came up with some

7   good administrative ideas, such as a scanning system for

8   records as well as hiring a new nurse practitioner; correct?

9            MR. SCHOENSTEIN:  Objection, your Honor.

10           THE COURT:  Basis.

11           MR. SCHOENSTEIN:  It's out on summary judgment, this

12  part.

13           THE COURT:  Sustained.

14  Q.  She gave some good suggestions while she worked there;

15  correct?

16  A.  Yes.

17  Q.  If Dr. Edelman was tasked with an assignment, you had

18  confidence that she was able to do that; correct?

19  A.  I don't know.  I never had tasked her with any specific

20  assignments.

21  Q.  Did you think if you gave Dr. Edelman a directive that,

22  based on her intelligence and her capacity as a rheumatologist,

23  she'd be able to fulfill that directive?

24  A.  Yeah, I would hope so.  I never tested that.

25  Q.  With respect to Dr. Edelman, you didn't have any

1  interpersonal conflicts with her; correct?

2  A.  No.

3  Q.  And you never complained to human resources or ELR,

4  employee labor relations about Dr. Edelman; correct?

5  A.  No.

6  Q.  You never submitted any written complaints to the office

7  manager or to anyone about Dr. Edelman in terms of your

8  personal interaction with her; correct?

9  A.  No, I did not.

10 Q.  And it's the clinical director, do I have the title right,

11 clinical director of rheumatology, you never put any complaints

12 in writing to NYU about Dr. Edelman's performance as a doctor;

13 correct?

14 A.  No.

15 Q.  And you never spoke to Dr. Edelman about her performance as

16 a doctor, correct, other than treating patient issues; correct?

17 A.  Yeah, I don't recall any.

18 Q.  Now, you are aware that Dr. Edelman filed a complaint

19 against Mr. Antonik in 2019; correct?

20 A.  Yes.

21 Q.  And prior to December of 2020, had anyone at NYU ever

22 spoken to you about Dr. Edelman's performance as a doctor prior

23 to that call with Mr. Rubin?

24 A.  There were some issues that had come up.

25 Q.  And did you discuss any of those issues with Dr. Edelman?

1    A.  No, I did not.

2    Q.  And prior to your call or speaking to Mr. Rubin, you didn't

3    have any plans to independently evaluate Dr. Edelman's

4    performance as a doctor; correct?

5    A.  No.

6    Q.  And at some point, you were contacted by Mr. Rubin;

7    correct?

8    A.  Correct.

9    Q.  And again, that was in and about December of 2020; correct?

10   A.  Correct.  I don't recall the exact dates, but sounds right.

11   Q.  And he raised concerns with you about Dr. Edelman's

12   clinical performance; is that correct?

13   A.  Yes, clinical performance and personal interactions in the

14   office.

15   Q.  And as a result of Mr. Rubin contacting you -- and by the

16   way, do you have any recollection how that was done in terms of

17   was that a phonecall, did he come visit you, Zoom, something

18   else?

19   A.  It was over a videoconference.

20   Q.  So that was something that had been set up, he asked to

21   speak to you and you calendared some type of Zoom meeting or

22   something like that?

23   A.  Yeah, I believe that's how it unfolded.

24   Q.  And as a result of that Zoom meeting with Dr. Rubin, you

25   did a clinical -- you looked at some of Dr. Edelman's medical

1    charts, is that right, patient charts?

2    A.  The first thing I did is I just, you know, asked around in

3    the office about, you know, what was going on with her.

4    Q.  Did you look at any medical charts?

5    A.  It's hard for me to recall because, you know, since she's

6    left the practice, I've seen a lot of her medical charts.  I

7    don't remember going through them, whether it was started

8    before or after she left the practice.

9    Q.  And you don't -- if you did -- and I'm not saying you did,

10   but if you did, do you have any of those medical charts with

11   you today?

12   A.  No.

13   Q.  Did you do any type of comparison of Dr. Edelman to the

14   other doctors in the rheumatology, any type of written

15   comparison?

16   A.  No written comparison, no.

17   Q.  And as part of your review, did you talk to Dr. Edelman?

18   A.  No.

19   Q.  Without speaking to Dr. Edelman, you concluded that the

20   issues that you looked into couldn't be remediated; correct?

21   A.  That's correct.

22   Q.  That means you didn't think that she could fix them; right?

23   A.  Essentially, yes, that's correct.

24   Q.  Did you ever give Dr. Edelman an opportunity to try and fix

25   them?

1  A.  I never spoke with her after that.

2  Q.  How long was your review of Dr. Edelman's work, how much

3  time did you put into that, was that five minutes, an hour, a

4  week, whatever?

5  A.  Well, I didn't keep track of the time.  What I did after my

6  call with Dr. Rubin is -- with Mr. Rubin is I spoke to a lot of

7  our colleagues in the office, I spoke to our nurse, I spoke to

8  our office manager, I spoke to Dr. Edelman's medical assistant,

9  I spoke to some of my colleagues, like Dr. Porges, to try to

10  get a better sense of, you know, is this remediable, is this

11  something here that we should try to hold onto or not.  So it

12  took me quite some time, I can't say I logged the hours.

13  Q.  You talked to a lot of people, but not the subject of your

14  investigation; right?

15  A.  Right.

16  Q.  Now, at some point -- and just so I understand, it was

17  Mr. Rubin who asked you to look into her clinical practice, and

18  I think you also said some inner personal issues; correct?

19  A.  Yes.  Well, he notified me about the fact that we were not

20  going to be renewing her and, you know, he did leave a window

21  open for some discussion, so I did some research on my own.

22  Q.  So when Mr. Rubin had that call with you, on the Zoom call,

23  he indicated that he was not going to renew her contract;

24  correct?

25  A.  That was the implication, yes.

1  Q.  And at that point, you hadn't done any type of review on

2  her; correct?

3  A.  I hadn't done any official review.  Obviously, I had been

4  working with her for the last however many years.

5  Q.  Now, when you did do this review, you believed that there

6  were a large number, an unusually large number of blood samples

7  and x-rays that were being done on Dr. Edelman's patients;

8  correct?

9  A.  Correct.  One of the clinical complaints that came up is

10 just, yeah, an overabundance of laboratory tests, x-ray tests,

11 referrals to outside sources, things like that.

12 Q.  This is something that you found out after Mr. Rubin told

13 you they weren't going to renew her contract; correct?

14 A.  Well, this was something that I knew about beforehand.  I

15 mentioned to you there were some evolving issues.  I used the

16 term "minor issues," but these were some of the things that

17 were going on even before this.  You know, again, it wasn't

18 fully in my purview exactly what was going on.

19 Q.  When you did your review, you didn't do any type of written

20 comparison of the number of tests she was taking versus what

21 other doctors were taking, correct, there was no side-by-side

22 comparison, she's doing X for her patient, so and so is doing

23 Y, nothing like that; correct?

24 A.  I didn't write it, but you can see it checked off on

25 various, you know, sometimes the medical assistant or the x-ray

1    tech would show me all the x-rays that are checked off.

2    Q.  Oh, yes, but what I'm saying is it's not like you did a

3    side-by-side comparison with Dr. Porges and Dr. Edelman;

4    correct?

5    A.  Correct.

6    Q.  You didn't do a side-by-side comparison with Dr. Modi and

7    Dr. Edelman; right?

8    A.  Correct, I didn't need to.

9    Q.  And it's fair to say that treating patients is not a

10   one-size-fits-all remedy; correct?

11   A.  Correct.

12   Q.  Some patients need more help than others, they have more

13   severe symptoms; correct?

14   A.  Correct.

15   Q.  And some patients need more tests than others; correct?

16   A.  Correct.

17   Q.  And some patients need more x-rays than others?

18   A.  Of course.

19   Q.  It just depends on the circumstances of that patient;

20   correct?

21   A.  Correct.

22   Q.  Did you ever ask Dr. Edelman to take less tests and do less

23   x-rays?

24   A.  I don't remember specifically asking her that.

25   Q.  Did Dr. Edelman ever refuse to decrease the number of blood

1   tests and x-rays, to your knowledge?

2   A.  As I said, I never asked her to do that.

3   Q.  As far as you knew, nobody did; right?

4   A.  I don't know.

5        THE COURT:  Mr. Labuda, in the next several minutes,

6   we'll take a break.  So we'll take a break at least by 11:30.

7   So whenever you get to a convenient breaking point, if you ask

8   a few more questions.

9   Q.  As the clinical director, you testified earlier, one of

10  your responsibilities was the oversight of all the medical care

11  and quality of services rendered at NYU for the Nassau

12  rheumatologists; correct, you remember that?

13  A.  Correct.

14  Q.  And you said that you did that, that you performed that

15  duty; correct?

16  A.  I believe so.

17  Q.  To just jump back, let's look at exhibit 24.

18       So according to your testimony, one of your jobs was, in

19  the third bullet, to provide clinical leadership and ensure

20  high quality services for all patients; correct?

21  A.  Correct.

22  Q.  And you earlier testified that you did do that; correct?

23  A.  I believe so.

24  Q.  And that would include the oversight of Dr. Edelman;

25  correct?

N7HCede3                          Goldberg – Direct

1   A.   Correct.   Again, I wasn't there to micromanage her

2   patients, I was there to oversee that we were overall

3   delivering high quality care.

4             THE COURT:   Mr. Labuda, is now a good time?

5             MR. LABUDA:   Now is a good time, your Honor.

6             THE COURT:   Members of the jury, it's almost 11:30,

7   we'll break for about 15 minutes, so until around 11:45.   So

8   have a good break.

9             (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (Jury not present)

2          THE COURT:  Dr. Goldberg, you can step down.  Please

3     try to be back here a little bit before 11:45.  During the

4     break, no conversations of substance with counsel for the

5     defendants.

6          Anything further from plaintiffs?

7          MR. LABUDA:  Just one issue, your Honor.  Just with

8     respect to your email this weekend, it seems as if and I would

9     anticipate that we're going to be concluding tomorrow, I just

10    wanted to get an understanding in terms of closing statements

11    and then the jury in terms of -- we've been doing 9:00 to 2:00,

12    I'm assuming, I don't want to assume, but I'm assuming that if

13    they get charged before 2 o'clock that they would continue on

14    and deliberate?

15         THE COURT:  My intention is really to leave that up to

16    the jury.  My deputy will offer them the opportunity to

17    continue past 2 o'clock unless the parties have a different

18    view.  People plan their lives and so I want to be respectful

19    of that.

20         MR. LABUDA:  The only issue I'd say is just

21    anticipating that, based on your order, I'm just wondering if

22    the Court wants to at least raise that issue so that if there

23    are some personal issues, they can try and take care of those.

24         THE COURT:  I think that's sensible.  What does

25    defendant think?

1          MR. SCHOENSTEIN:  I think that's sensible, too, your

2     Honor.  I think the jury should be given the option of staying

3     past 2:00.

4          THE COURT:  On the assumption that we finish testimony

5     tomorrow, what's the best guess as to what time tomorrow you

6     think we'll finish, Mr. Labuda?

7          MR. LABUDA:  You mean with the testimony?

8          THE COURT:  Yes.

9          MR. LABUDA:  I think it would depend on Porges.  I'm

10    not doing Dr. Porges, but I'm doing Modi and he's not long,

11    he's not very long at all.  So if we can do Porges a little bit

12    today and then finish him tomorrow, I think we'd probably be

13    done sometime around 11:00 is my guess.

14         THE COURT:  What's your estimate, Mr. Kataev, in terms

15    of how long Porges is going to go?

16         MR. KATAEV:  A little longer than Dr. Mehta, I'd say a

17    little over an hour.

18         THE COURT:  Does defense have a sense as to when we'll

19    break, now that you've heard from plaintiff?

20         MR. SCHOENSTEIN:  I assume we are within minutes of

21    being done with Dr. Goldberg's direct; am I right?

22         MR. LABUDA:  That's right.

23         MR. SCHOENSTEIN:  I'm going to have a cross of

24    Dr. Goldberg that's going to last 30 to 45 minutes, I'm going

25    to say, then we're going to have Ms. Pacina on, I would assume

```
 1    she's a very brief witness, but plaintiff can tell me for sure.

 2    If that all happens, we can start Porges today.

 3              THE COURT:  So maybe 11 o'clock is the right --

 4              MR. SCHOENSTEIN:  We would hope so.  We would love to

 5    be done with all the testimony by then.  My questions largely

 6    depend on what plaintiffs ask.

 7              THE COURT:  One thing I might do before I let the jury

 8    go today is have you all up to sidebar, because one question in

 9    my mind, also, is after we conclude the testimony, all the

10    testimony in the case, I entertain motions, I entertain the

11    charge conference, let the jury go for the day, and then

12    Wednesday is closing statements, charge, and then they

13    deliberate.  You should all think about that.  Let's all try to

14    have a sidebar right before we close for the day, have a sense

15    of what your timing looks like, and then I'll try to give the

16    jury some views.

17              Make sense from plaintiff's perspective?

18              MR. LABUDA:  Yes, your Honor.

19              THE COURT:  What about from defendants?

20              MR. SCHOENSTEIN:  Agreed, your Honor.

21              THE COURT:  Anything else before we break, from

22    plaintiff?

23              MR. LABUDA:  No, your Honor.

24              THE COURT:  From defendant, Mr. Schoenstein.

25              MR. SCHOENSTEIN:  Nothing that can't wait for our
```

1   conference this afternoon, your Honor.

2              THE COURT:  Okay.

3              (Recess)

4              Let's have Dr. Goldberg retake his seat.

5              Counsel, my deputy just raised with the jurors the

6   possibility that tomorrow, rather than breaking at 2 o'clock,

7   depending on how things go, they might want to sit longer than

8   2 o'clock so that we can get the closing statements done.  So

9   they're going to think about that, they'll think about the

10  question of whether they deliberate past 2 o'clock.  I would

11  just make the observation, not cut off anybody's examination,

12  but I think you both would be served by keeping the

13  examinations tight.  The jury has been paying attention, but I

14  think sometimes we're losing their attention as the

15  examinations go longer.  So let's keep that in mind.

16             Let's bring in the jury.

17             (Continued on next page)

18

19

20

21

22

23

24

25

 1                  (Jury present)

 2                  THE COURT:  Counsel, you may inquire.

 3                  MR. LABUDA:  Thank you, your Honor.

 4       BY MR. LABUDA:

 5       Q.  Just a few more questions.

 6           With respect to Dr. Edelman's complaint, she spoke to you

 7       about that; correct?

 8       A.  Which complaint?

 9       Q.  Let me back up.  Sorry.

10           With respect to Dr. Edelman's complaint concerning

11       Mr. Antonik, she spoke to you about that; correct?

12       A.  She did.  We had a brief discussion about it.

13       Q.  And she told you that Mr. Antonik had yelled at her and

14       that she felt demeaned by what he said to her; correct?

15       A.  No, she just told me she felt intimidated.

16       Q.  And she also told you that she filed a complaint with human

17       resources; correct?

18       A.  She did.

19       Q.  That was around September of '19.  Withdrawn.

20           It was around September of 2019; correct?

21       A.  Could be.  I don't know the date.

22       Q.  Jumping back to your review of Dr. Edelman, did you ever

23       provide any type of written evaluation to Mr. Rubin about what

24       you had reviewed and concluded?

25       A.  No, I did not.

1  Q.  It was all verbal; right?  Or was it verbal?  Was there any

2  conclusion?  Withdrawn.

3      You had a phonecall with Mr. Rubin in and about December of

4  2020; correct?

5  A.  Correct.

6  Q.  Did you ever report anything back to Mr. Rubin?

7  A.  It was fairly brief.  All I remember reporting back is

8  that, you know, at this point, I'm in agreement with the

9  nonrenewal.

10  Q.  Do you have any sense in terms of how long it was after the

11  Zoom call you had with Mr. Rubin that you made this brief

12  comment to him?

13  A.  It was probably within the span of a few weeks.  I don't

14  remember, again, the details, but --

15  Q.  So that was sometime around mid December; is that right?

16  A.  Yes, that makes sense that it was either mid December or

17  maybe right after -- either right before or right after the

18  holidays.  I don't recall, but --

19  Q.  When you mean the holidays --

20  A.  I mean the end of the year, yeah.

21  Q.  It may have been at the beginning of the new year; correct?

22  A.  Could have been, yes.

23  Q.  So that would have been sometime in January of 2021; right?

24  A.  Right.

25  Q.  And you understood, just from Mr. Edelman continuing to

1    work, that she continued working there until around May of

2    2021; is that right?

3    A.  Yes.

4    Q.  As the clinical director, you still had oversight

5    responsibilities to make sure that she was providing high

6    quality patient care; correct?

7    A.  Correct.

8    Q.  And that's in accordance with your contract; right?

9    A.  Correct.

10   Q.  Did you have any discussions with Dr. Edelman about her

11   continued patient care between December and May of 2021 when

12   she left?

13   A.  I did not.

14   Q.  You've heard of OPMC; correct?

15   A.  Yes, I've heard of them.

16   Q.  What is OPMC?

17   A.  I don't know.  I've heard of them.  Well, I shouldn't say I

18   don't know.  I don't know the details of what they do.

19   Q.  You understand that to be the Office of Professional

20   Medical Conduct?

21   A.  Yes, I'm familiar with them.

22   Q.  They oversee all the doctors to make sure that they're

23   doing a good job; right?

24   A.  Right.

25   Q.  And there's a complaint procedure that anybody could file

1  it, a doctor or a patient could file if they have concern about

2  a doctor's care and the quality of their care; correct?

3  A.  I'm not familiar with their proceedings, but I've heard of

4  them and I've heard that you can complain through them, yes.

5  Q.  Did you ever raise any issue, either verbal or in writing,

6  with the OPMC about Dr. Edelman's care for her patients?

7  A.  No, I did not.

8           MR. LABUDA:  I don't have any other questions.

9  Thanks, Dr. Goldberg.

10          THE COURT:  Defense examination.

11          MR. LABUDA:  I'm going to pass the witness.

12  CROSS-EXAMINATION

13  BY MR. SCHOENSTEIN:

14  Q.  Good morning, Dr. Goldberg.

15  A.  Good morning.

16  Q.  You're not a defendant in this action; right?

17  A.  No, I'm not.

18  Q.  I want to talk about your getting hired with NYU.

19          MR. SCHOENSTEIN:  Could we put up exhibit 41, please.

20          This has already been entered, your Honor.  We're

21  going to publish.

22          THE COURT:  You may do so.

23  Q.  While we put that up, why don't you just tell the jury,

24  what was the role that you were discussing with NYU in or about

25  2013?

1   A.   So I had approached NYU -- had been introduced by a

2   colleague to start a rheumatology program on Long Island.  I

3   had an idea to also integrate with orthopedics and sort of

4   replicate what was going on in the city for the center of

5   musculoskeletal care where we would combine the activities of

6   orthopedics and rheumatology due to a lot of the collaboration

7   that we do and to get a rheumatology program started in Long

8   Island.  There were no rheumatologists under the NYU name in

9   Long Island when I first started to speak with them.

10   Q.   And was the discussion about you having a role in building

11   that?

12   A.   Absolutely, yes.

13   Q.   We put in front of you your curriculum vitae that was in

14   effect at the time you were negotiating with NYU; is that

15   right?

16   A.   Yes, that's correct.

17   Q.   And where were you working in 2013 when you were talking to

18   NYU?

19   A.   I was in North Shore University Hospital or the North Shore

20   LIJ system I think it was called then.

21   Q.   Were you unhappy with North Shore?

22   A.   Not particularly, no.

23   Q.   Was North Shore under any financial stress that you were

24   aware of?

25   A.   No.

1  Q.  Was there any prospect of you losing your job or having to

2  find a new job?

3  A.  No.

4  Q.  Did those factors impact at all your decision to talk to

5  NYU?

6  A.  No.

7  Q.  From your viewpoint, sir, was there any risk associated

8  with if you were to leave North Shore and join NYU?

9  A.  Yeah, I mean, there was a lot of risk.  At the time, North

10 Shore LIJ was a very large presence — and they still are a

11 large presence in the Long Island region — and NYU was just

12 starting out.  My recollection was that they had only about,

13 you know, they had a few practices, maybe up to 70 doctors at

14 the time, so they were kind of a small operation.  North Shore

15 LIJ was expanding and there was some other large groups on Long

16 Island that were expanding.  So there was the risk that an NYU

17 practice might not fit, there might just not be enough demand

18 to grow a practice under a new institution.

19 Q.  What, if any, connection did that risk have to the way you

20 approached salary negotiations?

21 A.  Obviously, you know, as I said, I was fairly happy at my

22 position at North Shore LIJ.  I had a good group of people.  I

23 obviously wanted something better.  So, you know, certainly

24 certain things were important to me, and increased compensation

25 was obviously one of them.

N7HCede3                        Goldberg – Cross

1  Q.  You were going to come build a rheumatology practice.  Were

2  you going to come do that for $25,000 a year?

3  A.  No, not really.

4  Q.  Were you going to do that if they had given you, say, a

5  10 percent, 20-percent increase on your salary?

6  A.  No, probably not.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N7hWede4                    Goldberg - Cross

1  BY MR. SCHOENSTEIN:

2  Q.  Did they ultimately make --

3           MR. LABUDA:  Objection.

4           THE COURT:  Stop the leading.

5           MR. SCHOENSTEIN:  All right.

6           THE COURT:  Overruled.

7  BY MR. SCHOENSTEIN:

8  Q.  Were you able ultimately to reach a financial package you

9  found satisfactory?

10  A.  Yes.

11           MR. SCHOENSTEIN:  I want to scroll down a little bit

12  on this.  Let's see, we've covered Hofstra.  Keep going.

13           OK.  Right there.

14  Q.  You see it says director, scleroderma and Raynaud's

15  treatment center?

16  A.  Yes.

17  Q.  Can you explain briefly what scleroderma is and how that

18  fits into your practice?

19  A.  Sure.  While I was at North Shore-LIJ, there was a -- the

20  rheumatologists there were encouraged to subspecialize.  There

21  was a lot of research going on in our division, and each

22  faculty rheumatologist was encouraged to have a subspecialty,

23  an expertise beyond general rheumatology.  I took an interest

24  in scleroderma around 2002, and I started to get involved in

25  research trials and attend a lot of scleroderma conferences and

N7hWede4                         Goldberg - Cross

1    started to see -- open up my practice and, and kind of

2    advertise my practice as a scleroderma expert.  And that

3    continued throughout my years at North Shore-LIJ, where I did a

4    lot of research studies during my time there, and, you know,

5    wrote a lot of papers in that area.

6    Q.  During your negotiations with NYU, did you speak to NYU

7    about your skills and credentials?

8    A.  Yes.

9    Q.  And can you tell us generally what you remember saying in

10   that regard?

11   A.  You know, obviously I had a number of different meetings

12   with people.  I, you know, I met with Mr. Rubin, a lot of the

13   administrative people.  I met with the then and still director

14   of rheumatology, Dr. Buyon, in the city.  And you know, my -- I

15   had a lot of different goals and a lot of different visions.

16        No. 1, I wanted to start a successful clinical practice.  I

17   did have a lot of connections in the area to try and bring on

18   more rheumatologists.  I did have a very good name in the area,

19   so I felt like we would easily attract a lot of patients.  A

20   lot of the internists and other subspecialists who refer to

21   rheumatologists knew me from my years with North Shore.  So

22   part of my objective was to, you know, start a successful

23   practice.

24        As I already mentioned, it also would have a

25   musculoskeletal practice where we would unite with other

1  specialties, orthopedists.  And then lastly, I was hoping to,

2  you know, continue some of the clinical research that I was

3  doing and maintain my expertise in scleroderma.

4  Q.  In terms of the part of your practice that's clinical work,

5  how long had you been doing that as of 2013?

6  A.  I finished my fellowship in 1999, so I had been a, a

7  board-certified rheumatologists and practiced for 13 years.

8  Q.  And you were asked on direct about whether you had teaching

9  roles and that kind of thing.  During those 13 years, with what

10  frequency did you see your own patients?

11  A.  Well, I -- I saw my own patients every day.  I had a, you

12  know, an active clinical practice.  But I also had other

13  responsibilities, such as training residents, fellows,

14  occasionally students, and interacting with other

15  subspecialties to help educate them about rheumatology.

16  Q.  Ms. Cardona says we didn't say what scleroderma is, so can

17  you just explain that real briefly?

18  A.  My apologies.

19  Q.  No, no.  I didn't ask the question.

20  A.  Scleroderma is a rare disease that is thought to evolve

21  from the immune system, where the host's immune system is

22  stimulated to overproduce scar tissue and to overproduce the

23  cells that line blood -- blood vessels, and it leads to all

24  sorts of complications, such as scarring of the skin, scarring

25  of the lungs and other organs and vascular abnormalities,

N7hWede4                          Goldberg - Cross

1   meaning blood vessel abnormalities, leading to all sorts of

2   complications in the organs as well.  It's an, unfortunately,

3   incurable disease because we really have no treatments for

4   overproduction of scar tissue, and that's why -- it's one of

5   the reasons I took an interest in it, because it's so difficult

6   to treat it.  And I thought over my career we would make

7   inroads.

8   Q.  What, if any, discussions did you have about that area of

9   your practice with NYU back in 2013?

10  A.  It wasn't the mainstay of my discussion, but it certainly

11  was something I brought up with Dr. Buyon when I first signed

12  on, about potentially developing that area.

13  Q.  What, if any, discussions did you have with Dr. Buyon about

14  your reputation and connections?

15  A.  I think -- I mean we had known each other from before.  I

16  think it -- you know, I did make it clear that I, you know, do

17  have a lot of connections that I've made over the years and

18  that I think a lot of the subspecialists in the area and

19  internists in the area had confidence in me that I would bring

20  in patient referrals.

21  Q.  Did you have an understanding as to whether patient

22  referrals were important to NYU at the time of these

23  discussions?

24  A.  I think that's fairly obvious.  I mean I -- the first thing

25  you would want if you're starting a new clinical practice is,

1  is patient volume.

2  Q.  At the time of these discussions with NYU in 2013, did you

3  have any debt that you were asking NYU to assume as part of the

4  deal?

5  A.  No.

6  Q.  Did you have any lease or office expenses that you were

7  asking NYU to take over?

8  A.  No.  I was a salaried employee at North Shore-LIJ.

9  Q.  So other than what NYU would pay you, are you aware of any

10  other expenses NYU would have had in connection with your hire?

11  A.  No.  There were no other expenses.

12  Q.  We looked at your contract -- I don't think I need to put

13  it up again -- but do you remember seeing that $23,000 at the

14  end of the year?

15  A.  Yes.

16  Q.  Do you recall how that came about?

17  A.  Yes.  That was put in as a retention bonus for the one

18  year.  It was, in part, because there is -- the -- I think I

19  would have received that amount of money in my retirement fund,

20  but you have to be at NYU for two years, and I had already done

21  my fellowship there, and they felt like, you know what, we're

22  going to give you the, that extra 23,000 because you're losing

23  it in the retirement fund.

24  Q.  And you recall there was negotiation about your RVU target;

25  you said that on direct, right?

1   A.  Yes.  The -- well, it was more about the -- the negotiation

2   was more about the actual salary for the RVU target rather than

3   the actual target.

4   Q.  So what I wanted to know is after you were hired, when did

5   you start work at NYU?

6   A.  I started on March 1, 2014.  I think it ended up being

7   March 3, because it was a weekend or something.

8   Q.  And were there any other rheumatologists on Long Island at

9   NYU when you walked in the door?

10  A.  No.

11  Q.  So how did you go about what you set out to do?

12  A.  Well, even before I walked in the door, I started, you

13  know, talking to some of my colleagues about whether they'd be

14  interested in joining the practice.

15  Q.  OK.  And how did that effort go in terms of recruiting

16  rheumatologists?

17  A.  It was a little slow at first.  NYU was very helpful.  They

18  started the negotiations with Dr. Porges's group, which, you

19  know, I then joined.  You know, some of my associates from

20  North Shore-LIJ were considering joining NYU as well, but they

21  chose not to in the end.  So then I started to look to some of

22  the private practices in -- you know, some of my colleagues in

23  private practice in the area.

24  Q.  And you were involved, you said, in the recruitment of Dr.

25  Edelman?

N7hWede4                         Goldberg - Cross

1   A.  Correct.

2   Q.  And I think you just said you became involved in the

3   recruitment of Dr. Porges?

4   A.  Correct.

5   Q.  In that time frame, while they were being recruited, did

6   you have a view as to their relative reputations in the field?

7           MR. LABUDA:  Objection.  For this witness, relevance.

8           THE COURT:  Overruled.

9   A.  So, yes, I did.  You know, Dr. Edelman and Mehta, as I

10  mentioned, were brought to my attention -- Dr. Kavina.  They

11  were younger.  They were a newer practice.  Dr. Porges did have

12  a very lengthy, very lengthy history of being a noted

13  rheumatologist on Long Island, so obviously, you know, his

14  practice was considered more esteemed, and Dr. Brancato as well

15  had done a lot of good things.  Her reputation had preceded her

16  as well.  They had a lot of publications and they'd a lot of

17  research, so obviously it was a higher stock practice.

18  Q.  And counsel asked you year by year about RVU targets.  Do

19  you have a general recollection, generally speaking, did you

20  meet or exceed your RVU targets over the years?

21  A.  Yeah, I exceeded my RVU target just about every year except

22  for 2020.

23  Q.  And after, and sometime in 2017, the discussion came up

24  about an addendum or revision of your contract.  Do you recall

25  that?

N7hWede4                         Goldberg - Cross

1   A.  Yes.

2   Q.  So how did that come about, if you recall?

3   A.  Well, I had -- you know, it had been three years, and I

4   actually hadn't remembered exactly when my contract expired,

5   whether it had been a three year or five-year agreement, but at

6   the time, the practice had really taken off.  We -- you know,

7   Drs. Porges and Brancato had joined us.  Drs. Edelman and Mehta

8   had joined us.

9        I had also by that time started to established a

10  practice -- I started going to the Huntington site once a week.

11  We had another site that was added to NYU, which did not have a

12  rheumatology practice either.  And that was around, I think,

13  2015.  But anyway, by that point, Huntington was starting to

14  become successful.  We had full-time people there, and our

15  practice had grown a lot.  Obviously we were up to -- I believe

16  it was five rheumatologists at the time.  And the NYU service

17  line was growing because of that.  The orthopedists were

18  becoming more successful in our building.

19       The -- we have an infusion suite in our building, which was

20  becoming busier and busier.  It's already been expanded a

21  number of times since I joined.  When I first joined, it was a

22  tiny infusion suite for, like, four, five patients.  Now we

23  service, like, 60 patients a day in the infusion suite.  So

24  there had been a tremendous amount of growth, so I obviously

25  wanted to revisit my agreement.

1  Q.  Who raised revisiting, NYU or you?

2  A.  I contacted, I think it was Jonathan Crowe at the time, who

3  was -- who I had worked with in the past.

4  Q.  And who is Jonathan Crowe?

5  A.  He, he worked in Mr. Rubin's office.

6  Q.  And did you end up discussing that addendum with Mr. Rubin?

7  A.  I don't remember if it was through Mr. Rubin or through

8  Mr. Crowe that we got it done.

9  Q.  What, if anything, was included in your pitch?

10 A.  I mean pretty much everything that I told you, that the

11 practice has grown tremendously; we've added a lot of people;

12 and, you know, I think my value has grown a lot here.

13 Q.  So -- OK.

14     Because you'd been -- withdrawn.

15     I think you said you had gotten some bonuses for RVU

16 targets, right?

17 A.  Right.  In addition, the fact was I was significantly -- by

18 that point I was significantly exceeding my RVU targets, so it

19 also just made more sense not to wait until the end of the year

20 and get a large bonus.  I just wanted to also incorporate the

21 higher RVUs that I was generating just into my regular salary

22 rather than wait for it as a bonus every year.

23 Q.  OK.  So in those discussions, were there references to both

24 the quantity of your production and the quantity of the whole

25 department's production?

N7hWede4                         Goldberg - Cross

1   A.  I believe so, yes.

2   Q.  And did you also have any discussions at the time about the

3   quality of the department that was being built?

4   A.  I believe so.  I think we were doing very well on many

5   levels.

6   Q.  And after those RVU targets were raised in the addendum in

7   2017, do you recall, generally speaking, if you continued to

8   meet the new, higher targets?

9   A.  Yes.  I wasn't exceeding them the way I had been

10  previously, but I continued to, to exceed them, you know, at a

11  smaller percentage.  It was a much better, you know, baseline

12  indicator.

13  Q.  I just want to pick on a couple of things you mentioned to

14  make sure we understand them.  You talked about a service line

15  to, I think you said orthotics?

16  A.  Orthopedics.

17  Q.  Orthopedics.  I'm glad there's a doctor in the house.

18      A service line to orthopedics, what does that mean?

19  A.  Well, you know, there are obviously many subspecialties in

20  medicine, and, you know, we all need patients in order to, to

21  do our trade, and there is a certain, as I say, collaboration

22  or a certain relationship between rheumatology and orthopedics,

23  because we're seeing a lot of patients with arthritic diseases,

24  joint diseases, bone diseases, and the surgeries and the types

25  of patients that are seen in orthopedics are people with joint

1    diseases, bone diseases, things like that.

2        I mean an easy example is joint replacement.  So as

3    rheumatologists we manage arthritic patients medically, mostly

4    medically or with injections and things like that, but if they

5    need a surgical procedure, like a joint replacement, that goes

6    to an orthopedist, so -- it's a great collaboration of

7    specialties.  So over the years, we, you know, NYU wisely

8    colocated us with the orthopedists.  And like this, we

9    developed relationships with them, and so if my patients needed

10   any orthopedic care, I would obviously refer them to the

11   on-site NYU orthopedists.  And it was great for the patients,

12   because I was able to follow up and advocate for them to make

13   sure they're getting the best care.  I was able to refer them

14   to the most appropriate doctors, and similarly, they sometimes

15   see patients who have more chronic illnesses that aren't really

16   in their purview and they subsequently refer those patients to

17   us.  So it became a very -- very good, you know, relationship.

18   Q.  What, if any, involvement did you, sir, have in that

19   colocation of orthopedics and rheumatology?

20   A.  Well, I -- I was the one who suggested it.  I remember on

21   one of my initial meetings with Mr. Rubin and Dr. Brotman, I

22   mentioned it, and they seemed very enthusiastic.  Again, I was

23   trying to replicate what they had already done here in New

24   York, in Manhattan, and, you know, it seemed to be a win-win

25   for everybody.  There were already a couple of orthopedists who

N7hWede4                           Goldberg - Cross

1   were under the NYU banner in -- in 2013, so they simply found

2   space and colocated us.

3   Q.  And when you have a patient of yours who goes and gets,

4   like, a joint replacement, what, if any, RVUs are you credited

5   for?

6   A.  Oh, I don't get any RVUs.  The orthopedists get those RVUs.

7   Q.  And if you have a patient who goes to the infusion center

8   to get an infusion, what, if any, RVUs do you get?

9   A.  Oh, none.  I don't get any RVUs for that.

10  Q.  Are those referrals, in your estimation, still of value to

11  NYU?

12  A.  Yeah, I think they're very valuable.

13  Q.  And what is -- have you continued on in your role of

14  helping build the rheumatology department on Long Island?

15  A.  Yes, I have.

16  Q.  And as you sit here today, how would you assess your

17  success?

18          MR. LABUDA:  Objection.

19          THE COURT:  Sustained.

20  BY MR. SCHOENSTEIN:

21  Q.  What, if anything, have you done in -- to accomplish in

22  that regard?

23          MR. LABUDA:  Objection.

24          THE COURT:  Overruled.

25  A.  I've continued to recruit people.  We added Dr. Given, who

1   is a, who is a very well-established rheumatologist.  We added

2   him at the beginning of 2020.  And you know, he had a very, a

3   very esteemed and well-known practice on Long Island.  He'd

4   been in private practice for many years.  We have also added

5   someone from, from the Winthrop fellowship, from the, I guess,

6   now NYU Long Island fellowship.  We added a new doctor from

7   there.  I don't get direct credit for that one, but I helped

8   kind of, you know, mentor him along since he joined and as well

9   as at Huntington we've now added a third rheumatologist.  In

10  addition to me, there's actually a fourth.  So I think it's

11  going great.  I think we've been recruiting people.

12       You know, in addition, if there are also subspecialists who

13  are interested in NYU, I think people know me as one of the

14  first people on Long Island to join.  So I've been approached

15  by people in hem-onc, in internal medicine, who have also ended

16  up joining NYU over the last few years.  So I think it's going

17  very well.

18            MR. LABUDA:  I'm just going to object and move to

19  strike as nonresponsive.  It's excessive to the question, your

20  Honor.

21            THE COURT:  Overruled.

22  BY MR. SCHOENSTEIN:

23  Q.  When you got to NYU, where was your office?

24  A.  At 1999 Marcus Avenue.

25  Q.  And do you recall the suite number?

N7hWede4                    Goldberg - Cross

1   A.  The first suite number, I think, was -- it was on the first

2   floor, like, suite 102 or something.

3   Q.  Were you in 202 at any time?

4   A.  Yes.

5   Q.  And --

6   A.  Should I give you the history?

7   Q.  If you can do it briefly --

8   A.  Yeah, just briefly.  I was on the first floor for about a

9   year.  Some new suites were built on the third floor, in 306.

10  And then I actually moved down to 202, which is where I was

11  colocated with orthopedics.  And then after a few years ago, I

12  went back up to suite 306.

13  Q.  When you moved down to 202 for a while, were you happy

14  about that?

15  A.  I was happy for a while, yes.

16  Q.  And in 306, has anyone ever used your office on days you're

17  not there?

18  A.  Yes.  On Tuesdays I go to the Huntington office, so

19  somebody else uses my office.

20  Q.  And have you ever had any issue with that?

21  A.  No.  It's fine.

22  Q.  Now, you were asked questions -- oh, I just want to ask you

23  one thing about your -- you have a child at NYU?

24  A.  Yes.

25  Q.  What part of NYU?

1  A.  He's in the College of Arts and Sciences.

2  Q.  Undergrad?

3  A.  Undergrad, yeah.

4  Q.  By the way, is that -- you said you got some discount on

5  tuition because you work at NYU?

6  A.  Correct.

7  Q.  Is that available to men and women who work at NYU?

8  A.  Yes, available to all the faculty.

9  Q.  So, I want to talk about the discussions you had with

10  Mr. Rubin about plaintiff and her contract.  Sitting here

11  today, do you know the dates of those discussions?

12  A.  No, of course not.

13  Q.  OK.  And you said something about holidays, working around

14  Thanksgiving, did that refresh your recollection?

15  A.  Possibly.  Your colleague mentioned something about, about

16  December, and it may have been around then.

17  Q.  OK.  At the time you were contacted, as you understood it,

18  had Dr. Edelman been told her contract was being nonrenewed?

19  A.  I don't remember.  The implication was that it was not

20  going to be renewed.  I don't think she had been told -- you

21  know, I don't --

22  Q.  Were you being asked to opine on the topic?

23  A.  It was more of to let me know.

24  Q.  Did you take it as an opportunity to opine on the topic?

25  A.  I did.

N7hWede4                         Goldberg - Cross

1    Q.  OK.  And did you?  Did you opine on the topic?

2    A.  I did.

3    Q.  And so, tell us -- I heard you say various things you did.

4    You talked about speaking to staff, speaking to the head nurse,

5    speaking to the medical assistant.  What kind of issues did you

6    hear about that you considered relevant to your assessment?

7    A.  So, you know, there were, there were issues of

8    relationships.  The -- you know, I guess I'll start with the

9    medical assistant said that they just had a very poor

10   communication, almost such that they didn't speak to each other

11   much.  It was all -- everything was done through messaging and

12   that the medical assistant had a difficult time working with

13   Dr. Edelman because she didn't know where she was at, she

14   didn't know what was going on a lot of times and there was a

15   big disconnect.

16       I spoke to our office manager --

17            MR. LABUDA:  Objection.  Hearsay.

18            THE COURT:  Sustained.

19   BY MR. SCHOENSTEIN:

20   Q.  OK.  What, if anything -- did you learn anything about the

21   interactions with the nurse that were relevant to your inquiry?

22   A.  Yeah.  So, I learned that --

23            MR. LABUDA:  Objection.  Hearsay.  Basis.  Foundation.

24            THE COURT:  Same ruling.

25            MR. SCHOENSTEIN:  It's not for the purposes --

1        THE COURT:  Sustained.  You can ask about the

2   conversations with Mr. Rubin, but not what he was told by

3   others that are not conveying it.

4   BY MR. SCHOENSTEIN:

5   Q.  Did you report to Mr. Rubin what the nurse had told you?

6        MR. LABUDA:  Objection.

7        THE COURT:  Overruled.

8   A.  Yes, I explained to Mr. Rubin that, you know, there were

9   all sorts of clinical problems.  Some of them were on a more

10  minor level, but they made the working environment difficult --

11  very difficult for our office staff, for our nurses, for our

12  managers.  So I explained to Mr. Rubin that, yes, I agree,

13  that, you know, if you're not going to renew, I totally support

14  that.

15       THE COURT:  Members of the jury, this testimony is

16  being received not for the truth as to whether Dr. Edelman had

17  these issues.  But because the state of mind of Mr. Rubin at

18  the time of the employment actions is at issue in this case,

19  it's being received for the fact that this is information that

20  is being conveyed to Mr. Rubin, because that's relevant to his

21  state of mind.

22       Go ahead.

23  BY MR. SCHOENSTEIN:

24  Q.  Did Mr. Rubin, did you and Mr. Rubin discuss whether there

25  were remedial efforts that could be implemented?

N7hWede4                     Goldberg - Cross

1   A.  Yes, we did.

2   Q.  And tell us about that discussion as best you recall it.

3   A.  Well, Mr. Rubin said that if we were to extend Dr.

4   Edelman's contract, we would have to do it for only a temporary

5   period of time and that there would have to be a physician that

6   would micromanage her and review her charts and check her work

7   and that I would probably be the person asked to do that.  And,

8   and it was put to me like that.  And it was not something that

9   I thought was appropriate.

10  Q.  Why did you not think it was appropriate?

11  A.  First of all, it's a big undertaking to try and micromanage

12  another physician's practice.  I have my own practice.  I'm

13  seeing my own patients.  I wasn't interested in following Dr.

14  Edelman around all day.  I also felt that due to all the

15  interpersonal issues in the office it wasn't worthwhile to put

16  in the efforts to continue her employment at NYU.

17  Q.  Did you think you'd be able to -- did you think about

18  whether you'd be able to resolve the issues just by having a

19  talk with Dr. Edelman; was that something you considered?

20  A.  I certainly considered it.

21  Q.  And what was your conclusion at the time?

22  A.  Again, after my investigations, I felt like things were a

23  little bit too far gone to, to, to do that action.

24  Q.  Did you discuss with Mr. Rubin whether or not the clinical

25  issues mentioned justified a nonrenewal?

1    MR. LABUDA:  Objection.  Leading.

2    THE COURT:  Overruled.

3    A.  Yes, of course, the clinical issues came up as well.

4    Q.  And did you indicate to Mr. Rubin any opinion in that

5    regard?

6    A.  I think it was, you know, it's -- I don't know that we

7    parsed each issue out.  I think in the end it was a summation

8    of issues that, between the clinical issues and the

9    interpersonal issues, it was just too difficult.

10   Q.  And do you stand, sitting here today, do you stand by that

11   assessment?

12   MR. LABUDA:  Objection.

13   THE COURT:  Overruled.

14   A.  Yes, I do.

15   Q.  You mentioned having heard at some point about an HR

16   complaint?

17   A.  Yes.

18   Q.  Did that affect in any way your view of the clinical

19   issues?

20   A.  No, not at all.

21   MR. SCHOENSTEIN:  Thank you, sir.

22   THE COURT:  Any further examination?

23   MR. LABUDA:  Yes, your Honor.

24   THE COURT:  OK.  Go ahead.

25   REDIRECT EXAMINATION

1  BY MR. LABUDA:

2  Q.  Dr. Goldberg, you had talked, just talked about the risk of

3  leaving North Shore, correct?

4  A.  Correct.

5  Q.  Is there any reference about risk in your contract with

6  NYU?

7  A.  Not that I'm aware of.

8  Q.  When you started over at NYU, how many patients did you

9  have?  What was your patient following at that time, do you

10  know?

11  A.  My first days at NYU --

12  Q.  Yes.

13  A.  -- you're asking?

14  Q.  Yes.

15  A.  The first couple of months it was, it was lower, maybe,

16  like, you know, eight to ten patients a day.  But already by

17  the end of the year, it had picked up to closer to, you know,

18  15 to 20 patients a day.

19  Q.  And does that, in terms of eight to ten patients, are those

20  ten patients that followed you from North Shore over to NYU?

21  A.  It was a combination of patients who followed me from North

22  Shore.  That was probably the bulk of people the first, you

23  know, few months.  And then new patients that started to be

24  added on.

25  Q.  Do you have any sense in terms of, like -- I know you're

```
 1   doing it on a daily basis.  Do you have a sense in terms of the
 2   patient following in total that you had when you came over,
 3   such as, you know, X number of patients signed up with me when
 4   I started over at NYU?
 5   A.  Well, the problem is you don't know that they've signed up
 6   with you until you've actually -- they've actually come to see
 7   you, because it's not like you ask them to sign something right
 8   away, like yes, I'm going to follow you or no, I'm not.  So
 9   it's just a question -- you know, I sent out well over a
10   thousand letters to, to prior patients and, and, you know,
11   little by little they trickled in.
12   Q.  OK.  And out of those thousand or so patients that you sent
13   letters to, do you have an estimate in terms of how many
14   followed over?  Would it be about half --
15   A.  It was more than half.
16   Q.  Would it be about three-quarters?
17   A.  Maybe 70 percent.
18   Q.  So that would be about 700 patients when you started, is
19   your best estimate?
20   A.  Perhaps.
21   Q.  OK.
22   A.  Again, it took a good year for me to know how many people
23   were still going to see me and how many were not.
24   Q.  And when Dr. Edelman was recruited over to NYU, she had a
25   patient following, correct?
```

1    A.  She did.

2    Q.  Do you have an understanding of how many patients she

3    had --

4    A.  No.

5    Q.  -- when she came over?

6    A.  I was not privy to her numbers when she started.

7    Q.  But that's an important factor for NYU for determining

8    salary because the patients generate the RVUs that ultimately

9    generate revenue for NYU, correct?

10   A.  Yeah, how, how -- you know, your recruitment of patients

11   is, of course, important.

12   Q.  Right.  If you don't see any patients, you're not

13   generating any RVUs, correct?

14   A.  Of course.

15   Q.  You had mentioned about this, that the retention bonus, the

16   $23,000?

17   A.  Right.

18   Q.  You said you had some, you had some understanding that that

19   was for lost retirement from North Shore, is that right?

20   A.  Yes.  That's my recollection of it.

21   Q.  OK.  Does that show up in your contract?  Is there any

22   reference to the fact that you're being paid the 23,000 signing

23   bonus, retention bonus because you're losing that --

24   A.  No.  It was just in my negotiations with NYU, I mentioned

25   it, and they said, you know what, we'll just give you this

1    retention bonus.

2    Q.   But in terms of that merger clause where everything's

3    supposed to be in the contract, there's nothing mentioned in

4    there about you getting 23,000 because you're giving up

5    retirement income from North Shore, correct?

6    A.   No, that was not in the contract.

7    Q.   And you had said that -- let me back up.

8        Your first contract, you were making 200, 201 at North

9    Shore, and then you got 290 in your clinical at NYU, correct?

10   A.   Correct.

11   Q.   Is that what you asked for to come over to NYU, was 290?

12   A.   I didn't put that number out there, no.

13   Q.   OK.  They put that number out to you?

14   A.   Yeah.  Well, they talked about 10 or 20 percent.  I

15   indicated that wasn't enough, and, you know, they came back.

16   Q.   OK.  And then the second contract, where it went from the

17   290 to 500, I think you had said you initiated that

18   conversation based on the growth of the practice, right?

19   A.   Correct.

20   Q.   And was that $500,000 number a number that you demanded or

21   suggested to NYU for the value that you had created?

22   A.   No.  It was a combination of the increased RVUs at the

23   time, and I did ask for a little bit of a raise.

24   Q.   OK.  I guess what I'm asking is did you come to that, did

25   you say, hey, look, I think I'm worth $500,000?

1   A.  No, I didn't put out the number.

2   Q.  You didn't put the number out, and then that was something

3   through negotiations?

4   A.  Correct.

5           MR. LABUDA:  Bear with me one second, your Honor.

6           THE COURT:  OK.

7           MR. LABUDA:  No further questions.

8           THE COURT:  Anything further, Mr. Schoenstein?

9           MR. SCHOENSTEIN:  No.  Thank you, your Honor.

10          THE COURT:  OK.  Sir, you're excused as a witness.

11  You may step down.

12          (Witness excused)

13          THE COURT:  Plaintiff, call your next witness.

14          MR. KATAEV:  Plaintiff calls Kathleen Pacina, your

15  Honor.

16          THE COURT:  OK.  Let's bring Ms. Pacina in.

17   KATHLEEN PACINA,

18       called as a witness by the Plaintiff,

19       having been duly sworn, testified as follows:

20          THE COURT:  Ms. Pacina, as you're testifying, please

21  try to keep your mouth close to the microphone and speak

22  loudly, clearly, slowly, for the benefit of the reporter and

23  the jury.

24          Counsel.

25  DIRECT EXAMINATION

N7hWede4                         Pacina – Direct

1    BY MR. KATAEV:

2    Q.  Good morning, Ms. Pacina.

3    A.  Good afternoon.

4    Q.  Yes, time flies.

5        You went to St. John's University College of Professional

6    Studies, correct?

7    A.  Yes.

8    Q.  And graduated in 2010, right?

9    A.  Yes.

10   Q.  And I know you went to a great college and got an amazing

11   education, because that's my alma mater, right?

12       Did you get a great education?

13   A.  Oh, yes.

14   Q.  And your first job out of college was at NYU, wasn't it?

15   A.  Yes.

16   Q.  And you started off as a temp in 2010, right?

17   A.  Yes.

18   Q.  Then you became a full-time employee in 2011, correct?

19   A.  Yes.

20   Q.  And you remain employed by NYU, don't you -- aren't you?

21   A.  Yes.

22   Q.  OK.  So in December of 2011, you became an employee

23   relations assistant, right?

24   A.  Yes.

25   Q.  In that capacity, you assisted the vice president of

1   employee relations, Reggie Odon, correct?

2   A.  Yes.

3   Q.  Mr. Odon's responsibilities included dealing with

4   complaints by employees, correct?

5   A.  Yes.

6   Q.  And in your capacity as his assistant, it's fair to say

7   that you gained some experience in handling those kind of

8   complaints, correct?

9   A.  Yes.

10  Q.  A year or two after that title, you became an employee

11  relations specialist, correct?

12  A.  Yes.

13  Q.  And in that capacity, you began directly dealing with

14  complaints made by employees, right?

15  A.  Yes.

16  Q.  You would discuss these complaints with Mr. Odon sometimes,

17  right?

18  A.  Yes, but also I had another assistant director.

19  Q.  You had many people that you could consult with --

20  A.  Yes.

21  Q.  -- at your department, right?

22  A.  Yes.

23  Q.  And just for the record, how many employees were in the

24  employee labor relations department in or about 2017?

25  A.  There were about four managers or -- three managers and one

1    specialist, myself.

2    Q.  And in 2017 or '18, you became an employee relations

3    manager yourself, didn't you?

4    A.  Yes.

5    Q.  Now, your duties as the manager included managing client

6    groups, right?

7    A.  Yes.

8    Q.  And speaking to employees regarding various issues, right?

9    A.  Yes.

10   Q.  And also speaking to employees about performance issues,

11   correct?

12   A.  Yes.

13   Q.  And you also learned how to deal with employee complaints,

14   didn't you?

15   A.  Yes.

16   Q.  At least continued to learn, right?

17   A.  Yes.

18   Q.  And you did this by shadowing specialists and being trained

19   by a team, correct?

20   A.  Yes.

21   Q.  Now, generally speaking, whenever a complaint is received,

22   you talk to all the parties involved, correct?

23   A.  Yes.

24   Q.  And you talk to the person that made the complaint, right?

25   A.  Yes.

1  Q.  You also talk to the person who the complaint is against,

2  right?

3  A.  Yes.

4  Q.  And sometimes you speak to other witnesses that may have

5  been involved, right?

6  A.  Correct.

7  Q.  And you then provide a response after doing so, correct?

8  A.  Yes.

9  Q.  You also determine in your capacity as an employee

10  relations manager whether a complaint that's made is founded or

11  unfounded, right?

12  A.  Correct.

13  Q.  You basically determine whether the complaint has any

14  merit, right?

15  A.  Yes.

16  Q.  And it's fair to say that over the years at NYU, you've

17  dealt with dozens, if not hundreds, of these kinds of

18  complaints over those years, correct?

19  A.  Yes.

20  Q.  Now, the jury has heard a little bit about your colleague,

21  Rashidat Ogbara.  Do you recall Mrs. Ogbara?

22  A.  Yes.

23  Q.  She's a peer who worked with you, correct?

24  A.  Correct.

25  Q.  She has the same title as you, right?

1  A.  Correct.

2  Q.  Your offices are right next door to each other, right?

3  A.  Yes.

4  Q.  And you would confer with her on cases sometimes, right?

5  A.  Yes.

6  Q.  And NYU obviously has equal employment opportunity

7  policies, right?

8  A.  Yes.

9  Q.  There's a policy against discrimination, isn't there?

10  A.  Yes.

11  Q.  There's a policy against harassment, right?

12  A.  Yes.

13  Q.  And there's a policy against retaliation, right?

14  A.  Yes.

15  Q.  And did you know that with certainty when I deposed you in

16  2021?

17  A.  That we had those policies?

18  Q.  Yes.

19  A.  Yes.

20        MR. KATAEV:  Your Honor, I'm going to hand up the

21  transcript of Ms. Pacina.

22        THE COURT:  I've got it.

23        MR. KATAEV:  Page 57, please.

24        THE COURT:  Sorry.  What page?

25        MR. KATAEV:  57, line 22 to 21 on the next page.

1          MR. SCHOENSTEIN:  Objection.

2          THE COURT:  Sustained.

3          MR. KATAEV:  I'm just going to quickly pull it up so I

4   have it anyway?

5          THE COURT:  Next question.

6          MR. KATAEV:  Sorry, your Honor.

7   Q.  And you received training about NYU's equal employment

8   policies, correct?

9   A.  Yes.

10  Q.  And has NYU ever provided you with training on how to

11  investigate complaints?

12  A.  Yes.

13         MR. KATAEV:  Page 89, your Honor, line 24, through

14  line 4 on the next page.

15         THE COURT:  All right.  Go ahead.

16         MR. KATAEV:  For the witness only, please.

17  Q.  I deposed you in this case in September of 2021, correct?

18  A.  Yes.  I don't recall the date, but yes.

19  Q.  At your deposition, I asked you the following question, and

20  you provided the following answer, correct?

21  "Q.  Does NYU provide training to you on how to investigate

22  complaints of discrimination, harassment or retaliation?

23  "A.  Do they provide it?  I don't recall specifically."

24      Do you recall giving that answer?

25  A.  Reading it here, now, yes.

N7hWede4                          Pacina - Direct

1    Q.  It's fair to say at the time of your deposition, in

2    September of 2021, you did not recall whether you'd received

3    any such training, correct?

4    A.  Yes.

5    Q.  And as an HR professional for the number of years that

6    you've been an HR professional, you do know what protected

7    activity means, correct?

8    A.  Protected activity?

9    Q.  Yes.

10   A.  I -- I wouldn't know how to define that right now.

11   Q.  During the time relative to when Dr. Edelman worked at NYU,

12   which I'll represent to you was 2014 through 2021, you worked

13   at One Park, correct?

14   A.  Sorry.  Can you say the dates again?

15   Q.  Between 2014 through 2021, you worked at One Park in

16   Manhattan, correct?

17   A.  Only until 2020.

18   Q.  When in 2020?

19   A.  November 2020.

20   Q.  Was that late November?

21   A.  I believe so, yes.

22   Q.  And you worked with Mr. Rubin at NYU, didn't you?

23   A.  Yes.

24   Q.  And his office is located in the same building where you

25   worked, right?

1   A.  Yes.

2   Q.  And you received a certified professional certificate from

3   the Society of Human Resources Management, correct?

4   A.  Yes.

5   Q.  And the Society of Human Resources Management is

6   colloquially shortened to SHRM, isn't it?

7   A.  Yes.

8   Q.  And SHRM is a professional human resources organization

9   that provides advice to HR professionals such as yourself,

10  correct?

11  A.  Yes.

12  Q.  Focusing your attention now on complaints that are made at

13  NYU by employees, those complaints are recorded in NYU's

14  Salesforce system, correct?

15  A.  Yes.

16  Q.  And you used that Salesforce system to include notes on

17  complaints, correct?

18  A.  Yes.

19  Q.  And whenever you enter anything in Salesforce, there's a

20  time stamp for what you enter, correct?

21  A.  I'm not sure if there's a time stamp.

22  Q.  You can also close out a case using the Salesforce system,

23  correct?

24  A.  Yes.

25  Q.  And although you're not required to do so, you typically

1  place notes in the Salesforce system whenever you have

2  conversations, correct?

3  A.  Yes.

4  Q.  Relating to complaints, right?

5  A.  Yes.

6  Q.  And part of your duties requires you -- excuse me.

7  Withdrawn.

8      Part of your duties requires you to investigate complaints,

9  correct?

10  A.  Yes.

11  Q.  And you do that to ensure that the policies are correctly

12  implemented and to ensure a fair working environment for

13  everyone at NYU, right?

14  A.  Yes.

15  Q.  And when you're done with your investigation, you provide

16  the results of the investigation to the employee by email or by

17  phone, don't you?

18  A.  Yes.

19  Q.  To the employee that complained, correct?

20  A.  Yes.

21  Q.  And even before you provide any results to employees, you

22  typically update these employees that complained about their

23  complaint by email or by phone, correct?

24  A.  Yes.

25  Q.  And if a complaint is substantiated or has merit, typically

N7hWede4                         Pacina - Direct

1    the employee complained about is disciplined, isn't that true?

2    A.  Not typically disciplined, but there would be some sort --

3    some form of, like a conversation with the employee, or --

4    Q.  Some action is taken, right?

5    A.  Yes.

6    Q.  Maybe it will be a verbal counseling, right?

7    A.  Yes.

8    Q.  Or a written counseling, right?

9    A.  Could be.

10   Q.  And you're usually one of the people that recommends what

11   the discipline should be, right?

12   A.  Yes.

13   Q.  But the department is the -- is ultimately responsible for

14   making a decision about discipline, isn't that right?

15   A.  Correct.

16   Q.  You can't override what the department decides to do with

17   your recommendation, isn't that right?

18   A.  Correct.

19   Q.  And focusing your attention a little bit about Dr.

20   Edelman's complaint, which we'll get into shortly, does that

21   mean that Mr. Antonik would make that determination?

22   A.  No.

23   Q.  What about Mr. Kaplan; would he?

24   A.  I'm not sure what the structure was at the time or at this

25   time.

N7hWede4                          Pacina - Direct

1    Q.  Would it be fair to say that human resources in the faculty

2    group practice would make that determination?

3    A.  Yes.

4    Q.  And that would have been, at this point in time,

5    Ms. Claudia Rose or Ms. Tisa Hall, right?

6    A.  They'd be part of it.

7    Q.  And both of those ladies work at One Park with Mr. Rubin,

8    didn't they?

9    A.  I don't know about Claudia, if she was there at the time.

10   But yes, Tisa worked at -- she worked at One Park.

11   Q.  Now, focusing on Dr. Edelman, on or about September 17,

12   2019, you spoke to Dr. Edelman over the phone concerning her

13   complaint, correct?

14   A.  Yes.

15   Q.  And the phone calls themselves, they're not recorded or

16   logged, to your knowledge, are they?

17   A.  No.

18   Q.  You're not aware of any conversation that Dr. Edelman ever

19   had with Ms. Rose or Ms. Hall, are you?

20   A.  No.

21   Q.  But you spoke to Ms. Hall, correct?

22   A.  Ms. -- Tisa Hall, yes.

23   Q.  About this complaint --

24   A.  Yes.

25   Q.  -- that Dr. Edelman raised?

1   A.  Yes.

2   Q.  And you spoke to Ms. Rose as well, didn't you?

3   A.  Yes.

4   Q.  And you spoke to them after you spoke to Dr. Edelman,

5   correct?

6   A.  Yes.

7   Q.  And is it fair to say -- withdrawn.

8       Your telephone -- withdrawn.

9       Your conversations with Ms. Rose were not memorialized,

10  were they?

11  A.  I don't recall.

12  Q.  You had telephone conversations with Ms. Hall, didn't you?

13  A.  I -- I don't recall specifically.

14  Q.  And do you recall whether you had any telephone

15  conversations with Ms. Rose?

16  A.  Yes.

17  Q.  Those telephone conversations were never memorialized in

18  writing, were they?

19  A.  I don't recall.

20  Q.  In terms of the department, when I refer to the department

21  making the decision on discipline, that department is the human

22  resources department in the faculty group practice, correct?

23  A.  I don't understand the question.

24  Q.  Earlier we were talking about the fact that you could only

25  recommend discipline, but you don't decide it, right?

1    A.   Yes.

2    Q.   The department that decides it is the human resources

3    department in the faculty group practice, correct?

4    A.   No.  So, HR would be different from the department.

5    Q.   Right.

6    A.   You would have a department leadership team and HR.

7    Q.   And who would the department leadership team in this case

8    with Dr. Edelman be?

9    A.   Anyone who Dr. Edelman would report to and the other

10   leaders in FGP.

11   Q.   That would include Mr. Antonik, correct?

12   A.   I don't recall if she reported to him at the time, but

13   yeah.

14   Q.   And that would include Mr. Kaplan, correct?

15   A.   If, if she reported to him, yes.

16   Q.   Part of your duties as an employee relations manager also

17   dealt with compensation, correct?

18   A.   No.

19        MR. KATAEV:  Your Honor, page 59, lines 13 to 23.

20        THE COURT:  Any objection?

21        MR. SCHOENSTEIN:  Yeah.  Improper.

22        THE COURT:  Sustained.

23   BY MR. KATAEV:

24   Q.   You're not aware of any analysis of compensation between

25   male and female doctors, correct?

N7hWede4                        Pacina - Direct

1    A.  No.

2    Q.  And you've never conducted any training or seminars

3    concerning gender pay discrimination, correct?

4    A.  No.

5    Q.  You did not advise Mr. Rubin about any gender pay disparity

6    while Dr. Edelman was employed, correct?

7    A.  No, I did not.

8    Q.  Nor did you advise Mr. Swirnow on gender pay disparity

9    while Dr. Edelman was employed, correct?

10   A.  I did not.

11   Q.  Mr. Swirnow never asked you to perform any analysis under

12   the Equal Pay Act for the doctors in the faculty group

13   practice, correct?

14   A.  Not that I'm aware of.

15   Q.  And neither did Mr. Rubin, correct?

16   A.  Not that I'm aware of.

17   Q.  And when you're unfamiliar with a federal, state or local

18   antidiscrimination law, what do you do?

19   A.  Can you repeat that?  I'm sorry.

20   Q.  What do you do, if anything, to familiarize yourself with

21   any federal, state or local discrimination law?

22   A.  I think that's --

23          MR. SCHOENSTEIN:  Objection.

24   BY MR. KATAEV:

25   Q.  Whenever you receive a complaint about discrimination, do

N7hWede4                      Pacina - Direct

1   you sometimes need to look up a federal, state or local

2   discrimination law?

3              MR. SCHOENSTEIN:  Objection.

4              THE COURT:  What's the relevance?

5              MR. KATAEV:  It goes to competency as an HR

6   professional, your Honor.

7              THE COURT:  Sustained.

8   BY MR. KATAEV:

9   Q.  Part of your duties involves having knowledge about

10  federal, state and local discrimination laws, correct?

11  A.  Yes.

12  Q.  And if you need to look those laws up, what do you usually

13  do?

14             MR. SCHOENSTEIN:  Objection.

15             THE COURT:  Sustained.

16  BY MR. KATAEV:

17  Q.  Do you ever do any research on federal, state or local

18  discrimination laws in the course of performing your duties as

19  an HR professional?

20             MR. SCHOENSTEIN:  Objection.

21             THE COURT:  Sustained.

22  BY MR. KATAEV:

23  Q.  When you were reviewing Dr. Edelman's complaint --

24  withdrawn.

25      Dr. Edelman made a complaint with you, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N7hWede4                           Pacina - Direct

1    A.  Yes.

2    Q.  And in response to that complaint, you spoke to her, right?

3    A.  Yes.

4    Q.  And you also spoke to Mr. Antonik, correct?

5    A.  I don't recall if I spoke to Dr. Antonik -- Mr. Antonik.

6    Q.  In the course of reviewing that complaint, did you ever

7    research any of the discrimination laws to see whether there

8    was any issue in that regard?

9              MR. SCHOENSTEIN:  Objection.

10             THE COURT:  Sustained.

11   BY MR. KATAEV:

12   Q.  Dr. Edelman alleges that you brushed aside her complaint.

13   Are you aware of that?

14   A.  No.

15   Q.  Is it true that you brushed aside her complaint?

16   A.  No.

17   Q.  What do you recall doing after Dr. Edelman first spoke to

18   you about her complaint?

19   A.  Speaking to the FGP HR folks.

20   Q.  And what happened then?

21   A.  I don't recall specifically, but, I spoke to the department

22   as well.

23   Q.  Did you understand that Dr. Edelman complained about the

24   way she was treated vis-à-vis her gender when she spoke to you?

25   A.  No.

N7hWede4                    Pacina - Direct

1           MR. KATAEV:  126, your Honor, line 24, through line 7

2     on the next page.

3           MR. SCHOENSTEIN:  Objection.

4           THE COURT:  Sustained.

5     BY MR. KATAEV:

6     Q.  It's fair to say that Dr. Edelman told you that her

7     complaint was not just about office space, correct?

8     A.  No.  She -- she spoke to me about the office space.

9     Q.  And she never told you that it was not about the office

10    space, it's about the way she was spoken to; that's your

11    testimony today?

12    A.  When -- I don't recall if it was about the way she was

13    spoken to, but what I can recall is about the office space.

14    Q.  During the course of your tenure as a human resources

15    manager, you never received any complaints about Dr. Edelman,

16    correct?

17    A.  Not that I can recall.

18          MR. KATAEV:  I'd like to mark for identification

19    Defendants' Exhibit PP.

20          THE COURT:  Any objection?

21          MR. SCHOENSTEIN:  No.

22          THE COURT:  PP's received.

23          (Defendants' Exhibit PP received in evidence)

24          THE COURT:  And may be published to the jury.

25    BY MR. KATAEV:

N7hWede4                        Pacina - Direct

1   Q.  Focusing your attention on the email sent by you at 5:27

2   p.m., you reached out to Ms. Rose here to discuss Dr. Edelman's

3   complaint, correct?

4   A.  Correct.

5   Q.  Ms. Rose told you that any faculty issues must be escalated

6   to leadership, correct?

7   A.  Yes.

8   Q.  And she offered her availability to speak with you, right?

9   A.  Yes.

10  Q.  And you responded three minutes after she responded to you,

11  stating that you wanted to discuss it with her before bringing

12  it to leadership's attention, correct?

13  A.  Yes.

14  Q.  And you did that because it was about Joe Antonik, correct?

15  A.  Yes.

16  Q.  And you didn't reference anything about office space here,

17  did you?

18  A.  No.

19  Q.  You referenced Mr. Antonik, correct?

20  A.  Yes.

21  Q.  And you had a phone call with Ms. Rose, didn't you?

22  A.  I believe so, yes.

23  Q.  It says in here that you'll call her tomorrow at nine.

24  That's 9 a.m., right?

25  A.  Yes.

1  Q.  And you did not memorialize your conversation with

2  Ms. Rose, did you?

3  A.  I don't -- if it's not here, I don't recall.

4  Q.  The following day, presumably after your phone call,

5  because it's at 9:58 a.m., Ms. Rose says that she sent you an

6  invite for 1 p.m.  Do you see that?

7  A.  Yes.

8  Q.  And that call at 1 p.m. was to speak to Mr. Antonik, right?

9  A.  I don't recall.

10  Q.  The email says, "I sent an invite for 1 p.m. for you to

11  call us on Joe's office phone."  Do you see that?

12  A.  Yes.

13  Q.  And so that was a phone call that you were supposed to have

14  with Ms. Rose and Mr. Antonik, right?

15  A.  I don't know if that just means Joe's office phone or if he

16  was on the call too.  I don't recall.

17  Q.  To your knowledge, would it make any sense for Ms. Rose to

18  have you call her on Mr. Antonik's office phone?

19  A.  It would, because Claudia would visit different sites.  I

20  don't think she had a specific work site.

21  Q.  You cannot recall what was said on that call or who was

22  present on that call, can you?

23  A.  That's correct.

24  Q.  You can't recall whether you even had the call, correct?

25  A.  I can't, no.

1   Q.  And you did not memorialize anything about this call in

2   Salesforce, did you?

3   A.  I don't remember.

4   Q.  Later on that morning, Ms. Rose sent you information about

5   Dr. Edelman's contract and provisions within it concerning

6   space, correct?

7   A.  Yes.

8   Q.  Your conversation was focused on the space issue, correct?

9   A.  That's correct.

10          MR. KATAEV:  I'd like to place up exhibit RR.  I

11  believe it's in evidence already.

12          THE COURT:  You may do so.

13  BY MR. KATAEV:

14  Q.  I'm showing you an email that you sent, Ms. Pacina, the

15  same day, in the afternoon.  Do you see that?

16  A.  Yes.

17  Q.  You sent this email to Mr. Kaplan, correct?

18  A.  Yes.

19  Q.  And you asked Mr. Kaplan whether he has a few minutes to

20  talk about this issue with you, correct?

21  A.  Yes.

22  Q.  And in here you reference an issue raised by Dr. Edelman

23  regarding Joe Antonik, right?

24  A.  Correct.

25  Q.  You did not reference anything about office space in here,

1   right?

2   A.  Correct.

3   Q.  And you spoke to Mr. Kaplan, is that right?

4   A.  I believe so.  I don't recall.

5   Q.  And you can't recall what was said during that call, if it

6   was said, correct?

7   A.  Correct.

8   Q.  And you did not memorialize anything about your

9   conversation with Mr. Kaplan, correct?

10  A.  I don't recall.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. KATAEV:  I'd like to go to exhibit 21, your Honor.

2     It's already in evidence.

3          THE COURT:  Okay.  Go ahead.

4     BY MR. KATAEV:

5     Q.  This is the Salesforce system that you used while working

6     at NYU in your capacity as an employee relations manager;

7     correct?

8     A.  Yes.

9     Q.  And it says on the top left, Salesforce comments; right?

10    A.  Yes.

11    Q.  And notes?

12    A.  Yes.

13    Q.  And it says original date not available, but it provides a

14    system advent date of March 13, 2020, doesn't it?

15    A.  Yes.

16    Q.  Normally, when you would put something into Salesforce, the

17    original date would be available; correct?

18    A.  It should be, yes.

19    Q.  Do you recall taking these notes down while Dr. Edelman was

20    on the phone with you on September 17th, 2019?

21    A.  Yes.

22    Q.  And you took these notes while you were on the phone with

23    her; right?

24    A.  That's correct.

25    Q.  Because of the date issue here, you cannot state with any

1    certainty whether this document has ever been edited; correct?

2    A.   That's correct.

3    Q.   You have no explanation for why it says March 13, 2020;

4    right?

5    A.   There could have been a system update that was made and

6    that could be the date that all cases were updated.  Other than

7    that, I'm not aware.

8            MR. KATAEV:  Move to strike as nonresponsive, your

9    Honor.

10           THE COURT:  No, it is responsive.  Overruled.

11   Q.   But you don't know that for a fact; correct?

12   A.   No, I don't.

13   Q.   This is the only document that you produced concerning

14   Dr. Edelman's complaint; correct?

15   A.   Correct.

16           MR. SCHOENSTEIN:  Objection.

17           THE COURT:  Overruled.

18   Q.   Focusing your attention on what I'm highlighting,

19   everything through pretty much here up to "call with Joe" are

20   the notes you took during your conversation with Dr. Edelman;

21   correct?

22   A.   I believe so, yes.

23   Q.   And focusing your attention on what I'm highlighting now

24   where it says "call with Joe" towards the end, that was

25   everything that was discussed between you and Mr. Antonik;

1    correct?

2    A.  Yes.

3    Q.  And then the only other notes you have here are resolution

4    notes, and it's about your conversation with Ms. Hall and

5    Mr. Kaplan; correct?

6    A.  Yes.

7    Q.  And those notes are dated October 8th, 2019; correct?

8    A.  Yes.

9    Q.  And those resolution notes predate the March 2020 date;

10   correct?

11   A.  Correct.

12   Q.  During your conversation with Mr. Antonik, you never

13   explained to him that it's unlawful for him to retaliate

14   against Dr. Edelman, did you?

15   A.  I don't recall.

16   Q.  That's not reflected in these notes, is it?

17   A.  It's not written here.

18   Q.  And in the resolution notes, it's fair to say that you did

19   consult with management, right, that's Mr. Kaplan?

20   A.  Yes.

21   Q.  But again, you can't recall what was discussed; right?

22   A.  Correct.

23   Q.  And you did not memorialize any of those discussions;

24   correct?

25   A.  Not that I could recall.

1   Q.  And your testimony, as you sit here today, is that

2   Dr. Edelman's complaint did not raise any concerns to you about

3   a hostile work environment; correct?

4   A.  That's correct.

5           THE COURT:  How much more do you have?

6           MR. KATAEV:  A little over two pages.

7           THE COURT:  Okay.  Maybe try to go through it quickly.

8   Q.  And you see in here that Dr. Edelman mentioned something

9   about Mr. Antonik throwing his arms and pointing at things;

10  correct?

11  A.  Yes.

12  Q.  And that didn't raise any red flags to you about a hostile

13  work environment; correct?

14          MR. SCHOENSTEIN:  Objection.

15          THE COURT:  Sustained.

16  Q.  And it's your testimony today that this complaint did not

17  raise any issues -- withdrawn.

18      It didn't occur to you, based on this complaint, that

19  Dr. Edelman complained about gender or sex discrimination;

20  correct?

21          MR. SCHOENSTEIN:  Objection.

22          THE COURT:  Overruled.  I'll permit that.

23  A.  Can you repeat that, please.

24  Q.  Did it occur to you, based on this complaint, that

25  Dr. Edelman was complaining about gender or sex discrimination?

1    A.  No.

2    Q.  And you never provided Dr. Edelman with any discrimination-

3    harassment report form, did you?

4    A.  Not that I can recall.

5    Q.  You do maintain such a report form at NYU; right?

6    A.  Yes.

7    Q.  But you didn't provide it to her because you did not deem

8    that it was a discrimination or harassment complaint; right?

9    A.  I'm actually not sure if we had that form at the time.

10            THE COURT:  Next question.

11            MR. KATAEV:  Moving on, your Honor.

12            Let's get 77.  I think that's admitted in evidence.

13            THE COURT:  Permission to show it to the witness and

14   you can publish it to the jury.

15   Q.  This is an email that Dr. Edelman sent you on September

16   25th, 2019; correct?

17   A.  Yes.

18   Q.  It references a case number here that was generated by your

19   Salesforce system; right?

20   A.  Yes.

21   Q.  Dr. Edelman complains in here about Mr. Kaplan coming to

22   see her about this issue; right?

23   A.  Yes.

24   Q.  And she says in here on September 25th this was a matter of

25   inappropriate conduct in the workplace; right?

N7HCede5                         Pacina - Direct

1    A.  Yes.

2    Q.  And she says:  "In the mannerism with which I was treated."

3    Right?

4    A.  Yes.

5    Q.  At the end of this email, she says that "as of," but I

6    believe it's "a."  "As a female physician in the organization,

7    I am disappointed that it is 2019 approaching 2020, and a major

8    hospital organization in New York, and I still have to contend

9    with male chauvinism."  Do you see that?

10   A.  Yes.

11   Q.  But you still deny Dr. Edelman raised any complaint about

12   gender discrimination; correct?

13   A.  Yes.

14             MR. SCHOENSTEIN:  Objection.

15             THE COURT:  Objection is sustained.

16             Move on.

17             MR. KATAEV:  Plaintiff's Exhibit 75, your Honor.

18             THE COURT:  Okay.

19             MR. KATAEV:  Permission to publish to the jury.

20             THE COURT:  Any objection to 75?

21             MR. SCHOENSTEIN:  No, your Honor.

22             THE COURT:  75 is received and may be published.

23             (Plaintiff's Exhibit 75 received in evidence)

24   Q.  The following day, Dr. Edelman reached out to you, didn't

25   she?

N7HCede5                          Pacina - Direct

1    A.  Yes.

2    Q.  And in this email, she informs you about an impending

3    conversation that was going to be had; right?

4    A.  Yes.

5    Q.  And she asked whether an HR representative could join her

6    for that call; correct?

7    A.  Yes.

8    Q.  You forwarded this email to Ms. Hall; correct?

9    A.  Yes.

10   Q.  And you told her that you'll review it internally and get

11   back to her; right?

12   A.  Yes.

13   Q.  But you never actually joined any conversation that was

14   had; correct?

15   A.  No.

16   Q.  And, in fact, you failed to respond to Dr. Edelman's email

17   with her request; correct?

18            MR. SCHOENSTEIN:  Objection.

19            THE COURT:  Sustained.

20            MR. KATAEV:  Let's go to 74, your Honor.

21            MR. SCHOENSTEIN:  No objection, your Honor.

22            THE COURT:  74 is received and may be published to the

23   jury.

24            (Plaintiff's Exhibit 74 received in evidence)

25   Q.  In this email, you confirmed receipt of Dr. Edelman's email

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    and state that you're reviewing it internally with HR and

2    you'll get back to her; correct?

3    A.  Yes.

4         MR. KATAEV:  Can I have Defendants' Exhibit QQ.  I

5    don't think that's admitted yet.

6         MR. SCHOENSTEIN:  No objection, your Honor.

7         THE COURT:  QQ is received and may be published.

8         (Defendants' Exhibit QQ received in evidence)

9    Q.  You received an email from Mr. Kaplan asking you to

10   connect; right?

11   A.  Yes.

12   Q.  And you did, in fact, have a discussion with him on or

13   about September 27th; right?

14   A.  I don't recall.

15   Q.  You do recall that Dr. Edelman also complained about

16   Mr. Kaplan; correct?

17   A.  I don't recall.

18   Q.  Do you have any recollection about the September 25th, 2019

19   email we just saw where she complained about Mr. Kaplan?

20   A.  I didn't read the whole thing just now, but I don't recall

21   if he was mentioned in it.

22         MR. KATAEV:  Permission to go back to 77, your Honor.

23         THE COURT:  What's the relevance?

24         MR. KATAEV:  To show the timeline that Dr. Edelman

25   received the --

1    THE COURT:  You've got five more minutes.  Use it

2  wisely.

3  Q.  In the September 25th email, Dr. Edelman complains about

4  Mr. Kaplan; correct?

5  A.  I don't see what the complaint is.

6  Q.  It refers to inappropriate conduct; correct?

7  A.  But I don't know if that's about David Kaplan.

8  Q.  In this paragraph, she refers to taking on similar

9  mannerisms of a condescending tone.  Do you see that?

10  A.  Yes.

11  Q.  This email from September 27th is two days after that

12  complaint; correct?

13  A.  After the email, yes.

14    MR. KATAEV:  I'd like to go to Plaintiff's Exhibit 70,

15  your Honor.

16    THE COURT:  Okay.

17    MR. KATAEV:  Permission to publish to the jury.

18    THE COURT:  Yes.

19    MR. SCHOENSTEIN:  No objection here.

20    THE COURT:  It's in evidence.

21  Q.  Ms. Hall emailed you on October 3rd, 2019; right?

22  A.  Yes.

23  Q.  And she told you what had happened based on her discussion

24  with Mr. Swirnow; correct?

25  A.  Yes.

N7HCede5                    Pacina - Direct

1    Q.  And it says at the end of this first paragraph that

2    Mr. Swirnow apologized for the miscommunication that

3    Dr. Edelman received; correct?

4    A.  Yes.

5    Q.  And it says at the end that you should round back with

6    Dr. Edelman to see if she still wants to pursue her complaint;

7    correct?

8    A.  Yes.

9    Q.  And going back to Plaintiff's Exhibit 21 and Salesforce, on

10   October 8th, 2019, you closed Dr. Edelman's complaint; correct?

11   A.  I don't remember the date on there, but --

12            MR. KATAEV:  One second, your Honor.  Here's 21.

13   A.  Yes.

14   Q.  Other than having these discussions, you did not do

15   anything else with Dr. Edelman's complaint; correct?

16   A.  About the office space, no, it was closed at that time.

17   Q.  And you did not do anything with respect to any complaint

18   of discrimination or harassment; correct?

19   A.  No.

20            MR. KATAEV:  71, your Honor.

21            THE COURT:  This is the last exhibit, I assume?

22            MR. KATAEV:  I have one, two, three, four more

23   exhibits, your Honor.

24            THE COURT:  All right, you got -- it's now 1:15,

25   you're done by 1:20.  Go fast.

1           MR. KATAEV:  Okay, your Honor.

2           THE COURT:  Any --

3           MR. SCHOENSTEIN:  No objection, your Honor.

4    Q.  After the complaint was closed on October 8th of 2019,

5    Dr. Edelman emailed you on November 1st; correct?

6    A.  Yes.

7    Q.  She explained to you that there was a harassment complaint

8    that was extensive and detailed; correct?

9    A.  Yes.

10   Q.  And you responded to her four days later; right?

11   A.  Yes.

12   Q.  And you said that you'll share this with the ELR manager

13   that now supports the FGP group and will get back to her;

14   correct?

15   A.  Yes.

16   Q.  Following this email, you never sent Dr. Edelman any other

17   emails, did you?

18   A.  I don't recall.

19   Q.  And you did not connect Dr. Edelman with Mrs. Ogbara in the

20   email chain, did you?

21   A.  I don't recall.

22   Q.  Ms. Ogbara sent an email to Dr. Edelman; correct?

23   A.  I don't recall.  It wasn't to me.

24   Q.  When you passed this complaint to Ms. Ogbara, you didn't do

25   that via email, correct, you just spoke to her about it?

N7HCede5                         Pacina - Direct

1   A.  I believe so.

2   Q.  And there's nothing in writing memorializing your

3   conversation with Ms. Ogbara; correct?

4   A.  No.

5           THE COURT:  Are we done?

6           MR. KATAEV:  With this exhibit, yes.

7           THE COURT:  Are we done with the examination, is my

8   question.

9           MR. KATAEV:  No, your Honor.  I have about one page.

10          THE COURT:  You've got three minutes.

11          MR. KATAEV:  I'm working on it, your Honor.

12          THE COURT:  Three minutes.

13          MR. KATAEV:  Plaintiff's Exhibit 50, your Honor.

14          THE COURT:  Any objection?

15          MR. SCHOENSTEIN:  No.

16          THE COURT:  It's received.

17          (Plaintiff's Exhibit 50 received in evidence)

18  Q.  In this email, Dr. Edelman follows up with you on November

19  18th, 2019; correct?

20  A.  Yes.

21  Q.  To your knowledge, you never responded to this email;

22  correct?

23  A.  I don't recall.

24  Q.  And you didn't forward it to Ms. Ogbara, did you?

25  A.  I don't recall.

1           MR. KATAEV:  Last exhibit, XX, your Honor.

2           THE COURT:  Any objection?

3           MR. SCHOENSTEIN:  No.

4           THE COURT:  XX is in evidence.  Go ahead.

5           (Defendants' Exhibit XX received in evidence)

6   Q.  Do you recall reviewing this document during your

7   deposition, Ms. Pacina?

8   A.  Yes.

9   Q.  Ms. Ogbara did not copy you on this email, did she?

10  A.  No.

11  Q.  And to your knowledge, there were no emails between you and

12  Ms. Ogbara about this issue; correct?

13  A.  Not that I can recall.

14          MR. KATAEV:  Just one second, your Honor.

15          I'm done, your Honor.

16          THE COURT:  Defense examination.

17  CROSS-EXAMINATION

18  BY MR. SCHOENSTEIN:

19  Q.  Ms. Pacina, in terms of the function of HR, does HR ever

20  tell administration that they have to do something differently?

21  A.  Yes.

22  Q.  Does HR have the power to overrule a decision of the FGP

23  administration if they want to?

24  A.  They can.

25  Q.  I'm sorry?

1    A.  They can.

2    Q.  With respect to the phonecall you had with Dr. Edelman, you

3    only talked to her the one time; right?

4    A.  Yes.

5    Q.  So what do you recall about the nature of that phonecall

6    and what she said to you?

7    A.  I remember her, she was upset about being told that she had

8    to have someone else in the office space and that she said she

9    was entitled to that office space per her contract.

10   Q.  Do you recall anything else specifically that she said?

11   A.  No, not specifically.

12   Q.  Did she raise issues that at the time you regarded as being

13   discrimination, gender discrimination, that kind of thing?

14   A.  No.

15           MR. KATAEV:  Objection.  Leading.

16           THE COURT:  Overruled.

17   Q.  There is reference to October --

18           THE COURT:  You elicited the same exact testimony.  Go

19   ahead.

20   Q.  There was reference to that complaint being closed on or

21   about October 8th.  Do you recall that?

22   A.  Yes.

23   Q.  Do you recall why it was closed?

24   A.  Because the issue of the space was discussed internally

25   with her and FGP leadership.

N7HCede5                         Pacina - Cross

1    Q.  And how did you know that?

2    A.  Tisa Hall had shared that that was concluded, that they had

3    spoken with her.

4    Q.  Who does Tisa Hall work for?

5    A.  She's human resources and FGP.  I believe she works for

6    Andrew Rubin.

7    Q.  What department is she in?

8    A.  FGP, human resources.

9    Q.  And Ms. Rose?

10   A.  She's also FGP, human resources.

11             MR. SCHOENSTEIN:  I'd like to put up exhibit PP.

12             THE COURT:  You may do so.

13             MR. SCHOENSTEIN:  Thank you, your Honor.

14             Could you scroll, please, Ms. Cardona, to page 43.

15   Q.  I'm going to show you the line counsel showed you about

16   Mr. Antonik.  There's a line in there, "wanted to discuss with

17   you before bringing it to leadership as it is about Joe

18   Antonik."  Do you know what you meant by that?

19   A.  Because she mentioned Joe Antonik during a phonecall and I

20   believe she reported to him.  I wanted to make sure that I let

21   his leadership know because it would be appropriate for me to

22   discuss that with his leadership rather than directly with him.

23   Q.  So who did you go to in that regard?

24   A.  That's why I went to David Kaplan after that.

25   Q.  And do you know if it ever went up the chain for

1    Mr. Kaplan?

2    A.  Not that I'm aware of, no.

3         MR. SCHOENSTEIN:  No scroll up to the top page.

4    Q.  You see in big bold, "this space provided to you" language?

5    A.  Yes.

6    Q.  Do you know what that was?

7    A.  I did talk -- I guess when I talked to Claudia, I talked to

8    her about the complaint regarding space and I wanted to know

9    what the contract said about space, so I asked her to pull the

10   language regarding space in Dr. Edelman's contract.

11   Q.  And why were you looking at the contract?

12   A.  Because she said she was entitled to space per her

13   contract.

14   Q.  And do you know, you looked at the contract on September

15   18th, do you know if Dr. Edelman bothered to look at the

16   contract after she spoke to you?

17   A.  Not that I'm aware of.

18        MR. SCHOENSTEIN:  I'd like to place up, your Honor,

19   two exhibits that have already been entered side by side,

20   Plaintiff's 50 and Defendants' XX, and publish to the jury.

21        THE COURT:  You may do so.

22   Q.  Now, on the left is plaintiff's 50.  That is an email to

23   you from Dr. Edelman.  Do you see that?

24   A.  Which one?  Sorry.

25   Q.  On the left is exhibit 50.

1  A.  Yes.

2  Q.  From Dr. Edelman to you.  Do you see that?

3  A.  Yes.

4  Q.  And what's the date and time of that email?

5  A.  It's November 18 at 1:46 p.m.

6  Q.  And then Exhibit XX on the right, that's from Rashidat

7  Ogbara to Dr. Edelman.  What's the date and time of that email?

8  A.  November 18, 2019, at 6:14 p.m.

9  Q.  Are you aware of anything on November 18th that caused the

10  email system to break down between 1 o'clock and 6 o'clock so

11  that Dr. Edelman wouldn't have been able to read the 6 o'clock

12  email?

13  A.  Not that I'm aware of.

14  Q.  After November 18th at 6:14 p.m., did you ever hear from

15  Dr. Edelman again?

16  A.  No.

17  Q.  After that first phonecall in September, did she ever call

18  you again?

19  A.  Not that I'm aware of.

20  Q.  Did she ever come to visit?

21  A.  No.

22  Q.  Did she ever email you after November 18th?

23  A.  Not that I can recall.

24         MR. SCHOENSTEIN:  Thank you, Ms. Pacina.

25         THE COURT:  Anything further?

1              MR. KATAEV:  Just four, five questions.

2              THE COURT:  Why don't you do it from where you are.

3              MR. KATAEV:  Sure.

4    REDIRECT EXAMINATION

5    BY MR. KATAEV:

6    Q.  I have on the screen what was marked as Plaintiff's

7    Exhibit 50, but I'm going to ask you some other questions

8    first.

9    A.  I don't have anything on the screen.  Okay.

10   Q.  It's fair to say that your resolution of Dr. Edelman's

11   complaint only dealt with office space and not about any

12   discrimination or harassment; right?

13   A.  Correct.

14   Q.  And it's also fair to say that you never directly informed

15   Dr. Edelman that you closed her complaint on October 8th of

16   '19; correct?

17   A.  No, because her leadership team had done that.

18   Q.  And you knew that Dr. Edelman was not aware her complaint

19   was closed because she kept emailing you in November; correct?

20   A.  Not about the office space.

21   Q.  Other than this email on November 5th, you never responded

22   to any further emails from Dr. Edelman; correct?

23              MR. SCHOENSTEIN:  Objection.

24   Q.  To your knowledge?

25              THE COURT:  Overruled.

 1   A.  It's whatever's here.  I don't recall any others --

 2           THE COURT:  Actually, I'm sorry.  The objection is

 3   sustained.  It's a good objection.  Ask a different question.

 4   Q.  In this email that you sent Dr. Edelman, you told her that

 5   you will share this with the ELR manager that now supports the

 6   FGP group; right?

 7   A.  Yes.

 8   Q.  And you did that on November 5th of '19; correct?

 9   A.  Yes.

10   Q.  But to your knowledge, Ms. Ogbara never reached out to

11   Dr. Edelman until November 18th after she followed up with you;

12   correct?

13   A.  Not that I'm aware of.

14   Q.  You just had the Defendants' Exhibit XX placed and it was

15   dated the same date as this email on top; correct?

16   A.  Yeah, but I don't know if there were other emails from

17   Rashidat to her.

18   Q.  And Dr. Edelman's November 1st email here, she told you

19   there was clearly implicit bias in how she was managed and

20   spoken to; correct?

21   A.  Yes.

22   Q.  She said in here that she was clear that the complaint was

23   a separate issue about treatment of females within the

24   workplace at NYU; correct?

25           MR. SCHOENSTEIN:  Objection.

1          THE COURT:  You're asking her what the document says?

2          MR. KATAEV:  Yes.

3          THE COURT:  I think the jury can read the document.

4    What's your next question.

5    Q.  You did not do anything in response to this complaint;

6    correct?

7    A.  I shared it with the ELR manager that was assigned to FGP

8    at the time.

9    Q.  And you didn't do any investigation or anything of the

10   sort; correct?

11   A.  No.

12   Q.  When you received this email from Dr. Edelman, did you

13   understand that she was complaining about being treated

14   differently based on her gender?

15   A.  I don't recall receiving this email.

16   Q.  Did you not respond to it on November 5th, four days later?

17          THE COURT:  Next question.  She said she --

18          MR. KATAEV:  Nothing further, your Honor.

19          THE COURT:  Anything further?

20          MR. SCHOENSTEIN:  No, your Honor.

21          THE COURT:  You're excused.

22          THE WITNESS:  Thank you.

23          (Witness excused)

24          THE COURT:  Call your next witness.

25          MR. KATAEV:  The plaintiff calls Dr. Andrew Porges,

1    your Honor.

2              THE COURT:  Dr. Porges, you may step up, remain in the

3    witness box, and my deputy will administer the oath.

4              Jury, you can do a stretch break if you want.

5              MR. KATAEV:  Permission to go to the podium, your

6    Honor.

7              THE COURT:  Yes.

8     ANDREW JAY PORGES,

9         called as a witness by the Plaintiff,

10        having been duly sworn, testified as follows:

11             THE DEPUTY CLERK:  Please state your full name for the

12   record and spell out your first and last name.

13             THE WITNESS:  I'm Dr. Andrew Jay Porges, A-n-d-r-e-w

14   J-a-y P-o-r-g-e-s.

15             THE COURT:  Dr. Porges, you can be seated.  Please try

16   to keep your voice up like you did before, speak into the

17   microphone.  Try to speak slowly and clearly.

18             Counsel, you may inquire.

19   DIRECT EXAMINATION

20   BY MR. KATAEV:

21   Q.  Good afternoon, Dr. Porges.

22   A.  Good afternoon.

23   Q.  You worked at NYU since November 2014; correct?

24   A.  Yes.

25   Q.  Prior to working at NYU, you had your own practice on

1    Northern Boulevard in Roslyn; right?

2    A.  Yes.

3    Q.  And you worked in that private practice for 12 years prior

4    to working at NYU; right?

5    A.  Correct.

6    Q.  You were recruited to NYU; correct?

7    A.  Yes.

8    Q.  After you were recruited, you met with Mr. Rubin and

9    Mr. Swirnow to discuss compensation; correct?

10   A.  Yes.

11   Q.  Ultimately, a deal was made on compensation, and in

12   addition, NYU assumed the assets of your practice; correct?

13   A.  Correct.

14   Q.  And so, assuming the practice, they received items such as

15   medication stock, capital equipment, and your lease; correct?

16   A.  Yes.

17   Q.  And the lease was considered an asset in your practice;

18   correct?

19   A.  I'm not sure if it was an asset or a liability, but it was

20   intrinsic to the finances of the practice.

21   Q.  NYU also assumed the tail coverage on your malpractice

22   policy, didn't they?

23   A.  Yes.

24   Q.  And they covered that at a cost of $40,000; correct?

25   A.  I don't know what the cost was.  NYU is self-insured.

1          MR. KATAEV:  Page 25, your Honor.  I should give you

2    the transcript.

3          THE COURT:  That would help.

4          Did NYU assume the tail coverage on your malpractice?

5          THE WITNESS:  Yes, they did.

6          THE COURT:  Next question.

7    Q.  Just to get into the cost of that.  The premium was

8    $40,000, wasn't it?

9    A.  I don't know what the premium was.

10         THE COURT:  You can use the transcript.  Go ahead.

11         MR. KATAEV:  To the witness only, Jeremy.

12   Q.  Looking at your answer in line 17 and 18, does that refresh

13   your recollection as to the premium for the policy?

14   A.  Yes.  I didn't recall that.

15         THE COURT:  What is your refreshed recollection?

16         THE WITNESS:  Something in that range, something like

17   two years.

18         THE COURT:  In what range, sir?

19         THE WITNESS:  In the $40,000 range.

20   Q.  NYU paid that cost; correct?

21   A.  I don't think they paid that, but they assumed liability

22   for that.

23   Q.  Now, you left private practice to go to NYU, didn't you?

24   A.  Yes.

25   Q.  And you did that because there were lower insurance

1   reimbursements; correct?

2   A.  I think there were a number of factors in that decision.

3   Q.  And that was one of them; right?

4   A.  The risk of lower reimbursement from insurance companies

5   over time was one of the factors in my decision, yes.

6   Q.  Another factor was your concern that if you got ill or

7   sick, you would not be able to meet your obligations; correct?

8   A.  I had a health scare at that time, so yes.

9   Q.  Once you came to NYU, your primary duty was to treat

10  patients; right?

11  A.  Yes.

12  Q.  And in order to meet your RVU target, you had to treat lots

13  of patients; correct?

14  A.  I was expected to meet the same patient care amount,

15  quantity as I was doing in my private practice the preceding

16  two years.

17  Q.  And you also had an administrative role; correct?

18  A.  Not initially, no.

19  Q.  Ultimately, you did?

20  A.  Ultimately, yes.

21  Q.  And when you did so, that role was a minor -- it took minor

22  time in terms of your effort and responsibility; correct?

23  A.  It was a minority of my time, yes.

24  Q.  And those duties involved staffing, interviewing admins,

25  and scheduling and assisting the office manager; right?

1   A.  I'm sorry.  Could you repeat that.

2   Q.  Your duties in the administrative role included staffing,

3   interviewing the administrative staff, and scheduling issues

4   and assisting the office manager; right?

5   A.  Those were among the duties, yes.

6   Q.  But you were also the clinical director at NYU prior to

7   taking on that medical director role; right?

8   A.  Yes.

9   Q.  And in your role as clinical director, you received

10  numerous complaints, didn't you?

11  A.  You're talking about patient complaints, yes?

12  Q.  Correct.

13  A.  Yes.

14  Q.  And there were many complaints, but there were no

15  complaints about you, were there?

16  A.  Not that I'm aware of.

17  Q.  You also did clinical research while at NYU; correct?

18  A.  Yes.

19  Q.  That was something you did in your private practice in

20  Roslyn; right?

21  A.  Yes.

22  Q.  But that work has been unwinding over the last several

23  years; right?

24  A.  Yes.

25  Q.  NYU reduced the resources available to you to do that work;

1    correct?

2    A.  Yes.

3    Q.  Ever since you started at NYU, the amount of time you spent

4    on clinical research decreased year over year; correct?

5    A.  Yes.

6    Q.  That research work was something you had negotiated with

7    NYU; right?

8    A.  There was a clause in my contract that included research,

9    clinical research, yes.

10   Q.  That clause exists because it's something that you wanted;

11   right?

12   A.  It existed because that was the initial time spent in my

13   occupation and duties, yes.

14   Q.  Before the clinical research work started unwinding, you

15   spoke to all the rheumatologists about joining in that research

16   effort; right?

17   A.  Yes.

18   Q.  And you suggested as an option to Dr. Edelman that she

19   could be a coinvestigator in that role; right?

20   A.  I believe so.  I would have suggested that to probably most

21   or all of the physicians I discussed putting time in doing

22   clinical research, yes.

23            MR. KATAEV:  Move to strike as nonresponsive, your

24   Honor.

25            THE COURT:  Overruled.

1  Q.  You have no recollection of discussing any compensation

2  with Dr. Edelman for such a role; right?

3  A.  I never discuss compensation with anyone.

4  Q.  And it's fair to say that NYU assumed your practice because

5  you brought to them the assets, reputation, and records of a

6  large practice; right?

7           MR. SCHOENSTEIN:  Objection.

8           THE COURT:  Sustained.

9  Q.  To your knowledge, NYU assumed your practice because it

10  brought the assets, reputation, and records of a large

11  practice; correct?

12  A.  As well as my abilities as a physician, yes.

13  Q.  And at the time that NYU assumed your practice, you had two

14  rheumatologists that came along with you; correct?

15  A.  No, that's not correct.

16           MR. KATAEV:  41, your Honor.

17  A.  Well, including myself -- including myself, there was one

18  part-time physician.

19  Q.  Dr. Brancato; correct?

20  A.  Yes.

21  Q.  And you had several thousand patients in your private

22  practice, didn't you?

23  A.  Yes.

24  Q.  And you had a large referral base; correct?

25  A.  Yes.

1  Q.  Now, when you came over to NYU, you reported to Mr. Kaplan;

2  correct?

3  A.  He was not originally there in 2015, no.

4  Q.  Ultimately, when he came to be the regional director there,

5  you did report to him; right?

6  A.  Later on when he was the regional director, yes.

7  Q.  But you only reported to him intermittently; right?

8  A.  Yes.

9  Q.  Primary person you reported to was Mr. Antonik; right?

10 A.  No.

11 Q.  Mr. Antonik was on site with you at that location, wasn't

12 he?

13 A.  Yes.

14 Q.  You were made aware of Dr. Edelman's September 2019

15 complaint; correct?

16 A.  I became aware of it at some point, yes.

17 Q.  And you were aware that this complaint was about

18 harassment, weren't you?

19 A.  Yes.

20 Q.  And Mr. Antonik was probably the first person to tell you

21 about it, wasn't he?

22 A.  Probably not, but I'm not sure.

23         MR. KATAEV:  Page 56, your Honor, line 21, going to

24 the next page to line 8.

25         MR. SCHOENSTEIN:  Objection.

1    THE WITNESS:  To the best of my recollection, I don't

2   have --

3    THE COURT:  Sustained.  Sustained.  Next question.

4    The lawyer is going to ask a new question.

5   Q.  You were made aware of Dr. Edelman's complaint?

6   A.  Yes.

7   Q.  By Joseph Antonik; correct?

8   A.  I believe at some point he told me about it.  I'm not sure

9   that he was the initial person who told me.

10   Q.  And in the course of your duties as the clinical director,

11   it became clear to you that Dr. Edelman's complaint was because

12   she did not like the way Mr. Antonik spoke to her; correct?

13   A.  I knew very little about the complaint.

14    MR. KATAEV:  Page 62, your Honor, lines 19 to 23.

15    THE COURT:  Go ahead.

16   Q.  At your deposition, I asked you the following question and

17   you gave the following answer; isn't that right?

18   "Q.  To your knowledge, what was Dr. Edelman's complaint to

19   human resources against Joseph Antonik about?

20   "A.  I was told she did not like the way he spoke to her."

21   Q.  Do you recall providing that testimony?

22   A.  Yes.

23   Q.  And you have no knowledge about any investigation into

24   Mr. Antonik's conduct; correct?

25   A.  No knowledge at all.

1  Q.  Even as the medical director of the practice there, no one

2  reached out to you about it; correct?

3  A.  No.

4  Q.  And you testified earlier today that one of your roles is

5  dealing with staffing issues; correct?

6  A.  Yes.

7  Q.  And similarly, you're not aware of any discussions

8  regarding Dr. Edelman's complaint with the human resources and

9  faculty practice; correct?

10  A.  I am not aware of those.

11  Q.  But you did discuss Dr. Edelman's complaint to human

12  resources with Mr. Kaplan, didn't you?

13  A.  Not exactly.

14  Q.  Isn't it true that you were supposed to be with Mr. Kaplan

15  when he approached Dr. Edelman?

16  A.  So that's not discussing the complaint.  It's Dr. Kaplan

17  asking me to attend with him when he met with Dr. Edelman.

18  Q.  You mean Mr. Kaplan?

19  A.  Mr. Kaplan, yes.

20  Q.  And you couldn't -- you agreed to go with Mr. Kaplan;

21  right?

22  A.  Yes.

23  Q.  But you ultimately did not do so; correct?

24  A.  Due to the timing of the meeting, yes.

25  Q.  And the reason why you were supposed to go with Mr. Kaplan

1  was to serve as an independent reliable witness; right?

2  A.  That was what I understood, yes.

3  Q.  And you were asked to be an independent reliable witness by

4  Mr. Kaplan; correct?

5  A.  I don't recall exactly what he asked me -- what he asked,

6  but that was my understanding of what he wanted, yes.

7  Q.  Now, prior to any complaints being brought to your

8  attention, you found Dr. Edelman to be qualified for a

9  position, didn't you?

10  A.  I was not asked -- I was not asked to evaluate her in this

11  regard at all.

12  Q.  And you have no knowledge as to whether Dr. Edelman was

13  ever made aware about any complaints concerning her clinical

14  care; correct?

15  A.  No, I did have some awareness regarding complaints with her

16  care, yes.

17  Q.  But you have no knowledge of Dr. Edelman being made aware

18  of those complaints; correct?

19  A.  At some point, I became aware that there was cases reviewed

20  by Dr. Buyon, who's the chief of rheumatology for all of NYU.

21  Q.  I just want you to listen to my question.  My question is:

22  Was Dr. Edelman ever made aware about any of those types of

23  clinical care complaints, to your knowledge?

24  A.  I don't know how they were transmitted to her, no.

25  Q.  You don't know if they were transmitted to her; correct?

1   A.  I believed they were, but I did not know that for a fact.

2               MR. KATAEV:  Page 71, your Honor, lines 16 through 23.

3               MR. SCHOENSTEIN:  Objection.

4               THE COURT:  Sustained.

5   Q.  You would agree with me that Dr. Edelman's fully qualified

6   in terms of education, training and experience, even after

7   learning about these complaints; correct?

8   A.  Yes.

9   Q.  And in your role as medical director, you ranked doctors

10  that had the most patient complaints, didn't you?

11  A.  I didn't rank anybody.  You asked me, I believe, how many

12  people had, but I did not have any ranking.

13  Q.  And when you say "I asked you," you're referring to the

14  deposition; correct?

15  A.  During the deposition, you asked me who had the most

16  complaints, but there was no ranking I performed outside of

17  that.

18  Q.  And when I asked you that question at your deposition, you

19  ranked Dr. Edelman at the top in terms of patient complaints;

20  right?

21  A.  I stated that she had more complaints than anyone else,

22  yes.

23  Q.  And then going down the ladder, so to speak, you ranked

24  Dr. Li, Dr. Mehta, and Dr. Brancato next; right?

25  A.  I stated that they had all had complaints noted, yes.

1  Q.  And that means that all the female doctors had the most

2  patient complaints.  Is that your testimony?

3  A.  Those doctors are all females, yes.

4  Q.  You didn't reference any of the male doctors when I asked

5  you that question, did you?

6  A.  I gave you a list of all the people that I recall dealing

7  with complaints for and I gave you the list.

8  Q.  Despite these complaints that you were made aware of, to

9  your knowledge, Dr. Edelman was never counseled; correct?

10 A.  I don't know what the followup with those complaints was,

11 no.

12 Q.  I'll represent to you that the jury is very intimately

13 aware with your November 6th, 2020 --

14       THE COURT:  Don't make any representations with

15 respect to the jury.  Ask a new question.

16       MR. KATAEV:  Withdrawn.

17 Q.  Mr. Antonik brought clinical issues about Dr. Edelman to

18 your attention, didn't he?

19 A.  At points, I did discuss clinical issues with Mr. Antonik.

20       THE COURT:  To whom?  Do you recall whether he brought

21 them to you or you brought them to him?

22       THE WITNESS:  So over a period of many years, I don't

23 recall, but I suspect I may have brought them to him, but I

24 don't know.

25       MR. KATAEV:  Page 47, your Honor.

1          MR. SCHOENSTEIN:  Objection.

2          THE COURT:  Sustained.

3  Q.  After being made aware of clinical issues, you called

4  Mr. Kaplan to tell him about those issues; correct?

5  A.  Well, I became aware of issues over a period of years, but

6  at one point in the fall of 2020, I did talk to Mr. Kaplan on

7  the phone about the clinical issues, yes.

8  Q.  And to your recollection, Mr. Kaplan told you, "Don't tell

9  me over the phone, I want an email."  Correct?

10  A.  No.

11  Q.  He did insist that you put your concerns in writing, didn't

12  he?

13  A.  So we -- ultimately, yes.  At a later point, he asked me to

14  put that in writing.

15  Q.  Mr. Kaplan is not a doctor; correct?

16  A.  He is not.

17  Q.  He would not know whether any of the clinical concerns that

18  you had raised to him are actually valid clinical concerns;

19  correct?

20  A.  The concerns weren't all clinical and some of them he would

21  have an opinion regarding, but he wouldn't be able to judge all

22  the clinical facts, no.

23  Q.  And during your call with Mr. Kaplan, he gave you a

24  deadline to provide this information; correct?

25  A.  Not during the initial call.  There was a call that was --

1    at subsequent days, probably weeks later where he gave me --

2    where he requested on that second call to provide a list of the

3    concerns regarding Dr. Edelman.

4    Q.  You did not ask for any deadline during that call; correct?

5    A.  So I was called and I believe it was on a Monday or

6    Tuesday, and I believe I was told that he was meeting with

7    leadership, including Andrew Rubin and Josh Swirnow on Friday

8    and I had till Friday to get him that material so that he could

9    properly present it to NYU leadership.

10   Q.  And to your knowledge, Mr. Kaplan did in fact meet with

11   Mr. Swirnow, Mr. Rubin about this; right?

12   A.  Yes.

13   Q.  And following his meeting, Mr. Kaplan informed you that you

14   have to meet with Mr. Rubin and Mr. Swirnow yourself; right?

15   A.  I was informed with that probably by Mr. Kaplan, but I

16   don't remember how I was informed of that.

17   Q.  And following your meeting with Mr. Swirnow and Mr. Rubin,

18   you then told Dr. Goldberg that Mr. Rubin wanted to speak with

19   him about the same issue; correct?

20   A.  Yes.

21   Q.  And you told Dr. Goldberg this in person; right?

22   A.  I believe so.

23   Q.  And that's because his office is right next door to yours;

24   correct?

25   A.  Yes.

1   Q.  And Dr. Goldberg told you he'd speak with staff, others in

2   the practice, and make his own judgment about your findings;

3   correct?

4   A.  Yes.

5   Q.  You never memorialized this conversation with Dr. Goldberg,

6   did you?

7   A.  No.

8   Q.  And you never memorialized your conversation with Mr. Rubin

9   and Mr. Swirnow; correct?

10  A.  No.

11  Q.  Nor did you memorialize your conversation with Mr. Kaplan,

12  correct, both of your conversations?

13  A.  No.

14  Q.  Prior to these conversations, you never had any discussions

15  about Dr. Edelman with Dr. Goldberg; correct?

16  A.  Not to my recollection.

17  Q.  It's fair to say that after Dr. Goldberg did what he said

18  he would do, you had a conversation with him; right?

19  A.  Yes.

20  Q.  And both of you determined during that conversation that

21  Dr. Edelman's practice patterns can't be remediated; correct?

22  A.  I was asked by Andrew Rubin whether I thought that the

23  practice patterns could be remediated, and I did discuss that

24  with Dr. Goldberg.

25  Q.  Did you decide with Dr. Goldberg that both of you could not

1    remediate Dr. Edelman in any way?

2    A.  I felt that way and I believe Dr. Goldberg agreed.  I

3    stated to Dr. Goldberg that I did not feel that I personally

4    could be responsible for the remediation --

5            MR. KATAEV:  Move to strike as nonresponsive, your

6    Honor.

7            THE COURT:  Overruled.

8            You can continue with your answer.  The objection is

9    overruled.

10   A.  So I told him that I did not think that it would -- I would

11   be able to do the remediation.  It was up to him whether he

12   thought he could be involved in remediation.

13   Q.  And you ultimately came to the conclusion following that

14   conversation with Dr. Goldberg that keeping Dr. Edelman at NYU

15   would cause harm to patients; correct?

16   A.  No.

17           MR. KATAEV:  Page 52, your Honor, 8 through 11.

18           THE COURT:  I'll permit it.

19   Q.  At your deposition, I asked you the following question, you

20   gave the following answer; correct?

21   "Q.  Did you at any point come to the conclusion that keeping

22   Dr. Edelman at NYU would cause harm or risk to patients?

23   "A.  Yes."

24   A.  So you said "harm," and harm is different than risk.  So I

25   do believe that her care provided some increased risk.

1    Q.  My question during your deposition as on the screen is

2    "harm or risk."

3    A.  Yes.  I guess I concluded there was some increased risk

4    related to her care for the patients.

5    Q.  Your testimony earlier today --

6    A.  But your question before was just about harm, not risk when

7    you asked me just now.

8            THE COURT:  Yes.  Go ahead.  Next question.

9    Q.  You conveyed this conclusion to Mr. Rubin and Mr. Swirnow;

10   correct?

11   A.  I believe so.

12   Q.  And you conveyed this conclusion because, based on your

13   review, approximately four to five patients received

14   unnecessary or excessive radiation; right?

15   A.  No.

16           MR. KATAEV:  75, your Honor --

17   A.  The answer is much more complicated than that.

18           THE COURT:  No, you're done.  He's asking a new

19   question.

20           MR. SCHOENSTEIN:  Objection.

21           THE COURT:  And I'll review to see --

22           MR. KATAEV:  Lines 2 to 12.

23           THE COURT:  Sustained.

24   Q.  By the time these complaints were brought to your

25   attention, Dr. Edelman had worked at NYU for almost seven

1    years; correct?

2    A.   By the time -- which complaint?  The one in 2020, yes.

3    Q.   And in the course of seven years, it's fair to say that

4    Dr. Edelman had thousands of patient appointments; right?

5    A.   Yes.

6    Q.   You had thousands of patient appointments over the course

7    of seven years; correct?

8    A.   Yes.

9    Q.   And it's fair to say that Dr. Edelman had a strong and busy

10   practice; correct?

11   A.   Yes.

12   Q.   And you would agree with me that there are inferences where

13   a number of x-rays are necessary; correct?

14   A.   Yes.

15   Q.   And it's fair to say that you wouldn't recall the most

16   number of x-rays you've ever performed on a patient yourself;

17   correct?

18   A.   Yes, I don't recall that.

19   Q.   And you only reviewed approximately four to five patient

20   charts in making your determinations about Dr. Edelman;

21   correct?

22   A.   About excessive x-rays, you're talking about?

23   Q.   In general, for all clinical concerns?

24   A.   No.  I think there were four or five charts related to

25   excessive x-rays that I was asked to review or I was told about

N7HCede5                          Porges – Direct

1   by the x-ray technicians.

2               MR. KATAEV:  Objection.  Hearsay.

3               THE COURT:  Overruled.

4               Are you at a convenient breaking point?

5               MR. KATAEV:  I could stop now or continue, your Honor.

6               THE COURT:  Let me see the parties at sidebar.

7               (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (At the sidebar)

2    THE COURT:  How much more do you have with your

3    examination?

4    MR. KATAEV:  I'm about halfway through, your Honor.

5    THE COURT:  So what does that mean, another

6    45 minutes, an hour?

7    MR. KATAEV:  Thereabout, a little less than an hour.

8    THE COURT:  What's your sense as to how much you're

9    going to have on your examination?

10   MR. SCHOENSTEIN:  I'm going to guess, right now, a

11   half hour.

12   THE COURT:  So the jury told my deputy that tomorrow

13   they can sit until 2:30.  Wednesday, they can sit as long as

14   necessary.

15   MR. SCHOENSTEIN:  Let's close Wednesday morning, your

16   Honor.

17   THE COURT:  Well, no.  You may close on Tuesday.  In

18   fact, you should plan on closing on Tuesday.  I'm going to tell

19   the jury that they should -- that I cannot make predictions for

20   shorter terms tomorrow, but my expectation is the evidence will

21   close tomorrow and it may be necessary for them to stay until

22   2:30 if they're able to do so, and that my expectation also is

23   that they would get the case on Wednesday to deliberate, and

24   that they should consider whether, if necessary, if they want

25   to, they could go beyond 2 o'clock.

N7HCede5                          Porges - Direct

1          Any objection to that from the plaintiff?

2          MR. LABUDA:  No, that's fine.  I think you had

3    indicted, your Honor, on Wednesday, they can stay later than

4    2:00?

5          THE COURT:  Yes.

6          MR. SCHOENSTEIN:  It's okay, your Honor.

7          (Continued on next page)

1        (In open court)

2        THE COURT:  Members of the jury, I'm going to let you

3   go for the day now.  Before I do so, let me tell you where we

4   stand with the trial and discuss with you scheduling.

5        It's my expectation that the evidence in this case

6   will close tomorrow, that you will receive all of the evidence

7   that you're going to consider by tomorrow.

8        I'm informed that you are able to sit tomorrow until

9   2:30 p.m.  I can't tell you for sure whether I'm going to ask

10   you to stay until 2:30.  There are going to be some legal

11   issues that I'm going to need to discuss with the parties and

12   there may be some breaks during the day tomorrow.  As you can

13   tell, I'm trying to move this case along, so are the parties.

14   I want to make sure that you are available to stay until 2:30

15   if necessary.  So try to plan your lives so that you can stay

16   until 2:30 tomorrow.

17        It's also my expectation that you will get the case to

18   deliberate on on Wednesday.  I will charge you and then you

19   will deliberate.

20        I'm informed that you're able to sit on Wednesday

21   beyond 2:00 p.m.  While you're deliberating, the Court will

22   provide lunch to you.  And then it will be up to you as to how

23   late to sit on Wednesday after you get the case.

24        Aside from those scheduling matters, for now, since

25   you don't have all of the evidence, you're not to reach any

N7HCede5

conclusions about what all of the evidence will say, you're not

to reach any conclusions about the case, you're not to talk to

the other jurors or anybody else about the case.  It's

critically important that you not do any research about the

case or any issues about the case.

            Enjoy your afternoon, enjoy your evening.  Breakfast,

again, will be available at 8:30.  Please be here by 8:45 and

we'll start again at 9 o'clock.  Thank you.

            (Continued on next page)

1          (Jury not present)

2          THE COURT:  You may step down.

3          While Dr. Porges is on examination by the plaintiff,

4    he's not to have any conversations about the substance of the

5    case with defense counsel.  You can have conversations about

6    logistics.  Please be here a couple of minutes before

7    9 o'clock.

8          MR. LABUDA:  Or anyone associated with the --

9          THE COURT:  Yes, anybody else associated with the

10   defendant.

11         THE WITNESS:  Yes, your Honor.

12         THE COURT:  Parties may be seated.

13         I provided the instructions to the parties over the

14   weekend as well as a verdict form.  I'm not going to do the

15   final charge conference now, you're entitled to have that after

16   the close of all of the evidence.

17         Since I've got you and I want to make efficient use of

18   the jury's time, if there are issues that either side can

19   identify now, I would ask you to do so.  My law clerk is just

20   getting a copy of the charge for me.

21         The other issue, while you're pulling the charge, are

22   exhibits that go to the jury.  There are a number of different

23   ways that we can handle it.  One way, which I think the charge

24   contemplates, is that I will give them a list of all the

25   exhibits that are received in evidence and list of the

N7HCede5

1    witnesses, and then if they want an exhibit, they can pass out

2    a note and ask for the exhibit.  That may be the most

3    expeditious for the jury.

4            If the parties would like this, we can also give them

5    hard copies of all the exhibits that are in evidence.  Why

6    don't you discuss that amongst yourselves and let me know by

7    email by 5 o'clock or so today what the parties' preference is.

8    If I don't hear by 5 o'clock, I'm going to assume I give them a

9    list of the exhibits and a list of the witnesses.

10           To that end, also, I appreciate the fact that the

11   parties have been giving me exhibit lists every day.  Keep it

12   coming.  We'll look for the exhibit list today and we will put

13   it into a form that can go to the jury.

14           Is there anything that the plaintiff can identify now

15   on the jury instructions that the plaintiff wants to bring to

16   my attention?

17           (Continued on next page)

18

19

20

21

22

23

24

25

N7hWede6

1          MR. LABUDA:  Yes, your Honor.

2          I wasn't able to get through any of the -- I got to

3     page 40, but I'm assuming that on page 25 -- there's some bold

4     in brackets, and I'm assuming that that is something that the

5     Court is potentially contemplating but has not yet decided on,

6     that particular issue.  That's my take on it.

7          THE COURT:  That's correct, on 25 and 29.  I will hear

8     from the parties with respect to whether there's evidence in

9     the record that would allow that charge.  I'm comfortable with

10    you addressing it now, frankly.  I'm not sure that there is

11    going to be any additional evidence.

12         MR. LABUDA:  Right.  I mean I will say this, your

13    Honor.  I just don't know if there's really been any testimony

14    about a system in terms of quality or quantity of production.

15    The law from *Ryduchowski* is that you have to have the system,

16    you have to implement the system and there has to be notice

17    about that.  I don't know if there's really been any, you know,

18    testimony about a system being in place with respect to setting

19    the pay.  It seems like it's more bona fide factors than any

20    type of, you know, organized system in place.

21         THE COURT:  Yes, and I did hear the testimony that you

22    elicited this morning from the witness.  On that particular

23    issue, unless there's more that the plaintiff has on the system

24    issue, do defendants have an answer on the system issue?

25         MR. STEER:  Yes, your Honor.

N7hWede6

1          Throughout the trial, contracts have been introduced

2     that show an incentive compensation system measured by

3     production standards, in other words, by RVUs.  That is exactly

4     what a system that measures earnings by quality and quantity of

5     production is, and we respectfully submit that the evidence is

6     there for that throughout the entire case.

7          THE COURT:  Is your defense that NYU uses a system,

8     and the system is RVUs and that that explains the disparity of

9     pay?  I thought that was the plaintiff's case.

10          MR. STEER:  Well, it's two different things, your

11     Honor.  So what we're really saying is with regard to setting

12     initial compensation, that is a factor other than sex.  We've

13     heard all the different things that go into it, like the

14     experience, people's seniority, patients and the like.  But

15     when you get to then the question of RVUs and people being paid

16     more on renewals, then we have a quality and quantity of

17     production system that gives incentive compensation to the

18     doctors that they earn above the targets, above the 1 percent,

19     and then those bonuses are built into their base in the next

20     renewal.

21          So we believe we have both.  We have, for initial

22     comp, we have factors other than sex.  For incentive comp and

23     what it produces in the way of a number, it's quality and

24     quantity of production, and we think that's directly on point.

25          THE COURT:  Yes, but aren't the incentive comp figures

N7hWede6

1   based ultimately on what you contend are factors other than

2   sex?  In other words, we heard a whole bunch of testimony that

3   the value of an RVU is not equal among the doctors, that the

4   RVUs have different values and that those different values

5   are -- I thought I heard from you -- a function of not a system

6   but of all of these qualitative factors.  So I'm not sure how a

7   system which measures earnings by quantity or quality of

8   production stands alone.  In fact, that seems it does stand

9   alone.

10          MR. STEER:  I think that, first of all, quality and

11   quantity of production is also subsumed in factors other than

12   sex.

13          THE COURT:  So then if it is, do you need it?

14          MR. STEER:  I'm just concerned whether the jury will

15   understand that -- if somebody gets incentive comp, that

16   they're not going to understand that we have proven our burden.

17   Whatever your Honor thinks is appropriate is fine, but I think

18   it's worthwhile having it, and I don't think it's going to

19   confuse anybody.

20          THE COURT:  All right.

21          What's the next thing that the plaintiff has?

22          MR. LABUDA:  I do make a note just with respect to the

23   New York State EPA claim.  I know that there's a reference on

24   page 32 -- I think it's on 32, about -- am I in the right --

25   yeah, it's a different page.

N7hWede6

1          Well, let me just go through this, your Honor.  I'm

2     sorry.

3          Next one, on page 33, we have the cat's paw

4     instruction again.

5          THE COURT:  I assume I'm going to hear -- I might as

6     well hear argument from both of you as to whether there's

7     evidence to support the cat's paw, but with respect to the

8     language of the cat's paw, I assumed that that was part of your

9     case.  Am I wrong about that, from the plaintiff's perspective?

10         MR. LABUDA:  Yes.  I think it's basically subsumed

11    already in the instructions that you've given in terms of

12    knowledge and corporate knowledge and all that, and I think

13    it's readily apparent that a lot of people knew about the

14    complaint in the leadership and upper management.

15         THE COURT:  It's not so clear to me.

16         MR. LABUDA:  OK.

17         THE COURT:  But do you have any exceptions to the

18    language that's in brackets on 33.

19         MR. LABUDA:  No.  The language is, I think, pretty

20    spot on, your Honor.

21         THE COURT:  And do you have an objection to me giving

22    that instruction?

23         MR. LABUDA:  I think it's already in there, but I

24    don't think that it would -- we don't have an objection.

25         The only thing that we would say is inasmuch as I

1    think there's some movement in, earlier about what the jury's

2    supposed to decide, with respect to cat's paw, it seems like

3    it's almost an alternate theory.  So we would just ask for the

4    word "alternatively," or something along those lines, that it's

5    another option for them to find that retaliatory motive.

6            THE COURT:  OK.

7            Let me hear from defendants on the charge on 33.

8            MR. STEER:  I don't know that it's an alternative, but

9    I don't know that the world would end if the word

10   "alternatively" was added there.  But I'm just concerned that's

11   more confusing than it's worth, frankly.

12           THE COURT:  Any objection to the law as I state it?

13           MR. STEER:  No, not at all, your Honor.  I think it's

14   correct.

15           THE COURT:  Or to the giving of that instruction?

16           MR. STEER:  No objection.  I think it's correct.

17           THE COURT:  What's the next thing the plaintiff has?

18           MR. LABUDA:  On page 34, in the end of the first

19   paragraph there, it references the real reason.  But this is a

20   "but for" standard, so we would just ask that instead of the

21   "real reason" it just say "a reason."

22           THE COURT:  This is on page 34 --

23           MR. LABUDA:  Page 34, at the end:  "If you find the

24   reasons articulated by NYU to be unbelievable, you still must

25   determine whether retaliation against Dr. Edelman for filing

N7hWede6

1    her complaint was the real reason for what occurred."

2              THE COURT:  OK.  I see.  And you're suggesting --

3              MR. LABUDA:  Instead of the "real reason" it say "a

4    reason," because it's a "but for" standard.

5              THE COURT:  Any objection?

6              MR. STEER:  Yes, your Honor.  Actually, the "real

7    reason" is the language, I believe, that's used directly from

8    the courts.

9              THE COURT:  From the what?  What did you say?  Where

10   is it --

11             MR. STEER:  I said the "real reason," I believe, is

12   the language used directly from the courts, that they talk

13   about the real reason, and that if you make it "a reason," I

14   think it changes the standard.  This is a "but for" cause, so

15   it isn't a reason, it's a "but for" cause.  Those are

16   inconsistent, I respectfully submit, your Honor.

17             THE COURT:  That seems right to me.  Let me hear from

18   the plaintiff, but really, since it's "but for" causation, as

19   you just indicated, it has to be the reason and not one of

20   several reasons.  Correct?

21             MR. LABUDA:  I would say that makes sense, but let me

22   sleep on that, your Honor.

23             THE COURT:  OK.

24             MR. LABUDA:  OK.

25             The only other one that I saw, your Honor -- as I

N7hWede6

1    said, I didn't get through everything -- but I noticed, you

2    know, we had submitted the letter about the disparate impact,

3    and I just wanted to talk about that because I didn't see that

4    in the instructions.

5            THE COURT:  Yes.  I ruled against you.

6            MR. LABUDA:  I figured.

7            THE COURT:  And it was substantially for the reasons

8    that were stated in the defendants' letter.  I'm not prepared

9    at the moment to give you an elaborate opinion from the bench

10   on it, although I could if you want, but I thought that the

11   defendants got the law right.  If there's more you want to

12   state on the record just so you have your record -- and I'll

13   think about it overnight -- please go ahead.

14           MR. LABUDA:  Not at this time, your Honor.

15           THE COURT:  OK.

16           MR. LABUDA:  Maybe at the final.

17           THE COURT:  OK.  If you have something more you want

18   to say, please let me know tonight, more authority, more law.

19   That way I can look at it tonight.  Just get it to me by 10

20   p.m. tonight if there's anything further.

21           MR. LABUDA:  OK.  Thank you.

22           THE COURT:  Anything else?

23           MR. LABUDA:  That was as far as I got, your Honor.

24           THE COURT:  Is there anything from the defendants?

25           MR. STEER:  Yes, your Honor.

1            On page 24, at the bottom of paragraph lower case A,

2    right above where effort is, and this is maybe an abundance of

3    caution, but because below is the charge with regard to

4    defendants' affirmative defense, I would just ask that when

5    we're talking then about, you know, skill, effort,

6    responsibility, that we say at the end of the last sentence

7    there, "this instruction does not address defendants'

8    affirmative defense discussed below."  I believe it's below.

9            THE COURT:  Why would I do that when after, later on,

10   when I get to the affirmative defenses, I say if you find for

11   the plaintiff on all of these factors, you must then consider

12   the affirmative defenses?

13           MR. STEER:  OK.  I agree, your Honor.  I hadn't

14   thought about it quite that way.

15           THE COURT:  OK.  Anything else?

16           MR. STEER:  Yes.

17           On page 29, your Honor, the one, two, third, fourth

18   line, I respectfully submit that your Honor may have reversed

19   the standard there.  It says, "plaintiff must prove by a

20   preponderance of the evidence that Drs. Goldberg, Porges and/or

21   Modi were performing work equal to the work she performed."  I

22   think the proper test is that there has to be proof that she

23   performed work equal to them.

24           THE COURT:  Yes.  That seems right to me.

25           I take it plaintiff agrees with that.

N7hWede6

1          MR. LABUDA:  Yes.  Looks like it's six of one,

2    half-dozen of the other, so we're fine with that.

3          MR. STEER:  Another one, your Honor -- oh, no.  Never

4    mind.

5          On page 46, second paragraph, there's a typo there, I

6    respectfully submit.

7          THE COURT:  Where is the typo?

8          MR. STEER:  It mentions a professor.

9          THE COURT:  Yes.  I'm not sure how that ended up here,

10   but thank you for pointing it out.

11         MR. STEER:  OK.

12         Then on page 48, under the damages under the Equal Pay

13   Act, on the one, two, three, four, five, sixth line down, it

14   says, "to calculate this figure, you should first determine the

15   salary that was paid to defendants' male employees," I

16   respectfully submit, your Honor, that that should say male

17   comparators.

18         THE COURT:  Yes.  That's fine.

19         MR. STEER:  And then when it goes on and says, "You

20   should then calculate the difference between the salary that

21   the plaintiff earned during the relevant years and the salary

22   of men," I would suggest, your Honor, there that it say "if any

23   whom you find were proper comparators and paid more money."

24         THE COURT:  Well, no.  At this point I think the "if

25   any" is wrong because if the jury gets to this point, they will

N7hWede6

1    have found that there are men who are comparators.

2                    MR. STEER:  OK.

3                    THE COURT:  But I think you are correct that it should

4    indicate the men whom you have found were comparators and were

5    paid more money.

6                    MR. STEER:  And then the only other thing I have on

7    that page, your Honor, is in the bottom of the paragraph we've

8    been discussing, the second-to-last line, after it says, "you

9    should calculate the difference using the salary of the man who

10   was paid the most during the relevant period," I would submit,

11   your Honor, that there should be some instruction -- this may

12   not be great wording, but something to the effect of you do not

13   add the amount of each alleged comparator together to reach a

14   total.

15                   THE COURT:  OK.

16                   Anything else?

17                   MR. STEER:  I'm not sure whether 51 -- I was thinking

18   that in the first full paragraph, where it says "alleged front

19   or back pay that arose from" --

20                   THE COURT:  I'm sorry.  Where?

21                   MR. STEER:  I'm sorry.  Page 51, the first full

22   paragraph.

23                   THE COURT:  OK.

24                   MR. STEER:  Last line, it says, "pay that arose from

25   her proven retaliation claims," and I was wondering if that

N7hWede6

1  should say -- well, again, let me go back, where you said

2  before, your Honor, but I was thinking that perhaps that should

3  say "any proof of retaliation claims."

4          THE COURT:  All right.  I'll think about that.  The

5  notion there, "or any alleged front or back pay that arose from

6  the retaliation claims that you find that she has proven."

7          MR. STEER:  OK.  That would be good, your Honor.

8  Thank you.

9          And then a last typo, your Honor.  And you know, I'm

10  the last person in the world to be talking about typos, because

11  this is always my problem, but it's labor law -- I'm sorry.

12  Page 54, third sentence down, labor law Section 194 claims.

13          THE COURT:  Thank you.

14          Anything else?

15          MR. STEER:  That's all I have.

16          THE COURT:  All right.  On the verdict form, anything

17  from the plaintiff on the verdict form?

18          MR. LABUDA:  Bear with me one second, your Honor.

19          With respect to the federal EPA claim, on page 2,

20  should there be some instruction about good faith?  I should

21  say I think there should be an instruction about good faith --

22  or a finding.

23          THE COURT:  Question about good faith?

24          MR. LABUDA:  What's that?

25          THE COURT:  Let me see if I've got that somewhere.

N7hWede6

1          MR. LABUDA:  I don't remember seeing it.

2          THE COURT:  Yes.  I'll make sure that that's

3      captioned.

4          MR. LABUDA:  That was the only comment we had, your

5      Honor.

6          THE COURT:  OK.

7          MR. STEER:  Your Honor, for defendants, page 2, No. 3,

8      we would request that it say, "Has Dr. Edelman proved by a

9      preponderance of the evidence that she was paid lower

10     compensation, including loans and lease repayments, than the

11     following individuals?"

12         THE COURT:  I'm not going to do that.

13         MR. STEER:  OK.

14         And then one last one, your Honor, that on page 4,

15     right under III, on Title VII, retaliation.

16         THE COURT:  Give me just one moment.

17         On page 4, III.  Yes?

18         MR. STEER:  We would submit that there should be a

19     question of, "Has Dr. Edelman proved by a preponderance of the

20     evidence that her complaint to ELR about Mr. Antonik and Mr.

21     Kaplan were made in good faith?"

22         THE COURT:  Let me ask you a question about that.  In

23     my instructions, I indicate that the jury can only find that

24     Dr. Edelman has shown that she engaged in protected activity if

25     it finds that she had a good faith, reasonable belief that

N7hWede6

1   NYU's conduct violated the laws forbidding gender

2   discrimination.  Why isn't the question that you've asked me to

3   ask the jury subsumed within question 8 already?

4           MR. STEER:  Let me look one more time, your Honor.

5           I was just concerned because they've heard so much

6   about protected activity that they may not recall that you have

7   to have that good faith element.  So they may be thinking of it

8   in terms of complaining, and I thought maybe it's necessary to

9   make it clear that -- I'm just, in essence, reminding them of

10  that first step.

11          THE COURT:  OK.  What else do you have on the verdict

12  form?

13          MR. STEER:  That's all I have, your Honor.

14          THE COURT:  Let me go back to the plaintiff on the

15  question regarding good faith.

16          My law clerk just pointed out to me what I thought we

17  had, and the fact is on page 3 is a question to the jury about

18  willfulness.  Willfulness obviously has an impact on good

19  faith.  The parties have argued what the impact is, but the

20  ultimate determination with respect to good faith is one for

21  the Court, as I understand it.  The law speaks to whether

22  willfulness controls my determination on good faith, but

23  ultimately, I'm the one who decides good faith.

24          So why should I give good faith to the jury?

25          MR. LABUDA:  Well, yes, if that's what the law says,

N7hWede6

1     then in terms of it being a court issue, not a jury issue, that

2     would make sense to me.

3                THE COURT:  Do defendants have a position on that?

4                MR. STEER:  Your Honor, I don't see the good faith --

5     you know, it's for the Court.  I don't see why we would want it

6     here.

7                THE COURT:  All right.  I'm not going to do a separate

8     question as to good faith.

9                The last thing I've got, and then I'll see if the

10    parties have got anything, is to the defendants.  You're going

11    to have a right to make a motion at the close of discovery.

12    Can you give me a preview as to the nature and the length of

13    that motion?

14               MR. SCHOENSTEIN:  Sure, your Honor.

15               We're going to finalize it this evening, of course,

16    but I think we're going to move -- I mean for starters, there's

17    no evidence of willfulness, so we're going to move to take that

18    entire question out of the case.  And we may take, given the

19    overwhelming state of the evidence on factors other than sex,

20    we will probably move on the Equal Pay Act claim in its

21    entirety.

22               We will also move on the discriminatory comments part

23    of the case, because there are no, and we'll speak to this more

24    tomorrow, but there are no gender-based comments that are

25    alleged.  There's this one allegation about muttering the word

N7hWede6

1     "bitch," and aside from that, there's nothing that would go to

2     the jury in the zone of sexist remarks.

3          THE COURT:  Isn't that, like, akin to "other than

4     that, Mrs. Lincoln?"  If there's conduct that is intimidating,

5     and if the jury believes the plaintiff, that Mr. Antonik

6     muttered bitch right after saying that, then wouldn't that be

7     enough?  City law's pretty liberal.

8          MR. SCHOENSTEIN:  It's not conduct, right?  It's

9     limited to remarks the way this claim has parsed out through

10    summary judgment, and the way it's addressed -- and it's a

11    petty slight, your Honor, which, even under the city law, would

12    not be sufficient, and we'll raise some authority for your

13    Honor in that regard tomorrow.  But muttering that, even if it

14    happened, is not sufficient under the city law or any other

15    law.  So I know we will be moving on that.

16         THE COURT:  OK.

17         MR. SCHOENSTEIN:  Those are the ones that I'm for sure

18    on, and the rest we'll determine tonight.  But I think it's

19    going to be a substantial motion, your Honor, and we do want an

20    opportunity to be heard before the jury is charged.

21         THE COURT:  And obviously there are implications in

22    terms of the law with respect to your specificity.  It sounds

23    to me like you're going to put the motion in writing.  Is that

24    right?  Or are you going to argue it orally?

25         MR. SCHOENSTEIN:  Depends when we're doing it.  We're

N7hWede6

 1   going to have specificity, so if nothing else, I could be

 2   specific on the record as to every element we are challenging,

 3   as is our obligation.  Whether I'd be able to provide your

 4   Honor with a brief at 11 o'clock tomorrow, I can't be sure.

 5          THE COURT:  OK.  All right.  Any sense as to how long

 6   you think you're going to need to lay out, with the specificity

 7   you believe to be requisite, your motion?

 8          MR. SCHOENSTEIN:  Probably 15 -- 15, 20 minutes.  He's

 9   saying a half an hour, but I speak faster than he does.  So

10   probably 20 minutes, your Honor.

11          THE COURT:  OK.  I'm not going to limit your time

12   period for that.  I'm also not going to limit plaintiff's time

13   period to respond.

14          One thing you're going to have to convince me of is

15   why if I think the question is at all close the right thing for

16   me to do and the efficient thing for me to do isn't to reserve,

17   let the jury come back with the verdict that it comes back

18   with, and then if, from the defendants' perspective, it's

19   disappointing, you will have preserved what you need to do to

20   make your postverdict motion.  So keep that in mind as

21   certainly something that I have in mind.

22          MR. SCHOENSTEIN:  Very good, your Honor.

23          I have one other issue to raise with the Court.

24          THE COURT:  OK.

25          MR. SCHOENSTEIN:  We received over the weekend an

1    amended initial disclosure from plaintiff, and it looks like

2    they changed some of their damages numbers.  And I just want to

3    make a record that their damages numbers are constrained by

4    what their disclosures were before trial and by rulings of this

5    Court on the motions *in limine*.  And to lob at us on a Sunday

6    in the middle of trial new numbers should not give them grounds

7    to argue nor more than they've already limited their case to.

8            THE COURT:  OK.  If you want to put something in

9    writing, if you're seeking to -- I'm not sure whether what

10   you're asking for is some limitation on their argument or you

11   just want it in the record so that if the jury returns a number

12   that's bigger, you've got it on the record.  Which is it?

13           MR. SCHOENSTEIN:  My understanding is they're not

14   going to give specific numbers in their argument.  That's what

15   we were always told.  So if that's still the case, that's not

16   going to be an issue.  I'm mostly preserving it for exactly the

17   latter point your Honor mentioned.  And if you would like a

18   letter, we're happy --

19           THE COURT:  I'm not inviting letters.

20           Mr. Labuda, are you going to mention the numbers that

21   you have in your amended initial disclosures?

22           MR. LABUDA:  No, I don't think we're going to mention

23   the numbers that are in the initial disclosures.

24           THE COURT:  All right.  Or are you going to mention

25   numbers, period, and are the numbers going to be larger than

N7hWede6

```
 1    what was in the initial disclosures that were served before

 2    trial?  I know you're not going to mention numbers for pain and

 3    suffering and emotional distress.

 4              MR. LABUDA:  Right.

 5              THE COURT:  Or for punitive damages.

 6              MR. LABUDA:  Right.  We're not going to have any

 7    numbers that are larger for the retaliation, for the

 8    compensatory.  And I think the only numbers we'll talk about

 9    with the jury, you know, in terms of specific numbers, would be

10    numbers for the Equal Pay Act.

11              THE COURT:  And I don't think, Mr. Schoenstein, with

12    respect to the Equal Pay Act, I haven't compared the numbers up

13    against what was in your initial disclosure, but you certainly

14    have had plenty of notice about what the numbers are that the

15    plaintiff is eliciting.

16              MR. SCHOENSTEIN:  Equal Pay Act numbers are not the

17    issue, your Honor.  That's fine.

18              THE COURT:  OK.

19              Is there anything else from the defense?

20              MR. STEER:  No, your Honor.

21              THE COURT:  Anything else from the plaintiff?

22              MR. LABUDA:  The only thing, your Honor, I know we

23    were talking about timing for closings, and I wanted to get a

24    sense in terms of timing for, like, the demonstratives as well,

25    if we're going to be using any demonstratives.
```

N7hWede6

1    THE COURT:  Yes.  If you're going to use

2    demonstratives in your closing, you should send them to me and

3    the other side tonight.  Same with the defense.

4         You should be, as I indicated, prepared to close

5    tomorrow.  We might give the jury a long break after the close

6    of all of the evidence.

7         Mr. Schoenstein, are you both delivering the closing

8    and making the motion?

9         MR. SCHOENSTEIN:  I am definitely delivering the

10   closing.  We're still fighting out who's making the motion, but

11   I think it will probably be me.

12        And can we set a time for the demonstratives?  Can I

13   suggest 7 o'clock.

14        THE COURT:  10 o'clock?

15        MR. LABUDA:  Yes, your Honor.  Thank you.

16        THE COURT:  I say that because, I say the bit about

17   who is going to be making the motion in that I will excuse

18   whatever lawyer wants to be excused while I'm meeting with the

19   lawyers on legal issues, which can translate to if one of you

20   wants to be absent to make final changes on a closing while the

21   other argues the legal issues, I'm fine with that.

22        MR. SCHOENSTEIN:  Thank you, your Honor.

23        MR. STEER:  Thank you, your Honor.

24        MR. SCHOENSTEIN:  We'll consider that.

25        THE COURT:  OK.  Have a good afternoon and good

N7hWede6

1    evening, everyone.

2              MR. LABUDA:   Thanks, your Honor.

3              (Adjourned to July 18, 2023, at 9 o'clock a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

 ANDREW RUBIN

Cross By Mr. Schoenstein . . . . . . . . . . . 959

Redirect By Mr. Kataev . . . . . . . . . . . 961

Recross By Mr. Schoenstein . . . . . . . . . 997

Redirect By Mr. Kataev . . . . . . . . . . . .1006

 AVRAM Z. GOLDBERG

Direct By Mr. Labuda . . . . . . . . . . . . .1012

Cross By Mr. Schoenstein . . . . . . . . . . .1057

Redirect By Mr. Labuda . . . . . . . . . . . .1080

 KATHLEEN PACINA

Direct By Mr. Kataev . . . . . . . . . . . . .1085

Cross By Mr. Schoenstein . . . . . . . . . . .1118

Redirect By Mr. Kataev . . . . . . . . . . . .1123

 ANDREW JAY PORGES

Direct By Mr. Kataev . . . . . . . . . . . . .1126

```
 1                    PLAINTIFF EXHIBITS

 2   Exhibit No.                             Received

 3    123   . . . . . . . . . . . . . . . . . 976

 4    5    . . . . . . . . . . . . . . . . . .1009

 5    75   . . . . . . . . . . . . . . . . . .1111

 6    74   . . . . . . . . . . . . . . . . . .1112

 7    50   . . . . . . . . . . . . . . . . . .1117

 8                    DEFENDANT EXHIBITS

 9   Exhibit No.                             Received

10    PP   . . . . . . . . . . . . . . . . . .1101

11    QQ   . . . . . . . . . . . . . . . . . .1113

12    XX   . . . . . . . . . . . . . . . . . .1118

13

14

15

16

17

18

19

20

21

22

23

24

25
```

N7ICede1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

DR. SARI EDELMAN,

                    Plaintiff,

          v.                            21 Civ. 502 (LJL)

NYU LANGONE HEALTH SYSTEM, *et
al.*,

                    Defendants.         Trial

------------------------------x
                                        New York, N.Y.
                                        July 18, 2023
                                        9:00 a.m.

Before:

                    HON. LEWIS J. LIMAN,

                                        District Judge
                                        -and a Jury-

                              APPEARANCES

MILMAN LABUDA LAW GROUP PLLC
        Attorneys for Plaintiff
BY:  JOSEPH M. LABUDA
     EMANUEL S. KATAEV

TARTER KRINSKY & DROGIN LLP
        Attorneys for Defendants
BY:  RICHARD C. SCHOENSTEIN
     RICHARD L. STEER
     INGRID J. CARDONA

N7ICede1

1                    (In open court; jury not present)

2                    THE COURT:  Let's put the witness on the stand, back

3      on the stand.

4                    MR. LABUDA:  Your Honor, just one issue.

5                    THE COURT:  Yes.

6                    MR. LABUDA:  I was just informed about one issue that

7      when Dr. Porges was testifying, some of the defendants were

8      like nodding their heads.  I'm sure it was innocuous, but I

9      would just --

10                   THE COURT:  Yeah, no nodding the heads or any gestures

11     from anybody at counsel table or any of the witnesses or

12     anybody like that on either side.  I don't know what was

13     happening, but nobody --

14                   MR. LABUDA:  Neither did I, your Honor.  I was just

15     told this.  So I just wanted to inform the Court and just have

16     the defendants instructed.  Thank you.

17                   MR. SCHOENSTEIN:  Your Honor, I'll go get him.

18                   THE COURT:  Might have one of your colleagues get him

19     because I have a couple of things for the parties.

20                   With respect to the demonstratives, let me give you

21     some preliminary views.  No. 1, the demonstrative exhibit for

22     closing will not go to the jury.

23                   No. 2, I don't have a problem with the demonstrative

24     stating propositions of law, as long as they're consistent with

25     the jury instruction.  It's free for any party to say, whether

N7ICede1

through demonstrative or orally, you will hear the Judge

instruct you the following, you should follow the Judge's

instructions, and state what they expect me to say in my

instruction and then help guide the jury as to why they believe

the evidence satisfies those instructions.  On the other hand,

if the demonstrative misstates what I'm saying in the jury

charge, then I do have a problem with it because I think it

would be confusing to the jury.  I've not looked at the

demonstrative with that point in mind.

          MR. LABUDA:  Your Honor, I know there was an error in

our part.  We had put in about the disparate impact, we're

taking that out.  We've cleaned it up to make sure it's

consistent with your Honor's instructions from last night.

          THE COURT:  The third point is that there shouldn't be

references to items not in evidence.  In my view, that includes

the quote from the Supreme Court, statistics that are not in

evidence and academic articles that purport to indicate the

significance of a smile.  Those are my preliminary views.  I'll

hear from the parties if anybody disagrees with any of that.

          Next, on disparate impact, I received a letter from

the plaintiff overnight.  I'll hear from the defendant during

the charge conference if they've got anything to say with

respect to that.

          Third, for tomorrow, I'm going to need from the

parties a list of exhibits, a list that can go to the jury that

N7ICede1

1    indicates the exhibits that are in evidence with neutral

2    descriptions.  I note that I do have descriptions from the

3    parties of the exhibits.  Mr. Labuda, some of the plaintiff's

4    descriptions are a bit too generic, they indicate something

5    like "email" or "email from particular date" and you might want

6    to make sure that they've got a little bit more content for the

7    jury.  I'm also going to need a list of the witnesses who

8    testified that can go to the jury.

9             Finally, with respect to exhibits, I'll give you my

10   preliminary view, which is that if the plaintiff wants to put

11   together a binder of all of the exhibits that are in evidence

12   and it's agreed between the parties that those are the accurate

13   copies of the exhibits in evidence, I don't see a problem with

14   that binder going to the jury.  Again, I'll hear from parties

15   with respect to that.

16            Anything else before we call in the jury from

17   plaintiff?

18            MR. LABUDA:  No, your Honor.

19            THE COURT:  From defendant?

20            MR. SCHOENSTEIN:  No, your Honor.

21            THE COURT:  Let's bring in the jury.

22            (Continued on next page)

23

24

25

1             (Jury present)

2             THE COURT:  Good morning, members of the jury.

3             Dr. Porges, you're reminded you you're still under

4     oath.

5             Counsel, you may inquire.

6      ANDREW JAY PORGES, resumed.

7     DIRECT EXAMINATION CONTINUED

8     BY MR. KATAEV:

9     Q.  Good morning, Dr. Porges.

10    A.  Good morning.

11    Q.  Yesterday we discussed your role as medical director and,

12    prior to that, your role as clinical director.  Do you recall

13    that testimony?

14    A.  Yes.

15            MR. KATAEV:  Now, I'd like to place up on the screen

16    what is marked as Plaintiff's 32 already in evidence.

17            THE COURT:  Go ahead.

18    Q.  And that's your renewal agreement, the first renewal.

19            MR. KATAEV:  Can the jury see?

20            JUROR:  Uh-huh.

21    Q.  There's a reference here under III to administrative

22    leadership.  Do you see that?

23    A.  Yes.

24    Q.  And this was not in your original agreement, was it?

25    A.  No.

1   Q.  So it's fair to say that you've been the clinical director

2   at NYU Langone at 1999 Marcus Avenue since April of '17;

3   correct?

4   A.  Yes.

5   Q.  Were you the clinical director at the same time as

6   Dr. Goldberg?

7   A.  Actually, the title there was clinical director of

8   rheumatology in Long Island.  At that point, Winthrop Hospital,

9   which became NYU Long Island, was not part of NYU.  So my role

10  was Long Island as opposed to the FGP in New Hyde Park alone.

11  Q.  But Dr. Goldberg worked at 1999 Marcus Avenue with you;

12  correct?

13  A.  Yes.

14         MR. KATAEV:  And going over to Plaintiff's Exhibit 24,

15  your Honor, already in evidence.

16         THE COURT:  Go ahead.

17  Q.  On page D793 of Dr. Goldberg's initial employment

18  agreement, it says here that he is the clinical director of NYU

19  Langone Nassau Rheumatology; correct?

20  A.  Yes.

21  Q.  So for a time period, both of you were clinical directors;

22  correct?

23  A.  So I'm not sure we had exactly the same title.  I think

24  that when I was -- received the promotion, the understanding

25  was that his title had to do with a subset of Lake Success and

N7ICede1                           Porges - Direct

1   my responsibility was a broader area of Long Island.

2   Q.  Isn't it true that when you became a clinical director,

3   Dr. Goldberg was no longer the clinical director for a period

4   of time?

5   A.  Not to my knowledge, no.

6   Q.  You don't recall anything about Dr. Goldberg be being upset

7   about losing his clinical director title?

8   A.  Not specifically.  I was told that when I was being named

9   clinical director, they were going to talk to Dr. Goldberg

10  first to make sure he understood what was going on.

11  Q.  And later on, within about a year of the time you became

12  clinical director, you became a medical director; right?

13  A.  A year or two.  I'm not sure of the exact time.

14  Q.  Going back to exhibit 32, it says here -- there's a list

15  here of your duties as clinical director; isn't that right?

16  A.  Yes.

17  Q.  And under B3, you were required as a clinical director to

18  review and provide feedback on physician productivity; correct?

19  A.  It is on the list.

20  Q.  And that feedback is to the physicians at NYU; correct?

21  A.  Not to my knowledge, no.

22  Q.  You never provided feedback to physicians on their

23  productivity?

24  A.  No.

25  Q.  Another aspect of your role as clinical director under 4

1   here is to review and ensure that quality patient care is

2   delivered by all clinicians; isn't that right?

3   A.  Yes.

4   Q.  And one way you can do that is by speaking to other doctors

5   at NYU; correct?

6   A.  Many ways I could do that.

7   Q.  Including by speaking to the doctors; correct?

8   A.  One option, yes.

9   Q.  Going back to the clinical research role you had, when you

10  were first being on-boarded at NYU, the clinical research was

11  raised in discussions as something that you wanted to do at

12  NYU; correct?

13  A.  Yes.

14  Q.  You were doing that in your private practice and you wanted

15  to continue doing that; correct?

16  A.  Yes.

17  Q.  You also mentioned yesterday there were two rheumatologists

18  in your practice including you; correct?

19  A.  Yes.

20  Q.  And both of those rheumatologists, you and Dr. Brancato

21  went over to NYU; correct?

22  A.  Correct.

23  Q.  In addition to yourself and Dr. Brancato, your wife,

24  Deborah Porges, was a dermatologist at your private practice;

25  correct?

1    A.  Yes.

2    Q.  And she also came to NYU; correct?

3    A.  Yes.

4    Q.  So with respect to your practice, when Mr. Rubin and

5    Mr. Swirnow were preparing the business plan, that business

6    plan included data from all three doctors; correct?

7    A.  My wife has a separate -- had a separate practice and she

8    had a separate financial evaluation from those of the practice

9    that was myself and Dr. Brancato, but they did evaluate all

10   those financials.

11   Q.  So your testimony is that your business plan did not

12   contain any information about the revenue generated by

13   Dr. Deborah Porges, your wife?

14   A.  She had her own separate financials, I believe.

15   Q.  Are you sure about that?

16   A.  She had a totally separate practice, separate tax ID.  I

17   don't know what spreadsheets they were combined on, but yes, I

18   believe that that's the case as far as I'm concerned.

19   Q.  Now, at the beginning of this case, you had a role in

20   collecting documents to be produced in this case, didn't you?

21   A.  Yes.

22   Q.  And your role included collecting old emails about

23   Dr. Edelman; right?

24   A.  Yes.

25   Q.  And you also asked your nurse to obtain patient records;

N7ICede1                          Porges - Direct

1    correct?

2    A.  Yes.

3    Q.  And you asked your nurse to pull up relevant patient

4    records about Dr. Edelman; correct?

5    A.  So the nurse is the nurse for all of the rheumatologists.

6    So it would be the nurse for the group, not just my nurse.

7    Q.  And you asked her to pull up relevant patient records about

8    Dr. Edelman; correct?

9    A.  I asked her to pull up -- to try to find records

10   representing cases we had spoken about in the past time and

11   cases where Dr. Edelman and I both had shared patients.

12   Q.  And when you did that, you knew which patients to ask for

13   because they came up in your emails; correct?

14   A.  I don't think so, no.

15           MR. KATAEV:  Your Honor, page 18, lines 18 to 21.

16           THE COURT:  Okay.

17           MR. KATAEV:  To the witness only.

18   Q.  At your deposition in December of 2021, I asked you the

19   following question and you gave the following answer, didn't

20   you?

21   "Q.  How did you know which relevant patients to search for?

22   "A.  These were patient names that came up in my emails."

23   Q.  Do you see that?

24   A.  Yeah.  So is that just -- is that for all the patients or

25   the x-ray patients?  So there were different groups of

1    patients.  I think there were patients from the x-ray tech,

2    which would have come up in the emails because I received those

3    emails from the x-ray techs, but there were other cases which I

4    think were -- that I provided as exhibits to counsel that were

5    not included in the email, as swell.

6    Q.  And Mr. Antonik also sent you emails about patients;

7    correct?

8    A.  So as I testified yesterday, I was given two or three days

9    to prepare an email in November 2020 reviewing specific

10   concerns and specific patient problems.  That was the point

11   that I reached out to the office nurse, as well as to the suite

12   manager, as well as to Joe Antonik so that I could obtain the

13   records that I believe that they had accumulated over the past

14   few years regarding patient problems.

15            MR. KATAEV:  Your Honor, pages 18 to 19, line 22

16   through line 5 on the next page.

17            MR. SCHOENSTEIN:  Objection.  Improper.

18            THE COURT:  Sustained.

19   Q.  So the answer is Mr. Antonik did email you patient names;

20   correct?

21   A.  I requested a -- the answer is that I requested specific

22   records of previous problems that had been documented that he

23   would have access to and that I believe that had been recorded

24   by the person preceding him, Alicia DiLavore, who was the site

25   manager before Joe Antonik came on site.

1  Q.  And the only email Mr. Antonik ever sent you was in

2  November of 2020; correct?

3  A.  I've gotten many emails from him -- I've gotten many

4  emails, so I don't know what you're talking about.  The only

5  one as far as I know with patient records related to

6  Dr. Edelman would be that.  That's the only one I'm aware of.

7          MR. KATAEV:  Page 19, your Honor, line 19 through

8  line 5 on the next page.

9          MR. SCHOENSTEIN:  Objection.

10          THE COURT:  Sustained.

11  Q.  Yesterday I asked you if you were made aware of

12  Dr. Edelman's complaint and you said at some point, yes, you

13  were; is that right?

14  A.  Yes.

15  Q.  Mr. Antonik was probably the first person to tell you about

16  the complaint, wasn't he?

17  A.  As I said yesterday, I'm not sure who the first person was.

18          MR. KATAEV:  56, your Honor, line 25 through line 8 on

19  the next page.

20          MR. SCHOENSTEIN:  Objection.

21          THE COURT:  Sustained.

22  Q.  After your initial conversation with Mr. Antonik about this

23  complaint, did you have any other discussions with him?

24  A.  None that I recall right now.

25  Q.  After Mr. Antonik provided you some information about

N7ICede1                    Porges - Direct

1   patients, you did not do any independent review; correct?

2   A.  No, that's incorrect.  I did a review -- I attempted a

3   review that involved many factors, including the cases from

4   Mr. Antonik, but I also tried to get cases from our nurse, and

5   I specifically asked for cases that I recalled that I asked our

6   nurse to find.

7   Q.  Other than your review, there was no independent review

8   conducted by someone outside of suite 306; correct?

9   A.  It's my understanding there was some review at some point

10  by Dr. Jill Buyon, who's the chief of rheumatology.

11  Q.  As far as these patient complaints go, you have no

12  knowledge as to whether Dr. Edelman was made aware of any of

13  these complaints; correct?

14  A.  I don't know what was transmitted to her.

15  Q.  You never discussed with Dr. Edelman directly, for example,

16  she was doing more x-rays than necessary; correct?

17  A.  I discussed it with the group as a whole, but not her

18  directly.

19  Q.  And that was sometime in 2019 or 2020; correct?

20  A.  Probably.

21  Q.  To your knowledge, Mr. Rubin and Mr. Swirnow together

22  decided not to renew Dr. Edelman's contract; correct?

23          MR. SCHOENSTEIN:  Objection.

24          THE COURT:  Sustained.

25  Q.  Do you know whether Mr. Rubin decided together with

1    Mr. Swirnow to not renew Dr. Edelman's contract?

2             THE COURT:  You can answer that question.

3             THE WITNESS:  I'm trying to think.

4    A.  The answer is I believe it to be the case, but I don't know

5    that I know it for a fact.

6             MR. KATAEV:  Your Honor, 74, lines 22 to 25.

7             THE COURT:  I'll permit it.

8    Q.  Dr. Porges, at your deposition, I asked you the following

9    question and you gave the following answer, didn't you?

10   "Q.  To your knowledge, who made the decision not to renew

11   Dr. Edelman's contract?

12   "A.  To my knowledge, that was done with Andrew Rubin together

13   with Joshua Swirnow."

14   Q.  Do you recall providing that testimony?

15   A.  Yes.  I think I'm saying the same thing now.  It's my

16   understanding that that's the case.

17   Q.  You testified yesterday that you concluded, based on your

18   review, that Dr. Edelman could cause harm or risk to patients;

19   correct?

20   A.  Yes.

21   Q.  But you have no knowledge as to why Dr. Edelman was kept on

22   at NYU for six months, despite the potential for harm or risk

23   to patients; correct?

24   A.  Correct.

25   Q.  As a doctor yourself, isn't it true that you had an

1    obligation to report any potential patient harm or risk to the

2    Office of Professional Medical Conduct?

3    A.   I don't know the exact stipulation, but -- and I don't know

4    what is exactly meant by "potential harm or risk."

5    Q.   Do you know what the office of professional conduct is,

6    professional medical conduct?

7    A.   I have only a vague idea about it in New York State.

8    Q.   And it's true, isn't it, that Dr. Edelman did in fact

9    continue to work for several months after NYU decided not to

10   renew her contract?

11   A.   Yes.

12   Q.   Were you not concerned, based on your findings, about

13   Dr. Edelman staying on for six months if she could potentially

14   cause harm or risk to patients?

15   A.   I had some concern in that regard, but I didn't have a high

16   level of concern.

17   Q.   In fact, you trusted the judgment of administration and

18   felt that you did your job by telling them; correct?

19   A.   That's correct, I did my best to present them with what I

20   saw was going on and I trusted administration, yes.

21   Q.   And you trusted administration, despite the fact that

22   Mr. Rubin and Mr. Swirnow are not clinicians; correct?

23   A.   Yes.

24   Q.   Now, you don't have the power as a medical director,

25   clinical director to actually terminate any physician, do you?

N7ICede1                              Porges - Direct

1    A.  Not to my knowledge, no.

2    Q.  Weren't you required as a clinical director to make those

3    judgments?

4    A.  I'm required to let administrative leadership know what's

5    going on and I have, at times, reported to physicians as well

6    as to financial and administrative leadership, such as Rubin

7    and Swirnow, but I have reviewed in other cases with clinicians

8    in physician leadership at NYU.

9              MR. KATAEV:  Move to strike the last portion as

10   nonresponsive.

11             THE COURT:  Overruled.

12   Q.  If there were really any concerns about patient care with

13   Dr. Edelman, if there was truly any harm or risk or potential

14   for it, Dr. Edelman could have been terminated for cause,

15   couldn't she?

16   A.  So I think if there's potential -- there's always potential

17   for risk in every situation, there's potential for risk every

18   time you see a patient, so it's just a level of risk.

19   Q.  And so it's your testimony that there was a low level of

20   risk; correct?

21   A.  There was a -- there was no acute risk.

22   Q.  Isn't it true that if there was even a small risk, that NYU

23   would deem that important to deal with?

24             MR. SCHOENSTEIN:  Objection.

25             THE COURT:  Sustained.

1  Q.  Dr. Edelman could have been placed on administrative leave

2  if there was a risk for harm or risk to patients, couldn't she?

3            MR. SCHOENSTEIN:  Objection.

4            THE COURT:  Overruled.

5  A.  I don't know what all the options that would be available

6  to administration would be.

7  Q.  To your knowledge, Dr. Edelman was not placed on any such

8  leave; correct?

9  A.  Not to my knowledge.

10  Q.  If it were your decision to be able to terminate

11  Dr. Edelman, would you have done so based on what you found?

12            MR. SCHOENSTEIN:  Objection.

13            THE COURT:  Overruled.

14  A.  My choice would not have been to renew her contract or give

15  six months, no, that would not have been my choice.

16            MR. KATAEV:  Page 55, your Honor, line 17 through 6 on

17  the next page.

18            THE COURT:  Go ahead.

19  Q.  At your deposition, I asked you the following question and

20  you gave the following answer, didn't you?

21  "Q.  Based on what you know about the concerns raised about

22  patient care with respect to Dr. Edelman, if it was your

23  decision, would you have kept her on for another six months

24  after notifying her of her nonrenewal?

25  "A.  I'm not aware of all the details regarding that decision

1    and I would have, if I was responsible for the decision, I

2    would have needed more information."

3    Q.  That's what you testified to at your dep; correct?

4    A.  Yes.

5    Q.  You never did any further investigation after you sent this

6    email, correct, the November 2020 email?

7    A.  So after that, there was a -- I did have the phonecall --

8    the Zoom call with Andrew Rubin and Josh Swirnow, that was

9    subsequent to the email.

10   Q.  And that phonecall was a discussion about what you had

11   already found based on your November 6th, 2020 email; correct?

12   A.  Correct.  And I also had a conversation with Dr. Goldberg

13   after he had independently -- I had asked Dr. Goldberg to make

14   an independent investigation, as well, that I testified to that

15   yesterday.

16   Q.  And Dr. Goldberg did that investigation; correct?

17   A.  Yes.

18   Q.  You did not do any further investigation; correct?

19   A.  I did a further investigation after Dr. Edelman left the

20   practice, but not at that time.

21   Q.  But you did a further investigation after a discussion was

22   already made not to renew her contract; correct?

23   A.  Yes.

24         MR. KATAEV:  I'd like to pull up Plaintiff's

25   Exhibit 86 already in evidence, your Honor.

N7ICede1                          Porges - Direct

1        THE COURT:  Go ahead.

2   Q.  You testified earlier about the email that Mr. Antonik sent

3   at your request; right?

4   A.  Yes.

5   Q.  This is, in fact, the email, isn't it?

6   A.  As far as I know, yes.

7   Q.  After he sent this initial email 2:20 p.m., he followed up

8   and Mr. Antonik followed up at 4:19; correct?

9   A.  Again, that's what's listed here.  I don't really have

10  recollection for those specific emails, but that is what's

11  listed here.

12  Q.  To your knowledge, are there any other emails, other than

13  this from Mr. Antonik?

14       THE COURT:  On this particular subject?  The question

15  is objectionable as phrased.

16       MR. KATAEV:  Yes, your Honor.  Thank you.

17  A.  So on this particular subject, none to my knowledge.

18  Q.  Now, you had received these emails at 2:20 p.m. as listed

19  here, and at 4:19 p.m.; correct?

20  A.  That's what it says on the list there, yes.

21       MR. KATAEV:  Permission to publish 1, which is already

22  in evidence.

23       THE COURT:  Go ahead.

24  Q.  And your email to Mr. Kaplan was sent at 4:31 p.m., just

25  12 minutes later; right?

1   A.  As I said, I was given only two days, and I'm sure at the

2   end of patient care on Friday is when I was desperately trying

3   to compile the best records that I could.  So that was all

4   happening on Friday afternoon and I was only given, to my

5   recollection, about two days.

6   Q.  Your email was preordained, wasn't it?

7           MR. SCHOENSTEIN:  Objection.

8           THE COURT:  Overruled.

9   A.  My email was an attempt to objectify something I had spoken

10  to David Kaplan about previously.  So I don't know what

11  "preordained" means exactly, but it was not -- it was

12  establishing something that -- based upon my experience in the

13  office over the preceding two or three years.

14  Q.  You knew, Dr. Porges, that you were going to send this

15  email before you ever got any email from Mr. Antonik; correct?

16  A.  As I said, I was asked two or three days before to prepare

17  an email.

18  Q.  And you coordinated with Mr. Antonik and Mr. Kaplan to

19  present these issues to Mr. Swirnow and Mr. Rubin; correct?

20  A.  I would say I coordinated with Mr. Kaplan.  I would say

21  that mister -- I asked Mr. Antonik to assist me.

22  Q.  Mr. Kaplan is not listed on these emails to you, is he?

23  A.  Correct, but he is the one who asked me to prepare the

24  email before he met with Andrew Rubin and Josh Swirnow.

25  Q.  Based on these emails, it's fair to say that you would not

1  trust Dr. Edelman with your patients; correct?

2  A.  I think over the course of my years that I spent in the

3  same office, I had a diminishing level of trust in her care.

4  Q.  In fact, you deny referring any patients to Dr. Edelman for

5  a second opinion; correct?

6  A.  I recall what I said was that there may have been one or

7  two patients in the first year or two she was in the practice,

8  but that I would not have referred her patients in the last

9  year or two for sure.

10 Q.  Now, you were not here for this testimony, but with the

11 Court's permission, I'll represent to you that --

12        MR. SCHOENSTEIN:  Objection.

13        THE COURT:  Sustained.

14 Q.  Isn't it true that Ms. Ruiz continued to provide some of

15 your patients to Dr. Edelman through her separation from

16 employment with NYU in February 2021?

17 A.  Can you repeat that question.

18 Q.  Isn't it true that Ms. Ruiz, as the office manager,

19 scheduled some of your patients to be seen by Dr. Edelman

20 through the end of her employment with NYU in February 2021?

21 A.  I don't believe I was aware of that.

22 Q.  If Ms. Ruiz stated that, would she be incorrect in her

23 testimony?

24        MR. SCHOENSTEIN:  Objection.

25        THE COURT:  Sustained.

N7ICede1                          Porges - Direct

Q.  Going back to your negotiations with NYU when you first
started there, you and Dr. Brancato negotiated your contracts
together; correct?

A.  Yes.

Q.  And to your knowledge, NYU prepared a business plan based
on data that you provided them; correct?

A.  Yes.

Q.  But they did not show you that business plan, did they?

A.  So I reviewed the financials that I provided to NYU.  You
know, there are things -- I've seen previous exhibits called
"Business Plan" which seem identical to the financials of the
old practice.  I'm not sure what exactly you're referring to,
but the financials of my previous practice were given by me to
NYU.

          MR. KATAEV:  Permission to publish 87, already in
evidence.

          THE COURT:  Okay.  Actually, 87 is not in evidence.

          MR. SCHOENSTEIN:  There's a different version of this
exhibit.

          MR. KATAEV:  It's exhibit EE.  I'll pull it up.  I'll
pull up the one that is in evidence, your Honor.

          THE COURT:  Just indicate for the record what you're
pulling up.

          MR. KATAEV:  It's exhibit EE.  I'll pull it up.

          THE COURT:  You may show the witness and the jury EE.

N7ICede1                          Porges - Direct

1   Q.   This is the business plan that NYU prepared; correct?

2        I'll rephrase the question.

3        These are not the financial records that you provided to

4   NYU; correct?

5   A.   I think they actually are.  I mean, it's nine years ago, so

6   I'm not certain, but I believe they're from my accounting

7   software.  It's nine years ago, but I believe, yes, they're

8   from my accounting software.

9             MR. KATAEV:  Page 80, your Honor, lines 14 to 21.

10             MR. SCHOENSTEIN:  Objection.

11             THE COURT:  Sustained.

12   Q.   You would agree with me, Dr. Porges, wouldn't you, that

13   there's some relationship between the number of RVUs and

14   compensation?

15   A.   There is what relationship, did you say?

16   Q.   There's a correlation between RVUs earned and compensation.

17   A.   Yes, that's where the contract is written.

18   Q.   Initial compensation that NYU offered you was $320,000;

19   correct?

20   A.   I believe that's correct.

21   Q.   But ultimately, you got $340,000, didn't you?

22   A.   Not until my -- not until a subsequent contract.

23             MR. KATAEV:  Permission to put up 31, your Honor.

24   It's already in evidence.

25             THE COURT:  Okay.

1  Q.  You first came to NYU in August of '14, in or about 2014;

2  correct?

3  A.  Right.  So, yes.  So -- okay.  So that must have been -- I

4  must have been incorrect, that 320 was my initial pay and it

5  was 340 then.

6  Q.  Throughout your tenure at NYU, you never had a business

7  expense that was not approved; correct?

8  A.  Correct.

9  Q.  In fact, you routinely had expenses up to $5,000 per year,

10  all of which were approved; correct?

11  A.  I think my testimony is that the expenses varied depending

12  upon the travel to the national meeting, but they got as high

13  as $5,000.

14  Q.  And you were never denied them; correct?

15  A.  Yes.

16  Q.  Looking at the bottom of this page going into the next

17  page, there is no cap on any expenses in here; correct?

18  A.  Yes.

19  Q.  Now, you're aware that Dr. Edelman came from a private

20  practice that she co-owned with Dr. Mehta; right?

21  A.  Yes.

22  Q.  And you also came from a private practice; right?

23  A.  Yes.

24  Q.  And you shared that similarity with Dr. Edelman, don't you?

25  A.  Yes.  They were different practices, but yes.

N7ICede1                     Porges - Direct

1  Q.  Both you and Dr. Edelman had the responsibility for

2  interviewing nurse practitioners, didn't you?

3  A.  So there was one set of nurse practitioners that were

4  interviewed.

5  Q.  And Dr. Edelman interviewed them as did you; correct?

6          MR. SCHOENSTEIN:  Objection.  This topic is out on

7  summary judgment, your Honor.

8          THE COURT:  No, I'll permit it.

9  A.  Yes, I interviewed a possible nurse practitioner.

10  Q.  And Dr. Edelman consulted with you regarding the free nurse

11  practitioner fellowship program, didn't she?

12  A.  I believe she raised the option at a meeting, but it was

13  after I had already been informed that the nurse practitioner

14  was likely to be taken away from us.

15          THE COURT:  Now I'll sustain the line of examination.

16  You're permitted to examine whether he had similar

17  responsibilities to Dr. Edelman, but not further than that.

18          MR. KATAEV:  I have nothing further on this line, your

19  Honor.

20  Q.  Focusing on your contractual obligations to NYU, is it fair

21  to say that you mostly met your RVU targets?

22  A.  Up until COVID, I was always within a couple of percent of

23  my RVU targets.

24  Q.  Did you exceed your RVU targets in every year except 2020?

25  A.  I don't believe so, no.  I was very close.  I don't even

N7ICede1                        Porges - Direct

 1   think I exceeded it at all.  I think I was within 5 percent,

 2   but mostly below.

 3   Q.  And because you were within a certain percentage, your

 4   compensation was unaffected; correct?

 5   A.  Correct.

 6   Q.  Fair to say you averaged a little over 50 RVUs per month;

 7   right?

 8   A.  On average, yes.

 9   Q.  And typically, that would lead to approximately a little

10   over 6000 RVUs every year; correct?

11   A.  Yes.

12   Q.  Except in COVID; right?

13   A.  A little less in COVID.

14   Q.  Because you met your RVU target and didn't really exceed

15   it, you did not receive any bonuses in any year from 2014

16   through the present; correct?

17   A.  The first year I ever received a bonus was actually last

18   year in 2022.

19   Q.  Prior to 2022, you did not receive any bonus; correct?

20   A.  Correct.

21   Q.  In your practice, you never really had any issues with the

22   Epic system when it came to communications; right?

23   A.  There were occasionally IT issues, but nothing major.

24   Q.  Never was there any issue that lasted for months and

25   months; correct?

1   A.  No.

2   Q.  If you had an issue with the Epic system, it would be dealt

3   with promptly; correct?

4              MR. SCHOENSTEIN:  Objection.

5              THE COURT:  Sustained.

6              THE WITNESS:  Can I answer?

7              THE COURT:  No, you can't answer.  The objection's

8   sustained.

9   Q.  Do you recall reaching out to IT whenever you had an issue

10  with the Epic system?

11  A.  I have filed IT tickets would be what I would do when I had

12  a problem.

13  Q.  And when you did that in the past, was that issue dealt

14  with promptly?

15  A.  Reasonably promptly.  I can't know exactly how long.

16  Q.  Not months; right?

17  A.  Not months.

18  Q.  Going back to Exhibit 1 --

19             MR. KATAEV:  Permission to publish to the jury?

20             THE COURT:  Yes.

21  Q.  Prior to sending this email to Mr. Kaplan, you had a call

22  with him; correct?

23  A.  I had a what?

24  Q.  A phonecall with him?

25  A.  Yes.

N7ICede1                          Porges - Direct

1    Q.  He directed you to send this email to him; correct?

2    A.  In a second call later on, yes.

3    Q.  And, in fact, he gave you a deadline of just one to

4    two days to do so during that second call?

5    A.  Could have been two to three days, but it was a short

6    deadline, yes.

7    Q.  And the reason he gave you the deadline was because

8    Mr. Kaplan was meeting Mr. Swirnow and Rubin and needed it in

9    advance of that meeting; correct?

10   A.  That's my understanding.

11   Q.  You even asked Mr. Kaplan for more time to put the email

12   together, but were denied that time; right?

13   A.  I think so.

14   Q.  And you spoke to Mr. Antonik that same week; correct?

15   A.  While trying to gather records to make an appropriate

16   email, yes.

17   Q.  But you don't recall any specific conversation that you had

18   with Mr. Antonik; correct?

19   A.  My best recollection is asking him in general to provide --

20   to find records, including those of the site manager that had

21   preceded him so that I could best have a well established

22   record of the concerns regarding Dr. Edelman over multiple

23   years.

24   Q.  In your email here, you make a reference to anecdotal

25   observations.  Do you see that?

N7ICede1                          Porges - Direct

1   A.   Yes.

2   Q.   Those anecdotal observations are based on patients of

3   Dr. Edelman's that you saw from time to time; correct?

4   A.   Those are some of the anecdotal observations, yes.

5   Q.   At the time that you made those observations, you never

6   informed anyone about those issues; correct?

7   A.   No one in senior leadership.

8   Q.   These concerns in this email were only compiled once

9   Mr. Antonik told you about Dr. Edelman's complaint; correct?

10  A.   I don't see those as connected at all, no.

11  Q.   You only compiled these concerns once Mr. Kaplan asked you

12  to do so; correct?

13  A.   Yes.

14  Q.   It says in your email that you have not performed a formal

15  review.  Do you see that?

16  A.   Yes.

17  Q.   You never did, in fact, do any formal review of

18  Dr. Edelman; correct?

19  A.   Correct.

20  Q.   In the portion that I highlighted, you stated in your email

21  that Dr. Edelman effectively ran too many labs; right?

22  A.   Yes.

23  Q.   You never compared the number of labs that Dr. Edelman

24  ordered to the number of labs that any other doctor ordered,

25  did you?

1   A.  I didn't do a statistical analysis, but I did not feel that

2   it was a close evaluation at all.

3           MR. KATAEV:  Move to strike the last portion as

4   unresponsive.

5           THE COURT:  Overruled.

6   Q.  The only basis for your contention in this email that

7   Dr. Edelman ran too many labs is based on what the medical

8   assistant told you; correct?

9   A.  No.

10          MR. KATAEV:  Page 118, your Honor, line 22 through 10

11  on the next page.

12          MR. SCHOENSTEIN:  Objection.

13          THE COURT:  Sustained.

14  Q.  Your reference in this email about her MA refers to

15  "medical assistant."  Correct?

16  A.  Yes.

17  Q.  And this reference to the medical assistant is made because

18  you spoke to the medical assistant; correct?

19  A.  Yes.

20  Q.  The medical assistant is not a doctor; correct?

21  A.  Correct.

22  Q.  You only saw one patient yourself that had too many labs;

23  correct?

24  A.  No, not correct.

25          MR. KATAEV:  Your Honor, page 119, line 11 through 22.

N7ICede1                          Porges - Direct

 1          MR. SCHOENSTEIN:  Objection.

 2          THE COURT:  Sustained.

 3   Q.  The concerns that you raise in this email were never

 4   discussed directly with Dr. Edelman by you; correct?

 5   A.  Correct.

 6   Q.  And the reason for that was because NYU is not a training

 7   program, in your words; correct?

 8   A.  That's not the entire reason, that's one of the reasons.

 9   Q.  You are not at NYU to help other doctors; correct?

10   A.  I'm not the -- I'm sorry.  Repeat that, please.

11   Q.  You are not at NYU to help other doctors; correct?

12   A.  No, I'm fully available to help many doctors.  I often work

13   with many doctors and we compare notes and I get asked to

14   assist with patients and sometimes I ask for doctors to assist

15   me.

16   Q.  In your role as medical director, you were not there to

17   train other doctors to provide better patient care.  Is that

18   your testimony?

19   A.  That's right, I'm not training the doctors.

20   Q.  And under your oversight as medical director, the doctors

21   sink or swim on their own; correct?

22          MR. SCHOENSTEIN:  Objection.

23          THE COURT:  Sustained.

24   Q.  In reviewing the tests that Dr. Edelman ordered, you

25   assumed that she did not run those tests due to a lack of

N7ICede1                        Porges - Direct

1   knowledge; correct?

2   A.  Correct.

3   Q.  And it's fair to say that you don't even know why she ran

4   the tests that she did and you wouldn't speculate on that;

5   correct?

6   A.  That was my testimony in the deposition, I would have to

7   speculate.

8   Q.  One of the risks of running too many tests is what's called

9   false positives; right?

10  A.  That's in my email, yes.

11  Q.  Generally speaking, in rheumatology, there's always a high

12  likelihood of false positives, isn't there?

13  A.  I think the job of rheumatology is to determine what is a

14  false positive and what is a true positive.

15  Q.  And you would agree with me that if there was a false

16  positive, it's a physician's responsibility to rule those out;

17  correct?

18  A.  It's a physician's responsibility to try to ascertain

19  whether a result on a blood test is a true positive or a false

20  positive, yes.

21  Q.  And in your experience as a physician, you've had patients

22  that were difficult to diagnose because the root problems were

23  unclear; correct?

24  A.  That's the nature of rheumatology, absolutely.

25  Q.  And therefore, it's fair to say that sometimes many tests

N7ICede1                         Porges - Direct

1    are required in such situation; correct?

2    A.  I think that the proper diagnosis of the patient is based

3    upon a synthesis of many factors, including history,

4    examination, as well as appropriate blood tests.

5            MR. KATAEV:  Move to strike as nonresponsive.

6            THE COURT:  Overruled.

7    Q.  My question is, isn't it true that when the root problem is

8    unclear, sometimes many tests are required?

9    A.  Sometimes more tests are of assistance, yes.

10   Q.  And that has been the case for your entire time practicing

11   medicine; correct?

12   A.  Yes.

13   Q.  Focusing again on your email from Plaintiff's Exhibit 1,

14   it's a fairly long email, isn't it?

15   A.  Sure.  The principle part is the paragraph that I made at

16   the beginning, which I had written over those couple of days

17   after being asked, which was a narrative.  Most of the rest I

18   was cutting and pasting from old records that I had obtained

19   from office staff.

20   Q.  And, for example, this formatting here is indicative of you

21   copying and pasting; correct?

22   A.  Correct.

23   Q.  And, in fact, you had asked Mr. Antonik and others to

24   provide you the examples listed here; correct?

25   A.  I asked Mr. Antonik and others to give me records that had

1   been gathered over previous years, yes.

2   Q.  And you did, in fact, copy the contents of Mr. Antonik's

3   email and placed it in your email to Mr. Kaplan; correct?

4   A.  At least some of it, much of it.  I don't know exactly.

5          MR. KATAEV:  Permission to place Plaintiff's Exhibit 1

6   and Plaintiff's Exhibit 86 side by side, your Honor.

7          THE COURT:  That's fine.

8   Q.  Comparing your entry for November 13th of '19 with an entry

9   in Mr. Antonik's email for the same date, you had edited that,

10  didn't you?

11  A.  I'm looking at that.

12  Q.  I'll represent to you, to make it easier for you, the right

13  side is Mr. Antonik's email, the left side is yours.

14      I'll make the question easier.  I'll withdraw the prior

15  question.

16  A.  So I don't know how that difference happened, and I'm not

17  sure whether I edited it or whether there's a separate email

18  that was cut and pasted that was perhaps from Miriam.  There

19  may have been a separate email.  I don't recall editing it, but

20  I don't know.

21  Q.  Focusing on the list of issues here from November 13th of

22  '19 to October 28th of 2020, you do not have any independent

23  knowledge about any of these issues; correct?

24         MR. SCHOENSTEIN:  Objection.

25         THE COURT:  Basis.

1    MR. SCHOENSTEIN:  Vague and overbroad.

2    THE COURT:  Want to try to make it a little more

3    targeted.

4    Q.  With respect to each item listed here that has a date in

5    front of it, is it fair to say that you do not have any

6    independent knowledge other than what's written in the email

7    from Mr. Antonik?

8    A.  I don't think so.  So I was physically in the office on

9    some of those times and, for example, on the 9/9 evidence --

10   the 9/9 where Dr. Edelman was 30 minutes late in the office and

11   six patients were waiting, I probably, probably on that date

12   and certainly on other dates, I was in the office while the

13   staff, front desk, medical assistant were talking to the office

14   manager about what to do.

15   Q.  With respect to the June 15, 2020 entry, you never spoke to

16   the patient referenced there; correct?

17   A.  I was told that -- I believe I was told that case by

18   Miriam.  Yes, I believe Miriam reviewed the case with me and

19   she showed me the original -- she showed me the MyChart records

20   from the patient and other correspondence that Miriam had

21   received in that case.

22   Q.  So you didn't speak to that patient; right?

23   A.  I saw records -- I believe I saw records that the patient

24   had created in the EMR.

25   Q.  The September 8 --

1      THE COURT:  Did you speak to the patient?

2      THE WITNESS:  I didn't physically -- I didn't verbally

3  speak to the patient.

4      MR. KATAEV:  Thank you, your Honor.

5  Q.  The September 8, 2020 entry references an inappropriate

6  chart note.  You never personally saw that chart note, did you?

7  A.  Not sure.  I was asked on occasion to look at inappropriate

8  chart notes.  I don't know if that one was one that I looked at

9  or not.

10 Q.  Focusing on the September 9th, 2020 entry, you did not

11 personally witness Dr. Edelman come in late that day, did you?

12 A.  As I said, I definitely was in the office when patients of

13 hers were outside waiting for her and upset.  I'm not sure on

14 that date or on other dates, but yes, I did witness the

15 patients and the staff dealing with that.

16     MR. KATAEV:  Page 126, your Honor, line 23 through 2

17 on the next page.

18     MR. SCHOENSTEIN:  Objection.

19     (Continued on next page)

20

21

22

23

24

25

N7iWede2                          Porges - Direct

1            THE COURT:  I'll permit it.  Go ahead.

2    BY MR. KATAEV:

3    Q.  In your deposition, I asked you the following question, and

4    you gave the following answer, didn't you?

5    "Q.  With respect to the September 9, 2020, incident, listing

6    concern of tardiness, did you physically witness that Dr.

7    Edelman came in late?

8    "A.  I don't remember."

9            Do you recall providing that testimony?

10   A.  So, what I think I'm saying is the same thing.  I don't

11   recall on that specific date, because what I'm saying now is

12   that I recall having witnessed that situation.  But I don't

13   know whether it was September 2020.

14   Q.  Do you recall speaking with Dr. Edelman about why she was

15   late that day?

16   A.  No.

17   Q.  Focusing on the September 15, 2020, entry, you did not

18   personally review that patient's medications, correct?

19   A.  As far as I know, that's correct, to the best of my

20   recollection.

21   Q.  The office manager represented to you that this was the

22   case, the details of this entry occurred, right?

23   A.  I believe so.

24   Q.  The office manager is not a doctor, is she?

25   A.  No.

N7iWede2                          Porges - Direct

1   Q.  You did not inform Mr. Rubin and Mr. Swirnow that the

2   entries listed in here were observed by you, correct?

3   A.  Not to my knowledge, no.

4   Q.  The email, the way it's written, it appears that you made

5   these observations, correct?

6              MR. SCHOENSTEIN:  Objection.

7              THE COURT:  Sustained.

8   BY MR. KATAEV:

9   Q.  You did not inform Mr. Rubin and Mr. Swirnow when you spoke

10  to them about this email that this information came from

11  Mr. Antonik, correct?

12  A.  I -- to the best of my knowledge, I believe that I told

13  David Kaplan that I was going to try to get records from

14  everyone in the office and -- to prepare the email.  So I don't

15  believe that's -- doesn't -- I don't believe it doesn't

16  represent that.  I don't believe that I tried to represent that

17  I wrote that whole email by myself, no.

18  Q.  But you didn't tell them that Mr. Antonik provided this

19  information specifically, correct?

20  A.  Not specifically, no.

21  Q.  After you sent this email, Mr. Kaplan called you and told

22  you you had to meet with Mr. Rubin and Mr. Swirnow, correct?

23  A.  Yes.

24  Q.  And you did, in fact, meet with them, right?

25  A.  I had a Zoom meeting, yes.

1   Q.  It was not in person, right?

2   A.  A Zoom meeting, yes.

3   Q.  And during that meeting with Mr. Rubin and Mr. Swirnow,

4   it's fair to say you have no recollection regarding whether you

5   discussed Dr. Edelman's HR complaint, right?

6   A.  I don't recall it being discussed.  I think I -- I believe

7   my testimony was that I don't -- it was not discussed, to my

8   knowledge, but I can't be certain that it wasn't discussed.

9   Q.  Moving on to a different topic, Dr. Carsons is someone that

10  you know who is the chief of rheumatology at Winthrop, and he's

11  involved with the medical school at Winthrop, correct?

12  A.  It's NYU-Long Island, but yes.

13  Q.  Dr. Carsons is considered to be a highly qualified doctor

14  with respect to rheumatology, right?

15  A.  Yes.

16  Q.  He's well-known and respected in the rheumatology

17  community?

18  A.  Yes.

19  Q.  And in fact, you'd be comfortable referring patients to

20  Dr. Carsons, correct?

21  A.  Yes.

22  Q.  And you have, in fact, done so, right?

23  A.  Yes.

24  Q.  And Dr. Edelman trained under Dr. Carsons, correct?

25  A.  Yes.

N7iWede2                           Porges - Direct

1  Q.  Now, you understand that Dr. Edelman got terminated after

2  she made a complaint to human resources, correct?

3          MR. SCHOENSTEIN:  Objection.

4          THE COURT:  Overruled.  It just goes to timing, not

5  causation, right?

6          MR. KATAEV:  Correct.

7  A.  So I'm aware, both of those events are true, but not that

8  they're connected, yes.

9          MR. KATAEV:  Move to strike the last portion.

10          THE COURT:  Granted.  He's aware that both of those

11  events are true.

12  BY MR. KATAEV:

13  Q.  Now, both you and your wife remain employed at NYU,

14  correct?

15  A.  Yes.

16  Q.  And you currently have one child attending or that attended

17  New York University college, correct?

18  A.  Yes.

19  Q.  And your child's tuition is or was covered for free as a

20  benefit based on your employment with NYU, correct?

21  A.  Yes.

22  Q.  It's fair to say that you would lose a lot if you lost your

23  employment with NYU, right?

24  A.  NYU is financially important.  It's my employer and my

25  wife's employer, yes.

N7iWede2                         Porges - Direct

1    Q.  Based on your email and Plaintiff's Exhibit 1, is it

2    accurate to state that you believe continuing to have Dr.

3    Edelman at NYU would compromise patient care?

4    A.  I believe it would have been a risk to patient care.

5    Q.  But you felt that your only duty in terms of that was to

6    tell Mr. Rubin, Mr. Swirnow and Mr. Kaplan nothing more,

7    correct?

8    A.  I subsequently had a conversation with Dr. Gary Kalkut, who

9    is a clinician in leadership.

10   Q.  To your knowledge, as a doctor, aren't you required to

11   report such patient care issues to the Office of Professional

12   Medical Conduct?

13   A.  To my knowledge, nothing rose to the level of immediate

14   concern that I had to report to the office of professional

15   misconduct, no.

16   Q.  It's fair to say that you don't know whether Dr. Edelman

17   committed misconduct that would rise to such a level, correct?

18   A.  I did not perform a systemic review.  I did not go through

19   each and every one of her cases.

20            MR. KATAEV:  Just one second, your Honor.

21            I have no further questions.

22            THE COURT:  OK.  Defense examination.

23            Members of the jury, if you want to stretch for a

24   minute while counsel sets up.

25            OK.  Mr. Schoenstein.

N7iWede2                          Porges - Cross

1    CROSS-EXAMINATION

2    BY MR. SCHOENSTEIN:

3    Q.  Dr. Porges, good morning.

4    A.  Good morning.

5    Q.  Does the role that NYU plays in your life and your family's

6    life affect at all the testimony you're giving today?

7             MR. KATAEV:  Objection.  Leading.

8             THE COURT:  Overruled.

9    A.  No.

10   Q.  OK.  You're not a defendant in this action, right?

11   A.  Correct.

12            MR. SCHOENSTEIN:  Let's put up, please, Plaintiff's

13   Exhibit 48.

14            THE COURT:  You may do so.

15            MR. SCHOENSTEIN:  Thank you, your Honor.

16   Q.  While we're putting that up, when were you first in private

17   practice?

18   A.  So, I finished my training in around 1992.  And I was at

19   that time an employee in a private practice.

20   Q.  And how long had you been in private practice when you

21   started talking to NYU in 2014?

22   A.  So, from 1992 to 2014.

23   Q.  Was this curriculum vitae that's up on the screen now, was

24   that something you provided to NYU?

25   A.  That is something similar to it.

N7iWede2                          Porges - Cross

```
 1   Q.  And was it true and accurate when you provided it?

 2   A.  Yes.

 3   Q.  Was your private practice that you had had for 12 or 13

 4   years, in your estimation, successful?

 5   A.  Yes.

 6   Q.  Were you happy there?

 7   A.  Very happy.

 8   Q.  Were you having any financial issues that were causing you

 9   to look around?

10   A.  No.

11   Q.  Did you have any outstanding loans that needed repayment?

12   A.  The office had a line of credit that was fluctuating with

13   payments.  We had very expensive biologics, but nothing of

14   substantive debt, no.

15   Q.  OK.  And was there any financial pressure on the practice

16   making you want to join another organization?

17           MR. KATAEV:  Objection.  Leading.

18           THE COURT:  Sustained.

19   BY MR. SCHOENSTEIN:

20   Q.  What, if any, financial pressure were you experiencing that

21   made you want to join another organization?

22   A.  As I testified, there were two issues going on at that

23   time.  One is that I had a health concern at the time, making

24   me worry that, that if something happened to me that I would be

25   responsible for the overhead in the office and it would be a
```

1    disaster financially.  That was -- that was a big concern of

2    mine at that time.

3         As well, the view of the private practice world was

4    changing and a large number of doctors in private practice were

5    becoming employed by hospitals due to difficulties in

6    reimbursement and the business model of being in private

7    practice.

8              MR. SCHOENSTEIN:  Let's put up, please, exhibit 31.

9    I'd like to show the jury, your Honor.  It's in evidence.

10             THE COURT:  OK.  You may do so.

11             MR. SCHOENSTEIN:  Oh, I'm sorry.  I'm sorry.  Wrong

12   exhibit.  I want the business plan, EE.

13             THE COURT:  EE?

14             MR. SCHOENSTEIN:  Also already in evidence.

15             Thank you.

16   Q.  Now, I think you said earlier you think this financial data

17   came from your systems?

18   A.  QuickBooks.  I think so, yeah.

19   Q.  Now, can you help us understand, did this cover you or you

20   and Dr. Brancato or you and Dr. Brancato and Dr. Deborah

21   Porges?  Can you tell by looking at it?

22             MR. KATAEV:  Objection.  Best evidence.

23             THE COURT:  Overruled.

24   A.  So, I'm certain that my financial analysis, I had totally

25   separate books.  My wife had a separate business under a

N7iWede2                          Porges - Cross

1     separate tax ID, so I do not believe this in any way includes
2     my wife's expenses, income or her practice.  Dr. Brancato at
3     that time was an employee of -- I was Andrew J. Porges, M.D.,
4     P.C., so it would include Dr. Brancato.
5     Q.  Is there a line item that would refer to your salary?
6     A.  So, I would think that the physician base salary would
7     include both my, my, when I was -- when I was a P.C., I had a
8     salary, and then whatever profit the practice made.  So I think
9     that includes my salary and Dr. Brancato's salary.
10    Q.  OK.  And in terms of patient base, do you know what
11    percentage of the practice was your patient base and what
12    percentage was Dr. Brancato's?  Is that something you knew at
13    the time?
14    A.  Well, I know that I saw probably more than three times as
15    many patients.  Dr. Brancato was part time, and I saw three
16    times as many patients as her.
17    Q.  What was your -- you discussed potentially joining NYU with
18    people at NYU back in 2014, is that right?
19    A.  You mean other physicians?
20    Q.  No, no.  Administration.
21    A.  Yeah.
22    Q.  Let me ask you this.  Who did you negotiate with at NYU?
23    A.  Andrew Rubin and Josh Swirnow.
24    Q.  And did you have a pitch about yourself and your practice?
25            MR. KATAEV:  Objection.  Form.  Leading.

1         THE COURT:  Overruled.

2    A.  So, they approached me.

3    Q.  OK.  And what did you tell them about your practice?

4    A.  I sat down with them together with Dr. Brancato, together,

5    and I reviewed the, the, the relevant issues about my practice.

6    Financial, referrals, my history before, before opening the

7    practice, all those things were discussed.

8    Q.  And your background, was that discussed?

9    A.  Yes.

10   Q.  Now, you ultimately came to an agreement to join NYU?

11   A.  Yes.

12   Q.  And did NYU assume any business loans on your behalf?

13   A.  No.

14   Q.  Did NYU -- in terms of the lease, did NYU assume a lease?

15   A.  Yes.

16   Q.  For what period of time was that lease assumed by NYU?

17   A.  So, the lease was ending very shortly, I believe I joined

18   NYU as of November 1, and I believe the lease ended December

19   31, January.  Within, within two months of me joining NYU, the

20   lease was over.

21   Q.  And other than that, did NYU assume any lease?

22   A.  That's the only lease.

23   Q.  Now, did there come a time where you discussed with NYU

24   taking on an administrative role?

25   A.  Yes.

N7iWede2                    Porges - Cross

1  Q.  How did that discussion come about, if you recall?

2  A.  The site manager predating Joe Antonik was Alicia Delavore,

3  and she had a number -- the practice had just been put

4  together, and Alicia Delavore came to me on many occasions when

5  she had concerns about the problems in the practice --

6  clinical, logistic, doctors, etc.  So I was taking on an

7  increasing administrative role informally, based upon her

8  approaching me.

9  Q.  And how did that lead, if it did, to a director role?

10  A.  So, I think at some point that those discussions led to me

11  having phone conversations with Andrew Rubin about problems

12  that were in the practice, and I was subsequently offered

13  medical director.  I believe those things were connected.

14  Q.  OK.  And did you accept the appointment as medical

15  director?

16  A.  Yes.

17  Q.  And did you have duties in that regard?

18  A.  Yes.

19  Q.  And are those the duties generally -- we've already seen

20  your contract.  Those duties are --

21  A.  They were stipulated in the contract, yes.

22  Q.  Did you from time to time raise concerns about doctors?

23  A.  Yes.  I think more often administration came to me with

24  concerns about doctors, but I was involved with concerns about

25  doctors on many occasions.

1    Q.  Were you involved with concerns about doctors other than

2    Dr. Edelman?

3    A.  Multiple.

4                MR. KATAEV:  Objection.  Relevant.

5                THE COURT:  Overruled.

6    BY MR. SCHOENSTEIN:

7    Q.  You started in 2014, around the same time as Dr. Edelman

8    started, right?

9    A.  Yes.

10   Q.  And were you in the office with her on a day-to-day basis?

11   A.  So, the office first -- 1999, suite 306 was under

12   construction when, in November, in the winter of 2015, and it

13   opened up sometime around May or June 2015.  And Dr. Edelman --

14   I was, so I was working for NYU in my old private practice

15   office until the office space was available, and Dr. Edelman

16   was in also her, her previous, previous private practice office

17   until, maybe, a couple months later.

18   Q.  So when, about when did you start being in the same suite

19   together?

20   A.  Maybe fall 2015.

21   Q.  And do you know when it was you first had any concerns

22   about the way she practiced?

23   A.  Well, my recollection often goes back, there was a specific

24   patient I was asked to see, who was actually a physician in the

25   practice, and I was asked by the office manager to see that

1    patient, and the office -- the site manager was upset about the

2    care for that physician.  And that would be back in, I think,

3    2015 or 2016.

4            MR. KATAEV:  Objection.  Hearsay.

5    A.  That, that --

6            THE COURT:  I'm going to -- the reference to the site

7    manager being upset is just background for the testimony that I

8    presume is going to come with respect to what Dr. Porges did.

9    Am I correct about that?

10           MR. SCHOENSTEIN:  Yes, yes, yes, yes.

11   Q.  What site manager was that you were referring to?

12   A.  That was Alicia Delavore.

13   Q.  So that wasn't a defendant in this case?

14   A.  Correct.

15   Q.  And what do you recall about your interaction with that

16   event?

17           THE COURT:  Just say what you recall about your

18   interaction, not what the site manager said to you.

19   A.  She said that this --

20           THE COURT:  Not what the site manager said to you.

21   A.  Oh.  I saw -- I saw the patient.  I was asked to see a

22   patient.  I saw the patient, and I at that point took a history

23   and physical, reviewed the patient's previous evaluation, heard

24   the patient's concerns, that the patient told me had led to her

25   being upset about her care provided.

1  Q.  And you testified on direct that you were aware of

2  instances where Dr. Edelman was late, there were patients

3  waiting.  Do you recall saying that?

4  A.  Yes.

5  Q.  And do you know when you started observing that kind of

6  thing, if you could time pinpoint it for us?

7  A.  I can't.  We were in the office together for five years, so

8  I don't know.

9        MR. SCHOENSTEIN:  Can we put up exhibit KK?  This one

10  is not in evidence yet, your Honor.

11        THE COURT:  Any objection to KK?

12        MR. KATAEV:  Yes, your Honor.

13        THE COURT:  OK.  Establish a foundation for it.  The

14  objection is sustained.

15        MR. SCHOENSTEIN:  Yes, sir.

16        THE COURT:  KK, I believe, is in evidence.  I have a

17  note that KK is in evidence.

18        MR. SCHOENSTEIN:  KKK, your Honor.

19        THE COURT:  Are you offering KKK?

20        MR. SCHOENSTEIN:  No.  KK, two Ks.  All right.

21        THE COURT:  If you both agree that it's not in

22  evidence, then establish the foundation first.

23        MR. SCHOENSTEIN:  OK.  Can you scroll up so the doctor

24  can see the email here.

25  Q.  Do you recognize this email, sir?  If you need us to scroll

1    for more of what's attached to it, and I only want to know

2    right now if you recognize it.

3    A.  It represents something that I was aware of, but I don't

4    remember that specific email.

5            MR. SCHOENSTEIN:  Can you scroll up to the patient

6    record.  And again, I don't want you to testify about the

7    substance at all until the judge says it's OK.  But I want to

8    go to the attached patient record that starts on page D1133.

9    Q.  Do you recognize this chart?

10   A.  I don't recall this case, no.

11           MR. SCHOENSTEIN:  In that case, I'm going to withdraw

12   that exhibit.  That is my mistake.  And I'm going to ask to

13   mark for identification only, because I know it's not in

14   evidence, exhibit III.

15           Exhibit III, your Honor, is somewhat voluminous.  I

16   would like to hand up to the witness a physical copy so he may

17   look through it in his hands.

18           THE COURT:  OK.  You may approach.

19   BY MR. SCHOENSTEIN:

20   Q.  I'm going to ask you, Dr. Porges, just as a general

21   matter -- again, we're establishing foundation -- do you

22   recognize exhibit III?

23   A.  Yes.  Was there a previous exhibit EE that became exhibit

24   III?

25   Q.  I don't know, sir.

1    A.  I believe so, yes.

2    Q.  What do you recognize it to be?

3    A.  I recognize a bunch of cases that I believe I have reviewed

4    in the past.

5    Q.  And are these records that were maintained in the ordinary

6    course of NYU business?

7    A.  Yes.

8    Q.  And were they reviewed by you previously in connection with

9    the issues in this case?

10   A.  Yes.

11          MR. SCHOENSTEIN:  I'd like to offer exhibit III into

12   evidence, your Honor.

13          MR. KATAEV:  Objection, your Honor.  Sidebar.

14          THE COURT:  What's the basis of the objection?

15          MR. KATAEV:  There are patient names listed in there.

16   It's a violation of HIPAA to have them listed.  I can provide

17   you with Bates numbers.  This is a fact witness, not an expert.

18   He can't provide an opinion about what's written in these

19   charts, and I have an objection.

20          THE COURT:  Overruled.  It comes in because it was

21   reviewed by the doctor.  It goes to his state of mind.  With

22   respect to HIPAA, I would note for the benefit of the jury that

23   patient names -- that there are redactions.  I assume those

24   redactions are of patient names.

25          MR. SCHOENSTEIN:  If we missed one, your Honor, it was

1    inadvertent, and we will redact in any copy of this exhibit

2    that's given to the jury.

3             THE COURT:  III is received.

4             (Defendants' Exhibit III received in evidence)

5             MR. KATAEV:  Your Honor, one last objection on this

6    point.  There is no foundation as to when these records were

7    reviewed.

8             THE COURT:  When did you review these records, Doctor?

9             THE WITNESS:  So, I believe these records were

10   reviewed in 2020, around the time that these emails were

11   generated.  I don't -- I don't -- I don't remember other than

12   more than, more than two years ago.

13            THE COURT:  All right.  III is received.

14   BY MR. SCHOENSTEIN:

15   Q.  Now, Dr. Porges --

16            MR. SCHOENSTEIN:  Oh, may we publish to the jury, your

17   Honor?

18            THE COURT:  Yes.

19            THE WITNESS:  But I did review them again recently.

20            MR. SCHOENSTEIN:  Fair enough.  So the jury will be

21   glad to hear I'm not going to go through 300 pages of medical

22   records this morning, but we have published it to the jury.

23   Q.  And I'm just wondering, Dr. Porges, can you, using this

24   exhibit, give us, you know, an example of the kind of thing you

25   were talking about about Dr. Edelman's medical practice that

N7iWede2                         Porges - Cross

1   concerned you?  You can pick the page and tell us what page

2   you're looking at.

3   A.  OK.

4   Q.  Look on your physical copy, and we'll turn to whatever page

5   you're looking at.  We'll follow your lead.

6   A.  OK.  So, let me take, I guess -- these were, these are

7   patients, many or all of them were seen by myself and Dr.

8   Edelman.

9           MR. KATAEV:  Objection.  There's no question pending.

10          THE COURT:  Yes.  The objection is sustained.

11          You were just asked to identify a page.

12          THE WITNESS:  One page.  Yeah, hold on.  I'm getting

13   there.

14   A.  I guess I'd start with the first case, and I would just go

15   to the labs ordered on page D001205.

16          MR. SCHOENSTEIN:  OK.  And let's get that up on the

17   screen.

18   Q.  Where it says orders placed, is that what we're talking

19   about?

20   A.  Yeah.

21          MR. SCHOENSTEIN:  Scroll up so we can see, please,

22   Ms. Cardona, all of the orders placed.

23   Q.  Why did an order like that cause concern, if it did?

24          MR. KATAEV:  Objection.  Opinion testimony.

25          THE COURT:  Overruled.

1        You're being asked to testify about the concern that

2   you had at the time.

3        MR. SCHOENSTEIN:  I'm sorry.

4   A.  So --

5   Q.  Get your head up and speak into the mike as best you can.

6   A.  So, this is just a patient with a clinically inactive

7   disease, who I ultimately saw months later and had had these

8   and similar large panels of tests.  And each of these -- many

9   of these tests are panels, so they, some of them have five, ten

10  results in a panel, and they were being done repeatedly in a

11  patient who had inactive disease frequently.  And I saw the

12  patient subsequently and felt clinically the patient had been

13  inactive for a -- with their disease for a long period of time.

14       MR. KATAEV:  Same objection.

15  BY MR. SCHOENSTEIN:

16  Q.  Why did that --

17       THE COURT:  Overruled.

18  BY MR. SCHOENSTEIN:

19  Q.  Why did that concern you at the time, Doctor?

20       MR. KATAEV:  Same objection.

21       THE COURT:  Overruled.

22       As I recall, plaintiff's counsel wanted a cat's-paw

23  instruction, which I've given.  Correct?

24       MR. KATAEV:  Yes.

25       THE COURT:  It's relevant.  Go ahead.

N7iWede2                          Porges - Cross

1  A.  So, as I said, when you order a large number of tests,

2  you're going to have positive results and that leads to concern

3  with a patient, potentially with the clinician, that obscures

4  the care of the patient.

5  Q.  And did you, in 2020, review -- do you know what number of

6  cases you reviewed in 2020?

7  A.  No.

8  Q.  But these records reflect cases you think you reviewed at

9  the time?

10  A.  So, I attempted -- I asked the office nurse, who was a

11  shared nurse, to try to find some cases where I had seen the

12  same patient as Dr. Edelman so that I could demonstrate that

13  the anecdotal, when I said I had anecdotal concerns, some of

14  the basis for my developing anecdotal concerns.

15  Q.  And who was that office nurse?  Identify her by name,

16  please.

17  A.  Patricia Feslowich.

18  Q.  And she helped you gather the records you reviewed?

19  A.  Yes.

20           MR. SCHOENSTEIN:  Can we put back up, please -- oh,

21  yeah.  Let's put back up Plaintiff's Exhibit 1, which is

22  already in evidence, your Honor.

23           THE COURT:  Go ahead.

24           MR. SCHOENSTEIN:  And I want to scroll up to the

25  opening paragraph.

1          No, no.  Scroll down, please, Ms. Cardona.

2          OK.  Stop right there.  And can you blow that up, if

3   you can, a little bit.

4   Q.  Do you see the language that begins on page D3, with "as we

5   discussed"?

6   A.  Yes.

7   Q.  And then as we scroll down, there's one paragraph and then

8   a second paragraph on the next page that begin "concerns

9   regarding patient care"?

10  A.  Uh-huh.

11  Q.  Who wrote those paragraphs?

12  A.  I did.

13  Q.  Did anybody assist you in writing those paragraphs?

14  A.  No.

15  Q.  Did you have a belief at the time as to the veracity and

16  accuracy of those paragraphs that you wrote and provided to

17  administration?

18          MR. KATAEV:  Objection.

19          THE COURT:  Overruled.

20  A.  Those are my genuine beliefs at the time, yes.

21  Q.  And were they based on the review you did that you've

22  talked about?

23  A.  They were based upon many factors, including my being in

24  the office for several years as well as reviewing some charts

25  as well as talking to people in the office.

1    MR. SCHOENSTEIN:  Now, I want to go to the paragraph

2    that begins "concerns regarding patient care."  Let's pull that

3    up and blow that up, please, a little bit.

4              Thank you.

5              I should say expand it -- blow it up, but you know

6    what I mean.

7    Q.  You see it says, "Concerns regarding patient care have been

8    raised based upon patient complaints as well as more anecdotal

9    observations."  Do you see that?

10   A.  Yes.

11   Q.  And I want to direct your attention to the language "Dr.

12   Edelman has a pattern of ordering lab tests in a pattern not in

13   keeping with the usual standards of rheumatology practice."  Do

14   you see that?

15   A.  Yes.

16             MR. SCHOENSTEIN:  Ms. Cardona has highlighted it for

17   me.

18   A.  Yes.  Thank you.

19   Q.  Do you see that language?

20   A.  Yes.

21   Q.  Did you believe it at the time?

22   A.  Yes.

23   Q.  Do you stand by that assessment today?

24   A.  Absolutely.

25   Q.  Now, if a physician orders tests, ordinarily do they review

1    the tests?

2    A.  Yes.

3    Q.  And do physicians earn more RVUs if they have more tests to

4    review?

5              MR. KATAEV:  Objection.

6              THE COURT:  Overruled.

7    A.  The number of tests does add to the complexity of the case,

8    which affects the coding, yes.

9    Q.  And does it affect the coding in a way that increases the

10   RVUs?

11   A.  Yes.

12   Q.  Now you see the next sentence says, "Her MA is routinely

13   needing more than 10 tubes of blood to run a long list of

14   obscure tests."  See that?

15   A.  Yes.

16   Q.  And who was her MA?

17   A.  Tiffany.

18   Q.  And did you know Tiffany?

19   A.  Yes.  She sat right next to my medical assistant, and I

20   talked to her frequently.

21   Q.  And did you talk to her about this at the time, the need to

22   run more than 10 tubes of blood routinely?

23             MR. KATAEV:  Objection.  Hearsay.

24             THE COURT:  Overruled.

25             MR. SCHOENSTEIN:  Just for his knowledge.

1  Q.  Did you talk to her?

2  A.  I saw it.  I was sitting there when she was coming out with

3  the tubes.

4  Q.  And then you say in the next sentence, "The result of

5  excessive testing is many false positive results, which then

6  leads to more testing and some questionable diagnoses being

7  received."  Do you see that?

8  A.  Yes.

9  Q.  Did you believe that to be true at the time?

10  A.  Yes.

11  Q.  Do you stand by that today?

12  A.  I do.

13        MR. SCHOENSTEIN:  I want to go -- I'm not going to

14  read all of this.  Let's go to the last sentence.

15  Q.  "Aside from the resultant work flow, the x-ray staff are

16  genuinely concerned about unnecessary patient x-ray exposure."

17  Do you see that?

18  A.  Yes.

19  Q.  Penultimate sentence.

20        How did you know about that?

21  A.  I was -- received a complaint from the head x-ray tech.

22        MR. KATAEV:  Objection.  Hearsay.

23        THE COURT:  Overruled.  It goes to his understanding.

24  BY MR. SCHOENSTEIN:

25  Q.  Who is the head x-ray tech?

1   A.  Joanna Silva.

2   Q.  And did you trust her view on x-ray testing?

3   A.  I asked her to provide with me a number of cases so I could

4   look at the cases specifically.

5   Q.  And you also talked to Miriam Ruiz in the course of

6   compiling your thoughts about Dr. Edelman?

7   A.  Yes, I did.

8   Q.  And how did you find Miriam Ruiz's competence level in your

9   experience working with her?

10          MR. KATAEV:  Objection.

11  A.  I've worked with Miriam for a couple of years, and she was

12  very competent and I trusted her.

13  Q.  And the last sentence says there, says, "I and other

14  clinicians, upon reading her notes, find it difficult to

15  ascertain the primary clinical issue and it seems a clear

16  diagnosis with classic positive serology --"

17  A.  Serology.

18  Q.  "-- is the exception in her patients."  Do you see that?

19  A.  Yes.

20  Q.  All right.  I'm a country lawyer.  What is positive

21  serology?

22  A.  So -- so, the -- the -- one of the major diagnoses treated

23  by, the biggest diagnoses we probably treat is rheumatoid

24  arthritis and lupus, and according to the sort of basic

25  textbook training that virtually every patient with lupus is

N7iWede2                         Porges – Cross

1    ANA–positive.  Every or virtually every patient is

2    ANA–positive, and that was often —— and something like 80

3    percent of patients who have rheumatoid arthritis are

4    rheumatoid–factor positive.  So in the patients I was coming

5    across, I saw a more than expected amount of people that would

6    be ANA–negative and still have a diagnosis of lupus based upon

7    the other extensive serology that was being sent.

8    Q.  And did you believe your assessment of her notes to be

9    accurate at the time you wrote it?

10           MR. KATAEV:  Objection.

11           THE COURT:  Overruled.

12   A.  Yes.

13   Q.  Do you stand by that assessment today, sir?

14   A.  I do.

15   Q.  After writing this email, you met with Mr. Rubin and

16   Mr. Swirnow, right?

17   A.  Yes.

18   Q.  And did you discuss the concerns that were raised in this

19   paragraph and elsewhere in your communications?

20   A.  To the best of my recollection, they asked me if what I was

21   saying there was the, was my genuine belief, and I said yes.

22   Q.  And was there discussion about whether or not the situation

23   could be remediated?

24           MR. KATAEV:  Objection.

25   A.  Yes.

1     MR. KATAEV:  Hearsay.

2     THE COURT:  Overruled.

3  BY MR. SCHOENSTEIN:

4  Q.  And you gave your opinion in that regard?

5  A.  Yes.

6  Q.  By the way, when did you get Dr. Goldberg involved in this?

7  A.  Right after that conversation with Andrew Rubin.

8  Q.  OK.  So do you know if that was before the final decision

9  was made to nonrenew the contract?

10     MR. KATAEV:  Objection.  Leading.

11     THE COURT:  I'll permit it.

12  A.  I was told by Andrew Rubin that he wanted to get input from

13  Dr. Goldberg to assist him in evaluating what my concerns were

14  about Dr. Edelman.

15     MR. KATAEV:  Objection.  Hearsay.

16     THE COURT:  Overruled.

17  BY MR. SCHOENSTEIN:

18  Q.  You understand that the decision ultimately was made to

19  nonrenew the plaintiff's contract?

20  A.  Yes.

21  Q.  Did you agree with that decision at the time?

22     MR. KATAEV:  Objection.  Relevance.

23     THE COURT:  Overruled.

24  A.  I think I've testified that it would not have probably been

25  my decision to, to continue her employment, but to nonrenew it,

N7iWede2                          Porges - Redirect

1    yes.

2    Q.  Do you stand by that assessment to --

3    A.  Yes.

4    Q.  And did the -- anything you had ever heard about plaintiff

5    making a complaint to HR, what, if any, role did that play in

6    your assessment of her clinical abilities at the end of 2020?

7    A.  My complaints had nothing to do with any HR complaints, and

8    they were driven by direct and -- observations in the office

9    and the other office staff coming to me.

10             MR. SCHOENSTEIN:  Thank you, Dr. Porges.

11             THE COURT:  OK.

12             Plaintiff's examination.  Anything further?

13   REDIRECT EXAMINATION

14   BY MR. KATAEV:

15   Q.  You testified about a line of credit that you had in your

16   private practice?

17   A.  I'm sorry?

18   Q.  You testified about a line of credit --

19   A.  Yes.

20   Q.  -- that you had in your private practice?

21   A.  Yes.

22   Q.  There was a balance due on that line of credit at the time

23   you went over to NYU?

24   A.  There was some balance, yes.

25   Q.  NYU assumed that?

N7iWede2                          Porges - Redirect

1    A.  No.  I paid it off from my personal funds.

2    Q.  In your private practice, before you went over to NYU, you

3    took a salary, didn't you?

4    A.  Yes.

5    Q.  What was that salary?

6    A.  I believe the salary was around a hundred and sixty.  I

7    don't remember exactly.  It was ten years ago.

8                MR. KATAEV:  Let's go to HH, I believe.

9                THE COURT:  It's in evidence.  You may do so.

10               MR. KATAEV:  I apologize, your Honor.  EE.

11               THE COURT:  EE?

12               MR. KATAEV:  Yes.

13               THE COURT:  Go ahead.

14               MR. KATAEV:  Publish, please.

15               THE WITNESS:  Judge, should I clarify that, or should

16   I just answer the question?

17               THE COURT:  Yes, if you want to clarify your answer --

18               THE WITNESS:  I would clarify that my salary was

19   actually the accountants telling me what was the appropriate

20   salary to draw, but my total income exceeded the salary based

21   upon the profits of the practice in addition to the salary.

22   And the -- I was advised by my accountant in terms of what was

23   correct, in terms of social security, taxes, withholding, etc.

24   BY MR. KATAEV:

25   Q.  This line item here from the business plan says that your

1    salary, says that the total salaries for the practice was

2    269,000, correct?

3    A.   Yes.

4    Q.   And that's the combined salaries of yourself and

5    Dr. Brancato, correct?

6    A.   I believe so, yes.

7    Q.   And so your recollection about earning 160, approximately,

8    is consistent with the number here, because it's two salaries

9    together, correct?

10   A.   Correct.  Her salary would have been around a hundred.

11   Q.   And effectively, your salary more than doubled when you

12   went to NYU, correct?

13   A.   No.

14   Q.   Isn't it true that you earned 340,000?

15   A.   But my income was significantly higher than that 160,000.

16   Q.   I'm focusing on just the salary number.  The base salary

17   of --

18   A.   The base salary, yes.  The base salary was much higher.

19   Q.   Double, correct?

20   A.   Sure.

21   Q.   160 times two is 320, right?

22   A.   Yes.

23   Q.   And you got 340, correct?

24   A.   I believe so.  320 -- I'm not sure if 320 or 340 to start,

25   but yes, it's --

1  Q.  You testified about, you testified with Mr. Schoenstein

2  about the fact that your background, reputation, experience was

3  discussed at a meeting with Mr. Rubin and Mr. Swirnow, correct?

4  A.  Yes.

5  Q.  Both discussions were geared towards whether you would come

6  on to NYU, correct; whether you'd be hired by NYU, correct?

7  A.  Yeah, they were getting to know me.  It was like an

8  interview, and they were asking about my experience and

9  knowledge, yes.

10 Q.  Those factors were not discussed in relation to setting

11 your salary, were they?

12 A.  I believe my salary was set based upon the financials that

13 I provided.

14 Q.  You just testified about too many labs being done, correct?

15 A.  Yes.

16 Q.  Typically, when labs are ordered, that's something that

17 gets processed through insurance companies, right?

18 A.  Yes.

19 Q.  And insurance companies ultimately have to approve those

20 labs, don't they?

21 A.  I think the -- I think laboratories are approved or not

22 approved based upon the diagnosis -- diagnostic code provided

23 by the physician.

24 Q.  There are instances where prior approval is sometimes

25 required for labs, isn't there?

1  A.  Almost never.  Unless it's a specialty situation, almost

2  never.

3  Q.  But it does happen sometimes?

4  A.  It does happen.

5  Q.  And even if prior approval is not required and a lab is

6  performed that is not proper, insurance companies deny

7  reimbursement for that, don't they?

8  A.  Only if it's not correctly coded.  Otherwise, they're -- to

9  my knowledge, that wouldn't happen.

10  Q.  During your testimony with Mr. Schoenstein, there were no

11  documents offered about any insurance companies' denials of

12  labs, correct?

13  A.  Correct.

14  Q.  Are you aware of any complaints by patients made against

15  you?

16  A.  No.

17        MR. KATAEV:  I'd like to mark for identification

18  Plaintiff's Exhibit 129.  I have it in hard copy format, your

19  Honor.  I'll provide it to the Court and to the defendants

20  first.

21        MR. SCHOENSTEIN:  Objection.

22        THE COURT:  Have you provided it to defendants before?

23        MR. KATAEV:  No.  It's to impeach him, your Honor.

24        THE COURT:  All right.  Hand up a copy to me.

25        MR. KATAEV:  Permission to hand to the witness, your

 1    Honor?

 2              THE COURT:  While you're up here, why don't you give

 3    my deputy your extra copy, and then we'll see what the

 4    questions are.

 5              What is this document?

 6              MR. KATAEV:  Would it be better for a sidebar, your

 7    Honor?

 8              THE COURT:  No.

 9              MR. KATAEV:  This is a patient review of Dr. Porges

10    concerning the same issue about testing.

11              MR. SCHOENSTEIN:  I object, your Honor.

12              THE COURT:  Basis?

13              MR. SCHOENSTEIN:  It's not on the pretrial list.  It's

14    never been produced.  It's not relevant and it's prejudicial.

15    It's also hearsay.

16              THE COURT:  I'm going to exclude it on 609 grounds and

17    on relevance grounds -- I'm sorry.  Not 609 but 608 grounds and

18    on relevance grounds.

19    BY MR. KATAEV:

20    Q.  When you went over to NYU from private practice, how many

21    patients did you -- how many patients followed you?  You can

22    approximate.

23    A.  Several thousand.  I don't know how many thousand.  I, I

24    saw about a hundred patients a week before and after I joined

25    NYU, and many of them just once a year, so thousands of

1   patients.

2   Q.   Less than 5,000?

3   A.   I don't think so.  I don't know what the number is.

4   Q.   There was testimony about Dr. Edelman being late in terms

5   of patients waiting.  Do you recall that testimony?

6   A.   Yes.

7   Q.   There was only one documented instance of that, correct?

8           MR. SCHOENSTEIN:  Objection.

9           THE COURT:  Overruled.

10  A.   I've only seen one, one document in that regard, yes.

11  Q.   And that's in almost seven years of Dr. Edelman practicing

12  side by side with you?

13  A.   I didn't say -- I -- I would not be the person to best know

14  when she arrived in the office and I would have asked Miriam

15  Ruiz, the office manager, would be more aware of how frequently

16  that happened.  That was not my area.  I just would have

17  anecdotally observed it on occasion.

18  Q.   It's fair to say that different doctors have different

19  styles of practice, isn't that right?

20  A.   Yes.

21  Q.   And you knew Dr. Edelman to be thorough with her patients

22  in terms of the time she took with them, correct?

23  A.   Yes.

24  Q.   She took a lot of time with her patients, didn't she?

25  A.   I think for the most part, she had the same schedule as

1  most of us, which was 30 minutes for a new and 15 minutes for a

2  follow-up.

3  Q.  And to your knowledge, didn't her 15-minute appointments go

4  longer than usual most of the time?

5  A.  I think it wasn't in -- yes, it happened.

6  Q.  You testified about lab reviews and the number of labs

7  being conducted as something that would help increase the

8  number of RVUs earned.  Do you recall that testimony?

9  A.  Yes.

10  Q.  But doctors don't receive, doctors such as you and Dr.

11  Edelman don't receive any RVUs or earn any RVUs for doing lab

12  reviews after the labs are received, correct?

13  A.  So, the -- I'm not a billing expert.  The coding people

14  tell me that one of the levels of complexity is based upon

15  having seen in your notes more than three blood tests ordered

16  and reviewed.

17  Q.  You receive monthly RVU reports, don't you?

18  A.  Yes.

19  Q.  When you received those reports, it itemizes the tasks and

20  how many RVUs are received for each task, didn't it?

21  A.  Yes.

22  Q.  Lab reviews don't earn any RVUs, do they?

23  A.  Not in and of itself, no.

24  Q.  You testified about concerns raised by the x-ray

25  technologist, Ms. Silva, is that right?

1    A.  Yes.

2    Q.  During your testimony, your attorneys did not offer any

3    documents from Ms. Silva to you, correct?

4    A.  I think there's documents of, of mine about the patients,

5    but no, she didn't -- there's nothing, I believe -- to my

6    knowledge, there's nothing from Joanna Silva documented.

7            MR. KATAEV:  Permission to publish Plaintiff's Exhibit

8    1, your Honor.

9            THE COURT:  OK.

10   BY MR. KATAEV:

11   Q.  In the last sentence of this paragraph, you reference "I

12   and other clinicians."  Do you see that?

13   A.  Yeah.

14   Q.  The other clinicians here would be Dr. Goldberg, right?

15   A.  Actually, my wife would also be another clinician.

16   Q.  She's a dermatologist, correct?

17   A.  Correct.

18   Q.  Not a rheumatologist, right?

19   A.  Correct.

20   Q.  Other than Dr. Deborah Porges and Dr. Goldberg, are there

21   any other clinicians that you're referencing here?

22   A.  No.

23   Q.  And you spoke to Dr. Goldberg after you sent this email,

24   didn't you?

25   A.  Yes.

1       MR. KATAEV:  Just one second, your Honor?

2            I have nothing further.

3            THE COURT:  Anything further from the defense?

4            MR. SCHOENSTEIN:  Briefly, your Honor.

5   RECROSS EXAMINATION

6   BY MR. SCHOENSTEIN:

7   Q.  On --

8            THE WITNESS:  Can I just add?  I would consider my

9   office nurse, who has 20 years of rheumatology experience, a

10  clinician as well.

11           MR. KATAEV:  OK.

12  BY MR. SCHOENSTEIN:

13  Q.  And Dr. Porges, another clinician you raised in that answer

14  right now was your wife?

15  A.  Yes.

16  Q.  And was there anything she said that played a role in your

17  review and assessment in that email you wrote?

18           MR. KATAEV:  Objection, your Honor.

19           THE COURT:  Overruled.

20  A.  Over the, you know, five years we were in the office, my

21  wife actually pointed out to me, probably years earlier -- she

22  didn't often respond, but years earlier, before I really had

23  much experience, she had seen a bunch of, like, dermatology

24  opinions of Dr. Edelman, and she showed me notes and said that

25  it was surprising to her the way the -- the notes were written

1  and the whole record.

2          MR. KATAEV:  Objection.  Move to strike.

3          THE COURT:  Overruled.

4          MR. SCHOENSTEIN:  Let's put up exhibit EE one more

5  time.

6          Your Honor, this is in evidence.

7          THE COURT:  Go ahead.

8          MR. SCHOENSTEIN:  So we never looked at the second

9  page of this document, so I'm going to ask Ms. Cardona to

10 scroll up to the second page.

11 Q.  Do you see that page, Dr. Porges?

12 A.  Yes.

13 Q.  And is that information --

14         MR. KATAEV:  Objection.  Beyond the scope.

15         THE COURT:  Let's see what the question is.

16 BY MR. SCHOENSTEIN:

17 Q.  Is that financial information that you provided to NYU?

18 A.  Yeah, so -- so, I think the --

19 Q.  I just asked if you provided --

20         THE COURT:  You're being asked if that's information

21 you provided to NYU.

22 A.  Yes.

23 Q.  So in terms of --

24         THE COURT:  Is it information you provided?

25 A.  I believe it's -- I believe it's from my financial records,

1    yes.

2    Q.  And in terms of where it lists M.D. salary, do you see

3    that?

4    A.  Yes.

5    Q.  Does that refresh your recollection at all as to what the

6    salaries were at the time?

7         MR. KATAEV:  Your Honor, it's improper to show the

8    jury if it's being used to refresh recollection.

9         THE COURT:  Well, it's in evidence, so it's not

10   improper.  The jury can see it.

11        Go ahead.

12   A.  So -- so I do believe that the total M.D. salary is correct

13   and does reflect my income at the time.  I don't quite know how

14   much base salary, nonfringe base, etc., where that calculation

15   comes from.

16   Q.  Do you have a recollection on your own of what you were

17   making, all in, salary, profit shares, all compensation, what

18   you were earning per year prior to joining NYU?

19   A.  So, approximately 290.  That was my -- that is my total,

20   all-in profit.  That's right.

21   Q.  And did that number impact your negotiation with NYU?

22   A.  I think that NYU made me an offer based upon that number.

23   That's how I believe that offer came from.

24   Q.  Were you looking for an offer that exceeded 290 --

25   A.  Yes.

1    Q.   -- when you talked to NYU?

2              MR. KATAEV:  Objection.  Leading.

3              THE COURT:  Sustained.

4    BY MR. SCHOENSTEIN:

5    Q.   What, if any, expectation did you have about the salary you

6    would need to join NYU?

7    A.   They, they gave me an offer of a salary, which exceeded

8    that 290 or 295 that I was making, and I was told by other

9    physicians as well as my attorney at the time that, that that

10   was a basically nonnegotiable issue and I should negotiate on

11   other -- other issues in the practice.

12             MR. KATAEV:  Objection.  Hearsay.

13             THE COURT:  The objection's sustained.  The testimony

14   is stricken.

15   BY MR. SCHOENSTEIN:

16   Q.   You received an offer from NYU for your salary?

17   A.   Yes.

18   Q.   How much was that?

19   A.   I don't know if it's 320 or 340, was the first offer.  It

20   was ten years ago.

21   Q.   Did you have an understanding based on your discussions at

22   the time as to whether that offer was based on the comp you had

23   been paid in private practice?

24   A.   Yes.  I believe it exceed -- I was told that that exceeded

25   the amount I was making, total net of my salary and net profit

1  as a sole owner of a practice.

2  Q.  If you look on the top of that page that Ms. Cardona has up

3  on the screen, there's a reference to revenue.  Do you see

4  that?

5  A.  Yes.

6  Q.  And that $2 million number in 2013, did that reflect the

7  revenue of your practice at the time?

8  A.  Yes.

9  Q.  And was all of the business that generated that revenue

10  going to NYU in the transaction that ensued?

11         MR. KATAEV:  Objection.  Leading.

12         THE COURT:  Overruled.

13  A.  So, that income -- yes, came from majority from clinical

14  practice, and the entire clinical practice went.  The residual

15  was from the clinical research, which also became part of NYU.

16         MR. SCHOENSTEIN:  Thank you, Dr. Porges.

17         THE COURT:  Anything further from plaintiff?

18         MR. KATAEV:  One or two questions.

19         THE COURT:  OK.  Go ahead.

20         (Continued on next page)

21

22

23

24

25

1          MR. KATAEV:  I'd like to place up on the screen what's

2     been marked already as EE.

3          THE COURT:  Go ahead.

4     REDIRECT EXAMINATION

5     BY MR. KATAEV:

6     Q.  Focusing on the first page of exhibit EE, this left side,

7     2013, contains the actual data provided to NYU; correct?

8     A.  I believe so.

9     Q.  And years 1 through 5 are the projections that NYU made;

10    correct?

11    A.  I don't -- I didn't review this document, but it looks like

12    that, but I don't really know.

13    Q.  Going down to the second page of this document and focusing

14    on the expenses where it says "MD salary," this section right

15    here, 2013, is the actual data that was submitted; correct?

16    A.  I believe so.

17    Q.  And this section here, Porges and Brancato, is year 1 of

18    the projections; correct?

19    A.  No, I don't think so.  I think Porges and Brancato were

20    2013 and then year 2 is NYU projections is what I believe.

21    Q.  In year 2, it says $320,000; correct?

22    A.  Yes.

23          THE COURT:  Is that what the document says?

24          THE WITNESS:  It says:  "Physician base salary, 320."

25    Q.  And if you add 230 plus 90 here, that's $320,000; correct?

1   A.  Yes.

2   Q.  And that's consistent with the remaining years 2 through 5;

3   correct?

4   A.  Yes.

5   Q.  So if you scroll up here, you have years 1 through year 5;

6   correct?

7   A.  Yes.

8   Q.  But if you scroll back down here, you don't see year 1

9   because it's broken down between both doctors; correct?

10  A.  Yes.

11  Q.  So this $230,000 was a projection of what your salary would

12  have been at NYU, not what it was; correct?  In your private

13  practice; correct?

14  A.  I don't know.  I don't know where that 230 comes from.

15  Q.  In terms of the figures listed here, you provided financial

16  documents to NYU for NYU to make this document; correct?

17  A.  Yes.

18  Q.  But your attorneys, during your testimony, did not offer

19  any of the backup documents into evidence, did they?

20  A.  What do you mean, "backup documents"?

21  Q.  The documents that support these numbers were not offered

22  during your testimony; correct?

23  A.  I don't know.  I don't know what was supported or not.

24  Q.  When you provided NYU the information, you provided them

25  documents such as tax returns; correct?

1   A.  Yes.

2   Q.  And you provided them information such as RVU reports or

3   insurance reimbursement reports; correct?

4   A.  Definitely tax returns.  I don't know about insurance.

5   Maybe.  I don't know.  I provided a lot of stuff, a lot of

6   details.

7   Q.  A lot of financial documents; correct?

8   A.  Correct.

9   Q.  Those financial documents and the tax returns were not

10  offered into evidence by your attorneys during your testimony;

11  correct?

12  A.  To my knowledge, no.

13          MR. KATAEV:  I have nothing further.

14          THE COURT:  Dr. Porges, you're excused as a witness.

15  You may step down.

16          (Witness excused)

17          Anything else from the plaintiff?

18          MR. LABUDA:  Just call the next witness, Dr. Modi.

19          THE COURT:  Let me see the parties at sidebar.

20          (Continued on next page)

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  Dr. Modi is your last witness?

3              MR. LABUDA:  Yes.

4              THE COURT:  How long is your examination?

5              MR. LABUDA:  Probably 15 minutes.

6              THE COURT:  Any sense?

7              MR. STEER:  I'd say 15, 20 minutes, also.  Maybe a

8    little more.

9              THE COURT:  Okay.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                (In open court)

 2                THE COURT:  Dr. Modi, you may come up.

 3                Dr. Modi, please stand up.  My deputy will administer

 4     the oath.

 5      ANANG MODI,

 6           called as a witness by the Plaintiff,

 7           having been duly sworn, testified as follows:

 8                THE DEPUTY CLERK:  Please state your full name for the

 9     record and please spell out your first and last name.

10                THE WITNESS:  Dr. Anang Modi.  First name A-n-a-n-g,

11     last name Modi, M-o-d-i.

12                MR. LABUDA:  May I proceed, your Honor?

13                THE COURT:  Yes.

14     DIRECT EXAMINATION

15     BY MR. LABUDA:

16     Q.  Good morning, Dr. Modi.

17     A.  Good morning.

18     Q.  You're a rheumatologist; correct?

19     A.  Yes.

20     Q.  And if you could just speak up into the mic a little bit.

21     A.  Yes.

22     Q.  Much better.

23          So just briefly describe what you do as a rheumatologist.

24     A.  We treat a lot of musculoskeletal and autoimmune joint

25     diseases.

N7ICede3                          Modi - Direct

1   Q.  And in terms of treating, what is it exactly that you do in

2   terms of treatment for the patients?

3   A.  Could be anywhere from medications, physical therapy,

4   injections.

5   Q.  So you do doctor visits with the patients and then based on

6   those visits, you prescribe a certain type of treatment for the

7   patient; correct?

8   A.  Correct.

9   Q.  You have a CV; correct?

10  A.  Yes.

11          MR. LABUDA:  I'd like to show the witness exhibit 46,

12  which I believe is in evidence.

13          MR. STEER:  I believe it is, your Honor.

14          THE COURT:  You may do so.

15  Q.  Dr. Modi, this is your CV; is that correct?

16  A.  Yes.

17  Q.  And you are a board certified rheumatologist; correct?

18  A.  Correct.

19  Q.  And you went to New York College of Osteopathic Medicine;

20  correct?

21  A.  Correct.

22  Q.  And you graduated in 2001; correct?

23  A.  Yes.

24  Q.  And the New York College of Osteopathic Medicine, that's

25  the same medical school that Dr. Edelman went to; is that

N7ICede3                         Modi - Direct

1   correct?

2   A.  I believe so, yes.

3   Q.  And you also did your residency in internal medicine at

4   Winthrop University Hospital; correct?

5   A.  Correct.

6   Q.  And that finished in 2004; correct?

7   A.  Correct.

8   Q.  And Dr. Edelman also did her internal medicine residency at

9   Winthrop, as well; correct?

10  A.  That's correct.

11  Q.  After that, you did your rheumatology fellowship; correct?

12  A.  Correct.

13  Q.  And that was at Winthrop University Hospital; correct?

14  A.  Correct.

15  Q.  And that's also where Dr. Edelman did her rheumatologist

16  fellowship; correct?

17  A.  Correct.

18  Q.  You finished your fellowship in 2006; correct?

19  A.  Correct.

20  Q.  And Dr. Edelman was a year or two behind you; correct?

21  A.  Two years, yes.

22  Q.  Same education path.  Did you guys know each other in

23  medical school and all these fellowships?

24  A.  Medical school, no.  Residency and fellowship, we were

25  colleagues.

1   Q.   So before NYU, you already knew Dr. Edelman; correct?

2   A.   Yes.

3   Q.   So after your residency, you started working at Advantage

4   Care Physicians; is that correct?

5   A.   Queens Long Island Medical Group, which later became

6   Advantage Care Physicians.

7   Q.   So out of your fellowship --

8   A.   After fellowship, correct.

9   Q.   You went to Queens -- what was it called again?

10  A.   QLIMG.  It's on the CV.  It's called Queens Long Island

11  Medical Group, which subsequently got bought over by Advantage

12  Care Physicians.

13  Q.   I see.  Okay.

14  A.   It stands for the same place, but bought over, so new name.

15  Q.   And Advantage Care is owned by Emblem Health; is that

16  right?

17  A.   Yes.

18  Q.   In 2017, what were you making, what was your salary at

19  advantage?

20  A.   2017 -- June 2017, I joined NYU, so the last full year of

21  salary would be 2016 at Advantage Care Physicians, and that was

22  $328,000.

23  Q.   Three twenty-eight?

24  A.   Correct.

25  Q.   And with respect to Advantage Care, you would see patients

1    that were insured by Emblem Health; is that correct?

2    A.  All insurances.  About 60 percent were Emblem Health, the

3    other 40 percent were all other HMOs.

4    Q.  Did NYU take Emblem Health patients?

5    A.  Yes.

6    Q.  I want to jump to your contract with NYU.  If you'll look

7    at exhibit 35.

8             THE COURT:  You may publish it to the jury.

9             MR. LABUDA:  Thank you, your Honor.

10   Q.  This is your contract with NYU; correct?

11   A.  Yes.

12   Q.  And it's dated February 10th of 2017; correct?

13   A.  Yes.

14   Q.  I'm going to go through some of the clauses in this

15   contract.

16       If you'd look at page D886, at the bottom of it, you see

17   the paragraph that says, "You agree that this agreement"?

18   A.  Yes.

19   Q.  Did you understand this paragraph to mean that this was the

20   complete agreement between you and NYU; is that fair?

21   A.  That's fair.

22   Q.  And that it superseded any prior proposals, understandings,

23   or other agreements, oral or written, related to your

24   employment with NYU; correct?

25   A.  Yes.

N7ICede3                          Modi - Direct

1   Q.  So if something isn't in your contract, there was no

2   agreement between you and NYU; correct?

3   A.  Correct.

4   Q.  Is that your understanding?

5   A.  That's my understanding.

6   Q.  If you turn to page D888, the effective date for your

7   employment with NYU is May 1st, 2017; correct?

8   A.  Yes.

9   Q.  And your starting salary was $360,000; correct?

10  A.  Correct.

11  Q.  So that's a $32,000 bump you got from NYU from Advantage;

12  correct?

13  A.  Yes.

14  Q.  In addition, if you turn to page D889, you also received a

15  bonus of $26,500; correct?

16  A.  That bonus was because I was not able -- that bonus was

17  there because I was not able to contribute to 401K until you

18  are employed by NYU for at least a year.

19        MR. LABUDA:  I'm going to move to strike as

20  nonresponsive, your Honor.  That wasn't my question.

21        THE COURT:  Motion's granted.

22        Sir, your job is just to answer the questions that are

23  asked.  The lawyer for the other side may bring out information

24  that they believe to be relevant in their examination.

25        Go ahead, counsel.

1  Q.  This bonus specifically says that it's going to be

2  received -- that you're going to receive it if you remain

3  employed for one year; correct?

4  A.  Correct.

5  Q.  It was a retention bonus; correct?

6  A.  It was.

7  Q.  That's what it says; correct?

8  A.  It says that I would get a bonus at the one-year mark.

9  Q.  Right.  And it doesn't say anything about retirement, lost

10  retirements; correct?

11  A.  Not in there, no.

12  Q.  We read that earlier part saying supersede all prior

13  understandings -- withdrawn.

14      So there's nothing about retirement in here; correct?

15  A.  Not in the bonus section, no.

16  Q.  If you look at the next page, Dr. Modi, you were hired as a

17  staff physician; correct?

18  A.  Correct.

19  Q.  And that's what all of the doctors, to your knowledge, in

20  rheumatology were hired as, staff physicians; correct?

21  A.  Yes, to my knowledge.

22  Q.  And you were hired full-time; correct?

23  A.  Correct.

24  Q.  That's five days a week; right?

25  A.  Yes.

1    Q.  And you had a three-year term; correct?

2    A.  Correct.

3    Q.  And that meant for the three years, you were paid $360,000

4    per year during '17, '18, '19, and part of '20; correct?

5    A.  Yes.

6    Q.  If you turn to page D892, in the FGP expectations, it again

7    indicates your salary of $360,000 and there's an RVU target of

8    6108 WRVUs; correct?

9    A.  Correct.

10   Q.  Do you have any understanding of, in that first year, the

11   '17 to '18 year, whether or not you were below, met, or

12   exceeded that target, and whether or not you received any type

13   of incentive compensation that's referenced below that with the

14   1 percent?

15   A.  So my -- if you don't meet your target, you get a reduction

16   in pay.  I know I didn't get a reduction in pay, so I must have

17   met my RVUs.

18   Q.  That would be the logical conclusion; correct?

19       Do you recall the number of RVUs you hit in '17, '18, '19,

20   '20; right?

21   A.  Recent years, yes, but six years ago, the exact total

22   number, I don't recall, but I did.

23   Q.  You did get information from NYU; correct?

24   A.  Yes.

25   Q.  They provided that to you on a monthly basis; correct?

N7ICede3                         Modi - Direct

1    A.  Yes.

2    Q.  And that still happens today, right, they still send you

3    monthly reports?

4    A.  Yes.

5    Q.  And then at the end of the year, you also get an annual

6    report of how many RVUs you hit; correct?

7    A.  Correct.

8    Q.  Do you have any recollection about, in any of the years,

9    '17, '18, '19, '20 into '21 of whether or not you got any

10   bonuses, like incentive bonuses?

11   A.  You get a bonus if you exceed your target RVU.

12   Q.  Yes.  What I'm asking you is, do you remember receiving any

13   bonuses in any of those years?

14   A.  Which years specifically?

15   Q.  We can go year by year.  First year, '17 to '18?

16   A.  I don't believe so.  I met my target RVUs.

17   Q.  You were at least within 5 percent of the target; correct?

18   A.  Correct.

19   Q.  What about the second year, '18 to '19, do you have any

20   recollection?

21   A.  I met my target RVUs.

22   Q.  But no incentive pay?

23   A.  No.

24   Q.  What about the third year?  That would be, I think, '19 to

25   '20.

1   A.  '19 to '20, I do recall that I met my target exactly.  I

2   was on the verge of exceeding my target significantly, but

3   unfortunately, COVID happened, and we saw about a 20-percent

4   drop in our RVUs.  However, despite the COVID year, I was able

5   to meet my 6100.

6   Q.  And NYU gave all the doctors a pass for the COVID just

7   because of COVID; correct?

8   A.  I didn't need one because I had 61 RVUs, but --

9   Q.  And with respect to in addition to your $360,000 clinical

10  compensation, NYU also paid expenses attendant with your

11  practice; correct?

12  A.  Yes.

13  Q.  And that would be like if you attended seminars out of

14  town; correct?

15  A.  They would pay for CME, yeah, continuing medical education.

16  Q.  And you would be able to fly to a seminar, stay in a hotel,

17  attend the seminar, and that would all be paid by NYU; correct?

18  A.  Yeah, depending on the, yes, hotel.  Modest accommodations.

19  Q.  Not talking the Bellagio or anything like that?

20  A.  No.  No.

21  Q.  Do you have a recollection of in those years, the '17 to

22  '21, attending conferences and submitting expenses?

23  A.  2017, '18, and '19, not since then.

24  Q.  And approximately, what were those expenses that you put in

25  and how much did you receive in reimbursement from NYU?

N7ICede3                        Modi - Direct

1    A.  Modest hotel and then fees for the conference.

2    Q.  And in terms of dollar amounts?

3    A.  I can't give you a value, but probably anywhere from $1,000

4    to $1,200.

5    Q.  Per year?

6    A.  Per year.

7    Q.  And you worked primarily, if not exclusively, at the

8    Huntington office; is that right?

9    A.  Yes.

10   Q.  Dr. Edelman also worked at the Huntington office on

11   occasion while you were working there; correct?

12   A.  Yes.

13   Q.  And you had occasion to interact with her when you were at

14   the office; correct?

15   A.  Occasionally.

16   Q.  Talk about patient care, things of that nature; correct?

17   A.  She was pretty quiet.  Cordial, but very quiet.

18   Q.  Based on your interactions with Dr. Edelman, did you

19   understand that she was doing the same type of work that you

20   were doing in terms of treating patients for rheumatology

21   issues?

22   A.  She's a rheumatologist, yes, we treat similar conditions.

23   Q.  That's what rheumatologists do; right?

24       And did you have occasion to understand, either from

25   Huntington or from Lake Success, that Dr. Goldberg, Porges, and

N7ICede3                        Modi - Direct

1   Dr. Mehta also did the same type of work as you?

2              MR. STEER:  Objection, your Honor.

3              THE COURT:  Overruled.

4   A.  They were rheumatologists, as well.

5   Q.  So they did the same type of work; correct?

6   A.  I suppose.

7   Q.  You did not have any administrative responsibilities;

8   correct?

9   A.  Not at NYU.

10  Q.  And you didn't have any research responsibilities; correct?

11  A.  No.

12  Q.  I think in your contract on page D888, your effort was

13  100 percent for clinical; correct?

14  A.  Yes.

15  Q.  And you understood that to mean that 100 percent of your

16  effort was to be devoted to treating patients clinically for

17  rheumatology issues; correct?

18  A.  Yes.

19  Q.  After three years, your contract was renewed; correct?

20  A.  Yes.

21  Q.  You're still working at NYU; right?

22  A.  Yes.

23  Q.  And that was around May of 2020; is that right?

24  A.  Yes.

25  Q.  And did you receive a salary increase in May of 2020?

1    A.  Yes.

2    Q.  And what was that?

3    A.  I believe a $10,000 increase in the base salary.

4    Q.  So it went from 360 to 370; correct?

5    A.  Yes, correct.

6    Q.  Is that still the case now, is that just like the old one,

7    it was for three years, so it stayed the same or did it change?

8    A.  Stayed the same.

9    Q.  So that's what you're making now.  Long way of asking that

10   question.  Sorry.

11        Now, in your interactions with Dr. Edelman, I believe you

12   indicated that you called her courteous?

13   A.  Cordial.

14   Q.  Cordial.  That's nice.  You didn't have any issues with

15   Dr. Edelman in terms of personal interactions; correct?

16   A.  No.

17   Q.  Did you have any issues or concerns about her professional

18   care to patients?

19   A.  I mean, I wasn't there to see her taking care of patients.

20             MR. STEER:  Objection, your Honor.

21             THE COURT:  Overruled.

22   A.  So it's hard for me to comment on that, but she was very

23   cordial to me and my colleagues.

24   Q.  And that would include the staff, correct, the MAs and the

25   office workers, as well, correct?

1  A.  She was cordial to them, but that's all -- I mean, she was

2  there one day a week.

3  Q.  Right.  But the one day a week she was there, she was

4  cordial; right?

5  A.  Yes.

6  Q.  And you found Dr. Edelman to be intelligent; correct?

7  A.  Again, I didn't go into exam rooms with her to see how she

8  was treating patients, but probably practicing appropriate

9  medicine.  But, again, I can't comment on that.  I wasn't in

10  the room with her as she took care of patients.

11  Q.  I'm not asking you, I'm talking in terms of your general

12  interactions with her, you found her to be an intelligent

13  person; correct?

14  A.  I found her to be a very sound rheumatologist.

15  Q.  Sound.  Fair.

16      Would you agree that if Dr. Edelman was tasked with an

17  assignment, she could actually complete that assignment?

18          MR. STEER:  Objection, your Honor.

19          THE COURT:  Sustained on foundation grounds.

20  Q.  Did you ever complain to human resources about Dr. Edelman

21  in any way?

22  A.  No.

23  Q.  Did anyone at NYU ever reach out to you about Dr. Edelman's

24  performance?

25  A.  No.

1  Q.  There were occasions that you saw some of Dr. Edelman's

2  patients; is that correct?

3  A.  A handful of times.

4  Q.  And in your treatment of Dr. Edelman's patients, you would

5  look at their medical records and their charts; correct?

6  A.  Yes.

7  Q.  Did you ever report any type of issues or concerns

8  concerning those charts that you reviewed?

9  A.  No.

10  Q.  Did you believe that there was any type of improper

11  treatment in the charts that you reviewed of Dr. Edelman's?

12  A.  In the handful of charts I probably reviewed, no.

13          THE COURT:  Counsel, it's now 11:28.  Are you done

14  with your examination?

15          MR. LABUDA:  I'm done, yes.

16          THE COURT:  Members of the jury, we're going to take

17  our break now for about 10 minutes and then we'll have the

18  examination by defense counsel.  Don't talk about the case

19  amongst yourselves and no research.  Enjoy the break.

20          (Continued on next page)

21

22

23

24

25

1                   (Jury not present)

2                   THE COURT:  Dr. Modi, you may step down.

3                   Counsel, you may be seated.

4                   Anything that plaintiff has to raise with the Court?

5                   MR. LABUDA:  No, your Honor.

6                   THE COURT:  From defendant?  Mr. Schoenstein, you're

7        standing.

8                   MR. SCHOENSTEIN:  No, your Honor.

9                   THE COURT:  I'll see you back here in 10 minutes and

10       then we'll see where things stand at the end of the

11       examinations in terms of whether we do closings or we do them

12       first thing tomorrow morning, we'll just see what the time

13       looks like.

14                  (Recess)

15                  Let's have Dr. Modi come back on the stand.

16                  Let's bring in the jury.

17                  (Continued on next page)

18

19

20

21

22

23

24

25

1    (Jury present)

2    THE COURT:  Mr. Steer you may inquire.

3    CROSS-EXAMINATION

4    BY MR. STEER:

5    Q.  Good morning, Dr. Modi.

6    A.  Good morning.

7    Q.  You understand you're not a defendant in this lawsuit?

8    A.  Yes.

9    Q.  And where do you work?

10   A.  NYU Langone.

11   Q.  And where?

12   A.  Huntington in Long Island.

13   MR. STEER:  Your Honor, may we publish exhibit 46 in

14   evidence, please, his curriculum vitae.

15   THE COURT:  Yes.  Have you got a question?

16   MR. STEER:  May we publish it to the jury?

17   THE COURT:  Yes.

18   MR. STEER:  Oh, I'm sorry, your Honor.

19   Q.  Dr. Modi, your curriculum vitae that we looked at a few

20   minutes ago, does it fairly and accurately reflect your

21   background, your education, and your job experience?

22   A.  Yes.

23   Q.  Now, you show on the CV that you were the chief of

24   rheumatology for former QLIMG, Queens Long Island Medical

25   Group; correct?

N7ICede3                    Modi - Cross

1    A.  Correct.

2    Q.  What was Queens Long Island Medical Group?

3    A.  It was a multi-specialty group of about 500 physicians

4    located in Queens and Long Island.

5    Q.  And as the chief rheumatology, what were your duties?

6    A.  Be the liaison between the rheumatologists in the group and

7    administration leadership to kind of discipline them or improve

8    the quality of care standards, as well as a connection between

9    the physicians and leadership if there was a need for any

10   modern equipment, approve their CMEs, their vacation time, any

11   connection between leadership and the rheumatology division.

12   Q.  And how many rheumatologists did you oversee, if any?

13   A.  Six.

14   Q.  And you testified earlier that I believe QLIMG was bought

15   by Advantage Care Physicians; correct?

16   A.  Yes.

17           MR. KATAEV:  Objection.  Asked and answered.

18           THE COURT:  Overruled.

19   A.  Yes.

20           THE COURT:  Mr. Kataev, my rule is only one lawyer,

21   and you're not the lawyer for this witness.

22           MR. KATAEV:  I apologize, your Honor.  I got over --

23           THE COURT:  Mr. Labuda.

24           Okay.  Go ahead.

25   Q.  What was Advantage Care Physicians?

1   A.   Advantage Care Physicians basically took over Queens Long

2   Island Medical Group where I served as medical director of one

3   of their offices.

4   Q.   And how many physicians did ACP, I'm going to call it,

5   Advantage Care Physicians, ACP, how big was it at the time that

6   you became the clinical director?

7   A.   The entire practice was approximately same as Queens Long

8   Island Medical Group, 500 physicians.

9   Q.   How many physicians, if any, did you oversee?

10   A.   The practice had over 20 offices.  I was the medical

11   director of the Hempstead medical office, which comprised about

12   15 physicians, two PAs, two nurse practitioners, seven or eight

13   RNs, and then the rest of it was front desk, receptionists,

14   medical assistants.

15   Q.   What insurances did Advantage Care Physicians take, if any?

16   A.   They take all insurances.  50 to 60 percent of the

17   patients, because the group is owned by Emblem, 50 to 60

18   percent of patients I saw were Emblem, the other 40 percent or

19   more were other insurance.

20   Q.   Are you familiar with a medical group called HIP?

21   A.   Yes.

22   Q.   What is HIP, to the best of your knowledge?

23   A.   HIP is an HMO.

24   Q.   Were they affiliated in any way with emblem?

25   A.   Yes.

1  Q.  And the patients you were seeing, were they required to be

2  seen in HIP centers or could they go anywhere?

3  A.  They could see any physician outside the group that

4  accepted emblem or HIP insurance.

5  Q.  Now, did there come a time when you sought to leave the

6  employment of Advantage Care?

7  A.  Yes.

8  Q.  How did that come about?

9  A.  There were rumors about financial instability of the

10 organization, and two of my colleagues who I used to work with

11 at Advantage Care Physicians had joined NYU and were very happy

12 there.

13 Q.  Was there any other reason that prompted you to seek

14 employment away from Advantage Care?

15 A.  NYU is definitely, you know, I would say more prestigious

16 to work as a rheumatologist, and it's a hospital for joint

17 disease, so prestige.

18 Q.  So in addition to the prestige of that, was there anything

19 about your work at Advantage Care that was of concern to you?

20 A.  Overall, I was happy there.  I just had some concerns about

21 their financial stability.  Perhaps one other thing, they had

22 me go to several -- a few office sites to see patients.  I

23 would much prefer to be at one site as opposed to, you know,

24 two, three sites.

25 Q.  And so, did there come a time that you met with someone at

1    NYU about the possibility of being employed there?

2    A.  Because of my two colleagues that were very happy with NYU,

3    I reached out to an NYU talent recruiter.

4    Q.  After you dealt with the recruiter, did there come a time

5    when you met someone in NYU's faculty group practice?

6    A.  Yes.

7    Q.  And who is that?

8    A.  Who did I interview with?

9    Q.  Yes.

10   A.  Andrew Rubin and Josh.

11   Q.  Josh Swirnow?

12   A.  Yes.

13   Q.  And how did you pitch yourself to them when you were

14   looking to join NYU, what did you tell them about yourself?

15   A.  I told them that I was out in practice for 11 years, so I

16   would come with a lot of experience, I was a very busy

17   rheumatologist, and, you know, I was pretty confident with my

18   patients, really value me as their rheumatologist, as their

19   physician.  I was pretty confident that a lot of those patients

20   would eventually come over to NYU, as well.  So it's much more

21   attractive to them than hiring, let's say, a new fellow out of

22   training since I'd be coming with some patient panel already.

23   And then I also pitched that I was a medical director, had some

24   administrative experience, had some experience as a chief of

25   rheumatology with the former group, as well.

N7ICede3                          Modi - Cross

1    Q.  With regard to those discussions, did you negotiate with

2    them about salary?

3    A.  I did.

4    Q.  And what happened in those negotiations?

5    A.  I told them that at Advantage Care, I was overall happy,

6    but I'm not willing to make a lateral career move, you know, I

7    was very happy with my patients, my patients were very happy

8    with me, and I did not want to make a lateral move in my

9    career, meaning, you know, to get the same salary or certainly

10   definitely would not join for a pay cut.  So I had requested at

11   least a 10-percent raise in my salary for me to move on and

12   join NYU.

13   Q.  And tell us again, please, or perhaps I didn't ask, what

14   was your salary at Advantage at the time of these negotiations

15   with NYU?

16   A.  $328,000.

17   Q.  What did you end up being offered as a salary by NYU?

18   A.  $360,000.

19   Q.  And how does that compare with your request for a

20   10-percent raise?

21   A.  They pretty much met it head on.

22   Q.  Was there RVUs that you had your production measured by

23   when were you at Advantage Care?

24   A.  Yes.

25   Q.  And how many RVUs did you do per year at Advantage Care,

1    let's say in your last year there?

2    A.  6100.

3    Q.  Do you have any knowledge, based on your experience as a

4    senior rheumatologist and as a medical director and as a chief

5    of rheumatology, how that 6001 RVUs compares to what

6    rheumatologists generally do throughout the United States?

7              THE COURT:  I take it you mean 6100?

8              MR. STEER:  I'm sorry.  6100.

9              MR. LABUDA:  Objection.  Foundation.

10             THE COURT:  The objection is sustained.

11   Q.  Did you attend conferences when you were at Advantage Care?

12   A.  Yes.

13   Q.  Did you also review information in the medical profession

14   regarding RVUs and RVU targets?

15   A.  Yes.

16   Q.  And what was your understanding of what they showed in

17   terms of the level of RVUs that you were generating compared to

18   the general population of rheumatologists?

19             MR. LABUDA:  Objection.  Hearsay.

20             THE COURT:  Overruled.

21             MR. STEER:  You may answer.

22   A.  Being a previous chief of rheumatology and having some

23   background, 6100 RVUs, when I was at ACP, was equal to top

24   tenth percentile as far as productivity for all rheumatologists

25   in the country.  So it's a pretty high bar.

1   Q.  And what target, if any, were you given at NYU for your

2   production in RVUs?

3   A.  6100.

4   Q.  That's the exact same number that you were doing at

5   Advantage?

6   A.  Yes.

7   Q.  When you came to NYU, did you have any debt?

8   A.  No.

9   Q.  No loans?

10  A.  No.

11  Q.  Did you have an office lease?

12  A.  No.

13  Q.  Did you have any staff that came with you?

14  A.  There was a medical assistant that interviewed with NYU,

15  but there was not negotiated that she has to come with me, it

16  was a choice she made after I joined.

17  Q.  Was there a medical assistant there already for your use or

18  if she did not come, what would have happened?

19  A.  She was not part of the negotiations at all.  It was

20  basically after I joined and signed the contract with NYU, they

21  basically asked me, we could either hire someone brand new that

22  you don't know and we don't know or if you have someone in

23  mind, you could ask them if they'd be interested because if

24  you're working with them and you know they're good, then we

25  would much rather hire someone that you know.

1    Q.  Now, once you joined NYU, did you always meet your RVU

2    targets?

3        Withdrawn.  I think you testified that earlier and I'm not

4    going to bore the jury with that whole round of questions

5    again.

6        Did any patients follow you from Advantage Care to NYU?

7    A.  Yes.

8    Q.  Can you estimate what percentage of your patients followed

9    you to NYU?

10   A.  About 35 to 40 percent.

11   Q.  Now, also, did you get any referrals from other physicians

12   when you joined NYU?

13   A.  Yes.

14   Q.  Would that happen from time to time?

15   A.  Yeah, quite frequently.  I had good relations with the

16   doctors at Advantage Care, so they would continue referring me

17   patients, but obviously the internists that I met through NYU

18   were referring me a lot of patients, as well, and community

19   internists, as well.

20   Q.  Is it your understanding that having the title "medical

21   director" of a large medical group or "chief of rheumatology"

22   at a large medical group was prestigious?

23               MR. LABUDA:  Objection.

24               THE COURT:  Sustained.

25   Q.  When you were working at Huntington, I believe you

N7ICede3                         Modi - Cross

1    testified earlier that Dr. Edelman worked there with you one

2    day a week?

3    A.  Yes, one day a week for one or two years.

4    Q.  Did you see her each day of the day she was there?

5    A.  I mean, not necessarily because she was in a different

6    hallway and I was in a different hallway.  So eventually,

7    sometimes we'd cross paths or sometimes --

8    Q.  Did you develop any sense, when you were working along with

9    Dr. Edelman in that office, what her hours were while working

10   at the Huntington Medical Group?

11   A.  I recall her working from, I believe, 9:00 to 3:00 and then

12   doing administrative or having two hours in the latter part of

13   the day if there were urgent patients or to complete paperwork,

14   so she'd be there probably 9:00 to 5:00, but I think 9:00 to

15   3:00 were the patient hours.

16   Q.  Have you, with regard to NYU, have you done anything that

17   has helped them in terms of growing their practice?

18   A.  Yes, very much so.

19   Q.  And could you explain to the jury why you say that.

20   A.  Even though my target of 6100 is my target per year, the

21   last two or three years, I've been doing almost 7000 RVUs per

22   year.

23          MR. LABUDA:  Objection.  Move to strike.  I didn't

24   know where the question was going, your Honor.  I thought it

25   was during the period of time in question.

1    THE COURT:  I'll strike the testimony.

2  Q.  Dr. Modi, what hours do you see patients?

3  A.  Monday through Friday, 9:00 to 5:00.

4  Q.  And how many days a week do you work?

5  A.  Five.

6  Q.  And with regard to the growth of the practice that you

7  testified to before -- withdrawn.

8    Did you have a renewal contract at NYU?

9  A.  Yes.

10  Q.  And I believe we looked at that before.

11    When that contract was renewed, did you receive a new RVU

12  target?

13  A.  Yes.

14  Q.  And what is that RVU target?

15  A.  It went from 59 to 61.

16  Q.  And have you been exceeding that RVU target?

17  A.  My RVU target for the year -- no, actually, the RVU target

18  remained the same, 6100.  I'm sorry.

19  Q.  How have your RVUs been in connection with that target?

20  A.  They've been exceeding.

21    MR. LABUDA:  Objection.

22    THE COURT:  Sustained.

23  Q.  What RVUs have you produced since the renewal of your

24  contract, if any?

25    MR. LABUDA:  Objection.

N7ICede3                    Modi - Redirect

1              THE COURT:  Sustained.

2              What's the relevance of after 2020?

3              MR. STEER:  It had been introduced in evidence, your

4    Honor.  I didn't realize --

5              THE COURT:  Are you asking him --

6              MR. STEER:  Withdrawn.

7              No further questions.

8              MR. LABUDA:  Just a few, your Honor.

9    REDIRECT EXAMINATION

10   BY MR. LABUDA:

11   Q.  If I understand correctly, Dr. Modi, in terms of you

12   getting hired by NYU, you reached out to them, they didn't

13   reach out to you about employment opportunities; correct?

14   A.  Correct.

15   Q.  And did you have some concern about the financial

16   instability of Advantage; is that right?  That was one of the

17   reasons why you reached out to them?

18   A.  There were rumors about it, yes, but it still stands today,

19   so they did well, I guess.

20   Q.  With respect to patient following, you had given a

21   percentage of the number of patients that came over from the

22   Emblem Health HIP organization of about 35 to 40 percent.  What

23   does that translate into in terms of patients when you first

24   started working in NYU in that first year, say '17 to '18, how

25   many patients would that be?

1   A.  I'd see about 20 to 25 patients a day, so out of 25

2   patients a day, about seven to eight of them at least would be

3   from Advantage Care.

4   Q.  I can't do the math in my head.  So just in terms of the

5   number of patients that followed you in that first year, can

6   you give your best estimate of what that is?

7   A.  35 to 40 percent of my patients followed me.

8   Q.  I get that, but I'm just saying what's that number?  I

9   don't know what 35 percent of what.  Is that of a thousand

10  patients?

11  A.  I believe a panel of about 2,000 patients, so that would be

12  about 400 patients, and that's a conservative number.

13  Q.  So about 400 patients followed you from Emblem over to NYU;

14  correct?

15  A.  Approximately.

16  Q.  And when you were negotiating your salary with NYU, you

17  indicated that you had this strong 400-patient following;

18  correct?

19  A.  Yes.

20  Q.  And they indicated that that was something that was of

21  interest to them, that it was a --

22          MR. STEER:  Objection.

23  Q.  It was a financial benefit to them to have a patient

24  following; correct?

25  A.  We didn't negotiate that.

N7ICede3                          Modi - Redirect

1    Q.  But that was something you mentioned?

2    A.  I mentioned that I think my patients are very satisfied

3    with my care, and although I cannot solicit them, which would

4    be illegal, I'm pretty confident that they would find me, and

5    the referring doctors that I'm still friends with that still

6    refer to me patients from Advantage Care would continue to

7    refer their patients to me.

8    Q.  And generally, in rheumatology, you have a long-term

9    relationship with patients as long as they're satisfied;

10   correct?

11   A.  Yes.

12   Q.  And that goes not only with you, but any doctor; correct?

13   A.  In rheumatology, we treat a lot of autoimmune diseases that

14   are lifelong, so they usually need rheumatologic care for the

15   rest of their life.

16   Q.  With respect to the positions you held at I think it was

17   Advantage or I think it was in Hempstead, those were

18   administrative roles that you mentioned; correct?

19   A.  Yes.

20   Q.  You didn't have any type of administrative role over at

21   NYU; correct?

22   A.  No.

23   Q.  You understand, to a certain degree, how the RVU credits

24   work, what you get credit for; correct?

25             MR. STEER:  Objection, your Honor.

1           THE COURT:  Overruled.

2    A.  Yes.

3    Q.  Do you have any understanding of whether or not you receive

4    any credit for supervising infusions?

5    A.  I did not get any credit for that.

6    Q.  And was there any difference in terms of how credits were

7    applied from advantage versus NYU?  In other words, was it the

8    exact same system, was it a little bit different or something

9    else?

10   A.  Systems were different.

11   Q.  How were they different?

12   A.  Are you asking how I got the RVU dollar value at NYU?

13   Q.  I'd say start with advantage first.

14   A.  Advantage Care, it was based on productivity and then also

15   patient satisfaction score.  So 20 percent of your compensation

16   was based on your patient satisfaction or what they call Press

17   Ganey scores where patients would be randomly surveyed, and if

18   they were very pleased with your care, you would get different

19   tier compensation.

20   Q.  And in contrast, NYU, there was no patient satisfaction

21   component; correct?

22   A.  The NYU RVU dollar value was solely based on the income,

23   that I wanted a 10-percent raise, which was 360 -- which ended

24   up being $360,000 divided by the annual number of RVUs I was

25   supposed to do.

N7ICede3                          Modi - Redirect

```
1    Q.  Is that what they told you, is that what Mr. Rubin told
2    you?
3    A.  No.
4    Q.  Is that something that you divined or something else?
5    A.  The $360,000 divided by 6100 would come out to 59, and
6    that's where that number came from.
7    Q.  Comes from --
8    A.  $360,000 was the annual compensation, and in order for me
9    to make $360,000 per year, I would have to do 6100 RVUs to make
10   that salary.  So when you divide those numbers, it comes out to
11   an RVU dollar value of $59.
12   Q.  $59?
13   A.  Per RVU.
14   Q.  Was that value discussed, the $59, that that's what you
15   would receive, that that was how your compensation was derived
16   when you were discussing this with Mr. Rubin and Swirnow?
17   A.  I don't know how to answer that any better.
18   Q.  I'm just saying, was that component in terms of -- was
19   there some discussion about the dollar value per RVU of $59 or
20   that there being a dollar value attendant with your salary?
21   A.  No, what I recall was just the salary, which is what I was
22   mainly concerned about.
23   Q.  Just so I understand, in terms of how RVUs were calculated
24   or credited, was it the same at Advantage as it was at NYU or
25   was there a different system in terms of crediting the RVUs?
```

N7ICede3                         Modi – Recross

1          MR. STEER:  Objection, your Honor.

2          THE COURT:  Basis.

3          MR. STEER:  Form.  Credited.

4          MR. LABUDA:  Earned.

5          THE COURT:  The objection is sustained as to form.

6   Q.  Was there a different method at Advantage as to how you

7   earned your RVUs as compared to NYU?

8   A.  Yes, it was based on a tier system of productivity.  Those

9   that produced in the top, you know, 10th percentile in the

10  country for their specialty received a higher RVU dollar value,

11  so I was in that top 10 percent.

12  Q.  Did that also follow at NYU, as well, where you got a

13  higher dollar value than others?

14  A.  No, the RVU value, again, at NYU was based on my salary

15  divided by my target RVUs that I had to make.

16  Q.  And that came out to $59 per RVU; correct?

17  A.  Correct.

18          MR. LABUDA:  I don't have any other questions.  Thank

19  you.

20          THE COURT:  Mr. Steer, any questions?

21          MR. STEER:  Just a couple of quick ones, your Honor.

22  RECROSS EXAMINATION

23  BY MR. STEER:

24  Q.  Dr. Modi, you talked about having a higher RVU dollar

25  value.  At NYU, was the compensation system based on a dollar

1   per RVU, is that something you were told?

2           MR. LABUDA:  Objection.  Leading.

3           THE COURT:  Overruled.

4   A.  We didn't really discuss the dollar RVU.  The only time

5   they had implications is if I exceeded my RVUs, that will

6   determine how much additional bonus I would make.

7   Q.  Are you aware whether RVUs are tied to what we've heard

8   testimony of here called CPT codes?

9   A.  Yes.

10   Q.  Do RVUs have a point system that correlate with CPT codes?

11   A.  Yes.

12   Q.  And in light of that, does CMS, centers for Medicaid

13   services, Medicare services, do they promulgate a dollar value

14   per RVU?

15   A.  They gave an assigned number to every -- everything a

16   physician does, whether it be see a patient, do a procedure,

17   there is an assigned RVU value to that.

18   Q.  And so the RVU values tied to procedures, does CMS have a

19   calculation where you divide salaries by RVUs, for example?

20   A.  No

21         (Continued on next page)

22

23

24

25

N7iWede4

1          MR. STEER:  No further questions, your Honor.

2          THE COURT:  Mr. Labuda, anything further?

3          MR. LABUDA:  No, your Honor.

4          THE COURT:  OK.  Dr. Modi, you're excused as a

5     witness.  You may step down.

6          (Witness excused)

7          THE COURT:  Plaintiff, call your next witness.

8          MR. LABUDA:  We are going to re-call Dr. Edelman on

9     brief rebuttal.

10          THE COURT:  Rebuttal?  There hasn't been --

11          MR. LABUDA:  Well, it's --

12          THE COURT:  Do you object to that?

13          MR. SCHOENSTEIN:  Your Honor, we object.

14          THE COURT:  All right.  Let me see you at sidebar.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    (At sidebar)

2    MR. LABUDA:  Your Honor, my understanding is that we

3    were going to call all witnesses just once and that what we

4    were doing was calling our witness -- we were calling a number

5    of the NYU witnesses as adverse witnesses and that they were

6    going to do their direct, and there was direct testimony that

7    was put in concerning certain issues.  So I consider that to be

8    their case in chief, and that's why I wanted an opportunity to

9    do a rebuttal, because we didn't know what they were going to

10   say during their direct testimony.

11   THE COURT:  What do you intend to cover in rebuttal?

12   MR. LABUDA:  There was one medical chart that

13   Dr. Porges showed that we wanted to have Dr. Edelman discuss in

14   terms of why she treated the patient that way.  That was not

15   raised by us.

16   THE COURT:  Anything beyond that?

17   MR. LABUDA:  That's it.

18   MR. SCHOENSTEIN:  So, your Honor, first of all, they

19   were supposed to list any witnesses the day before.  That was

20   your procedure.  We didn't get notice of this, so this is a

21   surprise at the last minute.

22   They picked the order of witnesses.  They could have

23   presented their case any way they wanted to.  They could have

24   put her on last.  They chose to put her on first.  And having

25   her go first and last wasn't one of their choices,

N7iWede4

1    respectfully.

2         MR. LABUDA:  Your Honor, if I may be heard?

3         This is testimony that Dr. Porges put on today.  We

4    had no opportunity to understand what he was going to say

5    today.

6         THE COURT:  How long do you expect to be?

7         MR. LABUDA:  Probably about five minutes.

8         THE COURT:  I'm going to permit it.  On the basis that

9    the defendants were permitted to exceed the scope of

10   cross-examination and put on their direct testimony through

11   cross-examination, this arguably constitutes rebuttal

12   testimony.  But it's limited to that one subject because

13   anything beyond that one subject would not be rebuttal

14   testimony.  So you can do that.

15        MR. LABUDA:  Understood.  Thank you, your Honor.

16        (Continued on next page)

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  You may re-call Dr. Edelman.

3              Actually, you're resting your case other than Dr.

4    Edelman, correct?

5              MR. LABUDA:  Correct.

6              THE COURT:  Do defendants have any witnesses?

7              MR. SCHOENSTEIN:  No, your Honor.  Defendants rest on

8    the basis of the evidence they've already put on.

9              THE COURT:  All right.  Dr. Edelman may testify just

10   as limited at sidebar to that one specific subject, and that's

11   it.

12             MR. LABUDA:  Yes, your Honor.

13             I'd like to publish exhibit III that was introduced

14   through Dr. Porges.

15             THE COURT:  You may do so.

16    SARI EDELMAN, re-called.

17   DIRECT EXAMINATION

18   BY MR. LABUDA:

19   Q.  If you can turn, Dr. Edelman, to page 1205, what is this

20   document there?  This is a document that Dr. Porges had

21   referenced in his testimony.  Just briefly, what is this?

22   A.  This is a documentation of labs that were ordered at a

23   patient visit.  So it's listed at the bottom of the note.

24   Q.  OK.  And when you say labs, you mean like -- is that the

25   same as a blood test?

A.  Yes.  So, these are blood tests.  This is a patient who was
being seen for a diagnosis of systemic lupus as well as
antiphospholipid antibody syndrome, which are two autoimmune
diseases which are monitored chronically.  So this particular
set of labs --

          THE COURT:  You're exceeding the question.

BY MR. LABUDA:

Q.  Did you order these lab tests for this particular patient?

A.  I did.

Q.  And why did you do that?

A.  I did that based on the diagnosis.  It's standard of care
in rheumatology to monitor disease activity and disease state
as well as to monitor for toxicities to medications.

     This particular patient was on a particular medicine for
her lupus that needed to be monitored, and that includes a
panel, which is broken down here.  This is the individual
tests.  This is not a bunch of different panels.  So the full
panel monitors the patient's white count, blood cell counts as
well as platelet counts, which are common tests to assess when
someone's on chronic therapy to make sure they're not having
side effects.

     There's also liver function testing and kidney function
testing and the comprehensive metabolic panel.  The
inflammatory markers are the sedimentation rate and CRP.  In
order to measure disease state in lupus, you need those scores

1  to determine how active the disease is and to predict if

2  someone's going to have a flare.

3      The urine testing is usually done quarterly in lupus.

4  That's also standard of care.  Typically, in lupus patients,

5  there are no symptoms early on if lupus attacks the kidney.  So

6  monitoring three to four times a year is standard so that we

7  can detect disease early and intervene so someone doesn't

8  present late stage and end up needing a kidney transplant or

9  more aggressive therapies.

10      The other testing is for these autoimmune clotting

11  antibodies, which is associated with a patient's other disease

12  state in rheumatology, which is called antiphospholipid

13  syndrome.  This is a condition where patient is prone to

14  clotting events.  These are not diagnostic tests.  These

15  cardiolipin antibodies and these beta 2 glycoprotein

16  antibodies, these are actually pathogenic antibodies.  When

17  they go up, they could indicate that they could be more

18  aggressive and cause a problem with that patient.  So

19  monitoring that quarterly as well helps to intervene.  If we

20  see that those are increased, then we know the disease is

21  becoming active before someone has a life-threatening event,

22  like a blood clot in the leg, the lung or a stroke.

23          THE COURT:  OK.  I think we're done.

24          MR. LABUDA:  OK.  Thank you.

25          THE COURT:  Cross-examination.

N7iWede4                          Edelman – Cross

1         MR. LABUDA:  I did have one --

2         THE COURT:  No.  I think that was the question you

3    said you were going to ask, so I permitted you to ask it.

4         MR. LABUDA:  Yes, your Honor.

5         THE COURT:  Cross-examination.

6    CROSS-EXAMINATION

7    BY MR. SCHOENSTEIN:

8    Q.  Dr. Edelman, is it your testimony that that patient had

9    active lupus?

10   A.  That patient did not have active lupus.

11        MR. SCHOENSTEIN:  Thank you, your Honor.

12        THE COURT:  OK.  Dr. Edelman, you're excused.

13        (Witness excused)

14        THE COURT:  Anything further from plaintiff?

15        MR. LABUDA:  No, your Honor.

16        THE COURT:  Let me see the parties at sidebar.

17        (Continued on next page)

18

19

20

21

22

23

24

25

N7iWede4

1

2              (At sidebar)

3              THE COURT:  OK.  I intend to tell the jury that that

4    concludes the presentation of evidence in the case; that I'm

5    going to let them go home for the afternoon and for the

6    evening, to return at 9 o'clock tomorrow morning for closing

7    statements and for my charge.  And then we'll proceed to the

8    charge conference and to the defendants' motion.  Defendants'

9    motion first and then the charge conference.

10             Any objection to that?

11             MR. LABUDA:  No, your Honor.

12             MR. SCHOENSTEIN:  No, your Honor.

13             THE COURT:  The plan for tomorrow, just so you'll

14   know, is you're going to do defense closing, then plaintiff

15   closing.  All of that's going to be done by 11 o'clock.  We're

16   going to take a break.  I'm going to give them a break at that

17   point, 11 o'clock, 11:15.  And then we'll come back for my

18   charge and then to deliver it.  All right.

19             MR. STEER:  Thank you.

20             (Continued on next page)

21

22

23

24

25

N7iWede4

1                     (In open court)

2                     THE COURT:  Members of the jury, that concludes the

3        presentation of the evidence in this case.  It's now about

4        12:25, so I'm going to let you go home for the afternoon and

5        for the evening.

6                     Tomorrow we will begin with the closing statements

7        that you'll have from the lawyers and then with my instructions

8        to you as to the law, and then you will retire to deliberate.

9                     As a reminder, we'll have breakfast for you at 8:30.

10       Please be here at 8:45.  And then tomorrow we will have lunch

11       for you while you deliberate.

12                    You've not heard the instructions from me, you have

13       not heard the summations, so please keep an open mind until you

14       hear the summations and until you hear my instructions.  Don't

15       talk to each other about the case.  Don't talk to anybody else

16       about the case.  Please don't do any research about the case.

17                    Again, enjoy your afternoon.  Enjoy your evening.  See

18       you here tomorrow morning.

19                    Thank you.

20                    (Continued on next page)

21

22

23

24

25

N7iWede4

1          (Jury not present)

2          THE COURT:  All right.  Be seated.

3          I take it defendants have a motion.

4          MR. SCHOENSTEIN:  Yes, your Honor.

5          THE COURT:  Mr. Schoenstein.

6          MR. SCHOENSTEIN:  Your Honor, defendants move for a

7   directed verdict on pretty much the entirety of the case for

8   the record.  I'm going to go issue by issue for the record so

9   we have it down.

10          The Court is familiar with the standards for a

11  directed verdict motion, as set forth in *Casmento v. Volmar*

12  *Construction*, 2022 WL 15773966.  In this case, under Rule 50,

13  directed verdict is appropriate because the evidence in favor

14  of movant is so overwhelming that reasonable and fair-minded

15  persons could not arrive at a verdict against it.

16          Let me start with the parties.

17          Of the corporate parties, the only correct party here

18  is NYU Grossman School of Medicine.  That is the employer of

19  plaintiff as it is currently known.  None of those other

20  entities employ her.  There is no evidence of any involvement

21  of any of them, other than she read their names in some of the

22  documents.  And that's not evidence of what any of them did.

23  They're not needed for the case.  NYU Grossman School of

24  Medicine is a division of NYU itself, so we don't need any of

25  these other corporations.  They confuse and confound the jury.

1    They should all be eliminated.

2            THE COURT:  And I take it that if a verdict was

3    returned against NYU Grossman School of Medicine -- is that a

4    legal entity that could satisfy a judgment?

5            MR. SCHOENSTEIN:  That is a division of NYU itself,

6    which is a legal entity, and there is zero question about

7    judgment satisfaction in this case, your Honor.  Zero.  I mean

8    hopefully there won't be one, but if there was.

9            THE COURT:  OK.

10           MR. SCHOENSTEIN:  Now, the Equal Pay Act claim, your

11   Honor, has not been substantiated.

12           First of all, she was not doing a substantial -- a job

13   with substantially equal skill, effort and responsibility of

14   the comparators.  She was below all three of them in

15   productivity.  Two of them, Goldberg and Porges, had different

16   jobs and responsibilities.  Modi was much more productive.  She

17   was not doing substantially equal work, which is the second

18   factor, because her RVUs were substantially less than the

19   others.  But really where this case turns on the Equal Pay Act

20   is the affirmative defense of a factor other than sex.

21           Respectfully, your Honor, there is no evidence that

22   sex played any role in this, so the only factors that went into

23   a determination of the pay were factors other than sex, and no

24   reasonable juror could disagree about that.  The evidence is

25   uniform that salary setters considered financial circumstances;

N7iWede4

experience; reputation; business plans, where they had them;

compensation needs, where they were advanced by the applicants;

etc.  Those are factors other than sex, and no other jury -- no

reasonable jury could decide otherwise.

Separately, your Honor, the willfulness part of the

Equal Pay Act must be dismissed.  I cite *McLaughlin v. Richland*

*Shoe*, 486 U.S. 128.  Willfulness depends on a finding that the

employer either knew or showed reckless disregard for the

matter of whether its conduct was prohibited by the statute.

There is zero evidence of disregard by any of the defendants.

In fact, the evidence is that they cleared salaries with legal.

They cleared salaries with HR.  They did outside surveys of

salary, both to benchmark and to check gender disparity.  There

is no evidence that anybody intentionally ignored or willfully

ignored law.  And the willfulness part should be dropped even

if you leave in the Equal Pay Act claims.

Now, your Honor asked yesterday why should you do this

now instead of after the jury decides, and the answer is

simple:  Prejudice.  It is prejudicial to have claims go to the

jury that are not supported by the evidence.  They may consider

them in rendering verdicts on the other parts of the case.  It

makes them more likely to find discrimination if they're

thinking about equal pay than if the equal pay part is taken

out.  So it needs to be addressed now.

It will also shorten our closing arguments

N7iWede4

considerably.  But that's not really a factor.  The fact is the

prejudice.  It increases the chance, your Honor, of a

compromised verdict if we leave in the case claims that don't

belong there.  If we leave stuff like willfulness that doesn't

belong there, it increases the possibility that the jury will

compromise on something in the middle, when the far end of the

spectrum has no support whatsoever and should not go to the

jury.

           I want to turn to retaliation.

           THE COURT:  I suppose that argument turns upon me

finding that there is some part of the plaintiff's case that

would survive a renewed motion.

           MR. SCHOENSTEIN:  Oh, yes.

           THE COURT:  If there's not, then even a compromise

verdict wouldn't stand.

           MR. SCHOENSTEIN:  Well, that's true, your Honor.

That's true.

           Retaliation, your Honor.

           There was no protected activity, and I say that

because the complaints here were about office space, not about

discrimination.  I'm going to cite a case called *Robinson v.*

*DeNiro*, recently decided, on May 25, 2023 --

           THE COURT:  I'm aware of it.

           MR. SCHOENSTEIN:  -- by a very good judge.

           You will see at pages 90 to 91 of your decision, your

Honor, you addressed that buzz words like "harassment" and

"toxic work environment" do not establish protected activity.

Now, remember, plaintiff's communications never said

anything about anyone calling her a bitch.  Her communications

were that she felt slightly intimidated because a tall guy came

into her office and waved his arms.  Those were not complaints

about discrimination, fairly read.  They were not understood by

NYU to be complaints about discrimination.  There is no

testimony that NYU regarded those as actual discrimination, so

it was not protected activity on the part, which is a predicate

for the retaliation claim.

Secondly, it did not cause an adverse employment

action.  All iterations of retaliation claims, be they Title

VII, state law or city law, require proof of causation.  There

is no such proof in this case.  Temporally, it's not close.

The allegations, the complaints end in November of 2020, 14

months -- well, at least 12 months -- before the alleged

adverse employment actions.  And the testimony uniformly --

every single witness -- was that the prior complaints about

office space had nothing to do with the decision to nonrenew

the contract, your Honor.

The decision was made, agree with it or not, based on

the assessment of her clinical practice.  So retaliation should

be dismissed against everybody, but let me also break it down

by defendant, because there are individual defendants here, and

1  they do not belong in the case.

2          I should add, by the way, that all of the arguments on

3  Equal Pay Act are even stronger as against the individual

4  defendants, Mr. Rubin and Mr. Swirnow, that they should be

5  taken out of the Equal Pay Act claims and the willfulness

6  claims whether or not you take out the others.

7          But on retaliation, Antonik didn't do anything to

8  retaliate.  He was asked to put forward some emails, and he

9  did.  He actually took notes from another employee, Ms. Ruiz,

10 the most credible witness I've ever seen, and gave them to

11 somebody else, as requested.  That's not retaliation.

12         Mr. Kaplan, he didn't do anything.  He said stop, put

13 it in writing and send it to the people who make these

14 decisions.  If that is retaliation, we are going down a really

15 bad path.

16         Mr. Swirnow didn't do anything.  He was involved in

17 discussions, but he didn't take an action or make a decision or

18 do anything that would be retaliation.

19         And Mr. Rubin, although he was the ultimate

20 decision-maker, he was the most removed from the complaints

21 that were supposedly being retaliated against.  And his

22 testimony is unimpeachable that he didn't take any of the prior

23 complaints into consideration.  He was considering only the

24 clinical factors, and you can't have a retaliation claim

25 against Mr. Rubin.

N7iWede4

1        THE COURT:  Could you on a cat's-paw-type theory?  I

2   mean assume that there is evidence that Dr. Porges was aware of

3   the complaint and assume that there's evidence that Dr. Porges

4   was motivated by some animus to the plaintiff and that

5   Mr. Rubin was manipulated.  Would that support a claim against

6   him or just against NYU?

7        MR. SCHOENSTEIN:  I think just against NYU.  If

8   Mr. Rubin is manipulated by others that he is considering in

9   good faith, I don't think there's any claim against Mr. Rubin.

10  I think he would have to be out.  And the evidence is just

11  overwhelming that he was basing his decision, in good faith, on

12  what he was told by the people he relies upon at NYU.

13       Mr. Steer's handing me a note about cat's-paw.  Of

14  course, there is no evidence of animus by Dr. Porges, but I

15  know your Honor was giving me a hypothetical.

16       So let me turn to what's left in the case, which is

17  the discrimination claim itself, which on summary judgment has

18  been limited to the issue of sexist remarks.  That is the issue

19  that brings us a case on discrimination.  And your Honor here,

20  too, there is no evidence sufficient to have a discrimination

21  claim.

22       Let me start with "smile," "fake it till you make it"

23  and "calm down."  Those are not gender-specific comments, and I

24  cite *Cadet-Legros v. N.Y. Univ. Hosp. Ctr.*, 135 A.D.3d 196,

25  from the First Department.  Generic terms like "tirade" and "a

N7iWede4

leopard does not change its spots" were not racially coded

language in the context of that case, and "smile" is not

racially coded in this case.  I cite for your Honor also

*Marseille v. Mount Sinai Hosp.*, 2022 WL 1470098.  In that it

was the term "aggressive."  It was a race-neutral term it would

not support.  Telling somebody to smile is not discrimination.

As I'm going to say to the jury tomorrow, if I have

to, we should all smile more.

Now, that leaves the alleged "bitch" comment.

THE COURT:  Just refresh me.  "Smile" and "fake it

till you make it," were these Rubin and --

MR. SCHOENSTEIN:  Smile --

THE COURT:  -- presence?

What's the evidence?

MR. SCHOENSTEIN:  Yes.  The evidence is that there was

a meeting in 2017, where Dr. Edelman's issues with her staff

first came to the attention, and she went in to see Mr. Rubin

and Mr. Swirnow.  And she testifies -- and no one else really

confirmed or expressly denied it -- that Mr. Rubin suggested

she smile and that she fake it till she makes it.  And

Mr. Rubin did not recall saying that, but --

THE COURT:  I remember his testimony.

MR. SCHOENSTEIN:  The "calm down" comment is the only

comment attributed to Mr. Kaplan.  That's his conversation with

her in 2020.  She says he called her doctor and told her to

N7iWede4

1    calm down and that that somehow was discriminatory.

2          So if we take out all of those, we are left with the

3    allegation that Mr. Antonik muttered the word "bitch," not that

4    he called her a bitch, not that he yelled bitch at her but that

5    he muttered it.  As your Honor knows, the laws do not impose a

6    general civility code.  Petty slights are not enough to

7    substantiate a discrimination claim.  I point again to the

8    *Robinson* case, at page 115, and also *Williams v. N.Y. City*

9    *Hous. Auth.*, 61 A.D.3d 62, another First Department case, under

10   the New York City law, which your Honor mentioned yesterday.

11   And it's "petty slights and trivial inconveniences" are not

12   enough to sustain a discrimination count even under the city

13   claim.

14          Similarly, stray remarks are not enough.  I cite for

15   the Court *Fruchtman v. City of N.Y.*, 129 A.D.3d 500.  "Stray

16   derogatory remarks, without more," do not constitute evidence

17   of discrimination; and *Harris v. Forklift Systems*, 510 U.S. 17,

18   "mere utterance of an...epithet which engenders offensive

19   feelings in an employee does not sufficiently affect conditions

20   of employment to implicate Title VII."  So the Supreme Court

21   case is a Title VII case.  Title VII claims should go, but also

22   the city claims.

23          THE COURT:  There is no Title VII discrimination

24   claim.  It's only the city claim.

25          MR. SCHOENSTEIN:  Oh, you're right.  Fair enough.

N7iWede4

1        Also, your Honor, with respect to the 2017 comments,

2   they would be time-barred, right?  Because the complaint wasn't

3   filed until January of 2021, so none of the 2017 remarks could

4   come in.

5        THE COURT:  Does that include the "calm down" from Mr.

6   Kaplan?

7        MR. SCHOENSTEIN:  No.  "Calm down" from Mr. Kaplan is

8   2020.  The 2020 remarks are Mr. Kaplan saying, "Calm down,

9   Doctor," or "Doctor, calm down," and Mr. Antonik allegedly

10  muttering the word "bitch."

11       Let me go here again for the Court by individual

12  defendant, because all four defendants are named on this claim.

13       Mr. Swirnow, there's no proof that he said anything

14  ever at any time that was considered discriminatory, in 2017,

15  2020, or ever.  So he's out.

16       Mr. Kaplan simply said "calm down," allegedly, in a

17  conversation where he was very polite and left immediately when

18  he was requested to do so by plaintiff.  So he has to be out.

19       Mr. Rubin said only, in 2017, allegedly, "smile more"

20  and "fake it till you make it."  Those are out by statute of

21  limitations.  They are also out because they are not sufficient

22  to set forth a discrimination claim.

23       That leaves Mr. Antonik, and the sole basis, the only

24  basis is this claim that he muttered the word "bitch."  And I

25  know your Honor will not take out that part of the case simply

N7iWede4

because it's not an allegation that was made anytime while

plaintiff was employed by NYU or in the complaint or in the

amended complaint or in the second amended complaint.  That's

for argument to the jury.  But existing alone, that one-word

muttering cannot support a discrimination claim under any of

the laws at issue in this case.

Finally, your Honor, I turn to damages.

Whether or not you leave any claims in the case will

affect this, but let me address a few specific things.

Plaintiffs are still claiming back pay and front pay.

There is no back pay proof in the case.  There's no loss of

revenue.  She didn't go a day unemployed or miss a check.  So

they have only front pay, and the front pay, as I understand

it, is based on retirement benefits.  And I'll say to the

plaintiff the same thing that I've been saying to all of our

witnesses:  Where are the documents?

There's no proof of any retirement benefits that she

had or lost.  There's no documentary proof that she doesn't get

retirement benefits now.  It is very short, unspecific

testimony by her, so front pay should be out.

The pain and suffering claim was limited to $50,000 in

the pretrial submission.  Suddenly, in the amended disclosures

we got the other night, it had a $250,000 number.  They're not

going to give the jury a number, but for the record, that

portion of their case must be limited to the 50,000 that was in

1    their pretrial submission.

2         And that leaves us, your Honor, with punitive damages.

3         Respectfully, no jury could award punitive damages on

4    this record.  There is no evidence of the type of gross

5    behavior or conduct that willfully or wantonly causes harm to

6    another.  They don't approach meeting the standard of punitive

7    damages, and it should be removed from the charge if any of

8    these claims remain, again, so that there's no risk of a

9    compromise verdict, so there's no risk of the jury saying,

10   well, we won't give her punitive damages, but we'll give her

11   some compensatory damages.  It's prejudicial to go forward

12   without an evidentiary basis.

13        Thank you, your Honor.

14        THE COURT:  Thank you.

15        All right.  I'll hear from the plaintiff responses

16   with respect to anything that the plaintiff wants to respond to

17   but, in particular, why any corporate defendant, if anybody

18   stays in the case, should stay in other than the NYU Grossman

19   School of Medicine; why willfulness should stay in the case;

20   why any of the individuals should stay in the case; and why, in

21   particular, any of the individuals with respect to the

22   discrimination claim, other than perhaps Antonik; and then

23   finally, why I should instruct on punitive damages.

24        MR. KATAEV:  I'll address each of them *seriatim*, your

25   Honor.

1          There is no evidence in the case with respect to the

2     corporate defendants on both sides.  There's an agreement that

3     the NYU Grossman School of Medicine employed her, but that's a

4     division of NYU.  They did not specify which corporate entity

5     of NYU it's a division of.  Moreover, the contract --

6          THE COURT:  If there's no evidence in the case with

7     respect to the corporate defendants on both sides and you've

8     got the burden, isn't it game over?

9          MR. KATAEV:  No, your Honor, because the contract

10    specifically provides who the employer is, and it makes

11    reference to all of those corporate entities.  And we pointed

12    that out during the plaintiff's testimony.  The jury can make a

13    determination based on what the contract says and based on what

14    the testimony was.

15         It's also a factual inquiry that should go to the

16    jury.

17         Moving on to the EPA, this is a very fact-intensive

18    issue.  There's been testimony about Drs. Porges, Goldberg and

19    Modi.  The defendants have shifting explanations for each

20    defendant.  None of them is consistent.

21         For example, they reference this clinical and research

22    work and the administrative work.  Everyone agrees that the

23    administrative work was only 5 to 10 percent of effort.  Each

24    doctor consistently testified that the primary duty was seeing

25    patients.  Substantially equal is substantially equal.  It's

not totally equal, and so there's enough evidence in the record to permit the jury to make that finding on their own.  And that's with respect to substantially equal work.

When looking at effort, skill and responsibility, there's also evidence in the record as to that.  Dr. Modi was paid substantially more than Dr. Edelman despite the fact that they're very similar in their training and background and education, and in fact, Dr. Modi was paid even more than Dr. Porges initially.  I understand there's a discrepancy, so to speak, for lack of a better term, with respect to when they started, but the fact is the starting salary for Dr. Modi, a less experienced doctor than Dr. Porges, was substantially higher.

The Court also heard evidence about the fact that Dr. Edelman lived near Huntington, and she would have been able to take on that role, especially if she was offered the same salary, and there was testimony that that was never offered to her.

Turning then to the defendants' defense based on a factor other than sex, they did not argue anything about quantity or quality, so I just want to make a reference that plaintiff believes that should be removed from the jury charge.

The only defense is a factor other than sex, and again, there are shifting explanations in that regard.  Judge Schofield covered this extensively in her opinion at Dkt. entry

N7iWede4

155.   The explanation for why one doctor was paid more does not apply consistently with why another male doctor was paid more. So they have to apply their explanations doctor by doctor in order for it to work.  It doesn't work that way.  It's a totality-of-the-circumstances test.  They say there's no evidence that sex played a role, but the evidence is that the female doctors earned substantially less.

We heard Dr. Mehta's testimony, an independent, unbiased witness.  In fact, she would be more biased to her current employer.  She conceded on the stand that it was unfair that she received less pay and had to do more work than Dr. Goldberg.  His effort for administrative duties was 10 percent, your Honor.  He was paid $25,000 for that work.  He spent time seeing patients.  He was so busy seeing patients his bonus for the 1 percent was off the charts.  That's why his compensation increased so much.  It doesn't make any sense.  It doesn't jibe.  They don't meet unequivocally the factor-other-than-sex test for their affirmative defense.  They have not met their burden, and the jury should decide that.

Going to willfulness, I have case law that I'd like to place on the record on this issue.  They say that there's zero evidence of disregard.  First of all, Mr. Rubin testified at his deposition and confirmed at trial that he did not even know about the Equal Pay Act.  Not knowing about a law that's been enacted since 1963, approaching its 50th anniversary, is

N7iWede4

1   reckless disregard, your Honor.  You have to know about these

2   laws if you're setting these salaries for 3,600 doctors.  He

3   admitted he didn't know about it.

4          He further admitted that he didn't do any statistical

5   analysis and that he never compared the salaries to find out if

6   there's any sort of discrepancy in the pay.  So just going to

7   some of the cases, *Hulsen v. Burlington School District*, a

8   District of Vermont case, 2021 WL 6750970.

9          THE COURT:  Let me ask you about willfulness.  Juries

10  are instructed on willfulness when the statute of limitations

11  with respect to the Equal Pay Act is at issue.  That's not a

12  question here.  Willfulness is not an element under the Equal

13  Pay Act.  Even if there was evidence that would support

14  willfulness, why should I instruct the jury on that?  Doesn't

15  that go to good faith, which ultimately is a question for the

16  Court?

17         MR. KATAEV:  For the federal Equal Pay Act, it does,

18  your Honor, but under the New York Labor Law, if there's a

19  finding of willfulness, there is an added 300 percent of

20  liquidated damages, and that's why it's important.

21         THE COURT:  But again, it's not an element, is it, of

22  either violation, state or federal?

23         MR. KATAEV:  I believe that under the New York Labor

24  Law, it is, your Honor.

25         THE COURT:  OK.  You'll brief that to me by 5 o'clock.

N7iWede4

1          Same with the defendants.

2          MR. KATAEV:  Willfulness as an element under the New

3     York Labor Law, correct?

4          THE COURT:  Yes.

5          MR. KATAEV:  OK.

6          Both *Hulsen* and another case, *Zhengfang Liang v. Cafe*

7     *Spice SB*, 911 F.Supp.2d 184, both of those stand for the

8     proposition that willfulness is a fact-intensive inquiry that

9     must go to the jury.  *Pollis*, 132 F.3d 115, Second Circuit

10    decision, covering willfulness in general.

11         I want to cover some cases that touch upon the

12    testimony that we've heard to explain why the jury should

13    consider this.  There's a case called *Banford v. Entergy*

14    *Nuclear Operations, Inc.*, 74 F.Supp.3d 658.  I believe the

15    Second Circuit did reverse it but on other grounds.  There, the

16    court, on a Rule 50 motion, found that there was a reckless

17    disregard such that willfulness could be found because there

18    was no analysis of the information concerning pay.  That's the

19    case here.  There was no analysis of the information concerning

20    pay.

21         Also, the defendants rely on the testimony that they

22    consulted about pay, but they didn't provide any real detail

23    about the substance of those conversations.  That's covered in

24    *Knox v. Varvatos*, a recent case in the Southern District of New

25    York, Equal Pay Act, and it's 512 F.Supp.3d 470.  There, just

1    like here, there was testimony about consulting, but there was

2    no actual substance about what was discussed, and the court

3    there found that the willfulness finding by the jury should

4    stand.  Notably, the willfulness question did go to the jury in

5    that recent case.

6          And finally, there's another case.  It's called *Chepak*

7    *v. N.Y.C. Health & Hosps. Corp.*, 2015 WL 509279, and there, the

8    court discusses a finding of willfulness based on indifference

9    to the requirements under the EPA based on the fact that many

10   of the witnesses confirmed that they did not look at or compare

11   the salaries of males versus females.  We would submit that the

12   jury could make a finding that they were indifferent, and that

13   would show a reckless disregard and that's enough for

14   willfulness.  So I think there's no question that willfulness

15   should go to the jury.  They'll have a second shot at a

16   postverdict Rule 50 motion, defendants will.

17         And the argument about --

18         THE COURT:  Retaliation.

19         MR. KATAEV:  I just wanted to address the arguments

20   about prejudice briefly.

21         Defendants argue that there's prejudice in allowing

22   willfulness to go to them.  The jury charge doesn't explain the

23   import of willfulness.  They're looking at this blindly, and

24   they will decide willfulness as a matter of fact.  And they

25   won't have any understanding that it will impact the damages in

1   this case.

2              Also, the finding of willfulness is a fact-intensive

3   inquiry.  Our charge is very separate and distinct as to

4   willfulness under the Equal Pay Act versus the elements of

5   Title VII and the New York State and city human rights law.

6              Going to retaliation --

7              THE COURT:  I should have mentioned there are issues

8   for you to address, and I'm sure you will, whether any of the

9   defendants stay in on retaliation.

10             MR. KATAEV:  I'm prepared to discuss that.

11             THE COURT:  OK.  The individual defendants I mean.

12             MR. KATAEV:  Understood.  And yes.

13             Focusing, first, broadly on retaliation, the

14  defendants submit that this was just, it was understood as an

15  office-space issue.  And maybe a jury could find that that was

16  the case with the initial complaint.  I want to read into the

17  record some of the stuff from exhibit 21, which is the initial

18  complaint.  These are the notes by Ms. Pacina, that she wrote

19  down.  She said, among other things, that "employee wants to

20  make a complaint against Joe Antonik"; "he was intimidating,

21  throwing his arms around and pointing at things"; "her heart

22  was racing"; "very uncomfortable."

23             THE COURT:  You agree that that would not support a

24  claim of discrimination.

25             MR. KATAEV:  That by itself wouldn't, but the conduct

N7iWede4

1    is at issue, and I think --

2              THE COURT:  But that conduct wouldn't support a claim

3    of discrimination.  It's not gender discrimination for somebody

4    to be intimidating, whether that person is a male or a female.

5    Put another way, the fact that somebody happens to have the

6    genetic features of a male and the physical features of a male

7    doesn't make the threatening activity to be gender

8    discrimination.

9              MR. KATAEV:  I respectfully disagree, your Honor.  I

10   think there was testimony on this point, that Mr. Antonik would

11   not have acted that way if it was a male doctor.  And I believe

12   Dr. Edelman testified that were it not for the fact that she

13   was a female, he would have never spoken to her that way.

14             THE COURT:  You're not going to support a verdict on

15   that basis.

16             MR. KATAEV:  That brings me to my second point on this

17   issue, your Honor, and you have to keep in mind that Ms. Pacina

18   wrote this while she was speaking to Dr. Edelman, and she did

19   not write everything down.  And there's this factual issue

20   about the March 13 date and no original date being set there.

21   So there's some potential inference that things could have been

22   edited.

23             Dr. Edelman clearly testified that Mr. Antonik

24   muttered the word "bitch" during this confrontation.  Coupled

25   with this comment and his conduct, there could be a finding

N7iWede4

1   that that interaction was motivated by discriminatory animus.

2          THE COURT:  Why wouldn't that just be a petty slight?

3          MR. KATAEV:  It wouldn't be a petty slight, your

4   Honor, because based on the facts and circumstances of this

5   case, in a medical office, in a professional environment, this

6   rises way above a petty slight or trivial inconvenience.

7   Doctors are given respect in the world at large.  People

8   respect doctors, and people don't call doctors a bitch,

9   especially a person who is a site director.

10          THE COURT:  Basically what you're asking me to do is

11   accept the proposition that it's OK to use that in a blue

12   collar setting, but because this person happens to have gone to

13   osteopathy school, it's not OK.

14          MR. KATAEV:  I understand the Court's concerns with

15   that, but in terms of reviewing the totality of the

16   circumstances, I think that the place where it occurred is

17   relevant, your Honor, and it should be considered.

18          There's also a concern that she raised in this

19   complaint about being concerned about being physically

20   assaulted.  That should go together with the comment and the

21   general conduct that occurred.

22          The jury had an opportunity to observe Mr. Antonik.

23   They saw how big he was.  They saw how he responded to

24   questions.  They saw his demeanor, and they should have the

25   right to make that determination.  Again, defendants would not

N7iWede4

be prejudiced by the jury making a finding because they still

have an opportunity to make a motion thereafter.

Even if the jury could potentially find that this

first complaint did not reference any gender discrimination,

they certainly can't find that with respect to the September

25, 2019, email, which came a little short of a week later.

She references in that email, exhibit 74, page Bates stamped

D1050, this was a matter of inappropriate conduct.  She

considered this a form of bullying in the workplace.  She felt

that it was an attempt to corner her.  Mr. Kaplan had a

condescending tone.  She needs to be able to work in a

nonhostile environment, and as a female physician at NYU, she's

disappointed she still has to contend with male chauvinism.

And there's no world in which an HR professional doesn't see

these as buzz words.  Ms. Pacina was just not reliable on that

point, and the jury should be able to decide whether Dr.

Edelman actually engaged in the protected activity.

Also, under the New York State human rights law, which

was amended in 2019, that law is now more in line with the New

York City Human Rights Law, which focuses on whether Dr.

Edelman was treated less well as a female.  The allegations

here rise to that level, to meet the standard of being treated

less well.

You also heard evidence about IT issues.  Dr. Porges

testified that his IT issues were few and far between, and they

N7iWede4

1    were handled quickly.

2              THE COURT:  No, no.  That's out of the case.  The only

3    thing that's in the case on discrimination is the couple of

4    comments.  We're talking about retaliation, so why don't you

5    march through retaliation, and then you can get to the couple

6    of comments on discrimination.

7              MR. KATAEV:  I would just also say that all the

8    evidence that the defendants rely on in terms of retaliation is

9    self-serving.  They don't --

10             THE COURT:  So is yours.

11             MR. KATAEV:  But we have documents, your Honor.

12             THE COURT:  I don't think so.

13             Go ahead.

14             MR. KATAEV:  The point is, your Honor, that this is

15   also a fact-intensive inquiry that requires an assessment of

16   the totality of the circumstances, and the lack of evidence by

17   the defendants, the lack of documentary evidence, the cloak and

18   dagger -- "I'll call you"; "fill me in on what happened" -- no

19   memorialization, is something that the jury should consider as

20   to whether there was a retaliatory motive involved in Dr.

21   Edelman's --

22             THE COURT:  Let's walk through the individual

23   defendants.

24             Antonik, there's no evidence whatsoever of his

25   involvement in an action that would constitute an adverse

1    employment action, is there?

2             MR. KATAEV:  No.  I would beg to differ, your Honor.

3             The evidence is that Dr. Porges was made aware of

4    clinical concerns by Mr. Antonik.  That's what the evidence

5    showed.  Dr. Porges tried to --

6             THE COURT:  No.  The hostile work environment here is

7    the nonrenewal of her contract and the termination.  That's

8    what you've told me to tell the jury.  So what is Antonik's

9    involvement in that?

10            MR. KATAEV:  He started the whole process to get her

11    nonrenewed.

12            THE COURT:  He arguably started a process which led

13    through a chain of events to her not being renewed.  Maybe you

14    can make that argument, although I think the evidence is fairly

15    powerful that really what starts it is Dr. Porges's concerns

16    about her medical practice.  But assuming that it starts with

17    Antonik, he doesn't have any involvement, does he, in the

18    adverse action?  He doesn't know that it's happened.

19            MR. KATAEV:  Your Honor, I beg to differ.  He started

20    it.  The whole thing snowballed.

21            THE COURT:  Tell me what the evidence is that Antonik

22    had a role and then tell me what the evidence is that Kaplan

23    had a role and then tell me the evidence that Swirnow had a

24    role and then tell me the evidence that Rubin knew about the

25    employment complaint, not about the dispute as to office space.

1          MR. KATAEV:  Antonik is the initial email.  That's

2    Defendants' Exhibit 86, and his direct report and his eyes and

3    ears at suite 306 was Ms. Ruiz.  Ms. Ruiz prepared this report.

4    The first incident is November of 2019, after the September 25

5    complaint.

6          September 25 to November 13 is a little less than a

7    month and a half.  OK?  And so she prepares this log that he

8    uses almost 14 months later to, word for word, and, in fact,

9    changes some things in there to submit later on.  And Judge

10   Schofield covered this in her decision on summary judgment,

11   Dkt. entry 155.  Based on the fact that the complaint came in

12   in September of '19 and the log started being maintained in

13   November of '19 and based on the fact that Dr. Edelman could

14   not be terminated except for cause, the inference is that they

15   waited until the first opportunity to strike.  So Mr. Antonik

16   started the snowball that became the avalanche.  OK?

17         THE COURT:  Is there any evidence that when

18   Mr. Antonik was asked by Dr. Porges to provide information of

19   the reason, that Mr. Antonik was told the reason why he was

20   being asked for that information or that he was told how it

21   would be used?

22         MR. KATAEV:  There is none of that.  Nothing's

23   memorialized, but the fact is Dr. Porges conceded that

24   Mr. Antonik brought these clinical concerns to his attention.

25   He's the site director, and these patient complaints come to

1   him.  He came to Dr. Porges and told him, There are clinical

2   concerns with Dr. Edelman; you should look into that.

3          THE COURT:  All right.  Let's go to the next

4   defendant.

5          Mr. Kaplan.

6          MR. KATAEV:  Mr. Kaplan testified that he was aware of

7   the complaint, and the complaint had been made against him

8   after September 25.

9          THE COURT:  He also testified, and I thought the

10  testimony was uniform, that he was not involved in the decision

11  to nonrenew the plaintiff.  Is there any testimony to the

12  contrary?  What are you going to point to to show that he had

13  any involvement in the decision to nonrenew her?

14         MR. KATAEV:  Your Honor, the fact is that he didn't

15  have the power to terminate her.  He's a facilities director.

16  He can't terminate any physician.  I asked him that during his

17  cross, and he agreed with me that he didn't have the power to

18  do it.  So the only way to have her terminated was to

19  participate with Mr. Antonik in this, and he testified that

20  Mr. Antonik made him aware of the complaint and he got a

21  complaint made against him.

22         THE COURT:  But tell me what the evidence is of his

23  involvement in the decision to nonrenew.  Assume that I agree

24  with you that somebody doesn't need to have the formal

25  authority to nonrenew to be held liable for an adverse

N7iWede4

employment action; they still need to have had some

involvement.  What's your best evidence that he had some

involvement?

　　　　MR. KATAEV:  He solicited the email and he provided

the deadline to Dr. Porges, which is very strange behavior,

because Dr. Porges agreed and Mr. Kaplan agreed that it is not

usual for Dr. Porges to go to Kaplan with a clinical care

concern.  Mr. Kaplan's not qualified to handle clinical care

concerns.

　　　　And there's evidence in the record also that when

Dr. Porges needed to, he had a direct line to Mr. Swirnow and

Mr. Rubin.  When he wanted his clinical director title, he went

directly to them.  So why is he going to Mr. Kaplan instead?

It doesn't make any sense.

　　　　THE COURT:  OK.  What's your best evidence with

respect to Mr. Swirnow on retaliation?

　　　　MR. KATAEV:  Mr. Swirnow got involved in the complaint

when he spoke to Dr. Edelman over the phone.  They resolved the

issue underlying the complaint, focusing on the space issue.

Following that complaint, following the resolution of the space

issue, there's testimony that Dr. Edelman told Mr. Swirnow

directly:  I made a complaint and I expect it to be resolved.

I am not drooping it.

　　　　And you saw the subsequent email, your Honor, where

Ms. Hall relayed what happened in the conversation with

N7iWede4

1    Mr. Swirnow, that he had with Dr. Edelman, and they asked at

2    the end, Can you please circle back -- to Pacina, can you

3    please circle back and see whether she still wants to pursue

4    the complaint.  He had knowledge of the complaint.

5            THE COURT:  OK.

6            With respect to Mr. Rubin, my recollection of the

7    testimony is that Mr. Rubin testified pretty unambiguously that

8    he was not aware of any employment complaint.  He was aware,

9    perhaps he was aware, I think he was aware of the space

10   complaint.  What's the evidence that he knew about the

11   employment complaint or from which the jury could infer that he

12   knew about the employment complaint at the time the decision is

13   taking place.

14           MR. KATAEV:  Two things, and it's very simple.  No. 1,

15   I asked him directly, you were aware of the HR complaint made

16   by Dr. Edelman, and he confirmed that he was.  And I showed him

17   his testimony.

18           THE COURT:  No, but he said as to that that he was

19   aware of the complaint with respect to space.

20           MR. KATAEV:  Yes, your Honor.  That was also a

21   self-serving statement, but the inference is very easy.

22   Because he worked right next to Mr. Swirnow and their offices

23   are close to each other and they worked extensively on these

24   issues, because Mr. Swirnow was made aware of it and

25   Mr. Swirnow was Mr. Rubin's right hand, the inference can be

1    made that he obviously knew about it as well.

2              THE COURT:  OK.

3              All right.  You want to address discrimination and

4    punitive damages.

5              MR. KATAEV:  Yes, your Honor.

6              We understand that it's limited to sexist remarks.

7    The sexist remarks are being told to smile more, fake it until

8    you make it.

9              THE COURT:  Aren't those barred by the statute of

10   limitations?

11             MR. KATAEV:  No, your Honor.  I would submit that the

12   continuing violation doctrine would apply, or at least the

13   parties should be given an opportunity to brief that issue.

14             Dr. Edelman complained extensively about various

15   issues.  I understand some of them have been dismissed, but

16   with respect to the remarks at least, there should be an

17   analysis about the continuing violations doctrine to see if

18   this falls within the ambit.

19             With respect to Mr. Kaplan, she was being told to calm

20   down.  I don't know about the Court or anyone else here, but

21   whenever I tell someone to calm down, it usually never works.

22   But it's been known colloquially that that's a sexist remark,

23   telling a female to calm down.  And the jury experiences life

24   as we do, and they take those life experiences with them to

25   determine things of this nature.  You know, being referred to

N7iWede4

1    as "Doctor, Doctor," and being placated, instead of having the

2    concerns addressed, that's all conduct indicative of

3    discriminatory animus.

4            And so the evidence is clear.  There was a directive

5    to deal with office space.  That directive came from Mr. Rubin

6    and Mr. Swirnow.  Mr. Antonik and Mr. Kaplan were charged with

7    making this happen, and they set about their goal and they

8    didn't care how anyone was affected; it just had to be done.

9    And so they didn't take Dr. Edelman's concerns into regard when

10   they went about carrying out their duty.

11           Again, the jury saw the demeanor of the witnesses.

12   They heard them deny the allegations, and it's up to the jury

13   to decide -- did they make these comments?  Did they act in

14   this way?  And again, it's a totality-of-the-circumstances

15   test, so the jury should decide that issue.

16           THE COURT:  OK.  Do you have anything on Swirnow on

17   discrimination?

18           MR. KATAEV:  Can I have one second, your Honor?

19           Your Honor, we would concede that point as to

20   Mr. Swirnow.  There was no evidence about him saying anything

21   wrong.  He was gentlemanly in the way he handled the issue.  He

22   did what the other defendants failed to.

23           THE COURT:  OK.

24           MR. KATAEV:  I think the last issue I have is damages.

25           THE COURT:  Yes.  Back pay, front pay, punitive

N7iWede4

1    damages.

2              MR. KATAEV:  I think we can concede with respect to

3    back pay.

4              THE COURT:  OK.

5              MR. KATAEV:  I think that the jury is being instructed

6    about back pay and front pay, but the Court is deciding that

7    issue anyway.  The bottom line is that --

8              THE COURT:  So I'm not going to instruct the jury with

9    respect to back pay if there's no evidence with respect to back

10   pay.

11             MR. KATAEV:  That's fine, your Honor.

12             With respect to front pay, Dr. Edelman testified as to

13   the amount.  She didn't provide any documents, but the jury's

14   entitled to give her testimony the weight that they decide to

15   give it.

16             THE COURT:  OK.

17             And then with respect to punitive damages.

18             MR. KATAEV:  I think the evidence here shows, your

19   Honor, that there was concerted activity by the individual

20   defendants.  Like I said before, there was a lot of cloak and

21   dagger.  They memorialized the complaint against Dr. Edelman.

22   They did not memorialize any of their discussions.  You would

23   think if this was a genuine decision not to renew her based on

24   clinical care concerns, they would speak to her about it.  They

25   would try to "remediate," which is a fancy word for fix.

N7iWede4

| | |
|---|---|
| 1 | They didn't make any effort to do any of that, and |
| 2 | anytime there was any discussion about this issue, nothing was |
| 3 | memorialized.  And I think the jury understands that, and we |
| 4 | covered that extensively.  So to the extent that these |
| 5 | individuals at NYU carried out a plan to retaliate against the |
| 6 | doctor for not meeting their directives about office space, |
| 7 | that's something that should go to the jury to decide.  And |
| 8 | this Court can, of course, correct any error that the jury |
| 9 | makes with respect to the calculation of those damages. |
| 10 | THE COURT:  OK.  Anything else? |
| 11 | MR. KATAEV:  I'm just going to check my notes, your |
| 12 | Honor. |
| 13 | Just to clarify about the individual defendants' role |
| 14 | in retaliation –– not with respect to Mr. Rubin and |
| 15 | Mr. Swirnow; I covered that.  But with respect to Messrs. |
| 16 | Kaplan and Antonik, they had a motive to retaliate against her |
| 17 | based on the complaint brought against them.  You recall |
| 18 | Mr. Antonik testified he wasn't thrilled or wasn't crazy about |
| 19 | having the complaint brought against him. |
| 20 | I think that's all I have. |
| 21 | THE COURT:  OK. |
| 22 | MR. KATAEV:  I'm sorry.  One last thing. |
| 23 | THE COURT:  OK. |
| 24 | MR. KATAEV:  The plaintiff views the defendants' |
| 25 | motion as an attempt to relitigate the summary judgment |

N7iWede4

1    decision and this Court should not permit it; the defendants

2    are trying to relitigate the summary judgment motion and the

3    Court should not permit that.

4              THE COURT:  Let me make one comment with respect to

5    that and how I'm going to view this.

6              Summary judgment is an order that allows the plaintiff

7    to put on the case.  Evidence may be presented at summary

8    judgment that may not be presented at a trial.  At the end of

9    the day, the summary judgment decision is subsumed within the

10   final judgment.  The fact that the plaintiff might have

11   survived summary judgment doesn't entitle the plaintiff to go

12   to the jury on a claim.  The plaintiff still has to present

13   evidence in court from which the jury could return a verdict

14   for the plaintiff.

15             That's how I'm going to view this, and I'm going to

16   take it under advisement.  I'll let you know my rulings.

17             That leaves the jury instructions and the charge.

18             It's now 1:15.  I'm not sure how much folks have on

19   the charge.  If it's very, very little, we could do it right

20   now.  Otherwise, I'll have you back at 2 o'clock.  I don't want

21   to shortcut anything.  You can all think about the charge.

22             What's the plaintiff's preference?

23             MR. LABUDA:  Either way, your Honor.  It may be better

24   for us to just do one last look.

25             THE COURT:  Then come back at 2 o'clock.

N7iWede4

1          MR. LABUDA:  We'd be leaning towards that.

2          THE COURT:  What is defendants' view?

3          MR. SCHOENSTEIN:  Well, Mr. Steer's going to handle

4     it, so I leave it to him.

5          MR. STEER:  I think 2 o'clock does make sense.

6          THE COURT:  OK.  Why don't you all come back here at 2

7     o'clock.  I do have a criminal matter on at 3 o'clock.

8     Hopefully we'll be done with the charge by then.  If not and

9     there's a need to go beyond that, then it will just cut into

10    some of your afternoon preparation.  We'll recess at three and

11    come back later.

12         Mr. Schoenstein.

13         MR. SCHOENSTEIN:  Just to be really clear on the

14    Court's expectations, both sides get to put in a writing before

15    5 o'clock on the willfulness issue.  But I gather that's the

16    only issue.

17         THE COURT:  That's the only issue on which I need

18    briefing.

19         OK.  Thanks.

20         (Luncheon recess)

21

22

23

24

25

N7ICede5

                           AFTERNOON SESSION

                               2:02 p.m.

1            THE COURT:  I had circulated the jury instructions

2      last night.  I've given the parties time to look through them.

3            Any exceptions from the plaintiff?

4            MR. LABUDA:  Yes, your Honor.  I dog-eared them, so

5      bear with me.

6            On page 32, your Honor, there's the typo with human --

7      it says "human recourse," resource.

8            THE COURT:  Yes.

9            MR. LABUDA:  And the third element in C, we just

10     wanted to add after "not renewal of plaintiff's contract and

11     subsequent termination," just add "subsequent termination."

12           THE COURT:  I take it no objection to that from the

13     defendants?

14           MR. STEER:  No objection, your Honor.

15           THE COURT:  We'll make both of those.  Thank you for

16     catching the typo.

17           MR. LABUDA:  And then on page 48, with damages under

18     Equal Pay Act, in the first paragraph, we'd like to remove the

19     last sentence there, which says:  "Do not add an amount for

20     interest.  This will be automatically calculated by the Court

21     after you reach YOUR verdict."  I don't think it's necessary,

22     so we just ask it be taken out.

23           THE COURT:  Any problem from the --

N7ICede5

1          MR. STEER:  We do object to that, your Honor.  We

2     think it's going to be -- the jury might consider it

3     unknowingly to anyone.  We don't see any harm in leaving it in.

4          MR. LABUDA:  Our point is they're not being instructed

5     to do that by your Honor anyway, so there's really no reason to

6     instruct them.  That's our view.

7          Then, the next paragraph, your Honor, we felt that the

8     next paragraph was just going to -- excessive reinforcement of

9     the instructions in terms of where it says:  "If you find that

10    NYU, Rubin, Swirnow violated the Equal Pay Act, Dr. Edelman is

11    also entitled to certain statutory damages.  The amount of

12    liquidated damages will be determined by the Court."  I don't

13    think it's necessary to instruct them at all about liquidated

14    damages or anything like that.

15         THE COURT:  So that entire paragraph?

16         MR. LABUDA:  Yeah, we would think it should be out

17    just as being excessive.

18         THE COURT:  Any objection to that particular change?

19         MR. STEER:  One moment, if I may, your Honor.

20         Your Honor, I'm sorry to ask.  Could we just have a

21    repetition of --

22         THE COURT:  The point is that the second full

23    paragraph on page 48, which informs the jury about certain

24    statutory damages and that there will be liquidated damages

25    determined by the Court is unnecessary because I'm informing

N7ICede5

1   the jury that I'm not then asking them to rule upon.

2          So Mr. Steer, we'll hear from you.

3          MR. STEER:  I don't see any objection to that, your

4   Honor.

5          THE COURT:  I'm going to drop that paragraph and I am

6   going to include the language with respect to interest in part

7   because of the Court's experience, sometimes juries think that

8   part of their role is to add interest.

9          MR. LABUDA:  That was it from plaintiff, your Honor.

10  I have to say I thought they were very good, so I thank the

11  Court and the court staff for that.

12         THE COURT:  Thank you.

13         Anything from defendants?

14         MR. STEER:  Couple of things, your Honor.  We would

15  ask that language on page 25, the third element of the wage

16  comparison that says wages include all forms of compensation

17  whether calling wages salary, expense, et cetera, et cetera.

18         MR. LABUDA:  Page 35?

19         MR. STEER:  Element C on page 25.

20         MR. LABUDA:  25.  I'm sorry.

21         THE COURT:  Yes.

22         MR. STEER:  We think that also should be included in

23  page 50 in the first paragraph where it says that "damages must

24  be awarded in an amount that compensates plaintiff for the

25  difference between wages she was paid and the wages the male

1  employees to whom you have compared her were paid during her

2  employment..."

3          THE COURT:  I'm sorry.  Where on page 50 are you

4  looking?

5          MR. STEER:  The first paragraph, your Honor.

6          THE COURT:  I see it.  What language?

7          MR. STEER:  So we're asking that the language on

8  page 25, where your Honor defined wages, where he's talking

9  about the third element, wage comparison, and it says:  "Wages

10  includes all forms of compensation, whether call wages salary,

11  expense, reimbursement, profit sharing..." et cetera, et

12  cetera, we think that should be in right after the word "wages"

13  when it's mentioned in page 48, the first paragraph, and also

14  under page 50, the first paragraph after the sentence "damages

15  must be awarded in an amount that compensates plaintiff for the

16  difference between wages she was paid and the wages of male

17  employees," we think that clarification is important.

18          THE COURT:  Let me ask the plaintiff if they have any

19  objection to me adding at the end of that first paragraph the

20  language or words to this effect.

21          MR. LABUDA:  What page are you on?

22          THE COURT:  Page 50.  Are you there?

23          MR. LABUDA:  Yes.

24          THE COURT:  "The same definition of wages I have given

25  you for the Equal Pay Act also applies under New York labor law

N7ICede5

 1   Section 194."

 2            MR. LABUDA:  That's fine, your Honor.

 3            MR. STEER:  Your Honor, we would also ask for that

 4   same clarification on page 48, the first paragraph, which is

 5   the damages under the Equal Pay Act.  It's the exact same

 6   beginning, I think, but one is the federal, one is the city.

 7            THE COURT:  I'm not sure, Mr. Steer, what change you

 8   want me to make to the instruction.

 9            MR. STEER:  We did 50, is my understanding, your

10   Honor.  On page 48, the first paragraph, line -- five lines

11   down before "to calculate."

12            THE COURT:  No, I don't think I need to do that

13   because I've already instructed them with respect to wages

14   under the Equal Pay Act.

15            MR. STEER:  Okay.  Thank you, your Honor.

16            THE COURT:  Anything else?

17            MR. STEER:  May I have one moment, your Honor.

18            Your Honor, I'm not sure whether your Honor wants an

19   oral response from us to the letter that was submitted by

20   plaintiff on disparate impact.

21            THE COURT:  Yes, why don't you give that to me,

22   please.

23            MR. STEER:  In reviewing the letter, first of all, the

24   statute starts out, as we pointed out in I think our first

25   letter to you, your Honor, or our only letter to you as per

N7ICede5

1    proper, it starts out that the defense -- the affirmative

2    defense shall not apply when the employee demonstrates, A, that

3    an employer uses a particular employment practice that causes a

4    disparate impact on the basis of sex.

5            In looking at plaintiff's letter, first of all, I

6    think the burdens are reversed there because it says that if

7    defendants prove an affirmative defense, only then does the

8    burden shift to plaintiff to prove disparate impact.  I think

9    that's backwards.  I think you have to prove adverse impact

10   before you prove -- it's the *prima facie* case of a disparate

11   impact case is proving adverse impact.  Then plaintiff talks

12   about the idea that the four-fifths rule under the uniform

13   guidelines on employee selection procedures are not the only

14   way you can establish a statistical disparity.

15           THE COURT:  Mr. Steer, let me advise you to try to

16   slow down when you're speaking, both for me and for the record.

17           MR. STEER:  I'm sorry, your Honor.

18           So plaintiff notes that courts have nonetheless

19   considered both the four-fifths rule and standard deviation

20   calculation in deciding whether a disparity is sufficiently

21   substantial to establish a *prima facie* case of disparate

22   impact.

23           The case that plaintiff cited that we discuss in our

24   letter to your Honor, which is the *Lavin-McEleney v. Marist*

25   *Coll.* case actually dealt with a case that did not use the

1    four-fifths rule of thumb for adverse impact.  They actually

2    had statisticians doing the type of analysis plaintiff is

3    talking about in the most recent letter.  What happened there

4    was the statisticians looked at it and found that you could not

5    do a disparate impact analysis with one professor and three

6    comparators, and they ended up having to expand out the

7    comparison to cover the whole institution.  That's exactly

8    we're saying here, your Honor, that this is not a case that

9    lends itself because of the small number of people involved to

10   disparate impact analysis.  And while we did raise initial,

11   whether there was a need to plead a disparate impact which

12   hadn't been pled, I don't frankly know whether your Honor even

13   has to reach that issue because there isn't a sufficient sample

14   size for a disparate impact charge to begin with.

15        THE COURT:  I'm not going to give a disparate impact

16   or adverse impact charge.  I don't think that there's evidence

17   in the record from which the jury could find that there was a

18   disparate or adverse impact in this case, both because of

19   issues with respect to defining the relevant universe and with

20   respect to the small sample size.  So that's my ruling.

21        I take it, Mr. Steer, nothing else?

22        MR. STEER:  Nothing else, your Honor.

23        THE COURT:  So I'm taking under advisement the motion

24   that defendants made.  I'd like to ask the parties to get on

25   the phone with me at 5:30 today.  I'll be prepared to give you

N7ICede5

1    rulings at that point.

2              For preparation purposes, you should assume, as I'm

3    sure you will, that I'm going to reserve judgment on the

4    motion, but I might not.  I say that you should assume that

5    because I know you're going to be working on your closings and

6    I want to make sure that you're prepared to address all of the

7    issues.

8              So tomorrow we'll begin at 9 o'clock.  As I indicated,

9    both sides will have one hour.  I'm going to hold you to that

10   strictly.  I'm going to give the jury a stretch break between

11   the defendants' closing and the plaintiff's closing.  After the

12   closings are over, the jury will take a break, I'll handle

13   another matter, and then we'll come back for the charge.  So

14   I'll speak to you all at 5:30.

15             Mr. Schoenstein.

16             MR. SCHOENSTEIN:  Your Honor, we heard your comments

17   on the demonstrative exhibit this morning.  I just ask that we

18   get an updated version of the demonstrative to make sure we

19   don't have any further objections, that we get that this

20   evening, 7:00 p.m.

21             THE COURT:  7:00 p.m., Mr. Schoenstein, seems plenty

22   fine.

23             MR. SCHOENSTEIN:  Fine to me.

24             THE COURT:  Why don't you all get here by 8:45

25   tomorrow morning just in case there are any objections to the

1   demonstratives.  If there are objections, let me have those

2   objections by 10:00 p.m.  That will give you three hours to

3   look through them.

4          MR. SCHOENSTEIN:  Can I send them by email as I did

5   last night?

6          THE COURT:  You can.  I'm going to ask you to do that.

7   You should also, if you want to preserve something, put it in a

8   letter that is filed on ECF.  I'm not intending to file emails

9   that I receive.

10          MR. SCHOENSTEIN:  And the 5:30 conference, we'll get a

11   conference call from the Court?

12          THE COURT:  It will be the court's call-in number

13   that's on my website, which is a public number, so the public

14   will be able to dial in.

15          MR. SCHOENSTEIN:  You want our writings on willfulness

16   by --

17          THE COURT:  I do.

18          MR. SCHOENSTEIN:  Thank you, your Honor.

19          MR. KATAEV:  I apologize, one more issue.  If we're

20   leaving now, we're going to be in traffic for a substantial

21   period of time.  I'm afraid my time to submit the letter by

22   5:00 will be impacted.  Can we increase that to 7:00, as well,

23   please.

24          THE COURT:  No, we can't, because I want to give you a

25   ruling with respect to that.  So maybe you can find some office

N7ICede5

1    space that you --

2            MR. SCHOENSTEIN:  I want to offer they can come to our

3    office and we'll put them in a conference room if they would

4    like.

5            MR. LABUDA:  We appreciate that.  We may be able to do

6    it here.

7            THE COURT:  Thank you.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N7iWede6

1        THE COURT:  Good afternoon.

2        The Court is prepared to give you its ruling on

3   defendants' motions for judgment as a matter of law.  The Court

4   assumes familiarity with the applicable legal principles as set

5   forth in *Casmento v. Volmar Construction, Inc.*, 2022 WL

6   15773966 (S.D.N.Y. Oct. 28, 2022).

7        The Court grants judgment as a matter of law to

8   defendants on the issue of willfulness under the Equal Pay Act

9   and New York Equal Pay Act claims.  I am convinced by

10   plaintiff's letter that if there was evidence to support

11   willfulness, it should go to the jury.  However, the evidence

12   in the record is insufficient for a reasonable jury to find

13   that defendants knew that they were violating the law or showed

14   reckless disregard for whether they were violating the law.

15   Negligent conduct is not willful conduct.  Although Rubin

16   testified that he did not know the requirements of the Equal

17   Pay Act, he also testified that he relied on the HR and legal

18   departments, which reviewed all contracts before they were

19   permitted to be signed and go into effect, and that all

20   contracts were benchmarked and surveyed for gender equality.

21        The Court grants judgment as a matter of law for

22   Kaplan on all claims of retaliation.  There is insufficient

23   evidence in the record for a reasonable jury to conclude that

24   Kaplan had any retaliatory intent or that he had any

25   involvement in any adverse action.

N7iWede6

1    The Court also grants judgment as a matter of law for

2    defendants Kaplan, Rubin and Swirnow on the discrimination

3    claims.  The evidence shows, at most, that Rubin stated to

4    plaintiff, in Swirnow's presence, to "smile more" and "fake it

5    till you make it" during a meeting to counsel her on

6    interpersonal relations, but those claims are barred on statute

7    of limitations grounds, and the continuing violation doctrine

8    does not apply.  In addition, at most, they constitute petty

9    slights.  In addition, plaintiff does not dispute an award of

10   judgment for Swirnow.  The statement attributed to Kaplan that,

11   when plaintiff got upset he said "calm down" is, at most, a

12   mere petty slight and petty inconvenience, and keeping the

13   claim in would otherwise turn the city human rights law into a

14   civility code.  There is no evidence from which a jury could

15   find that it was discriminatory.

16   On damages, defendants are granted judgment on the

17   claim for punitive damages.  There is no evidence from which a

18   reasonable jury could find that defendants engaged in gross

19   misbehavior or conduct that willfully or wantonly caused hurt

20   to another or engaged in willful or wanton negligence or

21   reckless conduct or consciously disregarded the rights of the

22   plaintiff.

23   The jury will not be charged on back pay, as agreed by

24   the plaintiff.

25   The charge will be amended to reflect these

N7iWede6

1    determinations, and a new draft will be circulated by 7 p.m.

2    Any objections that arise from the edits must be filed on ECF

3    and emailed to the Court by 10 p.m. tonight.

4            The Court reserves decision on the remainder of the

5    motions.

6            Any questions from plaintiff?

7            MR. LABUDA:  No, your Honor.

8            The only request we would make is just in terms of the

9    modifications of the demonstratives.  I think we had until

10   seven.  Could we just have until eight to clean these up based

11   on your Honor's rulings?

12           THE COURT:  That's fine.

13           Can defendants send me anything they've got, any

14   objections, by 11 p.m.?

15           MR. SCHOENSTEIN:  Yes, your Honor.

16           THE COURT:  Good.

17           All right.  Anything from defendants?

18           MR. SCHOENSTEIN:  Your Honor, I just want to make

19   sure, I did not hear a ruling as to the proper corporate

20   defendants.  I take it you are reserving decision on that part

21   of the motion as well.

22           THE COURT:  I am.  Everything that I did not rule upon

23   I'm reserving on.

24           MR. SCHOENSTEIN:  Understood.  Thank you, your Honor.

25           THE COURT:  OK.  I should also say that the verdict

N7iWede6

1  form will be revised as well to reflect these changes, and we

2  will email that to you as well.

3          Thank you, all.  Good luck preparing your closings.  I

4  look forward to seeing you and hearing from you tomorrow

5  morning.

6          (Adjourned to July 19, 2023, at 9 o'clock a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       INDEX OF EXAMINATION

 2    Examination of:                            Page

 3     ANDREW JAY PORGES

 4    Direct By Mr. Kataev . . . . . . . . . . . .1178

 5    Cross By Mr. Schoenstein . . . . . . . . . .1215

 6    Redirect By Mr. Kataev . . . . . . . . . . .1237

 7    Recross By Mr. Schoenstein . . . . . . . . .1246

 8    Redirect By Mr. Kataev . . . . . . . . . . .1251

 9     ANANG MODI

10    Direct By Mr. Labuda . . . . . . . . . . . .1255

11    Cross By Mr. Steer . . . . . . . . . . . . .1271

12    Redirect By Mr. Labuda . . . . . . . . . . .1282

13    Recross By Mr. Steer . . . . . . . . . . . .1287

14     SARI EDELMAN

15    Direct By Mr. Labuda . . . . . . . . . . . .1292

16    Cross By Mr. Schoenstein . . . . . . . . . .1295

17                      DEFENDANT EXHIBITS

18    Exhibit No.                            Received

19     III    . . . . . . . . . . . . . . . . . .1226

20

21

22

23

24

25
```

N7JCede1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DR. SARI EDELMAN,

            Plaintiff,

        v.                    21 Civ. 502 (LJL)

NYU LANGONE HEALTH SYSTEM, *et
al.*,

            Defendants.
                              Trial
------------------------------x
                              New York, N.Y.
                              July 19, 2023
                              8:55 a.m.

Before:

                    HON. LEWIS J. LIMAN,

                    District Judge
                    -and a Jury-

                        APPEARANCES

MILMAN LABUDA LAW GROUP PLLC
    Attorneys for Plaintiff
BY:  JOSEPH M. LABUDA
        EMANUEL S. KATAEV

TARTER KRINSKY & DROGIN LLP
    Attorneys for Defendants
BY:  RICHARD C. SCHOENSTEIN
        RICHARD L. STEER
        INGRID J. CARDONA

N7JCede1

```
 1                (In open court; jury not present)
 2                THE COURT:    I've received plaintiff's letter of last
 3   night with respect to the objections to the instructions.  I
 4   understand those objections to be not with respect to any
 5   language that the Court used, but of the deletion of language
 6   that was in the charge as a result of counts and claims that
 7   have been dismissed.
 8                So I'm going to deny the letter of July 18th, 2023
 9   with respect to the instructions on the grounds that it is, in
10   effect, a way of challenging and asking for reconsideration of
11   the Court's decision on the motion for judgment and the
12   instructions that I sent out to the parties last night will be
13   the instructions that I'm going to deliver.
14                With respect to the demonstrative exhibits, I received
15   a letter last night from the defendants objecting to various
16   slides.
17                The objection with respect to slide 7, 18, 19, 20, 33,
18   34, and 35 on the basis that plaintiff shows the defendant
19   portions of a transcript is denied.
20                The objection with respect to slides 11 to 16, 32, and
21   37 to 40, that they attempt to set forth the law is also
22   denied.
23                Finally, the objection with respect to slide 5, that
24   it addresses the alleged remarks in 2017, is also denied.
25                The jury will get an instruction as to the claims of
```

N7JCede1

1    discrimination that remain in the case and the defendants that

2    remain in the case, but that evidence is still in the case, so

3    plaintiff can argue that.

4                With respect to the objection to slides 15 to 16 and

5    the use of the language "motivated solely," I'll hear from the

6    plaintiffs briefly, but that appears to be inconsistent with

7    the charge.  I'll also hear from plaintiff on slide 31 whether

8    the plaintiff really intends to play a video that's not in

9    evidence.

10               Slide 32, the objection seems to be well founded that

11   the language about doctors treating patients full-time is an

12   argument on the facts, not a legal element, and that by putting

13   it in the column for elements, it's misleading.

14               I'll hear from the plaintiffs also about the language

15   "motive does not matter."  On slides 37 to 40, the objection

16   appears to be well founded, that that should not be under an

17   element.  Same thing with NYU's excuses of pretext, that should

18   not be indicated as a statement of law.

19               And then the last comment that I've got is with

20   respect to prior salary being a justification.  On slide 39,

21   the Court would be okay with that language if, after "prior

22   salary," the slide has the language "alone," otherwise the

23   Court believes that that would be a misstatement of the law if

24   it suggests that the defendant cannot at all consider prior

25   salary in coming up with pay calculations.

N7JCede1

1        Let me hear from the plaintiff with respect to the

2   open items.  Mr. Labuda, do you want to address them.

3            MR. LABUDA:    Sure.  Your Honor, with respect to 15 and

4   16, we believe that the language in the charge references the

5   fact that it has to be the motivating factor in the jury

6   instructions.  So, when it says "the motivating factor," I can

7   pull out the jury instructions, but that's what I believe -- I

8   received that language in terms of that.

9            THE COURT:    I think you're going to need to look at my

10  jury instructions and then revise the language, indicate what I

11  say in the instructions.

12           MR. LABUDA:    We can keep it consistent with the

13  instructions.  I believe it said "the motivating factor,"

14  indicating that it's "the," but if there is an objection to

15  "solely," the word "solely" is not in your instructions, we can

16  take that out.

17           MR. SCHOENSTEIN:    The word "solely" and the "100

18  percent" because that is inconsistent with the law.  It doesn't

19  have to be 100 percent, the factor.

20           THE COURT:    Those are the two things.  Just look at my

21  instructions.

22           MR. LABUDA:    That's fine.

23           THE COURT:    Basically, the instruction on the

24  affirmative defense is that the defendant has to show that it

25  would have taken the same action even absent the retaliatory

N7JCede1

1    motive.

2              MR. LABUDA:    With respect to 31, the video, we do

3    intend to play it.  We believe that, again, the Court is

4    instructing the jury that this is not anything --

5              THE COURT:    What is the video?

6              MR. LABUDA:    The video is a video of the Academy

7    Awards where there's a comment made about a pay disparity.  The

8    jury can -- again, it's not evidence.  The Court is instructing

9    the jury this is not evidence, but they could take into their

10   own experience, this is something they may have seen on TV, it

11   may have been comments that they've heard, but they're allowed

12   to take in their own experiences like that.  Again, we're not

13   saying that this is the law.  We're simply saying that we

14   believe that there is a pay disparity and that's why the Equal

15   Pay Act was initiated to begin with.  So we're allowed to make

16   arguments about the fact that they can take these

17   experiences --

18             THE COURT:    What happens in the clip?

19             MR. LABUDA:    In the video, Amy Schumer, who is a

20   comedian, she says that she -- that there are three women up

21   there, three actors presenting this award because it's cheaper

22   to have three women than one man.  And that's what it says.

23   Again, we're not offering it in evidence, but they can take

24   those experiences, and if there's comments that are out there,

25   we're allowed to make arguments about that.  We feel very

N7JCede1

| | |
|---|---|
| 1 | strongly about that.  It's 20 seconds, 25 seconds. |
| 2 | THE COURT:    Let me hear from the defendants on that. |
| 3 | MR. SCHOENSTEIN:    Your Honor, the jury can take into |
| 4 | their experiences, but the plaintiff wants to create an |
| 5 | experience by showing them a clip that's not in evidence that |
| 6 | the jurors may never have seen.  If they want to talk about the |
| 7 | Oscars in their closing, have at it, but they can't show them |
| 8 | clips that are not in evidence.  That is giving the jury |
| 9 | material that's not in this case.  It's bad enough they have |
| 10 | these drawings in there, which we didn't object to, but playing |
| 11 | a video goes too far. |
| 12 | THE COURT:    I'm going to permit it.  As the defendant |
| 13 | indicates, they could make reference to it in argument, the |
| 14 | fact they're showing it does not seem to be overly prejudicial. |
| 15 | MR. LABUDA:    Thank you. |
| 16 | With respect to 32, your Honor, with the treatment of |
| 17 | patients for full-time, I believe that that is -- |
| 18 | THE COURT:    That's just not going to be in your legal |
| 19 | elements.  I'm going to rule with respect to that. |
| 20 | MR. LABUDA:    We can move it over to the fact section, |
| 21 | your Honor, that's fine.  Although, I do believe it -- I |
| 22 | understand what you're saying. |
| 23 | THE COURT:    It's misleading to suggest it's an |
| 24 | element. |
| 25 | MR. LABUDA:    I understand what you're saying.  We can |

1   move that over.  It's more argument than it is element.  I

2   don't disagree with that.  We'll move it over to the facts.

3           THE COURT:    Motive doesn't matter.  You also, No. 1,

4   don't need it, and No. 2, I think it is misleading.  You have

5   there:  No intent to pay, lest discriminate women required.

6   that is a correct statement of the law, but you'll strike

7   "motive," does not matter.

8           MR. LABUDA:    We can move that over to the fact section

9   and make that argument.

10           THE COURT:    You'll make that.  At some point probably

11   during the defendants' closing, I will have the opportunity to

12   tell the jury that the parties' statement of law is not

13   controlling and that they should take my instructions, not what

14   any lawyer says.

15           MR. LABUDA:    Yes.

16           THE COURT:    If there's not an occasion to say that

17   during the defendants' closing, because the defendant doesn't

18   make a statement of the law, I will say that during the

19   plaintiff's closing.

20           MR. LABUDA:    Yes.  And I plan to instruct the jury or

21   to tell the jury that what I'm saying here is not the law,

22   you're going to hear from the Judge on the law.

23           THE COURT:    Okay.  Then slides 37 to 40.

24           MR. LABUDA:    37 to 40.

25           THE COURT:    With respect to no system, how are you

1     going to use that?

2              MR. LABUDA:    So the system has to do with the fact

3     that there's no system in terms of education, training, or

4     experience that's in play.  There's no factor that they used

5     where there's a metric.  There's testimony about --

6              THE COURT:    So you can argue that as to facts.  You

7     can't put that into the legal elements because that would be

8     misleading.  It would suggest that the jury's not going to be

9     instructed with respect to there being a system of quality and

10    quantity.  Those factors, as we've discussed, are relevant to

11    factors other than sex.  Again, you can move it.

12             MR. LABUDA:    The only thing I'd say, your Honor, is

13    with respect to even the bona fide factor, it has to be applied

14    evenly.  And so, what we're saying is there's just not a -- and

15    that's what the law is.

16             THE COURT:    Again, you can move that to that there's

17    no system, you can move that to the facts, but you can't put

18    that into the elements because it's not consistent with and not

19    part of my charge.

20             MR. LABUDA:    That's fine, your Honor.

21             And I think you had one last -- I think it was about

22    the pre --

23             THE COURT:    There are two other things.  NYU's excuses

24    of pretext and do not justify paying the doctors.

25             MR. LABUDA:    We will move that over.

N7JCede1

```
 1                THE COURT:   And then the last one is with respect to
 2    prior salary, you'll add the language:  "Prior salary alone
 3    cannot be justification."
 4                Any objection to that?
 5                MR. LABUDA:   That is in the affirmative defenses.  I
 6    believe our argument -- I mean, it's in Judge Schofield's
 7    summary judgment decision, I understand your Honor's ruling on
 8    that, but I mean she specifically says and we're allowed to
 9    argue, you can't use prior salary alone to make that
10    determination.  What they're arguing is --
11                THE COURT:   Okay.  Good.  You'll add the word "alone"
12    because you just did it in your argument to me.
13                MR. LABUDA:   Your Honor, we would say "alone," that's
14    fine, but that factor, "alone," is not sufficient to make the
15    pay disparity.  I can make that argument in the closing.
16    That's fine.
17                THE COURT:   But you can also add the word "alone" to
18    your slide because that's consistent with what you just said in
19    terms of the argument and with the law.
20                MR. LABUDA:   That's fine, your Honor.  We can add the
21    word "alone."
22                THE COURT:   Anything else before we bring in the jury
23    from plaintiff?
24                MR. LABUDA:   No, your Honor.
25                THE COURT:   Mr. Steer.
```

N7JCede1

 1              MR. STEER:    Your Honor, two small things.

 2              On the jury charges, my understanding was that David

 3    Kaplan's name was going to be removed as a defendant.  Maybe I

 4    have that wrong, but that was my understanding from your

 5    Honor's ruling, and he appears as a defendant on page 1 in the

 6    introduction and on page 7 in the "all persons equal before the

 7    law."  So I thought that --

 8              THE COURT:    Any problem removing his name since

 9    they're not going to be asked to consider him?

10              MR. LABUDA:    That's fine.  I think it was an

11    oversight.

12              THE COURT:    I would otherwise not entertain the

13    objection, but it seems to me to be a well founded one to which

14    there can be no objection, so we'll take care of that.

15              MR. STEER:    Your Honor, one last thing, and I spoke to

16    plaintiff's counsel about this, and I don't think they

17    disagree.  During the charging conference, your Honor indicated

18    that you were going to at least make some mention in the

19    charge, the first charge under the Equal Pay Act, that wages

20    included what you talked about before, which was in the third

21    element on page 25, that wages include all forms of

22    compensation.  I thought your Honor had said you are going to

23    either refer back to that or list it again.

24              THE COURT:    No, since I had mentioned already under

25    the Equal Pay Act, federal Equal Pay Act how wages are defined,

N7JCede1

1    I was not going to in the charge with respect to the federal

2    Equal Pay Act to mention it twice.  The jury will have it once.

3              MR. STEER:    Yes, I'm talking about in the damage

4    section, your Honor.

5              THE COURT:    I'll take another look at that.

6              The parties should make sure that they have given to

7    my deputy the list of exhibits and the list of witnesses.

8              Mr. Labuda, are you going to do the closing?

9              MR. LABUDA:    Yes.

10             THE COURT:    And do you want a warning, a ten-minute

11   warning, a five-minute warning?

12             MR. LABUDA:    I think I have my warning right next to

13   me, your Honor.  I'll have a watch up there, too.

14             THE COURT:    Mr. Schoenstein, are you going to deliver

15   the defense closing?

16             MR. SCHOENSTEIN:    I am, your Honor.

17             THE COURT:    Do you want a five- or ten-minute warning?

18             MR. SCHOENSTEIN:    If you don't have a hook, I'll take

19   a 10-minute warning.

20             THE COURT:    We'll give you a 10-minute warning and

21   we'll do it without the hook.

22             Anything else before I bring in the jury?

23             MR. KATAEV:    I just want to do a sound check for the

24   video.

25             THE COURT:    You should have done that before.

1    MR. KATAEV:    It should take one minute.

2    THE COURT:    You have 15 seconds.

3    (Pause)

4    Okay.  Let's bring in the jury.

5    (Jury present)

6         Good morning, members of the jury.  I hope you all had

7    a pleasant evening.  We'll begin this morning with closing

8    statements.  We'll hear first from defendants and then we'll

9    hear from plaintiff.

10        Mr. Schoenstein.

11        MR. SCHOENSTEIN:    Thank you, your Honor.

12        Good morning, everybody.  I still don't have any

13   charts, and there's not going to be any math on this part of

14   the test.  You don't need charts, you don't need math, you

15   don't need funny videos, this is not a reality show, this is

16   not an award show, this is a trial, and I told you I would come

17   with evidence, I would come with facts, I would come with

18   witnesses, and that is what we believe we did and that's all

19   you need to decide this case.

20        Now, I want to say it's been a total honor to

21   represent NYU and the four individual defendants, and it's been

22   an honor to try the case to you guys because we watch you every

23   day, we see you paying attention, we see you writing stuff

24   down, we see your concern and your interest, I know you're

25   thinking about this, and we really appreciate that.

1            So, we're almost at the end of the marathon, let's get

2   on.

3            Unfortunately, in 2023, discrimination is alive and

4   well in America.  Nobody in this room is confused about that

5   where people are discriminated against because of their gender,

6   their gender identity, their sexual preference, race,

7   religion — that should be quashed.  But this is not that case,

8   and just as it's important to quash discrimination where you

9   find it, we have to be able to distinguish what is a fight

10  about in office from what is discrimination.  We have to be

11  able to tell the difference from paying people differently

12  because of valid factors and paying people differently because

13  of their gender.  Not every day at work is great, not every

14  paycheck is as big as you want, and not every disagreement

15  belongs in federal court.

16            In this case, plaintiff did not prove that the

17  discussions about her office, even if they made her

18  uncomfortable, amounted to discriminatory treatment.  Plaintiff

19  did not prove that the nonrenewal of her contract 14 months

20  later resulted from that disagreement.  And Dr. Edelman has not

21  shown that she was paid less for the same work as male doctors

22  or that any difference was because of her gender.

23            I'm going to take you through all three components of

24  the claims made by plaintiff and talk about why we think their

25  proof has failed.  But, before I start on that, I want to make

N7JCede1                    Summation - Mr. Schoenstein

1    a few observations about credibility.

2              One of the things we ask a jury to do, the reason

3    you're here is to assess the credibility of the people on the

4    stand.  I'm not going to stand up here and call plaintiff a

5    liar.  I think that would be wholly unfair.  She feels

6    strongly, you can tell, about what she went through, but I do

7    have to point out that she embellished the facts in this case

8    many times.  She told you she had a very successful private

9    practice, but then you heard from her business partner.

10   They're paying themselves out of loans, the practice was in

11   debt, it was not profitable.

12             Plaintiff insisted their next employer, Nassau

13   Radiology, "we don't know anything about them going into

14   bankruptcy, that had nothing to do with us leaving," but again,

15   Dr. Mehta told you that's exactly why they left.

16             Plaintiff said that the repayment of her loan was

17   never considered part of her salary.  Dr. Mehta challenged

18   that, "of course we considered repayment of the loan part of

19   our salary, who wouldn't."  If somebody -- if your employer was

20   paying off a big loan for you, you would consider it part of

21   your compensation.

22             Plaintiff asked in negotiations for a $3,000 expense

23   allowance in her contract and then came into this courtroom and

24   told you it was some kind of cap on expenses.  It wasn't a cap,

25   it was a guarantee of $3,000 of expenses.  There was no cap you

N7JCede1          Summation - Mr. Schoenstein

1   heard in the testimony to what any doctor could ask for expense

2   reimbursement.

3              Plaintiff tried at the time and still tries to tell

4   you that her contract guaranteed her her own private exclusive

5   office forever, and that's not what the contract said.  You

6   guys saw it.

7              She told you she always got along with her staff, and

8   then you heard the truth about that.

9              She told you she had been deprived of a free NYU med

10  school education for her daughter, and then you heard NYU med

11  school is free for everyone in all specialties, and she still

12  argued.

13             She claimed moving to Florida was a hardship.  But the

14  evidence is really clear, she was considering moving to Florida

15  the whole time, from the moment this nonrenewal happened.

16             Now, Dr. Edelman, again, may earnestly believe she was

17  wronged, but her presentation in this courtroom has not been

18  limited to the facts.  And remember, she's the only witness who

19  really testified on her behalf.  The other witnesses, the other

20  10 witnesses in this case are NYU people, and while plaintiff

21  embellished her case, her lawyers basically called every other

22  witness on the stand a liar.

23             Think about that.  Plaintiff's case largely rests on

24  the proposition that all 10 of the other witnesses were lying.

25  Dr. Mehta is lying because there's a non-disparagement

N7JCede1            Summation - Mr. Schoenstein

1    provision in her contract like every other contract at NYU and

2    millions of other contracts.  Mr. Antonik and Mr. Kaplan are

3    lying because they had personal vendettas based on complaints

4    now four years old.  Mr. Swirnow and Mr. Rubin are lying, I

5    don't know why they're supposed to have been lying, but that's

6    the implication.  Ms. Ruiz, a nonparty former NYU employee,

7    she's lying because she's just doing Joe Antonik's bidding,

8    even though neither of them work for NYU anymore.  Ms. Pacina,

9    they said the other day, is not competent and is not telling

10   the truth.  Drs. Goldberg, Porges, and Modi, they're all lying

11   to you about the number of RVUs they did and whatever else that

12   plaintiff doesn't agree with.

13            Plaintiff spent so much time trying to nail witnesses

14   with little "gotchas" when they would read the deposition

15   testimony.  That mostly fell flat.  When these witnesses were

16   just asked what happened, they told you, and were strongly

17   credible in all respects.

18            On top of that, plaintiff says we didn't bring enough

19   documents to the case.  "Why didn't you bring more documents?"

20   Now, I want to ask you, did you really want us to bring more

21   documents?  Is that what you were hoping for?  You don't bring

22   every piece of paper out in the world when the testimony

23   establishes the facts.  So to find for the plaintiff, you have

24   to forgive her embellishments of the facts and decide that the

25   other 10 witnesses are all lying, and I just submit to you that

1    that's not a reasonable thing to do.

2              Let's talk about the three claims that are in this

3    case.  I want to start with plaintiff's claims that she was

4    paid less than male doctors doing the same work because she was

5    a woman.  I don't think there's any doubt that Dr. Edelman is a

6    hardworking, patient-focused rheumatologist.  We respect that.

7    But she was not doing the same job as Dr. Goldberg, Dr. Porges,

8    or Dr. Modi.  They all had different jobs and all, and the

9    evidence is undisputed, each one of them was more productive

10   than plaintiff was.  That's not disparaging, some people just

11   do more than others, that's just a thing, but that's a basis of

12   compensation.

13             In each case, there were good reasons for paying the

14   men more than plaintiff.  Dr. Goldberg, in particular, was

15   hired to do a much different job.  There wasn't even a

16   rheumatology department on Long Island when he was hired.  He

17   came in to build the group, and he did that, build a group and

18   greatly expanded his own personal numbers, that's what the

19   evidence showed.

20             Plaintiff's claim ignores Dr. Goldberg's greater

21   experience, he was a doctor 12 years before she was, his

22   productivity, his reputation, his academic background, his

23   leadership role.  It also ignores that he didn't have any need

24   to come to NYU at all.  He was taking a risk coming to a

25   nonexistent rheumatology department.  And he didn't come in

1   with anything, any loans, any expenses, there was no extra to

2   pay Goldberg, it was just salary.  They wanted him, they needed

3   to make a big splash to build the department, and they hired

4   him.  Dr. Goldberg was hired to do much more than plaintiff,

5   and as it turned out, he greatly exceeded her, both in the

6   amount of clinical work he performed and in the other

7   administration, recruiting.  I mean, he's the one who brought

8   in Dr. Edelman and Dr. Mehta and others, and practiced

9   building.

10              Now, Dr. Porges came from private practice.  Remember,

11  there's only two of them that came from private practice,

12  Dr. Edelman and Dr. Mehta and then Dr. Porges, but he had much

13  more experience.  He was a doctor when plaintiff was in grade

14  school.  I said high school in my opening, I misspoke.  He was

15  a doctor when she was in grade school.  He had a better

16  reputation, much more revenue.  Remember, $2 million his

17  practice was bringing in.  He had a research practice, he had

18  leadership responsibilities.  He was a much more attractive

19  candidate from the outset.  As Mr. Swirnow testified, it wasn't

20  even close.  And he, too, exceeded the plaintiff in his

21  clinical numbers, his clinical research which she did not do,

22  and his administrative responsibilities which she did not have.

23  Despite all of that, you heard plaintiff's testimony

24  continuously look to diminish and discount the additional value

25  he provided to NYU.  He brought in more patients, more

N7JCede1          Summation - Mr. Schoenstein

1    infusions, research money.  NYU thought he would have the more

2    valuable practice and he did.  Again, that's not disparaging

3    Dr. Edelman, but his practice was more valuable just on the

4    numbers.

5              Now, Dr. Modi didn't come from private practice, so he

6    didn't get compared the same way she did, but he, too, brought

7    more experience than Dr. Edelman, not as much more experience

8    as Dr. Porges, but they were all more experienced.  He had a

9    higher salary coming into NYU and NYU needed to exceed that

10   salary to get him to join.  He said, "I needed a 10-percent

11   raise, they gave me a 10-percent raise."  He wasn't coming

12   without that.

13             They sought to diminish Dr. Modi.  "Oh, he's just a

14   HIP doctor," whatever that means.  But he came with his

15   patients, he built other patients, and the numbers show that

16   Dr. Modi also outperformed plaintiff every step of the way.  He

17   said he's in the top 10 percent of all rheumatologists in terms

18   of productivity and he is paid accordingly.

19             By the way, did you notice yesterday that they pointed

20   out that Dr. Modi initially got paid more than Dr. Porges?

21   That proves our point.  It's not always exactly equivalent.

22   Some doctors get paid more than others.  Every doctor is looked

23   at differently.  Every negotiation is different.  Modi came in

24   at a higher salary than Dr. Porges, Dr. Porges may not have

25   been thrilled with that, but it's not discriminatory.

1              Dr. Edelman suggests that NYU haggled with her more

2      than the other doctors, but that's not what the evidence shows.

3      Her business plan shows that she was making $182,000 a year

4      before joining NYU.  I know she says $200,000, I know everybody

5      rounded up, but if you look at the numbers in the business

6      plan, it's $182,000 at Nassau Radiology.

7              The package she got at NYU was worth $265,000, right.

8      She got 207 in salary, $3,000 in guaranteed expenses, they

9      didn't guarantee those for any other doctor, and loan repayment

10     worth about $55,000 a year.  That's a $265,000 package.  That

11     is almost a 50-percent raise of what she was making before.

12     And NYU took over her lease, took over all her expenses, took

13     over her whole office on top of that, relieved her of all of

14     that responsibility and risk.

15             You have to count the loan.  Remember Dr. Mehta, when

16     asked:  "Did you think the loan repayment was part of the

17     salary?"  "Absolutely, that was part of the deal.  They were

18     going to repay that and then they would raise our salary."  And

19     they did that on renewal.  They gave her the extra value that

20     they had been putting into the loan and they even gave her a

21     raise on top of that.  NYU did what it said.  Now, NYU didn't

22     take on any expense for Dr. Goldberg or Dr. Modi.  And for

23     Dr. Porges, just a couple months of rent — not significant.

24             You may hear in the next closing argument plaintiff

25     say, well, split up the payments, look at them per RVU, this

1    person got more per RVU than that person or some other voodoo

2    mathematics to try to get you to see it their way.  I urge you

3    not to do that.  None of the doctors were paid by the RVUs.

4    Salaries were determined, the RVUs were targets factored into

5    the bonus.  If you're going to play the game of per RVU, then I

6    would suggest you look at the contract of Louise Raminfard,

7    exhibit X, who was being paid $265,000 with an RVU expectation

8    of 3900.  That would be about 68 cents per RVU.  That's more

9    than Modi got paid, that's more than Porges got paid.  So it

10   didn't depend on gender, it just depended on the contract.

11            Sorry.  That was pretty close to math and I said there

12   wouldn't be any math.  Creative math can't change the facts.

13            The jobs of Dr. Goldberg, Porges, and Modi required

14   greater skill, effort, and responsibility than plaintiff.

15   Dr. Edelman did not do substantially equal work to the other

16   doctors.  She had fewer responsibilities, she was less

17   productive.  Dr. Goldberg and Dr. Porges were essentially her

18   bosses.

19            And perhaps most importantly, the differences in pay

20   were based on factors other than sex.  That last point is

21   crucial.  You saw no evidence in this trial that anybody made a

22   decision about salary based on gender, none.  You heard

23   Mr. Swirnow and Mr. Rubin testify and explain how they meet the

24   doctors, the things they consider and how they set the

25   salaries.  They testified very credibly and consistently about

1    the factors and the greater additional monetary benefits that

2    NYU gets from the comparators and from plaintiff, about things

3    like infusion compensation, patient referrals.

4            Now, keep in mind, Swirnow and Rubin have two MBAs

5    between them, they have 42 years of experience setting

6    salaries.  There's no expert witnesses in this case, but

7    they're pretty close.  They've been doing this, they know what

8    they're doing, and they stood on that stand and told you

9    gender, of course, doesn't play into it.  You saw what

10   Mr. Rubin said when I asked him about that, if he considers it.

11   Just because plaintiff doesn't understand how NYU sets

12   physician salaries doesn't mean they lacked a system or they

13   set them arbitrarily.  Mr. Rubin and Mr. Swirnow describe a

14   multitude of bona fide factors that go into compensation

15   decisions.  Sex was not one of them, it played no role.

16           So, after our arguments, the Judge is going to give

17   you instructions.  You're all going to go back into the jury

18   room with a verdict form that the Court will give you.  This is

19   how you make decisions on what's in this case.

20           The first set of questions you're going to see are

21   about this equal pay claim.  There's a federal equal pay claim,

22   a federal law count.  There are five questions on the verdict

23   form.  You'll see them, you'll read what the questions are, so

24   don't take my word for it, read the form.

25           But the first question asks if plaintiff was employed

N7JCede1              Summation - Mr. Schoenstein

1    in a job requiring substantially equal skill, effort, and

2    responsibility to the comparators — she wasn't.  They had

3    different skill levels, different experience levels, different

4    responsibilities.

5              The second question asks did plaintiff perform under

6    similar working conditions.  That one we concede she did.  They

7    all worked under the same working conditions.  We have no

8    objection to that.

9              The third says was plaintiff paid lower compensation

10   for doing substantially equal work and the answer to that is

11   no, no, no.  Listen, just on the RVUs, she did the least work

12   of any of them.  That's just a fact.  Fewer days in the office,

13   fewer hours in the office, fewer RVUs, no research, no

14   administrative responsibilities, it wasn't an equal amount of

15   work.

16             The fourth question is going to be was the pay

17   differential based on factors other than sex.  Yes, yes, yes.

18   That's the testimony from Rubin and Swirnow.  They didn't

19   consider sex at all, they only considered other stuff.

20             And fifth, has Dr. Edelman proved a violation of the

21   Equal Pay Act.  And you'll see the fifth question is based on

22   your answers to the first four questions, you'll see how it

23   works, but the answer to the fifth question will be no.

24             And then the verdict form has two additional questions

25   because there's a state law Equal Pay Act claim, but those

1    questions will also flow from the first set of questions.

2            The evidence answers every single one of these

3    questions.  There is no basis to conclude that Dr. Edelman was

4    paid less than anyone because of her gender.  That's not the

5    reason.  You don't have to agree with what she was paid.  You

6    might say that's a quarter of $1 million, that sounds like a

7    lot, who would object to that.  You might say that doesn't seem

8    like quite as much as the other guys, I have some questions

9    about that.  You may say that just seems low to me.  It doesn't

10   matter.  The question is, was she paid differently than the

11   other people because of her gender and there is zero proof in

12   this case that that was a factor.  It is just supposition.

13           Let's turn to the second area of this case and the

14   question of anyone made sexist remarks that discriminated

15   against Dr. Edelman.

16           Everyone agrees that when plaintiff was asked if

17   another doctor could use her office on days she wasn't there,

18   she said no.  And you saw in the emails, two of the defendants

19   said that was ridiculous.  It was ridiculous.  Having another

20   doctor in her office on days she wasn't there was going to help

21   the department.  It wasn't targeted at her, they were trying to

22   move a lot of doctors into a small space.  But, instead of

23   agreeing, she threw two guys out of her office, she locked the

24   door, and she rearranged her schedule to be in Marcus Avenue

25   more so no one could use the office.

N7JCede1          Summation - Mr. Schoenstein

1                    Even Dr. Edelman agrees that the office issue was

2      ultimately worked out, but she insists Joe Antonik was

3      physically intimidating and called her a bad word.  I have the

4      bad word in my script, but I'm not going to say it this

5      morning, there are children in the room, but you know what word

6      I'm talking about.

7                    None of that sounds like the Joe Antonik that you met

8      and heard about in this trial.  You heard about him from

9      others.  There's no supporting evidence for the notion that he

10     went wild with arm raising and cursing under his breath.

11     Remember Miriam Ruiz?  She practically laughed out loud when I

12     asked her if she ever saw Mr. Antonik behave that way.

13                   Now, he is tall, he cannot help that, but tall doesn't

14     mean he was aggressive or inappropriate.  And this is where

15     plaintiff's prehension for embellishment comes in.  You will

16     note that this story has changed substantially from the story

17     she first told to Kathleen Pacina, and that Ms. Pacina recorded

18     in her notes that she typed while they had that conversation.

19     Ms. Pacina's notes, and you can look at them, they'll be in the

20     exhibits, say that Mr. Antonik was pointing at things and was

21     intimidating, but it doesn't say anything about him saying

22     everything belongs to me, not you, or him calling her a bad

23     word.

24                   On the telling the story, plaintiff began to embellish

25     and embellish it further.  It's sort of like one of those fish

N7JCede1            Summation - Mr. Schoenstein

1   stories where the fisher says I caught a fish this big, and on

2   the next telling, it was this big, and on the next telling, it

3   was this big.  There's a later email she sends that uses buzz

4   words.  She "says bullying in the workplace," "male

5   chauvinism," but it doesn't add any facts, it doesn't add that

6   somebody called her a bad word.

7            There's nothing in those descriptions that show

8   Mr. Antonik doing anything in a gender offensive manner.  A man

9   sitting in his office could have had the same reaction to the

10   alleged action of Mr. Antonik.  A man could have been sitting

11   at his desk and if someone really came in swinging arms and

12   shouting, a man, too, could have been intimidated.  It has

13   nothing to do with gender.

14            Now, for whatever reason, the story has grown from a

15   guppy to a whale.  Yes, I know a whale is not a fish, but stick

16   with me.  The whale in this case is the allegation that

17   Mr. Antonik muttered a five-letter bad word, and to that

18   question, I have two questions to put to you.  Did he really?

19   And if he did, is that really discrimination?  I submit to you

20   that plaintiff did not meet her burden of proving that

21   Mr. Antonik called her that word.  No witnesses confirmed the

22   allegation or even that Dr. Edelman said it happened.  She

23   didn't say that to Kathleen Pacina, she didn't say that to

24   Dr. Mehta.

25            There is no corroborating proof.  Recall plaintiff's

1  lawyers time after time asking our witnesses:  Where are your

2  documents?  Where are your contemporaneous notes?  Well, where

3  are her contemporaneous notes?  Where did she write down that

4  somebody called her a bad name?  She wrote multiple emails on

5  this topic, but she never put that in it.  She filed a charge

6  with the EEOC, it didn't say it.  She filed a complaint in this

7  case, a first amended complaint, a second amended complaint —

8  none of them contain that allegation.

9          Now she wants to say, well, nobody asked me until the

10  second day of my deposition.  Nobody asked her for any of it.

11  She told the story.  You would think a doctor would know more

12  than anybody to report all of the symptoms of what you're

13  complaining about.  Does it make any sense that Mr. Antonik

14  would have said something like that to her and she wouldn't

15  have mentioned it for two years, even while she's filing

16  complaints with NYU, even while she's filing a complaint in

17  this court?  She didn't make that allegation until two years

18  later.  I would call it a he-said, she-said case, except she

19  never said.  She didn't say that until deep into this case.

20  And Mr. Antonik's story hasn't changed at all from what he told

21  Kathleen Pacina on the day in question.

22          So let's turn to the second question.  Even if he said

23  that, is that enough for you to find discrimination?  Listen,

24  nobody should use that word to insult a woman.  It is gross.

25  But is it lawsuit gross, if you know what I mean.  If you

1    believe he said it, I think you have to ask yourself that

2    question.  Is that enough?  If you put aside -- remember, she

3    says he was muttering, but if you put aside that particular

4    allegation, there's nothing in her description about her

5    meeting with Mr. Antonik, even if she describes it now that

6    rises to the level of sexist misconduct requiring you guys to

7    be here for a week and a half.

8              Dr. Edelman conceded she could have been just as

9    intimidated by a six-foot-five woman.  This case is about

10   height, not sex in this regard.  They tried to paint a picture

11   of Mr. Antonik like he's some cartoonish, broad-shouldered guy

12   standing up and pointing a giant finger at a cowering woman.  I

13   wouldn't be half surprised if they show you a picture like that

14   in closing.  But that's not right.  You saw Mr. Antonik.  He's

15   not particularly intimidating.  They were both sitting down,

16   nobody was pointing at each other, and Dr. Edelman is anything

17   but cowering.  I think we saw that.

18             Remember, Dr. Edelman later complained about

19   Mr. Kaplan.  He, she said, was too calm, and she was offended

20   by that.  So Mr. Antonik was too loud, Mr. Kaplan was too

21   quiet, but fortunately Mr. Swirnow was just right, and she had

22   a telephone call with Mr. Swirnow and they straightened out the

23   office issue.  That should have been the end of it.  Don't get

24   me wrong, Dr. Edelman testified that she's entitled to her

25   opinion and entitled to be upset, and I agree with that.  As it

1   played out, her opinion was very much hurt, right.  The

2   rheumatology department changed its whole plan about the

3   offices to accommodate what she wanted.  She got her way, she

4   got to keep her office, even on Fridays.

5          When she told Mr. Antonik "get out of my office," he

6   got out.  When she told Mr. Kaplan to leave, he left.  When she

7   said she wanted to keep her office, she got to keep her office.

8   Dr. Edelman is a strong and forceful personality, she stood up

9   for what she wanted and she got it, and for that, you might

10  even commend her.  And you could also understand how everyone

11  at NYU thought the issue was over, it had been resolved,

12  resolved in her favor.  Nothing happened here that amounts to

13  intentional discrimination through sexist remarks.

14         Now, on the verdict form, you're going to be asked

15  whether NYU or Mr. Antonik discriminated against her.  She's

16  still suing Mr. Antonik for money.  She has not proven that the

17  remarks were made, she has the burden of proof on that, she has

18  not proven they were sexist, and she has not proven any intent

19  to discriminate.

20         Let's turn to the retaliation claim.

21         So, the fact that the office space matter was resolved

22  in the fall of 2019 really undercuts the retaliation claim.

23  Think about it.  Plaintiff says at the same time NYU ignored my

24  discrimination complaint, NYU retaliated against me because of

25  my discrimination complaint.  Which is it?  Did they ignore it

1   or were they so bothered about it that they retaliated?  Both

2   of those things can't be true.  The fact of the matter is NYU

3   did not think there was a discrimination complaint at any time,

4   but they certainly didn't think there was a discrimination

5   complaint after November 2019.

6               Ms. Cardona, could we have those two exhibits.

7               So I'm putting up on the screen the November 18, 2019

8   emails that we put up during Ms. Pacina's testimony.

9   Dr. Edelman writes to Ms. Pacina at 1:46 p.m., "Wanting to

10  follow up."  And Rashidat Ogbara writes back at 6:14 p.m. the

11  same day, "My colleague, Kathleen Pacina, informed me that you

12  raised some concerns regarding your treatment in the workplace.

13  I am the new ELR manager that supports FGP and will investigate

14  your concerns.  Are you available to speak sometime Thursday or

15  Wednesday?"  It is undisputed that Dr. Edelman never wrote

16  back.  It is undisputed that Dr. Edelman never sent another

17  email, never made another call, never did anything further.

18               You can take those down.

19               We've come to learn that Dr. Edelman was notorious for

20  missing emails.  You heard that in the testimony, but this was

21  an email she should have been looking out for if she was

22  concerned about it.  Whether she missed it accidentally or on

23  purpose doesn't matter, her failure to make any further attempt

24  to contact NYU's HR department means she abandoned the

25  complaint.

1          If I was going to show you one chart in this case, it

2     would have been a calendar — this is a blank piece of paper — I

3     would have written 2020 on it, and it would have had all of the

4     occasions on which plaintiff raised her discrimination

5     complaint with anyone at NYU.  So it would have been a blank

6     piece of paper because that entire year, she never said a word.

7     She did not call the female head of HR, she did not call the

8     female general counsel who leads NYU's legal department, she

9     did not call the female head of rheumatology, she didn't raise

10    it with any of the doctors.  She had so many avenues if she

11    wanted to pursue that discrimination complaint, and the fact

12    that she didn't pursue any of them is really startling.

13          There's a possibility that she only raised the issue

14    in September 2019 because she was mad about her office.  And

15    then she raised it again in November, because remember, there

16    was that little dustup about her moving from Huntington back to

17    Marcus Avenue, so maybe that's why she raised it again in

18    November.

19          Then, when that was quickly resolved, she didn't need

20    it.  We saw an ELR -- we saw her threaten an ELR complaint when

21    she was having computer issues on the premise that it was some

22    sort of plot against her, but maybe deep down, plaintiff had

23    already accomplished the objective she had in bringing the

24    complaint in the first place — she got her office.  Having done

25    that, she could tuck her complaint away in her desk drawer, in

N7JCede1            Summation - Mr. Schoenstein

1    her still totally private office that she kept under literal

2    lock and key, and save it in case she needed it some day.

3    Maybe plaintiff thought it was better to hold onto the

4    complaint than to resolve it.  Whether she did that

5    purposefully or not, the fact is she abandoned the ELR

6    complaint, she did not push it, and it did not persist as an

7    issue occupying the minds of defendants.  Plaintiff says that

8    even though she abandoned any complaint after November 2019 and

9    was never heard from again on the topic that the individual

10   defendants conspired, waited, and then struck to eke their

11   savage revenge.  That's a conspiracy theory and it is not

12   supported by the evidence.

13            Let's talk about the nonrenewal process.  That began

14   14 months after the HR complaint and it began with issues

15   raised by Dr. Porges, the medical director who had no

16   involvement in anything that had preceded.

17            You've heard about those clinical issues, you've

18   received confirmation that there were concerns.  Ms. Ruiz

19   testified, Dr. Goldberg testified, and you can understand, I

20   hope, why NYU would decide not to renew the contract.  She had

21   a lot of patients, and I'm sure she could come up here and show

22   you emails from patients, I'm sure her patients were very

23   satisfied, that she could probably show you that, but she

24   doesn't deny that she had the most complaints of anybody in the

25   rheumatology department.  That was offered and there was no

1    response to that.  She had the most patient complaints, she had

2    the most staff complaints, and Dr. Porges was genuinely

3    concerned.

4                Plaintiff says, well, if they were concerned, they

5    should have remediated the situation.  But I want to ask you

6    this, did you see plaintiff get back on the stand yesterday and

7    she was asked:  "Why did you draw so much blood?"  That's the

8    one thing she got on the stand to rebut and she said Dr. Porges

9    is wrong, this is why I did that.  So I ask you, do you really

10   think remediation would have worked?  Do you think there's any

11   chance that that could have been resolved?

12               Now, everyone involved at NYU thought it wouldn't.

13   They talked about it.  Mr. Rubin raised it, but Dr. Porges and

14   Dr. Goldberg didn't think it would work.  And seeing just this

15   little interaction between Dr. Edelman and Dr. Porges, I think

16   we have to agree.  But you don't have to agree to reach the

17   right verdict.  You don't have to agree that remediation was

18   impossible.  You don't even have to agree that the concerns

19   were sufficient to non-renew the contract.  That's not what

20   you're being asked.  You simply have to see, as the evidence

21   establishes, that it wasn't a product of some scheme by

22   defendants to remove plaintiff by NYU — that's a conspiracy

23   theory, that didn't happen.  Mr. Rubin, who made the decision,

24   he didn't even know about the HR submissions.  The decision

25   maker and his superiors didn't have anything to retaliate

1    against.  And because the nonrenewal begins with Dr. Porges and

2    ends with Andrew Rubin, the conspiracy theory falls flat.

3    Plaintiff offers no evidence other than her suspicions that

4    Mr. Antonik and Mr. Kaplan stayed mad at her for a year, even

5    though she said nothing at all while everybody in the world was

6    busy with COVID, but they were mad, just waiting.

7              Neither she or any other witness or piece of

8    documentary evidence shown to you demonstrates retaliatory

9    intent.  There's no proof that anybody was mad at her or that

10   that had anything to do with nonrenewal.  Her complaints were

11   in September and November of 2019, not a single witness

12   testified that anyone was looking to get back at her at the end

13   of 2020.

14             Dr. Porges, not one of the defendants in this case,

15   was not biased.  Dr. Goldberg was not biased.  The defendants

16   were not biased.  There was no target on Dr. Edelman as she

17   would now suggest.

18             Now, plaintiff's going to argue that the defendants

19   aren't sure if they had one phonecall or two, they don't know

20   if it was a Zoom or in person, they can't get the facts

21   straight, and I will tell you that that kind of gap in

22   recollection actually supports our theory of the case, right,

23   because if this was some crazy conspiracy, you would expect

24   everybody to tell exactly the same story, they would have

25   gotten in a room and figured it out.  So, if people can't

1   remember it exactly the same way, that only supports what we're

2   saying.  They weren't working together to do something

3   insidious because plaintiff herself never said a single word

4   about alleged discrimination after 2019.  There is a

5   determinative lapse of time between the complaints and the

6   nonrenewal.  Us lawyers call it "lack of temporal proximity."

7   That just means November 2019 is a year away from November of

8   2020.  But add it all up, there is no direct evidence, there's

9   no circumstantial evidence that supports her claim for

10  retaliation.  Nobody had an umbrella because it wasn't raining.

11  NYU had a legitimate, non-retaliatory reason for not renewing

12  her.  There was no showing that it was pretext or retaliation.

13          On the verdict form, you'll be asked if Dr. Edelman

14  was engaged in protected activity, and the Judge is going to

15  tell you what that means.  But I suggest to you that even if

16  you think the initial human rights complaint was made in good

17  faith, and you may or may not believe that, her failure to

18  follow up means it was abandoned.  She wasn't engaged in any

19  protected activity in November of 2020 because she wasn't doing

20  or saying anything about discrimination.

21          You will then be asked on the form a few times if the

22  defendants committed an adverse act against her or aided and

23  abetted in an adverse act because of her protected conduct —

24  again, you'll get the legal instruction from the Judge — but

25  the defendants and other NYU employees uniformly testified that

N7JCede1          Summation - Mr. Schoenstein

1     the nonrenewal was made on the basis of a clinical

2     determination, not because of any animus.

3               At the very end of the verdict form, there are some

4     questions about damages.  For the Equal Pay Act claim, you will

5     see, if you don't find liability, you don't have to do any

6     math.  It's like getting out of half the SAT.  If you were to

7     find some liability on the equal pay claim, you would have to

8     compare the difference between her pay and her comparators.  If

9     you were to do that, I would just ask, make sure you're

10    including everything — her loans count, her expenses count.

11    And if you're comparing her to others, don't include things

12    like the administrative amounts that doctors were getting for

13    things that she wasn't doing.  If you were to do that, you

14    would have to compare apples to apples, but we don't think you

15    should get that far because we don't think the differences had

16    anything to do with gender.

17              On retaliation, if you find liability, you're going to

18    be asked if she should be awarded front pay or compensatory

19    damages.  There's no evidence of either.  She never missed a

20    day of work, she never missed a paycheck.  She mentioned

21    something about retirement payments, but, again, where are her

22    documents?  She didn't give you any retirement account

23    information from which you could glean any numbers.

24              Her damage claim comes down to having to move to

25    Florida.  So let me just say a few words about Florida.  I

N7JCede1              Summation - Mr. Schoenstein

1   believe they call it the Sunshine State.  And if you listen to

2   Dr. Edelman, you never heard her say she doesn't like it down

3   there.  Her counsel's opening argument had a big story about

4   how she's away from her family, but she didn't testify to that.

5   And the fact is that she's down there now living comfortable at

6   $330,000 a year, the most she's ever been paid as a doctor,

7   with no state taxes, with lots of teachers and with

8   Mickey Mouse.

9            Also, to the extent she complains about being

10  separated from her family, it seems like she can get back to

11  New York whenever she wants.  She's been sitting here for a

12  week and a half.  She wanted to move down there.  They're going

13  to tell you she looked everywhere, but the only evidence you

14  have of her traveling for a job interview is going down to

15  Florida.  That's the only place she looked hard, that's the

16  place she was looking the day after she was nonrenewed, that's

17  the place where she accepted an offer in February, a month

18  later.  That's what she wanted.  And she got the moving

19  expenses paid for by her new company.  She never missed a day

20  of work.  Moving to Florida didn't cost her anything, so there

21  are no monetary damages.

22            She will argue she suffered emotional damages.  And

23  lots of us go to therapy now and then, and it can be very

24  helpful, but her going to therapy in July of 2021, two years

25  after the fight about the office, doesn't prove any damages

N7JCede1          Summation - Mr. Schoenstein

1    that justify compensation.

2             On the discrimination claim, if you really believe

3    someone called her a bad name and that amounts to

4    discrimination, you could enter a dollar amount, but I don't

5    think she's actually shown even a dollar of damage in that

6    regard.

7             So, again, there is no question that gender

8    discrimination is alive and well in 2023 in the workplace and

9    everywhere else, but this case is not the appropriate place to

10   dress that.  Almost everyone I have ever met wants a better

11   office and more money, but they don't make a federal case out

12   of it and plaintiff literally did just that.  Do not get me

13   wrong, employment discrimination laws are important and can be

14   a valuable tool, but if we start using them in cases that are

15   just a squabble over offices that really never have anything to

16   do with gender, that tool will be dulled beyond recognition.

17   Not every disagreement in the workplace belongs in federal

18   court, not every decision about the renewal of a contract

19   should be litigated.

20            In this case, plaintiff wants to assume the high moral

21   ground of standing up for women in the workplace, but I ask you

22   this:  How did they treat every female witness in this case?

23   "Dr. Mehta, she's the one that should have been nonrenewed,"

24   they suggested to you.  Miriam Ruiz obviously was out to get

25   her.  Kathleen Pacina they tried to call incompetent.

1    Plaintiff stands up for her own opinions and viewpoints as she

2    should, but she disregards the opinions and viewpoints of

3    others, including the people who worked with her, be they women

4    or men.

5              You guys all know somebody like plaintiff.  They're

6    never wrong, they never take responsibility.  She didn't take

7    responsibility at this trial for one single thing.  They don't

8    accept an apology.  It's not her fault, it's Tiffany's fault,

9    it's Miriam's fault.  You guys really think Ms. Ruiz is to

10   blame for anything?  "They only want my office because I'm a

11   woman."  "I can't find my emails, it must be a plot against

12   me."  "They are only non-renewing my contract because I

13   complained."  That kind of person is always telling everybody

14   else that they should look at themselves when, really, they're

15   the ones that need to look in the mirror.

16             This case is not about standing up for women, it's

17   about plaintiff trying to get a money judgment that, frankly,

18   she does not deserve for a case that, frankly, she has not

19   proved.  Plaintiff testified she is entitled to her opinion,

20   she is entitled to be upset, she is entitled to be heard.  I

21   wholeheartedly agree with that and I am glad she got the

22   opportunity to be heard by you and I am glad the other ten

23   witnesses with relevant evidence about the facts also got to be

24   heard by you.  They're all entitled to be heard, but plaintiff

25   is not entitled to any money and she's not entitled to a

N7JCede1                Summation - Mr. Schoenstein

 1    verdict in her favor.

 2                Thank you, all, again so much on behalf of my team and

 3    my clients for being here and for helping us resolve this

 4    dispute.

 5                Thank you.

 6                THE COURT:    Thank you, Mr. Schoenstein.

 7                We'll take a couple-minute stretch break as the

 8    plaintiff steps up.

 9                As you're taking that stretch break, let me remind

10    you, as I told you at the beginning of the trial that when it

11    comes to the law as distinguished from the facts, you'll take

12    your instructions from the Court, that is, from me.  After you

13    hear the next closing statement, we're going to take a break

14    and you'll go back into the jury room.  I have to handle

15    another matter.  And you will be entitled to a break and to

16    some refreshments before I deliver my charge to you, which will

17    take about an hour or so.  And then after that, you'll be

18    deliberating.

19                I want to instruct you again that nothing that the

20    lawyers say about the law is to be taken by you as the law

21    necessarily.  You're to be taken as what the law is will come

22    from the instructions that I give to you.

23                Mr. Labuda, are you ready?

24                MR. LABUDA:    I would just like a two-minute break,

25    your Honor, just to stretch outside.

1          THE COURT:    You've got one minute.

2          (Continued on next page)

1              THE COURT:  Mr. Labuda, start the clock.

2              MR. LABUDA:  Thank you, your Honor.

3              Good morning.  Again, I'd like to thank you as well.

4    I appreciate all the patience that you guys paid to this case.

5    You all paid attention to this case, and we're almost at the

6    end here.

7              As I had said at the beginning, this case has three

8    chapters to it.  The first one has to do with her

9    discrimination complaint about NYU creating a hostile work

10   environment against Dr. Edelman.  The second chapter is her

11   complaint that she did file with HR -- there's no dispute about

12   that -- and then being retaliated against with respect to her

13   adverse, the nonrenewal of her contract as well as the

14   termination that followed in May of 2021.  And the third one

15   has to do with NYU violating the Equal Pay Act by paying male

16   doctors less than her.

17             So I'd like to first talk about the witnesses that you

18   heard.  One issue that you guys are going to have to decide has

19   to do with the credibility of witnesses, and there's a lot of

20   different factors that you can look at.  You take your own

21   personal observations and experiences in terms of when you see

22   that somebody's telling you the truth, when they're lying, when

23   you think they're being, when they're saying something that may

24   not necessarily be 100 percent true.

25             A lot of different things.  You can look at the body

N7iWede6            Summation - Mr. Labuda.

language, see whether or not they talked to you, or are they

talking to the defendants or somebody else?  You can look to

see their eyes as well.  You can look at the bias that they

have.  You can look at the reasonableness of the testimony.

Does it actually make any sense, what they said?  Did their

story make sense to you?  The consistency that they had in

their testimony, the consistency between their story and

somebody else's story.  You can also tell by what they said and

what they didn't say.  OK?  Sometimes that's just as important.

You can also talk about and determine credibility by

whether or not they can back up their story.  You can say

whatever you want to, but if you have proof that can back that

up, you know, did they present that to you?  Because that's the

objective thing.  You can say whatever you want to.  You can

say what happened years ago:  No, didn't do this; didn't do

that; RVUs this; standards of care.  But do they have the

backup for it?  Do they have that objective support?  That

can't be questioned because it's just there in black and white.

Another thing, in terms of credibility, is if you

determine that somebody was not exactly telling you the truth,

you can accept or reject all of their testimony if you want to.

You can reject part of it as well.

And another thing is the impeachment of depositions.

You saw that with a number of witnesses.  Just so you

understand, the deposition is a statement, is testimony that

N7iWede6            Summation - Mr. Labuda.

1    that individual makes under oath, just like they did today.  So

2    they both swore to tell the truth, and if they're inconsistent,

3    that can lead to some credibility questions.  So take those

4    factors into account as well.

5         Like I said before, you can take into account your own

6    personal experiences, as a teacher, a secretary, sanitation

7    worker, working in business development, a doctor.  Whatever it

8    is, you take those experiences with you into that courtroom --

9    or into the jury room when you're deliberating on this case.

10        I will point out a couple things just with respect to

11   the credibility of the witnesses that jumped out to me.

12        You saw these business plans that were created.  So

13   you heard NYU and Mr. Rubin and Mr. Swirnow saying -- and

14   they're exhibits EE and HH.  And they said these are documents

15   that we created.  And they kind of made sense because you see a

16   five-year lookout.  But then you heard Dr. Porges say that's my

17   document.  On those documents, they can't even say who is

18   actually creating these documents, these pro formas about it.

19   So you should take that into account as well.

20        And like I said before, you have to, in terms of

21   determining credibility, you have to determine whether or not

22   they provided to you and gave you the full story here with the

23   RVUs, the draft pro formas that we talked about, these infusion

24   reports that they talked about, the logs from the other

25   doctors.  You heard all about that, but they were never

1      produced.

2            You know, in this case, you heard NYU say wait until

3      you hear the whole story.  That's what they wanted, what they

4      told you at the beginning.  But in this case, they ripped out

5      pages from the story.  Those are critical pieces of information

6      that should have been provided to you.  What were the RVUs?

7      What were these other logs for the other doctors?  Where are

8      these infusions?  Well, with these business plans, where is the

9      backup information showing how much these doctors were making?

10     Because they said they relied on these salaries, these prior

11     salaries.  Where is any of that information?  They have it.

12     They didn't produce it to you, and you have the right to take

13     that into account in terms of determining credibility.

14            Let's jump into the chapters.

15            So chapter one, this one has to do with -- we're going

16     to start at the beginning.  I'm going in reverse order from

17     what defendants did, because I think it tells the story better

18     and gives you a better understanding of everything as it flows

19     through.  So the first one has to do with Dr. Edelman being

20     discriminated against.  And we heard from Dr. Edelman that

21     throughout her employment there, there were certain sexist

22     things that she heard.  You heard her talking about being told

23     to smile more.  You heard her say, with Mr. Kaplan, that he

24     told her to calm down.  And she said, look, I never heard one

25     doctor who got upset, a male doctor who got upset and raised

 1  his voice being told to calm down.  Those are sexist things.

 2  Again, you can take your own experiences back into the jury

 3  room in determining whether or not you think that those things

 4  were sexist in any way.

 5       Let's look at the facts of what happened.

 6       So with respect to the legal elements, OK, and again,

 7  the Court's going to instruct you, as he did before, that he's

 8  going to, the Court, the judge is going to give you the

 9  instructions as to the law.  I wanted to give you a preview.

10  What I'm saying, I believe, complies with him, but ultimately

11  you listen to -- and comports with the judge, but ultimately

12  you need to listen to what the Court's instructions are on the

13  law.  But you're going to hear from the Court that the law for

14  discrimination is that you're treated less well.  That's the

15  standard, that you're treated less well because of your gender.

16  And this applies throughout any type of protected category, be

17  it race or religion or anything like that.  So if you're

18  treated less well, you are discriminated against.  OK?

19       And the law is not a civility code, but you can't

20  treat someone less well because of their gender.  Period, end

21  of story.  So if the reason why or a reason why you are being

22  treated less well is because of your gender, that's

23  discrimination under the law.  Period, end of story.

24       Also, with respect to discrimination, even a single

25  comment is sufficient to establish discrimination.  It can just

N7iWede6            Summation - Mr. Labuda.

1    be one thing, and you can take that totality of the

2    circumstances.  If there's one thing that's said or the way

3    that they act, you can look at the totality of the

4    circumstances to impute or infer that somehow the conduct that

5    was involved here was discriminatory.

6             Then lastly, this is what we call a mixed motive case.

7    So what that means is that sex, in this case, or gender, need

8    only be a motivating factor.  It doesn't have to be the only;

9    it just has to be one.  That could be 1 percent, 100 percent or

10   whatever.  It just has to be a factor to why she was treated

11   the way that she was, it's because of her gender.

12            So let's jump over to the facts.  OK?

13            In this case you heard testimony about Mr. Antonik

14   raising his voice and shouting at Dr. Edelman.  He's leaning

15   in.  He's an imposing figure, intimidating her, and if you

16   believe that he did that, in part, just as 1 percent, that, in

17   part, because of her gender, that's sufficient to create a

18   hostile work environment and discrimination.

19            You heard testimony she was called a -- not the nicest

20   word in the world; I'll say that.  So it was demeaning and

21   degrading.  She never heard him speak to another male coworker

22   like that.  She was very upset about this, couldn't sleep.  And

23   she further avoided all contact with Antonik for the rest of

24   the time that she worked there.

25            You also heard testimony about on September 25, that

N7iWede6              Summation - Mr. Labuda.

1  Dr. Kaplan came into her office and dismissed her claims,

2  wouldn't listen to her about what she perceived as a

3  contractual right to it.  And by the way, you heard testimony

4  and you saw documents about an unshared office.  That was in

5  the negotiations.  You heard Dr. Mehta tell, emailed, and you

6  saw an exhibit about Dr. Mehta explaining to Mr. Swirnow that

7  they had agreed on an unshared office.  So she had a right to

8  raise her voice -- raise her concern to Mr. Kaplan and

9  Mr. Antonik.  But they dismissed her.  You know?

10          In fact, Mr. Kaplan called her complaint or her

11  concern totally ridiculous -- totally ridiculous.  You know, he

12  didn't say that it was contractually unfounded.  You know, he

13  used the word "ridiculous" with respect to Dr. Edelman's

14  complaint and about her.

15          Let's talk about the word for a second.  So here, you

16  heard testimony that, in fact, this word was used before and

17  that NYU knew about it and they knew about it for years.  OK?

18  I'll just jump to the bottom line:

19  "A.  I wasn't asked.  I told Mr. Steer" -- one of NYU's

20  attorneys; you heard from him before -- "at my second

21  deposition when he asked."

22          They knew about this for years.  They're trying to say

23  somehow this wasn't raised at all; it's not in the Pacina

24  report that, by the way, is dated March of 2020, which, by the

25  way, was closed by Ms. Pacina on October 8 of 2019.  And it's

1    not in the complaint.

2          She's not drafting the complaint.  You know that.  You

3    wouldn't do that.  You wouldn't expect her to.  Again, you use

4    your own judgment.  Who would be making those drafts?  That's

5    the lawyers, and there are certain restrictions that lawyers

6    have in terms of putting items into a complaint.  So you take

7    those into account as well.

8          All right.  So after these incidents happened, in

9    fact, the next day after this incident with Mr. Antonik, Dr.

10   Edelman immediately calls HR and she speaks to Kathleen Pacina.

11   OK?  And as a result of that, she's ultimately terminated.  And

12   as I told you at the beginning of this case and I'll tell you

13   now, and the evidence supports it, is that she was under

14   contract.  NYU could not terminate her when she made the

15   complaint, and they couldn't -- and in fact, they testified

16   that they didn't have cause to terminate her.  So when her

17   contract was up for renewal a year later, that's when the

18   conduct happened, and ultimately they determined not to renew

19   her contract and terminate her, based on that.  So they

20   couldn't do anything to her back in September, October,

21   November, when she was complaining about this.

22          So let's look at the elements of a retaliation claim.

23          No. 1 is that Dr. Edelman engaged in protected

24   activity.  I don't think there's any dispute that she engaged

25   in protected activity.  Protected activity means that you made

1    a complaint.  Whether or not it turns out to be viable or not,

2    when you file a complaint, you have a right to make that

3    complaint.  You're allowed to have your voice heard.  That's

4    what the law says, and so that complaint could be either

5    something that you do to HR, it can also be something that you

6    do when you file a lawsuit.

7         I do want to say one thing, because you heard

8    testimony from Mr. Rubin.  You know, this is important.  You

9    heard him say -- and let me just back up to one other thing.

10        With the law, it also talks about the fact that

11   there's an adverse employment action that happens, that you get

12   terminated.  I don't think -- again, there's no dispute about

13   the adverse employment action.  But a company can't take any

14   type of adverse employment action, terminate you, because you

15   filed a complaint.  They can't do anything that's going to

16   adversely affect you.  That's what the law says.  They can't

17   take any type of conduct against you because of that.

18        But you heard Mr. Rubin say that, when he was shown

19   that email about saying that Dr. Edelman was a good doctor that

20   he sent after he fired her for being a bad doctor, he said if I

21   had known she was going to bring this lawsuit, I wouldn't have

22   written that email.  That's retaliation.  That's retaliation,

23   because he's taking an adverse action against Dr. Edelman

24   because she filed a complaint.  You're not allowed to do that

25   under the law.  And he said it in court.  You know, talk about

1   not accepting blame.  NYU wants to say that Dr. Edelman won't

2   accept any blame.  NYU doesn't thing think they did anything

3   wrong here.  Nothing -- nothing.

4            So let's just jump back into the elements here.

5            The law with respect to corporate, to protected

6   activity, you're going to get instructed that general corporate

7   knowledge of the protected activity is enough to establish

8   knowledge by NYU.  So anybody within NYU, as long as somebody

9   within the company knows that there was some type of protected

10  activity, that's sufficient to impute knowledge to the entire

11  company, because a company isn't a person.  And you heard

12  testimony, Ms. Pacina knew about it.  You heard Mr. Kaplan knew

13  about it.  You heard Dr. Goldberg say he knew about it.

14  Mr. Swirnow knew about it as well.  All these people, again, I

15  don't think it's in dispute.

16           The next element has to do with NYU's conduct likely

17  to deter future protected activity.  What that means is they

18  want to, they can't use that to try and send a message to

19  anybody.  You know?  And somehow the termination of Dr. Edelman

20  is going to deter future protected activity, that's unlawful.

21           Lastly, with respect to retaliatory motive -- again,

22  this is that lower standard with respect to mixed motive --

23  that her complaint and the motive that they had about her

24  termination need only be a motivating factor.  Again, it

25  doesn't have to be the only factor.  It could be anything from

N7iWede6          Summation - Mr. Labuda.

1  1 to 100 percent in terms of that.  So if her complaint played

2  some factor in what happened here in her termination, that's

3  sufficient.

4       You know, one thing that's interesting and telling

5  too, before we even get into the facts, are that, you know, for

6  six years, there's no complaints.  No complaints against Dr.

7  Edelman, nothing in writing, no warnings.  There was nothing.

8  They, in fact, renewed her contract.  And then all of a sudden,

9  soon after she files her complaint, there starts to be

10 complaints -- the log, for the first time, created.  No log

11 before that.  She had been working since 2014, and the log

12 doesn't appear until November of 2019.  So almost six years

13 later, the log.

14      You know, a zebra doesn't change its stripes, and Dr.

15 Edelman doesn't change how she acted and performed as a doctor

16 in those six years.  The one thing that changes or is different

17 from the first six years to the next year and a half is that

18 she filed a complaint.

19      So let's go through the facts again with respect to

20 this, just briefly.

21      September 16 is the incident with Mr. Antonik.

22      The next is the email exchange going back and forth

23 between November -- September 25 and November 12.

24      After that, there's emails back and forth, where Dr.

25 Edelman is insisting that this complaint continue on through

N7iWede6          Summation - Mr. Labuda.

1    her emails with Ms. Pacina.

2           And if we look at the next slide, we look at some of

3    the emails that she sends to -- or emails and notes from

4    Ms. Pacina; these are excerpts from Ms. Pacina's notes.  She

5    wants to make a complaint against Joe Antonik.  It doesn't say

6    anything about office space there.  It's about an individual

7    and the way that he acted towards her -- "intimidating,"

8    "throwing," "her heart was racing" and she felt "very

9    uncomfortable."  These are notes from Ms. Pacina.  And again,

10   these are notes that are dated in March of 2020.  So hard to

11   say that these things are the actual notes from back in

12   September.

13          What we do have is Dr. Edelman sending an email to

14   Ms. Pacina on September 25, 2019, about a week after, talking

15   about "inappropriate conduct," "bullying," "condescending,"

16   that he had cornered her.  And again, you can put your own

17   experiences in terms of Mr. Antonik coming into her office and

18   closing the door and it's just the two of them there and the

19   concerns that she had.  She's saying that she needs to be able

20   to work in a nonhostile environment, that she's a female

21   physician and disappointed about male chauvinism going on in

22   the workplace.

23          And then she repeats it again November 1, 2019, when

24   she talks about her harassment complaint and abusive and

25   bullying behavior, treatment of females, implicit bias and that

1    as a female, she's not going to tolerate treatment like this in

2    her workplace and she feels uncomfortable.

3           By the way, these are all the -- the November 1 one,

4    and we're going to get into this a little bit later, this is

5    after -- this is after -- she had had that conversation with

6    Mr. Swirnow about the office and it had been worked out where

7    she was going to go back to Huntington -- or actually, go from

8    Huntington to Marcus Avenue full time.  So it had been resolved

9    with Mr. Swirnow.  We'll get into the actual email, but it had

10   already been resolved.  And she's still, in November, pushing

11   the issue.  OK?

12          The other thing that NYU doesn't really address,

13   throughout this whole case, the closing, is what I call where

14   is the why?  OK?  Where is the why?  Why is it that Dr. Edelman

15   would make up this story?  What's the benefit to her?  They

16   don't explain any of this.  The best that they've got, you

17   heard from defense counsel, is that she must have made all of

18   this up because of an office, you know, this office dispute.

19          Again, take your own experiences into account, whether

20   or not she's going to bring a lawsuit and make these complaints

21   because of an office issue that, by the way, had already been

22   resolved.  And you heard her say, and you heard Mr. Swirnow

23   say, that once that office issue was resolved, she said I'm

24   still going to file, I still want my complaint to be heard.

25          If it was about office space, she'd say great; it's

1  all resolved.  She didn't do that.  They don't explain why is

2  it that she would continue on?  They don't explain where is the

3  why?  And the why is because she was discriminated against.

4  She was harassed.  She was called bad names, and she was

5  treated less well because of her gender.

6            So let's jump over to November 6.

7            This is a critical time, because this is when

8  Mr. Antonik emails and solicits negative feedback of Dr.

9  Edelman.  OK?  So it's not like he was asking, on November 6 --

10  and you saw the emails, and they're in evidence, exhibit 86 --

11  that he's asking for an objective analysis or objective

12  performance evaluation.  He's soliciting clear and convincing.

13  What does that sound like?  That sounds like lawyer speak to

14  me.  They were looking to fire her.  They knew it, and they

15  were looking for clear and convincing evidence about

16  inappropriate behavior.  They were targeting her because they

17  wanted to get rid of her.

18            Did they do this for any other doctor?  No.  And who's

19  the one who's sending this email?  Joe Antonik.  So he's

20  clearly targeting her about information.  And in fact, then,

21  later on in that email, he gave a few examples in the first

22  go-round and then he cut and pasted, with embellishments, the

23  Miriam Ruiz log and sends that out and says here's some more

24  dirt on her.  You know, he's piling on.

25            So then, 12 minutes after he sends that second

1    email -- 12 minutes -- Dr. Porges sends this email, cutting and

2    pasting Mr. Antonik's email and sending that over to Kaplan.

3    Shocked.  Mr. Kaplan is shocked by all this.  But the reality

4    is that the wheels were already moving in place.  They knew,

5    and you heard this from Dr. Goldberg -- that's another

6    important thing.  You heard Mr. Rubin saying, well, I was

7    concerned about her patient care, so I spoke to Dr. Porges and

8    Dr. Goldberg, and they confirmed that there were some serious

9    concerns about her clinical care.  But you heard Dr. Goldberg

10   say when he first spoke to spoke to Mr. Rubin, that was in

11   December of 2020.  That was the first time.  He said I spoke to

12   him in December of 2020, and Mr. Rubin told him we were going

13   to fire her.  That's what he told him.  And then he did an

14   independent look at some of her charts and concluded around New

15   Year, a month after she was terminated, that there may have

16   been some patient care issues.  But the wheels were set.  So

17   that's what Mr. Rubin told you.  He gave you the clear

18   impression that he spoke to two doctors -- that's just not the

19   case -- before he terminated and made that decision.

20          Then, what happens after that is Kaplan forwards the

21   email to Swirnow, who passes the information on to Rubin, who

22   ultimately makes the decision, based on all of this

23   information.  If a factor -- if a factor -- 1 percent, again,

24   was motivation by Joe Antonik in this, that's sufficient under

25   the law for a retaliation claim.

1              THE COURT:  Members of the jury, let me instruct you

2      again that as to matters of the law, it's the Court's

3      instructions that will govern, as counsel indicated.

4              MR. LABUDA:  Yes.

5              THE COURT:  Go ahead.

6              MR. LABUDA:  Yes.

7              With respect to -- you'll also be instructed in this

8      case about what's called the cat's-paw, and cat's-paw is a

9      legal theory.  It comes from an old Aesop fable, and the way

10     that it works, it has to do with somebody who doesn't

11     necessarily have a big retaliatory motive and how they get

12     tricked; they do something that they don't necessarily know all

13     the consequences of.  So cat's-paw goes like this:

14             There's a monkey who's sitting by a fire and he sees a

15     chestnut in the fire.  Right?  And he wants the chestnut, and

16     he tells his cat friend, can you go in and get that chestnut

17     for me?  So the cat goes in, grabs the chestnut, but he burns

18     his paw, and he brings out the chestnut and the monkey gets

19     what he wants.  So that's where it comes from, because in this

20     case, the real motive is from Antonik and Kaplan.  Maybe

21     Swirnow as well, but Rubin, who wasn't a person who was focused

22     on or a target of the complaint, was the one who ultimately

23     made the determination.  So just an interesting fact.

24             So let's look at the defendants' affirmative defenses.

25             Again, we talked about some of this stuff.  They have

1    the burden of proof.  Again, you're going to hear from the

2    Court, that it was motivated by some nonretaliatory reason, but

3    the reality is that their affirmative defense fails because

4    they have a lot of shifting explanations as to what actually

5    happened here.  They've got shifting stories, again, about when

6    things were said between Rubin and Goldberg.  They have

7    shifting stories about her being a bad doctor, yet you saw the

8    email four days later from Rubin saying that she was a very

9    good doctor.

10         You've got no comparison between Dr. Edelman and any

11   of the other doctors, you know, saying too many tests, too many

12   x-rays.  There's no comparison in terms of one doctor versus

13   another.  You didn't see that.  They have all the information.

14   Did they show you how many tests Modi was doing?  Did they show

15   you how many tests Porges was doing?  They didn't show you

16   anything.  Mehta?  They didn't show you any of that.

17         They didn't show you any logs from any other doctors,

18   and again, she had been working, Dr. Edelman had been working

19   for six years without any complaint.  And then boom, she files

20   the complaint and things start moving on that.

21         You heard testimony, again, about the fact that they

22   couldn't terminate her while she was under contract and that

23   they acknowledge that they didn't have cause.  They could never

24   fire her for cause.

25         You saw the emails about negative solicitations, and

1   you also heard testimony that nobody -- nobody -- ever spoke to

2   Dr. Edelman.  That's the crazy part, from my perspective.

3   Like, they get these complaints and they never speak to Dr.

4   Edelman.  They never get her side of the story.  And you heard

5   Mr. Rubin say that when there's some type of dispute, he gets

6   both sides of the story; he wants to hear from both sides.  He

7   didn't do that in this case.

8           Another thing, in terms of just not making a lot of

9   sense, is that although they terminated her and told her on

10  December 1, they allowed her and continued to have her work

11  until the end of May.  They say it's because there's some

12  policy at NYU, we keep everybody there for an extra six months.

13  Where is that policy? Nowhere.  Nowhere.

14          Again, they say something, they can't back it up.

15  Those are shifting stories.  They have the ability to do it.

16  They didn't give it to you.

17          Again, there's no documents here.  There's no standard

18  of care.  There's no nothing.

19          All right.  So let's jump on to the Goldberg, Emanuel.

20          Pass that.

21          Now, Dr. Goldberg, he said in his testimony that he

22  was -- it says:

23  "A.  Yes, well, he notified me about the fact that we were not

24  going to be renewing her and, you know, he did leave a window

25  open for some discussion, so I did some research on my own."

1          OK?  That's what he said when he first spoke to

2    Mr. Rubin.

3          OK.  Now let's go to Mr. Goldberg.

4          Later, he says that he did his review, and it was

5    around the holidays, meaning the end of the year, could have

6    been the beginning of the year.  I said:

7    "Q.  It could have been January '21, right?

8    "A.  Right."  And then you heard NYU's attorney say could it

9    have been in November?  Could it have been in November?  But

10   he's clearly saying that he made his decision, and he was

11   already told about this when he first spoke to Rubin.

12         In contrast, Mr. Swirnow, he indicated:

13   "Q.  Did you have any further discussions regarding clinical

14   issues?

15   "A.  We asked Porges if he felt he could mentor.

16   "Q.  Did you discuss the issue with anybody else?

17   "A.  We had a phone call with Dr. Goldberg to discuss the

18   matter," indicating, again, that somehow he was involved in it.

19         If you jump to the next page here, with this, but the

20   reality is that Dr. Edelman was a good doctor.  She treated her

21   patients very well.  In fact, when she was told about, when the

22   patients were informed about her leaving, there were a bevy of

23   emails.  There's 50 pages in exhibit 93, and I invite you to

24   look at them.  But some of them talk about, "I consider myself

25   to be very fortunate to be under Dr. Edelman's care.  She's the

1    only physician who thinks outside the box to properly diagnose

2    my medical condition."

3           So I just ask you to look at those, just for sake of

4    time.  But one thing that is important here is that, you know,

5    Dr. Edelman took the time with patients to figure out what's

6    going on.  Some of these, you heard testimony these

7    rheumatology patients, they can be lifetime patients with them.

8    So if she takes a little longer with them, that's a good thing,

9    not a bad thing.  But I think NYU is kind of saying:  You

10   should speed through this; hit your RVUs and go on.

11          If she takes the time, she's not supposed to be

12   penalized for that.  She's trying to take care of patients.

13          Let's jump to the equal pay.

14          All right.  So, with the equal pay, the Equal Pay Act,

15   created in 1963 -- that's when it was enacted, 1963.  Happy

16   anniversary, 60 years later.  Right?  And the reason why it was

17   enacted is because of the perceived pay disparity between men

18   and women, they thought that men thought that they should be

19   paid more for the same job, and the law says that's not OK.

20   That's why the law was enacted in the first place.

21          So let's see how the EPA and its enforcement is doing

22   now.

23          (Video played)

24          "VOICE:  All right.  We are here at the Oscar's.

25          "VOICE:  That's right, where movie lovers unite and

1    watch TV.

2            "VOICE:  This year the academy hired three women to

3    host because it's cheaper than hiring one man."

4            MR. LABUDA:  So, equal pay is still an issue.  OK?

5    It's still an issue.  It's an issue throughout the United

6    States.  It's an issue in New York, and it's an issue in Lake

7    Success, New York, where NYU was.  OK?  There's no dispute.

8            Again, take your own experiences in terms of equal pay

9    and what you've heard about that in terms of men being paid

10   more than women.  You take those experiences into the jury room

11   in determining why and how this happened.  But it exists.  It

12   exists, and I think everybody is aware of that.  And there's no

13   dispute that Dr. Edelman was paid less.  I mean the evidence is

14   overwhelming with that fact.  Again, NYU disputes somehow that

15   there wasn't, she wasn't paid less, but I'll let them make

16   their own arguments.

17           So let's get into the legal elements, again, that

18   you're going to hear from the Court, but it's pretty simple.

19           With respect to the law, for the plaintiff to prevail

20   in the case, it has to be equal work and unequal pay.  So

21   that's what the law is, and so equal work, talks about skill,

22   effort and responsibility; talks about similar working

23   conditions.  Again, there's no dispute from NYU.  You heard

24   that.  And then unequal pay, there's no dispute about the pay.

25   She was paid less.

1              The other thing that's important is that it's a strict

2     liability law.  It means that there's no intent required.  And

3     so that's significant as well.

4              I want to jump into the skill, effort and

5     responsibility.  Those are the three elements of the equal pay

6     claim in terms of the plaintiff's responsibilities.

7              Skill, they're all rheumatologists.  They all went to

8     medical school.  They all have the same skill.  You heard them

9     saying that.

10             Effort.  That's effort and responsibility.  You know,

11    we've seen those words before.  You know, they're actually in

12    the contract.

13             Emanuel, if you can go to exhibit 8.

14             They talk about, with that chart, if you remember that

15    chart, it had the word "effort" in it.  NYU uses that word,

16    "effort."  It says effort in there.  And that has to do with

17    the clinical compensation.  You remember it says effort, then

18    it says clinical and then for Dr. Edelman it's 100 percent.

19    They have that same chart for every doctor.  They're

20    acknowledging that effort is the same.  In fact, the testimony,

21    there you go -- effort.  There it is:  NYU -- effort.  So it's

22    the same effort that's involved here.

23             What they're trying to say is if you're a faster

24    doctor and you do more, you see more patients, that's different

25    than Dr. Edelman.  That's just not true at all.  Effort has to

1    do with the patient care.  If you're a good doctor and you

2    spend time with your patient and you spend it full time, that's

3    the same effort as somebody who's going through, boom, boom,

4    boom.  That is effort.  NYU defines it as effort.  It's in

5    their contract.  It's in all their contracts, and it's very

6    important, because they're trying to say she somehow didn't do

7    the same effort when she was working full time.

8           Responsibility, we've seen that word too.  OK?  Where

9    does responsibility show up?

10          Jump again, Emanuel, to D852.

11          OK.  So 52 -- go up.  Go up.  Go up.

12          Clinical responsibilities.  Responsibilities, they're

13   all the same for the doctors.

14          And if you roll down to see, Emanuel, in the

15   responsibilities, it says you will provide clinical patient

16   care in the specialty of rheumatology on a full-time basis.

17   That's the responsibility.  Guess what?  That shows up on

18   everybody's contract.  That's what their responsibility was.

19   There's no dispute about that.  OK?

20          So when you have NYU saying same effort or more by Dr.

21   Edelman, same responsibilities, same skill -- they're all

22   rheumatologists -- she's met her burden.  OK?

23          Now, let's jump to what happened in this case in terms

24   of the actual pay.  And by the way -- well, let's just go

25   through this real quick.

1              With respect to Dr. Edelman, she's performing the same

2      work as the other doctors.  The administration work is

3      negligible.  There's no research work with respect to

4      Dr. Porges; it got phased out.  And they're treating patients

5      all the same.

6              Then with respect to what was going on here, Mr. Rubin

7      wasn't even aware about this Equal Pay Act.  He didn't even

8      know about it.  There was no comparison studies between any

9      doctors and there's no production element of the Equal Pay Act.

10             So let's go to the actual pay that happened.

11             Again, you have the contracts.  You see what's in

12     there.  Dr. Modi indicates that they're all doing the same

13     work.  You heard every doctor say that.  They're all

14     rheumatologists.  They all do the same thing, and that Dr. Modi

15     felt that what Dr. Goldberg was paid was unfair, because he was

16     getting paid substantially less.

17             We can just jump from there, Emanuel.

18             Thank you.

19             So let's look at the actual pay.

20             This is the pay of the doctors in 2014, when the

21     practice started.  Again, you heard they're all doing the same

22     thing.  Porges and Goldberg paid substantially more than Dr.

23     Edelman.  Same thing in 2015, 2016, 2017, 2018, 2019 -- I know

24     there's a theme here -- 2020 and 2021.  Always at the bottom,

25     every year.  OK?

1          So no doubt that that's just what happened.  They

2   can't dispute that.  Those are the numbers.  OK?

3          So once we establish our claim, then it goes to the

4   defendants in terms of the affirmative defense.  OK?  So it's

5   their burden, not ours but their burden to show that there's a

6   bona fide factor other than sex that was a reason why they paid

7   that.  And they talk about education, training or experience.

8   OK?

9          So let's just talk about that for a second.

10          That's what the law is.  It's got to be derived from a

11   differential that's not based on sex.  It got to be

12   job-related, and there's got to be a business necessity.  OK?

13   That's what the law talks about.

14          Now let's talk about what NYU is alleging here.

15          They're talking about how, well, we paid doctors under

16   all sorts of different circumstance, this factor, that factor,

17   this factor, that factor, whatever.  They didn't have any type

18   of system.  You heard testimony about Dr. Modi and you saw

19   evidence.  Dr. Modi and Dr. Edelman, same school, same

20   experience, all that.  He was making $360,000, and she's making

21   207 at the time.  So if you talked about education, that can't

22   be the case, because they went to the same schools and they

23   both have the same education level.

24          Training or experience, again, same thing with Dr.

25   Modi.  They all had the same training and experience.  In fact,

1   you heard Dr. Goldberg, that he was a teaching resident at

2   school.  He didn't see nearly as many patients as Dr. Edelman

3   when she was in private practice.  They were all hired to see

4   patients on a full-time basis.  No teaching or anything like

5   that.

6          So you have issues with respect to NYU shifting their

7   stories here in terms of why it's important to pay one doctor

8   more versus another.  And then they talk about the fact that,

9   well, we paid Dr. Edelman less because of a lease or a loan.

10   You saw the contracts.  There's nothing referenced in there

11   about paying her less because of that.  And you saw that merger

12   clause that says everything that's an understanding between the

13   parties has to be included in that contract for it to be a part

14   of that contract.  So there's nothing like that.

15          They didn't have any type of gender-neutral point

16   system.  They didn't have any type of metric to determine pay.

17   They just did it on an arbitrary basis, and it ultimately ended

18   with women being paid less.

19          Another thing that they mentioned was about prior

20   salaries.  Prior salaries alone can't be justification, and the

21   reason why that's the case is because prior salaries perpetuate

22   a pay gap.  If you were paid less before, it's just going to

23   continue that pay gap.  And so that alone can't be a sufficient

24   basis.

25          They talked about RVUs.  RVUs, again, they even said

N7iWede6            Summation - Mr. Labuda.

1    we didn't use that as a basis to determine the pay.  And the

2    reality is that, and you saw this with Dr. Goldberg's salary,

3    he had a lower RVU target.  His target in 2014 was 3,481, and

4    for that he was getting paid $290,000.  In contrast, Dr.

5    Edelman was 4,966, and she was only getting paid $207,000.  So

6    that can't be the justification for the pay gap.

7            So you have that on top of the fact that with the

8    salaries, you heard that a lot of the male doctors demanded a

9    higher salary, and they got it.  Dr. Edelman demanded a higher

10   salary, and she didn't get it.  She asked for 260.  They gave

11   her 207.  Dr. Modi asked for 360.  He got 360.  Dr. Porges

12   asked for 340.  He got 340.  And then you heard testimony about

13   Dr. Goldberg jumping from 290 to $500,000, because he asked for

14   it.

15           All these reasons are what's called a pretext.

16   They're just excuses.  They just don't meet that affirmative

17   defense there, and they don't establish that any of these

18   things are some type of business necessity.  You have to have a

19   need for it.  It's like a teacher, let's say, for instance, who

20   has a Ph.D. and you need that Ph.D. in order to justify a

21   higher salary.  In this case, they're all getting paid the same

22   thing.  You know?  There's nothing that's different.  It's no

23   different than if there's a secretary who has an additional

24   skill set, who can speak Spanish to clients or something like

25   that.  There may be some need that you have, but they're not

1    showing you any type of need for why they needed to pay these

2    doctors any more, the male doctors more than what they did.

3          At the end, in terms of these cases and in terms of

4    this proof, let's just look at the scorecard for each one of

5    them in terms of the proofs that Dr. Edelman put in.

6          She established that she was treated less well, we

7    submit, and that it was based, in part, on her gender.  So that

8    would be a verdict in favor of Dr. Edelman.

9          With respect to the retaliation claim, she engaged in

10   protected activity.  They knew about it.  The conduct was

11   likely to deter future conduct.  There was a retaliatory

12   motive, and there was ultimately an adverse employment action

13   against her.  So that would be, again, a verdict in favor of

14   Dr. Edelman.

15         Lastly, with the equal pay, we submit to you that we

16   have established that she performed equal work and received

17   unequal pay and that any of the affirmative defenses just don't

18   fly.  So that would be, again, a verdict in favor of Dr.

19   Edelman.

20         Briefly, I want to talk to you about the damages in

21   this case.

22         Again, the damages are up to the jury in terms of

23   determining, but one component of the damages for

24   discrimination are compensatory damages.  So you can compensate

25   Dr. Edelman for the emotional pain, suffering, inconvenience,

1    mental anguish, the humiliation and loss of enjoyment of life.

2    That was attendant with the discrimination, and you heard

3    testimony about her emotional state, how she couldn't sleep at

4    night, and the state that she was working under while she

5    continued working at NYU and even thereafter, seeking therapy.

6            So, with the retaliation claim, that has two

7    components to it.  One is the front pay, and the second is the

8    compensatory damages aspect.

9            Let me just talk to you about front pay.

10           The front pay has really two components from what we

11   see.  One is the loss of her retirement benefits, because she

12   had that at NYU, where she was getting about $30,000 a year in

13   retirement benefits that she didn't receive at her new job.

14   And the other one with respect to front pay, that's some type

15   of expectation of future lost earnings that she has because she

16   lost her job at NYU as a result of the retaliation.  And with

17   respect to that, that could be future lost earnings based on

18   the fact that she's now in Florida.

19           In addition, you can award compensatory damages, the

20   emotional distress, the inconvenience of having to move to

21   Florida is within the compensatory realm.  The mental anguish,

22   the humiliation and the loss of life attendant with those

23   circumstances as well.

24           (Continued on next page)

25

1              MR. LABUDA:    And then with the EPA, we have some

2      figures.  Again, you can look at the contracts, but the

3      difference in her pay versus the highest doctors' pay here is

4      $1.7 million, that's the difference in the pay.  I will note,

5      we also factored in in here the administrative component of it,

6      that $25,000 because we don't think that NYU was using that as

7      administrative.  That was part of their overall pay, so we

8      added that in.  If you took -- again, you'll be instructed on

9      this, as well, but if you took and believed that somehow she

10     was in the average, that would come out to $1.1 million.

11             If you compare Dr. Porges with Dr. Edelman, the

12     difference is $900,000 in pay.  If you compare the pay between

13     Dr. Goldberg and Dr. Edelman, that's $1.6 million.  If you

14     compare Dr. Modi with Dr. Edelman, that's $500,000.  I will

15     say, Dr. Modi, the reason why that number's lower is that he

16     started in 2017.  You can still take into account the fact that

17     there may have been a prior comparator with either Dr. Porges

18     or Goldberg for the prior years in '14, '15, and '16.

19             Again, I just want to jump over to the RVU because

20     that was somehow raised that somehow she didn't have the same

21     effort.  But the reality is if you compare Dr. Goldberg and

22     Edelman in terms of the RVUs that were there, he's doing less

23     effort, according to what NYU and generating 348 RVUs, and he's

24     getting paid $30,000 more whereas she's doing more work, more

25     effort, seeing more patients, and she's only getting $20,000.

N7JCede3                  Summation - Mr. Labuda

1     There's no way for Dr. Edelman to ever catch up to the male

2     doctors, she's just not getting paid the same for any of this

3     work.

4              So I want to jump real quickly to Dr. Edelman's

5     efforts to find work because, again, NYU had issues raised

6     about the fact that she wanted to go to Florida, the Sunshine

7     State.  She didn't want to go to Florida, she wanted to stay in

8     New York.  She had a family up here.  She's got three sisters,

9     she's got her friends.  I don't think anybody wants to

10    involuntarily be moved anywhere.  They almost seem like they're

11    saying they did her a favor by firing her, which is insane.

12             But the reality is that she looked all over the

13    country.  You heard testimony about this.  She looked at New

14    Haven, she looked in Pennsylvania, Nashville, Colorado.  The

15    only place where she got a job offer was in Florida and she

16    took it because she needed to continue working, have an income,

17    support her family, and that's what happened.  So she didn't

18    want to do that.

19             In fact, you saw testimony that Northwell, she was in

20    contact with Northwell trying to get a job and they entered

21    into a confidentiality agreement about trying to get a job down

22    there in December.  She wanted to stay in New York.  Northwell

23    is in New York.  New Haven, you had New Haven on the next page.

24    She was applying to a job there on December 24th, that's in New

25    York.  And then the next one is that on December 3rd, she was

1    also looking for another job in New York, as well, at CLSLI,

2    another private practice in Long Island, catholic health

3    services.

4              So you heard all the testimony here.  Again, I

5    appreciate all your time and attention to this case.  The

6    evidence is now going to be before you and we would ask that

7    you return a just verdict in favor of plaintiff.

8              Thank you very much.

9              THE COURT:    Thank you, Mr. Labuda.

10             Members of the jury, we're now going to take a 15- or

11   20-minute break.  After you return, I will give you your

12   instructions and then you'll retire to deliberate.  You don't

13   have the case yet.  Please don't talk amongst yourselves about

14   the case, don't do any research.  Enjoy the break.

15             (Jury not present)

16             I want to commend counsel on both sides for keeping

17   within the time limits.

18             Second, there was a point that Mr. Steer mentioned

19   about the charge, it had to do with I think page 48, charge

20   3.1.  There are four places within that charge wherein telling

21   the jury how to calculate damages, I refer to "salary."  I

22   think Mr. Steer has a point, the word "salary" there should be

23   replaced by the word "wages," which would refer back to the

24   charge that I gave in the definition of wages.

25             Any objection to that from the plaintiff's

N7JCede3

1   perspective?  You want to take a quick look at that.

2           MR. LABUDA:    Page 48, your Honor?

3           THE COURT:    It's on my draft, page 48.

4           While you're doing that, the parties should also clean

5   out their tables because I'm going to ask you in a moment to --

6           MR. LABUDA:    Is this the damages under EPA, your

7   Honor?

8           THE COURT:    Yes, it is.

9           MR. LABUDA:    What line is this?

10          THE COURT:    Sixth line, eighth line, ninth line, and

11  eleventh line.

12          MR. LABUDA:    And you want to replace.

13          THE COURT:    "Salary" with "wages."

14          MR. LABUDA:    I'd have to look at the instructions in

15  terms of --

16          THE COURT:    Let me know that when you come back in

17  about 15 minutes or so.

18          MR. LABUDA:    Thank you, your Honor.

19          THE COURT:    Mr. Steer, any objection from you?

20          MR. STEER:    No, your Honor.

21          THE COURT:    I'm going to ask you to clear as the

22  parties in the criminal case may need to set up.

23          (Recess)

24          I'm going to keep the charge with respect to 3.1 as it

25  was provided to the parties last night.  I understand that that

N7JCede3            Charge

1    is the plaintiff's preference and the defendant had made an

2    objection with respect to 3.1 or a suggestion with respect to

3    3.1, but it was late.  I set numerous deadlines for exceptions

4    and objections to the charge and this suggestion came this

5    morning for the first time.  So the parties were entitled to

6    know what the charge was going to be before they closed and I'm

7    going to give the charge as delivered to the parties before

8    they closed.

9            Let's bring in the jury and I'll have them charged.

10           (Jury present)

11           Members of the jury, you've now heard all the evidence

12   as to the claim by the plaintiff, Sari Edelman, against the

13   defendants.  The defendants include the NYU Langone Health

14   system, NYU Langone Hospitals, NYU Langone Medical Center, NYU

15   at Langone Nassau Rheumatology, NYU School of Medicine, NYU

16   Grossman School of Medicine, and NYU Hospital Center, all of

17   which I will collectively refer to from now on as "NYU" for

18   short.  Defendants also include the individuals Andrew Rubin,

19   Joseph Antonik, and Joshua Swirnow, who I will refer to as the

20   "individual defendants."  You have paid careful attention to

21   the evidence and I am confident that you will act together with

22   fairness and impartiality to reach a just verdict in the case.

23   We are near the point where you will undertake your vital

24   function as jurors of deliberating.  Now that the lawyers have

25   made their closing arguments, I am going to instruct you about

1   the law that governs the case.  There are two parts to these

2   instructions:

3          First, I will give you some general instructions about

4   your role and about how you are to decide the facts of the

5   case.  These instructions would apply to just about any trial.

6          Second, I will give you specific instructions about

7   the legal rules applicable to this particular case.  Then I

8   will give you some final instructions before you begin your

9   deliberations.

10         Listening to these instructions may not be easy.  It

11  is important, however, that you listen carefully, but that you

12  concentrate.  I ask for your patience, cooperation, and

13  attention.  You will notice that I am reading these

14  instructions from a prepared text.  It would be more lively, no

15  doubt, if I just improvised, but it's important that I not do

16  that.  The law is made up of words and those words are very

17  carefully chosen.  So when I tell you the law, it's critical I

18  use exactly the right words.

19         You will have copies of what I am reading in the jury

20  room to consult, so don't worry if you miss a word or two.  But

21  for now, listen carefully and try to concentrate on what I'm

22  saying.  I will also be distributing to you a verdict form in

23  which to record your verdict.  It will list the questions that

24  you should consider in the order you should consider them.

25         I will now instruct you on the law.  It is my duty to

1    do that just as it has been my duty to preside over the trial

2    and decide what testimony and evidence is relevant under the

3    law for your consideration.  It is your duty to accept my

4    instructions on the law and to apply them to the facts as you

5    determine them.

6            On these legal matters, you must take the law as I

7    give it to you.  You must not substitute your own notions or

8    opinions of what the law is or ought to be.  You should not,

9    any of you, be concerned about the wisdom of any rule that I

10   state.  Regardless of any opinion that you may have as to what

11   the law may be or should be, it would violate your sworn duty

12   to base a verdict upon any other view of the law than that

13   which I give you.

14           If any attorney states or has stated a legal principle

15   different from any that I state to you in my instructions, it

16   is my instructions that you must follow.  You should not single

17   out any particular instruction alone as stating the law and you

18   should consider my instructions as a whole when you retire to

19   deliberate in the jury room.

20           You are not to infer from any of my questions or any

21   of my rulings on objections or anything else I've done during

22   this trial that I have any view as to the credibility of the

23   witnesses or how you should decide the case.  Any questions I

24   asked were designed to make sure the testimony was clear and to

25   avoid confusion.  You are expressly to understand that the

N7JCede3              Charge

1   Court has no opinion as to the verdict you should render in

2   this case.

3              As members of the jury, you are the sole and exclusive

4   judges of the facts.  You pass judgment upon the evidence, you

5   determine the credibility of the witnesses, you resolve any

6   conflicts that may be in the testimony, you draw whatever

7   reasonable inferences you decide to draw from the facts as

8   you've determined them, and you determine the weight of the

9   evidence.

10              Although you are encouraged to use all of your life

11   experiences in analyzing testimony in reaching a fair verdict,

12   you may not communicate any personal professional expertise you

13   might have or other facts not in evidence to the other jurors

14   during deliberations.  You must base your discussions and

15   decisions solely on the evidence presented to you during the

16   trial and that evidence alone.  You may not consider or

17   speculate on matters not in evidence or matters outside the

18   case.

19              Now, it is the duty of attorneys to object when the

20   other side offers testimony or other evidence that the attorney

21   believes is not properly admissible.  Therefore, you should

22   draw no inference from the fact that an attorney objected to

23   any evidence.  Nor should you draw any inference from the fact

24   that I might have sustained or overruled an objection.

25              From time to time, the lawyers and I had conferences

 1    at sidebar out of your hearing.  These conferences involved

 2    procedural and other matters.  None of the events relating to

 3    these conferences should enter into your deliberations at all.

 4              Similarly, the personalities and conduct of the

 5    counsel in the courtroom are not in any way an issue.  If you

 6    formed reactions of any kind to any of the lawyers, favorable

 7    or unfavorable, whether you approved or disapproved of their

 8    behavior as advocates, those reactions should not enter into

 9    your deliberations.

10              I know that you will try the issues that have been

11    presented to you according to the oath that you've taken as

12    jurors in which you promised that you would well and truly try

13    the issues joined in this case and render a true verdict.  If

14    you follow that oath and try the issues without fear or

15    prejudice or bias or sympathy, you will arrive at a true and

16    just verdict.

17              You are to evaluate the evidence calmly and

18    objectively, without prejudice or sympathy.  You are to be

19    completely fair and impartial.  Your verdict must be based

20    solely on the evidence developed at this trial or the lack of

21    evidence.  The parties in this case are entitled to a trial

22    free from prejudice and bias.  Our judicial system cannot work

23    unless you reach your verdict through a fair and impartial

24    consideration of the evidence.

25              It would be improper for you to consider in deciding

N7JCede3                    Charge

1     the facts of the case any personal feelings you may have about

2     the race, national origin, sex, or age of any party or any

3     witness, or any other such relevant factor.  This case should

4     be decided by you as an action between parties of equal

5     standing in the community and of equal worth.  Both parties are

6     entitled to the same fair trial at your hands.  Both parties

7     stand equal before the law and are to be dealt with as equals

8     in this court.

9              As noted, in reaching your verdict, you must remember

10    that all parties stand equal before the law and are to be dealt

11    with as equals in this court.  The mere fact that some of the

12    parties in this case are corporations does not mean that they

13    are entitled to any lesser consideration by you.  All litigants

14    are equal before the law, and corporations, big or small, are

15    entitled to the same fair consideration as you would give any

16    other individual party.  This means that you must treat Sari

17    Edelman, Andrew Rubin, Joseph Antonik, and Joshua Swirnow, all

18    natural persons, and the corporate NYU defendants as equal

19    under the law.

20             Because this is a civil case, the preponderance of the

21    evidence stands and applies to all disputed issues.  Some of

22    you may have heard of "proof beyond a reasonable doubt," which

23    is the proper standard of proof in a criminal trial.  That

24    requirement does not apply to a civil case such as this one and

25    you should put it out of your mind.

N7JCede3                    Charge

1                What does a "preponderance of the evidence" mean?  To

2       establish a fact by a preponderance of the evidence means to

3       prove that the fact is more likely true than not.  A

4       preponderance of the evidence means the greater weight of the

5       evidence.  It refers to the quality and persuasiveness of the

6       evidence, not the number of witnesses or documents.  In

7       determining whether a claim has been proven by a preponderance

8       of the evidence, you may consider the relevant testimony of all

9       the witnesses, regardless of who may have called them, and all

10      the relevant exhibits received in evidence, regardless of who

11      may have offered or produced them.

12               If, after considering all of the testimony, you are

13      satisfied that the plaintiff, the party with the burden of

14      proof, has carried her burden on each essential point of the

15      claim where she bears the burden of proof, then you must find

16      in plaintiff's favor on that claim.  If, after such

17      consideration, you find that the evidence produced by the

18      plaintiff is outweighed by the evidence against the plaintiff's

19      position or that the credible evidence on a given issue is

20      evenly divided between the parties, that it is as equally

21      probable that one side is right as it is the other side is

22      right, then you must decide that issue against the plaintiff.

23      That is because the plaintiff bears the burden of proof and she

24      must prove more than simple equality of evidence, she must

25      prove the element by a preponderance of the evidence.  On the

1    other hand, the plaintiff need prove no more than a

2    preponderance.  So long as you find that the scales tip,

3    however slightly, in favor of the plaintiff that what she

4    claims is more likely true than not, then that element will

5    have been proven by a preponderance of the evidence.

6           I want to take a moment to describe to you what is and

7    is not evidence in this case.  As I have said, you may rely

8    only on the evidence in your deliberations.  The evidence in

9    this case is the sworn testimony of the witnesses and the

10   exhibits received in evidence.  On the other hand, certain

11   things are not evidence.

12          First, I will describe a list of examples of things

13   that are not evidence:

14          A question by a lawyer is not to be considered by you

15   as evidence.  It is the witness's answers that are evidence,

16   not the questions.  At times, a lawyer may have incorporated

17   into a question a statement which assumed certain facts to be

18   true and asked the witness if the statement was true.  If the

19   witness denied the truth of a statement and if there's no

20   direct evidence in the record proving that assumed fact to be

21   true, then you may not consider it to be true simply because it

22   was contained in the lawyer's question.

23          Similarly, arguments by lawyers are not evidence

24   because the lawyers are not witnesses.  What they have said in

25   their opening statements and their closing statements was

intended to help you understand the evidence and to reach your

verdict.  However, if your recollection of the facts differs

from the lawyers' statements, it is your recollection which

controls.

Any dollar figure suggested by plaintiff's counsel as

appropriate relief in this case is only a comment on the

evidence or suggestion.  Such a suggestion is not evidence and

you are free to disregard it.

Statements that I may have made concerning the

evidence do not constitute evidence.

Testimony that has been stricken or excluded or that

I've asked you to disregard is not evidence and it may not be

considered by you in rendering your verdict.

Anything you may have seen or heard outside the

courtroom is not evidence.

Now I will provide you with some things that you may

consider as evidence.  As I have said, evidence may come in

several forms:

The sworn testimony of witnesses, regardless of who

called them, is evidence.  This is true of the witnesses'

answers on both direct and cross examination.  However, if

certain testimony was received for a limited purpose, you must

follow the limiting instruction I have given.

The exhibits that were admitted during the trial,

regardless of who may have presented them, are evidence.

N7JCede3                    Charge

1          Generally, as I told you in my initial instructions,

2     there are two types of evidence that you may consider in

3     reaching your verdict.

4          One type of evidence is direct evidence.  Direct

5     evidence is testimony by a witness about something he or she

6     knows by virtue of his or her own senses — something he or she

7     has seen, felt, touched, or heard.  For example, if a witness

8     testified that when she left her house this morning it was

9     raining, that would be direct evidence about the weather.

10         Circumstantial evidence is evidence from which you may

11    infer the existence of certain facts.  To restate the example I

12    gave you last week, assume that when you came into the

13    courthouse this morning and the sun was shining and it was a

14    nice day, assume that the courtroom blinds were drawn and you

15    could not look outside.  As you were sitting here, someone

16    walked in with an umbrella which was dripping wet.  Then a few

17    minutes later, another person entered with a wet raincoat.

18    Now, you cannot look outside the courtroom and you cannot see

19    whether or not it is raining, so you have no direct evidence of

20    that fact, but on the combination of facts that I have asked

21    you to assume, it would be reasonable and logical for you to

22    conclude that it had been raining.

23         That is all there is to circumstantial evidence.  You

24    infer on the basis and reason and common sense from one

25    established fact the existence or nonexistence of some other

N7JCede3          Charge

1    fact.  Many facts, such as a person's state of mind, are rarely

2    susceptible to proof by direct evidence.  Usually, such facts

3    are established by circumstantial evidence.  Where

4    circumstantial evidence is presented, it is of no less value

5    than direct evidence, for it is a general rule that the law

6    makes no distinction between direct evidence and circumstantial

7    evidence.

8              For certain defenses and issues in this case, the

9    defendants have the burden of proof.  I will explain those

10   later in my instructions.

11             During the trial, you may have heard the parties use

12   the term "inference," and in their arguments they have asked

13   you to infer on the basis of your reason, experience, and

14   common sense from one or more established facts the existence

15   of some other fact.

16             An inference is not a suspicion or a guess, it is a

17   reasoned, logical decision to conclude that a disputed fact

18   exists on the basis of another fact you know exists.

19             There are times when different inferences may be drawn

20   from the facts, whether proved by direct or circumstantial

21   evidence.  Plaintiff asks you to draw one set of inferences

22   while the defendants ask you to draw another.  It is for you

23   and you alone to decide what inferences you will draw.

24             The process of drawing inferences from facts in

25   evidence is not a matter of guesswork or speculation.  An

1   inference is a deduction or conclusion that you, the jury, are

2   permitted, but not required to draw from the facts that have

3   been established by either direct or circumstantial evidence.

4   In drawing inferences you should exercise your common sense.

5            So, while are you considering the evidence presented

6   to you, you are permitted to draw, from the facts that you find

7   to be proven, such reasonable inferences as would be justified

8   in light of your experience.

9            You've had the opportunity to observe the witnesses.

10  It is now your job to decide how believable each witness was in

11  his or her testimony.  You are the sole judge of the

12  credibility of each witness and of the importance of his or her

13  testimony.

14           In making these judgments, you should carefully

15  scrutinize the testimony for each witness, the circumstances

16  under which each witness testified, the impression the witness

17  made when testifying, and any other matter in evidence which

18  may help you decide the truth and the importance of each

19  witness's testimony.

20           How do you determine where the truth lies?  You

21  watched each witness testify.  Everything a witness said or did

22  on the witness stand counts in your determination.  How did the

23  witness impress you?  Did he or she appear to be frank,

24  forthright, and candid?  Or was the witness evasive and edgy as

25  if hiding something?  How did the witness appear?  What was his

1    or her demeanor — that is, the witness's carriage, behavior,

2    bearing, manner, and appearance while testifying?  Often, it is

3    not what a person says, but how he or she says it that moves

4    us.

5             You should use all the tests for truthfulness that you

6    would use in determining matters of importance to you in your

7    everyday life.  You should consider any bias or hostility the

8    witness may have shown for or against any party, as well as any

9    interest the witness has in the outcome of the case.  You

10   should consider the opportunity the witness had to see, hear,

11   and know the things about which the witness testified, the

12   accuracy of his or her testimony, his or her candor or lack of

13   candor, the witness's intelligence, the reasonableness and

14   probability of the witness's testimony, and its consistency or

15   lack of consistency, and its corroboration or lack of

16   corroboration with other credible testimony.

17            In other words, what you must try to do in deciding

18   credibility is to size a witness up in light of the witness's

19   demeanor, the explanations given, and all of the other evidence

20   in the case.  Always remember that you should use your common

21   sense, your good judgment, and your everyday experiences in

22   life to make your credibility determinations.

23            If you find that any witness has willfully testified

24   falsely to any material fact — that is, as to an important

25   matter — the law permits you to disregard the entire testimony

N7JCede3          Charge

1    of that witness upon the principle the one who testifies

2    falsely about one material fact is likely to testify falsely

3    about everything.  However, you are not required to consider

4    such a witness as totally unbelievable.  You may accept so much

5    of the witness's testimony as you deem true and disregard what

6    you feel is false.  By the processes by which I have just

7    described, you, as the sole judges of the facts, decide which

8    of the witnesses you will believe, what portion of each

9    witness's testimony you accept, and what weight you give it.

10           On some occasions during this trial, witnesses were

11   asked to explain an apparent inconsistency between testimony

12   offered at this trial and previous statements made by the

13   witness.

14           Evidence of a prior inconsistent statement was placed

15   before you not because it is itself evidence of the plaintiff's

16   claim or defenses to the claim, but only for the purpose of

17   helping you decide whether to believe the trial testimony of a

18   witness who may have contradicted a prior statement.  If you

19   find the witness made an earlier statement that conflicts with

20   the witness's trial testimony, you may consider that fact in

21   deciding how much of the witness's trial testimony, if any, to

22   believe.

23           In making this determination, you may consider whether

24   the witness purposefully made a false statement or whether it

25   was an innocent mistake, whether the inconsistency concerns an

N7JCede3          Charge

1    important fact or whether it had to do with a small detail,

2    whether the witness had an explanation for the inconsistency,

3    and whether that explanation appealed to your common sense.

4              It is exclusively your duty, based upon all of the

5    evidence and your own good judgment, to determine whether the

6    prior statement was inconsistent, and if so, how much, if any,

7    weight to give to the inconsistent statement in determining

8    whether to believe all or part of the witness's testimony.

9              You may have heard evidence during the trial that

10   certain witnesses discussed the facts of the case in their

11   testimony with the lawyers before the witnesses appeared in

12   court.  Although you may consider that fact when you are

13   evaluating a witness's credibility, I should tell you that

14   there's nothing either unusual or improper about a witness

15   meeting with the lawyers before testifying so that the witness

16   can be made aware of the subjects that he or she will be

17   questioned about, focus on those subjects, and have the

18   opportunity to review relevant exhibits before being questioned

19   about them.  In fact, it would be unusual for a lawyer to call

20   a witness without such consultation.  Again, the weight you

21   give to the fact or the nature of the witness's preparation for

22   his or her testimony and what inferences you draw from such

23   preparation are matters completely within your discretion.

24             In deciding whether to believe a witness, you should

25   take into account any evidence that shows that a witness may

N7JCede3              Charge

1    benefit in some way from the outcome of the case, such as a

2    financial interest.  Likewise, you should specifically note any

3    evidence of hostility or affection that the witness may have

4    towards one of the parties.  You should also consider any other

5    interest or motive that the witness may have in cooperating

6    with a particular party.

7                For example, in this case, the plaintiff, Sari

8    Edelman, and the defendants, Andrew Rubin, Joseph Antonik, and

9    Joshua Swirnow, and representatives of NYU testified before

10   you, Mr. Kaplan.  As parties or representatives of parties to

11   this action, they are, by definition, interested witnesses.

12               It is your duty to consider whether each witness has

13   permitted any such bias or interest to color his or her

14   testimony.  In short, if you find that a witness is biased, you

15   should view the witness's testimony with caution and weigh it

16   with care and subject it to close and searching scrutiny.

17               An interested witness is not necessarily less

18   believable than a disinterested witness.  The mere fact that a

19   witness is interested in the outcome of the case does not mean

20   that the witness has not told the truth.  It is for you to

21   decide from your observations and applying your common sense

22   and experience and all the other considerations mentioned

23   whether the possible interest of any witness or of any party

24   has intentionally or otherwise colored or distorted his or her

25   testimony.  You are not required to believe an interested

1    witness; you may accept as much of the witness's testimony as

2    you deem reliable and reject as much as you deem unworthy of

3    acceptance.

4            With these instructions in mind, let us turn to the

5    substantive law to be applied to this case.  In this case,

6    Dr. Edelman asserts that NYU, Mr. Rubin, and Mr. Swirnow

7    violated the federal Equal Pay Act, EPA, and New York labor law

8    Section 194 by failing to pay her the same as three male

9    doctors performing substantially equal work as her.  She also

10   asserts that NYU and Mr. Antonik discriminated against her in

11   violation of the New York City Human Rights Law on account of

12   her gender based on certain remarks.  Finally, Dr. Edelman

13   asserts that NYU and three of the individual defendants —

14   Mr. Rubin, Mr. Swirnow, and Mr. Antonik — retaliated against

15   her because she complained to the NYU human resources about the

16   way Mr. Antonik and Mr. Kaplan spoke to her and made certain

17   gestures.

18           Dr. Edelman has the burden of proving these claims.

19   NYU and the individual defendants deny those claims and assert

20   that, at all times, they treated Dr. Edelman in accordance with

21   the law.  Specifically, NYU and the individual defendants at

22   issue assert that they were motivated only by legitimate

23   business reasons.  Further, NYU and Messrs. Rubin and Swirnow

24   assert under the EPA and New York Labor Law Section 194,

25   Dr. Edelman cannot properly compare herself to the identified

N7JCede3                Charge

male rheumatologists who made more money than her and whose

salaries were set based on what they allege are legitimate

factors that had nothing to do with her gender.

Each claim and each defendant is separate and

distinct.  That is, you may find a violation with respect to

one of these claims without finding a violation with respect to

another claim.  For example, you may find that defendants

violated the Equal Pay Act, but not the retaliation or

discrimination laws.  You may find that all of the defendants

violated all of these laws or none of the defendants violated

any of the laws.  You may also find that a particular defendant

violated all of these laws or none of these laws.  You may find

that one defendant violated the law, but another defendant did

not violate the law.  You should consider each of these claims

separately.  I will explain the law that you are to apply with

respect to each claim.

Certain of the defendants in this action are

corporations and act through its employees.  It is established

law that under certain circumstances, an employer may be liable

for the wrongs, even willful wrongs done by its representatives

if the wrongs are committed during the scope of the employee's

employment duties and in furtherance of the employment's

business.  An employer's liability rests upon the broad

principle that if a corporation manages its affairs through

others, the corporation is bound to manage them in such a way

N7JCede3            Charge

1    that no person shall suffer injury from a wrong done by that

2    other while engaged upon the employer's business and acting

3    within the scope of their employment.

4              The fact that an employee was not specifically

5    authorized to commit the act or was even violating instructions

6    which had been given to them does not relieve the corporation

7    from liability if unlawful conduct is proven.  A corporation is

8    liable even if the employee was acting unlawfully or out of

9    personal animosity if the acts were committed within the scope

10   of his or her employment.

11             In this case, it is not disputed that the individual

12   defendants were engaged in the business of NYU, that they were

13   acting within the scope of their employment during

14   Dr. Edelman's tenure, and that their acts were the results of

15   attempts to carry out the work that was entrusted to them by

16   NYU.  Defendants dispute that they committed any unlawful acts.

17   If you find the individual defendants committed any unlawful

18   act, you must find that the corporate defendants, NYU, are

19   legally responsible.

20             Now, I am not suggesting that NYU is liable.  Whether

21   or not Dr. Edelman was discriminated and/or retaliated against

22   as she claims is a matter for you to decide in accordance with

23   these instructions.

24             I must first instruct you on the plaintiff's claim

25   against NYU, Mr. Rubin, and Mr. Swirnow under the Equal Pay

N7JCede3            Charge

1   Act.  She does not bring this claim against Mr. Kaplan and

2   Mr. Antonik.

3            Plaintiff claims that NYU, Mr. Rubin, and Mr. Swirnow

4   have discriminated against her because of her gender by paying

5   her a lower wage for performing work substantially similar to

6   the work performed by men who were being paid more.  The basis

7   for plaintiff's claim is a federal law called the Equal Pay

8   Act.

9            For plaintiff to prevail on her claim against NYU,

10  Mr. Rubin, and Mr. Swirnow for violation of the federal Equal

11  Pay Act, she must prove all of the following evidence by a

12  preponderance of the evidence:

13            First, plaintiff must prove that she performed equal

14  work to male employees in jobs requiring substantially equal

15  skill, effort, and responsibility;

16            Second, plaintiff must prove that the jobs are

17  performed under similar working conditions; and

18            Third, plaintiff must prove she was paid a lower wage

19  than one or more of the men whose work is the subject of the

20  comparison.

21            Proof of the employers discriminatory intent is not

22  necessary for plaintiff to prevail on her Equal Pay Act claim.

23            In this case, you've heard testimony about whether the

24  defendants are actually employers under the Equal Pay Act.  I

25  now instruct you that, as a matter of law, you need not

1    consider that question because I have determined that, for

2    purposes of this case, the defendants, both individual and

3    corporate, are employers covered by the Equal Pay Act and that

4    plaintiff is an employee covered by the Equal Pay Act.  You

5    must assume during your deliberations that that precondition

6    has been satisfied.

7            I will now instruct you on the definitions of "equal

8    work," "similar working conditions," and "wages" as they apply

9    to this claim.

10           In determining whether plaintiff's job required

11   substantially equal skill, effort, and responsibility as those

12   of the male employees, you must compare the jobs and not the

13   individual employees holding those jobs.  It is not necessary

14   that the two jobs be identical.  The Equal Pay Act requires

15   only that the plaintiff show that the performance of the two

16   jobs demands substantially equal skill, effort, and

17   responsibility.  Insignificant, insubstantial, or trivial

18   differences do not matter and may be disregarded.  On the other

19   hand, work is not considered substantially equal if material

20   differences in skill, effort, or responsibility exist.

21   Further, job classifications, descriptions, or titles are not

22   controlling.  It is the actual work or performance requirement

23   of the two jobs that is important.

24           In evaluating whether the performance requirements of

25   the two jobs are substantially equal, you must consider the

1    skill, effort, and responsibility required for those jobs.  I

2    will now tell you what is meant by the term "skills," "effort,"

3    and "responsibility."

4              First, in deciding whether the jobs require

5    substantially equal skill, you should consider such factors as

6    the level of education, experience, training, and ability

7    necessary to meet the performance requirements of their

8    respective jobs.  Jobs may require equal skill even if one job

9    does not require workers to use these skills as often as

10   another job.  Remember, also, that you are to compare the jobs,

11   not the employees.  So the fact that a male employee has a

12   qualification that plaintiff does not have is relevant only if

13   the particular qualification is necessary for performing the

14   job.  Similarly, the fact that plaintiff has a qualification

15   that male employees do not have is relevant only if the

16   particular qualification is necessary for performing a job.

17   Talents or skills that go beyond actual job requirements are

18   not to be considered.

19             Second, in deciding whether the jobs require

20   substantially equal effort, you should consider the mental or

21   physical exertion in connection with the performance of the

22   job.  A deficiency on one side, for example, less physical

23   exertion, may be compensated by a surplus on the other side,

24   for example, more mental exertion.  Duties that result in

25   mental or physical fatigue or emotional stress, as well as

N7JCede3                    Charge

1   factors that alleviate fatigue and stress, should be weighed

2   together in assessing the relative effort involved.

3              Equal effort does not require people to use effort in

4   exactly the same way.  If there's no substantial difference in

5   the amount or degree of effort to do the jobs, they require

6   equal effort.  However, if one job requires additional tasks

7   that consumes significant amount of extra time and effort that

8   the other job does not require, then the two jobs do not

9   require substantially equal effort.

10             Third, in deciding whether the jobs involve

11  substantially equal responsibility, you should consider the

12  degree of accountability required in the performance of the job

13  with emphasis on the importance of the job obligation.

14             In deciding whether the jobs involve substantially

15  equal responsibility, you should consider the degree of

16  accountability expected by the employer for the person filling

17  the jobs, as well as the amount of preparation required to

18  perform the job duties.  You should also take into account such

19  things as the level of authority delegated to plaintiff as

20  compared to the male employees.  Finally, you should consider

21  the consequences to the employer for the effect of performance

22  in the respective jobs.

23             You should note that "skill," "effort," and

24  "responsibility" constitute separate tests, each of which must

25  be met in order for the equal pay requirement to apply.

N7JCede3                    Charge

1              With respect to the second element of plaintiff's

2       claim, you must find the jobs are performed under similar

3       working conditions.  The conditions need only be similar, but

4       need not be identical.  In deciding whether the working

5       conditions of the jobs are similar, you should consider the

6       surroundings or the environment in which the work is performed

7       to which the respective employees may be exposed.  Overall, you

8       need to consider the entire situation and give it your common

9       sense appraisal to determine whether or not the working

10      conditions are similar.

11             With respect to the third element of plaintiff's

12      claim, plaintiff must prove she was paid a wage lower than male

13      employees doing substantially equal work.  For these purposes,

14      you should understand that the term "wages" includes all forms

15      of compensation, whether called wages, salary, expense

16      reimbursement, profit sharing, repayment of loans or some other

17      name.  Fringe benefits are also included in the comparison of

18      wages under the Equal Pay Act.

19             If you find that plaintiff has proved each of the

20      elements that she must establish in support of her claim under

21      the Equal Pay Act with regard to one or more of the

22      comparators, you must then consider defendants' affirmative

23      defense.  These defenses include a bona fide factor other than

24      sex, such as education, training, and experience.

25             Defendants have the burden of proof on their defenses,

1    not the plaintiff.  It must prove their defenses by a

2    preponderance of the evidence.  If defendants prove their

3    affirmative defenses by a preponderance of the evidence and

4    plaintiff is unable to show that this defense is pretext or

5    excuse for gender discrimination, then plaintiff is not

6    entitled to recover on her claim.

7            Defendants contend that the difference in pay between

8    the two jobs was the result of a factor other than sex.  To

9    establish this defense, defendants must prove that plaintiff's

10   sex played no part in the difference in wages.  Defendants must

11   also prove that a bona fide business-related reason exists for

12   what the defendants contend is a gender neutral factor that

13   resulted in any wage differential.  Defendants also have the

14   burden of showing that a business-related practice was in fact

15   followed and that adherence to that practice served their

16   stated legitimate business purpose.

17           Plaintiffs may also counter the defendants'

18   affirmative defense by offering evidence shown that the reasons

19   advanced by the defendants for any wage differential are

20   pretext for gender discrimination.  The appropriate inquiry to

21   determine if the factor put forward is a pretext, is whether

22   defendants used the factor reasonably in light of the

23   employer's stated purpose as well as its other practices.  In

24   evaluating the defendants' affirmative defense, you may take

25   account of any evidence that the defendants claim justification

N7JCede3                    Charge

1    for the pay disparities is pretextual and that the real reason

2    for the disparities is gender discrimination.  If the plaintiff

3    proves to you by a preponderance of the evidence that the

4    defendants' affirmative defense is pretextual, then you should

5    disregard that defense and find for plaintiff on the

6    affirmative defense.  In other words, if sex played any role in

7    creating a wage disparity, defendants' affirmative defense

8    fails.

9              If you find the defendants have proven by a

10    preponderance of the evidence that the difference in pay was

11    the result of a factor other than sex and that defendants used

12    that factor reasonably in light of a legitimate business

13    purpose, your verdict must be for defendants.  However, if you

14    find that plaintiff has satisfied her burden with respect to

15    the elements as to which she bears the burden of proof and

16    determine that defendants have failed to prove that the

17    difference in pay was caused by a factor other than sex, that

18    defendants used that factor unreasonably in light of their

19    stated purpose or that the factor other than sex was a pretext

20    or excuse for gender discrimination, you must decide in favor

21    of plaintiff.

22              (Continued on next page)

23

24

25

1          THE COURT:  Plaintiff has also made a claim against

2    NYU, Mr. Rubin and Mr. Swirnow under New York Labor Law Section

3    194.  She does not bring this claim against Mr. Kaplan and

4    Mr. Antonik.  I will refer to this law as Labor Law Section

5    194.  As applicable here, it prohibits employers from paying

6    men and women in the same establishment differently, except

7    under certain circumstances, as I will explain in more detail

8    momentarily.  Like the federal Equal Pay Act, a plaintiff under

9    Labor Law Section 194 does not need to show that an employer

10   intentionally paid her less because she was a woman; because of

11   this, Labor Law Section 194 is what is commonly called a strict

12   liability statute.  Also, both parties bear a burden of proof

13   on this claim.  First, Dr. Edelman bears a burden to prove a

14   violation of Labor Law Section 194 by a preponderance of the

15   evidence, and if she satisfies that burden, defendants have the

16   same burden to prove the same defense as I've already

17   instructed you under the Equal Pay Act.

18          Here, Dr. Edelman alleges for purposes of her Labor

19   Law Section 194 claim that NYU, Mr. Rubin and Mr. Swirnow paid

20   her less than Drs. Goldberg, Porges and Modi.

21          The first question for you to determine is whether Dr.

22   Edelman has proved that Drs. Goldberg, Porges and Modi are

23   appropriate comparators under Labor Law Section 194.  During

24   the time period at issue, Labor Law Section 194 made it

25   presumptively unlawful for an employer to pay a woman less than

1    a man for equal work on a job the performance of which requires

2    equal skill, effort and responsibility, and which is performed

3    under similar working conditions, except where payment is made

4    pursuant to a difference based on a bona fide factor other than

5    sex, such as education, training or experience.  Alternatively,

6    it is presumptively unlawful for an employer to pay a woman

7    less than a man for substantially similar work, when viewed as

8    a composite of skill, effort and responsibility, and performed

9    under similar working conditions, except where payment is made

10   pursuant to a difference based on a bona fide factor other than

11   sex, such as education, training or experience.

12          Plaintiff must prove by a preponderance of the

13   evidence that the work she performed was equal to the work that

14   Drs. Goldberg, Porges and/or Modi were performing.  Plaintiff

15   can satisfy her burden if she proves by a preponderance of the

16   evidence that Drs. Goldberg, Porges and/or Modi were performing

17   a job requiring equal skill, effort and responsibility to

18   plaintiff's.  This standard requires that plaintiff establish

19   that the compared jobs entail common duties or contents and do

20   not simply overlap in titles or classifications.  To satisfy

21   this burden, plaintiff must prove that the compared jobs have

22   the same common core of tasks.

23          There must be a comparison of actual job content.  In

24   evaluating whether the work performed was substantially similar

25   to the work performed by comparable male employees, you should

1    consider whether the work being compared required similar

2    skill, effort and responsibility.  Skill under Labor Law

3    Section 194 refers to the experience, training, education and

4    ability required to perform a job.  Effort refers to the mental

5    exertion needed to perform the job.  Jobs may require equal

6    effort in their performance even though the effort may be

7    exerted in different ways.  Responsibility refers to the degree

8    of accountability required in the performance of the job with

9    the emphasis on the importance of the job obligation.

10          Finally, if you conclude that any of Drs. Goldberg,

11   Porges and/or Modi are comparators under the law that I just

12   described, the second question you must determine is whether

13   plaintiff proved that NYU, Mr. Rubin and Mr. Swirnow paid her

14   less than the doctor or doctors whom you have found to be

15   appropriate comparators.  In determining whether plaintiff was

16   paid less than a male doctor who performed substantially

17   similar work, you should examine all amounts earned for work

18   performed at NYU related to such substantially similar work,

19   including salary, loan repayments and incentive compensation

20   bonus.

21          If plaintiff has proved these elements, a defendant

22   can avoid liability if the defendant has proved by a

23   preponderance of the evidence that NYU actually paid Drs.

24   Goldberg, Porges and/or Modi more based on a bona fide other

25   than sex, and that the factor was both job-related and

N7jWede4          Charge

1    consistent with business necessity.  A business necessity is a

2    factor that bears a manifest relationship to the employment in

3    question.  To meet the burden of establishing business

4    necessity, NYU, Mr. Rubin and Mr. Swirnow must prove by a

5    preponderance of the evidence that the factor considered

6    reflects a genuine business need and has a demonstrable

7    relationship to the job in question or the successful

8    performance of that job.

9         If you find in favor of plaintiff and also find that

10   defendants did not prove a bona fide factor other than sex

11   justified a difference in compensation, you may find that

12   plaintiff is entitled to a difference in compensation that she

13   has proven to exist.

14        Let me now instruct you as to the Title VII

15   retaliation claim against NYU.

16        This claim only applies to NYU.  It does not apply to

17   the individual defendants -- Mr. Swirnow, Mr. Rubin, Mr. Kaplan

18   or Mr. Antonik.  Plaintiff claims that NYU retaliated against

19   her in violation of Title VII of the Civil Rights Act of 1964

20   because she complained to the NYU human resources department

21   about what she claimed was discrimination in the way Mr. Kaplan

22   and Mr. Antonik spoke to her and made certain gestures when

23   discussing with her whether others would be allowed to use her

24   office on Marcus Avenue.  Plaintiff alleges that their words

25   and gestures constituted sexist and discriminatory remarks.

To make out her claim of retaliation, plaintiff must prove by a preponderance of the evidence each of the following elements:

1. that plaintiff engaged in protected activity by complaining of discrimination in her employment;

2. that NYU had knowledge of plaintiff's protected activity;

3. that NYU subjected plaintiff to a materially adverse employment action; and

4. that there was a causal connection between her protected activity and the materially adverse employment action.

I will now instruct you on each of these elements as they apply to this claim.

The first element is protected activity.

In determining whether defendants unlawfully retaliated against plaintiff for making a complaint to human resources about the alleged discriminatory conduct by Mr. Kaplan and Mr. Antonik, you must first decide whether the plaintiff engaged in protected activity.  A protected activity includes the opposition of any unlawful employment practice or the participation in a legal proceeding against the defendants.

Plaintiff's complaint to human resources would only be considered protected activity if she made her complaint concerning conduct that a reasonable person would have

considered discriminatory based on her sex.  Plaintiff must
prove that she had a good faith, reasonable belief that NYU's
conduct violated the laws forbidding gender discrimination.

        To prove that she engaged in protected activity,
plaintiff need not establish that she was correct in her
complaints or that there was indeed discrimination.  She need
only show that she had a good faith, reasonable belief that the
challenged actions by her employer violated the law.

        You must decide whether plaintiff reported
Mr. Antonik's and Mr. Kaplan's alleged statements and alleged
gestures to human resources in good faith or whether she did so
to extract a benefit from defendants.  If you find that
plaintiff did not report her alleged discrimination claims to
human resources in good faith, you must find for defendants.

        The second element is knowledge of plaintiff's
protected activity.

        There's no dispute that NYU knew of plaintiff's
protected activity.  If you find that plaintiff engaged in
protected activity, I direct you to find that plaintiff also
satisfied this element.

        The third element is materially adverse employment
action.

        There is also no dispute that the nonrenewal of
plaintiff's contract constitutes an adverse employment action.
I direct you to find that plaintiff satisfied this element.

1              The fourth element is causal connection.

2              A causal connection between the protected activity and

3       the alleged adverse action can be established indirectly, by

4       showing that plaintiff filed a complaint with NYU human

5       resources, the protected activity was followed closely by the

6       alleged adverse action, or directly through evidence of

7       retaliatory animus directed against plaintiff by NYU because of

8       her complaint.  Plaintiff must establish by a preponderance of

9       the evidence that NYU subjected her to the adverse employment

10      action because of her participation in the protected activity.

11             With respect to this fourth element, it must be the

12      case that NYU would not have taken the adverse action except as

13      a response to plaintiff's protected activity.  NYU must have

14      taken the adverse action because of an intent to retaliate

15      against plaintiff for complaining about employment

16      discrimination.

17             NYU's retaliatory intent may be imputed from the

18      intent and conduct of a subordinate if NYU's decision to

19      terminate was proximately caused by a subordinate who had a

20      retaliatory motive and intended to bring about the adverse

21      employment action.  NYU, however, must have been negligent or

22      reckless in giving effect to the retaliatory intent of its

23      low-level employees, which requires plaintiff to prove that NYU

24      knew or reasonably should have known about the retaliatory

25      motivation.  Of course, to make this finding, you must also

1    find that the false accusations themselves were the product of

2    retaliatory intent.

3            However, an employer may not be held liable simply

4    because it acts on information provided by a biased coworker.

5    Thus, if NYU, non-negligently and in good faith, relies on a

6    false and malign report of an employee who acted out of an

7    unlawful animus, it cannot be held accountable for or said to

8    have been motivated by the employee's animus.

9            Showing the four elements I just described creates a

10   presumption of retaliation, which NYU may rebut by merely

11   articulating a legitimate, nonretaliatory reason for the

12   nonrenewal of plaintiff's contract and subsequent termination.

13   In determining whether NYU took actions against plaintiff

14   because she opposed what she believed, in good faith, to be sex

15   discrimination, it is important to consider whether the

16   explanations NYU has given for its actions were untrue and that

17   retaliation was the real reason for its actions.  A reason is

18   not pretextual simply because you disagree with NYU's business

19   rationale.  You are not sitting in judgment on the wisdom of

20   NYU's business rationale.  In determining whether NYU's

21   explanations for its actions were untrue, you may consider

22   weaknesses, implausibilities, inconsistencies, incoherencies or

23   contradictions in defendants' proffered reasons for its

24   actions.  In making this determination, you should consider the

25   reasonableness, or lack thereof, of NYU's explanation for its

1  decisions and any evidence that those reasons were unlikely.

2  The temporal proximity between plaintiff's protected activity

3  and the adverse action may be relevant as to whether

4  defendants' explanations for its actions are pretextual, but it

5  is not sufficient alone to find that those reasons are

6  pretextual.  If you find the reasons articulated by NYU to be

7  unbelievable, you still must determine whether retaliation

8  against Dr. Edelman for filing her complaint was the real

9  reason for what occurred.

10      If you find that NYU did not have a legitimate,

11  nonretaliatory reason for the adverse employment actions and

12  that retaliation was the reason for those actions, you must

13  find for plaintiff.  However, if you find that NYU did

14  articulate a legitimate, nonretaliatory reason for the

15  nonrenewal of plaintiff's employment contract, then you must

16  determine whether that action would not have occurred in the

17  absence of a retaliatory motive, even if retaliation was not

18  the only reason for defendants' actions.  You must decide

19  whether plaintiff has proved by a preponderance of the evidence

20  that, in fact, NYU subjected plaintiff to the nonrenewal of her

21  contract because of a desire to retaliate against her for her

22  participation in a protected activity rather than the

23  nonretaliatory reasons NYU has put forward.

24      In other words, you must establish whether the

25  plaintiff has established by a preponderance of the evidence of

1    the totality of the circumstances that but for NYU wanting to

2    retaliate against plaintiff for having engaged in protected

3    activity, plaintiff would not have been subjected to the

4    adverse action even if retaliation was not NYU's only reason

5    for its actions.  When you consider this evidence, the question

6    is not whether NYU showed poor or erroneous judgment.  An

7    employer is entitled to make an employment decision for a good

8    reason, a bad reason or for no reason at all, so long as the

9    decision is not motivated by unlawful discrimination.  The sole

10   inquiry here is whether plaintiff has sustained her burden of

11   proving by a preponderance of the evidence that NYU subjected

12   plaintiff to an adverse employment action for having engaged in

13   protected activity.

14        Dr. Edelman has also brought a retaliation claim under

15   the New York State Human Rights Law.  Unlike the Title VII

16   retaliation claim, this claim is against three of the

17   individual defendants -- Mr. Rubin, Mr. Antonik and

18   Mr. Swirnow -- and NYU.  The state human rights law prohibits

19   employers from retaliating against an employee for the

20   employee's opposition to unlawful discrimination.

21        In order to prove her retaliation claim under the

22   state human rights law, Dr. Edelman must prove each of the

23   following elements by a preponderance of the evidence:

24        1. that she engaged in a protected activity, such as

25   making a good faith complaint about unlawful discrimination;

1          2. that the protected activity Dr. Edelman engaged in

2     was known to the defendants;

3          3. that she suffered a material adverse action; and

4          4. that defendants took the adverse action because of

5     Dr. Edelman's protected activity.

6          I will now instruct you on each element.

7          The first element of a claim under the state human

8     rights law is that the activity plaintiff engaged in that

9     resulted in retaliation against her was an activity protected

10    by law.  The standard for protected activity is the same as

11    under Title VII and my instructions to you with respect to that

12    element under Title VII also apply here.  An employee has a

13    right to report and protest workplace discrimination where such

14    discrimination has actually occurred or the employee reasonably

15    believes in good faith that discrimination occurred.

16         Protected activity includes an employee's conduct in

17    opposing in good faith unlawful discrimination by complaining

18    about discrimination to the employer.

19         The second element of a retaliation claim under the

20    state human rights law is that the defendant whose conduct you

21    are considering must have known that Dr. Edelman was engaged in

22    protected activity.  With respect to NYU, I instruct you that

23    general corporate knowledge that Dr. Edelman engaged in a

24    protected activity is sufficient to establish this element of a

25    retaliation claim under the state human rights law.  Thus, with

1    respect to NYU, my instructions as to Title VII also apply

2    here.  If you find that plaintiff has proven the first element

3    of her claim, I direct you to also find that plaintiff has

4    satisfied the second element as to the NYU defendants.

5         The third element of a retaliation claim under the

6    state human rights law is that plaintiff suffered a material

7    adverse action.  Here, plaintiff contends that defendants

8    engaged in material adverse actions when NYU did not renew her

9    employment agreement when it expired.  I instruct you that the

10   nonrenewal of plaintiff's employment agreement is a material

11   adverse action by NYU.  If you find that the individual

12   defendants at issue -- Mr. Rubin, Mr. Antonik or Mr. Swirnow --

13   aided or abetted that decision, in that they actually

14   participated in the decision not to renew plaintiff's contract

15   even if they did not have hiring or firing authority, you

16   should find in favor of the plaintiff as to this element with

17   respect to that defendant as well.

18        The fourth element of retaliation under the state

19   human rights law that plaintiff must prove by a preponderance

20   of the evidence is that a material adverse action was taken

21   against her because of her protected activity as I've defined

22   that term.  For example, proximity in time between an

23   employee's protected activity and an employer's alleged

24   retaliation may, although it does not necessarily, establish a

25   causal link between the two.

1              In considering whether plaintiff has proved that a

2       material adverse action was taken against her because of

3       protected activity she engaged in, you must first decide

4       whether the defendant you are considering was, in fact,

5       motivated by a desire to retaliate against her because of her

6       complaints to human resources.  If not, you must find in favor

7       of that defendant.

8              Like under Title VII, NYU's retaliatory intent may be

9       imputed from a subordinate under New York State Human Rights

10      Law if NYU's decision to terminate was proximately caused by a

11      subordinate who had a retaliatory motive and intended to bring

12      about the adverse employment action.  The same standard applies

13      here as under Title VII.  NYU must have been negligent or

14      reckless in giving effect to the retaliatory intent of its

15      low-level employees, which requires NYU to have known or

16      reasonably should have known about the retaliatory motivation.

17      Again, you must also find that the false accusations themselves

18      were the product of retaliatory intent.

19             Like under Title VII, an employer may not be held

20      liable simply because it acts on information provided by a

21      biased coworker.  Thus, if NYU, non-negligently and in good

22      faith, relies on a false and malign report of an employee who

23      acted out of an unlawful animus, it cannot be held accountable

24      or said to have been motivated by the employee's animus.

25             If you conclude that a defendant was motivated by a

1    desire to retaliate against plaintiff for having engaged in

2    protected activity, you must next consider whether that

3    defendant also had a nonretaliatory reason for the adverse

4    action.  If you decide that the defendant had no nonretaliatory

5    motive for the adverse action and that the adverse action was

6    solely motivated by retaliatory animus, then you must find for

7    plaintiff on this element as to that defendant.

8            However, if a defendant had both retaliatory and

9    nonretaliatory motives for taking the adverse action against

10   plaintiff, then you must consider whether the retaliatory

11   motive was the "but for" cause of the material adverse action

12   taken against plaintiff.  In other words, you must consider

13   whether the defendant would have taken the adverse action

14   against plaintiff absent the retaliatory motive.  If a

15   defendant would not have taken the material adverse action

16   against plaintiff absent a desire to retaliate against her for

17   having engaged in protected activity, then retaliatory animus

18   is the "but for" cause for the adverse action taken against

19   plaintiff, and you will find for her on this element.  If, on

20   the other hand, you decide that that defendant would have taken

21   the material adverse action against plaintiff even absent his

22   or its retaliatory intent, or if that defendant had no

23   retaliatory motive at all, then you must find for that

24   defendant on this claim.

25           When you consider the question of retaliatory motive,

1    you are to decide whether the nonretaliatory reasons advanced

2    by a defendant were the actual reasons for the defendant's

3    actions.  An employer or supervisor entitled to make decisions

4    for good reasons, bad reasons or for no reason at all so long

5    as the decision is not motivated by unlawful retaliation.  The

6    issue in this case is not whether you would have taken any of

7    the alleged adverse actions against plaintiff if you were in

8    charge.  Rather, you are to determine whether the defendant you

9    are considering took the alleged adverse actions against

10   plaintiff because of nonretaliatory reasons or because of her

11   protected activity.

12        If you believe that the reasons offered by a defendant

13   for adverse action taken against the plaintiff are false, you

14   may infer that that defendant acted out of a desire to

15   retaliate against her.  Here, temporal proximity, without more,

16   is insufficient to satisfy the plaintiff's burden to bring

17   forward some evidence of pretext.  However, if you find that

18   the reasons given by a defendant for the alleged adverse

19   actions are false, that does not necessarily mean that the true

20   motive was the illegal, retaliatory motive argued by plaintiff.

21        In determining whether Dr. Edelman has carried her

22   burden of proving retaliatory intent, you will consider all the

23   facts and circumstances that your common sense and good

24   judgment tell you are relevant in deciding why someone acted as

25   they did.  The central question is whether the defendants took

1  the alleged adverse actions against Dr. Edelman at least in

2  part because she engaged in a protected activity, and the

3  burden is on Dr. Edelman to prove that.

4         Unlike her Title VII claims, plaintiff also seeks to

5  hold three of the individual defendants -- Mr. Rubin,

6  Mr. Antonik or Mr. Swirnow -- liable for retaliation under New

7  York State Human Rights Law.  Although New York State Human

8  Rights Law does not allow employees to be liable as employers,

9  you may find these particular employees nonetheless

10  individually liable under an aiding-and-abetting theory to an

11  employer who has retaliated in violation of New York State

12  Human Rights Law.  Therefore, to find that these individual

13  defendants aided and abetted such a violation, you must first

14  find that the employer, NYU, violated New York State Human

15  Rights Law.  An individual defendant cannot aid and abet his

16  own retaliatory conduct; he may only aid and abet another's

17  violation of the law.  You may, however, find aiding and

18  abetting liability based on the same conduct that serves as the

19  predicate for NYU's liability, as long as you have found that

20  NYU engaged in retaliatory conduct.  If you find that the

21  individual defendants actually participated in the decision to

22  not renew plaintiff's contract and to terminate her employment,

23  then you may find them liable under an aider-and-abettor

24  theory, even if they did not have hiring or firing authority.

25  Furthermore, you must also find that they possessed the same

retaliatory motive or intent as the employer.  In other words,
they must have engaged in direct and purposeful participation
in the retaliation.

Plaintiff also asserts a retaliation claim under the
New York City Human Rights Law against NYU and three individual
defendants -- again, Mr. Rubin, Mr. Antonik and Mr. Swirnow.
The elements of a retaliation claim under the city human rights
law are similar to those under the state human rights law, but
there are some important differences, which I will explain.

To prevail on her retaliation claim under the city
human rights law, plaintiff must prove each of the following
four elements by a preponderance of the evidence:

1. that she engaged in protected activity, such as
making a complaint to her employer about discrimination;

2. that the protected activity plaintiff engaged in
was known to the defendant you are considering;

3. that the defendant you are considering engaged in
conduct that was reasonably likely to deter a person from
engaging in that protected activity; and

4. that the defendant's conduct was motivated, at
least in part, by plaintiff's protected activity.

In deciding whether plaintiff engaged in protected
activity under the city human rights law, the instructions
regarding protected activity set forth in connection with
plaintiff's state human rights law retaliation claim apply with

1   equal force.

2            In deciding whether plaintiff has proved that

3   defendants were aware that she had engaged in protected

4   activity, the instructions on this issue given in connection

5   with plaintiff's state human rights law retaliation claim apply

6   with equal force to her city human rights law retaliation

7   claim.

8            The third element of a retaliation claim under the

9   city human rights law is that the defendant you are considering

10  engaged in conduct that was reasonably likely to deter a person

11  from engaging in that protected activity.  Here, plaintiff

12  contends that the nonrenewal of her contract was reasonably

13  likely to deter a person from engaging in protected activity.

14  In contrast to Title VII and New York State Human Rights Law,

15  to constitute retaliatory conduct under the city human rights

16  law, a defendant's conduct need not have resulted in an

17  ultimate action with respect to plaintiff's employment or in a

18  materially adverse change in the terms and conditions of her

19  employment.  Instead, you need only find that the conduct at

20  issue was reasonably likely to deter a person from engaging in

21  protected activity.

22           The standard here is more lenient than that for a

23  materially adverse action under New York State Human Rights

24  Law.  I instruct you that the nonrenewal of plaintiff's

25  employment agreement is conduct reasonably likely to deter by

N7jWede4          Charge

1   NYU.  If you find that the individual defendants at issue --

2   Mr. Rubin, Mr. Antonik or Mr. Swirnow -- actually retaliated

3   against plaintiff or aided or abetted such retaliation, you

4   should find in favor of the plaintiff as to this element with

5   respect to that defendant as well.

6         The fourth element of retaliation under the city human

7   rights law that plaintiff must prove by a preponderance of the

8   evidence to succeed on her claim against a particular defendant

9   is that the desire of that defendant to retaliate against her

10  for engaging in a protected activity was a motivating factor in

11  that defendant's decision to engage in conduct that was

12  reasonably likely to deter a person from engaging in protected

13  activity.  Plaintiff contends that Mr. Rubin, Mr. Antonik,

14  Mr. Swirnow and NYU took action against her because she

15  protested discrimination by Mr. Antonik and Mr. Kaplan.

16  Defendants all claim that the actions at issue were taken

17  because of their legitimate concerns about plaintiff's job

18  performance and her alleged failure to meet NYU's clinical

19  standards for rheumatology practice.

20        In order to carry her burden as to this element,

21  plaintiff need not establish that her protected activity was

22  the sole or principal reason for any action that the particular

23  defendant you are considering took against her.  The city human

24  rights law is violated when retaliatory intent is a motivating

25  factor for a defendant's action, whether or not that

N7jWede4          Charge

retaliatory motive was the sole cause for the action.  If

plaintiff proves that the defendant you are considering had a

retaliatory motive for any action that he or it took against

her that would be reasonably likely to deter a person from

engaging in protected activity, this element is satisfied.

Plaintiff may show either that the individual or entity that

made the decision to take such action was motivated in part by

a desire to retaliate against her or that an individual who was

substantially motivated by retaliatory intent played a

meaningful role in the decision.

The instructions I gave you in connection with

plaintiff's claim under the state human rights law regarding

nonretaliatory reasons apply with equal force to her

retaliation claim under the city human rights law.  The

instructions I've given with respect to imputing retaliatory

intent based upon a subordinate with retaliatory motive, and

NYU's negligence or recklessness in giving effect to that

intent, also apply here.

If you find that plaintiff has proved all the elements

of her retaliation claim under the city human rights law, you

must then decide whether the defendant you are considering has

proved by a preponderance of the evidence that the action

against plaintiff would have been taken on the basis of

nonretaliatory reasons alone.  Defendants here claim that any

action taken against plaintiff that was reasonably likely to

deter a person from engaging in protected activity was taken

for a nonretaliatory reason.

In deciding whether the defendant you are considering

has satisfied his or its burden on this issue, follow these

steps:  Consider whether the defendant has proved that the

decision to take an action against plaintiff that was

reasonably likely to deter a person from engaging in protected

activity was motivated by a nonretaliatory reason in addition

to a retaliatory motive.  If you find that the defendant you

are considering was not motivated by any nonretaliatory reason,

you must find for plaintiff.  If, however, you find that the

defendant had a nonretaliatory reason or reasons for his or its

action, you must determine whether the defendant has proved

that he or it would have taken this action against plaintiff

based upon these nonretaliatory reasons alone.

Like her state human rights law claim, plaintiff also

seeks to hold three individual defendants -- Mr. Rubin,

Mr. Antonik or Mr. Swirnow -- liable for retaliation under the

city human rights law.  Unlike state human rights law, however,

you may those employees individually liable, both under a

direct liability theory and an aiding-and-abetting theory.  The

standards for an aiding-and-abetting theory are the same as

those under the state human rights law.  The instructions I

gave you with respect to aiding and abetting under the state

human rights law also apply under the city human rights law.

1    Therefore, to find that the individual defendants aided and

2    abetted retaliation, you must first find that the employer,

3    NYU, retaliated in violation of city human rights law.  You may

4    find aiding and abetting liability based on the same conduct

5    that serves as the predicate for NYU's liability, as long as

6    you have found that NYU engaged in retaliatory conduct.  Again,

7    if you find that the individual defendants actually

8    participated in the decision to not renew plaintiff's contract,

9    then you may find them liable under an aider-and-abettor

10   theory, even if they did not have hiring or firing authority.

11   Furthermore, you must also find that they possessed the same

12   retaliatory motive or intent as the employer.  In other words,

13   they must have engaged in direct and purposeful participation

14   in the retaliation.  But in addition to an aiding-and-abetting

15   theory, you may also find that the individual defendant, you

16   may also find the individual defendant liable for retaliation

17   under the New York City Human Rights Law, without regard to

18   whether they qualify as an employer or supervisor, and without

19   regard to whether NYU has itself retaliated against plaintiff,

20   if you find that the individual defendant has retaliated

21   against plaintiff for her engagement in protected activity.

22          Plaintiff brings a gender discrimination claim against

23   Mr. Antonik and NYU under the New York City Human Rights Law

24   based on certain remarks made to her by Mr. Antonik.  Under the

25   city human rights law, it is unlawful for an employer to

discriminate against an employee because of gender.  It is
sufficient to show that she suffered any adverse, differential
or unequal treatment at least in part based on her gender;
plaintiff does not need to identify a man who was treated more
favorably.  Even a single comment, if made in circumstances
where the comment would signal views about the role of women in
the workplace, may be sufficient to give rise to a claim of
gender discrimination.

            To prove her gender discrimination claim under the
city human rights law, plaintiff must prove by a preponderance
of the evidence that she has been treated less well than other
employees because of her gender.  In determining whether a
defendant discriminated against Dr. Edelman because of her
gender, you should consider the totality of the circumstances;
that is, the overall context in which the disputed conduct
occurred.

            In evaluating whether Mr. Antonik's conduct was
motivated at least in part by plaintiff's gender, plaintiff
need only show that her gender was a motivating factor.  It
need not be the sole motivating factor.  A motivating factor is
a factor that made a difference or played a part in a decision.
Stated another way, plaintiff must prove by a preponderance of
the evidence a causal connection between her gender and
Mr. Antonik's conduct.

            Further, keep in mind that the city human rights law

1   is not a general civility code.  Plaintiff still bears the

2   burden of showing that the conduct is caused by a

3   discriminatory motive.  It is not enough to show one has an

4   overbearing or obnoxious boss.  Plaintiff must show that she

5   has been treated less well at least in part because of her

6   gender.  Thus, even if Dr. Edelman establishes that allegedly

7   sexist remarks were made to her, NYU and Mr. Antonik can still

8   avoid liability by proving that the complained-of conduct at

9   issue is nothing more than what a reasonable person would

10  consider a petty slight or trivial inconvenience.

11          Members of the jury, I've got a couple more

12  instructions to give you, but let's all take a quick stretch

13  break now, and then I'll give you the remaining instructions.

14          OK.

15          My next instructions are on the law of damages.

16          You should consider the issue of damages only if you

17  find that Dr. Edelman has established any of her claims by a

18  preponderance of the evidence.

19          The fact that I charge you on the issue of damages

20  does not mean that Dr. Edelman is entitled to prevail -- that

21  is for you to decide.  I instruct you on this subject only in

22  the event that you decide that Dr. Edelman has sustained her

23  burden of proof as to any of her claims.  If you decide that

24  Dr. Edelman has not sustained her burden of proof as to any of

25  her claims, you need not consider damages.

1          The purpose of the law of damages is to award, as far

2     as possible, just and fair compensation for the loss, if any,

3     that the plaintiff has suffered as a result of the actions of

4     the defendant you are considering.  The damages that you award

5     must be fair and reasonable and neither inadequate nor

6     excessive.

7          In awarding damages, if you decide to award them, you

8     must be guided by dispassionate common sense.  Computing

9     damages may be difficult, but you must not let that difficulty

10    lead you to engage in arbitrary guesswork.  On the other hand,

11    the law does not require the plaintiff to prove the amount of

12    her losses with mathematical precision but only with as much

13    definiteness and accuracy as the circumstances permit.  In all

14    instances, you are to use sound discretion in fixing an award

15    of damages, drawing reasonable inferences where you deem

16    appropriate from the facts and circumstances in evidence.

17         If you make any award of damages, such award is not

18    subject to federal income taxes, and you should not consider

19    such taxes in determining the amount of damages, if any.

20         The verdict form I will give you will assist you in

21    recording the determinations, if any, that you make as to

22    damages.

23         If you decide in favor of plaintiff on her Equal Pay

24    Act claims, then you must award damages to plaintiff.

25    Plaintiff has the burden of proving the amount of those damages

N7jWede4          Charge

by a preponderance of the evidence.  Damages must be awarded in

an amount that compensates plaintiff for the difference between

the wages she was paid and the wages paid during her employment

period to the male employees whom you have found to be

appropriate comparators.  To calculate this figure, you should

first determine the salary that was paid to defendants' male

employees whom you found performed equal work to that performed

by plaintiff during the relevant years.  You should then

calculate the difference between the salary plaintiff earned

during the relevant years and the salary of the men you find

were paid more money for equal work in violation of the Equal

Pay Act.  If you find that plaintiff was paid less than several

men for substantially equal work, you should calculate the

difference using the salary of the man who performed equal work

to that performed by plaintiff who was paid the most during the

relevant period.  Do not simply add together the amounts paid

to the relevant comparators.  Do not add an amount for

interest.  This will be automatically calculated by the Court

after you reach your verdict.

          Like the Equal Pay Act, if you decide in favor of

plaintiff on her New York Labor Law Section 194 claims, then

you must award damages to plaintiff.  Damages must be awarded

in an amount that compensates plaintiff for the difference

between the wages she was paid and the wages the male employees

to whom you have compared her were paid during her employment

period.  The same standards guide damages under New York Labor
Law Section 194 as under the Equal Pay Act.  The same
definition of wages that I have given for the Equal Pay Act
also applies under New York Labor Law Section 194.

Plaintiff has sued for retaliation under Title VII
against NYU.  It is for this Court to determine any amount of
front pay to be awarded, if any, for any violation of Title VII
you may have found was committed.

Dr. Edelman asserts that, because she made allegedly
protected complaints of discrimination, defendants did not
renew her employment contract when it was expiring.  Your job
as the jury is to determine what damages, if any, Dr. Edelman
has proved by a preponderance of the evidence for each claim
that she has proven, if any.

If Dr. Edelman has proved her claim for retaliation
under the state human rights law or the city human rights law,
she would be entitled to lost wages and benefits arising under
such claim even if they were difficult to calculate.  Any
uncertainty about the amount of lost compensation to be awarded
to Dr. Edelman should be resolved in her favor.

Here, if you find for Dr. Edelman on her claims for
retaliation under state human rights law or city human rights
laws, you should consider her damages for front pay.  Front pay
damages, if any, represent a plaintiff's lost salary and
benefits, caused by an unlawful discharge or other adverse

action, accruing from the time of trial through some point in

the future.  If you find that Dr. Edelman will be unable to

earn in the future what she would have earned at NYU, then you

may award her, as additional compensation, the amount she would

have earned during the time period between the date of your

verdict and either: 1) the date you believe she would have

worked at NYU absent any discriminatory conduct or 2) the date

you can reasonably predict that she has a reasonable prospect

of obtaining comparable employment.  Factors to be considered

in determining front pay include the age of the plaintiff and

her reasonable prospects of obtaining comparable employment.

In doing so, you should bear in mind that the purpose of front

pay is to make a plaintiff whole -- that is, to put plaintiff

in the position she would have been in if defendants had not

discriminated against her.

That said, Dr. Edelman has the burden of proving that

she actually incurred a loss of front pay.  Please note that

Dr. Edelman is only entitled to be compensated once for any

alleged front pay that arose from the retaliation claims that

she's prevailed upon.

If you find that Dr. Edelman has established any of

her claims of gender retaliation and discrimination, you may

award her compensatory damages for injuries such as emotional

pain, suffering, inconvenience, mental anguish, humiliation and

loss of enjoyment of life.  Compensatory damages are an amount

1    that will fairly compensate her for any injury she actually

2    sustained as a result of defendants' conduct.  There's no

3    requirement that a claim of emotional distress be supported by

4    proof of expenses, lost earnings or specifically measurable

5    damages.  No expert testimony is necessary to prove such claim,

6    and you may rest your findings solely on Dr. Edelman's

7    testimony.

8            No evidence of the monetary value of such intangible

9    things as pain and suffering has been, or need be, introduced

10   into evidence.  There's no exact standard for fixing the

11   compensation to be awarded for these elements of damage.

12   Rather, you may issue an award of monetary damages based on the

13   emotional harm you determine Dr. Edelman to have suffered,

14   based on the evidence presented and your best judgment.  Any

15   award you make should be fair in light of the evidence

16   presented at the trial.

17           Members of the jury, you are now about to go into the

18   jury room to begin your deliberations.  Before you do that, I

19   will give you a few final instructions.

20           The parties have prepared a list of the exhibits that

21   were received, listed by exhibit number.  If you want a

22   particular exhibit or if you want any testimony sent or read

23   back to you, you may request that.  Any communication with the

24   Court should be made in writing, signed by your foreperson, and

25   given to the court security officer, whom, as in all cases, I

N7jWede4          Charge

1    will swear to ensure that your deliberations may take place

2    uninterrupted.

3        Please remember that it is not always easy to locate

4    what you might want, so be as specific as you possibly can.  If

5    you want testimony read back to you, please try to be as

6    specific as you possibly can because the court reporter will

7    have to look through the transcript, and the parties will have

8    to agree on what portions of testimony may be called for in

9    response to your request, and if they disagree, I must resolve

10   those disagreements.  If you want any further explanation of

11   the law as I've explained it to you, you may also request that

12   from the Court.  If there is any doubt or question about the

13   meaning of any part of the instructions that I've given you

14   during this trial, you should not hesitate to send me a note

15   asking for clarification or for further explanation.

16       It is very important that you not communicate with

17   anyone outside the jury room about your deliberations or about

18   anything touching this case.  There is only one exception to

19   this rule.  If it becomes necessary during your deliberations

20   to communicate with me -- to request testimony or to request

21   clarification on the law -- you should send a note to me, in

22   writing, signed by your foreperson, and given to one of the

23   court security Officers or to my deputy, Mr. Fishman.  No

24   member of the jury should ever attempt to communicate with me

25   except by a signed writing, and I will never communicate with a

member of the jury on any subject touching on the merits of the
case other than in writing, or orally here in open court.  If
you send any notes to the Court, do not disclose anything about
your deliberations.  Specifically, do not disclose to anyone --
not even to me -- how the jury stands, numerically or
otherwise, until after you have reached a unanimous verdict or
have been discharged.

Many of you have taken notes periodically throughout
this trial.  You should not show your notes to, or discuss your
notes with, any other jurors during your deliberations.  Any
notes you have taken are to be used solely to assist you.  The
fact that a particular juror has taken notes entitles that
juror's views to no greater weight than those of any other
juror.

I want to emphasize to you, as you're about to begin
your deliberations, that notes are simply an aid to memory.
Notes that any of you may have made may not be given any
greater weight or influence in determination of the case than
the recollections or impressions of other jurors, whether from
notes or memory, with respect to the evidence presented or what
conclusions, if any, should be drawn from such evidence.  Any
difference between a juror's recollection and another juror's
notes should be settled by asking to have the court reporter
read back the transcript, for it is the court record rather
than any juror's notes upon which the jury must base its

1    determination of the facts and its verdict.

2              You will now retire to decide the questions I've

3    described for you.  For the plaintiff to prevail on the

4    questions that you must answer, she must sustain her burden of

5    proof.  Your verdict on each question must be unanimous.  Each

6    juror is entitled to his or her opinion, but you are required

7    to exchange views with your fellow jurors.  This is the very

8    essence of jury deliberation.  It is your duty to discuss the

9    evidence.  If you have a point of view and after reasoning with

10   other jurors it appears that your own judgment is open to

11   question, then of course you should not hesitate in yielding

12   your original point of view if you are convinced that the

13   opposite point of view is really one that satisfies your

14   judgment and conscience.  You are not to give up a point of

15   view, however, that you conscientiously believe in simply

16   because you are outnumbered or outweighed.  You should vote

17   with the others only if you are convinced on the evidence, the

18   facts and the law that it is the correct way to decide the

19   case.  You are not to discuss the case until all jurors are

20   present.  Four or five jurors together is only a gathering of

21   individuals.  Only when all the jurors are present do you

22   constitute a jury, and only then may you deliberate.

23             The first thing you should do when you retire to

24   deliberate is take a vote to select one of you to sit as your

25   foreperson.  The foreperson will send out any notes, and when

1   the jury has reached a verdict, he or she will notify the court

2   security officer that the jury has reached a verdict, and when

3   you come into open court, the foreperson will be asked to state

4   what the verdict is.

5        Once you have made your verdict, you will record you

6   decisions in a verdict form which I have prepared for you.  You

7   should also proceed through the questions in the order in which

8   they are listed, following the instructions on that form.

9        Once you have completed the form, the foreperson

10   should then fill in the verdict sheet and date it, and each of

11   you should sign it.  The foreperson should then give a note to

12   the court security officer outside your door stating that you

13   have reached a verdict.  Do not specify what the verdict is in

14   your note.  I will stress that each of you must be in agreement

15   with the verdict that is announced in court.  Once your verdict

16   is announced by your foreperson in open court and officially

17   recorded, it cannot ordinarily be revoked.

18        I remind you that you took an oath to render judgment

19   impartially and fairly, without prejudice or sympathy and

20   without fear, solely upon the evidence in the case and the

21   applicable law.  Your oath sums up your duty.  I know that you

22   will do your duty and reach a just and true verdict.

23        Now, if you will wait just a moment and remain seated,

24   I need to confer with the attorneys to see if there are any

25   additional instructions that they would like to have given to

1   you or if there is anything I may not have covered.  In that

2   regard, please don't discuss the case while seated in the box

3   because the case still has not been formally submitted to you.

4            Let me see the parties at sidebar.

5            (At sidebar)

6            THE COURT:  Any exception from plaintiff?

7            MR. LABUDA:  The only thing we'd ask, your Honor, is

8   that you let the jury know if they need any additional aids

9   from the Court, that they can send you a note as well.  That

10  would be the only exception we have.

11           THE COURT:  What do you mean by additional aids?

12           MR. LABUDA:  If they need, let's say, a lot of times

13  jurors need or want a calculator.

14           THE COURT:  I'm not inclined to give that instruction.

15  I've given them the instructions.  If they've got any

16  questions, they can send me a note.

17           MR. LABUDA:  That's fine, your Honor.

18           THE COURT:  What about the defendants?

19           MR. SCHOENSTEIN:  You went a little long, but the

20  instructions were fine, your Honor.

21           THE COURT:  There were a couple of typos that I came

22  across, including, most significantly, that the example that I

23  gave them about rain was from last week, not from this week.

24  So before we give them the charge, I'm going to correct those

25  typos.  And we'll show you the corrected instructions.

N7jWede4

```
 1              MR. STEER:  Your Honor, one thing, if I may?  Your
 2      Honor may have already indicated this, but I noticed Mr.
 3      Kaplan's name was mentioned a couple of times.
 4              THE COURT:  It was mentioned intentionally so because
 5      he was an interested witness when he testified.
 6              MR. STEER:  Fine.  Thank you.
 7              THE COURT:  That's the reason I mentioned it.
 8              MR. SCHOENSTEIN:  Fair enough.
 9              THE COURT:  OK.
10              (In open court)
11              THE COURT:  Members of the jury, my deputy is going to
12      swear the court security officer.
13              (Court security officer sworn)
14              THE COURT:  Members of the jury, that concludes my
15      instructions to you.  You may now retire.  You are instructed
16      to retire to the jury room, and you may begin this phase of
17      your deliberations.
18              As a first matter of business, please select a
19      foreperson and send me a note, signed, dated and timed, through
20      the court security officer or my deputy, Mr. Fishman, telling
21      me whom you have selected as the foreperson.
22              (At 1 o'clock p.m., the jury retired to deliberate
23      upon a verdict)
24              THE COURT:  Be seated.
25              Do the parties have a list of exhibits prepared that
```

N7jWede4

1    we can give to the jury?

2              MR. KATAEV:  Yes, your Honor.  Unfortunately, I think

3    there's some dispute on that issue.  I'll represent to the

4    Court we have two binders, two volumes.

5              THE COURT:  Let's start -- put aside the binders -- is

6    there a list of exhibits?

7              MR. KATAEV:  Yes, your Honor.  I can give you them

8    now.

9              THE COURT:  Is that agreed upon, Mr. Kataev?

10             MR. KATAEV:  I don't believe that it is.

11             THE COURT:  OK.  So I'll resolve any disagreement with

12   respect to the list of exhibits.

13             Is there a list of witnesses that the parties agreed

14   upon?

15             MR. KATAEV:  I don't believe we've worked on that

16   together, your Honor.  I don't know if defendants have prepared

17   one.  We can work on it now.

18             THE COURT:  Do defendants have a list of exhibits?

19             MS. CARDONA:  We have a list of exhibits, yes.

20             THE COURT:  Do defendants have a list of witnesses?

21             MR. KATAEV:  No, your Honor.  We don't have --

22             THE COURT:  I'm not quite sure what part of my request

23   to the parties, which I think I made twice, that you put

24   together a list of witnesses was not understood.  We'll put

25   together a list of the witnesses.  We'll show it to the parties

1    before it goes to the jury.

2              Are there competing lists of exhibits?

3              MR. KATAEV:  Yes, your Honor.

4              THE COURT:  Mr. Kataev, do you want to hand up to my

5    law clerk the competing list of exhibits.

6              MS. CARDONA:  Your Honor, I do have an issue with

7    exhibit 93.  It's an exhibit that they were required to redact

8    all patient information.

9              THE COURT:  All we're talking about right now is the

10   list of exhibits.  We're not talking about the exhibit books,

11   just the list of exhibits.

12             MR. KATAEV:  May I approach?

13             THE COURT:  Thank you.

14             All right.  I'm not going to give the spreadsheet that

15   has objections, offered, received and trial date.  That's not

16   what I asked for.  What I asked for was simply the exhibit

17   number and the description.  I don't have a problem giving the

18   Bates numbers, since it seems that both parties are agreed on

19   the Bates numbers.

20             Is there any disagreement with respect to the

21   descriptions, Mr. Kataev?

22             MR. KATAEV:  No, your Honor.

23             THE COURT:  Defendants have agreed on that?

24             MS. CARDONA:  Yes.

25             THE COURT:  Is there any disagreement between the

1    parties that the spreadsheet that just lists the exhibit, the

2    Bates number and the description accurately reflects all of the

3    exhibits and only the exhibits that have been received into

4    evidence?

5         MR. KATAEV:  No.

6         MS. CARDONA:  No, your Honor.

7         THE COURT:  OK.

8         All right.  I think, then, we're done with that.  I

9    don't know whose list this was, but again, the jury doesn't

10   need to know -- in fact, it's not relevant to their

11   deliberations -- whether there were objections or not.

12        MR. KATAEV:  Just two things on this, your Honor?

13        THE COURT:  Yes.

14        MR. KATAEV:  The only reason the plaintiff has a

15   disagreement with the list provided by defendants is our

16   spreadsheet followed the order in which it was received whereas

17   this one simply follows the numerical value.

18        THE COURT:  I think it's appropriate that it follow

19   the numerical value.

20        MR. KATAEV:  Understood.

21        THE COURT:  OK.  We'll do the list of witnesses.  And

22   I gather there is -- does the plaintiff have a binder of all of

23   the exhibits?

24        MR. KATAEV:  Yes, your Honor.  Two binders, two

25   volumes.

N7jWede4

1    THE COURT:  OK.  And is there disagreement that

2    defendants have with respect to the binder of exhibits?  Let me

3    hear from defendants on that.

4    MS. CARDONA:  Yes, your Honor, there is.

5    Exhibit 93 is not a redacted version of that exhibit,

6    so it shows all patient information, cell phone numbers.  That

7    is a HIPAA violation.

8    MR. KATAEV:  May I address that, your Honor?

9    THE COURT:  Yes.  Let me look at the exhibit.

10   Mr. Kataev.

11   MR. KATAEV:  So, it is true that the particular

12   version in here is unredacted.  We have an electronic version

13   of the redacted, and we can either resolve that problem by,

14   obviously, removing that one and providing it if the jurors ask

15   for an electronic version, or if the Court would be open to

16   printing the redacted version.  It is 70 pages, though.

17   THE COURT:  It's 70 pages?

18   MR. KATAEV:  Yes, your Honor.

19   THE COURT:  Hold on for a second.

20   We can print 70 pages.

21   MR. KATAEV:  I'll have it emailed with a copy to all

22   counsel.

23   THE COURT:  Does that solve the problem from

24   defendants' perspective?

25   MS. CARDONA:  Yes, your Honor, but I would also like

N7jWede4

1    to use the binder that I reviewed that plaintiff provided this

2    morning.  I'm not sure what other binders he has provided to

3    the Court.

4             THE COURT:  He hasn't provided any binders to the

5    Court, so I assume that the two of you can work that out.

6             MR. KATAEV:  Correct.  It's the same binders we gave

7    to the defendants.

8             THE COURT:  All right.  You should each provide my

9    courtroom deputy cell phone numbers and stay nearby so that,

10   with five minutes' notice, you can be in the courtroom.  If the

11   jury needs to come in and we've given you five minutes' notice

12   and there's a lawyer or party who is not here, then you should

13   be aware that I may not waste the jury's time.  I may just

14   bring the jury in.  So in other words, cell phone number and

15   stay nearby.

16            Again, we'll correct the typos in the charge and show

17   the corrected version to the parties.

18            Is there anything else from plaintiff?

19            MR. LABUDA:  No, your Honor.

20            THE COURT:  Anything else from defendants?

21            MS. CARDONA:  No, your Honor.

22            MR. SCHOENSTEIN:  I was going to ask your Honor, does

23   your Honor have anything else in this courtroom this afternoon?

24            THE COURT:  Let me check that.

25            MR. SCHOENSTEIN:  Because nearby may be right here for

N7jWede4

1    at least part of the time.

2              THE COURT:  We don't have anything.  You'd obviously

3    always be welcome here anyway because it's an open court, but

4    we don't have anything, so you can keep all of your papers

5    where they are.  In fact, I suggest that you do that.

6              OK.  I'll see you when we've got a note, and if you

7    need me for any reason, just let my staff know.

8              My deputy or my law clerk will show you the corrected

9    instructions.

10             MR. LABUDA:  Thank you, your Honor.

11             MR. SCHOENSTEIN:  Thank you, your Honor.

12             (Recess pending verdict)

13

14

15

16

17

18

19

20

21

22

23

24

25

N7jWede5

1          THE COURT:  Be seated.

2          All right.  We've got a note from the jury, which I'm

3    going to have my deputy mark as Court Exhibit No. 2.  It has

4    the time of 1:30 today and was received by us at 1:50.

5          The note reads as follows:

6          "The foreperson is juror No. 7, Joanna Venar."

7          You can all inspect that.

8          Anything from plaintiff?

9          MR. LABUDA:  No, your Honor.

10         THE COURT:  Anything from defendants?

11         MR. SCHOENSTEIN:  No, your Honor.

12         THE COURT:  One thing, the jury informed my deputy

13    that their intention is not to stay beyond 5 o'clock today, so

14    that might be helpful to you for your planning purposes.

15         MR. LABUDA:  Thank you, your Honor.

16         (Recess pending verdict)

17

18

19

20

21

22

23

24

25

1          THE COURT:  My deputy should have provided you with a

2    copy of the second note that we got from the jury, which is

3    marked as Court Exhibit No. 3.  It's from the foreperson, with

4    the time of 2:08 p.m., received by us at 2:13 p.m.

5          It reads:

6          "We noticed that David Kaplan is mentioned as a

7    defendant but is not listed under any of the claims.  Is there

8    a reason for this?"

9          I have some thoughts, but why don't I hear first from

10   plaintiff and then from defendants what their thoughts are as

11   to how I should respond.

12         MR. LABUDA:  I would think it would be appropriate to

13   just indicate that you've given them your instructions and the

14   verdict, and they should proceed as instructed and follow the

15   verdict sheet.

16         THE COURT:  What's defendants' position?

17         MR. SCHOENSTEIN:  We think, your Honor, a more direct

18   answer would be to say there are no claims against Mr. Kaplan

19   that you need to determine.

20         THE COURT:  What I have in mind is that I would have

21   the jury come in and I would inform them that there is a reason

22   but not one that the Court will share and that their

23   responsibility is to follow my instructions and to answer the

24   questions that are posed in the verdict form and not say

25   anything beyond that.

1              MR. LABUDA:  That's fine, your Honor.

2              THE COURT:  What is the defendants' position?  Is

3      there a reason why I would do anything more than that?

4              MR. SCHOENSTEIN:  I just thought it was a more direct

5      and responsive answer to tell them expressly you have seen

6      right, there are no claims to decide against him.

7              THE COURT:  OK.

8              MR. SCHOENSTEIN:  Just because of the way they ask the

9      question.  I don't really object to the way your Honor phrased

10     it.  There's obviously nothing incorrect about that, but I was

11     just thinking if I was a juror and had asked that question, I

12     would want --

13             THE COURT:  Well, what they actually asked was, is

14     there a reason for this?

15             MR. SCHOENSTEIN:  Fair enough.

16             THE COURT:  And the direct answer to them is that

17     there is a reason to it but not one that the Court is prepared

18     to share.

19             MR. SCHOENSTEIN:  OK.  That's fine.  That's fine, your

20     Honor.

21             THE COURT:  All right.  Why don't we have them come

22     in.

23             I think I will also tell them that they should not

24     concern themselves with the reason.

25             MR. LABUDA:  That's fine, your Honor.  Thank you.

N7jWede6

```
 1              (Jury present)

 2              THE COURT:  Good afternoon, members of the jury.

 3              We have the note from you that you noticed that David

 4     Kaplan is mentioned as a defendant but is not listed under any

 5     of the claims and asking whether there's a reason for this.

 6              There is a reason for this, but not one that the Court

 7     is prepared to share.  You should not concern yourselves with

 8     the reason that Mr. Kaplan is not listed under any of the

 9     claims.  What you should do is follow my instructions on the

10     law and answer the questions on the verdict form.

11              Thank you.

12              (Jury not present)

13              THE COURT:  OK.  See you all back here next time we

14     have a note.

15              MR. LABUDA:  Thank you, your Honor.

16              MR. SCHOENSTEIN:  Thank you, your Honor.

17              (Recess pending verdict)

18

19

20

21

22

23

24

25
```

1       THE COURT:  All right.  We've got a note from the

2  jury.  It's stamped 3:37 p.m.  It was received by us 3:47 p.m.

3  It reads:

4           "We have a verdict."

5           I would suggest bringing the jury in.

6           Any problem with that from plaintiff's perspective?

7           MR. LABUDA:  No, your Honor.

8           The only thing I was going to ask is if you could

9  indicate to the jurors that if they wanted to stick around

10  afterwards and discuss just so that we could get some feedback.

11          THE COURT:  All right.  Let me give some thought to

12  that for a second.

13          Any objection to me bringing the jury in, from the

14  defendants' perspective?

15          MR. SCHOENSTEIN:  No, your Honor.

16          THE COURT:  What I was going to say is that I would

17  like to have an opportunity to talk to the jurors, not

18  substantively about the case, but just about the logistics,

19  unless any party objects.

20          I also usually give the instruction that if any of the

21  parties try to talk to you about the case, you're free to talk

22  to them or not to talk to them, as you see fit.  However, if

23  you do not wish to speak to any of the parties in this case and

24  that party persists in talking to you, I would tell you to

25  bring it to my courtroom deputy.

N7jWede7

```
 1              I'm prepared to add to those instructions that counsel
 2    have inquired whether any of the jurors would be willing to
 3    talk to them about the case, and if so -- not about the case.
 4    I'm sorry.
 5              Well, you tell me what you want to talk to them about.
 6              MR. LABUDA:  I guess about the presentation.
 7              THE COURT:  -- about the presentation and that if they
 8    desire to do so, the lawyers will be available -- you tell me
 9    where.
10              MR. LABUDA:  In the hallway.
11              THE COURT:  -- will be available in the hallway.
12              I'm fine with doing that.
13              Any problem with that from defendants' perspective?
14              MR. SCHOENSTEIN:  No objection here, your Honor.
15              MR. LABUDA:  Just how long do you think you'd be with
16    the jury, just so I get a sense?
17              THE COURT:  Not more than about ten minutes or
18    something like that.
19              MR. LABUDA:  OK.
20              THE COURT:  Just give me a second to jot down some
21    notes.
22              I will also add that I will caution them that they
23    might not want to talk about the deliberations.
24              OK.  Let's bring the jury in.
25              (Jury present)
```

```
 1                THE COURT:  Be seated.

 2                I've got a note from the jury.  It's marked as Court

 3      Exhibit No. 4.  It was received at 3:47 p.m., and it was

 4      written at 3:37 p.m.  It reads:

 5                "We have a verdict."

 6                Let me ask you, Ms. Venar, you are the foreperson?

 7                THE FOREPERSON:  I am.

 8                THE COURT:  And have you reached a verdict?

 9                THE FOREPERSON:  We have.

10                THE COURT:  Would you please hand your verdict

11      envelope to my courtroom deputy for me to inspect.

12                Mr. Fishman, would you please hand me the envelope.

13                Mr. Fishman, I'm handing you back the verdict

14      envelope, and I'll ask you to hand it to the foreperson.

15                Mr. Fishman, would you please take the verdict.

16                THE DEPUTY CLERK:  Has Dr. Edelman proved by a

17      preponderance of the evidence that NYU employed her and the

18      following individuals in a job requiring substantially equal

19      skill, effort and responsibility?

20                Dr. Goldberg; yes or no.

21                THE FOREPERSON:  No.

22                THE DEPUTY CLERK:  Dr. Porges; yes or no.

23                THE FOREPERSON:  No.

24                THE DEPUTY CLERK:  Dr. Modi; yes or no.

25                THE FOREPERSON:  No.
```

1          THE DEPUTY CLERK:  Has Dr. Edelman proved by a

2     preponderance of the evidence that her job and that of the

3     following individuals were performed under similar working

4     conditions?

5          Dr. Goldberg; yes or no.

6          THE FOREPERSON:  Yes.

7          THE DEPUTY CLERK:  Dr. Porges; yes or no.

8          THE FOREPERSON:  Yes.

9          THE DEPUTY CLERK:  Dr. Modi; yes or no.

10          THE FOREPERSON:  Yes.

11          THE DEPUTY CLERK:  Has Dr. Edelman proved by a

12     preponderance of the evidence that she was paid lower

13     compensation than the following individuals for doing

14     substantially equal work?

15          Dr. Goldberg; yes or no.

16          THE FOREPERSON:  No.

17          THE DEPUTY CLERK:  Dr. Porges; yes or no.

18          THE FOREPERSON:  No.

19          THE DEPUTY CLERK:  Dr. Modi; yes or no.

20          THE FOREPERSON:  No.

21          THE DEPUTY CLERK:  Have defendants proved by a

22     preponderance of the evidence that the differences in pay

23     between Dr. Edelman and the following individuals were based on

24     factors other than sex?

25          Dr. Goldberg; yes or no.

```
 1              THE FOREPERSON:  Yes.

 2              THE DEPUTY CLERK:  Dr. Porges; yes or no.

 3              THE FOREPERSON:  Yes.

 4              THE DEPUTY CLERK:  Dr. Modi; yes or no.

 5              THE FOREPERSON:  Yes.

 6              THE DEPUTY CLERK:  Have defendants proved by a

 7     preponderance of the evidence that the differences in pay

 8     between Dr. Edelman and the following individuals were based on

 9     factors other than sex?

10              Dr. Goldberg; yes or no.

11              THE FOREPERSON:  Yes.

12              THE DEPUTY CLERK:  Dr. Porges; yes or no.

13              THE FOREPERSON:  Yes.

14              THE DEPUTY CLERK:  Dr. Modi; yes or no.

15              THE FOREPERSON:  Yes.

16              THE DEPUTY CLERK:  Has Dr. Edelman proved by a

17     preponderance of the evidence that she engaged in protected

18     activity under Title VII?

19              Yes or no.

20              THE FOREPERSON:  Yes.

21              THE DEPUTY CLERK:  Has Dr. Edelman proved by a

22     preponderance of the evidence that any of the following

23     defendants committed an adverse act against her because of her

24     protected conduct under Title VII?

25              NYU Langone Health System; yes or no.
```

1           THE FOREPERSON:  Yes.

2           THE DEPUTY CLERK:  NYU Langone Hospitals; yes or no.

3           THE FOREPERSON:  Yes.

4           THE DEPUTY CLERK:  NYU Langone Medical Center; yes or

5    no.

6           THE FOREPERSON:  Yes.

7           THE DEPUTY CLERK:  NYU Langone Nassau Rheumatology;

8    yes or no.

9           THE FOREPERSON:  Yes.

10          THE DEPUTY CLERK:  NYU School of Medicine; yes or no.

11          THE FOREPERSON:  Yes.

12          THE DEPUTY CLERK:  NYU Grossman School of Medicine;

13   yes or no.

14          THE FOREPERSON:  Yes.

15          THE DEPUTY CLERK:  NYU Hospitals Center; yes or no.

16          THE FOREPERSON:  Yes.

17          THE DEPUTY CLERK:  Has Dr. Edelman proved by a

18   preponderance of the evidence that any of the following

19   defendants committed an adverse act against her because of her

20   protected conduct under New York State Human Rights Law?

21          NYU Langone Health System; yes or no.

22          THE FOREPERSON:  Yes.

23          THE DEPUTY CLERK:  NYU Langone Hospitals; yes or no.

24          THE FOREPERSON:  Yes.

25          THE DEPUTY CLERK:  NYU Langone Medical Center; yes or

N7jWede7

1    no.

2         THE FOREPERSON:  Yes.

3         THE DEPUTY CLERK:  NYU Langone Nassau Rheumatology;

4    yes or no.

5         THE FOREPERSON:  Yes.

6         THE DEPUTY CLERK:  NYU School of Medicine; yes or no.

7         THE FOREPERSON:  Yes.

8         THE DEPUTY CLERK:  NYU Grossman School of Medicine;

9    yes or no.

10        THE FOREPERSON:  Yes.

11        THE DEPUTY CLERK:  NYU Hospitals Center; yes or no.

12        THE FOREPERSON:  Yes.

13        THE DEPUTY CLERK:  Has Dr. Edelman proved by a

14   preponderance of the evidence that any of the individual

15   defendants aided or abetted an adverse act against her because

16   of her protected conduct under New York State Human Rights Law?

17        Rubin; yes or no.

18        THE FOREPERSON:  No.

19        THE DEPUTY CLERK:  Antonik; yes or no.

20        THE FOREPERSON:  Yes.

21        THE DEPUTY CLERK:  Swirnow; yes or no.

22        THE FOREPERSON:  No.

23        THE DEPUTY CLERK:  Has Dr. Edelman proved by a

24   preponderance of the evidence that any of the following

25   defendants' conduct was motivated, at least in part, by

1    plaintiff's protected activity?

2              NYU Langone Health System; yes or no.

3              THE FOREPERSON:  Yes.

4              THE DEPUTY CLERK:  NYU Langone Hospitals; yes or no.

5              THE FOREPERSON:  Yes.

6              THE DEPUTY CLERK:  NYU Langone Medical Center; yes or

7    no.

8              THE FOREPERSON:  Yes.

9              THE DEPUTY CLERK:  NYU Langone Nassau Rheumatology;

10   yes or no.

11             THE FOREPERSON:  Yes.

12             THE DEPUTY CLERK:  NYU School of Medicine; yes or no.

13             THE FOREPERSON:  Yes.

14             THE DEPUTY CLERK:  NYU Grossman School of Medicine;

15   yes or no.

16             THE FOREPERSON:  Yes.

17             THE DEPUTY CLERK:  NYU Hospitals Center; yes or no.

18             THE FOREPERSON:  Yes.

19             THE DEPUTY CLERK:  Rubin; yes or no.

20             THE FOREPERSON:  No.

21             THE DEPUTY CLERK:  Antonik; yes or no.

22             THE FOREPERSON:  Yes.

23             THE DEPUTY CLERK:  Swirnow; yes or no.

24             THE FOREPERSON:  No.

25             THE DEPUTY CLERK:  Has Dr. Edelman proved by a

N7jWede7

1    preponderance of the evidence that any of the defendants

2    engaged in conduct reasonably likely to deter a person from

3    engaging in the alleged protected activity?

4              NYU Langone Health System; yes or no.

5              THE FOREPERSON:  Yes.

6              THE DEPUTY CLERK:  NYU Langone Hospitals; yes or no.

7              THE FOREPERSON:  Yes.

8              THE DEPUTY CLERK:  NYU Langone Medical Center; yes or

9    no.

10             THE FOREPERSON:  Yes.

11             THE DEPUTY CLERK:  NYU Langone Nassau Rheumatology;

12   yes or no.

13             THE FOREPERSON:  Yes.

14             THE DEPUTY CLERK:  NYU School of Medicine; yes or no.

15             THE FOREPERSON:  Yes.

16             THE DEPUTY CLERK:  NYU Grossman School of Medicine;

17   yes or no.

18             THE FOREPERSON:  Yes.

19             THE DEPUTY CLERK:  NYU Hospitals Center; yes or no.

20             THE FOREPERSON:  Yes.

21             THE DEPUTY CLERK:  Rubin; yes or no.

22             THE FOREPERSON:  No.

23             THE DEPUTY CLERK:  Antonik; yes or no.

24             THE FOREPERSON:  Yes.

25             THE DEPUTY CLERK:  Swirnow; yes or no.

```
 1              THE FOREPERSON:  No.

 2              THE DEPUTY CLERK:  Has Dr. Edelman proved by a

 3    preponderance of the evidence that any of the individual

 4    defendants aided or abetted conduct that was reasonably likely

 5    to deter a person from engaging in the alleged protected

 6    activity?

 7              Antonik; yes or no.

 8              THE FOREPERSON:  Yes.

 9              THE DEPUTY CLERK:  Has Dr. Edelman proved by a

10    preponderance of the evidence that any of the following

11    defendants intentionally discriminated against her because of

12    her gender by making sexist remarks?

13              NYU Langone Health System; yes or no.

14              THE FOREPERSON:  No.

15              THE DEPUTY CLERK:  NYU Langone Hospitals; yes or no.

16              THE FOREPERSON:  No.

17              THE DEPUTY CLERK:  NYU Langone Medical Center; yes or

18    no.

19              THE FOREPERSON:  No.

20              THE DEPUTY CLERK:  NYU Langone Nassau Rheumatology;

21    yes or no.

22              THE FOREPERSON:  No.

23              THE DEPUTY CLERK:  NYU School of Medicine; yes or no.

24              THE FOREPERSON:  No.

25              THE DEPUTY CLERK:  NYU Grossman School of Medicine;
```

N7jWede7

```
 1    yes or no.

 2              THE FOREPERSON:  No.

 3              THE DEPUTY CLERK:  NYU Hospitals Center; yes or no.

 4              THE FOREPERSON:  No.

 5              THE DEPUTY CLERK:  Antonik; yes or no.

 6              THE FOREPERSON:  No.

 7              THE DEPUTY CLERK:  Has Dr. Edelman proved by a

 8    preponderance of the evidence that she suffered monetary

 9    damages because of retaliation for complaining to human

10    resources about alleged discrimination?

11              Title VII; yes or no.

12              THE FOREPERSON:  Yes.

13              THE DEPUTY CLERK:  NYSHRL; yes or no.

14              THE FOREPERSON:  Yes.

15              THE DEPUTY CLERK:  NYCHRL; yes or no.

16              THE FOREPERSON:  Yes.

17              THE DEPUTY CLERK:  What amount of damages for front

18    pay should Dr. Edelman be awarded?

19              THE FOREPERSON:  700,000.

20              THE DEPUTY CLERK:  What amount of compensatory damages

21    should Dr. Edelman be awarded?

22              THE FOREPERSON:  Zero.

23              THE DEPUTY CLERK:  Has Dr. Edelman proved by a

24    preponderance of the evidence that she suffered monetary

25    damages because allegedly sexist remarks were made to her?
```

N7jWede7

1      Yes or no.

2      THE FOREPERSON:  No.

3      THE COURT:  Thank you.

4      Is there a request for a poll from either plaintiff or

5  defendants?

6      From plaintiff.

7      MR. LABUDA:  Yes.

8      THE COURT:  Mr. Fishman, would you poll the jury.

9      THE DEPUTY CLERK:  Juror No. 1, is this your verdict?

10     JUROR NO. 1:  Yes.

11     THE DEPUTY CLERK:  Juror No. 2, is this your verdict?

12     JUROR NO. 2:  Yes.

13     THE DEPUTY CLERK:  Juror No. 3, is this your verdict?

14     JUROR NO. 3:  Yes.

15     THE DEPUTY CLERK:  Juror No. 4, is this your verdict?

16     JUROR NO. 4:  Yes.

17     THE DEPUTY CLERK:  Juror No. 6, is this your verdict?

18     JUROR NO. 6:  Yes.

19     THE DEPUTY CLERK:  Juror No. 7, is this your verdict?

20     JUROR NO. 7:  Yes.

21     THE DEPUTY CLERK:  Juror No. 8, is this your verdict?

22     JUROR NO. 8:  Yes.

23     THE COURT:  From plaintiff's perspective, is there any

24  reason the judgment should not now be recorded and filed?

25     MR. LABUDA:  No, your Honor.

N7jWede7

```
 1           THE COURT:  From defendants' perspective, is there any
 2    reason the judgment should not now be recorded and filed?
 3           MR. SCHOENSTEIN:  We reserve the right for a
 4    postjudgment motion, your Honor.  But other than that, no.
 5           THE COURT:  You can only do that after I record and
 6    file the verdict.
 7           I'm going to direct the clerk to record and file the
 8    verdict.
 9           Is there any reason why the jury should not now be
10    dismissed?
11           From plaintiff's perspective.
12           MR. LABUDA:  No, your Honor.
13           THE COURT:  From defendants' perspective.
14           MR. SCHOENSTEIN:  No, your Honor.
15           THE COURT:  Members of the jury, this concludes your
16    duty.
17           Ms. Venar, you can hand the microphone back to my
18    deputy.
19           I'm going to give you a couple of words before I
20    discharge you.  A much-esteemed judge of this court would never
21    comment on a jury verdict, nor would he thank the jurors for
22    their service.  It was that judge's view -- Judge Weinfeld --
23    not to thank the jury for performing what is their civic duty,
24    one of the highest and most important duties of citizenship.
25           I'm going to follow that practice in part.  I will not
```

1    comment on your verdict.  I will note, however, the attention

2    that you each paid to this case, the diligence and care that

3    you exercised and the sacrifice that many, if not all, of you

4    made in performing your jury duty in this case.  For that --

5    and this is where I get emotional -- I thank you on behalf of

6    our nation.

7         You are now dismissed.  You should leave your notes in

8    the jury room.  My courtroom deputy will ensure that they are

9    destroyed.

10         You're no longer under my injunction not to speak

11   about the case.  You're free to speak about the case or not

12   talk about the case, as you see fit.  I would, however, note

13   one thing for you to think about.  You might want to think

14   about whether, if you do talk about the case, you should just

15   talk about your own views.  No one signs up for jury duty with

16   the expectation that other jurors will comment upon what he or

17   she said in the jury room.  That's not an instruction to you.

18   Once you're discharged, I lose my authority over you.  It's

19   just one thing that you should keep in mind.

20         Another way of putting it is, the golden rule, that

21   you might think about not saying about others what you wouldn't

22   want to have them say about you.

23         It may be that people approach you to talk about the

24   case.  Again, you're free to talk about it or not talk about

25   it, as you see fit.  If any of the parties in this case try to

N7jWede7

1    talk to you about the case, you're also free to talk to them or

2    not talk to them, as you see fit.  However, if you do not wish

3    to speak to any of the parties in this case and that party

4    persists in talking to you, I will tell you to bring it to my

5    courtroom deputy's attention, Mr. Fishman, and we will take

6    care of that.

7              To that end, I will tell you that some of the lawyers

8    in this case have expressed an interest in talking to members

9    of the jury simply about the presentation of the evidence.

10   You're free to take them up on that offer and free not to take

11   them up on that offer.  They'll be in the hallway if you desire

12   to talk to them.

13             One thing that I would caution you about is that you

14   might not want to talk to them about your deliberations and

15   just confine whatever you say to the presentation of the

16   evidence.

17             With that, and again, thanking you on behalf of the

18   nation, you're now dismissed.

19             We'll stand for you one last time.  Take your

20   belongings and leave your notes in the jury room.

21             Mr. Fishman.

22             (Jury discharged)

23             THE COURT:  All right.  Be seated.

24             Under Rule 59, the defendants have no later than 28

25   days after today's entry of judgment to make a request for a

 1   new trial and to make their renewed motion for judgment.  Under

 2   Rule 6(b)(2), the Court may not extend those deadlines.

 3   Plaintiff shall submit her opposition no later than 14 days

 4   after the submission of the motion, and the defendant will have

 5   to submit their reply no later than seven days after the

 6   plaintiff files her opposition.

 7          With respect to the opposition and the reply, if

 8   there's agreement by the parties for an extension, you can make

 9   a motion for an extension, and the Court will take that under

10   advisement.

11          I said those are the deadlines for the defendants, but

12   I should also make it clear those are the deadlines for the

13   plaintiff as well.

14          MR. KATAEV:  Yes.

15          MR. LABUDA:  Understood, your Honor.

16          THE COURT:  It was a verdict for both plaintiff and

17   the defendants here.

18          Anything else from plaintiff?

19          MR. LABUDA:  No, your Honor.

20          THE COURT:  Anything else from the defendants?

21          MR. SCHOENSTEIN:  No.  Not at this time, your Honor.

22   Thank you so much.

23          MR. LABUDA:  Yes.  Thank you, your Honor.

24          THE COURT:  OK.  Thank you, all.

25          (Adjourned)