# EXHIBIT 3

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DR. SARI EDELMAN,

                Plaintiff,

        v.                              21 Civ. 502 (LJL)

NYU LANGONE HEALTH SYSTEM, et
al.,

                Defendants.
                                        Trial
------------------------------x
                                        New York, N.Y.
                                        July 10, 2023
                                        9:00 a.m.

Before:

                    HON. LEWIS J. LIMAN,

                                        District Judge
                                        -and a Jury-


                        APPEARANCES

MILMAN LABUDA LAW GROUP PLLC
     Attorneys for Plaintiff
BY:  JOSEPH M. LABUDA
     EMANUEL S. KATAEV
     -and-
     GLORIA GODSELL
     CLAUDIA AZEVEDO

TARTER KRINSKY & DROGIN LLP
     Attorneys for Defendants
BY:  RICHARD C. SCHOENSTEIN
     RICHARD L. STEER
     INGRID J. CARDONA
     -and-
     DAN DRIESEN
     ANNETTE JOHNSON
```

1          So, we're going to move on to chapter three.
2          Chapter three has to do with our claim that NYU
3   violated the Equal Pay Act by paying male doctors more.  So,
4   you're going to hear testimony in this case that Dr. Edelman
5   performed equal or substantially similar work as male doctors,
6   her male counterparts, part of the people that we heard about
7   in the cast.
8          You will also hear evidence that NYU willfully paid
9   Dr. Edelman less than the male doctors for the same work.
10         You'll also hear testimony that there was no Equal Pay
11  Act compliance training by Mr. Rubin, who set the salaries for
12  the doctors; that there were no evaluations of the salaries
13  between the male and female doctors; and that there was no
14  consultation with HR, human resources, about the salaries of
15  male and female doctors.
16         You will hear, effectively you will hear no testimony
17  that NYU had a legitimate reason to pay Dr. Edelman less.
18         NYU, you will hear testimony that NYU says that they
19  paid doctors and set their salaries based on a business plan
20  that was created by NYU, that included the doctor's prior
21  salaries from prior employment.  In reality, no system existed
22  setting salaries, and they were, in fact, set arbitrarily.  In
23  fact, NYU didn't even create these business plans for some of
24  the doctors.
25         Now, going on with chapter three, we're going to get

into the actual pay of the doctors, so you can see the difference in pay.

In 2014, when Dr. Edelman worked, you have Dr. Porges. You'll hear testimony about Dr. Porges, that he was on top with $340,000; Dr. Avram Goldberg, that he was second with $315,000, Dr. Mehta and Dr. Edelman were in third and fourth, respectively, and they were paid $207,000. And the difference between Dr. Porges is $133,000, between Dr. Edelman, and the difference between Dr. Goldberg and Dr. Edelman is $108,000.

You're going to hear testimony that all of these doctors, they all see patients. They treat patients for rheumatology. They're all doing the exact same work, and they all have the same hours.

And you're also going to hear testimony about the fact that in addition to the clinical pay, there can be a component of their pay for administrative or research work, and that some doctors got paid for administrative or research work on top of their clinical pay. But the evidence is that NYU, when somebody took on an additional role, what they did is they actually reduced the clinical pay and then added some pay for the administrative pay, so your pay was the same. So there was no difference in the pay; it just went down. They added that difference, the admin pay, so from our perspective, they were paid the same regardless of the clinical pay that they got and the administrative pay that they received. And in fact, you'll

1   hear testimony that Dr. Edelman was approached to take on one
2   of these roles for research and specifically asked am I going
3   to get paid anything extra for doing this research role, and
4   they said no.  So I think all that they were going to do was
5   rejigger her pay.
6            So that's in 2014.
7            Now let's get to the end, when she got terminated, in
8   2020.  So this is the pay that existed in 2020, with
9   Dr. Goldberg on top at 535,000.  Dr. Porges, he was at 400,000.
10  Dr. Modi, who we haven't talked about that much, he was new to
11  the practice, I think, starting in 2017, he was third, at
12  370,000; Dr. Edelman, 278; and Dr. Mehta at 270.  And then the
13  difference here with respect to Dr. Edelman, from Goldberg to
14  Edelman is $257,000, so the difference between Dr. Porges and
15  Dr. Edelman is $122,000 and the difference between Dr. Modi and
16  Dr. Edelman is $92,000.  And that was the last -- that was the
17  year that she was terminated.
18           So, we'll go through it quickly just so you have some
19  sense.
20           In 2014 we talked about, these are the pay rates
21  there.  In 2015, it's effectively the same, and 2016, Porges,
22  Goldberg, Mehta and Edelman, those salaries.  2017, that was
23  the last year her -- 2017, so this is Goldberg, Modi, Porges,
24  Edelman and Mehta.  2018 was, again, the same and the pattern
25  continues.  2019, 2020, and then, as I said before, after she

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DR. SARI EDELMAN,

         Plaintiff,

     v.                    21 Civ. 502 (LJL)

NYU LANGONE HEALTH SYSTEM, et
al.,

         Defendants.
                           Trial
------------------------------x
                           New York, N.Y.
                           July 11, 2023
                           9:00 a.m.

Before:

                    HON. LEWIS J. LIMAN,

                    District Judge
                    -and a Jury-


                    APPEARANCES

MILMAN LABUDA LAW GROUP PLLC
     Attorneys for Plaintiff
BY:  JOSEPH M. LABUDA
     EMANUEL S. KATAEV

TARTER KRINSKY & DROGIN LLP
     Attorneys for Defendants
BY:  RICHARD C. SCHOENSTEIN
     RICHARD L. STEER
     INGRID J. CARDONA
```

