# EXHIBIT 4

N7HCede1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DR. SARI EDELMAN,

                Plaintiff,

            v.                        21 Civ. 502 (LJL)

NYU LANGONE HEALTH SYSTEM, et
al.,

                Defendants.
                                      Trial
------------------------------x
                                      New York, N.Y.
                                      July 17, 2023
                                      9:00 a.m.

Before:

                    HON. LEWIS J. LIMAN,

                                      District Judge
                                      -and a Jury-


                         APPEARANCES

MILMAN LABUDA LAW GROUP PLLC
     Attorneys for Plaintiff
BY:  JOSEPH M. LABUDA
     EMANUEL S. KATAEV

TARTER KRINSKY & DROGIN LLP
     Attorneys for Defendants
BY:  RICHARD C. SCHOENSTEIN
     RICHARD L. STEER
     INGRID J. CARDONA
```

1   initial employment agreement.  He did, in fact, receive
2   $360,000; correct?
3   A.  That's what it says, yes.
4   Q.  So it's fair to say that Dr. Porges' seniority over
5   Dr. Modi did not result in a lower salary for Dr. Modi;
6   correct?
7   A.  I'm sorry.  Ask me that again.
8   Q.  You said that doctor -- I'm sorry.  You said that seniority
9   played a role in setting compensation; correct?
10  A.  Amongst many factors, yes.
11  Q.  And in this case, Dr. Porges' 15 years of seniority did not
12  result in higher pay for Dr. Porges over Dr. Modi, did it?
13  A.  I'm not saying that at all.
14  Q.  Now, you recall during your testimony that you mentioned
15  that there was a special need at Huntington; correct?
16  A.  I did, yes.
17  Q.  And that's part of what justified the high salary for
18  Dr. Modi, isn't it?
19  A.  I'm not going to say whether Dr. Modi's salary is high or
20  not.  What I'm going to say is we paid the salary we paid him
21  to fill the role we had at Huntington.
22  Q.  Is it fair to say, also, that Dr. Edelman was already
23  working Huntington one day a week when Dr. Modi joined; isn't
24  that right?
25  A.  I believe she was there one a day a week, correct.

1  Q.   And did you consider what each was earning in their prior
2  situation in determining what to pay them at NYU?
3  A.   We did.
4  Q.   Now, doctors who have administrative roles, is that
5  valuable for NYU?
6  A.   Highly.
7  Q.   How so?
8  A.   They -- they need to do -- depending on the nature of the
9  role, it's a function that needs to be done, and in a case of a
10 physician, it can't be done by someone like me or Mr. Swirnow,
11 Mr. Kaplan, Mr. Antonik.  It's done by people who have the
12 requisite skills to be able to perform those functions.  So
13 they can be very valuable to us.
14 Q.   And doctors who have research roles, does that bring value
15 to NYU?
16 A.   Absolutely.  They enhance the stature of the organization.
17 They, quite frankly, generate hopefully benefit for all
18 providers.  The research that any physician does that results
19 in improvements in how we deliver and treat clinical outcomes
20 benefits all the doctors, including those who don't do
21 research.
22 Q.   And if you have a doctor who has a great reputation in the
23 community, is that of value to NYU?
24 A.   Extraordinary.
25 Q.   Why is that?

1  A.  Multiple, multiple reasons.  One is other physicians will
2  want to join our network.  Other physicians will refer.  It
3  enhances the overall stature of the group and the network,
4  which benefits all physicians in the group.  So having a strong
5  clinical leadership, strong clinicians with good stature,
6  reputations in the community, the health system benefits, the
7  patients benefit, and quite frankly, all the doctors who don't
8  have that stature benefit.
9  Q.  Now, counsel asked you a bunch of questions about point
10 systems.  Do you recall that?
11 A.  I do.
12 Q.  OK.  So do you have a process for considering and hiring
13 physicians who come to your attention?
14 A.  We do.
15 Q.  All right.  And in that process, what, if any,
16 consideration do you give their educational background?
17 A.  Well, a lot.
18 Q.  Why is that?
19 A.  Why is that?
20 Q.  Yeah.
21 A.  Because where they went to school enhances, again, the
22 reputation and the stature within the organization and the
23 practice itself.
24 Q.  And what, if any, consideration do you give to their years
25 of experience?

1               (In open court)
2               THE COURT:  Mr. Labuda, do you want to announce your
3      next witness?
4               MR. LABUDA:  Yes.  Dr. Avram Goldberg.
5               THE COURT:  OK.  Bring Dr. Goldberg to the stand.
6       AVRAM Z. GOLDBERG,
7           called as a witness by the p,
8           having been duly sworn, testified as follows:
9               THE COURT:  Counsel, you may inquire.
10              MR. LABUDA:  Thank you.
