# EXHIBIT 5

N7ICede1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   DR. SARI EDELMAN,

 4                   Plaintiff,

 5            v.                            21 Civ. 502 (LJL)

 6   NYU LANGONE HEALTH SYSTEM, et
     al.,
 7
                     Defendants.
 8                                         Trial
     ------------------------------x
 9                                         New York, N.Y.
                                           July 18, 2023
10                                         9:00 a.m.

11   Before:

12                     HON. LEWIS J. LIMAN,

13                                         District Judge
                                           -and a Jury-
14

15                         APPEARANCES

16   MILMAN LABUDA LAW GROUP PLLC
          Attorneys for Plaintiff
17   BY:  JOSEPH M. LABUDA
          EMANUEL S. KATAEV
18
     TARTER KRINSKY & DROGIN LLP
19        Attorneys for Defendants
     BY:  RICHARD C. SCHOENSTEIN
20        RICHARD L. STEER
          INGRID J. CARDONA
21

22

23

24

25
```

N7ICede1                    Porges – Direct

1    think I exceeded it at all.  I think I was within 5 percent,

2    but mostly below.

3    Q.  And because you were within a certain percentage, your

4    compensation was unaffected; correct?

5    A.  Correct.

6    Q.  Fair to say you averaged a little over 50 RVUs per month;

7    right?

8    A.  On average, yes.

9    Q.  And typically, that would lead to approximately a little

10   over 6000 RVUs every year; correct?

11   A.  Yes.

12   Q.  Except in COVID; right?

13   A.  A little less in COVID.

14   Q.  Because you met your RVU target and didn't really exceed

15   it, you did not receive any bonuses in any year from 2014

16   through the present; correct?

17   A.  The first year I ever received a bonus was actually last

18   year in 2022.

19   Q.  Prior to 2022, you did not receive any bonus; correct?

20   A.  Correct.

21   Q.  In your practice, you never really had any issues with the

22   Epic system when it came to communications; right?

23   A.  There were occasionally IT issues, but nothing major.

24   Q.  Never was there any issue that lasted for months and

25   months; correct?

1          THE COURT:  Overruled.

2     A.  So, they approached me.

3     Q.  OK.  And what did you tell them about your practice?

4     A.  I sat down with them together with Dr. Brancato, together,

5     and I reviewed the, the, the relevant issues about my practice.

6     Financial, referrals, my history before, before opening the

7     practice, all those things were discussed.

8     Q.  And your background, was that discussed?

9     A.  Yes.

10    Q.  Now, you ultimately came to an agreement to join NYU?

11    A.  Yes.

12    Q.  And did NYU assume any business loans on your behalf?

13    A.  No.

14    Q.  Did NYU -- in terms of the lease, did NYU assume a lease?

15    A.  Yes.

16    Q.  For what period of time was that lease assumed by NYU?

17    A.  So, the lease was ending very shortly, I believe I joined

18    NYU as of November 1, and I believe the lease ended December

19    31, January.  Within, within two months of me joining NYU, the

20    lease was over.

21    Q.  And other than that, did NYU assume any lease?

22    A.  That's the only lease.

23    Q.  Now, did there come a time where you discussed with NYU

24    taking on an administrative role?

25    A.  Yes.

 1              (In open court)

 2              THE COURT:  Dr. Modi, you may come up.

 3              Dr. Modi, please stand up.  My deputy will administer

 4     the oath.

 5      ANANG MODI,

 6          called as a witness by the Plaintiff,

 7          having been duly sworn, testified as follows:

 8              THE DEPUTY CLERK:  Please state your full name for the

 9     record and please spell out your first and last name.

10              THE WITNESS:  Dr. Anang Modi.  First name A-n-a-n-g,

11     last name Modi, M-o-d-i.

12              MR. LABUDA:  May I proceed, your Honor?

13              THE COURT:  Yes.

14     DIRECT EXAMINATION

15     BY MR. LABUDA:

16     Q.  Good morning, Dr. Modi.

17     A.  Good morning.

18     Q.  You're a rheumatologist; correct?

19     A.  Yes.

20     Q.  And if you could just speak up into the mic a little bit.

21     A.  Yes.

22     Q.  Much better.

23          So just briefly describe what you do as a rheumatologist.

24     A.  We treat a lot of musculoskeletal and autoimmune joint

25     diseases.

1    Q.  And in terms of treating, what is it exactly that you do in

2    terms of treatment for the patients?

3    A.  Could be anywhere from medications, physical therapy,

4    injections.

5    Q.  So you do doctor visits with the patients and then based on

6    those visits, you prescribe a certain type of treatment for the

7    patient; correct?

8    A.  Correct.

9    Q.  You have a CV; correct?

10   A.  Yes.

11           MR. LABUDA:  I'd like to show the witness exhibit 46,

12   which I believe is in evidence.

13           MR. STEER:  I believe it is, your Honor.

14           THE COURT:  You may do so.

15   Q.  Dr. Modi, this is your CV; is that correct?

16   A.  Yes.

17   Q.  And you are a board certified rheumatologist; correct?

18   A.  Correct.

19   Q.  And you went to New York College of Osteopathic Medicine;

20   correct?

21   A.  Correct.

22   Q.  And you graduated in 2001; correct?

23   A.  Yes.

24   Q.  And the New York College of Osteopathic Medicine, that's

25   the same medical school that Dr. Edelman went to; is that

N7ICede3                          Modi - Direct

1    correct?

2    A.  I believe so, yes.

3    Q.  And you also did your residency in internal medicine at

4    Winthrop University Hospital; correct?

5    A.  Correct.

6    Q.  And that finished in 2004; correct?

7    A.  Correct.

8    Q.  And Dr. Edelman also did her internal medicine residency at

9    Winthrop, as well; correct?

10   A.  That's correct.

11   Q.  After that, you did your rheumatology fellowship; correct?

12   A.  Correct.

13   Q.  And that was at Winthrop University Hospital; correct?

14   A.  Correct.

15   Q.  And that's also where Dr. Edelman did her rheumatologist

