# EXHIBIT 6

N7ECede1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DR. SARI EDELMAN,

                Plaintiff,

          v.                            21 Civ. 502 (LJL)

NYU LANGONE HEALTH SYSTEM, et
al.,

                Defendants.
                                        Trial
------------------------------x
                                        New York, N.Y.
                                        July 14, 2023
                                        8:45 a.m.

Before:

                    HON. LEWIS J. LIMAN,

                                        District Judge
                                        -and a Jury-


                         APPEARANCES

MILMAN LABUDA LAW GROUP PLLC
     Attorneys for Plaintiff
BY:  JOSEPH M. LABUDA
     EMANUEL S. KATAEV

TARTER KRINSKY & DROGIN LLP
     Attorneys for Defendants
BY:  RICHARD C. SCHOENSTEIN
     RICHARD L. STEER
     INGRID J. CARDONA
```

1   A.   Incorrect.
2   Q.   When you initially started working at NYU, you only managed
3   the oncologists; correct?
4   A.   That is correct.
5   Q.   And initially, you had no responsibility for any of the
6   rheumatologists; isn't that right?
7   A.   That is correct.
8   Q.   But eventually, there came to be a time when you were told
9   you had to manage both the rheumatologists and the oncologists;
10  right?
11  A.   Correct.
12  Q.   And there were five rheumatologists at NYU at the time;
13  right?
14  A.   That is correct.
15  Q.   That would be Dr. Goldberg, Dr. Porges, Dr. Edelman,
16  Dr. Mehta, and Dr. Modi; correct?
17  A.   Incorrect.
18  Q.   Who were the doctors?
19  A.   Dr. Brancato was present, also.
20  Q.   So it's fair to say that your work effectively doubled;
21  right?
22  A.   Yes, that is correct.
23  Q.   And then you also had to manage the podiatrists; right?
24  A.   Incorrect.
25            MR. KATAEV:  Your Honor, I'd like to impeach, page 58,

1  Q.  Can you describe for the jury what you remember about that.
2  A.  Dr. Edelman wanted to discuss her hours that she was
3  supporting Marcus Avenue.  She was originally seeing patients
4  in a different location on Thursdays, and she wanted to move
5  those patients over to the Marcus Avenue schedule for
6  Thursdays, and if I recall correctly, Fridays, as well.  When I
7  asked her about what time she wanted to start or what time --
8  because her hours in Huntington were very different from Marcus
9  by almost an hour.  I had asked her at that time, like, what
10 time did she want to start here at Marcus, did she want to
11 start at her normal 8:45 appointments whereas, at Huntington,
12 she was starting, I believe, between 8:00 and 8:15.  She
13 replied to me that she was going to honor whatever it is that
14 the patients were scheduled for.  I asked her just in case if
15 there was a specific preference, just because we wanted to make
16 sure we didn't have to remove and schedule patients again since
17 we were moving them from one location to another, she said to
18 me that she wasn't going to give me set hours because she
19 didn't want people putting everybody in at different hours when
20 other patients, who were already scheduled, had that priority,
21 which I completely understood, but I had the ability to hold
22 the schedule so that I can manually put patients in to
23 accommodate the patient's needs, which is why most of the
24 issues with patients' appointments always got escalated to me.
25 She was very abrupt and loud when she was asked further

1   A.   Yes.
2   Q.   You deal with hiring and firing physicians; right?
3   A.   I do.
4   Q.   Revenue cycle, which is billing and collections?
5   A.   I do.
6   Q.   And you generally run the whole group; right?
7   A.   Correct.
8   Q.   Anything that has to do with physicians is within your
9   purview; right?
10  A.   Mine and others.
11  Q.   And you've had these same duties the entire time that
12  you've worked at NYU; correct?
13  A.   For the most part.
14  Q.   And it's fair to say that you know Dr. Edelman; right?
15  A.   I know her more now, yes.
16  Q.   You met her first in 2014 for the purpose of hiring her;
17  correct?
18  A.   Correct.
19  Q.   Speaking to your duties and as it relates to physicians,
20  your duties concern the physicians' performance and all their
21  work as it relates to their employment; right?
22  A.   I have many, many, many duties, but that would be certainly
23  one of them.
24  Q.   You're aware, as a senior vice president, of NYU's policies
25  concerning discrimination and harassment and retaliation;

1  A.  At this time I was not.
2  Q.  And your deposition was taken after Dr. Edelman was
3  terminated, correct?
4  A.  Yes.
5  Q.  And you're the one who decides whether a physician's salary
6  is increased upon renewal, correct?
7  A.  Amongst others.
8  Q.  You testified earlier today that you're made aware of
9  complaints by physicians, right?
10 A.  Yes.
11 Q.  And you were, in fact, made aware of Dr. Edelman's
12 complaint, weren't you?
13 A.  You need to be more specific.  Which complaint?
