# EXHIBIT 7

```
N7DCede1
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DR. SARI EDELMAN,

                Plaintiff,

         v.                           21 Civ. 502 (LJL)

NYU LANGONE HEALTH SYSTEM, *et al.*,

                Defendants.
                                      Trial
------------------------------x
                                      New York, N.Y.
                                      July 13, 2023
                                      8:55 a.m.

Before:

                    HON. LEWIS J. LIMAN,

                                      District Judge
                                      -and a Jury-


                         APPEARANCES

MILMAN LABUDA LAW GROUP PLLC
     Attorneys for Plaintiff
BY:  JOSEPH M. LABUDA
     EMANUEL S. KATAEV

TARTER KRINSKY & DROGIN LLP
     Attorneys for Defendants
BY:  RICHARD C. SCHOENSTEIN
     RICHARD L. STEER
     INGRID J. CARDONA

1  into compensation for a doctor, correct?
2  A.  Yes.
3  Q.  And every physician has different arrangements when it
4  comes to CPT codes and RVUs earned, right?
5  A.  Yes.
6  Q.  And in fact, some institutions have models where a
7  physician earns RVUs but it doesn't count towards their target,
8  correct?
9          MR. STEER:  Objection, your Honor.  Foundation, his
10 experience.
11         THE COURT:  Why don't you establish the foundation.
12 Sustained.
13 BY MR. KATAEV:
14 Q.  In your experience working with hospitals, you learned
15 about physician compensation, didn't you?
16 A.  In past experiences at other institutions, not here at NYU.
17 Q.  And you're aware that in at least other medical
18 institutions there are circumstances where a physician can
19 technically earn RVUs but it will not count towards their
20 target, correct?
21 A.  There are different models for different specialties in
22 different organizations.
23         MR. KATAEV:  I'd like to publish WW, your Honor.
24         THE COURT:  You may do so.  Go ahead.
25 BY MR. KATAEV:

1  Q.  And the reason she was called in was because many
2  appointments were rescheduled; right?
3  A.  I'm not sure if that was part of it.  I remember there
4  being concerns about her relationship with the staff in the
5  office.
6  Q.  And do you recall any discussions about the fact that there
7  were patients rescheduled?
8  A.  No.
9  Q.  You don't recall any concerns about the fact that numerous
10 patients were rescheduled and you inquired as to why?
11 A.  I don't recall.
12 Q.  During that meeting, you also counseled Dr. Edelman on how
13 to better get along with staff; correct?
14 A.  Yes.
15 Q.  And during that meeting, Mr. Rubin told Dr. Edelman to
16 smile more; isn't that right?
17 A.  I don't recall that being said.
18 Q.  During that meeting, Mr. Rubin told Dr. Edelman to fake it
19 till she makes it; right?
20 A.  I do not recall that being said.
21 Q.  But you do remember discussions about Mr. Rubin telling
22 Dr. Edelman to form relationships with staff; correct?
23 A.  I remember him telling her, coaching her on how to get
24 along better with staff, being nice to the staff.
25 Q.  And you haven't counseled any male physicians about how to

1    A.   RVUs are not part of a business plan.
2    Q.   Now, when a doctor's contract gets renewed after the
3    initial contract, you no longer use a business plan to
4    determine the compensation; correct?
5    A.   That's correct, we have actual experience.
6    Q.   And you work off the basic productivity; correct?
7    A.   Productivity is used as a target expectation based on the
8    contract terms.
9    Q.   And part of your duties involved reviewing
10   Dr. Edelman's RVUs to measure her performance against her
11   contractual requirements; right?
12   A.   Yes.
13   Q.   And you asked your business team to regularly produce RVU
14   reports to you to do so; right?
15   A.   I review performance of each physician annually or when
16   there's a need to.
17   Q.   Is it fair to say that someone like Mr. Antonik reviews
18   them more regularly, like on a monthly basis?
19   A.   I don't know what Mr. Antonik does.
20   Q.   You're not aware that Dr. Edelman -- I'm sorry.  That
21   Mr. Antonik receives monthly reports of RVUs earned by
22   physicians that he oversees?
