**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DR. SARI EDELMAN,

         Plaintiff,

    – against –

NYU LANGONE HEALTH SYSTEM, NYU LANGONE
HOSPITALS, NYU LANGONE MEDICAL CENTER, NYU
LANGONE NASSAU RHEUMATOLOGY, NYU SCHOOL
OF MEDICINE, NYU GROSSMAN SCHOOL OF
MEDICINE, NYU HOSPITALS CENTER, ANDREW T.
RUBIN, DAVID KAPLAN, JOSEPH ANTONIK, and
JOSHUA SWIRNOW,

         Defendants.

Case No. 1:21-cv-502 (LJL)

 

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION**
**TO PLAINTIFF'S MOTION FOR JUDGMENT AS A MATTER OF LAW**
**OR, ALTERNATIVELY, FOR A NEW TRIAL**

 

**TARTER KRINSKY & DROGIN LLP**
Richard L. Steer
Richard C. Schoenstein
Justin Chu
Ingrid J. Cardona
1350 Broadway, 11th Floor
New York, NY 10018
(212) 216-8000
rsteer@tarterkrinsky.com
rschoenstein@tarterkrinsky.com
jchu@tarterkrinsky.com
icardona@tarterkrinsky.com

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 1

    The Evidence Adduced At Trial ........................................................................................ 3

        As to Dr. Goldberg ...................................................................................................... 4

        As to Dr. Porges ......................................................................................................... 5

        As to Dr. Modi ............................................................................................................ 6

    The Directed Verdict ....................................................................................................... 9

    The Jury Verdict ............................................................................................................ 10

    This Motion ................................................................................................................... 10

ARGUMENT ........................................................................................................................ 10

    POINT I    Plaintiff Forfeited The Right To Move Under Rule 50(B) And
                  There Is No Manifest Injustice In The Jury Verdict ........................................ 11

    POINT II   There Is Sufficient Evidence To Support The Verdict That Dr. Modi
                  Was Not A Valid Comparator Under The Equal Pay Claims ............................ 12

        A.   Job Requiring The Same Skill, Effort, And Responsibility ..................... 13

             i.     As To Skill .................................................................................. 15

             ii.    As to Effort ................................................................................. 16

             iii.   As to Responsibility .................................................................... 16

        B.   Equal Work .............................................................................................. 17

        C.   Factor Other Than Sex ............................................................................. 18

             i.     As To Gender Neutral Factors Generally ................................... 19

             ii.    As To Gender Neutral Factors Regarding Modi ........................ 20

    POINT III  There Is No Basis For A New Trial ................................................................ 24

CONCLUSION ..................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Casmento v. Volmar Constr., Inc.*,
  No. 20-cv-0944, 2022 WL 15773966 (S.D.N.Y. Oct. 28, 2022) (Liman, J.) ..............11, 12, 15

*Cunningham v. Town of Ellicott*,
  No. 04-cv-301, 2007 WL 1756502 (W.D.N.Y. June 18, 2007), *aff'd*, 310 Fed.
  Appx. 448 (2d Cir. 2009) .................................................................................................24, 25

*Hodgson v. Corning Glass Works*,
  474 F.2d 226 (2d Cir. 1973) ....................................................................................................23

*Hughes v. Town of Bethlehem*,
  No. 10-cv-1489, 2015 WL 2130905 (N.D.N.Y May 7, 2015) ................................................24

*Husser v. New York City Dept. of Ed.*,
  137 F. Supp. 3d 253 (E.D.N.Y. 2015) ....................................................................................23

*Lippa v. General Motors Corp.*,
  107 F.3d 3, 1997 WL 62955 (2d Cir. 1997) ...........................................................................18

*Malmsteen v. Berdon, LLP*,
  369 Fed. Appx. 248 (2d Cir. 2010) .........................................................................................12

*Manley v. AmBase*,
  337 F.3d 237 (2d Cir. 2003) ....................................................................................................24

*Mazzella v. RCA Global Comm., Inc.*,
  642 F. Supp. 1531 (S.D.N.Y. 1986) *aff'd*, 815 F.2d 653 (2d Cir. 1987) ................................19

*Mitchel v. Ceros, Inc.*,
  21 Civ. 1570 (KPF), 2022 WL 748247 (S.D.N.Y. March 10, 2022).......................................24

*Ormerod v. County of Niagara*,
  No. 06-cv-7248, 2010 WL 3304202 (W.D.N.Y. Aug. 19, 2010) ...........................................11

*Osborn v. Home Depot U.S.A., Inc.*,
  518 F. Supp. 2d 377 (D. Conn. 2007) .....................................................................................24

*Pouncy v. Danka Off. Imaging Co.*,
  393 Fed. Appx. 770 (2d Cir. 2010) .........................................................................................25

*Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP*,
  No. 08-cv-931 (PKC)(JO), 2015 WL 3605143 (June 5, 2015) ...............................................11

*Reeves v. Sanderson Plumbing Prods, Inc.*,
    530 U.S. 133 (2002)................................................................14

*Setelius v. Nat'l Grid Elec. Servs. LLC*,
    No. 11 Civ. 5528, 2014 WL 4773975 (E.D.N.Y. Sept. 24, 2014)..........................24

*Woods-Early v. Corning Inc.*,
    18-CV-6162-FPG, 2023 WL 4598358 (W.D.N.Y. July 18, 2023)........................24

**Statutes**

CHRL....................................................................................2

Equal Pay Act.........................................................................18

federal Equal Pay Act.........................................................1, 2, 3

New York City Human Rights Law......................................................2

New York Labor Law Section 194.....................................................1, 2

NYLL 194...............................................................................3

SHRL....................................................................................2

State Human Rights Law................................................................2

**Other Authorities**

Rule 50............................................................................12, 15

Rule 50(a)......................................................................11, 12, 25

Rule 50(b)...................................................................1, 11, 13, 25

Rule 59(a)........................................................................24, 25

002528\5\170369063.v1

## PRELIMINARY STATEMENT

A litigant's opinion that "the jury reached the wrong result" is not a basis for overturning a verdict or granting a new trial. Yet, that is precisely the ground, and the only ground, for Plaintiff's motion. Plaintiff does not raise any challenges to the legal instructions, or the verdict form questions provided to the jury. Nor does Plaintiff otherwise contend that any errors of law were committed by the Court. Instead, Plaintiff seeks to substitute her own opinion in place of the jury's factual findings with respect to decisions now challenged by Plaintiff, which it made based on the legal instructions given and the evidence presented after an eight-day trial. Plaintiff's motion should be denied.[1]

Separately and independently, Plaintiff's motion for a judgment notwithstanding the verdict should be denied because it is procedurally defective, made without the requisite motion for a directed verdict before the submission of the case to the jury. As this Court noted, a post-trial Rule 50(b) motion for judgment as a matter of law is proper only if a motion for a directed verdict is made before submission of the case to the jury. Here, Plaintiff failed to submit the predicate motion for a directed verdict. Plaintiff's current motion, made as an afterthought, should therefore be denied on this separate and independent ground.

