UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
DR. SARI EDELMAN,

**Case No.:** 1:21-cv-502 (LJL) (GWG)

                              Plaintiff,

              -against-

NYU LANGONE HEALTH SYSTEM, NYU
LANGONE HOSPITALS, NYU LANGONE
MEDICAL CENTER, NYU LANGONE NASSAU
RHEUMATOLOGY, NYU SCHOOL OF
MEDICINE, NYU GROSSMAN SCHOOL OF
MEDICINE, NYU HOSPITALS CENTER,
ANDREW T. RUBIN, DAVID KAPLAN, JOSEPH
ANTONIK, and JOSHUA SWIRNOW,

                            Defendants.

-----------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(b) AND TO ALTER OR AMEND THE JUDGMENT PURSUANT TO FED. R. CIV. P. 59(e)**

**MILMAN LABUDA LAW GROUP PLLC**

Joseph M. Labuda, Esq.
Emanuel Kataev, Esq.
3000 Marcus Ave., Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
joe@mllaborlaw.com
emanuel@mllaborlaw.com

*Attorneys for Plaintiff*
*Dr. Sari Edelman*

i

## TABLE OF CONTENTS

PRELIMINARY STATEMENT.............................................................................................1

STATEMENT OF FACTS ...............................................................................................2

ARGUMENT ......................................................................................................8

   I.     **DEFENDANTS' RULE 50(b) MOTION SHOULD BE DENIED ON MULTIPLE GROUNDS**........................................................................................ 8

     **A. Defendants Failed to Preserve All of Their Instant 50(b) Arguments Because They Failed to Raise Them in Their Rule 50(a) Motion During Trial**........................ 8

     **B.  Defendants Failed to Establish that There was an Insufficient Evidentiary Basis for Finding that Defendants, Antonik, and NYU Retaliated Against Dr. Edelman. As Such, the Jury's Verdict on Plaintiff's Retaliation Claim Must Not be Disturbed.** ...................................................................................... 10

          **Legal Standard** ............................................................................ 10

          **i. Defendants Failed to Establish an Absence of Evidence that Antonik Had Knowledge of Plaintiff's Protected Activity** ...................................................... 11

          **ii. Defendants Failed to Establish an Absence of Evidence that Antonik Participated in the Adverse Employment Action Against Plaintiff** ............. 15

          **iii. Defendants Failed to Establish an Absence of Evidence that NYU Acted Negligently in Relying on the Information Provided by Antonik**.................. 18

  **II. THE COURT SHOULD DENY DEFENDANTS' MOTION FOR REMITTITUR OF THE JURY'S FRONT PAY AWARD** ........................................................... 22

     **A. LEGAL STANDARD** ........................................................................ 22

     **B. THE JURY'S FRONT PAY AWARD OF $700,000.00 SHOULD NOT BE DISTURBED** ........................................................................................ 23

**CONCLUSION**..............................................................................................26

TABLE OF AUTHORITIES

**Cases**

AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec. LLC,
646 F. Supp. 2d 385 (S.D.N.Y. 2009).................................................................. 9

AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec. LLC,
386 Fed. Appx. 5 (2d Cir. 2010)......................................................................... 9

Banister v. Davis,
140 S. Ct. 1698 (2020)........................................................................................ 22

Barkley v. Olympia Mortg. Co.,
557 Fed. Appx. 22 (2d Cir. 2014).................................................................. 9, 10

Blanco v. Brogan,
620 F. Supp. 2d 546 (S.D.N.Y. 2009)................................................................ 21

Blum v. Witco Chem. Corp.,
829 F.2d 367 (3d Cir. 1987)............................................................................... 23

Bracey v. Bd. of Educ. of City of Bridgeport,
368 F.3d 108 (2d Cir. 2004)................................................................................. 9

Broadnax v. City of New Haven,
141 Fed. Appx. 18, 23 (2d Cir. 2005)........................................................... 23, 24

Cardwell v. Davis Polk & Wardwell LLP,
2023 WL 2049800 (S.D.N.Y., 2023)................................................................. 11

Cross v. N.Y.C. Trans. Auth.,
417 F.3d 241 (2d Cir. 2005)............................................................................... 10

CSX Transp., Inc. v. Hensley,
556 U.S. 838 (2009)........................................................................................... 25

Deloreto v. Karengekis,
104 Fed. Appx. 765 (2d Cir. 2004).................................................................... 11

Dunson v. Tri-Maintenance & Contractors, Inc.,
171 F. Supp. 2d 103 (E.D.N.Y. 2001)............................................................... 15

Edelman v. NYU Langone Health System,
2022 WL 4537972 (S.D.N.Y. 2022).................................................................. 14

EEOC v. Ethan Allen, Inc.,
44 F.3d 116 (2d Cir. 1994)................................................................................. 21

Feingold v. New York,
  366 F.3d 138 (2d Cir. 2004)............................................................................... 15, 16

Fitchett v. City of New York,
  2021 WL 964972 (S.D.N.Y. 2021)........................................................................ 16

Grant v. Bethlehem Steel,
  622 F.2d 43 (2d Cir. 1980).................................................................................. 21

Hartley v. Dillard's, Inc.,
  310 F.3d 1054 (8th Cir. 2002) ............................................................................ 22

Hayes v. SkyWest Airlines, Inc.,
  12 F.4th 1186 (10th Cir. 2021) ........................................................................... 22

ING Glob. v. United Parcel Serv. Oasis Supply Corp.,
  757 F.3d 92 (2d Cir. 2014)................................................................................. 9, 11

Jones v. Town of East Haven,
  691 F.3d 72 (2d Cir. 2012)................................................................................. 10

Kato v. Ishihara,
  239 F. Supp. 2d 359 (S.D.N.Y. 2002)................................................................. 15

Krasner v. HSH Nordbank AG,
  680 F. Supp. 2d 502 (S.D.N.Y. 2010)................................................................. 12

Kregler v. City of New York,
  987 F. Supp. 2d 357 (S.D.N.Y. 2013)................................................................. 18

KT Group Limited v. NCR Corporation,
  412 F.Supp.3d 305 (S.D.N.Y. 2019)................................................................... 25

Lore v. City of Syracuse,
  670 F.3d 127 (2d Cir. 2012)............................................................................... 9

Malena v. Victoria's Secret Direct, LLC,
  886 F. Supp. 2d 349 (S.D.N.Y. 2012)................................................................. 16

Martell v. Boardwalk Enters.,
  748 F.2d 740 (2d Cir. 1984)............................................................................... 22

Martinez v. City of New York,
  2023 WL 4627739 (E.D.N.Y. 2023)................................................................... 17

Massaro v. Bd. of Educ.,
   774 Fed. Appx. 18 (2d Cir. May 21, 2019)....................................................... 21

Maxfield v. Sinclair Int'l,
   766 F.2d 788 (3d Cir. 1985)....................................................................... 22

McCardle v. Haddad,
   131 F.3d 43 (2d Cir. 1997).......................................................................... 9

McKenzie v. Big Apple Training Inc.,
   2023 WL 4866041, at *8 (S.D.N.Y., 2023)..................................................... 11

Mohammadi v. Islamic Republic of Iran,
   782 F.3d 9 (D.C. Cir. 2015)....................................................................... 22

Olaechea v. City of New York,
   2022 U.S. Dist. LEXIS 142037 ............................................................... 15, 24

Patane v. Clark,
   508 F.3d 106 (2d Cir. 2007)...................................................................... 19

Rasmy v. Marriott International, Inc.,
   952 F.3d 379 (2d Cir. 2020)...................................................................... 14

S.E.C. v. Ginder,
   752 F.3d 569 (2d Cir. 2014).............................................................. 2, 10, 11

Santiago v. Crown Heights Center for Nursing and Rehabilitation,
   2017 WL 9482107 (E.D.N.Y., 2017)............................................................ 25

Sass v. MTA Bus Co.,
   6 F. Supp. 3d 238 (E.D.N.Y. 2014) ............................................................ 25

Scala v. Moore McCormack Lines, Inc.,
   985 F.2d 680 (2d Cir. 1993)....................................................................... 22

Seivright v. Montefiore Med. Ctr.,
   2014 WL 896744 (S.D.N.Y. Mar. 3, 2014) .................................................... 11

