# EXHIBIT Q

N7ICede1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   DR. SARI EDELMAN,

4                  Plaintiff,

5          v.                          21 Civ. 502 (LJL)

6   NYU LANGONE HEALTH SYSTEM, *et
    al.*,

7
                   Defendants.
8                                      Trial
    ------------------------------x
9                                      New York, N.Y.
                                       July 18, 2023
10                                     9:00 a.m.

11  Before:

12                     HON. LEWIS J. LIMAN,

13                                     District Judge
                                       -and a Jury-
14

15                     APPEARANCES

16  MILMAN LABUDA LAW GROUP PLLC
         Attorneys for Plaintiff
17  BY:  JOSEPH M. LABUDA
         EMANUEL S. KATAEV
18
    TARTER KRINSKY & DROGIN LLP
19       Attorneys for Defendants
    BY:  RICHARD C. SCHOENSTEIN
20       RICHARD L. STEER
         INGRID J. CARDONA
21

22

23

24

25

N7ICede1                    Porges - Direct

1     patients, you did not do any independent review; correct?

2     A.  No, that's incorrect.  I did a review -- I attempted a

3     review that involved many factors, including the cases from

4     Mr. Antonik, but I also tried to get cases from our nurse, and

5     I specifically asked for cases that I recalled that I asked our

6     nurse to find.

7     Q.  Other than your review, there was no independent review

8     conducted by someone outside of suite 306; correct?

9     A.  It's my understanding there was some review at some point

10    by Dr. Jill Buyon, who's the chief of rheumatology.

11    Q.  As far as these patient complaints go, you have no

12    knowledge as to whether Dr. Edelman was made aware of any of

13    these complaints; correct?

14    A.  I don't know what was transmitted to her.

15    Q.  You never discussed with Dr. Edelman directly, for example,

16    she was doing more x-rays than necessary; correct?

17    A.  I discussed it with the group as a whole, but not her

18    directly.

19    Q.  And that was sometime in 2019 or 2020; correct?

20    A.  Probably.

21    Q.  To your knowledge, Mr. Rubin and Mr. Swirnow together

22    decided not to renew Dr. Edelman's contract; correct?

23              MR. SCHOENSTEIN:  Objection.

24              THE COURT:  Sustained.

25    Q.  Do you know whether Mr. Rubin decided together with

1          MR. SCHOENSTEIN:  Objection.

2          THE COURT:  Sustained.

3   Q.  The concerns that you raise in this email were never

4   discussed directly with Dr. Edelman by you; correct?

5   A.  Correct.

6   Q.  And the reason for that was because NYU is not a training

7   program, in your words; correct?

8   A.  That's not the entire reason, that's one of the reasons.

9   Q.  You are not at NYU to help other doctors; correct?

10  A.  I'm not the -- I'm sorry.  Repeat that, please.

11  Q.  You are not at NYU to help other doctors; correct?

12  A.  No, I'm fully available to help many doctors.  I often work

13  with many doctors and we compare notes and I get asked to

14  assist with patients and sometimes I ask for doctors to assist

15  me.

16  Q.  In your role as medical director, you were not there to

17  train other doctors to provide better patient care.  Is that

18  your testimony?

19  A.  That's right, I'm not training the doctors.

20  Q.  And under your oversight as medical director, the doctors

21  sink or swim on their own; correct?

22         MR. SCHOENSTEIN:  Objection.

23         THE COURT:  Sustained.

24  Q.  In reviewing the tests that Dr. Edelman ordered, you

25  assumed that she did not run those tests due to a lack of

N7iWede2                          Porges - Direct

1    Q.  Based on your email and Plaintiff's Exhibit 1, is it

2    accurate to state that you believe continuing to have Dr.

3    Edelman at NYU would compromise patient care?

4    A.  I believe it would have been a risk to patient care.

5    Q.  But you felt that your only duty in terms of that was to

6    tell Mr. Rubin, Mr. Swirnow and Mr. Kaplan nothing more,

7    correct?

8    A.  I subsequently had a conversation with Dr. Gary Kalkut, who

9    is a clinician in leadership.

10   Q.  To your knowledge, as a doctor, aren't you required to

11   report such patient care issues to the Office of Professional

12   Medical Conduct?

13   A.  To my knowledge, nothing rose to the level of immediate

14   concern that I had to report to the office of professional

15   misconduct, no.

16   Q.  It's fair to say that you don't know whether Dr. Edelman

17   committed misconduct that would rise to such a level, correct?

18   A.  I did not perform a systemic review.  I did not go through

19   each and every one of her cases.

20         MR. KATAEV:  Just one second, your Honor.

21         I have no further questions.

22         THE COURT:  OK.  Defense examination.

23         Members of the jury, if you want to stretch for a

24   minute while counsel sets up.

25         OK.  Mr. Schoenstein.

N7iWede2                          Porges - Cross

1          No, no.  Scroll down, please, Ms. Cardona.

2          OK.  Stop right there.  And can you blow that up, if

3     you can, a little bit.

4     Q.  Do you see the language that begins on page D3, with "as we

5     discussed"?

6     A.  Yes.

7     Q.  And then as we scroll down, there's one paragraph and then

8     a second paragraph on the next page that begin "concerns

9     regarding patient care"?

10    A.  Uh-huh.

11    Q.  Who wrote those paragraphs?

12    A.  I did.

13    Q.  Did anybody assist you in writing those paragraphs?

14    A.  No.

15    Q.  Did you have a belief at the time as to the veracity and

16    accuracy of those paragraphs that you wrote and provided to

17    administration?

18          MR. KATAEV:  Objection.

19          THE COURT:  Overruled.

20    A.  Those are my genuine beliefs at the time, yes.

21    Q.  And were they based on the review you did that you've

22    talked about?

23    A.  They were based upon many factors, including my being in

24    the office for several years as well as reviewing some charts

25    as well as talking to people in the office.

N7iWede4

1          (Jury not present)

2          THE COURT:  All right.  Be seated.

3          I take it defendants have a motion.

4          MR. SCHOENSTEIN:  Yes, your Honor.

5          THE COURT:  Mr. Schoenstein.

6          MR. SCHOENSTEIN:  Your Honor, defendants move for a

7    directed verdict on pretty much the entirety of the case for

8    the record.  I'm going to go issue by issue for the record so

9    we have it down.

