**EXHIBIT S**

N7CCede1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DR. SARI EDELMAN,

                Plaintiff,

        v.                              21 Civ. 502 (LJL)

NYU LANGONE HEALTH SYSTEM, et
al.,

                Defendants.
                                        Trial
------------------------------x
                                        New York, N.Y.
                                        July 12, 2023
                                        9:00 a.m.
Before:

                    HON. LEWIS J. LIMAN,

                                        District Judge
                                        -and a Jury-


                        APPEARANCES

MILMAN LABUDA LAW GROUP PLLC
     Attorneys for Plaintiff
BY:  JOSEPH M. LABUDA
     EMANUEL S. KATAEV

TARTER KRINSKY & DROGIN LLP
     Attorneys for Defendants
BY:  RICHARD C. SCHOENSTEIN
     RICHARD L. STEER
     INGRID J. CARDONA
```

1      THE COURT:  Overruled.
2  BY MR. KATAEV:
3  Q.  Answer?
4  A.  Yes.
5  Q.  In the course of your preparation for those depositions and
6  at this trial, did you review any patient satisfaction surveys
7  of Dr. Edelman?
8  A.  Not that I recall.
9  Q.  As part of the day-to-day functions in the performance of
10 your duties, you sent emails to others at NYU concerning the
11 performance of doctors, right?
12 A.  Yes.
13 Q.  Same question with respect to preparation for trial and
14 those depositions; there were no emails, other than the
15 November 2020 email, about Dr. Edelman's performance, correct?
16 A.  I don't remember.
17 Q.  Now, Dr. Edelman was terminated at the end of 2020, right?
18 A.  Yes.
19 Q.  And it's fair to say that you have no knowledge or
20 recollection as to why she was terminated?
21 A.  Correct.
22 Q.  And you don't remember providing any information about Dr.
23 Edelman in relation to her termination, do you?
24 A.  There was some information that I had worked with Miriam to
25 prepare and submit to, through a request to David Kaplan.

1  BY MR. KATAEV:
2  Q.  So it's fair to say that you do have an understanding of
3  the circumstances behind plaintiff's termination; correct?
4          MR. STEER:  Objection.
5          THE COURT:  He can answer that question.
6          Do you have an understanding of the circumstances that
7  led to the plaintiff's termination?  From your own knowledge,
8  not from what you learned in the litigation.
9  A.  From my own knowledge, at the time, I did not know that any
10 of this would be used for termination.
11 Q.  This email shows that you had direct involvement in
12 Dr. Edelman's termination, doesn't it?
13         MR. STEER:  Objection.
14         THE COURT:  Sustained.
15 A.  Can you repeat the question.
16         THE COURT:  Again, remember, listen to if there's an
17 objection, then listen to me.  If I say "sustained," that means
18 the lawyer moves on.  If I say "overruled," you answer the
19 question.
20         THE WITNESS:  Okay.
21 Q.  Going to the later-sent email at 4:19 the same day, you had
22 provided a lot more information than you provided in your
23 original email; correct?
24 A.  Yes.
25 Q.  And you did that approximately two hours later; correct?

1  A.  I don't remember the conversation with Dr. Porges.
2  Q.  You're aware of NYU's policies regarding discrimination,
3  harassment, or retaliation; correct?
4  A.  Correct.
5  Q.  You learned about these policies during orientation and
6  annual training that you took; correct?
7  A.  Correct.
8  Q.  And, of course, you paid attention during those annual
9  trainings because you're required to; right?
10  A.  Yes.
11  Q.  Now, HR contacted you about Dr. Edelman's complaint, didn't
12  they?
13  A.  Yes.
14  Q.  You spoke to Ms. Kathleen Pacina?
15  A.  Yes.
16  Q.  That's when you first learned about Dr. Edelman's
17  complaint?
18  A.  Yes.
19  Q.  And you don't have any recollection of what you and her
20  discussed, do you?
21  A.  With Ms. Pacina?
22  Q.  Correct.
23  A.  I recall we had a conversation, she had explained the
24  nature of the complaint, I had explained my understanding of
25  what happened, my version of it, and that's what I recall about

1   it.
2   Q.  And after that conversation with Ms. Pacina, nothing ever
3   happened; correct?
4           MR. STEER:  Objection, your Honor.
5           THE COURT:  Overruled.
6   A.  I don't quite remember.
7           MR. KATAEV:  I'd like to present 21.  I believe it's
8   in evidence.
9           THE COURT:  Go ahead.  You may.
10  Q.  I'll represent to you, Mr. Antonik, that this is an entry
11  made by Ms. Pacina in a system maintained by NYU to record
12  employee complaints.  I want to focus your attention on a
13  particular portion.
14      In reviewing this part that says "Call with Joe," please
15  read and confirm whether this reflects the nature of the
16  conversation you had with Ms. Pacina.
17  A.  Yes, this appears to reflect the conversation I had with
18  Ms. Pacina.
19  Q.  And this was the only conversation you ever had with
20  Ms. Pacina?
21  A.  I don't remember if there were any others.
22  Q.  During your call with Ms. Pacina, you called Dr. Edelman
23  defensive and snide; correct?
24  A.  It says this in this, so I would say yes.
25  Q.  In this log, it says you threatened to call the powers that

1  A.  Female.
2  Q.  Now, did you ever state to plaintiff in this September 16th
3  discussion with Dr. Edelman that you owned her?
4  A.  No.
5  Q.  Is that something that you would ordinarily say to someone?
6           MR. KATAEV:  Objection.
7           THE COURT:  Overruled.
8  A.  No.
9  Q.  When you're speaking with Dr. Edelman during this September
10 2016 discussion, did she raise her voice to you at all?
11 A.  No.
12 Q.  Did you raise your voice to her?
13 A.  No.
14 Q.  Did you lean over and try to intimidate her?
15 A.  I did not.
16 Q.  When you spoke with Dr. Edelman, were you sitting or
17 standing?
18 A.  I was sitting.
19 Q.  Just so the record, again, is clear, did you call
20 Dr. Edelman a bitch?
21 A.  I did not.
22 Q.  Did you mutter it under your breath?
23 A.  I did not.
24 Q.  After speaking with Dr. Edelman, what did you do?
25 A.  I stood up and I left the office.