**EXHIBIT CC**

N7ECede1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   DR. SARI EDELMAN,

4              Plaintiff,

5         v.                          21 Civ. 502 (LJL)

6   NYU LANGONE HEALTH SYSTEM, *et
    al.*,

7
               Defendants.
8   ------------------------------x          Trial

9                                       New York, N.Y.
                                        July 14, 2023
10                                      8:45 a.m.

11  Before:

12                  HON. LEWIS J. LIMAN,

13                                      District Judge
                                        -and a Jury-
14

15                      APPEARANCES

16  MILMAN LABUDA LAW GROUP PLLC
         Attorneys for Plaintiff
17  BY:  JOSEPH M. LABUDA
         EMANUEL S. KATAEV
18
    TARTER KRINSKY & DROGIN LLP
19       Attorneys for Defendants
    BY:  RICHARD C. SCHOENSTEIN
20       RICHARD L. STEER
         INGRID J. CARDONA
21

22

23

24

25

N7ECede1                        Ruiz - Cross

1    A.   Yes.

2    Q.   For what purpose?

3    A.   To keep documentation of things that were either going --

4    that were not, *per se*, going the right way.

5    Q.   And the spreadsheet and the documentation you've compiled,

6    did you do that at anybody's request?

7    A.   Yes.

8              MR. KATAEV:  Objection.  Leading.

9              THE COURT:  Overruled.

10   Q.   Who, if anyone, asked you to do that?

11   A.   Joseph Antonik.

12   Q.   What did he ask you to do?

13   A.   Keep records of anything that happens within the suite.

14   Q.   And when did he ask you to do that?

15   A.   That's always been part of my job.

16   Q.   Did that first happen in 2019?

17   A.   Before 2019 when I first started working for NYU, I kept

18   spreadsheets of all types of complaints.

19   Q.   Let's look at the spreadsheet we have on the screen here.

20   Do you see there's an undated entry at the top?

21   A.   Yes.

22   Q.   Says:  "Dr. Edelman has the tendency of documenting

23   information in a patient's chart, re: inner office issues, she

24   chastises the staff in these messages that become the patient

25   medical records."  Do you see that?

1   A.  Yes.

2   Q.  Do you know the date upon which that concern arose?

3   A.  That was just a consistent problem.

4   Q.  And tell the jury a little more about that.  What was the

5   problem that you memorialized here?

6   A.  So the problem would be because patients had access to

7   portal, they had the ability to message anything at any given

8   time, and a lot of the times, Dr. Edelman would fault the staff

9   for something not being done instead of bringing it to an

10  escalation of my awareness and then allowing us to address it.

11  It would never be that there was an issue going on or try to

12  pacify the situation, it's would always be a targeted instance

13  where she would blame sort of somebody else for whatever the

14  patient was complaining about.

15          MR. KATAEV:  Objection.  Narrative.

16          THE COURT:  Overruled.

17  Q.  Did you put in this chart every single instance of

18  something like that happening?

19  A.  To the best of my abilities.

20  Q.  Let's look at the entry on 9/9/2020.  Do you see that?

21  A.  Yes.

22  Q.  It says:  "Dr. Edelman notified me via text at 11:25 that

23  she was running an hour and a half behind.  She requested her

24  last hour patients from 12:00 to be rescheduled or moved down

25  to 2:00 p.m."  Do you recall that?

N7eWede2                      Rubin - Direct

1    A.   Definitely not Joe Antonik.

2    Q.   And Ms. Ruiz definitely didn't discuss --

3    A.   Definitely not.

4    Q.   It's fair to say that these concerns brought to your

5    attention from the November 6, 2020, email is what led to Dr.

6    Edelman's nonrenewal, correct?

7    A.   It's the only thing that led to the nonrenewal.

8    Q.   And at the time that you received this email in November of

9    2020, you were not aware that Dr. Porges's email was a

10   cut-and-paste job of Mr. Antonik's email, correct?

11              MR. SCHOENSTEIN:  Objection.

12              THE COURT:  Sustained.

13   BY MR. KATAEV:

14   Q.   At the time you that received Dr. Porges's email, you were

15   not aware that Mr. Antonik played a role in giving information

16   to Dr. Porges, correct?

17   A.   I don't even think I got an email from Dr. Porges.  I

18   had -- I had a conversation with Mr. Swirnow that Dr. Porges

19   had raised some -- some serious concerns.  Maybe I got an

20   email.  I don't recall.  But I -- I said let's get on the phone

21   or have a meeting -- again, I don't know if it was in person or

22   on the phone -- with Dr. Porges to hear what's going on.

23   Q.   It's fair to say that you had no knowledge of Mr. Antonik's

24   involvement in providing information about --

25   A.   Definitely not, definitely not.

1    the opinion of the clinicians that there was no -- while the

2    practice didn't meet our standard of care for rheumatology at

3    NYU, there was no inherent danger to a patient by letting her

4    stay.  So they supported giving her an opportunity to find

5    another job.

6    Q.  Would this have been something you would have reported to

7    compliance?

8    A.  No.  I think -- I think people confuse compliance.

9         Compliance is when there's fraudulent billing or unethical

10   activity going on.  This was -- this was a clinical concern

11   that had been raised by a physician, investigated and validated

12   by people who have experience in looking into these matters.

13   So as long as there was no risk or -- to a patient's safety, it

14   would never have gone to compliance.  And it would never have

15   gone to HR.

16   Q.  And did you report it outside of the organization?  Did you

17   report it to the medical board or any --

18   A.  There was nothing to report.

19   Q.  Why not?  Explain that.

20   A.  An investigation was done on the clinical practice by

21   clinicians who were experienced in reviewing the practice, that

22   person -- Dr. Edelman's practice.  They did not meet our

23   standards for delivering health care to our patients.  That is

24   not -- that -- had they uncovered activity that was dangerous

25   or irresponsible or problematic to the point where a patient's

N7eWede2                         Rubin - Cross

1    safety was at risk, we would have had an obligation to report

2    that to OPMC, this organization you're talking about.

3         This case did not rise to that level.  It rose to the level

4    of not meeting our own internal clinical standards for how our

5    rheumatology division wanted to deliver the care.  So we

6    nonrenewed.

7    Q.  In the process of determining whether or not to renew Dr.

8    Edelman's contract, did you consult at all with David Kaplan?

9    A.  Absolutely not.

10   Q.  Did you consult at all with Joe Antonik?

11   A.  I did not.

12   Q.  Did you consult with anybody other than the folks who you

13   mentioned in your testimony today?

14   A.  I did not.

15   Q.  After providing Dr. Edelman with notice of nonrenewal, did

16   she contact you?

17   A.  She did.

18   Q.  And tell us what, if anything, you remember about that

19   conversation.

20   A.  I remember very little, except for one thing.  I'm sure --

21   I'm going to tell you what I remember specifically.  She asked

22   me -- she had told me she wanted -- she was looking for a

23   job -- she wanted to move to Florida.  She and her husband had

24   been talking about moving to Florida.  Did I know anybody or

25   could I help her find any job in Florida?