UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. SARI EDELMAN,<br><br>Plaintiff,<br><br>– against –<br><br>NYU LANGONE HEALTH SYSTEM, NYU LANGONE HOSPITALS, NYU LANGONE MEDICAL CENTER, NYU LANGONE NASSAU RHEUMATOLOGY, NYU SCHOOL OF MEDICINE, NYU GROSSMAN SCHOOL OF MEDICINE, NYU HOSPITALS CENTER, ANDREW T. RUBIN, DAVID KAPLAN, JOSEPH ANTONIK, and JOSHUA SWIRNOW,<br><br>Defendants. | **ORAL ARGUMENT REQUESTED**<br><br>Case No. 1:21-cv-502 (LJL) |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(b) AND TO ALTER OR AMEND THE JUDGMENT PURSUANT TO FED. R. CIV. P. 59(e)**

## **TABLE OF CONTENTS**

**Page**

Preliminary Statement ................................................................................................................... 1

Argument ....................................................................................................................................... 2

    I.    Defendants' Motion for JMOL on Remaining Claim for Retaliation ............................ 2

        1.    There is no evidence that Antonik had knowledge of Plaintiff's purported activity prior to NYU's non-renewal of Plaintiff's employment ................................................................................................ 2

        2.    No evidence of any actual participation on the part of Antonik .............................. 4

        3.    No evidence that NYU acted negligently ................................................................ 5

    II.    Defendants' Motion for Remittitur of the Jury's Front Pay Award ............................... 8

        1.    The Front Pay Award Should be Vacated ................................................................ 8

Conclusion ................................................................................................................................... 10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Barkley v. Olympia Mortg. Co.*,
   557 Fed. Appx. 22 (2d Cir. 2014)......................................................................................2

*Casmento v. Volmar Constr., Inc.*,
   No. 20-cv-0944, 2022 WL 15773966 (S.D.N.Y. Oct. 28, 2022)...............................2

*Dunlap-McCuller v. Riese Org.*,
   980 F.2d 153 (2d Cir. 1992)................................................................................10

*Edwards v. Rochester Inst. of Tech.*,
   794 F. App'x 65 (2d Cir. 2019)............................................................................6

*ING Glob. V. United Parcel Serv. Oasis Supply Corp.*,
   757 F.3d 92 (2d Cir. 2014)..................................................................................2

*Krasner*,
   680 F. Supp. 2d 502, 520 (citations omitted)..........................................................3

*Kregler v. City of New York*,
   987 F. Supp. 2d 357 (S.D.N.Y. 2013)...................................................................7

*Olaechea*,
   2022 WL 3211424, at *6 (citation omitted)....................................................4, 5, 9

*Olivares v. Brentwood Indus.*,
   822 F.3d 426 (8th Cir. 2016) ...............................................................................9

*Smith v. Farmstand*,
   No. 11-cv-9147, 2016 WL 5912886 (N.D. Ill. Oct. 11, 2016) ................................9

*Tolbert v. Queens Coll.*,
   242 F.3d 58 (2d Cir. 2001)..................................................................................2

*Torres*,
   2023 WL 4487726, at *13 ..................................................................................8

*Vasquez v. Empress Ambulance Serv. Inc.*,
   835 F.3d 267 (2d Cir. 2016). (Pl. Memo .) ...........................................................6

**Other Authorities**

Fed. R. Civ. P. 50(a) ..............................................................................................................1, 2

Fed. R. Civ. P. 50(b) .................................................................................................................1

Rule 26 ...............................................................................................................................2, 10

**Preliminary Statement**

Defendants renew their Fed. R. Civ. P. 50(a) motion,[1] for judgment as a matter of law (JMOL), pursuant to Fed. R. Civ. P. 50(b) on Plaintiff's retaliation claim under Title VII, the SHRL, and the CHRL, against NYU and Joseph Antonik, and the jury's related award of front pay.

