# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

DR. SARI EDELMAN, :
:
Plaintiff, :
:
-v- :
:
NYU LANGONE HEALTH SYSTEM, NYU :
LANGONE HOSPITALS, NYU LANGONE MEDICAL :
CENTER, NYU LANGONE NASSAU :
RHEUMATOLOGY, NYU SCHOOL OF MEDICINE, :
NYU GROSSMAN SCHOOL OF MEDICINE, NYU :
HOSPITALS CENTER, ANDREW T. RUBIN, DAVID :
KAPLAN, JOSEPH ANTONIK, and JOSHUA :
SWIRNOW, :
:
Defendants. :
:
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/26/2023

21-cv-502 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Plaintiff Sari Edelman ("Plaintiff") and defendants NYU Langone Health System, NYU

Langone Hospitals, NYU Langone Medical Center, NYU Langone Nassau Rheumatology, NYU

School of Medicine, NYU Grossman School of Medicine, and NYU Hospitals Center

(collectively, "NYU"), and Andrew T. Rubin, David Kaplan, Joseph Antonik, and Joshua

Swirnow (together with NYU, "Defendants") cross-move for judgment as a matter of law,

pursuant to Federal Rule of Civil Procedure 50(b), or for a new trial or remittitur, pursuant to

Federal Rule of Civil Procedure 59. Dkt. Nos. 267, 271.

For the following reasons, Plaintiff's motion is denied and Defendants' motion for

judgment as a matter of law is granted.

## BACKGROUND

The Court discusses only the evidence adduced at trial that is relevant to the instant motions and, in each instance, in the light most favorable to the non-moving party.

Plaintiff is a rheumatologist. Trial Tr. 49:25. She graduated from the New York College of Osteopathic Medicine in 2003. *Id.* at 50:3–9. She subsequently performed her residency and a fellowship at Winthrop University Hospital. *Id.* at 52:12–15. Upon completing her fellowship in 2008, Plaintiff and a colleague from Winthrop, Dr. Kavini Mehta, went into private practice together, opening their own rheumatology office in Lake Success, New York, on Long Island. *Id.* at 54:10–19, 57:5–21.

In 2014, NYU sought to expand its rheumatology network to Long Island. The first rheumatologist NYU hired on Long Island was Dr. Avram Goldberg, who worked next door to Plaintiff and Dr. Mehta. *Id.* at 68:17–25. Dr. Goldberg approached Plaintiff and Dr. Mehta about joining NYU. *Id.* at 68:14. Excited by the opportunity, Plaintiff and Dr. Mehta interviewed with Rubin and Swirnow, who were senior administrators at NYU in Manhattan. *Id.* at 70:25–71:3. Rubin was Vice President of Clinical Affairs and Ambulatory Care, *id.* at 867:15–17, and Swirnow was Assistant Vice President for Clinical Affairs and Business Development, *id.* at 644:12–18. NYU hired Plaintiff and Dr. Mehta and took over their Lake Success office. *Id.* at 73:25–74:2, 77:20.

Plaintiff entered into a three-year contract with NYU to serve as an assistant professor of medicine and staff physician. *Id.* at 80:23–81:1, 82:11–12. During the term of her contract, NYU could only terminate Plaintiff for cause. *Id.* at 83:13–15. The contract also contained a target relative value unit ("RVU") for Plaintiff. *Id.* at 87:25, 88:7–10. RVUs are government-created metrics that reflect the relative time and difficulty of medical procedures for purposes of Medicare billing. *Id.* at 84:24–85:14. NYU tracked its physicians' RVU outputs to measure

their productivity and performance. *Id.* at 85:18–24.  Plaintiff's target RVU was 4,996.  *Id.* at 87:25, 88:7–10.

Initially, NYU's acquisition of Plaintiff's private practice was seamless, at least from an administrative perspective.  While the sign on the door changed, Plaintiff continued to work out of the same office with Dr. Mehta and their existing staff.  *Id.* at 79:5–19.  However, new NYU personnel soon joined the Lake Success location.  First, Dr. Goldberg began to practice alongside Plaintiff and Dr. Mehta there.  *Id.* at 93:21–23.  NYU also installed Dr. Andrew Porges at the Lake Success site as its medical director.  *Id.* at 93:24–25, 762:10–12.  And administrative staff arrived to help manage the office—including Kaplan, the senior site director, and Antonik, an office manager who reported to Kaplan.  *Id.* at 110:2–17.

NYU's expansion of its rheumatology network on Long Island was not limited to Lake Success.  While NYU's medical facility in Huntington, New York, had a large patient population, the facility did not offer rheumatological care.  *Id.* at 937:25–938:2.  Rubin, Swirnow, and other senior administrators were eager to recruit a rheumatologist to establish a practice in Huntington and fill that gap.  *Id.* at 737:20–25, 938:1–7.  NYU did so in February of 2017, when it hired Dr. Anang Modi.  *Id.* at 199:13–19.  Like Plaintiff, Dr. Modi attended the New York College of Osteopathic Medicine and then completed his residency and a rheumatology fellowship at Winthrop University.  *Id.* at 1009:8–18, 1256:19–17.  But Dr. Modi earned his degree two years ahead of Plaintiff.  *Id.* at 1257:20–21.  And, following his fellowship, he joined the Queens Long Island Medical Group, a healthcare provider with over 500 physicians that was subsequently acquired by Advantage Care Physicians.  *Id.* at 1257:3–17, 1273:4–9.  Dr. Modi was the medical director of its Hempstead office, where he practiced rheumatology and supervised a team of fifteen physicians.  *Id.* at 1273:9–14.  Based on his

experience and strong reputation, Rubin and Swirnow believed Dr. Modi was an ideal candidate to join NYU's Huntington facility.  *Id.* at 737:17–25; 937:20–938:4.  Dr. Modi's contract with NYU set his salary at $360,000 and his target RVU at 6,108.  *Id.* at 738:10–21.

In 2017, prior to the expiration of her initial contract, Plaintiff and NYU agreed to renew her contract for another three-year term, beginning January 1, 2018.  *Id.* at 107:14–21.  Plaintiff's renewed contract increased her salary to $278,000 and RVU target to 5,200.  *Id.* at 107:22–108:4.  Shortly after her renewed contract went into effect, Plaintiff began to spend one day per week seeing patients at NYU's Huntington facility and the remainder of her time at the Lake Success site.  *Id.* at 108:12–18, 112:15.

In the late afternoon of September 16, 2019, Antonik approached Plaintiff in her Lake Success office.  *Id.* at 110:21–111:1.  With the door closed, he informed her that because NYU had hired a new rheumatologist, another physician would need to use Plaintiff's office two days per week.  *Id.* at 111:9–17, 114:25.  Plaintiff replied that she believed her contract entitled her to full-time use of an office and that she would need to review the contract with her attorneys.  *Id.* at 112:7–15.  Antonik grew animated at Plaintiff's response.  *Id.* at 112:18.  According to Plaintiff, although both Antonik and Plaintiff were seated, Antonik moved his chair closer to Plaintiff.  *Id.* at 112:20–3.  He then raised his arms and pointed at pictures and other personal belongings on Plaintiff's desk, stating that Plaintiff did not own the office just because she put her stuff there.  *Id.* at 113:6–12.  It all belongs to NYU, he said, this whole office and we own you.  *Id.* at 113:12–14.  Plaintiff later testified at trial that Antonik uttered the word "bitch" under his breath during this conversation.  *Id.* at 113:16.  In his testimony, Antonik denied using that word.  *Id.* at 530:18.  Plaintiff backed up and told Antonik he needed to leave.  *Id.* at 113:15–19.

He did.  *Id.* at 113:20.  Plaintiff, who is smaller than Antonik, felt upset and intimated by the confrontation.  *Id.* at 113:22–114:2, 115:18–21.

The following day, Plaintiff called Kathleen Pacina—a Human Resources ("HR") manager responsible for handling performance problems, employee disputes, and other issues, *id.* at 1087:2–15—to complain about the incident, *id.* at 116:18–24.  Plaintiff described what had transpired.  *Id.* at 117:6–7.  As she was senior to Antonik and had been at the Lake Success location longer than he had, she stated that she found his conduct and demeanor profoundly disrespectful.  *Id.* at 117:15–22.  Plaintiff also characterized Antonik's behavior as sexist, discriminatory, and chauvinistic.  *Id.* at 117:4–5.  Pacina took notes during their conversation, assigned the complaint a case number, and said she would get back to Plaintiff.  *Id.* at 117:8–10.

Pacina's notes indicate that Plaintiff described how Antonik "thr[ew] his arms and point[ed] at things" and stated he would "bring this up to the powers that be."  Plaintiff's Ex. 21.  The notes also reflect that Plaintiff said she found Antonik's conduct "intimidating" and that their encounter made Plaintiff "very uncomfortable."  *Id.*  But Pacina's notes did not mention sexism, discrimination, or chauvinism.  *See id.*  And Pacina later testified at trial that she did not understand Plaintiff's complaint to concern the way she was treated vis-à-vis her gender.  Trial Tr. 1100:23–25.

Pacina followed up on Plaintiff's complaint by speaking to Antonik about the incident.  *Id.* at 523:11–15.  That conversation was when Antonik first learned about Plaintiff's complaint.  *Id.* at 523:16–18.  Antonik explained his perspective on what had occurred to Pacina.  *Id.* at 523:23–524:1.  Pacina again took notes.  *Id.* at 1107:23–1108:2.  Those notes state that Antonik denied raising his arms, but acknowledged that he said he would take the issue up with the "powers that . . . be" after Plaintiff said to contact her lawyers regarding her entitlement to an

5

office.  Plaintiff's Ex. 21.  Antonik told Pacina the office request was not personal to Plaintiff, as many doctors at NYU had to share their space.  *Id.*

Kaplan reached out to Plaintiff on September 25, 2019.  Trial Tr. 118:14–19.  He apologized for what had happened with Antonik but explained that NYU had reviewed her contract and confirmed that she was not entitled to an office five days a week, so she would need to share her space on Thursdays and Fridays.  *Id.* at 120:15–21.  Plaintiff became frustrated and refused to discuss the topic further.  *Id.* at 121:5–10.  Kaplan asked her to calm down.  *Id.* at 122:8–9.  Plaintiff considered Kaplan's comment sexist and ejected him from her office.  *Id.* at 122:10–14.  Later that night, Plaintiff emailed Pacina, stating that Kaplan had spoken to her in a condescending tone, *id.* at 125:13–15, and that she was "disappointed that it is 2019, approaching 2020, in a major hospital organization in New York, and [she] still ha[d] to contend with male chauvinism," *id.* at 126:5–7.

Swirnow called Plaintiff two days later.  *Id.* at 128:10–14.  They agreed Plaintiff would no longer go to the Huntington facility and that she could use her Lake Success office five days a week.  *Id.* at 130:24–131:5.  Plaintiff told Swirnow that she would nevertheless maintain her HR complaint.  *Id.* at 131:6–16.  Swirnow unenthusiastically assented.  *Id.* at 131:17–19.

Plaintiff and Pacina continued to correspond via email regarding Plaintiff's complaint throughout October and November of 2019.  *Id.* at 133:8–137:9.  During that time, despite Swirnow's assurances that Plaintiff could keep her Lake Success office full time, Antonik and Kaplan notified Plaintiff that they were going to move another doctor into her office on Thursdays.  *Id.* at 137:13–19.

