# **EXHIBIT B**

24-251-cv
*Edelman v. NYU Langone et al.*

# United States Court of Appeals

# For the Second Circuit

---

August Term 2024

Argued:  January 7, 2025
Decided:  June 18, 2025

No. 24-251-cv

---

DR. SARI EDELMAN,

*Plaintiff-Appellant,*

*v.*

NYU LANGONE HEALTH SYSTEM; NYU LANGONE
HOSPITALS; NYU LANGONE MEDICAL CENTER; NYU
LANGONE NASSAU RHEUMATOLOGY; NYU SCHOOL OF
MEDICINE; NYU GROSSMAN SCHOOL OF MEDICINE;
NYU HOSPITALS CENTER; ANDREW T. RUBIN; DAVID
KAPLAN; JOSEPH ANTONIK; JOSHUA SWIRNOW,

*Defendants-Appellees.*[*]

---

---

[*] The Clerk's Office is respectfully directed to amend the caption as reflected
above.

CERTIFIED COPY ISSUED ON 06/18/2025

Appeal from the United States District Court

for the Southern District of New York

No. 1:21CV00502, Lewis Liman, *Judge*.

_____

Before:        WALKER, ROBINSON, and MERRIAM, *Circuit Judges*.

Plaintiff-appellant Dr. Sari Edelman, a female rheumatologist formerly employed by the New York University hospital system, sued various NYU entities (collectively, "NYU"), as well as individual NYU employees Andrew Rubin, David Kaplan, Joseph Antonik, and Joshua Swirnow, after her employment was terminated following disputes with Antonik and Kaplan. Edelman asserted claims for violation of the New York and federal Equal Pay Acts, and for gender discrimination and retaliation under Title VII, the New York State Human Rights Law, and the New York City Human Rights Law.

The matter proceeded to a jury trial. The District Court granted, in part, a motion for judgment as a matter of law ("JMOL") at the close of the evidence, entering judgment in favor of Kaplan on all claims of retaliation; in favor of Kaplan, Rubin, and Swirnow on all claims of discrimination; and in favor of all defendants as to willfulness on the equal pay claims and as to punitive damages. The remaining claims of retaliation, discrimination, and equal pay proceeded to the jury. The jury found in favor of Edelman on her retaliation claims against NYU and Antonik and awarded Edelman $700,000 in damages; the jury found in favor of defendants on all other claims. After trial, the District Court granted judgment notwithstanding the verdict ("JNOV") in favor of defendants, vacating the verdicts in favor of Edelman. The District Court denied Edelman's cross-motion for JNOV on her equal pay claims.

We conclude that there was sufficient evidence to support the jury's verdicts in Edelman's favor, and that there was sufficient evidence to permit the retaliation claim against Kaplan to proceed to the jury. Accordingly, we VACATE the District Court's grant of JNOV for Antonik and NYU on Edelman's retaliation claims, and REMAND with instructions to reinstate the jury's verdict

on these claims. We further VACATE the District Court's decision granting
JMOL in favor of Kaplan on the retaliation claim, and remand for a new trial on
that claim. We AFFIRM the judgment as to the remaining claims.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

> JOSEPH MARTIN LABUDA, Milman Labuda Law
> Group PLLC, Lake Success, NY, *for Plaintiff-*
> *Appellant*.

> RICHARD S. SCHOENSTEIN (Richard Lane Steer,
> Justin Y. K. Chu, Ingrid Julieth Cardona, *on the*
> *brief*), Tarter, Krinsky & Drogin LLP, New York,
> NY, *for Defendants-Appellees*.

SARAH A. L. MERRIAM, *Circuit Judge*:

Dr. Sari Edelman is a female rheumatologist who was previously

employed by the New York University ("NYU") hospital system. After working

for NYU for almost five years without any disciplinary issues, Edelman had a

dispute with Joseph Antonik, the Site Director for NYU's Lake Success location,

about her office space. At trial, Edelman testified that during a heated

discussion, Antonik uttered a gender-based slur under his breath and behaved

aggressively toward her. Edelman lodged a complaint with NYU human

resources the day after the incident. She lodged another complaint with NYU

human resources about a week later, after a male supervisor, David Kaplan,

3

spoke with her about the office space issue in a manner that Edelman perceived

as discriminating against her based on her gender. Edelman pursued her

complaints against Antonik and Kaplan, describing them as relating to

"treatment of females within [the] workplace at NYU." Supp. App'x at 280. The

following year, Edelman's employment contract was not renewed and her

employment with NYU was terminated.

Edelman brought this action against various NYU entities,[1] as well as

Andrew Rubin, David Kaplan, Joseph Antonik, and Joshua Swirnow, asserting,

as relevant here, the following claims: (1) violation of the Equal Pay Act ("EPA"),

29 U.S.C. §206(d), and the New York State Equal Pay Act ("New York EPA"),

New York Labor Law ("NYLL") §194, against NYU, Swirnow, and Rubin;

(2) retaliation in violation of Title VII, 42 U.S.C. §2000e, against NYU; (3)

retaliation in violation of the New York State Human Rights Law ("NYSHRL"),

New York Executive Law §296(1)(a), and the New York City Human Rights Law

("NYCHRL"), New York City Administrative Code §8-107(7), against all

---

[1] We refer to NYU Langone Health System, NYU Langone Hospitals, NYU
Langone Medical Center, NYU Langone Nassau Rheumatology, NYU School of
Medicine, NYU Grossman School of Medicine, and NYU Hospitals Center
collectively as "NYU" in this opinion.

defendants; and (4) gender discrimination (under both direct and aiding-or-abetting theories) in violation of the NYCHRL, against all defendants.

After trial, the jury found for defendants on Edelman's federal and state EPA claims, and the District Court properly denied Edelman's post-trial motion for judgment notwithstanding the verdict ("JNOV") on those claims. We affirm the District Court's denial of Edelman's motion for JNOV on her EPA claims.

Before the case was submitted to the jury, the District Court granted judgment as a matter of law ("JMOL") in favor of Kaplan on Edelman's retaliation claim against him. The retaliation claims against NYU and Antonik went to the jury, which found in Edelman's favor and awarded her $700,000 in compensatory damages. However, the District Court then granted defendants' motion for JNOV on those claims. Because we conclude that the evidence at trial was sufficient to permit a reasonable jury to find in favor of Edelman on her claims of retaliation against NYU, Antonik, and Kaplan, we vacate the District Court's decisions granting JMOL in favor of Kaplan and JNOV in favor of Antonik and NYU. We remand with instructions for the District Court to reinstate the jury's verdict on the retaliation claims against Antonik and NYU, and we remand for a new trial on the retaliation claims against Kaplan.

I.    **BACKGROUND**

The NYU hospital system recruited Edelman to join its Lake Success office on Long Island in 2014.  Edelman negotiated her initial three-year employment contract with Joshua Swirnow, the Vice President of Ambulatory Care and Business Strategy, and Andrew Rubin, the Senior Vice President of Clinical Affairs and Ambulatory Care.  In 2017, her contract was renewed for another three-year term.

At trial, Edelman testified to the following events.  On September 16, 2019, Joseph Antonik, the Site Director for NYU's Lake Success location, visited Edelman's office.  During that visit, Antonik told Edelman that NYU had hired a new rheumatologist who would need to use her office two days a week.  Edelman told Antonik that she needed to review her employment contract with her attorney because she did not think her contract allowed NYU to require her to share an office.  At that point, Antonik's demeanor changed.  He started "flailing his arms" and, pointing at items in Edelman's office, said: "All of it belongs to NYU, this whole office.  None of it's yours.  We – we own you." App'x at 1206.  "During his rant [Antonik] uttered, under his breath, bitch."  *Id*. Edelman told Antonik to leave, and he did.

