# EXHIBIT "1"

N7ACede1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   DR. SARI EDELMAN,

4                  Plaintiff,

5            v.                          21 Civ. 502 (LJL)

6   NYU LANGONE HEALTH SYSTEM, *et
    al.*,
7
                   Defendants.
8                                        Trial
    ------------------------------x
9                                        New York, N.Y.
                                         July 10, 2023
10                                       9:00 a.m.

11  Before:

12                      HON. LEWIS J. LIMAN,

13                                       District Judge
                                         -and a Jury-
14

15                        APPEARANCES

16  MILMAN LABUDA LAW GROUP PLLC
         Attorneys for Plaintiff
17  BY:  JOSEPH M. LABUDA
         EMANUEL S. KATAEV
18       -and-
         GLORIA GODSELL
19       CLAUDIA AZEVEDO

20  TARTER KRINSKY & DROGIN LLP
         Attorneys for Defendants
21  BY:  RICHARD C. SCHOENSTEIN
         RICHARD L. STEER
22       INGRID J. CARDONA
         -and-
23       DAN DRIESEN
         ANNETTE JOHNSON
24

25

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

1    specializes in treating arthritis.  I also treat autoimmune

2    diseases.  This, for people who aren't familiar with

3    rheumatology, includes different types of diseases like lupus,

4    rheumatoid arthritis, as well as some rarer conditions that a

5    lot of people haven't heard about, like relapsing

6    polychondritis, vasculitis.  There are all different severities

7    of the diseases I treat, some could be extremely severe and

8    aggressive and need immediate treatment and care, and some are

9    more chronic conditions like osteoarthritis and gout.

10   Q.  And did you go to college?

11   A.  Yes.  I went to college in New York State up in Binghamton,

12   New York.  I followed my sister, who is also an alumni, and my

13   younger sister followed me.  I graduated in 1996 with honors,

14   magna cum laude.  I was a dual major in both English as well as

15   mathematics.  And I went on from Binghamton to pursue a career

16   in actuarial science.

17   Q.  I would like to show you what's been marked as Exhibit 15

18   for identification.

19           MR. KATAEV:  Your Honor, I believe it's been admitted.

20   Is it okay to publish to the jury?

21           THE COURT:  Is any objection to Exhibit 15 being

22   received?  Why don't you post it for defense counsel and for

23   the Court.

24           MR. SCHOENSTEIN:  No objection, your Honor.

25           THE COURT:  Exhibit 15 is received and may be

N7BCede1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    DR. SARI EDELMAN,

4            Plaintiff,

5            v.                    21 Civ. 502 (LJL)

6    NYU LANGONE HEALTH SYSTEM, *et
     al.*,
7
             Defendants.
8    ------------------------------x          Trial
                                   New York, N.Y.
9                                  July 11, 2023
10                                 9:00 a.m.

11   Before:

12                       HON. LEWIS J. LIMAN,

13                       District Judge
                         -and a Jury-
14

15                          APPEARANCES

16   MILMAN LABUDA LAW GROUP PLLC
          Attorneys for Plaintiff
17   BY:  JOSEPH M. LABUDA
          EMANUEL S. KATAEV
18
     TARTER KRINSKY & DROGIN LLP
19        Attorneys for Defendants
     BY:  RICHARD C. SCHOENSTEIN
20            RICHARD L. STEER
              INGRID J. CARDONA
21

22

23

24

25

N7BCede1            Edelman - Direct

 1    started, I don't know the approximate time we had stayed there,

 2    but the new space that they were building in the 1999 space

 3    wasn't complete, so we were at the 1991 space probably for a

 4    year-plus.

 5    Q.    So you didn't have to -- there was no moving whatsoever.

 6    Did you even have to change keys?

 7    A.    No.

 8    Q.    No change, it was seamless?

 9    A.    Right.

10    Q.    Friday you were working for your private practice, Monday

11    you worked for NYU?

12    A.    Yes.  They came in and they changed the sign.  So they

13    changed it from Rheumatology Associates of New York and they

14    put up the NYU Rheumatology sign in the front.  And our

15    electronic medical record was Epic at the time, which was the

16    same electronic medical record as NYU, but we did have to

17    switch over to their system.  So that was changed over.  They

18    did send in some people for training, I believe, for a short

19    period, but my staff was pretty much already trained on it.