1   A.  Yes.

2   Q.  And when that contract ended, that's when you joined NYU?

3   A.  Yes.

4   Q.  And with that group, when you were with that group before
5   you joined NYU, did you understand any type of financial
6   distress they were under, had they filed for bankruptcy or
7   anything like that?

8   A.  No, they had not filed for bankruptcy.  Our decision to
9   move over to NYU occurred after Dr. Goldberg approached us and
10  had said that NYU was looking to expand a rheumatology group
11  for NYU within the 1991 Marcus Avenue locations.

12  Q.  Just to be clear, who reached out to whom about joining
13  NYU?

14  A.  Dr. Goldberg reached out to Dr. Mehta and myself.

15  Q.  Dr. Goldberg at that point in time was working for NYU?

16  A.  I believe he had just joined or he was about to join.  So
17  he was working at the 1999 Marcus Avenue suite.  There's two
18  buildings at Marcus Avenue, they're sister buildings, they're
19  almost identical.  So he was in the first floor oncology suite
20  when he first started.  He was the first rheumatologist brought
21  on board at that location by NYU.  And we had a strong working
22  relationship with the hematology oncology group in that office
23  where he was working.  So he was well aware of our practice in
24  the building next door and I think that's what prompted him to
25  reach out to us.

1  you?
2  A.  No.  I had -- I had no assumption.  There was nothing that
3  was brought up at any of our rheumatology meetings about any of
4  these transitions that would be taking place at this point in
5  time.
6  Q.  OK.  So continue on.  I'm sorry.
7  A.  So, I had discussed with him at that point -- I said I need
8  to really, you know, take a look at what you're asking of me,
9  look at my contract with my attorneys and review it, because
10 I'm a full-time rheumatologist, and my understanding, per my
11 contract negotiations, is that I'm afforded full-time use of my
12 office.  I had concerns about having my space utilized on days
13 when I was using my office on Fridays for administrative work,
14 and I had concerns about my office being assigned to someone
15 else when I was at the Huntington group on Thursdays.
16     I didn't get that far in the conversation.  As soon as I
17 expressed that this was something that I would have to review
18 with my attorneys, Mr. Atonik's demeanor changed.
19 Q.  OK.  And how did it change?
20 A.  He moved himself closer, and you could see by the picture
21 of my desk, my desk wasn't that -- that big.
22 Q.  Let me ask you, when you were having this conversation with
23 Mr. Atonik, where are you and where was he?
24 A.  I was sitting in my office chair, and he was sitting in one
25 of the -- one of the striped chairs.