11     DIRECT EXAMINATION
12     BY MR. LABUDA:
13     Q.  Good morning, Dr. Goldberg.
14     A.  Good morning.
15     Q.  Dr. Goldberg, you're a rheumatologist, correct?
16     A.  Correct.
17     Q.  And just briefly, explain what a rheumatologist does.
18     A.  A rheumatologist is a, is a physician who cares for
19     patients with rheumatic diseases, which include all forms of
20     arthritis, autoimmune diseases and certain related conditions.
21     Q.  And you were hired by NYU to treat patients with rheumatoid
22     issues, is that correct?
23     A.  Correct.
24     Q.  At NYU, you had occasion to discuss, interact or consult
25     with the other doctors in the faculty group practice about

1  Q.  And from 2010 to 2013 --
2          MR. LABUDA:  If you could expand it out.
3  Q.  2010 to 2013, you were an assistant professor of medicine
4  at Hofstra, is that right?
5  A.  Yes.
6  Q.  And you also were at the North Shore school of medicine and
7  full-time faculty at North Shore University Hospital, correct?
8  A.  That's correct.
9  Q.  Just out of curiosity, is there a distinction between you
10 being an assistant professor of medicine at Hofstra and being
11 on the faculty at North Shore University Hospital?
12 A.  The, the practical part of it was my roles as faculty at
13 North Shore, at the hospital.  The associate professorship was
14 the academic title that I was given based on the affiliation of
15 the hospital and the medical school.
16 Q.  Was it the same type of duties you were doing at both
17 places?
18 A.  No.  The duties at the hospital were training residents and
19 fellows and giving lectures to them.  The duties at the medical
20 school would be things like giving lectures to medical students
21 and things like that.
22 Q.  At both places, there was a teaching component to your job,
23 correct?
24 A.  Correct.
25 Q.  And at both places, you also saw patients clinically as

1  A.  Correct.
2  Q.  OK.  And when you were at NYU, you didn't have any
3  responsibilities attendant with your Hofstra University School
4  of Medicine academic role, correct?
5  A.  Correct.
6  Q.  And other than your clinical work at NYU, your only other
7  responsibility was as the clinical director of rheumatology,
8  correct?
9  A.  Correct.
10 Q.  Do you know what your total RVU production was for 2014?
11 A.  I -- I don't remember the exact number, no.
12 Q.  Do you have any recollection of the amount of incentive pay
13 that you received that year?
14 A.  I -- I recall somewhere between -- I don't know.  $15,000,
15 maybe.  I don't remember.
16 Q.  And the RVUs would be provided, RVU production would be
17 provided to you by NYU on a monthly basis, is that right?
18 A.  No.  It was -- it's once a year.
19 Q.  Oh, once a year.  OK.  You were told at the end of the year
20 what your actual production was, but that was something that
21 was provided to you by NYU, correct?
22 A.  Correct.  They kept track of that.
23 Q.  OK.  And they maintained records with respect to your RVUs
24 for billing and compensation purposes, correct?
25 A.  Yes.  I did receive -- I knew every month where I was in

1  terms of RVUs. Just the compensation was at the end of the
2  year.
3  Q. OK. So I'm just curious about that. I know you said
4  earlier it was at the end of the year, but you got a monthly
5  report of your RVU production from NYU, correct?
6  A. Correct.
7  Q. So it was monthly and then you got a total at the end of
8  the year, right?
9  A. Correct.
10 Q. Same question with respect to 2015; do you recall your
11 total RVU production for 2015?
12 A. I don't recall exactly. I think it was higher in 2015 than
13 2014. I do remember that.
14 Q. OK. And so your incentive pay would have been more,
15 correct?
16 A. Right. The bonus pay, I believe, was higher at the end of
17 2015.
18 Q. Do you have any recollection at the end of 2015 what your
19 bonus pay was?
20 A. I may be confusing 2015 and 2016, but I think it was about
21 a hundred thousand dollars in 2015.
22 Q. A hundred thousand dollars extra, on top of the 290,
23 correct?
24 A. Correct.
25 Q. And then same question for 2016; the RVUs and your bonus

1  Q.  You thought that Dr. Edelman and her practice would benefit
2  NYU; correct?
3  A.  Correct.
4  Q.  And when you recruited Dr. Edelman to join NYU, you
5  believed that Dr. Edelman was a good doctor; correct?
6  A.  I did.
7  Q.  At some point in time while Dr. Edelman was working,
8  Mr. Rubin reached out to you; correct?
9  A.  Reached out to me?
10 Q.  He reached out to you about Dr. Edelman; correct?
11 A.  Correct.
12 Q.  And that was in and around December of 2020; correct?
13 A.  Yes.
14 Q.  And prior to Mr. Rubin reaching out to you, you had no
15 reason to change your opinion about Dr. Edelman as a doctor;
16 correct?