16   fellowship; correct?

17   A.  Correct.

18   Q.  You finished your fellowship in 2006; correct?

19   A.  Correct.

20   Q.  And Dr. Edelman was a year or two behind you; correct?

21   A.  Two years, yes.

22   Q.  Same education path.  Did you guys know each other in

23   medical school and all these fellowships?

24   A.  Medical school, no.  Residency and fellowship, we were

25   colleagues.

N7ICede3                          Modi - Direct

1   A.  Yes.

2   Q.  And that still happens today, right, they still send you

3   monthly reports?

4   A.  Yes.

5   Q.  And then at the end of the year, you also get an annual

6   report of how many RVUs you hit; correct?

7   A.  Correct.

8   Q.  Do you have any recollection about, in any of the years,

9   '17, '18, '19, '20 into '21 of whether or not you got any

10  bonuses, like incentive bonuses?

11  A.  You get a bonus if you exceed your target RVU.

12  Q.  Yes.  What I'm asking you is, do you remember receiving any

13  bonuses in any of those years?

14  A.  Which years specifically?

15  Q.  We can go year by year.  First year, '17 to '18?

16  A.  I don't believe so.  I met my target RVUs.

17  Q.  You were at least within 5 percent of the target; correct?

18  A.  Correct.

19  Q.  What about the second year, '18 to '19, do you have any

20  recollection?

21  A.  I met my target RVUs.

22  Q.  But no incentive pay?

23  A.  No.

24  Q.  What about the third year?  That would be, I think, '19 to

25  '20.

N7ICede3                          Modi - Direct

1   A.  '19 to '20, I do recall that I met my target exactly.  I

2   was on the verge of exceeding my target significantly, but

3   unfortunately, COVID happened, and we saw about a 20-percent

4   drop in our RVUs.  However, despite the COVID year, I was able

5   to meet my 6100.

6   Q.  And NYU gave all the doctors a pass for the COVID just

7   because of COVID; correct?

8   A.  I didn't need one because I had 61 RVUs, but --

9   Q.  And with respect to in addition to your $360,000 clinical

10  compensation, NYU also paid expenses attendant with your

11  practice; correct?

12  A.  Yes.

13  Q.  And that would be like if you attended seminars out of

14  town; correct?

15  A.  They would pay for CME, yeah, continuing medical education.

16  Q.  And you would be able to fly to a seminar, stay in a hotel,

17  attend the seminar, and that would all be paid by NYU; correct?

18  A.  Yeah, depending on the, yes, hotel.  Modest accommodations.

19  Q.  Not talking the Bellagio or anything like that?

20  A.  No.  No.

21  Q.  Do you have a recollection of in those years, the '17 to

22  '21, attending conferences and submitting expenses?

23  A.  2017, '18, and '19, not since then.

24  Q.  And approximately, what were those expenses that you put in

25  and how much did you receive in reimbursement from NYU?

 1              (Jury present)

 2              THE COURT:  Mr. Steer you may inquire.

 3    CROSS-EXAMINATION

 4    BY MR. STEER:

 5    Q.  Good morning, Dr. Modi.

 6    A.  Good morning.

 7    Q.  You understand you're not a defendant in this lawsuit?

 8    A.  Yes.

 9    Q.  And where do you work?

10    A.  NYU Langone.

11    Q.  And where?

12    A.  Huntington in Long Island.

13              MR. STEER:  Your Honor, may we publish exhibit 46 in

14    evidence, please, his curriculum vitae.

15              THE COURT:  Yes.  Have you got a question?

16              MR. STEER:  May we publish it to the jury?

17              THE COURT:  Yes.

18              MR. STEER:  Oh, I'm sorry, your Honor.

19    Q.  Dr. Modi, your curriculum vitae that we looked at a few

20    minutes ago, does it fairly and accurately reflect your

21    background, your education, and your job experience?

22    A.  Yes.

23    Q.  Now, you show on the CV that you were the chief of

24    rheumatology for former QLIMG, Queens Long Island Medical

25    Group; correct?

N7ICede3                          Modi - Cross

1   A.  Correct.

2   Q.  What was Queens Long Island Medical Group?

3   A.  It was a multi-specialty group of about 500 physicians

4   located in Queens and Long Island.

5   Q.  And as the chief rheumatology, what were your duties?

6   A.  Be the liaison between the rheumatologists in the group and

7   administration leadership to kind of discipline them or improve

8   the quality of care standards, as well as a connection between

9   the physicians and leadership if there was a need for any

10  modern equipment, approve their CMEs, their vacation time, any

11  connection between leadership and the rheumatology division.

12  Q.  And how many rheumatologists did you oversee, if any?

13  A.  Six.

14  Q.  And you testified earlier that I believe QLIMG was bought

15  by Advantage Care Physicians; correct?

16  A.  Yes.

17          MR. KATAEV:  Objection.  Asked and answered.

18          THE COURT:  Overruled.

19  A.  Yes.

20          THE COURT:  Mr. Kataev, my rule is only one lawyer,

21  and you're not the lawyer for this witness.

22          MR. KATAEV:  I apologize, your Honor.  I got over --

23          THE COURT:  Mr. Labuda.

24          Okay.  Go ahead.

25  Q.  What was Advantage Care Physicians?

A.  Advantage Care Physicians basically took over Queens Long

Island Medical Group where I served as medical director of one

of their offices.

Q.  And how many physicians did ACP, I'm going to call it,

Advantage Care Physicians, ACP, how big was it at the time that

you became the clinical director?

A.  The entire practice was approximately same as Queens Long

Island Medical Group, 500 physicians.

Q.  How many physicians, if any, did you oversee?

A.  The practice had over 20 offices.  I was the medical

director of the Hempstead medical office, which comprised about

15 physicians, two PAs, two nurse practitioners, seven or eight

RNs, and then the rest of it was front desk, receptionists,

medical assistants.

Q.  What insurances did Advantage Care Physicians take, if any?

A.  They take all insurances.  50 to 60 percent of the

patients, because the group is owned by Emblem, 50 to 60

percent of patients I saw were Emblem, the other 40 percent or

more were other insurance.