14 Q.  The complaint that she filed with HR on September 17, 2019.
15 A.  I -- I don't recall being made aware of that complaint, no.
16         MR. KATAEV:  Page 150 -- I'm sorry.  175, lines 8
17 through 13.
18         THE COURT:  Go ahead.
19         MR. KATAEV:  Your Honor, permission to publish to the
20 jury -- I'm sorry, to the witness.
21         THE COURT:  Yes.  To the witness, yes.
22         MR. SCHOENSTEIN:  Objection.  Improper.
23         THE COURT:  Overruled.
24 BY MR. KATAEV:
25 Q.  At your deposition, I asked you the following question, and

1  Q.  This is Dr. Edelman's initial employment agreement,
2  correct?
3  A.  Yes.
4  Q.  She was paid $207,000, correct?
5  A.  Yes.
6  Q.  And her RVU target was 4,966, correct?
7  A.  That's what this says, yes.
8  Q.  And she had to earn more RVUs, but she was paid less than
9  Dr. Goldberg, correct?
10 A.  That -- well, that's what these documents say, yes.
11          MR. KATAEV:  31, your Honor.  It's already in
12 evidence.
13          THE COURT:  Go ahead.
14 BY MR. KATAEV:
15 Q.  And this is Dr. Porges's initial employment agreement,
16 right?
17 A.  Yes.
18 Q.  He was paid $340,000, correct?
19 A.  Yes, that's what this says.
20 Q.  And for that $340,000, he was required to earn 6,524 RVUs,
21 correct?
22 A.  Again, that's what this says, yes.
23 Q.  And you were here when we showed Dr. Mehta what she would
24 earn in compensation?
25 A.  Actually, I wasn't here for Dr. Mehta's testimony.

1  Q.  And if I go to a doctor, sometimes there would be a form
2  that says do I agree to take part in this, that or the other
3  research thing, is that what you're talking about?
4  A.  That would --
5         MR. KATAEV:  Objection.  Leading.
6  A.  That could be --
7         THE COURT:  Overruled.
8  A.  That could be either.  So you can -- you know, I was in the
9  Covid Pfizer study, phase 1.  That was actually true research.
10 As the study expanded and it got moved out into practices, when
11 they wanted, as they are now, still doing Covid research and
12 the like, some of that can be done in a practice where a
13 physician is seeing patients.  They're doing an office visit.
14 They're sending out a bill, but they have a component of their
15 time in the exam room where they are doing a research
16 something, and the patient would fill out that form you just
17 described to say they understand they're part of a research
18 study.  The doctor would do that.  That would be -- that
19 portion of their salary would come through what we call
20 clinical research because money would be coming in to fund that
21 effort.
22 Q.  And Dr. Porges, of those two different types of research,
23 what was he involved in?
24 A.  He was in the latter.  He was in the clinical research.  He
25 was not being paid to sit in the laboratory, write grants and

do the other types of research.  He was working with pharmaceutical companies, clinical trial organizations on treatments for rheumatological diseases where those patients were part of his clinical practice.  Some of those patients were on research studies.  Some of them were not.

Q.  Does that clinical research add value to a doctor, from NYU's perspective?

A.  100 percent add -- 1,000 percent.

Clinical trials is how we advance health care.  You know, every, every time a new drug comes out, you need a mechanism to test its efficacy -- not so much is it safe, because by the time it gets into a practice it's already been proven safe.  But you want large numbers of people trying these new drugs because each new drug that is successful treats the next problem that we have or have not been able to cure.

So it is highly regarded and highly encouraged, but at the same time not everybody wants to do it because it's time-consuming, and people who want to do research tend to want to do research and make that a big part of their lives.  And, and candidly, many of our clinicians in our network don't do it just for that reason.

Q.  OK.

A.  The places you tend to see it most is cancer, and cancer has a lot of clinical trials.

Q.  Stick with me on my question.

Administrative time that's paid for, as it relates to what you see in those charts, again, is for specific jobs, managing a specific item of work that we need managed. That's administration.

I'm an administrator. If I had a contract, which I don't, you would see my salary on the line that says administrative.

Q. OK. Thank you for that. Now let's talk more generally.

What is your role in determining what physicians are hired and how much they get paid?

A. I'm part of a team. So the business plan, which we've all seen --

Q. No, no. What is your role?

A. My role? I hire the person. I make the offer.

Q. OK. And what is your process for determining what offer to make?

A. I'm going to look at the business plan that we've all seen. I'm going to look at their credentials. I'm going to look at the need in the network. I'm going to look at how many years' experience they have. I'm going to look at their external activities, if they have them. And again, some do, some don't. I'm going to look at the geography, where we're putting them. And then based on all those factors, when I meet with the physician, with that business plan as sort of the foundation, we would present an offer.