23   A.   I know the physicians receive their individual reports
24   monthly.
25   Q.   In order for you to obtain an RVU report, you use the Epic

BY MR. SCHOENSTEIN:

Q. Now, when you hire doctors to come into NYU, do you ever consider their gender?

A. Never.

Q. Do you consider their race or national origin?

    MR. KATAEV: Objection. Relevance.

    THE COURT: Overruled.

A. No.

Q. Does NYU have any particular objectives in terms of diversity in their doctor workforce?

A. Yes. We like our doctors to be representative of the communities in which they serve.

Q. And the New York area is a pretty diverse community, right?

A. Yes.

Q. Does NYU generally have a lot of female patients?

A. Yes.

Q. And would it like to have a lot of female doctors?

A. Yes.

Q. I want to turn your attention now to the employment of Dr. Edelman in 2014. Were you involved in negotiating agreements with Dr. Edelman and Dr. Mehta?

A. Yes.

    MR. SCHOENSTEIN: Can we put back up on the screen exhibit HH. That's the business plan we looked at previously.

    THE COURT: You may do so.

1            THE COURT:  OK.  I'll permit it.
2    A.  Yes.
3    Q.  From NYU's point of view, was the lease an attractive asset
4    that you were looking to acquire?
5    A.  No.  It was actually a burden.
6    Q.  And explain to the jury why it would have been a burden.
7    A.  First, I believe there was a 15-year-and-six-month lease,
8    and it actually sat empty for the two years following Dr. Mehta
9    and Edelman moving into NYU office.  And then when we found a
10   use for it, we actually had to do renovations because the group
11   that we were moving in to the office, it did not comport with
12   how the office was originally set up.  Dr. Mehta and Edelman's
13   office was set up for their practice.  We were moving in a
14   child psychiatry office, which doesn't use exam rooms, doesn't
15   use infusion suites.  They only use private counsel offices,
16   and we also had to make it kid-friendly.
17   Q.  And at the time of the negotiations, was the lease
18   something NYU viewed as valuable that it wanted to acquire?
19           MR. KATAEV:  Objection.
20   A.  No.
21   Q.  At the time of the negotiations, was it in NYU's financial
22   interest to become obligated on $300,000 of loans?
23   A.  No.
24   Q.  Was it in NYU's financial interest to become obligated to
25   pay the staff, the supplies and the other overhead of Dr.

1  A.  Yes, I would have.
2  Q.  And do you recall what your reaction was to reviewing that
3  information at the time?
4  A.  I thought he was the person we'd been looking for.
5  Q.  And what was his role -- what was the expectation of the
6  role he would assume?
7  A.  He would have a clinical practice.  He would bring with him
8  his extensive clinical research activity, and he would serve as
9  the director of the rheumatology group in that area and help us
10 build up the program.
11 Q.  Was that at all different from the expectations you had for
12 Dr. Edelman?
13 A.  Yes.
14 Q.  How so?
15 A.  The expectations for Dr. Edelman was just to have a
16 clinical practice.
17 Q.  Now, did Dr. Goldberg provide financial information about
18 his private practice?
19 A.  He didn't have a private practice.  He worked at another
20 institution.
21 Q.  So how did you go about, if you did, reviewing his
22 financial data?
23 A.  I don't recall whether he provided his current compensation
24 or not, but that would be typical.
25 Q.  Where was he employed prior to NYU, if you remember?

1           THE COURT:  You may do so.
2  BY MR. SCHOENSTEIN:
3  Q.  That's a 2017 contract with Dr. Goldberg?
4  A.  Yes.
5  Q.  It's been pointed out -- I think you were here -- that this
6  was renewed prior to the expiration of the first contract.  Do
7  you recall that?
8  A.  Yes.  It also states it on the No. 1 section below.
9  Q.  And why did that happen?  Why was there a renewal at this
10 time?
11 A.  We felt Dr. Goldberg had been doing a great job.  He had
12 really built up the program.  We had added several additional
13 rheumatologists to the group, and he was personally exceeding
14 his RVU expectations.
15           MR. SCHOENSTEIN:  And let's scroll down to the second
16 page.