## BACKGROUND

Plaintiff brought a slew of claims, including violation of the federal Equal Pay Act and New York Labor Law Section 194 ("NYLL 194"), discrimination, and retaliation against NYU and a host of individuals. She asserted that she was paid less than three male alleged comparators

---

[1] Unlike Plaintiff's motion, Defendants' post-trial application is a renewal of arguments they made for a directed verdict and challenges jury findings that are wholly unsupported by the evidentiary record. Plaintiff's motion, however, is not a renewal of any trial motion and is inconsistent with her own trial positions that the equal pay issues were solely for the jury to decide based on the "totality of the circumstances" presented at trial. Steer Decl., Ex. 5 (July 18 Tr. 1312:4-5, 1318:14-17, 1320:14-16).

1

at NYU because of her sex. She also asserted that the individual defendants discriminated against her and retaliated against her when she complained of discrimination.

This action was tried before a jury from July 10, 2023, through July 18, 2023. Numerous witnesses testified. They included Plaintiff, all four individual defendants, and six non-party witnesses. Seventy-three exhibits were admitted by the Parties. Plaintiff showed numerous demonstrative aids to the jury, including even a video of an Oscar award show. After hearing from this exhaustive list of witnesses and testimony concerning the many exhibits for eight days, the jury was charged and returned a verdict on the eighth day. The jury found that Defendants did not violate the Federal Equal Pay Act, or the equal pay provision of New York Labor Law Section 194. The jury also found that Defendants did not violate Title VII, the New York State Human Rights Law ("SHRL"), or the New York City Human Rights Law ("CHRL") with respect to Plaintiff's discrimination claim; and that Defendants Andrew Rubin and Joshua Swirnow did not retaliate against Plaintiff in violation of Title VII, SHRL or the CHRL.[2]

As to the alleged equal pay violations, the jury specifically rejected Plaintiff's claims, finding that, as a threshold matter, Plaintiff did not do equal work with her three alleged male comparators. Accordingly, none of the male physicians relied upon by Plaintiff were proper comparators. Steer Decl., Ex. 1 (Verdict Form (Dkt. No. 243), Question No. 1). Similarly, the jury found that Plaintiff was not paid less for doing equal work. *Id.* (Question No. 3). The jury also found that the pay differences between Plaintiff and each of the three male employees were based on factors other than sex. *Id.* (Question Nos. 4, 6). Each of these determinations, alone, is fatal to

---

[2] The jury, however, returned a verdict that the NYU Corporate Defendants committed an adverse act against Plaintiff by not renewing her expiring employment contract leading to her termination in violation of Title VII, the SHRL, and the CHRL, and that Joseph Antonik, the facilities manager of the building where Plaintiff worked, aided, or abetted an adverse act against Plaintiff in violation of the SHRL and the CHRL. As that verdict is without evidentiary support – indeed, contrary to the evidence – the NYU Corporate Defendants and Antonik moved to vacate that portion of the verdict. (Dkt. Nos. 267, 269, 270).

Plaintiff's equal pay claims. The jury was asked to determine these questions as to each of the three male employees separately and found against Plaintiff as to all three and rejected her equal pay claims in total. *Id.* Having suffered a complete loss on that front, Plaintiff now seeks to reverse course and contends that only one of the three male employees is a proper comparator, contrary to what she told the Court and the jury at trial. Steer Decl., Ex. 2 (Plaintiff's summation, July 19 Tr.[3] 1407-1412).

**The Evidence Adduced At Trial**

Plaintiff contended at trial that she was paid less than three male physicians, Dr. Avram Goldberg, Dr. Andrew Porges, and Dr. Anang Modi because of her sex in violation of the federal Equal Pay Act and NYLL 194. Steer Decl., Ex. 3 (July 10 Tr. 31:2-3, 32:3-7, 33:23-24). She contended that she should be paid no less than these male physicians and sought to recover such pay difference. At trial, Plaintiff called all three male physicians as witnesses. Steer Decl., Ex. 4 (July 17 Tr. 1012 (Godberg), 1126 (Porges)); Ex. 5 (July 18 Tr. 1255 (Modi)). Plaintiff also called Andrew Rubin, who made the ultimate decisions on hiring, termination, and compensation (Steer Decl., Ex. 6 (July 14 Tr. 870:2-3, 884:5-7)), as well as Joshua Swirnow, who negotiated Plaintiff's compensation. Steer Decl., Ex. 7 (July 13 Tr. 689:19-22). Documents concerning Plaintiff and these male physicians were also introduced at the trial and presented to the jury. *E.g.*, Steer Decl., Exs. 3 (July 11 Tr. 284-285); 8 (Pl's Trial Ex. ("P") 8, P-15, P-24, P-31); 15 (P-35, P-41, P-46, P-48).

Based on the extensive evidence presented over eight days of trial, the jury properly determined that none of these male physicians was a proper comparator. As testified to by these witnesses, their work was unequal to Plaintiff's as measured by skill, effort, and responsibility,

---

[3] Unless otherwise indicated, all cites to "Tr." are references to the Court Trial Transcript.

and their different compensation was based on factors other than sex.

**As to Dr. Goldberg** – In deciding the question of equal pay, and who were the proper comparators, the jury was presented with documents and testimony concerning Dr. Goldberg.

NYU hired Dr. Goldberg to start and build a rheumatology practice as NYU did not even have such a practice on Long Island when he was hired. Steer Decl., Ex. 6 (July 14 Tr. 934:19-21). Prior to coming to NYU, Dr. Goldberg was a full-time Professor of Medicine at Hofstra Northshore-LIJ School of Medicine. Steer Decl., Exs. 15 (P-41); 4 (July 17 Tr. 1014:6-8). He was also a practicing physician at the North Shore University-LIJ Medical Center, where he was the Director of Scleroderma and Raynaud's Treatment Center and a member of the Performance Improvement Committee. Steer Decl., Ex. 15 (P-41). Dr. Goldberg also had twelve years more experience as a doctor than Plaintiff. Compare Steer Decl., Exs. 15 (P-41) and 8 (P-15). Dr. Goldberg's background reflects the prestige and value that he brought to NYU's start-up rheumatology practice which NYU wished to build and expand with his assistance Goldberg. Steer Decl., Exs. 6 (July 14 Tr. 934:19-25, 935:1); 4 (July 17 Tr. 1000:14-1001:8).

The evidence presented to the jury showed that Plaintiff did not bring such prestige or value, nor was she hired for the same purpose as Dr. Goldberg, to wit: start and build the rheumatology practice. Instead, she was hired solely for the purpose of patient care. While that role is unquestionably important, it is limited and dissimilar to Dr. Goldberg's multiple roles and duties. Thus, there is evidence that Dr. Goldberg had more responsibilities than Plaintiff. The evidence showed that Dr. Goldberg succeeded in building the Long Island rheumatology practice[4], as well as in his own patient care practice, where his production far exceeded Plaintiff's. Steer Decl., Ex. 7 (July 13 Tr. 716:11-25); Ex. 9 (P-9). He essentially doubled his production as measured

---

[4] Dr. Goldberg also recruited Plaintiff and Dr. Mehta. *See e.g.,* Steer Decl., Exs. 3 (July 11 Tr. 68:12-14); 4 (July 17 Tr. 1039:4-6).

by RVUs once he joined NYU. Steer Decl., Ex. 7 (July 13 Tr. 716:17-22). Evidence also was presented to the jury that, unlike Plaintiff, Dr. Goldberg did not have a business loan that NYU had to pay off, nor an office lease that NYU had to assume. Steer Decl., Ex. 4 (July 17 Tr. 1065:2-8).