Soto-Padro v. Public Bldgs. Authority,
   675 F.3d 1 (1st Cir. 2012)......................................................................... 22

Stern v. State Univ. of N.Y.,
   No. 16-CIV.-5588, 2018 WL 4863588 (E.D.N.Y. Sept. 30, 2018).................................. 11

Tepperwien v. Entergy Nuclear Operations, Inc.,
    663 F.3d 556 (2d Cir. 2011)................................................................. 11

Tolbert v. Queens Coll.,
    242 F.3d 58 (2d Cir. 2001)............................................................... 9, 11

Tomka v. Seiler Corp.,
    66 F. 3d 1295(2d Cir. 1995)................................................................ 15

Triolo v. Nassau Cty,
    24 F.4th 98 (2d Cir. 2022) ................................................................. 11

United States v. City of N.Y.,
    No. 07-CIV.-2067, 2015 WL 1800245 (E.D.N.Y. Apr. 16, 2015) ................................... 25

Vasquez v. Empress Ambulance Service, Inc.,
    835 F.3d 267 (2d Cir. 2016)................................................................ 18

Warmin v. New York City Dep't of Educ.,
    2019 U.S. Dist. LEXIS 125774, 2019 WL 3409900 (S.D.N.Y. 2019)............................ 21

White v. N.H. Dep't of Emp. Sec.,
    455 U.S. 445 (1982)....................................................................... 22

**Rules**

Fed. R. Civ. P. 50 ................................................................... 1, 8, 9, 10, 11, 21

Fed. R. Civ. P. 59 ...................................................................... 22

**Treatises**

11 Charles Alan Wright et al., Federal Practice & Procedure § 2810.1 (3d ed.2012)................. 22

## PRELIMINARY STATEMENT

Defendants' motion is procedurally defective and must be denied out-of-hand.  Defendants never raised any of the issues in the instant motion in their previous motion for a directed verdict under Rule 50(a) of the Federal Rules of Civil Procedure (hereinafter referred to as "Rules" or "Rule") at trial, and are now barred from bringing this motion under Rule 50(b) on these issues.

Even if Defendants were permitted to move forward with their Rule 50(b) motion on the merits, a jury verdict is generally sacrosanct, and there is absolutely no legal or factual basis to overturn it here.  A jury verdict cannot be disturbed unless there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.  Defendants cannot come close to meeting this extraordinary standard.

In moving for this relief, Defendants omit critical facts most favorable to Dr. Edelman, and fail to draw all favorable inferences in her favor.  Further, Defendants engage in revisionist history, rewriting the facts and evidence adduced at trial to view through rose-colored glasses and serve their purposes, notwithstanding the fact that this Court may not weigh evidence, assess credibility, or substitute its opinion of the facts for that of the jury.

Because this court may grant such a motion only when there is either an utter lack of evidence supporting the verdict so that the jury's findings could only have resulted from pure guess-work, or the evidence is so overwhelming that reasonable and fair-minded persons could only have reached the opposite result, Defendants' motion for judgment as a matter of law ("JMOL") must be denied.

As will be evidenced below, Defendants fall far short of this standard, as there exists sufficient evidence in the trial record supporting Plaintiff's position which the jury undoubtedly accepted while rejecting Defendants' proffered evidence.

Similarly, Defendants' motion to alter the judgment must also be denied.  Remittitur is only appropriate where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, and – more generally – where the award is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.  Here, there exists ample support for the jury's appropriate award of $700,000.00 in light of Plaintiff's inability to be placed in the same position she would have been in if Defendants did not retaliate against her.  Accordingly, Defendants' motion must be denied in this respect as well.

## **STATEMENT OF FACTS**[1]

In 2014, NYU hired Dr. Sari Edelman ("Dr. Edelman" or "Plaintiff") as a rheumatologist with a three (3) year contract that only permitted her to be terminated "for cause."[2]  Dr. Edelman did not only meet her contractual performance targets – she exceeded them.[3]  NYU renewed Dr. Edelman's contract for another three (3) years for 2017-2020.  Joseph Antonik ("Antonik") was a manager[4] at the suite where Dr. Edelman worked.[5]  Dr. Edelman had very limited interaction with Antonik prior to September 16, 2019.[6]  That night, Antonik came in to Dr. Edelman's office for an unscheduled meeting and said she would be required to share her office, to which Dr. Edelman stated she would have to review her contract to see whether that would be appropriate.[7]

---

[1] The facts are presented in the light most favorable to Dr. Edelman, who is the non-moving party, and all favorable inferences that may be made based on those facts are presented herein.  "The court must consider the evidence in the light most favorable to the non-movant and 'give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.'"  See S.E.C. v. Ginder, 752 F.3d 569, 574 (2d Cir. 2014).

[2] See Plaintiff's Exhibits ("Pl. Exs.") 8 and 9; see also ECF Docket Entry 273-1 ("Tr.") at 82:25-83:15, 904:24-905:12.  All exhibits referenced are attached in Declaration of Emanuel Kataev, Esq. ("Kataev Decl.") in numerical order.

[3] Tr. at 905:8-12.

[4] Among other duties, Antonik was responsible for operations at four sites, including Dr. Edelman's site, and reviewing physicians' wRVUs earned to measure their performance.  Tr. at 493:1-494:1, 495:11-22.

[5] Tr. at 110:2-5.

[6] Tr. at 110:6-111:1.

[7] Tr. at 111:2-23.

As soon as Dr. Edelman resisted Antonik's directive, his demeanor changed; he moved closer to her and stated words to the effect of:

> you think that because you put this stuff in your office -- Because you put all your stuff here, this doesn't belong to you. This all belongs to NYU. All of it belongs to NYU, this whole office. None of it's yours. We -- we own you

during which time he was pointing at items on Dr. Edelman's desk, flailing his arms, and getting very close to her in an intimidating way[8] such that he completely lost his composure.[9] Dr. Edelman told Antonik he had to leave, whereupon Antonik uttered, under his breath, "bitch" and left.[10] The episode lasted approximately ten minutes.[11]

Dr. Edelman was physically shaken and could not sleep that night.[12] The following morning, Dr. Edelman called Human Resources ("HR") and made a complaint to Kathleen Pacina ("Pacina"), a human resources representative.[13] Dr. Edelman complained about the hostile and abusive behavior by Antonik – including the fact that he called her a bitch – because she did not feel safe stating that she believed his conduct was a sexist, discriminatory, chauvinistic attack that must be addressed by Defendants.[14] Dr. Edelman explained that Antonik's conduct was sexist and chauvinistic because he stated that he owned her and directed her what she was going to do.[15] Dr. Edelman told Pacina all of the foregoing when she made her complaint.[16] Human Resources spoke with Antonik the following day.[17]

---

[8] Antonik was substantially physically larger than Dr. Edelman.  Tr. at 115:3-15.
[9] Tr. at 111:24-113:19, 343:12-17.
[10] Id.; see also Tr. at 345:14-16, 349:23-350:14.
[11] Tr. at 114:9-12.
[12] Tr. at 113:20-114:8.
[13] Id.; see also Tr. at 115:22-116:6, 116:15-118:9.
[14] Id.; see also Tr. at 350:19-351:9, 359:11-16.
[15] Id.
[16] Tr. at 118:7-9.
[17] See Pl. Ex. 55 ("I sent an invite for 1:00 p.m. for you to call us on *Joe's office phone* ... He already escalated to David Kaplan since the doctor asked Enid Papa for ELR's #").

When HR called him, Antonik was fully aware of the incident with Dr. Edelman and knew that that he had, in fact, called her a bitch the day before. Antonik also knew that Dr. Edelman made a complaint against him because, *inter alia*, he called her a bitch. Antonik knew that Dr. Edelman's complaint[18] had nothing to do with office space and was really about the way he spoke to her.[19] Further, just two (2) days after the incident, Kaplan wrote to Joshua Swirnow ("Swirnow") informing him that "Dr. Edelman filed a complaint against Joe Antonik for being aggressive and retaliating for not allowing her to expand her hours."[20] Antonik was bothered by Dr. Edelman's complaint against him.[21] When HR did not inform Dr. Edelman of any updates concerning her complaint, after she was cornered into a meeting with David Kaplan ("Kaplan") concerning the office space issue Antonik previously addressed with her, Dr. Edelman followed up on September 25, 2019 via email absent Antonik's harassment of her because of her sex.[22] Receiving no response as to any action taken to investigate her complaints, Dr. Edelman wrote to Pacina again on November 1, 2019 absent Antonik's sexual harassment.[23]

---

[18] In fact, Antonik was alerted to the fact that Dr. Edelman was going to make a complaint about him before she even complained. Tr. at 568:7-569:18; see also Pl. Ex. 55.