10          The Court is familiar with the standards for a

11   directed verdict motion, as set forth in *Casmento v. Volmar*

12   *Construction*, 2022 WL 15773966.  In this case, under Rule 50,

13   directed verdict is appropriate because the evidence in favor

14   of movant is so overwhelming that reasonable and fair-minded

15   persons could not arrive at a verdict against it.

16          Let me start with the parties.

17          Of the corporate parties, the only correct party here

18   is NYU Grossman School of Medicine.  That is the employer of

19   plaintiff as it is currently known.  None of those other

20   entities employ her.  There is no evidence of any involvement

21   of any of them, other than she read their names in some of the

22   documents.  And that's not evidence of what any of them did.

23   They're not needed for the case.  NYU Grossman School of

24   Medicine is a division of NYU itself, so we don't need any of

25   these other corporations.  They confuse and confound the jury.

N7iWede4

1    They should all be eliminated.

2         THE COURT:  And I take it that if a verdict was

3    returned against NYU Grossman School of Medicine -- is that a

4    legal entity that could satisfy a judgment?

5         MR. SCHOENSTEIN:  That is a division of NYU itself,

6    which is a legal entity, and there is zero question about

7    judgment satisfaction in this case, your Honor.  Zero.  I mean

8    hopefully there won't be one, but if there was.

9         THE COURT:  OK.

10        MR. SCHOENSTEIN:  Now, the Equal Pay Act claim, your

11   Honor, has not been substantiated.

12        First of all, she was not doing a substantial -- a job

13   with substantially equal skill, effort and responsibility of

14   the comparators.  She was below all three of them in

15   productivity.  Two of them, Goldberg and Porges, had different

16   jobs and responsibilities.  Modi was much more productive.  She

17   was not doing substantially equal work, which is the second

18   factor, because her RVUs were substantially less than the

19   others.  But really where this case turns on the Equal Pay Act

20   is the affirmative defense of a factor other than sex.

21        Respectfully, your Honor, there is no evidence that

22   sex played any role in this, so the only factors that went into

23   a determination of the pay were factors other than sex, and no

24   reasonable juror could disagree about that.  The evidence is

25   uniform that salary setters considered financial circumstances;

experience; reputation; business plans, where they had them;

compensation needs, where they were advanced by the applicants;

etc.  Those are factors other than sex, and no other jury -- no

reasonable jury could decide otherwise.

Separately, your Honor, the willfulness part of the

Equal Pay Act must be dismissed.  I cite *McLaughlin v. Richland*

*Shoe*, 486 U.S. 128.  Willfulness depends on a finding that the

employer either knew or showed reckless disregard for the

matter of whether its conduct was prohibited by the statute.

There is zero evidence of disregard by any of the defendants.

In fact, the evidence is that they cleared salaries with legal.

They cleared salaries with HR.  They did outside surveys of

salary, both to benchmark and to check gender disparity.  There

is no evidence that anybody intentionally ignored or willfully

ignored law.  And the willfulness part should be dropped even

if you leave in the Equal Pay Act claims.

Now, your Honor asked yesterday why should you do this

now instead of after the jury decides, and the answer is

simple:  Prejudice.  It is prejudicial to have claims go to the

jury that are not supported by the evidence.  They may consider

them in rendering verdicts on the other parts of the case.  It

makes them more likely to find discrimination if they're

thinking about equal pay than if the equal pay part is taken

out.  So it needs to be addressed now.

It will also shorten our closing arguments

1   considerably.  But that's not really a factor.  The fact is the

2   prejudice.  It increases the chance, your Honor, of a

3   compromised verdict if we leave in the case claims that don't

4   belong there.  If we leave stuff like willfulness that doesn't

5   belong there, it increases the possibility that the jury will

6   compromise on something in the middle, when the far end of the

7   spectrum has no support whatsoever and should not go to the

8   jury.

9         I want to turn to retaliation.

10        THE COURT:  I suppose that argument turns upon me

11   finding that there is some part of the plaintiff's case that

12   would survive a renewed motion.

13        MR. SCHOENSTEIN:  Oh, yes.

14        THE COURT:  If there's not, then even a compromise

15   verdict wouldn't stand.

16        MR. SCHOENSTEIN:  Well, that's true, your Honor.

17   That's true.

18        Retaliation, your Honor.

19        There was no protected activity, and I say that

20   because the complaints here were about office space, not about

21   discrimination.  I'm going to cite a case called *Robinson v.*

22   *DeNiro*, recently decided, on May 25, 2023 --

23        THE COURT:  I'm aware of it.

24        MR. SCHOENSTEIN:  -- by a very good judge.

25        You will see at pages 90 to 91 of your decision, your

1    Honor, you addressed that buzz words like "harassment" and

2    "toxic work environment" do not establish protected activity.

3            Now, remember, plaintiff's communications never said

4    anything about anyone calling her a bitch.  Her communications

5    were that she felt slightly intimidated because a tall guy came

6    into her office and waved his arms.  Those were not complaints

7    about discrimination, fairly read.  They were not understood by

8    NYU to be complaints about discrimination.  There is no

9    testimony that NYU regarded those as actual discrimination, so

10   it was not protected activity on the part, which is a predicate

11   for the retaliation claim.

12           Secondly, it did not cause an adverse employment

13   action.  All iterations of retaliation claims, be they Title

14   VII, state law or city law, require proof of causation.  There

15   is no such proof in this case.  Temporally, it's not close.

16   The allegations, the complaints end in November of 2020, 14

17   months -- well, at least 12 months -- before the alleged

18   adverse employment actions.  And the testimony uniformly --

19   every single witness -- was that the prior complaints about

20   office space had nothing to do with the decision to nonrenew

21   the contract, your Honor.

22           The decision was made, agree with it or not, based on

23   the assessment of her clinical practice.  So retaliation should

24   be dismissed against everybody, but let me also break it down

25   by defendant, because there are individual defendants here, and

1   they do not belong in the case.

2           I should add, by the way, that all of the arguments on

3   Equal Pay Act are even stronger as against the individual

4   defendants, Mr. Rubin and Mr. Swirnow, that they should be

5   taken out of the Equal Pay Act claims and the willfulness

6   claims whether or not you take out the others.