There was insufficient evidence for a jury to determine in Plaintiff's favor any, let alone all, of the following requisite elements of a retaliation claim: (1) that Plaintiff was engaged in protected activity; (2) that NYU and/or Antonik were aware of protected activity; (3) that Antonik participated in the decision not to renew Plaintiff's expiring employment agreement; (4) that NYU (through the acts of its ultimate decision maker) was negligent in relying on any information it received in connection with Plaintiff's non-renewal; or (5) that there was any causal connection between Plaintiff's complaint to Human Resources and her non-renewal more than a year later.

Rather, the evidence shows that Andrew Rubin, the decision-maker on the non-renewal of Plaintiff's contract, had no animus towards Plaintiff, and that he acted in good faith and made his decision based on the review of medical opinions provided by two non-biased supervisory physicians, Dr. Avram Goldberg and Dr. Andrew Porges.[2] These physicians have not been accused, let alone been shown, to have any animus towards Plaintiff. Further, there is no evidence that the information provided to Rubin was inaccurate or false, or that Antonik ever directly communicated with, or influenced, Rubin. Likewise, there is no evidence that NYU or Rubin

---

[1] Declaration of Richard L. Steer executed August 16, 2023 ("Steer Decl."), Ex. A (July 18 Ct. Tr. 1298:6-1309:13)).

[2] The lack of NYU's animus is reflected by Rubin's attempt to assist Plaintiff in her job search. (Steer R. Decl. Ex. O (Pl's. Trial Ex. 123).) As Plaintiff expressed a desire to relocate to Florida, Rubin emailed a colleague there indicating that she was a very good doctor. (*Id.*) When questioned about his email, Rubin testified that he was very clear that she was nonrenewed because "she didn't meet NYU's clinical standards," and that the standards of the other medical school are less than NYU's. (Steer R. Decl. Ex. P (July 17 Ct. Tr. 977:2-8).) While Plaintiff did not meet NYU's high clinical standards, her performance did not rise to the level of "immediate concern" that would have required reporting to the Office of Professional Medical Conduct. (Steer R. Decl. Ex. Q (July 18 Ct. Tr. 1214:10-15.)

1

negligently relied upon false or biased information or were negligent in the non-renewal decision.

Further, the jury's $700,000 front pay award should be vacated as the record evidence shows that Plaintiff never went a day unemployed and makes roughly $71,000 more a year than she did at NYU, thereby impermissibly putting Plaintiff in a better position than when employed by NYU. Moreover, the award far exceeds the maximum amount of damages Plaintiff alleged that she lost for front and back pay as set forth in her First Amended Rule 26 Disclosures (Steer Decl. Ex. N (Dkt. No. 202-1, at 3, C(ii))) and Joint Final Pretrial Order (Dkt. No. 197).

## Argument

### I. Defendants' Motion for JMOL on Remaining Claim for Retaliation[3]

As detailed below, Defendants' motion directed at the retaliation claim should be granted because there is no evidence that: (1) Antonik knew or could not have reasonably known that Plaintiff engaged in protected activity; (2) Antonik participated in the decision not to renew Plaintiff's contract; and (3) NYU acted negligently in its decision not to renew Plaintiff's contract. Indeed, the evidence demonstrates the complete opposite to be true.

    1. <u>There is no evidence that Antonik had knowledge of Plaintiff's purported activity prior to NYU's non-renewal of Plaintiff's employment</u>

As a requisite element of a retaliation claim, an employer must be aware of the protected activity, *i.e.*, "it understood, or could reasonably have understood, that the plaintiff's opposition