In 2020, as her contract neared the end of its term, Plaintiff contacted Rubin about renewing her contract with NYU.  *Id.* at 147:6–9.  Rubin responded that NYU would let her

know its plans. *Id.* Meanwhile, NYU had commenced internal deliberations regarding Plaintiff's performance. Miriam Ruiz, the office manager who oversaw Plaintiff's suite, notified her supervisor, Antonik, regarding several issues with Plaintiff's work. *Id.* at 500:18–501:8, 580:18–19, 810:23–24. When Antonik raised those issues with his supervisor, Kaplan, *id.* at 500:18–501:8, Kaplan asked Antonik for more information, *id.* at 500:7–9, 501:9–13. Antonik emailed Dr. Porges and Ruiz, stating that Kaplan "requested all information on Edleman [sic] to be sent to him today. We need a clear, convincing summary with examples sent." Plaintiff's Ex. 86 at 2. Ruiz later testified that she maintained a spreadsheet for each doctor in her suite, noting issues they had and complaints against them. Trial Tr. 821:21–24. However, the earliest entry on Ruiz's spreadsheet regarding Plaintiff was dated November 13, 2019. *Id.* at 150:5–9. Based on Kaplan's request, Ruiz provided the spreadsheet she maintained on Plaintiff to Antonik. *Id.* at 826:12–13. Antonik drafted Ruiz's spreadsheet entries into an email that he sent to Dr. Porges. *Id.* at 504:24–505:2. Dr. Porges then sent an email to Kaplan, explaining that he had received frequent complaints from clinical and administrative staff about Plaintiff—including about her treatment of other NYU employees and her excessive test and x-ray orders—and providing the issues Antonik had compiled. *See* Plaintiff's Exs. 1, 86; Trial Tr. 504:24–505:2, 612:6–9. Kaplan forwarded Dr. Porges's message to Swirnow. Trial Tr. 616:15–18. When he later spoke to Kaplan, Swirnow said that he and Rubin would "take it from here." *Id.* at 617:17–21. Swirnow and Rubin spoke to Dr. Porges about his concerns with Plaintiff. *Id.* at 677:10–12, 886:2–10. Swirnow and Rubin also spoke to Dr. Goldberg, who echoed Dr. Porges clinical concerns with Plaintiff's performance. *Id.* at 677:15, 762:22–763:1, 886:2–10. Both Dr. Porges and Dr. Goldberg stated that they did not believe mentoring could resolve Plaintiff's performance issues. *Id.* at 762:18–763:3. Rubin spoke to other clinicians as well regarding

Plaintiff.  *Id.* at 893:1.  Ultimately, Rubin decided not to renew Plaintiff's contract.  *Id.* at 905:13–15.

NYU sent Plaintiff a letter in early December 2020, informing her that it would not renew her employment contract.  *Id.* at 147:23–148:5.  Plaintiff called Rubin, who told her that NYU had decided to go in a different direction, but he offered to help her find a new position.  *Id.* at 148:19–149:7.  After searching for a new job, Plaintiff accepted a position in Clearwater, Florida as a rheumatologist with the Arthritis and Rheumatism Associates on February 16, 2021.  *Id.* at 228:25–229:21.

## PROCEDURAL HISTORY

Plaintiff filed a charge of sex discrimination and retaliation with the Equal Employment Opportunity Commission on January 5, 2021.  Dkt. No. 1 ¶ 58.  She commenced the instant suit against the Defendants on January 20, 2021.  *See* Dkt. No. 1.  Plaintiff filed a first amended complaint on January 22, 2022.  Dkt. No. 96.  Her first amended complaint claimed violations of equal pay protections as well as discrimination and retaliation.  *See id.* ¶¶ 60–112.  Defendants moved for summary judgment on all of Plaintiff's claims on February 18, 2022.  Dkt. No. 108.  On September 28, 2022, the Honorable Lorna G. Schofield, to whom the case was then assigned, granted Defendants' motion for summary judgment in part and denied it in part.  Dkt. No. 155.  Specifically, Judge Schofield granted Defendants summary judgment on Plaintiff's discrimination claims under federal and state law.  *Id.* at 33.  But the Court ruled that Plaintiff had adduced sufficient evidence to proceed on: her federal unequal pay claims against NYU, Swirnow, and Rubin; her Title VII retaliation claim against NYU; her New York state and New York City retaliation claims against Defendants; and her discrimination claim under New York City law based on allegedly sexist remarks.  *Id.*

8

With leave of the Court, Dkt. No. 169, Plaintiff filed the operative Second Amended Complaint on December 8, 2022, Dkt. No 170.  The Second Amended Complaint added an unequal pay claim against the Defendants under New York state law.  *Id.* ¶¶ 58–62.

On June 7, 2023, the case was reassigned to the undersigned.  After ruling on the parties' motions *in limine*, Dkt. Nos. 221, 224, the Court held an eight-day jury trial beginning on July 10, 2023.  At the close of Plaintiff's case on July 18, 2023, Defendants moved for judgment as a matter of law ("JMOL"), pursuant to Federal Rule of Civil Procedure 50(a).  Trial Tr. 1298:6–1309:13.  Plaintiff opposed that motion.  *Id.* at 1309:24–1330:3.  After taking the matter under advisement, the Court granted JMOL to Defendants on the willfulness of their alleged violations of federal and state equal pay laws.  *Id.* at 1342:7–20.  Additionally, the Court granted JMOL on Plaintiff's retaliation claims against Kaplan, *id.* at 1342:21–22, explaining "[t]here is insufficient evidence in the record for a reasonable jury to conclude that Kaplan had any retaliatory intent or that he had involvement in any adverse action," *id.* at 1342:22–25.  The Court also granted JMOL in favor of Kaplan, Rubin, and Swirnow on Plaintiff's discrimination claims.  *Id.* at 1343:1–15.  Finally, the Court granted JMOL on punitive damages, as Plaintiff had adduced no evidence from which a reasonably jury could find Defendants engaged in sufficiently culpable misconduct.  *Id.* at 1343:16–22.

Following the close of evidence and the parties' summations, the Court charged the Jury on each of Plaintiff's claims.  *Id.* at 1439:24–1446:21 (Equal Pay Act), 1447:1–1450:13 (New York Labor Law), 1450:14–1456:13 (Title VII retaliation), 1456:14–1463:3 (New York State Human Rights Law retaliation), 1463:4–2468:21 (New York City Human Rights Law retaliation), 1468:22–1470:10 (New York City Human Rights Law discrimination).

On July 20, 2023, the Jury returned its verdict.  Dkt. No. 243.  First, the Jury found that Plaintiff had not proven that her job at NYU required substantially equal skill, effort, and responsibility to any of her three male comparators—namely, Dr. Goldberg, Dr. Porges, and Dr. Modi.  *Id.* at 1.  The Jury further found that Plaintiff had proven she performed her job under similar working conditions to those comparators, but that she had not proven she was paid less than any of those men for doing substantially equal work.  *Id.* at 1–2.  Moreover, the Jury found that Defendants had proven that differences in pay between Plaintiff and her male comparators were based on factors other than sex for purposes of both her federal and New York state unequal pay claims.  *Id.* at 2.

As for Plaintiff's discrimination claim, the Jury found that Plaintiff failed to prove that NYU or Antonik intentionally discrimination against her based on her gender by making sexist remarks.  *Id.* at 6.

Finally, the Jury returned a verdict in Plaintiff's favor on her retaliation claims under federal, state, and city law.  The Jury found Plaintiff had proven that she engaged in a protected activity under federal law and that NYU had taken adverse action against her because of that protected activity.  *Id.* at 3.  Likewise, the Jury determined that Plaintiff had proven that NYU committed an adverse act against her because of her protected conduct under state law, and that Antonik—but not Rubin or Swirnow—aided or abetted NYU's retaliation.  *Id.* at 4.  And the Jury found that NYU and Antonik, though not Rubin or Swirnow, engaged in conduct that was motivated at least in part by Plaintiff's protected activity, that NYU and Antonik's conduct was would reasonably likely deter a person from engaging in that protected activity, and that Antonik aided or abetted retaliatory conduct.  *Id.* at 4–5.  The Jury calculated Plaintiff's damages for her retaliation claims to be $700,000 in front pay.  *Id.* at 7.

10

The Court entered Judgment in accordance with the Jury's verdict on July 26, 2023.  Dkt. No. 260.

The parties filed the instant cross-motions under Federal Rules of Civil Procedure 50 and 59 on August 23, 2023, Dkt. Nos. 267, 271, along with accompanying memoranda of law and declarations, Dkt. Nos. 269–270, 272–273.  The parties subsequently filed oppositions and replies, as well as supporting memoranda and declarations.  Dkt. Nos. 276–283.  On December 8, 2023, the Court heard oral argument on the motions.

## LEGAL STANDARD

The moving party's burden on a motion pursuant to Federal Rule of Civil Procedure 50 for judgment as a matter of law is "particularly heavy" when the "jury has deliberated in the case and actually returned its verdict." *Cross v. N.Y.C. Trans. Auth.*, 417 F.3d 241, 248 (2d Cir. 2005).  The court may grant judgment as a matter of law only if it finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party."  Fed. R. Civ. P. 50(a)(1).  "The court must consider the evidence in the light most favorable to the non-movant and 'give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.'"  *SEC v. Ginder*, 752 F3d 569, 574 (2d Cir. 2014) (quoting *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012)).  A judgment notwithstanding the verdict ("JNOV") "may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]."  *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 112 (2d Cir. 2015) (alterations in original) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)).  A JNOV motion under Rule 50(b) "should be granted only if the court can conclude that, with credibility

assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party." *Id.* at 113 (quoting *Fairbrother v. Morrison,* 412 F.3d 39, 48 (2d Cir. 2005)). "The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001) (quoting *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 367 (2d Cir. 1988)); *see also ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014).

"A post-trial Rule 50(b) motion for judgment as a matter of law is properly made only if a Rule 50(a) motion for judgment as a matter of law has been made before submission of the case to the jury." *Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F.3d 108, 117 (2d Cir. 2004). In the initial motion for judgment on the law, the moving party "must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). "[T]he specificity requirement is obligatory." *Lore v. City of Syracuse*, 670 F.3d 127, 152 (2d Cir. 2012) (citation omitted). The initial motion for judgment as a matter of law "must at least identify the specific element that the defendant contends is insufficiently supported." *Tolbert*, 242 F.3d at 76. However, "[t]he ultimate question is whether the motion, either of itself or in the context of the ensuing colloquy, was sufficiently specific to alert the opposing party to the supposed deficiencies in her proof." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 287 (2d Cir. 1998); *see also Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 14 (2d Cir. 1993) ("[T]he rule gives the party against whom the motion for [JNOV] is made notice of defects in its proof so that it can cure them before the case goes to the jury.").