The following day, September 17, 2019, Edelman made a verbal complaint "over the phone" to Kathleen Pacina, an NYU human resources manager.  App'x at 1209.  Edelman described the complaint as follows: "My complaint was about the, the hostile and abusive behavior that had occurred the day before with [Antonik]; that I didn't feel safe and I wanted it rectified; that I felt that it was a sexist, discriminatory, chauvinistic attack and it needed to be addressed with HR."  App'x at 1210 (sic).  Edelman testified that she "went through the events of what happened" during her conversation with Pacina, *id.*, explaining to Pacina the events that she had "just described to the jury" in her testimony, App'x at 1211.

After the call from Edelman, Pacina emailed Claudia Rose, another human resources employee, to discuss Edelman's complaint.  Rose indicated that complaints from faculty members "need to be escalated to leadership," App'x at 2835, but Pacina communicated that she "wanted to discuss [Edelman's complaint] with [Rose] before bringing it to leadership as it is about Joe Antanik."  App'x at 2834 (sic).

Pacina and Rose discussed the complaint the following morning, on September 18, 2019.  Rose also conferred with Antonik, who told her that he had

"already escalated to David Kaplan." App'x at 2833. Pacina then spoke to

Antonik about the incident; he claimed that "he didnt raise his arms" and

asserted that Edelman had been "defensive and snide." Supp. App'x at 236 (sic).

Pacina advised Antonik that she would speak to Kaplan, which she did later that

day. After the call from Pacina, Kaplan emailed Swirnow, describing the

situation as follows: "Edelman filed a complaint against Joe Antonik for being

aggressive and retaliating for not allowing her to expand her hours." App'x at

3229. Swirnow responded that Edelman "is busy so we should look at it. We can

definitely put someone in her office when she's not there but I would like to

review her schedule and the space plan before we revisit."[2] *Id*. Kaplan testified

that he also discussed the issue with Swirnow in person, and that Swirnow

"suggested [a] followup conversation with" Edelman. App'x at 1684.

Edelman did not receive any response from Pacina regarding her

September 17, 2019, complaint before the next incident, which occurred on

September 25, 2019. Edelman testified at trial that on the evening of September

25, 2019, Kaplan interrupted her while she was working with patients, saying

---

[2] Antonik had previously notified Kaplan and Swirnow about his meeting with
Edelman shortly after it occurred on September 16, 2019. In his email to Kaplan
and Swirnow, Antonik asserted that Edelman "became very defensive" when he
spoke to her about sharing her office space. Supp. App'x at 350.

"we need to talk now."  App'x at 1212-13.  Edelman further testified that Kaplan

told her: "[Y]ou're going to need to give your space up Thursdays and Fridays,

and we looked at your contract and this is what it says."  App'x at 1213.

Edelman became upset and told Kaplan that she needed to speak to Swirnow

and Rubin, who had signed her contract, and to her attorneys.  She testified:

"And when I started to get upset when Mr. Kaplan was in the room with me, he

started to say: Doctor.  Doctor, calm down.  Calm down, Doctor."  App'x at 1215.

Edelman felt his behavior "was very demeaning" and "patronizing" to her, and

she told him to leave.  *Id.*

That night, Edelman sent an email to Pacina describing the incident with

Kaplan.  The email stated that Kaplan "took on similar mannerisms [to Antonik]

of condescending tone, raising his voice to child-like manner to placate my

disagreement."  App'x at 1218.  The email also stated:

> As a female physician in the organization, I am disappointed that it is
> 2019, approaching 2020, in a major hospital organization in New York,
> and I still have to contend with male chauvinism.  . . .  It remains
> unclear to me why I am being discriminated against to accommodate
> another physician, particularly a male physician, who will be joining
> the practice, which is the stated reason I will be pushed out to another
> space.  . . .  This is the first time in all these years where I feel my
> growth as a physician is being deliberately infringed on by senior
> male managers.

App'x at 1219.  Pacina did not respond to Edelman; she did, however, inform

Kaplan that Edelman had made a complaint against him.

On September 26, 2019, Edelman emailed Pacina again because Swirnow

and Kaplan had asked to speak with her, and she "would appreciate if you or an

HR representative can be involved in this conversation."  Supp. App'x at 281.

Edelman did not receive a response until October 8, 2019.  *See id.*

The following day, September 27, 2019, Edelman spoke with Swirnow, and

they came up with a solution regarding the office space.  However, Edelman

informed Swirnow that she "was going to maintain or keep the HR complaint"

because "the issue of office space was an independent situation to the HR

complaint."  App'x at 1224.

On October 8, 2019, Pacina emailed Edelman, saying: "I understand that

you met with Mr. Swirnow and he explained the rationale for office use one day

[per] week when you are not at Marcus Avenue.  Please let me know if you

would like to discuss further."  Supp. App'x at 281.  Edelman did not respond

until October 23, 2019, when she emailed Pacina to inquire about the status of her

"complaint requesting investigation for workplace harassment."  Supp. App'x at

280-81.  She did not receive a response.  On November 1, 2019, Edelman followed

up with an email to Pacina explaining:

> The harassment complaint was extensive detailed letter about
> treatment by manager using abusive and bullying behavior.  While I
> spoke with Joshua Smirnow about the office space, I also was clear
> that the complaint was separate issue about treatment of females
> within workplace at NYU which is unacceptable moving into 2020.
> There was clearly implicit bias in how I was "managed" and spoken
> to in a manner clearly not appropriate by Joe Antonik and David
> Kaplan.

Supp. App'x at 280 (sic).  On November 5, 2019, Pacina responded to Edelman,

acknowledging receipt of her emails and indicating that she thought "the matter

was closed."  *Id.*  On November 12, 2019, Edelman followed up with Pacina again

about her complaints, confirming that the matter was not resolved and indicating

that she felt that a recent office move was "retaliatory to [her] complaint."  Supp.

App'x at 283.

The next day – November 13, 2019 – corresponds to the first dated entry on

a spreadsheet entitled "Dr. Sari Edelman Issues" that was maintained by Miriam

Ruiz, the office manager, who reported directly to Antonik.  App'x at 3294.  At

trial, Ruiz testified that Antonik had asked her to start maintaining the

spreadsheet, and that she did so regarding complaints against all the doctors

who worked in the suite.  The record is ambiguous as to the date Ruiz made

these entries, but the spreadsheet contained no entries dated before Edelman first

11

made her complaints against Antonik and Kaplan.

On November 18, 2019, Edelman emailed Pacina again to follow up about
her complaints.  She received no response.

Around the same time, Edelman and her long-time colleague, Dr. Kavini
Mehta, began discussing the potential renewal of their contracts with NYU,
which were scheduled to expire at the end of 2020.  In the lead-up to their prior
contract renewals in 2017, Edelman and Mehta had negotiated their contracts
together.  Edelman recommended that they negotiate their contracts separately
this time, however, because she feared that she would be retaliated against in
response to her complaints.  Mehta agreed, and they separately emailed hospital
administration to set up negotiations.  The administration agreed to move
forward with negotiations for Mehta, but Rubin told Edelman that NYU would
"let [her] know [their] plans."  App'x at 1240.