20    Q.    And above that in Section 3, it references "Benefits."

21    What benefits did you have when you worked at NYU, other than

22    let's say your compensation?

23    A.    So we had an expense of $3,000, which was for going to

24    conferences or paying for societies.  We had retirement

25    benefits.  So we had a match, they had a 10-percent match of

N7BCede1            Edelman - Direct

1    your salary each year, which was not based on my contribution,

2    they just -- they matched up to 10 percent.  So if you were

3    making $200,000 a year, they put in $20,000 for you.  There was

4    an additional pension fund that you could put money into.  I

5    think it was called a 403B.  And then there was also the 401D

6    that you could put in based on the maximal allowable, you know,

7    what the government allowed each year, which changed, which

8    could be $18,000 or whatever it was.

9    Q.    And I just want to clarify, the first retirement vehicle

10   you were talking about, you mentioned matching.  Did you have

11   to put money into that retirement account or was that something

12   that NYU put in solely?

13   A.    I believe they matched it to what I put in.  So if I put in

14   the 20, they put in the other 20.  So it was $40,000 a year tax

15   free.

16   Q.    Let's go down to page 46.

17                  MR. KATAEV:    D46?

18                  MR. LABUDA:    D46, yes.

19   Q.    You received an academic appointment at NYU; is that

20   correct?

21   A.    Yes.

22   Q.    And what was your appointment?

23   A.    It's an assistant professor of medicine.

24   Q.    And you were a faculty member at the NYU School of

25   Medicine; is that correct?

N7BCede1                Edelman - Direct

1    A.    Yes, and you're considered a staff physician.

2              MR. LABUDA:    And if you want to scroll down to

3    page D49, please.

4    Q.    At for being employed at NYU and providing services, you

5    received compensation; correct?

6    A.    Yes.

7    Q.    And I think you had said you had asked for a $260,000.

8    Ultimately, the agreed upon amount was $207,000; is that right?

9    A.    Yes.

10   Q.    And that was to provide clinical services?

11   A.    Yes, it was 100 percent clinical services, which would be

12   outpatient, seeing patients.  We did have some hospitals, as

13   well.  So we had privileges at the hospital.  So we did see

14   some patients at Winthrop as well as Northwell.

15             MR. LABUDA:    And if you scroll down to Section 49,

16   expenses.

17   Q.    I think this was what you were referring to before in terms

18   of $3,000 for expenses?

19   A.    That's correct, yes.

20             MR. LABUDA:    If you move to D50, please.

21   Q.    This is where it lists your faculty appointment as clinical

22   assistant professor in the department of medicine; is that

23   right?

24   A.    Yes.

25   Q.    And the academic track is clinical, and it's a nontenured

N7BCede1                Edelman - Direct

1    when this is emailed to me, am I meeting my target so by the

2    end of the year, I'm going to meet my productivity standards.

3    I know this is medicine and I'm a doctor and you don't like to

4    think like this, but this is how I'm contracted, so I do have

5    to look at it and make sure that I am billing appropriately to

6    continue to practice with NYU.

7    Q.    Let's just jump back to exhibit 8 then.  If you go back to

8    that page, D52, the reference there is the target 4966, that

9    was your RVU target?

10   A.    Yes.

11   Q.    That was set by NYU; is that right?

12   A.    Yes.

13   Q.    There is a section below that about a 1 percent

14   productivity incentive compensation.  Do you see that?

15   A.    Yes.

16   Q.    And how did that work?

17   A.    These are -- this is an excerpt provision they put for

18   bonus.  So if you go above, you would get a bonus payment for

19   every 1 percent above the 4996.

20   Q.    So if you had a productivity -- if you had an additional

21   10 percent of your RVUs, you would get an additional 10 percent

22   of your pay; is that right?

23   A.    Yes.

24            MR. LABUDA:    Could we scroll down further.

25   Q.    You have hospital responsibilities on page 53.  Do you see

N7BCede3              Edelman - Direct

1    Manhattan if somebody needed COVID testing when it became

2    available, at the time it wasn't available yet, but the

3    organization was already getting ahead of it to have a protocol

4    in place, so we started to focus on that.

5    Q.    During COVID, was there any type of change in treatment?

6    You were saying you were going to the office five days a week,

7    one day with the admin.  Did that change within the advent of

8    COVID?

9    A.    Yes.  So all of the outpatient shut down by March 20th of

10   2020.  I had gotten COVID on March 19th, so I was already out

11   as of the 19th, but by the next day, there was a mass shutdown.