1  Q.   And academic track was clinical, just like you, correct?
2  A.   Yes.
3  Q.   And the tenure status is nontenure eligible, just like you,
4  correct?
5  A.   Yes.
6  Q.   And on the next page, D860, the employment status is staff
7  physician, full time, correct?
8  A.   Yes, correct.
9  Q.   Just like you?
10 A.   Yes.
11 Q.   On page D862, his salary for the clinical compensation,
12 again, is listed, and it lists his RVU target of 6,524,
13 correct?
14 A.   Yes.
15          MR. LABUDA:  If you look at the next one, 32, and we'd
16 offer that into evidence.
17          THE COURT:  Any objection?
18          MR. SCHOENSTEIN:  No objection.
19          THE COURT:  32 is received and may be published.
20          (Plaintiff's Exhibit 32 received in evidence)
21 BY MR. LABUDA:
22 Q.   This is a contract with Dr. Porges, dated April 3, 2017,
23 correct?
24 A.   Yes.
25 Q.   And if you look on the third page, the percent, effort and

INDEX OF EXAMINATION

Examination of:                                              Page

SARI EDELMAN

Direct By Mr. Labuda . . . . . . . . . . . . . . . .65

Cross By Mr. Schoenstein . . . . . . . . . . . 216

PLAINTIFF EXHIBITS

Exhibit No.                                              Received

11    . . . . . . . . . . . . . . . . . . . . . . . .75
8     . . . . . . . . . . . . . . . . . . . . . . . .76
89    . . . . . . . . . . . . . . . . . . . . . . . .86
47    . . . . . . . . . . . . . . . . . . . . . . . .97
12    . . . . . . . . . . . . . . . . . . . . . . . 106
9     . . . . . . . . . . . . . . . . . . . . . . . 107
117   . . . . . . . . . . . . . . . . . . . . . . . 109
59    . . . . . . . . . . . . . . . . . . . . . . . 124
58    . . . . . . . . . . . . . . . . . . . . . . . 127
52    . . . . . . . . . . . . . . . . . . . . . . . 132
68    . . . . . . . . . . . . . . . . . . . . . . . 136
21    . . . . . . . . . . . . . . . . . . . . . . . 140
7     . . . . . . . . . . . . . . . . . . . . . . . 147
84    . . . . . . . . . . . . . . . . . . . . . . . 149
86    . . . . . . . . . . . . . . . . . . . . . . . 161
93    . . . . . . . . . . . . . . . . . . . . . . . 170
108   . . . . . . . . . . . . . . . . . . . . . . . 171
41    . . . . . . . . . . . . . . . . . . . . . . . 177

```
 1    46  . . . . . . . . . . . . . . . . . . . . 180
 2    48  . . . . . . . . . . . . . . . . . . . . 184
 3    42  . . . . . . . . . . . . . . . . . . . . 187
 4    24  . . . . . . . . . . . . . . . . . . . . 189
 5    25  . . . . . . . . . . . . . . . . . . . . 192
 6    26  . . . . . . . . . . . . . . . . . . . . 194
 7    31  . . . . . . . . . . . . . . . . . . . . 194
 8    32  . . . . . . . . . . . . . . . . . . . . 196
 9    33  . . . . . . . . . . . . . . . . . . . . 197
10    34  . . . . . . . . . . . . . . . . . . . . 198
11    35  . . . . . . . . . . . . . . . . . . . . 199
12    88  . . . . . . . . . . . . . . . . . . . . 223
```

### DEFENDANT EXHIBITS

Exhibit No.                    Received

```
15    XX   . . . . . . . . . . . . . . . . . . . 142
16    KKK  . . . . . . . . . . . . . . . . . . . 163
17    HH   . . . . . . . . . . . . . . . . . . . 212
18    EE   . . . . . . . . . . . . . . . . . . . 214
19    OOO  . . . . . . . . . . . . . . . . . . . 231
20    QQQ  . . . . . . . . . . . . . . . . . . . 233
```