17 A.  You know, obviously my opinion had evolved about her over
18 the years.
19 Q.  Prior to December 2020, you didn't have any issues with
20 Dr. Edelman's clinical work; correct?
21 A.  If I did, they were minor issues.
22 Q.  You thought that Dr. Edelman was intelligent; correct?
23 A.  I did think she was intelligent, yes.
24 Q.  And you thought that she was fully capable of treating
25 patients with rheumatoid issues; correct?

1  is patient volume.
2  Q.  At the time of these discussions with NYU in 2013, did you
3  have any debt that you were asking NYU to assume as part of the
4  deal?
5  A.  No.
6  Q.  Did you have any lease or office expenses that you were
7  asking NYU to take over?
8  A.  No.  I was a salaried employee at North Shore-LIJ.
9  Q.  So other than what NYU would pay you, are you aware of any
10 other expenses NYU would have had in connection with your hire?
11 A.  No.  There were no other expenses.
12 Q.  We looked at your contract -- I don't think I need to put
13 it up again -- but do you remember seeing that $23,000 at the
14 end of the year?
15 A.  Yes.
16 Q.  Do you recall how that came about?
17 A.  Yes.  That was put in as a retention bonus for the one
18 year.  It was, in part, because there is -- the -- I think I
19 would have received that amount of money in my retirement fund,
20 but you have to be at NYU for two years, and I had already done
21 my fellowship there, and they felt like, you know what, we're
22 going to give you the, that extra 23,000 because you're losing
23 it in the retirement fund.
24 Q.  And you recall there was negotiation about your RVU target;
25 you said that on direct, right?

1   your Honor.
2           THE COURT:  Dr. Porges, you may step up, remain in the
3   witness box, and my deputy will administer the oath.
4           Jury, you can do a stretch break if you want.
5           MR. KATAEV:  Permission to go to the podium, your
6   Honor.
7           THE COURT:  Yes.
8    ANDREW JAY PORGES,
9        called as a witness by the Plaintiff,
10       having been duly sworn, testified as follows:
11          THE DEPUTY CLERK:  Please state your full name for the
12  record and spell out your first and last name.
13          THE WITNESS:  I'm Dr. Andrew Jay Porges, A-n-d-r-e-w
14  J-a-y P-o-r-g-e-s.
15          THE COURT:  Dr. Porges, you can be seated.  Please try
16  to keep your voice up like you did before, speak into the
17  microphone.  Try to speak slowly and clearly.
18          Counsel, you may inquire.
19  DIRECT EXAMINATION
20  BY MR. KATAEV:
21  Q.  Good afternoon, Dr. Porges.
22  A.  Good afternoon.
23  Q.  You worked at NYU since November 2014; correct?
24  A.  Yes.
25  Q.  Prior to working at NYU, you had your own practice on

1  correct?
2  A.  Yes.
3  Q.  Ever since you started at NYU, the amount of time you spent
4  on clinical research decreased year over year; correct?
5  A.  Yes.
6  Q.  That research work was something you had negotiated with
7  NYU; right?
8  A.  There was a clause in my contract that included research,
9  clinical research, yes.
10 Q.  That clause exists because it's something that you wanted;
11 right?
12 A.  It existed because that was the initial time spent in my
13 occupation and duties, yes.
14 Q.  Before the clinical research work started unwinding, you
15 spoke to all the rheumatologists about joining in that research
16 effort; right?
17 A.  Yes.
18 Q.  And you suggested as an option to Dr. Edelman that she
19 could be a coinvestigator in that role; right?
20 A.  I believe so.  I would have suggested that to probably most
21 or all of the physicians I discussed putting time in doing
22 clinical research, yes.
23          MR. KATAEV:  Move to strike as nonresponsive, your
24 Honor.
25          THE COURT:  Overruled.

1  Q.  You have no recollection of discussing any compensation
2  with Dr. Edelman for such a role; right?
3  A.  I never discuss compensation with anyone.
4  Q.  And it's fair to say that NYU assumed your practice because
5  you brought to them the assets, reputation, and records of a
6  large practice; right?
7              MR. SCHOENSTEIN:  Objection.
8              THE COURT:  Sustained.
9  Q.  To your knowledge, NYU assumed your practice because it
10 brought the assets, reputation, and records of a large
11 practice; correct?
12 A.  As well as my abilities as a physician, yes.
13 Q.  And at the time that NYU assumed your practice, you had two
14 rheumatologists that came along with you; correct?
15 A.  No, that's not correct.
16             MR. KATAEV:  41, your Honor.
17 A.  Well, including myself -- including myself, there was one
18 part-time physician.
19 Q.  Dr. Brancato; correct?
20 A.  Yes.
21 Q.  And you had several thousand patients in your private
22 practice, didn't you?
23 A.  Yes.
24 Q.  And you had a large referral base; correct?
25 A.  Yes.