Q.  Are you familiar with a medical group called HIP?

A.  Yes.

Q.  What is HIP, to the best of your knowledge?

A.  HIP is an HMO.

Q.  Were they affiliated in any way with emblem?

A.  Yes.

N7ICede3                         Modi - Cross

1    NYU about the possibility of being employed there?

2    A.  Because of my two colleagues that were very happy with NYU,

3    I reached out to an NYU talent recruiter.

4    Q.  After you dealt with the recruiter, did there come a time

5    when you met someone in NYU's faculty group practice?

6    A.  Yes.

7    Q.  And who is that?

8    A.  Who did I interview with?

9    Q.  Yes.

10   A.  Andrew Rubin and Josh.

11   Q.  Josh Swirnow?

12   A.  Yes.

13   Q.  And how did you pitch yourself to them when you were

14   looking to join NYU, what did you tell them about yourself?

15   A.  I told them that I was out in practice for 11 years, so I

16   would come with a lot of experience, I was a very busy

17   rheumatologist, and, you know, I was pretty confident with my

18   patients, really value me as their rheumatologist, as their

19   physician.  I was pretty confident that a lot of those patients

20   would eventually come over to NYU, as well.  So it's much more

21   attractive to them than hiring, let's say, a new fellow out of

22   training since I'd be coming with some patient panel already.

23   And then I also pitched that I was a medical director, had some

24   administrative experience, had some experience as a chief of

25   rheumatology with the former group, as well.

1   Q.  With regard to those discussions, did you negotiate with

2   them about salary?

3   A.  I did.

4   Q.  And what happened in those negotiations?

5   A.  I told them that at Advantage Care, I was overall happy,

6   but I'm not willing to make a lateral career move, you know, I

7   was very happy with my patients, my patients were very happy

8   with me, and I did not want to make a lateral move in my

9   career, meaning, you know, to get the same salary or certainly

10  definitely would not join for a pay cut.  So I had requested at

11  least a 10-percent raise in my salary for me to move on and

12  join NYU.

13  Q.  And tell us again, please, or perhaps I didn't ask, what

14  was your salary at Advantage at the time of these negotiations

15  with NYU?

16  A.  $328,000.

17  Q.  What did you end up being offered as a salary by NYU?

18  A.  $360,000.

19  Q.  And how does that compare with your request for a

20  10-percent raise?

21  A.  They pretty much met it head on.

22  Q.  Was there RVUs that you had your production measured by

23  when were you at Advantage Care?

24  A.  Yes.

25  Q.  And how many RVUs did you do per year at Advantage Care,

1  let's say in your last year there?

2  A.  6100.

3  Q.  Do you have any knowledge, based on your experience as a

4  senior rheumatologist and as a medical director and as a chief

5  of rheumatology, how that 6001 RVUs compares to what

6  rheumatologists generally do throughout the United States?

7           THE COURT:  I take it you mean 6100?

8           MR. STEER:  I'm sorry.  6100.

9           MR. LABUDA:  Objection.  Foundation.

10          THE COURT:  The objection is sustained.

11 Q.  Did you attend conferences when you were at Advantage Care?

12 A.  Yes.

13 Q.  Did you also review information in the medical profession

14 regarding RVUs and RVU targets?

15 A.  Yes.

16 Q.  And what was your understanding of what they showed in

17 terms of the level of RVUs that you were generating compared to

18 the general population of rheumatologists?

19          MR. LABUDA:  Objection.  Hearsay.

20          THE COURT:  Overruled.

21          MR. STEER:  You may answer.

22 A.  Being a previous chief of rheumatology and having some

23 background, 6100 RVUs, when I was at ACP, was equal to top

24 tenth percentile as far as productivity for all rheumatologists

25 in the country.  So it's a pretty high bar.

N7ICede3                         Modi - Cross

1    Q.  And what target, if any, were you given at NYU for your

2    production in RVUs?

3    A.  6100.

4    Q.  That's the exact same number that you were doing at

5    Advantage?

6    A.  Yes.

7    Q.  When you came to NYU, did you have any debt?

8    A.  No.

9    Q.  No loans?

10   A.  No.

11   Q.  Did you have an office lease?

12   A.  No.

13   Q.  Did you have any staff that came with you?

14   A.  There was a medical assistant that interviewed with NYU,

15   but there was not negotiated that she has to come with me, it

16   was a choice she made after I joined.

17   Q.  Was there a medical assistant there already for your use or

18   if she did not come, what would have happened?

19   A.  She was not part of the negotiations at all.  It was

20   basically after I joined and signed the contract with NYU, they

21   basically asked me, we could either hire someone brand new that

22   you don't know and we don't know or if you have someone in

23   mind, you could ask them if they'd be interested because if

24   you're working with them and you know they're good, then we

25   would much rather hire someone that you know.

|    |                                                                     |
|----|---------------------------------------------------------------------|
| 1  | testified earlier that Dr. Edelman worked there with you one        |
| 2  | day a week?                                                          |
| 3  | A.  Yes, one day a week for one or two years.                        |
| 4  | Q.  Did you see her each day of the day she was there?               |
| 5  | A.  I mean, not necessarily because she was in a different           |
| 6  | hallway and I was in a different hallway.  So eventually,            |
| 7  | sometimes we'd cross paths or sometimes --                          |
| 8  | Q.  Did you develop any sense, when you were working along with      |
| 9  | Dr. Edelman in that office, what her hours were while working        |
| 10 | at the Huntington Medical Group?                                    |
| 11 | A.  I recall her working from, I believe, 9:00 to 3:00 and then      |
| 12 | doing administrative or having two hours in the latter part of      |