Q. That business plan gives you some of the economic

1    information?
2    A.  Business plan -- I used the word "foundation" on purpose.
3    It sets the baseline for what we think, you know, gives us the
4    guide point, the starting point of where we think we need to
5    go.
6    Q.  Is it the only relevant factor?
7    A.  No.  That's what I was saying.  There's lots of other
8    factors, and those, again, can be academic versus nonacademic;
9    years of experience; the reputational status in the community;
10   do we have a need in the community that we can't meet?  Do we
11   have a geography that we can't cover?  So there are all sorts
12   of factors that go into compensation of how we pay a physician
13   beyond just the economics of a business plan.
14            MR. KATAEV:  Objection.  Narrative.
15            THE COURT:  What's the basis of your objection?
16            MR. KATAEV:  Narrative.
17            THE COURT:  Overruled.
18   BY MR. SCHOENSTEIN:
19   Q.  Is there any kind of formula that you utilize to come up
20   with an offer?
21   A.  No.  I think -- I think I answered that with Mr. Kataev.  I
22   don't have a checklist, a written checklist.
23   Q.  Does NYU do any benchmarking of physician salaries that
24   you're aware of?
25   A.  We do.  We have a -- we have a couple check -- checks and

1  and any comment you made in that regard?
2  A.  So, I didn't recall any of it until Dr. Mehta -- when she
3  came in, I was leaving and I saw her.  I hadn't seen her in a
4  long time.  When Dr. Mehta and Dr. Edelman first came to my
5  office, one of the things -- I'm negotiating a salary,
6  potentially a business relationship that's going to tie us
7  together for, for a very long time, and it's a personal thing.
8  So when I -- and we have -- I travel extensively.  We actually
9  have some, some things that we do in, off in Southeast Asia.
10      So when I met Dr. Mehta, I had never heard her first name
11 before, and I commented on her first name and said I wasn't
12 sure if this was a male or female name.  I assure you that I
13 know Sari Edelman is a female name.  And I would certainly --
14 if I had offended anybody, would apologize.  But I don't
15 believe the doctor, based on her testimony, was offended.  I
16 was inquiring to the nature of her name, not -- or commenting
17 on the nature of her name, not her gender.
18 Q.  Did anybody indicate at the meeting that they were
19 offended?
20 A.  No.
21 Q.  Did anyone indicate, prior to someone filing this lawsuit,
22 that they were offended by that comment?
23 A.  I never heard it before or after and hope to never hear it
24 again.
25 Q.  In the course of the negotiations with Dr. Edelman and Dr.

Mehta, was it a pro or a con for NYU that you would be assuming a lease?

A. It was a con.

Q. And why is that?

A. Because I didn't want their space.

Q. Why not?

A. Because I didn't need it.

Q. And did the duration of the lease have any impact on that being a negative?

A. Yes. It was a -- I don't recall now, but -- I recall now because I didn't recall then, you know, last year, but it was a 15-year lease, and I didn't need the space.

Q. Was assuming a loan, a business loan that Dr. Mehta and Dr. Edelman had taken on, was that a pro or a con for NYU?

A. That was a -- that was a con as well.

Q. And how about taking over the other salaries and expenses of their practice?

A. I'm going to call that neutral.

Q. Why is that neutral?

A. Because I was happy to be able to offer employment to their staff. And in -- you know, in fact, as in most cases, their staff, when we hire them, they have better advancement, you know, advancement opportunities, and usually their salaries are increased and they get the same -- similar benefits to the physicians.

1  Q.  Well, did you negotiate the salary for Dr. Goldberg?
2  A.  I believe -- I -- I believe I did.
3  Q.  And you took into account the kind of factors we've talked
4  about today?
5  A.  I definitely did that.
6  Q.  OK.
7          MR. KATAEV:  Same objection.
8          THE COURT:  Objection's overruled.
9  BY MR. SCHOENSTEIN:
10 Q.  And on the basis of your involvement in those activities,
11 do you believe the salary you negotiated was fair and
12 appropriate?
13         MR. KATAEV:  Objection.
14         THE COURT:  Sustained.
15 BY MR. SCHOENSTEIN:
16 Q.  Was Dr. Goldberg hired to do the same job as Dr. Edelman?
17 A.  No.
18 Q.  How were they different?
19 A.  Dr. Goldberg was hired to build out our network, help us
20 establish a footprint in, in that part of the Long Island and,
21 quite frankly, rheumatology in all of Long Island.  We had
22 planned and then delivered on, at this point, building more
23 programs beyond rheumatology.  We have a lot of orthopedists
24 who now work in that facility; those specialties can sometimes