17 Q.  You see there that his RVU target was raised to 5,850?
18 A.  Yes.
19 Q.  And was that reflective of the performance he had in the
20 first couple of years?
21 A.  Yes.  That would have been what he had been producing in
22 that preceding year.
23 Q.  Did he continue to meet RVU targets over the years that
24 followed?
25 A.  Yes.  I believe he got even busier.

1   than one doctor?  What did this business plan reflect?
2   A.  It was for Dr. Andrew Porges and Dr. Lenore Brancato, who
3   was a part-time employee of Dr. Porges's in his practice.
4   Q.  Did you have an understanding of the breakup of the work
5   between Dr. Porges and Dr. Brancato prior to coming to NYU
6   based on what they told you?
7            MR. KATAEV:  Objection.  Best evidence.
8            THE COURT:  Overruled.
9   A.  Yes, we knew exactly what each doctor was doing.
10  Q.  And who was doing the bulk of the work, if you knew?
11  A.  Dr. Porges was doing the majority.  I would say upwards of
12  80 percent.
13  Q.  OK.  So Dr. Edelman and Dr. Mehta had about a 50-50
14  practice, right?
15  A.  Yes.
16  Q.  And your understanding of the Porges-Brancato practice was
17  more like 80-20?
18  A.  Approximately, yes.
19  Q.  OK.  Now, at the top of this, in revenue, it has the number
20  of $2 million.  Do you see that?
21  A.  I do.
22  Q.  What does that reflect, 2013, the 2 million-plus number?
23  A.  That's how much revenue Dr. Porges's practice was
24  generating.
25  Q.  Was that an attractive amount of revenue for NYU?

1   going to forget about top line, bottom line.
2   Q.  You considered both of these business plans, right?
3   A.  Yes.
4   Q.  Did you have a view as to which practice was more
5   attractive to NYU?
6   A.  Yes.
7   Q.  What was that view?
8   A.  Dr. Porges's practice was significantly larger and brought
9   more things to NYU with it.  He had clinical research revenue
10  and he had a more robust practice that generated significantly
11  more revenue.
12           MR. KATAEV:  Objection to relevance, your Honor.
13           THE COURT:  Overruled.
14           (Continued on next page)

1  Q.  Why was it higher?
2  A.  That was what he was doing in his practice before he joined
3  us.
4        MR. SCHOENSTEIN:  And then go to the next page,
5  please.
6  Q.  Do you see that research revenue target?
7  A.  I do.
8  Q.  Can you explain what that provision means.
9  A.  Yes.  This is the revenue that Dr. Porges generated from
10 his clinical research activities, and he was required to not
11 only meet that 6500-and-change RVU target, but also generate
12 $228,000 of research revenue.  So he had two expectations from
13 his clinical activity.
14 Q.  Did that differ from the expectations of Dr. Edelman?
15 A.  Yes, she just had an RVU target.
16 Q.  Are you familiar with Dr. Porges' performance with respect
17 to RVUs?
18 A.  I'm not going to be able to recollect the specific numbers,
19 but I recall him meeting or exceeding the RVU target.
20 Q.  And is that true throughout his tenure at NYU?
21 A.  Yes.
22 Q.  Are there any years that would be exceptions to that?
23 A.  Yes.  During the pandemic and COVID, it was difficult for
24 physicians, obviously.  Everybody was home and not coming into
25 the doctors' offices, so we kept paying all of our physicians

Case 1:21-cv-00502-LJL   Document 276-7   Filed 09/21/23   Page 13 of 20    732
N7DCede5                           Swirnow - Cross

```
1    the health system.
2    Q.  In the 2017 contract, do you recognize this as his renewal
3    contract in 2017?
4    A.  Yes.
5    Q.  And scroll down, please, to page H71.  And do you see a
6    $17,000 administration number?
7    A.  Yes.
8    Q.  Did that have any relation to his new role?
9    A.  Yes, that was directly tied to his new role with clearly
10   defined job responsibilities associated with that.
11   Q.  And his clinical number went down to 323?
12   A.  Yes.  Essentially, what we were doing was saying you're
13   going to be taking on this role with these expectations, which
14   is going to take you away from being able to provide clinical
15   time.