There was thus ample evidence presented to the jury to evaluate and conclude that Dr. Goldberg was not a proper comparator.

**<u>As to Dr. Porges</u> -** The jury was also presented evidence showing that, like Dr. Goldberg, Dr. Porges performed leadership and administrative duties, which are important functions Plaintiff did not perform. Steer Decl., Exs. 7 (July 13 Tr. 732:17-24, 733:3-11), 10 (P-32). In addition, Dr. Porges performed a significant amount of research work for well-known pharmaceutical companies that generated additional revenues, as well as additional prestige and name recognition for NYU. Steer Decl., Exs. 4 (July 17 Tr. 1131:8-13, 1132:9-12, 21-25); 7 (July 13 Tr. 726:8-11); 6 (July 14 Tr. 918:22-25, 919:1-21); 8 (P-31). Plaintiff did not perform any research work, let alone research work that generated revenue. Steer Decl., Ex. 7 (July 13 Tr. 713:11-16). Indeed, Dr. Porges' contract presented at the trial showed that he had a separate revenue target for his research work, whereas there was no such revenue source or target for Plaintiff. Steer Decl., Ex. 7 (July 13 Tr. 730:6-13); Ex. 8 (P-31). Their job functions were therefore different.

Also like Dr. Goldberg, Dr. Porges had considerably more experience than Plaintiff. Dr. Porges's experience also far exceeded Plaintiffs. In fact, Plaintiff was still in grade school when Dr. Porges began his practice. Steer Decl., Exs. 11 (D-EE); 12 (D-HH). Further, while both Dr. Porges and Plaintiff were recruited from private practice, with patient bases that NYU expected to absorb upon hire, the evidence presented to the jury showed that their respective practices were far different. Dr. Porges' private practice generated $2 million in revenue (Steer Decl., Ex. 7 (July 13 Tr. 719:22-24); Ex. 11 (Defendants' Trial Ex. ("D") -EE)) compared to $726,151 that Plaintiff's

and Dr. Mehta's private practice generated. Steer Decl., Ex. 12 (D-HH). Dr. Porges' private practice was also more profitable than Plaintiff's private practice, which had to be supported by a business loan and was operating at a loss. *Id*. While Dr. Porges' RVU target was 6,524, he typically achieved more than 6,000 a year (which far exceeded Plaintiff's productivity). *E.g.*, Steer Decl., Exs. 5 (July 18 Tr. 1199:9-11) and 8 (P-31 (Porges' 6524 RVUs)) compared to Ex. 8 (P-8 (Plaintiff's 4966 RVUs)).

The jury was also presented with evidence including the difference in the economic value of Dr. Porges' and Plaintiff's respective private practices that it would assume when they joined NYU. Unlike Plaintiff, Dr. Porges did not have a business loan that NYU needed to pay off, and Dr. Porges office lease assumed by NYU expired several months after he joined NYU (Steer Decl., Ex. 5 (July 18 Tr. 1219:14-20)), whereas Plaintiff's office lease that NYU had to assume was to last for over a decade when NYU did not want and did not need the space. Steer Decl., Exs. 7 (July 13 Tr. 702:3-20); 6 (July 14 Tr. 930:25-931:15).

As a result of these differences, there is sufficient evidence on which the jury had a proper basis to believe and find Dr. Porges brought different, and more, economic value and contribution to NYU than Plaintiff.

**As to Dr. Modi -** While Plaintiff now alleges that the jury erred in rejecting Dr. Modi as a comparator, the evidence showed that he, similar to Dr. Goldberg, was hired to build out and expand NYU's rheumatology practice on Long Island, specifically its Huntington location. Steer Decl., Ex. 6 (July 14 Tr. 937:20-938:7). As Rubin testified at trial, NYU had a "large medical group" and a "huge patient population" in the Huntington location, but no rheumatology services there. *Id*. NYU therefore had to fill that "role." Steer Ex. 4 (July 17 Tr. 986:14-21). Like Dr. Goldberg, and unlike Plaintiff, the jury was presented with evidence that Dr. Modi had significant

leadership roles and responsibilities prior to joining NYU that made him a valuable asset and well-suited to build up the Huntington site. Dr. Modi was the Chief Rheumatologist for the Queens Long Island Medical Group, a multi-specialty group of 500 physicians. Steer Ex. 5 (July 18 Tr. 1271:23-1272:4). Dr. Modi then became a Medical Director at Advantage Care Physician when it took over the Queens Long Island Medical Group. *Id.* at 1273:1-3.

More specifically, as Dr. Modi testified, he had the following leadership and administrative responsibilities while at the Queens Long Island Medical Group:

> Q. And as the chief rheumatology, what were your duties?
> A. Be the liaison between the rheumatologists in the group and administration leadership to kind of discipline them or improve the quality of care standards, as well as a connection between the physicians and leadership if there was a need for any modern equipment, approve their CMEs, their vacation time, any connection between leadership and the rheumatology division.
> Q. And how many rheumatologists did you oversee, if any?
> A. Six.

*Id*. at 1272:5-13.

He also had subsequently larger leadership roles and duties while at Advantage Care Physicians, immediately prior to joining NYU:

> Q. And how many physicians did ACP, I'm going to call it, Advantage Care Physicians, ACP, how big was it at the time that you became the clinical director?
> A. The entire practice was approximately same as Queens Long Island Medical Group, 500 physicians.
> Q. How many physicians, if any, did you oversee?
> A. The practice had over 20 offices. I was the medical director of the Hempstead medical office, which comprised about 15 physicians, two PAs, two nurse practitioners, seven or eight RNs, and then the rest of it was front desk, receptionists, medical assistants.

*Id*. at 1273:4-14. The record included testimony by Mr. Swirnow that these and other qualities are what made Dr. Modi "attractive to NYU." Steer Decl., Ex. 7 (July 13 Tr. 737:14-15). As Swirnow testified:

> A. I remember him being a busy rheumatologist, I remember him having a good reputation in the community, and I remember him having had demonstrated leadership positions and that we

were recruiting him to our Huntington Medical Group practice, which was a large existing group, about 50 physicians in that practice. But we didn't have any rheumatology services at that practice and we wanted to add that because our patients in that area needed that service, so we identified Dr. Modi as someone that could help -- come in and help see those patients for us.

Q. In hiring Dr. Modi, did NYU have to assume any loans?

A. No.

Q. Did NYU have to take over an office lease?

A. No.

Q. Did NYU have any expenses that it had to take over for staff or office supplies or overhead?

A. No.

*Id.* at 737:14-738:7. These are leadership responsibilities and experiences that Plaintiff did not possess.