[19] Tr. at 530:5-10, 570:3-25 (Q. It doesn't say here that it's about the office issue; correct? **A. No.** Q. It says that it's about you; correct? **A. Yes.**"); see also Pl. Ex. 49.

[20] Tr. at 576:6-578:6; see also Defendants' Exhibit ("Def. Ex.") SS.

[21] Tr. at 530:11-13.

[22] Tr. at 118:10-123:19; see also Pl. Ex. 59 ("I am following up on our discussion. … Kaplan requested to speak with me, and he apologized for Joe Antonik's behavior … This was … inappropriate conduct in the workplace … and has not been addressed as HR matter. … he said he would bring it to senior management … which … was done in manner to threaten any opinion I may have on the matter. There was no discussion as to my concerns of the request, it was presented as matter of fact with no regard for my professional opinion or contractual concerns. I consider this form of bullying in the workplace. … On completing my discussion … he took on similar mannerisms of condescending tone, raising his voice to child like manner to placate my disagreement with his request. … I need to be able to work in a non-hostile environment. As of female physician in the organization, I am disappointed that is 2019, approaching 2020 in a major hospital organization in New York, and I still have to contend with male chauvinism. … It remains unclear to my why I am being discriminated against to accommodate another physician, particularly a male physician …, which is the stated reason I will be "pushed" out to another space. … This is the first time in all these years where I feel my growth as a physician is being deliberately infringed on by senior male managers. …").

[23] See Pl. Ex. 52 ("Hi, The harassment complaint was … about treatment by manager using abusive and bullying behavior. … [it] was separate issue about treatment of females within workplace at NYU which is unacceptable …. There was … implicit bias in how I was "managed" and spoken to …. … Smirnow [sic] apologized for how they handled the situation  …. I am an educated female and I will not tolerate this treatment …. I do expect this to be addressed. …").

Pacina wrote down notes reflecting Dr. Edelman's discussion with her on September 17, 2019 regarding the events of the day prior, but the notes are dated March 13, 2020.  There were no subsequent notes, and the notes reflect a brief summary of a long conversation Dr. Edelman had with Pacina.[24]  Although Antonik was bothered by Dr. Edelman's complaint against him, Dr. Edelman was under contract with NYU until December 31, 2020 and could not be terminated without cause which NYU conceded did not exist.[25]  However, shortly after Dr. Edelman complained about Antonik's sexist behavior, for the first time in her then five (5) year tenure at NYU, a log was created about "Edelman issues" in November 2019.[26]  This was a little over a month after her late-September 2019 complaint to human resources.

Miriam Ruiz ("Ruiz"), the office manager who reported directly to Antonik, created the log and claimed that she kept logs for other doctors, but Defendants failed to produce any such logs.[27]  After Dr. Edelman's complaint, Antonik also raised clinical concerns about Dr. Edelman (even though he is not a doctor and has no clinical responsibilities) with Dr. Andrew Porges ("Dr. Porges") who, in turn, raised these concerns with Rubin.[28]  Thereafter, on November 6, 2020, Antonik used the contents of the Ruiz log to raise concerns with Dr. Edelman's performance with Kaplan and solicited several other NYU employees to provide him with "clear and convincing" evidence of Dr. Edelman's poor work performance, which ultimately precipitated her termination by Rubin.[29]  Although Defendants sent cryptic emails to each other about the November 6, 2020 email, nobody discussed any of these work issues directly with Dr. Edelman.[30]

---

[24] Tr. at 140:10-142:5; see also Pl. Ex. 21.
[25] Tr. at 810:20-811:13, 821:21-822:25, 904:22-905:4; see also Pl. Ex. 8.
[26] Tr. at 149:16-151:4; see also Pl. Ex. 84.
[27] Tr. at 822:17-19.
[28] Tr. at 498:17-502:20, 504:5-12, 1138:17-24..
[29] Tr. at 161:6-163:8; see also Pl. Exs. 86 and 1.
[30] Tr. at 163:9-164:21; see also Def. Ex. KKK.

Moreover, the November 6, 2020 email was drafted by Antonik at the request of Kaplan *after Antonik first made Kaplan aware of purported issues with Dr. Edelman*.[31]  Critically, Antonik did not have the power to terminate Dr. Edelman himself.[32]

On December 1, 2020, NYU terminated Dr. Edelman.[33]  Dr. Edelman subsequently had a conversation with Defendant Andrew Rubin ("Rubin"), who did not state anything about clinical performance concerns nor interpersonal conflicts as the reason for the termination.[34]  Instead, Rubin stated that she was a great doctor but that NYU was "going in a different direction" and offered to help her find a new job.[35]  In fact, on December 4, 2020, Rubin emailed a colleague in Florida about Plaintiff to help her with a job opportunity, and stated in that email that she is a very good doctor.[36]  Dr. Edelman sought to remain in New York following her termination, but was unable to secure a contract despite advancing in interviews.[37]  She ultimately accepted a position in Clearwater, Florida where she earned $300,000.00.[38]  No retirement plan was offered her first year at her new position, and following her anniversary date, Dr. Edelman had a typical 401(k) with no matching.[39]  When she worked for Defendants, Dr. Edelman enjoyed retirement benefits with a ten percent (10%) match by NYU of her salary.[40]  In addition, Dr. Edelman was able to contribute approximately $18,000.00 per year towards her 401(d) retirement account, plus there was a 403(b) retirement account that she had the ability to contribute monies to.[41]

---

[31] Tr. at 498:17-502:20, 504:5-12.
[32] Tr. at 507:5-9.
[33] Tr. at 147:16-148:5; see also Pl. Ex. 7.
[34] Tr. at 148:19-149:15.
[35] Id.; see also Tr. at 148:16-149:7.
[36] See Pl. Ex. 123.
[37] Tr. at 205:19-207:8, 208:22-209:1, 234:4-236:25, 367:14-23.
[38] Tr. at 209:18-210:14.  Dr. Edelman's current salary is $325,000.00, and she earned $330,000.00 in 2022 with bonuses.  Tr. at 218:16-219:1.
[39] Tr. at 210:15-25.
[40] Tr. at 79:20-80:15.  Thus, Dr. Edelman earned $20,700.00 per year in 2015, 2016, and 2017, and $27,800.00 per year in 2018, 2019, and 2020 in retirement benefits directly contributed by NYU.  See Pl. Exs. 8 and 9.
[41] Id.

Similarly, the health insurance plan she obtained in Florida was very expensive such that Dr. Edelman went on her husband's medical plan where she incurred high out-of-pocket expenses and deductibles.[42]   Also, Dr. Edelman enjoyed $3,000.00 in expense reimbursements at NYU which she did not have at her new job in Florida.[43]   Further, whereas Dr. Edelman enjoyed significant salary increases at NYU, she did not receive similar increases in Clearwater, Florida.[44] As such, the trajectory of Dr. Edelman's increases in salary were severely stunted at her new job, and Dr. Edelman was on a path to make less in Florida than she would have earned at NYU but for their unlawful termination of her.

Defendants' unlawful retaliation against Dr. Edelman impacted her life in a profound way.[45]   Despite searching for a position in New York, she was forced to relocate to Florida even though she wanted to remain in New York such that she was effectively exiled.[46]

<u>Jury Verdict</u>

Following the trial, the jury rendered a verdict in favor of Dr. Edelman's retaliation claims on July 19, 2023.[47]   They found that Dr. Edelman engaged in protected activity under Title VII, the NYSHRL, and NYCHRL.[48]   The jury also found that all of the Defendants committed an adverse act against Dr. Edelman because of her protected conduct under Title VII, NYSHRL, and the NYCHRL.[49]   In addition, the jury found that Antonik aided or abetted an adverse act against her because of her protected conduct under the NYSHRL and NYCHRL.[50]

---

[42] <u>Tr.</u> at 211:1-9.
[43] <u>Tr.</u> at 81:17-19.
[44] <u>Tr.</u> at 210:12-14, 218:16-219:1 (indicating $25,000.00 increases in Florida); <u>see also</u> <u>Pl.</u> <u>Exs.</u> 8 and 9 (indicating $71,000.00 increases at NYU).
[45] <u>Tr.</u> at 205:19-206:6.
[46] <u>Id.</u>
[47] <u>See</u> ECF Docket Entry 243.
[48] <u>Id.</u> at 3 § III(8).
[49] <u>Id.</u> at 3 §§ III(9) & V(10).
[50] <u>Id.</u> at 4 § IV(11).