7           But on retaliation, Antonik didn't do anything to

8   retaliate.  He was asked to put forward some emails, and he

9   did.  He actually took notes from another employee, Ms. Ruiz,

10  the most credible witness I've ever seen, and gave them to

11  somebody else, as requested.  That's not retaliation.

12          Mr. Kaplan, he didn't do anything.  He said stop, put

13  it in writing and send it to the people who make these

14  decisions.  If that is retaliation, we are going down a really

15  bad path.

16          Mr. Swirnow didn't do anything.  He was involved in

17  discussions, but he didn't take an action or make a decision or

18  do anything that would be retaliation.

19          And Mr. Rubin, although he was the ultimate

20  decision-maker, he was the most removed from the complaints

21  that were supposedly being retaliated against.  And his

22  testimony is unimpeachable that he didn't take any of the prior

23  complaints into consideration.  He was considering only the

24  clinical factors, and you can't have a retaliation claim

25  against Mr. Rubin.

N7iWede4

1          THE COURT:  Could you on a cat's-paw-type theory?  I

2     mean assume that there is evidence that Dr. Porges was aware of

3     the complaint and assume that there's evidence that Dr. Porges

4     was motivated by some animus to the plaintiff and that

5     Mr. Rubin was manipulated.  Would that support a claim against

6     him or just against NYU?

7          MR. SCHOENSTEIN:  I think just against NYU.  If

8     Mr. Rubin is manipulated by others that he is considering in

9     good faith, I don't think there's any claim against Mr. Rubin.

10     I think he would have to be out.  And the evidence is just

11     overwhelming that he was basing his decision, in good faith, on

12     what he was told by the people he relies upon at NYU.

13          Mr. Steer's handing me a note about cat's-paw.  Of

14     course, there is no evidence of animus by Dr. Porges, but I

15     know your Honor was giving me a hypothetical.

16          So let me turn to what's left in the case, which is

17     the discrimination claim itself, which on summary judgment has

18     been limited to the issue of sexist remarks.  That is the issue

19     that brings us a case on discrimination.  And your Honor here,

20     too, there is no evidence sufficient to have a discrimination

21     claim.

22          Let me start with "smile," "fake it till you make it"

23     and "calm down."  Those are not gender-specific comments, and I

24     cite *Cadet-Legros v. N.Y. Univ. Hosp. Ctr.*, 135 A.D.3d 196,

25     from the First Department.  Generic terms like "tirade" and "a

| | |
|---|---|
| 1 | leopard does not change its spots" were not racially coded |
| 2 | language in the context of that case, and "smile" is not |
| 3 | racially coded in this case.  I cite for your Honor also |
| 4 | *Marseille v. Mount Sinai Hosp.*, 2022 WL 1470098.  In that it |
| 5 | was the term "aggressive."  It was a race-neutral term it would |
| 6 | not support.  Telling somebody to smile is not discrimination. |
| 7 | As I'm going to say to the jury tomorrow, if I have |
| 8 | to, we should all smile more. |
| 9 | Now, that leaves the alleged "bitch" comment. |
| 10 | THE COURT:  Just refresh me.  "Smile" and "fake it |
| 11 | till you make it," were these Rubin and -- |
| 12 | MR. SCHOENSTEIN:  Smile -- |
| 13 | THE COURT:  -- presence? |
| 14 | What's the evidence? |
| 15 | MR. SCHOENSTEIN:  Yes.  The evidence is that there was |
| 16 | a meeting in 2017, where Dr. Edelman's issues with her staff |
| 17 | first came to the attention, and she went in to see Mr. Rubin |
| 18 | and Mr. Swirnow.  And she testifies -- and no one else really |
| 19 | confirmed or expressly denied it -- that Mr. Rubin suggested |
| 20 | she smile and that she fake it till she makes it.  And |
| 21 | Mr. Rubin did not recall saying that, but -- |
| 22 | THE COURT:  I remember his testimony. |
| 23 | MR. SCHOENSTEIN:  The "calm down" comment is the only |
| 24 | comment attributed to Mr. Kaplan.  That's his conversation with |
| 25 | her in 2020.  She says he called her doctor and told her to |

N7iWede4

1   calm down and that that somehow was discriminatory.

2           So if we take out all of those, we are left with the

3   allegation that Mr. Antonik muttered the word "bitch," not that

4   he called her a bitch, not that he yelled bitch at her but that

5   he muttered it.  As your Honor knows, the laws do not impose a

6   general civility code.  Petty slights are not enough to

7   substantiate a discrimination claim.  I point again to the

8   *Robinson* case, at page 115, and also *Williams v. N.Y. City*

9   *Hous. Auth.*, 61 A.D.3d 62, another First Department case, under

10  the New York City law, which your Honor mentioned yesterday.

11  And it's "petty slights and trivial inconveniences" are not

12  enough to sustain a discrimination count even under the city

13  claim.

14          Similarly, stray remarks are not enough.  I cite for

15  the Court *Fruchtman v. City of N.Y.*, 129 A.D.3d 500.  "Stray

16  derogatory remarks, without more," do not constitute evidence

17  of discrimination; and *Harris v. Forklift Systems*, 510 U.S. 17,

18  "mere utterance of an...epithet which engenders offensive

19  feelings in an employee does not sufficiently affect conditions

20  of employment to implicate Title VII."  So the Supreme Court

21  case is a Title VII case.  Title VII claims should go, but also

22  the city claims.

23          THE COURT:  There is no Title VII discrimination

24  claim.  It's only the city claim.

25          MR. SCHOENSTEIN:  Oh, you're right.  Fair enough.

N7iWede4

1          Also, your Honor, with respect to the 2017 comments,

2     they would be time-barred, right?  Because the complaint wasn't

3     filed until January of 2021, so none of the 2017 remarks could

4     come in.

5          THE COURT:  Does that include the "calm down" from Mr.

6     Kaplan?

7          MR. SCHOENSTEIN:  No.  "Calm down" from Mr. Kaplan is

8     2020.  The 2020 remarks are Mr. Kaplan saying, "Calm down,

9     Doctor," or "Doctor, calm down," and Mr. Antonik allegedly

10    muttering the word "bitch."