---

[3] As required, Defendants' instant motion is premised on the grounds specified in their Rule 50(a) motion. *See Barkley v. Olympia Mortg. Co.*, 557 Fed. Appx. 22, 27 (2d Cir. 2014). Plaintiff was sufficiently put on notice by Defendants' Rule 50(a) motion as to the issues for which she needed to put forth more evidence. *See Tolbert v. Queens Coll.*, 242 F.3d 58, 76 (2d Cir. 2001). Defendants argued that (i) there was no protected activity; (ii) any alleged protected activity did not cause an adverse employment action; and (iii) Antonik did not retaliate because all he did was forward information upon the request of others. (Steer R. Decl. Ex. Q (July 18 Ct. Tr. at 1298:3-1331:19.) The Court may nonetheless grant a post-trial motion to a party that did not make the requisite predicate motion "to prevent manifest injustice." *Casmento v. Volmar Constr., Inc*., No. 20-cv-0944, 2022 WL 15773966, at *4 (S.D.N.Y. Oct. 28, 2022). "Manifest injustice" exists when, as here, a jury's verdict is wholly without legal support." *Id.; ING Glob. V. United Parcel Serv. Oasis Supply Corp*., 757 F.3d 92, 97 (2d Cir. 2014). Here, the jury's verdict with respect to the retaliation claim as to NYU and Antonik and the delated front pay award were wholly without legal support.

2

was directed at conduct prohibited by Title VII." *Krasner*, 680 F. Supp. 2d 502, 520 (citations omitted). (Steer R. Decl. Ex. R (July 19 Ct. Tr. 1467:16-1468:1-16).)  Here, there is no evidence that Antonik was aware that Plaintiff was engaged in "protected activity." Antonik's knowledge was limited to Plaintiff's complaint about NYU's request to permit another doctor to use Plaintiff's office on the days that she was not using it and his purportedly raising his arms during their meeting about the use of her office.[4] (Steer Decl. Exs. B (Pl's. Trial Ex. 21); C (July 12 Ct. Tr. 530:8-10); Steer R. Decl. Ex. S (July 12 Ct. Tr. 523:11-524:1, 14-18).) Plaintiff testified that she complained to Kathleen Pacina who "took everything down." (Steer R. Decl. Ex. T (July 11 Ct. Tr. 117:6-8).) Yet, according to Pacina's notes from that call, Plaintiff was complaining only about office space.[5] (Steer Decl. Ex. B.) There is no mention of any purportedly "sexist," "discriminatory," or "chauvinistic," conduct, or of Antonik purportedly calling her a "bitch."[6] *Id.*

Plaintiff's utter speculation as to the knowledge possessed by Antonik regarding her internal complaint is contradictory to all evidence of what was known at the time, and is not a substitute for the evidence necessary to permit rational inferences by a jury of Antonik's

---

[4] While Plaintiff alleges that David Kaplan wrote to Joshua Swirnow that Plaintiff filed a complaint against Antonik for being aggressive and retaliating for not allowing her to expand her hours, there was no reason for NYU or Antonik (who was not copied on the email) to understand that it had to do with gender discrimination. (Steer Decl. Ex. U (Ds' Trial Ex. SS).) As stated by this Court, in addressing Plaintiff's opposition to Defendants' 50(a) motion, "It's not gender discrimination for somebody to be intimidating, whether the person is a male or female. Put another way, the fact that somebody happens to have the genetic features of a male and the physical features of a male doesn't make the threating activity to be gender discrimination." (Steer Decl. Ex. Q (July 18 Ct. Tr. 1317:2-8).) In response to Plaintiff's assertion that "were it not for the fact that she was a female, he would have never spoken to her that way," the Court responded that "You're not going to support a verdict on that basis." (*Id.* at 1317:11-15.) Plaintiff's argument to the contrary are purely speculative and not based on any evidence.

[5] When Antonik was shown an email thread within HR (in which he is not copied) (Steer R. Decl. Ex. V (Pl's. Trial Ex.79)), at trial, he testified that his understanding was it had to do with the way he spoke to Plaintiff (as opposed to just office space). (Pl. Memo at 4, n. 19 (citing Tr. 530:5-10).) However, there is no evidence that Antonik had ever seen this email prior to the commencement of this lawsuit or that Antonik was aware that what Plaintiff was complaining about to Human Resources was anything more than gender neutral conduct.