Because Federal Rule of Civil Procedure 50(b) merely permits a party to "renew" its motion after an unfavorable verdict, "'[t]he posttrial motion is limited to those grounds that were

specifically raised in the prior motion for [JMOL]'; the movant is not permitted to add new grounds after trial." *Tolbert*, 242 F.3d at 70 (quoting *McCardle v. Haddad,* 131 F.3d 43, 51 (2d Cir.1997)). "A Rule 50(a) motion requesting judgment as a matter of law on one ground but omitting another is insufficient to preserve a JMOL argument based on the latter." *Lore*, 670 F.3d at 152–53; *see also Barkley v. Olympia Mortg. Co.*, 557 F. App'x 22, 27 (2d Cir. 2014) (summary order) ("A post-verdict motion for JMOL under Fed. R. Civ. P. 50(b) must be premised on grounds specified in a Rule 50(a) motion made prior to the submission of the case to the jury"). "The law is pellucid that a party's failure to move under Rule 50(a) has consequences. If that party later moves under Rule 50(b), the standard for granting judgment as a matter of law is elevated, and the motion may not properly be granted by the district court, or upheld on appeal, except to prevent manifest injustice." *ING Glob.*, 757 F.3d at 97. "Manifest injustice exists where a jury's verdict is wholly without legal support." *Id.*

"The standard for granting a new trial under Rule 59 is less stringent, but still relatively high." *Starr Indem. & Liab. Co. v. Am. Claims Mgmt., Inc.*, 131 F. Supp. 3d 185, 188 (S.D.N.Y. 2015). A court can grant a motion for a new trial "if the verdict is against the weight of the evidence." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012). "A verdict was against the weight of the evidence if the jury reached a 'seriously erroneous result' or the verdict constitutes 'a miscarriage of justice.'" *Hughes v. Town of Bethlehem*, 644 F. App'x 49, 50 (2d Cir. 2016) (summary order) (quoting *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 634 (2d Cir. 2002) (per curiam)); *see also Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003). In adjudicating a motion for a new trial, "the court 'may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner.'" *ING Global*, 757 F.3d at 99 (quoting *Raedle*, 670 F.3d at 418). But a "high degree of

deference accorded to the jury's evaluation of witness credibility, and . . . jury verdicts should be disturbed with great infrequency." *Raedle*, 670 F.3d at 418.

A trial judge's discretion to grant a new trial "includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996)). "Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Stampf v. Long Island R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) (quoting *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir.1984)). "Remittitur is appropriate in two situations: '(1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, and (2) more generally, where the award is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.'" *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 51 (2d Cir. 2015) (quoting *Kirsch*, 148 F.3d at 165).

## DISCUSSION

### I.     Plaintiff's Motion for a JNOV or New Trial

Plaintiff moves for a JNOV or, alternatively, a new trial on her unequal pay claims under the federal Equal Pay Act ("EPA"), 29 U.S.C. 29 U.S.C. § 206(d)(1), and New York Labor Law ("NYLL") § 194(1). Dkt. No. 272 at 1. She asserts that she "indisputably established" the elements of those claims such that she is entitled to judgment in her favor or, at minimum, a new trial. *Id.*

As an initial matter, Plaintiff did not move for JMOL pursuant to Federal Rule of Civil Procedure 50(a) on *any* ground, let alone the specific ones she now contends warrant a JNOV.

To the contrary, she argued that her unequal pay claims presented "very fact-intensive issue[s]," Trial Tr. 1310:17–18, that should be resolved by the jury, *id.* at 1311:2, 1312:19. Accordingly, Plaintiff must establish a "manifest injustice" for the Court to award her a JNOV on her unequal pay claims. *ING Glob.*, 757 F.3d at 97. On the other hand, Plaintiff's argument that she is entitled to a new trial because the verdict is against the weight of the evidence requires her to show that the jury reached a "seriously erroneous result" or that the verdict amounts to "a miscarriage of justice."[1] *Manley*, 337 F.3d at 245 (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1988)).

To establish a *prima facie* EPA claim, a plaintiff must demonstrate: "i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions." *Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 523 (2d Cir. 2023) (quoting *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999)). If the plaintiff establishes a *prima facie* case, the burden of persuasion shifts to the employer to show that the pay disparity is justified by one of the EPA's affirmative defenses. *See id.*; *Hatzimihalis v. SMBC Nikko Sec. Am., Inc.*, 2023 WL 3764823, at *4 (S.D.N.Y. June 1, 2023). "To establish the EPA's 'factor other than sex' defense, a defendant must prove only that the pay disparity in question results from a differential based on any factor except for sex." *Eisenhauer*, 84 F.4th at 523–24.

NYLL § 194(1) "employs language extremely similar to the EPA." *Hatzimihalis*, 2023 WL 3764823, at *4. Generally, "[a]n equal pay claim under New York Labor Law § 194 is

---

[1] While "the sufficiency of the evidence is not the only ground to order a new trial," *Saleh v. Pretty Girl, Inc.*, 2022 WL 4078150, at *8 (E.D.N.Y. Sept. 6, 2022), that is the sole ground Plaintiff relies upon in moving for a new trial, *see* Dkt. No. 282 at 10 ("[T]his Court should find that the jury's verdict is against the weight of the evidence, such that a new trial is warranted for Dr. Edelman's EPA claims as they relate to Dr. Modi.").

analyzed under the same standards applicable to the federal Equal Pay Act." *Wu v. Good Samaritan Hosp. Med. Ctr.*, 815 F. App'x 575, 581 n.5 (2d Cir. 2020) (summary order) (quoting *Chiaramonte v. Animal Med. Ctr.*, 677 F. App'x 689, 690 n.1 (2d Cir. 2017) (summary order)). But "the EPA and § 194(1) differ in at least one key respect." *Eisenhauer*, 84 F.4th at 525.  To prevail on a "factor other than sex" affirmative defense under NYLL § 194(1), the employer "must prove that the pay disparity in question results from a differential based on a job-related factor." *Id.*  "By contrast, the EPA's 'factor other than sex' defense imposes no such requirement." *Id.*  Because the EPA and NYLL impose distinct requirements, the Second Circuit has admonished district courts to analyze a plaintiff's "§ 194(1) claim as altogether distinct from her EPA one." *Id.*

Plaintiff challenges the jury's finding that she did not perform equal work to Dr. Modi[2] for purposes of her *prima facie* EPA claim, *see* Dkt. No. 243 at 1, as she avers that the evidence at trial "established that she and Dr. Modi had jobs requiring substantially equal skill, effort, and responsibility," Dkt. No. 272 at 8.  Defendants respond that Dr. Modi's greater experience, higher RVU target, and larger patient population amply support the jury's finding that he and Plaintiff did not perform equal work.  Dkt. No. 277 at 15–17.

"While the equal work inquiry does not demand evidence that a plaintiff's job is 'identical' to a higher-paid position, the standard is nonetheless demanding, requiring evidence that the jobs compared are 'substantially equal.'" *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 255 (2d Cir. 2014) (quoting *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 480 (2d Cir.

---

[2] Although Plaintiff argued at trial that Dr. Goldberg and Dr. Porges were also appropriate male comparators for her unequal pay claims, her post-trial motion exclusively challenges the jury's findings as to Dr. Modi.  *See* Dkt. No. 282 at 1 ("[E]vidence related to Drs. Andrew Goldberg and Andrew Porges . . . is beyond the scope of the instant motion and therefore not at all pertinent to the question before this Court." (cleaned up)).

2001)). Equal skill, equal effort, and equal responsibility "constitute separate tests, each of which must be met in order for the equal pay standard to apply." 29 C.F.R. § 1620.14; *see Edwards v. Thomson Reuters (Tax & Acct.) Inc.*, 2020 WL 2132348, at *3 (S.D.N.Y. May 5, 2020); *see also Stopka v. All. of Am. Insurers*, 141 F.3d 681, 686 (7th Cir. 1998). Equal effort "looks to 'the measurement of the physical or mental exertion needed for the performance of a job.'" *Port Auth. of N.Y. & N.J.*, 768 F.3d at 256 (quoting 29 C.F.R. § 1620.16(a)); *see also Drury v. Waterfront Media, Inc.*, 2007 WL 737486, at *3 (S.D.N.Y. Mar. 8, 2007). But "[s]o long as the ultimate degree of exertion remains comparable, the mere fact that two jobs call for effort different in kind will not render them unequal." *Usery v. Columbia Univ.*, 568 F.2d 953, 959 (2d Cir. 1977). Consequently, equal effort depends on "the quantum of effort necessarily expended, not on the kind of effort or the manner of exertion." *Marshall v. Meyer Mem'l Hosp.*, 1982 WL 1991, at *13 (W.D.N.Y. July 21, 1982), *aff'd sub nom. EEOC v. Erie County*, 751 F.2d 79 (2d Cir. 1984). In assessing the effort required for a position, courts must look to "actual job content," since "broad generalizations drawn from job titles, classifications, or divisions, and conclusory assertions of sex discrimination, cannot suffice." *Port Auth. of N.Y. & N.J.*, 768 F.3d at 256.

Here, the evidence at trial establishes that Plaintiff did not perform equal work to Dr. Modi because their positions did not require substantially equal effort. Several witnesses— including Plaintiff, Dr. Mehta, Swirnow, and Rubin—testified that RVUs are an important metric for healthcare providers such as NYU to quantify and track each physician's productivity by services rendered. *See* Trial Tr. 85:18–20 (Plaintiff), 85:5–14, 331:9–11, 381:9–12, 407:25– 408:13 (Dr. Mehta), 706:7–9 (Swirnow), 926:2–15 (Rubin). As their testimony confirms, "RVUs are numbers representing, in relative terms, the time and effort required to perform a

particular medical procedure."[3] *Am. Soc. of Dermatology v. Shalala*, 962 F. Supp. 141, 143

(D.D.C. 1996), *aff'd*, 116 F.3d 941 (D.C. Cir. 1997); *see also* 42 U.S.C. § 1395w-4(c)(2)(C)(i)

(stating RVUs must be "based on the relative resources incorporating physician time and

intensity required in furnishing the service or group of services").  Plaintiff's initial contract with

NYU provided that her compensation was "based on [her] maintaining a level of productivity as

measured by work RVUs, which is 4,996 [RVUs] annually."  Plaintiff's Ex. 8 at 8; *see also* Trial

Tr. 88:7–10.  Her renewed contract stipulated that her compensation was "based upon [her]

maintaining a level of productivity as measured by work RVUS, which is 5,200 [RVUs]

annually."  Plaintiff's Ex. 9 at 4; *see also* Trial Tr. 108:2–4.  By contrast, Dr. Modi's contract

with NYU provided his compensation was "contingent upon [him] maintaining a level of

productivity as measured by work RVUs, which is 6,108 [RVUs] annually."  Plaintiff's Ex. 35 at

10; *see also* Trial Tr. 738:20–21.  As such, Dr. Modi's RVU target was 22% greater than

Plaintiff's initial target and 17% greater than her renewed target.  The evidence at trial further

demonstrates this RVU differential was significant.  Dr. Modi stated that his RVU target was a

"high bar" as it required him to fall within the "top tenth percentile as far as productivity for all

rheumatologists in the country."  Trial Tr. 1277:23–25.  And when she learned Dr. Modi's RVU

target was more than 6,000, Plaintiff texted Dr. Mehta: "Impossible he's seeing that many more

visits year [sic]."  Plaintiff's Ex. 108 at 3; *see also* Trial Tr. 439:18–23, 440:19–24.

Consequently, Dr. Modi's position required him to expend significantly greater effort than

Plaintiff's position did.  *Cf. Savignac v. Day*, 539 F. Supp. 3d 107, 113 (D.D.C. 2021)

(explaining "a difference in the number of hours the employee works . . . go[es] to the demands

---

[3] Plaintiff testified that RVUs are an imperfect measure of productivity because certain
procedures, like venipuncture, have RVU values of zero.  Trial Tr. 103:8–11.

of the job").  As Plaintiff did not prove that her job required equal effort to Dr. Modi's, she failed

to demonstrate that she and he performed equal work for purposes of her *prima facie* EPA case.[4]

Plaintiff seeks to avoid that conclusion by arguing that she and Dr. Modi were required to

expend substantially equal effort, because both of their contracts included a section entitled

"Effort and Compensation" that required them to devote 100% of their effort to clinical

activities, instead of educational leadership, research, or administration.  Plaintiff's Exs. 8 at 5, 9

at 3, 108 at 6; *see* Dkt. No. 272 at 10; Dkt. No. 282 at 5.  According to Plaintiff, the fact that she

and Dr. Modi provided those same kind of services on behalf of NYU is dispositive.  Dkt. No.