On November 6, 2020, nearly a year later, Antonik, Dr. Andrew Porges,
and Ruiz exchanged emails, in which Antonik stated: "David [Kaplan] requested
all information on Edelman to be sent to him today.  We need a clear, convincing
summary with examples sent. . . .  Ideally we want recent examples of
innappropriate behavior and communicates between Edelman, staff and

patients." App'x at 2879 (sic). The emails included the entries on Ruiz's "Dr.

Sari Edelman Issues" log. Porges sent an email to Kaplan later that day with the

information they had collected. Kaplan, in turn, emailed the information to

Swirnow, and Swirnow provided it to Rubin. Rubin testified that the

information in that email was "the only thing that led to the nonrenewal" of

Edelman's contract. App'x at 1996.

On December 1, 2020, Edelman was notified that her contract would not be

renewed and that her employment with NYU would be terminated.

## II.  <u>PROCEDURAL HISTORY</u>

In January 2021, Edelman brought this action in District Court against

multiple entities within the NYU hospital system, as well as Rubin, Kaplan,

Antonik, and Swirnow, individually. In the Second Amended Complaint – the

operative complaint at the time of trial – Edelman asserted the following claims:

(1) equal pay under the Equal Pay Act ("EPA"), 29 U.S.C. §206(d), and the New

York State Equal Pay Act ("NYS EPA"), New York Labor Law ("NYLL") §194,

against NYU, Swirnow, and Rubin; (2) retaliation in violation of Title VII, 42

U.S.C. §2000e, against NYU; (3) retaliation in violation of the New York State

Human Rights Law ("NYSHRL"), New York Executive Law §296(1)(a), and the

New York City Human Rights Law ("NYCHRL"), New York City Administrative

Code §8-107(7), against all defendants; and (4) gender discrimination in violation

of the NYCHRL, against all defendants.

The matter proceeded to a jury trial in July 2023.  Before the case was

submitted to the jury, the defendants moved for JMOL on all of Edelman's

claims.  The District Court granted the motion for JMOL in part, entering

judgment in favor of Kaplan on all claims of retaliation; in favor of Kaplan,

Rubin, and Swirnow on all claims of discrimination; in favor of all defendants as

to willfulness under the equal pay laws; and in favor of all defendants as to

punitive damages.  The remaining claims of retaliation, discrimination, and equal

pay were submitted to the jury.  The jury found in favor of Edelman on her

retaliation claims against NYU and Antonik and awarded Edelman $700,000 in

compensatory damages.  The jury found for defendants on all other claims before

it.

After the jury returned its verdict, the parties filed cross-motions for

judgment notwithstanding the verdict ("JNOV").  The District Court denied

Edelman's motion, but granted defendants' motion, vacating the jury's verdict

and damages award in favor of Edelman on her retaliation claims against NYU and Antonik.  Edelman timely appealed.

On appeal, Edelman argues that the District Court improperly denied her motion for JNOV on her state and federal equal pay claims, erred in granting JNOV on her retaliation claims against Antonik and NYU, and erred in granting the defendants' motion for JMOL on her retaliation claims against Kaplan.  We address each argument in turn.

## III.   EDELMAN'S MOTION FOR JNOV OR A NEW TRIAL ON HER EQUAL PAY CLAIMS

Edelman argues that the District Court improperly denied her motion for JNOV or, in the alternative, for a new trial on her federal and state equal pay claims.  We disagree.

"We review the denial of a Rule 50 motion *de novo*."  *S.E.C. v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014) (citation omitted).  A Rule 50 motion for JNOV "may only be granted" in favor of a plaintiff if "the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it."  *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008) (citation and quotation marks omitted).

A party has two opportunities to seek judgment as a matter of law during

trial.  Under Rule 50(a), a party may move for JMOL "at any time before the case

is submitted to the jury."  Fed. R. Civ. P. 50(a)(2).  If the Rule 50(a) motion is not

granted *before* the matter is submitted to the jury, and the jury finds against the

movant, the movant may renew its motion after trial under Rule 50(b) as a

motion for JNOV.  "A post-trial Rule 50(b) motion for judgment as a matter of

law is properly made only if a Rule 50(a) motion for judgment as a matter of law

has been made before submission of the case to the jury."  *Bracey v. Bd. of Educ. of

Bridgeport*, 368 F.3d 108, 117 (2d Cir. 2004).[3]  If a party fails to move under Rule

50(a) before the matter is submitted to the jury but "later moves under Rule 50(b),

the standard for granting judgment as a matter of law is elevated, and the motion

may not properly be granted by the district court, or upheld on appeal, except to

prevent manifest injustice."  *ING Global v. United Parcel Serv. Oasis Supply Corp.*,

757 F.3d 92, 97 (2d Cir. 2014).  "Manifest injustice exists where a jury's verdict is

wholly without legal support."  *Id.*

   Edelman did not move for judgment as a matter of law under Rule 50(a)

before the case was submitted to the jury.  Consequently, she must demonstrate

---

[3] A motion for JNOV under Rule 50(b) is also sometimes referred to as a post-trial
or renewed motion for judgment as a matter of law.  We use the term JNOV in
this opinion to clearly distinguish between the motions made prior to the jury's
deliberations and the motions made after the verdict was received.

manifest injustice to prevail on appeal.  *See id.*  Edelman has failed to do so.

To establish a claim under the federal EPA, a plaintiff must demonstrate

that: "i) the employer pays different wages to employees of the opposite sex; ii)

the employees perform equal work on jobs requiring equal skill, effort, and

responsibility; and iii) the jobs are performed under similar working conditions."

*Eisenhauer v. Culinary Inst. Am.*, 84 F.4th 507, 523 (2d Cir. 2023) (citation and

quotation marks omitted).  Although Edelman's claim under New York's EPA is

"altogether distinct" from her claim under the federal EPA, for purposes of the

issues here, the two statutes encompass the same elements.  *See id.* at 524-26.[4]

In support of her EPA claims, Edelman offered evidence that Dr. Anang

Modi, a male rheumatologist at the practice, was paid more than she was.  We

assume that Edelman and Modi were subject to similar working conditions.

Nevertheless, the jury could reasonably have concluded that Edelman failed to

show that she and Modi "perform[ed] equal work on jobs requiring equal skill,

effort, and responsibility."  *Id.* at 523.

---

[4] The New York and federal EPAs vary in the applications of certain affirmative
defenses, and the New York EPA prohibits pay discrimination on the basis of
membership in other protected classes in addition to sex, but these differences
are not relevant here.  *See Eisenhauer*, 84 F.4th at 525 (discussing differences
between the two statutes in the bona-fide-factor-other-than-sex defense).

The jury could reasonably have concluded that Edelman failed to demonstrate that she and Modi possessed equal skill.  In determining whether the employees possess equal skill, we consider "such factors as experience, training, education, and ability," measured "in terms of the performance requirements of the job."  *EEOC v. Port Auth. of N.Y. and N.J.*, 768 F.3d 247, 255 (2d Cir. 2014) (quoting 29 C.F.R. §1620.15(a)) (emphasis omitted).  Modi had two more years of experience than Edelman, and he also had demonstrated leadership skills.  Prior to joining NYU, Modi served as Chief Rheumatologist for a multi-specialty medical group of 500 physicians, where he supervised six rheumatologists.  He also previously served as a medical director, which required him to supervise fifteen physicians, twelve non-physician medical professionals, and several support staff.  Edelman presented no evidence of comparable experience prior to joining NYU.