12   Q.    Let's move on.  COVID starts.  In 2020, your contract is

13   expiring; correct?

14   A.    Yes.

15   Q.    So did you have any discussions with any colleagues about

16   your contract expiring in terms of renewing it and things of

17   that nature?

18   A.    I did.

19   Q.    Who did you have conversations with?

20   A.    I spoke with Dr. Mehta.  We had done our contract

21   negotiations, our two previous contracts and we had been

22   business partners prior and we had always done our business

23   plans together.  So I met with her or spoke with her in the

24   office about the upcoming contracts.

25   Q.    Just pause that for one quick second.

N7bWede4                Edelman - Direct

1   Q.  OK.  There was reference to the RVUs in the contracts,

2   right; and I know you had said that you, that you received

3   those from NYU on a monthly basis?  Correct?

4   A.  Yes.

5   Q.  During the course of this litigation, did you ask for the

6   RVUs from, for the male doctors?

7   A.  Yes, we did.

8   Q.  And what happened?

9   A.  They were not produced.

10  Q.  Do you know that -- there were targets listed in there.  Do

11  you know what the male doctors received or actually what they

12  did in RVUs?

13  A.  I do not know.  I only know from conversations that two,

14  two different rheumatologists expressed to me that they were

15  having trouble hitting their target RVUs, and that was

16  Dr. Goldberg as well as Dr. Modi.

17  Q.  Now, with respect to -- now I want to move on to another

18  topic here.

19      With respect to the incidents that happened that you

20  described in September of 2019, did you have any -- were there

21  any type of emotional issues that you had as a result of the

22  incidents that happened in September?

23  A.  It, it definitely impacted my life in a very profound way.

24  After the events, I was very upset and shaken up by it.  When

25  it had happened and after the termination, my entire life got

N7bWede4          Edelman - Direct

1    upended.  I tried to seek a position in New York to stay close

2    to my family and to not have to transition my children's

3    education and be away from the people and friends that I loved.

4    And in my endeavors to secure a position in the New York area,

5    I was not successful, which forced a relocation down to

6    Florida.

7    Q.  So where did you look in New York for work after you were

8    terminated?

9    A.  I used headhunters to look for positions in all of the New

10   York tristate area.  I spoke to the Catholic Health systems, to

11   Northwell hospital.  I spoke to -- I had interviews with Yale

12   New Haven Health.

13   Q.  OK.  And did any of those local interviews pan out?

14   A.  Nothing panned out, and the interview with Northwell

15   extended for almost five months.  I was still interviewing

16   while I was packing up to move to Florida, hoping that I would

17   be able to get an offer.  But it just seemed like every time I

18   got to the last stages, to put a contract on the table and they

19   would say we're going to reach out to your former employer,

20   things went dark.

21   Q.  Other than in the New York area, did you -- in terms of the

22   headhunters, where else were you looking for work to relocate?

23   A.  I applied for positions in Colorado, in Pennsylvania, in

24   Connecticut.  There was the -- Tennessee, and for -- and

25   different -- and different areas of Florida as well.

N7bWede4                Edelman - Direct

1    Q.  With respect to your emotional state, did you ever seek any

2    type of professional help?

3    A.  I did.  When I got down to, to -- the period of time from

4    the termination to securing a job was really focused on

5    resilience and moving forward and figuring out how to make this

6    work for my family and our financial needs.  And when I got

7    down to Florida, I think that's when the emotional wave hit me

8    of everything I left behind.

9             (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N7BCede5          Edelman - Direct

1    BY MR. LABUDA:

2    Q.    And you sought help?

3    A.    I did.

4    Q.    And who did you seek help from?

5    A.    I met with a therapist, a social worker in a nearby town.

6    Q.    How often did you do that?

7    A.    I went once a week for several months, I think about six

8    months.

9    Q.    Had you ever sought any type of emotional help from a

10   professional before your termination with NYU?

11   A.    No.

12   Q.    And just with respect to while you were working at NYU, was

13   there any -- with respect to your interactions with Mr. Antonik

14   and Kaplan, what did you do with respect to those, if anything?