| 13 | the day if there were urgent patients or to complete paperwork,     |
| 14 | so she'd be there probably 9:00 to 5:00, but I think 9:00 to        |
| 15 | 3:00 were the patient hours.                                        |
| 16 | Q.  Have you, with regard to NYU, have you done anything that        |
| 17 | has helped them in terms of growing their practice?                 |
| 18 | A.  Yes, very much so.                                               |
| 19 | Q.  And could you explain to the jury why you say that.             |
| 20 | A.  Even though my target of 6100 is my target per year, the        |
| 21 | last two or three years, I've been doing almost 7000 RVUs per       |
| 22 | year.                                                                |
| 23 |          MR. LABUDA:  Objection.  Move to strike.  I didn't         |
| 24 | know where the question was going, your Honor.  I thought it        |
| 25 | was during the period of time in question.                         |

1    THE COURT:  I'll strike the testimony.

2    Q.  Dr. Modi, what hours do you see patients?

3    A.  Monday through Friday, 9:00 to 5:00.

4    Q.  And how many days a week do you work?

5    A.  Five.

6    Q.  And with regard to the growth of the practice that you

7    testified to before -- withdrawn.

8        Did you have a renewal contract at NYU?

9    A.  Yes.

10   Q.  And I believe we looked at that before.

11       When that contract was renewed, did you receive a new RVU

12   target?

13   A.  Yes.

14   Q.  And what is that RVU target?

15   A.  It went from 59 to 61.

16   Q.  And have you been exceeding that RVU target?

17   A.  My RVU target for the year -- no, actually, the RVU target

18   remained the same, 6100.  I'm sorry.

19   Q.  How have your RVUs been in connection with that target?

20   A.  They've been exceeding.

21       MR. LABUDA:  Objection.

22       THE COURT:  Sustained.

23   Q.  What RVUs have you produced since the renewal of your

24   contract, if any?

25       MR. LABUDA:  Objection.

N7iWede4

1           (Jury not present)

2           THE COURT:  All right.  Be seated.

3           I take it defendants have a motion.

4           MR. SCHOENSTEIN:  Yes, your Honor.

5           THE COURT:  Mr. Schoenstein.

6           MR. SCHOENSTEIN:  Your Honor, defendants move for a

7   directed verdict on pretty much the entirety of the case for

8   the record.  I'm going to go issue by issue for the record so

9   we have it down.

10           The Court is familiar with the standards for a

11   directed verdict motion, as set forth in *Casmento v. Volmar*

12   *Construction*, 2022 WL 15773966.  In this case, under Rule 50,

13   directed verdict is appropriate because the evidence in favor

14   of movant is so overwhelming that reasonable and fair-minded

15   persons could not arrive at a verdict against it.

16           Let me start with the parties.

17           Of the corporate parties, the only correct party here

18   is NYU Grossman School of Medicine.  That is the employer of

19   plaintiff as it is currently known.  None of those other

20   entities employ her.  There is no evidence of any involvement

21   of any of them, other than she read their names in some of the

22   documents.  And that's not evidence of what any of them did.

23   They're not needed for the case.  NYU Grossman School of

24   Medicine is a division of NYU itself, so we don't need any of

25   these other corporations.  They confuse and confound the jury.

1    They should all be eliminated.

2            THE COURT:  And I take it that if a verdict was

3    returned against NYU Grossman School of Medicine -- is that a

4    legal entity that could satisfy a judgment?

5            MR. SCHOENSTEIN:  That is a division of NYU itself,

6    which is a legal entity, and there is zero question about

7    judgment satisfaction in this case, your Honor.  Zero.  I mean

8    hopefully there won't be one, but if there was.

9            THE COURT:  OK.

10            MR. SCHOENSTEIN:  Now, the Equal Pay Act claim, your

11    Honor, has not been substantiated.

12            First of all, she was not doing a substantial -- a job

13    with substantially equal skill, effort and responsibility of

14    the comparators.  She was below all three of them in

15    productivity.  Two of them, Goldberg and Porges, had different

16    jobs and responsibilities.  Modi was much more productive.  She

17    was not doing substantially equal work, which is the second

18    factor, because her RVUs were substantially less than the

19    others.  But really where this case turns on the Equal Pay Act

20    is the affirmative defense of a factor other than sex.

21            Respectfully, your Honor, there is no evidence that

22    sex played any role in this, so the only factors that went into

23    a determination of the pay were factors other than sex, and no

24    reasonable juror could disagree about that.  The evidence is

25    uniform that salary setters considered financial circumstances;

1   experience; reputation; business plans, where they had them;

2   compensation needs, where they were advanced by the applicants;

3   etc.  Those are factors other than sex, and no other jury -- no

4   reasonable jury could decide otherwise.

5          Separately, your Honor, the willfulness part of the

6   Equal Pay Act must be dismissed.  I cite *McLaughlin v. Richland*

7   *Shoe*, 486 U.S. 128.  Willfulness depends on a finding that the

8   employer either knew or showed reckless disregard for the

9   matter of whether its conduct was prohibited by the statute.

10  There is zero evidence of disregard by any of the defendants.

11  In fact, the evidence is that they cleared salaries with legal.

12  They cleared salaries with HR.  They did outside surveys of

13  salary, both to benchmark and to check gender disparity.  There

14  is no evidence that anybody intentionally ignored or willfully

15  ignored law.  And the willfulness part should be dropped even

16  if you leave in the Equal Pay Act claims.

17         Now, your Honor asked yesterday why should you do this

18  now instead of after the jury decides, and the answer is