25 be linked.  And we hired him to help us do that.  And he came

1   with very good credentials to do that.
2   Q.   You were involved in the recruitment, hiring and salary of
3   Dr. Porges?
4   A.   I was.
5   Q.   He came from private practice, right?
6   A.   He did.
7   Q.   So just to be, just so everybody's clear, we're talking
8   about Dr. Edelman, Dr. Goldberg, Dr. Porges and Dr. Modi.  So
9   of those four, who came from private practice?
10  A.   Mehta, Edelman, Porges and Brancato came from private
11  practice.  Goldberg and Modi came from academic or group-based
12  practice.
13  Q.   OK.  And so for Goldberg and Modi, did you have business
14  plans?
15  A.   No.
16  Q.   And you had to use other factors that we've discussed?
17  A.   Correct.
18           MR. KATAEV:  Objection.  Leading.
19           THE COURT:  Try not to lead.
20           MR. SCHOENSTEIN:  Trying to move it along, your Honor.
21  I'll try not to.
22  Q.   For Dr. Porges, would you have approved his appointments as
23  clinical director and medical director?
24  A.   Would I have approved it or --
25  Q.   Yes.

1    A.  Ask the question again?  I'm sorry.
2    Q.  Did you approve his appointments as clinical director and
3    later medical director?
4    A.  I consulted with my boss, who's a physician, as well as the
5    chair of medicine, who happens to be a rheumatologist, and told
6    him that he would like the role, and we thought he was a good
7    pick for it.  So I was part of the team that approved it.
8    Q.  What, if any, importance did the medical director position
9    have, from your point of view?
10   A.  It's -- it's actually --
11           MR. KATAEV:  Objection.
12   A.  -- extremely important role, and it -- I'm sorry.  Did
13   someone object?
14           MR. KATAEV:  Objection.  Opinion testimony.
15           THE COURT:  Overruled.
16   A.  It's an extremely important position in our network as we,
17   as we build a site, as we grow a site and add physicians to a
18   site -- in this case Marcus Avenue.  And I don't recall how
19   many physicians were in it at the time.  But clinical issues
20   come up within a practice, similar to what we're here
21   discussing.  So we need clinical leadership to help us sort of
22   resolve clinical issues as they come up, help us with medical
23   staff issues as they come up.
24       I, as a nonphysician, may have administrative credibility,
25   but I don't have clinical credibility.  So we partner with a

1    medical director to help us resolve conflicts or issues when
2    they arise.
3    Q.  From your point of view, sir, was Dr. Porges hired to do
4    the same job as Dr. Edelman?
5              MR. KATAEV:  Objection.  Opinion testimony.
6              THE COURT:  Overruled.
7    A.  No.
8    Q.  How is it different?
9    A.  Well, I mean Dr. Porges had a large practice.  He was doing
10   clinical research.  We weren't doing a lot of that at the time.
11   So he brought something to the table that other practitioners
12   that we were recruiting at the time did not bring to the table.
13   Q.  Were you directly involved in hiring Dr. Modi?
14   A.  Yes.
15   Q.  And you were involved in negotiating his salary?
16   A.  I was.
17   Q.  And he did not have a business plan, correct?
18   A.  He did not.
19   Q.  So what do you recall about figuring out Dr. Modi's salary?
20   A.  A couple, couple things.  One, he had been referred to us
21   from -- we had been having discussions at the time with
22   AdvantageCare Physicians about doing some collaboration
23   services, and his name had come up as a very strong and capable
24   rheumatologist.
25        We have a large medical group, very large medical group in

1  Huntington, Long Island, with a huge patient population.  We
2  did not have rheumatology services there, so we were looking to
3  fill a hole that we had in our network to be able to provide
4  that care.  So that would be an example where I was telling you
5  why another -- a salary may be different in that case is
6  because we had a hole to fill, patients that we needed to take
7  care of, so we needed to get someone in there.
8  Q.  Is Dr. Edelman the only doctor whose contract has not been
9  renewed since you've been in your position?
10           MR. KATAEV:  Objection.  Relevance.
11           THE COURT:  Overruled.
12  A.  Unfortunately not, no.  There are many -- not many.  There
13  are some.  It's an unfortunate thing when it happens.
14  Q.  And on your watch, has any physician ever been terminated
15  for cause?
16  A.  A couple.
17  Q.  Tell us what you remember about how the issues came up in
18  or about November 2020.
19  A.  So, my memory is, is pretty clear on that.  It was brought
20  to my attention through Mr. Swirnow, who I rely on heavily
21  for -- for things like this, to keep his pulse on the network,
22  because I have a lot of other things that I'm doing.  And it
23  had come to his attention that there were some clinical
24  concerns with Dr. Edelman's practice.
25       I said -- you know, I said OK.  I said I don't know what