16   Q.  I see.
17       And tell me, what was his title?
18   A.  Clinical director of ambulatory rheumatology in Long
19   Island.
20   Q.  Did there come a time where his title changed?
21   A.  Yes.
22   Q.  When did that happen, if you know?
23   A.  I don't recall, but I know that he became the medical
24   director of the ambulatory care site in Lake Success.
25   Q.  How did that come about?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.  Dr. Porges expressed interest in taking on that role and
2   sent us a proposal of what he would accomplish in that role.
3   Q.  How did the medical director role differ, if at all, from
4   the clinical director role?
5   A.  The clinical director role was solely in rheumatology.  The
6   medical director role was for all specialties.
7   Q.  And it covers the whole Marcus Avenue practice?
8   A.  Yes, we had offices, I believe, at that time in three
9   different buildings right on that campus.  So it encompassed
10  the entirety of what we would call Ambulatory Care Lake Success
11  of those three buildings.
12          MR. SCHOENSTEIN:  Let's put up, please, exhibit 34,
13  which has been previously entered.
14  Q.  This is the 2020 renewal of Dr. Porges.  Do you recognize
15  it?
16  A.  If you could scroll down, it's the cover page.  Yes.
17          MR. SCHOENSTEIN:  And let's go to page 878.  Stop at
18  the top of page 878 for a minute.
19  Q.  Do you see that bullet point that non-disparagement clause
20  at the top of page 878?
21  A.  I do.
22  Q.  Are you familiar with that provision?
23  A.  It's in all of our agreements.
24  Q.  With all of your doctors?
25  A.  Yes.

1  NYU, did you know that at the time?
2  A.  Yes, $340,000.
3          MR. KATAEV:  Objection.  Best evidence.
4          THE COURT:  Overruled.
5  Q.  Did he have any demands that he made or communicated to you
6  regarding salary if he were to join NYU?
7  A.  Yes, he wanted an increase and I believe he asked for
8  $360,000.
9  Q.  I don't think I asked you this about Dr. Goldberg.  Did he
10 have a salary demand when he joined NYU?
11 A.  Yes.
12 Q.  What was that?
13 A.  $290,000.
14 Q.  Was Dr. Modi attractive to NYU?
15 A.  Yes.
16 Q.  Why, what reasons do you recall, sitting here today?
17 A.  I remember him being a busy rheumatologist, I remember him
18 having a good reputation in the community, and I remember him
19 having had demonstrated leadership positions and that we were
20 recruiting him to our Huntington Medical Group practice, which
21 was a large existing group, about 50 physicians in that
22 practice.  But we didn't have any rheumatology services at that
23 practice and we wanted to add that because our patients in that
24 area needed that service, so we identified Dr. Modi as someone
25 that could help -- come in and help see those patients for us.

1  Q.  In hiring Dr. Modi, did NYU have to assume any loans?
2  A.  No.
3  Q.  Did NYU have to take over an office lease?
4  A.  No.
5  Q.  Did NYU have any expenses that it had to take over for
6  staff or office supplies or overhead?
7  A.  No.
8           MR. SCHOENSTEIN:  Let's put up Plaintiff's 35, which
9  is already in evidence.
10 Q.  Do you recognize that to be the 2017 contract with
11 Dr. Modi?
12 A.  Yes.
13          MR. SCHOENSTEIN:  And let's go to page 888.
14 Q.  His compensation was set at $360,000?
15 A.  Yes.
16 Q.  Was that consistent with his demand at the time?
17 A.  Yes.
18          MR. SCHOENSTEIN:  Let's go to page 892, if we can get
19 it back on the screen.
20 Q.  Do you see his RVU target was 6108?
21 A.  Yes.
22 Q.  Do you know if Dr. Modi generally met or exceeded his RVU
23 targets?
24          MR. KATAEV:  Objection.  Best evidence.
25          THE COURT:  Overruled.  It's not being used to prove

1  the contents of the written communication.  Go ahead.