Dr. Modi further distinguished himself from Plaintiff in terms of productivity and effort. Prior to joining NYU, Dr. Modi already was more productive than Plaintiff, having produced 6,100 RVU in his last year at Advantage Care Physicians. Steer Decl., Ex. 5 (July 18 Tr. 1276:22-1277:25). Steer Decl., Ex. 15 (P-46). He consistently generated higher RVUs than Plaintiff during their employment. Moreover, the unrebutted evidence showed that Dr. Modi's production reflected effort that far exceeded that of Plaintiff. While at NYU, Dr. Modi saw patients five days a week (Steer Decl., Ex. 5 (July 18 Tr. 1281:2-5)), while Plaintiff saw patients less than four days a week (Steer Decl., Exs. 5 (July 18 Tr. 1280:11-15); 3 (July 11 Tr. 112:13)). Dr. Modi's RVU target of just over 6100 annually at NYU. Steer Decl., Ex. 5 (July 18 Tr. 1278:1-3, 1263:15-1264:1). That put Dr. Modi in the top ten percent of all rheumatologists in the country. *Id.* at 1277:3-1278:6. Plaintiff's effort was not even close. Plaintiff's RVU target was 5,200 in 2017. Steer Decl., Ex. 9 (P-9).

Dr. Modi also testified that he would not have joined NYU without a raise. Steer Decl., Ex. 5 (July 18 Tr. 1275:4-1276:12). As noted above, the evidence presented at trial also showed that, unlike Plaintiff, Dr. Modi did not have a business loan that NYU needed to pay off, nor an

8

office lease that NYU was forced to assume. Steer Decl., Ex. 7 (July 13 Tr. 737:14-25, 738:1-7).

Dr. Modi also is more experienced than Plaintiff, having practiced two years longer than she.

Steer Decl., Exs. 5 (July 18 Tr. 1256:19-1257:21; 15 (P-46)).

In sum, Dr. Modi was hired by NYU for the purposes of filling a specific need at its

Huntington location and to accomplish its strategic goal of growing the rheumatology practice

with a highly productive practitioner. He was more qualified and experienced than Plaintiff,

both clinically and as a physician leader, and he greatly outworked Plaintiff both before and

after arriving at NYU. The jury heard this unrebutted and undisputed evidence from which it

properly concluded that, like Dr. Goldberg and Dr. Porges, Dr. Modi brought different and

greater economic worth, more prestige, undertook more job functions, and made greater

contributions of value to NYU than Plaintiff. The jury therefore received more than sufficient

evidence upon which to conclude that Dr. Modi was not a proper comparator and that his higher

salary was unrelated to his sex.

**<u>The Directed Verdict</u>**

At the close of evidence, Defendants moved for a directed verdict on all counts. Steer

Decl., Ex. 5 (July 18 Tr. 1298-1309). In opposition, Plaintiff argued that all issues should be

reserved for the jury, contending in particular as to the "EPA [claims], this is a very fact-

intensive issue." *Id*. at 1310. Plaintiff also told the Court that the determination of other claims

and issues are similarly fact intensive and that their determination must be made by the jury

based on the "totality of the circumstances." *Id*. at 1312:4-5, 1318:14-17, 1320:14-16.

After hearing arguments from both sides, the Court granted judgment as a matter of law

to Defendants on the issue of willfulness under the equal pay claims. *Id*. at 1342:7-9. The Court

also granted defendants judgment on the claim for punitive damages. *Id*. at 1343:16-17. The Court

further granted judgment for defendants Kaplan, Rubin, and Swirnow on the discrimination claims (*Id*. at 1343:1-3), and judgment for Kaplan on the retaliation claims. *Id*. at 1342:21-22.

In contrast to Defendants, Plaintiff did not move for a direct verdict, a prerequisite for a motion for a judgment notwithstanding the verdict, which Plaintiff now seeks to make as an afterthought.

**The Jury Verdict**

After an eight-day trial, the jury returned a verdict and provided its answers to a special verdict form containing twenty-one questions concerning the different claims asserted by Plaintiff. Steer Decl., Ex. 1 (Verdict Form (Dkt. No. 243)). As to the equal pay claims, the jury found that, contrary to Plaintiff's contention, none of the three male physicians is a proper comparator. *Id*. (Question No. 1). The jury similarly found that Plaintiff failed to prove that she was paid less for doing equal work. *Id*. (Question No. 3). It also found that the pay differences between Plaintiff and each of the three male physicians were based on factors other than sex. *Id*. (Question Nos. 4, 6). Each of these determinations on the separate questions, alone, doomed Plaintiff's equal pay claim.

**This Motion**

Unhappy with the result, Plaintiff now moves to vacate the jury verdict and seeks to have this Court supplant the findings of the jury verdict. Plaintiff's motion is both procedurally improper and without merit.

**ARGUMENT**

Having failed to make the predicate motion for a directed verdict, Plaintiff forfeited her right to move for a judgment notwithstanding the verdict or the related motion for a new trial.

Even if the Court were to entertain the motion, it should be denied. As demonstrated above, there is ample evidence to support the jury's verdict. Having contended that all claims and issues

10

should be reserved for the jury because "fact-intensive" determinations were required (*Id*. at 1310:15-18), Plaintiff cannot now be heard that the Court should instead supplant the factual findings of the jury simply because she does not agree. For the same reasons, there is no justification for a new trial.

## POINT I
## PLAINTIFF FORFEITED THE RIGHT TO MOVE UNDER RULE 50(B) AND THERE IS NO MANIFEST INJUSTICE IN THE JURY VERDICT

As this Court held, a "post-trial motion Rule 50(b) for judgment as a matter of law is properly made only if a Rule 50(a) motion for judgment as a matter of law has been made before submission of the case to the jury." *Casmento v. Volmar Constr., Inc.*, No. 20-cv-0944, 2022 WL 15773966, at *4 (S.D.N.Y. Oct. 28, 2022) (Liman, J.); *Ormerod v. County of Niagara*, No. 06-cv-7248, 2010 WL 3304202, at *1 (W.D.N.Y. Aug. 19, 2010) (applying the same standard to a plaintiff). Moreover, such a post-trial motion "is limited to those grounds specifically raised in the prior motion [for a directed verdict]." *Casmento*, 2022 WL 15773966, at *4; *Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP*, No. 08-cv-931 (PKC)(JO), 2015 WL 3605143, at *4 (June 5, 2015) (arguments not made on a pre-verdict Rule 50(a) motion are forfeited and cannot be made on a post-verdict Rule 50(b) motion). Here, Plaintiff did not make the predicate motion for a directed verdict under Rule 50(a) and is thus foreclosed from making a post-trial motion under Rule 50(b). While the Court may nonetheless grant a post-trial motion to a party that failed to make the requite predicate motion before submission of the case to the jury, the motion may not be granted "except to prevent manifest injustice." *Id.* As this Court further explained, "manifest injustice exists only when a jury's verdict is wholly without legal support." *Id.*

Plaintiff cites this standard in her brief, but then goes silent when required to apply it to the facts at issue. Plaintiff does not argue that letting the verdict stand would result in manifest

injustice, let alone that the verdict is wholly without legal support. Instead, she completely ignores her failure to make the predicate motion for a directed verdict, completely ignores the fact that she must meet the heightened "manifest injustice" standard, and simply declares her motion should be granted based upon her reassertion of her same failed arguments. For these reasons, Plaintiff's motion should be denied. *Malmsteen v. Berdon, LLP*, 369 Fed. Appx. 248, 250 (2d Cir. 2010) ("the forfeited issue may be reached if to ignore it would result in manifest injustice or if it is a purely legal error").