Moreover, the jury found that all the Defendants – except Rubin and Swirnow – were motivated to terminate Dr. Edelman due to her protected activity.[51]  The jury also found that all the Defendants – except Rubin and Swirnow – engaged in conduct reasonably likely to deter a person from engaging in protected activity, and that Antonik aided or abetted conduct that was reasonably likely to deter a person from engaging in protected activity.[52]  Finally, the jury found that Dr. Edelman suffered monetary damages on her retaliation claim for complaining to Human Resources about alleged discrimination and awarded her $700,000.00 in front-pay.[53]  The jury was charged with respect to retaliation and determining damages for retaliation prior to rendering their verdict.[54]  Prior to the jury's verdict, when Plaintiff rested her case-in-chief, Defendants moved for a directed verdict.[55]  The issues raised by the Defendants in the instant motion are not the same issues raised at trial.

## **ARGUMENT**

## I.   **DEFENDANTS RULE 50(b) MOTION SHOULD BE DENIED ON MULTIPLE GROUNDS**

### A.   **Defendants Failed to Preserve All of Their Instant 50(b) Arguments Because They Failed to Raise Them in Their Rule 50(a) Motion During Trial**

Defendants did not raise Antonik's alleged lack of knowledge of protected activity, Antonik's lack of participation in Plaintiff's termination, or that NYU acted non-negligently in relying on information provided by Antonik when terminating Dr. Edelman in  their motion for a directed verdict pursuant to Rule 50(a) at trial.  As such, Defendants are now barred from raising these issues in the instant Rule 50(b) motion.

---

[51] Id. at 4 § V(12).
[52] Id. at 5 §§ V(13) and V(14).
[53] Id. at 6-7 §§ VII(B)(17) and VII(B)(18).
[54] Tr. at 1421:11-1480:4; see also Kataev Decl. ¶ 19 (quoting relevant portions of charge).  Crucially, Defendants did not object to these jury instructions.  Tr. at 243:4-283:7, 1332:3-1339:14, 1419:18-1421:9 (charging conferences).
[55] Tr. at 1301:9-1304:15, 1308:7-1309:1 (quoting the relevant portions of Defendants' motion for a directed verdict).

"A post-trial Rule 50(b) motion for [JMOL] is properly made only if a Rule 50(a) motion for [JMOL] has been made before submission of the case to the jury."[56]  In an initial motion for judgment on the law, the moving party "must specify the judgment sought and the law and facts that entitle the movant to the judgment."[57] "[T]he specificity requirement is obligatory."[58]

A Rule 50(a) motion "must at least identify the *specific element* that the defendant contends is insufficiently supported."[59] "The rationale is that the motion must be sufficient to inform the opposing party of the precise issue as to which more evidence is needed in order to warrant its submission to the jury."[60]  "A post-trial motion for [JMOL] 'is limited to those grounds that were "specifically raised in the prior motion for [JMOL]."'"[61] "A Rule 50(a) motion requesting [JMOL] on one ground but omitting another is insufficient to preserve a [JMOL] argument based on the latter."[62]  "The law is pellucid that a party's failure to move under Rule 50(a) has consequences. If that party later moves under Rule 50(b), the standard for granting [JMOL] is elevated, and the motion may not properly be granted by the district court, or upheld on appeal, except to prevent manifest injustice."[63] In this Rule 50(b) motion, Defendants argue there was insufficient evidence that: (i) Antonik had knowledge of Plaintiff's protected activity prior to NYU's non-renewal of Plaintiff's employment; (ii) Antonik actually participated in the termination of Plaintiff's employment; and (iii) NYU acted negligently in any reliance on information provided by Antonik.

---

[56] See Bracey v. Bd. of Educ. of City of Bridgeport, 368 F.3d 108, 117 (2d Cir. 2004).

[57] See Fed. R. Civ. P. 50(a)(2).

[58] See Lore v. City of Syracuse, 670 F.3d 127, 152 (2d Cir. 2012) (citation omitted).

[59] See Tolbert v. Queens Coll., 242 F.3d 58, 76 (2d Cir. 2001) (emphasis added).

[60] Id. at 76–77.

[61] See AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec. LLC, 646 F. Supp. 2d 385, 408 (S.D.N.Y. 2009), aff'd, 386 Fed. Appx. 5 (2d Cir. 2010) (quoting McCardle v. Haddad, 131 F.3d 43, 51 (2d Cir. 1997)).

[62] See Lore, 670 F.3d at 152-53; see also Barkley v. Olympia Mortg. Co., 557 F. App'x 22, 27 (2d Cir. 2014) (summary order) ("A post-verdict motion for JMOL under Fed. R. Civ. P. 50(b) must be premised on grounds specified in a Rule 50(a) motion made prior to the submission of the case to the jury").

[63] See ING Glob. v. United Parcel Serv. Oasis Supply Corp., 757 F.3d 92, 97 (2d Cir. 2014) ("Manifest injustice exists where a jury's verdict is wholly without legal support").

This is different from their Rule 50(a) motion.  In fact, Defendants failed to raise any of the three (3) current issues in their motion for a directed verdict pursuant to Rule 50(a) at trial.[64] These arguments made in support of Defendants' motion for a directed verdict are simply not the same arguments made here. Indeed, at trial, Defendants did not argue any lack of awareness of Dr. Edelman's protected activity by Antonik.  There is absolutely no evidence of such an argument in the record.  Similarly, Defendants did not argue at trial that Antonik did not participate in the retaliatory conduct, only that Rubin was the decision-maker.  Finally, Defendants failed to argue at trial that NYU was not negligent in relying on the information provided by Antonik or in its investigation leading to Dr. Edelman's termination.  Because Defendants did not raise these arguments at trial, this Court may not consider them in their Rule 50(b) motion.[65]

**B.    Defendants Failed to Establish that There was an Insufficient Evidentiary Basis for Finding that Defendants, Antonik, and NYU Retaliated Against Dr. Edelman.  As Such, the Jury's Verdict on Plaintiff's Retaliation Claim Must Not be Disturbed.**

<u>Legal Standard</u>

Assuming *arguendo* Defendants complied with Rule 50(a), their burden on a Rule 50(b) motion for JMOL is "*particularly heavy*" when the "jury has deliberated in the case and actually returned its verdict."[66]  JMOL may only be granted if it "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party."[67]  "The court must consider the evidence in the light most favorable to the non-movant and 'give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.'"[68]

---

[64] Instead, Defendants argued under Rule 50(a) at trial only the following relevant arguments: (i) there was no protected activity; (ii) any alleged protected activity did not cause an adverse employment action; (iii) Antonik did not retaliate because all he did was forward some emails upon the request of others. <u>Tr.</u> at 1298:3-1331:19. These arguments simply do not mirror the arguments Defendants now attempt to improperly raise under Rule 50(b).

[65] <u>See Barkley v. Olympia Mortg. Co.</u>, 557 Fed. Appx. 22, 27 (2d Cir. 2014) (summary order).

[66] <u>See Cross v. N.Y.C. Trans. Auth.</u>, 417 F.3d 241, 248 (2d Cir. 2005) (emphasis added).

[67] <u>See</u> Fed. R. Civ. P. 50(a)(1).

[68] <u>See Ginder</u>, 752 F.3d at 574 (<u>quoting Jones v. Town of East Haven</u>, 691 F.3d 72, 80 (2d Cir. 2012)).