11         Let me go here again for the Court by individual

12    defendant, because all four defendants are named on this claim.

13         Mr. Swirnow, there's no proof that he said anything

14    ever at any time that was considered discriminatory, in 2017,

15    2020, or ever.  So he's out.

16         Mr. Kaplan simply said "calm down," allegedly, in a

17    conversation where he was very polite and left immediately when

18    he was requested to do so by plaintiff.  So he has to be out.

19         Mr. Rubin said only, in 2017, allegedly, "smile more"

20    and "fake it till you make it."  Those are out by statute of

21    limitations.  They are also out because they are not sufficient

22    to set forth a discrimination claim.

23         That leaves Mr. Antonik, and the sole basis, the only

24    basis is this claim that he muttered the word "bitch."  And I

25    know your Honor will not take out that part of the case simply

1   because it's not an allegation that was made anytime while

2   plaintiff was employed by NYU or in the complaint or in the

3   amended complaint or in the second amended complaint.  That's

4   for argument to the jury.  But existing alone, that one-word

5   muttering cannot support a discrimination claim under any of

6   the laws at issue in this case.

7           Finally, your Honor, I turn to damages.

8           Whether or not you leave any claims in the case will

9   affect this, but let me address a few specific things.

10          Plaintiffs are still claiming back pay and front pay.

11  There is no back pay proof in the case.  There's no loss of

12  revenue.  She didn't go a day unemployed or miss a check.  So

13  they have only front pay, and the front pay, as I understand

14  it, is based on retirement benefits.  And I'll say to the

15  plaintiff the same thing that I've been saying to all of our

16  witnesses:  Where are the documents?

17          There's no proof of any retirement benefits that she

18  had or lost.  There's no documentary proof that she doesn't get

19  retirement benefits now.  It is very short, unspecific

20  testimony by her, so front pay should be out.

21          The pain and suffering claim was limited to $50,000 in

22  the pretrial submission.  Suddenly, in the amended disclosures

23  we got the other night, it had a $250,000 number.  They're not

24  going to give the jury a number, but for the record, that

25  portion of their case must be limited to the 50,000 that was in

1    their pretrial submission.

2              And that leaves us, your Honor, with punitive damages.

3              Respectfully, no jury could award punitive damages on

4    this record.  There is no evidence of the type of gross

5    behavior or conduct that willfully or wantonly causes harm to

6    another.  They don't approach meeting the standard of punitive

7    damages, and it should be removed from the charge if any of

8    these claims remain, again, so that there's no risk of a

9    compromise verdict, so there's no risk of the jury saying,

10   well, we won't give her punitive damages, but we'll give her

11   some compensatory damages.  It's prejudicial to go forward

12   without an evidentiary basis.

13             Thank you, your Honor.

14             THE COURT:  Thank you.

15             All right.  I'll hear from the plaintiff responses

16   with respect to anything that the plaintiff wants to respond to

17   but, in particular, why any corporate defendant, if anybody

18   stays in the case, should stay in other than the NYU Grossman

19   School of Medicine; why willfulness should stay in the case;

20   why any of the individuals should stay in the case; and why, in

21   particular, any of the individuals with respect to the

22   discrimination claim, other than perhaps Antonik; and then

23   finally, why I should instruct on punitive damages.

24             MR. KATAEV:  I'll address each of them *seriatim*, your

25   Honor.

N7iWede4

<pre>
 1          There is no evidence in the case with respect to the
 2   corporate defendants on both sides.  There's an agreement that
 3   the NYU Grossman School of Medicine employed her, but that's a
 4   division of NYU.  They did not specify which corporate entity
 5   of NYU it's a division of.  Moreover, the contract --
 6          THE COURT:  If there's no evidence in the case with
 7   respect to the corporate defendants on both sides and you've
 8   got the burden, isn't it game over?
 9          MR. KATAEV:  No, your Honor, because the contract
10   specifically provides who the employer is, and it makes
11   reference to all of those corporate entities.  And we pointed
12   that out during the plaintiff's testimony.  The jury can make a
13   determination based on what the contract says and based on what
14   the testimony was.
15          It's also a factual inquiry that should go to the
16   jury.
17          Moving on to the EPA, this is a very fact-intensive
18   issue.  There's been testimony about Drs. Porges, Goldberg and
19   Modi.  The defendants have shifting explanations for each
20   defendant.  None of them is consistent.
21          For example, they reference this clinical and research
22   work and the administrative work.  Everyone agrees that the
23   administrative work was only 5 to 10 percent of effort.  Each
24   doctor consistently testified that the primary duty was seeing
25   patients.  Substantially equal is substantially equal.  It's
</pre>

N7iWede4

```
1     not totally equal, and so there's enough evidence in the record

2     to permit the jury to make that finding on their own.  And

3     that's with respect to substantially equal work.

4             When looking at effort, skill and responsibility,

5     there's also evidence in the record as to that.  Dr. Modi was

6     paid substantially more than Dr. Edelman despite the fact that

7     they're very similar in their training and background and

8     education, and in fact, Dr. Modi was paid even more than

9     Dr. Porges initially.  I understand there's a discrepancy, so

10    to speak, for lack of a better term, with respect to when they

11    started, but the fact is the starting salary for Dr. Modi, a

12    less experienced doctor than Dr. Porges, was substantially

13    higher.

14            The Court also heard evidence about the fact that Dr.

15    Edelman lived near Huntington, and she would have been able to

16    take on that role, especially if she was offered the same

17    salary, and there was testimony that that was never offered to

18    her.

19            Turning then to the defendants' defense based on a

20    factor other than sex, they did not argue anything about

21    quantity or quality, so I just want to make a reference that

22    plaintiff believes that should be removed from the jury charge.

23            The only defense is a factor other than sex, and

24    again, there are shifting explanations in that regard.  Judge

25    Schofield covered this extensively in her opinion at Dkt. entry
```

155.   The explanation for why one doctor was paid more does not apply consistently with why another male doctor was paid more. So they have to apply their explanations doctor by doctor in order for it to work.  It doesn't work that way.  It's a totality-of-the-circumstances test.  They say there's no evidence that sex played a role, but the evidence is that the female doctors earned substantially less.