[6] Antonik testified that he did not call her a bitch (Steer Decl. Ex C (Tr. 530:16-22); Steer R. Decl. Ex. S (July 12 Ct. Tr. 544:19-25)), and there is also no testimony that Plaintiff ever told anyone that Antonik purportedly called her a bitch or that any such allegation was conveyed to Antonik. (Steer R. Decl. Ex. W (July 13 Ct. Tr. 637:13-24).) Indeed, the allegation of his purported use of the word "bitch" was never documented in any internal complaint at NYU, nor was it included in Plaintiff's EEOC Charge or her court Complaints filed herein. (Steer R. Decl. Exs. X (Ds' Trial Ex. QQQ); Y (Ds' Trial Ex. RRR); Z (Ds' Trial Ex. TTT); AA (Ds' Trial Ex. VVV).)

3

purported knowledge of alleged protected activity or retaliatory motive. *Olaechea*, 2022 WL 3211424, at *6 (citation omitted). Plaintiff's later email to HR using buzz words like "harassment" and "toxic work environment" also does not amount to protected activity. *Robinson*, 2023 WL 4862772, at *90-91. Of even greater significance, there is no record evidence that Antonik was aware of those subsequent communications from Plaintiff to HR. Because there is no record evidence that Antonik was aware of any complaints about purported discrimination, Plaintiff failed to prove the existence of the predicate for a retaliation claim. Even if the jury had credited Plaintiff's testimony that Antonik had said the word "bitch," which is a stray remark, attributing knowledge of protected activity on Antonik's part would still be speculative because, based on his conversation with Pacina, there was no reason for him to believe Plaintiff's complaint was about discrimination. Indeed, the jury found for Defendants on the claim of discrimination despite Plaintiff's testimony that Antonik had muttered such word.

    2.    <u>No evidence of any actual participation on the part of Antonik</u>

The jury was instructed that if they "find that the individual defendants *actually participated in the decision* to not renew plaintiff's contract and to terminate her employment, then [they] may find them liable under an aider-and-abettor theory." (Steer R. Decl. Ex. R (July 19 Ct. Tr. 1462:20-24) (emphasis added).) Here, Antonik did not participate in the decision. He did not even know that a decision to non-renew Plaintiff's contract was being considered. (Steer Decl. Ex. C (July 12 Ct. Tr. 534:2-13; 535:13-17).) Antonik was not consulted as to whether Plaintiff's contract should be non-renewed. (*Id*. at 535:13-17.) He had no knowledge or recollection as to why Plaintiff was terminated. (Steer R. Decl. Ex. S (July 12 Ct. Tr. 498:19-21).

The record demonstrates that Antonik merely played a ministerial role in the gathering of information compiled by Ruiz concerning Plaintiff at the direction of others. (Steer Decl. Ex. C (July 12 Ct. Tr. 500:4-9); Steer Decl. Ex. A (Tr. 1184:6-14).) But even if he had played more than a

4

ministerial role, his conduct had no effect on the non-renewal of Plaintiff's contract. As Dr. Porges testified at trial, he independently became aware of clinical issues with Plaintiff over a period of years. (Steer R. Decl. Ex. P (July 17 Ct. Tr. 1139:3-7.) Porges raised his concerns about Plaintiff's clinical practices via a telephone conversation with Kaplan. (*Id*. at 6-7; Steer R. Decl. Ex. W (July 13 Ct. Tr. 608: 6-18).) In turn, Kaplan asked Dr. Porges to put his concerns in writing. (Ex. W (July 13 Ct. Tr. 608:9-18).) Dr. Porges then reached out to the office nurse, the suite manager (Miriam Ruiz), and the site manager (Antonik), so that they could provide him records accumulated over the years regarding Plaintiff's patient problems. (Steer Decl. Ex. A (July 18 Ct. Tr. 1184:6-14).) On November 6, 2020, Dr. Porges emailed his concerns in writing to Kaplan. (Steer R. Decl. Ex. BB (Pl's Trial Ex. 1.) In his email, Dr. Porges stated "I have had the opportunity to review many charts and observe her practice when seeing patients in the office for second opinions or occasionally for emergency practice coverage. Dr. Edelman has a pattern of ordering lab tests in a pattern not in keeping with the usual standards of rheumatology practice." (*Id*. at 2 (D000004).) At trial, Dr. Porges testified that he wrote the paragraph quoted above without assistance from anyone. (Steer R. Decl. Ex. Q (July 18 Ct. Tr. 1230:11-14).)