282 at 6 ("[T]he test is whether the comparators perform the same type of work.").  She contends

that looking instead to RVU targets to compare the effort required by Plaintiff and Dr. Modi's

positions "confuse[s] the amount of work with the type of work."  *Id.*  But Plaintiff's arguments

misstate the governing legal principles.  Contrary to her assertion that kind, not degree, defines

equality of effort, courts have determined that "[t]he focus is on the quantum of effort necessarily

expended, not on the kind of effort or the manner of exertion."  *Marshall*, 1982 WL 1991, at *13;

*accord Savignac*, 539 F. Supp. 3d at 113.  EEOC regulations similarly provide:

> Where substantial differences exist in the amount or degree of effort required to be
> expended in the performance of jobs, the equal pay standard cannot apply even
> though the jobs may be equal in all other respects. . . .  [J]obs may require equal
> effort in their performance even though the effort may be exerted in different ways
> on the two jobs.  Differences only in the kind of effort required to be expended in
> such a situation will not justify wage differentials.

29 C.F.R. § 1620.16(a).  Thus, the mere fact that Plaintiff and Dr. Modi both devoted their time

to clinical services—as opposed to teaching, research, or administration—does not establish that

---

[4] Whether a plaintiff can "establish[] a *prima facie* case [under the EPA] by identifying a single
male-comparator employee who earns more than her" remains an open question in the Second
Circuit.  *Eisenhauer*, 84 F.4th at 524 n.83.  But the Court need not resolve that question here
because, even assuming a single comparator would suffice, Plaintiff has not identified an
appropriate comparator.

they were required to expend substantially similar amounts of effort in providing those services for purposes of Plaintiff's *prima facie* case.

Additionally, Plaintiff contends that the evidence shows she performed equal work to Dr. Modi notwithstanding his higher RVU target because "there is no correlation between compensation and the number of []RVUs." Dkt. No. 282 at 5. In support of that assertion, Plaintiff merely cites her own testimony that Dr. Louise Raminfard, a female rheumatologist at NYU, had a salary of $265,000 and RVU target of 3,900, *id.* (citing Trial Tr. 337:15–338:2), and a portion of Defendants' summation,[5] *id.* (citing Trial Tr. 1366:24–1367:10). If differences between two positions do not affect compensation, then "the facts as a whole [may] support the conclusion that the differences are too insubstantial to prevent the jobs from being equal in all significant respects under the law." *EEOC v. Port Auth. of N.Y. & N.J.*, 2012 WL 1758128, at *6 (S.D.N.Y. May 17, 2012) (alteration in original) (quoting 29 C.F.R. § 1620.14(a)), *aff'd*, 768 F.3d 247 (summary order). Plaintiff is correct that salaries at NYU were not perfectly correlated with rheumatologists' RVU outputs. As Rubin testified, NYU does "not pay dollars per RVU." Trial Tr. 990:11. But that is not the test. For many rheumatologists, including Plaintiff and Dr. Modi, their RVU outputs affected their compensation: exceeding one's RVU target resulted in additional incentive pay, whereas falling short of that target resulted in a deduction from the rheumatologist's base salary. Plaintiff's Exs. 8 at 8–9, 9 at 4, 108 at 10–11. Thus, the evidence establishes that differences in RVUs affected

---

[5] *But see United States v. Arboleda*, 20 F.3d 58, 61 (2d Cir. 1994) ("A summation is not evidence.").

compensation in a not insubstantial manner.  That is sufficient to show that Plaintiff and Dr. Modi did not perform equal work.[6]

Even if Plaintiff had established a *prima facie* EPA claim, that claim would still fail because the evidence at trial demonstrates that the difference between Plaintiff's pay and Dr. Modi's pay is attributable to a factor other than sex.  The Second Circuit recently held that to establish the affirmative defense that a pay differential for equal work is "based on any other factor other than sex," *Eisenhauer*, 84 F.4th at 517 (quoting 29 U.S.C. § 206(d)(1)(iv)), the employer "must prove only that a pay disparity in question results from a differential based on any factor except for sex," regardless of whether that factor is "job related," *id.* at 513. Defendants established that affirmative defense here.  First, Rubin testified that Dr. Modi's salary reflected NYU's geographical demand for "a very strong and capable rheumatologist" to "fill a hole we had in our network" by serving the "very large medical group in Huntington, Long Island, with a huge patient population."  Trial Tr. 937:23–938:3; *see also id.* at 938:4–7. He also testified that geographical coverage was an important consideration for NYU in setting the compensation of its physicians generally.  *Id.* at 922:10–12 ("[D]o we have a need in the community that we can't meet?  Do we have a geography that we can't cover?  So there are all sorts of factors that go into compensation of how we pay a physician.").  NYU's geographical

---

[6] At oral argument Plaintiff challenged the significance of RVUs by emphasizing that the Court had declined to instruct the jury on systems which measure earnings by quantity or quality of production.  Oral Arg. Tr. 33:5–12; *see also* Dkt. No. 272 at 15.  Because such a system is an affirmative defense, *see Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 524 (2d Cir. 1992), that doctrine has no bearing on the Jury's finding that Plaintiff did not establish her *prima facie* case.  Nor was the Court's omission of that instruction an implicit rejection of the relevance of RVUs to Plaintiff's equal pay claims.  Defendants consented to the deletion of that instruction at the charge conference.  Trial Tr. 1154:17.  And the Court permitted extensive testimony on the role RVUs played in compensation at NYU, demonstrating the Court's abiding view that RVUs *were* relevant to Plaintiff's equal pay claims.

interest in hiring a well-respected rheumatologist to serve patients at NYU's Huntington facility is a "factor other than sex" that justifies the pay differential between Dr. Modi and Plaintiff for purposes of the EPA. Second, Dr. Modi had more experience than Plaintiff, as he graduated medical school and completed his residency and fellowship two years before Plaintiff did. Trial Tr. 328:8–9. And Rubin testified that NYU takes seniority into account when setting physicians' base salaries. *Id.* at 908:2–15. Dr. Modi's additional two years practicing rheumatology constitute another "factor other than sex" that defeats Plaintiff's EPA claim, even if she had established her *prima facie* case.[7]

Thus, the Jury's verdict comports with the weight of the evidence and Plaintiff has not shown that the Jury reached a seriously erroneous result or that the verdict amounts to a miscarriage of justice. *See Manley*, 337 F.3d at 245. Having independently weighed the evidence adduced at trial, the Court concludes the Jury correctly found that Plaintiff did not perform equal work to Dr. Modi and that the disparity between their pay reflected a factor other than sex. A new trial on Plaintiff's EPA claim is therefore unwarranted. And given that Plaintiff has not satisfied the "less stringent" standard for a new trial under Rule 59, *Starr Indem. & Liab. Co.*, 131 F. Supp. 3d at 188, *a fortiori* she has not shown a "manifest injustice" for purposes of her JNOV motion pursuant to Rule 50(b). Accordingly, the Court denies Plaintiff's motion for a JNOV or new trial on her EPA claims.

Plaintiff's NYLL claim fares no better. NYLL § 194(1) forbids employers from paying an "employee with status within one or more protected class or classes" less for "(a) equal work

---

[7] Because Dr. Modi's location and seniority adequately support the verdict as to Defendants' affirmative defense, the Court need not address their arguments that Dr. Modi's pay also reflected two additional factors other than sex—namely, his managerial background and higher salary before joining NYU. Dkt. No. 277 at 21, 23.

on a job the performance of which requires equal skill, effort and responsibility, and which is
performed under similar working conditions, or (b) substantially similar work, when viewed as a
composite of skill, effort, and responsibility, and performed under similar working conditions."
NYLL § 194(1).  "To establish a violation of New York Equal Pay Act, the plaintiff must show
that (1) the employer pays different wages to members of the opposite sex, (2) the employees
perform equal work on jobs requiring equal skill, effort, and responsibility, and (3) the jobs are
performed under similar working conditions."  *Quinn v. JPMorgan Chase & Co.*, 819 N.Y.S.2d
212 (Sup. Ct. 2006).  Consequently, the "equal work inquiry" is "[c]ritical" for unequal pay
claims under the NYLL.  *Woods-Early v. Corning Inc.*, 2023 WL 4598358, at *4 (W.D.N.Y. July
18, 2023); *see Kent v. Papert Cos., Inc.*, 764 N.Y.S.2d 675, 684 (1st Dep't 2003).  As explained
above, Plaintiff failed to show that her position required equal effort to Dr. Modi's, given his
significantly higher RVU target.  Plaintiff therefore has not shown that her job and Dr. Modi's
job demanded equal work for purposes of her NYLL claim.[8]  Even if she had, Defendants have
proven that the pay disparity between Plaintiff and Dr. Modi was pursuant to a "bona fide factor
other than status within one or more protected class or classes, such as education, training, or
experience."  NYLL § 194(1)(iv).  New York law specifies that such a factor must "be job-
related with respect to the position in question and . . . be consistent with business necessity."
NYLL § 194(1)(iv)(B).  NYU's interest in recruiting a respected rheumatologist like Dr. Modi to
expand its offerings in Huntington is clearly related to Dr. Modi's position, which required him
to provide rheumatology services to patients in Huntington.  Furthermore, Dr. Modi's distinctive
geographical role is consistent with business necessity, as Rubin testified that NYU had "patients

---

[8] Because Plaintiff has not identified any appropriate comparators, the Court need not address
"how many comparators are necessary to establish a *prima facie* case under [NYLL] § 194(1)."
*Eisenhauer*, 84 F.4th at 524 n.83.

that we needed to take care of" in Huntington, "so we needed to get someone in there." Trial Tr. 938:6–7. Dr. Modi's lengthier experience as a rheumatologist is another bona fide factor other than sex that justifies his higher pay. Indeed, "experience" is one of the three paradigmatic bona fide factors other than status enumerated in NYLL § 194(1)(iv). His additional years practicing rheumatology were evidently related to Dr. Modi's job as a rheumatologist at NYU and consistent with the business necessity, as Rubin testified NYU sought a "very strong and capable rheumatologist" to launch the new rheumatology practice at NYU's Huntington facility. Trial Tr. 937:23–24. Thus, Plaintiff has not shown that the Jury's verdict on her NYLL unequal pay claims was against the weight of the evidence for purposes of Rule 59, let alone that it amounted to a manifest injustice for purposes of Rule 50(b).

In sum, neither a JNOV nor a new trial is warranted on Plaintiff's unequal pay claims under the EPA and NYLL. The Court therefore denies Plaintiff's motion.

## II. Defendants' Motion for a JNOV or Remittitur

Defendants move for a JNOV on Plaintiff's retaliation claims against NYU and Antonik under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e-3(a), the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296(1)(e), and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107(7). Dkt. No. 270 at 1. According to Defendants, Plaintiff cannot prevail on her retaliation claims because there is "no evidence that Antonik was aware that Plaintiff was engaged in 'protected activity.'" *Id.* at 9. They also argue that there is insufficient evidence to conclude NYU's decision not to renew her contract was retaliatory because Rubin rendered that decision based on the clinical concerns of Drs. Porges and Goldberg, rather than any information gathered by Antonik, and Rubin exercised good faith and due care in doing so. *Id.* at 13. Finally, Defendants seek vacatur or remittitur of the Jury's front-pay award to Plaintiff, as they contend it is unsupported by the evidence. *Id.* at 1.