The jury was also entitled to conclude that Edelman had failed to demonstrate that she and Modi exerted equal "effort."  "Effort" under the federal EPA is not a measure of personal commitment, but instead "looks to 'the measurement of the physical or mental exertion needed for the performance of a job.'"  *Id.* (quoting 29 C.F.R. §1620.16(a)) (emphasis omitted).  This measurement

considers the amount of effort involved in a job, and a difference in wages does not violate the law when it is "based on differences in the . . . amount of effort required" for a job. 29 C.F.R. §1620.16(b). Modi's annual production target was 6,100 relative value units ("RVUs"), which put him in the top ten percent of rheumatologists in the country, while Edelman's target was 5,200 RVUs.[5] Modi saw patients five days a week, while Edelman saw patients fewer than four days a week. These differences in the amount of effort required could readily defeat Edelman's claim.

In sum, the jury could reasonably conclude on the record before it that Edelman failed to establish that she and Modi possessed equal skill and exerted equal effort; as such, the jury's verdict against her on her federal and New York EPA claims was not "wholly without legal support." *ING Global*, 757 F.3d at 97. Accordingly, we affirm the District Court's denial of Edelman's motion for judgment as a matter of law as to these claims.[6]

---

[5] RVUs are based on the time and intensity required to provide a particular service. *See* 42 U.S.C. §1395w-4(c)(2)(C)(i).

[6] Edelman also argues that the District Court erred by declining to give her requested charge to the jury regarding the disparate impact affirmative defense under the New York EPA. "We review challenges to a district court's jury instructions *de novo*. We will overturn a verdict on a challenge to jury instructions only if (1) the instructions were erroneous, and (2) the error was

## IV.   DEFENDANTS' MOTIONS FOR JMOL AND JNOV

Edelman challenges the District Court's grant of defendants' motion for

JMOL on her claims for punitive damages and her retaliation claims against

Kaplan; she also challenges its grant of defendants' motion for JNOV on her

retaliation claims against NYU and Antonik.[7]  Again, we review *de novo*.  *See*

*Cash v. Cnty. of Erie*, 654 F.3d 324, 332 (2d Cir. 2011) ("We review *de novo* a district

court's decision to grant a Rule 50 motion for judgment as a matter of law.").

### A.   Punitive Damages

Edelman contends that the District Court erred by granting JMOL in favor

of defendants on her claims for punitive damages under Title VII and the

NYCHRL.  "Punitive damages are available under Title VII where an employer

discriminates or retaliates against an employee with malice or reckless

---

prejudicial."  *Saint-Jean v. Emigrant Mortg. Co.*, 129 F.4th 124, 147 (2d Cir. 2025)
(citations omitted).  We need not determine whether the District Court's
instructions were erroneous.  Because the jury found that Edelman failed to meet
her burden at trial of establishing the *essential elements* of her equal pay claims,
any possible error in declining to instruct the jury regarding limitations on the
defendants' *affirmative defenses* could not have prejudiced Edelman and would be
harmless.

[7] Edelman does not separately challenge, on appeal, the District Court's grant of
JMOL for defendants "on the issue of willfulness under the Equal Pay Act and
New York Equal Pay Act claims."  App'x at 2431.

indifference to the employee's federally protected rights." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 572-73 (2d Cir. 2011) (citation and quotation marks omitted). "A plaintiff can satisfy this burden by presenting evidence that the employer discriminated (or retaliated) against [her] with conscious knowledge it was violating the law, or that it engaged in egregious or outrageous conduct from which an inference of malice or reckless indifference could be drawn." *Id.* at 573 (citation and quotation marks omitted).

A lower degree of culpability is required for punitive damages under the NYCHRL. "[T]he standard for determining punitive damages under the NYCHRL is whether the wrongdoer has engaged in discrimination with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard." *Chauca v. Abraham*, 30 N.Y.3d 325, 334 (2017) (citations and quotation marks omitted). While this standard is lower than the federal standard, the New York Court of Appeals has expressly rejected the idea that "a punitive damages charge is automatic on a finding of liability" under the NYCHRL, instead "requiring an appropriate showing of heightened culpability for [an award of] punitive damages." *Id.* at 331, 334. Such conduct requires "a high degree of moral

culpability." *Home Ins. Co. v Am. Home Prods. Corp.*, 75 N.Y.2d 196, 203 (1990).[8]

Edelman fails to satisfy even the lower NYCHRL standard. As set forth below, we conclude that the record supports a finding that the defendants retaliated against Edelman, but that is not sufficient to justify an award of punitive damages. Edelman argues that "[t]here is not such a complete lack of evidence with regard to punitive damages that a jury should be prevented from considering [the issue]." Appellant's Br. at 38-39. However, Edelman does not point to any evidence presented at trial suggesting that any of the defendants retaliated against her "with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others," or with a higher degree of moral culpability than is present in every instance of retaliation in the workplace. *Chauca*, 30 N.Y.3d at 334 (citations and quotation marks omitted); *see* Appellant's Br. at 38-39; *see also* Reply Br. at 28-29. Nor does our search of the record reveal any such evidence. Accordingly, we affirm the District Court's grant of judgment as a matter of law as to punitive damages.

---

[8] *Home Insurance* interpreted New York common law rather than the NYCHRL. But in *Chauca*, the New York Court of Appeals expressly adopted its approach, concluding that "[t]he standard for punitive damages articulated in *Home Ins.*" should be applied to NYCHRL claims. *Chauca v. Abraham*, 30 N.Y.3d 325, 334 (2017).

## B.    Retaliation Claims Against NYU & Antonik

Edelman next argues that the District Court improperly vacated the jury's

verdict on her retaliation claims against NYU and Antonik.  We agree.

"We review de novo the grant of a motion for judgment as a matter of law

under Rule 50."  *Connelly v. Cnty. of Rockland*, 61 F.4th 322, 325 (2d Cir. 2023)

(citation and quotation marks omitted).  "Such a motion may only be granted if

there exists such a complete absence of evidence supporting the verdict that the

jury's findings could only have been the result of sheer surmise and conjecture."

*Id.* (citation and quotation marks omitted).  A court considering a Rule 50 motion

"may not weigh the credibility of witnesses or otherwise consider the weight of

the evidence" on its own.  *Brady*, 531 F.3d at 133 (quotation marks omitted).

Instead, the court must consider "the evidence in a light most favorable to the

nonmovant and grant that party every reasonable inference that the jury might

have drawn in its favor."  *Wolf v. Yamin*, 295 F.3d 303, 308 (2d Cir. 2002) (citation

omitted).  We also "disregard all evidence favorable to the moving party that the

jury is not required to believe."  *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 153 (2d

Cir. 2014) (citation and quotation marks omitted).  "The movant's burden is

particularly heavy where, as here, the jury has deliberated in the case and

actually returned its verdict." *Triolo v. Nassau Cnty.*, 24 F.4th 98, 105 (2d Cir. 2022) (citation and quotation marks omitted).

We conclude that the District Court failed to construe the evidence in the light most favorable to Edelman and to draw all reasonable inferences in her favor. *See Wolf*, 295 F.3d at 308. There was not "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." *Connelly*, 61 F.4th at 325 (citation and quotation marks omitted). Rather, considering "the evidence in a light most favorable to [Edelman] and grant[ing] [her] every reasonable inference that the jury might have drawn in [her] favor," *Wolf*, 295 F.3d at 308 (citation omitted), there was sufficient evidence of each element of Edelman's retaliation claims against NYU and Antonik to support the jury's verdict in her favor.

The operative complaint brings claims for retaliation in violation of Title VII, the NYSHRL, and the NYCHRL. The jury found that (1) NYU retaliated against Edelman in violation of all three statutes, (2) Antonik aided and abetted NYU's retaliation under the NYSHRL and the NYCHRL, and (3) Antonik individually retaliated against Edelman in violation of the NYCHRL. The District Court vacated the jury's verdict on these claims.