15   A.    So after the events that happened at NYU, once I didn't

16   hear anything back about any sort of support or followthrough

17   on what had happened, I went to selfhelp, which was to avoid

18   them both, you know, when they were on the floor, in my office,

19   I closed the door and locked it.  If I had to walk down a

20   hallway where they might be, I made sure to avoid or go a

21   different direction.  That's how I handled it at that point.

22   Q.    After you found out you were no longer working at NYU, did

23   you have a preference as to where you'd want your next job to

24   be?

25   A.    I wanted to stay in New York.  My support system is in New

N7BCede5               Edelman - Direct

1    York and I really needed that from my family.  It was very,

2    very challenging to try to navigate those changes without my

3    family nearby.  My business that I built, my patient

4    relationships, you know, some of my patients had been with me

5    since I was a fellow.  It was just very saddening to me to be

6    getting an outpouring of emails from people of where are you

7    going, I don't want you to leave, you're my doctor.  It was

8    twofold, things all happening at once where I was kind of

9    grieving the loss of all these relationships I had built and a

10   career I built here that was just stripped away from me for

11   nothing that I did wrong, basically for trying to protect my

12   rights.  And then I was trying to protect my family and make

13   sure that I could pay my daughter's tuition, that I could

14   support my younger daughter's needs, so my husband could still

15   work --

16               THE COURT:    I'm going to strike the testimony.

17               You could ask a new question.

18   Q.   Ultimately, you found a position down in Clearwater,

19   Florida; is that right?

20   A.   Yes.

21   Q.   Who was that with?

22   A.   That was with Arthritis and Rheumatism in Clearwater.

23   Q.   And you entered into a contract with them in February of

24   2021; correct?

25   A.   Yes.

N7BCede5                Edelman - Direct

1    Q.    When were you planning on starting work down there?

2    A.    Around July of 2021.

3    Q.    Was that start date accelerated?

4    A.    Yes.

5    Q.    And what happened there?

6    A.    The doctor that I was coming in to replace had left earlier

7    on leave.  So the physicians in the practice had called and

8    urged if I could come sooner because they had a demand to have

9    me there sooner.

10   Q.    And when did you start there?

11   A.    I started May 1st of 2021.

12   Q.    And with respect to the new position down in Florida, when

13   you started there, how much were you making?

14   A.    $300,000.

15   Q.    And with respect to the retirement plans that they offered,

16   what did they offer in terms of retirement plans?

17   A.    You're asking Florida?

18   Q.    Yes, in Florida.  Sorry.

19   A.    They didn't offer any retirement plan for my first year.

20   Q.    And then after that, what was the retirement plan?

21   A.    It was a typical 401K, there was no matching.

22   Q.    So you could contribute into it?

23   A.    Yes.

24   Q.    For pretax dollars?

25   A.    Yes.

N7BCede5            Edelman - Direct

Q.    What about health insurance?

A.    That health insurance plan was not a good plan, it was very

expensive, and we ended up needing to use my husband's.  So NYU

had great health insurance.  And that was something that we

always struggled with when we got to Florida because there were

high out-of-pockets and deductibles and finances that hit us.

Q.    Just to be clear, when you worked at NYU, you used their

plan, not your husband's?

A.    Yes, we used my plan through NYU.

Q.    And was there any type of free tuition, were they

affiliated with any college where you could get free tuition

for medical school?

A.    No.

Q.    And you moved down to Florida, was there any stressors that

you had down when you moved to Florida?

A.    So there was the stresses of starting my life there.  We

didn't have a home when we got there, we lived out of a hotel

for three months with the stresses of adjusting my younger

daughter to school.  And she was -- I'm not sure what I'm

allowed to say.

Q.    That's fine.

A.    My husband was adjusting to a new job, as well.  He was

working with the same bank, but it was with different

management.

Q.    One last line of questioning, one thing I forgot.  I wanted

N7BCede5                    Edelman - Cross

1    employment in Florida, you went from one job to another?

2    A.    Yes.

3    Q.    You didn't miss a paycheck?

4    A.    I can't answer that 100 percent based on when the paychecks

5    came in.

6    Q.    But you're not aware of missing a paycheck?

7    A.    I don't know the answer to that.

8    Q.    And you've remained employed continuously ever since May of

9    2021, right, same employer, same job?

10   A.    Yes.

11   Q.    They have you on a partnership track there?

12   A.    Not as of yet.

13   Q.    Is it anticipated you will be on a partnership track?

14   A.    I am hopeful, yes.

15   Q.    If that works out, you could be a part owner of that

16   business in Florida?