19  simple:  Prejudice.  It is prejudicial to have claims go to the

20  jury that are not supported by the evidence.  They may consider

21  them in rendering verdicts on the other parts of the case.  It

22  makes them more likely to find discrimination if they're

23  thinking about equal pay than if the equal pay part is taken

24  out.  So it needs to be addressed now.

25         It will also shorten our closing arguments

N7iWede4

1   considerably.  But that's not really a factor.  The fact is the

2   prejudice.  It increases the chance, your Honor, of a

3   compromised verdict if we leave in the case claims that don't

4   belong there.  If we leave stuff like willfulness that doesn't

5   belong there, it increases the possibility that the jury will

6   compromise on something in the middle, when the far end of the

7   spectrum has no support whatsoever and should not go to the

8   jury.

9              I want to turn to retaliation.

10             THE COURT:  I suppose that argument turns upon me

11   finding that there is some part of the plaintiff's case that

12   would survive a renewed motion.

13             MR. SCHOENSTEIN:  Oh, yes.

14             THE COURT:  If there's not, then even a compromise

15   verdict wouldn't stand.

16             MR. SCHOENSTEIN:  Well, that's true, your Honor.

17   That's true.

18             Retaliation, your Honor.

19             There was no protected activity, and I say that

20   because the complaints here were about office space, not about

21   discrimination.  I'm going to cite a case called *Robinson v.*

22   *DeNiro*, recently decided, on May 25, 2023 --

23             THE COURT:  I'm aware of it.

24             MR. SCHOENSTEIN:  -- by a very good judge.

25             You will see at pages 90 to 91 of your decision, your

Honor, you addressed that buzz words like "harassment" and
"toxic work environment" do not establish protected activity.

Now, remember, plaintiff's communications never said
anything about anyone calling her a bitch.  Her communications
were that she felt slightly intimidated because a tall guy came
into her office and waved his arms.  Those were not complaints
about discrimination, fairly read.  They were not understood by
NYU to be complaints about discrimination.  There is no
testimony that NYU regarded those as actual discrimination, so
it was not protected activity on the part, which is a predicate
for the retaliation claim.

Secondly, it did not cause an adverse employment
action.  All iterations of retaliation claims, be they Title
VII, state law or city law, require proof of causation.  There
is no such proof in this case.  Temporally, it's not close.
The allegations, the complaints end in November of 2020, 14
months -- well, at least 12 months -- before the alleged
adverse employment actions.  And the testimony uniformly --
every single witness -- was that the prior complaints about
office space had nothing to do with the decision to nonrenew
the contract, your Honor.

The decision was made, agree with it or not, based on
the assessment of her clinical practice.  So retaliation should
be dismissed against everybody, but let me also break it down
by defendant, because there are individual defendants here, and

1  they do not belong in the case.

2          I should add, by the way, that all of the arguments on

3  Equal Pay Act are even stronger as against the individual

4  defendants, Mr. Rubin and Mr. Swirnow, that they should be

5  taken out of the Equal Pay Act claims and the willfulness

6  claims whether or not you take out the others.

7          But on retaliation, Antonik didn't do anything to

8  retaliate.  He was asked to put forward some emails, and he

9  did.  He actually took notes from another employee, Ms. Ruiz,

10  the most credible witness I've ever seen, and gave them to

11  somebody else, as requested.  That's not retaliation.

12          Mr. Kaplan, he didn't do anything.  He said stop, put

13  it in writing and send it to the people who make these

14  decisions.  If that is retaliation, we are going down a really

15  bad path.

16          Mr. Swirnow didn't do anything.  He was involved in

17  discussions, but he didn't take an action or make a decision or

18  do anything that would be retaliation.

19          And Mr. Rubin, although he was the ultimate

20  decision-maker, he was the most removed from the complaints

21  that were supposedly being retaliated against.  And his

22  testimony is unimpeachable that he didn't take any of the prior

23  complaints into consideration.  He was considering only the

24  clinical factors, and you can't have a retaliation claim

25  against Mr. Rubin.

N7iWede4

1    THE COURT:  Could you on a cat's-paw-type theory?  I

2    mean assume that there is evidence that Dr. Porges was aware of

3    the complaint and assume that there's evidence that Dr. Porges

4    was motivated by some animus to the plaintiff and that

5    Mr. Rubin was manipulated.  Would that support a claim against

6    him or just against NYU?

7    MR. SCHOENSTEIN:  I think just against NYU.  If

8    Mr. Rubin is manipulated by others that he is considering in

9    good faith, I don't think there's any claim against Mr. Rubin.

10   I think he would have to be out.  And the evidence is just

11   overwhelming that he was basing his decision, in good faith, on

12   what he was told by the people he relies upon at NYU.

13   Mr. Steer's handing me a note about cat's-paw.  Of

14   course, there is no evidence of animus by Dr. Porges, but I

15   know your Honor was giving me a hypothetical.

16   So let me turn to what's left in the case, which is

17   the discrimination claim itself, which on summary judgment has

18   been limited to the issue of sexist remarks.  That is the issue

19   that brings us a case on discrimination.  And your Honor here,

20   too, there is no evidence sufficient to have a discrimination

21   claim.

22   Let me start with "smile," "fake it till you make it"

23   and "calm down."  Those are not gender-specific comments, and I

24   cite *Cadet-Legros v. N.Y. Univ. Hosp. Ctr.*, 135 A.D.3d 196,

25   from the First Department.  Generic terms like "tirade" and "a

N7iWede4