2  A.  Yes, he exceeded his target.
3  Q.  Is Dr. Modi still with the team?
4  A.  Yes.
5  Q.  Do you view that as having been a successful hire?
6  A.  Yes.
7  Q.  In hiring Dr. Goldberg, Dr. Porges, and Dr. Modi, did their
8  gender come into play in any of your discussions or
9  considerations?
10 A.  Not at all.
11 Q.  Did it matter to you at all that they were men?
12 A.  No.
13 Q.  There was some testimony, some questions about a meeting in
14 2017 that you were involved in with Dr. Edelman.  Do you recall
15 that?
16 A.  I do.
17 Q.  Who, if anyone, do you recall being at that meeting?
18 A.  Dr. Edelman, myself, Andrew Rubin, and Fran Drummond.
19 Q.  Who is Fran Drummond?
20 A.  She's the vice president of operations with the
21 organization.  She's my peer.
22 Q.  And what is her area, what does she do?
23 A.  She's responsible for the day-to-day operations of all of
24 the ambulatory care network.
25 Q.  Do you know why that meeting was held?

1  A.  Yes.
2  Q.  Why?
3  A.  We were made aware of some issues between Dr. Edelman and
4  the staff.
5  Q.  To the best of your recollection, what were the nature of
6  those issues?
7  A.  I think they were not getting along, there were complaints
8  about the way Dr. Edelman communicated or didn't communicate
9  with the staff.
10 Q.  And do you know, was that meeting scheduled and calendared
11 with everybody and then held?
12 A.  Yes.
13 Q.  Do you recall what happened at that meeting?
14 A.  I recall talking to doctor -- we, as a group, talking to
15 Dr. Edelman about the issues and coaching her a little bit
16 about how to better get along with the staff, giving her some
17 advice and pointers on how to develop better relationships with
18 the staff.
19 Q.  Did you speak at that meeting?
20 A.  I don't recall.
21 Q.  Did Mr. Rubin?
22 A.  Yes.
23 Q.  Did Ms. Drummond?
24 A.  Most likely.
25 Q.  Do you recall specifically anything Mr. Rubin said?

1  A.  Just the general themes, nothing specific.
2  Q.  And what was the result of the meeting, if any?
3  A.  I think things got better after that with Dr. Edelman and
4  the staff for some period of time at least.
5  Q.  Do you recall anything else about the nature of the issues
6  between her and the staff that came to your attention?
7  A.  Not specifically, no.
8  Q.  Now, a meeting like that with the doctor having issues with
9  staff, is she the only doctor you've ever had a meeting like
10 that with?
11 A.  No.
12 Q.  How often, if any, does a meeting like that happen?
13            MR. KATAEV:  Objection.  Relevance.
14            THE COURT:  Overruled.
15 A.  Between phonecalls about the topic and meetings, I'd say
16 monthly.
17 Q.  Do you recall other in-person meetings with doctors,
18 coaching them on how to get along with staff?
19 A.  Yes, many.
20 Q.  Do you have meetings like that with male doctors?
21 A.  Yes.
22 Q.  And female doctors?
23 A.  Yes.
24 Q.  Are there more with men or more with women or do you
25 recall?

1  herself, which I said was up to her.  It was her decision to go
2  to Huntington Medical Group in the first place, and if she no
3  longer wanted to go there and wanted to work four days or five
4  days in the Lake Success office, that was totally fine with us
5  and we would make it work.
6  Q.  What was the tone of the conversation?
7  A.  Mostly pleasant, as far as I recall.
8  Q.  Did either side raise their voice, to your recollection?
9  A.  Not at all.
10 Q.  And did Dr. Edelman say anything about an HR complaint that
11 you remember?
12 A.  At the end, she mentioned that there was an HR complaint,
13 but we never got into any details about what the complaint was
14 about.
15 Q.  And what, if anything, did you say to her about that?
16 A.  My understanding was the complaint was about the use of the
17 office space, so I was a little bit confused when she said she
18 was still going through with the complaint because I thought we
19 had just resolved the issue.  So I think I said something like,
20 okay, every employee is within their rights to file a complaint
21 and if that's what you want to do, go ahead.
22 Q.  Were you concerned about that complaint after talking with
23 her?
24 A.  No, because I thought, again, that we had resolved the
25 issue.