As this Court explained in *Casmento*, "a party's failure to move under Rule 50(a) has consequences." 2022 WL 15773966, at *4. The Court should give effect to this dictate, and should not countenance, let alone condone, Plaintiff's willful disregard of the legal requirements and standards. Otherwise, every losing litigant can come to court without regard to the requirements and standards of Rule 50, render them toothless, and relitigate every issue.

But even, *arguendo*, if the Court were to consider Plaintiff's motion absent the requisite motion for a directed verdict at trial and deem that the "manifest injustice" standard does not apply, the motion still should be denied because there is ample evidence to support the jury's verdict, as explained in further detail below.

**POINT II**
**THERE IS SUFFICIENT EVIDENCE TO SUPPORT THE VERDICT THAT DR. MODI
WAS NOT A VALID COMPARATOR UNDER THE EQUAL PAY CLAIMS**

"A Rule 50 motion may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Casmento*, 2022 WL 15773966, at *3. Moreover, as Plaintiff acknowledges (Pl. Memo., at p. 7 (Dkt. No. 272)), the evidence must be

considered in the light most favorable to the nonmovant, here Defendants, and the Court must give the non-movant the benefit of all reasonable inferences that the jury might have drawn in their favor from the evidence. *See id.* Plaintiff does not meet the stringent requirements of Rule 50(b), especially when all inferences are drawn in Defendants' favor.

Rather, the jury properly concluded that Plaintiff failed to prove the requisite elements of the equal pay claims. Indeed, even though it was Plaintiff's burden to prove that (a) she was employed in a job requiring the substantially the same skill, effort, and responsibility and (b) she was paid less for doing substantially equal work, the evidence presented at trial was sufficient for the jury to affirmatively conclude the opposite. Defendants, on the other hand, met their burden of proof that the difference in pay was due to factors other than sex.

### A.  Job Requiring The Same Skill, Effort, And Responsibility

At trial, Plaintiff contended that three male physicians, Drs. Goldberg, Porges, and Modi were proper comparators for her equal pay claims. The jury heard from these physicians and found that, as to each of them, Plaintiff did not prove they were employed in a job requiring "substantially equal skill, effort, and responsibility" as hers. Steer Decl., Ex. 1 (Verdict Form (Dkt. No. 243) Question No. 1). This finding, alone, doomed Plaintiff's equal pay claims. Completely defeated at trial, Plaintiff now changes tact and ignores her contention at trial as to who were the comparators. Instead, she seeks to effectively have this Court, instead of the jury, retry the case using solely Dr. Modi as the comparator. There is no such do-over under the rules. Nor is there any reason to supplant the jury's findings.

Plaintiff's attempt to isolate Dr. Modi fails in any event because there is evidence to support the verdict even as to him. As Plaintiff acknowledged in opposing Defendants' motion for a directed verdict, the determination of the claims and issues are "very fact-intensive" that must be

based on the "totality of the circumstances." Steer Dec., Ex. 5 (July 18 Tr. 1312:4-5, 1318:14-17, 1320:14-16); *see Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 149 (2002) ("in entertaining a motion for judgment as a matter of law, the court should review all of the evidence on the record" and "must draw all reasonable inferences in favor of the nonmovant").

After hearing extensive testimonial and documentary evidence in an eight-day trial, the jury rendered its verdict against Plaintiff. There is no justification to change the result in Plaintiff's favor. Rather, there is ample evidence to support the verdict as to each male physician on Questions Nos. 1, 3, 4, and 6 of the Verdict Form, including Dr. Modi. Steer Decl., Ex. 1 (Dkt. No. 243).

As to the legal standards on equal work (*Id.* (Question No. 1)), the Court's instructions to the jury included the following:

> [W]ork is not considered substantially equal if material differences in skill, effort, or responsibility exists." Steer Decl., Ex. 2 (July 19 Tr. 1441:19-20).
>
> First, in deciding whether jobs require substantially equal skill, you should consider such factors as the level of education, experience, training, and ability necessary to meet the performance requirements of their respective jobs. *Id.* at 1442:4-8.
>
> Second, in deciding whether the jobs require substantially equal effort, you should consider the mental or physical exertions in connection with the performance of the job. *Id.* at 1442:19-22.
>
> In deciding whether the jobs involve substantially equal responsibility, you should consider the degree of accountability expected by the employer for the person filling the jobs, as well as the amount of preparation required to perform the job duties. *Id.* at 1443:14-18.

Critically, the Court further instructed the jury, "[y]ou should note that 'skill,' 'effort,' and 'responsibility' constitute separate tests, each of which must be met in order for the equal pay requirement to apply." *Id.* at 1443:23-25. The jury determined that Plaintiff failed to carry this burden at trial.

Now, post-trial, Plaintiff has failed to carry her burden under Rule 50 showing that "the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Casmento*, 2022 WL 15773966, at *3. Rather than meeting this burden, Plaintiff's motion is mere repetition of what she believes to be her strongest evidence that she already pitched to the jury without success. Pl. Memo., at pp. 8-11 (Dkt. No. 272). But the jury is not bound to credit that evidence or consider only the evidence Plaintiff selects. This Court should decline to engage in the fact finding that Plaintiff urges upon it. *Id.* ("the court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury").

In contrast to Plaintiff's lack of evidence to carry her burden, Defendants presented ample evidence for the jury to find against Plaintiff on the following, even though Defendants did not bear any burden of proof on these issues.

### i.    As To Skill

The trial evidence showed that Dr. Modi was more experienced than Plaintiff by at least two years. Steer Decl., Exs. 5 (July 18 Tr. 1256:19-1257:21); 15 (P-46).

The evidence further showed Dr. Modi's significantly superior leadership and management experience and responsibilities before joining NYU, having served as the Chief Rheumatologist and Medical Director at his prior employer, where he supervised fifteen physicians, twelve non-physician medical professionals, and several support staff. Steer Decl., Exs. 5 (July 18 Tr. 1271:9-1273:14); 15 (P-46)). In contrast, Plaintiff came from a small two-physician practice that she ran at a deficit. Steer Decl., Exs. 12 (D-HH); 13 (July 12 Tr. 290:4-16).

In sum, Dr. Modi had greater skills, especially to meet NYU's business goal of expanding its rheumatology practice on Long Island, factors to which its business leaders testified were

relevant to their decision on hiring and compensation. Steer Decl., Exs. 5 (July 18 Tr. 1256:19-1257:21, 1271:9-1273:14); 6 (July 14 Tr. 937:20-938:7); 15 (P-46); 12 (D-HH); 13 (July 12 Tr. 290:4-16).