"A Rule 50 motion may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of *sheer surmise and conjecture*, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]."[69] "'The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury,' and 'must disregard all evidence favorable to the moving party that the jury is not required to believe.'"[70]  As will be demonstrated below, Defendants fail to meet the extremely high standard under Rule 50(b) necessary to overturn the jury's verdict of Dr. Edelman's retaliation claim and their motion must be denied.

   i.   Defendants Failed to Establish an Absence of Evidence that Antonik Had
        <u>Knowledge of Plaintiff's Protected Activity</u>

In order to establish that an individual defendant had knowledge of protected activity, a plaintiff must show that the individual defendant *was aware* of the plaintiffs' protected activity.[71]

In their motion, Defendants failed to demonstrate the complete absence of evidence in the trial record about Antonik's lack of knowledge of protected activity needed to overturn the jury's verdict under Rule 50.  In fact, the trial record is replete with evidence and reasonable inferences the jury could easily make that Antonik had knowledge of Dr. Edelman's protected activity.   In support, Defendants rely on <u>Krasner v. HSH Nordbank AG</u>[72] to argue that lack of knowledge of protected activity requires dismissal retaliation claim.  But <u>Krasner</u> involved a plaintiff who never previously complained about discrimination, which is easily distinguishable from the facts here.

---

[69] <u>Id.</u> (emphasis added) (quoting <u>Tepperwien v. Entergy Nuclear Operations, Inc.,</u> 663 F.3d 556, 567 (2d Cir. 2011)); <u>see also</u> <u>Triolo v. Nassau Cty,</u> 24 F.4th 98, 105 (2d Cir. 2022).

[70] <u>See</u> <u>ING Glob.,</u> 757 F.3d at 97 (citation omitted); <u>see also</u> <u>Deloreto v. Karengekis,</u> 104 Fed. Appx. 765, 767 (2d Cir. 2004) (summary order) (quoting <u>Tolbert,</u> 242 F.3d at 70).

[71] <u>See</u> <u>Stern v. State Univ. of N.Y.,</u> No. 16-CIV.-5588, 2018 WL 4863588, at *18 (E.D.N.Y. Sept. 30, 2018) (emphasis added); <u>see also</u> <u>Cardwell v. Davis Polk & Wardwell LLP,</u> 2023 WL 2049800, at *32 (S.D.N.Y., 2023).

[72] <u>See</u> 680 F. Supp. 2d 502, 521 (S.D.N.Y. 2010); <u>Seivright v. Montefiore Med. Ctr.,</u> 2014 WL 896744, at *12 (S.D.N.Y. Mar. 3, 2014); McKenzie v. Big Apple Training Inc., 2023 WL 4866041, at *8 (S.D.N.Y., 2023).

Here, based on the facts in the trial record most favorable to Plaintiff and drawing all reasonable inferences in her favor, the jury could reasonably infer that Antonik knew about Dr. Edelman's protected activity, because – unlike the plaintiff in Krasner – she unquestionably complained about harassment based on her sex.  The record is rife with ample evidence for the jury to reasonably infer that Antonik knew about her complaint to HR about his conduct.

*First*, during the September 16, 2019 incident in her office, Antonik called Dr. Edelman a bitch, yelled at her, and physically tried to intimidate her because of her sex.  Antonik did all of this and was well aware of his conduct against Dr. Edelman.  The jury could reasonably infer that Antonik understood that his conduct was sexist and that calling Dr. Edelman a bitch could be construed by Dr. Edelman as harassment based on her sex.

*Second*, the very next day, even before Dr. Edelman complained to HR, Antonik escalated the incident by reporting it to his superiors.[73]  Based on his own reporting, the jury could reasonably infer that he escalated the situation because he realized that he acted unlawfully, that calling Dr. Edelman a bitch was discriminatory and harassing, and wanted to get ahead of any fallout that might result for what he anticipated would be a complaint from Dr. Edelman given that the incident ended with Dr. Edelman kicking Antonik out of her office due to his conduct.

*Third*, on September 17, 2023 (the same day Antonik escalated the issue), he received a call from HR about the incident with Dr. Edelman.[74]  Pacina said that she discussed the incident with Antonik.  It is reasonable for the jury to infer that Pacina, as an experienced HR manager, fully informed Antonik about Dr. Edelman's complaint, including that he called her a bitch and that Dr. Edelman complained that Antonik acted in a demeaning and harassing manner because of her sex.

---

[73] Tr. at 568:7-569:18; see also Pl. Ex. 55.
[74] Tr. at 523:11-524:24.

Thus, it is reasonable for the jury to determine that Pacina fully and completely informed Antonik of the charges against him so that he, in turn, could fully respond.  As a result, by that point in time, again, the jury could reasonably infer that Antonik was aware of Dr. Edelman's protected activity.  Moreover, although neither Antonik nor Pacina recall their conversations with each other,[75] the jury could easily find that Pacina told Antonik about Dr. Edelman's harassment complaint because she called him right after speaking to Dr. Edelman as the complaint was fresh in Pacina's mind.

*Fourth*, Antonik even admitted that he understood Dr. Edelman's complaint was not about office space but rather about him and his sexist conduct against Dr. Edelman – another inference of Antonik's knowledge of Dr. Edelman's protected activity.[76]

*Fifth*, Antonik admitted that he was bothered by Dr. Edelman's complaint against him.  A jury could reasonably infer that he was bothered because he knew that Dr. Edelman had logged a discrimination and harassment complaint against him.  In contrast, a jury could reasonably infer that Antonik would not have been bothered if the dispute was just about "office space."

*Sixth*, just two (2) days after the incident, Kaplan wrote to Swirnow informing him that "Dr. Edelman filed a complaint against Joe Antonik for being aggressive and retaliating for not allowing her to expand her hours."[77]  As the director of Antonik, and someone who works closely with him, it is reasonable for the jury to infer that Kaplan shared the contents of this email with Antonik such that Antonik was aware of the complaint against him for being aggressive which included calling Dr. Edelman a bitch, demonstrating his awareness of her protected activity.

---

[75] Tr. at 523:19-524:1, 1100:4-5, 1108:12-15.

[76] Tr. at 530:5-10, 570:3-25 (Q. It doesn't say here that it's about the office issue; correct? **A. No.** Q. It says that it's about you; correct? **A. Yes.**"); see also Pl. Ex. 49.

[77] Tr. at 576:6-578:6; see also Def. Ex. SS.

*Seventh*, when Dr. Edelman's complaint was not resolved, she continuously followed up with HR over the status of her complaint and further highlighted the harassment stating that there was "inappropriate conduct" in the workplace, that she considered this "bullying" in the workplace, she needed to be able to work in a "non-hostile environment," and disappointment that she had to contend with "male chauvinism."  It is also reasonable for the jury to infer that HR followed up with Antonik about Dr. Edelman's subsequent emails as part of NYU's investigation which again would have made Antonik aware of her protected activity.

*Lastly*, Antonik's subsequent adverse actions against Dr. Edelman after her complaint (especially in the absence of any such actions prior thereto) such as: (i) not allowing Dr. Edelman to expand her hours; (ii) the "Edelman issues" log appearing from Antonik's subordinate shortly after her complaint; and (iii) his November 6, 2020 email coordinating and encouraging her fellow employees to provide negative feedback about Dr. Edelman could lead the jury to reasonably infer that Antonik had a retaliatory animus against Dr. Edelman, not because of an office dispute, but because Dr. Edelman accused Antonik of discrimination and harassment.  Further, Antonik's November 2020 emails provide sufficient circumstantial evidence that he had a retaliatory animus towards Dr. Edelman due to the complaint she filed against him.[78]  Based on all of the above, the jury could therefore reasonably infer that, because Antonik was upset by Dr. Edelman's complaint, he instigated "concerns" about her to get her fired.

---

[78] Tr. at 500:1-6; see also Pl. Ex. 86 ("we need a clear, convincing summary with examples sent"); see also Edelman v. NYU Langone Health System, 2022 WL 4537972, at *11 (S.D.N.Y. 2022) ("While the lapse of a bit more than one year is longer than a typical temporal-proximity case, Plaintiff was not an at-will employee, and her conduct did not fit into any of the narrow categories of cause for which she could be fired immediately. Defendants began making a record of purportedly non-discriminatory reasons to discharge Plaintiff within weeks after she made her discrimination complaint and then fired her at the first opportunity, when her contract came up for renewal. Under those circumstances, the temporal proximity between Plaintiff's protected activity and her firing is sufficient to raise an inference of causation at the first step") (quoting Rasmy v. Marriott International, Inc., 952 F.3d 379, 391 (2d Cir. 2020) ("Questions regarding the time gap and causal connection of an alleged retaliatory termination may entail special consideration of the size and complexity of a defendant employer, where termination of employment may involve multiple layers of decisionmakers....").