We heard Dr. Mehta's testimony, an independent, unbiased witness.  In fact, she would be more biased to her current employer.  She conceded on the stand that it was unfair that she received less pay and had to do more work than Dr. Goldberg.  His effort for administrative duties was 10 percent, your Honor.  He was paid $25,000 for that work.  He spent time seeing patients.  He was so busy seeing patients his bonus for the 1 percent was off the charts.  That's why his compensation increased so much.  It doesn't make any sense.  It doesn't jibe.  They don't meet unequivocally the factor-other-than-sex test for their affirmative defense.  They have not met their burden, and the jury should decide that.

Going to willfulness, I have case law that I'd like to place on the record on this issue.  They say that there's zero evidence of disregard.  First of all, Mr. Rubin testified at his deposition and confirmed at trial that he did not even know about the Equal Pay Act.  Not knowing about a law that's been enacted since 1963, approaching its 50th anniversary, is

1    reckless disregard, your Honor.  You have to know about these

2    laws if you're setting these salaries for 3,600 doctors.  He

3    admitted he didn't know about it.

4          He further admitted that he didn't do any statistical

5    analysis and that he never compared the salaries to find out if

6    there's any sort of discrepancy in the pay.  So just going to

7    some of the cases, *Hulsen v. Burlington School District*, a

8    District of Vermont case, 2021 WL 6750970.

9          THE COURT:  Let me ask you about willfulness.  Juries

10   are instructed on willfulness when the statute of limitations

11   with respect to the Equal Pay Act is at issue.  That's not a

12   question here.  Willfulness is not an element under the Equal

13   Pay Act.  Even if there was evidence that would support

14   willfulness, why should I instruct the jury on that?  Doesn't

15   that go to good faith, which ultimately is a question for the

16   Court?

17         MR. KATAEV:  For the federal Equal Pay Act, it does,

18   your Honor, but under the New York Labor Law, if there's a

19   finding of willfulness, there is an added 300 percent of

20   liquidated damages, and that's why it's important.

21         THE COURT:  But again, it's not an element, is it, of

22   either violation, state or federal?

23         MR. KATAEV:  I believe that under the New York Labor

24   Law, it is, your Honor.

25         THE COURT:  OK.  You'll brief that to me by 5 o'clock.

N7iWede4

1            Same with the defendants.

2            MR. KATAEV:  Willfulness as an element under the New

3    York Labor Law, correct?

4            THE COURT:  Yes.

5            MR. KATAEV:  OK.

6            Both *Hulsen* and another case, *Zhengfang Liang v. Cafe*

7    *Spice SB*, 911 F.Supp.2d 184, both of those stand for the

8    proposition that willfulness is a fact-intensive inquiry that

9    must go to the jury.  *Pollis*, 132 F.3d 115, Second Circuit

10   decision, covering willfulness in general.

11           I want to cover some cases that touch upon the

12   testimony that we've heard to explain why the jury should

13   consider this.  There's a case called *Banford v. Entergy*

14   *Nuclear Operations, Inc.*, 74 F.Supp.3d 658.  I believe the

15   Second Circuit did reverse it but on other grounds.  There, the

16   court, on a Rule 50 motion, found that there was a reckless

17   disregard such that willfulness could be found because there

18   was no analysis of the information concerning pay.  That's the

19   case here.  There was no analysis of the information concerning

20   pay.

21           Also, the defendants rely on the testimony that they

22   consulted about pay, but they didn't provide any real detail

23   about the substance of those conversations.  That's covered in

24   *Knox v. Varvatos*, a recent case in the Southern District of New

25   York, Equal Pay Act, and it's 512 F.Supp.3d 470.  There, just

1   like here, there was testimony about consulting, but there was

2   no actual substance about what was discussed, and the court

3   there found that the willfulness finding by the jury should

4   stand.  Notably, the willfulness question did go to the jury in

5   that recent case.

6          And finally, there's another case.  It's called *Chepak*

7   *v. N.Y.C. Health & Hosps. Corp.*, 2015 WL 509279, and there, the

8   court discusses a finding of willfulness based on indifference

9   to the requirements under the EPA based on the fact that many

10  of the witnesses confirmed that they did not look at or compare

11  the salaries of males versus females.  We would submit that the

12  jury could make a finding that they were indifferent, and that

13  would show a reckless disregard and that's enough for

14  willfulness.  So I think there's no question that willfulness

15  should go to the jury.  They'll have a second shot at a

16  postverdict Rule 50 motion, defendants will.

17         And the argument about --

18         THE COURT:  Retaliation.

19         MR. KATAEV:  I just wanted to address the arguments

20  about prejudice briefly.

21         Defendants argue that there's prejudice in allowing

22  willfulness to go to them.  The jury charge doesn't explain the

23  import of willfulness.  They're looking at this blindly, and

24  they will decide willfulness as a matter of fact.  And they

25  won't have any understanding that it will impact the damages in

1    this case.

2            Also, the finding of willfulness is a fact-intensive

3    inquiry.  Our charge is very separate and distinct as to

4    willfulness under the Equal Pay Act versus the elements of

5    Title VII and the New York State and city human rights law.

6            Going to retaliation --

7            THE COURT:  I should have mentioned there are issues

8    for you to address, and I'm sure you will, whether any of the

9    defendants stay in on retaliation.

10           MR. KATAEV:  I'm prepared to discuss that.

11           THE COURT:  OK.  The individual defendants I mean.

12           MR. KATAEV:  Understood.  And yes.

13           Focusing, first, broadly on retaliation, the

14   defendants submit that this was just, it was understood as an

15   office-space issue.  And maybe a jury could find that that was

16   the case with the initial complaint.  I want to read into the

17   record some of the stuff from exhibit 21, which is the initial

18   complaint.  These are the notes by Ms. Pacina, that she wrote

19   down.  She said, among other things, that "employee wants to

20   make a complaint against Joe Antonik"; "he was intimidating,

21   throwing his arms around and pointing at things"; "her heart

22   was racing"; "very uncomfortable."

23           THE COURT:  You agree that that would not support a

24   claim of discrimination.

25           MR. KATAEV:  That by itself wouldn't, but the conduct

1    is at issue, and I think --

2          THE COURT:  But that conduct wouldn't support a claim

3    of discrimination.  It's not gender discrimination for somebody

4    to be intimidating, whether that person is a male or a female.