Thus, there is no record evidence that any information provided by Antonik affected Dr. Porges' evaluation and medical opinion that he provided to Kaplan, which formed the bases of Plaintiff's non-renewal. (Steer R. Decl. Ex. CC (July 14 Ct. Tr. 907:4-7).) The lack of evidence showing that Antonik participated in the non-renewal decision of Plaintiff's contract, a requisite element of the retaliation claim, requires the vacatur of the finding of retaliation. "For an individual defendant to be liable for retaliation under the NYCHRL, he must have 'actually participated in the conduct giving rise to the plaintiff's' claims.'" *Olaechea*, 2022 WL 3211424, at *5.

    3.    <u>No evidence that NYU acted negligently</u>

The jury was charged with a Cat's Paw instruction. (Steer Decl. Ex. G (July 19 Ct. Tr.

5

1459:8-24)); *see also, e.g.*, *Edwards v. Rochester Inst. of Tech.*, 794 F. App'x 65, 67 (2d Cir. 2019) (finding no liability affirmed where, *inter alia*, that although the employer consulted with the discriminatory employee before terminating plaintiff, the employer also spoke with four other employees and found the evidence consistent) (citations omitted)). Here, consistent information was conveyed to the decision-maker, Rubin, from multiple sources – none of which was shown to be false or malign. Neither Antonik nor any other employee, was shown to have provided false information upon which a decision was based. There is no evidence that Rubin was negligent in such reliance, or that he was manipulated by anyone.[7] The evidence shows that he based his decision, in good faith, on the evaluations by multiple physicians who were non-parties, none of which was found to be "false" or "malign," to wit: Drs. Goldberg and Porges, who both determined independently from any alleged bias of Antonik that Plaintiff's clinical practice was inconsistent with NYU standards and could not be remediated. (Steer R. Decl. Exs. CC (July 14 Ct. Tr. 942:20-943:1-6); P (July 17 Ct. Tr. 1044:19-21; 1141:22-1142:1-4).)[8]

---

[7]  Plaintiff attempts to compare herself to the plaintiff in *Vasquez v. Empress Ambulance Serv. Inc.*, 835 F.3d 267 (2d Cir. 2016). (Pl. Memo at 19.) However, the facts in *Vasquez* are <u>remarkably different</u> in every respect as Vasquez, within a span of 24 hours, "faced unwelcome sexual advances in the workplace, complained about that conduct to her employer, and lost her job." *Vasquez*, 835 F.3d at 269. Further, when Vasquez's coworker discovered her complaint, the co-worker provided the employer with false documents purporting to show Vasquez's consent, and in reliance on those false documents the employer immediately fired Vasquez alleging she had engaged in sexual harassment despite her offers to produce evidence in refutation. *Id.*

[8]  Plaintiff, without citing to any evidence, contends that Antonik directed Ruiz to prepare her log. (Pl. Memo at 17.) However, Ruiz testified that since she first started working for NYU, prior to 2019, she created spreadsheets of all types of complaints. (Steer Decl. Ex. F (July 14 Ct. Tr. 839:10-18, 857:8-16).) While Plaintiff further questions the timing of Ruiz's log (Pl. Memo at 17, n 84), Ruiz testified that the first entry of her log about Plaintiff was undated as it was a "consistent problem." (Steer R. Decl. Ex. CC (July 14 Ct. Tr. 839:19-840:1-14).)