24

Unlike Plaintiff, Defendants moved for JMOL during the trial pursuant to Rule 50(a). Trial Tr. 1298:6–1309:13. In their motion, Defendants argued that all of Plaintiff's retaliation claims should be dismissed.[9] *Id.* at 1302:23–24 ("[R]etaliation should be dismissed against everybody."). They contended that Plaintiff had not engaged in protected activity "because the complaints here were about office space, not about discrimination," despite Plaintiff's use of "buzz words." Trial Tr. 1301:20–1302:2. Defendants similarly argued that her complaints did not apprise Defendants that she was challenging gender discrimination. *Id.* at 1302:3–11. Additionally, Defendants averred that Plaintiff failed to establish causation, as the decision not to renew her contract resulted from clinical concerns and was unrelated to Plaintiff's complaints. *Id.* at 1302:12–23. Plaintiff's evidence was also insufficient as to "the individual defendants here," Defendants asserted. *Id.* at 1302:24–1303:1. When the Court asked whether Plaintiff's could prevail by showing that "Rubin was manipulated," under a cat's paw theory, Defendants responded that Rubin had made his decision in "good faith" and that such a theory would not provide a basis for holding Rubin individually liable for retaliation. *Id.* at 1304:1–15.

Defendants' JMOL motion sufficiently raised the arguments in their JNOV motion. First, Defendants stated:

> [P]laintiff's communications never said anything about anyone calling her a bitch. Her communications were that she felt slightly intimidated because a tall guy came into her office and waved his arms. Those were not complaints about discrimination, fairly read. They were not understood by NYU to be complaints about discrimination.

Trial Tr. 1302:3–8. Defendants argued that no reasonable observer would—and no NYU personnel did—understand Plaintiff's complaints to raise gender-based discrimination, as

---

[9] Defendants' JMOL motion also challenged: Plaintiff's claims against corporate entities other than NYU Grossman School of Medicine, Trial Tr. 1298:17–1299:1; her equal pay claims, *id.* at 1298:17–1300:16; her discrimination claim, *id.* at 1304:16–1308:6; and her asserted damages, *id.* at 1308:7–1309:12.

opposed to a mere interpersonal dispute between coworkers.  Defendants' present argument is
somewhat narrower: that a specific NYU employee, Antonik, did not understand Plaintiff's
complaint to allege gender-based discrimination.  But while Defendants "frame[] the argument
slightly differently," their JNOV argument is "closely enough related to the 'grounds specified in
[Defendants'] Rule 50(a) motion made prior to the submission of the case to the jury.'"[10]
*Casmento v. Volmar Constr., Inc.*, 2022 WL 15773966, at *6 (S.D.N.Y. Oct. 28, 2022) (quoting
*Barkley v. Olympia Mortg. Co.*, 557 F. App'x 22, 27 (2d Cir. 2014) (summary order)).  Indeed,
the assertion that *no one* at NYU understood Plaintiff's complaint to allege gender discrimination
necessarily entails the claim that Antonik did not understand her complaint that way.  "The
ultimate question is whether the motion . . . was sufficiently specific to alert the opposing party
to the supposed deficiencies in her proof."  *Galdieri-Ambrosini*, 136 F.3d at 287.  And
Defendants' JMOL argument provided Plaintiff with ample "notice of defects in [her] proof so
that [she could] cure them before the case [went] to the jury."  *Samuels*, 992 F.2d at 14.  By
contending that Plaintiff failed to show that anyone at NYU realized her complaints alleged
gender discrimination, Defendants gave Plaintiff the opportunity to seek to introduce additional
evidence showing how her complaints conveyed discrimination and how they were received by
NYU personnel including Antonik, whom Plaintiff claimed was individually liable for
retaliation.  Under these circumstances, Defendants' JNOV argument is not a "trap" that

---

[10] The court in *Silivanch v. Celebrity Cruises, Inc.*, 171 F. Supp. 2d 241 (S.D.N.Y. 2001)
concluded that a JMOL motion that raised "issues common to all [defendants,]" instead of
"suggest[ing] that evidence was wanting as to [two defendants] in particular" was inadequate to
preserve arguments specific to those two defendants for purposes of a JNOV motion.  *Id.* at 261.
But unlike Defendants here, the defendants in *Silivanch* sought to raise an entirely new legal
doctrine unique to a subset of the defendants by arguing vicarious liability was improper.  *Id.* at
260.  Accordingly, *Silivanch* did not address whether a JMOL argument as to several defendants
preserves an identical JNOV argument as to some of those defendants but not others.

countenances "'tactical victories at the expense of substantive interests.'"  *Id.* at 14 (quoting 5A James W. Moore et al., *Moore's Federal Practice* 50-89 (2d ed. 1993)).

Second, Defendants argued that the evidence established that when Rubin decided not to renew Plaintiff's contract, he "didn't take any of the prior complaints into consideration.  He was considering only the clinical factors."  Trial Tr. 1303:22–24; *see also id.* at 1302:18–21 ("[T]he testimony uniformly—every single witness—was that the prior complaints about office space had nothing to do with the decision to nonrenew the contract.").  In their colloquy with the Court, Defendants also contended that Rubin was not manipulated for purposes of a cat's paw theory, because "the evidence is just overwhelming that he was basing his decision, in good faith, on what he was told by the people he relies upon at NYU."  *Id.* at 1304:10–12.  Defendants' affirmative arguments and responses to the Court's questions gave Plaintiff adequate notice of the purported deficiencies in her proof that improper considerations influenced Rubin's non-renewal decision and that his decision did not reflect good faith and due care.  *See Galdieri-Ambrosini*, 136 F.3d at 287 ("We must, however, view the motion in the context of the ensuing colloquy between counsel and the trial court, and if that colloquy fleshes out the motion, it may provide the opposing party with the requisite notice.").  As such, the JMOL motion "preserved [Defendants'] right to make a Rule 50(b) motion" regarding the bases for Rubin's decision not to renew Plaintiff's contract.  *Hamptons Locations, Inc. v. Rubens*, 640 F. Supp. 2d 208, 211 (E.D.N.Y. 2009).

Because Defendants' JNOV motion renews arguments specifically raised in their JMOL motion at trial, the Court must determine whether Defendants have either identified "a complete absence of evidence supporting the verdict," such that the Jury must have based its verdict on "sheer surmise and conjecture," or shown that "the evidence in favor of the movant is so

overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Wiercinski*, 787 F.3d at 112 (quoting *Brady*, 531 F.3d at 133).  In reviewing the evidence adduced at trial, the Court must make all credibility assessments and draw all inferences against Defendants as the moving parties.  *See id.* at 113.

To prevail on a retaliation claim under Title VII, the plaintiff must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 316 (2d Cir. 2015) (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)).  "An employee's complaint may qualify as protected activity, satisfying the first element of this test, 'so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" *Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (quoting *Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001)).  "As to the second element [of the *prima facie* case], implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Id.* (alteration in original) (quoting *Galdieri-Ambrosini*, 136 F.3d at 292).  A challenged action is sufficiently "adverse" when it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  To establish causation, a plaintiff must show "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).  "[C]ausation does not require proof

that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). Accordingly, a "retaliatory purpose [is] necessary" to satisfy "causation." *Mehta v. City of N.Y.*, 2022 WL 280460, at *7 (E.D.N.Y. Jan. 31, 2022); *see also Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 271 (2d Cir. 2016).

When "an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no [retaliatory] motive," the employer can nevertheless be held liable for retaliation under a "cat's paw" theory if the supervisor was "manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Vasquez*, 835 F.3d at 272 (quoting *Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012)). The cat's paw theory requires the plaintiff to show "an employer in effect adopt[ed] an employee's unlawful animus by acting *negligently* with respect to the information provided by the employee, and thereby afford[ed] that biased employee an outsize role in its own employment decision." *Id.* at 275. However, "an employer who negligently relies on a low-level employee's false accusations in making an employment decision will not be liable under Title VII unless those false accusations themselves were the product of discriminatory or retaliatory intent." *Id.*; *see id.* at 272 n.4; *see also Menaker v. Hofstra Univ.*, 935 F.3d 20, 37 (2d Cir. 2019) ("In a 'cat's paw' case . . . the *intent* of the agent is imputed to the employer.").

"The same standards govern retaliation claims under Title VII and the NYSHRL."[11] *Kraiem*, 571 F. Supp. 3d at 60 (quoting *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d

---

[11] Even if Plaintiff's NYSHRL retaliation claims were governed by the more liberal standards that apply to "claims that accrued on or after October 11, 2019," *Arazi v. Cohen Bros. Realty Corp.*, 2022 WL 912940, at *16 (S.D.N.Y. Mar. 28, 2022), the Court would reach the same result for the reasons articulated in the NYCHRL discussion below, *see Matthew v. Tex. Comptroller of Pub. Accts.*, 2022 WL 4626511, at *14 n.10 (S.D.N.Y. Sept. 30, 2022); *Kraiem v.*

51, 66 (S.D.N.Y. 2020)).  Consequently, a plaintiff asserting a retaliation claim under the

NYSHRL must establish: participation in a protected activity; defendant's knowledge of the

protected activity; an adverse employment action; and a causal connection between the protected

activity and the adverse employment action.  *See Sanderson v. Leg Apparel LLC*, 2023 WL

2753200, at *16 (S.D.N.Y. Mar. 31, 2023).  The Second Circuit has also applied the cat's paw

doctrine to retaliation claims under the NYSHRL.  *See Vasquez*, 835 F.3d at 272 n.3.

The NYCHRL is sufficiently distinct from its federal and state counterparts that

"NYCHRL claims must be analyzed separately and independently."  *Mihalik v. Credit Agricole*

*Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013).  NYCHRL retaliation requires a

plaintiff to show:

> (1) he or she engaged in a protected activity as that term is defined under the
> NYCHRL, (2) his or her employer was aware that he or she participated in such
> activity, (3) his or her employer engaged in conduct which was reasonably likely
> to deter a person from engaging in that protected activity, and (4) there is a causal
> connection between the protected activity and the alleged retaliatory conduct.

*Bilitch v. N.Y.C. Health & Hosps. Corp.*, 148 N.Y.S.3d 238, 246 (2d Dep't 2021); *Robinson v.*

*De Niro*, 2023 WL 4862772, at *40 (S.D.N.Y. May 25, 2023); *Rowe v. Google LLC*, 2022 WL

4467194, at *7 (S.D.N.Y. Sept. 26, 2022).  The third element requires a plaintiff to establish

merely that the challenged conduct was "reasonably likely to deter a person from engaging in

protected activity," N.Y.C. Admin. Code § 8–107(7), not that it was the type of materially

adverse employment action necessary for purposes of Title VII, *see Bermudez v. City of N.Y.*,

783 F. Supp. 2d 560, 588 (S.D.N.Y. 2011); *Heron v. Medrite Testing, LLC*, 2022 WL 1214179,

at *6 (S.D.N.Y. Apr. 25, 2022).  Also, the NYCHRL's causation element is more forgiving than

the Title VII's, since the plaintiff need not show but-for causation under the City law.  *See*

---

*JonesTrading Institutional Servs. LLC*, 571 F. Supp. 3d 53, 60 n.6 (S.D.N.Y. 2021).

*Santiago v. ACACIA Network, Inc.*, 634 F. Supp. 3d 143, 157 n.6 (S.D.N.Y. 2022). Rather, causation is met so long as the action was motivated "at least in part" by a retaliatory motive. *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 449 (S.D.N.Y. 2018). But an NYCHRL retaliation claim is inadequate if the plaintiff "fail[s] to offer *any* evidence of a retaliatory motive." *Jones v. City of N.Y.*, 2023 WL 6205630, at *2 (2d Cir. Sept. 25, 2023) (summary order); *see also Aiossa v. Bank of Am., N.A.*, 538 F. App'x 8, 10 (2d Cir. 2013) (summary order). Because the NYCHRL must be given the broadest construction that is reasonably possible, *see Robinson*, 2023 WL 4862772, at *40, the Court concludes that the cat's paw theory also applies to retaliation claims under the NYCHRL, *see Hornig v. Trs. of Columbia Univ. in City of N.Y.*, 2022 WL 976267, at *23 (S.D.N.Y. Mar. 31, 2022).