We review retaliation claims brought pursuant to Title VII, NYSHRL, and NYCHRL under the familiar burden-shifting test established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, a plaintiff carries the initial burden of making out a prima facie case of retaliation. *See McDonnell Douglas*, 411 U.S. at 802. In the Title VII context, this requires the plaintiff to establish four elements: (1) "an adverse employment action"; (2) "participation in a protected activity"; (3) "that the defendant knew of the protected activity"; and "(4) a causal connection between the protected activity and the adverse employment action." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 316 (2d Cir. 2015) (citation and quotation marks omitted). The NYCHRL and NYSHRL employ a more liberal standard: "[A] plaintiff claiming retaliation must demonstrate that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122 (2d Cir. 2024) (citation and quotation marks omitted).[9]

---

[9] "The NYSHRL historically utilized the same standard as Title VII, but it was amended in 2019 to align with the NYCHRL's more liberal pleading standard." *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122-23 (2d Cir. 2024) (footnote omitted) (applying same standard for retaliation claims under the NYSHRL and NYCHRL on summary judgment); *see also, e.g., Syeed v. Bloomberg L.P.*, 41 N.Y.3d 446, 451 (2024) (construing NYSHRL and NYCHRL claims together).

If the plaintiff establishes a prima facie case of retaliation under any of these statutes, "the defendant then has the opportunity to offer legitimate reasons for its actions." *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75-76 (2d Cir. 2015). If the defendant articulates a non-discriminatory basis for the adverse employment action, the burden shifts back to the plaintiff to show "either that the defendant's reasons were pretextual, or that the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least in part on discrimination." *Id.* at 76 (citations and quotation marks omitted). As set forth below, we conclude that the jury could reasonably find that Edelman met her initial burden of establishing a prima facie case, and that defendants failed to articulate a legitimate, non-retaliatory basis for the termination of her contract.

## 1. Adverse Employment Action

There is no dispute that Edelman was subjected to an adverse employment action when her employment was terminated by the failure to renew her

---

Specifically, the amendment directs courts to construe the NYSHRL "liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of [the NYSHRL], have been so construed." N.Y. Exec. Law §300. The amendment took effect on August 12, 2019, before Edelman's claims arose. *See* 2019 N.Y. Laws 6 (A. 8421); *Golston-Green v. City of New York*, 123 N.Y.S.3d 24, 35 n.1 (2d Dep't 2020) (noting that the "amendment was made to be effective August 12, 2019").

contract. "[T]ermination constitutes an adverse employment action" under Title

VII. *Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 468 (2d Cir. 2019). Termination

also constitutes "conduct that was reasonably likely to deter a person from

engaging in" protected activity, as required for retaliation claims under the

NYSHRL and NYCHRL. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715

F.3d 102, 112 (2d Cir. 2013).

## 2. Protected Activity

The evidence presented at trial was also more than adequate to establish

that Edelman engaged in protected activity. That evidence established that

Edelman made at least three complaints to human resources: the September 17,

2019, phone call to Pacina about Antonik; the September 25, 2019, email to Pacina

about Kaplan; and the November 1, 2019, email to Pacina about both men. "An

employee's complaint may qualify as protected activity, satisfying [this] element

of this test, so long as the employee has a good faith, reasonable belief that the

underlying challenged actions of the employer violated the law." *Kelly v. Howard*

*I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per

curiam) (citation and quotation marks omitted). Edelman had a good-faith,

reasonable belief that the actions she challenged in each of her complaints

constituted unlawful gender discrimination in violation of Title VII, the

NYSHRL, and the NYCHRL.

Edelman testified that she expressed her belief, in each complaint, that the

conduct of Antonik and Kaplan was discriminatory, hostile, and sexist.  Other

evidence at trial corroborated Edelman's testimony.  For instance, the September

25, 2019, email expressly states Edelman's belief that she was "contend[ing] with

male chauvinism" in the workplace and that she was "being discriminated

against to accommodate . . . a male physician."  App'x at 1219.  Likewise, the

November 1, 2019, email explained that her complaints related to the "treatment

of females within [the] workplace at NYU which is unacceptable."  Supp. App'x

at 283.  Edelman therefore established at trial that she engaged in protected

activity.

### 3.    Knowledge of Protected Activity

We turn next to the requirement that each "defendant knew of the

protected activity."  *Littlejohn*, 795 F.3d at 316 (citation and quotation marks

omitted).  At least as to Edelman's Title VII claim, "implicit in the requirement

that the employer have been aware of the protected activity is the requirement

that it understood, or could reasonably have understood, that the plaintiff's

opposition was directed at conduct prohibited by [the statute]." *Qorrolli*, 124 F.4th at 122. As to NYU, the District Court instructed the jury: "There's no dispute that NYU knew of plaintiff's protected activity." App'x at 2541.[10] Antonik, however, disputes that he knew that Edelman's complaints concerned gender discrimination. Accordingly, he argues that he did not know Edelman engaged in protected activity. The District Court agreed, concluding that "there is a *complete absence* of evidence supporting the proposition that Antonik was aware that Plaintiff's complaint concerned gender discrimination." *Edelman v. NYU Langone Health Sys.*, 708 F. Supp. 3d 409, 437 (S.D.N.Y. 2023) (emphasis added). We disagree.

The evidence presented at trial was more than adequate to support the jury's finding that Antonik knew Edelman's complaint involved claims of gender discrimination. Edelman testified in detail about her encounter with Antonik on

_____

[10] In any event, Edelman presented sufficient evidence to establish this element. "Nothing more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." *Summa v. Hofstra Univ.*, 708 F.3d 115, 125-26 (2d Cir. 2013) (citation and quotation marks omitted). Pacina, at the very least, was aware of Edelman's protected activity; Edelman submitted her complaints directly to Pacina. Because Pacina, as a human resources manager, was an officer of NYU, Pacina's knowledge of Edelman's protected activity may be imputed to NYU. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013).

September 16, 2019, including that "he uttered, under his breath, bitch," and that

she "felt that it was a sexist, discriminatory, chauvinistic attack." App'x at 1206,

1210. Antonik participated in the incident, so he knew exactly what had

occurred. Edelman further testified that when she made her verbal complaint to

Pacina on September 17, 2019, she "went through the events of what happened"

in the confrontation with Antonik, informing Pacina of the events that she had

"just described to the jury." App'x at 1210-11. That testimony included

Antonik's use of the word "bitch."

Pacina took notes during the call. Pacina's notes did not include Antonik's

use of the word "bitch," nor did they report that Edelman had asserted that she

felt the encounter was sexist and chauvinistic. But Edelman testified that the

notes did not reflect the entirety of her statements to Pacina. And Edelman cast

doubt on whether Pacina's notes were created or finalized contemporaneously

with their September 17, 2019, conversation or whether they had been

subsequently edited, because the notes were electronically marked as having

been altered on March 13, 2020, almost six months after the fact. The jury was

entitled to discredit Pacina's notes and to believe Edelman's testimony that she

told Pacina everything that happened, including that Antonik called her a

"bitch," and that she conveyed to Pacina that her complaint was at least in part

about the sexist nature of the encounter. Pacina therefore would have

understood that Edelman's complaint involved gender discrimination. Pacina, in

turn, testified that she explained the nature of Edelman's complaint to Antonik.

She also testified that her job duties required her to report any allegations of

discrimination, including by talking to the person who is the subject of the

complaint.