17   A.    In several years.

18   Q.    By the way, there's no state income tax in Florida; right?

19             MR. LABUDA:    Objection.

20             THE COURT:    Overruled.

21   A.    Yes.

22   Q.    So $300,000 in Florida is worth more than $300,000 in New

23   York; fair to say?

24             MR. LABUDA:    Objection.

25             THE COURT:    Overruled.

N7BCede5          Edelman - Cross

1    your compensation was $300,000 when you started there; correct?

2    A.    Yes.

3    Q.    And increasing to $325,000 in the second year; correct?

4    A.    Yes.

5    Q.    With eligibility for a bonus as set forth in paragraph 15;

6    correct?

7    A.    Yes.

8    Q.    So the result of leaving NYU is you got an immediate raise,

9    the financial result; correct?

10   A.    I think that's relative.

11   Q.    Sorry?

12   A.    I think that's a relative question.

13   Q.    Well, it's relative, okay.  You'd agree with me that 300 is

14   more than 278?

15   A.    If we're talking about finances and compensation and what

16   my household income looked like, then no, I didn't increase in

17   pay, my expenses changed.

18   Q.    No, I'm asking you a very specific question.  300 is more

19   that happen 278; correct?

20   A.    Yes, 300 is more than 278.

21   Q.    They also paid you $25,000 towards your relocation to

22   Florida; is that correct?

23   A.    Yes.

24   Q.    And paragraph 21, if we look on P6, that is the ownership

25   proposal that we talked about a little bit before; correct?

1   A.    That's not a partnership track, that's a clause in my

2   contract to allow for discussion for partnership in future

3   contracts.

4   Q.    I see.  And what you now have -- and what you're now hoping

5   is to advance to the partnership track?

6   A.    Yes.

7              MR. SCHOENSTEIN:    Let's mark exhibit OOO for

8   identification.

9              MR. LABUDA:    No objection.

10             THE COURT:    I don't think it's been offered yet.  Are

11  you offering it?

12             MR. SCHOENSTEIN:    Yes, I am offering it.

13             THE COURT:    OOO is received and may be published to

14  the jury.

15             (Defendant's Exhibit OOO received in evidence)

16  Q.    This is your résumé that you put together to look for a new

17  job; is that correct?

18  A.    You have to scroll through the whole document.

19             MR. SCHOENSTEIN:    Sure.  Can you scroll through it for

20  her, please.

21  A.    I believe this is the updated résumé.

22  Q.    If you look back at the top, it speaks of your NYU

23  experience, which is listed as 2014 through present.  Does that

24  verify for you that this is the latest version of the résumé

25  that you shared with us in this action?

N7BCede5              Edelman - Cross

1    A.    I'm not sure, there's a lot of discovery, but I would

2    surmise likely.

3    Q.    And you received notice of nonrenewal on December 2nd,

4    2020.  Did you already have your résumé together or did you

5    have to put it together?

6    A.    I did it that very day or the next day.  I updated my

7    résumé to get on the recruiting sites.

8    Q.    So you had to put your résumé together and start getting it

9    on recruiting sites, and then you were very focused on finding

10   a new job; correct?

11   A.    Yes.

12   Q.    Now, on January 8th, 2021, about a month after, you filed

13   this lawsuit; right?

14   A.    I don't recall the direct date of filing of the lawsuit.

15   Q.    Let's take a look, please, at exhibit QQQ.

16           MR. SCHOENSTEIN:    We're going to offer exhibit QQQ if

17   there's no objection, your Honor.

18           THE COURT:    Any objection?

19           MR. LABUDA:    Objection.  Hearsay.

20           THE COURT:    It's the complaint in this case?

21           MR. SCHOENSTEIN:    It's the EEOC complaint and the

22   attached complaint in this case.

23           THE COURT:    The basis of the objection is hearsay; is

24   that right?  Basis of the objection is hearsay?

25           MR. LABUDA:    Yes.

N7BCede5          Edelman - Cross

 1              THE COURT:   Overruled.

 2              MR. SCHOENSTEIN:    So that's accepted into evidence,

 3   your Honor?

 4              THE COURT:   Correct.  It may be published.

 5              (Defendant's Exhibit QQQ received in evidence)

 6   Q.    So this document, this is a charge of discrimination that

 7   was filed with the EEOC.  Do you recognize that?