```
 1   leopard does not change its spots" were not racially coded

 2   language in the context of that case, and "smile" is not

 3   racially coded in this case.  I cite for your Honor also

 4   Marseille v. Mount Sinai Hosp., 2022 WL 1470098.  In that it

 5   was the term "aggressive."  It was a race-neutral term it would

 6   not support.  Telling somebody to smile is not discrimination.

 7            As I'm going to say to the jury tomorrow, if I have

 8   to, we should all smile more.

 9            Now, that leaves the alleged "bitch" comment.

10            THE COURT:  Just refresh me.  "Smile" and "fake it

11   till you make it," were these Rubin and --

12            MR. SCHOENSTEIN:  Smile --

13            THE COURT:  -- presence?

14            What's the evidence?

15            MR. SCHOENSTEIN:  Yes.  The evidence is that there was

16   a meeting in 2017, where Dr. Edelman's issues with her staff

17   first came to the attention, and she went in to see Mr. Rubin

18   and Mr. Swirnow.  And she testifies -- and no one else really

19   confirmed or expressly denied it -- that Mr. Rubin suggested

20   she smile and that she fake it till she makes it.  And

21   Mr. Rubin did not recall saying that, but --

22            THE COURT:  I remember his testimony.

23            MR. SCHOENSTEIN:  The "calm down" comment is the only

24   comment attributed to Mr. Kaplan.  That's his conversation with

25   her in 2020.  She says he called her doctor and told her to
```

1   calm down and that that somehow was discriminatory.

2            So if we take out all of those, we are left with the

3   allegation that Mr. Antonik muttered the word "bitch," not that

4   he called her a bitch, not that he yelled bitch at her but that

5   he muttered it.  As your Honor knows, the laws do not impose a

6   general civility code.  Petty slights are not enough to

7   substantiate a discrimination claim.  I point again to the

8   *Robinson* case, at page 115, and also *Williams v. N.Y. City*

9   *Hous. Auth.*, 61 A.D.3d 62, another First Department case, under

10  the New York City law, which your Honor mentioned yesterday.

11  And it's "petty slights and trivial inconveniences" are not

12  enough to sustain a discrimination count even under the city

13  claim.

14           Similarly, stray remarks are not enough.  I cite for

15  the Court *Fruchtman v. City of N.Y.*, 129 A.D.3d 500.  "Stray

16  derogatory remarks, without more," do not constitute evidence

17  of discrimination; and *Harris v. Forklift Systems*, 510 U.S. 17,

18  "mere utterance of an...epithet which engenders offensive

19  feelings in an employee does not sufficiently affect conditions

20  of employment to implicate Title VII."  So the Supreme Court

21  case is a Title VII case.  Title VII claims should go, but also

22  the city claims.

23           THE COURT:  There is no Title VII discrimination

24  claim.  It's only the city claim.

25           MR. SCHOENSTEIN:  Oh, you're right.  Fair enough.

N7iWede4

1        Also, your Honor, with respect to the 2017 comments,

2   they would be time-barred, right?  Because the complaint wasn't

3   filed until January of 2021, so none of the 2017 remarks could

4   come in.

5        THE COURT:  Does that include the "calm down" from Mr.

6   Kaplan?

7        MR. SCHOENSTEIN:  No.  "Calm down" from Mr. Kaplan is

8   2020.  The 2020 remarks are Mr. Kaplan saying, "Calm down,

9   Doctor," or "Doctor, calm down," and Mr. Antonik allegedly

10   muttering the word "bitch."

11        Let me go here again for the Court by individual

12   defendant, because all four defendants are named on this claim.

13        Mr. Swirnow, there's no proof that he said anything

14   ever at any time that was considered discriminatory, in 2017,

15   2020, or ever.  So he's out.

16        Mr. Kaplan simply said "calm down," allegedly, in a

17   conversation where he was very polite and left immediately when

18   he was requested to do so by plaintiff.  So he has to be out.

19        Mr. Rubin said only, in 2017, allegedly, "smile more"

20   and "fake it till you make it."  Those are out by statute of

21   limitations.  They are also out because they are not sufficient

22   to set forth a discrimination claim.

23        That leaves Mr. Antonik, and the sole basis, the only

24   basis is this claim that he muttered the word "bitch."  And I

25   know your Honor will not take out that part of the case simply

because it's not an allegation that was made anytime while

plaintiff was employed by NYU or in the complaint or in the

amended complaint or in the second amended complaint.  That's

for argument to the jury.  But existing alone, that one-word

muttering cannot support a discrimination claim under any of

the laws at issue in this case.

Finally, your Honor, I turn to damages.

Whether or not you leave any claims in the case will

affect this, but let me address a few specific things.

Plaintiffs are still claiming back pay and front pay.

There is no back pay proof in the case.  There's no loss of

revenue.  She didn't go a day unemployed or miss a check.  So

they have only front pay, and the front pay, as I understand

it, is based on retirement benefits.  And I'll say to the

plaintiff the same thing that I've been saying to all of our

witnesses:  Where are the documents?

There's no proof of any retirement benefits that she

had or lost.  There's no documentary proof that she doesn't get