### ii.   As to Effort

Dr. Modi testified that he saw patients 5 days a week at NYU (Steer Decl., Ex. 5 (July 18 Tr. 1281:2-5)), compared to Plaintiff who generally saw patients less than four days a week (*Id.* 1280:11-15; Ex. 3 (July 11 Tr. 112:13)). Dr. Modi had a target of just over 6,100 RVUs annually at NYU. Steer Decl., Ex. 5 (July 18 Tr. 1278:1-3, 1263:15-1264:1). That put Dr. Modi in the top tenth percentile of all rheumatologists in the country. *Id.* at 1277:3-1278:6. Plaintiff's effort was not even close, never approaching the targets Dr. Modi regularly set and exceeded.[5] Plaintiff's RVU target was 5,200 in 2017. Steer Decl., Ex. 9 (P-9). Their levels of productivity were consistently disparate throughout their respective tenures at NYU, as well as prior to their recruitment. Simply put, Dr. Modi outworked and out produced Plaintiff, exerted more "effort" before and after he was hired, warranting greater compensation.

### iii.   As to Responsibility

NYU was building and expanding its rheumatology practice on Long Island when it hired Dr. Modi, just as it did when it hired Dr. Goldberg, albeit further along in that process.

---

[5] The term RVU (or wRVU) appears 460 times in the Trial Transcript, and Plaintiff's counsel questioned Plaintiff, all four individual defendants, and three non-party witnesses about RVUs. (*E.g.*, Steer Decl., Exs. 3 (July 11 Tr. 196:11-14) (Plaintiff); 13 (July 12 Tr. 426:17-18) (Mehta); 13 (July 12 Tr. 495:18-20) (Antonik); 7 (July 13 Tr. 609:3-5) (Kaplan); 7 (July 13 Tr. 663:9-12) (Swirnow); 6 (July 14 Tr. 912:20-22) (Rubin); 4 (July 17 Tr. 1026:23-1027:2) (Goldberg); 5 (July 18 Tr. 1199:9-11) (Porges); 5 (July 18 Tr. 1263:24-1264:5) (Modi).) However, despite this, and while admitting that "there was substantial evidence regarding quantity of production – *i.e.*, wRVU production," and citing to no authority, Plaintiff now claims, post-verdict, that the jury could not consider such evidence as the jury was not instructed to consider "a system which measures compensation by quantity…." Plaintiff's last-ditch effort is unavailing. The jury was properly permitted to consider the extensive testimony concerning production in returning its verdict for Defendants with respect to, for example, the value Plaintiff's alleged comparators brought to NYU, factors other than sex, and the amount and degree of effort presented by Plaintiff and her alleged comparators.

Steer Decl., Ex. 6 (July 14 Tr. 934:19-938:7).

Dr. Modi was responsible for virtually the entire rheumatology practice at the Huntington location, which had "a huge patient population" (*see Id.* at 937:13-938:7), whereas Plaintiff was one of several rheumatologists in the Lake Success location working under the leadership of Drs. Goldberg and Porges (*Id.* at 808:12-19).[6]  In sum, Dr. Modi had more responsibility than Plaintiff.

Thus, the mass of evidence on the separate tests of skill, effort, and responsibility heard by the jury provided sufficient evidence to conclude that Plaintiff failed to prove equal work. Plaintiff must satisfy each of the three individual tests to prove equal work – but instead she failed to meet any - therefore, the jury was entitled to conclude that Plaintiff did not prove her equal pay claims. Steer Decl., Ex. 2 (July 19 Tr. 1443:23-25 ("'skill,' 'effort,' and 'responsibility' constitute separate tests, each of which must be met in order for the equal pay requirement to apply")). The evidence presented at trial was more than sufficient for the jury to find that Plaintiff failed to meet any one, or in this case, all of these tests. This jury finding alone means Plaintiff does not have a cause of action for her equal pay claims.

### B.  Equal Work

Even if the jury had found for Plaintiff on whether NYU employed her and the alleged comparators in a job requiring substantially the same skill, effort, and responsibility, Plaintiff still loses her equal pay claims because the jury found that she failed to prove that she was paid less for doing substantially equal work. Steer Decl., Ex. 1 (Verdict Form (Dkt. No. 243) Question No.

---

[6]  While Plaintiff spent a day during the week in the Huntington location, she only saw patients there for part of the day and spent the part of the day doing paperwork. Steer Decl., Ex. 5 (July 18 Tr. 1280:11-15). Though Plaintiff alleges that she was available to work full-time in Huntington but was not offered a full-time position there (Pl. Memo., at p. 17 (Dkt. No. 272)), it was Plaintiff's decision if and when to work at Huntington. Steer Decl., Exs. 7 (July 13 Tr. 745:1-5); 6 (July 14 Tr. 842:2-6). Her employment agreement did not restrict or assign where she had to provide services, and her salary did not vary depending on at what location she worked. Steer Decl., Exs. 8 (P-8), 9 (P-9).

3).

The Court gave the following instructions to the jury on equal work: "[w]ith respect to the third element of plaintiff's claim, plaintiff must prove she was paid a wage lower than male employees doing substantially equal work." Steer Decl., Ex. 2 (July 19 Tr. 1444:11-13.) The evidence on equal work presented to the jury as discussed above was sufficient for the jury to find against Plaintiff. The evidence included: (i) Dr. Modi saw patients five days a week, whereas Plaintiff saw patients less than four days a week; (ii) Dr. Modi's RVU target was just over 6100 RVUs annually, compared Plaintiff's highest RVU target of 5,200 per year; (iii) Dr. Modi was responsible for rheumatology care of virtually the entire Huntington location, which was "a huge patient population," whereas Plaintiff was one of several rheumatologists in the Lake Success location. Steer Decl., Exs. 5 (July 18 Tr. 1281:2-5, 1280:11-15, 1278:1-3, 1263:15-1264:1); 3 (July 11 Tr. 112:13); 9 (P-9); 6 (July 14 Tr. 808:12-18, 937:13-938:7).

Such evidence provides a sufficient basis for the jury to find that Plaintiff failed to prove that she was paid less for doing substantially equal work in comparison to Dr. Modi. This determination also, by itself, doomed Plaintiff's equal pay claims.

In sum, there is no basis to disturb the factual findings of the jury. As Plaintiff acknowledged in opposing Defendants' summary judgment motion, "the question of whether two employees are similarly situated is a question of fact for the jury." Steer Decl., Ex. 14 (Dkt. No. 129, at p. 9); *see Lippa v. General Motors Corp.*, 107 F.3d 3, 1997 WL 62955, at *2 (2d Cir. 1997) (a judge cannot "make a factual finding that differed from that of the jury" in a case involving Equal Pay Act claims). Plaintiff should not now be allowed to argue otherwise and ask the Court to make factual findings that wholly contradict what the jury determined.

### C.  Factor Other Than Sex

In addition to finding that Plaintiff failed to prove equal work, the jury also found that Defendants proved that the difference in pay was based on factors other than sex. The jury finding for Defendants on this affirmative defense is a complete bar to the equal pay claims, even if Plaintiff had proven all elements of the claims, which she did not. *Mazzella v. RCA Global Comm., Inc.*, 642 F. Supp. 1531, 1551 (S.D.N.Y. 1986) *aff'd*, 815 F.2d 653 (2d Cir. 1987) (the "factor other than sex" affirmative defense, if proven, "is a complete defense to conduct that would otherwise violate the statute").