For all the foregoing reasons, there was ample evidence and a plethora of reasonable inferences drawn by the jury that Antonik was well aware of Dr. Edelman's protected activity, and the jury's verdict was not the product of sheer surmise and conjecture needed to grant Defendants' Rule 50(b) motion.

ii.   Defendants Failed to Establish an Absence of Evidence that Antonik Participated
        in the Adverse Employment Action Against Plaintiff

Defendants argue that Antonik did not participate in the process that led to Dr. Edelman's termination.  They rely on <u>Olaechea v. City of New York</u>[79] for the proposition that an individual defendant must participate in the adverse employment action and have a retaliatory intent.  But <u>Olaechea</u> is inapposite since the individual defendant consistently disavowed knowledge of the plaintiff's protected activity in that case, and the plaintiff was only able to adduce evidence that the court found was circumstantial.  Here, and as set forth below, Defendants' argument is not supported by the trial record which contains evidence that Antonik knew about Dr. Edelman's complaint and that it was not just about office space.

Under the NYSHRL, any co-worker who actually participates in the conduct giving rise to a discrimination claim is liable under the NYSHRL even if that co-worker lacks authority to hire or fire the plaintiff.[80]  In <u>Feingold</u>, the plaintiff proffered evidence that the individual defendants actually participated in conduct that gave rise to Plaintiff's discrimination claims and the supervisor made no efforts to remedy the behavior (despite awareness), and terminated the employment for impermissible factors. <u>Id.</u>

---

[79] <u>See</u> 2022 U.S. Dist. LEXIS 142037, *14.
[80] <u>See</u> <u>Feingold v. New York</u>, 366 F.3d 138, 158 (2d Cir. 2004); <u>see also</u> <u>Tomka v. Seiler Corp.</u>, 66 F. 3d 1295, 1317 (2d Cir. 1995).  The same standards of analysis used to evaluate aiding and abetting claims under the NYSHRL applies to claims under the NYCHRL because the language of the two laws is virtually identical.  <u>See</u> <u>Dunson v. Tri-Maintenance & Contractors, Inc.</u>, 171 F. Supp. 2d 103, 113-114 (E.D.N.Y. 2001); <u>see also</u> <u>Kato v. Ishihara</u>, 239 F. Supp. 2d 359, 365 (S.D.N.Y. 2002).

Specifically, the Second Circuit found in <u>Feingold</u> that defendants Lee–Sang, Tapia, and Waltrous all participated in creating a hostile work environment, (b) that Waltrous and Isaacs assigned him a disproportionate workload because of his race, and (c) that Sullivan and Schulgasser not only took no action to remedy such behavior although they were aware of it, but also terminated Feingold's employment on the basis of impermissible factors.[81]

This case is similar to <u>Feingold</u>, where: (i) Antonik – like Lee-Sang, Tapia, Waltrous, and Isaacs – engaged in discriminatory behavior by calling Dr. Edelman a bitch, then having a log created and soliciting others for negative feedback on Dr. Edelman which paved the way to retaliate against her by having her terminated; (ii) Rubin – like Sullivan and Schulgasser – not only took no action to remedy Antonik's behavior despite their awareness of it but instead terminated Dr. Edelman without performing a proper, independent investigation.

Crucially, under both the NYSHRL and the NYCHRL, the individual must have actually participated in the conduct that would reasonably deter a person from engaging in protected activity and and the NYCHRL provides "a broader basis for direct individual liability than" the NYSHRL, in that it permits liability regardless of the individual's decision-making power.[82]  In other words, it is irrelevant that Antonik had no decision-making authority over Dr. Edelman's employment at NYU.  Antonik's concerted action could reasonably have played an important role in her termination by having logs prepared, raising concerns with Kaplan and Dr. Porges, and encouraging others to pile on to Dr. Edelman.  This is more than enough to constitute "participation" under the NYSHRL and NYCHRL.  Indeed, Antonik was the catalyst and primary actor behind Dr. Edelman's termination,  and admitted that he was the first to complain about her.[83]

---

[81] <u>Id.</u>
[82] <u>See</u> <u>Fitchett v. City of New York</u>, 2021 WL 964972, at *8 (S.D.N.Y. 2021) (<u>citing</u> <u>Malena v. Victoria's Secret Direct, LLC</u>, 886 F. Supp. 2d 349, 366 (S.D.N.Y. 2012).
[83] <u>Tr.</u> at 498:17-502:20, 504:5-12.

In addition, the jury could also reasonably infer that Antonik directed Ruiz, a subordinate, to create a log of "issues" for Dr. Edelman shortly after her complaint against him.[84]

Thereafter, Antonik raised clinical concerns about Dr. Edelman to Dr. Porges and Kaplan, even though it was not Antonik's job to do so.  The creation of the log would be sufficient participation in that a reasonable person may be deterred from engaging in protected activity if they knew that a log would be created to document that their "alleged" work deficiencies.

After he raised these concerns, Antonik compiled and editorialized notes from the log and solicited others on his own to provide him with "clear and convincing" examples of Plaintiff's poor performance so that he could get this information to someone in a position to terminate Dr. Edelman.  In short, Antonik instigated and targeted Dr. Edelman (and Dr. Edelman alone), and led a campaign against her that ultimately led to her termination.[85]  Again, this type of solicitation of co-workers would reasonably deter someone from engaging in protected activity.  Antonik's level of involvement constitutes participation under the NYSHRL and NYCHRL; without it, Dr. Edelman would not have been fired.[86]  As such, Antonik sufficiently participated in Dr. Edelman's termination to hold him liable for retaliation as the jury concluded.

---

[84] Defendants' argument that there was no evidence Antonik directed Ruiz to log issues concerning Dr. Edelman following her complaint against Antonik is similarly non-sensical.  Ruiz's log virtually matches Antonik's November 6, 2020 email in content and the log begins within two (2) months of Dr. Edelman's complaint against Antonik despite the fact Dr. Edelman has worked at NYU since December 2014 and Ruiz commenced employment with NYU many years earlier.  Tr. at 77:16-78:1, 807:1-2.    The jury could reasonably infer that Antonik, as Ruiz's supervisor, was involved in the logs against Dr. Edelman.

[85] Further, it is evident that the jury rejected Antonik's testimony in its entirety in rendering the verdict.  To the extent the jury did so, they were able to reject his entire testimony based on his lack of credibility.  Tr. at 1436:17-1437:3 (charging jury that they "are not required to believe an interested witness" and that they "may accept as much of the witness's testimony as [they] deem reliable and reject as much as [they] deem unworthy of acceptance"); see also Martinez v. City of New York, 2023 WL 4627739, at *10 (E.D.N.Y. 2023) ("the jury was, of course, free to credit Plaintiff's own testimony and that of her expert witnesses and reject Defendants'").

[86] Defendants' argument that Antonik did not have any conversations about Dr. Edelman with Rubin or Swirnow is also unsupported by the trial record.  Antonik met with  Rubin and Swirnow on a monthly basis at their office in Manhattan, and Antonik admitted that the directives concerning office space came from Rubin and Swirnow, such that they would be kept informed about all developments concerning same. Tr. at 512:25-513:24, 512:10-18.

17

Finally, it bears emphasis that Antonik not only collected evidence from Ruiz concerning Dr. Edelman, but he editorialized them despite the fact he did not witness nor have first-hand knowledge of any of the items in Ruiz's log.[87] The jury could also conclude that Antonik participated in the process that led to Dr. Edelman's termination when he engaged and solicited others to provide "clear and convincing" evidence of "issues" with Dr. Edelman and did so with a retaliatory animus as there was no evidence presented that he did this for any other physician and Ruiz's log begins shortly after Dr. Edelman first complained about Antonik.

Based on the above, the jury could easily find that Antonik unquestionably instigated and directly participated in retaliating against Dr. Edelman for engaging in protected activity which ultimately led to her termination.

    iii.    Defendants Failed to Establish an Absence of Evidence that NYU Acted <u>Negligently in Relying on the Information Provided by Antonik</u>

Contrary to Defendants' argument, the trial record reflects ample evidence that NYU acted negligently in relying on the information provided by Antonik.  Defendants rely on <u>Kregler v. City of New York</u>[88] to support the argument that they were not negligent in relying on the information provided by Antonik, but that case is inapposite.  In <u>Kregler</u>, the individual who provided information to have the plaintiff there terminated had no knowledge of the plaintiff's complaint, whereas here, Antonik, Kaplan, and Dr. Porges were all aware of Dr. Edelman's complaint against Antonik.