5    Put another way, the fact that somebody happens to have the

6    genetic features of a male and the physical features of a male

7    doesn't make the threatening activity to be gender

8    discrimination.

9          MR. KATAEV:  I respectfully disagree, your Honor.  I

10   think there was testimony on this point, that Mr. Antonik would

11   not have acted that way if it was a male doctor.  And I believe

12   Dr. Edelman testified that were it not for the fact that she

13   was a female, he would have never spoken to her that way.

14         THE COURT:  You're not going to support a verdict on

15   that basis.

16         MR. KATAEV:  That brings me to my second point on this

17   issue, your Honor, and you have to keep in mind that Ms. Pacina

18   wrote this while she was speaking to Dr. Edelman, and she did

19   not write everything down.  And there's this factual issue

20   about the March 13 date and no original date being set there.

21   So there's some potential inference that things could have been

22   edited.

23         Dr. Edelman clearly testified that Mr. Antonik

24   muttered the word "bitch" during this confrontation.  Coupled

25   with this comment and his conduct, there could be a finding

1    that that interaction was motivated by discriminatory animus.

2              THE COURT:  Why wouldn't that just be a petty slight?

3              MR. KATAEV:  It wouldn't be a petty slight, your

4    Honor, because based on the facts and circumstances of this

5    case, in a medical office, in a professional environment, this

6    rises way above a petty slight or trivial inconvenience.

7    Doctors are given respect in the world at large.  People

8    respect doctors, and people don't call doctors a bitch,

9    especially a person who is a site director.

10             THE COURT:  Basically what you're asking me to do is

11   accept the proposition that it's OK to use that in a blue

12   collar setting, but because this person happens to have gone to

13   osteopathy school, it's not OK.

14             MR. KATAEV:  I understand the Court's concerns with

15   that, but in terms of reviewing the totality of the

16   circumstances, I think that the place where it occurred is

17   relevant, your Honor, and it should be considered.

18             There's also a concern that she raised in this

19   complaint about being concerned about being physically

20   assaulted.  That should go together with the comment and the

21   general conduct that occurred.

22             The jury had an opportunity to observe Mr. Antonik.

23   They saw how big he was.  They saw how he responded to

24   questions.  They saw his demeanor, and they should have the

25   right to make that determination.  Again, defendants would not

N7iWede4

1    be prejudiced by the jury making a finding because they still

2    have an opportunity to make a motion thereafter.

3           Even if the jury could potentially find that this

4    first complaint did not reference any gender discrimination,

5    they certainly can't find that with respect to the September

6    25, 2019, email, which came a little short of a week later.

7    She references in that email, exhibit 74, page Bates stamped

8    D1050, this was a matter of inappropriate conduct.  She

9    considered this a form of bullying in the workplace.  She felt

10   that it was an attempt to corner her.  Mr. Kaplan had a

11   condescending tone.  She needs to be able to work in a

12   nonhostile environment, and as a female physician at NYU, she's

13   disappointed she still has to contend with male chauvinism.

14   And there's no world in which an HR professional doesn't see

15   these as buzz words.  Ms. Pacina was just not reliable on that

16   point, and the jury should be able to decide whether Dr.

17   Edelman actually engaged in the protected activity.

18          Also, under the New York State human rights law, which

19   was amended in 2019, that law is now more in line with the New

20   York City Human Rights Law, which focuses on whether Dr.

21   Edelman was treated less well as a female.  The allegations

22   here rise to that level, to meet the standard of being treated

23   less well.

24          You also heard evidence about IT issues.  Dr. Porges

25   testified that his IT issues were few and far between, and they

N7iWede4

1    were handled quickly.

2           THE COURT:  No, no.  That's out of the case.  The only

3    thing that's in the case on discrimination is the couple of

4    comments.  We're talking about retaliation, so why don't you

5    march through retaliation, and then you can get to the couple

6    of comments on discrimination.

7           MR. KATAEV:  I would just also say that all the

8    evidence that the defendants rely on in terms of retaliation is

9    self-serving.  They don't --

10          THE COURT:  So is yours.

11          MR. KATAEV:  But we have documents, your Honor.

12          THE COURT:  I don't think so.

13          Go ahead.

14          MR. KATAEV:  The point is, your Honor, that this is

15   also a fact-intensive inquiry that requires an assessment of

16   the totality of the circumstances, and the lack of evidence by

17   the defendants, the lack of documentary evidence, the cloak and

18   dagger -- "I'll call you"; "fill me in on what happened" -- no

19   memorialization, is something that the jury should consider as

20   to whether there was a retaliatory motive involved in Dr.

21   Edelman's --

22          THE COURT:  Let's walk through the individual

23   defendants.

24          Antonik, there's no evidence whatsoever of his

25   involvement in an action that would constitute an adverse

1    employment action, is there?

2         MR. KATAEV:  No.  I would beg to differ, your Honor.

3         The evidence is that Dr. Porges was made aware of

4    clinical concerns by Mr. Antonik.  That's what the evidence

5    showed.  Dr. Porges tried to --

6         THE COURT:  No.  The hostile work environment here is

7    the nonrenewal of her contract and the termination.  That's

8    what you've told me to tell the jury.  So what is Antonik's

9    involvement in that?

10        MR. KATAEV:  He started the whole process to get her

11   nonrenewed.

12        THE COURT:  He arguably started a process which led

13   through a chain of events to her not being renewed.  Maybe you

14   can make that argument, although I think the evidence is fairly

15   powerful that really what starts it is Dr. Porges's concerns

16   about her medical practice.  But assuming that it starts with

17   Antonik, he doesn't have any involvement, does he, in the

18   adverse action?  He doesn't know that it's happened.

19        MR. KATAEV:  Your Honor, I beg to differ.  He started

20   it.  The whole thing snowballed.

21        THE COURT:  Tell me what the evidence is that Antonik

22   had a role and then tell me what the evidence is that Kaplan

23   had a role and then tell me the evidence that Swirnow had a

24   role and then tell me the evidence that Rubin knew about the

25   employment complaint, not about the dispute as to office space.