Plaintiff alleges that Antonik participated in Plaintiff's non-renewal because he purportedly editorialized Ruiz's log in his email to Dr. Porges. (Pl. Memo at 18.) However, the Court sustained Defendants' objections to Plaintiff's counsel's attempt to question both Antonik and Ruiz, at the trial, about whether Antonik "editorialized" the log and was directed to "ask in a different form without the 'editorialized.'" (Steer R. Decl. Exs. W (July 13 Ct. Tr. 579:19-23); CC (July 14 Ct. Tr. 825:3-6).) Antonik's email dated November 6, 2020, to Porges (Steer R. Decl. DD (Pl's Trial Ex. 86)) included a summary of Ruiz's underlying log and its attached supporting documents. For example, Antonik summarizes the November 13, 2019, entry from Ruiz's chart (along with the referenced example 11.13.19 attached to Ruiz's chart). (Steer R. Decl. DD (Pl's Trial Ex. 86); EE ( Pl's Trial Ex. 84); FF (Ds' Trial Exhibit JJJ (D001100, D001104)).) There is no evidence that anything in Antonik's email to Porges contained anything inaccurate based on the documentary support that Antonik was instructed to gather. Further, Antonik testified that "from [his]

6

"Moreover, unlike the typical cat and monkey roles, here there were additional layers of attenuation" between Antonik and Rubin. *See Kregler v. City of New York*, 987 F. Supp. 2d 357, 369 (S.D.N.Y. 2013). Like in *Kregler*, Plaintiff's theory that one person gave information to a second person that was tainted by retaliatory animus, and that person in turn provided information to a third person that was also tainted, "strains the cat's paw theory beyond existing case law." *Id*. Like in *Kregler*, this Court should grant Defendants' judgment as a matter of law.[9]

Plaintiff's contention that NYU should have investigated "Antonik's claims knowing that he had a possible retaliatory motive" (Pl. Memo at 19) is a mere attempt at diversion. First, Antonik made no claims against Plaintiff. At the direction of Porges, he gathered and relayed the information gathered by Ruiz. Second, and more importantly, it was Dr. Porges who independently raised concerns regarding Plaintiff's clinical practice that eventually led to the non-renewal of Plaintiff's contract. Thus, regardless of Antonik's alleged conduct or motive, Rubin determined not to renew Plaintiff's contract based on the reviews and medical opinions of Drs. Goldberg and Porges, not based on any input by Antonik (he had none).[10]

---

own knowledge, at the time, [he] did not know that any of this would be used for termination." (Steer R. Decl. Ex. S (July 12 Ct. Tr. 503:2-3, 9-10.) Assuming, *arguendo,* none of these issues were discussed with Plaintiff as she alleges (Pl. Memo at 5), there is no evidence that NYU was required to do so. Plaintiff does not cite any legal authority for her claim that hearing from both sides is the *sine qua non* to any reasoned determination. (Pl. Memo. At 20.) Further, Porges testified that NYU is not a training program and that he is not training the doctors. (Steer R. Decl. Ex. Q (July 18 Ct. Tr. 1204:6-8, 16-19).) It is clear from the record that speaking with Plaintiff would have been futile as Drs. Porges and Goldberg did not believe that Plaintiff's practice issues could be remediated or that they could mentor her to improve her quality standards. (Steer R. Decl. Exs. W (July 13 Ct. Tr. 683:14-17); P (July 17 Ct. Tr. 1044:19-21, 1141:25-1142:1-4.) In any event, Dr. Porges did testify that he talked to the [rheumatology] group as a whole about excessive x-rays. (Steer R. Decl. Ex. Q (July 18 Ct. Tr. 1186:15-18.)