Finally, the NYSHRL and NYCHRL differ from Title VII in permitting individual liability. "Title VII does not provide for individual liability." *Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 641 F. App'x 60, 62 (2d Cir. 2016) (summary order). By contrast, the NYSHRL and NYCHRL "provide for individual liability—under the NYSHRL, for 'employers' who retaliate against the plaintiff or those who aided and abetted an employer, and under the NYCHRL for anyone who participated in retaliation, even if not an 'employer.'" *Dodd v. City Univ. of N.Y.*, 541 F. Supp. 3d 318, 321 (S.D.N.Y. 2021). "Under both the NYSHRL and the NYCHRL, though, 'individual liability . . . is limited to cases where an individual defendant . . . actually participates in the conduct giving rise to the plaintiff's [discrimination or] retaliation claim." *Friederick v. Passfeed, Inc.*, 2022 WL 992798, at *9 (S.D.N.Y. Mar. 31, 2022) (alterations in original) (quoting *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 366 (S.D.N.Y. 2012)). "Such participation requires retaliatory 'intent'—and therefore necessarily requires an individual's knowledge of the protected activity at the time of his

participation." *Olaechea v. City of N.Y.*, 2022 WL 3211424, at *5 (S.D.N.Y. Aug. 9, 2022)
(quoting *Malena*, 886 F. Supp. 2d at 366)).

Making all credibility determinations and drawing all reasonable inferences in Plaintiff's
favor, there is a complete absence of evidence supporting the proposition that Antonik was aware
that Plaintiff's complaint concerned gender discrimination. To the contrary, the evidence
favoring Defendants on that issue is so overwhelming that reasonable persons could not return a
verdict in Plaintiff's favor on her retaliation claims. Plaintiff testified at trial that she first
reported the incident with Antonik to HR during a phone call with Pacina, Trial Tr. 116:24, in
which Plaintiff explained: "My complaint was about . . . the hostile and abusive behavior that
had occurred the day before with Mr. Antonik; that I didn't feel safe and I wanted it rectified;
that I felt that it was a sexist, discriminatory, chauvinistic attack and it needed to be addressed
with HR," *id.* at 117:2–6. Plaintiff explained what had transpired with Antonik. *Id.* at 117:6–7.
She stated that she believed "[t]he way he was speaking to me, telling me that nothing in that
office belongs to me" was sexist because "[t]here was no seniority that he had over me to say
that he, he had – that it belonged to him more than me. The only difference was that he was a
male, and he was saying he owned me." *Id.* at 117:16–19. Plaintiff neither testified nor adduced
any other evidence indicating she told Pacina that Antonik had called her a "bitch."

Pacina testified that she did not understand Plaintiff's complaint to concern the way she
was treated vis-à-vis her gender. *Id.* at 1100:23–25; *see also id.* at 1109:24–1110:1 ("Q. Did it
occur to you, based on this complaint, that Dr. Edelman was complaining about gender or sex
discrimination? A. No."). Instead, Pacina testified that she understood Plaintiff's grievance to
concern "office space," *id.* at 1101:13, though Pacina acknowledged Plaintiff may have also
complained about "the way she was spoken to," *id.* at 1101:12–13. Pacina stated that, while on

the phone with Plaintiff, Pacina memorialized their conversation in notes on NYU's HR system.

*Id.* at 1106:19–24.  Those notes provide:

> [E]mployee wants to make a complaint against Joe Antanik. at the end of patient hours yesterday, she had a conversation with Joe around 3:30-3:35 on 9/16 on in her office. she was on the office on the phone with her daughter, he came into her office and said that directive above was that they wanted to move the rhum into 1 space and that he had a specific request - that another doctor would be using her personal consult office during Thursday and Friday. laying down the foundation - he insinuated who was moving where and he didnt dictate who made the decision. she said that she uses the office on Friday to do clinical work and he said "how often are you really here". He was sitting and he was pointing at things in her office and was intimidating. He said you really think this (office) is yours - throwing his arms and pointing at things. she stated that contractually the office is designated for her and he replied that he will bring this up to the powers that be. then he left, walked out. her heart was racing. was supposed to be calling patients back and she was very uncomfortable after this conversation.

Plaintiff's Ex. 21.

Following her call with Plaintiff, Pacina spoke to Antonik about the incident.  *See id.* at 1107:23–1108:2.  Antonik testified that during that conversation "[Pacina] had explained the nature of the complaint [and] I had explained my understanding of what happened, my version of it."  *Id.* at 523:23–25.  He also testified that this conversation was when he first learned about Plaintiff's complaint.  *Id.* at 523:16–18.  Pacina again memorialized the conversation in notes on NYU's HR system.  *Id.* at 1107:23–1108:2.  Her notes state:

> call with Joe - he didnt raise his arms. she doesnt come in fridays. maybe 1 friday a month for 2 hours. explained that there was a need to use the office. she defense and snide. she said i have a contract and you can have them call my lawyers. she said that she was promised the officer per her contract and he said thta he wasnt aware and that she would bring it up to the power that to be address. if the friday are no good then what about thursday. she was unwilling and not flexible to let others use this office. it wasn't personal to her or targeted to her because this happens often. advised that i would reach out to David Kaplan and that he should meet to Dr. Edelman.

Plaintiff's Ex. 21.  Both Pacina and Antonik testified that those notes reflected their discussion.  *Id.* at 524:10–18, 1107:24–1108:2.

Viewing the evidence at trial in Plaintiff's favor, she told Pacina about a dispute with Antonik that began over office space but ended with Antonik waving his arms in an intimidating manner and disrespecting Plaintiff by insisting that NYU owned her and her office. Plaintiff stated that she considered Antonik's behavior sexist because Antonik's administrative position was subordinate to Plaintiff's as a rheumatologist, so she believed the only reason he spoke to her the way he did was because he was a man. Despite what Plaintiff may have hoped to convey in her complaint, however, Pacina's testimony and contemporaneous notes indicate that Pacina had a different understanding of Plaintiff's grievance: Pacina believed that Plaintiff objected to Antonik's directive to share her office, his insinuation that she was seldom in the office, the intimidating way in which he pointed at items in Plaintiff's office, and his threat to escalate the issue to management. Yet there is no evidence that Plaintiff told Pacina that Antonik called Plaintiff a "bitch," nor that Pacina interpreted Plaintiff's complaint as raising gender-based concerns. When Antonik later learned about Plaintiff's complaint, he did so through a conversation with Pacina, not Plaintiff. Pacina relayed her understanding of Plaintiff's concerns to Antonik. And Pacina's notes illuminate what Antonik was told and how he responded. Antonik and Pacina discussed how often Plaintiff used her office on Fridays, whether or not he raised his arms, and why he said he would escalate the issue to the powers that be. Antonik also stated that he took exception to Plaintiff's tone, which he found defensive and snide. Accordingly, there is no evidence that Pacina relayed any gender-based allegations or concerns to Antonik when she conveyed the substance of Plaintiff's complaint to him; instead, all of the evidence of Pacina's conversation with Antonik indicates that they understood and treated Plaintiff's HR complaint as an interpersonal dispute about office space, aggressive pointing, disrespectful tones of voice, and a threat to get management involved. But an employee's

complaint regarding a colleague's aggressive or rude demeanor does not, on its own, constitute a complaint about gender discrimination—even if the coworkers differ in gender or size. Nor is there any evidence that Antonik was privy to Plaintiff's subsequent communications regarding her complaint with Antonik. Thus, the evidence at trial establishes that the sole occasion on which Antonik was told about the substance of Plaintiff's complaint, Pacina did not relay any gender-based grievances or concerns.

Although Plaintiff raises eight separate grounds from which the Jury could have inferred Antonik's awareness that she had complained to HR about gender discrimination, none is availing. Instead, they amount to an assertion that anyone who learns an employee has lodged a complaint is *ipso facto* aware that the complaint concerns discrimination. But law and logic alike require more. Without some indication that the plaintiff has challenged *discrimination*, a workplace complaint remains just that: a grievance about one's working conditions. Employers are not obligated to treat every complaint as reporting discrimination until shown otherwise. Much less are coworkers presumed to know that any complaint, no matter its content, opposes discrimination.

First, Plaintiff avers that the Jury could infer that Antonik knew Plaintiff's complaint alleged gender discrimination because Antonik knew he had acted in a sexist manner and called Plaintiff a "bitch." Dkt. No. 278 at 18. As a legal principle, Plaintiff's argument proves too much. The occurrence of sexist conduct and submission of a complaint cannot alone establish that the complaint is about discrimination—particularly where, as here, the complainant had grounds for complaint entirely apart from whether the conduct directed towards him or her was based on gender. While an "explicit" allegation of unlawfulness is not required, *Tulino v. City of N.Y.*, 2019 WL 3810975, at *5 (S.D.N.Y. Aug. 1, 2019), a complaint must at least "implicit[ly]

reference" discrimination, *Robinson*, 2023 WL 4862772, at *45.  Were the law otherwise, the protected activity requirement would be a nullity.  Every complaint would have to be treated as one about discrimination for fear that the complainant, later faced with adverse action, will claim that his complaint really was about discrimination.  *Cf. Hamann v. Gates Chevrolet, Inc.*, 910 F.2d 1417, 1420 (7th Cir. 1990) ("[C]ausation must be proved in its own right; its existence cannot be bootstrapped from the existence of the other two elements" of opposing discrimination and an adverse employment action).  Under Plaintiff's theory, a complaint that unquestionably does *not* raise or imply gender discrimination would constitute protected activity and be sufficient evidence to establish a defendant's awareness for purposes of retaliation, rendering an employer liable for any adverse action in the wake of a complaint even though the employer has no reason to know that the complaint concerned discrimination.  *Contra Kelly*, 716 F.3d at 17 (explaining a complaint is insufficient "to put an employer on notice of a protected complaint . . . if nothing in the substance of the complaint suggests that the complained-of activity is, in fact, unlawfully discriminatory"); *Rosioreanu v. City of N.Y.*, 526 F. App'x 118, 120 (2d Cir. 2013) (summary order) ("[Because] Rosioreanu's complaints could easily have described a conflict between co-workers of any sex—regardless of the presence or absence of discriminatory animus . . . the evidence was not sufficient for a jury to conclude that the City had notice (or should have had notice) that Rosioreanu believed that the conduct of which she complained was based on her sex.").  Plaintiff's questionable principle is especially dubious here, as the dispute between Plaintiff and Antonik was not so manifestly gender based as to put Antonik on notice that any complaint against him would allege discrimination.  Indeed, when Plaintiff described the dispute to Pacina, a seasoned HR professional, she did not understand the conflict as one involving potential gender discrimination.  Trial Tr. 1109:24–1110:1.  And in conveying Plaintiff's

complaint to Antonik, Pacina did not suggest that Plaintiff had alleged Antonik's actions were discriminatory.  According to Plaintiff, the Jury could have reasonably inferred that Antonik was aware Plaintiff had complained about gender discrimination despite his conversation with Pacina to the contrary, given his actions on September 16, 2019.  But neither law nor evidence would have supported that inference.

Second, Plaintiff observes that Antonik reported the dispute to Kaplan.  Dkt. No. 278 at 12 (citing Trial Tr. 568:7–569:18).  Plaintiff argues the Jury "could reasonably infer that he escalated the situation because he realized that he acted unlawfully . . . and wanted to get ahead of any fallout that might result for what he anticipated would be a complaint from [Plaintiff.]" *Id.*  Just as he told Plaintiff he would, Antonik reported her unwillingness to share her office to his superior.  Yet Plaintiff did not adduce any evidence suggesting Antonik did so because he knew Plaintiff would lodge a gender-discrimination complaint with HR.  To infer that motivation in the absence of such evidence would amount to the kind of "rank speculation and conjecture" that is insufficient to support a jury verdict.  *Airday v. City of N.Y.*, 406 F. Supp. 3d 313, 321 (S.D.N.Y. 2019).