Indeed, Pacina contacted Antonik about the complaint the day after that

incident. Pacina also contacted Claudia Rose, a "Human Resources Business

Partner," App'x at 887,[11] to discuss Edelman's complaint. Rose spoke to Antonik

directly about Edelman's complaint and participated in Pacina's discussion with

Antonik. Antonik testified that he understood the nature of the complaint, and,

in particular, that he knew it was not about office space, but "about the way that

[he] spoke to her." App'x at 1623. Antonik admitted that he was "bothered by"

the complaint. *Id.*

Pacina also testified that she called Kaplan after receiving Edelman's initial

---

[11] Antonik testified that he spoke to Rose "every now and then" about "HR-related issues." App'x at 1619.

complaint about Antonik.  Kaplan testified that after speaking with Pacina, his understanding was that "Edelman filed a complaint against Joe Antonik *for being aggressive and retaliating* for not allowing her to expand her hours."  App'x at 3229 (emphasis added).[12]

Thus both Antonik and Kaplan understood – based, apparently, on their discussions with Pacina – that Edelman's complaints were not just about an office space dispute, but about their treatment of Edelman.  But Pacina insisted at trial that she had no such understanding.  Instead, Pacina testified that "Edelman's complaint [about Antonik] did not raise any concerns to [Pacina] about a hostile work environment," and that it did not "occur to" her that "Edelman was complaining about gender or sex discrimination" when Edelman made that complaint.  App'x at 2198.

Antonik's and Kaplan's understanding bolsters the inference that Pacina *did* know that Edelman's complaint was about more than just a dispute over office space.  This further supports our conclusion that the jury could reasonably

_____

[12] At some point after this conversation, Kaplan also spoke to Antonik.  And, as described below, the other evidence adduced at trial established that Kaplan knew that the complaint was about gender discrimination.  The jury could reasonably infer that Kaplan conveyed his understanding of that fact to Antonik.

have found that Pacina's testimony about Edelman's complaints was not credible and discredited that testimony – including Pacina's testimony about what Pacina reported to Antonik and Kaplan about the complaints.

Furthermore, on September 25, 2019, Edelman sent Pacina an email regarding her complaints, expressly stating her frustration that, "[a]s a female physician," she was dealing "with male chauvinism." App'x at 1219. At trial, Pacina denied any recollection of that email. *See* App'x at 2214. After reviewing the email with Pacina, Edelman's counsel asked Pacina: "But you still deny Dr. Edelman raised any complaint about gender discrimination; correct?" Pacina responded: "Yes." App'x at 2200. Again, the jury could reasonably have questioned Pacina's credibility in light of that testimony and the email.

Finally, in her November 1, 2019, email, Edelman clearly advised Pacina that her complaints related to the "treatment of females within [the] workplace at NYU" and that she felt the behavior of both Antonik and Kaplan – both of whom she named specifically in the email – had been "not appropriate" and amounted to "abusive and bullying behavior." Supp. App'x at 280. Pacina responded to that email by indicating that she would share the complaint with the appropriate labor relations manager and get back to her "regarding next steps." *Id.* On

November 12, 2019, Edelman again contacted Pacina, complaining specifically of

retaliation related to an office move.  *See* Supp. App'x at 283.  Antonik testified

that in his role as site manager, his duties included "managing doctors' office

space and moving them sometimes."  App'x at 1586.  The jury could thus

reasonably infer that Pacina informed both Antonik and Kaplan of the November

2019 emails.

Considering "the evidence in a light most favorable to" Edelman, and

drawing "every reasonable inference that the jury might have drawn in" her

favor, *Wolf*, 295 F.3d at 308, we conclude that the jury could reasonably have

found that Antonik was aware that Edelman engaged in protected activity as

soon as the day after her first complaint, and at least through November 12, 2019.

### 4.    Causation and Intent

That brings us to the final requirement: "a causal connection between the

protected activity and the adverse employment action."  *Littlejohn*, 795 F.3d at 316

(citation and quotation marks omitted).  We have recently reaffirmed that "proof

of a causal relationship between the protected activity and the adverse action[]

can be established either (1) directly, through evidence of retaliatory animus

toward the plaintiff, or (2) indirectly, through circumstantial evidence."  *Moll v.*

*Telesector Res. Grp., Inc.*, 94 F.4th 218, 239 (2d Cir. 2024) (citation and quotation

marks omitted).  Thus, a jury "can find retaliation even if the agent [who causes

the adverse employment action] denies direct knowledge of a plaintiff's

protected activities, for example, so long as the jury finds that the circumstances

evidence knowledge of the protected activities."  *Gordon v. N.Y.C. Bd. of Educ.*,

232 F.3d 111, 117 (2d Cir. 2000); *see also Zann Kwan*, 737 F.3d at 845.

Before evaluating the evidence of causation, we note that we have long

cautioned against granting judgment as a matter of law where intent is at issue.

We have emphasized that summary judgment in favor of an employer on this

prong should be granted only sparingly "because careful scrutiny of the factual

allegations may reveal circumstantial evidence to support the required inference

of discrimination [or retaliation]."  *Konits v. Valley Stream Cent. High Sch. Dist.*, 394

F.3d 121, 124 (2d Cir. 2005) (citation and quotation marks omitted);  *see also, e.g.*,

*Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004);  *Gallo v. Prudential*

*Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  This need for

caution is heightened in the context of a JMOL, which takes the question out of

the jury's hands, and even more so when considering a request to set aside a

jury's considered verdict on a motion for JNOV.  And circumstantial evidence is

often necessary in these contexts because "where an employer has acted with discriminatory [or retaliatory] intent, direct evidence of that intent will only rarely be available." *Bart v. Golub Corp.*, 96 F.4th 566, 569 (2d Cir. 2024) (citation and quotation marks omitted). "Instead, plaintiffs usually must rely on bits and pieces of information to support an inference of discrimination [or retaliation]." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015) (citation and quotation marks omitted). Indeed, because "direct evidence of retaliatory intent is rarely available . . . , courts have long since held it proper for a jury to base its verdict wholly on reliable inferences deduced from circumstantial evidence." *United States v. Brown*, 937 F.2d 32, 36 (2d Cir. 1991) (citations omitted).

Upon careful review of the record, we conclude that ample circumstantial evidence supports the jury's verdict. The evidence at trial supported an inference that Antonik harbored retaliatory intent, and his intent may be imputed to NYU under the "cat's paw" theory. We begin with Antonik.

### a.    Antonik's Liability under NYSHRL and NYCHRL

The jury found Antonik liable as an aider-or-abettor under the NYSHRL, and both directly and as an aider-or-abettor under the NYCHRL. These findings were adequately supported by the evidence presented at trial.

"Employees may be held personally liable under the NYSHRL" and NYCHRL for aiding and abetting an employer's retaliatory act "if they participate in the conduct giving rise to a [retaliation] claim." *Feingold*, 366 F.3d at 158-59 (citation and quotation marks omitted).

To show causation under the NYSHRL and NYCHRL, a plaintiff need only show that retaliatory animus "was a motivating factor," that is, that it played any role at all in the challenged conduct. *Bennett v. Health Mgmt. Sys.*, 936 N.Y.S.2d 112, 120 (1st Dep't 2011) (citation and quotation marks omitted) (stating standard for NYCHRL retaliation claims); *see Qorrolli*, 124 F.4th at 122 (explaining that the NYSHRL now mirrors the standards applicable to the NYCHRL).

The evidence presented at trial was sufficient to support the jury's verdict against Antonik.  In particular, the jury was entitled to place weight on the temporal proximity between Edelman's complaints and Antonik's actions against her.  Even under Title VII's more demanding standard, "[a] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 277 (2d Cir. 2023) (citation and quotation marks omitted).