 8   A.    You'd have to scroll through the whole document for me,

 9   please.

10   Q.    Sure.  If now or at any time you need a physical copy of a

11   document in front of you, we have those and would be more than

12   happy to provide them.

13              THE COURT:   Do you have the question that you're being

14   asked?

15              THE WITNESS:   Yes.

16              THE COURT:   Can you answer it?

17   A.    Yes.

18              MR. SCHOENSTEIN:    Can you scroll down to the last

19   page --

20              THE COURT:   This is a document that you filed with the

21   EEOC; is that correct?

22              THE WITNESS:   Yes.

23   Q.    And I see a correspondence date, it was filed on January 6,

24   2021; is that correct?

25   A.    That's what it says.

N7BCede5            Edelman - Cross

1    Q.    And is that consistent with your recollection of how

2    quickly you brought an EEOC complaint and litigation?

3    A.    Yes, I believe I filed the complaint very quickly.

4    Q.    Now, in addition to Florida, you interviewed at Northwell

5    Health here in New York; correct?

6    A.    Yes.

7    Q.    You were not turned down by Northwell Health; correct?

8    A.    I wasn't offered a contract.

9    Q.    But you might have been able to go forward and stay in New

10   York at Northwell Health, that was a possibility?

11            MR. LABUDA:    Objection.

12            THE COURT:    Overruled.

13   A.    I had no determination from them on my last conversation

14   with them in the last week of May that there would be an

15   opportunity to move forward with them.

16   Q.    You didn't know one way or the other if there was an

17   opportunity to move forward, is that what you're saying?

18   A.    They gave me no -- I asked them for some form of -- some

19   form of contract stating that there would be future employment

20   at X said date as of the last week in May and they could not

21   offer that to me at that time.

22   Q.    At what time?

23   A.    The last week in May, like the last week in April leading

24   to when I was leaving.

25   Q.    So you interviewed with Northwell Health and a decision

1  hadn't been made about whether they were going to hire you or

2  not as of the end of April, is that what you're saying?

3  A.    I believe that conversation, in my understanding, was that

4  there was a decision made that they couldn't offer me any

5  employment.

6  Q.    Do you remember being deposed in this matter?

7  A.    Yes.

8  Q.    You were sworn to tell the truth like you were today and

9  you were questioned by my partner, Mr. Steer?

10  A.    Yes.

11        MR. SCHOENSTEIN:    I'm going to open the deposition,

12  please, for the Court and counsel to page 47, line 22.  It's

13  day 2 of the deposition, because there was a two-day

14  deposition.

15        THE COURT:    Which line number?

16        THE WITNESS:    He's looking for where I said --

17        THE COURT:    You're not being asked a question at the

18  moment.

19        THE WITNESS:    Okay.

20  Q.    Page 47, line 22, do you recall being asked the following

21  questions and giving the following answers:

22  "Q.    And did you apply at any point for a position with

23  Northwell Health?

24  "A.    I did.

25  "Q.    Were you interviewed?

N7BCede5          Edelman - Cross

1    "A.    Yes, I interviewed for several months.

2    "Q.    And were you turned down by Northwell Health?

3    "A.    I wasn't turned down.  They just couldn't put a job offer

4    on the table in the timing that I needed it in time for my

5    termination with NYU.  I left the negotiation table because of

6    the timing."

7    Q.    Do you recall giving that answer?

8    A.    My deposition was dated what date?

9    Q.    November 19th, 2021.

10   A.    Okay.

11           THE COURT:    Were you asked those questions and did you

12   give those answers?

13           THE WITNESS:    Yes.

14   Q.    So you left the negotiation with Northwell; correct?

15   A.    Per my --

16           MR. LABUDA:    Objection.  Asked and answered.

17           THE COURT:    Overruled.

18   A.    Yes.  I've not -- so your question is what?

19   Q.    You left the negotiation with Northwell, there was an

20   ongoing negotiation about you moving to Northwell Health and

21   you left it and moved to Florida?

22   A.    I think the answer I gave in my deposition is correct.

23   They didn't put a contract on the table and I left, and when I

24   pressured them for a contract before I left, there was no

25   contract presented.

N7CCede1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DR. SARI EDELMAN,

                    Plaintiff,

            v.                          21 Civ. 502 (LJL)

NYU LANGONE HEALTH SYSTEM, *et
al.*,

                    Defendants.