retirement benefits now.  It is very short, unspecific

testimony by her, so front pay should be out.

The pain and suffering claim was limited to $50,000 in

the pretrial submission.  Suddenly, in the amended disclosures

we got the other night, it had a $250,000 number.  They're not

going to give the jury a number, but for the record, that

portion of their case must be limited to the 50,000 that was in

N7iWede4

1    their pretrial submission.

2            And that leaves us, your Honor, with punitive damages.

3            Respectfully, no jury could award punitive damages on

4    this record.  There is no evidence of the type of gross

5    behavior or conduct that willfully or wantonly causes harm to

6    another.  They don't approach meeting the standard of punitive

7    damages, and it should be removed from the charge if any of

8    these claims remain, again, so that there's no risk of a

9    compromise verdict, so there's no risk of the jury saying,

10   well, we won't give her punitive damages, but we'll give her

11   some compensatory damages.  It's prejudicial to go forward

12   without an evidentiary basis.

13           Thank you, your Honor.

14           THE COURT:  Thank you.

15           All right.  I'll hear from the plaintiff responses

16   with respect to anything that the plaintiff wants to respond to

17   but, in particular, why any corporate defendant, if anybody

18   stays in the case, should stay in other than the NYU Grossman

19   School of Medicine; why willfulness should stay in the case;

20   why any of the individuals should stay in the case; and why, in

21   particular, any of the individuals with respect to the

22   discrimination claim, other than perhaps Antonik; and then

23   finally, why I should instruct on punitive damages.

24           MR. KATAEV:  I'll address each of them *seriatim*, your

25   Honor.

1          There is no evidence in the case with respect to the

2     corporate defendants on both sides.  There's an agreement that

3     the NYU Grossman School of Medicine employed her, but that's a

4     division of NYU.  They did not specify which corporate entity

5     of NYU it's a division of.  Moreover, the contract --

6          THE COURT:  If there's no evidence in the case with

7     respect to the corporate defendants on both sides and you've

8     got the burden, isn't it game over?

9          MR. KATAEV:  No, your Honor, because the contract

10    specifically provides who the employer is, and it makes

11    reference to all of those corporate entities.  And we pointed

12    that out during the plaintiff's testimony.  The jury can make a

13    determination based on what the contract says and based on what

14    the testimony was.

15          It's also a factual inquiry that should go to the

16    jury.

17          Moving on to the EPA, this is a very fact-intensive

18    issue.  There's been testimony about Drs. Porges, Goldberg and

19    Modi.  The defendants have shifting explanations for each

20    defendant.  None of them is consistent.

21          For example, they reference this clinical and research

22    work and the administrative work.  Everyone agrees that the

23    administrative work was only 5 to 10 percent of effort.  Each

24    doctor consistently testified that the primary duty was seeing

25    patients.  Substantially equal is substantially equal.  It's

155.   The explanation for why one doctor was paid more does not apply consistently with why another male doctor was paid more. So they have to apply their explanations doctor by doctor in order for it to work.  It doesn't work that way.  It's a totality-of-the-circumstances test.  They say there's no evidence that sex played a role, but the evidence is that the female doctors earned substantially less.

          We heard Dr. Mehta's testimony, an independent, unbiased witness.  In fact, she would be more biased to her current employer.  She conceded on the stand that it was unfair that she received less pay and had to do more work than Dr. Goldberg.  His effort for administrative duties was 10 percent, your Honor.  He was paid $25,000 for that work.  He spent time seeing patients.  He was so busy seeing patients his bonus for the 1 percent was off the charts.  That's why his compensation increased so much.  It doesn't make any sense.  It doesn't jibe.  They don't meet unequivocally the factor-other-than-sex test for their affirmative defense.  They have not met their burden, and the jury should decide that.

          Going to willfulness, I have case law that I'd like to place on the record on this issue.  They say that there's zero evidence of disregard.  First of all, Mr. Rubin testified at his deposition and confirmed at trial that he did not even know about the Equal Pay Act.  Not knowing about a law that's been enacted since 1963, approaching its 50th anniversary, is

1     that that interaction was motivated by discriminatory animus.

2                    THE COURT:  Why wouldn't that just be a petty slight?

3                    MR. KATAEV:  It wouldn't be a petty slight, your

4     Honor, because based on the facts and circumstances of this

5     case, in a medical office, in a professional environment, this

6     rises way above a petty slight or trivial inconvenience.

7     Doctors are given respect in the world at large.  People

8     respect doctors, and people don't call doctors a bitch,

9     especially a person who is a site director.