Evidence concerning the "factor other than sex" defense was presented at length during the trial. The evidence showed that those factors included: physician's credentials, years of experience, reputational status, productivity, the need of the NYU network, and whether a particular geographical location was being covered. Below is a sampling of that evidence.

### i.    As To Gender Neutral Factors Generally

Rubin, the decision-maker on hiring and compensation, testified to the jury as to the gender-neutral factors that were considered by NYU in hiring physicians and determining their compensation.

Q. What is your role in determining what physicians are hired and how much they get paid?
A. I'm part of a team. So the business plan, which we've all seen - -
Q. No, no. What is your role?
A. My role? I hire the person. I make the offer.
Q. OK. And what is your process for determining what offer to make?
A. I'm going to look at the business plan that we've all seen. I'm going to look at their credentials. I'm going to look at the need in the network. I'm going to look at how many years' experience they have. I'm going to look at their external activities, if they have them. And again, some do, some don't. I'm going to look at the geography, where we're putting them. And then based on all those factors, when I meet with the physician, with that business plan as sort of the foundation, we would present an offer.
Q. That business plan gives you some of the economic information?
A. Business plan – I used the word "foundation" on purpose. It sets the baseline for what we think, you know, gives us the guide point, the starting point of where we think we need to go.
Q. Is it the only relevant factor?
A. No. That's what I was saying. There's lots of other factors, and those, again, can be academic

versus nonacademic; years of experience; the reputational status in the community; do we have a need in the community that we can't meet? Do we have a geography that we can't cover? So there are all sorts of factors that go into compensation of how we pay a physician beyond just the economics of a business plan.

Steer Decl., Ex. 6 (July 14 Tr. 921:8-922:13).

### ii.    As To Gender Neutral Factors Regarding Modi

The testimonial and documentary evidence presented at trial showed not just one, but multiple, "factor other than sex" supporting the jury's finding that the difference in pay between Plaintiff and Dr. Modi's was not gender based. Indeed, there is no evidence in the trial record from which a jury could conclude that gender played any role in setting the compensation of physicians at NYU.

The jury was presented with evidence showing that, like Dr. Goldberg, Dr. Modi was hired to further NYU's goal of geographical expansion of its rheumatology practice on Long Island and to fill the needs of a particular location. As Rubin testified:

> Q. Were you directly involved in hiring Dr. Modi?
> A. Yes.
> Q. And you were involved in negotiating his salary?
> A. I was.
> Q. And he did not have a business plan, correct?
> A. He did not.
> Q. So what do you recall about figuring out Dr. Modi's salary?
> A. A couple, couple things. One, he had been referred to us from -- we had been having discussions at the time with Advantage Care Physicians about doing some collaboration services, and his name had come up as a very strong and capable rheumatologist. We have a large medical group, very large medical group in Huntington, Long Island, with a huge patient population. We did not have rheumatology services there, so we were looking to fill a hole that we had in our network to be able to provide that care. So that would be an example where I was telling you why another -- a salary may be different in that case is because we had a hole to fill, patients that we needed to take care of, so we needed to get someone in there.

*Id*. at 937:13-938:7. The jury therefore could consider this evidence and properly conclude that a gender neutral, bona fide business-related reason existed for the difference in pay, including NYU's goal of expanding its rheumatology practice on Long Island.

Furthermore, the evidence presented to the jury showed that, similar to Dr. Goldberg and unlike Plaintiff, Dr. Modi had significant leadership roles and responsibilities prior to joining NYU. For example, Dr. Modi testified he was the Chief Rheumatologist for the Queens Long Island Medical Group, a multi-specialty group of 500 physicians located in Queens and Long Island, where he supervised six rheumatologists. Steer Decl., Exs. 5 (July 18 Tr. 1271:9-1273:14); 15 (P-46). Dr. Modi then became a Medical Director at Advantage Care Physician when it took over the Queens Long Island Medical Group, where he supervised 15 physicians, twelve non-physician medical professionals, and several support staff. Steer Decl., Ex. 5 (July 18 Tr. 1273:9-14). These are the leadership responsibilities and experiences that Plaintiff did not possess. To the contrary, the evidence showed that Plaintiff had difficulty in maintaining a professional working relationship with the staff in the office she shared with other physicians and was counseled by leadership to interact successfully with her co-workers. Steer Decl., Ex. 7 (July 13 Tr. 646:12-14, 739:13-741:4).

The evidence presented to the jury also showed that Dr. Modi is otherwise more qualified based on his greater experience, having practiced two years longer than Plaintiff. Steer Decl., Exs. 5 (July 18 Tr. 1256:15-1257:21); 15 (P-46).

The evidence therefore allowed the jury to properly conclude that employing a more qualified and more prominent rheumatologist than Plaintiff, such as Dr. Modi, would bring prestige and value to NYU and help its goal of expanding and improving its rheumatology practice on Long Island. As Rubin testified at trial, "having a strong clinical leadership, strong clinician with good stature, reputations in the community, the health system benefits, and quite frankly, all the doctors who don't have that stature benefit." Steer Decl., Ex. 4 (July 17 Tr. 1001:4-8). Indeed, the evidence showed that NYU repeatedly sought and hired highly qualified rheumatologists with

21

significant reputational status in the community, from Dr. Goldberg, to Dr. Porges, to Dr. Modi, in the execution of its goals of expanding and improving its rheumatology practice.

Dr. Modi also distinguished himself from Plaintiff by outworking her, thus providing evidence to the jury of an additional factor other than sex. In this regard, the jury was presented with evidence showing that prior to joining NYU, Dr. Modi was already more productive than Plaintiff, having produced 6,100 RVU in his last year at Advantage Care Physicians. Steer Decl., Ex. 5 (July 18 Tr. 1276:22-1277:25). As Dr. Modi explained, the 6,100 RVU production put him in the top ten percent of all rheumatologists in the entire country. *Id.* at 1277:22-25. While at NYU, the evidence upon which the jury was entitled to rely showed that Dr. Modi's annual RVU target in 2017 was 6,108 (which he met or exceeded each year) (Steer Decl., Ex. 15 (P-35)), whereas Plaintiff's RVU target was 5,200 in 2017 (Steer Decl., Ex. 9 (P-9)). The evidence further showed that while at NYU, Dr. Modi saw patients five days a week (Steer Decl., Ex. 5 (July 18 Tr. 1281:2-5)), while Plaintiff saw patients less than four days a week (Steer Decl., Exs. 5 (July 18 Tr. 1280:11-15); 3 (July 11 Tr. 112:13)).

The jury was entitled to rely on, and credit, all or part of this vast amount of evidence, including that Dr. Modi was more qualified, worked harder, and was more productive than Plaintiff, even though they were both rheumatologists. The evidence at trial, therefore, provided the jury with a proper basis to determine that NYU proved that it actually paid based on bona factors other than sex, and that the factors were both job-related and consistent with business necessity, as they were properly charged to do.