---

[87] <u>Compare</u> <u>Pl. Exs.</u> 84 (Ruiz log) with 86 (Antonik email) with 1 (Dr. Porges email); <u>see also</u> <u>Tr.</u> at 504:13-16, 504:24-505:1, 505:14-16, 579:9-18, 580:23-581:3.
[88] <u>See</u> 987 F. Supp. 2d 357, 369 (S.D.N.Y. 2013).

In Vasquez v. Empress Ambulance Service, Inc., the Second Circuit has held that an employer may be liable under Title VII when, through its own negligence, the employer gives effect to the retaliatory intent of one of its—even low-level—employees.[89]

The circumstances in Vasquez are virtually identical to those here.  Like the plaintiff in Vasquez, Dr. Edelman complained about gender discrimination.  Antonik learned about the complaint and offered information to NYU for the purpose of terminating Dr. Edelman.  Like the employer in Vasquez, NYU relied on Antonik's information and negligently chose to credit only his account[90] without getting Dr. Edelman's side of the story and without performing a proper investigation.

Indeed, while Defendants argue that NYU did not act negligently in relying on what were ultimately Antonik's complaints against Dr. Edelman that came to NYU by and through Kaplan, Dr. Porges, and Dr. Goldberg, the jury had an ample basis to reject this testimony for several reasons.  As an initial matter, there is no dispute that NYU had corporate knowledge of Dr. Edelman's complaint against Antonik.[91]   As such, NYU should have questioned and investigated Antonik's claims knowing that he had a possible retaliatory motive to act against Dr. Edelman.  As such, NYU should not have taken Antonik's complaints as gospel, but should have instead viewed the allegations with a jaundiced eye.

---

[89] See 835 F.3d 267, 273-74 (2d Cir. 2016) ("an employer can be held liable under Title VII if: the plaintiff's co-worker makes statements maligning the plaintiff, for discriminatory reasons and with the intent to cause the plaintiff's firing; the co-worker's discriminatory acts proximately cause the plaintiff to be fired; and the employer acts negligently by allowing the co-worker's acts to achieve their desired effect though it knows (or reasonably should know) of the discriminatory motivation").

[90] While NYU sought accounts from Drs. Porges and Goldberg, the trial record establishes that: (i) Antonik came to Dr. Porges with the clinical concerns, which he claims to have investigated but failed to provide any evidence in support of any such investigation; and (ii) Dr. Goldberg only provided his opinion after Dr. Edelman was already terminated.  Viewed in a light most favorable to Dr. Edelman, this "investigation" was not enough.

[91] See Patane v. Clark, 508 F.3d 106, 115 (2d Cir. 2007).

Critically, Defendants' myopic focus on the alleged clinical concerns ignore the fact that the jury squarely rejected Defendants' proffered reason for Dr. Edelman's termination as pretextual in light of the plethora of evidence that she was an amazing doctor who met all of her performance targets.[92]  Indeed, the evidence adduced at trial shows that Dr. Edelman was qualified, met all of her performance metrics, was not written up or disciplined in any way, and had a large following of loyal patients.  It is therefore obvious that her termination had nothing to do with her performance.  There is ample evidence and reasonable inferences the jury could draw to support its finding that NYU acted negligently in giving effect to Antonik's retaliatory intent.  Because NYU knew about Dr. Edelman's complaint against Antonik, it should have verified the concerns raised independently and failed to do so in numerous ways.

*First*, Defendants failed to discuss their alleged concerns with Dr. Edelman.[93]  The *sine qua non* to any reasoned determination is to hear from both sides in order to make an appropriate determination.  Defendants concede that they *never* discussed any of these serious concerns with Dr. Edelman, which support the reasonable inference the jury drew: the concerns were pretextual and NYU acted negligently.

*Second*, Defendants did not offer any evidence at trial supporting the clinical concerns.  For example, Dr. Porges testified that Dr. Edelman ordered way too many labs and x-rays.  Yet, NYU failed to even identify the number of labs and x-rays that Plaintiff performed other than stating that it was "too many" which the jury could have easily found unpersuasive.  Further, Defendants failed to produce any evidence concerning any comparison with the other rheumatologists with respect to labs and x-rays ordered.

---

[92] See Pl. Ex. 93.  As such, there was not an absence of evidence for the jury to be unable to infer that Antonik discussed Dr. Edelman's complaint with Swirnow and/or Rubin. See Pl. Ex. 62 (referencing the fact that leadership – i.e., Rubin and/or Swirnow – had to be notified about Dr. Edelman's complaint).

[93] See, e.g., Tr. at 825:23-24.

Dr. Porges even conceded that it was at times necessary to order many labs.[94]  Again, this was negligent on the part of NYU. Moreover, Defendants claim that Dr. Edelman's clinical performance was not up to NYU's standards, but failed to present any evidence at trial as to what those standards are.  As such, it was reasonable for the jury to conclude that this purported reason for Dr. Edelman's termination was pretextual and not worthy of belief.

*Third*, Defendants failed to follow protocol concerning patient care issues to the extent they existed.  NYU did not report Dr. Edelman's conduct to the compliance department or the Office of Professional Medical Conduct, nor did they remove Dr. Edelman from NYU to avoid the risk of any other alleged patient care issues.

*Fourth*, NYU kept Dr. Edelman employed as a physician for six (6) months after learning that of her alleged clinical concerns.  The jury could have reasonably inferred that if there were actual clinical concerns, Defendants would not have permitted to remain employed for six (6) additional months to avoid any risk to patients.

*Lastly*, there was no evidence offered of any interpersonal conflicts other than two isolated instances in November 2019 and March 2020, both of which were after Dr. Edelman's complaint against Antonik.  Without such conduct, the jury could reasonably infer that the Plaintiff's alleged conflicts with staff did not merit termination.    It also bears emphasis that Dr. Edelman began working for NYU in November 2014 and had no issues with her employment for six (6) years.  With these complaints suddenly surfacing, it was reasonable for the jury to infer they were raised as a pretext for retaliation.  Where an employer offers different reasons for termination, pretext is inferred.[95]

---

[94] Tr. at 1144:12-18.
[95] See EEOC v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994).

In <u>Warmin v. New York City Dep't of Educ.</u>,[96] the court held, and cited cases in support of the holding, that:

> [C]ausal connection may still be inferred where longer periods of time separate a protected activity and adverse action, if it is plausible that there was no earlier opportunity to retaliate in the manner alleged.[97] … In this case, Warmin has alleged that the DOE acted to block his employment at its first opportunity, when he was nominated for a job in 2016. These facts support a reasonable inference of causal connection under the law of the Second Circuit.

Viewing the facts in this light most favorable to Dr. Edelman, as required on a Rule 50(b) motion, it is reasonable for the jury to infer that that Defendants engaged in after-the-fact justifications for their decision to terminate Dr. Edelman, which was obviously based on her decision to pursue a complaint against Antonik and that NYU was negligent in reaching its decision to terminate Dr. Edelman.

Their decision was a *fait accompli*, and NYU was negligent in giving effect to Antonik's complaints about Dr. Edelman.

## II.   THE COURT SHOULD DENY DEFENDANTS' MOTION FOR REMITTITUR OF THE JURY'S FRONT PAY AWARD

### A.   Legal Standard

Rule 59 allows a district court "to alter or amend a judgment."[98]  This rule "enables a party to request that a district court reconsider a just-issued judgment."[99]

---

[96] <u>See</u> 2019 U.S. Dist. LEXIS 125774, *23-24, 2019 WL 3409900 (S.D.N.Y. 2019)

[97] <u>See</u> <u>Grant v. Bethlehem Steel</u>, 622 F.2d 43, 45-46 (2d Cir. 1980) (holding that plaintiff established causal connection despite an eight-month lapse in time when the defendant was unable to retaliate in the manner alleged any sooner); <u>see also</u> <u>Massaro v. Bd. of Educ.</u>, 774 Fed. Appx. 18 (2d Cir. May 21, 2019) (summary order) (finding causal connection where a school retaliated against an employee at its earliest opportunity, after summer break had concluded); <u>Blanco v. Brogan</u>, 620 F. Supp. 2d 546, 557 (S.D.N.Y. 2009) (collecting cases for proposition that "[t]he Second Circuit and the Courts of this District have found a causal connection" where a defendant retaliated at its first opportunity, even where action was up to 13 months removed from the protected activity).