1        MR. KATAEV:  Antonik is the initial email.  That's

2    Defendants' Exhibit 86, and his direct report and his eyes and

3    ears at suite 306 was Ms. Ruiz.  Ms. Ruiz prepared this report.

4    The first incident is November of 2019, after the September 25

5    complaint.

6            September 25 to November 13 is a little less than a

7    month and a half.  OK?  And so she prepares this log that he

8    uses almost 14 months later to, word for word, and, in fact,

9    changes some things in there to submit later on.  And Judge

10   Schofield covered this in her decision on summary judgment,

11   Dkt. entry 155.  Based on the fact that the complaint came in

12   in September of '19 and the log started being maintained in

13   November of '19 and based on the fact that Dr. Edelman could

14   not be terminated except for cause, the inference is that they

15   waited until the first opportunity to strike.  So Mr. Antonik

16   started the snowball that became the avalanche.  OK?

17           THE COURT:  Is there any evidence that when

18   Mr. Antonik was asked by Dr. Porges to provide information of

19   the reason, that Mr. Antonik was told the reason why he was

20   being asked for that information or that he was told how it

21   would be used?

22           MR. KATAEV:  There is none of that.  Nothing's

23   memorialized, but the fact is Dr. Porges conceded that

24   Mr. Antonik brought these clinical concerns to his attention.

25   He's the site director, and these patient complaints come to

1    him.  He came to Dr. Porges and told him, There are clinical

2    concerns with Dr. Edelman; you should look into that.

3         THE COURT:  All right.  Let's go to the next

4    defendant.

5         Mr. Kaplan.

6         MR. KATAEV:  Mr. Kaplan testified that he was aware of

7    the complaint, and the complaint had been made against him

8    after September 25.

9         THE COURT:  He also testified, and I thought the

10   testimony was uniform, that he was not involved in the decision

11   to nonrenew the plaintiff.  Is there any testimony to the

12   contrary?  What are you going to point to to show that he had

13   any involvement in the decision to nonrenew her?

14        MR. KATAEV:  Your Honor, the fact is that he didn't

15   have the power to terminate her.  He's a facilities director.

16   He can't terminate any physician.  I asked him that during his

17   cross, and he agreed with me that he didn't have the power to

18   do it.  So the only way to have her terminated was to

19   participate with Mr. Antonik in this, and he testified that

20   Mr. Antonik made him aware of the complaint and he got a

21   complaint made against him.

22        THE COURT:  But tell me what the evidence is of his

23   involvement in the decision to nonrenew.  Assume that I agree

24   with you that somebody doesn't need to have the formal

25   authority to nonrenew to be held liable for an adverse

1    employment action; they still need to have had some

2    involvement.  What's your best evidence that he had some

3    involvement?

4              MR. KATAEV:  He solicited the email and he provided

5    the deadline to Dr. Porges, which is very strange behavior,

6    because Dr. Porges agreed and Mr. Kaplan agreed that it is not

7    usual for Dr. Porges to go to Kaplan with a clinical care

8    concern.  Mr. Kaplan's not qualified to handle clinical care

9    concerns.

10             And there's evidence in the record also that when

11   Dr. Porges needed to, he had a direct line to Mr. Swirnow and

12   Mr. Rubin.  When he wanted his clinical director title, he went

13   directly to them.  So why is he going to Mr. Kaplan instead?

14   It doesn't make any sense.

15             THE COURT:  OK.  What's your best evidence with

16   respect to Mr. Swirnow on retaliation?

17             MR. KATAEV:  Mr. Swirnow got involved in the complaint

18   when he spoke to Dr. Edelman over the phone.  They resolved the

19   issue underlying the complaint, focusing on the space issue.

20   Following that complaint, following the resolution of the space

21   issue, there's testimony that Dr. Edelman told Mr. Swirnow

22   directly:  I made a complaint and I expect it to be resolved.

23   I am not drooping it.

24             And you saw the subsequent email, your Honor, where

25   Ms. Hall relayed what happened in the conversation with

1    Mr. Swirnow, that he had with Dr. Edelman, and they asked at

2    the end, Can you please circle back -- to Pacina, can you

3    please circle back and see whether she still wants to pursue

4    the complaint.  He had knowledge of the complaint.

5              THE COURT:  OK.

6              With respect to Mr. Rubin, my recollection of the

7    testimony is that Mr. Rubin testified pretty unambiguously that

8    he was not aware of any employment complaint.  He was aware,

9    perhaps he was aware, I think he was aware of the space

10   complaint.  What's the evidence that he knew about the

11   employment complaint or from which the jury could infer that he

12   knew about the employment complaint at the time the decision is

13   taking place.

14             MR. KATAEV:  Two things, and it's very simple.  No. 1,

15   I asked him directly, you were aware of the HR complaint made

16   by Dr. Edelman, and he confirmed that he was.  And I showed him

17   his testimony.

18             THE COURT:  No, but he said as to that that he was

19   aware of the complaint with respect to space.

20             MR. KATAEV:  Yes, your Honor.  That was also a

21   self-serving statement, but the inference is very easy.

22   Because he worked right next to Mr. Swirnow and their offices

23   are close to each other and they worked extensively on these

24   issues, because Mr. Swirnow was made aware of it and

25   Mr. Swirnow was Mr. Rubin's right hand, the inference can be

N7iWede4

1    made that he obviously knew about it as well.

2                 THE COURT:  OK.

3                 All right.  You want to address discrimination and

4    punitive damages.

5                 MR. KATAEV:  Yes, your Honor.

6                 We understand that it's limited to sexist remarks.

7    The sexist remarks are being told to smile more, fake it until

8    you make it.

9                 THE COURT:  Aren't those barred by the statute of

10   limitations?

11                MR. KATAEV:  No, your Honor.  I would submit that the

12   continuing violation doctrine would apply, or at least the

13   parties should be given an opportunity to brief that issue.

14                Dr. Edelman complained extensively about various

15   issues.  I understand some of them have been dismissed, but

16   with respect to the remarks at least, there should be an

17   analysis about the continuing violations doctrine to see if

18   this falls within the ambit.

19                With respect to Mr. Kaplan, she was being told to calm

20   down.  I don't know about the Court or anyone else here, but

21   whenever I tell someone to calm down, it usually never works.