[9] Plaintiff's attempt to distinguish *Kregler* based on the notion that "the individual who provided information to have the plaintiff there terminated had no knowledge of the plaintiff's complaint" purportedly unlike the defendants here (Pl. Memo. at 18) is unavailing. It appears that Plaintiff fails to include a supporting cite as the alleged protected activity in *Kregler* was not predicated on a complaint, and Plaintiff's complaint was not protected activity in any event.

[10] Plaintiff alleges that a causal connection may be inferred where longer periods separated the protected activity and adverse action if it is plausible that there was no earlier opportunity to retaliate. (Pl. Memo at 22.) However, the jury was charged that a causal connection can be established by Plaintiff by, *inter alia*, showing that the protected activity was *followed closely* by the alleged adverse action and that NYU subjected her to the adverse employment action *because of* her participation in the protected activity. (Steer R. Decl. Ex. R (July 19 Ct. Tr. 1453:2-10).) There

7

**II. Defendants' Motion for Remittitur of the Jury's Front Pay Award**

The Court may determine that remittitur, as opposed to a new trial on damages, is appropriate with respect to a jury's award for lost wages that is, like here, unduly speculative and without adequate support. *Torres*, 2023 WL 4487726, at *13. "Front pay damages, if any, represent a plaintiff's lost salary and benefits, caused by an unlawful discharge or other adverse action, accruing from the time of trial through some point in the future." (Steer Decl. Ex. G (July 19 Ct. Tr. 1473:23-1474:1-2).) Here, Plaintiff suffered no loss in compensation. The award of $700,000 is therefore an unwarranted windfall and should be vacated.

  1. <u>The Front Pay Award Should be Vacated</u>

Just prior to Plaintiff's non-renewal, her compensation with NYU was $278,000. (Steer Decl. Exs. K, L (July 11 Ct. Tr. 107:19-24).) By February 16, 2021, Plaintiff secured a job in Florida. (Steer Decl. Ex. M.) Plaintiff did not go a day unemployed (Steer Decl. Ex. L (July 11 Ct. Tr. 87:21-23; 210:10-11)), and her new salary was higher at $300,000 for the first year (plus a $25,000 moving expense allowance). (Steer Decl. Exs. M.) Plaintiff also testified that $300,000 in Florida is worth more than $300,000 in New York. (Steer R. Decl. Ex. T (July 11 Ct. Tr. 220:22-221-1).)[11] Plaintiff's salary increased to $325,000 the following year. (*Id*.) Moreover, she also received incentive compensation in the amount of 20% of her gross collection in excess of 200% of her base salary for the first completed year of employment, and then 25% for the following years. (*Id*. at P4, Par. 15.) Plaintiff is earning approximately $71,000 more per year than she did while at NYU. (*See* Steer Decl. Exs. K, M.)

---

is insufficient evidence in the record connecting Plaintiff's HR complaint in September 2019 with her non-renewal (based on the review of her clinical issues resulting from non-party Dr. Porges' concerns raised in November 2022).

[11] Plaintiff alleges "she was forced to relocate to Florida even though she wanted to remain in New York…." (Pl. Memo. At 7.) However, she testified that two days after she received her notice of non-renewal from NYU, she was telling recruiters that she was looking to make a move to Florida and had already identified specific locations in Florida in which she was interested. (Steer R. Decl. Ex. T (July 11 Ct. Tr. 223:12-224:6, 224:17-225:2).)

8

While Plaintiff alleges that front pay awards may be issued towards some unfixed future point in time (Pl. Memo at 25), the jury was instructed that:

> If you find that Dr. Edelman will be unable to earn in the future what she would have earned at NYU, then you may award her, as additional compensation, the amount she would have earned during the time period between the date of your verdict and either: 1) the date you believe she would have worked at NYU absent any discriminatory conduct or 2) *the date you can reasonably predict that she has a reasonable prospect of obtaining comparable employment.*

(Steer Decl. Ex. G (July 19 Ct. Tr. 1474:2-9) (emphasis added).) Plaintiff did not suffer any damages under the Court's unchallenged legal instructions.