Third, because Pacina discussed Plaintiff's complaint with Antonik, Plaintiff contends the Jury could have reasonably inferred that "Pacina, as an experienced HR manager, fully informed Antonik about [Plaintiff's] complaint, including that he called her a bitch and that [Plaintiff] complained that Antonik acted in a demeaning and harassing manner because of her sex."  Dkt. No. 278 at 12.  But the only evidence of what Pacina and Antonik discussed—that is, their testimony and Pacina's HR notes—is to the contrary.  Thus, it would be unduly "speculative" for the jury to assume Antonik "must have been informed of [Plaintiff's] protected activity" during his conversation with Pacina without any countervailing evidence to support that conclusion.

*Olaechea*, 2022 WL 3211424, at *8. Nor would the mere fact of Pacina's involvement imply that Plaintiff's complaint concerned gender-based discrimination, as Pacina was responsible for resolving a wide array of HR issues unrelated to discrimination, including performance problems and interpersonal disputes. *See* Trial Tr. 1087:5–1088:8.

Fourth, Plaintiff asserts that "Antonik even admitted that he understood [Plaintiff's] complaint was not about office space but rather about him and his sexist conduct." Dkt. No. 278 at 13. However, the testimony Plaintiff cites in support of that contention belies her assertion. Plaintiff directs the Court to Antonik's testimony that he understood Plaintiff's complaint was not really about office space but rather about the way Antonik spoke to Plaintiff, Trial Tr. 530:5–10, but Antonik's testimony does not mention sexism or gender nor suggest that the grievance about his manner of speech was related to gender, *see also id.* at 570:3–25. Consequently, the Jury could not have treated those statements as an admission that Antonik knew Plaintiff's complaint concerned gender-based discrimination.

Fifth, Plaintiff notes Antonik's testimony that he was upset Plaintiff complained about him. Dkt. No. 278 at 13; *see* Trial Tr. 530:11–13. Plaintiff argues that the Jury "could reasonably infer that he was bothered because he knew that [Plaintiff] had logged [sic] a discrimination and harassment complaint against him." Dkt. No. 278 at 13. Yet that reasoning crosses the line from reasonable inference to conjectural leap. Coworkers involved in an interpersonal dispute will almost invariably dislike each other afterwards, particularly if one coworker reports the other to HR. Deeming such resentment sufficient to show an awareness of protected activity would dilute that element of retaliation beyond recognition. *Cf. Zacharowicz v. Nassau Health Care Corp.*, 177 F. App'x 152, 155 (2d Cir. 2006) (summary order) ("Such nondiscriminatory-grounded dislike, whether inappropriate, understandable, or neutral, does not,

of course, constitute a basis for a Title VII suit."). Thus, Antonik's antipathy towards Plaintiff after she complained about their dispute was not adequate evidence for the Jury to conclude that Antonik believed her complaint alleged gender discrimination.

Sixth, Kaplan emailed Swirnow on September 18, 2019: "just received a call from Kathleen Pacina from Labor Relations, apparently Dr. Edelman filed a complaint against Joe Antonik for being aggressive and retaliating for not allowing her to expand her hours." Defendants' Ex. SS. Plaintiff asserts that "[a]s the director of Antonik, and someone who works closely with him, it is reasonable for the jury to infer that Kaplan shared the contents of this email with Antonik." Dkt. No. 278 at 13. The Jury could not reasonably infer that Kaplan and Antonik discussed that email simply because they worked together. *See Cardwell v. Davis Polk & Wardwell LLP*, 2023 WL 2049800, at *28 (S.D.N.Y. Feb. 16, 2023) (refusing to credit "unsupported speculation that Chudd or the Associate Development Department must have told Hudson about the complaint merely because they were in contact with each other"). Moreover, even if there were evidence that Kaplan shared his email with Antonik, the contents of Kaplan's email do not suggest gender-based discrimination. A complaint that a coworker was aggressive or retaliated due to a dispute over hours does not on its face raise discrimination. *See Hernandez v. N.Y.C. Dep't of Sanitation*, 2018 WL 5447540, at *4 (S.D.N.Y. Oct. 29, 2018) (concluding a complaint about "aggressive and harassing conduct towards him in retaliation for Plaintiff's request for an accommodation" did not "convey[] race-based mistreatment"). To the extent Plaintiff suggests the use of the term "retaliating" would have notified Antonik that Plaintiff had alleged discrimination, the use of such a buzzword does not transform an otherwise gender-neutral complaint into one that unmistakably raises discrimination. *See Kelly*, 716 F.3d at 17; *Sutton v. Stony Brook Univ.*, 2022 WL 4479509, at *3 n.3 (2d Cir. Sept. 27, 2022) (summary

order); *Robinson*, 2023 WL 4862772, at *42; *Filippi v. Elmont Union Free Sch. Dist. Bd. of Educ.*, 2012 WL 4483046, at *19 (E.D.N.Y. Sept. 27, 2012) (collecting cases). Accordingly, the Jury could not have reasonably inferred from Kaplan's September 18, 2019 email to Swirnow that Antonik was aware Plaintiff had complained about gender discrimination.

Seventh, because Plaintiff followed up with Pacina regarding the status of her complaint, Plaintiff argues the Jury could have reasonably inferred "HR followed up with Antonik about [Plaintiff's] subsequent emails." Dkt. No. 278 at 13. Yet Plaintiff does not identify testimony or documentary evidence suggesting HR had follow-up communications with Antonik regarding her complaint. In the absence of supportive evidence, a jury finding that such communications occurred could rest only on sheer surmise. *See Cardwell*, 2023 WL 2049800, at *27. Indeed, Plaintiff's resort to speculation about discussions that *could* have occurred between HR and Antonik underscores the limits of the evidence Plaintiff actually adduced at trial. Aside from the conversation between Pacina and Antonik, there is no evidence that anyone informed Antonik about the nature of Plaintiff's complaint to HR.

Eighth, Plaintiff argues that the Jury could have inferred Antonik was aware that her complaint concerned discrimination based on "Antonik's subsequent adverse actions against [her] after her complaint." Dkt. No. 278 at 14. Specifically, Plaintiff avers that Antonik's unwillingness to expand Plaintiff's hours, Ruiz's compilation of issues with Plaintiff beginning shortly after her complaint, and Antonik's "coordinating and encouraging her fellow employees to provide negative feedback about [Plaintiff]" evince an awareness that Plaintiff's complaint raised gender discrimination. *Id.* Indeed, after Kaplan asked Antonik to gather information on Plaintiff's issues, Trial Tr. 500:7–9, Antonik fulfilled that request with alacrity. He emailed colleagues at NYU's Lake Success office and solicited "recent examples of inappropriate

behavior and commucat[ions] between Edelman, staff and patients."  Plaintiff's Ex. 86 at 2.

Less than two hours later, Antonik had compiled a list of issues from Ruiz, Trial Tr. 823:7–15,

and sent them to Dr. Porges, Plaintiff's Ex. 86 at 1.  Once again, the jury could conclude that

Antonik's actions betray an obvious aversion to Plaintiff, but no evidence supports that that he

disliked Plaintiff and compiled the list of issues because she complained about gender

discrimination.  Permitting Plaintiff to treat adverse actions as sufficient to show an awareness of

protected activity would deprive the awareness requirement of independent meaning.  Under that

theory, a plaintiff who suffered an adverse employment action but took no steps to inform his

employer that the adverse action was based on gender would automatically be able to proceed to

and prevail at trial, notwithstanding the absence of evidence that the adverse action was based on

gender.  Yet courts have time and again *granted* summary judgment under precisely those

circumstances.[12]  In doing so, courts have implicitly rejected Plaintiff's conflation of a

defendant's adverse action and awareness of protected activity.  Plaintiff's argument is also

factually infirm.  While Antonik's actions reflect his admitted dislike for Plaintiff, the further

inference that Antonik disliked Plaintiff because he knew she filed a discrimination complaint

against him is based on sheer conjecture, rather than evidence or sound reasoning.

    The complete absence of evidence that Antonik was aware that Plaintiff had complained

about gender discrimination is fatal to her retaliation claims against NYU.  Plaintiff's theory at

---

[12] *See, e.g.*, *Concha v. Purchase Coll. State Univ. of N.Y.*, 2019 WL 3219386, at *10 (S.D.N.Y. July 17, 2019); *Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 383 (S.D.N.Y. 2013); *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007); *Payton v. City Univ. of N.Y.*, 453 F. Supp. 2d 775, 785 (S.D.N.Y. 2006); *see also Arizmendi v. Rich Prod. Corp.*, 2023 WL 4246106, at *2 (2d Cir. June 29, 2023) (summary order) ("Since 'one cannot . . . [be] motivated to retaliate by something he was unaware of,' Arizmendi has failed to demonstrate that her termination occurred under circumstances giving rise to an inference of retaliatory intent." (quoting *Ameen v. Amphenol Printed Cirs., Inc.*, 777 F.3d 63, 70 (1st Cir. 2015))).

trial relied on the cat's paw doctrine:  She argued that Antonik, acting out of retaliatory animus, had manipulated Rubin to ensure her contract was not renewed.  Trial Tr. 1402:20–25 ("Kaplan forwards the email to Swirnow, who passes the information on to Rubin, who ultimately makes the decision, based on all of this information.  If a factor—if a factor—1 percent, again, was motivated by Joe Antonik in this, that's sufficient under the law for a retaliation claim."); *see also id.* at 29:3–25, 1401:18–24.  As a result, the Court instructed the Jury on the cat's paw doctrine for each of Plaintiff's retaliation claims against NYU.  *Id.* at 1453:17–1454:8, 1459:8–24, 1466:14–18.  And Plaintiff maintains that cat's paw theory in her post-trial briefing, contending that "Antonik was the catalyst and primary actor behind Dr. Edelman's termination, and admitted that he was the first to complain about her."  Dkt. No. 278 at 16.  She reiterated that theory at oral argument.[13]  But the cat's paw theory permits an "employee's motivation [to] be imputed to the employer and used to support a claim" of retaliation.  *Vasquez*, 835 F.3d at 275; *see Menaker*, 935 F.3d at 37–38.  As a result, a plaintiff cannot prevail on a cat's paw theory if the manipulating employee lacks a retaliatory intent.  *See Campbell v. Nat'l Fuel Gas Distribution Corp.*, 252 F. Supp. 3d 205, 214 (W.D.N.Y. 2017), *aff'd*, 723 F. App'x 74 (2d Cir. 2018) (summary order); *Vaughn v. Empire City Casino at Yonkers Raceway*, 2017 WL 3017503, at *22 (S.D.N.Y. July 14, 2017).  Here, there is no evidence that Antonik knew Plaintiff's complaint alleged gender discrimination.  Without that knowledge, Antonik could not have intended to retaliate against Plaintiff for reporting gender discrimination.[14]  *See Olaechea*, 2022

---

[13] Oral Arg. Tr. 23:21–24 ("I think the jury could reasonably conclude that there was more than just office space or just about yelling because of what [Antonik] did.  He's the one that instigated this whole exercise."), 26:22–23 ("NYU clearly gave effect to Antonik's retaliatory intent.").
[14] Plaintiff's assertion at oral argument that general corporate knowledge could suffice is misplaced.  Oral Arg. Tr. 16:12–18, 17:17–19.  While general corporate knowledge can satisfy the knowledge requirement in a plaintiff's *prima facie* case of retaliation, *see Zann Kwan*, 737 F.3d at 844, a plaintiff pursuing cat's paw liability must also show that the manipulating

WL 3211424, at *5 (explaining retaliatory intent "necessarily requires . . . knowledge of the protected activity"); *see also* EEOC, *Enforcement Guidance on Retaliation and Related Issues*, No. 915.004 (Aug. 25, 2016) ("Absent knowledge, there can be no retaliatory intent."); *accord Romero v. Allstate Ins. Co.*, 3 F. Supp. 3d 313, 328 (E.D. Pa. 2014), *aff'd sub nom. EEOC v. Allstate Ins. Co.*, 778 F.3d 444 (3d Cir. 2015); *Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 957–58 (N.D. Ga. 1995); *Downey v. Isaac*, 622 F. Supp. 1125, 1132 (D.D.C. 1985), *aff'd*, 794 F.2d 753 (D.C. Cir. 1986).  Thus, given the complete absence of evidence that Antonik knew Plaintiff complained about gender discrimination, no reasonable jury could find that Antonik formed a retaliatory intent that NYU adopted when it decided not to renew Plaintiff's contract.