Antonik directed Ruiz, the office manager who reported directly to him, to prepare a "spreadsheet" and "documentation" regarding purported "issues" with Edelman.  App'x at 1928.  Ruiz titled this log "Dr. Sari Edelman Issues," and the first dated entry in it was made on November 13, 2019 – only *one day after* Edelman followed up yet again with Pacina about her complaints against Antonik and Kaplan, indicating to Pacina that Edelman was still pursuing the issue.  App'x at 3294.[13]  Significantly, Edelman had worked at NYU for over five years at that point, and there is no evidence that such a log had ever been prepared before, or indeed that there had previously been any complaints against Edelman to log.  Although Ruiz testified that she kept "logs in the same format for other doctors," App'x at 1946, no such logs were introduced in evidence, no other witness testified to ever having seen such a log for any other doctor, and Ruiz did not identify any other specific doctors about whom she maintained such a log, or when she first created any such logs.  Likewise, Kaplan testified that he had never received an email "[a]bout [a] physician's

---

[13] Kaplan confirmed that Antonik's actions against Edelman began only when she made her initial complaint, testifying that September 17, 2019, was "the first time that Mr. Antonik ever sent [him] any email about Dr. Edelman."  App'x at 1703.

performance" like the one he was sent, based on the Ruiz/Antonik Log, about

Edelman.  App'x at 1699.

When Edelman made her complaints and the "issues" log was created,

Edelman's contract was not set to expire for another year, in November 2020.

Edelman's contract provided that she could only be terminated "for cause."

App'x at 2669.  Her contract therefore could not be easily *terminated* – but it did

not have to be *renewed* once it expired in 2020.  The "issues" log documented

several complaints relating to Edelman's treatment of patients and staff,

including her "unprofessional" conduct and failure to keep appointments with

patients, rude behavior toward staff, and failure to properly keep medical

records.  However, Rubin testified that Edelman "did not fit any of the for-cause

definitions laid out in her contract."  App'x at 1994.

This circumstantial evidence supports an inference that Kaplan and

Antonik began collecting information with an eye toward ensuring that

Edelman's contract would not be renewed.  *See* App'x at 2879 (email from

Antonik indicating that he and Kaplan "need a clear, convincing summary with

examples" about Edelman).  Indeed, based on the evidence presented at trial, it is

difficult to discern any reason for the creation of the log and the gathering of

information about Edelman *other than* the desire to ensure that her contract not

be renewed. Although Antonik testified that some of the issues described in the

log related to "patient care," and that NYU had a special employee hotline for

reporting patient care issues, he took no steps to report those issues until

Edelman's contract was up for renewal. App'x at 1598-99. He never spoke to

Edelman about any of the issues. *See* App'x at 1600. He did not claim to have

contacted Rubin about Edelman's performance because of any purported

concerns about patient welfare or satisfaction until almost a year after the log

was created. Instead, the information was delivered to Rubin for the first time on

November 6, 2020, and it formed the sole basis for Rubin's decision not to renew

Edelman's contract. Antonik's suspicious silence about purported patient care

issues that one would expect to require prompt attention strongly suggests that

his order to track such issues was motivated by retaliatory animus.

A reasonable jury, having observed the testimony of Antonik, Kaplan,

Edelman, Ruiz, and others, could conclude – as this jury did – that but for

Antonik's collection of the information in the list, Rubin would not have

terminated Edelman's employment. Based on the temporal proximity between

Edelman's complaints and Antonik's efforts to compile issues with Edelman,

40

such a jury could also conclude that Antonik's decision to provide this information to Rubin was rooted, at least in part, in retaliatory animus. And despite the year-long delay between Edelman's protected activity and her non-renewal, we may infer causation from the fact that Edelman suffered adverse consequences "at the first actual opportunity to retaliate." *Summa*, 708 F.3d at 128 (inferring causation where plaintiff was terminated at "the first moment in time when the football coaching staff could have retaliated against [her]").

Antonik therefore "participated" in the conduct underlying Edelman's retaliation claim and can be held liable as an aider-or-abettor under both the NYSHRL and the NYCHRL. *See Feingold*, 366 F.3d at 158-59. Further, a reasonable jury could conclude that Antonik's collection of this information was "conduct that was," when made known, "reasonably likely to deter a person from engaging in [protected] action," *Mihalik*, 715 F.3d at 112, and could infer that retaliatory animus was at least a motivating factor underlying this conduct, *see Bennett*, 936 N.Y.S.2d at 120. Thus, the jury's verdict as to Antonik's direct liability under the NYCHRL is also supported. The District Court therefore erred in granting the motion for JNOV in Antonik's favor.

## b.    NYU's "Cat's Paw" Liability Under Title VII

To establish causation under Title VII, a plaintiff must show that retaliation

was the "but-for" reason for the adverse employment action.  *Tafolla v. Heilig*, 80

F.4th 111, 125 (2d Cir. 2023).  As the District Court explained, Edelman's theory

of causation at trial as to NYU's liability "relied on the cat's paw doctrine: She

argued that Antonik, acting out of retaliatory animus, had manipulated Rubin to

ensure her contract was not renewed."  *Edelman v. NYU Langone Health Sys.*, 708

F. Supp. 3d 409, 442 (S.D.N.Y. 2023).  The "cat's paw" theory of liability under

Title VII

> refers to a situation in which an employee is fired or subjected to some
> other adverse employment action by a supervisor who himself has no
> discriminatory motive, but who has been manipulated by a
> subordinate who does have such a motive and intended to bring
> about the adverse employment action.  Because the supervisor, acting
> as agent of the employer, has permitted himself to be used as the
> conduit of the subordinate's prejudice, that prejudice may then be
> imputed to the employer and used to hold the employer liable for
> employment discrimination.

*Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016) (citations

and quotation marks omitted).  The "subordinate" – Antonik – who manipulates

the employer – Rubin and NYU – must "intend[], for discriminatory [or

retaliatory] reasons, that the adverse [employment] action occur."  *Staub v.*

*Proctor Hosp.*, 562 U.S. 411, 419 (2011).

As discussed above, the jury reasonably found that Antonik intended, for retaliatory reasons, to prevent Edelman's contract from being renewed. Antonik did not have ultimate decision-making authority over Edelman's contract. But under the cat's paw theory, an employer may be found "liable under Title VII when, through its own negligence, the employer gives effect to the retaliatory intent of one of its – even low-level – employees." *Vasquez*, 835 F.3d at 273-74. Antonik initiated the compilation of a log of "issues" with Edelman, which was ultimately transmitted to Rubin. This list was the sole basis for Rubin's decision not to renew Edelman's contract. Viewing the evidence in the light most favorable to Edelman, as we are required to do in light of the jury's verdict, the information compiled by Ruiz at Antonik's request "became the entire case against [Edelman] when [NYU] negligently chose to credit" only this information in deciding to terminate the contract. *Id.* at 275.

Defendants argue that there was no evidence at trial that Rubin acted negligently in relying on the information gathered by Antonik (and others). But Rubin testified that in response to the email of "issues" with Edelman, he conducted only a very limited inquiry. He did not express any surprise at the

sudden onset of "issues" with Edelman in late 2019, after five years of

employment without complaints.  While he had conversations with two doctors

– Porges and Dr. Avram Goldberg, *see* App'x at 2029 – he did not interview

Edelman, Antonik, Kaplan, or any of the staff members or patients identified as

having made complaints about Edelman.  *See* App'x at 2032.  He did not inquire

about any human resources investigations involving Edelman and was therefore

apparently unaware of the 2019 complaints.  *See* App'x at 2030.  The jury could

reasonably have concluded that this was not an adequate inquiry into the

charges against Edelman, and that Rubin – acting on behalf of NYU – was

negligent in accepting the reports and terminating Edelman's contract as a result.