------------------------------x                Trial

                                        New York, N.Y.
                                        July 12, 2023
                                        9:00 a.m.

Before:

                    HON. LEWIS J. LIMAN,

                                        District Judge
                                        -and a Jury-

                          APPEARANCES

MILMAN LABUDA LAW GROUP PLLC
        Attorneys for Plaintiff
BY:  JOSEPH M. LABUDA
     EMANUEL S. KATAEV

TARTER KRINSKY & DROGIN LLP
        Attorneys for Defendants
BY:  RICHARD C. SCHOENSTEIN
     RICHARD L. STEER
     INGRID J. CARDONA

```
         N7CCede1                  Edelman - Cross
```

 1          It's already in evidence, your Honor.  We're going to

 2     publish it if that's okay.

 3          THE COURT:  Plaintiff's Exhibit 9 is in evidence.  You

 4     may publish it to the jury.

 5     Q.  This is your renewal contract in 2017?

 6     A.  Yes.

 7          MR. SCHOENSTEIN:  Let's take a look at page D60.

 8     Q.  The salary you ended up agreeing to was $278,000?

 9     A.  Correct.

10     Q.  And that was pretty close to the $280,000 you and Dr. Mehta

11     had requested; right?

12     A.  Yes.

13     Q.  And your RVU target went up to 5200?

14     A.  Correct.

15     Q.  So your salary went up from 207 to 278, that's about a

16     25-percent increase; would you agree?

17     A.  I'll have to trust you on the math.

18     Q.  I did use a calculator.

19     A.  Okay.

20     Q.  Your RVU target went from 4966 to 5200, and that was just a

21     4.5-percent increase; right?

22     A.  Okay.

23     Q.  So your salary increase did not directly correlate to your

24     RVU increase.  Is that fair to say?

25     A.  Yes.

N7CCede3                    Edelman - Redirect

1    Q.  I want to follow up on some questions you were asked

2    yesterday as well as today.

3        You were asked some questions about taxes yesterday.  Do

4    you remember that?

5    A.  I'm not sure.

6    Q.  When you worked in New York, did you pay federal taxes?

7    A.  Yes, I did.

8    Q.  When you started working in Florida, did you pay federal

9    taxes?

10   A.  Yes.

11   Q.  Did you have an understanding that in every state that you

12   work, you have to pay federal taxes?

13   A.  Yes.

14   Q.  Do you remember some questions yesterday about Northwell, a

15   Northwell job opportunity?

16   A.  Yes.

17   Q.  Did they ever make you a formal job offer?

18   A.  Never.

19   Q.  Did you ever receive any written contract from them?

20   A.  Never.

21   Q.  Is it fair to say that most of the interviews that you had

22   after you were terminated from NYU were in New York?

23   A.  Yes.

24   Q.  Why is it that you also looked in Florida and other states

25   for a job when you were unemployed?

N7ICede1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   DR. SARI EDELMAN,

4               Plaintiff,

5          v.                           21 Civ. 502 (LJL)

6   NYU LANGONE HEALTH SYSTEM, *et
    al.*,
7
                Defendants.
8                                       Trial
    ------------------------------x
9                                       New York, N.Y.
                                        July 18, 2023
10                                      9:00 a.m.

11  Before:

12              HON. LEWIS J. LIMAN,

13                                      District Judge
                                        -and a Jury-
14

15                      APPEARANCES

16  MILMAN LABUDA LAW GROUP PLLC
            Attorneys for Plaintiff
17  BY:  JOSEPH M. LABUDA
         EMANUEL S. KATAEV
18
    TARTER KRINSKY & DROGIN LLP
19          Attorneys for Defendants
    BY:  RICHARD C. SCHOENSTEIN
20       RICHARD L. STEER
         INGRID J. CARDONA
21

22

23

24

25

1308

N7iWede4

1 because it's not an allegation that was made anytime while

2 plaintiff was employed by NYU or in the complaint or in the

3 amended complaint or in the second amended complaint.  That's

4 for argument to the jury.  But existing alone, that one-word

5 muttering cannot support a discrimination claim under any of

6 the laws at issue in this case.

7            Finally, your Honor, I turn to damages.

8            Whether or not you leave any claims in the case will

9 affect this, but let me address a few specific things.