10                    THE COURT:  Basically what you're asking me to do is

11    accept the proposition that it's OK to use that in a blue

12    collar setting, but because this person happens to have gone to

13    osteopathy school, it's not OK.

14                    MR. KATAEV:  I understand the Court's concerns with

15    that, but in terms of reviewing the totality of the

16    circumstances, I think that the place where it occurred is

17    relevant, your Honor, and it should be considered.

18                    There's also a concern that she raised in this

19    complaint about being concerned about being physically

20    assaulted.  That should go together with the comment and the

21    general conduct that occurred.

22                    The jury had an opportunity to observe Mr. Antonik.

23    They saw how big he was.  They saw how he responded to

24    questions.  They saw his demeanor, and they should have the

25    right to make that determination.  Again, defendants would not

1    were handled quickly.

2              THE COURT:  No, no.  That's out of the case.  The only

3    thing that's in the case on discrimination is the couple of

4    comments.  We're talking about retaliation, so why don't you

5    march through retaliation, and then you can get to the couple

6    of comments on discrimination.

7              MR. KATAEV:  I would just also say that all the

8    evidence that the defendants rely on in terms of retaliation is

9    self-serving.  They don't --

10             THE COURT:  So is yours.

11             MR. KATAEV:  But we have documents, your Honor.

12             THE COURT:  I don't think so.

13             Go ahead.

14             MR. KATAEV:  The point is, your Honor, that this is

15   also a fact-intensive inquiry that requires an assessment of

16   the totality of the circumstances, and the lack of evidence by

17   the defendants, the lack of documentary evidence, the cloak and

18   dagger -- "I'll call you"; "fill me in on what happened" -- no

19   memorialization, is something that the jury should consider as

20   to whether there was a retaliatory motive involved in Dr.

21   Edelman's --

22             THE COURT:  Let's walk through the individual

23   defendants.

24             Antonik, there's no evidence whatsoever of his

25   involvement in an action that would constitute an adverse

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    THE COURT:  Good afternoon.

2    The Court is prepared to give you its ruling on

3    defendants' motions for judgment as a matter of law.  The Court

4    assumes familiarity with the applicable legal principles as set

5    forth in *Casmento v. Volmar Construction, Inc.*, 2022 WL

6    15773966 (S.D.N.Y. Oct. 28, 2022).

7    The Court grants judgment as a matter of law to

8    defendants on the issue of willfulness under the Equal Pay Act

9    and New York Equal Pay Act claims.  I am convinced by

10   plaintiff's letter that if there was evidence to support

11   willfulness, it should go to the jury.  However, the evidence

12   in the record is insufficient for a reasonable jury to find

13   that defendants knew that they were violating the law or showed

14   reckless disregard for whether they were violating the law.

15   Negligent conduct is not willful conduct.  Although Rubin

16   testified that he did not know the requirements of the Equal

17   Pay Act, he also testified that he relied on the HR and legal

18   departments, which reviewed all contracts before they were

19   permitted to be signed and go into effect, and that all

20   contracts were benchmarked and surveyed for gender equality.

21   The Court grants judgment as a matter of law for

22   Kaplan on all claims of retaliation.  There is insufficient

23   evidence in the record for a reasonable jury to conclude that

24   Kaplan had any retaliatory intent or that he had any

25   involvement in any adverse action.

1    The Court also grants judgment as a matter of law for

2    defendants Kaplan, Rubin and Swirnow on the discrimination

3    claims.  The evidence shows, at most, that Rubin stated to

4    plaintiff, in Swirnow's presence, to "smile more" and "fake it

5    till you make it" during a meeting to counsel her on

6    interpersonal relations, but those claims are barred on statute

7    of limitations grounds, and the continuing violation doctrine

8    does not apply.  In addition, at most, they constitute petty

9    slights.  In addition, plaintiff does not dispute an award of

10   judgment for Swirnow.  The statement attributed to Kaplan that,

11   when plaintiff got upset he said "calm down" is, at most, a

12   mere petty slight and petty inconvenience, and keeping the

13   claim in would otherwise turn the city human rights law into a

14   civility code.  There is no evidence from which a jury could

15   find that it was discriminatory.

16   On damages, defendants are granted judgment on the

17   claim for punitive damages.  There is no evidence from which a

18   reasonable jury could find that defendants engaged in gross

19   misbehavior or conduct that willfully or wantonly caused hurt

20   to another or engaged in willful or wanton negligence or

21   reckless conduct or consciously disregarded the rights of the

22   plaintiff.

23   The jury will not be charged on back pay, as agreed by

24   the plaintiff.

25   The charge will be amended to reflect these