Plaintiff's contention that the jury could not have considered the difference in quantity and production because it was not given instructions on it misses the point. (Pl. Mem. at p. 15 (Dkt. No. 272).) The Court in its "factor other than sex" instructions charged the jury that

"defendants must prove that plaintiff's sex played no part in the difference in wages" to successfully invoke this defense. Steer Decl., Ex. 2 (July 19 Tr. 1445:8-10). As the Second Circuit explained, "differentials based on any other factor other than sex" exclusion is a "broad general exception" to the prohibition against pay differences between women and men. *Hodgson v. Corning Glass Works*, 474 F.2d 226, 232 (2d Cir. 1973) (quoting Congressional Committee Report). The jury therefore certainly could have considered the difference in the efforts exerted by Plaintiff and Dr. Modi in concluding that Plaintiff's sex did not play a part in the pay difference. Plaintiff has no basis to contest the jury's determination in this regard.

The jury also was presented with evidence that, prior to joining NYU, Dr. Modi was making more money than Plaintiff and that he would not have joined NYU without a raise. Steer Decl., Ex. 5 (July 18 Tr. 1275:4-1276:12). The compensation that NYU offered Dr. Modi was necessary to lure him to the Huntington location in order to accomplish the business goals of geographical expansion of the rheumatology practice and to service the need of a large patient base in that location. Steer Decl., Ex. 6 (July 14 Tr. 937:19-938:7). Moreover, unlike Plaintiff, Dr. Modi did not have any loans, leases, or expenses that NYU had to assume. Steer Decl., Ex. 7 (July 13 Tr: 738:1-7). As the witnesses testified to the jury, NYU paid off Plaintiff's business loan and assumed her office lease, even though NYU did not want or need the space. Steer Decl., Exs. 7 (July 13 Tr. 702:3-20), 6 (July 14 Tr. 930:25-931:15). This, as well as the fact that Dr. Modi was more productive than Plaintiff, provided additional evidence for the jury to conclude that the pay difference was due to factors other than sex.[7]

In sum, the trial evidence provided a sufficient basis for the jury to conclude that Dr.

---

[7] Plaintiff's cited cases (at Pl. Memo., at p. 17, n.67) concerning whether prior pay by itself is a factor other than sex are irrelevant, as Defendants introduced probative evidence that prior salary in addition to numerous other bona fide factors were considered in setting salaries. Defendants never relied on prior salary alone.

Modi was paid more than Plaintiff because of one or more of these gender-neutral factors, and not because of Plaintiff's sex. *Husser v. New York City Dept. of Ed.*, 137 F. Supp. 3d 253, 269 (E.D.N.Y. 2015) ("an employer may properly decide to pay higher salaries to employees with greater experience, more advanced educational degrees, or objectively better credentials than their co-workers"); *Osborn v. Home Depot U.S.A., Inc.*, 518 F. Supp. 2d 377, 385 (D. Conn. 2007) ("market forces, previous experience, education, and inducement to hire the best person for the job have been held to be legitimate factors justifying pay differentials under the EPA"); *Setelius v. Nat'l Grid Elec. Servs. LLC*, No. 11 Civ. 5528, 2014 WL 4773975, at *31 (E.D.N.Y. Sept. 24, 2014) (collecting cases).[8]

## POINT III
## THERE IS NO BASIS FOR A NEW TRIAL

While Plaintiff purports to move for a new trial under Rule 59(a), she perfunctorily recites the standard but does not even argue, let alone demonstrate, that she meets this standard, nor does she provide any basis for this extraordinary relief. In order to grant a new trial, the Court "must conclude that the jury has reached a seriously erroneous result, or the verdict is a miscarriage of justice, *i.e.*, it must view the jury's verdict as against the weight of the evidence." *Manley v. AmBase*, 337 F.3d 237, 234 (2d Cir. 2003). As the courts further explained, "the court may only grant a new trial if, after viewing all the evidence, it has a definite and firm conviction that a mistake has been committed." *Hughes v. Town of Bethlehem*, No. 10-cv-1489, 2015 WL 2130905,

---

[8] The standards for the determination of the equal pay claims under the federal and New York statutes are the same. *Woods-Early v. Corning Inc.*, 18-CV-6162-FPG, 2023 WL 4598358, at *4 (W.D.N.Y. July 18, 2023) ("plaintiff's EPA and NYLL claims—that she received unequal pay based on her gender—are analyzed under the same standards"); *Mitchel v. Ceros, Inc.*, 21 Civ. 1570 (KPF), 2022 WL 748247, at *5 (S.D.N.Y. March 10, 2022) (same). The Court gave essentially the same jury instructions under the two statutes. Tr. 1439-50. The Verdict Form questions for the two claims are identical. Steer Decl., Ex. 1 (Verdict Form (Dkt. No. 243) Question Nos. 1-7). Plaintiff does not contend otherwise.

at *2 (N.D.N.Y May 7, 2015); *Cunningham v. Town of Ellicott*, No. 04-cv-301, 2007 WL 1756502, at *4 (W.D.N.Y. June 18, 2007), *aff'd*, 310 Fed. Appx. 448 (2d Cir. 2009) (same). Where, as here, to justify setting aside a special verdict and hold a new trial, "the special verdict answers be ineluctably inconsistent." *Cunningham*, 2007 WL 1756502, at *4. Plaintiff has not come close to meeting this high hurdle.

As detailed above, there is ample evidence to support the jury verdict. Based on the same evidence and for the same reasons discussed under Rule 50(a), Plaintiff's motion for a new trial should be denied. This is particularly so since Plaintiff does not set forth separate reasons for its Rule 59(a) motion for a new trial, but rather indistinguishably seeks a Rule 50(b) judgment as a matter of law for the same reasons. *Pouncy v. Danka Off. Imaging Co.*, 393 Fed. Appx. 770, 773 (2d Cir. 2010) (affirming denial of both motions since movant's "arguments in support of his Rule 59(a) motion were identical to those in support of his Rule 50(b) motion" and concluding that there that jury verdict was not "seriously erroneous").

Simply put, Plaintiff did not demonstrate a "serious error" in the verdict or that the vacating of the verdict is necessary to prevent "manifest injustice." The jury was presented with ample evidence to conclude that Plaintiff did not perform equal work to Dr. Modi or the other two alleged comparators, Dr. Goldberg and Dr. Porges, as measured by skill, effort, or responsibility.

Similarly, Plaintiff failed to meet the test for a retrial on the "factor other than sex" defense. As discussed at length above, there was ample evidence for the jury to find that Defendants proved this defense. There is no "manifest injustice" in this determination by the jury that would warrant a new trial.

## CONCLUSION

For the reasons set forth herein above, Defendants respectfully request that Plaintiff's motion for judgment as a matter of law or, alternatively, for a new trial, be denied in its entirety.

002528\5\170369063.v1

Dated:  New York, New York
         September 21, 2023

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Defendants*

By:   */s/ Richard L. Steer*
         Richard L. Steer
         Richard C. Schoenstein
         Justin Chu
         Ingrid J. Cardona
         1350 Broadway, 11th Floor
         New York, New York 10018
         (212) 216-8000
         rsteer@tarterkrinsky.com
         rschoenstein@tarterkrinsky.com
         jchu@tarterkrinsky.com
         icardona@tarterkrinsky.com

26