[98] <u>See</u> Fed. R. Civ. P. 59(e).

[99] <u>See</u> <u>Banister v. Davis</u>, 140 S. Ct. 1698, 1703 (2020).

The rule "gives a district court the chance 'to rectify its own mistakes in the period immediately following' its decision."[100] Critically, "reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly."[101]  "In reviewing a claim that the jury awarded excessive damages, we view the evidence and draw all factual inferences in favor of the [non-moving party], and we accord substantial deference to the jury's determination of factual issues."[102]  Front pay compensates employees for the diminution in expected earnings for as long as the injury from the discrimination is expected to affect their job prospects.[103]  Front pay is a form of equitable relief.[104]  By its nature, front pay is not a fixed, precise amount; calculating front pay necessarily implicates predictions and assumptions about the future.[105]  Courts include sums that compensate employees for lost earnings and benefits in fashioning front pay awards, including employer contributions toward benefits and net lost pension benefits.[106]

**B.     The Jury's Front Pay Award of $700,000.00 Should Not be Disturbed**

Defendants' argue that the jury's $700,000.00 verdict is not supported by the record and unduly speculative.  However, there is more than sufficient evidence with which the jury could have rendered its conclusion. As an initial matter, front pay awards may be sustained if they are based on instructions to "apply sound judgment [and] common sense in reaching the proper amount of damages" and that "there must be evidence to establish damages."[107]

---

[100] Id. (quoting White v. N.H. Dep't of Emp. Sec., 455 U.S. 445, 450 (1982)).

[101] See Mohammadi v. Islamic Republic of Iran, 782 F.3d 9, 17 (D.C. Cir. 2015) (citing 11 Charles Alan Wright et al., Federal Practice & Procedure § 2810.1 (3d ed.2012)); see also Soto-Padro v. Public Bldgs. Authority, 675 F.3d 1, 9 (1st Cir. 2012) ("Given all this, it is exceedingly difficult for a litigant to win a Rule 59(e) motion").

[102] See Scala v. Moore McCormack Lines, Inc., 985 F.2d 680, 683 (2d Cir. 1993) (internal quotation marks and citations omitted) (citing Martell v. Boardwalk Enters., 748 F.2d 740, 750 (2d Cir. 1984)).

[103] See Maxfield v. Sinclair Int'l, 766 F.2d 788, 795-97 (3d Cir. 1985)).

[104] See Hayes v. SkyWest Airlines, Inc., 12 F.4th 1186, 1205 (10th Cir. 2021).

[105] Id.

[106] See Hartley v. Dillard's, Inc., 310 F.3d 1054, 1063 (8th Cir. 2002); see also Blum v. Witco Chem. Corp., 829 F.2d 367, 373-74 (3d Cir. 1987)).

[107] See Broadnax v. City of New Haven, 141 Fed. Appx. 18, 23 (2d Cir. 2005).

District courts in this Circuit have interpreted <u>Broadnax</u> to stand for the proposition that, as long as a court instructs a jury to tether its damages award to lost compensation, a front pay award is proper.  Notwithstanding, Defendants rely on <u>Olaechea</u> for the proposition that front pay awarded based on speculation should be subject to remittitur.   However, that court vacated the front pay award because there was *no evidence* the plaintiff there made any effort to mitigate her damages.  Here, the trial record contains extensive evidence of Dr. Edelman's mitigation efforts.[108]

Moreover, Dr. Edelman clearly sought as front pay her lost retirement benefits, medical benefits, and expense reimbursements, among other benefits.  Further, there is no basis to conclude that the jury's $700,000.00 award was excessive.  The evidence adduced at trial shows that Dr. Edelman would have had a successful career at NYU were it not for Defendants' retaliatory conduct.  She always met or exceeded her wRVU targets, and hence would have enjoyed increases in pay as a result of same.  Indeed, the trajectory of the increases in her compensation – from $207,000.00 (2014-2017) to $278,000.00 (2018-2021) – suggests a similar large increase in 2021 but for Defendants' unlawful retaliation against her.  Indeed, because Dr. Edelman received an approximately thirty-five percent (35%) increase in salary following her first renewal at NYU, it would be reasonable for the jury to conclude that she could have received a similar increase for her second renewal, i.e., $375,300.00 which would justify the jury's proper front pay award.[109]

Further, it is undisputed that the benefits at Dr. Edelman's new practice in Florida pale in comparison to that of NYU's in every respect.  Dr. Edelman lost those benefits upon being unlawfully terminated.   This is especially true of retirement benefits, given their tax advantages and expected rates of return over the course of many years, and courts routinely award such

---

[108] <u>Tr.</u> 145:5-14; <u>see also</u> <u>Pl.</u> <u>Ex.</u> 88.
[109] Dr. Edelman's renewed contract does not state a basis for the increase which the jury could reasonably infer was a merit increase.

benefits as part of a plaintiff's Title VII damages on the basis that such relief is "necessary to fulfill the court's duty to remedy the Defendants' proven past wrongs."[110]  Courts have also awarded retirement benefits as part of a plaintiff's NYSHRL and NYCHRL damages.[111]  Here, Dr. Edelman lost health benefits and related benefits that the jury could reasonably have inferred the value of based on their common sense and life experiences.[112]  In addition, the jury was instructed that front pay awards may be issued towards some unfixed future point in time.[113]  Defendants did not object to this language, and it was reasonable for the jury to infer the value of Dr. Edelman's benefits at NYU totaled $700,000.00 based on what she could have expected to earn there over the course of her long career at NYU had she not been unlawfully terminated.  Because, "in all cases, juries are presumed to follow the court's instructions,"[114] the jury in this case is presumed to have found that Dr. Edelman lost $700,000.00 in wages and benefits if she was not retaliated against for engaging in protected activity.[115]

Defendants also argue without any legal support that Dr. Edelman's front pay award should be reduced due to her Rule 26 disclosures.  However, as the court aptly noted to the jury, front pay is for lost compensation "even if difficult to calculate" and "[a]ny uncertainty about the amount of lost compensation to be awarded to Dr. Edelman should be resolved in her favor." Moreover, front pay is awarded for compensation *after* the jury verdict for *future* lost compensation which would be difficult to predict and impossible to calculate in Rule 26 disclosures.  Accordingly, Defendants' argument is meritless.  As such, there is no basis to reduce front pay award here.

---

[110] See Santiago v. Crown Heights Center for Nursing and Rehabilitation, 2017 WL 9482107, at *20 (E.D.N.Y., 2017) (citing United States v. City of N.Y., No. 07-CIV.-2067, 2015 WL 1800245, at *7 (E.D.N.Y. Apr. 16, 2015)).

[111] See Sass v. MTA Bus Co., 6 F. Supp. 3d 238, 258 (E.D.N.Y. 2014) (ordering defendant to provide contributions to plaintiff's retirement plan as part of plaintiff's damages awarded under the NYCHRL).

[112] See https://www.kff.org/report-section/ehbs-2022-section-1-cost-of-health-insurance/ ("The average annual premiums in 2022 are … $22,463 for family coverage").

[113] Tr. at 1473:15-1474:2.

[114] See CSX Transp., Inc. v. Hensley, 556 U.S. 838, 841 (2009)

[115] See KT Group Limited v. NCR Corporation, 412 F.Supp.3d 305, 327 (S.D.N.Y. 2019).

## **CONCLUSION**

Based on the foregoing, Defendants' motion for judgment as a matter of law and to alter

or amend the judgment must be denied in its entirety

Dated:    Lake Success, New York
            September 21, 2023                  Respectfully submitted,

                **MILMAN LABUDA LAW GROUP PLLC**

              By:_____/s/_____
                Joseph M. Labuda, Esq.
                Emanuel Kataev, Esq.
                3000 Marcus Avenue, Suite 3W8
                Lake Success, New York 11042
                (516) 328-8899 (office)
                (516) 328-0082 (facsimile)
                joe@mllaborlaw.com
                emanuel@mllaborlaw.com

                *Attorneys for Plaintiff*
                *Dr. Sari Edelman*