22   But it's been known colloquially that that's a sexist remark,

23   telling a female to calm down.  And the jury experiences life

24   as we do, and they take those life experiences with them to

25   determine things of this nature.  You know, being referred to

N7iWede4

1    as "Doctor, Doctor," and being placated, instead of having the

2    concerns addressed, that's all conduct indicative of

3    discriminatory animus.

4            And so the evidence is clear.  There was a directive

5    to deal with office space.  That directive came from Mr. Rubin

6    and Mr. Swirnow.  Mr. Antonik and Mr. Kaplan were charged with

7    making this happen, and they set about their goal and they

8    didn't care how anyone was affected; it just had to be done.

9    And so they didn't take Dr. Edelman's concerns into regard when

10   they went about carrying out their duty.

11           Again, the jury saw the demeanor of the witnesses.

12   They heard them deny the allegations, and it's up to the jury

13   to decide -- did they make these comments?  Did they act in

14   this way?  And again, it's a totality-of-the-circumstances

15   test, so the jury should decide that issue.

16           THE COURT:  OK.  Do you have anything on Swirnow on

17   discrimination?

18           MR. KATAEV:  Can I have one second, your Honor?

19           Your Honor, we would concede that point as to

20   Mr. Swirnow.  There was no evidence about him saying anything

21   wrong.  He was gentlemanly in the way he handled the issue.  He

22   did what the other defendants failed to.

23           THE COURT:  OK.

24           MR. KATAEV:  I think the last issue I have is damages.

25           THE COURT:  Yes.  Back pay, front pay, punitive

N7iWede4

1   damages.

2          MR. KATAEV:  I think we can concede with respect to

3   back pay.

4          THE COURT:  OK.

5          MR. KATAEV:  I think that the jury is being instructed

6   about back pay and front pay, but the Court is deciding that

7   issue anyway.  The bottom line is that --

8          THE COURT:  So I'm not going to instruct the jury with

9   respect to back pay if there's no evidence with respect to back

10  pay.

11         MR. KATAEV:  That's fine, your Honor.

12         With respect to front pay, Dr. Edelman testified as to

13  the amount.  She didn't provide any documents, but the jury's

14  entitled to give her testimony the weight that they decide to

15  give it.

16         THE COURT:  OK.

17         And then with respect to punitive damages.

18         MR. KATAEV:  I think the evidence here shows, your

19  Honor, that there was concerted activity by the individual

20  defendants.  Like I said before, there was a lot of cloak and

21  dagger.  They memorialized the complaint against Dr. Edelman.

22  They did not memorialize any of their discussions.  You would

23  think if this was a genuine decision not to renew her based on

24  clinical care concerns, they would speak to her about it.  They

25  would try to "remediate," which is a fancy word for fix.

N7iWede4

1    They didn't make any effort to do any of that, and

2    anytime there was any discussion about this issue, nothing was

3    memorialized.  And I think the jury understands that, and we

4    covered that extensively.  So to the extent that these

5    individuals at NYU carried out a plan to retaliate against the

6    doctor for not meeting their directives about office space,

7    that's something that should go to the jury to decide.  And

8    this Court can, of course, correct any error that the jury

9    makes with respect to the calculation of those damages.

10          THE COURT:  OK.  Anything else?

11          MR. KATAEV:  I'm just going to check my notes, your

12   Honor.

13          Just to clarify about the individual defendants' role

14   in retaliation -- not with respect to Mr. Rubin and

15   Mr. Swirnow; I covered that.  But with respect to Messrs.

16   Kaplan and Antonik, they had a motive to retaliate against her

17   based on the complaint brought against them.  You recall

18   Mr. Antonik testified he wasn't thrilled or wasn't crazy about

19   having the complaint brought against him.

20          I think that's all I have.

21          THE COURT:  OK.

22          MR. KATAEV:  I'm sorry.  One last thing.

23          THE COURT:  OK.

24          MR. KATAEV:  The plaintiff views the defendants'

25   motion as an attempt to relitigate the summary judgment

1    decision and this Court should not permit it; the defendants

2    are trying to relitigate the summary judgment motion and the

3    Court should not permit that.

4              THE COURT:  Let me make one comment with respect to

5    that and how I'm going to view this.

6              Summary judgment is an order that allows the plaintiff

7    to put on the case.  Evidence may be presented at summary

8    judgment that may not be presented at a trial.  At the end of

9    the day, the summary judgment decision is subsumed within the

10   final judgment.  The fact that the plaintiff might have

11   survived summary judgment doesn't entitle the plaintiff to go

12   to the jury on a claim.  The plaintiff still has to present

13   evidence in court from which the jury could return a verdict

14   for the plaintiff.

15             That's how I'm going to view this, and I'm going to

16   take it under advisement.  I'll let you know my rulings.

17             That leaves the jury instructions and the charge.

18             It's now 1:15.  I'm not sure how much folks have on

19   the charge.  If it's very, very little, we could do it right

20   now.  Otherwise, I'll have you back at 2 o'clock.  I don't want

21   to shortcut anything.  You can all think about the charge.

22             What's the plaintiff's preference?

23             MR. LABUDA:  Either way, your Honor.  It may be better

24   for us to just do one last look.

25             THE COURT:  Then come back at 2 o'clock.

N7iWede4

1          MR. LABUDA:  We'd be leaning towards that.

2          THE COURT:  What is defendants' view?

3          MR. SCHOENSTEIN:  Well, Mr. Steer's going to handle

4    it, so I leave it to him.

5          MR. STEER:  I think 2 o'clock does make sense.

6          THE COURT:  OK.  Why don't you all come back here at 2

7    o'clock.  I do have a criminal matter on at 3 o'clock.

8    Hopefully we'll be done with the charge by then.  If not and

9    there's a need to go beyond that, then it will just cut into

10   some of your afternoon preparation.  We'll recess at three and

11   come back later.

12         Mr. Schoenstein.

13         MR. SCHOENSTEIN:  Just to be really clear on the

14   Court's expectations, both sides get to put in a writing before

15   5 o'clock on the willfulness issue.  But I gather that's the

16   only issue.

17         THE COURT:  That's the only issue on which I need

18   briefing.

19         OK.  Thanks.

20         (Luncheon recess)

21

22

23

24

25