Further, Plaintiff's award of front pay should be vacated as it impermissibly puts her in a better position than while employed by NYU. *See Olaechea*, at *8 (citations omitted); *see Smith v. Farmstand*, No. 11-cv-9147, 2016 WL 5912886, at *24 (N.D. Ill. Oct. 11, 2016) (plaintiff not entitled to front pay as he successfully mitigated damages by maintaining comparable job for more than 12 months that afforded him equal or greater salary).

Plaintiff's only claim for front pay is based on an alleged lack of contribution to her retirement plan by her new employer. (Steer Decl. Ex. L (July 11 Ct. Tr. 210:15-19).) But Plaintiff has no documentary proof that she does not receive retirement benefits now. Her very short, unspecific testimony that she has a 401k option in her present position just as she did at NYU is insufficient. (Steer Decl. Exs. L (July 11 Ct. Tr. 210:20-25); M); *see Olivares v. Brentwood Indus.*, 822 F.3d 426, 430 (8th Cir. 2016) (district court declined to speculate about a front pay award solely on plaintiff's testimony). There is no evidence that she contributed to her retirement plan at NYU, let alone that NYU provided any corresponding matching amount. Plaintiff only indicates that she had that ability to do so. (Pl. Memo. at 6.) There is also no evidence concerning the 401k option or Plaintiff's election or contribution or lack thereof at her new employer. Furthermore, she did not suffer any loss because her new compensation is above the combined level of salary and

9

retirement benefits she received at NYU. Any award in this regard would therefore be both against the Court's instructions and speculative. *Dunlap-McCuller v. Riese Org.*, 980 F.2d 153, 159 (2d Cir. 1992) ("An award of front pay cannot be unduly speculative").

Further, it is illogical to look at only one component of Plaintiff's compensation (retirement benefits) while ignoring another (salary). Otherwise, if at her new job, her salary increased to $1 million more a year than she made at NYU (but with no retirement benefits), under her theory, she would still be entitled to the $26,000 maximum match from NYU (Steer Decl. Ex. K) to purportedly make her whole and would thus receive an unjust windfall.

The award to Plaintiff of lost front pay is therefore an unjustified and speculative windfall. Lastly, even if Plaintiff's damages award is not vacated, as it should be, it should be capped at $137,400. While Plaintiff alleges that front pay "would be difficult to predict and impossible to calculate in Rule 26 disclosures," (Pl. Memo at 25) she did so in her Amended Rule 26 Disclosures, dated April 3, 2023, stating that her "back pay and front pay" as "currently calculated at $137,400.00" was derived at based on her losing $27,800 per year in 2022-2024 for NYU's 10% match into her retirement account. (Steer Decl. Ex. N (p. 3, C(ii), n. 2).) She also included the same calculation of $137,400.00 as "lost wages (back & front pay)" in the Joint Final Pretrial Order also dated April 3, 2023. (Dkt. No. 197.) As Plaintiff failed to put forth any evidence that she suffered any loss entitling her to any front pay, the award must be vacated or alternatively remitted for an amount of no more than $137,400.

## Conclusion

Defendants respectfully request that their motion for JMOL be granted and the front pay award be vacated or, alternatively, remitted and limited to the amount Plaintiff sought in her pretrial filings.

10

Dated: New York, New York
October 12, 2023

        **TARTER KRINSKY & DROGIN LLP**
        *Attorneys for Defendants*

        By:   */s/ Richard L. Steer*
            Richard L. Steer
            Richard C. Schoenstein
            Ingrid J. Cardona
            1350 Broadway, 11th Floor
            New York, New York 10018
            (212) 216-8000
            rsteer@tarterkrinsky.com
            rschoenstein@tarterkrinsky.com
            icardona@tarterkrinsky.com