At oral argument, Plaintiff suggested in passing that Pacina, Porges, or Rubin could have instead supplied the retaliatory intent for cat's paw liability.  *See* Oral Arg. Tr. 16:5–9, 17:13–16. Plaintiff did not raise that argument in her post-trial briefing, so the Court deems it waived. *Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 369 (S.D.N.Y. 2022) ("[T]his argument was raised for the first time at oral argument and so was waived in terms of this motion." (quoting *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 137 (S.D.N.Y. 2008))).  But "[e]ven if the Court were to consider this argument on the merits, Plaintiff[] would not prevail."  *Id.*  The record is bereft of evidence that Pacina harbored retaliatory intent towards Plaintiff or played any part in the decision not to renew her contract.  Consequently, the Jury could not have found that Pacina provided retaliatory animus that NYU adopted in reaching that decision.  *See Larnard v. McDonough*, 578 F. Supp. 3d 371, 391 (W.D.N.Y. 2022); *Petronio v. Nat'l R.R. Passenger Corp.*, 2019 WL 4857579, at *6 (S.D.N.Y. Oct. 2, 2019), *aff'd*, 836 F.

---

employee knew that the plaintiff engaged in protected activity in order to form a "retaliatory intent," *Vasquez*, 835 F.3d at 273 n.4.

App'x 39 (2d Cir. 2020) (summary order). Dr. Porges participated in discussions with Swirnow

and Rubin regarding whether to renew Plaintiff's contract. Trial Tr. 967:24–25. And Dr. Porges

testified that he knew Plaintiff had complained about harassment. *Id.* at 1133:14–19. However,

he also testified that the concerns he relayed to Swirnow and Rubin "had nothing to do with any

HR complaints." *Id.* at 1237:7. The parties have not cited—nor the Court identified—any

evidence to support that Dr. Porges intended to retaliate against Plaintiff because she complained

about discrimination. Given that total absence, Plaintiff cannot prevail on a cat's paw theory

based on Dr. Porges's intent. *See Oliver v. N.Y. State Police*, 2020 WL 1989180, at *43

(N.D.N.Y. Apr. 27, 2020) ("Captain Nigrelli and Major Cerretto had some knowledge of

Plaintiff's EEO complaints, but there is no evidence from which a factfinder could infer that they

acted with retaliatory intent."); *Campbell v. Nat'l Fuel Gas Distribution Corp.*, 252 F. Supp. 3d

205, 214 (W.D.N.Y. 2017) ("[I]nformation Jandreau provided to senior management provided

the basis for [the] decision to terminate Plaintiff. However, Plaintiff has failed to establish that

Jandreau was motivated by [unlawful] intent."), *aff'd*, 723 F. App'x 74 (2d Cir. 2018) (summary

order); *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 2007 WL 2261652, at *7 (E.D.N.Y. Aug. 2,

2007), *aff'd*, 353 F. App'x 621 (2d Cir. 2009) (summary order). Rubin made the ultimate

decision not to renew Plaintiff's contract. Trial Tr. 905:13–15. Because it would be nonsensical

to find that Rubin "manipulate[d]" himself, *Vasquez*, 835 F.3d at 272, Rubin cannot also supply

the retaliatory intent under a cat's paw theory. But, in any event, there is no evidence that Rubin

was aware that Plaintiff had complained about gender discrimination,[15] or that he intended to retaliate against her for lodging such a complaint.[16]  Accordingly, the evidence at trial was insufficient for the Jury to conclude that Rubin provided the intent for Plaintiff's retaliation claims.  *See Wallen v. Teknavo Grp.*, 2019 WL 1435879, at *22 (E.D.N.Y. Mar. 30, 2019).

Plaintiff's failure to adduce any evidence of retaliatory intent to support her cat's paw theory requires the Court to grant a JNOV in NYU's favor on each of her retaliation claims.  *See Wiercinski*, 787 F.3d at 112.  A retaliatory intent is indispensable for a Title VII retaliation claim.  *See Nassar*, 570 U.S. at 352 ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."); *Zann Kwan*, 737 F.3d at 846; *Campbell*, 93 F. Supp. 3d at 178–79.  Retaliatory intent is likewise necessary for a NYSHRL retaliation claim.  *See Hawkins v. N.Y. State Off. of Mental Health*, 845 F. App'x 9, 10 (2d Cir. 2021) (summary order); *Brown v. City of N.Y.*, 622 F. App'x 19, 20 (2d Cir. 2015) (summary order).  Finally, notwithstanding the NYCHRL's liberal standards, a plaintiff cannot prevail on a NYCHRL retaliation claim without establishing a retaliatory intent.  *See Aiossa*, 538 F. App'x at 10 ("[E]ven where Appellant may be entitled to the NYCHRL's broader protections, there is no genuine issue as to whether discriminatory or retaliatory intent motivated Defendants' actions."); *Kellman v. Metro. Transp. Auth.*, 8 F. Supp. 3d 351, 390 (S.D.N.Y. 2014) ("[A] defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by . . . retaliatory

---

[15] *See* Trial Tr. 941:10–16 ("Q. At the time [the renewal process] was going on, did you have personal knowledge of any complaint by Dr. Edelman pending in the employee and labor relations department?  A. None whatsoever.  Q. Had you ever heard of such a complaint at this time or previously?  A. None whatsoever."); *see also id.* at 885:10–13 ("Q. You were made aware of a complaint, right?  A. You asked me an HR complaint.  I was not made aware of an HR complaint.  I was aware of a complaint relating to an office dispute.").

[16] *See* Trial Tr. 944:25–945:6 ("Q. Did that nonrenewal of the contract have anything to do with any animus you held against Dr. Edelman? . . .  A. I had no animus against Dr. Edelman.  I was, as I am today, saddened by the situation.").

motives" (alterations in original) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013)).  The Court therefore grants Defendant's motion for a JNOV on Plaintiff's retaliation claims against NYU.

JNOV is also warranted on Plaintiff's retaliation claims against Antonik.  Individual liability for aiding and abetting retaliation under the NYSHRL "requires that the aider and abettor share the [retaliatory] intent or purpose of the principal actor." *Dodd v. City Univ. of N.Y.*, 489 F. Supp. 3d 219, 268 (S.D.N.Y. 2020) (quoting *Fried v. LVI Servs., Inc.*, 2011 WL 2119748, at *7 (S.D.N.Y. May 23, 2011)); *McHenry*, 510 F. Supp. 3d at 68.  The defendant's "retaliatory intent" is likewise required for individual liability under the NYCHRL, whether for a direct violation or aiding and abetting retaliation.  *Olaechea*, 2022 WL 3211424, at *5 (internal quotation marks omitted); *see also Cardwell*, 2023 WL 2049800, at *26.  Given the utter lack of evidence supporting the conclusion that Antonik knew Plaintiff complained about discrimination, no reasonable jury could conclude Antonik intended to retaliate against Plaintiff because she reported discrimination.  Without a retaliatory intent, Antonik cannot be held individually liable for aiding and abetting retaliation under the NYSHRL.  *See Dodd*, 489 F. Supp. 3d at 272.  Plaintiff's failure to adduce evidence that Antonik knew Plaintiff reported discrimination and therefore formed an intent to retaliate against her similarly precludes individual liability against Antonik under the NYCHRL.  *See Cardwell*, 2023 WL 2049800, at *26; *Carmody v. N.Y. Univ.*, 2023 WL 5803432, at *10 (S.D.N.Y. Sept. 7, 2023).  Thus, the Court grants a JNOV in favor of Antonik on Plaintiff's retaliation claims against him under the NYSHRL and NYCHRL.

In sum, the complete absence of evidence that Antonik was aware that Plaintiff's complaint against him alleged gender discrimination requires a JNOV in Defendants' favor on

her retaliation claims for lack of retaliatory intent.[17]  Because the Court directs a verdict in

Defendants' favor on all of Plaintiff's retaliation claims, the Court also vacates the Jury's

corresponding award of compensatory damages.  Consequently, the Court does not address

Defendants' motion for remittitur.

## CONCLUSION

Plaintiff's motion for judgment as a matter of law or a new trial, Dkt. No. 271, is

DENIED.  Defendants' motion for judgment as a matter of law, Dkt. No. 267, is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 267 and 271, enter

judgment in favor of Defendants, and close this case.

---

[17] By contrast, Defendants are not entitled to a JNOV on Plaintiff's retaliation claims on the grounds that the "overwhelming and uncontradicted evidence shows" that Rubin decided not to renew Plaintiff's contract based on the clinical concerns of Drs. Porges and Goldberg, rather than the information compiled by Antonik.  Dkt. No. 270 at 13.  The standard for judgment as a matter of law requires the Court to view the evidence in the light most favorable to Plaintiff and not to examine the weight of conflicting evidence.  And, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that, at the time he made the decision not to renew Plaintiff's contract, Rubin was aware of the "recent examples of inappropriate behavior and commucat[ions] between Edelman, staff and patients," Plaintiff's Ex. 86 at 2, that had been compiled by Antonik and included in the email that Dr. Porges sent to Kaplan, in which Dr. Porges also expressed clinical concerns with Plaintiff's use of tests and x-rays, Plaintiff's Ex. 1 at 1–2.  In particular, Kaplan forwarded Dr. Porges's email to Swirnow, *id.* at 1, and there is evidence Swirnow shared the substance of the email with Rubin, Trial Tr. 761:14–15.  Rubin testified that the concerns in Dr. Porges's email were "the only thing that led to the nonrenewal" of Plaintiff's contract.  *Id.* at 907:7.  From the timing of the email with Antonik's information, as well as from the fact that Rubin could not recall the specific issues Dr. Porges raised, *id.* at 939:6–8 ("Dr. Porges went through me with what the clinical issues were – practice style, and just rattled off a whole bunch of stuff."); *id.* at 889:23–25 ("Q. Now, the issues that were raised were too many blood tests, right?  A. Amongst other things.  I don't recall all the details."), there is at least some evidence that the issues raised by Antonik were both a contributing factor and a but-for factor in the decision not to renew Plaintiff's contract.  The Court does not decide whether the conclusion that Antonik influenced Rubin's decision not to renew Plaintiff's contract was against the weight of the evidence for purposes of Federal Rule of Civil Procedure 59, however, because Defendants are entitled to judgment for the other reasons stated in this Opinion and Order.

SO ORDERED.

Dated: December 26, 2023
     New York, New York

_____
LEWIS J. LIMAN
United States District Judge