This was sufficient to allow a reasonable jury to find NYU liable for retaliation

under a cat's paw theory.

Considering "the evidence in a light most favorable to" Edelman, and

drawing "every reasonable inference that the jury might have drawn in" her

favor, *Wolf*, 295 F.3d at 308, we conclude that the jury could reasonably have

found a causal connection between Edelman's complaints and the termination of

her contract.

### 5.      Legitimate, Non-Retaliatory Reasons for Non-Renewal

In response to Edelman's establishment of a prima facie case of retaliation

against Antonik and NYU, defendants failed to offer any evidence, apart from

the list of issues compiled by Ruiz, that they had legitimate, non-retaliatory

reasons for the non-renewal of Edelman's contract and resultant termination of

her association with NYU.  As noted, defendants admitted that the information

that was delivered to Rubin on November 6, 2020 – that is, the information

gathered by Antonik and Kaplan in retaliation for Edelman's complaints against

them – formed the sole basis for Rubin's decision not to renew Edelman's

contract.  In other words, there is no dispute that the only basis for NYU's

termination of Edelman was the material that we have concluded is itself infected

by the retaliatory motives of Antonik and Kaplan.  As such, we need not proceed

to the third step of the *McDonnell Douglas* framework.  *See Ya-Chen Chen*, 805 F.3d

at 75-76.

### 6.      Defendants' Motions for JNOV Should Have Been Denied

The jurors watched each of the relevant parties testify.  They heard their

statements and observed their demeanors.  They alone were entitled to make

credibility determinations.  They were entitled to believe Edelman, and to

discredit the testimony of Pacina and Antonik.  The jury was entitled to consider

all of the information before it – all of the direct and circumstantial evidence, and

the credibility of each witness – in reaching its verdict.  Viewing that evidence in

the light most favorable to Edelman and drawing all reasonable inferences in her

favor, the evidence was sufficient to support a verdict for Edelman.  In sum, the

jury's verdicts against Antonik and NYU were not "the result of sheer surmise

and conjecture," and should not have been set aside by the District Court.

*Connelly*, 61 F.4th at 325 (citation and quotation marks omitted).

We therefore vacate the District Court's judgment as to Edelman's

retaliation claims against NYU and Antonik and direct the District Court to

reinstate the jury's verdict on these claims.

## C.    Retaliation Claims Against Kaplan

Edelman also argues that the District Court improperly granted the

defendants' motion for judgment as a matter of law as to Kaplan on Edelman's

retaliation claims.  Again, we agree.

As noted above, we review this issue *de novo*.  *See id*.  Claims under the

NYSHRL and NYCHRL are reviewed under the *McDonnell Douglas* burden-

shifting framework.  To establish a prima facie case of retaliation under the

NYSHRL or the NYCHRL, a plaintiff must show:

> (1) he or she engaged in a protected activity as that term is defined
> under the NYCHRL, (2) his or her employer was aware that he or she
> participated in such activity, (3) his or her employer engaged in
> conduct which was reasonably likely to deter a person from engaging
> in that protected activity, and (4) there is a causal connection between
> the protected activity and the alleged retaliatory conduct.

*Bilitch v. N.Y.C. Health & Hosps. Corp.*, 148 N.Y.S.3d 238, 246 (2d Dep't 2021)

(citations and quotation marks omitted).

At the close of Edelman's case-in-chief, Kaplan moved for entry of JMOL,
and the District Court heard argument on the motion.  The District Court's ruling
in Kaplan's favor was oral, and brief: "The Court grants judgment as a matter of
law for Kaplan on all claims of retaliation.  There is insufficient evidence in the
record for a reasonable jury to conclude that Kaplan had any retaliatory intent or
that he had any involvement in any adverse action."  App'x at 2431.

We conclude that there was sufficient evidence in the record for a
reasonable jury to conclude that Kaplan had retaliatory intent and that he
participated in the nonrenewal of Edelman's contract.  As described above,
Edelman established that she engaged in protected activity and that she suffered
an adverse employment action.  We conclude that she also proffered sufficient
evidence from which a reasonable jury could conclude that Kaplan knew of the

protected activity, and that the adverse employment action was causally connected to her protected activity.

There is ample evidence in the record to support a finding that Kaplan knew Edelman's complaint was based on gender. After Edelman's first verbal complaint, Pacina called Kaplan. After speaking with Pacina, Kaplan's understanding was that "Dr. Edelman filed a complaint against Joe Antonik for being aggressive and retaliating for not allowing her to expand her hours." App'x at 3229. When Kaplan met with Edelman following her initial complaint, he told her to "calm down," to which Edelman responded: "[I]t is sexist to say to a woman calm down." App'x at 1215. Edelman then sent an email to Pacina describing the incident with Kaplan. The email stated, in relevant part, that Kaplan "took on similar mannerisms [to Antonik] of condescending tone, raising his voice to child-like manner to placate my disagreement." App'x at 1218. The email also stated:

> As a female physician in the organization, I am disappointed that it is 2019, approaching 2020, in a major hospital organization in New York, and I still have to contend with male chauvinism. . . . It remains unclear to me why I am being discriminated against to accommodate another physician, particularly a male physician, who will be joining the practice, which is the stated reason I will be pushed out to another space. . . . This is the first time in all these years where I feel my growth as a physician is being deliberately infringed on by senior

48

male managers.

App'x at 1219. Kaplan admitted that Pacina spoke to him about this complaint, too. Under any reasonable reading, Edelman's written complaint clearly related, at least in part, to gender discrimination. And the record reflects that Kaplan and Antonik were both directly involved in the effort to gather the information about Edelman that was ultimately the basis for her non-renewal. *See* App'x at 2879 (email from Antonik indicating that Kaplan "requested all information on Edleman [sic] to be sent to him today," November 6, 2020).

"[T]he evidence at trial did not preclude a finding that" Kaplan retaliated against Edelman based on her complaints. *Leopold v. Baccarat, Inc.*, 174 F.3d 261, 269 (2d Cir. 1999). To the contrary, there was sufficient evidence to show Kaplan's involvement in the effort to prevent Edelman's contract from being renewed, and there was sufficient evidence to support a finding that he was motivated by retaliatory animus. We therefore conclude "that the district court erred by taking the [retaliation claim against Kaplan] from the jury, we vacate the district court's entry of judgment as a matter of law, and we remand for a new trial on that claim." *Id.*

V.    **CONCLUSION**

For the foregoing reasons we:

- AFFIRM the District Court's denial of Edelman's motion for judgment as a matter of law on her state and federal EPA claims;

- AFFIRM the District Court's grant of judgment as a matter of law to all defendants as to Edelman's claims for punitive damages;

- VACATE the District Court's decision granting judgment notwithstanding the verdict as to Edelman's retaliation claims against Antonik under the NYSHRL and the NYCHRL, and against NYU under Title VII, the NYSHRL, and the NYCHRL, and REMAND with instructions to reinstate the jury's verdict on those claims; and

- VACATE the District Court's decision granting judgment as a matter of law to Kaplan on Edelman's retaliation claims under the NYSHRL and the NYCHRL, and REMAND for a new trial on those claims.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

Catherine O'Hagan Wolfe

50