10           Plaintiffs are still claiming back pay and front pay.

11 There is no back pay proof in the case.  There's no loss of

12 revenue.  She didn't go a day unemployed or miss a check.  So

13 they have only front pay, and the front pay, as I understand

14 it, is based on retirement benefits.  And I'll say to the

15 plaintiff the same thing that I've been saying to all of our

16 witnesses:  Where are the documents?

17           There's no proof of any retirement benefits that she

18 had or lost.  There's no documentary proof that she doesn't get

19 retirement benefits now.  It is very short, unspecific

20 testimony by her, so front pay should be out.

21           The pain and suffering claim was limited to $50,000 in

22 the pretrial submission.  Suddenly, in the amended disclosures

23 we got the other night, it had a $250,000 number.  They're not

24 going to give the jury a number, but for the record, that

25 portion of their case must be limited to the 50,000 that was in

N7JCede1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   DR. SARI EDELMAN,

4           Plaintiff,

5           v.                    21 Civ. 502 (LJL)

6   NYU LANGONE HEALTH SYSTEM, *et*

7   *al.*,

            Defendants.           Trial
8   ------------------------------x
9                                 New York, N.Y.
                                  July 19, 2023
10                                8:55 a.m.

11  Before:

12                     HON. LEWIS J. LIMAN,

13                     District Judge
                       -and a Jury-

14

15                     APPEARANCES

16  MILMAN LABUDA LAW GROUP PLLC
        Attorneys for Plaintiff
17  BY:  JOSEPH M. LABUDA
         EMANUEL S. KATAEV
18
    TARTER KRINSKY & DROGIN LLP
19      Attorneys for Defendants
    BY:  RICHARD C. SCHOENSTEIN
20       RICHARD L. STEER
         INGRID J. CARDONA
21

22

23

24

25

1    period.  The same standards guide damages under New York Labor

2    Law Section 194 as under the Equal Pay Act.  The same

3    definition of wages that I have given for the Equal Pay Act

4    also applies under New York Labor Law Section 194.

5            Plaintiff has sued for retaliation under Title VII

6    against NYU.  It is for this Court to determine any amount of

7    front pay to be awarded, if any, for any violation of Title VII

8    you may have found was committed.

9            Dr. Edelman asserts that, because she made allegedly

10   protected complaints of discrimination, defendants did not

11   renew her employment contract when it was expiring.  Your job

12   as the jury is to determine what damages, if any, Dr. Edelman

13   has proved by a preponderance of the evidence for each claim

14   that she has proven, if any.

15           If Dr. Edelman has proved her claim for retaliation

16   under the state human rights law or the city human rights law,

17   she would be entitled to lost wages and benefits arising under

18   such claim even if they were difficult to calculate.  Any

19   uncertainty about the amount of lost compensation to be awarded

20   to Dr. Edelman should be resolved in her favor.

21           Here, if you find for Dr. Edelman on her claims for

22   retaliation under state human rights law or city human rights

23   laws, you should consider her damages for front pay.  Front pay

24   damages, if any, represent a plaintiff's lost salary and

25   benefits, caused by an unlawful discharge or other adverse

N7jWede4          Charge

1    action, accruing from the time of trial through some point in

2    the future.  If you find that Dr. Edelman will be unable to

3    earn in the future what she would have earned at NYU, then you

4    may award her, as additional compensation, the amount she would

5    have earned during the time period between the date of your

6    verdict and either: 1) the date you believe she would have

7    worked at NYU absent any discriminatory conduct or 2) the date

8    you can reasonably predict that she has a reasonable prospect

9    of obtaining comparable employment.  Factors to be considered

10   in determining front pay include the age of the plaintiff and

11   her reasonable prospects of obtaining comparable employment.

12   In doing so, you should bear in mind that the purpose of front

13   pay is to make a plaintiff whole -- that is, to put plaintiff

14   in the position she would have been in if defendants had not

15   discriminated against her.

16       That said, Dr. Edelman has the burden of proving that

17   she actually incurred a loss of front pay.  Please note that

18   Dr. Edelman is only entitled to be compensated once for any

19   alleged front pay that arose from the retaliation claims that

20   she's prevailed upon.

21       If you find that Dr. Edelman has established any of

22   her claims of gender retaliation and discrimination, you may

23   award her compensatory damages for injuries such as emotional

24   pain, suffering, inconvenience, mental anguish, humiliation and

25   loss of enjoyment of life.  Compensatory damages are an amount